KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Proposed Counsel for Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                  :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SAINT VINCENTS CATHOLIC MEDICAL | : | Case No. 10-11963 (CGM) |
| CENTERS OF NEW YORK, <u>et al.</u>, | : | |
| | : | |
| Debtors. | : | Joint Administration Pending |
| | : | |

-------------------------------------------------------- X

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS TO INCUR POSTPETITION INDEBTEDNESS;
(II) GRANTING SENIOR SECURITY INTERESTS AND SUPERPRIORITY
CLAIMS; (III) AUTHORIZING THE DEBTORS TO USE CASH
COLLATERAL; (IV) GRANTING ADEQUATE PROTECTION; (V) PROVIDING
<u>RELATED RELIEF; AND (VI) SCHEDULING A FINAL HEARING</u>**

TO THE HONORABLE CECELIA G. MORRIS,
UNITED STATES BANKRUPTCY JUDGE:

            Saint Vincents Catholic Medical Centers of New York ("**SVCMC**") and certain

of its affiliates, as Chapter 11 debtors and debtors in possession (each a "**Debtor**" and

collectively, the "**Medical Centers**" or the "**Debtors**")[1] in the above-referenced Chapter 11

cases (the "**Chapter 11 Cases**"), hereby move (the "**Motion**") for entry of an Interim Order,

---

[1] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc. There are certain affiliates of SVCMC who are not debtors.

annexed as **Exhibit A** hereto (the "**Interim Order**"), authorizing the Debtors to (i) incur postpetition indebtedness; (ii) grant senior security interests and superpriority claims, pursuant to Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "**Bankruptcy Code**"), including pursuant to sections 105(a), 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) thereof, and rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); (iii) use Cash Collateral (defined below) pursuant to Bankruptcy Rule 4001(b) and section 363(c) of the Bankruptcy Code, and (iv) provide adequate protection in accordance with sections 364(d), 363(c)(2) and 361 of the Bankruptcy Code; (v) grant other related relief; and (vi) schedule a final hearing ("**Final Hearing**") for entry of a Final Order (the "**Final Order**" and, together with the Interim Order, collectively, the "**DIP Orders**") providing for similar relief on a final basis. In support of the Motion, the Debtors rely upon the Declaration of Mark E. Toney filed on the petition date (the "**Toney Declaration**"), and respectfully represent as follows:

## JURISDICTION

1.        This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.        Venue is proper before this Court pursuant to 28 U.S.C. § 1408.

3.        The statutory predicates for the relief requested herein are sections 105(a), 361, 362, 363, 364(c) and (d) and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

## CONCISE STATEMENT PURSUANT TO
## BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2

4.        In accordance with Bankruptcy Rules 4001(b), (c) and (d) and Local

2

Rule 4001-2, the following is a summary of the material terms of the proposed debtor in possession credit facility (as further described below, the "**DIP Facility**"), as set forth in the Interim Order and the Debtor-in-Possession Credit Agreement (the "**DIP Credit Agreement**"), by and among General Electric Capital Corporation ("**GE Capital**"), as agent (the "**DIP Agent**") and the parties thereto from time to time as lenders, including TD Bank, N.A. ("**TD Bank**") and GE Capital (collectively, the "**DIP Lenders**") and the Debtors in substantially the form annexed hereto as **Exhibit B**:[2]

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Required Disclosure** | **Terms** |
| **Borrowers**<br><br>[*Preamble to the DIP Credit Agreement*] | (a) SVCMC; (b) St. Jerome's Health Services Corporation ("**Holy Family Home**"); (c) Pax Christi Hospice, Inc. ("**Pax Christi**"); (d) Sisters of Charity Health Care System Nursing Home, Inc., d/b/a St. Elizabeth Ann's Health Care Rehabilitation Center ("**St. Elizabeth Ann**"); (e) Bishop Francis J. Mugavero Center for Geriatric Care, Inc. ("**Bishop Mugavero Center**"); (f) SVCMC Professional Registry, Inc. (g) Chait Housing Development Corporation; (h) Fort Place Housing Corporation; (i) 555 6th Avenue Apartment Operating Corporation |
| **DIP Agent and DIP Lenders**<br><br>[*Preamble to the DIP Credit Agreement*] | DIP Agent – GE Capital<br><br>DIP Lenders – parties from time to time to the Debtor Credit Agreement, including GE Capital and TD Bank, N.A. |
| **Maximum Amount of the DIP Facility**<br><br>[*Interim Order ¶(d) of the Preamble; DIP Credit Agreement §1.1*] | The DIP Facility will be in the maximum amount of $78,000,000. Borrowers have the option to request an increase in the aggregate commitments to an amount not to exceed $85,000,000, which increase will be in the sole discretion of DIP Agent and DIP Lenders. |

---

[2] This summary of the DIP Facility is intended only to assist the Court in understanding the material terms of the arrangement and is qualified in its entirety by reference to the DIP Facility, as it may be modified by the DIP Orders. All capitalized terms not otherwise defined in this Section have the meaning given to them in the Interim Order and the DIP Credit Agreement.

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Required Disclosure** | **Terms** |
| **Interim Loan Amount**<br><br>[*Interim Order ¶(c) of the Preamble*] | $50 million (the "**Interim Amount**"), during the period from the Petition Date (defined below) through and including the date of entry of a Final Order |
| **Approved Budget**<br><br>[*Credit Agreement, Definitions*] | A budget of Borrowers satisfactory to the DIP Agent in its discretion, as such budget may be modified from time to time with the approval of DIP Agent in its discretion. |
| **Use of Proceeds of the DIP Facility and the Cash Collateral**<br><br>[*Interim Order: ¶(f) of the preamble, ¶8(c),(d) of the Orders;*<br>*DIP Credit Agreement §1.1*] | The proceeds of the DIP Facility and the Cash Collateral may be used to (A) pay the full amount of the prepetition secured revolving loan obligations owing to Prepetition Agent and Prepetition Lenders (as each is defined below), and (B) fund general financial requirements of the Borrowers under the Chapter 11 Cases subject to the limitations set forth in the DIP Credit Agreement and the restrictions set forth in Schedule 6.2 thereto (Financial and Budgetary Covenants; Financial Reports). |
| **Limitation on the Use of the Proceeds of the DIP Facility**<br><br>[*Interim Order: Orders ¶22, DIP Credit Agreement §1.20*] | The proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, or the Carve-Out may not be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with: (a) objecting, contesting or raising any defense to the validity, perfection, priority, or enforceability of, or any amount due under, the DIP Loan Documents or the Prepetition Loan Documents or any security interests, liens or claims granted under the Interim Order, the DIP Loan Documents, or the Prepetition Loan Documents to secure such amounts; (b) asserting any challenges, claims, actions or causes of action against any of the DIP Agent, the DIP Lenders, the Prepetition Agent, or the Prepetition Lenders or any of their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors; (c) preventing, hindering or otherwise delaying enforcement or realization on the DIP Collateral or the Prepetition Collateral or (d) seeking to amend or modify any of the rights granted to the DIP Agent, the DIP Lenders, the Prepetition Agent, or the Prepetition Lenders under the Interim Order, the DIP Loan Documents or the Prepetition Loan Documents; provided, however, that up to $25,000 of the proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve-Out may be used by the Committee to investigate (but not prosecute or Challenge) Prepetition Liens and Claim Matters. |
| **Scheduled Maturity Date**<br><br>[*DIP Credit Agreement,* | December 31, 2010 |

4

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Required Disclosure** | **Terms** |
| *Definitions*] | |
| **Interest Rates**<br><br>[*DIP Credit Agreement §1.3*] | <u>Non-Default Interest Rate</u>: Base Rate <u>plus</u> 3% per annum, payable in arrears on the first day of each month.<br><br><u>Default Interest Rate</u>: Base Rate <u>plus</u> 5% per annum, payable on demand of the DIP Agent. |
| **Fees**<br><br>[*Interim Order: ¶11 of the Orders;<br>DIP Credit Agreement §1.9*] | <u>Loan Fee</u> - a loan fee in the amount of 1% of the Aggregate Commitment amount, payable at closing.<br><br><u>Agent Fee</u> - an agency fee to the DIP Agent, as set forth in a confidential side letter.<br><br><u>Unused Line Fee</u> - an unused commitment fee equal to the average daily balance of the Aggregate Commitment during the preceding calendar month, less the sum of the average daily balance of the DIP Loans outstanding during the preceding calendar month, multiplied by one-half of 0.50% per annum. |
| **Treatment of the Lenders' Expenses**<br><br>[*Interim Order: ¶11(c) of the Orders,<br>DIP Credit Agreement §§1.09(d), 1.10(a)*] | Borrowers must reimburse the DIP Agent and the DIP Lenders for all fees, costs and expenses (including the Attorney Costs and reasonable fees, costs and expenses of all advisors, auditors, appraisers, and consultants) (all such costs, the "**Fees and Expenses**"), incurred in connection with the negotiation, preparation and filing and/or recordation of the DIP Loan Documents. Such Fees and Expenses are secured by the DIP Collateral and may be paid by the DIP Agent by making a loan advance under the DIP Facility to pay such Fees and Expenses. The invoices supporting the Fees and Expenses must be submitted to counsel for the Borrowers, with copies to counsel for the U.S. Trustee, the Prepetition Agent and the Committee. Attorneys and advisors for the DIP Agent or DIP Lenders are not required to file an application with the Court. The U.S. Trustee, Prepetition Agent, the Borrower, and Committee will have ten (10) business days in which to raise an objection to the payment of any fees and expenses of such attorneys and advisors. |
| **Carve-Out**<br><br>[*Interim Order: ¶16 of the Orders;<br>DIP Credit Agreement §1.14*] | The claims of the respective retained professionals of the Debtors and Committee that have been approved by this Court during the Chapter 11 Cases pursuant to sections 327, 328, and 1103 of the Bankruptcy Code, (collectively, the "**Retained Professionals**") and reasonable expenses of members of the Committee ("**Committee Member Expenses**") for unpaid fees and expenses which were incurred (A) on and after the Petition Date and before the Carve-Out Trigger Date in amounts not in excess of the amounts set forth in the DIP Budget and (B) on and after the Carve-Out Trigger Date in an aggregate amount not exceeding $2 million, for all Retained Professionals and Committee Member Expenses. |

