**DEBTOR IN POSSESSION**
**CREDIT AGREEMENT**

**Dated as of April \_\_, 2010**

**by and among**

**SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK,**
**ST. JEROME'S HEALTH SERVICES CORPORATION,**
**PAX CHRISTI HOSPICE, INC.,**
**SISTERS OF CHARITY HEALTH CARE SYSTEM NURSING HOME, INC.,**
**BISHOP FRANCIS J. MUGAVERO CENTER FOR GERIATRIC CARE, INC.,**
**SVCMC PROFESSIONAL REGISTRY, INC.,**
**CHAIT HOUSING DEVELOPMENT CORPORATION,**
**FORT PLACE HOUSING CORPORATION,**
**555 6TH AVENUE APARTMENT OPERATING CORPORATION,**

**as Borrowers,**

**THE OTHER PERSONS PARTY HERETO THAT ARE**
**DESIGNATED AS CREDIT PARTIES,**

**GENERAL ELECTRIC CAPITAL CORPORATION,**
**for itself, as a Lender and as Agent for all Lenders,**

**and**

**THE OTHER FINANCIAL INSTITUTIONS PARTY HERETO,**
**as Lenders**

# TABLE OF CONTENTS

ARTICLE I.      THE CREDITS ................................................................................2

    1.1      The Revolving Loan. ..........................................................................2
    1.2      Notes ....................................................................................................3
    1.3      Interest..................................................................................................3
    1.4      Loan Accounts. ....................................................................................4
    1.5      Procedure for Borrowing. ...................................................................5
    1.6      Reserved................................................................................................6
    1.7      Optional Prepayments.........................................................................6
    1.8      Mandatory Payments and Prepayments...............................................6
    1.9      Fees. .....................................................................................................7
    1.10     Payments by Borrowers. .....................................................................9
    1.11     Payments by Lenders to Agent; Settlement. .....................................10
    1.12     Borrower Representative ....................................................................12
    1.13     [Reserved]..........................................................................................12
    1.14     Security Interest; Priority; Carveout. ................................................13
    1.15     Confirmation of Plan of Reorganization...........................................14
    1.16     Release ...............................................................................................14
    1.17     Waivers ..............................................................................................15
    1.18     Special Terms Relating to Aptium Receivables. ...............................15
    1.19     Acknowledgment of Pre-Petition Credit Agreement.........................16
    1.20     Certain Conditions ............................................................................16

ARTICLE II.     CONDITIONS PRECEDENT ........................................................16

    2.1      Conditions to Initial Loans................................................................17
    2.2      Conditions to All Borrowings ...........................................................19

ARTICLE III.    REPRESENTATIONS AND WARRANTIES....................................19

    3.1      Corporate Existence and Power.........................................................19
    3.2      Corporate Authorization; No Contravention .....................................20
    3.3      Governmental Authorization .............................................................20
    3.4      Binding Effect....................................................................................20
    3.5      Litigation............................................................................................21
    3.6      No Default...........................................................................................21
    3.7      ERISA Compliance............................................................................21
    3.8      Use of Proceeds; Margin Regulations...............................................22
    3.9      Ownership of Real Property...............................................................22
    3.10     Approved Budget ...............................................................................22
    3.11     Regulated Entities .............................................................................22
    3.12     Agreements with Advisors.................................................................22
    3.13     Brokers' Fees; Transaction Fees........................................................22
    3.14     Insurance ............................................................................................22

| | | |
|---|---|---|
| 3.15 | Ventures, Subsidiaries and Affiliates | 22 |
| 3.16 | Jurisdiction of Organization; Chief Executive Office | 23 |
| 3.17 | Deposit Accounts and Other Accounts | 23 |
| 3.18 | Full Disclosure | 23 |
| 3.19 | Foreign Assets Control Regulations and Anti-Money Laundering. | 23 |
| 3.20 | Patriot Act | 23 |
| 3.21 | [Reserved]. | 24 |
| 3.22 | Facility Reports | 24 |
| 3.23 | Compliance With Health Care Laws | 24 |
| 3.24 | HIPAA Compliance | 25 |
| 3.25 | Medicare/Medicaid Programs | 25 |
| 3.26 | Certificate of Need | 26 |
| 3.27 | Hospital Accreditation | 26 |
| 3.28 | Funds from Restricted Grants | 26 |
| 3.29 | Investigations or Audits | 26 |
| 3.30 | Hill-Burton Act | 26 |
| 3.31 | Chapter 11 Cases | 26 |
| ARTICLE IV. | AFFIRMATIVE COVENANTS | 27 |
| 4.1 | Financial Statements | 27 |
| 4.2 | Other Reports and Information | 28 |
| 4.3 | Notices | 29 |
| 4.4 | Preservation of Corporate Existence, Etc | 31 |
| 4.5 | Maintenance of Property | 31 |
| 4.6 | Insurance. | 32 |
| 4.7 | Payment of Obligations | 33 |
| 4.8 | Compliance with Laws | 34 |
| 4.9 | Inspection of Property and Books and Records | 34 |
| 4.10 | Use of Proceeds | 34 |
| 4.11 | Cash Management Systems; Bank Accounts | 34 |
| 4.12 | ERISA Compliance | 34 |
| 4.13 | Further Assurances | 35 |
| 4.14 | Environmental Matters | 36 |
| 4.15 | Licensure; Medicaid/Medicare Cost Reports | 36 |
| 4.16 | Accounts Information | 36 |
| 4.17 | Retention of Chief Restructuring Officer | 37 |
| 4.18 | Financial Advisor | 37 |
| 4.19 | Investment Banker; Disposition of Non-Hospital Assets | 37 |
| 4.20 | Transaction Side Letter | 37 |
| 4.21 | Main Hospital Facility | 38 |
| ARTICLE V. | NEGATIVE COVENANTS | 38 |
| 5.1 | Limitation on Liens | 38 |
| 5.2 | Disposition of Assets | 38 |

SF:278847.8

| | | |
|---|---|---|
| 5.3 | Consolidations and Mergers | 38 |
| 5.4 | Acquisitions; Loans and Investments | 39 |
| 5.5 | Limitation on Indebtedness | 39 |
| 5.6 | Employee Loans and Transactions with Affiliates | 39 |
| 5.7 | Compensation | 39 |
| 5.8 | Margin Stock; Use of Proceeds | 40 |
| 5.9 | Contingent Obligations | 40 |
| 5.10 | Compliance with ERISA | 40 |
| 5.11 | Restricted Payments | 40 |
| 5.12 | Change in Business | 41 |
| 5.13 | Change in Structure | 41 |
| 5.14 | Changes in Accounting, Name or Jurisdiction of Organization | 41 |
| 5.15 | Material Contracts | 41 |
| 5.16 | Reserved | 42 |
| 5.17 | OFAC; Patriot Act | 42 |
| 5.18 | Sale-Leasebacks | 42 |
| 5.19 | Hazardous Materials | 42 |
| 5.20 | Certificates of Need | 42 |
| 5.21 | Tax Issues | 42 |
| 5.22 | Credit and Collection | 42 |
| 5.23 | Issuance of Revocation Order | 43 |
| 5.24 | Reclamation Claims | 43 |
| **ARTICLE VI.** | **FINANCIAL AND BUDGETARY COVENANTS** | 43 |
| 6.1 | Revisions to Approved Budget | 43 |
| 6.2 | Compliance with Budgetary and Financial Covenants; Financial Reports | 43 |
| **ARTICLE VII.** | **EVENTS OF DEFAULT** | 43 |
| 7.1 | Events of Default | 43 |
| 7.2 | Suspension or Termination of Commitments; Acceleration and Other Remedies | 47 |
| 7.3 | [Reserved] | 48 |
| 7.4 | Rights Not Exclusive | 48 |
| **ARTICLE VIII.** | **THE AGENT** | 48 |
| 8.1 | Appointment and Duties. | 48 |
| 8.2 | Binding Effect | 49 |
| 8.3 | Use of Discretion. | 49 |
| 8.4 | Delegation of Rights and Duties | 50 |
| 8.5 | Reliance and Liability. | 50 |
| 8.6 | Agent Individually | 52 |
| 8.7 | Lender Credit Decision. | 52 |
| 8.8 | Expenses; Indemnities; Withholding. | 53 |

| | | |
|---|---|---|
| 8.9 | Resignation of Agent. | 54 |
| 8.10 | Release of Collateral or Guarantors | 54 |
| 8.11 | Additional Secured Parties | 55 |

| | | |
|---|---|---|
| ARTICLE IX. | MISCELLANEOUS | 55 |

| | | |
|---|---|---|
| 9.1 | Amendments and Waivers. | 55 |
| 9.2 | Notices. | 57 |
| 9.3 | Electronic Transmissions. | 58 |
| 9.4 | No Waiver; Cumulative Remedies | 59 |
| 9.5 | Costs and Expenses | 59 |
| 9.6 | Indemnity. | 60 |
| 9.7 | Marshaling; Payments Set Aside | 61 |
| 9.8 | Successors and Assigns. | 61 |
| 9.9 | Assignments and Participations; Binding Effect. | 61 |
| 9.10 | Non-Public Information; Confidentiality | 64 |
| 9.11 | Set-off; Sharing of Payments. | 66 |
| 9.12 | Counterparts; Facsimile Signature | 67 |
| 9.13 | Severability | 67 |
| 9.14 | Captions | 67 |
| 9.15 | Independence of Provisions | 67 |
| 9.16 | Interpretation | 67 |
| 9.17 | No Third Parties Benefited | 68 |
| 9.18 | Governing Law and Jurisdiction. | 68 |
| 9.19 | Waiver of Jury Trial | 69 |
| 9.20 | Entire Agreement; Release; Survival. | 69 |
| 9.21 | Patriot Act | 69 |
| 9.22 | Replacement of Lender | 70 |
| 9.23 | Joint and Several | 70 |
| 9.24 | Creditor-Debtor Relationship | 70 |
| 9.25 | Actions in Concert | 71 |
| 9.26 | Parties Including Trustees; Bankruptcy Court Proceedings | 71 |

| | | |
|---|---|---|
| ARTICLE X. | TAXES | 71 |

| | | |
|---|---|---|
| 10.1 | Taxes. | 71 |
| 10.2 | Certificates of Lenders | 74 |

| | | |
|---|---|---|
| ARTICLE XI. | CROSS-GUARANTY | 74 |

| | | |
|---|---|---|
| 11.1 | Cross-Guaranty | 74 |
| 11.2 | Waivers By Borrowers | 75 |
| 11.3 | Benefit of Guaranty | 75 |
| 11.4 | Waiver of Subrogation, Etc. | 75 |
| 11.5 | Election of Remedies | 75 |
| 11.6 | Limitation | 76 |
| 11.7 | Contribution with respect to Guarantee Obligations. | 76 |

iv

11.8        Liability Cumulative ...........................................................................77

ARTICLE XII.    DEFINITIONS.......................................................................77

12.1        Defined Terms ................................................................................77
12.2        Other Interpretive Provisions..........................................................103
12.3        Accounting Terms and Principles.....................................................104
12.4        Payments .......................................................................................104

SF:278847.8

# SCHEDULES

Schedule 1.1          Loan Commitments
Schedule 3.5          Audits, etc.
Schedule 3.7          Benefit Plans
Schedule 3.9          Owned Real Property
Schedule 3.15         Ventures, Subsidiaries and Affiliates; Outstanding Stock
Schedule 3.16         Jurisdiction of Organization; Chief Executive Office
Schedule 3.17         Deposit Accounts and Other Accounts
Schedule 6.2          Financial and Budgetary Covenants; Financial Reports

SF:278847.8

**EXHIBITS**

Exhibit 2.1          Closing Checklist
Exhibit 4.11         Cash Management System
Exhibit 9.2          Addresses for Notice Purposes
Exhibit 12.1(a)      Form of Assignment
Exhibit 12.1(c)      Form of Notice of Borrowing

SF:278847.8

# DEBTOR IN POSSESSION
## CREDIT AGREEMENT

       This DEBTOR IN POSSESSION CREDIT AGREEMENT (including all exhibits and schedules hereto, as the same may be amended, modified and/or restated from time to time, this "Agreement") is entered into as of April [__,] 2010, by and among SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK, a New York not-for-profit corporation, as debtor in possession ("SVCMC"), ST. JEROME'S HEALTH SERVICES CORPORATION, a New York not-for-profit corporation, as debtor in possession ("St. Jerome's"), PAX CHRISTI HOSPICE, INC., a New York not-for-profit corporation, as debtor in possession ("Pax Christi"), SISTERS OF CHARITY HEALTH CARE SYSTEM NURSING HOME, INC., a New York not-for-profit corporation, as debtor in possession ("St. Elizabeth Ann's"), SVCMC PROFESSIONAL REGISTRY, INC., a New York corporation, as debtor in possession ("Registry"), CHAIT HOUSING DEVELOPMENT CORPORATION, a New York not-for-profit corporation, as debtor in possession ("Chait"), FORT PLACE HOUSING CORPORATION, a New York not-for-profit corporation, as debtor in possession ("Ft. Place"), 555 6TH AVENUE APARTMENT OPERATING CORPORATION, a New York corporation, as debtor in possession ("6th Street"), and BISHOP FRANCIS J. MUGAVERO CENTER FOR GERIATRIC CARE, INC., a New York not-for-profit corporation, as debtor in possession ("Mugavero" and, collectively with the foregoing, "Borrowers" and individually each, a "Borrower"), SVCMC (as Borrower Representative), the other Persons party hereto that are designated as a "Credit Party", General Electric Capital Corporation, a Delaware corporation (in its individual capacity, "GE Capital"), as Agent for the several financial institutions from time to time party to this Agreement (collectively, "Lenders" and individually each a "Lender") and for itself as a Lender, and such Lenders. Each capitalized term used but not defined in this introductory statement has the meaning given it in Article 12).

W I T N E S S E T H:

       WHEREAS, on April [__], 2010 (the "Petition Date"), each Borrower filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which petitions are jointly administered as Case No. [_____] (the "Chapter 11 Cases"), and Borrowers, as Debtors, continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code;

       WHEREAS, prior to the commencement of the Chapter 11 Cases, Pre-Petition Agent and Pre-Petition Lenders made loans and advances and provided other financial or credit accommodations to Borrowers and certain of their Affiliates secured by substantially all assets and properties of Borrowers and certain of their Affiliates as set forth in the Pre-Petition Loan Documents;

       WHEREAS, the Bankruptcy Court has entered an Interim Order and/or a Final Order pursuant to which Agent and Lenders may make post-petition loans and advances,

and provide other financial accommodations, to Debtors secured by substantially all the assets and properties of Debtors as set forth in, as applicable, the Interim Order or Final Order and this Agreement.

WHEREAS, the Interim Order or Final Order, as applicable, provides that as a condition to the making of such post-petition loans, advances and other financial accommodations, Debtors shall execute and deliver this Agreement;

WHEREAS, Debtors desire to reaffirm their obligations to Pre-Petition Agent and the Pre-Petition Lenders pursuant to the Pre-Petition Loan Documents and acknowledge their continuing liabilities to Agent and Lenders thereunder (after giving effect to the transactions contemplated herein) in order to induce Agent and Lenders to make such post-petition loans and advances, and provide such other financial accommodations, to Debtors; and

WHEREAS, Debtors have requested that Agent and Lenders make post-petition loans and advances and provide other financial or credit accommodations to Debtors, and Agent and Lenders are willing to do so, only upon the terms and conditions set forth herein, including the requirement that such loans and other extensions of credit constitute allowed superpriority administrative expense claims with priority over all other administrative expense claims in the Chapter 11 Cases and are secured by first priority Liens (as defined below), superior to all other Liens held by any other lienholder, on all of the assets of Borrowers, except in each instance as otherwise set forth in the Interim Order or the Final Order, as applicable; and

WHEREAS, Borrowers are unable to obtain funds or credit on any other terms and there is adequate protection of the interests of the other lienholders whose Liens are being subordinated to Lenders' senior Liens provided for in this Agreement.

NOW, THEREFORE, in consideration of the mutual premises and the agreements, provisions and covenants contained herein, Borrowers, Credit Parties, Lenders and Agent agree as follows:

**ARTICLE I.**
**THE CREDITS**

1.1     <u>The Revolving Loan</u>.

(a)     Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Credit Parties contained herein, on and after the Closing Date, each Lender agrees to lend, severally but not jointly, to Borrowers, in separate Loans comprising revolving credit advances that may be requested by Borrower Representative from time to time in accordance with <u>Section 1.5</u> hereof, its pro rata share of such revolving credit advances not to exceed in the aggregate the amount set forth opposite such Lender's name in <u>Schedule 1.1</u> under the heading "Loan Commitments" (such amount being referred to herein as such Lender's "<u>Commitment</u>"); <u>provided</u> that after giving effect to any Borrowing of the Loans, the aggregate principal amount of all outstanding Loans shall not as of any date exceed the Maximum Permitted

Loan Balance for such date. The Loans shall be used to (A) refinance the full amount of the Pre-Petition Revolving Loan Obligations owed by certain of the Borrowers to the Pre-Petition Lenders, and (B) fund general financial requirements of the Borrowers and the other Credit Parties under the Chapter 11 Cases subject to the limitations set forth in this Agreement and the restrictions set forth in Schedule 6.2. The amounts advanced to Borrowers by Lenders pursuant to this subsection 1.1 are referred to as "Loans" or the "Loan". Agent shall have the right to establish Reserves from time to time in Agent's good faith credit judgment. Agent shall promptly notify Borrower Representative in writing when Agent has established a Reserve.

(b) Subject to the other terms and conditions hereof, amounts borrowed under this subsection 1.1 may be repaid and reborrowed from time to time.

(c) The initial amount of the Aggregate Commitments shall be Seventy Eight Million Dollars ($78,000,000). Borrowers shall have the option to request an increase in the Aggregate Commitments to an amount not to exceed Eighty Five Million Dollars ($85,000,000). Any such increase shall be in the sole discretion of Agent and Lenders. If Agent and Lenders in their sole discretion consent to an increase in the Aggregate Commitments, the new amount of the Aggregate Commitments shall be the amount so agreed.

1.2     Notes. The Loans made by each Lender shall be evidenced by this Agreement and, if requested by such Lender, a Note payable to such Lender in an amount equal to such Lender's Commitment.

1.3     Interest.

(a) Subject to subsections 1.3(c) and 1.3(d), each Loan shall bear interest on the outstanding principal amount thereof from the date when made at a rate per annum equal to the Base Rate plus the Applicable Margin. Each determination of an interest rate by Agent shall be conclusive and binding on each Borrower and Lenders in the absence of manifest error. All computations of fees and interest payable under this Agreement shall be made on the basis of a 360-day year and actual days elapsed. Interest and fees shall accrue during each period during which interest or such fees are computed from the first day thereof to the last day thereof.

(b) Interest on each Loan shall be paid in arrears on each Interest Payment Date. Interest shall also be paid on the date of any payment or prepayment in full of the Loans.

(c) While any Event of Default exists, unless otherwise determined by Agent in its discretion, Borrowers shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the Loans under the Loan Documents from and after the date of occurrence of such Event of Default, at a rate per annum which is determined by adding two percent (2.00%) per annum to the Applicable Margin then in effect for such Loans plus the Base Rate (the "Default Rate"). All such interest shall be payable on demand of Agent.

(d)     Anything herein to the contrary notwithstanding, the obligations of Borrowers hereunder shall be subject to the limitation that payments of interest shall not be required, for any period for which interest is computed hereunder, to the extent (but only to the extent) that contracting for or receiving such payment by the respective Lender would be contrary to the provisions of any law applicable to such Lender limiting the highest rate of interest which may be lawfully contracted for, charged or received by such Lender, and in such event Borrowers shall pay such Lender interest at the highest rate permitted by applicable law ("Maximum Lawful Rate"); provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrowers shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by Agent, on behalf of Lenders, is equal to the total interest that would have been received had the interest payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement.

1.4     Loan Accounts.

(a)     Agent, on behalf of Lenders, shall record on its books and records the amount of each Loan made, the interest rate applicable, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding. Agent shall deliver to Borrower Representative on a monthly basis, or such other period as shall be determined by Agent, a loan statement setting forth such record for the immediately preceding calendar month or applicable period. Such record shall, absent manifest error, be conclusive evidence of the amount of the Loans made by Lenders to Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so, or any failure to deliver such loan statement shall not, however, limit or otherwise affect the obligation of Borrowers hereunder (and under any Note) to pay any amount owing with respect to the Loans or provide the basis for any claim against Agent.

(b)     Agent, acting as a non-fiduciary agent of Borrowers solely for tax purposes and solely with respect to the actions described in this subsection 1.4(b), shall establish and maintain at its address referred to in Section 9.2 (or at such other address as Agent may notify Borrower Representative) (A) a record of ownership (the "Register") in which Agent agrees to register by book entry the interests (including any rights to receive payment hereunder) of Agent and each Lender in the Loans, each of their obligations under this Agreement to participate in each Loan, and any assignment of any such interest, obligation or right and (B) accounts in the Register in accordance with its usual practice in which it shall record (1) the names and addresses of Lenders (and each change thereto pursuant to Sections 9.9 and 9.22), (2) the Commitment of each Lender, (3) the amount of each Loan and each funding of any participation described in clause (A) above, (4) the amount of any principal or interest due and payable or paid, and (5) any other payment received by Agent from a Borrower and its application to the Obligations.

(c)     Notwithstanding anything to the contrary contained in this Agreement, the Loans (including any Notes evidencing such Loans) are registered obligations, the right, title and interest of Lenders and their assignees in and to such Loans shall be transferable only upon notation of such transfer in the Register and no

assignment thereof shall be effective until recorded therein. This <u>Section 1.4</u> and <u>Section 9.9</u> shall be construed so that the Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(d)     The Credit Parties, Agent and Lenders shall treat each Person whose name is recorded in the Register as a Lender for all purposes of this Agreement. Information contained in the Register with respect to any Lender shall be available for access by Borrowers, Borrower Representative, Agent and such Lender during normal business hours and from time to time upon at least one Business Day's prior notice. No Lender shall, in such capacity, have access to or be otherwise permitted to review any information in the Register other than information with respect to such Lender unless otherwise agreed by Agent.

1.5     <u>Procedure for Borrowing</u>.

(a)     Each Borrowing shall be made upon Borrower Representative's irrevocable (subject to <u>Section 10.5</u>) written notice delivered to Agent substantially in the form of a Notice of Borrowing or in a writing in any other form acceptable to Agent, which notice must be received by Agent prior to 2:00 p.m. (New York time) on the date which is two (2) Business Days prior to the requested Borrowing date of such Borrowing. Such Notice of Borrowing shall specify:

(i)     the amount of the Borrowing (which shall be in an aggregate minimum principal amount of $250,000); and

(ii)     the requested Borrowing date, which shall be a Business Day.

(b)     No Borrowing shall cause the outstanding principal balance of the Loans to exceed the Maximum Permitted Loan Balance applicable on the date such Borrowing will be funded.

(c)     Upon receipt of a Notice of Borrowing, Agent will promptly notify each Lender of such Notice of Borrowing and of the amount of such Lender's Commitment Percentage of the Borrowing.

(d)     Unless Agent is otherwise directed in writing by Borrower Representative, the proceeds of each requested Borrowing after the Closing Date will be made available to Borrowers by Agent by wire transfer of such amount to Borrower Representative pursuant to wire transfer instructions provided by Borrower Representative to Agent. In making any such advance, Agent shall be entitled to rely on any wire transfer instructions delivered to Agent by Borrower Representative that Agent in good faith believes to be genuine and Agent shall have no duty to inquire as to the authorization of the Person delivering the wire transfer instructions on behalf of Borrower Representative.

1.6    Reserved.

1.7    Optional Prepayments.

(a)    Borrowers may, at any time upon at least one (1) Business Days' (or such shorter period as is acceptable to Agent) prior written notice by Borrower Representative to Agent, prepay the Loans in whole or in part in an amount greater than or equal to $100,000, in each instance, without penalty or premium.

(b)    The notice of any prepayment shall not thereafter be revocable by Borrower Representative and Agent will promptly notify each Lender thereof.  The payment amount specified in such notice shall be due and payable on the date specified therein.

1.8    Mandatory Payments and Prepayments.

(a)    Scheduled Payments. The principal amount of the Loans shall be paid in full on the Termination Date subject, however, to acceleration upon (or following) the occurrence of an Event of Default and during its continuation, or upon earlier termination of this Agreement, as provided for herein.

(b)    Loan Exceeding Projected Budgeted Amount.  If, during any calendar week, the aggregate outstanding principal balance of the Loans shall at any time exceed one hundred five percent (105%) of the amount projected under the Approved Budget to be outstanding for such week, Borrowers shall immediately make a payment of principal equal to the amount of such excess.

(c)    Disposition of Assets.  Immediately upon receipt of any Net Proceeds arising from a Disposition, other than a Disposition referenced in clause (a), (b), or (c) of Section 5.2, Borrowers shall prepay the Loans  in an amount equal to the Net Proceeds of such Disposition.  Following receipt of such Net Proceeds, Agent, in its discretion, may adjust the Approved Budget to reduce the projected Loan balance by the amount so received.

(d)    Prepayment from Debt Issuance.  Upon receipt on or after the Closing Date by any Credit Party of any funds arising from the incurrence by any Credit Party or any of its Subsidiaries of Indebtedness for borrowed money or Indebtedness evidenced by notes, bonds, debentures or similar instruments (other than intercompany Indebtedness permitted by this Agreement), Borrowers shall immediately pay or cause to be paid the full amount thereof to Agent for application on account of the Loans.

(e)    Application of Prepayments from Events of Loss.  If any insurance or condemnation proceeds are paid to Agent on account of the Obligations, Agent, at its option and in its discretion, may adjust the Approved Budget to reduce the projected Loan balance by the amount so received.

(f)    No Implied Consent.  Provisions contained in this Section 1.8 for the application of proceeds of certain transactions shall not be deemed to constitute

consent of Lenders to transactions that are not otherwise permitted by the terms hereof or the other Loan Documents.

1.9    Fees.

(a)    Loan Fee.  On the Closing Date, Borrowers shall pay to Agent for the benefit of Lenders a fee equal to one percent (1.00%) of the Aggregate Commitment Amount on the Closing Date.  Such fee shall be non-refundable and shall be fully earned upon the occurrence of the Closing Date.  If at any time the amount of the Aggregate Commitments shall increase, Borrowers shall pay to Agent for the benefit of Lenders on the date that such increase becomes effective a fee equal to one percent (1.00%) of the amount by which the Aggregate Commitments have increased.  Such fee shall be non-refundable and shall be fully earned upon its receipt by Agent.

(b)    Agent's Fee.  Borrowers shall pay to Agent, for Agent's own account, the fees set forth in a letter agreement (the "Fee Letter") between Borrower Representative and Agent dated on or about the date of this Agreement.

(c)    Unused Commitment Fee.  Borrowers shall pay to Agent a fee (the "Unused Commitment Fee") in an amount equal to:

(i)    the average daily balance of the Aggregate Commitment during the preceding calendar month, less

(ii)    the sum of (x) the average daily balance of the Loans outstanding during the preceding calendar month,

multiplied by one-half of one percent (0.50%) per annum.  Such fee shall be payable monthly in arrears on the first day of the calendar month following the date hereof and the first day of each calendar month thereafter.  The Unused Commitment Fee provided in this subsection 1.9(c) shall accrue at all times from and after the Closing Date.  Following receipt of the Unused Commitment Fee, Agent shall pay to each Lender an amount equal to its pro rata share (based upon such Lender's Commitment) of the Unused Commitment Fee.

(d)    Expenses and Attorneys' Fees.  Borrowers shall reimburse Agent and Lenders (provided that, at any time at which there are more than two Lenders, the reimbursement obligation with respect to Lenders shall only apply with respect to clauses (ii), (iii) and (iv) below) for all fees, costs and expenses (including the Attorney Costs and reasonable fees, costs and expenses of all advisors, auditors, appraisers, and consultants) (all such costs, the "Fees and Expenses"), incurred in connection with the negotiation, preparation and filing and/or recordation of the Loan Documents and incurred in connection with:

(i)    any amendment, modification or waiver of, consent with respect to, or termination of, any of the Loan Documents or advice in connection with the administration of the Loans made pursuant hereto or its rights hereunder or thereunder;

(ii)    any litigation, contest, dispute, suit, proceeding or action (whether instituted by Agent, any Lender, Borrowers or any other Person and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the Loan Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrowers or any other Person that may be obligated to Agent or any Lender by virtue of the Loan Documents; including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Loans during the pendency of one or more Events of Default; provided, that no Person shall be entitled to reimbursement under this clause (ii) in respect of any litigation, contest, dispute, suit, proceeding or action to the extent any of the foregoing results from such Person's gross negligence or willful misconduct;

(iii)   any attempt to enforce any remedies of Agent against Borrowers or any other Person that may be obligated to Agent or any Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Loans during the pendency of one or more Events of Default;

(iv)   any workout or restructuring of the Loans during the pendency of one or more Events of Default;

(v)    the obtaining of approval of the Loan Documents by the Bankruptcy Court;

(vi)   the preparation and review of pleadings, documents and reports related to the Chapter 11 Cases and any subsequent case under Chapter 7 of the Bankruptcy Code, attendance at meetings, court hearings or conferences related to the Chapter 11 Cases and any subsequent case under Chapter 7 of the Bankruptcy Code, and general monitoring of the Chapter 11 Cases and any subsequent case under Chapter 7 of the Bankruptcy Code;

(vii)  efforts to (x) monitor the Loans or any of the other Obligations, (y) evaluate, observe or assess Borrowers or its affairs, and (z) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral; including, as to each of clauses (i) through (vi) above, all reasonable attorneys' and other professional and service providers' fees arising from such services and other advice, assistance or other representation, including those in connection with any appellate proceedings, and all reasonable expenses, out of pocket costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this subsection 1.9(d), all of which shall be payable, on demand, by Borrowers to Agent.  Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, out of pocket costs and expenses of accountants, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air

express charges; telegram or telecopy charges; secretarial overtime charges; and reasonable expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services. All fees, charges, costs and expenses for which Borrowers are responsible under this subsection 1.9(d) shall be deemed part of the Obligations when incurred, payable in accordance with the final sentence of subsection 1.10(a) and secured by the Collateral.

1.10    Payments by Borrowers.

(a)    All payments (including prepayments) to be made by each Credit Party on account of principal, interest, fees and other amounts required hereunder shall be made without set-off, recoupment, counterclaim or deduction of any kind, shall, except as otherwise expressly provided herein, be made to Agent (for the ratable account of the Persons entitled thereto) at the address for payment specified in the signature page hereof in relation to Agent (or such other address as Agent may from time to time specify in accordance with Section 9.2), including payments utilizing the ACH system, and shall be made in Dollars and by wire transfer or ACH transfer in immediately available funds (which shall be the exclusive means of payment hereunder) to the Collection Account. For purposes of computing interest and fees as of any date, all payments shall be deemed received on the First Business Day following the Business Day on which immediately available funds therefor are received in the Collection Account prior to 1:00 p.m. (New York time). Any payment received by Agent later than 1:00 p.m. (New York time) shall be deemed to have been received on the immediately succeeding Business Day. Borrowers and each other Credit Party hereby irrevocably waives the right to direct the application during the continuance of an Event of Default of any and all payments in respect of any Obligation and any proceeds of Collateral. Each Borrower hereby authorizes Agent and each Lender to make a Loan advance to pay interest, Fees and Expenses, Unused Commitment Fees, fees, and other Obligations, in each instance on the date due.

(b)    If any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.

(c)    During the continuance of an Event of Default, Agent may, and shall upon the direction of Required Lenders apply any and all payments received by Agent in respect of any Obligation in accordance with clauses first through sixth below. Notwithstanding any provision herein to the contrary, all amounts collected or received by Agent after any or all of the Obligations have been accelerated (so long as such acceleration has not been rescinded), including proceeds of Collateral, shall be applied as follows:

first, to payment of the Fees and Expenses of Agent payable or reimbursable by the Credit Parties under the Loan Documents;

second, to payment of the Fees and Expenses of Lenders payable or reimbursable by Borrowers under this Agreement;

third, to payment of all accrued unpaid interest on the Obligations and fees owed to Agent and Lenders;

fourth, to payment of principal of the Obligations then due and payable;

fifth, to payment of any other amounts owing constituting Obligations; and

sixth, any remainder shall be for the account of and paid to whoever may be lawfully entitled thereto.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category and (ii) each of Lenders or other Persons entitled to payment shall receive an amount equal to its pro rata share of amounts available to be applied pursuant to clauses third, fourth and fifth above.

