**Bidding Procedures Objection Deadline: May 4, 2010 by 4:00 p.m. (prevailing Eastern Time)**
**Bidding Procedures Hearing: May 13, 2010 at 2:00 p.m. (prevailing Eastern Time)**
**Sale Objection Deadline: June 10, 2010 by 4:00 p.m. (prevailing Eastern Time)**
**Sale Hearing: June 17, 2010 at 11:00 a.m. (prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Proposed Counsel for Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SAINT VINCENTS CATHOLIC MEDICAL | : | Case No. 10-11963 (CGM) |
| CENTERS OF NEW YORK, <u>et al.</u>, | : | |
| | : | |
| Debtors. | : | Jointly Administered |

-------------------------------------------------------- X

### NOTICE OF MOTION OF THE DEBTORS FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES AND BIDDER PROTECTIONS WITH RESPECT TO THE SALE OF THE REAL ESTATE AND PERSONAL PROPERTY LOCATED AT 555 6TH AVENUE AND ASSIGNMENT OF LEASES RELATED THERETO, (B) SCHEDULING AN AUCTION AND SALE HEARING RELATED THERETO, (C) APPROVING THE FORM AND MANNER OF NOTICE OF THE AUCTION AND SALE HEARING, AND (D) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (II) AN ORDER APPROVING SUCH SALE FREE <u>AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS</u>

**PLEASE TAKE NOTICE** that a hearing will be held before the Honorable Cecelia G.

Morris, United States Bankruptcy Judge, in Room 701 of the United States Bankruptcy Court for

the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green,

New York, New York 10004-1408, on **May 13, 2010 at 2:00 p.m. (prevailing Eastern Time)**

to consider the Motion of the Debtors for (I) an Order (the "**Bidding Procedures Order**") (A)

Approving Bidding Procedures and Bidder Protections With Respect to the Sale of the Real Estate and Personal Property Located at 555 6th Avenue and Assignment of Leases Related Thereto, (B) Scheduling an Auction and Sale Hearing Related Thereto, (C) Approving the Form and Manner of Notice of the Auction and Sale Hearing, and (D) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) an Order Approving Such Sale Free and Clear Of Liens, Claims, Encumbrances and Other Interests (the "**Sale Motion**").

**PLEASE TAKE FURTHER NOTICE** objections, if any, to entry of the Bidding Procedures Order must: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) proposed counsel to the Debtors, c/o Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021 Attn: Robert Andrew Wild, Esq. and Sean P. Leyden, Esq.; (b) proposed counsel for the Official Committee of Unsecured Creditors, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq.; (c) counsel to Secured Creditors: (i) Sun Life Assurance Company of Canada c/o Kelley Drye & Warren LLP, 101 Park Avenue, New York, New York 10017, Attn: James S. Carr, Esq.; (ii) MedMal Trust Monitor, c/o Cooley Godward Kronish LLP, 1114 Avenue of the Americas, New York, New York 10036, Attn: Richard S. Kanowitz, Esq.; and (iii) General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier, Esq.; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802 Attn: Randy Rogers, Esq.; and (d) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall

Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; and (e) the

Purchaser (as defined in the Sale Motion);, so as to be **actually received by 4:00 p.m.**

**(prevailing Eastern Time) on May 4, 2010** (the "**Objection Deadline**").

A copy of the Sale Motion can be viewed and obtained on the Court's website
www.ecf.nysb.uscourts.gov or (without charge) at http://chapter11.epiqsystems.com/svcmc2010.

**Your rights may be affected. You should read these papers carefully and discuss
them with your attorney if you have one in these bankruptcy cases. (If you do not have an
attorney in these bankruptcy cases, you may wish to consult one.)**

If you do not want the Court to grant the relief requested in the Sale Motion, or if you
want the Court to consider your view on the Sale Motion, you or your attorney must attend the
Hearing. **If you or your attorney do not attend the Hearing, the Court may grant the relief
requested in the Sale Motion.**

Dated: New York, New York
April 23, 2010

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/  Adam C. Rogoff
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

*Proposed Counsel for Debtors and
Debtors in Possession*

**Bidding Procedures Objection Deadline: May 4, 2010 by 4:00 p.m. (prevailing Eastern Time)**
**Bidding Procedures Hearing: May 13, 2010 at 2:00 p.m. (prevailing Eastern Time)**
**Sale Objection Deadline: June 10, 2010 by 4:00 p.m. (prevailing Eastern Time)**
**Sale Hearing: June 17, 2010 at 11:00 a.m. (prevailing Eastern Time**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Proposed Counsel for Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SAINT VINCENTS CATHOLIC MEDICAL | : | Case No. 10-11963 (CGM) |
| CENTERS OF NEW YORK, <u>et al.</u>, | : | |
| | : | |
| Debtors. | : | Jointly Administered |

---------------------------------------------------------- x

## MOTION OF THE DEBTORS FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES AND BIDDER PROTECTIONS WITH RESPECT TO THE SALE OF THE REAL ESTATE AND PERSONAL PROPERTY LOCATED AT 555 6TH AVENUE AND ASSIGNMENT OF LEASES RELATED THERETO, (B) SCHEDULING AN AUCTION AND SALE HEARING RELATED THERETO, (C) APPROVING THE FORM AND MANNER OF NOTICE OF THE AUCTION AND SALE HEARING, AND (D) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (II) AN ORDER APPROVING SUCH SALE FREE <u>AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS</u>

TO THE HONORABLE CECELIA G. MORRIS,
UNITED STATES BANKRUPTCY JUDGE:

Saint Vincents Catholic Medical Centers of New York ("**<u>SVCMC</u>**") and certain of its

affiliates, as Chapter 11 debtors and debtors in possession (each a "**<u>Debtor</u>**" and collectively, the

"**Medical Centers**" or the "**Debtors**")[1] in the above-referenced Chapter 11 cases (the "**Chapter 11 Cases**"), hereby file a motion (the "**Motion**") for (i) an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"), (a) approving bidding procedures and bidder protections, substantially in the form attached to the Bidding Procedures Order as **Annex 1** (collectively, the "**Bidding Procedures**") with respect to the sale (the "**Sale**") of the real estate and personal property located at 555 6th Avenue in New York, New York, commonly referred to by the Debtors as the "Staff House" (the "**Assets**" or the "**Staff House**") and assignments of leases related thereto; (b) scheduling an auction (the "**Auction**") for the Assets and a hearing approving the Sale of the Assets (the "**Sale Hearing**"); (c) approving the form and manner of the notice of the auction and sale hearing related thereto, substantially in the form attached to the Bidding Procedures Order as **Annex 2** (the "**Auction and Hearing Notice**"); and (d) approving certain procedures related to the assumption and assignment of those executory contracts and unexpired leases related to the Assets and whose assignment is contemplated by the Sale, substantially in the form annexed to the Bidding Procedures Order as **Annex 3** (collectively, the "**Assignment Procedures**"); and (ii) an order, substantially in the form attached hereto as **Exhibit B** (the "**Sale Order**"), approving such sale free and clear of liens, claims, encumbrances and other interests.  In support of the Motion, the Debtors rely upon the Declaration of Mark E. Toney Pursuant to Local Bankruptcy Rule 1007-2 and in Support of First Day Motions and Applications filed on the Petition Date (the "**Toney Declaration**"), and respectfully represent as follows:

---

[1] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc.  There are certain affiliates of SVCMC who are not Debtors.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are sections 105(a) 363(b), and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**").

## GENERAL BACKGROUND

4. On April 14, 2010 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors have requested that the Chapter 11 Cases be jointly administered for procedural purposes only.

5. The Debtors are operating their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. On April 21, 2010, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code [Docket No. 106] (the "**Creditors' Committee**").

## SUMMARY OF RELIEF REQUESTED

6. By this Motion, the Debtors seek to sell a residential building they own, located at 555 6th Avenue, New York, New York, and commonly known as the "Staff House." The Debtors used the Staff House as apartments for medical residents while they were employed at the Hospital. However, as part of the Closure Plan (defined below) for the Hospital, the Debtors no longer require the Staff House. Its sale also allows for a material paydown of secured

debt against the Debtors, as there are various mortgages on the property. To facilitate this process, prior to the Petition Date, the Debtors, working with their secured creditors, began evaluating options for the sale of the Staff House and determined to enter into a stalking horse agreement, subject to an auction, with TIP Acquisitions LLC, an affiliate of Taconic Investment Partners LLC for $48 million. This Motion seeks approval of (i) customary bidding procedures (including the payment of a break-up fee) and (ii) the sale of the Staff House and related assets.