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Required Disclosure** | **Terms** |
| **DIP Liens and Priority**<br><br>*[Interim Order: Orders¶¶14(b),(c),(d); DIP Credit Agreement §1.14]* | The DIP Agent is granted the following liens to secure the obligations owing pursuant to the DIP Facility:<br><br>Section 364(d)(1) Lien - a priming security interest and lien pursuant to Bankruptcy Code section 364(d)(1) on all encumbered property of the Borrowers, subject only to (a) the Carve-Out, and (b) prepetition liens on property of the Borrowers that are valid, perfected, not avoidable, and senior in priority to the Prepetition Liens of the Prepetition Agent on such property, and (c) the Prepetition Liens of the Prepetition Agent (liens described in clauses (b) and (c), collectively, the "Permitted Prior Senior Liens").<br><br>Section 364(c)(2) Liens - a first priority security interest and lien pursuant to Bankruptcy Code section 364(c)(2) on all unencumbered property of the Borrowers, which will be subject only to the Carve-Out.<br><br>Section 364(c)(3) Liens - a junior security interest and lien pursuant to Bankruptcy Code section 364(c)(3) on all property of the Borrowers and that is subject to a Permitted Prior Senior Lien. |
| **Liens on Proceeds of Avoidance Actions**<br><br>*[Interim Order ¶23 of the Orders]* | DIP Liens will, subject to the entry of the Final Order, extend to the proceeds of all claims and causes of actions under Chapter 5 of the Bankruptcy Code, including, without limitation, those under sections 502(d), 544, 545, 547, 548, 549, 550, 552(b) and 553, and state laws of similar import. |
| **The Revolver Roll-Up Payment**<br><br>*[Interim Order, ¶¶7, 8(c) of the Orders; DIP Credit Agreement §1.1(a)]* | Upon entry of the Interim Order, Borrowers are authorized and directed to use the DIP Facility and Cash Collateral to repay in full the $43.19 million prepetition secured obligations in respect of the prepetition revolving loan facility, using $22 million proceeds of the Interim Amount and $21.19 million of the Cash Collateral to pay such obligations. |
| **Superpriority Administrative Claim Status**<br><br>*[Interim Order: ¶14(a) of the Orders; DIP Credit Agreement §1.14]* | The DIP Agent will have a superpriority administrative expense claim pursuant to Bankruptcy Code section 364(c)(1) with priority over all other administrative expenses pursuant to, *inter alia*, sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 552(b), 726 and 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which superpriority expenses of the DIP Agent and DIP Lenders will be subordinate only to the Carve-Out. |
| **Adequate Protection**<br><br>*[Interim Order ¶24(a)-(c) of the Orders]* | Adequate Protection Liens – each of the Prepetition Agent shall be granted (for the ratable benefit of the respective Prepetition Lenders) valid, binding, enforceable and perfected security interests and replacement liens upon all property of the Borrowers, to secure the Prepetition Obligations of, without |

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Required Disclosure** | **Terms** |
| | duplication, the aggregate diminution, if any, subsequent to the Petition Date, in the value of the Prepetition Collateral, which will be subordinated to the Carve-Out, Permitted Prior Senior Liens, DIP Obligations, DIP Liens and DIP Superpriority Claims.<br><br>Adequate Protection Superpriority Claims - To the extent the Prepetition Agent will hold claims allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code, notwithstanding the provision of Adequate Protection hereunder, the Prepetition Agent is hereby granted, for the ratable benefit of the Prepetition Lenders, an administrative expense claim pursuant to Bankruptcy Code section 507(b) of the Bankruptcy Code with priority over all other administrative expenses, but in all cases subject and subordinate to the Carve-Out, Permitted Prior Senior Liens, DIP Obligations, DIP Liens and DIP Superpriority Claims.<br><br>Adequate Protection Payments - The Borrowers will, in accordance with the DIP Budget, (a) with respect to the Prepetition Agent and Prepetition Lenders: (i) promptly pay all reasonable fees and expenses under the Prepetition Loan Documents incurred by the Prepetition Agent, whether incurred prior to or following the Petition Date, and (ii) pay all other payments payable when and as due under the Prepetition Loan Documents, including all payments of principal, interest, fees and charges, and (b) make regularly scheduled principal and interest payments due to DASNY pursuant to the Bishop Mugavero Note, subject to any party's right to request recharacterization of such payments as payments of principal. |
| **Automatic Perfection of the DIP Lien and Adequate Protection Replacement Lien**<br><br>[*Interim Order ¶18 of the Orders*] | The DIP Liens and the Adequate Protection Liens granted pursuant to the Interim Order to the Prepetition Agent for the benefit of the Prepetition Lenders, will be valid, enforceable, and perfected by operation of law upon entry of the Interim Order by the Court without any further action by any party. |
| **Limitation on the Revolver Roll-Up Payment and Adequate Protection Lien**<br><br>[*Interim Order ¶21 of the Orders*] | The Interim DIP Order reserves the right, after a notice and a hearing, to unwind the Roll-Up Payment and Adequate Protection Liens, in the event that there is a timely and successful challenge to the validity, enforceability, extent, perfection, or priority of any secured party's claims and/or liens (including with respect to the Prepetition Lenders) or a determination that prepetition debt of such secured party's claims and/or liens (including with respect to the Prepetition Lenders) was undersecured as of the Petition Date, pursuant to the terms of the Interim Order, including, without limitation, the Challenge Deadline. |
| **Modification of Automatic Stay to** | If any Event of Default has occurred and is continuing, DIP Agent may (and at the written request of the Required Lenders will), notwithstanding the |

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Required Disclosure** | **Terms** |
| **Exercise Remedies**<br><br>[*Interim Order ¶26 of the Orders;*<br>*DIP Credit Agreement 7.2(b)]* | provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, or order from, the Bankruptcy Court: (a) terminate all or any portion of DIP Lenders' obligations to make additional DIP Loans; (b) reduce the Commitments from time to time; (c) declare all or any portion of the DIP Obligations, including all or any portion of any DIP Loan, to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrowers and each other Credit Party; or (d) exercise any rights and remedies provided to DIP Agent under the DIP Loan Documents or at law or equity, including all remedies provided under the Code; and pursuant to the Final Order, the automatic stay of Section 362 of the Bankruptcy Code will be modified and vacated to permit DIP Agent and Lenders to exercise their remedies under the DIP Agreement and the other DIP Loan Documents, without further application or motion to, or order from, the Bankruptcy Court, underlined, notwithstanding anything to the contrary contained herein, DIP Agent will be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of any Borrower in the Collateral only upon 7 days' prior written notice (or such other notice period as may be set forth in the Interim Order or Final Order, as applicable) to such Borrower and counsel approved by the Bankruptcy Court for the Committee. |
| **Debtors' Stipulations as to the Prepetition Credit Facilities**<br><br>[*Interim Order ¶19 of the Orders*] | Prepetition Loans. Pursuant to the Prepetition Loan Documents, the Prepetition Agent and Prepetition Lenders were granted liens on, and security interests in (the "Prepetition Liens"), substantially all property of each Borrower under the Prepetition Loan Documents, whether now owned or existing or hereafter acquired or arising (all as more fully set forth in the Prepetition Loan Documents, the "Prepetition Collateral"). All indebtedness and other obligations in respect of the Prepetition Loan Documents will be referred to as the "Prepetition Obligations."<br><br>Prepetition Obligations.<br><br>(a) the Borrowers were indebted and liable to the Prepetition Agent and Prepetition Lenders, without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $313 million in respect of loans made, letters of credit issued, and other financial accommodations provided, by the Prepetition Agent and Prepetition Lenders pursuant to the Prepetition Credit Agreement and the other Prepetition Loan Documents, plus accrued but unpaid interest, costs, fees and expenses as provided in the Prepetition Loan Documents;<br><br>(b) the Prepetition Liens are (i) valid, binding, perfected, enforceable, first priority liens on and security interests in the Prepetition Collateral, (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and (iii) subject only to |