1.11    Payments by Lenders to Agent; Settlement.

(a)    Agent may, on behalf of Lenders, disburse funds to Borrowers for Loans requested. Each Lender shall reimburse Agent on demand for all funds disbursed on its behalf by Agent, or if Agent so requests, each Lender will remit to Agent its Commitment Percentage of any Loan before Agent disburses same to Borrowers. If Agent elects to require that each Lender make funds available to Agent prior to disbursement by Agent to Borrowers, Agent shall advise each Lender by telephone or fax of the amount of such Lender's Commitment Percentage of the Loan requested by Borrower Representative no later than the Business Day prior to the scheduled Borrowing date applicable thereto, and each such Lender shall pay Agent such Lender's Commitment Percentage of such requested Loan, in same day funds, by wire transfer to Agent's account, as set forth on Agent's signature page hereto, no later than 1:00 p.m. (New York time) on such scheduled Borrowing date. Nothing in this subsection 1.11(a) or elsewhere in this Agreement or the other Loan Documents, including the remaining provisions of Section 1.11, shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Agent, any Lender or Borrowers may have against any Lender as a result of any default by such Lender hereunder.

(b)    At least once each calendar week or more frequently at Agent's election (each, a "Settlement Date"), Agent shall advise each Lender by telephone or fax of the amount of such Lender's Commitment Percentage of principal, interest and fees paid for the benefit of Lenders with respect to each applicable Loan. Provided that each Lender has funded all payments required to be made by it and funded all purchases of participations required to be funded by it under this Agreement and the other Loan Documents as of such Settlement Date, Agent shall pay to each Lender such Lender's Commitment Percentage of principal, interest and fees paid by Borrowers since the

10

previous Settlement Date for the benefit of such Lender on the Loans held by it. Such payments shall be made by wire transfer to such Lender not later than 2:00 p.m. (New York time) on the next Business Day following each Settlement Date. Agent shall be entitled to set off the funding shortfall against any Non-Funding Lender's Commitment Percentage of all payments received from Borrowers and hold, in a non-interest bearing account, all remaining portions of any payments received by Agent for the benefit of any Non-Funding Lender pursuant to this Agreement as cash collateral for any unfunded reimbursement obligations of such Non-Funding Lender until the Obligations are paid in full in cash and all Commitments have been terminated, and upon such unfunded obligations owing by a Non-Funding Lender becoming due and payable, Agent shall be authorized to use such cash collateral to make such payment on behalf of such Non-Funding Lender. Any amounts owing by a Non-Funding Lender to Agent which are not paid when due shall accrue interest at the interest rate then applicable to the Loans.

(c)     Availability of Lender's Commitment Percentage.     Agent may assume that each Lender will make its Commitment Percentage of each Loan available to Agent on each Borrowing date. If such Commitment Percentage is not, in fact, paid to Agent by such Lender when due, Agent will be entitled to recover such amount on demand from such Lender without setoff, counterclaim or deduction of any kind. If any Lender fails to pay the amount of its Commitment Percentage forthwith upon Agent's demand, Agent shall promptly notify Borrower Representative and Borrowers shall immediately repay such amount to Agent. Nothing in this subsection 1.11(c) or elsewhere in this Agreement or the other Loan Documents shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Borrowers may have against any Lender as a result of any default by such Lender hereunder. Without limiting the provisions of subsection 1.11(b), to the extent that Agent advances funds to Borrowers on behalf of any Lender and is not reimbursed therefor on the same Business Day as such advance is made, Agent shall be entitled to retain for its account all interest accrued on such advance from the date such advance was made until reimbursed by the applicable Lender.

(d)     Return of Payments.

(i)     If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from Borrowers and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind.

(ii)     If Agent determines at any time that any amount received by Agent under this Agreement or any other Loan Document must be returned to any Credit Party or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, Agent will not be required to distribute any portion thereof to any Lender. In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent

is required to pay to any Borrower or such other Person, without setoff, counterclaim or deduction of any kind, and Agent will be entitled to set-off against future distributions to such Lender any such amounts (with interest) that are not repaid on demand.

(e)     Non-Funding Lenders.  The failure of any Non-Funding Lender to make any Loan or any payment required by it hereunder, or to fund any purchase of any participation to be made or funded by it on the date specified therefor shall not relieve any other Lender (each such other Lender, an "Other Lender") of its obligations to make such loan or fund the purchase of any such participation on such date, but neither Agent nor, other than as expressly set forth herein, any Other Lender shall be responsible for the failure of any Non-Funding Lender to make a loan, fund the purchase of a participation or make any other payment required hereunder.  Notwithstanding anything set forth herein to the contrary, a Non-Funding Lender shall not have any voting or consent rights under or with respect to any Loan Document or constitute a "Lender" (or be, or have its Loans and Commitments, included in the determination of "Required Lenders" or "Lenders directly affected" pursuant to Section 9.1) for any voting or consent rights under or with respect to any Loan Document.  Moreover, for the purposes of determining Required Lenders, the Loans and Commitments held by Non-Funding Lenders shall be excluded from the total Loans and Commitments outstanding.

(f)     Procedures.  Agent is hereby authorized by each Credit Party and each other Secured Party to establish procedures (and to amend such procedures from time to time) to facilitate administration and servicing of the Loans and other matters incidental thereto.  Without limiting the generality of the foregoing, Agent is hereby authorized to establish procedures to make available or deliver, or to accept, notices, documents and similar items on, by posting to or submitting and/or completion on, E-Systems.

1.12    Borrower Representative.  Each Borrower hereby designates and appoints SVCMC as its representative and agent on its behalf (the "Borrower Representative") for the purposes of issuing Notices of Borrowings, delivering certificates including Compliance Certificates, giving instructions with respect to the disbursement of the proceeds of the Loans, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or Borrowers under the Loan Documents. Borrower Representative hereby accepts such appointment.  Agent and each Lender may regard any notice or other communication pursuant to any Loan Document from Borrower Representative as a notice or communication from all Borrowers.  Each warranty, covenant, agreement and undertaking made on behalf of a Borrower by Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

1.13    [Reserved]

1.14    Security Interest; Priority; Carveout.

(a)    The payment and performance of the Obligations shall be secured by a lien and security interest on all assets of Borrowers pursuant to the Interim Order and the Final Order. Payment and performance of the Obligations is secured by the Collateral Documents; provided that the taking of any such documents shall be in the sole discretion of Agent and Agent shall have a lien and security interest covering all assets of Borrowers pursuant to the Interim Order and the Final Order without the necessity of taking any Collateral Documents.

(b)    The priority of the Liens granted to Agent, for the ratable benefit of Lenders, on the Collateral shall have the priority established in the Interim Order and the Final Order.

(c)    All Obligations shall constitute administrative expenses of Borrowers in the Chapter 11 Cases, with administrative priority and, with respect to current assets, senior secured status under Sections 364(c) and 364(d) of the Bankruptcy Code, as shall be set forth in the Interim Order and the Final Order. Subject to the Carveout, such administrative claim shall have priority over all other administrative expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provision of the Bankruptcy Code, and shall at all times be senior to the rights of each Credit Party, its respective estates, and any successor trustee or estate representative in any of the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code (the "Superpriority Claims"). The Superpriority Claims and first priority security interests in and Liens on the Collateral granted in favor of Agent, for the ratable benefit of Lenders, shall have the priority and senior secured status afforded by Sections 364(c) and 364(d)(1) of the Bankruptcy Code subject only to the Carve-Out and the Senior Permitted Liens; provided, that nothing in this subsection 1.14(c) or otherwise shall be construed to impair the ability of any party in interest in the Chapter 11 Cases to object to any of the fees, expenses, reimbursement or compensation included within the Carveout.

(d)    The Liens granted to Agent for the ratable benefit of Lenders on the Collateral and the administrative claim under Sections 364(c)(1) and 364(d) of the Bankruptcy Code shall also have priority over any claims arising under Section 506(c) of the Bankruptcy Code subject and subordinate only to, and up to a maximum aggregate amount unpaid on the Termination Date not to exceed, the Carveout.

(e)    The payment of any Professional Fees of the Retained Professionals pursuant to the Carveout shall not, and shall not be deemed to, (i) reduce Borrowers' obligations owed to Agent or any Lender or (ii) modify, alter or otherwise affect any of the liens and security interests of such parties in the Collateral (or their respective claims against Borrowers). Neither Agent nor any Lenders shall be responsible for the direct payment or reimbursement of any amounts constituting the Carveout and nothing herein or otherwise shall be construed to obligate such parties in any way to pay such amounts.

1.15    Confirmation of Plan of Reorganization.    Borrowers agree that (i) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in the Chapter 11 Cases (and Borrowers, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge with respect to Agent and Lenders) and (ii) the super-priority administrative claim granted to Agent and Lenders pursuant to the Interim Order and Final Order and described herein and the Liens granted to Agent pursuant to the Interim Order and Final Order and described herein shall not be affected in any manner by the entry of an order confirming a Plan of Reorganization in any Chapter 11 Case.

1.16    Release.    Borrowers hereby acknowledge that, effective upon entry of the Final Order, Borrowers have no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of Borrowers' liability to repay Agent or any Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from Agent or any Lender.  Each Borrower, in its own right, on behalf of its bankruptcy estates, and on behalf of all its successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "Releasing Parties"), hereby fully, finally and forever releases and discharges Agent and Lenders and all of Agent's and Lenders' past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which in each case are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Interim Order, the Final Order and the transactions contemplated hereby (other than the Pre-Petition Loan Documents and the financings provided thereunder), and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.  No Released Party shall be entitled to the benefits of the foregoing release for claims primarily arising from gross negligence or willful misconduct of such Released Party as subsequently determined by a court of competent jurisdiction in a final non-appealable order.  For the avoidance of doubt, the parties agree that nothing in this paragraph (including the first sentence hereof) in any form or manner releases, compromises or affects any of the rights or obligations with respect to the Pre-Petition Credit Agreement or the Pre-Petition Lender Obligations.

1.17    Waivers.  Upon the Closing Date, and on behalf of itself and its estates, and for so long as any Obligations shall be outstanding, each Borrower hereby irrevocably waives any right, pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations other than as expressly set forth in the Interim Order (or the Final Order, when applicable).

1.18    Special Terms Relating to Aptium Receivables.

(a)    Agent, Lenders, and Borrowers acknowledge that on the Petition Date the Lien of Aptium on the Aptium Receivables is in first priority position as set forth in the Aptium Intercreditor Agreement.  Borrower Representative shall deliver to Agent, on or prior to each Monthly Report Date, an Aptium Estimation Report.  On each Business Day, Borrowers hereby instruct Agent to deposit, and Agent hereby agrees to deposit to the Aptium Control Account, an amount equal to the Aptium Daily Estimation Distribution; provided, that, (i) if Agent shall not have received an updated Aptium Estimation Report, then Agent shall continue to deposit the amount then being deposited by Agent until an updated Aptium Estimation Report has been delivered to Agent, and (ii) on any Business Day, if collections deposited in the Collection Account on such Business Day, are less than the Aptium Daily Estimation Distribution, Agent shall deposit such lesser amount into the Aptium Control Account, and such deficiency in collections for such Business Day shall be added to the amount to be deposited into the Aptium Control Account on the following Business Day.

(b)    If, for any reason, Borrower Representative is unable to prepare the Aptium Estimation Report for any month, Aptium may prepare and deliver to Agent, and Agent shall be entitled to rely upon, a substitute Aptium Estimation Report for any such month, which substitute report shall be subject to the review and approval of Agent, such approval not to be unreasonably withheld or delayed.

(c)    As soon as practical after the end of each month, but in no event later than the tenth day of the following month, Borrower Representative shall notify Agent of the amount of Aptium Receivables collected during such month and whether the amount of Agent's disbursements to the Aptium Control Account during such month were greater or lesser than the amount of Aptium Receivables collected. (Any such greater amount is the "Aptium Excess Amount" and any such lesser amount is the "Aptium Shortfall Amount").  No later than the fifteenth of the following month, the parties shall "true up" the prior month's estimate by a lump-sum payment.  If there is an Aptium Shortfall Amount for the month, then Agent shall disburse the Aptium Shortfall Amount to the Aptium Control Account at such time.   If there is an Aptium Excess Amount for the month, then Borrowers shall withdraw the Aptium Excess Amount from the Aptium Control Account or leave such excess on deposit in the Aptium Control Account, as Borrowers deem fit.

(d)    Following the distribution of the Aptium Daily Estimation Distribution in the manner set forth in subsection 1.18(a), and Agent's compliance with

any instructions set forth in the notice referred to in <u>subsection 1.18(c)</u>, Agent and Lenders shall have no further liability or obligations to Borrowers, Aptium or any other Person with respect to collections on Aptium Receivables.

1.19 <u>Acknowledgment of Pre-Petition Credit Agreement</u>. The Credit Parties acknowledge the Pre-Petition Lender Obligations (subject to the transactions contemplated herein) and acknowledge that Pre-Petition Agent and the Pre-Petition Lenders have, pending repayment in full of the Pre-Petition Lender Obligations: (i) valid, perfected and unavoidable Liens on the collateral pledged under the Pre-Petition Credit Agreement and the Pre-Petition Loan Documents and (ii) valid and enforceable claims, not subject to setoffs, counterclaims or other defenses, in an aggregate amount not less than the principal balance outstanding on the Petition Date (prior to repayment of the revolving loan constituting a portion of the Pre-Petition Obligations as contemplated herein), together with the interest accrued and accruing thereon, and fees and costs incurred in connection therewith, whether accrued or incurred prior to, on or after the Petition Date.

1.20 <u>Certain Conditions</u>. In consideration for the use of cash collateral and the Loans provided pursuant to this Agreement:

(a) No portion of the Loans or any Collateral shall be used to prosecute claims against Lenders, Pre-Petition Agent, or the Pre-Petition Lenders under this Agreement or the Pre-Petition Credit Agreement or to contest the validity, perfection, priority or enforceability of any of the Liens securing such claims or any payment made thereunder, provided, however, that not more than $25,000 of the proceeds of the Loans shall be available for use by a Committee for investigating (but not prosecuting) any of the foregoing claims so long as such investigation is concluded within sixty (60) days following appointment of the Committee.

(b) The Credit Parties hereby release any and all claims of any type or nature that arise out of or relate to the Pre-Petition Lender Obligations deemed valid and unavoidable. Such release shall be binding on Credit Parties, and any successors in interest and all parties in interest in the Chapter 11 Cases except that a Committee, on or before sixty (60) days after the retention of counsel by any Committee, may file a written objection to the Pre-Petition Lender Obligations. If no such objection is properly and timely filed, the Pre-Petition Lender Obligations shall become final and binding and each Committee shall be deemed to be bound by such release.

(c) SVCMC shall make timely payment of all interest as and when such interest is due under the Pre-Petition Loan Documents.

## ARTICLE II.
## CONDITIONS PRECEDENT

The obligations of Lenders to make Loans are subject to satisfaction of all of the applicable conditions set forth below.

SF:278847.8

2.1     Conditions to Initial Loans.  The obligations of Lenders to make the initial Loans on the Closing Date are, in addition to the conditions precedent specified in Section 2.2, subject to:

(a)     Credit Agreement; Loan Documents.   This Agreement or counterparts hereof shall have been duly executed by, and delivered to, Borrowers, Agent, and Lender; and Agent shall have received such documents, instruments, agreements as Agent shall request in connection with the transactions contemplated by this Agreement and the other Loan Documents, including all those listed in the Closing Checklist and all documents concerning cash management, each in form and substance satisfactory to Agent.

(b)     Satisfaction of Outstanding L/Cs.  All letters of credit issued or guaranteed by Pre-Petition Lenders shall have been cash collateralized.

(c)     Approvals.  Agent shall have received (i) satisfactory evidence that the Credit Parties have obtained all required consents and approvals of all Persons including all requisite Governmental Authorities, to the execution, delivery and performance of this Agreement and the other Loan Documents, the consummation of the Refinancing, or (ii) an officer's certificate in form and substance satisfactory to Agent affirming that no such consents or approvals are required.

(d)     Payment of Fees.  Borrowers shall have paid all fees (including all Fees and Expenses) required to be paid on the Closing Date in the respective amounts specified in Section 1.9 and shall have reimbursed Agent for all fees, costs and expenses of closing presented as of the Closing Date.

(e)     Due Diligence.  Agent shall have completed its legal and business due diligence, with results satisfactory to Agent.

(f)     Approved Budget; Business Plan.  Agent shall have received the Approved Budget and such business plans as Agent shall require, all of which shall be in form and substance satisfactory to Agent.

(g)     HIPAA Business Associate Agreement.  Agent shall have received a HIPAA Business Associate Agreement acceptable to Lender.

(h)     Restructuring Professionals and Investment Banker.  Borrowers shall have obtained the services of restructuring professionals and investment bankers as Agent shall consider appropriate, and the terms of engagement of each such Person shall be satisfactory to Agent.

(i)     Interim Order and Other Bankruptcy Court Filings.  The Bankruptcy Court shall have entered the Interim Order by no later than five (5) days after the Petition Date, in form and substance satisfactory to Agent and Lenders, (i) authorizing and approving the credit facilities under this Agreement and the transactions contemplated hereby, including the granting of the superpriority status, security interests and liens, and the payment of all fees referred to herein and (ii) lifting

the automatic stay to permit Borrowers to perform their obligations and Lenders and Agent to exercise their rights and remedies with respect to the credit facilities under this Agreement, which Interim Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of Agent and Lenders.  All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection shall and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to Agent.  The administrative agent under the Pre-Petition Credit Agreement shall have consented, on behalf of itself and the lenders under such agreement, to the entry of the Interim Order.

(j)     First Day Orders. The "first day" orders in form, scope and substance satisfactory to Agent shall have been entered in the Chapter 11 Cases, including, within forty-five (45) days after the Petition Date, a motion filed by the Debtors to extend Debtors' time to assume or reject nonresidential real property  leases for a period of ninety (90) days in addition to the mandated 120-day period, pursuant to Bankruptcy Code Section 365(d)(4)(B).

(k)     Automatic Stay.  Pursuant to the terms of the Interim Order and the Final Order, the automatic stay shall have been modified to permit the creation and perfection of Agent's Liens and security interests and shall have been automatically vacated in accordance with the terms of the Interim Order and the Final Order, to permit enforcement of Agent's and Lenders' rights and remedies under this Agreement and the Loan Documents.

(l)     Additional Conditions.  Borrowers shall have complied with the conditions precedent, if any, specified in the Transaction Side Letter.

(m)     State of New York.  SVCMC shall have received commitments from the State of New York, which commitments shall be satisfactory to Agent, with respect to assistance in transferring of patients from the Main Hospital Facility and continued funding of grant/pool/Medicaid amounts without offset, recoupment, or counterclaim.

(n)     New York Department of Health.  The New York Department of Health shall have consented to the transfer of non-restricted funds of St. Elizabeth Ann's and Mugavero to SVCMC for use by SVCMC in connection with the wind down of its operations at the Main Hospital Facility.

(o)     Wind Down of Operations.  SVCMC shall be in compliance with the Closure Plan and shall have delivered WARN Act notices to all employees affected by such Closure Plan.

(p)     Benefit Plans.  Borrowers shall have delivered to Agent copies of all Benefit Plans listed on Schedule 3.7.

2.2    Conditions to All Borrowings.  Except as otherwise expressly provided herein, no Lender shall be obligated to fund any Loan if, as of the date thereof:

(a)    any representation or warranty by any Credit Party contained herein or in any other Loan Document is untrue or incorrect in any respect as of such date, except to the extent that such representation or warranty expressly relates to an earlier date, and Agent or Required Lenders have determined not to make such Loan as a result of the fact that such warranty or representation is untrue or incorrect;

(b)    any Default or Event of Default has occurred and is continuing or would result after giving effect to any Loan and Agent or Required Lenders shall have determined not to make any Loan as a result of that Default or Event of Default;

(c)    after giving effect to any Loan, the principal amount of the aggregate Loans outstanding would exceed the then applicable Maximum Permitted Loan Balance;

(d)    the Interim Order shall have been vacated, stayed, reversed, modified or amended without the consent of Agent and the Required Lenders, and each order shall not otherwise be in full force and effect or the requested Borrowing would cause the principal balance of the Loans outstanding to exceed the amount then authorized by the Interim Order or the Final Order, as the case may be;

(e)    all orders entered by the Bankruptcy Court on or prior to the entry of the Final Order are not satisfactory in form and substance to Agent and its counsel;

(f)    Borrowers have not complied with all requirements of the New York Department of Health and Medicare applicable to the Loans.

The request and acceptance by Borrowers of the proceeds of any Loan shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by Borrowers that the conditions in this Section 2.2  have been satisfied and (ii) a reaffirmation by Borrowers of the granting and continuance of Agent's Liens, on behalf of itself and Lenders, pursuant to the Collateral Documents.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES

The Credit Parties, jointly and severally, represent and warrant to Agent and each Lender that the following are, and after giving effect to the transactions contemplated hereunder will be, true, correct and complete:

3.1    Corporate Existence and Power.  Each Credit Party and each of their respective Subsidiaries:

(a)    is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization;

(b)	has the requisite corporate power and authority and all governmental licenses, authorizations, Permits, consents and approvals to own its assets, carry on its business and, subject to the entry of the Orders, execute, deliver, and perform its obligations under, the Loan Documents to which it is a party;

(c)	is duly qualified as a foreign corporation, and licensed and in good standing, under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification or license; and

(d)	is in compliance with all Requirements of Law;

except, in each case referred to in <u>clauses (b)</u>, <u>(c)</u> or <u>(d)</u>, to the extent that the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

3.2	<u>Corporate Authorization; No Contravention</u>.  Subject to the entry of the Orders, the execution, delivery and performance by each of the Credit Parties of this Agreement, and by each Credit Party and each of their respective Subsidiaries of any other Loan Document to which such Person is party, have been duly authorized by all necessary action, and do not and will not:

(i)	contravene the terms of any of that Person's Organization Documents;

(ii)	conflict with or result in any material breach or contravention of, or result in the creation of any Lien under, any document evidencing any material Contractual Obligation to which such Person is a party or any order, injunction, writ or decree of any Governmental Authority to which such Person or its Property is subject, in any case in which the consequences of such breach or violation is not stayed by the filing of the Chapter 11 Cases; or

(iii)	violate any Requirement of Law in any material respect.

3.3	<u>Governmental Authorization</u>.  Subject to the entry of the Orders, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Credit Party or any Subsidiary of any Credit Party of this Agreement, any other Loan Document except (a) for recordings and filings in connection with the Liens granted to Agent under the Collateral Documents, and (b) those obtained or made on or prior to the Closing Date.

3.4	<u>Binding Effect</u>.  Subject to entry of the Orders, this Agreement and each other Loan Document to which any Credit Party is a party constitute the legal, valid and binding obligations of each such Person which is a party thereto, enforceable against such Person in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

SF:278847.8

3.5     Litigation.  Except for matters stayed by the automatic stay of Section 362(a) of the Bankruptcy Code, there are no actions, suits, proceedings, claims or disputes pending, or to the best knowledge of each Credit Party, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, against any Credit Party, any Subsidiary of any Credit Party or any of their respective Properties which:

(a)     purport to affect or pertain to this Agreement, any other Loan Document or any of the transactions contemplated hereby or thereby; or

(b)     would reasonably be expected to result in equitable relief or monetary judgment(s), individually or in the aggregate, in excess of $250,000.

No injunction, writ, temporary restraining order or any order of any nature has been issued by any court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of this Agreement, any other Loan Document or any Related Agreement, or directing that the transactions provided for herein or therein not be consummated as herein or therein provided.  As of the Closing Date, except as set forth in Schedule 3.5, no Credit Party or any Subsidiary of any Credit Party is the subject of an audit or, to each Credit Party's knowledge, any review or investigation by any Governmental Authority (excluding the IRS and other taxing authorities) concerning the violation or possible violation of any Requirement of Law.   Any actions, suits or proceedings pending against or affecting Borrowers have been stayed by the Chapter 11 Cases.

3.6     No Default.  No Default or Event of Default exists or would result from the incurring of any Obligations by any Credit Party or the grant or perfection of Agent's Liens on the Collateral or the consummation of the transactions contemplated hereunder.  No Credit Party and no Subsidiary of any Credit Party is in default under or with respect to any Contractual Obligation in any respect which, individually or together with all such defaults, would reasonably be expected to have a Material Adverse Effect.

3.7     ERISA Compliance.  Schedule 3.7 constitutes a complete and correct list of, and separately identifies, with respect to each Borrower as of the Closing Date, (a) all Title IV Plans, (b) all Multiemployer Plans and (c) all material Benefit Plans.  Borrowers have provided copies to Agent of each plan listed in Schedule 3.7.  Each Benefit Plan, and each trust thereunder, intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Requirements of Law so qualifies.

SF:278847.8

3.8     Use of Proceeds; Margin Regulations.  No Credit Party and no Subsidiary of any Credit Party is engaged in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock.

3.9     Ownership of Real Property.  As of the Closing Date, the Real Estate listed in Schedule 3.9 constitutes all of the owned Real Estate of each Credit Party and each of their respective Subsidiaries.

3.10    Approved Budget.  The Approved Budget furnished to Agent on the Closing Date was prepared by the chief financial officer of Borrower Representative, is based on underlying assumptions which provide a reasonable basis for the forecasts contained therein and reflects the Credit Parties' collective judgment based on present circumstances of a reasonably anticipated set of conditions and course of action for the projected period, provided that Agent and Lenders acknowledge and agree that such Approved Budget contains forward looking statements and the actual results may differ from the forecasted results.

3.11    Regulated Entities.  None of any Credit Party, any Person controlling any Credit Party, or any Subsidiary of any Credit Party, is (a) an "investment company" within the meaning of the Investment Company Act of 1940 or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code, or any other Federal or state statute, rule or regulation limiting its ability to incur Indebtedness, pledge its assets or perform its Obligations under the Loan Documents.

3.12    Agreements with Advisors.  Borrowers have delivered to Agent true, complete and correct copies of its agreements with its Chief Restructuring Officer and each professional retained in connection with the marketing and disposition of Borrowers' assets, which agreements have not been amended or modified as of the Closing Date.

3.13    Brokers' Fees; Transaction Fees.  Except for fees payable to Agent and Lenders, none of the Credit Parties or any of their respective Subsidiaries has any obligation to any Person in respect of any finder's, broker's or investment banker's fee in connection with the Obligations.

3.14    Insurance.  Each of the Credit Parties and each of their respective Subsidiaries and their respective Properties are insured with financially sound and reputable insurance companies, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar Properties in localities where such Person operates.

3.15    Ventures, Subsidiaries and Affiliates.  Except as set forth in Schedule 3.15, as of the Closing Date, no Credit Party and no Subsidiary of any Credit Party has any Subsidiaries, is engaged in any joint venture or partnership with any other Person, or is an Affiliate of any other Person.  Schedule 3.15 sets forth a true, complete and correct list of Borrowers and all of their Subsidiaries.

3.16    Jurisdiction of Organization; Chief Executive Office.  Schedule 3.16 lists each Credit Party's jurisdiction of organization, legal name, organizational type, organizational identification number, if any, and the location of such Credit Party's chief executive office or sole place of business, in each case as of the date hereof.

3.17    Deposit Accounts and Other Accounts.  Schedule 3.17 lists all banks and other financial institutions at which any Credit Party maintains deposit or other accounts as of the Closing Date, and such Schedule correctly identifies the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

3.18    Full Disclosure.  None of the representations or warranties made by any Credit Party or any of their Subsidiaries in the Loan Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement or certificate furnished by or on behalf of any Credit Party or any of their Subsidiaries in connection with the Loan Documents, contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.  To the extent Borrowers have provided to Agent any forecasts or projections of future performance, such forecasts and projections are not a guaranty of future performance, and actual results may differ from the results projected therein.

3.19    Foreign Assets Control Regulations and Anti-Money Laundering.

(a)    OFAC.  Each Credit Party and each Subsidiary of Credit Party is and will remain in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it.  No Credit Party and no Subsidiary or Affiliate of a Credit Party (i) is a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (ii) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is controlled by (including by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited under U.S. law.

3.20    Patriot Act.  The Credit Parties, each of their Subsidiaries and each of their Affiliates are in compliance with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to "*know*

*your customer*" and anti-money laundering rules and regulations. No part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

3.21 [Reserved].

3.22 <u>Facility Reports</u>. Borrowers have timely filed or caused to be timely filed, all cost reports and other reports of every kind whatsoever required by law or by written or oral contracts or otherwise to have been filed or made with respect to each Facility, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Other than with respect to adjustments claimed or sought in the Ordinary Course of Business, to Borrowers' knowledge, there are no claims, actions or appeals pending (and Borrowers have not filed any material claims or reports which should result in any such claims, actions or appeals) before any commission, board or agency including any intermediary or carrier, the Provider Reimbursement Review Board, the Administrator of the Centers for Medicare and Medicaid Services, the Secretary of HHS, or the OIG, with respect to any state or federal Medicare or Medicaid cost reports or claims filed by Borrowers, or any disallowance by any commission, board, agency or other Governmental Authority in connection with any audit of such cost reports. Except as set forth in Schedule 3.15, no validation review or program integrity review related to Borrowers, or the consummation of the transactions contemplated herein, or related to each Facility or the Collateral, have been conducted by any commission, board or agency in connection with the Medicare, Medicaid, or Tricare/CHAMPUS programs.

3.23 <u>Compliance With Health Care Laws</u>. Without limiting the generality of <u>Section 3.1</u> or any other representation or warranty made herein, to Borrowers' knowledge, each Facility, and each of its licensed employees and contractors (other than contracted agencies) in the exercise of their respective duties on behalf of each Facility, is in compliance in all material respects with all Healthcare Laws. Borrowers have maintained in all material respects all records required to be maintained by The Joint Commission, the Food and Drug Administration, Drug Enforcement Agency and State Boards of Pharmacy and the Federal and/or State Healthcare Programs as required by the Healthcare Laws and, to the knowledge of Borrowers, there are no presently existing circumstances which would result or likely would result in material violations of the Healthcare Laws. Borrowers and their Affiliates shall have, effective as of the Closing Date and at all time thereafter (except as is consistent with the Closure Plan), such permits, licenses, franchises, certificates and other approvals or authorizations of governmental or regulatory authorities as are necessary under applicable law to own their respective properties and to conduct their respective business (including such permits as are required under such federal, state and other Healthcare Laws, and under such healthcare maintenance organization or similar licensure laws and such insurance laws and regulations, as are applicable thereto), and with respect to those facilities and other businesses that participate in Federal and/or State Healthcare Programs, to receive

reimbursement under Federal and/or State Healthcare Programs, the failure of which to maintain could reasonably be expected to have a Material Adverse Effect. To Borrowers' knowledge, there currently exist no restrictions, deficiencies, required plans of corrective actions or other such remedial measures with respect to Federal and/or State Healthcare Program certifications or licensure, except such of the foregoing that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Borrowers, and to Borrowers' knowledge, no Person employed by any of them, is excluded from participation in any Federal and/or State Healthcare Program.

3.24    HIPAA Compliance.  To the extent that and for so long as each Borrower is a "covered entity" within the meaning of HIPAA, such Borrower (i) has undertaken all reasonable steps, including surveys, audits, inventories, reviews, analyses and/or assessments (including any necessary risk assessments) of all areas of its business and operations to be in compliance with HIPAA except to the extent such non-compliance would not constitute a Material Adverse Effect; (ii) has developed a compliance plan (a "HIPAA Compliance Plan") for being HIPAA Compliant; and (iii) has implemented those provisions of such HIPAA Compliance Plan in all material respects necessary to ensure that Borrower is HIPAA Compliant.   For purposes hereof, "HIPAA Compliant" shall mean that a Borrower (x) is or will be in compliance in all material respects with each of the applicable requirements of the so-called "Administrative Simplification" provisions of HIPAA on and as of each date that any part thereof, or any final rule or regulation thereunder, becomes effective in accordance with its or their terms, as the case may be (each such date, a "HIPAA Compliance Date") except to the extent failure to be so compliant could not reasonably be expected to have a Material Adverse Effect and (y) is not and could not reasonably be expected to become, as of any date following any such HIPAA Compliance Date, the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity and other than minor or insignificant matters) that could reasonably be expected to materially and adversely affect a Borrower's business, operations, assets, properties or condition (financial or otherwise), in connection with any actual or potential violation by a Borrower of the then effective provisions of HIPAA.

3.25    Medicare/Medicaid Programs.  Except to the extent consistent with the Closure Plan and except as disclosed in Schedule 3.15, each Facility and all separately licensed units of each Facility shall be, effective as of the Closing Date and at all times thereafter, certified for participation in the Medicare and Medicaid programs, and shall be, effective as of the Closing Date and at all times thereafter, each a party to valid participation agreements for payments by Medicare and Medicaid program, which agreements are, as of the Closing Date and at all times thereafter, in full force and effect. To Borrowers' knowledge, no Facility has received notice of pending, threatened or possible investigation by, or loss of participation in, the Medicare or Medicaid programs relating to the period of Borrowers' ownership of such Facility.  Except as previously disclosed to Agent, there are no material overpayments due to Medicare, Medicaid or any third party payor.

3.26    Certificate of Need.  Borrowers are the respective lawful owners of any certificate of need or other required license for the respective ownership and operation of its Facilities and its services.