## THE MEDICAL CENTERS' HISTORY AND BUSINESS

7.     Founded by the Sisters of Charity in 1849, the Medical Centers are the only remaining Catholic-sponsored, acute-care hospital network in New York City. Dedicated to fulfilling a charitable healthcare mission, the Medical Centers are committed to a mission that demands they give "Respect, Integrity, Compassion and Excellence to all who come to us in need, especially the poor."

8.     Until recently, the Medical Centers' core business centered around St. Vincent's Hospital Manhattan (the "**Hospital**"), which is located in the Greenwich Village section of Manhattan. The Medical Centers operate numerous other services, including a behavioral health facility, nursing homes, continuing care facilities, a hospice, a home health agency and a military health plan serving active duty dependents, retirees, and their families. Additionally, the Medical Centers operate certain physician-related affiliates, provide specialized care across 14 clinical departments, and are affiliated with 18 licensed behavioral health and community medicine programs and six ambulatory care providers in Manhattan, including the Comprehensive Cancer Center, an HIV center, and a wound care center.

9.     SVCMC and its then debtor- and non-debtor affiliates emerged from Chapter 11 in the summer of 2007 subject to over $1 billion of liabilities. After emergence,

management attempted to increase their revenue, improve their operations, and reduce costs. Despite these efforts, however, the Medical Centers' revenue remained constant, and the Debtors incurred operating losses of approximately $43 million in 2008 and approximately $64 million in 2009. In 2008 and 2009, the Hospital alone had operating losses of approximately $81 and $107 million, respectively.

10. The Medical Centers' poor operating results stem from four principal causes.

- The Hospital's large operating footprint and staffing are not properly aligned with the current state of its business, as significant changes in the healthcare industry have reduced the number of hospital admissions. While certified as a 727-bed hospital, and burdened with all of the attendant costs of a larger physical facility, the Hospital, in 2009, used only approximately 340 beds on a daily basis.

- The Medical Centers' patient mix and reimbursement experience limited their revenues. The Hospital had one of the lowest percentages of higher margin private patients of all private Manhattan hospitals and the highest percentage of Medicare and self-pay (i.e., uninsured) discharges per year. In addition, approximately 56% of the Hospital's inpatient admissions come through its Emergency Department, which is required by law to treat patients without regard to their ability to pay. Moreover, as a stand-alone healthcare provider, the Medical Centers have been unable to negotiate reimbursement rates that are competitive with other private area hospitals.

- The profound financial crisis that has gripped New York and the rest of the Nation over the last several years has magnified the financial challenges faced by the Medical Centers. In an effort to balance their budgets, New York State and the federal government have repeatedly reduced hospital reimbursement rates over the last several years, a change that disproportionately impacts the Medical Centers because they have a higher government payor population than other New York medical centers.

- The financial and other obligations assumed in connection with the Prior Chapter 11 Plan resulted in annual payment obligations that exceeded what the current Hospital operations could bear.

11. By the end of 2009, the Debtors faced a severe cash crisis. In response, the Board appointed a Special Restructuring Committee in December 2009, hired a chief

restructuring officer in late January, and other restructuring professionals shortly thereafter, and took steps to cut costs and assess their restructuring alternatives. Despite these efforts, however, the Debtors' liquidity crisis deepened. By early February 2010, only emergency funding provided by their prepetition lenders and the State of New York enabled the Debtors to make payroll and stave off an immediate bankruptcy filing.

12.     The Debtors used the respite provided by this emergency financing, subsequent financial assistance from their prepetition lenders, the State of New York, the Sisters of Charity and a Board member, and wage concessions by employees to explore options for preserving their businesses' long-term viability and maximizing the value of their assets. Among other things, the Debtors worked to identify and negotiate with potential new sponsors to preserve operations at the Hospital and potential purchasers for their non-Hospital services and assets. While these efforts have led to the entry of non-binding letters of intent for the sale of certain non-Hospital services, they did not yield a transaction that will support the continued operation of the Hospital. Despite an extensive marketing process and several serious indications of interest, negotiations concerning the last potential transaction terminated on March 31, 2010. When it became clear that all potential partners had withdrawn from consideration, the Debtors concluded that the continued operation of the Hospital was no longer a viable option.

13.     As a result, on April 6, 2010, the Board of Directors of SVCMC voted to approve the closure of the Hospital and the transfer or closure of the outpatient programs and clinics associated with and operated by the Hospital. In accordance with New York State law, the Debtors submitted their proposed plan of closure on April 9, 2010 (the "**Closure Plan**") (as such may be amended from time to time in consultation with New York State Department of

Health ("**DOH**")) to the DOH for approval.  Prior to the Petition Date, the Debtors commenced the process of implementing their Closure Plan.

**THE SALE OF THE STAFF HOUSE**

14.     The Staff House is a residential building located at 555 6th Avenue in the Greenwich Village section of Manhattan.  The Staff House primarily served as a housing facility for graduate medical residents. The building is currently occupied by approximately 160 graduate medical residents and other staff members.  The leases relating to the medical residents and staff members (the "**Staff Leases**") are due to terminate on their own terms no later than June 30, 2010.  In addition to the Staff Leases, the Debtors are lessors under certain rent-stabilized leases to non-staff tenants.

15.     The Staff House is owned by SVCMC and managed by Debtor 555 6th Avenue Apartment Operating Corporation.   The Staff House is primarily encumbered by mortgages held by the following secured creditors (the "**Secured Creditors**") in the following order of priority:

16.     <u>First Lien - Sunlife</u>.  In connection with their emergence from the Medical Centers' prior Chapter 11 cases (the "**Prior Chapter 11 Cases**"), SVCMC issued a promissory note to Sun Life Assurance Company of Canada (U.S.) ("**Sun Life**"), a Delaware corporation, in the principal amount of $42.5 million (the "**Staff House Note**").   The Staff House Note is secured by, *inter alia*, a first priority mortgage and security interest on, and an assignment of the leases and rents, of the Staff House.  The Staff House Note bears interest at a rate equal to 6.35% per annum and matures on September 1, 2014.  As of the Petition Date, the principal amount of approximately $40 million was outstanding on the Staff House Note.

17.     Second Lien - MedMal Trusts.  Pursuant to the plan of reorganization confirmed in the Prior Chapter 11 Cases (the **"Prior Chapter 11 Plan"**), SVCMC agreed to fund approximately three separate medical malpractice trusts (the "**MedMal Trusts**") to cover its estimated liability for medical malpractice claims against its physicians and employees.  To secure the contractual obligations of SVCMC to the MedMal Trusts under the Prior Chapter 11 Plan, SVCMC granted the MedMal Trusts a second priority mortgage on the Staff House (the "**MedMal Trusts Staff House Mortgage**").  The Debtors estimate that the MedMal Trusts are owed approximately $113 million as of the Petition Date.

18.     Third Lien - GE Capital.  In order to finance their exit from the Prior Chapter 11 Cases, the Medical Centers entered into a credit facility (the "**GE Credit Facility**") with General Electric Capital Corporation ("**GE Capital**"), as agent, letter of credit issuer and lender, and Commerce Bank, N.A. (n/k/a TD Bank, N.A.), as lender, consisting of (i) a $270 million term loan that matures on August 30, 2014 and (ii) a $50 million revolving credit facility that also matures on August 30, 2014.  The GE Credit Facility is secured by a third priority lien on the Staff House.

19.     The Sale Order provides that the liens existing on the Assets will attach to the net proceeds of the Sale after taking into account the costs of the Sale.  Sale costs will include costs directly relating to the transaction, including brokerage commissions and the Debtors' legal fees.

***Marketing the Assets and Selection of Stalking Horse***

20.     Prior to the Petition Date, the Debtors' management undertook a process to solicit offers for the sale of the Staff House.  It was initially contemplated that any such sale would occur prior to the commencement of these Chapter 11 Cases and, thus, was not considered

as a bankruptcy sale. However, the Debtors later determined that the maximum value for the property could be obtained by selling the Assets through these Chapter 11 Cases. Because substantial efforts had been taken by the Debtors' management to sell the Staff House prior to bankruptcy, including the solicitation of several offers from interested bidders, the determination was made to identify the most appropriate bidder for the Real Estate (as defined below) and enter into a stalking horse agreement, subject to higher or better bids. In connection with this process, the Debtors coordinated with both GE Capital and the monitor for the MedMal Trusts on the most appropriate way to proceed to select a stalking horse.[2]

21.    Notably, the Debtors engaged in extensive discussions with counsel for the monitor for the MedMal Trusts regarding the then-current bid selection process; thereafter, the monitor's counsel became actively involved in the marketing of this property. These discussions further resulted in an agreement for the Debtors to engage Grubb & Ellis ("**G&E**"), a nationally renowned real estate broker, to assist in the marketing of the Staff House following the selection of the stalking horse bidder and in furtherance of a Court-approved auction process.[3]

22.    Ultimately, the Debtors agreed to enter into that certain Purchase and Sale Agreement with TIP Acquisitions LLC (the "**Purchaser**"), an affiliate of Taconic Investment Partners LLC, dated as of April 21, 2010 attached hereto as **Exhibit C** (the "**Purchase Agreement**"). Pursuant to the Purchase Agreement, the Purchaser has agreed to purchase the Staff House for $48 million, all cash.