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Required Disclosure** | **Terms** |
| | (A) after giving effect to the Interim Order, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, and the Carve-Out, and (B) Permitted Prior Senior Liens; |
| | (c) the Prepetition Obligations constitute the legal, valid and binding obligations of the Borrowers that are party thereto, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code) and no portion of the Prepetition Obligations is subject to avoidance, recharacterization, disgorgement, recovery or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; |
| | (d) the Borrowers do not have, and hereby forever release and waive, any claims, objections, challenges, counterclaims, causes of action, defenses or setoff rights, whether arising under the Bankruptcy Code or applicable non-bankruptcy law, against the Prepetition Agent, Prepetition Lenders, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees from the beginning of time; |
| | (e) all of the Borrowers' cash collateral existing as of the Petition Date, except for proceeds of the DIP Facility, including without limitation, all cash and other amounts on deposit or maintained by the Borrowers in any account or accounts with any Prepetition Lender, constitutes Cash Collateral of the Prepetition Agent and Prepetition Lenders; and |
| | (f) the Borrowers are in default with respect to their Prepetition Obligations and an Event of Default has occurred under the Prepetition Loan Documents. |
| **Effect of Stipulations on Third Parties**<br><br>[*Interim Order ¶19 of the Orders*] | The admissions, stipulations, agreements, releases, and waivers set forth in the Interim Order are and will be binding on the Borrowers, any subsequent trustee, responsible person, examiner with expanded powers, any other Estate representative and all parties-in-interest and all of their successors-in-interest and assigns, including, without limitation, the Committee, <u>unless</u>, and solely to the extent that, (a) the Committee or another party-in-interest with standing and requisite authority, has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in the Interim Order) challenging the Prepetition Lien and Claim Matters (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "<u>Challenge</u>") by no later than the earlier of (a) 75 days after the Petition Date or (b)  60 days after the appointment of the Committee, and (b) this Court rules in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such ruling is not subject to any further review or appeal. |

KL2 2647358.2

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Required Disclosure** | **Terms** |
| **Waiver of Section 506(c) Surcharge Right and Section 552(b) "Equities of the Case" Claims**<br><br>[*Interim Order ¶17 of the Orders*] | In light of the consent of the DIP Agent and DIP Lenders to the current payment of administrative expenses of the Borrowers' Estates in accordance with the DIP Budget and (a) the agreement of the DIP Agent and DIP Lenders to subordinate their Superpriority Claims to the Carve-Out, and (b) the agreement of the DIP Agent and DIP Lenders to subordinate their DIP Liens to the Carve-Out and Permitted Prior Senior Liens, the DIP Agent, DIP Lenders, Prepetition Agent and Prepetition Lenders are each entitled to, subject to the entry of the Final Order, a waiver of (i) the provisions of section 506(c) of the Bankruptcy Code and (ii) any "equities of the case" claims or other claims under sections 105(a) or 552(b) of the Bankruptcy Code. |
| **Indemnity**<br><br>[*Interim Order ¶25 of the Orders;*<br>*DIP Credit Agreement §9.6*] | The Borrowers will indemnify the DIP Agent and DIP Lenders and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "<u>Indemnified Person</u>") and hold each of them harmless from and against all costs, expenses (including reasonable fees, disbursements and other charges of counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrowers or any of their affiliates or shareholders) that relates to the DIP Facility or the Interim Order, including the financing contemplated hereby, the Chapter 11 Cases, or any transactions in connection therewith, provided that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such Person's gross negligence or willful misconduct. Nothing herein is meant to limit the scope of any indemnity provided for the benefit of the DIP Agent or DIP Lenders in the DIP Loan Documents. |
| **Releases**<br><br>[*DIP Credit Agreement §1.16*] | Borrowers acknowledge that, effective upon entry of the Final Order, Borrowers have no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of Borrowers' liability to repay Agent or any Lender as provided in the DIP Credit Agreement or to seek affirmative relief or damages of any kind or nature from Agent or any Lender. Each Borrower, in its own right, on behalf of its bankruptcy estates, and on behalf of all its successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "<u>Releasing Parties</u>"), hereby fully, finally and forever releases and discharges Agent and Lenders and all of Agent's and Lenders' past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them |

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Required Disclosure** | **Terms** |
| | (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which in each case are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to the DIP Agreement, the Interim Order, the Final Order and the transactions contemplated hereby (other than the Prepetition Loan Documents and the financings provided thereunder), and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing. No Released Party will be entitled to the benefits of the foregoing release for claims primarily arising from gross negligence or willful misconduct of such Released Party as subsequently determined by a court of competent jurisdiction in a final non-appealable order. |
| **Asset Sale Milestones**<br><br>*[Interim Order ¶34 of the Orders,*<br>*DIP Credit Agreement*<br>*§4.20]* | Until the full and indefeasible payment and satisfaction of the DIP Obligations, Borrowers must comply with the terms of the Transaction Side Letter, which is a confidential letter that sets forth certain requirements and deadlines in connection with Borrowers' sale of their assets. |

| SUMMARY OF THE INTERESTS HELD IN CASH COLLATERAL |
|---|
| **SVCMC Cash Collateral and Parties with Interest Therein** | The "**SVCMC Cash Collateral**" shall mean "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code that is in the possession of SVCMC (excluding cash collateral generated from SVCMC's outpatient cancer center in which Aptium W. New York, Inc. has a lien that is senior in priority to the Prepetition Liens), in which the following parties have an interest:<br><br>• Prepetition Agent and Prepetition Lenders, which have a first priority lien |

| **SUMMARY OF THE INTERESTS HELD IN CASH COLLATERAL** |
|---|

<table>
<tr><td></td><td>on all of the SVCMC Cash Collateral on account of their prepetition secured indebtedness in the approximate amount of $313 million (Motion ¶¶ 11-12);<br><br>• The Pension Benefit Guaranty Corporation ("**PBGC**"), which has a second priority lien on all of the SVCMC Cash Collateral on account of their prepetition secured indebtedness in the amount of $5 million (Motion ¶¶ 21-2);<br><br>• The Dormitory Authority of the State of New York ("**DASNY**"), which has a third priority lien on all of the SVCMC Cash Collateral on account of their prepetition secured indebtedness in the amount of $32.9 million (Motion ¶¶ 13-14)</td></tr>
<tr><td>**Other Cash Collateral and Parties with Interest Therein**</td><td>The "**Other Cash Collateral**" shall mean "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code that is in the possession of Pax Christi, Holy Family Home, St. Elizabeth Ann, and Bishop Mugavero, in which the following parties have an interest:<br><br>• Prepetition Agent and Prepetition Lenders, which have a first priority interest in the Other Cash Collateral on account of their prepetition secured indebtedness in the approximate amount of $313 million (Motion ¶¶ 11-12); and<br><br>• PBGC, which has a second priority security interest in the Other Cash Collateral on account of their prepetition secured indebtedness in the amount of $5 million (Motion ¶¶ 11-12).</td></tr>
</table>

## GENERAL BACKGROUND

5.      On the date hereof (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are operating their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

## THE MEDICAL CENTERS' HISTORY AND BUSINESS

6.      Founded by the Sisters of Charity in 1849, the Medical Centers are the only remaining Catholic-sponsored, acute-care hospital network in New York City.  Dedicated to fulfilling a healthcare mission, the Medical Centers are committed to providing "Respect, Integrity, Compassion and Excellence to all who come to us in need, especially the poor."

7.      Until recently, the Medical Centers' core business was centered around St.

KL2 2647358.2

Vincent's Hospital Manhattan (the "**Hospital**"), which is located in the Greenwich Village section of Manhattan. The Medical Centers operate numerous other services, including a behavioral health facility, nursing homes, continuing care facilities, a hospice, a home health agency, and a military health plan that serves active duty dependents, retirees, and their families. Additionally, the Medical Centers operate certain physician-related affiliates, provide specialized care across 14 clinical departments, and are affiliated with 18 licensed behavioral health and community medicine programs and six ambulatory care providers in Manhattan, including the Comprehensive Cancer Center, an HIV center, and a wound care center.

## PREPETITION SECURED INDEBTEDNESS

8. The Debtors have a complex prepetition debt structure consisting of various layers of secured debt. As of the Petition Date, the Debtors have at least $408 million of outstanding secured indebtedness (on a consolidated basis) owing to the various prepetition secured parties, which includes:

- approximately $313 million in principal owing to the Prepetition Agent and Prepetition Lenders (as each term is defined below) in respect of the senior secured revolving facility and term loan;

- approximately $30 million in principal owing to the Dormitory Authority of the State of New York ("**DASNY**") in respect of a certain settlement, certain new loan advances and proceeds of public bonds;[3]

- approximately $5 million owing to the Pension Benefit Guaranty Corporation (the "**PBGC**") in respect of a quarterly contribution payment that the Debtors failed to make in February 2010;

- approximately $60 million in principal owing to Sun Life Assurance Company of Canada (U.S.) ("**Sun Life**") in respect of two promissory notes; and

---

[3] In March 2010, St. Elizabeth Ann transferred funds previously reserved and other cash on hand to the trustee for the holders of certain DASNY - AIDS Long-Term Health Care Facilities Revenue Bonds, Series 2005 that were allocable to the loan made by DASNY to St. Elizabeth Ann (the "**SEA Loan**"). Consequently, the SEA Loan was deemed satisfied and discharged.

KL2 2647358.2

- approximately $113 million owing to three medical malpractice trusts (the "**MedMal Trusts**"), a significant portion of which is unsecured.

9. Each of these obligations is described in more detail in the Toney Declaration.

## A. The Prepetition GE Facility

10. SVCMC's primary debt facility consists of a term loan and a revolving loan facility (collectively, the "**Prepetition GE Facility**") provided by parties to the Prepetition Loan Agreement (defined below) from time to time as lenders, including GE Capital and TD Bank, N.A. (collectively, the "**Prepetition Lenders**") and GE Capital as agent for the Prepetition Lenders (the "**Prepetition Agent**"), pursuant to that certain Credit Agreement dated as of August 30, 2007 (as amended from time to time, the "**Prepetition Credit Agreement**," and together with all the loan documents entered into in connection therewith, collectively, the "**Prepetition Loan Documents**") by and among the Credit Parties (defined below), the Prepetition Agent and the Prepetition Lenders. The Prepetition GE Facility is guaranteed, on joint and several bases, by Bishop Mugavero, Holy Family Home, Pax Christi, and St. Elizabeth Ann (all the guarantors, together with SVCMC, collectively the **"Credit Parties"**).