3.27    Hospital Accreditation.  Each Facility is currently accredited by The Joint Commission, to the extent applicable.  Borrowers have previously delivered to Agent, true, correct and complete copies of each Facility's most recent accreditation survey report from The Joint Commission and deficiency lists, if any.  Borrowers have cured all deficiencies relating to the period of Borrowers' ownership of the Facility or submitted a plan of correction to cure all such deficiencies noted therein and Borrowers have no reason to expect that any plans of correction will be disapproved by The Joint Commission.

3.28    Funds from Restricted Grants.  Except as disclosed in Schedule 3.15 or as previously disclosed to Agent, neither a Facility nor other Collateral is subject to, and Borrowers shall indemnify and hold Lender harmless from and against, any liability in respect of amounts received by Borrowers or others for the purchase or improvement of the Facility or other Collateral or any part thereof under restricted or conditioned grants or donations, including monies received under the Public Health Service Act, 42 U.S.C. Section 291 et seq. which funds were used in violation of such restriction or condition.

3.29    Investigations or Audits.  As of the Closing Date, except as disclosed in Schedule 3.15 or as previously disclosed to Agent, no Credit Party or any of their Subsidiaries is the subject of an audit by the IRS, CMS, the OIG, DOJ, the New York State Attorney General, or a state agency, or, to each Credit Party's knowledge, any review by the IRS or any governmental investigation by the OIG, CMS, DOJ, New York Attorney General or other Governmental Authority concerning the violation or possible violation of any law.

3.30    Hill-Burton Act.  To any Credit Party's knowledge, no Facility is, as of the Closing Date, subject to any material obligations as a result of any funding for such Facility under the federal Hill-Burton Act.

3.31    Chapter 11 Cases.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with the Requirements of Law and proper notice thereof and the proper notice for (x) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (y) the hearing for the approval of the Interim Order, and (z) the hearing for the approval of the Final Order were or, if applicable, will be given.  Borrowers have given, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b)    After the entry of the Interim Order, and pursuant to and as more fully set forth in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all

administrative expense claims and unsecured claims against the Borrowers now existing or hereafter arising, of any kind whatsoever, including all administrative expenses (except for the Carveout) of the kind specified in Bankruptcy Code Sections 105, 326, 330, 331, 503(b), 504(a), 506(c), 507(a), 507(b), 546(c), 726 and 1114.

(c)     After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid Lien on all of the Collateral.

(d)     The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed, modified or amended.

## ARTICLE IV.
## AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied:

4.1     <u>Financial Statements</u>.  Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, a system of accounting established and administered in accordance with sound business practices to permit the preparation of financial statements in conformity with GAAP (provided that monthly financial statements shall not be required to have footnote disclosures and are subject to normal year-end adjustments).   Borrowers shall deliver to Agent and each Lender by Electronic Transmission and in detail satisfactory to Agent and the Required Lenders:

(a)     with respect to each Nursing Home, as soon as available, but not later than one hundred eighty (180) days after the end of each Fiscal Year, a copy of the audited consolidated and consolidating balance sheets of such Nursing Home as at the end of such year and the related consolidated and consolidating statements of income or operations, shareholders' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, and accompanied by the report of any "Big Four" or other nationally-recognized independent public accounting firm reasonably acceptable to Agent which report shall (i) contain an unqualified opinion, stating that such consolidated financial statements present fairly in all material respects the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years and (ii) not include any explanatory paragraph expressing substantial doubt as to going concern status;

(b)     with respect to SVCMC and its Subsidiaries, as soon as available, but not later than one hundred eighty (180) days after the end of each Fiscal Year, a copy of the unaudited consolidated and consolidating balance sheets of SVCMC and its Subsidiaries as at the end of such year and the related consolidated and consolidating

statements of income or operations, shareholders' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, certified on behalf of Borrower Representative by an appropriate Responsible Officer of Borrower Representative as being complete and correct and fairly presents, in all material respects, in accordance with GAAP, the financial position and the results of operations of SVCMC and its Subsidiaries;

(c)     with respect to each Nursing Home, as soon as available, but not later than forty-five (45) days after the end of each fiscal month of each year, a copy of the unaudited consolidated and consolidating balance sheets of such Nursing Home, and the related consolidated and consolidating statements of income, shareholders' equity and cash flows as of the end of such fiscal month and for the portion of the Fiscal Year then ended, all certified on behalf of such Nursing Home by an appropriate Responsible Officer of such Nursing Home as being complete and correct and fairly presents, in all material respects, in accordance with GAAP, the financial position and the results of operations of such Nursing Home, subject to normal year-end adjustments and absence of footnote disclosures; and

(d)     with respect to SVCMC and its Subsidiaries, as soon as available, but not later than forty-five (45) days after the end of each fiscal month of each year, a copy of the unaudited consolidated and consolidating balance sheets of SVCMC and its Subsidiaries, and the related consolidated and consolidating statements of income, shareholders' equity and cash flows as of the end of such fiscal month and for the portion of the Fiscal Year then ended, all certified on behalf of SVCMC and its Subsidiaries by an appropriate Responsible Officer of Borrower Representative as being complete and correct and fairly presents, in all material respects, in accordance with GAAP, the financial position and the results of operations of SVCMC and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures.

4.2     Other Reports and Information.  Borrowers shall furnish to Agent and each Lender by Electronic Transmission:

(a)     together with each delivery of financial statements pursuant to section 4.1, a management discussion and analysis report, in reasonable detail, signed by the chief financial officer of Borrower Representative or the applicable Nursing Home, describing the operations and financial condition of the applicable Borrowers for the fiscal month and the portion of the Fiscal Year then ended (or for the Fiscal Year then ended in the case of annual financial statements);

(b)     copies of all monthly or other periodic reports, projections, or other information respecting Borrowers or any of their Subsidiaries' business or financial condition or prospects as well as all pleadings, motions, applications and judicial information filed by or on behalf of Borrowers with the Bankruptcy Court or provided by or to the United States Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or the Committee, at the time such document is filed with the Bankruptcy Court, or provided by or, to the United States Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or any Committee;

28

(c)     on a monthly basis or at such more frequent intervals as Agent may request from time to time (together with a copy of all or any part of such delivery requested by any Lender in writing after the Closing Date), collateral reports, including all additions and reductions (cash and non-cash) with respect to Accounts of the Credit Parties in each case accompanied by such supporting detail and documentation as shall be requested by Agent in its discretion each of which shall be prepared by Borrower Representative as of the last day of the immediately preceding month or the date 2 days prior to the date of any request;

(d)     to Agent, at the time of delivery of each of the monthly financial statements delivered pursuant to subsection 4.1, a reconciliation of the outstanding Loans as set forth in the monthly loan account statement provided by Agent to each Borrower's general ledger and monthly Financial Statements delivered pursuant to subsection 4.1, in each case accompanied by such supporting detail and documentation as shall be requested by Agent in its discretion;

(e)     at the time of delivery of each of the monthly financial statements delivered pursuant to Section 4.1, a listing of government contracts of each Borrower subject to the Federal Assignment of Claims Act of 1940 or any similar state or municipal law;

(f)     promptly upon receipt thereof, copies of any reports submitted by the certified public accountants in connection with each annual, interim or special audit or review of any type of the financial statements or internal control systems of any Credit Party made by such accountants, including any comment letters submitted by such accountants to management of any Credit Party in connection with their services;

(g)     upon Agent's request from time to time, the Credit Parties shall permit and enable Agent to obtain appraisals in form and substance and from appraisers satisfactory to Agent stating the fair market value, or such other value as determined by Agent, of any Real Estate of any Credit Party or any Subsidiary of any Credit Party, including any appraisal required to comply with FIRREA;

(h)     on a monthly basis, proof that Borrowers and each Credit Party has paid all postpetition payroll taxes owed by Borrowers;

(i)     those reports listed on Schedule 6.2; and

(j)     promptly, such additional business, financial, corporate affairs, perfection certificates and other information as Agent may from time to time reasonably request.

4.3     Notices.  Borrower Representative shall notify promptly Agent and each Lender of each of the following (and in no event later than three (3) Business Days after a Responsible Officer becoming aware thereof):

(a)     the occurrence or existence of any Default or Event of Default, or any event or circumstance that foreseeably will become a Default or Event of Default;

(b) any breach or non-performance of, or any default under, any Contractual Obligation of any Credit Party or any Subsidiary of any Credit Party, or any violation of, or non-compliance with, any Requirement of Law, which would reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect, including a description of such breach, non-performance, default, violation or non-compliance and the steps, if any, such Person has taken, is taking or proposes to take in respect thereof;

(c) other than matters that would be stayed by the automatic stay in the Chapter 11 Cases, any dispute, litigation, investigation, proceeding or suspension which may exist at any time between any Credit Party or any Subsidiary of any Credit Party and any Governmental Authority which would reasonably be expected to result, either individually or in the aggregate, in Liabilities in excess of $250,000;

(d) other than matters that would be stayed by the automatic stay in the Chapter 11 Cases, the commencement of, or any material development in, any litigation or proceeding (other than medical malpractice claims arising in the Ordinary Course of Business) affecting any Credit Party or any Subsidiary of any Credit Party (i) in which the amount of damages claimed is $250,000 (or its equivalent in another currency or currencies) or more, (ii) in which injunctive or similar relief is sought and which, if adversely determined, would reasonably be expected to have a Material Adverse Effect, or (iii) in which the relief sought is an injunction or other stay of the performance of this Agreement or any other Loan Document;

(e) other than matters that would be stayed by the automatic stay in the Chapter 11 Cases, (i) the receipt by any Credit Party of any notice of violation of or potential liability or similar notice under Environmental Law, (ii)(A) unpermitted Releases, (B) the existence of any condition that could reasonably be expected to result in violations of or Liabilities under, any Environmental Law or (C) the commencement of, or any material change to, any action, investigation, suit, proceeding, audit, claim, demand, dispute alleging a violation of or Liability under any Environmental Law which in the case of clauses (A), (B) or (C) would reasonably be expected to result in a Material Adverse Effect, (iii) the receipt by any Credit Party of notification that any property of any Credit Party is subject to any Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities and (iv) any proposed acquisition or lease of Real Estate, if such acquisition or lease would have a reasonable likelihood of resulting in a Material Adverse Effect;

(f) (i) on or prior to any filing by any ERISA Affiliate of any notice of any reportable event under Section 4043 of ERISA, or intent to terminate any Title IV Plan, a copy of such notice (ii) promptly, and in any event within ten (10) days, after any officer of any ERISA Affiliate knows or has reason to know that a request for a minimum funding waiver under Section 412 of the Code has been filed with respect to any Title IV Plan or Multiemployer Plan, a notice describing such waiver request and any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notice filed with the PBGC or the IRS pertaining thereto, and (iii) promptly, and in any event within ten (10) days after any officer of any ERISA Affiliate knows or has reason

to know that an ERISA Event will or has occurred, a notice describing such ERISA Event, and any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notices received from or filed with the PBGC, IRS, Multiemployer Plan or other Benefit Plan pertaining thereto;

(g)     any material change in accounting policies or financial reporting practices by any Credit Party or any Subsidiary of any Credit Party;

(h)     any labor controversy resulting in or threatening to result in any strike, work stoppage, boycott, shutdown or other labor disruption against or involving any Credit Party or any Subsidiary of any Credit Party if the same would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(i)     The occurrence of any Event of Loss resulting in damages (or anticipated damages) in excess of $250,000 or more, whether or not covered by insurance.

Each notice pursuant to this <u>Section 4.3</u> shall be in electronic form accompanied by a statement by a Responsible Officer of Borrower Representative setting forth details of the occurrence referred to therein, and stating what action Borrowers or other Person proposes to take with respect thereto and at what time.  Each notice under <u>subsection 4.3(a)</u> shall describe with particularity any and all clauses or provisions of this Agreement or other Loan Document that have been breached or violated.

4.4     <u>Preservation of Corporate Existence, Etc</u>.  Each Credit Party shall, subject to the Closure Plan, and shall cause each of its Subsidiaries to:

(a)     preserve and maintain in full force and effect its organizational existence and good standing under the laws of its jurisdiction of organization;

(b)     preserve and maintain in full force and effect all rights, privileges, qualifications, permits, licenses and franchises necessary in the normal conduct of its business except in connection with sales of assets permitted by <u>Section 5.2</u> and except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(c)     preserve or renew all of its registered trademarks, trade names and service marks, the non-preservation of which would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; and

(d)     conduct its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any material respect and shall comply in all material respects with the terms of its IP Licenses.

4.5     <u>Maintenance of Property</u>.  Subject to the Closure Plan, each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, and preserve all its Property which is used or useful in its business in good working order and condition, ordinary wear and tear excepted and shall make all necessary repairs thereto and renewals

SF:278847.8

and replacements thereof except where the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. Borrowers agree to maintain all liquid and solid waste in disposal septic and sewer systems located on its Real Estate in compliance with applicable laws, except where failure to do so would not have a Material Adverse Effect. Borrowers shall not take action or permit to exist a condition with respect to liquid and sold waste disposal septic and sewer systems located on its Real Estate that would cause a Material Adverse Effect.

      4.6    <u>Insurance</u>.

      (a)    Each Credit Party shall, and shall cause each of its Subsidiaries to, (i) maintain or cause to be maintained in full force and effect all policies of insurance of any kind with respect to the property and businesses of the Credit Parties and such Subsidiaries (including policies of life, fire, theft, product liability, public liability, Flood Insurance, property damage, other casualty, employee fidelity, workers' compensation, business interruption and employee health and welfare insurance) with financially sound and reputable insurance companies or associations (in each case that are not Affiliates of Borrowers) of a nature and providing such coverage as is sufficient and as is customarily carried by businesses of the size and character of the business of the Credit Parties and (ii) cause all such insurance relating to any property or business of any Credit Party to name Agent as additional insured or loss payee, as appropriate. All policies of insurance on real and personal property of the Credit Parties will contain an endorsement, in form and substance acceptable to Agent, showing loss payable to Agent (Form CP 1218 or equivalent) and extra expense and business interruption endorsements. Such endorsement, or an independent instrument furnished to Agent, will provide that the insurance companies will give Agent at least 45 days' prior written notice before any such policy or policies of insurance shall be altered or canceled and that no act or default of the Credit Parties or any other Person shall affect the right of Agent to recover under such policy or policies of insurance in case of loss or damage. Each Credit Party irrevocably makes, constitutes and appoints Agent (and all officers, employees or agents designated by Agent), so long as any Default or Event of Default has occurred and is continuing or the anticipated insurance proceeds exceed $250,000, as such Credit Party's true and lawful agent and attorney-in-fact for the purpose of making, settling and adjusting claims under its "All Risk" policies of property insurance, and shall direct all present and future insurers under such policies to pay all proceeds payable thereunder directly to Agent. If any insurance proceeds are paid by check, draft or other instrument payable to any Credit Party and Agent jointly, Agent may endorse such Credit Party's name thereon and do such other things as Agent may deem advisable to reduce the same to cash. Agent reserves the right at any time, upon review of each Credit Party's risk profile, to require additional forms and limits of insurance. After deducting from such proceeds (i) the expenses incurred by Agent in the collection or handling thereof, and (ii) amounts required to be paid to creditors (other than Lenders) holding Senior Permitted Liens, Agent may, at its option, apply such proceeds to reduction of the Obligations. Notwithstanding the requirement in subsection (i) above, Federal Flood Insurance shall not be required for (x) Real Estate not located in a Special Flood Hazard Area, or (y) Real Estate located in a Special Flood Hazard Area in a community that does not participate in the National Flood Insurance Program.

SF:278847.8

(b)     Unless the Credit Parties provide Agent with evidence of the insurance coverage required by this Agreement, Agent may purchase insurance at the Credit Parties' expense to protect Agent's and Lenders' interests in the Credit Parties' and their Subsidiaries' properties.  This insurance may, but need not, protect the Credit Parties' and their Subsidiaries' interests.  The coverage that Agent purchases may not pay any claim that any Credit Party or any Subsidiary of any Credit Party makes or any claim that is made against such Credit Party or any Subsidiary in connection with said Property.  Borrowers may later cancel any insurance purchased by Agent, but only after providing Agent with evidence that there has been obtained insurance as required by this Agreement.  If Agent purchases insurance, the Credit Parties will be responsible for the costs of that insurance, including interest and any other charges Agent may impose in connection with the placement of insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance shall be added to the Obligations. The costs of the insurance may be more than the cost of insurance Borrowers may be able to obtain on their own.

4.7     <u>Payment of Obligations</u>.  Such Credit Party shall, and shall cause each of its Subsidiaries to, pay, discharge and perform as the same shall become due and payable or required to be performed, all their respective obligations and liabilities (except to the extent such obligations and liabilities have been stayed pursuant to the Chapter 11 Cases), including:

(a)     all tax liabilities, assessments and governmental charges or levies upon it or its Property arising after the Petition Date, or arising Pre-Petition and authorized by the Bankruptcy Court to be paid after the Petition Date in accordance with the Approved Budget, unless (i) the same are being contested in good faith by appropriate proceedings diligently prosecuted which stay the filing or enforcement of any Lien and for which adequate reserves in accordance with GAAP are being maintained by such Person; and (ii) the aggregate Liabilities secured by such Lien do not exceed $250,000.

(b)     all lawful claims arising after the Petition Date, or arising Pre-Petition and authorized by the Bankruptcy Court to be paid after the Petition Date in accordance with the Approved Budget, which, if unpaid, would by law become a Lien upon its Property unless the same are being contested in good faith by appropriate proceedings diligently prosecuted which stay the imposition or enforcement of any Lien and for which adequate reserves in accordance with GAAP are being maintained by such Person;

(c)     all Indebtedness arising after the Petition Date and permitted under this Agreement, or arising Pre-Petition and authorized by the Bankruptcy Court to be paid after the Petition Date in accordance with the Approved Budget, as and when due and payable, but subject to any subordination provisions contained herein, in any other Loan Documents and/or in any instrument or agreement evidencing such Indebtedness;

(d)     the performance of all obligations under any Contractual Obligation to such Credit Party or any of its Subsidiaries is bound, or to which it or any

of its Property is subject, except where the failure to perform would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; and

(e)     payments to the extent necessary to avoid the imposition of a Lien with respect to, or the involuntary termination of any underfunded Benefit Plan.

4.8     Compliance with Laws.  Each Credit Party shall, and shall cause each of its Subsidiaries to, comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business, except where the failure to comply would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.9     Inspection of Property and Books and Records.  Each Credit Party shall maintain and shall cause each of its Subsidiaries to maintain proper books of record and account consistent with industry standards, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Person.  Each Credit Party shall, and shall cause each of its Subsidiaries to, with respect to each owned, leased, or controlled property, during normal business hours and upon reasonable advance notice (unless an Event of Default shall have occurred and be continuing, in which event no notice shall be required and Agent shall have access at any and all times during the continuance thereof): (a) provide access to such property to Agent and any of its Related Persons, as frequently as Agent determines to be appropriate; and (b) permit Agent and any of its Related Persons to conduct field examinations, audit, inspect and make extracts and copies (or take originals if reasonably necessary) from all of such Credit Party's books and records, and evaluate and make physical verifications of the Inventory and other Collateral in any manner and through any medium that Agent considers advisable, in each instance, at the Credit Parties' expense.  Any Lender may accompany Agent or its Related Persons in connection with any inspection at such Lender's expense.

4.10     Use of Proceeds.  Borrowers shall not use the proceeds of the Loans: (i) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of Agent and Lenders or their rights and remedies under this Agreement, the other Loan Documents, the Interim Order or the Final Order, (ii) to make any payment or distribution on account of Pre-Petition Indebtedness, unless such payment has been approved by Agent, (iii) to make any payment or distribution under a plan of reorganization in the Chapter 11 Cases, or (iv) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of Agent.

4.11     Cash Management Systems; Bank Accounts.  Borrowers shall at all times comply with the cash management system described in Exhibit 4.11 hereto.  If any Borrower elects to establish any new deposit account, Borrower shall establish such account with TD Bank, N.A.

4.12     ERISA Compliance.  If requested by Agent, Borrowers shall deliver to Agent such certificates and other information requested by Agent confirming whether:

(x) each Benefit Plan is in compliance with applicable provisions of ERISA, the Code and other Requirements of Law, (y) there are existing or pending (or to the knowledge of any Credit Party, threatened) claims (other than routine claims for benefits in the normal course), sanctions, actions, lawsuits or other proceedings or investigation involving any Benefit Plan to which any Credit Party incurs or otherwise has or could have an obligation or any Liability and (z) an ERISA Event has occurred during the past seven years or is reasonably expected to occur.

      4.13    Further Assurances.

      (a)    Each Credit Party shall ensure that all written information, exhibits and reports furnished to Agent or Lenders do not and will not contain any untrue statement of a material fact and do not and will not omit to state any material fact or any fact necessary to make the statements contained therein not misleading in light of the circumstances in which made, and will promptly disclose to Agent and Lenders and correct any defect or error that may be discovered therein or in any Loan Document or in the execution, acknowledgement or recordation thereof.

      (b)    Promptly upon request by Agent, the Credit Parties shall (and, subject to the limitations hereinafter set forth, shall cause each of their Subsidiaries to) take such additional actions and execute such documents as Agent may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement or any other Loan Document, (ii) to subject to the Liens created by any of the Collateral Documents any of the Properties, rights or interests covered by any of the Collateral Documents, (iii) to perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document.  Without limiting the generality of the foregoing and except as otherwise approved in writing by Agent, the Credit Parties shall cause each of its Subsidiaries to guaranty the Obligations and to cause each such Subsidiary to grant to Agent, for the benefit of the Secured Parties, a security interest in, subject to the limitations hereinafter set forth, all of such Subsidiary's Property to secure such guaranty.  In the event any Credit Party or any Subsidiary of any Credit Party acquires any Real Estate, simultaneously with such acquisition, such Person shall execute and/or deliver, or cause to be executed and/or delivered, to Agent, (v) an appraisal complying with FIRREA, (w) within forty-five days of receipt of notice from Agent that Real Estate is located in a Special Flood Hazard Area, Federal Flood Insurance as required by subsection 4.6(a), (x) a fully executed Mortgage, in form and substance satisfactory to Agent together with an A.L.T.A. lender's title insurance policy issued by a title insurer satisfactory to Agent, in form and substance and in an amount satisfactory to Agent insuring that the Mortgage is a valid and enforceable first priority Lien on the respective property, free and clear of all defects, encumbrances and Liens, (y) then current A.L.T.A. surveys, certified to Agent by a licensed surveyor sufficient to allow the issuer of the lender's title insurance policy to issue such policy without a survey exception and (z) an environmental site assessment prepared by a qualified firm reasonably acceptable to Agent, in form and substance satisfactory to Agent.  In addition

to the obligations set forth in subsections 4.6(a) and 4.13(b), within forty-five days after written notice from Agent to Credit Parties that any Real Estate is located in a Special Flood Hazard Area, Credit Parties shall satisfy the Federal Flood Insurance requirements of subsection 4.6(a).

4.14 Environmental Matters. Without limiting the generality of the foregoing, each Credit Party shall, and shall cause each of its Subsidiaries to, comply with, and maintain its Real Estate, whether owned, leased, subleased or otherwise operated or occupied, in compliance with, all applicable Environmental Laws (including by implementing any Remedial Action necessary to achieve such compliance) or that is required by orders and directives of any Governmental Authority except where the failure to comply would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect. Each Credit Party shall, promptly upon receipt of request from Agent, cause the performance of, and allow Agent and its Related Persons access to such Real Estate for the purpose of conducting, such environmental audits and assessments, including subsurface sampling of soil and groundwater, and cause the preparation of such reports, in each case as Agent may from time to time request. Such audits, assessments and reports, to the extent not conducted by Agent or any of its Related Persons, shall be conducted and prepared by reputable environmental consulting firms reasonably acceptable to Agent and shall be in form and substance acceptable to Agent.

4.15 Licensure; Medicaid/Medicare Cost Reports. Except with respect to acute care operations at the Main Hospital Facility or as consistent with the Closure Plan, each Credit Party will maintain all certificates of need, provider numbers and licenses necessary to conduct its business as currently conducted, and take any steps required to comply with any new or additional applicable requirements that may be imposed on providers of medical products and Medical Services, except in each case where the failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. If required, all Medicaid/Medicare cost reports will be properly filed.

4.16 Accounts Information. Subject to compliance with and the limitations of applicable law in effect from time to time, including patient confidentiality restrictions which may limit or otherwise proscribe the providing of requested medical information, the following information shall, as appropriate and without limiting the effect of Section 4.8, be provided by Borrowers to Agent with respect to the Accounts, together with such other information and in such form as may reasonably be requested from time to time by Agent (the "Accounts Information"): (i) customer/patient demographic information; (ii) insured party demographic and other policy-related information; (iii) services and products classification information (i.e., D.R.G. and other like information established by Borrowers from time to time to classify services rendered by Borrowers or goods sold at the Facility); (iv) Account Debtor required information (i.e., information provided in the Ordinary Course of Business to any specified Account Debtor or any other information required to be provided to an Account Debtor pursuant to any agreement, contract or other arrangement with such Account Debtor); and (v) billing information (i.e., all information provided by Borrowers on invoices to Account Debtors and any other

36

information required to be provided pursuant to the Credit and Collection Policy and, to the extent the transmission will not be via computer interface, including a copy of the admitting face sheet, CMS Form and a detailed copy of the bill). Borrowers shall timely and fully comply in all material respects with the Credit and Collection Policy in regard to each Account and the related contract.

4.17    <u>Retention of Chief Restructuring Officer</u>.  Until the full and indefeasible payment and satisfaction of the Obligations, Credit Parties shall continue to retain the Chief Restructuring Officer on terms and conditions acceptable to Agent.  If a Chief Restructuring Officer resigns and provides notice of his or her intention to resign as Chief Restructuring Officer, Credit Parties shall have ten (10) days from the date of resignation (or, if more than ten (10) days notice is provided, from the date of such notice of resignation) within which to retain a replacement Chief Restructuring Officer, with appropriate authority and turnaround experience acceptable to Agent.

4.18    <u>Financial Advisor</u>.    Until the full and indefeasible payment and satisfaction of the Obligations, Credit Parties shall continue to retain the Financial Advisor on terms and conditions acceptable to Agent and with a scope of work satisfactory to Agent.  If the Financial Advisor resigns and provides notice of its intention to resign as financial advisor to the Borrowers, Credit Parties shall have ten (10) days from the date of resignation (or, if more than ten (10) days notice is provided, from the date of such notice of resignation) within which to retain a replacement Financial Advisor acceptable to Agent.

4.19    <u>Investment Banker; Disposition of Non-Hospital Assets</u>.  Until the full and indefeasible payment and satisfaction of the Obligations, Credit Parties shall continue to retain the Investment Banker, on terms and conditions acceptable to Agent, to manage the marketing and Disposition of the Non-Hospital Assets.  The Credit Parties and the Investment Banker shall provide Agent with all information reasonably requested by Agent from time to time, including any and all information in connection with, related to or otherwise concerning a Disposition of the Non-Hospital Assets.  The Investment Banker shall keep Agent fully informed with respect to the Investment Banker's progress in consummating a Disposition of the Non-Hospital Assets, and shall regularly communicate with Agent with respect to such information.  The Credit Parties shall execute any and all additional documents to effect the Disposition of the Non-Hospital Assets.  Notwithstanding the foregoing, any Disposition of the Non-Hospital Assets shall be subject to the approval of Agent in accordance with <u>Section 5.2</u> hereof.

4.20    <u>Transaction Side Letter</u>.  Until the full and indefeasible payment and satisfaction of the Obligations, Borrowers shall comply with the terms of the Transaction Side Letter.  Borrowers and Agent agree that it would be detrimental to Borrowers' ability to market and sell the Non-Hospital Assets if the terms of the Transaction Side Letter were known to the general public and/or to potential purchasers.  Accordingly, Borrowers, Agent and Lenders agree to keep the terms and conditions of the Transaction Side Letter confidential and not to disclose those terms to any third party; provided, however, that the Transaction Side Letter (a) may, upon execution of an appropriate confidentiality agreement, be shared with the United States Trustee and each Committee,

and (b) shall, if required by the Bankruptcy Court, be filed under seal or otherwise disclosed to the Bankruptcy Court in a manner that maintains the confidentiality of the Transaction Side Letter.

4.21  Main Hospital Facility.  SVCMC shall continue to comply with the Closure Plan, until such time as its obligations thereunder have been fully discharged.

## ARTICLE V.
## NEGATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied, unless Agent has otherwise consented in Agent's discretion:

5.1  Limitation on Liens.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its Property, whether now owned or hereafter acquired, other than Permitted Encumbrances.  No Credit Party shall on or after the date hereof directly or indirectly enter into or assume any agreement (other than the Loan Documents and other than any asset sale agreement that has been approved by Agent) prohibiting the creation or assumption of any Lien upon its properties or assets, whether now owned or hereafter acquired and other than (i) provisions restricting subletting or assignment under any lease governing a leasehold interest or lease of personal property; (ii) restrictions with respect to a Subsidiary imposed pursuant to any agreement which has been entered into for the sale of disposition of all or substantially all of the equity interests or assets of such Subsidiary, so long as such sale or disposition of all or substantially all of the equity interests or assets of such Subsidiary is permitted under this Agreement; and (iii) restrictions on assignments or sublicensing of licensed Intellectual Property.

5.2  Disposition of Assets.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, undertake any Disposition of (whether in one or a series of transactions) any Property or enter into any agreement to do any of the foregoing, except (a) sale of inventory in the ordinary course of business; (b) Disposition of equipment at the Main Hospital Facility that is no longer needed as a result of the Closure Plan, (c) Disposition of worn-out or surplus equipment having a book value not exceeding $50,000 in the aggregate after the Petition Date; (d) conversion of Cash Equivalents into different Cash Equivalents; (e) licenses, sublicenses, leases or subleases granted to third Persons in the Ordinary Course of Business not interfering in any material respect with the business of any Borrower or any of its Subsidiaries; and (f) as set forth in the Transaction Side Letter.

5.3  Consolidations and Mergers.  No Credit Party shall, and no party shall permit or suffer any of its Subsidiaries to, directly or indirectly, by operation of law or otherwise, (a) form or acquire any Subsidiary, or (b) merge with, consolidate with,

acquire all or substantially all of the assets or Stock of, or otherwise combine with or acquire, any Person.

5.4     Acquisitions; Loans and Investments.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries, to (i) purchase or acquire, or make any commitment to purchase or acquire any Stock or Stock Equivalents, or any obligations or other securities of, or any interest in, any Person, including the establishment or creation of a Subsidiary, or (ii) make or commit to make any Acquisitions, or any other acquisition of all or substantially all of the assets of another Person, or of any business or division of any Person, including by way of merger, consolidation or other combination or (iii) make or purchase, or commit to make or purchase, any advance, loan, extension of credit or capital contribution to or any other investment in, any Person (the items described in clauses (i), (ii) and (iii) are referred to as "Investments"), except for (a) Investments in cash and Cash Equivalents; (b) Investments acquired in connection with the settlement of delinquent Accounts in the Ordinary Course of Business or in connection with the bankruptcy or reorganization of suppliers or customers; (c) Investments existing on the Closing Date; (d) loans or advances to employees permitted under this Agreement; (e) intercompany loans and advances to the extent permitted under this Agreement, and (f) other Investments not to exceed $50,000 in the aggregate at any one time outstanding.

5.5     Limitation on Indebtedness.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except for (a) the Obligations; (b) Indebtedness created hereunder and under the other Loan Documents; (c) Indebtedness existing on the Petition Date; (d) Indebtedness consisting of intercompany loans and advances made by a Credit Party to another Credit Party; and (e) the Adequate Protection Obligations and the Pre-Petition Lender Obligations.  Notwithstanding the foregoing, no Indebtedness shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or pari passu with the superpriority administrative expense claims of Agent and Lenders as set forth herein and in the Interim Order and Final Order.

5.6     Employee Loans and Transactions with Affiliates.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, enter into any transaction with any Affiliate of a Borrower or of any such Subsidiary, except (a) those in existence on the Petition Date, (b) as expressly permitted by this Agreement; (c) in the Ordinary Course of Business and pursuant to the reasonable requirements of the business of such Credit Party or such Subsidiary upon fair and reasonable terms no less favorable to such Credit Party or such Subsidiary than would be obtained in a comparable arm's length transaction with a Person not an Affiliate of a Borrower or such Subsidiary; and (d) loans or advances to employees of Credit Parties for travel, entertainment and relocation expenses and other ordinary business purposes in the Ordinary Course of Business not to exceed $50,000 in the aggregate outstanding at any time.

5.7     Compensation.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, pay any management, consulting or similar fees to any Affiliate of

any Credit Party or to any officer, director or employee of any Credit Party or any Affiliate of any Credit Party except (a) payment of reasonable compensation to officers and employees for actual services rendered to the Credit Parties and their Subsidiaries in the Ordinary Course of Business on terms in effect on the Petition Date; and (b) payment of reimbursement of actual out-of-pocket expenses incurred by board members in connection with attending board of director meetings after the Petition Date

5.8    <u>Margin Stock; Use of Proceeds</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, use any portion of the Loan proceeds, directly or indirectly, to purchase or carry Margin Stock or repay or otherwise refinance Indebtedness of any Credit Party or others incurred to purchase or carry Margin Stock, or otherwise in any manner which is in contravention of any Requirement of Law or in violation of this Agreement.