---

[2] As noted above, because the net sale proceeds are anticipated to repay in full the Staff House Note held by Sun Life and are not expected to yield any recovery for GE Capital on account of its third priority mortgage, the Debtors determined to coordinate their marketing efforts for the Staff House most closely with the monitor for the MedMal Trusts on the belief that this creditor is most directly affected by the ultimate sale process and net sale proceeds.

[3] By separate application, the Debtors are requesting permission to retain G&E and compensate G&E solely from the proceeds of the sale of Staff House.

23.     The Purchase Agreement is explicitly conditioned on the approval of the Court, and, as described in greater detail below, remains subject to the Debtors' solicitation of higher or otherwise better bids in accordance with the Bidding Procedures. The Purchase Agreement is also subject to several conditions, including entry of the Bidding Procedures Order and the Sale Order, and approval of the Break-Up Fee (defined below). As detailed herein, the sale of the Assets pursuant to the Purchase Agreement, and subject to the Bidding Procedures, is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

***The Purchase Agreement***

24.     The following is a summary of the material terms of the Purchase Agreement:[4]

- <u>Sale of the Assets</u>.  Subject to the terms and conditions set forth in the Purchase Agreement, SVCMC shall sell to the Purchaser, and the Purchaser shall purchase from SVCMC, the real estate related to the Staff House (the "**Real Estate**") and related assets as described more fully in the Purchase Agreement.

- <u>Purchase Price</u>.  The purchase price to be paid by the Purchaser to SVCMC for the Assets is $48,000,000 (the "**Purchase Price**").  The Purchase Price shall be paid as follows:

  - *Cash Deposit*:  An earnest money cash deposit of $3,000,000 (the "**Cash Deposit**") payable upon execution of the Purchase Agreement. The Purchaser has the option to substitute a letter of credit for the Cash Deposit on five business days' notice to SVCMC.  The Cash Deposit will be increased to $4,800,000 when other potential bidders are required to post a security deposit in accordance with the Bidding Procedures.

  - *Payment at Closing*:  At the consummation of the transaction (the "**Sale Transaction**") contemplated by the Purchase Agreement (the "**Closing**"), the Purchaser shall pay the balance of the Purchase Price and any amounts required to cure (the "**Cure Amounts**") those

---

[4] To the extent there are any inconsistencies between the summary description of the Purchase Agreement contained herein and the terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement control. Capitalized terms contained in the summary description of the Purchase Agreement that are not defined in this Motion shall have the meaning ascribed to them in the Purchase Agreement.

executory contracts and unexpired leases being assumed by the Debtors and assigned to the Purchaser (the "**Assumed Contracts and Leases**").

- <u>Free and Clear</u>. The Purchase Agreement provides, subject to the Permitted Exceptions (as defined below), that the Purchaser will take the assets free and clear of liens, encumbrances, pledges, mortgages, deeds of trust, security interests, claims, leases, charges, options, rights of first refusal, easements, servitudes, proxies, voting trusts or agreements, transfer restrictions under any agreement (collectively, the "**Interests**").

- <u>Permitted Exceptions</u>. In addition to certain permitted exceptions customary for a real estate purchase agreement, such as exceptions for certain liens, easements, or other rights relating to taxes, utilities, or violation of governmental ordinances, the Purchaser will take the Assets subject to the Assumed Contracts and Leases (the **"Permitted Exceptions"**).

  o <u>Assumed Contracts and Leases</u>. In addition to a management agreement related to the operation of the Staff House's parking garage and the Staff Leases, the Assumed Contracts and Leases include five rent-stabilized apartments located in the Staff to which SVCMC is the lessor. Pursuant to the Purchase Agreement, the Purchaser will purchase the Assets subject to these leases. Notably, however, prior to the Petition Date, SVCMC entered into agreements to terminate two of these leases consensually and, as of today, certain final payments need be made under these agreements to the rent stabilized tenants (the "**Termination Payments**"). As part of the sale, SVCMC seeks permission to make these final payments, which will reimbursed through a credit from Purchaser at the Closing. Accordingly, the Debtors' estates will not incur administrative expense liability in connection with the Termination Payments.

- <u>Leaseback</u>. In the event the Sale closes prior to the tenants vacating the premises currently leased in Staff House, SVCMC will enter into a lease covering those units that remain occupied on the Closing Date (other than certain excluded leases which will become direct leases with the Purchaser) pursuant to the terms and conditions of a master lease (the "**Master Lease**"). In the event Purchaser elects not to cause SVCMC to enter into the Master Lease, Purchaser will accept title to the Assets subject to the leases. The Master Lease is merely to facilitate the Closing of the Sale Transaction and permit the existing tenants to remain in their apartment pending the termination of their leases.

- <u>Representations and Warranties</u>. SVCMC provides customary representations and warranties related to the Assets, including representations related to consents and approvals.

25.     As is customary in a sale transaction of this nature, the Purchase Agreement permits the Debtors' consideration of higher or otherwise better competing bids (each a "**Competing Bid**") pursuant to the Bidding Procedures.  Similarly, in consideration of the Purchaser having expended considerable time and expense in negotiating the Purchase Agreement, the Purchase Agreement provides that upon consummation of a transaction resulting from a Competing Bid, the Debtors will pay the Purchaser a fee equal to approximately 1.8% of the Purchase Price, or $870,000 (the "**Break-Up Fee**").  The Break-Up Fee will only be payable upon consummation of a sale resulting from a Competing Bid and solely from the proceeds of a transaction resulting from a Competing Bid.  As noted, the Purchase Agreement – including the payment of the Break-Up Fee – was negotiated with the input of the counsel for the monitor for the MedMal Trusts.

*Successor Liability*

26.     The parties intend, and the Sale Order shall reflect, that the Purchaser shall not be deemed to be a successor to SVCMC or the Medical Centers and shall not be liable for any claims against SVCMC or the Medical Centers, their predecessors, or their affiliates.  As described below, given the nature of the Debtors' business, a critical inducement for the Purchaser to enter into the Sale Transaction is the ability to take the Assets free and clear from any potential of successor liability.

## RELIEF REQUESTED

27.     By this Motion, the Debtors respectfully request the entry of two orders related to the disposition of the Staff House.  First, the Debtors seek entry of the Bidding Procedures Order, which approves (i) the Bidding Procedures by which the Debtors will solicit and consider additional qualified bids for the Assets, (ii) the conduct of the Auction in the event the Debtors receive more than one Qualified Bid (defined below), (iii) the scheduling of the Sale

Hearing to approve the Sale of the Assets to the Successful Bidder (as defined below) at the Auction, (iv) approving the form of the Auction and Hearing Notice, and (v) approving the Assignment Procedures. Second, in order to effectuate the Sale of the Assets to the Successful Bidder, the Debtors seek entry of the Sale Order to approve (i) the conveyance of the Assets to the Successful Bidder free and clear of liens, claims, encumbrances and other interests; and (ii) the assumption and assignment of those executory contracts and unexpired leases being assigned to the Successful Bidder pursuant to its bid.

***Bidding Procedures***

28.     In an effort to ensure that the maximum value is obtained for the Assets, the Debtors seek entry of the Bidding Procedures Order and approval of the Bidding Procedures. The Debtors believe that the solicitation procedures and Auction contemplated by the Bidding Procedures will maximize the value of the Assets.

29.     The following is a summary of certain provisions of the Bidding Procedures pertaining to the solicitation of Competing Bids and the conduct of the Auction:[5]

(a)     <u>Qualification of Bids and Bidders</u>.  In order to participate in the bidding process and to have a bid considered by the Debtors, each potential bidder must deliver a written offer or group of offers satisfying the below criteria.  A "**Qualified Bidder**" is a potential bidder that delivers a binding bid that in the Debtors' discretion after consultation with the Secured Creditors satisfies the following (a "**Qualified Bid**"):

(i)     *Bid Deadline*:  Each Bid Package (as defined below) must be delivered in written and electronic form to: (i) Saint Vincents Catholic Medical Centers of New York, 170 W. 12th Street, Smith Building, 5th Floor, New York, New York 10011, Attn: Scott Davis (scott.davis@gt.com); (ii) Grubb & Ellis New York, Inc., 1177 Avenue of the Americas, New York, NY 10036, Attn: Vincent Carrega

---

[5] To the extent that there are any inconsistencies between the summary description of the Bidding Procedures contained herein and (i) the terms and conditions of the Purchase Agreement and/or (ii) the Bidding Procedures, the terms of the Bidding Procedures control.