11. The Prepetition GE Facility, which matures on August 30, 2014, is comprised of two separate facilities: (a) a $270 million term loan (the "**Prepetition Term Loan**") and (ii) a $50 million revolving loan facility (the "**Prepetition Revolving Facility**"). As of the date hereof, the full amount of principal is owed on account of the Prepetition Term Loan and approximately $43,190,000 in principal is owed on account of the Prepetition Revolving Facility (together with the other obligations owing pursuant to the Prepetition Loan Documents,

KL2 2647358.2

the "**Prepetition Obligations**")[4]

12.     The Prepetition GE Facility is secured by a first priority lien on substantially all of the assets of the Credit Parties and junior liens on: (i) certain other real estate owned by SVCMC (i.e., the Staff House[5] and the Westchester Real Property[6]) (ii) certain SVCMC indigent care and professional educational pool funds; (iii) the real estate owned by St. Elizabeth Ann and Bishop Mugavaro Center; and (iv) certain receivables related to cancer-related services at SVCMC's Comprehensive Cancer Center (all the foregoing collateral, including as further described in the Prepetition Credit Agreement, the "**Prepetition Collateral**").

B.     **DASNY Obligations**

     *i.*     ***Bishop Mugavero Center***

13.     On January 28, 1993, DASNY (through its predecessor, the New York State Medical Care Facilities Finance Agency) issued Hospital and Nursing Home Insured Mortgage Revenue Bonds 1993 Series A (the "**Bonds**").  On April 21, 1993, a portion of the proceeds of the Bonds (in the amount of $27,036,400) were loaned to Bishop Mugavero Center. The loan was evidenced by a building loan agreement and a mortgage note (collectively, the "**Bishop Mugavero Note**") issued by Bishop Mugavero Center in favor of DASNY in the principal amount of $27,036,400, which matures on February 1, 2025.  As of the date hereof, approximately $20 million in principal is owed on account of the Bishop Mugavero Note.

14.     As security for its obligations under the Bishop Mugavero Note, Bishop

---

[4] The amount outstanding under the Prepetition Revolving Facility includes two overadvances in the aggregate amount of $8 million made by the Prepetition Lenders to SVCMC in February and March 2010.

[5] "Staff House" refers to the real property located 555 6th Avenue, New York New York.

[6] "Westchester Real Property" refers to the real property located at 275 North Street, Westchester, New York.

Mugavero Center granted to DASNY a first priority mortgage (the "**Bishop Mugavero Mortgage**") on the real property located at 155 Dean Street, Brooklyn, New York (the "**Bishop Mugavero Nursing Home Facility**")[7] and a first priority lien on all equipment, furniture and fixtures located at the Bishop Mugavero Nursing Home Facility (the **"DASNY/Mugavero Collateral"**).

15.     In connection with the Bishop Mugavero Note, Bishop Mugavero Center established a "depreciation reserve fund" (the "**Bishop Mugavero Depreciation Reserve Fund**") to service the amounts due under the Bishop Mugavero Note.  The Bishop Mugavero Depreciation Reserve Fund is held by Bishop Mugavero Center in an escrow account maintained at HSBC Bank, N.A. and is funded periodically in the amount determined pursuant to a formula set forth in that certain Depreciation and Reserve Agreement entered into by DASNY and Bishop Mugavero Center in connection with the Bishop Mugavero Note.  As of the date hereof, the Bishop Mugavero Depreciation Reserve Fund contains $2,433,764.

16.     The Bishop Mugavero Mortgage was insured by the U.S. Department of Housing and Urban Development ("**HUD**").  Pursuant to the requirements of that certain Regulatory Agreement entered into between Bishop Mugavero Center and HUD to effectuate HUD's insurance obligations, Bishop Mugavero Center set up an additional reserve fund (the "**Bishop Mugavero Operating Escrow Account**") for, among other things, effecting replacement of structural elements and mechanical equipment at the Bishop Mugavero Nursing Home Facility.  The Bishop Mugavero Operating Escrow Account is held by Bishop Mugavero in an escrow account maintained at Prudential Bank and is replenished on a monthly basis in the

---

[7] As part of its security for the Prepetition Obligations, the Prepetition Agent was granted a second priority mortgage on the Bishop Mugavero Nursing Home Facility.

KL2 2647358.2

amount of $46,000. As of the date hereof, the Bishop Mugavero Operating Escrow Account contains $9,620,141.

### ii. SVCMC

17. In connection with the Debtors' prior chapter 11 cases (the "**Prior Chapter 11 Cases**"), DASNY and SVCMC entered into a stipulation (the "**DASNY Stipulation**"), which was approved by the Court on July 31, 2007, to resolve certain DASNY claims. To secure approximately $2.9 million of its obligations under the DASNY Stipulation, SVCMC granted to DASNY a second priority mortgage on the real property located at 36 Seventh Avenue, New York, New York (the "**O'Toole Building**").[8]

18. As a separate transaction, in February 2010, DASNY made two emergency loans to SVCMC in the aggregate amount of $9 million, which loans are secured by a first priority lien in certain "Arbitrage Rebate Accounts" (as such term is defined in the Reimbursement Agreement)[9] (the "**Arbitrage Rebate Accounts**"), a junior lien on the "gross receipts" (as such term is defined in the Reimbursement Agreement), a third priority mortgage and security interest on, and an assignment of the leases and rents of, the O'Toole Building, and second, third, and fourth priority mortgages on various other real estate owned by SVCMC.

19. In addition, in March 2010, DASNY made an additional emergency loan to SVCMC in the amount of $1 million, which is secured by a first lien on the proceeds of a $1

---

[8] As part of its security for the Prepetition Obligations, the Prepetition Agent was granted a first priority mortgage on the O'Toole Building.

[9] The Arbitrage Rebate Accounts are three accounts, which SVCMC maintains at either M&T Bank and Bank of New York Mellow on behalf of DASNY for the purpose of making certain arbitrage rebate payments that SVCMC may be required to make to the Internal Revenue Service in respect of certain defeased bonds issued by DASNY to SVCMC.

million grant to be made from the "HCRA Speaker's Priority Pool."[10]

## C.    Pension Plan/PBGC

20.    At the time of the Prior Chapter 11 Cases, SVCMC sponsored the Saint Vincents Catholic Medical Centers Retirement Plan (the "**Pension Plan**").  The Pension Plan was subject to minimum funding requirements of ERISA and the Internal Revenue Code.

21.    Pursuant to the plan of reorganization entered into in the Prior Chapter 11 Cases ("**Prior Chapter 11 Plan**"), SVCMC was required to pay $13.5 million to the Pension Plan during each of calendar years 2008 through 2012.

22.    As a result of the Debtors' failure to make a required $5 million quarterly payment due to the Pension Plan on January 15, 2010 a statutory lien (which attached to the real and personal property of the Debtors) in favor of the Pension Plan arose automatically equal to the unpaid balance of the $5 million missed contribution payment.  The PBGC perfected this lien on or about February 3, 2010.[11]

23.    PBGC has a first priority lien on the real estate owned by St. Elizabeth Ann.  Before the Petition Date, St. Elizabeth Ann entered into a non-binding letter of intent to sell its business (including the real estate) as a going-concern.  The proceeds of such sale will be sufficient to satisfy PBGC's $5 million claim in full.

## D.    The Sun Life Mortgage Loans

24.    On August 30, 2007, in connection with its emergence from the Prior

---

[10] Pursuant to an intercreditor agreement between Prepetition Agent and DASNY, dated February 8, 2010 (as amended on March 22, 2010), Prepetition Agent has agreed to the relative priority of DASNY's liens granted in respect of the three emergency loans.

[11] Subsequently, the PBGC and the Prepetition Agent entered into that certain Lien Subordination Agreement under which the PBGC agreed to subordinate its liens in the Credit Parties' personal property (only) to (i) the Prepetition Agent's liens in such property and (ii) to liens in such personal property granted by the Credit Parties to secure additional or replacement financing prior to April 22, 2010.

KL2 2647358.2

Chapter 11 Cases, SVCMC issued two promissory notes to Sun Life. The first promissory note, in the principal amount of $42.5 million (the "**Staff House Note**"), is secured by a first priority lien on the Staff House, and a second priority mortgage on the Westchester Real Property. The second promissory note, in the principal amount of $17.5 million (the "**Westchester Note"** and together with the Staff House Note, the "**Sun Life Notes**"), is secured by a first priority lien on the Westchester Real Property. As of the Petition Date, approximately $40 million and $16.4 million in principal are owed on the Staff House Note and the Westchester Note, respectively.

25.     Sun Life's liens on the on the Staff House and the Westchester Real Property will not be primed by the security interests granted to the DIP Agent and DIP Lenders pursuant to the DIP Credit Agreement.

**E.     MedMal Trusts Claims**

26.     Pursuant to the Prior Chapter 11 Plan, SVCMC agreed to fund the MedMal Trusts to cover its estimated liability for medical malpractice claims against its physicians and employees. Approximately $42 million was funded at the conclusion of the Prior Chapter 11 Cases and $10 million was funded on or about August 30, 2008. The remainder was to be funded through annual payments over a period of eight years, made pursuant to a funding schedule. To secure the contractual obligations of SVCMC to the MedMal Trusts, under the Prior Chapter 11 Plan, SVCMC granted to the MedMal Trusts a second priority lien in the Staff House and a third priority lien in the Westchester Real Property.