5.9    <u>Contingent Obligations</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Contingent Obligations except in respect of the Obligations and except (a) endorsements for collection or deposit in the Ordinary Course of Business; (b) Contingent Obligations in customary form arising under indemnity agreements to title insurers to cause such title insurers to issue to Agent title insurance policies; and (c) Contingent Obligations arising under guarantees made in the Ordinary Course of Business of obligations of any Credit Party, which obligations are otherwise permitted hereunder; provided that if such obligation is subordinated to the Obligations, such guarantee shall be subordinated to the same extent.

5.10    <u>Compliance with ERISA</u>.  Except for matters stayed by the automatic stay, no ERISA Affiliate shall cause or suffer to exist (a) any event that could result in the imposition of a Lien on any asset of a Credit Party or a Subsidiary of a Credit Party with respect to any Title IV Plan or Multiemployer Plan (b) any other ERISA Event, that would, in the aggregate, result in Liabilities in excess of $50,000 the enforcement of which is not stayed by the automatic stay, and (c) any event that could result in the imposition of a Lien with respect to any Benefit Plan.

5.11    <u>Restricted Payments</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (a) declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any Stock or Stock Equivalent, (b) purchase, redeem or otherwise acquire for value any Stock or Stock Equivalent now or hereafter outstanding, (c) make any payment or prepayment of or with respect to principal, interest, premium, fees, redemption, exchange, purchase, retirement, defeasance, sinking fund or similar payment with respect to any Indebtedness, or (d) make payment of any Pre-Petition Indebtedness (the items described in <u>clauses (a)</u>, <u>(b)</u>, <u>(c)</u>. and <u>(d)</u> above are referred to as "<u>Restricted Payments</u>"); except for (i) prepayment of the Obligations, in accordance with the terms of this Agreement; (ii) intercompany loans and advances between Borrowers to the extent such Indebtedness is permitted under this Agreement; (iii) employee loans permitted under this Agreement; (iv) scheduled payments of interest, at the interest rate in effect under the Pre-Petition Credit Agreement on the Petition Date, on the outstanding balance of the

Pre-Petition Term Loan Obligations, (v) Indebtedness secured by a Senior Permitted Lien if the asset securing such Indebtedness has been sold or otherwise disposed of in a transaction approved by the Bankruptcy Court and that is otherwise permitted hereunder, (vi) payment by Mugavero of its regularly scheduled interest, principal, and other payments required under its bond financing as in effect on the Petition Date, (vii) payment by SVCMC to DASNY of amounts received by SVCMC on account of that certain forthcoming $1 million grant from the "HCRA Speaker's Priority Pool" so long as such payment has been permitted by the Bankruptcy Court, and (viii) payment of Pre-Petition Indebtedness if (A) Borrowers are permitted to pay such Pre-Petition Indebtedness pursuant to an order of the Bankruptcy Court, and (B) Agent has specifically approved the payment of such Pre-Petition Indebtedness. For purposes of the foregoing, the inclusion of any Pre-Petition Indebtedness in the Approved Budget does not by itself constitute the consent by Agent to the payment of such Pre-Petition Indebtedness, it being understood that certain items have been included in the Approved Budget for contingency or planning purposes. For purposes of clarification, except pursuant to a confirmed reorganization plan and except as specifically permitted hereunder, no Credit Party shall, without the express prior written consent of Agent or pursuant to an order of the Bankruptcy Court after notice and a hearing, make any payment or transfer with respect to any Pre-Petition Indebtedness, or any other Lien or Indebtedness incurred or arising before the Petition Date, that is subject to the automatic stay provisions of the Bankruptcy Code, whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

5.12    Change in Business.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, engage in any line of business different from those lines of business carried on by it on the Closing Date (including the provision of Medical Services), without the prior written consent of Agent.

5.13    Change in Structure.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, make any changes in its equity capital structure or amend any of its Organization Documents in any material respect.

5.14    Changes in Accounting, Name or Jurisdiction of Organization.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (a) make any significant change in accounting treatment or reporting practices, except as required by GAAP, (b) change the Fiscal Year or method for determining Fiscal Quarters of any Credit Party or of any consolidated Subsidiary of any Credit Party, (c) change its name as it appears in official filings in its jurisdiction of organization or (d) change its jurisdiction of organization.

5.15    Material Contracts.  The Credit Parties (a) shall not change or amend any material term or provision of the contracts and agreements pursuant to which the Chief Restructuring Officer, the Investment Banker and the Financial Advisor have been retained, (b) shall not change or amend any material term or provision of any material contracts, and (c) shall not cause or permit any amendment or modification of the Aptium Services Agreement nor any other material agreement entered into in connection with or pursuant to the Aptium Services Agreement.

41

5.16    Reserved.

5.17    OFAC; Patriot Act.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to fail to comply with the laws, regulations and executive orders referred to in Section 3.19.

5.18    Sale-Leasebacks.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, engage in a sale leaseback, synthetic lease or similar transaction involving any of its assets.

5.19    Hazardous Materials.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, cause or suffer to exist any Release of any Hazardous Material at, to or from any Real Estate that would violate any Environmental Law, form the basis for any Environmental Liabilities or otherwise adversely affect the value or marketability of any Real Estate (whether or not owned by any Credit Party or any Subsidiary of any Credit Party) which in each case could reasonably be expected to have a Material Adverse Effect.

5.20    Certificates of Need.  Except to the extent consistent with the Closure Plan, Borrowers will not (a) apply for a certificate of need to amend or change in any materially adverse way, or suspend or terminate or make provisional in any material way its operating certificate; or (b) change in any materially adverse way, or suspend or terminate its Medicare or Medicaid provider agreement or any participation agreement, without the prior written consent of Agent, which consent shall not be unreasonably withheld.  Borrowers shall immediately notify Agent in writing if (x) the State of New York, without application by Borrowers, makes any amendment or change in any materially adverse way or suspends or terminates or makes provisional Borrowers' operating certificates (as applicable); or (y) CMS or the New York State Medicaid agency or a commercial third-party payor (as applicable), without the request of Borrowers, changes in any materially adverse way, or suspends or terminates Borrowers' Medicare or Medicaid provider agreement or any participation agreement.

5.21    Tax Issues.

(a)    None of Credit Parties nor any of their Subsidiaries shall perform any act or enter into any agreement which shall adversely affect its federal income tax status as a Section 501(c)(3) public charity organization, and each shall conduct its operations in the manner which will conform in all material respects to the standards necessary to retain its status as a Section 501(c)(3) public charity organization.

(b)    Borrowers shall immediately advise Lender in the event that any of the Credit Parties shall have received a letter or other notification from the IRS indicating that their status as a Section 501(c)(3) public charity organization has been modified, limited or revoked, or adversely implicating their status as a "foundation".

5.22    Credit and Collection.  Borrowers shall not amend, waive or otherwise permit or agree to any deviation from the terms or conditions of any Account, except in accordance in all material respects with the Credit and Collection Policy.  Borrowers

42

shall not make any material change in the Credit and Collection Policy without the prior written consent of Agent.

5.23 <u>Issuance of Revocation Order</u>. No Borrower shall issue an order revoking any governmental account control agreements.

5.24 <u>Reclamation Claims</u>. No Borrower shall enter into any agreement to return any Inventory to any of its creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims under Section 546(g) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount of Pre-Petition Indebtedness, Pre-Petition trade payables and other Pre-Petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $50,000.

## ARTICLE VI.
## FINANCIAL AND BUDGETARY COVENANTS

Each Credit Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied:

6.1 <u>Revisions to Approved Budget</u>. If any Non-Hospital Asset shall be sold, or become subject to any management, operating, or similar agreement, the Approved Budget shall be amended to reflect the impact on projected cash flow arising from such sale or agreement. Borrowers shall submit a proposed revised Approved Budget to Agent no less than five (5) days before the scheduled date for such sale or agreement. If approved by Agent, such revised Approved Budget shall replace and supersede the then-existing Approved Budget concurrently with the effectiveness of such sale or agreement. If Agent does not approve Borrowers' proposed Approved Budget, then the Approved Budget shall be amended as specified by Agent in its good faith commercial judgment.

6.2 <u>Compliance with Budgetary and Financial Covenants; Financial Reports</u>. The Credit Parties shall comply with each of the covenants set forth in <u>Schedule 6.2</u>.

## ARTICLE VII.
## EVENTS OF DEFAULT

7.1 <u>Events of Default</u>. Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court or any notice to Borrower or other party in interest, and subject to <u>Section 7.2</u>, the occurrence of any one or more of the following shall constitute an "<u>Event of Default</u>":

(a) <u>Non-Payment</u>. Any Credit Party fails to pay when and as required to be paid herein, any amount of principal of, or interest on, any Loan, including after

maturity of the Loans or any fee or any other amount payable hereunder or pursuant to any other Loan Document;

(b)     <u>Representation or Warranty</u>.  Any representation, warranty or certification by or on behalf of any Credit Party or any of its Subsidiaries made or deemed made herein, in any other Loan Document, or which is contained in any certificate, document or financial or other statement by any such Person, or their respective Responsible Officers, furnished at any time under this Agreement, or in or under any other Loan Document, shall prove to have been incorrect in any material respect (without duplication of other materiality qualifiers contained therein) on or as of the date made or deemed made;

(c)     <u>Specific Defaults</u>.  Any Credit Party fails to perform or observe any term, covenant or agreement contained in any of <u>Sections 4.1</u>, <u>4.3(a)</u> or <u>9.10(d)</u>, <u>4.9</u>, <u>4.10</u>, <u>4.11</u> or <u>4.15</u> or <u>Article V</u> or <u>VI</u> or in the Transaction Side Letter;

(d)     <u>Other Defaults</u>.  Any Credit Party or Subsidiary of any Credit Party fails to perform or observe any other term, covenant or agreement contained in this Agreement or any other Loan Document, and, if such failure is by its nature capable of being remedied, such default shall continue unremedied for a period of three (3) Business Days after the earlier to occur of (i) the date upon which a Responsible Officer of any Credit Party becomes aware of such default and (ii) the date upon which written notice thereof is given to Borrower Representative by Agent or Required Lenders;

(e)     <u>Modification of Government Receivables Account Agreements; Depositary Agreements</u>.  Any Government Receivables Account Agreement, or Depositary Agreement or cash sweep instructions between Borrowers and any bank or other financial institution, whether pursuant to the cash management systems established pursuant to <u>Section 4.11</u> of this Agreement and the other Loan Documents or otherwise, is terminated or modified for any reason without Agent's prior written consent;

(f)     <u>HIPAA Breach</u>.  Any Credit Party (i) breaches any material provision of or terminates the HIPAA Business Associate Agreement, or (ii) except as required by applicable Healthcare Laws in effect from time to time, any Credit Party agrees to be bound by restrictions on use and/or disclosure of PHI (as defined in the HIPAA Business Associate Agreement) that in the credit judgment of Agent unreasonably limits Agent's access to the Collateral or information about the Collateral; or

(g)     <u>Invalidity of Loan Documents</u>.  Any material provision of any of the Loan Documents for any reason, other than a partial or full release in accordance with the terms thereof, ceases to be in full force and effect or is declared to be null and void, or any Credit Party denies that it has any further liability under any Loan Documents to which it is party, or gives notice to such effect;

(h)     <u>Damage; Casualty</u>.  Except as otherwise expressly permitted in this Agreement (including the Closure Plan and any Disposition approved by Agent), any

event occurs, whether or not insured or insurable, as a result of which revenue-producing activities cease or are substantially curtailed with respect to the Facility of any Credit Party and such cessation or curtailment continues for more than 5 days;

(i)     Overpayment.  As of any date of determination, any Borrower is found to have been overpaid by Governmental Authorities by 10% or more during any period covered by an audit conducted by CMS or the State of New York and such overpayment or any installment thereof is not repaid within 30 days of its final adjudication date unless it is otherwise due and payable prior to such date or reserved for in a manner reasonably acceptable to Agent;

(j)     Chapter 11 Events.  Any of the following occur in the Chapter 11 Cases:

(i)     unless the Obligations will be fully and indefeasibly paid and Lenders' commitments to make Loans terminated pursuant thereto, the bringing of a motion or taking of any action, or the filing of any plan of reorganization or disclosure statement attendant thereto by Borrowers in the Chapter 11 Cases:  (w) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (x) to grant, suffer, or exist any Lien on or affecting any Collateral other than a Permitted Encumbrance; (y) except as provided in the Interim Order or the Final Order, to use cash collateral of Agent or Lenders under Section 363(c) of the Bankruptcy Code without the prior written consent of Agent and Required Lenders; or (z) taking any other action or actions adverse to Agent or Lenders or their rights and remedies hereunder or their interest in the Collateral, provided, however, that, so long as such action does not involve the filing of a pleading with the Bankruptcy Court, such action shall not constitute an Event of Default hereunder unless Borrowers fail to remedy or otherwise cure such breach to Agent's satisfaction within three (3) Business Days following notice from Agent;

(ii)     unless the Obligations will be fully and indefeasibly paid and Lenders' commitments to make Loans terminated pursuant thereto, the filing of any plan of reorganization or disclosure statement attendant thereto by Borrowers or any other Person in the Chapter 11 Bankruptcy Cases to which Agent and Required Lenders do not consent or otherwise agree to the treatment of their claims or the loss by any Borrower of the exclusive right to file and solicit acceptances of a plan of reorganization;

(iii)     except as may otherwise be approved by Agent, the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not contain a provision for termination of the Commitments and repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans;

(iv)     the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Interim Order or the Final Order without the written consent of Agent;

(v)     the payment of, or application for authority to pay, any Pre-Petition Indebtedness without Agent's prior written consent or pursuant to an order of the Bankruptcy Court after notice and hearing unless otherwise permitted under this Agreement or in any "first day order" in form and substance acceptable to Agent and as set forth in the Approved Budget;

(vi)     the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any of the Collateral;

(vii)     the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver, responsible officer or examiner in the Chapter 11 Cases with expanded powers (i.e., powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code pursuant to Section 1106(b) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of Borrowers; or the sale, without Agent and Required Lenders' consent, of all or substantially all of Borrowers' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise that does not provide for payment in full of the Obligations and termination of Lenders' commitment to make Loans;

(viii)     the dismissal of any of the Chapter 11 Cases, or the conversion of any of the Chapter 11 Cases from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code, or the filing by Borrowers of a motion or other pleading seeking the dismissal of the Chapter 11 Cases (or any of them) under Section 1112 of the Bankruptcy Code or otherwise, in each instance without Agent's or Required Lenders' written consent;

(ix)     the entry of an order by the Bankruptcy Court granting relief from, terminating, or modifying the automatic stay of Section 362 of the Bankruptcy Code (or holding that such stay does not apply), under circumstances that would have a Material Adverse Effect, (x) allowing any creditor to execute upon or enforce a Lien on any Collateral, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority;

(x)     the entry of an order by the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code, under circumstances that would have a Material Adverse Effect, ordering that one or more executory contracts to which any Borrower is party are to be rejected, if such rejection has not been consented to by such Borrower, Agent and Required Lenders;

(xi)     except as otherwise permitted under the Orders, the commencement of a suit or action against Agent or Pre-Petition Agent or any Lender or any Pre-Petition Lender related in any way to a Credit Party and, as to any suit or action brought by any Person other than a Credit Party or a Subsidiary, officer, or employee of a Credit Party, the continuation thereof without dismissal for thirty (30) days after service thereof;

(xii)    except with the consent of Agent, or in connection with a final determination of the Bankruptcy Court that Agent or Lenders have breached provisions of this Agreement applicable to such payments, the entry of an order in any of the Chapter 11 Cases avoiding or requiring disgorgement of any portion of the payments made on account of the Obligations owing under this Agreement;

(xiii)    the failure of any Borrower to perform any of its obligations under the Interim Order or the Final Order;

(xiv)    the remittance, use or application of the proceeds of Collateral other than in accordance with cash management procedures and agreements established pursuant to this Agreement or otherwise acceptable to Agent;

(xv)    the use of cash collateral without the consent of Agent and Pre-Petition Agent;

(xvi)    any attempt by a Credit Party to reduce, set off or subordinate the Obligations or the Liens securing the Obligations to any other Indebtedness;

(xvii)    the Interim Order shall expire without the Final Order having been entered or the Final Order is not entered within thirty (30) days (or such other period as Agent may agree to in writing) following the entry of the Interim Order;

(xviii)    the entry of an order in any of the Chapter 11 Cases granting any other superpriority administrative claim (excluding the Carveout) or Lien equal or superior to that granted to Agent, on behalf of itself and Lenders, without Agent's consent.

7.2    Suspension or Termination of Commitments; Acceleration and Other Remedies.

(a)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the occurrence and during the continuance of any Event of Default, Agent may, and shall at the request of the Required Lenders, without any application, motion or notice to or order from the Bankruptcy Court, suspend the provision of Loans, whereupon any additional Loans shall be made or incurred in Agent's sole discretion so long as such Default or Event of Default is continuing. If any Event of Default has occurred and is continuing, the rate of interest applicable to the Loans shall immediately and automatically increase to the Default Rate unless otherwise determined by Agent in its discretion.

(b)    If any Event of Default has occurred and is continuing, Agent may (and at the written request of the Required Lenders shall), notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, or order from, the Bankruptcy Court: (i) terminate all or any portion of Lenders' obligations to make additional Loans; (ii) reduce the Commitments from time to time; (iii) declare all or any portion of the Obligations, including all or any portion of any Loan, to be

47

forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrowers and each other Credit Party; or (iv) exercise any rights and remedies provided to Agent under the Loan Documents or at law or equity, including all remedies provided under the Code; and pursuant to the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Agent and Lenders to exercise their remedies under this Agreement and the Loan Documents, without further application or motion to, or order from, the Bankruptcy Court, provided, notwithstanding anything to the contrary contained herein, Agent shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of any Borrower in the Collateral only upon three (3) Business Days' prior written notice (or such other notice period as may be set forth in the Interim Order or Final Order, as applicable) to such Borrower and counsel approved by the Bankruptcy Court for the Committee. Upon the occurrence of an Event of Default and exercise by Agent and Lenders of their rights and remedies under this Agreement and other Loan Documents, Borrowers shall assist Lenders in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition.

7.3     [Reserved].

7.4     <u>Rights Not Exclusive</u>.  The rights provided for in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

## ARTICLE VIII.
## THE AGENT

8.1     <u>Appointment and Duties</u>.

(a)     <u>Appointment of Agent</u>.  Each Lender hereby appoints GE Capital (together with any successor Agent pursuant to <u>Section 8.9</u>) as Agent hereunder and authorizes Agent to (i) execute and deliver the Loan Documents and accept delivery thereof on its behalf from any Credit Party, (ii) take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to Agent under such Loan Documents and (iii) exercise such powers as are incidental thereto.

(b)     <u>Duties as Collateral and Disbursing Agent</u>.  Without limiting the generality of <u>subsection (a)</u> above, Agent shall have the sole and exclusive right and authority (to the exclusion of Lenders), and is hereby authorized, to (i) act as the disbursing and collecting agent for Lenders with respect to all payments and collections arising in connection with the Loan Documents or in connection with the Chapter 11 Cases, and each Person making any payment in connection with any Loan Document to any Secured Party is hereby authorized to make such payment to Agent, (ii) file and prove claims and file other documents necessary or desirable to allow the claims of the Secured Parties with respect to any Obligation in connection with the Chapter 11 Cases

(but not to vote, consent or otherwise act on behalf of such Person), (iii) act as collateral agent for each Secured Party for purposes of the perfection of all Liens created by such agreements and all other purposes stated therein, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Loan Documents, (vi) except as may be otherwise specified in any Loan Document, exercise all remedies given to Agent and the other Secured Parties with respect to the Collateral, whether under the Loan Documents, applicable Requirements of Law or otherwise and (vii) execute any amendment, consent or waiver under the Loan Documents on behalf of any Lender that has consented in writing to such amendment, consent or waiver; provided, however, that Agent hereby appoints, authorizes and directs each Lender to act as collateral sub-agent for Agent and Lenders for purposes of the perfection of Liens with respect to any deposit account maintained by a Credit Party with, and cash and Cash Equivalents held by, such Lender, and may further authorize and direct Lenders to take further actions as collateral sub-agents for purposes of enforcing such Liens or otherwise to transfer the Collateral subject thereto to Agent, and each Lender and hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed.

(c)    Limited Duties.  Under the Loan Documents, Agent (i) is acting solely on behalf of the Secured Parties (except to the limited extent provided in subsection 1.4(b) with respect to the Register), with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Agent", the terms "agent", "Agent" and "collateral agent" and similar terms in any Loan Document to refer to Agent, which terms are used for title purposes only, (ii) is not assuming any obligation under any Loan Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any Lender or any other Person and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Loan Document, and each Secured Party, by accepting the benefits of the Loan Documents, hereby waives and agrees not to assert any claim against Agent based on the roles, duties and legal relationships expressly disclaimed in clauses (i) through (iii) above.

8.2    Binding Effect.  Each Secured Party, by accepting the benefits of the Loan Documents, agrees that (a) any action taken by Agent or the Required Lenders (or, if expressly required hereby, a greater proportion of Lenders) in accordance with the provisions of the Loan Documents, (b) any action taken by Agent in reliance upon the instructions of Required Lenders (or, where so required, such greater proportion) and (c) the exercise by Agent or the Required Lenders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are incidental thereto, shall be authorized and binding upon all of the Secured Parties.

8.3    Use of Discretion.

(a)    Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of Lenders as shall be expressly provided for herein or in the other Loan Documents);

provided, that Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose Agent to liability or that is contrary to any Loan Document or applicable Requirement of Law; and

(b)     Agent shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Credit Party or its Affiliates that is communicated to or obtained by Agent or any of its Affiliates in any capacity.

8.4     <u>Delegation of Rights and Duties</u>.  Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Secured Party).  Any such Person shall benefit from this <u>Article VIII</u> to the extent provided by Agent.

8.5     <u>Reliance and Liability</u>.

(a)     Agent may, without incurring any liability hereunder, (i) treat the payee of any Note as its holder until such Note has been assigned in accordance with <u>Section 9.9</u>, (ii) rely on the Register to the extent set forth in <u>Section 1.4</u>, (iii) consult with any of its Related Persons and, whether or not selected by it, any other advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, any Credit Party) and (iv) rely and act upon any document and information (including those transmitted by Electronic Transmission) and any telephone message or conversation, in each case believed by it to be genuine and transmitted, signed or otherwise authenticated by the appropriate parties.

(b)     None of Agent and its Related Persons shall be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and each Secured Party, Borrowers and each other Credit Party hereby waive and shall not assert (and Borrowers shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting primarily from the gross negligence or willful misconduct of Agent or, as the case may be, such Related Person (each as determined in a final, non-appealable judgment by a court of competent jurisdiction) in connection with the duties expressly set forth herein.  Without limiting the foregoing, Agent:

(i)     shall not be responsible or otherwise incur liability for any action or omission taken in reliance upon the instructions of the Required Lenders or for the actions or omissions of any of its Related Persons selected with reasonable care (other than employees, officers and directors of Agent, when acting on behalf of Agent);

(ii)     shall not be responsible to any Lender or other Person for the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Loan Document;

(iii)  makes no warranty or representation, and shall not be responsible, to any Lender or other Person for any statement, document, information, representation or warranty made or furnished by or on behalf of any Credit Party or any Related Person of any Credit Party in connection with any Loan Document or any transaction contemplated therein or any other document or information with respect to any Credit Party, whether or not transmitted or (except for documents expressly required under any Loan Document to be transmitted to Lenders) omitted to be transmitted by Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by Agent in connection with the Loan Documents; and

(iv)  shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document, whether any condition set forth in any Loan Document is satisfied or waived, as to the financial condition of any Credit Party or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from Borrower Representative or any Lender describing such Default or Event of Default clearly labeled "notice of default" (in which case Agent shall promptly give notice of such receipt to all Lenders);

and, for each of the items set forth in clauses (i) through (iv) above, each Lender and Borrowers hereby waive and agrees not to assert (and Borrowers shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action it might have against Agent based thereon.

(c)  Each Lender (i) acknowledges that it has performed and will continue to perform its own diligence and has made and will continue to make its own independent investigation of the operations, financial conditions and affairs of the Credit Parties and (ii) agrees that it shall not rely on any audit or other report provided by Agent or its Related Persons (an "Agent Report").  Each Lender further acknowledges that any Agent Report (i) is provided to Lenders solely as a courtesy, without consideration, and based upon the understanding that such Lender will not rely on such Agent Report, (ii) was prepared by Agent or its Related Persons based upon information provided by the Credit Parties solely for Agent's own internal use, (iii) may not be complete and may not reflect all information and findings obtained by Agent or its Related Persons regarding the operations and condition of the Credit Parties.  Neither Agent nor any of its Related Persons makes any representations or warranties of any kind with respect to (i) any existing or proposed financing, (ii) the accuracy or completeness of the information contained in any Agent Report or in any related documentation, (iii) the scope or adequacy of Agent's and its Related Persons' due diligence, or the presence or absence of any errors or omissions contained in any Agent Report or in any related documentation, and (iv) any work performed by Agent or Agent's Related Persons in connection with or using any Agent Report or any related documentation.

(d)  Neither Agent nor any of its Related Persons shall have any duties or obligations in connection with or as a result of any Lender receiving a copy of any

Agent Report. Without limiting the generality of the forgoing, neither Agent nor any of its Related Persons shall have any responsibility for the accuracy or completeness of any Agent Report, or the appropriateness of any Agent Report for any Lender's purposes, and shall have no duty or responsibility to correct or update any Agent Report or disclose to any Lender any other information not embodied in any Agent Report, including any supplemental information obtained after the date of any Agent Report. Each Lender releases, and agrees that it will not assert, any claim against Agent or its Related Persons that in any way relates to any Agent Report or arises out of any Lender having access to any Agent Report or any discussion of its contents, and agrees to indemnify and hold harmless Agent and its Related Persons from all claims, liabilities and expenses relating to a breach by any Lender arising out of such Lender's access to any Agent Report or any discussion of its contents.

      8.6    <u>Agent Individually</u>. Agent and its Affiliates may make loans and other extensions of credit to, acquire Stock and Stock Equivalents of, engage in any kind of business with, any Credit Party or Affiliate thereof as though it were not acting as Agent and may receive separate fees and other payments therefor. To the extent Agent or any of its Affiliates makes any Loan or otherwise becomes a Lender hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other Lender and the terms "Lender", "Required Lender" and any similar terms shall, except where otherwise expressly provided in any Loan Document, include Agent or such Affiliate, as the case may be, in its individual capacity as Lender or as one of the Required Lenders.

      8.7    <u>Lender Credit Decision</u>.

      (a)    Each Lender acknowledges that it shall, independently and without reliance upon Agent, any Lender or any of their Related Persons or upon any document (including any offering and disclosure materials in connection with the syndication of the Loans) solely or in part because such document was transmitted by Agent or any of its Related Persons, conduct its own independent investigation of the financial condition and affairs of each Credit Party and make and continue to make its own credit decisions in connection with entering into, and taking or not taking any action under, any Loan Document or with respect to any transaction contemplated in any Loan Document, in each case based on such documents and information as it shall deem appropriate. Except for documents expressly required by any Loan Document to be transmitted by Agent to Lenders, Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Credit Party or any Affiliate of any Credit Party that may come in to the possession of Agent or any of its Related Persons.

      (b)    If any Lender has elected to abstain from receiving MNPI concerning the Credit Parties or their Affiliates, such Lender acknowledges that, notwithstanding such election, Agent and/or the Credit Parties will, from time to time, make available syndicate-information (which may contain MNPI) as required by the terms of, or in the course of administering the Loans to the credit contact(s) identified for

receipt of such information on the Lender's administrative questionnaire who are able to receive and use all syndicate-level information (which may contain MNPI) in accordance with such Lender's compliance policies and contractual obligations and applicable law, including federal and state securities laws; provided, that if such contact is not so identified in such questionnaire, the relevant Lender hereby agrees to promptly (and in any event within one (1) Business Day) provide such a contact to Agent and the Credit Parties upon request therefor by Agent or the Credit Parties. Notwithstanding such Lender's election to abstain from receiving MNPI, such Lender acknowledges that if such Lender chooses to communicate with Agent, it assumes the risk of receiving MNPI concerning the Credit Parties or their Affiliates.

8.8     Expenses; Indemnities; Withholding.

(a)     Each Lender agrees to reimburse Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party) promptly upon demand, severally and ratably, for any costs and expenses (including fees, charges and disbursements of financial, legal and other advisors and Other Taxes paid in the name of, or on behalf of, any Credit Party) that may be incurred by Agent or any of its Related Persons in connection with the preparation, syndication, execution, delivery, administration, modification, consent, waiver or enforcement (whether through negotiations, through any work-out, bankruptcy, restructuring or other legal or other proceeding or otherwise) of, or legal advice in respect of its rights or responsibilities under, any Loan Document.

(b)     Each Lender further agrees to indemnify Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party), severally and ratably, from and against Liabilities (including, to the extent not indemnified pursuant to subsection 8.8(c), taxes, interests and penalties imposed for not properly withholding or backup withholding on payments made to or for the account of any Lender) that may be imposed on, incurred by or asserted against Agent or any of its Related Persons in any matter relating to or arising out of, in connection with or as a result of any Loan Document, any Related Document or any other act, event or transaction related, contemplated in or attendant to any such document, or, in each case, any action taken or omitted to be taken by Agent or any of its Related Persons under or with respect to any of the foregoing; provided, however, that no Lender shall be liable to Agent or any of its Related Persons to the extent such liability has resulted primarily from the gross negligence or willful misconduct of Agent or, as the case may be, such Related Person, as determined by a court of competent jurisdiction in a final non-appealable judgment or order.

(c)     To the extent required by any applicable law, Agent may withhold from any payment to any Lender under a Loan Document an amount equal to any applicable withholding tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that Agent did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate certification form was not delivered, was not properly executed, or fails to establish an exemption from, or reduction of, withholding tax with respect to a particular type of payment, or because

such Lender failed to notify Agent or any other Person of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), or Agent reasonably determines that it was required to withhold taxes from a prior payment but failed to do so, such Lender shall promptly indemnify Agent fully for all amounts paid, directly or indirectly, by such Agent as tax or otherwise, including penalties and interest, and together with all expenses incurred by Agent, including legal expenses, allocated internal costs and out-of-pocket expenses. Agent may offset against any payment to any Lender under a Loan Document, any applicable withholding tax that was required to be withheld from any prior payment to such Lender but which was not so withheld, as well as any other amounts for which Agent is entitled to indemnification from such Lender under this subsection 8.8(c).

8.9    Resignation of Agent.

(a)    Agent may resign at any time by delivering notice of such resignation to Lenders and Borrowers, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date such notice shall be effective in accordance with the terms of this Section 8.9. If Agent delivers any such notice, the Required Lenders shall have the right to appoint a successor Agent. If, within 30 days after the retiring Agent having given notice of resignation, no successor Agent has been appointed by the Required Lenders that has accepted such appointment, then the retiring Agent may, on behalf of Lenders, appoint a successor Agent from among Lenders.

(b)    Effective immediately upon its resignation, (i) the retiring Agent shall be discharged from its duties and obligations under the Loan Documents, (ii) Lenders shall assume and perform all of the duties of Agent until a successor Agent shall have accepted a valid appointment hereunder, (iii) the retiring Agent and its Related Persons shall no longer have the benefit of any provision of any Loan Document other than with respect to any actions taken or omitted to be taken while such retiring Agent was, or because such Agent had been, validly acting as Agent under the Loan Documents and (iv) subject to its rights under Section 8.3, the retiring Agent shall take such action as may be reasonably necessary to assign to the successor Agent its rights as Agent under the Loan Documents. Effective immediately upon its acceptance of a valid appointment as Agent, a successor Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent under the Loan Documents.

8.10    Release of Collateral or Guarantors. Each Lender hereby consents to the release and hereby directs Agent to release (or, in the case of clause (b)(ii) below, release or subordinate) the following:

(a)    any Subsidiary of a Borrower from its guaranty of any Obligation if all of the Stock and Stock Equivalents of such Subsidiary owned by any Credit Party are sold or transferred in a transaction permitted under the Loan Documents (including pursuant to a waiver or consent); and

(b)    any Lien held by Agent for the benefit of the Secured Parties against (i) any Collateral that is sold, transferred, conveyed or otherwise disposed of by a

Credit Party in a transaction permitted by the Loan Documents (including pursuant to a waiver or consent) and (ii) all of the Collateral and all Credit Parties, upon (A) termination of the Commitments, (B) payment and satisfaction in full of all Loans and all other Obligations under the Loan Documents and all Obligations arising under Secured Rate Contracts, that Agent has theretofore been notified in writing by the holder of such Obligation are then due and payable, (C) deposit of cash collateral with respect to all contingent Obligations, in amounts and on terms and conditions and with parties satisfactory to Agent and each Indemnitee that is, or may be, owed such Obligations (excluding contingent Obligations as to which no claim has been asserted) and (D) to the extent requested by Agent, receipt by Agent and the Secured Parties of liability releases from the Credit Parties each in form and substance acceptable to Agent.