(vincent.carrega@grubb-ellis.com) or Neil Helman (neil.helman@grubb-ellis.com) (iii) Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff (arogoff@kramerlevin.com); (iv) Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021, Attn: Sean P. Leyden, Esq. (sleyden@garfunkelwild.com); (v) counsel to Secured Creditors: (x) Sun Life Assurance Company of Canada c/o Kelley Drye & Warren LLP, 101 Park Avenue, New York, New York 10017, Attn: James S. Carr, Esq.; (y) MedMal Trust Monitor, c/o Cooley Godward Kronish LLP, 1114 Avenue of the Americas, New York, New York 10036, Attn: Cathy Hershcopf, Esq. and Richard S. Kanowitz, Esq.; and (z) General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier. Esq.; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; and (vi) proposed counsel for the Official Committee of Unsecured Creditors, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq. (and any other statutory committees appointed in the Chapter 11 Cases), so as to **actually be received no later than 4:00 (prevailing Eastern Time) on May 27, 2010 (the "Bid Deadline")**.

(ii) *Bid Package*: Each bid must include (collectively, the "**Bid Package**"): (i) a written and signed irrevocable offer stating that (x) the bidder offers to consummate a Sale Transaction on terms and conditions no less favorable than found in the Purchase Agreement, (y) confirming that the bid will remain irrevocable until one business day following the closing of a Sale to the Successful Bidder (as defined below); (ii) an executed copy of the Purchase Agreement as modified by the bidder in accordance with its bid (the "**Modified Purchase Agreement**"); and (iii) an electronic markup of the Purchase Agreement showing the revisions in the Modified Purchase Agreement; and (iv) a CD-ROM containing a clean copy of the Modified Purchase Agreement (formatted as a Microsoft Word document or such other word processing format acceptable to the Debtors) and the electronic markup of the Purchase Agreement. The Debtors shall, in consultation with the Secured Creditors, determine whether any Modified Purchase Agreement that modifies the Purchase Agreement in any respect beyond the identity of the purchaser and the

purchase price under the Purchase Agreement is a Qualified Bid.

(iii) *Minimum Bid*:  The amount of the purchase price in such bid must provide for net cash (or cash equivalent) that is $500,000 more than the purchase price contained in the Purchase Agreement plus the amount of the Break-Up Fee (i.e., $49,370,000) (the "**Minimum Bid**").

(iv) *Deposit*: A potential bidder must deposit 10% of the initial purchase price set forth in the Modified Purchase Agreement with an escrow agent selected by the Debtors (the "**Deposit Agent**") in the form of a certified check or wire transfer at least three business days before the Deposit (the "**Deposit**").  The potential bidder shall forfeit the Deposit if (i) the potential bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein, before the Bankruptcy Court approves the Debtors' selection of the Successful Bidder (defined below), or (ii) the bidder is the Successful Bidder and (x) modifies or withdraws the bid without the Debtors' consent before the consummation of the sale contemplated by the bid, or (y) breaches the Modified Purchase Agreement.  The Deposit shall be returned to the bidder (i) as soon as practicable if the bidder is not determined to be a Qualified Bidder or (ii) no later than five business days after entry of the Sale Order if the bidder is a Qualified Bidder (who has not otherwise forfeited its Deposit), but is not the Successful Bidder or the Backup Bidder (defined below). Unless otherwise required by the Purchase Agreement, the Debtors will not be required to maintain any Deposit in an interest bearing account, but any interest earned on any Deposit will be remitted to the appropriate Qualified Bidder if the Deposit is returned to the Qualified Bidder pursuant to the above.

(b) <u>Determination of Qualified Bids</u>.  The Debtors shall have the exclufsive right, in their discretion (after consultation with the Secured Creditors), to determine whether a bid is a Qualified Bid and shall notify bidders whether their bids have been determined to be Qualified Bids at or prior to the Auction.  In addition to the requirements above, the Debtors may, in their sole and absolute discretion, request any additional information from any bidder to assist them in making their determination as to whether a bid is a Qualified Bid.  For the avoidance of doubt, the Purchaser is a Qualified Bidder and the Purchase Agreement is a Qualified Bid.

(c)    <u>Auction</u>.  In the event that the Debtors timely receive more than one Qualified Bid, the Debtors shall conduct the Auction with respect to the Assets.  The Auction will take place at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, on **June 4, 2010, starting at 9:00 a.m. (prevailing Eastern Time)**, or at such other place, date and time as may be designated by the Debtors at or prior to the Auction.  In the discretion of the Debtors and with the consent of the Secured Creditors, the Auction may be conducted openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid (an "**Open Auction**"), although the Debtors will be free to meet privately with any Qualified Bidder to negotiate the terms of its bid.  In the discretion of the Debtors with the consent of the Secured Creditors, the Auction may be conducted as a closed auction through the submission of closed bids with the results being openly announced at the conclusion of the Auction (a "**Closed Auction**").  The Debtors will announce how they intend to proceed prior to the commencement of the Auction.

(d)    <u>Bidding</u>.  Bidding at the Auction shall commence at the amount of the highest or otherwise best Qualified Bid submitted prior to the Auction; Qualified Bidders may then submit successive bids in increments of $100,000 (the "**Bid Increment**"); <u>provided</u>, <u>however</u>, that the Debtors shall retain the right to modify the Bid Increment at the Auction.

(e)    <u>Successful Bid</u>.  The Auction shall continue until there is only one offer that the Debtors determine, in their discretion (after consultation with the Secured Creditors) and subject to Court approval, is the highest or otherwise best offer from among the Qualified Bids submitted at the Auction (the "**Successful Bid**").  The bidder submitting such Successful Bid shall become the "**Successful Bidder**," and shall have such rights and responsibilities of the Purchaser, as set forth in the Modified Purchase Agreement or the Purchase Agreement, as applicable.  Within one business day after the conclusion of the Auction (but in any event prior to the commencement of the Sale Hearing), the Successful Bidder shall (i) complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made, and (ii) supplement its Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such deposit equals 10% of the Successful Bid.

(f)    <u>Backup Bid</u>.  At the conclusion of the Auction, the Debtors will also announce the second highest or otherwise best bid from

among the Qualified Bids submitted at the Auction (the "**Backup Bid**"). The bidder submitting such Backup Bid shall become the "**Backup Bidder**," and shall have such rights and responsibilities of the Purchaser, as set forth in the Modified Purchase Agreement or the Purchase Agreement, as applicable. Within one business day after the conclusion of the Auction (but in any event prior to the commencement of the Sale Hearing), the Backup Bidder shall (i) complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Backup Bid was made, and (ii) supplement its Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such deposit equals 10% of the Backup Bid. In the event the Backup Bidder fails to comply with the requirements of this paragraph, it will be deemed to have forfeited its Deposit. The Backup Bidder's Deposit will be returned by the Debtors upon consummation of the Sale of the Assets to the Successful Bidder. If the Purchaser is the Backup Bidder, the Purchaser shall be relieved of its obligations as a Backup Bidder and the Purchaser's Deposit shall be returned upon the earlier to occur of (i) the consummation of the Sale to the Successful Bidder, or (ii) 60 days following the date of the Sale Order, unless SVCMC shall provide written notice to Purchaser prior to such 60th day that the Successful Bidder has failed to close and that Purchaser shall be obligated to proceed to closing under the terms of the Purchase Agreement.

(g)     At the conclusion of the Auction, the Debtors shall file with the Court and serve on the Notice Parties (defined below) a notice identifying the Successful Bidder and the Backup Bidder.

***Auction and Hearing Notice***

30.     Within three business days of entry of the Bidding Procedures Order, the Debtors will serve copies of the Bidding Procedures, the Bidding Procedures Order, and the Auction and Hearing Notice on the following parties (collectively, the "**Notice Parties**"): (a) all potential purchasers identified by the Debtors or their agent; (b) the Office of the United States Trustee for the Southern District of New York; (c) the Debtors' material prepetition and postpetition secured lenders or any agent therefore; (d) the Office of the United States Attorney; (e) the Office of the New York State Attorney General; (f) the New York State Department of Health; (g) the Internal Revenue Service; and (h) counsel for the Official Committee of

Unsecured Creditors; (i) the parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (j) counsel to the Official Committee of Unsecured Creditors; and (k) all counterparties (each a **"Counterparty"** and collectively the **"Counterparties"**) to the proposed Assumed Contracts and Leases.