27.     The MedMal Trust's liens on the on the Staff House and the Westchester Real Property will not be primed by the security interests granted to the DIP Agent and DIP Lenders pursuant to the DIP Credit Agreement.

KL2 2647358.2

## CIRCUMSTANCES LEADING TO CHAPTER 11

### A.     The Debtors' Liquidity Crisis

28.     SVCMC and its then debtor and non-debtor affiliates emerged from the Prior Chapter 11 Cases in the summer of 2007 subject to over $1 billion of liabilities.  In an attempt to increase their revenue, the Medical Centers took steps to improve their operations and reduce costs.  Despite these efforts, however, the Medical Centers' revenue remained flat and the Hospital alone had operating losses in both 2007 and 2008.

29.     The Medical Centers' poor operating results stemmed from a combination of factors, including the Hospital's large operating footprint and staffing, the Hospital's relatively low reimbursement rates, the profound financial crisis that has gripped New York and the rest of the Nation over the last several years, and the Hospital's inability to bear the significant payment obligations assumed in connection with the Prior Chapter 11 Plan.

30.     By the end of 2009, the above factors had combined to create a severe liquidity crisis for the Medical Centers.  In early February 2010, as the crisis deepened, only emergency funding that was provided by their prepetition lenders and the State of New York (the "**State**") enabled the Debtors to make payroll and stave off an immediate bankruptcy filing.

31.     The Debtors used the respite provided by this emergency funding – as well as subsequent financing provided by their prepetition lenders, the State, certain charitable sources, and wage concessions by employees – to explore options for preserving their businesses' long-term viability and maximizing the value of their assets.  As part of this process, the Debtors, with the assistance of their professionals and advisors, directed their efforts towards selling their non-Hospital services and assets and searching for a viable healthcare partner for the Hospital.

20

**B.      Efforts to Sell Non-Hospital Assets**

32.      Prior to the Petition Date, the Debtors, with the assistance of their professionals and advisors, began marketing their non-Hospital services for sale as going-concerns.  In addition, the Debtors' marketed certain valuable real estate (together with the non-Hospital services, the "**Non-Hospital Assets**").[12]  The Debtors' marketing initiatives were carried out on local, regional, statewide and national levels, and included soliciting potential purchasers, preparing confidentiality agreements, preparing a virtual data room, conducting on-site visits with the interested parties, and responding to the written indications of interest from the interested parties.

33.      As a result of these initiatives, the Debtors have made substantial progress towards selling certain of the Non-Hospital Assets.  The Debtors intend to file motions approving the sale of their Non-Hospital Assets pursuant to section 363 of the Bankruptcy Code during these Chapter 11 Cases.  The Debtors are also continuing the marketing and sales processes relating to the remaining Non-Hospital Assets for which they have not yet entered into letters of intent.

34.      Importantly, it is contemplated that the Non-Hospital Assets will be sold as going-concerns, and negotiations with potential purchasers have proceeded on this basis.  The value of such businesses will be greatly diminished if they are forced to close prior to their sale.

**C.      Efforts to Find a Healthcare Partner for Hospital**

35.      As its operating losses deepened, SVCMC concluded that the only way to

---

[12] The Non-Hospital Assets include: (i) Bishop Mugavero; (ii) Holy Family Home; (iii) St. Elizabeth Ann; (iv) Pax Christi; (v) Westchester Real Property Hospital's behavioral health businesses and associated real estate; (vi) the Home Health businesses (including a Certified Home Health Agency and a Long Term Home Health Program); (vii) the US Family Health Plan; and (viii) the Staff House.

preserve the Hospital's operations was to obtain a viable healthcare partner, sponsor or other affiliation for the Hospital. SVCMC believed that such a transaction could provide improved reimbursement rates, retention of physicians, reduction in administration and overhead, realignment of service offerings, access to capital for hospital reconfiguration, improvements in the revenue cycle and technology, and routine and deferred capital improvements. It also would have avoided the substantial costs attendant to a shut-down of the Hospital, including closing costs, patient relocation costs, medical records retention, severance and other potential employee-related claims.

36. To this end, over the course of three months beginning in January 2010, the Debtors discussed a potential transaction with more than ten major hospitals in the New York City area. A number of discussions led past the preliminary stages to serious negotiations and due diligence. Mount Sinai Medical Center ("**Mount Sinai**") eventually emerged as the most interested and qualified party. In the weeks preceding the Petition Date, Mount Sinai and the Debtors worked diligently to structure a transaction in the face of numerous operating and financial obstacles. The hurdles to completing a strategic transaction, however, ultimately proved insurmountable and on March 31, 2010, Mount Sinai withdrew from discussions.

**D.     Decision to Close Hospital and File for Bankruptcy**

37. Once Mount Sinai withdrew from the process, the Debtors determined that there were no other viable and qualified interested partners or sponsors for the Hospital. Moreover, because the Debtors lacked sufficient funds to continue operation of the Hospital on a standalone basis, closure became the only option for the Hospital.

38. Consequently, on April 6, 2010, the Board of Directors of SVCMC voted

to approve the closure of the Hospital and the transfer or closure of the outpatient programs and clinics associated with and operated by the Hospital (together with the Hospital, the "**Hospital Services**").  In accordance with New York State law, the Debtors submitted a proposed plan of closure of the Hospital Services (the "**Closure Plan**") to the New York Department of Health (the "**DOH**") for approval on April 9, 2010.  While the DOH has not yet approved the Closure Plan, the Debtors have already begun the closure process and are working closely with DOH to implement the Closure Plan.

**EFFORTS TO OBTAIN ALTERNATIVE FINANCING**

39.     Prior to the Petition Date, the Debtors' advisors engaged in discussions with three lenders other than the Prepetition Lenders regarding the provision of postpetition financing.  Although all three lenders initially expressed interest in providing postpetition financing, none of them were willing to extend credit on an unsecured basis as an administrative expense under section 503(b) of the Bankruptcy Code.  Further, upon learning that the Debtors had no significant unencumbered assets, these lenders were also not interested in extending credit on a secured basis pursuant to section 364(c)(2) or (3) of the Bankruptcy Code.  Finally, in light of the high cost and the uncertainty of a potential priming fight with the Prepetition Lenders, the Debtors, in consultation with their professionals, determined that it was most prudent to pursue discussions and negotiations of the postpetition financing with the Prepetition Lenders.

**RELIEF REQUESTED**

40.     Pursuant to sections 105(a), 361, 362, 363, 364(c) and (d) and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014, and Local Rule 4001-2, the Debtors respectfully request the relief set forth in the Interim Order and the Final Order,

including the following:

a. authority, pursuant to sections 363 and 364(c)(1), (2), (3) and (d)(1) of the Bankruptcy Code, to obtain postpetition financing in the form of a revolving credit facility up to an aggregate principal amount of $78 million[13] (the "**DIP Facility**", and any loans or other extensions of credit thereunder, the "**DIP Loans**"), pursuant to the terms and conditions of the DIP Credit Agreement;

b. authority to execute and deliver the DIP Credit Agreement and all agreements, documents and instruments entered into in connection with the DIP Facility (collectively, the "**DIP Loan Documents**");

c. authority to borrow, on an interim basis, during the period from the Petition Date through entry and including the date of entry of a Final Order (the "**Interim Period**"), up to a maximum principal amount of $50 million (the "**Initial DIP Loan**"), in accordance with the DIP Budget (as defined below);

d. authority to use the SVCMC Cash Collateral and the Other Cash Collateral (collectively, the "**Cash Collateral**");

e. authority to use proceeds of the DIP Financing and the Cash Collateral in accordance with the budget prepared by the Debtors and approved by the DIP Agent, annexed hereto as **Exhibit D** (as updated from time to time in accordance with the DIP Credit Agreement, the "**DIP Budget**"), including to use $22 million of the proceeds of the Initial DIP Loan and $21.19 million of the Cash Collateral to repay in full amounts owing to the Prepetition Agent and Prepetition Lenders pursuant to the Prepetition Revolving Facility;

f. authority to grant to the DIP Agent, for its own benefit and the benefit of the DIP Lenders, to secure the obligations owing pursuant to the DIP Facility:

    i. a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code (the "**DIP Superpriority Claim**");

    ii. a first priority and senior lien on, and security interests in, all of the Debtors' unencumbered assets pursuant to section 364(c)(2) of the Bankruptcy Code;

---

[13] At the discretion of the DIP Agent and the DIP Lenders, the maximum amount of the DIP Facility may be increased to an amount not to exceed $85 million.