Each Lender hereby directs Agent, and Agent hereby agrees, upon receipt of at least five (5) Business Days' advance notice from Borrower Representative, to execute and deliver or file such documents and to perform other actions reasonably necessary to release the guaranties and Liens when and as directed in this <u>Section 8.10</u>.

       8.11   <u>Additional Secured Parties</u>.  The benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not a Lender party hereto as long as, by accepting such benefits, such Secured Party agrees, as among Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by Agent, shall confirm such agreement in a writing in form and substance acceptable to Agent) this Agreement and the decisions and actions of Agent and the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of Lenders or other parties hereto as required herein) to the same extent a Lender is bound; provided, however, that, notwithstanding the foregoing, (a) such Secured Party shall be bound by <u>Section 8.8</u> only to the extent of Liabilities, costs and expenses with respect to or otherwise relating to the Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of pro rata share or similar concept, (b) each of Agent and Lenders party hereto shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (c) except as otherwise set forth herein, such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

**ARTICLE IX.**
**MISCELLANEOUS**

       9.1   <u>Amendments and Waivers</u>.

       (a)     No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Credit

Party therefrom, shall be effective unless the same shall be in writing and signed by Agent, the Required Lenders (or by Agent with the consent of the Required Lenders), and Borrowers, and then such waiver shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such waiver, amendment, or consent shall, unless in writing and signed by all Lenders directly affected thereby (or by Agent with the consent of all Lenders directly affected thereby), in addition to Agent and the Required Lenders (or by Agent with the consent of the Required Lenders) and Borrowers, do any of the following:

(i)     increase or extend the Commitment of any Lender (or reinstate any Commitment terminated pursuant to subsection 7.2(b));

(ii)    postpone or delay any date fixed for, or reduce or waive, any scheduled installment of principal or any payment of interest, fees or other amounts (other than principal) due to Lenders (or any of them) hereunder or under any other Loan Document (for the avoidance of doubt, mandatory prepayments pursuant to Section 1.8 may be postponed, delayed, waived or modified with the consent of Required Lenders);

(iii)   reduce the principal of, or the rate of interest specified herein or the amount of interest payable in cash specified herein on any Loan, or of any fees or other amounts payable hereunder or under any other Loan Document; provided that the decision on whether to impose or waive interest at the Default Rate shall be in the discretion of Agent;

(iv)    change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans which shall be required for Lenders or any of them to take any action hereunder;

(v)     amend this Section 9.1 or the definition of Required Lenders or any provision providing for consent or other action by all Lenders; or

(vi)    discharge any Credit Party from its respective payment Obligations under the Loan Documents, or release all or substantially all of the Collateral, except as otherwise may be provided in this Agreement or the other Loan Documents (including the Transaction Side Letter);

it being agreed that all Lenders shall be deemed to be directly affected by an amendment or waiver of the type described in the preceding clauses (iv), (v) and (vi).

(b)     No amendment, waiver or consent shall, unless in writing and signed by Agent in addition to the Required Lenders or all Lenders directly affected thereby, as the case may be (or by Agent with the consent of the Required Lenders or all Lenders directly affected thereby, as the case may be), affect the rights or duties of Agent, as applicable, under this Agreement or any other Loan Document. No amendment, modification or waiver of this Agreement or any Loan Document altering the ratable treatment of Obligations arising under Secured Rate Contracts resulting in such Obligations being junior in right of payment to principal on the Loans or resulting in Obligations owing to any Secured Swap Provider becoming unsecured (other than

56

releases of Liens permitted in accordance with the terms hereof), in each case in a manner adverse to any Secured Swap Provider, shall be effective without the written consent of such Secured Swap Provider or, in the case of a Secured Rate Contract provided or arranged by GE Capital or an Affiliate of GE Capital, GE Capital.

(c)     No amendment or waiver shall, unless signed by Agent and Required Lenders (or by Agent with the consent of Required Lenders): (i) amend or waive compliance with the conditions precedent to the obligations of Lenders to make any Loan in Section 2.2; (ii) amend or waive non-compliance with any provision of subsection 1.1; (iii) waive any Default or Event of Default for the purpose of satisfying the conditions precedent to the obligations of Lenders to make any Loan in Section 2.2; or (iv) amend or waive this subsection 9.1(c) or the definitions of the terms used in this subsection 9.1(c) insofar as the definitions affect the substance of this subsection 9.1(c).

(d)     Notwithstanding anything to the contrary contained in this Section 9.1, Agent and Borrowers may amend or modify this Agreement and any other Loan Document to cure any ambiguity, omission, defect or inconsistency therein, or grant a new Lien for the benefit of the Secured Parties, extend an existing Lien over additional property for the benefit of the Secured Parties or join additional Persons as Credit Parties.

9.2     Notices.

(a)     Addresses.     All notices and other communications required or expressly authorized to be made by this Agreement shall be given in writing, unless otherwise expressly specified herein, and (i) addressed to the address set forth on Exhibit 9.2, (ii) posted to Intralinks® (to the extent such system is available and set up by or at the direction of Agent prior to posting) in an appropriate location by uploading such notice, demand, request, direction or other communication to www.intralinks.com, faxing it to 866-545-6600 with an appropriate bar-code fax coversheet or using such other means of posting to Intralinks® as may be available and reasonably acceptable to Agent prior to such posting, (iii) posted to any other E-System approved by or set up by or at the direction of Agent or (iv) addressed to such other address as shall be notified in writing (A) in the case of Borrowers and Agent, to the other parties hereto and (B) in the case of all other parties, to Borrower Representative and Agent.     Transmissions made by electronic mail or E-Fax to Agent shall be effective only (x) for notices where such transmission is specifically authorized by this Agreement, (y) if such transmission is delivered in compliance with procedures of Agent applicable at the time and previously communicated to Borrowers, and (z) if receipt of such transmission is acknowledged by Agent.

(b)     Effectiveness.

(i)     All communications described in clause (a) above and all other notices, demands, requests and other communications made in connection with this Agreement shall be effective and be deemed to have been received (i) if delivered by hand, upon personal delivery, (ii) if delivered by overnight courier service, one (1) Business Day after delivery to such courier service, (iii) if delivered by mail, three (3)

Business Days after deposit in the mail, (iv) if delivered by facsimile (other than to post to an E-System pursuant to <u>clause (a)(ii)</u> or <u>(a)(iii)</u> above), upon sender's receipt of confirmation of proper transmission, and (v) if delivered by posting to any E-System, on the later of the Business Day of such posting and the Business Day access to such posting is given to the recipient thereof in accordance with the standard procedures applicable to such E-System; provided, however, that no communications to Agent pursuant to <u>Article I</u> shall be effective until received by Agent.

(ii)     The posting, completion and/or submission by any Credit Party of any communication pursuant to an E-System shall constitute a representation and warranty by the Credit Parties that any representation, warranty, certification or other similar statement required by the Loan Documents to be provided, given or made by a Credit Party in connection with any such communication is true, correct and complete except as expressly noted in such communication or E-System.

(c)     Each Lender shall notify Agent in writing of any changes in the address to which notices to such Lender should be directed, of addresses of its Lending Office, of payment instructions in respect of all payments to be made to it hereunder and of such other administrative information as Agent shall reasonably request.

9.3     <u>Electronic Transmissions</u>.

(a)     <u>Authorization</u>.  Subject to the provisions of <u>subsection 9.2(a)</u>, each of Agent, Lenders, each Credit Party and each of their Related Persons, is authorized (but not required) to transmit, post or otherwise make or communicate, in its sole discretion, Electronic Transmissions in connection with any Loan Document and the transactions contemplated therein.  Each Credit Party and each Secured Party hereto acknowledges and agrees that the use of Electronic Transmissions is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the transmission of Electronic Transmissions.

(b)     <u>Signatures</u>.  Subject to the provisions of <u>subsection 9.2(a)</u>, (i)(A) no posting to any E-System shall be denied legal effect merely because it is made electronically, (B) each E-Signature on any such posting shall be deemed sufficient to satisfy any requirement for a "signature" and (C) each such posting shall be deemed sufficient to satisfy any requirement for a "writing", in each case including pursuant to any Loan Document, any applicable provision of any UCC, the federal Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural Requirement of Law governing such subject matter, (ii) each such posting that is not readily capable of bearing either a signature or a reproduction of a signature may be signed, and shall be deemed signed, by attaching to, or logically associating with such posting, an E-Signature, upon which Agent, each Secured Party and each Credit Party may rely and assume the authenticity thereof, (iii) each such posting containing a signature, a reproduction of a signature or an E-Signature shall, for all intents and purposes, have the same effect and weight as a signed paper original and (iv) each party hereto or beneficiary hereto agrees not to contest the validity

58

or enforceability of any posting on any E-System or E-Signature on any such posting under the provisions of any applicable Requirement of Law requiring certain documents to be in writing or signed; provided, however, that nothing herein shall limit such party's or beneficiary's right to contest whether any posting to any E-System or E-Signature has been altered after transmission.

(c)     Separate Agreements.  All uses of an E-System shall be governed by and subject to, in addition to Section 9.2 and this Section 9.3, the separate terms, conditions and privacy policy posted or referenced in such E-System (or such terms, conditions and privacy policy as may be updated from time to time, including on such E-System) and related Contractual Obligations executed by Agent and Credit Parties in connection with the use of such E-System.

(d)     LIMITATION OF LIABILITY.   ALL E-SYSTEMS AND ELECTRONIC TRANSMISSIONS SHALL BE PROVIDED "AS IS" AND "AS AVAILABLE".  NONE OF AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS WARRANTS THE ACCURACY, ADEQUACY OR COMPLETENESS OF ANY E-SYSTEMS OR ELECTRONIC TRANSMISSION AND DISCLAIMS ALL LIABILITY FOR ERRORS OR OMISSIONS THEREIN.  NO WARRANTY OF ANY KIND IS MADE BY AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS IN CONNECTION WITH ANY E-SYSTEMS OR ELECTRONIC COMMUNICATION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS.  Borrowers, each other Credit Party executing this Agreement and each Secured Party agrees that Agent has no responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Electronic Transmission or otherwise required for any E-System.

9.4     No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of Agent or any Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  No course of dealing between any Credit Party, any Affiliate of any Credit Party, Agent or any Lender shall be effective to amend, modify or discharge any provision of this Agreement or any of the other Loan Documents.

9.5     Costs and Expenses.  Any action taken by any Credit Party under or with respect to any Loan Document, even if required under any Loan Document or at the request of Agent or Required Lenders, shall be at the expense of such Credit Party, and neither Agent nor any other Secured Party shall be required under any Loan Document to reimburse any Credit Party or any Subsidiary of any Credit Party therefor except as expressly provided therein.   In addition, Borrowers agree to pay or reimburse upon demand (a) Agent for all out-of-pocket costs and expenses incurred by it or any of its Related Persons, in connection with the investigation, development, preparation, negotiation, syndication, execution, interpretation or administration of, any modification

of any term of or termination of, any Loan Document, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, in each case including Attorney Costs of Agent, the cost of environmental audits, Collateral audits and appraisals, background checks and similar expenses, (b) Agent for all costs and expenses incurred by it or any of its Related Persons in connection with internal audit reviews, field examinations and Collateral examinations (which shall be reimbursed, in addition to the out-of-pocket costs and expenses of such examiners, at the per diem rate per individual charged by Agent for its examiners), (c) each of Agent and its Related Persons for all costs and expenses incurred in connection with (i) any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out", (ii) the enforcement or preservation of any right or remedy under any Loan Document, any Obligation, with respect to the Collateral or any other related right or remedy or (iii) the commencement, defense, conduct of, intervention in, or the taking of any other action with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to any Credit Party, any Subsidiary of any Credit Party, Loan Document, Obligation (or the response to and preparation for any subpoena or request for document production relating thereto), including Attorney Costs and (d) fees and disbursements of Attorney Costs of Lenders incurred in connection with any of the matters referred to in clause (c) above.

9.6     Indemnity.

(a)     Each Credit Party agrees to indemnify, hold harmless and defend Agent, each Lender and each of their respective Related Persons (each such Person being an "Indemnitee" and collectively, the "Indemnitees") from and against all Liabilities (including brokerage commissions, fees and other compensation) that may be imposed on, incurred by or asserted against any such Indemnitee in any matter relating to or arising out of, in connection with or as a result of (i) any Loan Document, any Obligation (or the repayment thereof), the use or intended use of the proceeds of any Loan or any securities filing of, or with respect to, any Credit Party, (ii) any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of any Credit Party or any Affiliate of any of them in connection with any of the foregoing and any Contractual Obligation entered into in connection with any E-Systems or other Electronic Transmissions, (iii) any actual or prospective investigation, litigation or other proceeding, whether or not brought by any such Indemnitee or any of its Related Persons, any holders of securities or creditors (and including attorneys' fees in any case), whether or not any such Indemnitee, Related Person, holder or creditor is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Requirement of Law or theory thereof, including common law, equity, contract, tort or otherwise or (iv) any other act, event or transaction related, contemplated in or attendant to any of the foregoing (collectively, the "Indemnified Matters"); provided, however, that no Credit Party shall have any liability under this Section 9.6 to any Indemnitee with respect to any Indemnified Matter, and no Indemnitee shall have any liability with respect to any Indemnified Matter other than (to the extent otherwise liable), to the extent such liability has resulted primarily from the gross negligence or willful misconduct of such

Indemnitee, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. Furthermore, Borrowers and each other Credit Party executing this Agreement waives and agrees not to assert against any Indemnitee, and shall cause each other Credit Party to waive and not assert against any Indemnitee, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted against any Related Person.

(b) Without limiting the foregoing, "Indemnified Matters" includes all Environmental Liabilities, including those arising from, or otherwise involving, any property of any Credit Party or any Related Person of any Credit Party or any actual, alleged or prospective damage to property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such property or natural resource or any property on or contiguous to any Real Estate of any Credit Party or any Related Person or any Credit Party, whether or not, with respect to any such Environmental Liabilities, any Indemnitee is a mortgagee pursuant to any leasehold mortgage, a mortgagee in possession, the successor-in-interest to any Credit Party or any Related Person of any Credit Party or the owner, lessee or operator of any property of any Related Person through any foreclosure action, in each case except to the extent such Environmental Liabilities (i) are incurred solely following foreclosure by Agent or following Agent or any Lender having become the successor-in-interest to any Credit Party or any Related Person of any Credit Party and (ii) are attributable solely to acts of such Indemnitee.

9.7    Marshaling; Payments Set Aside.  No Secured Party shall be under any obligation to marshal any property in favor of any Credit Party or any other Person or against or in payment of any Obligation.  To the extent that any Secured Party receives a payment from Borrowers, from any other Credit Party, from the proceeds of the Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

9.8    Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that any assignment by any Lender shall be subject to the provisions of Section 9.9, and provided further that Borrowers may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Lender.

9.9    Assignments and Participations; Binding Effect.

(a)    Binding Effect.  This Agreement shall become effective when it shall have been executed by Borrowers, the other Credit Parties signatory hereto and Agent and when Agent shall have been notified by each Lender that such Lender has executed it.  Thereafter, it shall be binding upon and inure to the benefit of, but only to

61

the benefit of, Borrowers, the other Credit Parties hereto (in each case except for Article VIII), Agent, each Lender receiving the benefits of the Loan Documents and, to the extent provided in Section 8.11, each other Secured Party and, in each case, their respective successors and permitted assigns. Except as expressly provided in any Loan Document (including in Section 8.9), none of Borrowers, any other Credit Party or Agent shall have the right to assign any rights or obligations hereunder or any interest herein.

(b)　　Right to Assign. Each Lender may sell, transfer, negotiate or assign (a "Sale") all or a portion of its rights and obligations hereunder (including all or a portion of its Commitments and its rights and obligations with respect to Loans and Letters of Credit) to (i) any existing Lender, (ii) any Affiliate or Approved Fund of any existing Lender or (iii) any other Person acceptable (which acceptance shall not be unreasonably withheld or delayed) to Agent and, as long as no Event of Default is continuing, Borrower Representative (which acceptances shall be deemed to have been given unless an objection is delivered to Agent within five (5) Business Days after notice of a proposed sale is delivered to Borrower Representative); provided, however, that (v) [reserved], (w) for each Loan, the aggregate outstanding principal amount (determined as of the effective date of the applicable Assignment) of the Loans, Commitments subject to any such Sale shall be in a minimum amount of $1,000,000, unless such Sale is made to an existing Lender or an Affiliate or Approved Fund of any existing Lender, is of the assignor's (together with its Affiliates and Approved Funds) entire interest in such facility or is made with the prior consent of Borrower Representative (to the extent required) and Agent, (x) such Sales shall be effective only upon the acknowledgement in writing of such Sale by Agent, (y) interest accrued prior to and through the date of any such Sale may not be assigned, and (z) such Sales by Non-Funding Lenders shall be subject to Agent's prior written consent in all instances. Agent's refusal to accept a Sale to a Credit Party, an Affiliate of a Credit Party, a holder of Indebtedness subordinated to the Loans or an Affiliate of such a holder, or the imposition of conditions or limitations (including limitations on voting) upon Sales to such Persons, shall not be deemed to be unreasonable.

(c)　　Procedure. The parties to each Sale made in reliance on clause (b) above (other than those described in clause (e) or (f) below) shall execute and deliver to Agent an Assignment via an electronic settlement system designated by Agent (or, if previously agreed with Agent, via a manual execution and delivery of the Assignment) evidencing such Sale, together with any existing Note subject to such Sale (or any affidavit of loss therefor acceptable to Agent), any tax forms required to be delivered pursuant to Section 10.1 and payment of an assignment fee in the amount of $3,500 to Agent, unless waived or reduced by Agent; provided, that (i) if a Sale by a Lender is made to an Affiliate or an Approved Fund of such assigning Lender, then no assignment fee shall be due in connection with such Sale, and (ii) if a Sale by a Lender is made to an assignee that is not an Affiliate or Approved Fund of such assignor Lender, and concurrently to one or more Affiliates or Approved Funds of such Assignee, then only one assignment fee of $3,500 shall be due in connection with such Sale (unless waived or reduced by Agent). Upon receipt of all the foregoing, and conditioned upon such receipt and, if such Assignment is made in accordance with clause (iii) of subsection 9.9(b), upon Agent (and Borrowers, if applicable) consenting to such Assignment, from and after

the effective date specified in such Assignment, Agent shall record or cause to be recorded in the Register the information contained in such Assignment.

(d)    Effectiveness.  Subject to the recording of an Assignment by Agent in the Register pursuant to subsection 1.4(b), (i) the assignee thereunder shall become a party hereto and, to the extent that rights and obligations under the Loan Documents have been assigned to such assignee pursuant to such Assignment, shall have the rights and obligations of a Lender, (ii) any applicable Note shall be transferred to such assignee through such entry and (iii) the assignor thereunder shall, to the extent that rights and obligations under this Agreement have been assigned by it pursuant to such Assignment, relinquish its rights (except for those surviving the termination of the Commitments and the payment in full of the Obligations) and be released from its obligations under the Loan Documents, other than those relating to events or circumstances occurring prior to such assignment (and, in the case of an Assignment covering all or the remaining portion of an assigning Lender's rights and obligations under the Loan Documents, such Lender shall cease to be a party hereto).

(e)    Grant of Security Interests.  In addition to the other rights provided in this Section 9.9, each Lender may grant a security interest in, or otherwise assign as collateral, any of its rights under this Agreement, whether now owned or hereafter acquired (including rights to payments of principal or interest on the Loans), to (A) any federal reserve bank (pursuant to Regulation A of the Federal Reserve Board), without notice to Agent or (B) any holder of, or trustee for the benefit of the holders of, such Lender's Indebtedness or equity securities, by notice to Agent; provided, however, that no such holder or trustee, whether because of such grant or assignment or any foreclosure thereon (unless such foreclosure is made through an assignment in accordance with clause (b) above), shall be entitled to any rights of such Lender hereunder and no such Lender shall be relieved of any of its obligations hereunder.

(f)    Participants and SPVs.  In addition to the other rights provided in this Section 9.9, each Lender may, (x) with notice to Agent, grant to an SPV the option to make all or any part of any Loan that such Lender would otherwise be required to make hereunder (and the exercise of such option by such SPV and the making of Loans pursuant thereto shall satisfy the obligation of such Lender to make such Loans hereunder) and such SPV may assign to such Lender the right to receive payment with respect to any Obligation and (y) without notice to or consent from Agent or Borrowers, sell participations to one or more Persons in or to all or a portion of its rights and obligations under the Loan Documents (including all its rights and obligations with respect to the Loans); provided, however, that, whether as a result of any term of any Loan Document or of such grant or participation, (i) no such SPV or participant shall have a commitment, or be deemed to have made an offer to commit, to make Loans hereunder, and, except as provided in the applicable option agreement, none shall be liable for any obligation of such Lender hereunder, (ii) such Lender's rights and obligations, and the rights and obligations of the Credit Parties and the Secured Parties towards such Lender, under any Loan Document shall remain unchanged and each other party hereto shall continue to deal solely with such Lender, which shall remain the holder of the Obligations in the Register, except that (A) each such participant and SPV shall be

entitled to the benefit of <u>Article X</u>, but, with respect to <u>Section 10.1</u>, only to the extent such participant or SPV delivers the tax forms such Lender is required to collect pursuant to <u>subsection 10.1(f)</u> and then only to the extent of any amount to which such Lender would be entitled in the absence of any such grant or participation and (B) each such SPV may receive other payments that would otherwise be made to such Lender with respect to Loans funded by such SPV to the extent provided in the applicable option agreement and set forth in a notice provided to Agent by such SPV and such Lender, provided, however, that in no case (including pursuant to <u>clause (A)</u> or <u>(B)</u> above) shall an SPV or participant have the right to enforce any of the terms of any Loan Document, and (iii) the consent of such SPV or participant shall not be required (either directly, as a restraint on such Lender's ability to consent hereunder or otherwise) for any amendments, waivers or consents with respect to any Loan Document or to exercise or refrain from exercising any powers or rights such Lender may have under or in respect of the Loan Documents (including the right to enforce or direct enforcement of the Obligations), except for those described in <u>clauses (ii)</u> and <u>(iii)</u> of <u>subsection 9.1(a)</u> with respect to amounts, or dates fixed for payment of amounts, to which such participant or SPV would otherwise be entitled and, in the case of participants, except for those described in <u>clause (vi)</u> of <u>subsection 9.1(a)</u>. No party hereto shall institute (and each Borrower shall cause each other Credit Party not to institute) against any SPV grantee of an option pursuant to this <u>clause (f)</u> any bankruptcy, reorganization, insolvency, liquidation or similar proceeding, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper of such SPV; provided, however, that each Lender having designated an SPV as such agrees to indemnify each Indemnitee against any Liability that may be incurred by, or asserted against, such Indemnitee as a result of failing to institute such proceeding (including a failure to get reimbursed by such SPV for any such Liability). The agreement in the preceding sentence shall survive the termination of the Commitments and the payment in full of the Obligations.

9.10    <u>Non-Public Information; Confidentiality.</u>

(a)    <u>Non-Public Information</u>.  Agent and each Lender acknowledges and agrees that it may receive material non-public information ("<u>MNPI</u>") hereunder concerning the Credit Parties and their Affiliates and agrees to use such information in compliance with all relevant policies, procedures and applicable Requirements of Laws (including United States federal and state security laws and regulations).

(b)    <u>Confidential Information</u>.  Until the Termination Date, each Lender and Agent agrees to use all reasonable efforts to maintain, in accordance with its customary practices, the confidentiality of information obtained by it pursuant to any Loan Document and designated in writing by any Credit Party as confidential or reasonably understood to be confidential, except that, subject to the HIPAA Business Associate Agreement, except that such information may be disclosed (i) with Borrowers' consent, (ii) to Related Persons of such Lender or Agent, as the case may be, that are advised of the confidential nature of such information and are instructed to keep such information confidential in accordance with the terms hereof, (iii) to the extent such information presently is or hereafter becomes (A) publicly available other than as a result of a breach of this <u>Section 9.10</u> or (B) available to such Lender or Agent or any of their

Related Persons, as the case may be, from a source (other than any Credit Party) not known by them to be subject to disclosure restrictions, (iv) to the extent disclosure is required by applicable Requirements of Law or other legal process or requested or demanded by any Governmental Authority, (v) to the extent necessary or customary for inclusion in league table measurements, (vi) (A) to the National Association of Insurance Commissioners or any similar organization, any examiner or any nationally recognized rating agency or (B) otherwise to the extent consisting of general portfolio information that does not identify Credit Parties, (vii) to current or prospective assignees, SPVs (including the investors or prospective investors therein) or participants, direct or contractual counterparties to any Secured Rate Contracts and to their respective Related Persons, in each case to the extent such assignees, investors, participants, counterparties or Related Persons agree to be bound by provisions substantially similar to the provisions of this Section 9.10 (and such Person may disclose information to their respective Related Persons in accordance with clause (ii) above), (viii) to any other party hereto, and (ix) in connection with the exercise or enforcement of any right or remedy under any Loan Document, in connection with any litigation or other proceeding to which such Lender or Agent or any of their Related Persons is a party or bound, or to the extent necessary to respond to public statements or disclosures by Credit Parties or their Related Persons referring to a Lender or Agent or any of their Related Persons. In the event of any conflict between the terms of this Section 9.10 and those of any other Contractual Obligation entered into with any Credit Party (whether or not a Loan Document), the terms of this Section 9.10 shall govern.

(c)     Tombstones.  Each Credit Party consents to the publication by Agent or any Lender of advertising material relating to the financing transactions contemplated by this Agreement using any Credit Party's name, product photographs, logo or trademark.  Agent or such Lender shall provide a draft of any advertising material to Borrower Representative for review and comment prior to the publication thereof.

(d)     Press Release and Related Matters.  No Credit Party shall, and no Credit Party shall permit any of its Affiliates to, issue any press release or other public disclosure (other than any document filed with the Bankruptcy Court) using the name, logo or otherwise referring to GE Capital or of any of its Affiliates, the Loan Documents or any transaction contemplated therein to which Agent is party without the prior consent of GE Capital except to the extent required to do so under applicable Requirements of Law and then, only after consulting with GE Capital.

(e)     Distribution of Materials to Lenders.  The Credit Parties acknowledge and agree that the Loan Documents and all reports, notices, communications and other information or materials provided or delivered by, or on behalf of, the Credit Parties hereunder (collectively, the "Borrower Materials") may be disseminated by, or on behalf of, Agent, and made available, to Lenders by posting such Borrower Materials on an E-System. The Credit Parties authorize Agent to download copies of their logos from its website and post copies thereof on an E-System.

(f)     Material Non-Public Information.  The Credit Parties hereby agree that if either they, any parent company or any Subsidiary of the Credit Parties has

publicly traded equity or debt securities in the U.S., they shall (and shall cause such parent company or Subsidiary, as the case may be, to) (i) identify in writing, and (ii) to the extent reasonably practicable, clearly and conspicuously mark such Borrower Materials that contain only information that is publicly available or that is not material for purposes of U.S. federal and state securities laws as "PUBLIC". The Credit Parties agree that by identifying such Borrower Materials as "PUBLIC" or publicly filing such Borrower Materials with the Securities and Exchange Commission, then Agent and Lenders shall be entitled to treat such Borrower Materials as not containing any MNPI for purposes of U.S. federal and state securities laws. The Credit Parties further represent, warrant, acknowledge and agree that the following documents and materials shall be deemed to be PUBLIC, whether or not so marked, and do not contain any MNPI: (A) the Loan Documents, including the schedules and exhibits attached thereto, and (B) administrative materials of a customary nature prepared by the Credit Parties or Agent (including, Notices of Borrowing, and any similar requests or notices posted on or through an E-System). Before distribution of any Borrower Materials, the Credit Parties agree to execute and deliver to Agent a letter authorizing distribution of the evaluation materials to prospective Lenders and their employees willing to receive MNPI, and a separate letter authorizing distribution of evaluation materials that do not contain MNPI and represent that no MNPI is contained therein.

9.11    Set-off; Sharing of Payments.

(a)    Right of Setoff.  Each of Agent, each Lender and each Affiliate (including each branch office thereof) of any of them is hereby authorized (notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, or order from, the Bankruptcy Court), without notice or demand (each of which is hereby waived by each Credit Party), at any time and from time to time during the continuance of any Event of Default and to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (whether general or special, time or demand, provisional or final) at any time held and other Indebtedness, claims or other obligations at any time owing by Agent, such Lender or any of their respective Affiliates to or for the credit or the account of Borrowers or any other Credit Party against any Obligation of any Credit Party now or hereafter existing, whether or not any demand was made under any Loan Document with respect to such Obligation and even though such Obligation may be unmatured.  No Lender shall exercise any such right of setoff without the prior consent of Agent or Required Lenders. Each of Agent, each Lender agrees promptly to notify Borrower Representative and Agent after any such setoff and application made by such Lender or its Affiliates; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application.  The rights under this Section 9.11 are in addition to any other rights and remedies (including other rights of setoff) that Agent, Lenders, their Affiliates and the other Secured Parties, may have.

(b)    Sharing of Payments, Etc.  If any Lender, directly or through an Affiliate or branch office thereof, obtains any payment of any Obligation of any Credit Party (whether voluntary, involuntary or through the exercise of any right of setoff or the receipt of any Collateral or "proceeds" (as defined under the applicable UCC) of

Collateral) other than pursuant to <u>Section 9.9</u> or <u>Article X</u> and such payment exceeds the amount such Lender would have been entitled to receive if all payments had gone to, and been distributed by, Agent in accordance with the provisions of the Loan Documents, such Lender shall purchase for cash from other Lenders such participations in their Obligations as necessary for such Lender to share such excess payment with such Lenders to ensure such payment is applied as though it had been received by Agent and applied in accordance with this Agreement (or, if such application would then be at the discretion of Borrowers, applied to repay the Obligations in accordance herewith); provided, however, that (a) if such payment is rescinded or otherwise recovered from such Lender in whole or in part, such purchase shall be rescinded and the purchase price therefor shall be returned to such Lender without interest and (b) such Lender shall, to the fullest extent permitted by applicable Requirements of Law, be able to exercise all its rights of payment (including the right of setoff) with respect to such participation as fully as if such Lender were the direct creditor of the applicable Credit Party in the amount of such participation.  If a Non-Funding Lender receives any such payment as described in the previous sentence, such Lender shall turn over such payments to Agent in an amount that would satisfy the cash collateral requirements set forth in <u>subsection 1.11(b)</u>.

9.12  <u>Counterparts; Facsimile Signature</u>.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Agreement by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

9.13  <u>Severability</u>.  The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

9.14  <u>Captions</u>.  The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

9.15  <u>Independence of Provisions</u>.  The parties hereto acknowledge that this Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters, and that such limitations, tests and measurements are cumulative and must each be performed, except as expressly stated to the contrary in this Agreement.

9.16  <u>Interpretation</u>.  This Agreement is the result of negotiations among and has been reviewed by counsel to Credit Parties, Agent, each Lender and other parties hereto, and is the product of all parties hereto.  Accordingly, this Agreement and the other Loan Documents shall not be construed against Lenders or Agent merely because of Agent's or Lenders' involvement in the preparation of such documents and agreements.  Without limiting the generality of the foregoing, each of the parties hereto has had the advice of counsel with respect to <u>Sections 9.18</u> and <u>9.19</u>.

67

9.17    No Third Parties Benefited.  This Agreement is made and entered into for the sole protection and legal benefit of Borrowers, Lenders, Agent and, subject to the provisions of Section 8.11, each other Secured Party, and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents.  Neither Agent nor any Lender shall have any obligation to any Person not a party to this Agreement or the other Loan Documents.

9.18    Governing Law and Jurisdiction.

(a)    Governing Law.  The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Agreement, including its validity, interpretation, construction, performance and enforcement.

(b)    Submission to Jurisdiction.  Any legal action or proceeding with respect to any Loan Document shall be brought exclusively in the Bankruptcy Court, to the extent that the Bankruptcy Court has jurisdiction over the matter and, if no such jurisdiction exists, in the courts of the State of New York located in the City of New York, Borough of Manhattan, or of the United States of America for the Southern District of New York and, by execution and delivery of this Agreement, Borrowers and each other Credit Party executing this Agreement hereby accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts; provided that nothing in this Agreement shall limit the right of Agent to commence any proceeding in the federal or state courts of any other jurisdiction to the extent Agent determines that such action is necessary or appropriate to exercise its rights or remedies under the Loan Documents.  The parties hereto (and, to the extent set forth in any other Loan Document, each other Credit Party) hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

(c)    Service of Process.  Each Credit Party hereby irrevocably waives personal service of any and all legal process, summons, notices and other documents and other service of process of any kind and consents to such service in any suit, action or proceeding brought in the United States of America with respect to or otherwise arising out of or in connection with any Loan Document by any means permitted by applicable Requirements of Law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of Borrowers specified herein (and shall be effective when such mailing shall be effective, as provided therein).  Each Credit Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(d)    Non-Exclusive Jurisdiction.  Nothing contained in this Section 9.18 shall affect the right of Agent or any Lender to serve process in any other manner permitted by applicable Requirements of Law or commence legal proceedings or otherwise proceed against any Credit Party in any other jurisdiction.