*Auction*

31.     If one or more Qualified Bids is received pursuant to the Bidding Procedures before the Bid Deadline, the Debtors propose to hold the Auction at 12:00 p.m. (prevailing Eastern Time) on June 4, 2010, at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, or such later time or other place determined by the Debtors. The Bidding Procedures contain the terms and procedures that will govern the submission of bids for the Assets.

32.     At the Auction, and subject to the Bidding Procedures, Qualified Bidders will submit their bids for the Assets, as either part of an Open Auction or a Closed Auction, as determined by the Debtors with the consent of the Secured Creditors. The Debtors will determine the highest or otherwise best bid for the Assets. At the Sale Hearing, the Debtors will seek approval of the Sale of the Assets to the Purchaser or to the Successful Bidder, as appropriate.

*Objections to Sale*

33.     The Debtors propose that objections, if any, to entry of the Sale Order (other than Cure Objections, as such term is defined below) thereto, must: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) Debtor's counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021 Attn: Robert Andrew

Wild, Esq. and Sean P. Leyden, Esq.; (b) proposed counsel for the Official Committee of Unsecured Creditors, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq.; (c) counsel to Secured Creditors: (i) Sun Life Assurance Company of Canada c/o Kelley Drye & Warren LLP, 101 Park Avenue, New York, New York 10017, Attn: James S. Carr, Esq.; (ii) MedMal Trust Monitor, c/o Cooley Godward Kronish LLP, 1114 Avenue of the Americas, New York, New York 10036, Attn: Richard S. Kanowitz, Esq.; and (iii) General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier, Esq.; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; (d) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; (e) the Successful Bidder; and (f) the Backup Bidder, so as to be **actually received by 4:00 p.m. (prevailing Eastern Time) on June 10, 2010** (the "**Objection Deadline**").

### *Sale Hearing*

34.     The Successful Bid and the Backup Bid will be subject to approval by entry of the Sale Order after the Sale Hearing that will take place on **June 17, 2010 at 11:00 a.m. (prevailing Eastern Time)** (subject to the Court's schedule).  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court, and the Debtors reserve their rights, in the exercise of their fiduciary obligations, to cancel the Sale at anytime.  Upon approval of the Backup Bid by the Court, the Backup Bid shall remain open and irrevocable until the consummation of the Successful Bid.

*Assumed Contracts and Leases and the Assignment Procedures*

35.     Pursuant to section 2.1.2 of the Purchase Agreement, the Assumed Contracts and Leases consist of (i) certain executory contracts (the "**Assumed Contracts**") and unexpired leases (the "**Assumed Leases**") designated to be assumed by the Debtors and assigned to the Purchaser.  In order to ensure the orderly assignment of the Assumed Contracts and Leases and the timely resolution of objections thereto, the Debtors seek entry of the Bidding Procedures Order and approval of the Assignment Procedures.  The following is a summary of certain provisions of the Assignment Procedures:[6]

(a)     <u>Initial Notice of Assumed Contracts and Leases</u>.  Within one business days after entry of the Bidding Procedures Order, the Debtors will serve by first class mail an initial assignment notice (the "**Initial Assignment Notice**") on each Counterparty to the Assumed Contracts and Leases, substantially in the form attached as **Annex 4** to the Bidding Procedures Order (and such party's attorney, if such attorney has filed a notice of appearance in the Debtors' Chapter 11 proceedings) at the last known address available to the Debtors.  The Initial Assignment Notice shall include an exhibit that (i) identifies the name and address of the Counterparty, (ii) identifies the specific Assumed Contract or Assumed Lease being assumed, (iii) identifies, for each Assumed Lease, the premises relating to the Assumed Lease, and (iv) the cure amount asserted by the Debtors that is necessary to cure any default under the relevant Assumed Contract or Assumed Lease pursuant to section 365 of the Bankruptcy Code (the "**Cure Amount**").  The Initial Assignment Notice will also include (i) a description of the Purchaser and a statement as to the Purchaser's ability to perform the Debtors' obligations under the Assumed Contracts and/or Assumed Leases ("**Purchaser's Adequate Assurance**").  The Initial Assignment Notice shall also be served upon the Notice Parties.

(b)     <u>Initial Objections</u>.  To the extent that any interested party wishes to object to any matter pertaining to the assumption and assignment of an Assumed Contract or an Assumed Lease, including without limitation Purchaser's Adequate Assurance or the Cure Amount

---

[6]  To the extent that there are any inconsistencies between the summary description of the Assignment Procedures contained herein and (i) the terms and conditions of the Purchase Agreement and/or (ii) the Assignment Procedures, the terms of the Assignment Procedures control.

designated in the Initial Assignment Notice, such interested party must file a written objection (an **"Initial Objection"**) with the Court no later than **June 2, 2010 at 4:00 p.m. (prevailing Eastern Time)** (the "**Initial Objection Deadline**"), and simultaneously serve its Initial Objection on the following parties (the "**Objection Parties**"): (a) Debtor's counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021 Attn: Robert Andrew Wild, Esq. and Sean P. Leyden, Esq.; (b) proposed counsel for the Official Committee of Unsecured Creditors, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq.; (c) counsel to Secured Creditors: (i) Sun Life Assurance Company of Canada c/o Kelley Drye & Warren LLP, 101 Park Avenue, New York, New York 10017, Attn: James S. Carr, Esq.; (ii) MedMal Trust Monitor, c/o Cooley Godward Kronish LLP, 1114 Avenue of the Americas, New York, New York 10036, Attn: Richard S. Kanowitz, Esq.; and (iii) General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier, Esq.; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; (d) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; (e) the Successful Bidder, and (f) the Backup Bidder so that it is **actually received** by the Initial Objection Deadline. To the extent that any party in interest does not timely serve an Initial Objection as set forth above, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Assumed Contract or Assumed Lease; (ii) agreed that the Purchaser has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) consented to the relevant Cure Amount, if any; and (iv) agreed to the terms of the Sale Order.

(c)     <u>Supplemental Notice of Assumed Contracts and Leases</u>. Within two business days of the conclusion of the Auction, the Debtors will file a notice (the **"Auction Results Notice"**) with the Court, and simultaneously serve it upon each of the Counterparties and the Notice Parties. The Auction Results Notice shall, *inter alia*, identify the Successful Bidder and the Backup Bidder chosen at the Auction in accordance with the Bidding Procedures and such other information as hereinafter provided. If, and only if, the Successful Bid or the Backup Bid include (i) new executory contracts (each an "**Additional Assumed Contract**") or new unexpired leases (each an "**Additional Assumed Lease**") to be assumed and assigned by

the Debtors to either the Successful Bidder or the Backup Bidder (as the case may be), or (ii) a different Cure Amount than the one listed in the Initial Assignment Notice (such Cure Amount, an "**Amended Cure Amount**"), then the Auction Results Notice shall include an exhibit that (a) identifies the name and address of the Counterparty, (b) identifies the specific Additional Assumed Contract and/or Additional Assumed Lease being assumed and assigned, (c) identifies, for each Additional Assumed Lease, the premises relating to the Additional Assumed Lease, and (d) the Cure Amount asserted by the Debtors that is necessary to cure any default under the relevant Additional Assumed Contract or Additional Assumed Leases, pursuant to section 365 of the Bankruptcy Code (the "**Additional Cure Amount**"). For each Amended Cure Amount, the Auction Results Notice shall include an exhibit that (a) identifies the name and address of the Counterparty, (b) identifies the relevant Assumed Contract or Assumed Lease, (c) identifies, for each Assumed Lease, the premises relating to the relevant Assumed Lease, and (d) the Amended Cure Amount. The Auction Results Notice shall include, to the extent such party is not the Purchaser or with respect to the Additional Assumed Contracts and the Additional Assumed Leases, a description of the Successful Bidder and the Backup Bidder and a statement as to the ability of the Successful Bidder or the Backup Bidder to perform the Debtors' obligations under the Assumed Contracts and Assumed Leases (and, to the extent applicable, the Additional Assumed Contracts and the Additional Assumed Leases) (the "**Successful Bidder's Adequate Assurance**" or the "**Backup Bidder's Adequate Assurance**").