KL2 2647358.2

  iii. a junior lien on all of the Debtors' encumbered assets pursuant to section 364(c)(3); and

  iv. a first priority priming lien on all assets of the Debtors pursuant to section 364(d)(1) (together with the liens granted pursuant to clauses ii and iii above, collectively, the "**DIP Liens**");  provided, however, that such priming lien shall be subordinate to (a) the prepetition liens of the Prepetition Agent, and (b) those prepetition liens on the Debtors' assets that are valid, perfected, not avoidable and senior to the liens of the Prepetition Agent (collectively, the "**Permitted Prior Senior Liens**"); provided, further, that the DIP Superpriority Claims and the DIP Liens are subject to the payment of the following fees and expenses: (a) allowed administrative expenses pursuant to 28 U.S.C. §1930(a)(6); (b) reasonable professional fees and expenses ("**Professional Fees**") of the estate professionals retained pursuant to the Bankruptcy Code (the "**Retained Professionals**") and the expenses of the committee established pursuant to section 1102 of the Bankruptcy Code (the "**Committee**"), actually incurred and allowed by the Bankruptcy Court on and after the Petition Date by the Retained Professionals and the Committee, which amount shall not exceed, before Carve-Out Trigger Date (as defined in the Interim Order), the budgeted Professional Fees set forth in the DIP Budget with respect to such period and, with respect to Professional Fees incurred after Carve-Out Trigger Date, $2 million, in the aggregate; and (c) any statutorily mandated costs and fees of the United States Trustee with respect to the Chapter 11 Cases (all of the foregoing, collectively, the "**Carve-Out**").

 g. authority, pursuant to sections 361, 363(e), 364(d)(1) of the Bankruptcy Code, to grant adequate protection in the form of the following, without duplication (collectively, the "**Adequate Protection Obligations**"):

  i. payment of regularly scheduled principal and interest payments due to DASNY pursuant to the Bishop Mugavero Note;

  ii. payment of (a) all reasonable fees and expenses under the Prepetition GE Facility incurred by the Prepetition Agent prior to or following the Petition Date and (b) all other payments under the Prepetition Loan Documents

as they become due (including principal and interest); and

iii.    to the extent there is diminution of value in the Prepetition Collateral (including Cash Collateral) resulting from the priming by the DIP Liens and the DIP Superpriority Claim or from the Debtors' use of such collateral, (A) a replacement lien in favor of Prepetition Agent in all of the Debtors' collateral with the same relative priority as their prepetition lien (collectively, the "**Adequate Protection Liens**") and (B) an allowed superpriority administrative expense claim in favor of Prepetition Agent as provided for in section 507(b) of the Bankruptcy Code (the "**Adequate Protection Superpriority Claims**"); provided, however, that the Adequate Protection Liens and the Adequate Protection Superpriority Claims shall be subject to and subordinate with respect to the Carve-Out, the DIP Superpriority Claims, the DIP Liens and the Permitted Prior Senior Liens;

h.    modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement the terms and provisions of the DIP Loan Documents and the DIP Orders and satisfy the Adequate Protection Obligations;

i.    waive any stay (including under Bankruptcy Rule 4001(a)(3)) applicable to and provide for the immediate effectiveness of the Interim Order; and

j.    (a) schedule a Final Hearing to allow entry of the Final Order, to be held no earlier than 14 days after the date of this Motion, and no later than 30 days after entry of the Interim Order and (b) establish notice procedures in respect of the Final Hearing.

### BASIS FOR RELIEF

41.    Without the proposed DIP Facility and the use of the Cash Collateral, the Debtors do not have sufficient cash collateral or other available sources of working capital and financing to implement the Closure Plan and to operate, market and consummate the sales of their Non-Hospital Assets. Accordingly, the Debtors urgently need access to the DIP Facility and use of the Cash Collateral to continue to provide adequate care to the remaining Hospital patients and facilitate their transfer to other facilities, to pay their

employees, utilities, and other short-term costs attendant to the closure of the Hospital Services, and to otherwise implement the Closure Plan.  In addition, the Debtors require access to the DIP Loans and the use of the Cash Collateral to continue operating the Non-Hospital Assets to preserve the going-concern value of such assets while the Debtors continue marketing such assets and consummate the sale transactions that were negotiated prior to the Petition Date.

42.     The proposed DIP Facility and the use of the Cash Collateral (all pursuant to the DIP Budget) will provide the Debtors with sufficient funds to accomplish all of the tasks described above.  The Debtors expect that the proposed DIP Facility will be sufficient to fund the wind-down of the Debtors' estates and satisfy all administrative expense obligations that the Debtors reasonably expect to incur during the pendency of these Chapter 11 Cases.

43.     Finally, the DIP Facility is the only source of financing available to the Debtors at this time.  As described further below, despite their efforts, the Debtors have been unable to obtain financing (i) in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, (ii) solely as an administrative expense under section 364(a)-(b) of the Bankruptcy Code, or (iii) solely in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code.  Indeed, the proposed financing under the DIP Facility was the only viable postpetition financing option available to the Debtors.

44.     Thus, based on the foregoing and for the reasons set forth below, the Debtors submit that they have satisfied the requirements to access postpetition financing on a superpriority, secured basis pursuant to section 364(c) and (d) of the Bankruptcy Code as

KL2 2647358.2

well as the requirements for use of the Cash Collateral pursuant to section 363(c) of the Bankruptcy Code.

**A.    The Debtors Satisfy the Requirement for Obtaining Postpetition Credit on a Secured and Superpriority Basis Pursuant to Section 364(c) and (d) of the Bankruptcy Code**

45.    Section 364 of the Bankruptcy Code governs requests for approval of postpetition financing.  If a debtor cannot obtain postpetition credit on an unsecured, administrative expense basis, section 364(c) of the Bankruptcy Code authorizes a debtor to incur debt that is entitled to superpriority administrative expense status, secured by a lien on otherwise unencumbered property, or secured by a junior lien on encumbered property.  11 U.S.C. §364(c); see In re 495 Cent. Park Ave Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (discussing financing options under section 364).  Similarly, if a debtor is unable to obtain credit under section 364(c), section 364(d) of the Bankruptcy Code authorizes a debtor to incur debt that is secured by a senior or equal lien on encumbered property.  11 U.S.C. § 364(d); see 495 Cent. Park Ave, 136 B.R. at 630.

46.    Courts review a variety of factors to determine whether a debtor has satisfied the requirements of section 364(c) and (d) of the Bankruptcy Code.  Such factors include whether: (i) alternative financing is available on any other basis; (ii) the financing is necessary to preserve the assets of the estate and is necessary, essential and appropriate for continued operation of the Debtors' business; (iii) the financing is in the best interests of the Debtors' creditors and estates; (iv) entry into the financing constitutes an exercise of the debtor's sound and reasonable business judgment; (v) the terms of the financing are fair, reasonable and adequate; and (vi) the financing was negotiated in good faith and at arm's length between the debtor, on the one hand, and the agents and the lenders on the other.  See In re Farmland Indus., Inc., 294 B.R. 855, 879-81 (Bankr. W.D. Mo. 2003); Transcript of

28

Record at 733, <u>In re Lyondell Chem. Co.</u>, Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (citing <u>Farmland</u> factors); <u>In re Mid-State Raceway, Inc.</u>, 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005) (citing <u>Farmland</u> factors); <u>see</u>, <u>also</u> <u>In re Barbara K. Enters., Inc.</u>, No. 08-11474, 2008 WL 2439649, *10 (Bankr. S.D.N.Y. June 16, 2008) (applying a subset of the above listed factors in reliance on <u>In re Crouse Group, Inc.</u>, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987)).

47.     Further, to the extent that financing is sought pursuant to section 364(d), a debtor must also demonstrate that the interests of holders of existing liens are adequately protected.  11 U.S.C. § 364(d)(1)(B); <u>see</u> <u>495 Cent. Park Ave</u>, 136 B.R. at 631.

48.     Here, the Debtors propose to incur senior indebtedness as a superpriority administrative expense, which is secured by (i) a first priority senior lien on all of the Debtors' assets (subordinate only to the liens of Prepetition Agent and the valid liens that are senior to the liens of the Prepetition Agent and Prepetition Lenders), (ii) a senior lien on the Debtors' unencumbered assets, and (iii) a junior lien on the Debtors' encumbered assets.  For the reasons set forth below, the DIP Facility satisfies each of the relevant factors for obtaining credit pursuant to section 364(c) and (d) of the Bankruptcy Code.

### I.     *The DIP Facility is the Only and Best Source of Postpetition Financing Under the Circumstances*

49.     To obtain secured financing pursuant to sections 364(c) and (d) of the Bankruptcy Code, a debtor must show that unsecured financing was not available.  11 U.S.C. §§ 364(c), (d)(1)(A).  However, a debtor is not required to seek alternative financing from every conceivable source.  <u>See</u> <u>Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)</u>, 789 F.2d 1085, 1088 (4th Cir. 1986); <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990); <u>495 Central Park Avenue</u>, 136 B.R. at 630-31.  Instead,

a debtor must show that it has made a "reasonable" or "good faith" effort to seek other sources of credit on more favorable terms.  See Ames Dep't Stores, 115 B.R. at 40.

50.     The sufficiency of a debtor's efforts to obtain alternative financing will be informed by the likelihood that other lenders would be willing to extend financing on more favorable terms.  See, e.g., In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (noting it would be "unrealistic and unnecessary" to require debtor to conduct an exhaustive search for financing where, due to debtor's geographical location, financial stress, and lack of unencumbered property, only existing secured lenders or lenders with a tie to the community would be likely to provide financing); Ames Dep't Stores, 115 B.R. at 40 (discussions with four lenders sufficient where the "existence of additional lending institutions with the ability to loan $250 million to financially troubled companies is doubtful").  In addition, courts consider such factors as current market conditions and the immediacy of the debtor's needs.  See, e.g., Transcript of Record at 734-35, 740, In re Lyondell Chem. Co., Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (discussing relevance of market conditions); Mid-State Raceway, 323 B.R. at 60 (taking into consideration fact that while Board was considering offers, "the Debtors were in dire financial straits and had serious concerns whether they would be able to make payroll in another week").