68

9.19   Waiver of Jury Trial.  THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY.  THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

9.20   Entire Agreement; Release; Survival.

(a)   THE LOAN DOCUMENTS EMBODY THE ENTIRE AGREEMENT OF THE PARTIES AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER THEREOF AND ANY PRIOR LETTER OF INTEREST, COMMITMENT LETTER, CONFIDENTIALITY AND SIMILAR AGREEMENTS INVOLVING ANY CREDIT PARTY AND ANY LENDER OR ANY OF THEIR RESPECTIVE AFFILIATES RELATING TO A FINANCING OF SUBSTANTIALLY SIMILAR FORM, PURPOSE OR EFFECT OTHER THAN THE FEE LETTER.  IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT, THE TERMS OF THIS AGREEMENT SHALL GOVERN (UNLESS SUCH TERMS OF SUCH OTHER LOAN DOCUMENTS ARE NECESSARY TO COMPLY WITH APPLICABLE REQUIREMENTS OF LAW, IN WHICH CASE SUCH TERMS SHALL GOVERN TO THE EXTENT NECESSARY TO COMPLY THEREWITH).

(b)   Execution of this Agreement by the Credit Parties constitutes a full, complete and irrevocable release of any and all claims which each Credit Party may have at law or in equity in respect of all prior discussions and understandings, oral or written, relating to the subject matter of this Agreement and the other Loan Documents. In no event shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).  Borrowers and each other Credit Party signatory hereto hereby waives, releases and agrees (and shall cause each other Credit Party to waive, release and agree) not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)   (i) Any indemnification or other protection provided to any Indemnitee pursuant to this Section 9.20, Sections 9.5 (Costs and Expenses) and 9.6 (Indemnity) and Articles VIII (Agent) and X (Taxes, Yield Protection and Illegality), in each case, shall (x) survive the termination of the Commitments and the payment in full of all other Obligations and (y) with respect to clause (i) above, inure to the benefit of any Person that at any time held a right thereunder (as an Indemnitee or otherwise) and, thereafter, its successors and permitted assigns.

9.21   Patriot Act.  Each Lender that is subject to the Patriot Act hereby notifies the Credit Parties that pursuant to the requirements of the Patriot Act, it is required to

SF:278847.8

obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender to identify each Credit Party in accordance with the Patriot Act.

9.22 <u>Replacement of Lender</u>. Within forty-five days after: (i) receipt by Borrower Representative of written notice and demand from any Lender that is not Agent or an Affiliate of Agent (an "<u>Affected Lender</u>") for payment of additional costs as provided in <u>Sections 10.1</u>, <u>10.3</u> and/or <u>10.6</u>; or (ii) any failure by any Lender (other than Agent) to consent to a requested amendment, waiver or modification to any Loan Document in which Required Lenders have already consented to such amendment, waiver or modification but the consent of each Lender (or each Lender directly affected thereby, as applicable) is required with respect thereto, Borrowers may, at their option, notify Agent and such Affected Lender (or such defaulting or non-consenting Lender, as the case may be) of Borrowers' intention to obtain, at Borrowers' expense, a replacement Lender ("<u>Replacement Lender</u>") for such Affected Lender (or such defaulting or non-consenting Lender, as the case may be), which Replacement Lender shall be satisfactory to Agent. In the event Borrowers obtain a Replacement Lender within forty-five (45) days following notice of its intention to do so, the Affected Lender (or defaulting or non-consenting Lender, as the case may be) shall sell and assign its Loans and Commitments to such Replacement Lender, at par, provided that Borrowers have reimbursed such Affected Lender for its increased costs for which it is entitled to reimbursement under this Agreement through the date of such sale and assignment. In the event that a replaced Lender does not execute an Assignment pursuant to <u>Section 9.9</u> within five (5) Business Days after receipt by such replaced Lender of notice of replacement pursuant to this <u>Section 9.22</u> and presentation to such replaced Lender of an Assignment evidencing an assignment pursuant to this <u>Section 9.22</u>, Borrowers shall be entitled (but not obligated) to execute such an Assignment on behalf of such replaced Lender, and any such Assignment so executed by Borrowers, the Replacement Lender and Agent, shall be effective for purposes of this <u>Section 9.22</u> and <u>Section 9.9</u>. Notwithstanding the foregoing, with respect to a Lender that is a Non-Funding Lender or an Impacted Lender, Borrowers or Agent may obtain a Replacement Lender and execute an Assignment on behalf of such Non-Funding Lender or an Impacted Lender at any time and without prior notice to such Non-Funding Lender or an Impacted Lender and cause its Loans and Commitments to be sold and assigned at par. Upon any such assignment and payment and compliance with the other provisions of <u>Section 9.9</u>, such replaced Lender shall no longer constitute a "Lender" for purposes hereof; provided, any rights of such replaced Lender to indemnification hereunder shall survive.

9.23 <u>Joint and Several</u>. The obligations of the Credit Parties hereunder and under the other Loan Documents are joint and several.

9.24 <u>Creditor-Debtor Relationship</u>. The relationship between Agent and each Lender, on the one hand, and the Credit Parties, on the other hand, is solely that of creditor and debtor. No Secured Party has any fiduciary relationship or duty to any Credit Party arising out of or in connection with, and there is no agency, tenancy or joint venture relationship between the Secured Parties and the Credit Parties by virtue of, any Loan Document or any transaction contemplated therein.

70

9.25    Actions in Concert.  Notwithstanding anything contained herein to the contrary, each Lender hereby agrees with each other Lender that no Lender shall take any action to protect or enforce its rights against any Credit Party arising out of this Agreement or any other Loan Document (including exercising any rights of setoff) without first obtaining the prior written consent of Agent or Required Lenders, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the other Loan Documents shall be taken in concert and at the direction or with the consent of Agent or Required Lenders.

9.26    Parties Including Trustees; Bankruptcy Court Proceedings.    This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Credit Party, the estate of Borrowers, and any trustee, other estate representative or any successor in interest of Borrowers in any Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Agent and Lenders and their respective assigns, transferees and endorsees.  The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Credit Party to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Agent file financing statements or otherwise perfect its Liens under applicable law.  No Credit Party may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of Agent and Lenders.  Any such purported assignment, transfer, hypothecation or other conveyance by any Credit Party without the prior express written consent of Agent and Lenders shall be void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Credit Party, Agent and Lenders with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

## ARTICLE X.
## TAXES

10.1    Taxes.

(a)    Except as otherwise provided in this Section 10.1, each payment by any Credit Party under any Loan Document shall be made free and clear of all present or future taxes, levies, imposts, deductions, charges or withholdings imposed by any Governmental Authority and all liabilities with respect thereto (and without deduction for any of them) (collectively, but excluding the taxes set forth in clauses (i) and (ii) below, the "Taxes") other than for (i) taxes measured by overall net income (however denominated, including branch profits taxes) and franchise taxes imposed in lieu of net income taxes, in each case imposed on any Secured Party by the jurisdiction (or any

political subdivision thereof) in which such Secured Party is organized, maintains its principal office or applicable Lending Office, or (ii) taxes that are directly attributable to the failure (other than as a result of a change in any Requirement of Law) by Agent or any Lender to deliver the documentation required to be delivered pursuant to <u>clause (f)</u> below.

(b)     If any Taxes shall be required by law to be deducted from or in respect of any amount payable under any Loan Document to any Secured Party (i) such amount shall be increased as necessary to ensure that, after all required deductions for Taxes are made (including deductions applicable to any increases to any amount under this <u>Section 10.1</u>), such Secured Party receives the amount it would have received had no such deductions been made, (ii) the relevant Credit Party shall make such deductions, (iii) the relevant Credit Party shall timely pay the full amount deducted to the relevant taxing authority or other authority in accordance with applicable Requirements of Law and (iv) within 30 days after such payment is made, the relevant Credit Party shall deliver to Agent an original or certified copy of a receipt evidencing such payment or other evidence of payment satisfactory to Agent; provided, however, that no such increase shall be made with respect to, and no Credit Party shall be required to indemnify any Secured Party pursuant to <u>clause (d)</u> below for, (x) withholding taxes to the extent that the obligation to withhold amounts existed on the date that such Person became a "Secured Party" under this Agreement in the capacity under which such Person makes a claim under this <u>clause (b)</u>, designates a new Lending Office or experiences a change in circumstances (other than a change in a Requirement of Law), except in each case to the extent such Person is a direct or indirect assignee (other than pursuant to <u>Section 9.22</u>) of any other Secured Party that was entitled, at the time the assignment to such Person became effective, or such Secured Party was entitled at the time of designation of a new Lending Office or change in circumstances, to receive additional amounts under this <u>clause (b)</u>, or (y) any United States backup withholding tax required by the Code to be withheld from amounts payable to a Secured Party that is subject to backup withholding due to (A) notified payee underreporting of reportable interest or dividend payments or other reportable payments or (B) the IRS notifying Agent or Borrowers that the furnished taxpayer identification number is incorrect.

(c)     In addition, Borrowers agree to pay, and authorize Agent to pay in their name, any stamp, documentary, excise or property tax, charges or similar levies imposed by any applicable Requirement of Law or Governmental Authority and all Liabilities with respect thereto (including by reason of any delay in payment thereof), in each case arising from the execution, delivery or registration of, or otherwise with respect to, any Loan Document or any transaction contemplated therein (collectively, "<u>Other Taxes</u>").  Within 30 days after the date of any payment of Other Taxes by any Credit Party, Borrowers shall furnish to Agent, at its address referred to in <u>Section 9.2</u>, the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment satisfactory to Agent.

(d)     Borrowers shall reimburse and indemnify, within 30 days after receipt of demand therefor (with copy to Agent), each Secured Party for all Taxes and Other Taxes (including any Taxes and Other Taxes imposed by any jurisdiction on

amounts payable under this <u>Section 10.1</u>) paid by such Secured Party and any Liabilities arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted. A certificate of the Secured Party (or of Agent on behalf of such Secured Party) claiming any compensation under this <u>clause (d)</u>, setting forth the amounts to be paid thereunder and delivered to Borrower Representative with copy to Agent, shall be conclusive, binding and final for all purposes, absent manifest error. In determining such amount, Agent and such Secured Party may use any reasonable averaging and attribution methods.

        (e)      Any Lender claiming any additional amounts payable pursuant to this <u>Section 10.1</u> shall use its commercially reasonable efforts (consistent with its internal policies and Requirements of Law) to change the jurisdiction of its Lending Office if such a change would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the sole determination of such Lender, be otherwise disadvantageous to such Lender.

        (f)      (i) Each Non-U.S. Lender Party that, at any of the following times, is entitled to an exemption from United States withholding tax or is subject to such withholding tax at a reduced rate under an applicable tax treaty, shall (w) on or prior to the date such Non-U.S. Lender Party becomes a "Non-U.S. Lender Party" hereunder, (x) on or prior to the date on which any such form or certification expires or becomes obsolete, (y) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this <u>clause (i)</u> and (z) from time to time if requested by Borrower Representative or Agent (or, in the case of a participant or SPV, the relevant Lender), provide Agent and Borrower Representative (or, in the case of a participant or SPV, the relevant Lender) with two completed originals of each of the following, as applicable: (A) Forms W-8ECI (claiming exemption from U.S. withholding tax because the income is effectively connected with a U.S. trade or business), W-8BEN (claiming exemption from, or a reduction of, U.S. withholding tax under an income tax treaty) and/or W-8IMY (together with appropriate forms, certifications and supporting statements) or any successor forms, (B) in the case of a Non-U.S. Lender Party claiming exemption under Sections 871(h) or 881(c) of the Code, Form W-8BEN (claiming exemption from U.S. withholding tax under the portfolio interest exemption) or any successor form and a certificate in form and substance acceptable to Agent that such Non-U.S. Lender Party is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of Borrowers within the meaning of Section 881(c)(3)(B) of the Code or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code or (C) any other applicable document prescribed by the IRS certifying as to the entitlement of such Non-U.S. Lender Party to such exemption from United States withholding tax or reduced rate with respect to all payments to be made to such Non-U.S. Lender Party under the Loan Documents. Unless Borrower Representative and Agent have received forms or other documents satisfactory to them indicating that payments under any Loan Document to or for a Non-U.S. Lender Party are not subject to United States withholding tax or are subject to such tax at a rate reduced by an applicable tax treaty, the Credit Parties and Agent shall withhold amounts required to be withheld by applicable Requirements of Law from such payments at the applicable statutory rate.

(ii)     Each U.S. Lender Party shall (A) on or prior to the date such U.S. Lender Party becomes a "U.S. Lender Party" hereunder, (B) on or prior to the date on which any such form or certification expires or becomes obsolete, (C) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this <u>clause (f)</u> and (D) from time to time if requested by Borrower Representative or Agent (or, in the case of a participant or SPV, the relevant Lender), provide Agent and Borrowers (or, in the case of a participant or SPV, the relevant Lender) with two completed originals of Form W-9 (certifying that such U.S. Lender Party is entitled to an exemption from U.S. backup withholding tax) or any successor form.

(iii)     Each Lender having sold a participation in any of its Obligations or identified an SPV as such to Agent shall collect from such participant or SPV the documents described in this <u>clause (f)</u> and provide them to Agent.

10.2     <u>Certificates of Lenders</u>.     Any Lender claiming reimbursement or compensation pursuant to this <u>Article X</u> shall deliver to Borrower Representative (with a copy to Agent) a certificate setting forth in reasonable detail the amount payable to such Lender hereunder and such certificate shall be conclusive and binding on Borrowers in the absence of manifest error.

**ARTICLE XI.**
**CROSS-GUARANTY**

11.1     <u>Cross-Guaranty</u>.     Each Borrower hereby agrees that such Borrower is jointly and severally liable for, and hereby absolutely and unconditionally guarantees to Agent and Lenders and their respective successors and assigns, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of, all Obligations owed or hereafter owing to Agent and Lenders by each other Borrower. Each Borrower agrees that its guaranty obligation hereunder is a continuing guaranty of payment and performance and not of collection, that its obligations under this <u>Article XI</u> shall not be discharged until payment and performance, in full, of the Obligations has occurred, and that its obligations under this <u>Article XI</u> shall be absolute and unconditional, irrespective of, and unaffected by:

(a)     the genuineness, validity, regularity, enforceability or any future amendment of, or change in, this Agreement, any other Loan Document or any other agreement, document or instrument to which any Borrower is or may become a party;

(b)     the absence of any action to enforce this Agreement (including this <u>Article XI</u>) or any other Loan Document or the waiver or consent by Agent and Lenders with respect to any of the provisions thereof;

(c)     the existence, value or condition of, or failure to perfect its Lien against, any security for the Obligations or any action, or the absence of any action, by Agent and Lenders in respect thereof (including the release of any such security);

(d)     the insolvency of any Credit Party; or

(e)    any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor.

Each Borrower shall be regarded, and shall be in the same position, as principal debtor with respect to the Obligations guaranteed hereunder.

11.2    Waivers By Borrowers.  Each Borrower expressly waives all rights it may have now or in the future under any statute, or at common law, or at law or in equity, or otherwise, to compel Agent or Lenders to marshal assets or to proceed in respect of the Obligations guaranteed hereunder against any other Credit Party, any other party or against any security for the payment and performance of the Obligations before proceeding against, or as a condition to proceeding against, such Borrower.  It is agreed among each Borrower, Agent and Lenders that the foregoing waivers are of the essence of the transaction contemplated by this Agreement and the other Loan Documents and that, but for the provisions of this Article XI and such waivers, Agent and Lenders would decline to enter into this Agreement.

11.3    Benefit of Guaranty.  Each Borrower agrees that the provisions of this Article XI are for the benefit of Agent and Lenders and their respective successors, transferees, endorsees and assigns, and nothing herein contained shall impair, as between any other Borrower and Agent or Lenders, the obligations of such other Borrower under the Loan Documents.

11.4    Waiver of Subrogation, Etc.  Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, and except as set forth in Section 10.7, each Borrower hereby expressly and irrevocably waives any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off and any and all defenses available to a surety, guarantor or accommodation co-obligor.  Each Borrower acknowledges and agrees that this waiver is intended to benefit Agent and Lenders and shall not limit or otherwise affect such Borrower's liability hereunder or the enforceability of this Article 10, and that Agent, Lenders and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this Section 10.4.

11.5    Election of Remedies.  If Agent or any Lender may, under applicable law, proceed to realize its benefits under any of the Loan Documents giving Agent or such Lender a Lien upon any Collateral, whether owned by any Borrower or by any other Person, either by judicial foreclosure or by non-judicial sale or enforcement, Agent or any Lender may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this Article XI.  If, in the exercise of any of its rights and remedies, Agent or any Lender shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Borrower or any other Person, whether because of any applicable laws pertaining to "election of remedies" or the like, each Borrower hereby consents to such action by Agent or such Lender and waives any claim based upon such action, even if such action by Agent or such Lender shall result in a full or partial loss of any rights of subrogation that each Borrower might otherwise have had but for such action by Agent or such

Lender. Any election of remedies that results in the denial or impairment of the right of Agent or any Lender to seek a deficiency judgment against any Borrower shall not impair any other Borrower's obligation to pay the full amount of the Obligations. In the event Agent or any Lender shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the Loan Documents, Agent or such Lender may bid all or less than the amount of the Obligations and the amount of such bid need not be paid by Agent or such Lender but shall be credited against the Obligations. The amount of the successful bid at any such sale, whether Agent, Lender or any other party is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of the Obligations guaranteed under this <u>Article XI</u>, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which Agent or any Lender might otherwise be entitled but for such bidding at any such sale.

11.6  <u>Limitation</u>.  Notwithstanding any provision herein contained to the contrary, each Borrower's liability under this <u>Article XI</u> (which liability is in any event in addition to amounts for which such Borrower is primarily liable under <u>Article I</u>) shall be limited to an amount not to exceed as of any date of determination the greater of:

(a)  the net amount of all Loans advanced to any other Borrower under this Agreement and then re-loaned or otherwise transferred to, or for the benefit of, such Borrower; and

(b)  the amount that could be claimed by Agent and Lenders from such Borrower under this <u>Article XI</u> without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law after taking into account, among other things, such Borrower's right of contribution and indemnification from each other Borrower under <u>Section 11.7</u>.

11.7  <u>Contribution with respect to Guarantee Obligations</u>.

(a)  To the extent that any Borrower shall make a payment under this <u>Article XI</u> of all or any of the Obligations (other than Loans made to that Borrower for which it is primarily liable) (a "<u>Guarantor Payment</u>") that, taking into account all other Guarantor Payments then previously or concurrently made by any other Borrower, exceeds the amount that such Borrower would otherwise have paid if each Borrower had paid the aggregate Obligations satisfied by such Guarantor Payment in the same proportion that such Borrower's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Borrowers as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Obligations and termination of the Commitments, such Borrower shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Borrower for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

76

(b)     As of any date of determination, the "Allocable Amount" of any Borrower shall be equal to the maximum amount of the claim that could then be recovered from such Borrower under this Article XI without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.

(c)     This Section 11.7 is intended only to define the relative rights of Borrowers and nothing set forth in this Section 11.7 is intended to or shall impair the obligations of Borrowers, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement, including Section 11.1.  Nothing contained in this Section 11.7 shall limit the liability of any Borrower to pay the Loans made directly or indirectly to that Borrower and accrued interest, fees and expenses with respect thereto for which such Borrower shall be primarily liable.

(d)     The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Borrower to which such contribution and indemnification is owing.

(e)     The rights of the indemnifying Borrowers against other Credit Parties under this Section 11.7 shall be exercisable upon the full and indefeasible payment of the Obligations and the termination of the Commitments.

11.8   Liability Cumulative.  The liability of Borrowers under this Article XI is in addition to and shall be cumulative with all liabilities of each Borrower to Agent and Lenders under this Agreement and the other Loan Documents to which such Borrower is a party or in respect of any Obligations or obligation of the other Borrower, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

# ARTICLE XII.
# DEFINITIONS

12.1   Defined Terms.  The following terms are defined in the Sections or subsections referenced opposite such terms:

| | |
|---|---|
| "Accounts Information" | 4.16 |
| "Affected Lender" | 9.22 |
| "Agent Report" | 8.5(c) |
| "Agreement" | Preamble |
| "Allocable Amount" | 11.7(a) |
| "Aptium Excess Amount" | 1.18(c) |
| "Aptium Shortfall Amount" | 1.18(c) |
| "Bankruptcy Court" | Recitals |
| "Borrower" | Preamble |
| "Borrower Materials" | 9.10(e) |

| | |
|---|---|
| "Borrower Representative" | 1.12 |
| "Chapter 11 Cases" | Recitals |
| "Commitment" | 1.1 |
| "Default Rate" | 1.3(c) |
| "Event of Default" | 7.1 |
| "Fee Letter" | 1.9(b) |
| "Fees and Expenses" | 1.9(d) |
| "Guarantor Payment" | 11.7(a) |
| "GE Capital" | Preamble |
| "Government Receivables Account Agreement" | See Exhibit 4.11 |
| "HIPAA Compliance Date" | 3.24 |
| "HIPAA Compliance Plan" | 3.24 |
| "HIPAA Compliant" | 3.24 |
| "Indemnified Matters" | 9.6 |
| "Indemnitees" | 9.6 |
| "Intercompany Notes" | 5.5(f) |
| "Investments" | 5.4 |
| "Lender" | Preamble |
| "Loans" | 1.1 |
| "Maximum Lawful Rate" | 1.3(d) |
| "MNPI" | 9.10(a) |
| "Mugavero" | Preamble |
| "OFAC" | 3.27 |
| "Other Lender" | 1.11(e) |
| "Other Taxes" | 10.1(c) |
| "Pax Christi" | Preamble |
| "Petition Date" | Recitals |
| "Register" | 1.4(b) |
| "Released Parties" | 1.16 |
| "Releasing Parties" | 1.16 |
| "Restricted Payments" | 5.11 |
| "Replacement Lender" | 9.22 |
| "Sale" | 9.9(b) |
| "SDN List" | 3.27 |
| "Settlement Date" | 1.11(b) |
| "St. Jerome's" | Preamble |
| "SVCMC" | Preamble |
| "Taxes" | 10.1(a) |
| "Unused Commitment Fee" | 1.9(b) |

In addition to the terms defined elsewhere in this Agreement, the following terms have the following meanings:

"Account Debtor" means the customer of a Credit Party who is obligated on or under an Account.

SF:278847.8

"Accounts" means all "accounts," as such term is defined in the UCC, now owned or hereafter acquired by any Credit Party, including (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper, or Instruments), including any such obligations that may be characterized as an account or contract right under the Code, (b) all of each Credit Party's rights in, to and under all purchase orders or receipts for goods or services, (c) all of each Credit Party's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (d) all rights to payment due to any Credit Party for property sold, leased, licensed, assigned or otherwise disposed of, for a policy of insurance issued or to be issued, for a secondary obligation incurred or to be incurred, for energy provided or to be provided, for the use or hire of a vessel under a charter or other contract, arising out of the use of a credit card or charge card, or for services rendered or to be rendered by such Credit Party or in connection with any other transaction (whether or not yet earned by performance on the part of such Credit Party), (e) all healthcare insurance receivables and (f) all collateral security of any kind, now or hereafter in existence, given by any Account Debtor or any other Person with respect to any of the foregoing.

"Acquisition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (b) the acquisition of in excess of fifty percent (50%) of the Stock and Stock Equivalents of any Person or otherwise causing any Person to become a Subsidiary of a Borrower, or (c) a merger or consolidation or any other combination with another Person.

"Adequate Protection Obligations" shall mean all provisions in the Interim Order or the Final Order granting adequate protection to or otherwise providing benefits to the Pre-Petition Agent or the Pre-Petition Lenders.

"Affiliate" means, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract or otherwise. Without limitation, any director, executive officer or beneficial owner of five percent (5%) or more of the Stock (either directly or through ownership of Stock Equivalents) of a Person shall for the purposes of this Agreement, be deemed to be an Affiliate of the other Person. Notwithstanding the foregoing, neither Agent nor any Lender shall be deemed an "Affiliate" of any Credit Party or of any Subsidiary of any Credit Party solely by reason of the provisions of the Loan Documents.

"Agent" means GE Capital in its capacity as administrative agent for Lenders hereunder, and any successor administrative agent.

"Aggregate Commitment" means the combined Commitments of Lenders, which shall initially be in the amount set forth in Schedule 1.1, as such amount may be modified from time to time pursuant to this Agreement.

"Applicable Margin" means three percent (3%) per annum.

"Approved Budget" means a budget of Borrowers satisfactory to Agent in its discretion, as such budget may be modified from time to time with the approval of Agent in its discretion.

"Approved Fund" means, with respect to any Lender, any Person (other than a natural Person) that (a) (i) is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the Ordinary Course of Business or (ii) temporarily warehouses loans for any Lender or any Person described in clause (i) above and (b) is advised or managed by (i) such Lender, (ii) any Affiliate of such Lender or (iii) any Person (other than an individual) or any Affiliate of any Person (other than an individual) that administers or manages such Lender.

"Aptium" means Aptium W. New York, Inc., formerly known as Comprehensive Cancer Corporation of New York, a New York corporation.

"Aptium Control Account" means SVCMC's bank account #7922714493 at TD Bank, N.A., or such other bank account of SVCMC designated by SVCMC and Aptium from time to time (which account Aptium has informed Agent is subject to a control agreement in favor of Aptium).

"Aptium Daily Estimation Distribution" for each Business Day in any Month, means an amount equal to (i) the Aptium Estimation Amount for such Month, divided by (ii) the number of Business Days in such Month.

"Aptium Estimation Amount" means, for any Month, the estimated amount of collections from Aptium Receivables expected to be deposited into the Collection Account during such Month, which amount shall be determined based on actual reconciled amounts collected during the trailing three months after adjusting for any extraordinary cash receipts such as third party settlements.

"Aptium  Estimation Report" means, for any Month, a report prepared and delivered by SVCMC and approved by Aptium, setting forth the Aptium Estimation Amount for the next succeeding month.

"Aptium Intercreditor Agreement" means the Intercreditor Agreement, dated as of August 30, 2007, among Agent and Aptium and accepted and agreed by SVCMC, as such agreement may be amended, modified or supplemented from time to time in accordance with its terms.

"Aptium Receivables" shall have the meaning set forth in the Aptium Intercreditor Agreement.

"Aptium Services Agreement" means that certain Second Amended and Restated Consulting and Administrative Services Agreement initially dated as of April 11, 1996, as extended and as clarified by the letter dated May 1, 2007 from Aptium to SVCMC, by and between Aptium and SVCMC, as in effect on the Closing Date.

"Assignment" means an assignment agreement entered into by a Lender, as assignor, and any Person, as assignee, pursuant to the terms and provisions of Section 9.9 (with the consent of any party whose consent is required by Section 9.9), accepted by Agent, in substantially in the form of Exhibit 12.1(a) or any other form approved by Agent.

"Attorney Costs" means and includes all fees, expenses and disbursements of any law firm or other external counsel.

"Bankruptcy Code" shall mean the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, 11 U.S.C. §§101 *et seq*, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"Base Rate" means, for any day, a rate per annum equal to the highest of (a) the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by Agent) or any similar release by the Federal Reserve Board (as determined by Agent), and (b) the sum of three percent (3.00%) per annum and the Federal Funds Rate.

"Benefit Plan" means any employee benefit plan as defined in Section 3(3) of ERISA (whether governed by the laws of the United States or otherwise) to which any Credit Party incurs or otherwise has any obligation or liability, contingent or otherwise.

"Borrowing" means a borrowing hereunder consisting of Loans made to or for the benefit of Borrowers on the same day by Lenders pursuant to Article I.

"Business Day" means any day other than a Saturday, Sunday or other day on which federal reserve banks are authorized or required by law to close.

"Capital Adequacy Regulation" means any guideline, request or directive of any central bank or other Governmental Authority, or any other law, rule or regulation, whether or not having the force of law, in each case, regarding capital adequacy of any Lender or of any corporation controlling a Lender.

"Capital Lease" means any leasing or similar arrangement which, in accordance with GAAP, is classified as a capital lease.

"Capital Lease Obligations" means all monetary obligations of any Credit Party or any Subsidiary of any Credit Party under any Capital Leases.

81

"Carveout" shall have the meaning ascribed thereto in the Orders; provided, that no portion or proceeds of the Carveout shall be used in any manner that is inconsistent with terms of the Orders.

"Cash Equivalents" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency of the United States federal government the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state of the United States, (d) any Dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) any Lender or (ii) any commercial bank that is (A) organized under the laws of the United States, any state thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000 and (e) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; provided, however, that the maturities of all obligations specified in any of clauses (a), (b), (c) or (d) above shall not exceed 365 days.

"Chattel Paper" means all "chattel paper", as such term is defined in the UCC, now owned or hereafter acquired by any Credit Party, wherever located.

"Chief Restructuring Officer" means Mark Toney or such other Person retained in accordance with subsection 2.1(h) and/or Section 4.17 and acceptable to Agent in all respects.

"Closing Checklist" means the closing checklist attached as Exhibit 2.1 hereto.

"Closing Date" shall mean the date that this Agreement has been duly executed by the parties hereto and delivered to Agent and all other conditions set forth in Section 2.1 have been satisfied or waived and on which the initial Loans are advanced under this Agreement.

"Closure Plan" means that certain closure plan submitted by SVCMC to the New York Department of Health with respect to the closure of the Main Hospital Facility.

"CMS" means the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services.

"Code" means the Internal Revenue Code of 1986, as amended, and regulations promulgated thereunder.

"Collateral" means all Property and interests in Property and proceeds thereof now owned or hereafter acquired by any Credit Party, any of their respective Subsidiaries and any other Person who has granted a Lien to Agent, in or upon which a Lien is granted or purported to be granted or now or hereafter exists in favor of any Lender or Agent for the benefit of Agent, Lenders and other Secured Parties, whether under this Agreement or under any other documents executed by any such Persons and delivered to Agent.

"Collateral Documents" means, collectively, the Mortgages, each Depositary Agreement, the Security Agreement and all other security agreements, pledge agreements, patent and trademark security agreements, lease assignments, guarantees and other similar agreements, and all amendments, restatements, modifications or supplements thereof or thereto, by or between any one or more of any Credit Party, and any Lender or Agent for the benefit of Agent, Lenders and other Secured Parties now or hereafter delivered to Lenders or Agent pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or hereafter filed in accordance with the UCC or comparable law) against any such Person as debtor in favor of any Lender or Agent for the benefit of Agent, Lenders and the other Secured Parties, as secured party, as any of the foregoing may be amended, restated and/or modified from time to time.

"Collection Account" means that certain account of Agent, account number 502-69-534 in the name of Agent at DeutscheBank Trust Company Americas in New York, New York ABA No. 021 001 033, or such other account as may be specified in writing by Agent as the "Collection Account".

"Commercial Tort Claims" means all "commercial tort claims", as such term is defined in the UCC, now owned or hereafter acquired by any Credit Party, wherever located.

"Commitment Percentage" means, as to any Lender, the percentage equivalent of such Lender's Commitment divided by the Aggregate Loan Commitment; provided that after the Loans have been funded, Commitment Percentages shall be determined for the respective Loans by reference to the outstanding principal balances thereof as of any date of determination rather than the Commitments therefor.

"Committees" shall mean, collectively, the official committee of unsecured creditors and any other official committee formed, appointed or approved in the Chapter 11 Cases, and each of such Committees shall be referred to herein as a "Committee".

"Compliance Certificate" has the meaning given thereto in subsection 4.2(b).

"Contingent Obligation" means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person: (a) with respect to any Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the

Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto; (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (c) under any Rate Contracts; (d) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (e) for the obligations of another Person through any agreement to purchase, repurchase or otherwise acquire such obligation or any Property constituting security therefor, to provide funds for the payment or discharge of such obligation or to maintain the solvency, financial condition or any balance sheet item or level of income of another Person. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if not a fixed and determined amount, the maximum amount so guaranteed or supported.

"Contractual Obligations" means, as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement to which such Person is a party or by which it or any of its Property is bound.

"Copyrights" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to copyrights and all mask work, database and design rights, whether or not registered or published, all registrations and recordations thereof and all applications in connection therewith.

"Credit and Collection Policy" means those credit and collection policies and practices of Borrowers with respect to Accounts in effect on the date of this Agreement, as such policies and practices may be modified from time to time with the consent of Agent.

"Credit Parties" means SVCMC, St. Jerome's, Pax Christi, Mugavero, St. Elizabeth Ann's and each Borrower and each other Person (i) which executes a guaranty of the Obligations, or (ii) which grants a Lien on all or substantially all of its assets to secure payment of the Obligations.