(d)      <u>Supplemental Objections</u>. To the extent that any interested party wishes to object to the assumption and assignment of an Additional Assumed Contract or an Additional Assumed Lease, or the Amended Cure Amount, including without limitation the Successful Bidder's Adequate Assurance or the Backup Bidder's Adequate Assurance designated in the Auction Results Notice, then such party must file a written objection with the Court no later than **June 10, 2010 at 4:00 p.m. (prevailing Eastern Time)** (the "**Supplemental Objection Deadline**"), and serve such an objection on the Objection Parties so that it is **actually received** by the Supplemental Objection Deadline. To the extent that any interested party does not timely serve an objection as set forth above, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Additional Assumed Contract or Additional Assumed Lease; (ii) agreed that the Successful Bidder and the Backup Bidder have provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) consented to the

relevant Additional Cure Amount or Amended Cure Amount, if any; and (iv) agreed to the terms of the Bidding Procedures Order and the Sale Order.

(e)     Resolution and Adjudication of Objections.  Upon filing of an objection by an interested party, the Debtors and/or the Purchaser will contact the objecting party to consensually resolve any timely served objection.  If the Debtors and/or the Purchaser are unable to resolve an objection in response to the Initial Assignment Notice or the Auction Results Notice, (i) to the extent such objections (each an "**Adequate Assurance Objection**") relate to the adequate assurance of future performance by the Purchaser, such objections will be heard at the Sale Hearing or (ii) to the extent such objections relate to a Cure Amount, Additional Cure Amount, or Amended Cure Amount, such objections will be heard at a hearing to be scheduled by the Court at the Sale Hearing (the "**Cure Objection Hearing**").

(f)     In the event an objection relates solely as to a Cure Amount, Additional Cure Amount, or Amended Cure Amount, (a "**Cure Objection**"), then such objecting party will be deemed to consent to the assumption of the related Assumed Contract or Assumed Lease and its assignment to the Purchaser, notwithstanding such objection.  In the event the Debtors and/or the Purchaser are unable to resolve the Cure Objection prior to the Cure Objection Hearing, the Purchaser may elect not to request assumption and assignment of the related Assumed Contract or Assumed Lease as part of the Sale.

## EXTRAORDINARY PROVISIONS OF THE PROPOSED SALE ORDER

36.     Pursuant to General Order M-383 of the United States Bankruptcy Court for the Southern District of New York, dated November 18, 2009, establishing this Court's Guidelines for the Conduct of Asset Sales, the Debtors are required to highlight any "extraordinary provisions" in a separate section of a motion seeking to sell estate assets.  The extraordinary provisions are as follows:

(a)     Use of Proceeds. Under the Purchase Agreement, proceeds from a Sale pursuant to a Competing Bid will be used to pay the Break-Up Fee.  The Sale Order also provides that liens existing on the Assets will attach to the net proceeds of the Sale after taking into account the costs of the Sale.  Sale costs will include costs directly relating

to the transaction, including brokerage commissions and the Debtors' legal fees.

(b) <u>Relief from Bankruptcy Rule 6004(h)</u>. The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy rule 6004(h). The Debtors submit that such relief is appropriate under the circumstances.

(c) <u>Successor Liability</u>. The proposed form of Sale Order contains findings and provisions limiting the Purchaser's successor liability. The Debtors believe that a finding that the sale can be made free and clear of successor liability claims in the Sale Order complies with applicable principles of sales free and clear of successor liability claims pursuant to section 363(f) of the Bankruptcy Code and applicable non-bankruptcy law. In addition, the Debtors are providing notice of the proposed Sale as set forth herein (including publication notice).

## BASIS FOR RELIEF

### *The Bidding Procedures Should be Approved*

37. The Bidding Procedures, which are standard for the sale of assets in large Chapter 11 cases, will ensure that the Debtors' estate receives the greatest benefit available from the Sale of the Assets. The Bidding Procedures have been structured to attract the maximum number of Qualified Bids for the Assets while allowing the Debtors the flexibility to select the bid that provides maximum value to the Debtors' estate. Finally, the Bidding Procedures set out a timeframe that will allow potential purchasers sufficient time to conduct due diligence, arrange financing, and construct and submit informed Competing Bids, while still providing for the expeditious Sale of the Assets.

38. The Debtors submit that the Bidding Procedures are reasonably designed to ensure that the Debtors and their estate receive the maximum benefit available from the Sale of the Assets, and therefore warrant Court approval.

*The Break-Up Fee Should be Approved*

39.     The Debtors are also requesting approval of the provisions of the Purchase Agreement and the Bidding Procedures regarding the Break-Up Fee in the maximum amount of $870,000 (i.e., approximately 1.8% of the Purchase Price).  The Break-Up Fee is only payable upon consummation of a Competing Bid and solely payable from the proceeds of a sale pursuant to a Competing Bid.

40.     The Purchaser required the inclusion of these provisions in the Purchase Agreement to be willing to serve as a stalking horse bidder.  As set forth herein, the Purchaser's bid establishes an appropriate floor value for the Assets after months of marketing and discussions with numerous potentially interested bidders.

41.     Bankruptcy courts have approved bidding incentives similar to the Break-up Fee under the "business judgment rule," and such arrangements are presumptively valid provided that (i) the Debtors' decision to agree to the Break-Up Fee is not tainted by bad faith or self-dealing, (ii) the Break-up Fee does not hamper bidding, and (iii) the amount of the Break-Up Fee is reasonable.  See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656-57 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).  A break-up fee serves as an "incentive payment" offered to an unsuccessful bidder who places the debtor's property in a "sales configuration mode," thereby attracting other bidders to the auction.  Specifically, break-up fees (i) attract or retain a potentially successful bid, (ii) establish a bid standard or minimum for other bidders to follow, and (iii) attract additional bidders.  Integrated Res. at 661-62.

42.     In the instant case, the Break-Up Fee is the product of good faith, arm's-length negotiations between the Debtors and the Purchaser, each of whom was represented by counsel.  The Break-Up Fee provides a material benefit to the estate by enabling the Debtors to

obtain the commitment of the Purchaser which has and will continue to expend money, time and effort formulating and negotiating an offer for the Assets, notwithstanding that the Purchase Agreement is subject to higher or better offers. In the Debtors' business judgment, the Break-Up Fee is fair and reasonable when considering the time, effort, cost, and expense that the Purchaser has incurred in negotiating the Purchase Agreement. Indeed, the Sale contemplated by the Purchase Agreement is substantially higher and better than any other expression of interest for the Assets to date. If higher or better offers for the Assets are received, such offers are the direct result of the Purchaser serving as a "stalking horse bidder" for those assets.

43. Moreover, the Break-Up Fee does not hamper any other party's ability to offer a higher or better bid for the Assets. Given the size of the Break-Up Fee relative to the total amount of consideration provided for the Assets pursuant to the Purchase Agreement, and relative to the "overbid" requirements set forth in the Bidding Procedures, the fee is not so large as to have a "chilling effect" on other prospective bidders' interest in the Assets. Because the Purchase Agreement has created a floor for any additional bids, the Purchaser has provided significant value to the Debtors' estate. The Debtors submit that the Break-Up Fee is appropriate under these unusual circumstances.

44. Finally, the Break-Up Fee is reasonable in relation to the size of the proposed Sale and under the unique facts and uncertainties of this transaction. These potentially include the Purchaser remaining a back-up bidder for until the consummation of the Successful Bid in the event the Purchaser is selected as the Back-Up Bidder and will remain subject to the terms of the Purchase Agreement.

45. The Break-Up Fee is less than 2% of the Purchase Price. This amount is similar to other break-up fees approved in the Southern District of New York in other large

Chapter 11 cases.  See, e.g., In re Cabrini Med. Ctr.  Case No. 09-14398 (AJG) (Bankr. S.D.N.Y. Dec. 30, 2009) (approving a break-up fee of 3.75% of $80 million sale); In re Bearingpoint, Inc., No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) (approving a break-up fee of 3% of a $350 million sale); In re Loral Space & Commc'ns Ltd., No. 03-41710 (RDD) (Bankr. S.D.N.Y. Aug. 18, 2003) (approving a break-up fee of 2% of $1 billion sale); In re Magellan Health Servs., Inc., No. 03-40515 (PCB) (Bankr. S.D.N.Y. Apr. 7, 2003) (approving discrete termination and commitment fees of 2% and 3%, respectively, in connection with a $30-$50 million equity commitment); In re Adelphia Bus. Solutions, Inc., No. 02-11389 (REG) (Bankr. S.D.N.Y. Dec. 16, 2002) (approving a termination fee of 2.5% of $10.7 million sale); In re Bradlees Stores, Inc., No. 00-16035 (BRL) (Bankr. S.D.N.Y. Jan. 11, 2001) (approving a termination fee of 2% of $150 million sale); Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 662 (S.D.N.Y. 1992) (approving termination fee of 3.2% of the $190 million out-of-pocket costs for $565 million sale), appeal dismissed, 3 F.3d 49 (2d Cir. 1993); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking.") (citation omitted).