51.     Here, the Debtors' ability to obtain postpetition financing on more favorable terms from an alternative lender was complicated by the Debtors' ultimate decision to shut down the Hospital.  Indeed, in light of the Debtors' financial condition, substantial secured debt, limited prospect of significant future cash flow from operations, and lack of any material unencumbered assets, the likelihood of obtaining unsecured

30

financing or financing secured only by junior liens was remote at best. In addition, based on their discussions with the Prepetition Agent, the Debtors determined that the Prepetition Lenders would not consent to third-party postpetition financing secured by liens that are senior to the liens held by the Prepetition Lenders.

52. In spite of these challenges, the Debtors explored the possibility of obtaining postpetition financing from alternative lenders by engaging in discussions with three lenders other than the Prepetition Lenders. Although all three lenders initially expressed interest in providing postpetition financing, none of them were willing to extend credit on an unsecured basis as an administrative expense. In addition, in light of the lack of material unencumbered assets, none were willing to extend credit on a secured basis pursuant to section 364(c)(2) or (3) of the Bankruptcy Code.

53. Having made good-faith efforts to explore other options, the Debtors and their advisors focused their efforts on negotiating a postpetition financing package with the Prepetition Lenders on terms favorable to the Debtors.

## II. *Entry into the DIP Facility is in the Best Interests of the Debtors' Patients and Creditors*

54. The Debtors' decision to enter into the proposed DIP Facility is manifestly in the best interests of their patients and creditors. The Debtors urgently need access to postpetition financing to implement the Closure Plan, to continue to provide adequate care to the Hospital's patients in advance of their transfer to other facilities, to satisfy the costs attendant to an orderly shut-down of the Hospital Services and the preservation of the Debtors' ongoing non-Hospital services, real estate and equipment pending eventual sale, as well as to meet the expenses attendant to these Chapter 11 Cases.

KL2 2647358.2

### III.    The Debtors Have Exercised Their Sound Business
###         Judgment in Entering into the DIP Facility

55.    A debtor's decision to enter into a postpetition lending facility under

section 364 of the Bankruptcy Code is governed by the business judgment standard.  <u>See</u>

<u>Ames Dep't Stores</u>, 115 B.R. at 40 (noting that courts defer to a debtor's business judgment

"so long as the financing agreement does not contain term that leverage the bankruptcy

process and powers or its purpose is not so much to benefit the estate as it is to benefit a

party-in-interest"); <u>Barbara K. Enters.</u>, 2008 WL 2439649 at *14.  The business judgment

standard is a deferential one.  In particular, in the context of postpetition financing, courts

have held that it is appropriate to interfere with a debtor's management of its affairs only if a

decision the debtor's decision is clearly erroneous or is made arbitrarily, in bad faith, with

fraudulent intent, on the basis of inadequate information, in violation of fiduciary duties, or

in violation of the Bankruptcy Code.  <u>See, e.g.</u>, <u>Mid-State Raceway</u>, 323 B.R. at 58;

<u>Farmland Indus.</u>, 294 B.R. at 881.  In addition, courts look to whether the debtor and its

professionals have made efforts to negotiate the best terms that they could.  <u>See</u> Transcript

of Record at 734, <u>In re Lyondell Chem. Co.</u>, Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27,

2009); <u>see also</u> <u>Barbara K. Enters.</u>, 2008 WL 2439649 at *14 (noting, in context of

discussion of business judgment, that "debtor should provide evidence of a potential benefit

for the estate in obtaining the financing").

56.    Here, the Debtors' decision to obtain the DIP Facility is an exercise of

their sound business judgment that the Court should approve.  Before the Petition Date, the

Debtors and their advisors undertook a detailed investigation as to the Debtors' projected

financing needs during a potential bankruptcy as well as the costs associated with closing

the Hospital Services, the results of this investigation are reflected in the DIP Budget, which

KL2 2647358.2

the Debtors and their advisors have independently determined should be sufficient to support the closure of the Hospital Services, marketing and consummating the sales of the Non-Hospital Assets, and the administration of these Chapter 11 Cases (including payment of the administrative expenses incurred in connection therewith). The Debtors, in consultation with their advisors, have determined that the proposed DIP Facility to be provided by the DIP Lenders pursuant to the terms of the DIP Credit Agreement is the most favorable available under the circumstances and will allow the Debtors to fund closing requirements.

57. Specifically, as noted above, the DIP Loan Documents, in accordance with the DIP Budget, will provide the Debtors with access to $50 million immediately after entry of the Interim Order (which will include approximately $28 million of new postpetition advances under the DIP Facility) and up to a total of $78 million (possibly even $85 million) after entry of the Final Order, as well as access to the Cash Collateral that will relieve the Debtors of the cost of borrowing additional amounts to replace that cash. The DIP Budget, which has projections through December 31, 2010, contemplates that the proceeds of the DIP Loans (including the $28 million of new postpetition advances during the Interim Period) and the Cash Collateral would provide the Debtors with sufficient funds to consummate an orderly shut-down of the Hospital Services, to operate, market and sell the Non-Hospital Assets, to wind down the remainder of the Debtors' estates, and to pay the administrative expenses that the Debtors reasonably anticipate to incur during the course of these Chapter 11 Cases.

58. In light of all factors outlined above, entering into the DIP Facility and obtaining the use of the Cash Collateral constitute an exercise of the Debtors' sound

KL2 2647358.2

business judgment that should be approved by the Court.

## V. The Terms of the DIP Facility are Fair, Reasonable and Appropriate

59.     In considering whether the terms of postpetition financing are fair and reasonable, courts "examine all the facts and circumstances," and will generally "permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest." Ames Department Stores, 115 B.R. at 39-40; see also Farmland Indus., 294 B.R. at 886 (evaluating reasonableness of terms in light of the "relative circumstances of the parties").  Courts recognize that debtors oftentimes "enjoy little negotiating power with a proposed lender, particularly where the lender has a pre-petition lien on cash collateral." Ames Department Stores, 115 B.R. at 38.  Thus, "debtors may have to enter into hard bargains to acquire (or continue to receive) the funds needed." Farmland Indus., 294 B.R. at 885-86.

60.     Here, the terms and conditions of the DIP Financing are fair and reasonable, and will enable the Debtors to implement the Closure Plan and the sale of the Non-Hospital Services.  Moreover, the terms of the DIP Credit Agreement are typical of debtor in possession financing agreements of this nature, especially in the current credit markets.  Importantly, the Debtors have concluded – after arm's length negotiations with the DIP Lenders – that the terms of the DIP Credit Agreement represent the most favorable terms on which the DIP Lenders would agree to make the DIP Facility available.

61.     The DIP Credit Agreement contains certain provisions that are or may be considered "extraordinary provisions" under Bankruptcy Rule 4001(c) and Local Rule 4001, including the following provisions (which are described more fully in the "Material Terms of the DIP Facility" chart of this Motion):

- Carve-Out;

- The Revolver Roll-Up Payment;

- Proceeds of Avoidance Actions;

- Waiver of Section 506(c) Surcharge Right and Section 552(b) "Equities of the Case" Claims;

- Modification of Automatic Stay to Exercise Remedies; and

- Payment of Fees and Expenses of DIP Agent and DIP Lenders.

62. In the course of their negotiations with the DIP Lenders, the Debtors explored whether the DIP Lenders would provide the DIP Facility without one or more of these "extraordinary" provisions. However, the DIP Lenders were not willing to provide the DIP Facility and the Prepetition Lenders would not agree to the use of Cash Collateral or the priming of their liens by the DIP Lenders, as applicable, without the inclusion of such provisions. Moreover, in light of the unavailability of any alternative source of postpetition financing, the Debtors and their advisors determined in their sound business judgment that the terms of the DIP Loan Documents, including these "extraordinary" provisions, were superior to any other set of terms reasonably available to the Debtors that excluded one or more of these provisions. Moreover, the interests of the Debtors' creditors, patients and other parties in interest, and the estates as a whole are best served by the Debtors' entering into the DIP Loan Documents, notwithstanding their inclusion of these "extraordinary" provisions.

## IV. The DIP Facility Was Negotiated in Good Faith and at Arm's Length and the DIP Lenders Should Therefore be Afforded the Protections of Section 364(e) of the Bankruptcy Code

63. Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or

modified on appeal.  See 11 U.S.C. § 364(e).  The Bankruptcy Code does not define "good faith" as used in section 364(e).  However, courts have held that the forms of misconduct that would defeat good faith status include "fraud, collusion, or an attempt to take grossly unfair advantage of others."  Keltic Fin. Partners, LP v. Foreside Mgmt. Co. (In re Foreside Mgmt. Co.), 402 B.R. 446, 452-53 (1st Cir. B.A.P. 2009); see also, Evergreen Int'l Airlines, Inc. v. Pan Am Corp. (In re Pan Am Corp.), Case No. 91 Civ. 8319, 1992 WL 154200, *4 (S.D.N.Y. June 18, 1992).

64.     Here, the terms of the DIP Facility were negotiated in good faith and at arm's length between the Debtors and the DIP Lenders.  As explained above, the DIP Loan Documents are the result of the Debtors' sound business determination that the terms and conditions of the DIP Loan Documents are fair and reasonable and inure for the benefit of their estates and all parties in interest.  Moreover, the proceeds of the DIP Facility will be extended by the DIP Lenders in good faith and will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to either the DIP Agent or the DIP Lenders other than as described herein.

65.     Accordingly, the DIP Agent and the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section to the extent any of the provision of the DIP Facility, the Interim Order, or the Final Order are hereafter modified reversed or modified on appeal.