"Debtors" shall mean, collectively, Borrowers and other Affiliates who file Chapter 11 Cases, as debtors and debtors in possession in cases under the Bankruptcy Code.

"Default" means any event or circumstance which, with the giving of notice, the lapse of time, or both, would (if not cured or otherwise remedied during such time) constitute an Event of Default.

"Deposit Accounts" means all "deposit accounts", as such term is defined in the UCC, now owned or hereafter acquired by any Credit Party, wherever located.

"Depositary Agreement" means any agreement entered into among any Borrower, Agent, and a depository institution pursuant to Exhibit 4.11.

"Designated Borrowers" means SVCMC and each other Borrower whose receipts and disbursements are covered by the Approved Budget.

"Disposition" means (a) the sale, assignment, lease, sublease, license, transfer, conveyance or other disposition of Property, and (b) the sale or transfer by a Borrower or any Subsidiary of a Borrower of any Stock or Stock Equivalent issued by any Subsidiary of a Borrower and held by such transferor Person.

"DOJ" means the United States Department of Justice.

"Dollars", "dollars" and "$" each mean lawful money of the United States of America.

"Electronic Transmission" means each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail or E-Fax, or otherwise to or from an E-System or other equivalent service acceptable to Agent.

"Environmental Laws" means all applicable federal, state, local and foreign laws, statutes, ordinances, codes, rules, standards and regulations, now or hereafter in effect, and any applicable judicial or administrative interpretation thereof, including any applicable judicial or administrative order, consent decree, order or judgment, imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). Environmental Laws include the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.) ("CERCLA"); the Hazardous Materials Transportation Authorization Act of 1994 (49 U.S.C. §§ 5101 et seq.); the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136 et seq.); the Solid Waste Disposal Act (42 U.S.C. §§ 6901 et seq.); the Toxic Substance Control Act (15 U.S.C. §§ 2601 et seq.); the Clean Air Act (42 U.S.C. §§ 7401 et seq.); the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 et seq.); the Occupational Safety and Health Act (29 U.S.C. §§ 651 et seq.); and the Safe Drinking Water Act (42 U.S.C. §§ 300(f) et seq.), law regarding the disposal of medical waste and any and all regulations promulgated thereunder, and all analogous state, and local counterparts or equivalents.

"Environmental Liabilities" means all Liabilities (including costs of Remedial Actions, natural resource damages and costs and expenses of investigation and feasibility studies, including the cost of environmental consultants and the cost of attorney's fees) that may be imposed on, incurred by or asserted against any Credit Party or any Subsidiary of any Credit Party as a result of, or related to, any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law or otherwise, arising under any Environmental Law or in connection with any environmental, health or safety condition or with any Release and resulting from the

ownership, lease, sublease or other operation or occupation of property by any Credit Party or any Subsidiary of any Credit Party, whether on, prior or after the date hereof.

"Equipment" means all "equipment," as such term is defined in the UCC, now owned or hereafter acquired by any Credit Party, wherever located.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means, collectively, any Credit Party and any Person under common control or treated as a single employer with, any Credit Party, within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"ERISA Event" means any of the following: (a) a reportable event described in Section 4043(b) of ERISA (or, unless the 30-day notice requirement has been duly waived under the applicable regulations, Section 4043(c) of ERISA) with respect to a Title IV Plan; (b) the withdrawal of any ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any ERISA Affiliate from any Multiemployer Plan; (d) with respect to any Multiemployer Plan, the filing of a notice of reorganization, insolvency or termination (or treatment of a plan amendment as termination) under Section 4041A of ERISA; (e) the filing of a notice of intent to terminate a Title IV Plan (or treatment of a plan amendment as termination) under Section 4041 of ERISA; (f) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (g) the failure to make any required contribution to any Title IV Plan or Multiemployer Plan when due; (h) the imposition of a lien under Section 412 or 430(k) of the Code or Section 303 or 4068 of ERISA on any property (or rights to property, whether real or personal) of any ERISA Affiliate; (i) the failure of a Benefit Plan or any trust thereunder intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Requirements of Law to qualify thereunder; (j) a Title IV plan is in "at risk" status within the meaning of Code Section 430(i); (k) a Multiemployer Plan is in "endangered status" or "critical status" within the meaning of Section 432(b) of the Code; and (l) any other event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the imposition of any material liability upon any ERISA Affiliate under Title IV of ERISA other than for PBGC premiums due but not delinquent.

"Event of Loss" means, with respect to any Property, any of the following: (a) any loss, destruction or damage of such Property; (b) any pending or threatened institution of any proceedings for the condemnation or seizure of such Property or for the exercise of any right of eminent domain; or (c) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property.

"E-Fax" means any system used to receive or transmit faxes electronically.

"E-Signature" means the process of attaching to or logically associating with an Electronic Transmission an electronic symbol, encryption, digital signature or process (including the name or an abbreviation of the name of the party transmitting the Electronic Transmission) with the intent to sign, authenticate or accept such Electronic Transmission.

"E-System" means any electronic system approved by Agent, including Intralinks® and ClearPar® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by Agent, any of its Related Persons or any other Person, providing for access to data protected by passcodes or other security system.

"Facility" means (a) the acute care medical and surgical hospital commonly known as Saint Vincents Catholic Medical Center, (b) the long term care facility commonly known as the Bishop Francis J. Mugavero Center for Geriatric Care, Inc., (c) the hospice commonly known as Pax Christi Hospice, (d) the long term care facility commonly known as Holy Family Home in Brooklyn, NY and operated by St. Jerome's, (e) Saint Vincents Hospital Westchester, and (f) the business conducted by any Borrower's home care division.

"Federal and/or State Healthcare Programs" means one or more of the Medicare, Medicaid, Tricare/CHAMPUS, Veterans, and black lung disease programs and any other health care plan or program that provides health benefits, whether directly, through insurance or otherwise, which is funded directly, in whole or in part, by the United States government, other than the federal employee health benefits program; and any program receiving funds under Titles V, XVIII (including Medicare), XIX (including Medicaid), and XX of the Social Security Act, or from an allotment to a state under such title, or a state child health plan approved under Title XXI of the Social Security Act.

"Federal Flood Insurance" means Federally backed Flood Insurance available under the National Flood Insurance Program to owners of real property improvements located in Special Flood Hazard Areas in a community participating in the National Flood Insurance Program.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to Agent on such day on such transactions as determined by Agent in a commercially reasonable manner.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System, or any entity succeeding to any of its principal functions.

"Federal/State Healthcare Program Account Debtor" means any Account Debtor which is (a) the United States of America acting under the Medicaid/Medicare program

established pursuant to the Social Security Act, the Tricare/CHAMPUS Program or any other Federally sponsored healthcare program other than the healthcare programs for which Federal government employees are beneficiaries, (b) any state or the District of Columbia acting pursuant to a health plan adopted pursuant to Title XIX of the Social Security Act or other Federal or State statute or (c) any agent, carrier, administrator or intermediary for any of the foregoing.

"FEMA" means the Federal Emergency Management Agency, a component of the U.S. Department of Homeland Security that administers the National Flood Insurance Program.

"FIRREA" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to Agent, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless Agent waives such requirement), together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Agent, which, among other matters but not by way of limitation, authorizes Borrowers to obtain credit, incur or guaranty Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of Agent's and Lenders' claims.

"Final Order Entry Date" means the date upon which the Final Order is entered by the Bankruptcy Court.

"Financial Advisor" means Grant Thornton or such other Person retained in accordance with subsection 2.1(h) or Section 4.18 and acceptable to Agent in all respects

"Financial Statements" means financial statements delivered or required to be delivered pursuant to subsection 4.1(b).

"Fiscal Month" means any of the monthly accounting periods of the Credit Parties ending on the last day of each calendar month.

"Fiscal Quarter" means any of the quarterly accounting periods of the Credit Parties, ending on March 31, June 30, September 30 and December 31 of each year.

"Fiscal Year" means any of the annual accounting periods of the Credit Parties ending on December 31 of each year.

"Fixtures" means all "fixtures", as such term is defined in the UCC, now owned or hereafter acquired by any Credit Party, wherever located.

"Flood Insurance" means, for any Real Estate located in a Special Flood Hazard Area, Federal Flood Insurance or private insurance that meets the requirements set forth by FEMA in its *Mandatory Purchase of Flood Insurance Guidelines*. Flood Insurance shall be in an amount equal to the full, unpaid balance of the Loans and any prior liens on the Real Estate up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Agent, with deductibles not to exceed $50,000.

"GAAP" means generally accepted accounting principles in the United States set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), which are applicable to the circumstances as of the date of determination, subject to Section 12.3 hereof.

"General Intangibles" means all "general intangibles", as such term is defined in the UCC, now owned or hereafter acquired by any Credit Party, wherever located.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"Government Receivables Account" means any deposit account into which a Governmental Authority directly deposits government health care program receivables or into which a Borrower deposits or directs the deposit of checks received from a Governmental Authority representing government health care receivables.

"Hazardous Materials" means any substance, material or waste that is regulated or otherwise gives rise to liability under any Environmental Law, including any "Hazardous Waste" as defined by the Resource Conservation and Recovery Act (RCRA) (42 U.S.C. § 6901 et seq. (1976)), any "Hazardous Substance" as defined under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. §9601 et seq. (1980)), any contaminant, pollutant, petroleum or any fraction thereof, asbestos, asbestos containing material, polychlorinated biphenyls, mold, and radioactive substances or any other substance that is toxic, ignitable, reactive, corrosive, caustic, or dangerous.

"Healthcare Laws" means all applicable statutes, laws, ordinances, rules and regulations of any Governmental Authority with respect to the regulation of patient health care and the submission of claims for reimbursement including: (1) federal fraud and abuse laws and regulations, including, the federal patient referral law, 42 U.S.C. §1395nn, commonly known as "Stark II", the federal anti-kickback law, 42 U.S.C. §1320a-7b, the federal civil monetary penalty statute 42 U.S.C. §1320a-7a, federal laws and regulations regarding the submission of false claims, false billing, false coding, and similar state laws and regulations; (2) federal and state laws applicable to reimbursement

and reassignment; (3) HIPAA; (4) federal laws and regulations affecting the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act and any statutes succeeding thereto; (5) laws affecting the Tricare/CHAMPUS, Veterans, and black lung disease programs and any other health care program financed with United States government funds; (6) all federal laws and regulations affecting the medical assistance program established by Titles V, XIX, XX, and XXI of the Social Security Act and any laws succeeding thereto, and all state laws and plans for medical assistance enacted in connection with the federal laws and regulations; (7) the Emergency Medical Treatment and Labor Act, commonly known as "EMTALA"; and (8) any other federal or state law or regulation governing health care.

"HHS" means the United States Department of Health and Human Services.

"HIPAA" means the administrative simplification provisions of the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"HIPAA Business Associate Agreement" means a HIPAA business associate agreement between each Credit Party and Agent, in form acceptable to Agent in its good faith credit judgment.

"Impacted Lender" means any Lender that fails promptly to provide Agent, upon Agent's request, satisfactory assurance that such Lender will not become a Non-Funding Lender.

"Indebtedness" of any Person means, without duplication: (a) all indebtedness for borrowed money; (b) all obligations issued, undertaken or assumed as the deferred purchase price of Property or services (other than trade payables entered into in the Ordinary Course of Business); (c) the face amount of all letters of credit issued for the account of such Person and without duplication, all drafts drawn thereunder and all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments issued by such Person; (d) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of Property, assets or businesses; (e) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to Property acquired by the Person (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such Property); (f) all Capital Lease Obligations; (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing product; (h) all obligations, whether or not contingent, to purchase, redeem, retire, defease or otherwise acquire for value any of its own Stock or Stock Equivalents (or any Stock or Stock Equivalent of a direct or indirect parent entity thereof); (i) all indebtedness referred to in clauses (a) through (h) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in Property (including accounts and contracts rights) owned by such Person, even though such Person has not

90

assumed or become liable for the payment of such indebtedness; and (j) all Contingent Obligations described in <u>clause (a)</u> of the definition thereof in respect of indebtedness or obligations of others of the kinds referred to in <u>clauses (a)</u> through <u>(i)</u> above.

"**Insurer**" means a Person that insures a patient against certain of the costs incurred in the receipt by such patient of Medical Services, or that has an agreement with a Borrower to compensate such Borrower for providing goods or services to a patient.

"**Instruments**" means all "instruments", as such term is defined in the UCC, now owned or hereafter acquired by any Credit Party, wherever located.

"**Intellectual Property**" means all rights, title and interests in or relating to intellectual property and industrial property arising under any Requirement of Law and all IP Ancillary Rights relating thereto, including all Copyrights, Patents, Trademarks, Internet Domain Names, Trade Secrets and IP Licenses.

"**Interest Payment Date**" means the first day of each month.

"**Interim Order**" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to Agent and Lenders, which, among other matters (but not by way of limitation, authorizes, on an interim basis, Borrowers to execute and perform under the terms of this Agreement and the other Loan Documents).

"**Internet Domain Name**" means all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to internet domain names.

"**Inventory**" means all of the "inventory" (as such term is defined in the UCC) of the Credit Parties, including all merchandise, raw materials, parts, supplies, work-in-process and finished goods intended for sale, together with all the containers, packing, packaging, shipping and similar materials related thereto, and including such inventory as is temporarily out of a Credit Party's custody or possession, including inventory on the premises of others and items in transit.

"**Investment Banker**" means Cain Brothers or such other Person retained in accordance with <u>subsection 2.1(h)</u> or <u>Section 4.19</u> and acceptable to Agent in all respects.

"**Investment Property**" means all "investment property", as such term is defined in the UCC, now owned or hereafter acquired by any Credit Party, wherever located.

"**IP Ancillary Rights**" means, with respect to any other Intellectual Property, as applicable, all foreign counterparts to, and all divisionals, reversions, continuations, continuations-in-part, reissues, reexaminations, renewals and extensions of, such Intellectual Property and all income, royalties, proceeds and Liabilities at any time due or payable or asserted under or with respect to any of the foregoing or otherwise with

respect to such Intellectual Property, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, dilution, violation or other impairment thereof, and, in each case, all rights to obtain any other IP Ancillary Right.

"IP License" means all Contractual Obligations (and all related IP Ancillary Rights), whether written or oral, granting any right, title and interest in or relating to any Intellectual Property.

"IRS" means the Internal Revenue Service of the United States and any successor thereto.

"Lender-Related Distress Event" means, with respect to any Lender or any Person that directly or indirectly controls such Lender (each a "Distressed Person"), (a) a voluntary or involuntary case with respect to such Distressed Person under the Bankruptcy Code or any similar bankruptcy laws of its jurisdiction of formation, (b) a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, (c) such Distressed Person is subject to a forced liquidation, merger, sale or other change of majority control supported in whole or in part by guaranties or other support (including the nationalization or assumption of majority ownership or operating control by) the U.S. government or other Governmental Authority, or (d) such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt. For purposes of this definition, control of a Person shall have the same meaning as in the second sentence of the definition of "Affiliate".

"Lending Office" means, with respect to any Lender, the office or offices of such Lender specified as its "Lending Office" beneath its name on the applicable signature page hereto, or such other office or offices of such Lender as it may from time to time notify Borrower Representative and Agent.

"Letter of Credit Rights" means all "letter of credit rights", as such term is defined in the UCC, now owned or hereafter acquired by any Credit Party, wherever located.

"Liabilities" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, taxes, commissions, charges, disbursements and expenses, in each case of any kind or nature (including interest accrued thereon or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge or deposit arrangement, encumbrance, lien (statutory or otherwise) or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including those created by, arising under or evidenced by any conditional

sale or other title retention agreement, the interest of a lessor under a Capital Lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of any financing statement naming the owner of the asset to which such lien relates as debtor, under the UCC or any comparable law) and any contingent or other agreement to provide any of the foregoing, but not including the interest of a lessor under a lease which is not a Capital Lease.

"Loan" means an extension of credit by a Lender to Borrowers pursuant to Article I.

"Loan Documents" means this Agreement, the Notes, the Transaction Side Letter, the Fee Letter, the Collateral Documents, and all documents delivered to Agent and/or any Lender in connection with any of the foregoing.

"Main Hospital Facility" means the Facility owned by SVCMC as of the date hereof that is commonly known as the "Main Hospital Campus" and is situate on block numbers 607 and 617 of lot 1 in New York County, New York.

"Margin Stock" means "margin stock" as such term is defined in Regulation T, U or X of the Federal Reserve Board.

"Material Adverse Effect" means a material adverse condition or material adverse change, other than the filing of the Chapter 11 Cases, with respect to any of the following: (a) the operations, business, Properties, condition (financial or otherwise) or prospects of any Credit Party or the Credit Parties and their Subsidiaries taken as a whole; (b) the legality, validity, binding effect or enforceability of any Loan Document or the rights and remedies of Agent or Secured Party thereunder; or (c) the perfection or priority of any Lien granted to Lenders or to Agent for the benefit of the Secured Parties under any of the Collateral Documents. Without limiting the generality of the foregoing, any event or occurrence which results or would reasonably be expected to result in Liabilities (other than Liabilities which are stayed by the automatic stay) to the Credit Parties in excess of $2,000,000 individually or in the aggregate shall be deemed to have a Material Adverse Effect; provided that this $2,000,000 amount shall not apply to matters affecting collection of Accounts of the closed Main Hospital Facility.

"Maximum Permitted Loan Balance" means, as of any date, the lesser of (a) the then applicable amount of the Aggregate Commitments, and (b) in any week, 105% of the amount shown in the Approved Budget as the "DIP Balance" for such week; in each case minus any Reserves established by Agent.

"Medicaid" means the medical assistance program established by Title XIX of the Social Security Act (42 U.S.C. Secs. 1396 et seq.) and any statutes succeeding thereto.

"Medical Services" means medical and health care services provided to a patient, including medical and health care services provided to a patient, inpatient hospital services, outpatient hospital services which are covered by a policy of insurance issued by an Insurer, and includes but is not limited to physician services, nurse and therapist services, dental services, hospital services, skilled nursing facility services,

comprehensive outpatient rehabilitation services, home health care services, residential and out-patient behavioral healthcare services, and medicine or health care equipment provided to a patient for a necessary or specifically requested valid and proper medical or health purpose.

"Medicare" means the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. Secs. 1395 et seq.) and any statutes succeeding thereto.

"Monthly Report Date" means the 25th day of each Month or is such day is not a Business Day, the next succeeding Business Day.

"Mortgage" means any deed of trust, leasehold deed of trust, mortgage, leasehold mortgage, deed to secure debt, leasehold deed to secure debt or other document creating a Lien on Real Estate or any interest in Real Estate.

"Multiemployer Plan" means any multiemployer plan, as defined in Section 3(37) or 4001(a)(3) of ERISA, as to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"National Flood Insurance Program" means the program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, as revised by the National Flood Insurance Reform Act of 1994, that mandates the purchase of flood insurance to cover real property improvements located in Special Flood Hazard Areas in participating communities and provides protection to property owners through a Federal insurance program.

"Net Proceeds" means proceeds in cash, checks or other cash equivalent financial instruments (including Cash Equivalents) as and when received by Borrowers or any of their Subsidiaries from any Disposition, net of: (a) payment of investment banker fees to the extent such fees have been approved by the Court and consented to by Agent in the Transaction Side Letter or otherwise, (b) customary escrow pro-rations, (c) to the extent approved by the Court, and except as may otherwise be provided in the Transaction Side Letter, amounts required to be applied to repay any Indebtedness or other obligation secured by a Permitted Encumbrance on the asset which is the subject of such Disposition that is senior to the Lien of Agent (which shall, for the avoidance of doubt, include the Permitted Encumbrance of the Pre-Petition Agent); provided that (x) if any sale of a Designated Borrower shall include Accounts, then that portion of the sale price attributable to the Accounts shall be considered Net Proceeds and applied on account of the Loans and (y) in the case of a Disposition involving sale of the business or real property of a Nursing Home Borrower, the Net Proceeds received from such Disposition and any other property the owned by such Nursing Home Borrower shall, at the option of Agent, be applied on account of the Obligations rather than on account of the Pre-Petition Obligations.

"Non-Funding Lender" means any Lender (a) that has failed to fund any payments required to be made by it under the Loan Documents within two (2) Business

Days after any such payment is due, (b) that has given verbal or written notice to a Borrower, Agent or any Lender or has otherwise publicly announced that such Lender believes it will fail to fund all payments required to be made by it or fund all purchases of participations required to be funded by it under this Agreement and the other Loan Documents, (c) as to which Agent has a good faith belief that such Lender or an Affiliate of such Lender has defaulted in fulfilling its obligations (as a lender, agent or letter of credit issuer) under one or more other syndicated credit facilities or (d) with respect to which one or more Lender-Related Distress Events has occurred with respect to such Person or any Person that directly or indirectly controls such Lender and Agent has determined that such Lender may become a Non-Funding Lender. For purposes of this definition, control of a Person shall have the same meaning as in the second sentence of the definition of Affiliate.

"Non-Hospital Assets" shall consist of all of the operations of Borrowers and their affiliates, other than Medical Services provided at the Main Hospital Facility.

"Non-U.S. Lender Party" means each of Agent, each Lender, each SPV and each participant, in each case that is not a United States person as defined in Section 7701(a)(30) of the Code.

"Note" means a promissory note of Borrowers payable to a Lender evidencing the Indebtedness of Borrowers to such Lender resulting from the Loans made to Borrowers by such Lender.

"Notice of Borrowing" means a notice given by Borrower Representative to Agent pursuant to Section 1.5, in substantially the form of Exhibit 12.1(c) hereto.

"Nursing Home Borrowers" means St. Jerome's, St. Elizabeth Ann's, and Mugavero.

"Obligations" means all Loans, and other Indebtedness, advances, debts, liabilities, obligations, covenants and duties owing by any Credit Party to any Lender, Agent, any Secured Swap Provider or any other Person required to be indemnified, that arises under any Loan Document or any Secured Rate Contract, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.

"OIG" means the Office of the Inspector General of HHS.

"Orders" shall mean the Interim Order or the Final Order, as applicable under the circumstances.

"Ordinary Course of Business" means, in respect of any transaction involving any Person, the ordinary course of such Person's business, as conducted by any such Person in accordance with past practice and undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any Loan Document.

"Organization Documents" means, (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation and any shareholder rights agreement, (b) for any partnership, the partnership agreement and, if applicable, certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or (d) any other document setting forth the manner of election or duties of the officers, directors, managers or other similar persons, or the designation, amount or relative rights, limitations and preference of the Stock of a Person.

"Patents" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to letters patent and applications therefor.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56, as amended.

"PBGC" means the United States Pension Benefit Guaranty Corporation any successor thereto.

"Permits" means, with respect to any Person, any permit, approval, authorization, license, registration, certificate, concession, grant, franchise, variance or permission from, and any other Contractual Obligations with, any Governmental Authority, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Permitted Encumbrances" means the following encumbrances:

(a)     Liens on property or assets of the Borrowers and the Subsidiaries existing on the Petition Date;

(b)     any Lien created under the Loan Documents;

(c)     Liens for taxes or assessments or other governmental charges not yet due or which are being contested in compliance with subsection 4.7(a) or to the extent that the Borrowers do not take any action (including by way of motion or application to the Bankruptcy Court) to pay, and are permitted under the Bankruptcy Code to not pay such charges.

(d)     (i) carriers', warehousemen's, suppliers, materialmen's, repairmen's or other like Liens arising after the Petition Date in the Ordinary Course of Business that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings, so long as such Liens attached only to inventory; (ii) inchoate and unperfected workers', mechanics' or similar Liens arising in the Ordinary Course of Business, so long as such Liens attach only to equipment, fixtures and/or real estate;

(e)     pledges and deposits made after the Petition Date in the Ordinary Course of Business in compliance with workmen's compensation, unemployment insurance and other social security laws or regulations (excluding Liens under ERISA);

(f)     deposits made after the Petition Date to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the Ordinary Course of Business;

(g)     zoning restrictions, easements, rights-of-way, restrictions on use of real property and other similar encumbrances arising after the Petition Date and incurred in the Ordinary Course of Business which, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Borrowers or any of the Subsidiaries or the ability of the Borrowers or any of the Subsidiaries to utilize such property for its intended purpose;

(h)     any interest or title of a lessor or sublessor arising after the Petition Date under any lease entered into by any Borrower or any of its Subsidiaries in the Ordinary Course of Business and covering only the assets so leased;

(i)     Liens after the Petition Date on cash deposits and other funds maintained with a depositary institution, in each case arising in the Ordinary Course of Business by virtue of any statutory or common law provision relating to banker's liens;

(j)     Liens on the Collateral securing obligations under the Pre-Petition Credit Agreements and Pre-Petition Loan Documents and adequate protection Liens in favor of the Pre-Petition Agent and the Pre-Petition Lenders;

(k)     leases, licenses, subleases or sublicenses granted after the Petition Date to others in the Ordinary Course of Business that do not (i) interfere in any material respect with the business of any Borrower or any of the Subsidiaries or (ii) secure any Indebtedness;

(l)     Liens (i) of a collection bank arising under Section 4-210 of the UCC on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the Ordinary Course of Business, and (iii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking industry;

(m)     rights of setoff upon deposits of cash in favor of banks or other depository institutions as permitted by any Depositary Agreement or Government Receivables Account or, with respect to deposits of cash not subject to a Depositary Agreement, customary rights of setoff in favor of such banks or depository institutions; and

(n)     Liens for insurance premium financing secured solely by refunds or other cash surrender amounts due under the policies financed.

97

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture or Governmental Authority.

"Petition Date" means the date on which the Chapter 11 cases were commenced.

"Plan of Reorganization" means a plan of reorganization or liquidation in form and substance satisfactory to Agent and Lenders confirmed by an order (in form and substance satisfactory to Lenders) of the Bankruptcy Court under the Chapter 11 Cases (i) containing a provision for termination of the Commitments and repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan; (ii) containing a release in favor of Agent and Lenders and their respective affiliates; (iii) containing provisions with respect to the settlement or discharge of all claims and other debts and liabilities; (iv) providing that such plan shall be in full force and effect and shall not have been modified, altered, amended or otherwise changed or supplemented without the prior written consent of Agent and Lenders; (v) from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless Agent and Lenders waive such requirement) and (v) containing such other terms as Agent and Lenders may reasonably require.

"Post-Petition" means the time period beginning immediately upon the filing of the Chapter 11 Cases.

"Pre-Petition" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"Pre-Petition Agent" means General Electric Capital Corporation, in its capacity as administrative agent under the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents.

"Pre-Petition Credit Agreement" means that certain Credit Agreement, dated as of August 30, 2007, as amended from time to time, among certain Borrowers, as credit parties, Pre-Petition Agent and Pre-Petition Lenders.

"Pre-Petition Indebtedness" means all Indebtedness and other obligations of Borrowers outstanding immediately prior to the filing of the Chapter 11 Cases, other than Indebtedness under the Pre-Petition Credit Agreement.

"Pre-Petition Lenders" means Lenders under the Pre-Petition Credit Agreement.

"Pre-Petition Lender Obligations" means the Pre-Petition Revolving Loan Obligations and the Pre-Petition Term Loan Obligations, collectively, together with all other "Obligations" (as such term is defined in the Pre-Petition Credit Agreement) arising under the Pre-Petition Credit Agreement or the Pre-Petition Loan Documents.

"Pre-Petition Loan Documents" has the meaning assigned to the term "Loan Documents" in the Pre-Petition Credit Agreement.

"Pre-Petition Revolving Loan Obligations" means any and all amounts owed by the Borrowers to the Pre-Petition Lenders with respect to revolving loans made pursuant to the Pre-Petition Credit Agreement and the Pre-Petition Loan Documents.

"Pre-Petition Term Loan Obligations" means any and all amounts owed by the Borrowers to the Pre-Petition Lenders with respect to term loans made pursuant to the Pre-Petition Credit Agreement and the Pre-Petition Loan Documents.

"Professional Fees" means allowed professional fees and expenses to any Retained Professionals.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"Rate Contracts" means swap agreements (as such term is defined in Section 101 of the Bankruptcy Code) and any other agreements or arrangements designed to provide protection against fluctuations in interest or currency exchange rates.

"Real Estate" means any Real Estate owned, leased, subleased or otherwise operated or occupied by any Credit Party or any Subsidiary of any Credit Party.

"Refinancing" means the partial refinancing by Borrowers of the Pre-Petition Lender Obligations on the Closing Date.

"Related Persons" means, with respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisor (including those retained in connection with the satisfaction or attempted satisfaction of any condition set forth in Article II) and other consultants and agents of or to such Person or any of its Affiliates.

"Releases" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material into or through the environment.

"Remedial Action" means all actions required to (a) clean up, remove, treat or in any other way address any Hazardous Material in the indoor or outdoor environment, (b) prevent or minimize any Release so that a Hazardous Material does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or (c) perform pre remedial studies and investigations and post-remedial monitoring and care with respect to any Hazardous Material.

"Required Lenders" means at any time Lenders then holding more than fifty percent (50%) of the sum of the Commitments then in effect plus the aggregate unpaid principal balance of the Loans then outstanding.

SF:278847.8

"Requirement of Law" means, as to any Person, any law (statutory or common), ordinance, treaty, rule, regulation, order, policy, other legal requirement (including any Environmental Law or Healthcare Law) or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Reserves" means an amount determined by Agent from time to time in its good faith discretion to reflect (a) expenses incurred by Borrowers that were contemplated by the Approved Budget to be paid during a week but remain outstanding in a subsequent week, and (b) any other event or circumstance that renders inaccurate the forecasts contained in the Approved Budget or that otherwise affects the Collateral or future advances with respect to the Loans.

"Responsible Officer" means the Chief Restructuring Officer, the chief executive officer or the president of a Borrower, or any other officer having substantially the same authority and responsibility; or, with respect to compliance with financial covenants or delivery of financial information, the chief financial officer or the treasurer of a Borrower or any other officer having substantially the same authority and responsibility.

"Retained Professionals" means the retained professionals of Borrowers and Committees, whose retention is approved by the Bankruptcy Court during the Chapter 11 Cases pursuant to Sections 327, 328, and 1103 of the Bankruptcy Code.

"Scheduled Maturity Date" means December 31, 2010.

"Secured Party" means Agent, each Lender, each other Indemnitee and each other holder of any Obligation of a Credit Party including each Secured Swap Provider.

"Secured Rate Contract" means any Rate Contract between Borrowers and the counterparty thereto, which (i) has been provided or arranged by GE Capital or an Affiliate of GE Capital, or (ii) Agent has acknowledged in writing constitutes a "Secured Rate Contract" hereunder.

"Secured Swap Provider" means (i) a Lender or an Affiliate of a Lender (or a Person who was a Lender or an Affiliate of a Lender at the time of execution and delivery of a Rate Contract) who has entered into a Secured Rate Contract with Borrowers, or (ii) a Person with whom a Borrower has entered into a Secured Rate Contract provided or arranged by GE Capital or an Affiliate of GE Capital, and any assignee thereof.

"Security Agreement" means the Security Agreement of even date herewith entered into by and among Agent, on behalf of itself and Lenders, and each Credit Party that is a signatory thereto.

"Senior Permitted Liens" means any Lien on property of a Credit Party on the Petition Date that (a) (i) was valid, perfected, and unavoidable, (ii) if Pre-Petition Agent held a Lien on such property on the Petition Date, such Lien was senior in priority to the Lien of Pre-Petition Agent on the Petition Date, and (iii) is stated in the Interim Order

and the Final Order to be senior to the Lien of Agent, or (b) was in favor of the Pre-Petition Agent.

"Software" means (a) all computer programs, including source code and object code versions, (b) all data, databases and compilations of data, whether machine readable or otherwise, and (c) all documentation, training materials and configurations related to any of the foregoing.

"Special Flood Hazard Area" means an area that FEMA's current flood maps indicate has at least a one percent (1%) chance of a flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year.

"SPV" means any special purpose funding vehicle identified as such in a writing by any Lender to Agent.

"Stock" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"Stock Equivalents" means all securities convertible into or exchangeable for Stock or any other Stock Equivalent and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Stock or any other Stock Equivalent, whether or not presently convertible, exchangeable or exercisable.

"Subsidiary" of a Person means any corporation, association, limited liability company, partnership, joint venture or other business entity of which more than fifty percent (50%) of the voting Stock, is owned or controlled directly or indirectly by the Person, or one or more of the Subsidiaries of the Person, or a combination thereof.

"Superpriority Claims" has the meaning specified in Section 1.14.

"Tax Affiliate" means, (a) Borrowers and their Subsidiaries and (b) any Affiliate of a Borrower with which such Borrower files or is required to file tax returns on a consolidated, combined, unitary or similar group basis.

"Termination Date" means the earliest to occur of: (a) the Scheduled Maturity Date; (b) the earlier of (i) the date upon which the Interim Order expires or (ii) thirty (30) days after the entry of the Interim Order, in either case, if the Final Order has not been entered prior to the expiration of such period; (c) if a Plan of Reorganization has been confirmed by the Bankruptcy Court, the earlier of (i) the effective date of such Plan of Reorganization or (ii) the thirtieth (30th) day after the date of entry of the confirmation order; (d) the closing of a sale of substantially all of the equity or assets of the Borrowers; (e) the date of indefeasible payment in cash in full by Borrowers of all Obligations in accordance with the terms hereof; or (f) the acceleration of the Obligations.