**The Auction and Hearing Notice Should be Approved**

46.     Pursuant to Bankruptcy Rules 2002(c) and 6004, the Debtors are required to give 21 days' notice of any proposed sale of property not in the ordinary course of business. Bankruptcy Rule 2002(c) further provides that such notice must include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale.

47.     The Auction and Hearing Notice sets forth all the information a potential bidder and any other party-in-interest should require about the bidding process for the Assets, including: notice of the Bidding Procedures and information on how to obtain a copy of the

Bidding Procedures; the Bid Deadline; the time, date, and location of the Auction; and the time, date, and location of the Sale Hearing.

48.     The Debtors submit that the Auction and Hearing Notice as provided for herein complies fully with Bankruptcy Rule 2002, Local Bankruptcy Rule 2002-1 and General Order M-331, and constitutes good and adequate notice of the Sale of the Assets and the proceedings with respect thereto.  Because the Debtors are providing notice of this Motion, the Bidding Procedures, and the Assignment Procedures to the Notice Parties and the Counterparties well in advance of the Auction, the Debtors submit that the notice requirements of Bankruptcy Rules 2002(2) and 6004 are satisfied. The Debtors also propose to publish the Auction and Sale Notice in the Local Edition of the New York Times pursuant to Bankruptcy Rule 2002(l). Therefore, the Debtors respectfully request that the Court approve the Auction and Hearing Notice and the notice procedures proposed above.

**The Sale of the Assets Should be Approved**

49.     Section 363(b) of the Bankruptcy Code governs transactions outside the ordinary course of business involving property of the debtor's estate.  Specifically, that section provides, in relevant part, that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."

50.     The Debtors' sale or use of property of the estate outside the ordinary course of business should be approved by the Court if the Debtors can demonstrate a sound business justification for the proposed transaction.  See In re Chrysler LLC, 576 F.3d 108, 117-18 (2d Cir. 2009), citing In re Iridium Operating LLC, 478 F.3d 452, 466 (2d Cir. 2007) ("In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.'" (citing Comm. of

Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983));

see also In re Gen. Motors Corp., 407 B.R. 463, 494-5 (Bankr. S.D.N.Y. 2009) (noting that sales

under § 363(b) are "commonly" approved subject to the business judgment rule).

51.     In addition, section 105(a) of the Bankruptcy Code grants the Court the

authority to "issue any order, process, or judgment that is necessary or appropriate to carry out

the provisions of [the Bankruptcy Code]." This provision is "the basis for a broad exercise of

power [by the Court] in the administration of a bankruptcy case." 2 Collier on Bankruptcy ¶

105.01 (Lawrence P. King, et al. eds., 15th ed. rev. rel. 2000).

52.     A sound business justification exists because the proposed sale will allow

the Debtors to: (i) monetize the Assets for the benefit of the Debtors' estates and creditors,

including Sun Life and the MedMal Trusts (who are the primary economic parties-in-interest);

and (ii) avoid the incurrence of any carrying costs associated with the Assets, including the

incurrence of real estate taxes. Moreover, given (i) the thorough marketing of the Assets, (ii) the

significant cash Purchase Price and Deposit being offered by the Purchaser; (iii) the Purchaser's

willingness to promptly consummate the sale on an "as is, where is" basis; and (iv) the further

market testing of the Assets at the Auction proposed herein, with the possibility of higher and

better bids, the Debtors submit that their sale of the Assets is fair, reasonable, and in the best

interests of the estates.

53.     The Debtors are confident that they and the Purchaser will be able to close

the Sale. The Debtors also believe that the Purchase Price is fair and reasonable. Finally, any

concern that the Debtors may be able to sell the Assets on better overall terms than those

provided for in the Purchase Agreement should be allayed by the fact that the primacy of the

Purchase Agreement will be tested through the Bidding Procedures, and at the Auction. As such,

the Debtors submit that the Sale of the Assets offers the greatest financial benefits to the Debtors' estate, and is an exercise of the Debtors' sound business judgment and warrants approval by the Court.

**The Assets Should be Sold Free and Clear**

54. Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property under section 363(b) of the Bankruptcy Code free and clear of liens, claims and encumbrances if one of the following conditions is satisfied:

1. applicable nonbankruptcy law permits sale of such property free and clear of such interest;

2. the entity holding the lien, claim or encumbrance consents to the sale;

3. the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property;

4. the interest is in bona fide dispute; or

5. the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). See In re Smart World Tech., LLC, 423 F.3d 166, 169 n.3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests... It thus allows purchasers… to acquire assets [from a debtor] without any accompanying liabilities."); In re Dundee Equity Corp., No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.").

55. Pursuant to the Purchase Agreement, the Debtors request that the Court authorize the Sale of the Assets free and clear of all Interests, other than the "Permitted Exceptions" described in the Purchase Agreement. Thus, the Sale of the Assets pursuant to the Bidding Procedures will satisfy section 363(f)(1) of the Bankruptcy Code because any entities

holding Interests in the Assets will have received notice of this Motion and the Auction and Hearing Notice.

56.     Section 363(f)(2) of the Bankruptcy Code is satisfied as to those parties that consent or do not object to the proposed Sale.  In addition, all parties-in-interest will be given sufficient opportunity to object to the relief requested in this Motion, and any such entity that does not object to the Sale should be deemed to have consented.  See Futuresource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent... It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same).  Courts in the Southern District of New York have applied the same principle.  See, e.g., In re Enron Corp., 2004 WL 5361245 at *2 (Bankr. S.D.N.Y. 2004) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).  As such, to the extent that no party holding an Interest objects to the relief requested in this Motion, the Sale of the Assets free and clear of all Interests except the Permitted Exceptions satisfies section 363(f)(2) of the Bankruptcy Code.

57.     Section 363(f)(3) of the Bankruptcy Code is satisfied because the price at which the Debtors' property is to be sold is greater than the economic value of the liens on the Assets.  While the face value of the liens asserted against the Assets exceed the Purchase Price

currently offered by the Purchaser, the economic value of the Assets has been determined by the market and there is the possibility that an auction will result in a higher and better bid. A sale can be made free and clear of any liens pursuant to section 363(f)(3) of the Bankruptcy Code so long as the purchase price exceeds "the aggregate value of all liens on such property." While the interpretation of section 363(f)(3) has produced some division in the courts, this Court has adopted the better-reasoned view that the "aggregate value of all liens" means the actual economic value placed on the liens – not the face amount of the liens. In re Levitz Home Furnishings, Inc., No. 05-45189 (BRL) (Bankr. S.D.N.Y. Dec. 14, 2005) (rejecting creditor's "face value" argument, finding requirements of section 363(f) satisfied and interest of secured creditors adequately protected by attachment of their liens to sales proceeds); In re Oneida Lake Dev., Inc., 114 B.R. 352, 356-57 (Bankr. N.D.N.Y. 1990) (value and not amount of liens is what the court must look at in applying section 363(f)(3)). Here, the value offered under the Purchase Agreement is greater than the amount offered by any other party-in-interest and remains subject to higher and better offers after what has been a thorough marketing effort. Accordingly, section 363(f)(3) is satisfied.

58. Section 363(f)(5) of the Bankruptcy Code is satisfied. Any entity holding an Interest in the Assets not included in the Permitted Exceptions could be compelled to accept a monetary satisfaction of its Interest. Furthermore, the Debtors propose that any Interest in the Assets that is not included in the Permitted Exceptions shall attach to the net proceeds of the Sale of those Assets subject to any claims and defenses the Debtors may possess with respect thereto, in the priority they had before the Sale. As such, the Sale of the Assets free and clear of all Interests other than Permitted Exceptions satisfies section 363(f)(5) of the Bankruptcy Code. With the exception of the description of the liens of Sun Life and the MedMal Trusts set forth

herein, the Debtors do not believe that any entities hold or assert liens on the Assets that are not Permitted Exceptions.

*Successor Liability*

59.     The Debtors also seek to sell the Assets free and clear of any successor liability claims related to the Assets.  Notwithstanding reference to the conveyance free and clear of "any interest" in section 363(f), that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims, as well.  See, e.g., In re Gen. Motors Corp. (n/k/a Motors Liquidation Corp.), Case No. 09-50026 (REG) (Bankr. S.D.N.Y. Jul. 5, 2009) (authorizing sale of assets free and clear of successor liability claims); In re Old Carco LLC (f/k/a/ Chrysler LLC), Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Jun. 1, 2009) (same); see also In re Trans World Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program).

60.     Here, the Sale Transaction is dependent on the ability of the Debtors to transfer the Assets free and clear from successor liability.  In order to be able to dispose of their various non-hospital business segments, the Debtors must be able to transfer these assets free and clear from potential successor liability claims.  Indeed, the transfer the Assets free and clear of successor liability claims is a critical inducement for the Purchaser to enter into the Sale transaction.  See Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997) (stating that a sale pursuant to § 363 of the Bankruptcy Code "maximizes the purchase price of assets because without this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property").

61.     Furthermore, pursuant to New York law and traditional common law, a purchaser of another company's assets will be found to be liable only for the seller's liabilities where (i) the successor expressly or impliedly assumes the predecessor's tort liability, (ii) the seller and purchaser merged or otherwise consolidated, (iii) the purchaser is a mere continuation of the seller, and (iv) the transaction is fraudulent.  See N.Y. v. Nat'l Serv. Indus., Inc., 460 F.3d 201, 209 (2d Cir. 2006).  Because none of these circumstances apply to the Sale Transaction, a finding by the Court that the transfer of the Assets is free and clear of any successor liability claims is proper.  See Douglas v. Stamco, Case No. 09-1390-cv, 2010 WL 337043 (2d Cir. Feb. 1, 2010) (holding that sale pursuant to § 363 extinguished successor liability claims where there was no (i) assumption of such liability, (ii) merger of the parties, (iii) mere continuation of the seller, or (iv) fraud).

62.     Accordingly, the Assets should be transferred to the Purchaser free and clear of all liens, claims, encumbrances and other interests, including rights or claims based on any successor liability.

**The Purchaser is a Good Faith Purchaser**

63.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) was later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)]… does not affect the validity of a sale… to an entity that purchased… such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale… were stayed pending appeal."

See Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m)… provides that good faith transfers of property will not be affected by the reversal or modification

on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

64.     Although the Bankruptcy Code does not define "good faith," the Second Circuit, in In re Gucci, has held:

> Good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."

126 F.3d at 390 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m) of the Bankruptcy Code)); see also Bace v. Babbitt, No. 07 Civ. 2420 (WHP), 2008 WL 800579, at *3 (S.D.N.Y. Mar. 25, 2008) (same; quoting Gucci).

65.     The Second Circuit has indicated that a party would have to show fraud or collusion between a buyer and the debtor-in-possession or trustee in order to demonstrate a lack of good faith.  See Kabro Assocs. of West Islip, LLC, v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276, (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); see also In re Angelika Films 57th, Inc., Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. 1997); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

66. Here, the Purchaser – who is not an "insider" of the Debtors under section 101(31) of the Bankruptcy Code – and the Debtors have satisfied the requirements of Section 363(m). The Purchase Agreement is the result of extended arm's-length, good faith negotiations between the Debtors and the Purchaser, each represented by their respective professionals.

67. Accordingly, the Purchaser is a "good-faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and should be entitled to its protection. Accordingly, the Debtors request that the Court make a finding that the Purchaser is entitled to the protections of section 363(m) of the Bankruptcy Code.

68. To the extent that the Purchaser is not the Successful Bidder(s) at the Auction, the Debtors will seek a finding from the Court at the Sale Hearing that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code, as well as an identical finding with regard to the Back-Up Biddder.

### *The Sale Complies with Applicable Nonbankruptcy Law*

69. Sections 363(d) and 541(f) of the Bankruptcy Code require that the transfer of property by a not-for-profit corporation comply with applicable nonbankruptcy law governing such a transfer. Specifically, section 363(d) provides that "[t]he trustee may use, sell or lease property under subsection (b) or (c) of this section only – (1) in accordance with applicable nonbankruptcy law that governs the transfer of property by a corporation that is not a moneyed, business or commercial corporation..." Section 541(f) further provides that "property that is held by a debtor that is a corporation described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code may be transferred to an entity that is not such a corporation, but only under the same conditions as would apply if the debtor had not filed a case..." Pursuant to section 1221 of the Bankruptcy

Abuse Prevention and Consumer Protection Act of 2005, sections 363(d) and 541(f) of the Bankruptcy Code are applicable to all cases pending or filed on or after April 20, 2005.

70.     The Debtors submit that the Sale complies with applicable nonbankruptcy law.  While the Assets are owned and were used by the Debtors in the operation of their businesses, the Asset being sold is real estate (residential apartments).  Accordingly, there are no specific regulatory requirements restricting the transfer of this asset.  Furthermore, the Purchase Agreement provides that it is enforceable only to the extent permitted by law.  The Debtors submit, therefore, that the terms of the Purchase Agreement comply with all applicable not-for-profit laws, including the not-for-profit laws of the State of New York, and applicable federal law.  As such, the Purchase Agreement satisfies the requirements of sections 363(d) and 541(f) of the Bankruptcy Code.

### *Assumption of the Assumed Contracts and Leases and the Assignment Procedures Should be Approved*

71.     Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

72.     The "business judgment" test is the standard applied by courts in determining whether an executory contract or unexpired lease should be assumed.  See, e.g., In re Old Carco LLC (f/k/a/ Chrysler LLC), 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009); see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures), 4 F.3d 1095, 1099 (2d Cir. 1993); see also Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985) ("[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially").  A

court should approve the assumption of a contract under section 365(a) of the Bankruptcy Code if it finds that a debtor has exercised its sound business judgment in determining that assumption of an agreement is in the best interests of its estate. See, e.g., Old Carco, 406 B.R. at 196-97; In re Child World, Inc., 142 B.R. 87, 89-90 (Bankr. S.D.N.Y. 1992); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr. S.D.N.Y. 1989); see also Sharon Steel Corp. v. National Fuel Gast Distrib. Corp (In re Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989).

73.     When assuming an executory contract, section 365(b) of the Bankruptcy Code requires the debtor to cure any defaults under the contract or provide adequate assurance that it will promptly cure such defaults. If there has been a default, the debtor must also provide adequate assurance of future performance under the contract.

74.     Assuming and assigning the Assumed Contracts and Leases to the Purchaser or the Successful Bidder pursuant to the Assignment Procedures is an appropriate exercise of the Debtors' business judgment. As the Debtors are selling the Assets, the Assumed Contracts and Leases will no longer have any value to the Debtors. By assuming and assigning the Assumed Contracts and Leases to the Purchaser or the Successful Bidder, the Debtors' estate will benefit from avoiding the rejection damage claims that would arise from rejecting the Assumed Contracts and Leases.

75.     In addition, the Purchaser has sufficient capital and financing commitments to provide adequate assurance of future performance on all the Assumed Contracts and Leases and the Debtors are requiring any Qualified Bidder similarly to demonstrate its ability to provide adequate assurance of future performance.

76.     The Assignment Procedures proposed by the Debtors for determining Cure Amounts and providing the Counterparties to the Assumed Contracts and Leases notice and

an opportunity to object to the assumption and assignment and/or the Cure Amounts are fair to all parties and satisfies the notice requirements of Bankruptcy Rule 6006(c).

77.    Therefore, because assuming and assigning the Assumed Contracts and Leases to the Successful Bidder(s) avoids the costs of rejecting those executory contracts and unexpired leases and increases the value to be realized from the Sale of the Assets, assumption and assignment to the Successful Bidder(s) of the Assumed Contracts and Leases (as amended by the Supplemental Notice of Assumed Contracts and Leases) is clearly an exercise of the Debtors' sound business judgment which warrants approval by this Court.

***Waiver of 14-Day Stay Under Bankruptcy Rule 6004(h)***

78.    Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing a sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of such order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  The Debtors believe that such waiver is appropriate here with respect to the Sale Order because all parties that have expressed interest in the Assets will have (i) received notice of this Motion and any entry of the Bidding Procedures Order and (ii) had the opportunity to participate in the Auction at which the Debtors propose to sell the Assets.

## NOTICE

79.    No trustee or examiner has been appointed in these Chapter 11 Cases. Notice of this Motion has been provided to the Notice Parties, as described above.  Additionally, in accordance with the Second Interim Administrative Order Establishing Case Management and Scheduling Procedures (the "**Case Management Order**"), entered on April 19, 2010 [Docket no. 83], notice of this Motion has been given to the parties identified on the General Service List

and the Special Service List (as such terms are identified in the Case Management Order). The Debtors submit that no other or further notice need be provided.

## <u>NO PREVIOUS REQUEST</u>

80.     No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested and such other or further relief as is just.

Dated: New York, New York
           April 23, 2010

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ Adam C. Rogoff
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

*Proposed Counsel for Debtors and
Debtors in Possession*