### V.     The Secured Parties' Interests Are Adequately Protected From a Priming Risk

66.     Here, the protection provided by the Adequate Protection Obligations meets the standards for obtaining postpetition financing under section 364(d)(1)(B).

36

67.     If the Prepetition Lenders suffer diminution in value of their collateral as a result of the priming of their liens by the DIP Liens, the DIP Superpriority Claims and the Carve-Out, the Prepetition Agent (for the benefit of the Prepetition Lenders) shall receive replacement liens in all of the Debtors' assets as well as administrative expense claims pursuant to section 507(b) of the Bankruptcy Code.  As additional adequate protection, the Prepetition Agent and the Prepetition Lenders will receive regularly scheduled payments of principal and interest owing pursuant to the Prepetition Credit Agreement.

68.     In addition, DASNY's interests will be adequately protected from diminution in value due to priming by the DIP Liens, the DIP Superpriority Claims and the Carve-Out through the payment of the regularly scheduled payments of the interest and principal due on account of the Bishop Mugavero Note.

69.     Lastly, as discussed further below, PBGC's interests will be protected through the operation of St. Elizabeth Ann as a going-concern pending an anticipated sale thereof, which sale will yield enough proceeds to fully repay PBGC's $5 million debt.

**B.      The Debtors Should be Authorized to Use the Cash Collateral**

70.     A debtor's use of estate property is governed by section 363 of the Bankruptcy Code.  Specifically, section 363(c) of the Bankruptcy Code restricts a debtor's use of a secured creditor's cash collateral as follows:

> "The trustee may not use, sell, or lease cash collateral . . . unless – (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363]."

11 U.S.C. § 363(c)(2).  Further, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."

71.     For the reasons outlined below, the Debtors have satisfied the requirements of section 363(c)(2) and (e) of the Bankruptcy Code.  Use of the Cash Collateral (in addition to the DIP Loans) will help to stave off an immediate liquidation, provide the Debtors with access to much-needed liquidity, enable the Debtors' to complete the transfer of the Hospital's patients to other providers, and otherwise implement the Closure Plan.  In addition, the use of Cash Collateral will permit the Debtors to continue the sale, marketing and orderly disposition of their assets and keep their non-Hospital services operational pending their sale.  Further, providing the Debtors with an immediate right to use the Cash Collateral will relieve the Debtors of the cost of borrowing additional amounts to replace that cash under the DIP Facility.

72.     Finally, as described below, the interests of all parties that hold liens in the Cash Collateral – namely, DASNY, PBGC, the Prepetition Agent and the Prepetition Lenders (the "**Prepetition Secured Parties**") – are adequately protected by the grant of adequate protection as set forth in the DIP Orders.

## C.     Granting the Replacement Liens and Superpriority Claims and Payment of Certain Prepetition Obligations Constitutes "Adequate Protection"

73.     Adequate protection is meant to ensure that a secured creditor receives the value for which it originally bargained.  See In re Worldcom, Inc., 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004). Specifically, adequate protection protects a secured creditor from diminution in the value of its interest in collateral during the use period.  See In re 495 Cent.

Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

74.    The appropriate form of adequate protection will vary depending on the individual circumstances of each case.  See Beker, 58 B.R. at 736 (noting that the application of adequate protection is "left to the vagaries of each case").  The grant of replacement liens, however, is a well-recognized and accepted form of adequate protection. See 11 U.S.C. § 361(2); MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1398 (10th Cir. 1987); In re Dynaco Corp., 162 B.R. 389, 397 (Bankr. D. N.H. 1993).  In addition, adequate protection may also be demonstrated by a showing that the secured creditor's interest in the collateral is preserved by the debtor's use of the cash collateral in a manner that maintains or enhances the collateral's value. See In re Salem Plaza Assoc., 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a secured creditor was adequately protected when cash collateral was used to pay necessary operating expenses); In re Constable Plaza Assocs., L.P., 125 B.R. 98, 105-06 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral and existing equity cushion); In re Pine Lake Village Apartment Co., 16 B.R. 750, 756 (Bankr. S.D.N.Y. 1982) ("The protection and maintenance of the plaintiff-mortgagee's collateral ... clearly ensures that the plaintiff-mortgagee's investment is adequately protected.").

75.    Here, the protection provided by the Adequate Protection Obligations is sufficient to satisfy the "adequate protection" requirements of sections 363(d)(1)(B) and (e) of the Bankruptcy Code.

76.    The interests of the Prepetition Lenders in their collateral will be

protected by virtue of the grant of replacement liens and allowed superpriority administrative expense claims as provided for in section 507(b) of the Bankruptcy Code. In addition, the interests of the Prepetition Lenders will be protected through the payment of fees and expenses under the Prepetition GE Facility and certain other regularly scheduled payments under the Prepetition Credit Agreement.

77.     Moreover, the use of the Cash Collateral will preserve and enhance the value of the Prepetition Secured Parties' collateral, as well as the Debtors' estates as a whole. The Debtors will use the Cash Collateral to preserve the value of the businesses and real estate owned by St. Elizabeth Ann and Bishop Mugavero as they continue to market these facilities as going-concerns. The proceeds of the sale of the real estate owned by St. Elizabeth Ann will generate more than sufficient funds to satisfy obligations owing to the PBGC as the holder of the first priority lien. Similarly, DASNY has a first priority lien on the real estate owned by Bishop Mugavero and will benefit from the Debtors' use of Cash Collateral to preserve the going-concern value of Bishop Mugavero Center. Accordingly, allowing the Debtors to use the Cash Collateral of PBGC and DASNY will aid to protect their most important collateral and therefore satisfies the requirements of "adequate protection" of section 363(e).

**D.      The Debtors Require Immediate Access
         to the DIP Loans and the Cash Collateral**

78.     Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), the Court may grant interim relief in respect of a motion filed pursuant to either section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable

to the debtors' other business decisions.  See, e.g., Ames Dep't Stores, 115 B.R. at 36.

79.     In the case at hand, the Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to use the Cash Collateral and to borrow the Interim DIP Loan in the amount of $50 million, is not granted promptly after the Petition Date.  As described above, the Debtors have an immediate need for access to liquidity to, among other things, implement the Closure Plan, continue to provide adequate care to the Hospital's patients in advance of their transfer to other facilities, pay claims of employees, utilities, and other short-term costs pending the shut-down of the Hospital Services, and preserve the value of the Debtors' assets for the benefit of all creditors and other parties in interest.

80.     The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances.  See, e.g., In re Tronox Inc., Case No. 09-10156 [Docket No. 46] (Bankr. S.D.N.Y. Jan. 13, 2009) (order approving postpetition financing on an interim basis); In re Lyondell Chem. Co., Case No. 09-10023 [Docket No. 79] (Bankr. S.D.N.Y. Jan. 8, 2009) (same); In re Lenox Sales, Inc., Case No. 08-14679 [Docket No. 34] (S.D.N.Y. Nov. 25, 2008) (same); In re Wellman, Inc., Case No. 08-10595 [Docket No. 60] (S.D.N.Y. Feb. 27, 2008) (same). Accordingly, for all of the reasons set forth above, prompt entry and effectiveness of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

**E.     The Debtors Request Scheduling of the Final Hearing**

81.     Pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, which is no sooner than 14 days after the date of this

Motion and no later than 30 days[14] after the entry of the Interim Order, to hold a hearing to consider entry of the Final Order. The Debtors also request authority to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, to entry of the Final Order, by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final Order under Bankruptcy Rule 4001(c)(2).

## NOTICE

82. Rule 4001 Bankruptcy Rules sets forth the notice requirements with respect to a motion to obtain credit pursuant to section 364 of the Bankruptcy Code. Specifically, Bankruptcy Rule 4001(c)(1) provides that a motion pursuant to section 364 of the Bankruptcy Code must be served on all committees (or their authorized agents) appointed in a debtor's chapter 11 case pursuant to section 1102 of the Bankruptcy Code, and on such other entities as the court may direct, and must be accompanied by a copy of the credit agreement. Bankruptcy Rule 4001(c)(2) further provides that a hearing on the motion may be held "no earlier than fifteen (15) days after service of the motion." Finally, Bankruptcy Rule 4001(d)(1) and (2) provide that (a) a motion for approval to modify or terminate the automatic stay shall be served on any official creditors committee, on the creditors included on the list filed under Bankruptcy Rule 1007(d), and on other such entities as the court may direct, and (b) objections may be filed within 15 days of the mailing of notice of the motion and the time for filing objections thereto.

83. The Debtors have provided or will provide notice of this Motion, including a copy of the DIP Loan Documents, by electronic mail, facsimile and/or overnight

---

[14] The DIP Credit Agreement requires that the Final Order be entered no later than 30 days after entry of the Interim Order.

mail to: (a) the Office of the U.S. Trustee for the Southern District of New York; (b) the Office of New York State Attorney General; (c) the DOH; (d) the Internal Revenue Service; (c) counsel to the DIP Agent; (d) counsel to the Prepetition Agent; (e) counsel to DASNY; (f) counsel to PBGC and (g) the other parties required to provided with notice of this Motion pursuant to the Local Rules. Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that further notice of this Motion is neither required nor necessary, and that the notice of this Motion described above satisfies the requirements of Bankruptcy Rule 4001.

## NO PRIOR REQUEST

84. No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court (a) enter the Interim Order and the Final Order granting the relief requested herein on an interim and permanent basis, respectively, and (b) grant such other and further relief as is just and proper.

Dated: New York, New York
April 14, 2010

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/  Kenneth H. Eckstein
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

*Proposed Counsel for Debtors*
*and Debtors in Possession*

43