"Title IV Plan" means a pension plan subject to Title IV of ERISA, other than a Multiemployer Plan, to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"Trade Secrets" means all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trade secrets.

"Trademark" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers and, in each case, all goodwill associated therewith, all registrations and recordations thereof and all applications in connection therewith.

"Transaction Side Letter" means an agreement between Agent and Borrowers setting forth certain requirements and deadlines in connection with Borrowers' disposition of assets.

"Tricare/CHAMPUS" means the Civilian Health and Medical Program of the Uniformed Service, a program of medical benefits covering former and active members of the uniformed services and certain of their dependents, financed and administered by the United States Departments of Defense, Health and Human Services and Transportation and established pursuant to 10 U.S.C. §§ 1071-1106, and all regulations promulgated thereunder and any successor thereto including (a) all federal statutes (whether set forth in 10 U.S.C. §§ 1071-1106 or elsewhere) affecting health care programs for former and active members of the uniformed services and their dependents; and (b) all rules, regulations (including 32 CFR 199), manuals, orders and administrative, reimbursement and other guidelines of all Governmental Authorities (including HHS, the Department of Defense, the Department of Transportation, the Assistant Secretary of Defense (Health Affairs), and the Office of Tricare/CHAMPUS, or any Person or entity succeeding to the functions of any of the foregoing) promulgated pursuant to or in connection with any of the foregoing (whether or not having the force of law) in each case as may be amended, supplemented or otherwise modified from time to time.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York.

"United States" and "U.S." each means the United States of America.

"U.S. Lender Party" means each of Agent, each Lender, each SPV and each participant, in each case that is a United States person as defined in Section 7701(a)(30) of the Code.

"Welfare Plan" means a Plan described in Section 3(i) of ERISA.

"Wholly-Owned Subsidiary" means any Subsidiary in which (other than directors' qualifying shares required by law) one hundred percent (100%) of the Stock and Stock Equivalents, at the time as of which any determination is being made, is

102

owned, beneficially and of record, by any Credit Party, or by one or more of the other Wholly-Owned Subsidiaries, or both.

12.2    Other Interpretive Provisions.

(a)    Defined Terms.  Unless otherwise specified herein or therein, all terms defined in this Agreement or in any other Loan Document shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.  The meanings of defined terms shall be equally applicable to the singular and plural forms of the defined terms.  Terms (including uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the meanings therein described.

(b)    Terms Generally.  Wherever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The word "will" shall be construed to have the same meaning and effect as the word "shall".

(c)    The Agreement.  The words "hereof", "herein", "hereunder" and words of similar import when used in this Agreement or any other Loan Document shall refer to this Agreement or such other Loan Document as a whole and not to any particular provision of this Agreement or such other Loan Document; and subsection, section, schedule and exhibit references are to this Agreement or such other Loan Documents unless otherwise specified.

(d)    Certain Common Terms.  The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.  The term "including" is not limiting and means "including without limitation."

(e)    Performance; Time; Discretion.  Whenever any performance obligation hereunder or under any other Loan Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including." If any provision of this Agreement or any other Loan Document refers to any action taken or to be taken by any Person, or which such Person is prohibited from taking, such provision shall be interpreted to encompass any and all means, direct or indirect, of taking, or not taking, such action.  If any provision in any Loan Document refers to the "discretion" of any party thereto, such reference shall, unless otherwise specifically qualified, mean the "sole and absolute" discretion of such party.  If any provision in any Loan Document refers to a matter being "satisfactory" to any party thereto, such reference shall mean satisfactory in the "sole and absolute" discretion of such party.

(f)    Contracts.  Unless otherwise expressly provided herein or in any other Loan Document, references to agreements and other contractual instruments, including this Agreement and the other Loan Documents, shall be deemed to include all

subsequent amendments thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document.

(g) <u>Laws</u>. References to any statute or regulation are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

12.3 <u>Accounting Terms and Principles</u>. All accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in accordance with GAAP. No change in the accounting principles used in the preparation of any financial statement hereafter adopted by Borrowers shall be given effect for purposes of measuring compliance with any provision of <u>Article V</u> or <u>VI</u> unless Agent and the Required Lenders agree to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements, Compliance Certificates and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to in <u>Article V</u> and <u>Article VI</u> shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Credit Party or any Subsidiary of any Credit Party at "fair value." A breach of a financial covenant contained in <u>Article VI</u> shall be deemed to have occurred as of any date of determination by Agent or as of the last day of any specified measurement period, regardless of when the financial statements reflecting such breach are delivered to Agent.

12.4 <u>Payments</u>. Agent may set up standards and procedures to determine or redetermine the equivalent in Dollars of any amount expressed in any currency other than Dollars and otherwise may, but shall not be obligated to, rely on any determination made by any Credit Party. Any such determination or redetermination by Agent shall be conclusive and binding for all purposes, absent manifest error. No determination or redetermination by any Secured Party or any Credit Party and no other currency conversion shall change or release any obligation of any Credit Party or of any Secured Party (other than Agent and its Related Persons) under any Loan Document, each of which agrees to pay separately for any shortfall remaining after any conversion and payment of the amount as converted. Agent may round up or down, and may set up appropriate mechanisms to round up or down, any amount hereunder to nearest higher or lower amounts and may determine reasonable de minimis payment thresholds.

**[Signature Pages Follow.]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

BORROWERS:

**SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK**

By: _____
Name: _____
Title: _____

**ST. JEROME'S HEALTH SERVICES CORPORATION**

By: _____
Name: _____
Title: _____

**PAX CHRISTI HOSPICE, INC.**

By: _____
Name: _____
Title: _____

**BISHOP FRANCIS J. MUGAVERO CENTER FOR GERIATRIC CARE, INC.**

By: _____
Name: _____
Title: _____

**SISTERS OF CHARITY HEALTH CARE SYSTEM NURSING HOME, INC.**

By: _____
Name: _____
Title: _____

**SVCMC PROFESSIONAL REGISTRY, INC.**

By: _____
Name: _____
Title: _____

**CHAIT HOUSING DEVELOPMENT CORPORATION**

By: _____
Name: _____
Title: _____

**FORT PLACE HOUSING CORPORATION**

By: _____
Name: _____
Title: _____

**555 6TH AVENUE APARTMENT OPERATING CORPORATION**

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

**[NAME OF OTHER CREDIT PARTIES]**

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

GENERAL ELECTRIC CAPITAL CORPORATION, as Agent and as a Lender

By: _____
Name: _____
Title: Duly Authorized Signatory

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written

TD BANK, N.A.,
as a Lender

By: _____
Name: _____
Title: _____

Schedule 1.1

Loan Commitments

**<u>Loan Commitments</u>**

General Electric Capital Corporation    $62,400,000
TD Bank, N.A.    $15,600,000
Aggregate Commitment:    $78,000,000

SF:278847.8

Schedule 3.5

Audits, Etc.

To be added to Final Execution Copy

Schedule 3.7

Benefit Plans

To be added to Final Execution Copy

SF:278847.8

Schedule 3.9

Owned Real Property

To be added to Final Execution Copy

Schedule 3.15

Subsidiaries and Affiliates

To be added to Final Execution Copy

Schedule 3.16

Jurisdiction of Organization,
Organization Identification Number[1] and Chief Executive Office

To be added to Final Execution Copy

[1]The State of New York does not issue organization identification numbers.

SF:278847.8

Schedule 3.17

Deposit Accounts and Other Accounts

To be added to Final Execution Copy

SF:278847.8

Schedule 6.2

Financial and Budgetary Covenants; Financial Reports

1. <u>Financial Reporting</u>.

1.1. By close of business on every Tuesday following the Closing Date, Borrower Representative shall provide Agent with the following documents, each of which shall be prepared and/or approved by the Financial Advisor and certified by Borrower Representative to Agent as true, complete and correct:

1.1.1.  A reconciliation report comparing the Designated Borrowers' actual receipts and disbursements to the projected amount of receipts and disbursements set forth in the Approved Budget for the calendar week ending on the previous Friday.  The reconciliation report shall identify variances in each line item and for each entity in the Approved Budget.

1.1.2.  Commencing on the fourth Tuesday following the Closing Date, a reconciliation report comparing the Designated Borrowers' actual disbursements during the immediately preceding four week period, ending on the previous Friday, to the projected amount of disbursements set forth in the Approved Budget for such period.  The reconciliation report shall identify variances in each line item and for each entity in the Approved Budget.

1.1.3.  A trial balance showing Accounts outstanding aged from invoice date as follows: 1 to 30 days, 31 to 60 days, 61 to 90 days, 91 to 120 days, 121 to 150 days and 151 days or more, accompanied by such supporting detail and documentation as shall be requested by Agent in its discretion including a reconciliation report showing all payments and adjustments posted.

1.1.4.  A report listing all postpetition accounts payable and other postpetition liabilities (other than Professional Fees) incurred by the Designated Borrowers during the calendar week ending on the previous Friday, in a form and accompanied by such supporting detail and documentation as shall be requested by Agent in its discretion.

1.1.5.  A statement of the Designated Borrowers' cash on hand as of the previous Friday in a form and accompanied by such supporting detail and documentation as shall be requested by Agent in its discretion.

1.2. By close of business on every Tuesday following the Closing Date, Borrower Representative shall provide Agent with an updated budget (in the same format as the original Approved Budget and containing separate projections for each

division consistent with the original Approved Budget) reflecting actual financial performance for the for the calendar week ending on the previous Friday and a proposed revised version of the Approved Budget to take into account the developments during such preceding week.  If Agent, in its sole discretion, approves the updated budget then such updated budget shall become the new Approved Budget in place of the Approved Budget previously in effect.

1.3. By close of business on Tuesday of each week, Borrower Representative shall provide Agent with a report reflecting, as of the previous Friday, the status of Borrowers' progress in the disposition of each of the Non-Hospital Assets.

1.4. No later than the tenth day of each month, Borrower Representative shall provide Agent with (a) a monthly reconciliation report, for the prior month, of the number and value of accounts receivable by type with each and every vendor responsible for collecting accounts receivable, and (b) a monthly report, for the prior month, detailing the results of a review of a selection of accounts receivable (as acceptable to the Agent) for each vendor.

1.5. Each Borrower that is not a Designated Borrower shall deliver to Agent such other financial reports concerning such Borrower as Agent shall from time to time reasonably request, including the following:

   1.5.1.   By close of business on every Tuesday following the Closing Date, Borrower Representative shall provide Agent with a report showing the actual cash receipts and disbursements of each Nursing Home and of Pax Christi (until such asset has been sold) for the calendar week ending on the previous Friday.

1.6. Borrower Representative shall deliver to Agent such other financial reports as Agent shall from time to time reasonably request.

2. Adherence to Budget.

2.1. During each of the first three weeks covered by the Approved Budget, the Designated Borrowers shall not make disbursements with respect to any particular line item in the Approved Budget in excess of the amount that, when added to the amounts disbursed during the previous weeks covered by the Approved Budget with respect to such line item, would cause the aggregate disbursements for such line item during such period to exceed 110% of the aggregate amount forecast to be disbursed for such line item during such period in the Approved Budget.

2.2. During any subsequent week, the Designated Borrowers shall not make disbursements with respect to any particular line item in the Approved Budget in excess of the amount that, when added to the amounts disbursed during the

previous three weeks with respect to such line item, would cause the aggregate disbursements for such line item during such four week period to exceed, 105% of the aggregate amount forecast to be disbursed for such line item during such four-week period in the Approved Budget.

3. <u>Adherence to Closure Plan</u>.

   3.1. SVCMC shall at all times comply with the terms and conditions of the Closure Plan.

4. <u>Financial Performance</u>.

   4.1. At the close of any week, the outstanding principal amount of the Loan shall not exceed 105% of the amount projected to be outstanding for such week in the Approved Budget.

   4.2. In any particular week, the Designated Borrowers' aggregate cash receipts shall not be less than 95% of the amount forecast to be received during such week in the Approved Budget.

   4.3. The Designated Borrowers shall not incur postpetition trade credit in excess of $2,000,000 outstanding at any one time.

   4.4. As of Friday of any particular week, the Designated Borrowers shall not have cash on hand in excess of $5,000,000 in the aggregate.

SF:278847.8

**EXHIBIT 2.1**
**to**
**<u>CREDIT AGREEMENT</u>**

**CLOSING CHECKLIST**

Exhibit 2.1
Page 1

SF:278847.8

**EXHIBIT 4.11**
**to**
**CREDIT AGREEMENT**

**CASH MANAGEMENT SYSTEM**

1.      At all times following the Closing Date, SVCMC shall maintain the lockboxes (each, a "<u>Lock Box</u>" and collectively, the "<u>Lockboxes</u>") and associated lockbox accounts (each, a "<u>Lockbox Account</u>") described on <u>Schedule 3.17</u> hereof with the banks described in such schedule (each, a "<u>Lockbox Bank</u>"). SVCMC shall ensure that all collections of Accounts due from Account Debtors other than Federal/State Healthcare Program Account Debtors are paid directly from such Account Debtors into such Lockbox for deposit into such Lockbox Account, or into the Lockbox Account directly, and that all funds deposited into such Lockbox Account are immediately transferred to the Collection Account or to such other account maintained by Agent as determined by Agent in its sole discretion by written notice delivered in accordance with the applicable Lockbox Agreement. Notwithstanding any rights SVCMC may have to the contrary, SVCMC agrees that it will not modify or terminate any Depositary Agreement (as defined herein) executed with respect to a Lockbox Account during the term of the Credit Agreement without the express written consent of Agent.

2.      With respect to Accounts payable by Federal/State Healthcare Program Account Debtors, Borrowers shall establish and maintain an agreement (a "<u>Government Receivables Account Agreement</u>") and an associated account (a "<u>Government Receivables Account</u>") with the bank at which such account is located in such form as may be approved by Agent. Except as otherwise agreed by Agent in writing, Borrowers shall ensure that all collections of Accounts owed by Federal/State Healthcare Program Account Debtors are paid directly from such Account Debtors into Government Receivables Accounts established pursuant to this subsection, and that all funds deposited into each Government Receivables Account are immediately transferred to the Collection Account or to such other account maintained by Agent as determined by Agent in its sole discretion by written notice delivered in accordance with the applicable Depositary Agreement.

3.      Each Borrower shall deposit and cause its Subsidiaries to deposit or cause to be deposited promptly, and in any event no later than the first Business Day after the date of receipt thereof, all cash, checks, drafts or other similar items of payment relating to or constituting payments made in respect of any and all Collateral that have not been delivered to a Lockbox (without implying that such is permitted under the Credit Agreement) into the Collection Account except for checks from Federal/State Healthcare Program Account Debtors, which such Borrower and its subsidiaries shall deposit in a Government Receivables Account.

4.      Borrowers may maintain, in the name of Saint Vincents Catholic Medical Center, a Deposit Account (the "<u>Disbursement Account</u>") at TD Bank, N.A. or such other bank as may be acceptable to Agent into which Agent shall, from time to time, deposit proceeds

Exhibit 4.11
Page 1

of Borrowings made to Borrowers pursuant to <u>subsection 1.1</u> for use by Borrowers in accordance with the provisions of this Agreement. The terms of the Depositary Agreement governing the Disbursement Account shall provide that Borrowers may make withdrawals from the Disbursement Account, issue checks drawn on the Disbursement Account, and otherwise direct the disposition of funds in the Disbursement Account (but not to close the Disbursement Account) until such time as Agent delivers a "trigger notice" to the bank at which such account is maintained. Agent agrees not to deliver such a trigger notice unless and Event of Default has occurred and is continuing.

5.  On or before the Closing Date, each bank where any account referred to in this Exhibit 4.11 is maintained or disclosed on Schedule 3.17 (except to the extent otherwise approved by Agent) shall have entered into tri-party blocked account agreements (each, a "<u>Depositary Agreement</u>" and each account subject to a Depositary Agreement, a "<u>Blocked Account</u>") with Agent, for the benefit of itself and Lenders, and Borrowers and Subsidiaries thereof, as applicable, in form and substance acceptable to Agent in its good faith credit judgment, which shall become operative on or prior to the Closing Date. Except as modified for Government Receivables Accounts as agreed to by Agent in writing, each Depositary Agreement referred to in this Exhibit 4.11 shall provide, among other things, that (i) all items of payment deposited in such account and proceeds thereof deposited in the Collection Account are held by such bank as agent or bailee-in-possession for Agent, on behalf of itself and Lenders, (ii) the bank executing such agreement has no rights of setoff or recoupment or any other claim against such account, as the case may be, other than for payment of its service fees and other charges directly related to the administration of such account and for returned checks or other items of payment, and (iii) from and after the Closing Date (A) with respect to banks at which a Lockbox Account or Government Receivables Account is maintained, such bank agrees to forward immediately all amounts in each Lockbox Account or Government Receivables Account to the Collection Account and to commence the process of daily sweeps from such Lockbox Account or Government Receivables Account into the Collection Account or (B) with respect to depositary institutions at which a Deposit Account that is not a Lockbox Account or a Government Receivables Account is maintained, such depositary institution agrees to comply solely with the instructions of Agent following delivery by Agent of a "trigger notice" in accordance with the applicable Depositary Agreement. Agent agrees not to deliver such a trigger notice unless and Event of Default has occurred and is continuing. Borrowers shall not, and shall not cause or permit any Subsidiary thereof to, accumulate or maintain cash in Disbursement Accounts or payroll accounts as of any date of determination in excess of checks outstanding against such accounts as of that date and amounts necessary to meet minimum balance requirements. Borrowers shall not modify or revoke any agreement with a bank regarding the sweep of funds from Government Receivables Accounts to the Collection Account without the written consent of Agent.

6.  So long as no Event of Default has occurred and is continuing, Borrowers may amend <u>Schedule 3.17</u> to add or replace a bank, Lock Box, Lockbox Account or Government Receivables Account or to replace any Disbursement Account; provided, that (i) Agent

Exhibit 4.11
Page 2

SF:278847.8

shall have consented in its good faith credit judgment in writing in advance to the opening of such account or Lock Box with the relevant bank and (ii) prior to the time of the opening of such account or Lock Box, Borrowers or its Subsidiaries, as applicable, and such bank shall have executed and delivered to Agent a tri-party blocked account agreement, in form and substance satisfactory to Agent.  Borrowers shall establish replacement accounts in accordance with the foregoing sentence promptly and in any event within sixty (60) days following written notice from Agent that the creditworthiness of any bank holding an account is no longer acceptable in Agent's good faith credit judgment, or that the operating performance, funds transfer or availability procedures or performance with respect to accounts or Lockboxes of the bank holding such accounts or Agent's liability under any tri-party blocked account agreement with such bank is no longer acceptable in Agent's good faith credit judgment.  Promptly after establishing the account, and in no event after expiration of such sixty (60) day period, Borrowers shall notify each Account Debtor to remit payment to the replacement accounts and use reasonable commercial efforts to cause such Account Debtors to comply.  Borrower shall close any accounts superseded by such replacement accounts as soon as commercially reasonable, but in no event more than one year after the replacement account was established.

7.      The Lockboxes, Lockbox Accounts, Government Receivables Accounts, Blocked Accounts and Disbursement Accounts shall be cash collateral accounts, with all cash, checks and other similar items of payment in such accounts securing payment of the Loans and all other Obligations, and in which Borrowers and each Subsidiary thereof shall have granted a Lien to Agent, on behalf of itself and Lenders, pursuant to the Security Agreement.

8.      All amounts deposited in the Collection Account shall be deemed received by Agent in accordance with Section 1.10 and shall be applied (and allocated) by Agent in accordance with such Section.  In no event shall any amount be so applied unless and until such amount shall have been credited in immediately available funds to the Collection Account.

9.      Borrowers shall and shall cause its Affiliates, officers, employees, agents, directors or other Persons acting for or in concert with Borrower (each a "Related Person") to (i) hold in trust for Agent, for the benefit of itself and Lenders, all checks, cash and other items of payment received by Borrowers or any such Related Person that constitute Collateral, and (ii) within one (1) Business Day after receipt by Borrowers or any such Related Person of any checks, cash or other items of payment, deposit the same into a Lockbox Account.  Borrowers on behalf of themselves and each Related Person acknowledges and agrees that all cash, checks or other items of payment constituting proceeds of Collateral are part of the Collateral.  All proceeds of the sale or other disposition of any Collateral, shall be deposited directly into a Lockbox Account or the Collection Account.

Exhibit 4.11
Page 3

SF:278847.8

**EXHIBIT 9.2**
**to**
**CREDIT AGREEMENT**

**ADDRESSES FOR NOTICE PURPOSES**

(A)    If to Agent or GE Capital, at

General Electric Capital Corporation
Healthcare Financial Services
2 Bethesda Metro Center, Suite 600
Bethesda, MD 20814
ATTN: Saint Vincents Account Manager
Telecopier No:  (301) 664-9891
Telephone No:  (301) 664-9800

with copies to:

General Electric Capital Corporation
Healthcare Financial Services
2 Bethesda Metro Center, Suite 600
Bethesda, MD 20814
ATTN: General Counsel
Telecopier No:  (301) 664-9866
Telephone No:  (301) 664-9800

(B)    If to Borrower, at

Saint Vincents Catholic Medical Centers of New York
130 West 12th Street, Suite 6-J
New York, NY 10011
ATTN:  President
Telecopier No: (212) 604-7533
Telephone No:  (212) 604-7000
ATTN:  Chief Financial Officer
Telecopier No:  (212) 356-4439
Telephone No:  (212) 604-7000

With a copy to:

Saint Vincents Catholic Medical Centers of New York
430 W. 33rd Street, Room 457
New York, NY 10001
ATTN:  General Counsel
Telecopier No.:  (212) 356-4990
Telephone No.:  (212) 356-4791

Exhibit 9.2
Page 1

SF:278847.8

**EXHIBIT 12.1(a)**
**TO**
**CREDIT AGREEMENT**

**FORM OF ASSIGNMENT**

This ASSIGNMENT, dated as of the Effective Date, is entered into between _____ ("the Assignor") and _____ ("the Assignee").

The parties hereto hereby agree as follows:

| | |
|---|---|
| Borrower: | Saint Vincents Catholic Medical Centers of New York, a New York not-for-profit corporation, St. Jerome's Health Services Corporation, a New York not-for-profit corporation, Pax Christi Hospice, Inc., a New York not-for-profit corporation, Sisters of Charity Health Care System Nursing Home, Inc., a New York not-for-profit corporation and Bishop Francis J. Mugavero Center for Geriatric Care, Inc., a New York not-for-profit corporation (together, the "<u>Borrowers</u>") |
| Agent: | General Electric Capital Corporation, as administrative agent for the Lenders (in such capacity and together with its successors and permitted assigns, the "<u>Agent</u>") |
| Credit Agreement: | Debtor In Possession Credit Agreement, dated as of April ___, 2010, among the Borrowers, the Borrower Representative, the Credit Parties party thereto, the Lenders party thereto and the Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"; capitalized terms used herein without definition are used as defined in the Credit Agreement) |
| [Trade Date: | _____, _____][1] |
| Effective Date: | _____, _____ [2] |

---

[1] Insert for informational purposes only if needed to determine other arrangements between the assignor and the assignee.

[2] To be filled out by Agent upon entry in the Register.

Exhibit 12.1(a)
Page 1

| Loan/ Commitment Assigned[3] | Aggregate amount of Commitments or principal amount of Loans for all Lenders[4] | Aggregate amount of Commitments or principal amount of Loans Assigned[5] | Percentage Assigned[6] |
|---|---|---|---|
| | $_____ | $_____ | __.____% |
| | $_____ | $_____ | __.____% |
| | $_____ | $_____ | __.____% |

[THE REMAINDER OF THIS PAGE WAS INTENTIONALLY LEFT BLANK]

---

[3] Fill in the appropriate defined term for the type of Loan and/or Commitment under the Credit Agreement that are being assigned under this Assignment.

[4] The aggregate amounts are inserted for informational purposes only to help in calculating the percentages assigned which, themselves, are for informational purposes only.

[5] Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[6] Set forth, to at least 9 decimals, the Assigned Interest as a percentage of the aggregate Commitment or Loans in the Loan facility. This percentage is set forth for informational purposes only and is not intended to be binding. The assignments are based on the amounts assigned not on the percentages listed in this column.

Exhibit 12.1(a)
Page 2

Section 1.    Assignment.    Assignor hereby sells and assigns to Assignee, and Assignee hereby purchases and assumes from Assignor, Assignor's rights and obligations in its capacity as Lender under the Credit Agreement (including Liabilities owing to or by Assignor thereunder) and the other Loan Documents, in each case to the extent related to the amounts identified above (the "Assigned Interest").

Section 2.    Representations, Warranties and Covenants of Assignors.    Assignor (a) represents and warrants to Assignee and the Agent that (i) it has full power and authority, and has taken all actions necessary for it, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and (ii) it is the legal and beneficial owner of its Assigned Interest and that such Assigned Interest is free and clear of any Lien and other adverse claims and (iii) by executing, signing and delivering this assignment via ClearPar® or any other electronic settlement system designated by the Agent, the Person signing, executing and delivering this Assignment on behalf of the Assignor is an authorized signatory for the Assignor and is authorized to execute, sign and deliver this Agreement, (b) makes no other representation or warranty and assumes no responsibility, including with respect to the aggregate amount of the Loans and Commitments, the percentage of the Loans and Commitments represented by the amounts assigned, any statements, representations and warranties made in or in connection with any Loan Document or any other document or information furnished pursuant thereto, the execution, legality, validity, enforceability or genuineness of any Loan Document or any document or information provided in connection therewith and the existence, nature or value of any Collateral, (c) assumes no responsibility (and makes no representation or warranty) with respect to the financial condition of any Credit Party or the performance or nonperformance by any Credit Party of any obligation under any Loan Document or any document provided in connection therewith and (d) attaches any Notes held by it evidencing at least in part the Assigned Interest of such Assignor (or, if applicable, an affidavit of loss or similar affidavit therefor) and requests that the Agent exchange such Notes for new Notes in accordance with Section 1.2 of the Credit Agreement.

Section 3.    Representations, Warranties and Covenants of Assignees.    Assignee (a) represents and warrants to Assignor and the Agent that (i) it has full power and authority, and has taken all actions necessary for Assignee, to execute and deliver this Assignment and to consummate the transactions contemplated hereby, (ii) it is **[not]** an Affiliate or an Approved Fund of _____, a Lender and (iii) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest assigned to it hereunder and either Assignee or the Person exercising discretion in making the decision for such assignment is experienced in acquiring assets of such type, (iv) by executing, signing and delivering this Assignment via ClearPar® or any other electronic settlement system designated by the Agent, the Person signing, executing and delivering this Assignment on behalf of the Assignor is an authorized signatory for the Assignor and is authorized to execute, sign and deliver this Agreement, (b) appoints and authorizes the Agent to take such action as administrative agent on its behalf and to exercise such powers under the Loan Documents as are delegated to the Agent by the terms thereof, together with such powers as are reasonably incidental thereto, (c) shall perform in accordance with their terms all obligations that, by the terms of the Loan Documents, are required to be performed by it as a Lender, (d) confirms it has received such documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and shall

Exhibit 12.1(a)
Page 3

SF:278847.8

continue to make its own credit decisions in taking or not taking any action under any Loan Document independently and without reliance upon Agent, any Lender or any other Indemnitee and based on such documents and information as it shall deem appropriate at the time, (e) acknowledges and agrees that, as a Lender, it may receive material non-public information and confidential information concerning the Credit Parties and their Affiliates and their Stock and agrees to use such information in accordance with Section 9.10 of the Credit Agreement, (f) specifies as its applicable lending offices (and addresses for notices) the offices at the addresses set forth beneath its name on the signature pages hereof, (g) shall pay to the Agent an assignment fee in the amount of $3,500 to the extent such fee is required to be paid under Section 9.9 of the Credit Agreement and (h) to the extent required pursuant to Section 10.1(f) of the Credit Agreement, attaches two completed originals of Forms W-8ECI, W-8BEN, W-8IMY or W-9 and, if applicable, a portfolio interest exemption certificate.

Section 4.    Determination of Effective Date; Register.  Following the due execution and delivery of this Assignment by Assignor, Assignee and, to the extent required by Section 9.9 of the Credit Agreement, the Borrowers, this Assignment (including its attachments) will be delivered to the Agent for its acceptance and recording in the Register.  The effective date of this Assignment (the "Effective Date") shall be the later of (i) the acceptance of this Assignment by the Agent and (ii) the recording of this Assignment in the Register.  The Agent shall insert the Effective Date when known in the space provided therefor at the beginning of this Assignment.

Section 5.    Effect.  As of the Effective Date, (a) Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment, have the rights and obligations of a Lender under the Credit Agreement and (b) Assignor shall, to the extent provided in this Assignment, relinquish its rights (except those surviving the termination of the Commitments and payment in full of the Obligations) and be released from its obligations under the Loan Documents other than those obligations relating to events and circumstances occurring prior to the Effective Date.

Section 6.    Distribution of Payments.  On and after the Effective Date, the Agent shall make all payments under the Loan Documents in respect of each Assigned Interest (a) in the case of amounts accrued to but excluding the Effective Date, to Assignor and (b) otherwise, to Assignee.

Section 7.    Miscellaneous.  (a) The parties hereto, to the extent permitted by law, waive all right to trial by jury in any action, suit, or proceeding arising out of, in connection with or relating to, this Assignment and any other transaction contemplated hereby.  This waiver applies to any action, suit or proceeding whether sounding in tort, contract or otherwise.

(b)    On and after the Effective Date, this Assignment shall be binding upon, and inure to the benefit of, the Assignor, Assignee, the Agent and their Related Persons and their successors and assigns.

(c)    This Assignment shall be governed by, and be construed and interpreted in accordance with, the law of the State of New York.

Exhibit 12.1(a)
Page 4

(d)     This Assignment may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

(e)     Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Assignment by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart of this Assignment.

Exhibit 12.1(a)
Page 5

SF:278847.8

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be executed by their respective officers thereunto duly authorized, as of the date first above written.

[NAME OF ASSIGNOR]
as Assignor

By: _____
    Name:
    Title:

[NAME OF ASSIGNEE]
as Assignee

By: _____
    Name:
    Title:

<u>Lending Office (and address for notices)</u>:

[Insert Address (including contact name, fax number and e-mail address)]

[SIGNATURE PAGE FOR ASSIGNMENT FOR CREDIT AGREEMENT]

Exhibit 12.1(a)
Page 6

ACCEPTED and AGREED
this __ day of _____ _____:

GENERAL ELECTRIC CAPITAL CORPORATION
as Agent

By:_____
    Name:
    Title:

[SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK,
as the Borrower Representative]

By:_____
    Name:
    Title:

[SIGNATURE PAGE FOR ASSIGNMENT FOR CREDIT AGREEMENT]

Exhibit 12.1(a)
Page 7

EXHIBIT 12.1(c)
TO
CREDIT AGREEMENT

**FORM OF NOTICE OF BORROWING**

GENERAL ELECTRIC CAPITAL CORPORATION
as Agent under the Credit Agreement referred to below

_____ __, ___

    Re: Saint Vincents Catholic Medical Centers of New York (the "Borrower Representative") and the other "Borrowers" under the Credit Agreement referred to <u>below (collectively, together with the Borrower Representative, the "Borrowers")</u>

    Reference is made to the Debtor In Possession Credit Agreement, dated as of April ___, 2010 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among the Borrowers, the Credit Parties party thereto, the Lenders party thereto and General Electric Capital Corporation, as administrative agent for such Lenders. Capitalized terms used herein without definition are used as defined in the Credit Agreement.

    The Borrower Representative, on behalf of Borrowers, hereby gives you irrevocable notice, pursuant to <u>Section 1.5</u> of the Credit Agreement of its request of a Borrowing (the "<u>Proposed Borrowing</u>") under the Credit Agreement and, in that connection, sets forth the following information:

      A. The date of the Proposed Borrowing is _____, ____ (the "<u>Funding Date</u>").

      B. The aggregate principal amount of the Loan requested is $_____.

    The undersigned hereby certifies that, except as set forth on <u>Schedule A</u> attached hereto, the following statements are true on the date hereof and will be true on the Funding Date, both before and after giving effect to the Proposed Borrowing and any other Loan to be made on or before the Funding Date:

      (i) the representations and warranties set forth in <u>Article III</u> of the Credit Agreement and elsewhere in the Loan Documents are true and correct in all material respects (without duplication of any materiality qualifier contained therein), except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties were true and correct as of such earlier date;

      (ii) no Default or Event of Default has occurred and is continuing; and

Exhibit 12.1(c)
Page 1

(iii)    the aggregate outstanding amount of Loans does not exceed the Maximum Permitted Loan Balance or the Aggregate Loan Commitment as of the date hereof.

**SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK**, as the Borrower Representative

By:    _____
       Name:
       Title: