KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Proposed Counsel for Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------- x
In re:                              :   Chapter 11
                                    :
SAINT VINCENTS CATHOLIC MEDICAL     :   Case No. 10-11963 (CGM)
CENTERS OF NEW YORK, et al.,        :
                                    :
                        Debtors.    :   Jointly Administered
-------------------------------------------------- x
```

**EMERGENCY MOTION OF THE DEBTORS
FOR AN ORDER (A) APPROVING THE SALE OF ASSETS OF PAX CHRISTI
HOSPICE, INC. ON AN EXPEDITED BASIS TO VISITING NURSE SERVICE OF NEW
YORK HOSPICE CARE, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES
AND OTHER INTERESTS; (B) APPROVING THE RETENTION OF AN APPRAISER
IN CONNECTION WITH THE SALE; (C) AUTHORIZING THE DEBTORS
TO ENTER INTO A MANAGEMENT CONSULTING AGREEMENT; AND (D)
AUTHORIZING PAYMENT OF THE INVESTMENT BANKERS' TRANSACTION FEE**

TO THE HONORABLE CECELIA G. MORRIS,
UNITED STATES BANKRUPTCY JUDGE:

  Saint Vincents Catholic Medical Centers of New York ("**SVCMC**") and certain of its

affiliates, as Chapter 11 debtors and debtors in possession (each a "**Debtor**" and collectively, the

"**Medical Centers**" or the "**Debtors**")[1] in the above-referenced Chapter 11 cases (the "**Chapter**

---

[1] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc.  There are certain affiliates of SVCMC who are not Debtors.

**11 Cases**"), hereby file a motion (the "**Motion**") for an order, substantially in the form attached hereto as **Exhibit A** (the "**Sale Order**"), (a) approving the sale (the "**Sale**") of certain assets related to the Debtors' hospice services (as described in greater detail in the parties' asset purchase agreement, the "**Hospice**," or the "**Assets**") owned and operated by Debtor Pax Christi Hospice, Inc. ("**Pax Christi**") to Visiting Nurse Service of New York Hospice Care ("**VNS**" or the "**Purchaser**") free and clear of liens, claims, encumbrances and other interests; (b) approving the retention of an appraiser in connection with the sale in order to comply with New York state law requirements; (c) authorizing the Debtors to enter into a management consulting agreement and (d) authorizing the payment of the investment bankers' Transaction Fee (as defined below) in connection with the Sale. In support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are sections 105(a), 363(b) and 363(d) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**").

## GENERAL BACKGROUND

4. On April 14, 2010 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. By order of this Court, the Debtors'

Chapter 11 cases have been consolidated, for procedural purposes only, and shall be jointly administered in accordance with Bankruptcy Rule 1015(b).

5.     The Debtors are operating their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.     On April 21, 2010, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code.

## SUMMARY OF RELIEF REQUESTED

7.     This Motion is necessitated by the urgent need to transfer the management and ownership of the Debtors' Hospice care services (both inpatient and outpatient services) for terminally ill patients to a qualified third party care giver. Prior to the filing of this Motion, the Debtors undertook extensive discussions with the New York State Department of Health (the "**DOH**") to approve the process by which this urgent transfer would occur. As the Debtors have advised the Court since the Petition Date, patient care is the estates' highest priority. This Motion is predicated upon the need to assure the continuation of compassionate, high quality patient care for terminally ill patients, consistent with the core of the Debtors' Mission (as defined below). Importantly, the Hospice patients are the last remaining inpatients of the Manhattan Hospital, which is otherwise closed. The relief requested in the Motion will facilitate the prompt transfer of this service.

8.     By this emergency Motion, the Debtors seek to transfer, on an expedited basis, substantially all of the assets and ongoing services of the Hospice to VNS free and clear of all liens, claims, encumbrances and interests. As a result of the Debtors' financial condition and the commencement of the closure of the Debtors' Manhattan Hospital (defined below), the

Debtors are not able to continue providing appropriate long-term hospice care for inpatient and outpatient Hospice patients. In light of the Debtors' need to stabilize the Hospice management as part of, and as a consequence of, the closure process, the circumstances are urgent. With the consent of the DOH, the Debtors seek immediate relief to transfer and sell the ongoing operations of the Hospice and its related services to VNS, and to enter into an interim management agreement. Notably, the DOH has indicated that it will issue emergency approval of VNS' "Certificate of Need" application for authority to operate the Hospice business. This approval is necessary to transfer and operate the Hospice. Further, the Debtors submit that the consideration to be received from the sale – $9 million (subject to adjustments) – represents a fair and reasonable value for the transfer.[2]

## THE MEDICAL CENTERS' HISTORY AND BUSINESS

9.      Founded by the Sisters of Charity in 1849, the Medical Centers are the only remaining Catholic-sponsored, acute-care hospital network in New York City. Dedicated to fulfilling a charitable healthcare mission, the Medical Centers are committed to a mission (the **"Mission"**) that demands they give "Respect, Integrity, Compassion and Excellence to all who come to us in need, especially the poor."

10.      Until recently, the Medical Centers' core business centered around St. Vincent's Hospital Manhattan (the "**Hospital**"), which is located in the Greenwich Village section of Manhattan. The Medical Centers operate numerous other services, including a behavioral health facility, nursing homes, continuing care facilities, a hospice, a home health

---

[2] New York State law provides for the submission of an appraisal when a not-for-profit entity sells all of its assets. Consistent with this process, the Debtors will be obtaining an appraisal and submitting the same to the New York State Attorney General's office. As such, by this Motion the Debtors request authority to engage an appraiser, under section 327 of the Bankruptcy Code. This appraisal will further establish the reasonableness of the consideration to be received for the transfer.

agency and a military health plan serving active duty dependents, retirees, and their families. Additionally, the Medical Centers operate certain physician-related affiliates, provide specialized care across 14 clinical departments, and are affiliated with 18 licensed behavioral health and community medicine programs and six ambulatory care providers in Manhattan, including the Comprehensive Cancer Center, an HIV center, and a wound care center.

11.     SVCMC and its then debtor- and non-debtor affiliates emerged from Chapter 11 in the summer of 2007 subject to over $1 billion of liabilities. After emergence, management attempted to increase their revenue, improve their operations, and reduce costs. Despite these efforts, however, the Medical Centers' revenue remained constant, and the Debtors incurred operating losses of approximately $43 million in 2008 and approximately $64 million in 2009. In 2008 and 2009, the Hospital alone had operating losses of approximately $81 and $107 million, respectively.

12.     The Medical Centers' poor operating results stem from four principal causes.

- The Hospital's large operating footprint and staffing are not properly aligned with the current state of its business, as significant changes in the healthcare industry have reduced the number of hospital admissions. While certified as a 727-bed hospital, and burdened with all of the attendant costs of a larger physical facility, the Hospital, in 2009, used only approximately 340 beds on a daily basis.

- The Medical Centers' patient mix and reimbursement experience limited their revenues. The Hospital had one of the lowest percentages of higher margin private patients of all private Manhattan hospitals and the highest percentage of Medicare and self-pay (i.e., uninsured) discharges per year. In addition, approximately 56% of the Hospital's inpatient admissions come through its Emergency Department, which is required by law to treat patients without regard to their ability to pay. Moreover, as a stand-alone healthcare provider, the Medical Centers have been unable to negotiate reimbursement rates that are competitive with other private area hospitals.

- The profound financial crisis that has gripped New York and the rest of the Nation over the last several years has magnified the financial challenges faced by the Medical Centers. In an effort to balance their budgets, New York State and the federal government have repeatedly reduced hospital reimbursement rates over the last several years, a change that disproportionately impacts the Medical Centers because they have a higher government payor population than other New York medical centers.

- The financial and other obligations assumed in connection with the Prior Chapter 11 Plan resulted in annual payment obligations that exceeded what the current Hospital operations could bear.

13.     By the end of 2009, the Debtors faced a severe cash crisis. In response, the Board appointed a Special Restructuring Committee in December 2009, hired a chief restructuring officer in late January and other restructuring professionals shortly thereafter, and took steps to cut costs and assess their restructuring alternatives. Despite these efforts, however, the Debtors' liquidity crisis deepened. By early February 2010, only emergency funding provided by their prepetition lenders and the State of New York enabled the Debtors to make payroll and stave off an immediate bankruptcy filing.

14.     The Debtors used the respite provided by this emergency financing, subsequent financial assistance from their prepetition lenders, the State of New York, the Sisters of Charity and a Board member, and wage concessions by employees to explore options for preserving their businesses' long-term viability and maximizing the value of their assets. Among other things, the Debtors worked to identify and negotiate with potential new sponsors to preserve operations at the Hospital and potential purchasers for their non-Hospital services and assets. While these efforts have led to the entry of non-binding letters of intent for the sale of certain non-Hospital services, they did not yield a transaction that will support the continued operation of the Hospital. Despite an extensive marketing process and several serious

indications of interest, negotiations concerning the last potential transaction terminated on March 31, 2010. When it became clear that all potential partners had withdrawn from consideration, the Debtors concluded that the continued operation of the Hospital was no longer a viable option.

15. As a result, on April 6, 2010, the Board of Directors of SVCMC voted to approve the closure of the Hospital and the transfer or closure of the outpatient programs and clinics associated with and operated by the Hospital. In accordance with New York State law, the Debtors submitted their proposed plan of closure on April 9, 2010 (the "**Closure Plan**") (as such may be amended from time to time in consultation with the DOH) to the DOH for approval. Prior to the Petition Date, the Debtors commenced the process of implementing their Closure Plan.

## THE TRANSFER OF THE HOSPICE SERVICES

16. The Hospice is owned and operated by Pax Christi, a not-for-profit corporation of which SVCMC is the sole member. The Hospice provides compassionate end-of-life at-home and inpatient hospice care to patients throughout the five boroughs of New York City. The Hospice's patients suffer from advanced illness with limited life expectancy and have chosen to forego aggressive treatment to focus on alleviating their symptoms.

17. For inpatient care, evaluation, or short-term symptom management, the Hospice currently operates a 31-bed inpatient unit at the Hospital. Eligible patients may transfer to the inpatient unit from any medical or residential facility. The Hospice also offers bereavement counseling to families of the deceased.

18. The Hospice's professionals include a full-time medical director, physicians and nurses trained in symptom management, clinical social workers, registered dieticians, certified home health aides, clergy, alternative therapy providers, and highly-trained

volunteers. Hospice's nurses make regular home visits, and patients have access to nurses 24 hours a day.

*Marketing the Services and Decision to Pursue a Private Transaction*

19.    Prior to the commencement of these Chapter 11 Cases, the Debtors commenced their efforts to transfer and sell the Hospice, retaining Cain Brothers & Company ("**Cain Brothers**") as investment banker to the Medical Centers to facilitate the transfer of the Hospice as a going concern. In coordination with the Debtors' senior management and Grant Thornton, the Debtors' proposed crisis managers, Cain Brothers contacted potential purchasers. These efforts culminated in the Debtors entering into a letter of intent with VNS on March 5, 2010 (the "**LOI**"). In the weeks that followed, the parties negotiated the definitive documents while VNS conducted its due diligence.

20.    During this period, the Debtors also announced the closure of the Hospital in early April 2010. This announcement, coupled with the deteriorating financial condition of the Hospital, resulted in the need for the Debtors to move on a more expedited basis to transfer the management and ownership of the Hospice services in order to preserve high quality patient care for terminally ill patients. The parties determined that, without an immediate sale of the Hospice to VNS, the Debtors could face critical staffing shortages affecting patient care. Moreover, in addition to deteriorating patient care, the value of the Hospice services to a new operator could deteriorate rapidly.

*DOH Regulatory Approval Process*

21.    As noted, approval of the transfer of the Hospice services, including any pre-closing management arrangements, requires approval of the DOH. See N.Y. Pub. Health Law § 4004 (prescribing regulatory approval process for the establishment of a hospice).

Specifically, pursuant to New York law, certain sale transactions involving health care providers - including hospices - must be reviewed and authorized by the New York State Public Health Council through what is known as a "Certificate of Need" ("**CON**") process. In accordance with section 4004 of the New York Public Health Law, an applicant proposing to operate a hospice must make written application to the Public Health Council to become an established hospice operator. The Public Health Council will not act on the application until it is approved by both the relevant health systems agency and the State Hospital Review and Planning Council. The Public Health Council will only approve an application if it is satisfied as to: (a) the public need for the hospice; (b) the character, competence and standing in the community of the proposed owners or operators; and (c) the financial resources of the proposed hospice operator. See N.Y. Pub. Health § 4004(2).

22. Under normal circumstances, the CON review process can take many months to complete. However, in recognition of the critical need for continued operations at the Hospice, on April 16, 2010, the Debtors received indications from the DOH that it would consent to approving VNS as hospice operator on an expedited basis. This emergency approval would allow VNS to step in and operate the hospice even though the formal Certificate of Need approval process has not been completed, contingent upon VNS completing the process after the closing of the transaction. DOH only agrees to bypass the statutorily mandated approval process in situations of extreme emergency. In this case, there is concern over the Debtor's ability to care for the Hospice patients in the near term and in particular, the well-being of those inpatient Hospice residents at the Hospital, in light of the closure of the Hospital. The Hospice inpatients are the last remaining patients in the Manhattan Hospital at this time, as all other patients have been transferred or discharged.

23.     Accordingly, in order to preserve continuity of Hospice patient care and also preserve the purchase price for these services, with the consent of its postpetition DIP lender, the Debtors agreed to enter into a private sale transaction with VNS that would take advantage of this unique opportunity, facilitated by the DOH's emergency approval of VNS as the new hospice operator.

### Additional Approvals

24.     In addition to VNS obtaining CON approval from the DOH on an emergency basis to operate the Hospice, the New York Not-for-Profit Corporation Law ("**N-PCL**") requires that certain requirements be met before Pax Christi may sell substantially all of its assets (the "**State Approval Process**").

25.     Section 510 of the N-PCL of the provides that the board of a "Type B" not-for-profit corporation must request permission of the New York Supreme Court in the jurisdiction where the corporation is located prior to the sale, lease, exchange or other disposition of all, or substantially all, the assets of such a corporation.  N-PCL § 510(a).  Pax Christi is a "Type B" not-for-profit corporation, and the Assets being sold pursuant to the APA constitute substantially all of its Assets.

26.     Pursuant to a nonbankruptcy process, section 511 of the N-PCL provides that in order to obtain the leave of the New York Supreme Court, a petition (the "**Petition**")[3]

---

[3] While the Debtors are in the process of submitting the Petition to the New York Supreme Court, the Debtors reserve their right to have the Court decide all issues related to the Sale, including the Debtors' compliance with the N-PCL.  Section 363(d)(1) requires that the Sale comply with the N-PCL and was added to the Bankruptcy Code in section 1221(e) of the Bankruptcy Abuse and Consumer Prevention Act of 2005 ("**BAPCPA**").  However, section 1221(e) of BAPCPA explicitly states that "[**n**]**othing in this section shall be construed to require the court** in which a case under chapter 11 of title 11, United States Code, is pending **to remand or refer any proceeding, issue, or controversy to any other court or to require the approval of any other court for the transfer of property**." Pub. L. No. 109-8, § 1221(e) (2005) (emphasis added); see also 3 COLLIER ON BANKRUPTCY ¶ 363.04. Accordingly, this Court has the jurisdiction to resolve any issues regarding the Debtors' compliance with the N-PCL.

seeking approval of the sale must be filed and that the Petition be noticed on the New York Attorney General (the "**NY AG**").[4]  N-PCL § 511(a)-(b).  It is standard practice, however, for the Petition to be filed first with the NY AG for review in advance of filing with the court.  See A GUIDE TO SALE AND OTHER DISPOSITIONS OF ASSETS PURSUANT TO NON-FOR-PROFIT CORPORATION LAW §§ 510-511 AND RELIGIOUS CORPORATION LAW § 12 ("**NY AG Guidelines**")*,* Charities Bureau, New York State Office of the Attorney General, available at http://www.charitiesnys.com/pdfs/sales.pdf.

27.     One of the substantive requirements is that there be "a statement of the fair value of such assets." N-PCL § 511(a)(4).  To ensure satisfaction of this requirement, the NY AG, as part of its decision whether to endorse a Petition, the not-for-profit entity will submit an appraisal establishing that the sale is for fair market value, preferably prepared by a board-certified appraiser.

28.     Consistent with the N-PCL and NY AG Guidelines, the Debtors are currently in the process of filing a Petition to the Supreme Court for Richmond County, and have engaged VMG Health, LLC (the "**Appraiser**") to provide an appraisal in connection with the Sale pursuant to the terms of that certain engagement letter dated as of April 20, 2010 attached hereto as **Exhibit C** (the "**Appraiser Engagement Letter**").[5]

---

[4] As noted, by filing the Petition, the Debtors are not waiving any rights or claims that this Court has the exclusive jurisdiction over the Debtors' estates and assets under the Bankruptcy Code and the right to determine any issues with the Debtors' compliance with N-PCL.

[5] By this Motion, the Debtors also seek approval of the retention of the Appraiser as required by section 327 of the Bankruptcy Code.

*The Asset Purchase Agreement*

29.    On May 4, 2010, the Debtors entered into that certain Asset Purchase Agreement with the Purchaser ("**APA**") for the sale of the Hospice, subject to this Court's approval.  A copy of the APA is attached hereto as **Exhibit B**.  The following is a summary of the material terms of the APA:[6]

- Sale of the Assets.[7]  Subject to the terms and conditions set forth in the APA, Purchaser will purchase, acquire and accept from Pax Christi, and Pax Christi will sell, transfer, assign, convey and deliver to Purchaser, all of Pax Christi's right, title and interest in, to and under the Assets, free and clear of any and all liens, claims or any other interest (collectively, the "**Interests**"), to the extent provided in the Sale Order pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code, excepting only such liabilities that Purchaser has expressly agreed to assume as provided in the APA.

- Purchase Price.  The purchase price to be paid by the Purchaser to Pax Christi for the Assets is $9,000,000 (the "**Purchase Price**"), subject to certain adjustments provided for in the APA.  The Purchase Price shall be paid as follows:

  - *Purchase Price Deposit*:  Upon execution of the APA, the Purchaser deposited $450,000 with the Debtors' escrow agent, and will deposit an additional $450,000 one business prior to the hearing on this Motion (the "**Sale Hearing**").

  - *Payment at Closing*:  At the consummation of the Sale (the "**Closing**"), the Purchaser will pay any remaining amount of the Purchase Price that has not been released from escrow.

- Free and Clear.  The APA provides, subject to the Permitted Exceptions (as defined below), that the Purchaser will take the assets free and clear of liens, encumbrances, pledges, mortgages, deeds of trust, security interests, claims, leases, charges, options, rights of first refusal, easements, servitudes, proxies,

---

[6]  To the extent there are any inconsistencies between the summary description of the APA contained herein and the terms and conditions of the APA, the terms of the APA control.  Capitalized terms contained in the summary description of the APA that are not defined in this Motion shall have the meaning ascribed to them in the APA.

[7]  The Sale does not contemplate the assumption of any executory contracts or unexpired leases by the Debtors for assignment to the Purchaser.

voting trusts or agreements, transfer restrictions under any agreement (collectively, the "**Interests**").

- <u>Representations and Warranties</u>.  The APA contains various representation and warranties by the parties as customary for this sort of transaction.

*Pre-Closing Management Consulting Agreement*

30.     While the Debtors anticipate a brief period of only several days between entry of the Sale Order and the Closing, the APA contemplates that the parties may enter into that certain Interim Management Agreement attached to the APA as **Exhibit B** (the "**Management Consulting Agreement**"), in the event of a delayed Closing, in order to stabilize the Hospice services for the benefit of patients – and also preserve the value of the Hospice services for the benefit of creditors.  The Management Consulting Agreement provides that VNS will assume day-to-day management of the Hospice within two business day after entry of the Sale Order and prior to the closing under the APA.

31.     The Management Consulting Agreement is subject to approval of the DOH in accordance with the DOH's State Hospital Code.  <u>See</u> 10 N.Y. Comp. Codes R. & Regs. ("**NYCCRR**") § 793.2.  Pursuant to the NYCCRR, Pax Christi is prohibited from entering into "managing authority contract," but is permitted to enter into a contract for "management consulting services."  <u>See</u> 10 NYCCRR §793.2(b).  The criteria for determining whether Pax Christi has improperly delegated its authority under the Management Consulting Agreement include whether it retains or delegates its authority (i) to hire or fire the administrator or other key management employees; (ii) for the maintenance and control of the books and records; (iii) over the disposition of assets and the incurring of liabilities on behalf of the facility; or (iv) over the adoption and enforcement of policies regarding the operation of the facility.  <u>See</u> 10 NYCCRR §793.2(b)(1)(i)-(iv).

32. The significant terms of the Management Consulting Agreement include the following:[8]

(a) <u>VNS Responsibilities</u>. VNS will manage the day-to-day operation of the Hospice Business on behalf of Pax Christi in accordance with the provisions of the Management Consulting Agreement, the policies, rules and regulations of Pax Christi, and the laws, rules and regulations of all governmental authorities having jurisdiction over the Hospice, including providing or arranging for the provision of those services specified in the Management Consulting Agreement and such other services as are agreed to in writing by the parties from time to time which are necessary for the day-to-day management and operation of the Hospice; <u>provided, however</u>, that Pax Christi shall retain on-going responsibility for statutory and regulatory compliance. At all times relevant, VNS shall be subject to the general supervision and direction of Pax Christi. VNS shall have no authority to bind Pax Christi to any contract. VNS will also provide a full-time on-site manager who will support the administrator of the Hospice in the clinical and administrative aspects of the day-to-day operations of the Hospice.

(b) <u>Pax Christi Responsibilities</u>. Pax Christi will retain the authority to hire or fire the administrator of the Hospice; dispose of assets outside of the ordinary course of business, adopt internal policies; comply with applicable statues or regulations; ensure the quality of care offered by the Hospice; and ensure adherence to the Hospice's plan of care. Pax Christi will also use commercially-reasonable efforts to allow VNS access to and consultation with the Patient Care Ombudsman.

(c) <u>Fee</u>. No fee will be payable by Pax Christi or any of the Debtors to VNS for the services furnished pursuant to the Management Consulting Agreement.

(d) <u>Term</u>. The term of the Management Consulting agreement commences upon approval of the Court and the DOH, and ends on the earlier of (i) the closing of the APA; (ii) June 1, 2011; or (iii) at the discretion of Pax Christi, 60 days after the termination of the APA, subject to the approval of the DOH.

---

[8] To the extent there are any inconsistencies between the summary description of the Management Consulting Agreement contained herein and the terms and conditions of the Management Consulting Agreement, the terms of the Management Consulting Agreement control. Capitalized terms contained in the summary description of the Management Consulting Agreement that are not defined in this Management Consulting Agreement shall have the meaning ascribed to them in the APA.

(e)   <u>Termination</u>.   Pax Christi may terminate the Management Consulting Agreement on 90 days' prior written notice to VNS, and either party may terminate on 30 day's written notice of a material breach or default, with such breach or default remaining uncured for 30 days after such notice. The parties may also terminate the Management Consulting Agreement on mutual consent.

**Successor Liability**

33. The parties intend, and the Sale Order shall reflect, that the Purchaser shall not be deemed to be a successor to SVCMC, Pax Christi or the Medical Centers and shall not be liable for any claims against SVCMC, Pax Christi or the Medical Centers, their predecessors, or their affiliates. As described below, given the nature of the Debtors' business, a critical inducement for the Purchaser to enter into the Sale is the ability to take the Assets free and clear from any potential successor liability.

## RELIEF REQUESTED

34. By this Motion, the Debtors respectfully request the entry of the Sale Order to (a) approve the transfer and Sale of the Hospice to VNS free and clear of liens, claims, encumbrances and other interests, including successor liability; (b) approve the retention of the Appraiser as part of the State Approval Process; (c) authorize the Debtors to enter into the short-term pre-closing Management Consulting Agreement, and (d) authorize the payment of the investment bankers' Transaction Fee in connection with the Sale.

**The Need for a Private Sale**

35. The Debtors seek to complete the transfer and Sale of the Hospice by a private transaction with VNS without the delay of an auction process. Given their current financial state and the imperative to preserve critical services to the Hospice patients, an

expedited private transaction is necessary and in the best interests of the Debtors' estates for preserving both critical patient services and the value of the Hospice.

36.     Indeed, the importance of transferring the Hospice's management and ownership on an immediate basis – and the desirability of such a transfer of these important healthcare services for terminally ill patients to VNS – has been underscored by the DOH's indication that it would issue an emergency CON approval of VNS as the hospice operator on an expedited basis to protect patient care.  As such, upon Court approval, the Sale to VNS could close far sooner than a standard CON process would otherwise entail.  This expedited approval is based upon the DOH's belief that VNS is an appropriate operator of these services.  Thus, the expedited CON process is specific to VNS.  In addition, the Debtors believe that the value to be received from VNS more than fairly compensates for the value of the services being acquired.[9] The expeditious sale also preserves that value and eliminates the downside risk from delay. When dealing with the important healthcare Mission attendant to Hospice care – as supported by the approval of the DOH to proceed expeditiously with a sale and transfer to VNS – this Court may approve the business judgment of the Debtors.  See In re United Healthcare Sys., Inc., 1997 U.S. Dist. LEXIS 5090, *1 (D.N.J. Mar. 26 1997) (holding that decision by debtor to sell medical assets cannot ignore the public interest in health services and focus solely on when value).

*Retention of the Appraiser*

37.     As described above, consistent with New York law relating to the sale of all or substantially all of the assets of a not-for-profit entity, the Debtors will be obtaining an

---

[9] As noted, the Debtors will be obtaining an appraisal to validate the Purchase Price in relation to the value of the services being acquired.

appraisal of the Assets by rendered by an appraiser who is completely independent of both the Debtors and VNS. The Debtors seek to retain VMG Health, LLC ("**VMG**") as the Appraiser pursuant to section 327(a) of the Bankruptcy Code in accordance with the terms of the Appraiser Engagement Letter.

38. As described in the Declaration of Vincent M. Kickirillo, a principal of VMG who will oversee the appraisal of the Assets, in support of the retention of the Appraiser attached hereto as **Exhibit D** (the "**Appraiser Declaration**"), VMG is recognized by leading healthcare providers and investors as one of the most trusted valuation and transaction advisors in the United States. VMG focuses exclusively on healthcare services, and possesses an in-depth understanding of the critical financial, operational, and legal issues that impact value in the healthcare environment. VMG performs more than 500 healthcare valuations each year throughout the United States and abroad. VMG has obtained national recognition for determining and understanding fair market value in today's healthcare regulatory environment through publications such as *Healthcare Financial Management*, *Compliance Today*, *SurgiStrategies*, *The PHA Pulse*, and *Health Lawyers Weekly*. Mr. Kickirillo specializes in providing financial, valuation and transaction advisory services to clients in the health care industry, including hospitals, health systems, ambulatory surgery centers, imaging centers, catherterization labs, radiation therapy centers and other healthcare entities, and has provided expert testimony related to the value of companies in the healthcare industry. Prior to joining VMG, he worked as a Director for FTI Consulting, Inc., a Director in KPMG's Valuation and Litigation practices, and as a staff and senior analyst in the Financial Advisory Services practice at Ernst & Young.

39.     Pursuant to the terms of the Appraiser Engagement Letter, the Appraiser's fee is $10,000, plus reasonable out of pocket expenses related to the engagement, including expenses of $300 related to courier services, long distance charges, and document preparation services (collectively, the "**Appraiser Fee**").  The Appraiser Fee will constitute a cost of the transaction to be deducted from the asset sale proceeds.

*Pre-Closing Management Consulting Agreement*

40.     As described more fully above, because the Hospice is a complex operation, and because any transition of ownership must be accomplished as seamlessly as possible, Pax Christi and VNS may enter into the Management Consulting Agreement.  The need for VNS to assume immediate oversight under the Management Consulting Agreement in the event of a delayed Closing is a critical part of the overall transaction and the need for the parties to move expeditiously.  The Management Consulting Agreement would only be in place until the closing, which is expected to occur within a week following this Court's approval of the Motion.  In the event the Closing is delayed, VNS has agreed to provide immediate assistance in the day-to-day Hospice operations – a critical benefit for Hospice patients given the closure of the Debtors' Manhattan Hospital operations generally

41.     The Management Consulting Agreement is intended to protect patient care as part of the sale process to ensure that patients continue to receive high-quality care throughout the transfer.  Accordingly, the Debtors seek separate authorization under section 363(b) of the Bankruptcy Code to enter into the Management Consulting Agreement.

*Objections to the Transaction*

42.     The Debtors propose that objections, if any, to entry of the Sale Order, including objections to the proposed thereto, must (i) be in writing; (ii) specify with particularity

the basis of the objection; and (iii) be filed with the Court and simultaneously served on the following parties (the "**Notice Parties**"): (a) Debtors' counsel, c/o Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq.; and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021; Attn: Robert Wild, Esq. and Judith Eisen, Esq.; (b) counsel for the Official Committee of Unsecured Creditors, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq.; (c) counsel to the Debtors' postpetition lenders General Electric Capital Corporation, as Agent for itself; and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier, Esq.; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802 Attn: Randy Rogers, Esq.; (d) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; (e) VNS Visiting Nurse Service of New York, 1675 Broadway, New York, New York, Attn: Charles Blum, Vice-President, Legal and Government Affairs; and Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New, York, Attn: Gregory Petrick, Esq., so as to be **actually received by 10:00 a.m. (prevailing Eastern Time) on May 11, 2010** (the "**Objection Deadline**").

*Sale Hearing*

43.     The transfer and Sale to VNS will be subject to approval by entry of the Sale Order after the Sale Hearing that will take place on or about May 13, 2010 (subject to the Court's schedule).

***Payment of the Investment Bankers' Transaction Fee***

44.     As described in greater detail in the Debtors' application to retain Cain Brothers, upon the successful closing of the Sale, Cain Brothers will be entitled to a transaction fee equal to 2% of the aggregate transaction value of the Sale as calculated in accordance with Cain Brothers' engagement letter (the "**Transaction Fee**").  By this Motion, subject to the entry of a separate order of the Court approving the terms of Cain Brothers' engagement, the Debtors seek to pay the Transaction Fee upon the closing of the Sale and without the necessity of further order of the Court.

## EXTRAORDINARY PROVISIONS OF THE PROPOSED SALE ORDER

45.     Pursuant to General Order M-383 of the United States Bankruptcy Court for the Southern District of New York, dated November 18, 2009, establishing this Court's Guidelines for the Conduct of Asset Sales (the "**Sale Guidelines**"), the Debtors are required to highlight any "extraordinary provisions" in a separate section of a motion seeking to sell estate assets.  The extraordinary provisions are as follows:

(a)     <u>Private Transfer and Sale</u>.  For the reasons discussed herein, the Debtors are seeking to transfer and sell the Hospice to the Purchaser pursuant to a private sale.  The Debtors submit that such relief is appropriate under the circumstances.

(b)     <u>Interim Arrangements with Proposed Buyer</u>.  As described above, the Debtors may enter into the Management Consulting Agreement with VNS.  As prescribed by the Sale Guidelines, the Debtors seek separate authority to enter into the Management Consulting Agreement.

(c)     <u>Relief from Bankruptcy Rule 6004(h)</u>.  The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy rule 6004(h).  The Debtors submit that such relief is appropriate under the circumstances.

(d)     <u>Records Retention</u>.  To the extent any records related to the Hospice are not transferred to the Purchaser, subject to further

order of the Court and the Debtors' rights under the Bankruptcy Code, the Debtors will comply with their obligations under applicable nonbankruptcy law to retain custody and management over the records.

(e) <u>Use of Proceeds</u>. The Debtors propose that the net proceeds of the sale will be transferred to the lenders under the Debtors' primary credit facility provided by General Electric Capital Corporation and TD Bank, N.A (the "**GE Lenders**").[10] The GE Lenders have a first lien on the Hospice's assets. In addition, as described herein, the Debtors seek to pay the fees of the Appraiser and Cain Brothers out of the proceeds of the Sale.

(f) <u>Successor Liability</u>. The proposed form of Sale Order contains findings and provisions limiting the Purchaser's successor liability. The Debtors believe that a finding that the sale can be made free and clear of successor liability claims in the Sale Order complies with applicable principles of sales free and clear of successor liability claims pursuant to section 363(f) of the Bankruptcy Code and applicable non-bankruptcy law.

## BASIS FOR RELIEF

### *The Private Transfer and Sale to the Purchaser Should be Approved*

46.     Section 363(b) of the Bankruptcy Code governs transactions outside the ordinary course of business involving property of the debtor's estate. Specifically, that section provides, in relevant part, that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."

47.     The Debtors' sale or use of property of the estate outside the ordinary course of business should be approved by the Court if the Debtors can demonstrate a sound business justification for the proposed transaction. See In re Chrysler LLC, 576 F.3d 108, 117-18 (2d Cir. 2009) (citing In re Iridium Operating LLC, 478 F.3d 452, 466 (2d Cir. 2007) ("In this

---

[10] Payment of the net sales proceeds to the GE Lenders as requested by this Motion is without prejudice to any separate order(s) of the Court relating to reservation of rights in favor of the Creditors' Committee or otherwise concerning the GE Lenders' liens and claims.

Circuit, the sale of an asset of the estate under § 363(b) is permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.'" (citing <u>Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063, 1071 (2d Cir. 1983)); <u>see</u> <u>also</u> <u>In re Gen. Motors Corp.</u>, 407 B.R. 463, 495 (Bankr. S.D.N.Y. 2009) (noting that sales under § 363(b) are "commonly" approved subject to the business judgment rule).

48.     In addition, section 105(a) of the Bankruptcy Code grants the Court the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  This provision is "the basis for a broad exercise of power [by the Court] in the administration of a bankruptcy case." <u>In re Flores</u>, 291 B.R. 44, 54 (Bankr. S.D.N.Y. 2003) (quoting 2 Collier on Bankruptcy ¶ 105[5] (Lawrence P. King, et al. eds., 15th ed. rev. rel. 2000)).

49.     A sound business justification exists because the proposed transaction will allow the Debtors to monetize the Hospice for the benefit of the Debtors' estates and creditors, and avoid the incurrence of any additional carrying costs associated with the Hospice.  The Sale will not only preserve the value of a fragile asset, but, more importantly, allows the Hospice's terminally ill patients to receive the critical and compassionate end-of-life care they need, consistent with the Debtors' healthcare Mission.

50.     Bankruptcy Rule 6004 sets forth the procedural parameters for asset sales outside of the ordinary course of business and provides that such sales may be effected by either public or private sale.  Fed. R. Bankr. P. 6004(f)(l) (expressly contemplating private sale); <u>see</u> <u>also</u> Local Rule 6004-1(a) (same); Sale Guidelines, n.2 (stating that the Sale Guidelines "do not express a preference for public over private sales as a means to maximize the sale price.").

51.     Courts in this district have allowed chapter 11 debtors to sell assets outside the ordinary course of business by private sale when the debtors demonstrate that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code.  See, e.g., In re BearingPoint, Inc., Case Bo. 09-10691 (REG) (Bankr. S.D.N.Y. Nov. 9, 2009); In re Lehman Bros. Holdings Inc., Ch. 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Feb. 24, 2009).  In approving private sales, courts have examined factors such as declining value of the asset to be sold and the sufficiency of the marketing of the asset.  See In re Bakalis, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) ("When a debtor or trustee conducts a sale under § 363(b), it has an obligation to maximize revenues for the estate."); In re Nepsco, Inc., 36 B.R. 25, 26 (D. Me. 1983) ("Clearly, the thrust of the statutory scheme is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, i.e., the creditors of the estate.").  Accordingly, if a debtor concludes that a particular private purchase offer is the "most advantageous of the estate," a court should defer to the debtor's business judgment.  Bakalis, 220 B.R. at 532.

52.     The Sale in the manner proposed is in the best interests of the estates and is a sound exercise of the Debtors' business judgment.  First, the urgency of the transfer for the patients' sake is paramount concern for all parties, including the DOH.  Secondly, insofar as estate value is concerned, an expeditious sale prevents a precipitous drop in Hospice value and its continued viability.  The Hospital is in the process of implementing the Closure Plan.  There are no remaining inpatient services remaining at the Manhattan Hospital other than the Hospice services.  Accordingly, the Debtors expect that the Hospice services will be exposed to further stress if it continues to operate under the management and ownership of the Debtors, resulting in a reduced potential purchase price.  Absent the transaction proposed herein with VNS, the Hospice may lose staff, further reducing the value of the Hospice to the Debtors' estates.

53.     Moreover, the substantive requirements for the State Approval Process confirm that the Sale is a sound exercise of the Debtors' business judgment. Consistent with that process, the Debtors will ask that the New York State Supreme Court for Richmond County and the New York Attorney General validate that the Sale is fair and reasonable. Because the Debtors will subject the Hospice to an appraisal, this will ensure that the estates receive the fair market value of the Hospice services.

54.     Importantly, the Sale also ensures that the Hospice patients continue to receive the high quality care they deserve and as required by Pax Christi's health care mission. Pax Christi's mission states that the purpose of the Hospice is to provide the Hospices' patients with "palliative and supportive care to meet the special needs arising out of physical, psychological, spiritual, social and economic stresses which are experienced during the final stages of illness and during dying and bereavement."

55.     Court's have recognized that a non-profit debtor may seek to preserve its mission in evaluating potential asset divestures and that highest value is not the determinative factor. See In re United Healthcare Sys., Inc., 1997 U.S. Dist. LEXIS 5090, *1 (D.N.J. Mar. 26 1997) (holding that decision by debtor to sell medical assets cannot ignore the public interest in health services and focus solely on value); see also In re Jewish Mem'l Hosp., 13 B.R. 417, 418-20 (Bankr. S.D.N.Y. 1981) (Lifland, J.) (recognizing that bankruptcy court, in exercise of its equitable powers, may excuse a debtor from strict compliance with the Bankruptcy Code, if the health and safety of the public would be jeopardized and an adverse decision would rid the community of essential health services).

56.     Here, the DOH has recognized that the expeditious consummation of Sale to VNS is critical to the continued existence of the Hospice by indicating that a CON will be

granted on an emergency basis.  Thus, the private sale is appropriate because it both (i) maximizes the value of the Hospice by preventing any financial deterioration that would accompany a lengthy sale process, and (ii) serves Pax Christi's mission by preserving the Hospice's staff and ensuring that the sensitive needs of the Hospice's patients are continued to be met.

### *The Assets Should be Sold Free and Clear*

57.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property under section 363(b) of the Bankruptcy Code free and clear of liens, claims and encumbrances if one of the following conditions is satisfied:

1.   applicable nonbankruptcy law permits sale of such property free and clear of such interest;

2.   the entity holding the lien, claim or encumbrance consents to the sale;

3.   the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property;

4.   the interest is in bona fide dispute; or

5.   the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See In re Smart World Tech., LLC, 423 F.3d 166, 169 n.3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests.  It thus allows purchasers… to acquire assets [from a debtor] without any accompanying liabilities."); In re Dundee Equity Corp., No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.").

58.     Section 363(f)(2) of the Bankruptcy Code is satisfied as to those parties that consent or do not object to the proposed Sale.  In addition, all parties-in-interest will be

given sufficient opportunity to object to the relief requested in this Motion, and any such entity that does not object to the Sale should be deemed to have consented. See FutureSource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same). Courts in the Southern District of New York have applied the same principle. See, e.g., In re Enron Corp., 2004 WL 5361245 at *2 (Bankr. S.D.N.Y. 2004) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)). As such, to the extent that no party holding an Interest objects to the relief requested in this Motion, the Sale of the Assets free and clear of all Interests except the Permitted Exceptions satisfies section 363(f)(2) of the Bankruptcy Code.

59. Section 363(f)(5) of the Bankruptcy Code is satisfied. Any entity holding an Interest in the Assets not included in the Permitted Exceptions could be compelled to accept a monetary satisfaction of its Interest. Furthermore, the Debtors propose that any Interest in the Assets that is not included in the Permitted Exceptions shall attach to the net proceeds of the Sale of those Assets subject to any claims and defenses the Debtors may possess with respect thereto, in the priority they had before the Sale. As such, the Sale of the Assets free and clear of all Interests other than Permitted Exceptions satisfies section 363(f)(5) of the Bankruptcy Code.

*Successor Liability*

60.     The Debtors also seek to sell the Assets free and clear of any successor liability claims related to the Assets.  Notwithstanding reference to the conveyance free and clear of "any interest" in section 363(f), that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims, as well.  See, e.g., In re Gen. Motors Corp. (n/k/a Motors Liquidation Corp.), Case No. 09-50026 (REG) (Bankr. S.D.N.Y. Jul. 5, 2009) (authorizing sale of assets free and clear of successor liability claims); In re Chrysler LLC (n/k/a Old Carco LLC), Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Jun. 1, 2009) (same); see also In re Trans World Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program).

61.     Here, the Sale is dependent on the ability of the Debtors to transfer the Assets free and clear from successor liability.  In order to be able to dispose of their various non-hospital business segments, the Debtors must be able to transfer these assets free and clear from potential successor liability claims.  Indeed, the transfer the Assets free and clear of successor liability claims is a critical inducement for the Purchaser to enter into the Sale.  See Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997) (stating that a sale pursuant to § 363 of the Bankruptcy Code "maximizes the purchase price of assets because without this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property").

62.     Furthermore, pursuant to New York law and traditional common law, a purchaser of another company's assets will be found to be liable only for the seller's liabilities where: (i) the successor expressly or impliedly assumes the predecessor's tort liability, (ii) the

seller and purchaser merged or otherwise consolidated, (iii) the purchaser is a mere continuation of the seller, and (iv) the transaction is fraudulent. See N.Y. v. Nat'l Serv. Indus., Inc., 460 F.3d 201, 209 (2d Cir. 2006). Because none of these circumstances apply to the Sale, a finding by the Court that the transfer of the Assets is free and clear of any successor liability claims is proper. See Douglas v. Stamco, Case No. 09-1390-cv, 2010 WL 337043 (2d Cir. Feb. 1, 2010) (holding that sale pursuant to § 363 extinguished successor liability claims where there was no (i) assumption of such liability, (ii) merger of the parties, (iii) mere continuation of the seller, or (iv) fraud).

63.     Accordingly, the Assets should be transferred to the Purchaser free and clear of all liens, claims, encumbrances and other interests, including rights or claims based on any successor liability.

**The Purchaser is a Good Faith Purchaser**

64.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) was later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)]… does not affect the validity of a sale… to an entity that purchased… such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale… were stayed pending appeal."

See Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m)… provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11

U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

65.     Although the Bankruptcy Code does not define "good faith," the Second Circuit, in In re Gucci, has held:

> Good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."

126 F.3d at 390 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m) of the Bankruptcy Code)); see also Bace v. Babbitt, No. 07 Civ. 2420 (WHP), 2008 WL 800579, at *3 (S.D.N.Y. Mar. 25, 2008) (same) (quoting Gucci).

66.     The Second Circuit has indicated that a party would have to show fraud or collusion between a buyer and the debtor-in-possession or trustee in order to demonstrate a lack of good faith.  See Kabro Assocs. of West Islip, LLC, v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276, (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [purchaser's] good faith status at a judicial sale involves fraud, collusion between the [purchaser] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); see also In re Angelika Films 57th, Inc., Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. 1997); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

67.     Here, the Purchaser – who is not an "insider" of the Debtors under section 101(31) of the Bankruptcy Code – and the Debtors have satisfied the requirements of Section

363(m). The APA is the result of extended arm's-length, good faith negotiations between the Debtors and the Purchaser, each represented by their respective professionals.

68. Accordingly, the Purchaser is a "good-faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and should be entitled to its protection. Accordingly, the Debtors request that the Court make a finding that the Purchaser is entitled to the protections of section 363(m) of the Bankruptcy Code.

***The Transfer and Sale Complies with Applicable Nonbankruptcy Law***

69. Sections 363(d) and 541(f) of the Bankruptcy Code require that the transfer of property by a not-for-profit corporation comply with applicable nonbankruptcy law governing such a transfer. Specifically, section 363(d) provides that "[t]he trustee may use, sell or lease property under subsection (b) or (c) of this section only – (1) in accordance with applicable nonbankruptcy law that governs the transfer of property by a corporation that is not a moneyed, business or commercial corporation . . . ." Section 541(f) further provides that "property that is held by a debtor that is a corporation described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code may be transferred to an entity that is not such a corporation, but only under the same conditions as would apply if the debtor had not filed a case . . . ." Pursuant to section 1221 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, sections 363(d) and 541(f) of the Bankruptcy Code are applicable to all cases pending or filed on or after April 20, 2005. Here, the Purchaser is not a "corporation described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code." Accordingly, section 541(f) of the Bankruptcy Code does not apply.

70. In compliance with the Bankruptcy Code requirements, the Debtors expect to obtain, prior to the closing of the Sale, any regulatory approval for the Sale to the extent required by applicable law. Furthermore, the APA provides that it is enforceable only to the extent permitted by law. As such, the APA satisfies the requirements of sections 363(d) and 541(f) of the Bankruptcy Code.[11]

*Retention of the Appraiser*

71. Pursuant to section 327(a) of the Bankruptcy Code, a debtor "may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the [debtor's] duties . . . ." 11 U.S.C. § 327(a).

72. Here, the Appraiser is sought in furtherance of the State Approval Process. As provided in the Appraiser Declaration, the Appraiser is a disinterested party for the purposes of section 327(a).

73. The Debtors seek the ability to compensate the Appraiser in accordance with the terms of the Appraiser Engagement Letter without the need for the Appraiser to submit a fee application. The Debtors submit that this compensation arrangement is appropriate because the Appraiser is compensated by a flat-fee for a one-time, discrete task. This compensation arrangement is appropriate under section 328 of the Bankruptcy Code. See 11 U.S.C. § 328(a) (authorizing the debtor to employ a professional "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on

---

[11] If any regulatory body fails to approve a transaction with the Purchaser, the Debtors reserve the right to challenge any such lack of approval under the Bankruptcy Code or other law, as appropriate.

a contingent fee basis").  The costs of the Appraiser will be deducted from the sale proceeds as a cost of the transaction.

***Entry into the Management Consulting Agreement Should be Approved***

74.    In the event the Closing is delayed, the Management Consulting Agreement would be fundamental to the preservation of Hospice care services.  The Debtors may enter into the Management Consulting Agreement in their reasonable business judgment.  See In re Chrysler LLC, 576 F.3d 108, 117-18 (2d Cir. 2009) (citations omitted).  The "business judgment" test is met when the debtor shows that the proposed use of property would be beneficial to the estate.  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

75.    Once the debtor articulates a valid business justification, the business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)) (the business judgment rule is satisfied where the debtor acts "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.")  Thus, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts generally will not entertain objections to the debtor's conduct".  Comm. Of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns Manville Corp.), 60 B.R. 612, 616 (Bank. S.D.N.Y. 1986).

76. The debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Del. 2001) (quoting In re Logical Software, 66 B.R. 683, 686 (Bankr. D. Mass. 1986)); Integrated Resources, 147 B.R. at 656 ("Courts are loath to interfere with corporate decisions absent a showing of bad faith, self interest or gross negligence") (citations omitted).

77. Here, entering into the Management Consulting Agreement represents a sound exercise of the Debtors' business judgment and should be approved as in the best interests of the Debtors' estates, their creditors and other parties in interest. The Management Consulting Agreement may be necessary to preserve the value of the Hospice services prior to closing and effectuate the Sale in the event the Closing is delayed. The interim management agreement, which is subject to DOH approval, also ensures adequate management resources for continuity of hospice patients despite the closure of the Manhattan Hospital. This interim management is essential to preserving the high quality of patient care and Hospice service values.

### Waiver of 14-Day Stay Under Bankruptcy Rule 6004(h)

78. As evidenced by the DOH's willingness to expedite the CON process, time is of the essence. Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing a sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of such order. The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). The Debtors believe that such waiver is appropriate here with respect to the Sale Order for the reasons set forth in this Motion. The ability of the Debtors to proceed to implement the Sale on an

immediate basis is critical to preserving the high quality services offered by the Hospice to its patients and to preserving the going concern value of the Hospice.

## **NOTICE**

79.     No trustee or examiner has been appointed in these Chapter 11 Cases. Notice of this Motion has been provided to the Notice Parties.  In addition, in accordance with the Second Interim Administrative Order Establishing Case Management and Scheduling Procedures (the "**Case Management Order**"), entered on April 19, 2010, notice of this Application has been given to the parties identified on the General Service List and the Special Service List (as such terms are identified in the Case Management Order).  The Debtors submit that no other notice need be given.

## **NO PREVIOUS REQUEST**

80.     No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested and such other or further relief as is just.

Dated: New York, New York
     May 5, 2010               KRAMER LEVIN NAFTALIS & FRANKEL LLP

                            /s/ Adam C. Rogoff_____ ___
                            Kenneth H. Eckstein
                            Adam C. Rogoff
                            P. Bradley O'Neill
                            1177 Avenue of the Americas
                            New York, New York 10036
                            Telephone: (212) 715-9100

                            *Proposed Counsel for Debtors and*
                            *Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Sale Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X

In re:                                    :        Chapter 11
                                          :
SAINT VINCENTS CATHOLIC MEDICAL           :        Case No. 10-11963 (CGM)
CENTERS OF NEW YORK, et al.,              :
                                          :
                       Debtors.           :        Jointly Administered

---------------------------------------------------------- X

**ORDER (A) APPROVING THE SALE OF ASSETS OF PAX CHRISTI
HOSPICE, INC. ON AN EXPEDITED BASIS TO VISITING NURSE SERVICE OF NEW
YORK HOSPICE CARE, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES
AND OTHER INTERESTS; (B) APPROVING THE RETENTION OF AN APPRAISER
IN CONNECTION WITH THE SALE; (C) AUTHORIZING THE DEBTORS
TO ENTER INTO A MANAGEMENT CONSULTING AGREEMENT; AND (D)
AUTHORIZING PAYMENT OF THE INVESTMENT BANKERS' TRANSACTION FEE**

Upon the Motion (the "**Motion**")[1] of Saint Vincents Catholic Medical Centers of

New York ("**SVCMC**") and certain of its affiliates, as Chapter 11 debtors and debtors in

possession (each a "**Debtor**" and collectively, the "**Medical Centers**" or the "**Debtors**")[2] in the

above-referenced Chapter 11 cases (the "**Chapter 11 Cases**") for an order (a) approving the sale

(the "**Sale**") of certain assets related to the Debtors' hospice service (as described in greater

detail in the parties' asset purchase agreement, the "**Hospice**," or the "**Assets**") owned and

operated by Debtor Pax Christi, Inc. ("**Pax Christi**") to Visiting Nurse Service of New York

---

[1] Unless otherwise indicated, capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion. The terms "**Prepetition Agent**," "**Prepetition Lenders**," "**Prepetition Obligations**," "**DIP Loan**," "**DIP Agent**," "**DIP Lenders**" shall have the meanings ascribed to them in the Interim Order (I) Authorizing Debtors to Incur Postpetition Indebtedness; (II) Granting Senior Security Interests and Superpriority Claims (III) Authorizing the Debtors to Use Cash Collateral (IV) Granting Adequate Protection; (V) Providing Related Relief; and (VI) Scheduling a Final Hearing [Docket No. 61] (the "**DIP Order**")

[2] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc.

Hospice Care ("**VNS**" or the "**Purchaser**") free and clear of liens, claims, encumbrances and other interests; (b) approving the retention of an appraiser in connection with the sale; (c) authorizing the Debtors to enter into a management consulting agreement (the "**Management Consulting Agreement**"); and (d) authorizing the payment of the investment bankers' Transaction Fee in connection with the Sale, all as more fully described in the Motion; and the Court having conducted a hearing on the Motion on [DATE] (the "**Sale Hearing**") to consider approval of the Sale to Purchaser pursuant to the parties' asset purchase agreement, attached hereto as **Annex 1** (the "**APA**") and authorization for the Debtors to enter into the Management Consulting Agreement; and all parties in interest having been heard, or having had the opportunity to be heard, regarding the approval of the APA, the transactions contemplated thereby, and the authorization to enter into the Management Consulting Agreement; and upon the Motion and supporting documentation filed in connection therewith; and the Court having reviewed and considered the Motion and the Appraiser Declaration and any objections or responses thereto; and upon the record of the Sale Hearing and the full record of these Chapter 11 Cases; and the Court having determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:[3]

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.

A.     Jurisdiction and Venue.  The Court has subject matter jurisdiction over the Motion and the relief request therein pursuant to 28 U.S.C. section 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.).  The Motion is a core proceeding pursuant to 28 U.S.C. section 157(b); and venue is proper before the Court pursuant to 28 U.S.C. sections 1408 and 1409.

B.     Statutory Predicates.  The statutory predicates for this order are sections 105(a), 327(a), 363(b), and 363(d) of the Bankruptcy Code and Bankruptcy Rules 2002, 2014, 6004, 6005 and 6006.

C.     Notice.  Proper, timely, adequate and sufficient notice of the Sale Motion and the relief requested therein, including the Sale and related transactions described in the APA and entry into the Management Consulting Agreement (all such transactions being collectively referred to as the "**Sale Transaction**"), has been provided in accordance with sections 102(1) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 and such notice was good and sufficient, and appropriate under the particular circumstances.  No other or further notice of the Sale Motion, the relief requested therein and all matters relating thereto, or entry of this Order is or shall be required.

D.     Opportunity to Object.  Creditors, parties-in-interest and other entities have been afforded a reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities.

E.     Compliance with General Order.  As detailed herein, the Debtors have complied in all respects with General Order M-383 of the United States Bankruptcy Court for the

- 3 -

Southern District of New York, dated November 18, 2009 establishing guidelines for the conduct of asset sales.

F.  Prompt Consummation.  Time is of the essence in consummating the Sale and it is in the best interests of the Debtors and their estates to sell the Assets within the time constraints set forth in the Motion and the APA.  The Sale must be approved and consummated promptly in order to maximize the value of Assets for the Debtors' estates.

G.  Marketing Process.  The marketing and bidding processes implemented by the Debtors, as set forth in the Motion and the Toney Sale Declaration, were fair, proper, and reasonably calculated to result in the best value received for the Assets.

H.  Corporate Authority.  The Debtors have full corporate power and authority to consummate the Sale Transaction pursuant to the APA and all other documents contemplated thereby, and no consents or approvals, other than those expressly provided for in the APA, are required for the Debtors to consummate the Sale Transaction.

I.  Business Justification.  The Debtors have articulated good, sufficient, and sound business reasons for consummating the APA, for the sale of the Assets outside a Chapter 11 plan, and for entry into the Management Consulting Agreement, and it is a reasonable exercise of the Debtors' business judgment to consummate the transactions contemplated by the APA and to enter into the Management Consulting if needed.

J.  Best Interests.  Approval of the APA, entry into the Management Consulting Agreement, and the consummation of the Sale Transaction, is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

K.    <u>Consideration</u>.  The purchase price to be paid by the Purchaser pursuant to the APA is fair consideration and constitutes reasonably equivalent value for the Assets, as determined by the marketing and auction process.

L.    <u>Arm's Length Transaction</u>.  The APA was negotiated, proposed and entered into by the Debtors and the Purchaser without collusion, in good faith and from arm's-length bargaining positions.  The Purchaser is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the APA to be avoided under section 363(n) of the Bankruptcy Code.  Specifically, the Purchaser has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders.

M.    <u>Good Faith</u>.  The Purchaser is a good faith purchaser of the Assets within the meaning of section 363(m) of the Bankruptcy Code and is therefore entitled to all of the protections afforded thereby.  The Purchaser has proceeded in good faith in all respects in connection with this proceeding in that: (i) the Purchaser in no way induced or caused the Chapter 11 filing of the Debtors; (ii) they have recognized that the Debtors were free to deal with any other party interested in acquiring the Assets; and (iii) all payments to be made to the Purchaser pursuant to the APAs or other arrangements entered into by the Purchaser in connection with the Sale have been disclosed.

N.    <u>Free and Clear</u>.  The Assets constitute property of the Debtors' estates. The transfers of the Assets to the Purchaser will be a legal, valid, and effective transfer of the Assets, and will vest the Purchaser with all right, title, and interest of the Debtors in and to the Assets free and clear of all liens, claims, interests, obligations, rights and encumbrances, except as otherwise specifically provided in the APA.  Except as specifically provided in the APA, the

Purchaser shall have no liability for any claims against the Debtors or their estates or any liabilities or obligation of the Debtors or their estates. Accordingly, the Debtors may sell the Assets free and clear of all liens, encumbrances, pledges, mortgages, deeds of trust, security interests, claims, leases, charges, options, rights of first refusal, easements, servitudes, proxies, voting trusts or agreements, transfer restrictions under any agreement (collectively, the "**Interests**") and adverse claims, except as provided in the APA, because one or more of the standards set forth in section 363(f)(1) – (5) has been satisfied with regard to each such Interest or adverse claim. Those non-debtor parties with Interests or adverse claims in or with respect to the Assets who did not object, or who withdrew their objections to the Sale Transaction or the Sale Motion are deemed to have consented to the sale of the Assets free and clear of those non-debtor parties' interests in the Assets pursuant to section 363(f)(2) of the Bankruptcy Code.

O.    <u>Adequate Assurance</u>.  The assumption and assignment of the Assumed Contracts and Leases pursuant to the terms of this Order is integral to the APA and is in the best interests of the Debtors and their estates, creditors and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors. The Purchaser has provided adequate assurance of its future performance under the Assumed Contracts and Leases within the meaning of sections 365(b)(1)(c) and (f)(2)(B) of the Bankruptcy Code.

P.    <u>Avoidance and Successor Liability</u>.  Except as otherwise set forth in the Agreement, the transfer of the Assets to the Purchaser (i) do not constitute avoidable transfers under the Bankruptcy Code or under applicable bankruptcy or non-bankruptcy law and (ii) do not and will not subject the Purchaser to any liability whatsoever with respect to the operation of the Debtors' business prior to the closing of the Sale Transaction or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of

Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability.

Q. <u>Disinterestedness of the Appraiser</u>. The Appraiser is disinterested as that term is defined under section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.

R. <u>Compliance with Nonbankruptcy Law</u>. In satisfaction of section 363(d) and 541(f) of the Bankruptcy Code, the transfer of property as contemplated by the Sale Transaction complies with applicable nonbankruptcy law governing such a transfer.

S. <u>Legal and Factual Bases</u>. The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

NOW THEREFORE, IT IS HEREBY ORDERED THAT:

1. <u>Motion</u>. The Motion is hereby granted as provided herein.

2. <u>Objections</u>. All objections to the Motion and the relief requested therein that have not been withdrawn, waived or settled, and all reservations of rights included in such objections, are hereby overruled on the merits and denied.

3. <u>Sale Approval</u>. The Sale and all of the terms and conditions and transactions contemplated by the APA are hereby authorized and approved pursuant to sections 105(a), 363(b) and 365(a) of the Bankruptcy Code. Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized and directed to consummate the Sale Transaction pursuant to and in accordance with the terms and conditions of the APA. The Debtors are authorized to execute and deliver, and empowered to perform under, consummate, and implement the APA, together with all additional instruments and documents that may be reasonably necessary or

desirable to implement the APA and effectuate the provisions of this Order and the transactions approved hereby, and to take all further actions as may be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser or reducing to possession, the Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the APA. The failure to specifically include any particular provision of the APA in this Order shall not diminish or impair the efficacy of such provision, it being the intent of this Court that the APA and each and every provision, term and condition thereof be authorized and approved in their entirety

4.     Transfer of the Assets.  As of the closing of the Sale (the "**Closing**"), the transactions contemplated by the APA effect a legal, valid, enforceable and effective sale and transfer of the Assets to the Purchaser, and shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Assets.

5.     Free and Clear.  Except as provided for in Section 3.3 of the APA, the transfer of the Assets shall vest the Purchaser with all right, title, and interest of the Debtors in the Assets pursuant to section 363(f) of the Bankruptcy Code, free and clear of any and all Interests, whether arising by statute or otherwise and whether arising before or after the commencement of these Chapter 11 Cases, whether known or unknown, including, but not limited to, Interests of or asserted by any of the creditors, vendors, employees, suppliers, or lessors of the Debtors or any other third party, other other than any claims and defenses of a consumer under any consumer credit transaction subject to the Truth in Lending Act or a consumer credit contract, as defined in 16 C.F.R. § 433.1 (and as may be amended).  Any and all such Interests shall attach to the net proceeds of the Sale Transaction.  Except as provided for in the APA, the Purchaser shall not be liable (as successor entity or otherwise) for any Interests,

including without limitation, statutory claims, that any of the foregoing parties or any other third party may have against the Debtors. All persons and entities asserting or holding any Interests in or with respect to the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), howsoever arising, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such Interests against the Purchaser. Each and every federal, state, and local governmental agency, recording office or department and all other parties, persons or entities is hereby directed to accept this Order for recordation as conclusive evidence of the free and clear and unencumbered transfer of title to the Assets conveyed to the Purchaser. Without limitation on the foregoing, Purchaser shall take the Assets free and clear of all leases of real property relating to the Assets irrespective of any rights of the tenants under section 365(h) of the Bankruptcy Code, if any, and such tenants shall be required to vacate the leased premises prior to the Closing.

6. <u>Surrender of Assets</u>. All entities who are presently, or who as of the Closing may be, in possession of some or all of the Assets hereby are directed to surrender possession of the Assets to the Purchaser as of the Closing.

7. <u>Good Faith</u>. The Sale Transaction has been undertaken by the Debtors and the Purchaser at arms'-length, without collusion, and the Purchaser will acquire the Assets pursuant to the APA in good faith, under section 363(m) of the Bankruptcy Code, and is, and shall be entitled to all of the protections in accordance therewith. The consideration provided by the Purchaser for the Assets under the APA is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

8. <u>Required Permits</u>. The Debtors are hereby authorized and directed to assign all state and federal licenses and permits used in connection with the Assets to the Purchaser in accordance with the terms of the APA.

9. <u>Sale Proceeds</u>. The Debtors are authorized and directed to remit the "Net Sale Proceeds" to the Prepetition Agent on account of the Prepetition Obligations. As used in the foregoing sentence, "Net Sale Proceeds" shall mean all amounts paid or payable by the Purchaser to the Debtors with respect to the Sale, after pro-rations and any other adjustments that affect the final purchase price, and after all other obligations required to be paid by the Debtors in connection with the Sale, including the Transaction Fee payable to the Debtors' investment banker arising from the Sale. The Debtors are also authorized and directed to remit to the Prepetition Agent the following: (a) all cash on deposit in any deposit accounts maintained by Pax Christi, after reserving such funds as are reasonably necessary to pay postpetition expenses of Pax Christi, and (b) the net proceeds of all accounts, intangibles, and other assets of Pax Christi as and when received by Pax Christi. The amounts remitted to the Prepetition Agent pursuant to this Order (the "**<u>Pax Christi Payments</u>**") shall be applied by the Prepetition Agent and the Prepetition Lenders on account of the Prepetition Obligations in accordance with the underlying agreements and applicable law. Payment of the Pax Christi Payments shall not prejudice any rights of the Official Committee of Unsecured Creditors (the "**<u>Committee</u>**") to investigate, challenge or avoid any prepetition liens, claims or security interests of the Prepetition Agent and Prepetition Lenders pursuant to the provisions of the DIP Order.

10. <u>DIP Agent Rights</u>. The Court finds that (a) the Assets and all other assets of Pax Christi are subject to a lien and security interest in favor of the DIP Agent for the benefit of the DIP Lenders, (b) by the terms of the DIP Order, the lien and security interest of the DIP

Agent is junior in priority to any Permitted Prior Senior Liens (as defined in the DIP Order), and (c) the DIP Agent and the DIP Lenders have consented to the Sale of the Purchased Assets free and clear of the liens of the DIP Agent, to remittance of the Net Sale Proceeds to the Prepetition Agent on account of its Permitted Prior Senior Lien. If this Court shall subsequently determine that the payments made to the Prepetition Agent pursuant to this Order are to be returned or disgorged, the lien of the DIP Agent shall immediately and automatically attach to such amounts in a first priority position.

11. <u>Modifications</u>. The APA, the Management Consulting Agreement, and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

12. <u>Management Consulting</u>. The Debtors are authorized but not directed to enter into the Management Consulting Agreement, and to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers contemplated thereby; and it is further

13. <u>Retention of the Appraiser</u>. The retention and employment of the Appraiser to the Debtors pursuant to section 327(a) of the Bankruptcy Code on the terms set forth in the Engagement Letter and this Order is hereby approved. The Appraiser shall not be required to file an application and may be compensated from the proceeds of the Sale without further application to the Court.

14.    Transaction Fee.  The Debtors are authorized to pay the Transaction Fee to
Cain Brothers upon the closing of the Sale subject to the provisions of the Court's order
approving the retention of Cain Brothers.

15.    Non-Severability.  The provisions of this Order are non-severable and
mutually dependent.

16.    Order Immediately Effective.  As provided by Bankruptcy Rules 6004(h),
6006(d) and 7062, this Order shall be effective and enforceable immediately upon its entry, and
the sale approved by this Order may close immediately upon entry of this Order, notwithstanding
any otherwise applicable waiting periods.

17.    Retention of Jurisdiction.  This Court shall retains jurisdiction on all
matters pertaining to the relief granted herein, including to interpret, implement, and enforce the
terms and provisions of this Order, the APA, the Management Consulting Agreement, and any
related agreements, documents, or other instruments  and to adjudicate any dispute relating to the
Sale Transaction or the proceeds thereof, and the assumption, assignment and cure of any of the
Assumed Contracts and Leases.

Dated:    New York, New York
          _____, 2010


                                         _____
                                         THE HONORABLE CECELIA G. MORRIS
                                         UNITED STATES BANKRUPTCY JUDGE

# ANNEX 1
## APA

## Exhibit B

## Asset Purchase Agreement

ASSET PURCHASE AGREEMENT


by and between


PAX CHRISTI HOSPICE, INC.


and


VISITING NURSE SERVICE OF NEW YORK HOSPICE CARE


Dated as of May 4, 2010

# TABLE OF CONTENTS

**Page**

ARTICLE I       DEFINITIONS ........................................................................................ 1

     Section 1.1      Certain Definitions. .................................................................... 1

     Section 1.2      Terms Defined Elsewhere in this Agreement .............................. 8

     Section 1.3      Other Definitional and Interpretive Matters. ............................ 10

ARTICLE II      PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ....................................................................................... 11

     Section 2.1      Purchase and Sale of Assets ....................................................... 11

     Section 2.2      Excluded Assets .......................................................................... 14

     Section 2.3      Assumption of Liabilities ............................................................ 15

     Section 2.4      Excluded Liabilities .................................................................... 16

     Section 2.5      Assignment and Cure Amounts. .................................................. 16

     Section 2.6      Further Conveyances and Assumptions. ...................................... 17

     Section 2.7      Bulk Sales Laws. ......................................................................... 18

     Section 2.8      Accounts Receivable. .................................................................. 18

     Section 2.9      Agreement Regarding Confidentiality of Patient Information ......... 19

     Section 2.10    Agreement Regarding Clinical Affiliation .................................... 19

ARTICLE III     CONSIDERATION ................................................................................ 19

     Section 3.1      Consideration .............................................................................. 19

     Section 3.2      Purchase Price Deposit ............................................................... 19

     Section 3.3      Payment of Purchase Price .......................................................... 20

ARTICLE IV     CLOSING AND TERMINATION ....................................................... 20

     Section 4.1      Closing Date. ............................................................................... 20

     Section 4.2      Deliveries by Seller .................................................................... 21

     Section 4.3      Deliveries by Purchaser .............................................................. 21

     Section 4.4      Termination of Agreement. .......................................................... 22

     Section 4.5      Procedure for Termination .......................................................... 23

     Section 4.6      Effect of Termination. ................................................................. 24

ARTICLE V      REPRESENTATIONS AND WARRANTIES OF PAX CHRISTI ............................................................................................... 24

     Section 5.1      Organization and Good Standing. ................................................ 24

     Section 5.2      Authorization of Agreement ....................................................... 24

Section 5.3     Consents of Third Parties; Contractual Consents. ..........................25

Section 5.4     Financial Information.........................................................................25

Section 5.5     Title to Purchased Assets ...................................................................26

Section 5.6     Real Property. ....................................................................................26

Section 5.7     Tangible Personal Property.................................................................26

Section 5.8     Intellectual Property...........................................................................26

Section 5.9     Material Contracts...............................................................................26

Section 5.10    Employees; Employee Benefits. .........................................................27

Section 5.11    Employment and Labor.......................................................................28

Section 5.12    Compliance with Laws; Permits. ........................................................28

Section 5.13    Absence of Certain Developments......................................................28

Section 5.14    Taxes ..................................................................................................29

Section 5.15    Litigation............................................................................................29

Section 5.16    Financial Advisors ..............................................................................29

Section 5.17    No Other Representations or Warranties; Schedules.....................................29

ARTICLE VI     REPRESENTATIONS     AND     WARRANTIES     OF
               PURCHASER ......................................................................................30

Section 6.1     Organization and Good Standing........................................................30

Section 6.2     Authorization of Agreement ..............................................................30

Section 6.3     Conflicts; Consents of Third Parties. ..................................................30

Section 6.4     Litigation............................................................................................31

Section 6.5     Financial Advisors ..............................................................................31

Section 6.6     Healthcare Regulatory Compliance Status ..........................................31

Section 6.7     Acknowledgement Regarding Condition of the Business ....................31

Section 6.8     Financing.............................................................................................32

Section 6.9     No Other Representations or Warranties; Schedules......................................32

ARTICLE VII    BANKRUPTCY COURT MATTERS .................................................32

Section 7.1     Bankruptcy Court Approval................................................................32

Section 7.2     Bankruptcy Court Filings....................................................................32

Section 7.3     Treatment of Monetary Obligations.....................................................33

ARTICLE VIII   COVENANTS ....................................................................................33

Section 8.1     Access to Information..........................................................................33

Section 8.2     Conduct of the Business Pending the Closing. ....................................33

| Section 8.3 | Consents; Insurance. | 35 |
| Section 8.4 | Regulatory Approvals. | 35 |
| Section 8.5 | Further Assurances | 37 |
| Section 8.6 | Confidentiality. | 38 |
| Section 8.7 | Preservation of Records | 40 |
| Section 8.8 | Publicity | 40 |
| Section 8.9 | Use of Name | 40 |
| Section 8.10 | Supplementation and Amendment of Schedules. | 41 |
| Section 8.11 | Covenant Not to Compete or Solicit. | 41 |
| ARTICLE IX | EMPLOYEES AND EMPLOYEE BENEFITS | 43 |
| Section 9.1 | Offers of Employment. | 43 |
| ARTICLE X | CONDITIONS TO CLOSING | 44 |
| Section 10.1 | Conditions Precedent to Obligations of Purchaser | 44 |
| Section 10.2 | Conditions Precedent to Obligations of Seller | 45 |
| Section 10.3 | Conditions Precedent to Obligations of Purchaser and Seller | 45 |
| Section 10.4 | Frustration of Closing Conditions | 46 |
| ARTICLE XI | TAXES | 46 |
| Section 11.1 | Transfer Taxes | 46 |
| Section 11.2 | Prorations | 46 |
| Section 11.3 | Purchase Price Allocation | 46 |
| Section 11.4 | Cooperation on Tax Matters | 47 |
| ARTICLE XII | MISCELLANEOUS | 47 |
| Section 12.1 | Expenses | 47 |
| Section 12.2 | Specific Performance | 47 |
| Section 12.3 | Governing Law; Jurisdiction; Consent to Service of Process | 47 |
| Section 12.4 | WAIVER OF JURY TRIAL | 48 |
| Section 12.5 | Entire Agreement; Amendments and Waivers | 48 |
| Section 12.6 | Notices | 48 |
| Section 12.7 | Invalid Provisions | 49 |
| Section 12.8 | Binding Effect; Assignment; Successors and Assigns | 50 |
| Section 12.9 | No Personal Liability | 50 |
| Section 12.10 | Execution in Counterparts | 50 |
| Section 12.11 | Survival of Representations and Warranties | 50 |

Exhibits

Exhibit A – Form of Sale Order
Exhibit B – Form of Assignment
Exhibit C – Form of Management Consulting Agreement

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>"), is made and entered into as of May 4, 2010, by and between Pax Christi Hospice, Inc., a New York not-for-profit corporation ("<u>Pax Christi</u>" or "<u>Seller</u>") and Visiting Nurse Service of New York Hospice Care, a New York not-for-profit corporation ("<u>Purchaser</u>").

## RECITALS

WHEREAS, Seller, along with Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers ("SVCMC") and certain of its affiliates (collectively, the "<u>Debtors</u>"), is a debtor-in-possession under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "<u>Bankruptcy Code</u>"), and filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code ("the <u>Bankruptcy Case</u>") on April 14, 2010 (the "<u>Petition Date</u>"), in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") (Case No. 10-11963);

WHEREAS, Seller is entering into this Agreement subject to approval by the Bankruptcy Court;

WHEREAS, Pax Christi is engaged in the business of owning and operating a hospice (the "<u>Hospice</u>"), as identified in <u>Section A</u> of the Seller Disclosure Schedule (the "<u>Business</u>");

WHEREAS, Pax Christi's sole member is SVCMC; and

WHEREAS, subject to the approval of the Bankruptcy Court, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to, *inter alia*, Sections 105, 363, and 365 of the Bankruptcy Code all of the Purchased Assets and Assumed Liabilities (each, as defined below), all as more specifically provided herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    <u>Certain Definitions</u>.

Unless the context otherwise requires or as otherwise defined herein, capitalized terms used in this Agreement shall have the meanings set forth in this <u>Section 1.1</u>:

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct

or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Antitrust Laws" means the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, the Donnelly Act, as amended, and the Hart-Scott-Rodino Antitrust Improvements Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, Orders, decrees, administrative or judicial doctrines or other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close.

"CMS" means the Centers for Medicare & Medicaid Services.

"Code" means the Internal Revenue Code of 1986, as amended.

"CON Application" means a Certificate of Need application for authorization to operate the Business to be submitted by Purchaser to DoH. Purchaser has submitted a request for the issuance of a temporary authorization to conduct the Business on an emergency basis subject to submission by Purchaser to DoH of a permanent Certificate of Need application thereafter.

"CON Approval" means the approval by DoH of the CON Application without contingencies or conditions that have not been satisfied, other than reasonable contingencies or conditions that may be reasonably expected to be fully satisfied in accordance with their terms after the Closing in the reasonable discretion of Purchaser. Emergency approval by DOH without contingencies or conditions that have not been satisfied, other than reasonable contingencies or conditions that may be reasonably expected to be fully satisfied in accordance with their terms after the Closing in the reasonable discretion of Purchaser (including submission of a permanent CON application, which Purchaser acknowledges is a reasonable post-Closing contingency), will be deemed to constitute CON Approval.

"Confidentiality Agreement" means the Confidentiality Agreement, dated February 11, 2010, by and between Seller and Purchaser.

"Contemplated Transactions" means the transactions contemplated by this Agreement.

"Contract" means any written contract, indenture, note, bond, lease, license or other agreement, other than a real property lease, a personal property lease or an Intellectual Property License.

"Copyrights" means all copyrights and registrations and applications therefor and works of authorship, and mask work rights.

"Cost Reports" means all cost and other reports filed pursuant to the requirements of Healthcare Programs for payment or reimbursement of amounts due from such programs for services provided.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials exclusively related to the Business or the Purchased Assets, in each case whether or not in electronic form, other than Patient Records.

"DoH" means the Department of Health of the State of New York.

"Employees" means all individuals, as of any date specified herein, who are employed by Seller in the conduct of the Business, together with individuals who are hired in respect of the conduct of the Business after the date hereof and prior to the Closing; provided that "Employees" shall not include (a) any officer of Seller or (b) individuals who regularly perform administrative functions for both the Seller and in any material respect SVCMC except that, at any time before the fifth (5th) Business Day prior to the Sale Hearing, with Seller's and SVCMC's consent, Purchaser may request to include the designated individuals described in the foregoing clause (b) as Employees (and, subject to the prior consent of Seller and SVCMC, in accordance with Section 9.1(b) hereto, request to make offers of employment to such individuals).

"Environmental Law" means any Law currently in effect relating to the protection of human health and safety or the environment, natural resources or the protection thereof, or relating to hazardous materials, including the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.), and the regulations promulgated pursuant thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Contracts" means every Contract that is not an Assigned Contract or not otherwise specifically identified in Sections 2.1(a) through 2.1(h) hereto as a Purchased Asset, including without limitation the CBAs and/or the Plans.

"Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment (including medical equipment) and leasehold improvements owned by Seller and used by Seller exclusively in the conduct of the Business, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by Seller, the telephone numbers associated therewith used in the Ordinary Course of Business and not used by SVCMC), cubicles and miscellaneous office furnishings.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Hazardous Material" means any substance, material or waste which is regulated by any Governmental Body including petroleum and its by-products, asbestos, biomedical waste, medical waste and any chemical, material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" under any provision of Environmental Law.

"Healthcare Program Liabilities" means all (i) Liabilities under any applicable Medical Reimbursement Program Law, including any obligations for settlement and retroactive adjustments under the Medicare and Medicaid programs for open periods ending on or before the Closing Date and (ii) Liabilities for violations of the Conditions of Participation for open periods ending on or before the Closing Date.

"Healthcare Regulatory Consents" means in respect of Seller or Purchaser, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body as shall be required to be obtained and such notifications to any Governmental Body as shall be required to be given by such party in order for it to consummate the Contemplated Transactions in compliance with all applicable Laws relating to health care or healthcare services of any kind and shall include obtaining any such consents, approvals, authorizations, waivers, Orders, licenses or Permits, or notices to, the New York State Public Health Council, CMS, DoH and shall include Purchaser obtaining CON Approval with respect to its operation of the Business and the parties obtaining any consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body needed for them to consummate the Contemplated Transactions and for Purchaser to operate the Business.

"Intellectual Property Licenses" means (a) any grant by Seller to a third Person of any right to use any of the Purchased Intellectual Property owned by Seller and (b) any grant to Seller of a right to use in connection with the Business any Intellectual Property Rights owned by any other Person (other than the SVCMC Marks), to the extent, and only to the extent, such right is transferable by Seller.

"Intellectual Property Rights" means all intellectual property rights available in respect of Copyrights, Marks (other than the SVCMC Marks), Software, trade secrets and Patents, whether registered or unregistered, and whether owned or licensed.

"Inventory" means all medical supplies, drugs, medications, food, janitorial, housekeeping and office supplies and other consumables located in or used in connection with the operation of the Business.

"Knowledge" means the actual knowledge of those officers of Purchaser or of those officers of SVCMC or Pax Christi or senior managers of the Business as of or prior to the Closing (each of which is identified in Section 1.1(a) of the Seller Disclosure Schedule), as applicable.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule, regulation or directive enacted or issued by a Governmental Body.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, alternative dispute resolution, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all fines, penalties, costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement and transfer restriction under any agreement.

"Marks" means all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof.

"Material Adverse Effect" means (a) a material adverse effect on the Business (taken as a whole), including its assets, properties, results of operations or condition (financial or otherwise) as conducted on March 5, 2010 other than an effect resulting from an Excluded Matter, (b) a material adverse effect on the Purchased Assets other than an effect resulting from an Excluded Matter, or (c) a material adverse effect on the ability of Pax Christi to consummate the Contemplated Transactions or to perform its obligations under this Agreement. "Excluded Matter" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general that does not materially disproportionately affect Seller; (ii) the effect of any change that generally affects any industry in which Seller operates that does not materially disproportionately affect Seller; (iii) the effect of any changes in national or international political conditions, including any engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack occurring prior to, on or after the date of this Agreement that does not materially disproportionately affect Seller; (iv) the effect of any change in applicable Laws or accounting rules that does not materially disproportionately affect Seller; (v) the effect of any action taken by Purchaser or its Affiliates with respect to the Contemplated Transactions or with respect to Seller or its Employees, including with respect to the Interim Agreement, which action is a substantial cause of the Material Adverse Effect; (vi) any matter set forth in Section 1.1(b) of the Seller Disclosure Schedule; (vii) any effect reasonably anticipated from the filing or pendency of the Bankruptcy Case; provided, that the extent of the Material Adverse Effect would have been reasonably anticipated prior to the Petition Date; and (viii) any

reduction in patient census, or reduction or elimination of Employees or staff in connection with Seller's wind down and closure of its inpatient hospice unit.

"Medicaid" means any state program for medical assistance administered under Title XIX of the Social Security Act.

"Medical Reimbursement Program" means Medicare, Medicaid, any other federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and any other state sponsored reimbursement program.

"Medical Reimbursement Program Laws" means the Laws governing the Medical Reimbursement Programs, including: 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a- 7b; §§ 1395 through 1395fff; §§ 1396-1396v; the False Claims Act (31 U.S.C. § 3729 et seq.); the False Statements Act (18 U.S.C. § 1001); the Program Fraud Civil Penalties Act (31 U.S.C. § 3801 et seq.); the anti-fraud and abuse provisions of the Health Insurance Portability and Accountability Act of 1996 (18 U.S.C. § 1347, 18 U.S.C. § 669, 18 U.S.C. § 1035, 18 U.S.C. § 1518); and the corresponding reimbursement, fraud and abuse, false claims and anti self-referral Laws of any other Governmental Body.

"Medicare" means the health insurance program administered under Title XVIII of the Social Security Act.

"Order" means any order, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice, it being understood that Seller is winding down and closing its inpatient hospice unit, and subject, however, to those actions necessary and incident, or otherwise relating, to the Bankruptcy Case, provided, however, that Seller complies with the requirements of the Bankruptcy Code after the filing of the Bankruptcy Case.

"Organizational Documents" means (a) the articles or certificate of incorporation, the bylaws and any shareholders agreement of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and certificate of formation or organization of any limited liability company, (e) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and (f) any amendment to any of the foregoing.

"Patents" means all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon.

"Patient Records" shall mean any documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996, the Health

Information Technology for Economic and Clinical Health Act, Title XIII of the American Recovery and Reinvestment Act of 2009 and all regulations promulgated pursuant thereto.

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Body.

"Permitted Liens" means Liens set forth in Section 1.1(c) of the Seller Disclosure Schedule, solely to the extent that such Liens cannot be removed by operation of Sections 105 and/or 363(f) of the Bankruptcy Code.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, association, estate, Governmental Body or other entity.

"Plan" means each material "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other material employee plan or agreement maintained by the Seller.

"Pre-Closing Accounts Receivable" means accounts receivable arising out of the rendition of medical, surgical, behavioral, diagnostic or other professional health care services or the sale of medical products in the Ordinary Course of Business for dates of service occurring prior to midnight on the Closing Date.

"Purchased Intellectual Property" means all Intellectual Property Rights (other than rights under an Intellectual Property License and other than the SVCMC Marks) owned by Seller and (a) used by Seller exclusively in connection with the Business and (b) not used to a material degree by SVCMC, including any in the form of or arising from or in respect of Patents, Marks, Copyrights, Software or Technology, except for any that is an Excluded Asset.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching of Hazardous Material into the indoor or outdoor environment, or into or out of any property.

"Representatives" means, with respect to any Person, any of its Affiliates and the directors, trustees, officers, members, employees, consultants, agents, advisors and other representatives of such Person or its Affiliates.

"Sale Hearing" means the hearing(s) before the Bankruptcy Court to consider the Sale Motion and entry of the Sale Order.

"Sale Motion" means the motion or motions of Seller seeking approval and entry of the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court substantially in the form of Exhibit A hereto, with such changes as are reasonably acceptable to Purchaser and Pax Christi.

"Software" means, except to the extent generally available for purchase from a third Person, any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (d) all documentation including user manuals and other training documentation related to any of the foregoing, in each case, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business. That portion of the Software that is owned by Seller is referred to herein as the "Proprietary Software," and that portion of the Software that is owned by any Person other than Seller is referred to herein as the "Third-Party Software."

"Tax Authority" means any federal, state or local government, or agency, instrumentality or employee thereof, charged with the administration of any Law relating to Taxes.

"Taxes" means (a) all federal, state, local or foreign taxes, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, unrelated business income, and estimated taxes, whether disputed or not, and (b) all interest, penalties and additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (a).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business, other than any in the form of Software.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and the New York State Worker Adjustment and Retraining Notification Act.

Section 1.2    Terms Defined Elsewhere in this Agreement.    For purposes of this Agreement, each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
|---|---|
| Additional Deposit | 3.2 |
| Agreement | Recitals |

| Term | Section |
|---|---|
| Allocation | 11.3 |
| Antitrust Bureau | 8.4(b) |
| Antitrust Division | 8.4(b) |
| Assigned Contracts | 2.1(d) |
| Assumed Liabilities | 2.3 |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Business Confidential Information | 8.6(b) |
| CBAs | 5.11(c) |
| Clinical Affiliation Agreement | 2.10 |
| Closing | 4.1 |
| Closing Date | 4.1 |
| COBRA | 9.2(g) |
| CON Termination Date | 4.4(c)(iv) |
| Cure Amount | 2.5 |
| Escrow Agent | 3.2 |
| Escrow Agreement | 3.2 |
| Escrow Funds | 3.2 |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Excluded Matter | 1.1 |
| Excluded Owned Property | 2.2(f)(i) |
| Excluded Personal Property Leases | 2.2(e) |
| Excluded Real Property | 2.2(f)(ii) |
| Excluded Real Property Leases | 2.2(f)(ii) |
| Financial Statements | 5.4 |
| FTC | 8.4(b) |
| Healthcare Applications | 8.4(a) |
| Healthcare Programs | 5.12(b) |
| Hospice | Recitals |
| Initial Deposit | 3.2 |
| Interim Agreement | 8.13 |
| Interim Balance Sheet | 5.4 |
| Material Contracts | 5.9(a) |
| Nonassignable Assets | 2.6(b) |
| Owned Properties | 5.6(a) |
| Pax Christi | Recitals |
| Personal Property Leases | 5.7 |
| Petition Date | Recitals |
| Proprietary Software | 1.1 |
| Purchase Price | 3.1 |
| Purchased Assets | 2.1 |
| Purchased Intellectual Property Licenses | 2.1(c) |

| Term | Section |
|------|---------|
| Purchased Owned Property | 2.1(a) |
| Purchased Personal Property Leases | 2.1(b)(iii) |
| Purchased Real Property | 2.1(a) |
| Purchased Real Property Leases | 2.1(a) |
| Purchaser | Recitals |
| Purchaser Disclosure Schedule | Article VI |
| Purchaser Documents | 6.2 |
| Real Property Leases | 5.6(a) |
| Seller Confidential Information | 8.6(a) |
| Seller Disclosure Schedule | Article V |
| Seller Documents | 5.2 |
| Seller | Recitals |
| Signing Bonus | 9.1 |
| SVCMC | Recitals |
| SVCMC Marks | 8.9 |
| Third-Party Software | 1.1 |
| Transfer Taxes | 11.1 |
| Year End Financial Statements | 5.4 |

Section 1.3    <u>Other Definitional and Interpretive Matters</u>.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

<u>Calculation of Time Periods</u>.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.  Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

<u>Dollars</u>.  Any reference in this Agreement to currency shall be to, and all payments hereunder shall be paid in, U.S. dollars.

<u>Exhibits/Schedules</u>.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

<u>Gender and Number</u>.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number shall have the corresponding meanings in the plural and vice versa.

Headings.  The provision of a Table of Contents, the division of this Agreement into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All article, section, schedule and exhibit references used in this Agreement are to articles, sections, schedules and exhibits to this Agreement unless otherwise specified.

Herein.  The words "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation", whether or not so stated, and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Made Available to Purchaser.  The phrase "made available to Purchaser" shall mean made available to Purchaser through posting in SVCMC's electronic data room, via email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

Make Available to Seller.  The phrase "make available to Seller" shall mean make available to Seller or its agents through email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

Part of Speech.  If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).

Date.  The phrase "the date of this Agreement," "date hereof" and terms of similar import, unless the context otherwise requires, shall be deemed to refer to the date set forth in the preamble of this Agreement.

Accounting Terms.  All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.

(b)     Each party hereto has been advised by experienced counsel, and the parties hereto have participated jointly, in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto, and no rule of construction shall operate and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1     Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, and subject to entry of the Sale Order, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall, subject to Section 2.5 hereto, sell,

transfer, assign, convey and deliver to Purchaser, all of Seller's right, title and interest in, to and under the Purchased Assets, subject to the Permitted Liens, free and clear of any and all Liens, claims or any other interest, to the extent provided in the Sale Order pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code, excepting only such liabilities that Purchaser has expressly agreed to assume as provided in this Agreement. Other than the Permitted Liens, all indebtedness secured by mortgages or other liens on the Purchased Assets shall attach to the proceeds pursuant to Section 363(f) of the Bankruptcy Code so that the Purchased Assets will be sold free and clear of such liens. "Purchased Assets" means all of the assets, rights and properties of Seller exclusively pertaining to or exclusively used in connection with the Business as existing on the Closing Date (wherever located and whether or not required to be reflected on a balance sheet), other than the Excluded Assets, and in each case subject to Section 2.6(b) hereto, including, without limitation, all of Seller's right, title and interest in and to the following:

(a) all right, title and interest of Seller in and to each Owned Property set forth in Section 5.6(a) of the Seller Disclosure Schedule (other than any identified in Section 2.2(f)(i) hereto as Excluded Owned Property) (the "Purchased Owned Property") and under each Real Property Lease set forth in Section 2.1(a) of the Seller Disclosure Schedule (other than any identified in Section 2.2(f)(ii) hereto as Excluded Real Property Leases) (along with any additional Real Property Leases exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.2 hereto, the "Purchased Real Property Leases", and the real property that is the subject of the Purchased Real Property Leases, collectively with the Purchased Owned Property, the "Purchased Real Property"), together with all improvements and fixtures thereto and other appurtenances and rights in respect thereof (provided that Purchaser shall be permitted to remove any Purchased Real Property Lease listed on Schedule 2.1(a) by notice to Seller at any time on or before the fifth (5th) Business Day prior to the Closing Date); provided, however, that in the event Purchaser elects to remove any Purchased Real Property Lease listed on Schedule 2.1(a), except as provided in Section 2.5(b) hereto, Purchaser shall be liable for any administrative expense claim related thereto for the time period from the date of the entry of the Sale Order until the date such Purchased Real Property Lease is rejected under the Bankruptcy Code;

(b) (i) the Furniture and Equipment; (ii) the tools, spare parts, supplies (including all of Seller's Inventory) and all other tangible personal property owned by Seller, used by Seller in the conduct of the Business and set forth on Section 2.1(b) of the Seller Disclosure Schedule; and (iii) the Personal Property Leases identified in Section 2.1(b) of the Seller Disclosure Schedule, other than any identified in Section 2.2(e) of the Seller Disclosure Schedule as Excluded Personal Property Leases (along with any additional Personal Property Leases exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.2 hereto, the "Purchased Personal Property Leases") (provided that Purchaser shall be permitted to remove any Purchased Personal Property Lease listed on Schedule 2.1(b) by notice to Seller at any time on or before the fifth (5th) Business Day prior to the Closing Date); provided, however, that in the event Purchaser elects to remove any Purchased Personal Property Lease listed on Schedule 2.1(b), except as provided in Section 2.5(b) hereto, Purchaser shall be liable for any administrative expense claim related thereto for the time period from the date of the entry of the

Sale Order until the date such Purchased Personal Property Lease is rejected under the Bankruptcy Code;

(c)     (i) the Purchased Intellectual Property set forth on Section 2.1(c) of the Seller Disclosure Schedule; and (ii) the rights of Seller as licensor under the Intellectual Property Licenses identified in Section 2.1(c) of the Seller Disclosure Schedule and all rights of Seller as licensee under the Intellectual Property Licenses (along with any additional Intellectual Property Licenses exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.2 hereto, the "Purchased Intellectual Property Licenses") (provided that Purchaser shall be permitted to remove any Purchased Intellectual Property License listed on Schedule 2.1(c) by notice to Seller at any time on or before the fifth (5th) Business Day prior to the Closing Date); provided, however, that in the event Purchaser elects to remove any Purchased Intellectual Property License listed on Schedule 2.1(c), except as provided in Section 2.5(b) hereto, Purchaser shall be liable for any administrative expense claim related thereto for the time period from the date of the entry of the Sale Order until the date such Purchased Intellectual Property License is rejected under the Bankruptcy Code;

(d)     all Contracts set forth in Section 2.1(d) of the Seller Disclosure Schedule (provided that Purchaser shall be permitted to remove any Contract listed on Schedule 2.1(d) by notice to Seller at any time on or before the fifth (5th) Business Day prior to the Closing Date) and all rights arising out of such Contracts (along with any additional Contracts exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.2 hereto, the "Assigned Contracts"); provided, however, that in the event Purchaser elects to remove any Contract listed on Schedule 2.1(d), except as provided in Section 2.5(b) hereto, Purchaser shall be liable for any administrative expense claim related thereto for the time period from the date of the entry of the Sale Order until the date such Contract is rejected under the Bankruptcy Code;

(e)     subject to the provisions of Sections 2.9 and 8.7 hereto, all Documents that are exclusively used in, held for use in or intended to be used in, or that arise exclusively out of, the Business, including Documents relating to the services provided by the Business, personnel and employee health files for Employees who accept an offer of employment from Purchaser (including, to the extent available, pre-employment, criminal background, drug screen, and immigration records) and books, files, invoices, flow sheets and other technical and non technical data and information relating to the operations and services provided by the Business which are owned by Seller and which are exclusively used in and integral to the operation of the Business, but excluding any Documents and Patient Records described in Section 2.2(h) or Section 2.2(i) hereto;

(f)     all Permits exclusively used by Seller in the Business and set forth in Section 2.1(f) of the Seller Disclosure Schedule (to the extent transferable);

(g)     all goodwill and other intangible assets (other than Intellectual Property Rights) owned by Seller and exclusively used in connection with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property; and

(h)     all other assets used exclusively in the Business.

Section 2.2     Excluded Assets.   Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser or its Affiliates, and Seller shall retain all right, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean the following assets, properties, interests and rights of Seller:

(a)     all cash, cash equivalents, bank deposits or similar cash items of Seller, all securities owned by Seller and any accounts receivable or trade receivables owned by Seller, including Pre-Closing Accounts Receivable and related party receivables;

(b)     the Excluded Contracts, including, but not limited to the CBAs and/or the Plans;

(c)     any rights to refunds, settlements and retroactive adjustments arising in connection with the Medicare and Medicaid provider numbers and related participation agreements or any other third-party healthcare payor program of the Business;

(d)     any other Contract to which Seller is a party or under which it has rights that is not used exclusively in the Business or is used to a material degree by SVCMC, unless included in Section 2.1(d) of the Seller Disclosure Schedule among the Assigned Contracts;

(e)     the Personal Property Leases identified in Section 2.2(e) of the Seller Disclosure Schedule (the "Excluded Personal Property Leases");

(f)     (i) the Owned Property identified in Section 2.2(f)(i) of the Seller Disclosure Schedule (collectively the "Excluded Owned Property"), and (ii) the Real Property Leases identified in Section 2.2(f)(ii) of the Seller Disclosure Schedule (the "Excluded Real Property Leases", and the real property that is the subject of the Excluded Real Property Leases, collectively with the Excluded Owned Property, the "Excluded Real Property");

(g)     any Intellectual Property Rights of Seller other than the Purchased Intellectual Property; it being understood that Seller shall not convey, and Purchaser shall not acquire, pursuant to this Agreement any right in or to any website or e-mail address owned or used by Seller (whether or not used in the Business);

(h)     any (i) personnel files for Employees of Seller who do not accept an offer of employment from Purchaser; (ii) other books and records that Seller is required by Law to retain (provided that Purchaser shall have a right to make and retain copies of such books and records that relate to the Business at its sole expense, to the extent permitted by applicable Law or subject to any contractual confidentiality obligation owed to a third party); (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party (other than any patient confidentiality obligation referred to in the foregoing clause (ii) or in Section 2.9 hereto); (iv) books and records and other Documents related to malpractice prevention programs, incident reporting or quality assurance to the extent confidential under applicable Law; (v) Documents relating to proposals to acquire the Business by Persons other than Purchaser or its Affiliates; (vi) any Documents primarily related to or that are required to realize the benefits of any Excluded Assets; (vii) Documents related to Pre-

Closing Accounts Receivable; (viii) corporate records and Tax Returns of Seller and (ix) Documents necessary to prepare Tax Returns and Cost Reports;

(i)      any Patient Records; <u>provided</u> that, subject to <u>Section 2.9</u> hereto, Seller shall provide Purchaser with custody of Patient Records;

(j)      any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom;

(k)      all insurance policies or rights to proceeds thereof relating to the Business or the Purchased Assets;

(l)      all deposits (including customer deposits and security deposits for rent, electricity, telephone or other utilities and deposits posted under any Assigned Contract) and prepaid charges and expenses of Seller;

(m)      any rights, claims or causes of action of Seller against third parties relating to assets, properties, business or operations of Seller, including any actions under Chapter 5 of the Bankruptcy Code;

(n)      the amounts described in <u>Section 2.8(a)</u> hereto and all other rights of Seller under this Agreement, the Seller Documents and the Contemplated Transactions;

(o)      any assets of SVCMC not otherwise described in <u>Section 2.1</u> hereto;

(p)      any tangible personal property having religious significance which may be removed from the Purchased Real Property identified in <u>Section 2.2(p)</u> of the Seller Disclosure Schedule;

(q)      any personal, tangible and intangible property of Seller identified in <u>Section 2.2(q)</u> of the Seller Disclosure Schedule;

(r)      any right to receive or expectancy of Seller in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate), whether or not designated to be applied or used in respect of the Business;

(s)      the Medicare and Medicaid provider numbers for the Business and related provider agreements used in the Business, as identified in <u>Section 2.2(s)</u> of the Seller Disclosure Schedule; and

(t)      any marketable securities of Seller.

Section 2.3    <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely pay, perform and discharge in accordance with their respective terms, only the following Liabilities (collectively, the "<u>Assumed Liabilities</u>"):

(a)     all Liabilities accruing from and after the Closing with respect to the Assigned Contracts, the Purchased Intellectual Property Licenses, the Purchased Real Property Leases and the Purchased Personal Property Leases; and

(b)     the Cure Amounts as required by Section 2.5 hereto.

Section 2.4     Excluded Liabilities.  Except for the Assumed Liabilities, Purchaser shall not assume or become liable for the payment or performance of any Liability of Seller of any nature whatsoever, whether accrued or unaccrued, known or unknown, fixed or contingent ("Excluded Liabilities"), including the following, which shall remain Liabilities of Seller:

(a)     except as otherwise provided in Section 2.3(a) hereto, any Liability for Taxes of Seller arising from the operation of the Business for periods prior to the Closing;

(b)     any Liability associated with any Excluded Assets;

(c)     any Liability arising out of events or omissions occurring prior to the Closing Date from or relating to any overpayment, duplicate payment, refunds, discounts or adjustments due to private sector healthcare cost reimbursement program or insurance coverage;

(d)     any Liability related to claims of medical malpractice and/or other professional Liability of Seller, or any of its Employees, agents or independent contractors to the extent incurred prior to the Closing Date arising out of events or omissions occurring prior to the Closing Date;

(e)     all Healthcare Program Liabilities arising from events prior to the Closing Date;

(f)     any Liability arising out of or in connection with any Legal Proceedings (whether instituted prior to or after the Closing) to the extent arising from acts or omissions which occurred prior to the Closing Date (except as otherwise provided by Section 2.3 hereto); and

(g)     any Liability relating to Seller's Employees (whether current, former or retired) prior to the Closing Date.

Section 2.5     Assignment and Cure Amounts.

(a)     Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing and pursuant to Section 365 of the Bankruptcy Code, Seller shall assume and assign to Purchaser, and Purchaser shall take assignment from Seller, the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses pursuant to an assignment (the "Assignment") in the form annexed hereto as Exhibit B.  No contract, lease, or other agreement shall be assumed absent concurrent assignment to Purchaser.  Purchaser shall be responsible for satisfying the requirements of "adequate assurance of future performance" as required by Section 365 of the Bankruptcy Code and shall cooperate fully with Seller in seeking such approval from the Bankruptcy Court,

including without limitation, Purchaser providing the necessary evidence required as part of the Sale Motion to approve this Agreement and the transactions contemplated herein.

(b)     The cure amounts (collectively, the "Cure Amounts"), if any, as determined by the Bankruptcy Court, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of Seller under the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses shall be paid by Purchaser (or Purchaser shall have delivered into escrow on terms reasonably acceptable to Pax Christi amounts sufficient to pay any claim therefor that remains disputed as of the Closing, as such amount shall have been determined by the Bankruptcy Court) at or before the Closing (except as otherwise agreed to by the other party to the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses) and Seller shall have no Liability for any such cure amount.  Except as provided for in Section 4.4(a)(i) and Article X hereto, Purchaser shall not have the right to terminate this Agreement as a result of the failure by Seller or inability of Seller to assign to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof) at the Closing any Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses or Purchaser's decision not to assume any Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses as to which Purchaser has not paid the related Cure Amount in accordance with this section. Purchaser, with the reasonable cooperation of the Seller will commence and prosecute to conclusion, in expedited proceedings before the Bankruptcy Court, objection(s) to the cure amount(s) claimed by the counterparty to any contract, lease or license; provided, however, that Purchaser will reimburse all of the actual and necessary expenses incurred by Seller in connection therewith.  A good faith estimate as of the date hereof of the Cure Amounts described in this section, based on the Knowledge of Seller, is set forth on Section 2.5(b) of the Seller Disclosure Schedule.  At least fifteen (15) Business Days prior to the Closing Date, the Seller shall prepare and deliver to Purchaser an updated Section 2.5(b) of the Seller Disclosure Schedule setting forth the Cure Amounts.  Nothing contained in this Section 2.5 shall restrict or prohibit Purchaser's right to remove any item identified in Section 2.1(a), 2.1(b), 2.1(c), or 2.1(d) of the Seller Disclosure Schedule pursuant to the corresponding Sections thereto; provided, however, that in the event Purchaser elects to remove any such item, Purchaser shall not be liable for any administrative expense claim related thereto for the time period from the date of the entry of the Sale Order until the date such item is rejected under the Bankruptcy Code, if the Cure Amount described on the updated Section 2.5(b) of the Seller Disclosure Schedule is substantially higher than the Cure Amount described on Section 2.5(b) of the Seller Disclosure Schedule as of the date hereof.

Section 2.6     Further Conveyances and Assumptions.

(a)     From time to time following the Closing, each party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents

at the Closing and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the Liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents at the Closing, and to otherwise make effective the transactions contemplated hereby and thereby; provided however that nothing herein shall obligate or otherwise require Seller to pay any claims or liabilities arising prior to the Petition Date.  In the event that Purchaser or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Purchaser shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to Pax Christi.  In the event that Seller receives any Purchased Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver such Purchased Assets (or any payments or proceeds related thereto) to Purchaser.

(b)     To the extent that the assignment of any Purchased Asset shall require the consent of any other Person and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code (each, a "Nonassignable Asset"), (i) nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained, and (ii) except as provided for in Section 4.4(a)(i) and Article X hereto, Purchaser shall be obligated to close whether or not the Nonassignable Asset can be transferred and Seller agrees to reasonably cooperate with Purchaser to seek to obtain any required consent; provided however that Seller shall not be required to pay any claims or incur any other obligations in order to obtain such consent.  Except as provided for in Section 4.4(a)(i) and Article X hereto, notwithstanding anything to the contrary contained herein, Purchaser shall not have the right to terminate this Agreement as a result of the failure by Seller or inability of Seller to assign to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof) at the Closing any Assigned Contract, Purchased Personal Property Lease, Purchased Real Property Lease or Purchased Intellectual Property License.

Section 2.7     Bulk Sales Laws.  The parties hereto hereby waive compliance by Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

Section 2.8     Accounts Receivable.

(a)     All Pre-Closing Accounts Receivable of the Business shall remain the property of Pax Christi following the Closing.  All accounts receivable relating to the operation of the Business based on services rendered after midnight on the Closing Date shall be the property of Purchaser.  For the avoidance of doubt, Pax Christi shall be entitled to bill for and receive all amounts collected, to the extent permitted by applicable Law, in respect of services rendered by the Business before the Closing, and Purchaser shall be entitled to bill for and receive all amounts collected in respect of services rendered by the Business after the Closing.

(b)     Purchaser shall cooperate with Seller for a period of one hundred and twenty (120) days after the Closing Date in Seller's efforts to collect its accounts receivable arising out of the Business before the Closing Date, at no cost to Seller.  Each of Purchaser and Pax Christi agrees that it will pay over or cause to be paid over, insofar as practicable within

three (3) Business Days of receipt, to the other (and until so paid, shall hold in trust for the other) all sums received by it or any of its Affiliates in respect of or on account of the other's receivables, and provide therewith information available to it identifying the source of the amounts so paid over so to permit the other to apply correctly such amounts to the other's accounts receivable. In addition, upon reasonable request, each recipient shall allow the other (at the other's cost) to audit, access and copy any of its records relating thereto. All payments for accounts receivable arising out of the Business received from an obligor after the Closing shall be applied to the receivable specifically designated by such obligor; provided that in the event that the obligor does not specifically designate a receivable, the payment shall be applied in the order of the age of the accounts receivable of such obligor, starting with the oldest such accounts receivable. The provisions of this Section 2.8 shall survive the Closing to the extent contemplated herein.

Section 2.9    Agreement Regarding Confidentiality of Patient Information. Seller shall have no obligation to make available to Purchaser hereunder any confidential patient information unless and until such patient has agreed to a transfer to Purchaser.

Section 2.10    Agreement Regarding Clinical Affiliation. Subject to applicable Law and if feasible, at or prior to the Closing, SVCMC and Purchaser shall, and SVCMC shall use best efforts to cause any successor-in-interest to its acute care hospital operation in Manhattan (and not with respect to any other SVCMC programs) to, enter into a clinical affiliation with Purchaser that defines the relationship between the respective parties. SVCMC and Purchaser contemplate that the clinical affiliation will include Purchaser becoming the preferred hospice provider for SVCMC and its Affiliates (or SVCMC's successor-in-interest, as the case may be), as well as its clinical partner for hospice community care management, and that the clinical affiliation will be in a form to be negotiated by the parties (the "Clinical Affiliation Agreement"). The parties acknowledge and agree that the foregoing obligation is not currently feasible and shall not be feasible if SVCMC's acute care hospital operation in Manhattan closes.

## ARTICLE III

## CONSIDERATION

Section 3.1    Consideration. The consideration for the Purchased Assets shall be, subject to adjustment as provided in Section 9.1 hereto, (a) Nine Million Dollars ($9,000,000.00) (the "Purchase Price"); (b) the assumption by Purchaser of the Assumed Liabilities, and (c) the aggregate Cure Amounts payable or reserved by Purchaser under Section 2.5 hereto.

Section 3.2    Purchase Price Deposit. Purchaser shall immediately deposit with Garfunkel Wild, P.C., in its capacity as escrow agent (the "Escrow Agent"), pursuant to that certain Escrow Agreement, dated as of the date hereof, by and among Purchaser, SVCMC and the Escrow Agent (the "Escrow Agreement"), by wire transfer of immediately available funds, (a) an amount equal to Four Hundred Fifty Thousand Dollars ($450,000.00) upon execution of this Agreement (the "Initial Deposit"), and (b) on or prior to one (1) Business Day prior to the date of the Sale Hearing, an amount (the "Additional Deposit", together with the Initial Deposit, the "Escrow Funds") equal to Four Hundred Fifty Thousand Dollars ($450,000.00), each such deposit to be released by the Escrow Agent and delivered to either Purchaser or Pax Christi, in

accordance with the provisions of the Escrow Agreement. Pursuant to the Escrow Agreement, the Escrowed Funds shall be deposited into an interest bearing account and (together with all accrued investment income thereon) distributed as follows:

(a)      upon the Closing, the Escrowed Funds shall be delivered to Pax Christi as partial consideration for the Purchased Assets, and all accrued investment income thereon shall be delivered to Purchaser at the Closing;

(b)      if this Agreement is terminated pursuant to Section 4.4(c)(ii), the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Purchaser;

(c)      if this Agreement is terminated by Pax Christi pursuant to Section 4.4(b)(ii) hereto, the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Pax Christi; or

(d)      if this Agreement is terminated pursuant to Section 4.4 hereto, other than by Pax Christi pursuant to Section 4.4(b)(ii) hereto, the Escrowed Funds, together with all accrued investment income thereon, shall in each case be returned to Purchaser.

Section 3.3    Payment of Purchase Price.  On the Closing Date, Purchaser shall (a) pay the Purchase Price (less an amount equal to the portion of the Escrowed Funds being released to Pax Christi on the Closing Date pursuant to Section 3.2 hereto) to Pax Christi, which shall be paid by wire transfer of immediately available funds into an account designated by Pax Christi, and (b) deposit cash in escrow equal to such amount (if any) as is required by Section 2.5 hereto.

## ARTICLE IV

## CLOSING AND TERMINATION

Section 4.1    Closing Date.  Subject to the satisfaction of the conditions set forth in Article X hereto (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereto (the "Closing") shall take place at the offices of Garfunkel Wild, P.C. located at 111 Great Neck Road, Suite 503, Great Neck, NY 11021 (or at such other place as Pax Christi and Purchaser may designate in writing) at 10:00 a.m. (New York time) on a date agreed upon by Pax Christi and Purchaser that is not less than three (3) nor more than seven (7) Business Days following the satisfaction or waiver of the conditions set forth in Article X hereto (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by Pax Christi and Purchaser.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."  With respect to the Closing, unless otherwise agreed by Pax Christi and Purchaser in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of Pax Christi in the assets to be acquired by Purchaser hereunder at the Closing, and any Assumed Liability and all risk of loss with respect to the Business, shall be considered to have passed to Purchaser as of 11:59 p.m. (New York time) on the Closing Date.

Section 4.2    Deliveries by Seller.    At the Closing, Seller shall deliver, or cause SVCMC to deliver, as applicable, to Purchaser:

(a)    a duly executed bill of sale in a form reasonably acceptable to Purchaser and Seller;

(b)    the Assignment, substantially in the form of Exhibit B, duly executed by Seller;

(c)    the officer's certificates required to be delivered pursuant to Sections 10.1(a) and 10.1(b) hereto;

(d)    copies of all consents and notices required by Section 10.2(c) hereto for which Seller is responsible;

(e)    all other instruments of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser free and clear of all Liens (except Permitted Liens) (provided however that the Sale Order shall be the only required document to evidence the conveyance and transfer free and clear of such Liens); and

(f)    such other Documents, instruments and certificates as Purchaser may reasonably request.

Section 4.3    Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to Seller:

(a)    the Purchase Price, in immediately available funds, in accordance with Section 3.3 hereto;

(b)    a duly executed bill of sale in form reasonably acceptable to Purchaser and Seller;

(c)    the Assignment, substantially in the form of Exhibit B, duly executed by Purchaser;

(d)    the officer's certificates required to be delivered pursuant to Sections 10.2(a) and 10.2(b) hereto;

(e)    copies of all consents and notices required by Section 10.1(d) hereto for which Purchaser is responsible;

(f)    a copy of any notification that Purchaser is required under the Escrow Agreement to deliver to the Escrow Agent in order for the Escrow Agent to release the Escrowed Funds to Pax Christi at the Closing;

(g)    evidence reasonably acceptable to Pax Christi of Purchaser's deposit in escrow of such amounts (if any) required by Section 2.5 hereto; and

(h)     such other Documents, instruments and certificates as Pax Christi may reasonably request.

Section 4.4     Termination of Agreement.

(a)     Termination by Purchaser.  Purchaser may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)     if Seller fails or is unable to assign to Purchaser those Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses listed on Section 4.4(a)(i) of the Purchaser Disclosure Schedule;

(ii)     if any of the conditions to the obligations of Purchaser to close that are set forth in Sections 10.1 and 10.3 hereto shall have become incapable of fulfillment other than as a result of a breach by Purchaser or its Affiliates of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser; provided that the right to terminate this Agreement pursuant to this Section 4.4(a)(ii) shall not apply with respect to the approvals of Governmental Bodies addressed in Sections 4.4(c)(iii) and (c)(iv) hereto, which are addressed and provided for in such Sections;

(iii)     if there shall be a breach by Seller of any representation or warranty, or any covenant or agreement contained in this Agreement, which breach would result in a Material Adverse Effect and cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Purchaser to Pax Christi of such breach;

(iv)     so long as Purchaser is not then in breach of its obligations under this Agreement in any material respect, if the Sale Order is not entered within sixty (60) days from the Petition Date; or

(v)     if the Sale Order has been vacated, reversed or modified in a material manner with respect to Purchaser's rights or protections thereunder without Purchaser's prior written consent.

(b)     Termination by Pax Christi.  Pax Christi may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)     if any of the conditions to the obligations of Seller to close that are set forth in Sections 10.2 and 10.3 hereto shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Pax Christi; provided that the right to terminate this Agreement pursuant to this Section 4.4(b)(i) shall not apply with respect to the approvals of Governmental Bodies addressed in Sections 4.4(c)(iii) and (c)(iv) hereto, which are addressed and provided for in such Sections;

(ii)     if there shall be a breach by Purchaser of any representation or warranty, or by Purchaser of any covenant or agreement contained in this Agreement,

which breach would preclude the Purchaser from consummating the Contemplated Transactions or performing its obligations under this Agreement and cannot be cured or has not been cured by within twenty (20) Business Days after the giving of written notice by Pax Christi to Purchaser of such breach; or

(iii)     if the Sale Order is subject to a stay other than a stay sought by Seller.

(c)     <u>Termination by Purchaser or Pax Christi</u>. Either Purchaser or Pax Christi may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)     by mutual written consent of Pax Christi and Purchaser;

(ii)     if the Bankruptcy Court shall deny entry of the Sale Order after the conclusion of the Sale Hearing;

(iii)     upon twenty (20) Business Days' written notice to the other party if the Closing shall not have occurred by the close of business on November 1, 2010 (the "<u>CON Termination Date</u>"); <u>provided</u> that such termination pursuant to this <u>Section 4.4(c)(iii)</u> shall not be effective if within such twenty (20) Business Day period (A) all outstanding required regulatory approvals shall have been obtained and all other closing conditions shall have been satisfied or (B) Pax Christi has received reasonably satisfactory assurances that all required approvals and closing conditions shall be satisfied prior to the date which is twelve (12) months after entry of the Sale Order by the Bankruptcy Court; <u>provided</u>, <u>further</u>, that if the Closing shall not have occurred on or before the CON Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement, then the breaching party or its Affiliates may not terminate this Agreement pursuant to this <u>Section 4.4(c)(iii)</u>; or

(iv)     upon twenty (20) Business Days' prior written notice to the other party if DoH revokes its agreement to waive any Medicaid successor liability of Purchaser for any Healthcare Program Liabilities arising from events prior to the Closing Date in connection with the issuance of the emergency CON Approval, as reasonably determined by Purchaser and Seller.

(d)     <u>Extension of Time Periods</u>.   The time periods for termination of this Agreement set forth in this <u>Section 4.4</u> may be extended upon the written agreement of the parties without the further consent of the Bankruptcy Court.

Section 4.5     <u>Procedure for Termination</u>.  In the event of termination of this Agreement by Purchaser or Pax Christi, or both, pursuant to <u>Section 4.4</u> hereto, written notice thereof shall forthwith be given to the other party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in <u>Section 4.4</u> hereto) the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by <u>Section 4.6</u> hereto, without further action by the parties.

Section 4.6    Effect of Termination.

(a)    In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any party; provided that the obligations of the parties set forth in the Confidentiality Agreement, Escrow Agreement, Sections 3.2, 4.6, and 8.6 hereto and Article XII hereto, and to the extent necessary to effectuate the foregoing enumerated provisions, Article I hereto, shall survive any such termination and shall be enforceable in accordance with their terms.  In addition, if this Agreement is terminated as provided herein, Purchaser shall upon request redeliver to Seller as soon as practicable any or all Documents, work papers and other material relating to the Business, whether obtained before or after the execution hereof, together with written certification by an authorized officer of Purchaser who has supervised its compliance with this sentence that confirms such compliance.

(b)    Nothing in this Section 4.6 shall relieve the parties of any Liability for a breach of this Agreement prior to the date of termination of this Agreement.  If this Agreement is terminated in accordance with Sections 4.4 and 4.5 hereto, Purchaser shall not and shall cause its Affiliates not to directly solicit for employment, nor hire any Employee of Seller without the prior approval of Seller, for a period of one (1) year from the date of this Agreement, it being understood that routine job postings of open positions and solicitations of a generalized nature (e.g., newspaper advertisements, mass mailings, and job fairs) do not constitute such direct solicitations.

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF PAX CHRISTI

Except as otherwise disclosed to Purchaser in a schedule delivered to Purchaser by Pax Christi prior to the execution of this Agreement (the "Seller Disclosure Schedule"), and except for the effects of  the commencement of the Bankruptcy Case, Pax Christi hereby represents and warrants to Purchaser as follows:

Section 5.1    Organization and Good Standing.    Pax Christi is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the State of New York, and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 5.2    Authorization of Agreement.  Subject to entry of the Sale Order, (a) Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action, including approval of its members (as applicable), necessary for it to validly execute and deliver, this Agreement and each other agreement, document, or instrument or certificate contemplated by this Agreement to be executed and delivered by Seller in connection with entering into this Agreement and (b) subject to the satisfaction of the conditions referred to in Section 5.3 hereto, Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action necessary for it to validly execute and deliver, each agreement, document, or instrument or certificate contemplated by this Agreement to be

executed by Seller in connection with the consummation of the Contemplated Transactions (together with the other Documents, other than this Agreement, referred to in clause (a) of this sentence, the "<u>Seller Documents</u>") and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. This Agreement and each of the Seller Documents contemplated to be executed and delivered in connection with Seller entering into this Agreement have been, and each other Seller Document will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto and the entry of the Sale Order this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a Legal Proceeding at law or in equity). None of the execution and delivery by Seller of this Agreement and the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Seller.

Section 5.3    <u>Consents of Third Parties; Contractual Consents</u>.

(a)    Except as set forth in <u>Section 5.3</u> of the Seller Disclosure Schedule, Seller is not required to obtain any consent, waiver, approval, Order, Permit or authorization of, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Seller Documents by Seller, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order, (ii) the Healthcare Regulatory Consents, and (iii) approvals under applicable Antitrust Laws**,** if any.

(b)    Except as set forth on <u>Section 5.3(b)</u> of the Seller Disclosure Schedule and as otherwise superseded by the applicable provisions of the Bankruptcy Code, none of the execution and delivery by Seller of this Agreement or any of the Seller Documents, the consummation of the Contemplated Transactions by Seller, or compliance by Seller with any provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Assigned Contract or Permit applicable to the Business.

Section 5.4    <u>Financial Information</u>.    Pax Christi has made available to Purchaser (i) Seller's unaudited balance sheet for the Business as of December 31, 2009 and December 31, 2008 and the related statements of income for each twelve (12) month period then ended (collectively, the "<u>Year End Financial Statements</u>"), and (ii) Seller's unaudited balance sheet for the Business as of January 31, 2010 (the "<u>Interim Balance Sheet</u>" and together with the Year End Financial Statements, the "<u>Financial Statements</u>"). The Financial Statements have been compiled from the books and records of the Business as at the date and for the period then ended

and correctly reflect, in all material respects, the revenues and direct expenses of the Business for the periods covered thereby.

Section 5.5    Title to Purchased Assets.  Except as set forth in Section 5.5 of the Seller Disclosure Schedule, and other than the real property subject to the Real Property Leases, intellectual property licensed to Seller and the personal property subject to the Personal Property Leases, Seller owns each of the Purchased Assets, and Purchaser will be vested with good title to such Purchased Assets, subject to entry of the Sale Order, free and clear of all Liens, other than Permitted Liens, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

Section 5.6    Real Property.

(a)    Section 5.6(a) of the Seller Disclosure Schedule sets forth a true, correct and complete list of (i) all real property and interests in real property owned in fee by Seller and exclusively used in the Business (the "Owned Properties"), and (ii) all real property and interests in real property leased or licensed by Seller and used in any material degree in the Business, as lessee, lessor, licensee or licensor (the "Real Property Leases").  Seller has (A) insurable fee simple title to all Purchased Owned Property, free and clear of all Liens except Liens set forth in Section 5.6(a) of the Seller Disclosure Schedule and Permitted Liens and (B) a valid leasehold interest in the Purchased Real Property Leases, subject to entry of the Sale Order, free and clear of all Liens other than Permitted Liens.

(b)    All Purchased Real Property Leases are in full force and effect.  Except as set forth in Section 5.6(b) of the Seller Disclosure Schedule and as otherwise superseded by the applicable provisions of the Bankruptcy Code, to the Knowledge of Seller, Seller is not in material breach or default, and, to the Knowledge of Seller, the other parties under each of the Purchased Real Property Leases have complied in all material respects therewith, and are not in default thereunder beyond any applicable notice and cure periods.

(c)    Except as set forth in Section 5.6(c) of the Seller Disclosure Schedule, to the Knowledge of Seller, there is no pending or threatened legal action affecting the Purchased Real Property, including any condemnation actions.

Section 5.7    Tangible Personal Property.  Section 5.7 of the Seller Disclosure Schedule sets forth all leases of personal property, including Equipment, exclusively used by Seller in the operation of the Business ("Personal Property Leases") that involve annual payments in excess of $10,000.  Except as set forth in Section 5.7 of the Seller Disclosure Schedule, Seller is not in material breach or default, and, to the Knowledge of Seller, the other parties under each of the Personal Property Leases have complied in all material respects therewith, and are not in default thereunder.

Section 5.8    Intellectual Property.  Seller has licenses to use all Third-Party Software used in the operation of the Business as now operated.

Section 5.9    Material Contracts.

(a)    Section 5.9(a) of the Seller Disclosure Schedule sets forth a list of all of the following Contracts to which Seller is a party or by which it is bound and that are exclusively

related to the Business or by which the Purchased Assets may be bound or affected and that are Assigned Contracts (collectively, the "Material Contracts"):

>> (i) Contracts with any Affiliate or current or former officer or director of Seller;

>> (ii) Any clinical affiliation agreements with healthcare providers relating to the Business;

>> (iii) Contracts with any labor union or association representing any Employees of Seller;

>> (iv) Any written employment, confidentiality, non-competition, severance or termination agreements as to employees or consultants of the Business;

>> (v) Contracts that in any way could limit the freedom of Purchaser to engage in any line of business or to compete in any area or territory;

>> (vi) Contracts with a Governmental Body; and

>> (vii) Contracts which involve the annual expenditure of more than $100,000 in the aggregate or require performance by any party more than one year from the date hereof that, in either case, are not terminable by Seller without penalty on less than one hundred eighty (180) days' notice.

> (b) True and complete copies of the Material Contracts have been made available to Purchaser by Seller prior to the date of this Agreement.

> (c) Except (i) as otherwise provided in the Bankruptcy Code, (ii) for events of default arising as a result of the commencement of the Bankruptcy Case, or (iii) for general principles of equity that may limit the specific performance of particular provisions, each Material Contract is a legal, valid and binding obligation of Seller and is enforceable by Seller against the other party or parties to such Material Contract in accordance with its terms, and Seller is not in material breach or default thereunder.

> Section 5.10    Employees; Employee Benefits.

> (a) Section 5.10(a) of the Seller Disclosure Schedule sets forth a true and complete list of all Plans. Each Plan has been administered and is in compliance with the terms of such Plan and in accordance with all other applicable Laws where the failure thereof would have a Material Adverse Effect. Purchaser shall not assume any responsibility or liability in connection with the operation, administration or funding of any of Seller's Plans.

> (b) Except as set forth in Section 5.10(b) of the Seller Disclosure Schedule, no "reportable event" (as such term is used in Section 4043 of ERISA), "prohibited transaction" (as such term is used in Section 406 of ERISA or Section 4975 of the Code) or "accumulated funding deficiency" (as such term is used in Section 412 or 4971 of the Code) has heretofore occurred with respect to any Plan which would have a Material Adverse Effect.

Section 5.11    Employment and Labor.

(a)    To the Knowledge of Seller, the list annexed hereto as Section 5.11(a) of the Seller Disclosure Schedule is a true and complete list of all Employees of the Business as of the date hereof and accurately sets forth in all material respects the following information: (1) the name and position; (2) date of hire; (3) current annual salary, hourly wage or visit-based wage; (4) the average number of hours worked per week; and (5) the collective bargaining unit, if any, of which the Employee is a member.  Thereafter and at least twenty (20) Business Days prior to the Closing Date, Seller shall likewise deliver as soon as practicable to Purchaser updates to Section 5.11(a) of the Seller Disclosure Schedule.

(b)    To the Knowledge of Seller, Seller has made available to Purchaser complete and accurate copies of each employment, consulting or other similar agreements between Seller and any service provider to the Business.

(c)    Section 5.11(b) of the Seller Disclosure Schedule identifies each labor or collective bargaining agreement applicable to Employees of the Business (the "CBAs").

Section 5.12    Compliance with Laws; Permits.

(a)    Pax Christi is duly authorized by DoH to operate the Business.  The operating certificate issued to the Business authorizes the operation of the Hospice in the following County:  Richmond.

(b)    Pax Christi is eligible to receive payment under Titles XVIII and XIX of the Social Security Act and is a "provider" under existing provider agreements with the Medicare and Medicaid programs (collectively, the "Healthcare Programs") through the applicable intermediaries.  Except as set forth in Section 5.12(b) of the Seller Disclosure Schedule, there is no pending or to Seller's Knowledge, threatened Legal Proceeding under the Healthcare Programs involving the Business.

(c)    Except as set forth in Section 5.12(c) of the Seller Disclosure Schedule and except with respect to the Purchased Real Property, to the Knowledge of Seller, Seller is in compliance in all material respects with Laws and Permits applicable to the Purchased Assets or the Business.

(d)    Except as a result of the Bankruptcy Case, there are no outstanding Orders, injunctions or decrees of any Governmental Body that apply to the Business or the Purchased Assets.

(e)    The Seller has all Permits that are necessary to enable it to own, lease or otherwise hold the Purchased Assets and to operate the Business as currently conducted.  Section A of the Seller Disclosure Schedule lists all Permits of Seller for the operation of the Business, such permits are in full force and effect and to Seller's Knowledge, no proceedings are pending or threatened that would have the effect of revoking or limiting the transfer of the Permits.

Section 5.13    Absence of Certain Developments.  Except as expressly contemplated by this Agreement or as set forth on Section 5.13 of the Seller Disclosure Schedule, since December

31, 2009 the Seller has conducted the Business in the Ordinary Course of Business and has made commercially reasonable efforts to preserve the goodwill of the Business and its relationship with patients and suppliers with whom it deals in connection with the Business.

Section 5.14    Taxes.  Seller is an entity exempt from federal income tax under Section 501(c)(3) of the Code and exempt from New York State income, corporate or franchise tax under the comparable provisions of the Tax Law of the State of New York, and to Seller's Knowledge, there is no action pending by any Tax Authority to revoke its tax-exempt status.

Section 5.15    Litigation.  Except as set forth in Section 5.15 of the Seller Disclosure Schedule, there are no Legal Proceedings pending or, to the Knowledge of Seller, threatened against Seller involving the Business or the Purchased Assets.

Section 5.16    Financial Advisors.  Except as set forth in Section 5.16 of the Seller Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the Contemplated Transactions and no Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

Section 5.17    No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this Article V (as modified by the Seller Disclosure Schedules), neither Seller nor any other Person makes any other representation or warranty whether express or implied, written or oral, with respect to Seller, the Business, the Purchased Assets, the Assumed Liabilities or the Contemplated Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, its Affiliates or any of their respective officers, directors, members, employees, agents, consultants or other Representatives.  Except for the representations and warranties contained in this Article V (as modified by the Seller Disclosure Schedules), Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser or its Representatives by any director, officer, member, employee, agent, consultant or other Representative of Seller or any of its Affiliates).  Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business.    Seller makes no implied representation or warranty as to the condition, merchantability, usage, suitability or fitness for any particular purpose with respect to the Purchased Assets except for the representations and warranties contained in this Article V (as modified by the Seller Disclosure Schedules).  The disclosure of any matter or item in any Section of the Seller Disclosure Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.  The representations and warranties of Seller in this Agreement are for diligence purposes and constitute conditions to Closing pursuant to the terms of Section 10.1(a) hereof and do not survive the Closing, however their disclaimers survive.

# ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as otherwise disclosed to Seller in a schedule delivered to Seller by Purchaser prior to the execution of this Agreement (the "<u>Purchaser Disclosure Schedule</u>"), Purchaser hereby represents and warrants to Seller as follows:

Section 6.1    <u>Organization and Good Standing</u>.  Purchaser is a not-for-profit corporation duly organized, validly existing and in good standing under the Laws of the State of New York and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 6.2    <u>Authorization of Agreement</u>.  Purchaser has all requisite power, authority and legal capacity to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by it in connection with the consummation of the transactions contemplated hereby and thereby (the "<u>Purchaser Documents</u>"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly and validly authorized by all necessary corporate action on behalf of Purchaser.  This Agreement has been, and each Purchaser Document will be at or prior the Closing, duly and validly executed and delivered by Purchaser, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a Legal Proceeding at law or in equity).  None of the execution and delivery by Purchaser of this Agreement and the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Purchaser.

Section 6.3    <u>Conflicts; Consents of Third Parties</u>.

(a)    Except as set forth in <u>Section 6.3(a)</u> of the Purchaser Disclosure Schedule, Purchaser is not required to obtain any consent, approval, authorization, waiver, Order or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) the Healthcare Regulatory Consents, (ii) approvals under applicable Antitrust Laws**,** if any, and (iii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications (A) that have already been obtained or made or (B) of which the failure to have obtained or made would not have a Material Adverse Effect or would not reasonably be

expected to prevent or materially delay the ability of Purchaser to perform or consummate the Contemplated Transactions.

(b)     Except as set forth in <u>Section 6.3(b)</u> of the Purchaser Disclosure Schedule, none of the execution and delivery by Purchaser of this Agreement or any of the Purchaser Documents, the consummation of the Contemplated Transactions by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser or any of its Affiliates is a party or by which any of the properties or assets of Purchaser or any of its Affiliates are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the Contemplated Transactions.

Section 6.4     <u>Litigation</u>.  There are no Legal Proceedings pending or, to the Knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions. Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions.

Section 6.5     <u>Financial Advisors</u>.  Except as set forth in <u>Section 6.5</u> of the Purchaser Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the Contemplated Transactions and no Person is entitled to any fee or commission or like payment from Seller in respect thereof.

Section 6.6     <u>Healthcare Regulatory Compliance Status</u>.  Purchaser is a certified home health agency.  To Purchaser's Knowledge, no fact exists that would cause DoH to recommend disapproval of its CON Application on the basis of character, competency or financial feasibility.

Section 6.7     <u>Acknowledgement Regarding Condition of the Business</u>.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that neither SVCMC nor Seller is making any representations or warranties whatsoever, whether express or implied or written or oral, beyond those expressly given by Pax Christi to Purchaser in <u>Article V</u> hereto (as modified by the Seller Disclosure Schedule), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred to Purchaser on a "WHERE IS" and, as to condition, "AS IS" basis.  Purchaser further represents that neither SVCMC, Seller, any of their Affiliates nor any other Person has made any representation or warranty, express or implied, written or oral, as to the accuracy or completeness of any information regarding Seller, the Business or the Contemplated Transactions not expressly set forth in this Agreement, and neither SVCMC, Seller, any of their Affiliates nor any other Person will have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or the use by Purchaser or any of its Affiliates of, any such information,

including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its Representatives, or any other document or information in any form provided to Purchaser or its Representatives in connection with the sale of the Business and the Contemplated Transactions. Purchaser acknowledges that it, along with its Representatives, has conducted to its satisfaction, its own independent investigation of the Business and the Purchased Real Property and, in making the determination to proceed with the Contemplated Transactions, Purchaser has relied on the results of its own independent investigation. The Purchased Real Property is being sold by Seller and Purchaser agrees to accept the Purchased Real Property in "as-is" and "where-is" condition on the Closing Date.

Section 6.8    Financing.  Purchaser has and on the Closing Date Purchaser will have sufficient funds on hand to consummate the Contemplated Transactions. Purchaser acknowledges that it shall not be a condition to the obligations of Purchaser to consummate the Contemplated Transactions that Purchaser have sufficient financial resources for payment of the Purchase Price.

Section 6.9    No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this Article VI (as modified by the Purchaser Disclosure Schedules), neither Purchaser nor any other Person makes any other representation or warranty, whether express or implied, written or oral, with respect to Purchaser or the Contemplated Transactions, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser or any of their respective officers, directors, members, managers, employees, agents, consultants or other Representatives. Except for the representations and warranties contained in this Article VI (as modified by the Purchaser Disclosure Schedules), Purchaser disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Seller by any director, officer, member, manager, employee, agent, consultant, or other Representative of Purchaser or any of its Affiliates). The disclosure of any matter or item in any Section of the Purchaser Disclosure Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

Section 7.1    Bankruptcy Court Approval.  This Agreement is subject to approval by the Bankruptcy Court.

Section 7.2    Bankruptcy Court Filings.  No later than five (5) Business Days after the execution of this Agreement, Pax Christi shall file with and seek the approval of the Bankruptcy Court of the Sale Motion. Purchaser agrees that it will promptly take such actions as are reasonably requested by Pax Christi to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other Documents or information for filing with the Bankruptcy Court for the purposes, among others,

of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order shall be appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.

Section 7.3    Treatment of Monetary Obligations.    All monetary obligations of the Seller to Purchaser under this Agreement, including but not limited to the obligation of the Seller in respect of Transfer Taxes (if any), shall be entitled to administrative expense priority in the Bankruptcy Case.

## ARTICLE VIII

## COVENANTS

Section 8.1    Access to Information.    Subject to Section 2.9 hereto and the other provisions of this Section 8.1 and subject to compliance with applicable Antitrust Laws, Seller agrees that, prior to the Closing Date, and at its own expense, Purchaser shall be entitled, through its Representatives, to make such investigation of the assets, properties and operations of the Business and such examination of the books and records of Seller pertaining to the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and, and at its own expense, to make extracts and copies of such books and records; it being understood, however, that the foregoing shall not entitle Purchaser to access (a) the books, records and Documents referred to in Section 2.2(h) hereto, or (b) any books, records or Documents the disclosure of which by Seller to Purchaser would (i) notwithstanding Section 2.9 hereto, violate any patient confidentiality obligation of Seller or (ii) any other agreement or any obligation of confidentiality to which Seller is a party or is bound prior to the date hereof or (iii) any obligation of confidentiality by which Seller is bound under applicable Law. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, any request for such examination shall be made to one of the Persons identified in Section 8.1 of the Seller Disclosure Schedule, and Purchaser's use of the information disclosed by Seller shall be subject to any applicable agreement to which Seller is a party or is bound prior to the date hereof or under applicable Law. Seller shall cause its Representatives to cooperate with Purchaser and its Representatives in connection with such investigation and examination, and Purchaser and its Representatives shall cooperate with Seller and its Representatives and shall use its commercially reasonable efforts to minimize any disruption to Seller's business and operations, including the Business. Notwithstanding anything herein to the contrary, Seller shall not be required to permit any such investigation or examination if, and to the extent that, Pax Christi, upon advice of counsel, determines that such investigation or examination by Purchaser would or is reasonably likely to result in a loss of any attorney-client or attorney work product privilege available to Seller.

Section 8.2    Conduct of the Business Pending the Closing.

(a)    Subject to the terms and conditions of the Interim Agreement, during the period from the date hereof through and including the Closing, except (i) as set forth in Section 8.2 of the Seller Disclosure Schedule, (ii) as required by applicable Law (including without limitation as a result of the commencement of the Bankruptcy Case), (iii) as otherwise expressly

provided in this Agreement, or (iv) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Seller shall use commercially reasonable efforts to:

        (A)     operate the Business in the Ordinary Course of Business;

        (B)     (I) maintain the Purchased Assets consistent with past practice, ordinary wear and tear excepted and (II) maintain commercially reasonable insurance coverage in place with respect to the Purchased Assets;

        (C)     perform when due all material obligations under the Assigned Contracts, the Purchased Intellectual Property Licenses, the Purchased Real Property Leases and the Purchased Personal Property Leases except to the extent such performance is excused under the Bankruptcy Code or by order of the Bankruptcy Court;

        (D)     maintain the books and records of the Business in the Ordinary Course of Business;

        (E)     maintain the Permits applicable to the Business; and

        (F)     retain staff employed in the Business with the goal of maintaining the ongoing operation thereof.  In connection with such efforts, however, Seller will not be obligated to make any retention or severance payments or pay any other amounts or incur any other obligations.

        (b)     Without limiting the generality of the foregoing, from the date of this Agreement through and including the Closing, Seller shall not, except (i) as set forth in <u>Section 8.2</u> of the Seller Disclosure Schedule, (ii) as required by applicable Law (including without limitation as a result of the commencement of the Bankruptcy Case), (iii) as otherwise expressly provided in this Agreement, or (iv) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), solely as it relates to the Business:

        (A)     other than in the Ordinary Course of Business, including, but not limited to, as may be required by a collective bargaining agreement,  (I) materially increase the annual level of compensation of any Employee, (II) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any Employee, or (III) with respect to any Employee, increase the coverage or benefits available under any (or create any new) Plan except, in each case, as required by applicable Law from time to time in effect or by any of the Plans or the Employee pension plans maintained by Seller;

        (B)     sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets (except pursuant to an existing Contract in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets); or

        (C)     agree to do anything prohibited by this <u>Section 8.2</u>.

Section 8.3    Consents; Insurance.

(a)    Through the filing of the Sale Motion and except as may be satisfied through the entry of the Sale Order, Seller shall use its commercially reasonable efforts, and Purchaser shall cooperate with Seller, including by taking the actions referred to in Section 8.4 hereto, to obtain at the earliest practicable date following entry of the Sale Order all necessary consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Seller (including all consents listed in Section 5.3 of the Seller Disclosure Schedule), and to give at the earliest practicable date following entry of the Sale Order any notices required to be given by Seller, in order for Seller to consummate the Contemplated Transactions on the terms and in the manner provided hereby; provided that Seller shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than postpetition filing or postpetition application fees payable to any Governmental Body) or to initiate any litigation or Legal Proceedings to obtain any such item except as otherwise provided by Section 8.4 hereto. Purchaser shall use its commercially reasonable efforts, and Seller shall cooperate with Purchaser, including by taking the actions referred to in Section 8.4 hereto, to obtain at the earliest practicable date following entry of the Sale Order all consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Purchaser, and to give at the earliest practicable date following entry of the Sale Order any notices required to be given by Purchaser, in order for Purchaser to consummate the Contemplated Transactions on the terms and in the manner provided hereby and to operate the Business after the Closing; provided that Purchaser shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any litigation or Legal Proceedings to obtain any such consent or approval except as otherwise provided by Section 8.4 hereto.

(b)    As of the Closing, Purchaser shall have appropriate insurance coverage in place with respect to the Business consistent with what would be maintained under good industry business practices.

Section 8.4    Regulatory Approvals.

(a)    Purchaser has submitted the request for an emergency CON Application to DoH.  Purchaser shall, at its own cost and expense, (i) within the later of thirty (30) Business Days after the date of this Agreement or five (5) Business Days after entry of the Sale Order by the Bankruptcy Court, provide to Pax Christi a draft of the CON Application and consult with Pax Christi regarding such application; (ii) cooperate with Pax Christi in initiating informal discussions with DoH concerning the form and substance of the CON Application; (iii) within the later of thirty (30) Business Days after submission of a draft CON Application to Seller by Purchaser pursuant to Section 8.4(a)(i) or twenty (20) Business Days after the entry of the Sale Order by the Bankruptcy Court, formally submit the CON Application to DoH; and (iv) promptly after the entry of the Sale Order by the Bankruptcy Court, submit to any other Governmental Body all other applications for any Healthcare Regulatory Consents required in order for Purchaser to consummate the Contemplated Transactions and to operate the Business in accordance with applicable Law (collectively with the CON Application, the "Healthcare Applications").  Purchaser shall provide Pax Christi with an opportunity to review the Healthcare Applications in advance of filing, and both parties shall cooperate in the preparation and

prosecution of the Healthcare Applications. Purchaser shall use best efforts to prosecute the Healthcare Applications and shall timely submit all information and Documents requested in connection therewith by DoH and any other Governmental Body.  Purchaser shall provide Pax Christi with prompt written notice of Purchaser's submission of a Healthcare Application. Within three (3) Business Days of its submission or receipt, Purchaser shall deliver to Pax Christi a complete copy of all correspondence to or from DoH or any other applicable Governmental Body having jurisdiction concerning a Healthcare Application.  Purchaser shall provide Pax Christi with periodic reports of Purchaser's efforts to obtain all Healthcare Regulatory Approvals.  In addition, Purchaser shall provide Pax Christi with notice as promptly as practicable of its receipt of DoH's approval, contingent approval or a rejection of the CON Application, along with a copy of any documentation related thereto. Purchaser shall not knowingly take any action prior to the Closing intended to disqualify Purchaser as an authorized and licensed operator of the Business.

(b)      If necessary, each of Purchaser and Seller shall use its commercially reasonable efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under any of the Antitrust Laws with respect to the Contemplated Transactions (including such submission to the Antitrust Bureau of the Office of the Attorney General of the State of New York (the "Antitrust Bureau") as may be required in connection with the CON Application under the Donnelly Act (New York General Business Law Sections 340 through 347)) as promptly as practicable and, in any event, within five (5) Business Days in connection with all submissions to the Antitrust Bureau in connection with the CON Application and within five (5) Business Days in the case of all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request under any of the Antitrust Laws for information, Documents, or other materials received by each of them or any of their respective Affiliates from the Federal Trade Commission (the "FTC"), the Antitrust Division of the United States Department of Justice (the "Antitrust Division"), the Antitrust Bureau or any other Governmental Body in respect of such filings or the Contemplated Transactions and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such Documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division, the Antitrust Bureau or any other Governmental Body under any of the Antitrust Laws with respect to any such filing or any such transaction.

(c)      If necessary, each of Purchaser and Seller shall use its commercially reasonable efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates in respect of the Contemplated Transactions under any applicable Law, other than those referred to in Section 8.4(a) or 8.4(b) hereto, including such filings as are required to obtain the consents, approvals, authorizations, waivers, Orders, licenses or Permits or to provide the notices specified in Section 5.3 of the Seller Disclosure Schedule or Section 6.3(a) of the Purchaser Disclosure Schedule, as promptly as practicable, (ii) comply at the earliest practicable date with any request for additional information, Documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Body in respect of such filings or the transactions contemplated by this Agreement and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such Documents to the non-filing parties prior to filing

and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any Governmental Body under such Laws with respect to any such filing or any such transaction.

(d)     Each of Purchaser and Seller shall use its commercially reasonable efforts to furnish to each other through counsel all information required for any application or other filing to be made pursuant to any applicable Law in connection with the Contemplated Transactions. Each such party shall promptly inform the other parties through counsel of any material oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No such party shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.

(e)     Subject to applicable Law, Purchaser and Seller will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under any of the Antitrust Laws. Each such party may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.4 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials.

(f)     Each of Purchaser and Seller shall use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the Contemplated Transactions under any of the Antitrust Laws. In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement as in violation of any of the Antitrust Laws, each such party shall cooperate and use its commercially reasonable efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other Order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the Contemplated Transactions, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and Pax Christi decide that litigation is not in their respective reasonable best interests. Each such party shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under any of the Antitrust Laws with respect to such transactions as promptly as possible after the date of this Agreement. In connection with and without limiting the foregoing, each of Purchaser and Seller agrees to use its commercially reasonable efforts to take promptly any and all steps necessary to avoid or eliminate each and every impediment under any Antitrust Laws that may be asserted by any Federal, state and local and non-United States antitrust or competition authority, so as to enable Purchaser and Seller to close the Contemplated Transactions as expeditiously as possible.

Section 8.5     Further Assurances.

(a)     Each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Contemplated Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Contemplated Transactions.  Without limiting the generality of the foregoing, from time to time after the Closing, without additional consideration, each party hereto will (or, if appropriate, cause its Affiliates to) execute and deliver such further instruments and take such other action as may be necessary or reasonably requested by the other party to make effective the Contemplated Transactions and to provide the other party with the intended benefits of this Agreement.  In addition, upon the reasonable request of Purchaser, Seller shall execute, acknowledge and deliver all such further assurances, deeds, assignments, powers of attorney and other instruments and paper as may be required to sell, transfer, convey, assign and deliver to Purchaser all right, title and interest in, to and under the Purchased Assets.  If any party to this Agreement shall, following the Closing, have in its possession any asset or right which under this Agreement should have been delivered to the others at the Closing, such party shall promptly deliver such asset or right to the others.

(b)     Without limiting the generality of the foregoing, if Purchaser or any of its Affiliates shall at any time after the Closing receive any charitable gift, contribution or bequest that might be an Excluded Asset, or receives any notice that such a charitable gift, contribution or bequest may be received or available to Purchaser, Purchaser shall give prompt written notice thereof to Pax Christi and make available to Pax Christi upon reasonable request such information that Purchaser or any of its Affiliates has available to it regarding such gift, contribution or bequest and will cooperate with Pax Christi in determining whether such gift, contribution or bequest should be characterized as an Excluded Asset.  To the extent that any such charitable gift, contribution or bequest received after the Closing is an Excluded Asset and Purchaser or any of its Affiliates shall request that such gift, contribution or bequest be transferred to Purchaser, neither Seller nor its Affiliates shall take a position contrary to the position of Purchaser and/or its Affiliates if such transfer is consistent with the donor's intent.  Further, any such transfer shall be subject to the approval of any applicable Governmental Body, including, but not limited to, the Charities Bureau of the New York State Attorney General's Office, if applicable.  The provisions of this Section 8.5 shall survive the Closing.

Section 8.6     Confidentiality.

(a)     From and after the date hereof, Purchaser shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Seller, and not use to the detriment of Seller, any Seller Confidential Information relating to or obtained from Seller or its Representatives.  For purposes of this Section 8.6, "Seller Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Purchased Assets, the Assumed Liabilities, the Business, the Excluded Assets, or the Excluded Liabilities, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided that Seller Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Purchaser or any of its Representatives, (ii) becomes available to Purchaser on a non-confidential basis from a source other than Seller or its

Representatives; _provided_ that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Purchaser from a third party having the right to disseminate the Seller Confidential Information without restriction on disclosure or (iv) can be shown by Purchaser through written Documents or evidence maintained by Purchaser to have been independently developed by either of them; and _provided_, _further_, that upon the Closing, the restrictions contained in this Section 8.6 shall not apply to confidential or proprietary information related primarily to the Business or the Purchased Assets and the Assumed Liabilities. Purchaser may disclose any of the Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. Purchaser shall instruct its Representatives having access to the Seller Confidential Information of such obligation of confidentiality. If Purchaser or anyone to whom it has transmitted Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Confidential Information, Purchaser shall provide Seller with prompt written notice prior to making any disclosure so that such Seller may seek a protective Order or other appropriate remedy. If such protective Order or other remedy is not obtained, Purchaser shall furnish only that portion of the Seller Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed, and Purchaser will exercise commercially reasonable efforts to obtain assurance to the extent possible that confidential treatment will be accorded to that portion of Seller Confidential Information that is being disclosed. In any event, Purchaser will not oppose action by Seller to obtain an appropriate protective Order or other reliable assurance that confidential treatment will be accorded Seller Confidential Information.

(b)     From and after the Closing Date, unless this Agreement is terminated prior to the Closing, Seller shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Purchaser, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with (i) any investigations by Governmental Bodies, (ii) compliance activities after the Closing related to periods occurring prior the Closing Date, (iii) any Legal Proceedings, (iv) enforcing any rights or other claims of Seller under this Agreement, or (v) performing any obligations of Seller under this Agreement, including billing and collecting Pre-Closing Account Receivable and other related activities. For purposes of this Section 8.6(b), "Business Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Business or to the Purchased Assets or the Assumed Liabilities, other than information primarily pertaining to the Excluded Assets, or the Excluded Liabilities, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; _provided_ that Business Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Seller or its Representatives, (ii) becomes available to Seller on a non-confidential basis from a source other than Seller or its Representatives; _provided_ that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Purchaser or (iii) is lawfully received by Seller from a third party having the right to disseminate the Business Confidential Information without restriction on disclosure. Seller may disclose any of the Business Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. Seller shall

instruct its Representatives having access to the Business Confidential Information of such obligation of confidentiality. If Seller or anyone to whom it has transmitted Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information, Seller shall provide Purchaser with prompt notice prior to making any disclosure so that Purchaser may seek a protective Order or other appropriate remedy. If such protective Order or other remedy is not obtained, Seller shall furnish only that portion of the Business Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed, and Seller will exercise commercially reasonable efforts to obtain assurance to the extent possible that confidential treatment will be accorded to that portion of Business Confidential Information that is being disclosed. In any event, Seller will not oppose action by Purchaser to obtain an appropriate protective Order or other reliable assurance that confidential treatment will be accorded Business Confidential Information.

(c)     The obligations contained in this <u>Section 8.6</u> are in addition to any separate confidentiality agreements between any of Seller and Purchaser or its Affiliates.

Section 8.7     <u>Preservation of Records</u>.  Purchaser agrees that it shall preserve and keep the records held by it relating to patients that are transferred to Purchaser as of the Closing Date for the maximum period of time required by Law, and shall, subject to <u>Section 2.9</u> hereto, make such records and personnel available to Seller as may be reasonably required by Seller in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or other governmental or healthcare payor investigations or audits of Seller or any of its Affiliates or in order to enable Seller to comply with its obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In connection therewith, Seller shall reimburse Purchaser for Purchaser's out-of-pocket expenses.

Section 8.8     <u>Publicity</u>.  Each of Seller and Purchaser agrees that it shall not issue any press release or public announcement concerning this Agreement or the Contemplated Transactions without obtaining the prior written approval of either Purchaser or Pax Christi, as applicable, which approval will not be unreasonably withheld, delayed or conditioned, unless, in the judgment of such issuing party upon advice of counsel, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement; <u>provided</u> that such party that intends to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other parties with respect to the text thereof.  Notwithstanding the foregoing, Purchaser understands that Seller will be filing various pleadings, including the Sale Motion, in furtherance of obtaining Bankruptcy Court approval of this Agreement and the Contemplated Transactions.

Section 8.9     <u>Use of Name</u>.  Purchaser agrees that it shall (a) as soon as practicable after the Closing Date and in any event within thirty (30) days following the Closing Date, cease to make any use of the name "Pax Christi", "Saint Vincents Catholic Medical Centers" or any variation thereon or derivative thereof (including "St. Vincent's") or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing any of the foregoing, including any name or mark confusingly similar thereto (collectively, the "<u>SVCMC Marks</u>") which are included in the Purchased Assets or otherwise

included in materials or assets transferred to Purchaser in connection with the Closing, and (b) immediately after the Closing, cease to hold itself or its Affiliates out as having any affiliation or association with Pax Christi, SVCMC or any of their Affiliates.  In furtherance thereof, as promptly as practicable but in no event later than thirty (30) days following the Closing Date, Purchaser shall remove, strike over or otherwise obliterate all SVCMC Marks from all materials including any vehicles, business cards, schedules, stationery, packaging materials, displays, signs, promotional materials, manuals, forms, computer Software and other materials transferred to Purchaser on the Closing Date; provided that so long as Purchaser uses any SVCMC Marks and has not removed all SVCMC Marks from all materials, Purchaser shall comply with the Ethical and Religious Directives for Catholic Health Care Services issued by the National Conference of Catholic Bishops, as amended from time to time. Purchaser shall also take, and cooperate with Seller in taking, such actions as are reasonably necessary to change all telephone book listings of the Business. Notwithstanding any of the foregoing, Seller agrees that as of the Closing and for the length of the covenants set forth in Section 8.11 hereto, Seller shall not use the words "hospice" or any variation thereon or derivative thereof in any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing any of the foregoing.

Section 8.10    Supplementation and Amendment of Schedules.

(a)    Purchaser may, at its option, include in the Purchaser Disclosure Schedule, and Seller may, at its option, include in the Seller Disclosure Schedule, as the case may be, items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement.

(b)    No less than three (3) Business Days prior to the Closing Date, Seller shall deliver to Purchaser an update to the sections of the Seller Disclosure Schedule referenced in Sections 2.1 and 2.2 hereto, to reflect changes thereto which occur between the date hereof and the Closing Date in the Ordinary Course of Business in accordance with Section 8.2 hereto.

Section 8.11    Covenant Not to Compete or Solicit.

(a)    Throughout the ten (10) year period immediately after the Closing Date, neither Seller nor SVCMC shall, and Seller shall not permit any of its Affiliates which it controls to, at any time, directly or indirectly, without the prior written consent of Purchaser, own, operate, manage or control any business or healthcare facility that renders the type of healthcare services as provided by the Business on the Closing Date except as set forth in Section 8.11(a) of the Seller Disclosure Schedule within the following New York State counties: Bronx, Kings, New York, Queens and Richmond.   Notwithstanding the foregoing and without agreeing (implicitly or otherwise) that the following activities would otherwise be subject to the provisions of this Section 8.11(a), nothing in this Agreement shall preclude, prohibit or restrict Seller, SVCMC nor or any of their Affiliates from engaging in any manner in the current and contemplated businesses listed in Section 8.11(a) of the Seller Disclosure Schedule.

(b)     From the date hereof and throughout the two (2) year period immediately after the Closing Date, neither Seller nor SVCMC shall, and SVCMC shall not permit any of its Affiliates which it controls to, at any time, directly or indirectly, without the prior written consent of Purchaser, solicit, recruit, employ or contract with any Employee, provided, that except as expressly provided in this Agreement, nothing in this Agreement shall preclude SVCMC or any of its Affiliates, including Seller, from continuing any employment relationships with Employees existing on the date hereof.

(c)     From the date hereof and throughout the two (2) year period immediately after the Closing Date, neither Seller nor SVCMC shall, and SVCMC shall not permit any of its Affiliates which it controls to, at any time, directly or indirectly, without the prior written consent of Purchaser, solicit, recruit, employ or contract with any employee of the Purchaser; provided that nothing shall prohibit SVCMC or its Affiliates from performing, or having performed on their behalf, a general solicitation for employees not specifically focused at the employees of the Purchaser through the use of media, advertisement, electronic job boards or other general, public solicitations.

(d)     From the date hereof until the Closing Date, Purchaser shall not and shall cause its Affiliates not to, directly or indirectly, without the prior written consent of Seller, solicit, recruit, employ or contract with any Employee; provided that nothing shall prohibit Purchaser or its Affiliates from (1) soliciting or recruiting Employees for employment in connection with the Business, and (2) performing, or having performed on their behalf, a general solicitation for employees not specifically focused at the Employees, through the use of media, advertisement, electronic job boards or other general, public solicitations.

(e)     Cooperation.  Seller and Purchaser agree to reasonably cooperate with each other, from the date hereof through and following the Closing Date, in good faith, in an effort to satisfy all further conditions, undertakings and agreements contained in this Agreement.

(f)     Management Consulting Agreement.  Within two (2) days of entry of the Sale Order by the Bankruptcy Court, the parties may enter into a Management Consulting Agreement substantially in the form attached hereto as Exhibit C under which Purchaser has agreed to assume the day-to-day management responsibility of the Business, to the extent allowed by applicable law and regulations through the Closing Date (the "Interim Agreement"). The parties shall submit the Interim Agreement to DoH for notice or approval, if appropriate. Subject to Bankruptcy Court approval of the Interim Agreement and entry of the Sale Order, the Interim Agreement will become effective upon both (i) its approval by DoH, if appropriate and (ii) the execution and delivery of the Interim Agreement, and will terminate upon the Closing or according to its terms.  In the event that the parties do not enter into the Interim Agreement and for the period of time between the date hereof and the effective date of the Interim Agreement, Seller shall (i) schedule and conduct regular meetings involving Purchaser's and Seller's respective senior management staff to discuss the Business; (ii) allow Purchaser's senior management staff reasonable access to the Business and its personnel for periodic monitoring of the conduct of the Business consistent with Sections 8.1 and 8.6 hereof; (iii) consult with Purchaser prior to making any material business decisions affecting the Business other than in the Ordinary Course of Business; and (iv) use good faith efforts to assist Purchaser in planning the transition of patients from the Business to Purchaser.

# ARTICLE IX

## EMPLOYEES AND EMPLOYEE BENEFITS

Section 9.1 <u>Offers of Employment</u>.

(a) Purchaser intends, but is not obligated, to offer employment, commencing on the Closing Date, to most of the professional clinical staff and nursing attendants of the Business on the terms and conditions as in effect for similarly situated employees of Purchaser's organization on the Closing Date. Notwithstanding the foregoing, Purchaser shall offer employment to the Employees set forth in <u>Section 9.1(a)</u> of the Purchaser Disclosure Schedule, commencing on the Closing Date, on Purchaser's terms and conditions and in accordance with the Purchaser's collective bargaining agreements with bargaining representatives for Purchaser's employees and/or Purchaser's Policies and Procedures on the Closing Date. Purchaser shall be permitted to offer and pay signing bonuses or other payments to staff employed by Seller in the operation of the Business and who Purchaser contemplates employing or employs on or after the Closing (collectively, "<u>Signing Bonuses</u>"). Such Signing Bonuses shall include payments in the amount of Two Hundred and Sixty Thousand Dollars ($260,000.00) in the aggregate by Purchaser hereunder to the Employees set forth in <u>Section 9.1(a)</u> of the Purchaser Disclosure Schedule between the Closing Date and July 15, 2010. The parties agree that the Purchase Price shall be reduced at Closing by Two Hundred and Sixty Thousand Dollars ($260,000.00) to reflect the payments described in the preceding sentence. Purchaser shall immediately refund to Seller any portion of the Signing Bonuses not paid to the Employees set forth in <u>Section 9.1(a)</u> of the Purchaser Disclosure Schedule on July 16, 2010. Without limiting the foregoing, in the event that Purchaser offers any pre-Closing Signing Bonuses up to Forty Thousand Dollars ($40,000), the Purchase Price shall be further reduced by the lesser of: (i) the amount of such aggregate pre-Closing Signing Bonuses, and (ii) Forty Thousand Dollars ($40,000.00).

(b) To the extent that Seller severs the employment of any Employees of the inpatient hospice unit prior to the Closing Date, Seller shall give Purchaser notice of same as soon as reasonably practicable. Within a reasonable period of time prior to the Closing Date but not later than two (2) Business Days prior to the Closing Date, Purchaser shall deliver an offer of employment effective as of the Closing Date to each Employee listed in <u>Section 5.11(a)</u> of the Seller Disclosure Schedule to whom Purchaser chooses to offer employment, who was employed by the Seller on the day immediately preceding the Closing Date. Seller shall terminate all Employees as of the Closing Date. All such Employees who accept Purchaser's offer of employment shall become employees of Purchaser as of such date. As of the Closing Date Seller shall not have any liability or responsibility with respect to any employee benefit plan, program, policy or other arrangement maintained by or contributed to by Purchaser with respect to Employees employed by Purchaser. Seller shall remain obligated after the Closing Date for any obligation or liability of Seller to Employees which arises prior to the Closing Date, including but not limited to all accrued but unpaid vacation leave, sick time and personal days of Employees and any and all employee compensation and benefit obligations or any obligation that may arise from the CBAs or otherwise. Purchaser shall not assume any CBAs, Employee compensation and/or benefit obligations or other terms and conditions of employment for any Employee pursuant to the CBAs or otherwise.

(c)     Seller shall be responsible for providing continuation coverage, as required by Section 4980B(f) of the Code and Part 6 of Title I of ERISA or any similar Law ("COBRA"), to Employees of the Business who for any reason experience a COBRA "qualifying event" within the meaning of Section 4980B of the Code and Part 6 of Title I of ERISA prior to the Closing Date.

(d)     Seller shall bear sole responsibility for any Liabilities under WARN with respect to the termination of the employment of any Employees up to the Closing Date.  On and after the date hereof, Seller shall not effect a "plant closing" or "mass layoff" with respect to the Business as those terms are defined by WARN without notifying Purchaser in advance and obtaining advance approval from Purchaser, and complying with all provisions of WARN.

(e)     Nothing contained in this Agreement, expressed or implied, shall be construed to confer upon any Employee (including any beneficiary or dependent thereof) any rights or remedies whatsoever including, without limitation, any right to employment or continued employment for any specified period or of any nature or kind under or by reason of this Agreement.

## ARTICLE X

## CONDITIONS TO CLOSING

Section 10.1    Conditions Precedent to Obligations of Purchaser.  The obligation of Purchaser to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Pax Christi set forth in this Agreement shall be true and correct (without giving effect to any materiality or Material Adverse Effect qualifiers set forth therein) at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date) and Purchaser shall have received a certificate signed by an authorized officer of Pax Christi, dated as of the Closing Date, to the foregoing effect; provided that in the event any such representation or warranty has been breached the condition set forth in this Section 10.1(a) shall nevertheless be deemed satisfied unless the effect of all such breaches of representations and warranties taken together result in a Material Adverse Effect;

(b)     Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date and Purchaser shall have received a certificate signed by an authorized officer of Pax Christi, dated as of the Closing Date, to the forgoing effect; provided that the condition set forth in this Section 10.1(b) shall be deemed satisfied unless all such failures to so perform or comply taken together result in a Material Adverse Effect;

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in clauses (a) through (f) of Section 4.2 hereto; and

(d)     all notices, consents, approvals, licenses or Permits, or waivers thereof, of the Governmental Bodies set forth in Section 10.1(d) of the Purchaser Disclosure Schedule shall have been made or obtained by Purchaser, and any applicable waiting period under any of the Antitrust Laws shall have expired or been terminated.

Section 10.2     Conditions Precedent to Obligations of Seller.  The obligation of Seller to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Pax Christi in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchaser set forth in this Agreement shall be true and correct (without giving effect to any materiality qualifiers set forth therein) at and as of the Closing, except to the extent such representations and warranties relate expressly to an earlier date (in which case such representations and warranties shall be true and correct, on and as of such earlier date) and Pax Christi shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect; provided that in the event any such representation or warranty has been breached the condition set forth in this Section 10.2(a) shall nevertheless be deemed satisfied unless the effect of all such breaches of representations and warranties taken together would prevent or materially delay the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Pax Christi shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect; provided that the condition set forth in this Section 10.2(b) shall be deemed satisfied unless all such failures to so perform or comply taken together prevent or materially delay the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions;

(c)     all notices, consents, approvals, licenses or Permits, or waivers thereof, of the Governmental Bodies set forth in Section 10.2(c) of the Seller Disclosure Schedule shall have been made or obtained by Seller, and any applicable waiting period under any of the Antitrust Laws shall have expired or been terminated; and

(d)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 4.3 hereto.

Section 10.3     Conditions Precedent to Obligations of Purchaser and Seller.  The respective obligations of the parties to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the

following conditions (any or all of which may be waived by Purchaser or Pax Christi in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions; and

(b)     the Sale Order shall have been entered by the Bankruptcy Court and (i) the time for appealing the Sale Order has expired and no party has taken an appeal or (ii) the Sale Order shall not be subject to a stay in connection with such an appeal.

Section 10.4     Frustration of Closing Conditions.  No party may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3 hereto, as the case may be, to excuse it from consummating the Contemplated Transactions if such failure was caused by such party's failure to comply with any provision of this Agreement.

**ARTICLE XI**

**TAXES**

Section 11.1     Transfer Taxes.  Seller shall pay any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges (including any interest and penalty thereon) payable in connection with the Contemplated Transactions ("Transfer Taxes").  Seller shall make due and timely payment of any Transfer Tax to the applicable Tax Authority and shall provide Purchaser with a true and complete copy of each Tax Return relating to Transfer Taxes as filed and evidence of the timely filing of such Tax Return and payment of such Transfer Tax.  The parties shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds of Transfer Taxes.

Section 11.2     Prorations.  All real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets, if any, for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between Seller and Purchaser as of 11:59 p.m. (New York time) on the Closing Date based on the number of days in such period through and including the Closing Date and the number of days in such period after the Closing Date; provided, however, that nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party.  If any Taxes subject to proration are paid by Purchaser, on the one hand, or Seller, on the other hand, the proportionate amount of such Taxes paid (or in the event of a refund of any portion of such Taxes previously paid is received, such refund) shall be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund).

Section 11.3     Purchase Price Allocation.  The Purchase Price will be allocated for Tax purposes (the "Allocation") among the Purchased Assets in accordance with GAAP and as mutually agreed upon by the parties at or prior to the Closing. The Seller and the Purchaser shall report the Allocation as provided in Section 1060 of the Code, and shall prepare and file all Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes

consistent with the Allocation. No party shall take any position (whether in audits, Tax Returns or otherwise) that is inconsistent with the Allocation unless required to do so by applicable law.

Section 11.4 <u>Cooperation on Tax Matters</u>.  The parties shall furnish or cause to be furnished to each other, as promptly as practicable following the request therefore, and at the expense of the requesting party, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other filings relating to Tax matters, for the preparation for and defense of any Tax audit, for the preparation of any Tax protest, or for the prosecution or defense of any suit or other proceeding relating to Tax matters.

**ARTICLE XII**

**MISCELLANEOUS**

Section 12.1 <u>Expenses</u>.  Except as otherwise expressly provided in this Agreement, each party shall bear its own costs and expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

Section 12.2 <u>Specific Performance</u>.  The parties hereto agree that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine, and that the parties hereto shall be entitled to specific performance of the terms hereof (without the posting of any bond), in addition to any other remedy at law or equity.  The rights set forth in this <u>Section 12.2</u> shall be in addition to any other rights which a party may have at law or in equity pursuant to this Agreement.

Section 12.3 <u>Governing Law; Jurisdiction; Consent to Service of Process</u>.  This Agreement and any disputes arising in connection herewith shall be governed by and construed in accordance with the internal Laws of the State of New York without regard to the conflict of law principles thereof.  Without limiting any party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (b) any and all Legal Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations pursuant to <u>Section 12.2</u> hereto; <u>provided</u> that if the Bankruptcy Case has closed, each of the parties hereto irrevocably agrees that any Legal Proceeding with respect to this Agreement or for recognition and enforcement of any judgment in respect hereof shall be brought and determined exclusively in the United States District Court for the Southern District of New York or if such Legal Proceeding may not be brought in such court for jurisdictional purposes, exclusively in the Supreme Court of New York sitting in the County of New York.  Each of the parties hereto hereby (a) irrevocably submits with regard to any such Legal Proceeding to the exclusive personal jurisdiction of the aforesaid courts in the event any dispute arises out of this Agreement or any transaction contemplated hereby, (b) agrees that it shall not attempt to deny or defeat such

personal jurisdiction by motion or other request for leave from any such court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the state or federal courts referenced above. Each of the parties hereto further agrees to accept and acknowledge service of any and all process which may be served in any such Legal Proceeding in said courts in the State of New York, and agrees that service of process upon such party, mailed by certified mail to such party's address as set forth in Section 12.6 hereto, will be deemed in every respect effective service of process upon such party, in any Legal Proceeding.

Section 12.4  WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY ACTION TO WHICH THEY ARE PARTIES INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

Section 12.5  Entire Agreement; Amendments and Waivers.  This Agreement (including the schedules and exhibits hereto), the Confidentiality Agreement and the Escrow Agreement, contain the entire understanding and agreement of the parties hereto and thereto with respect to the subject matter hereof and thereof, and supersede all previous written or oral negotiations, commitments, understandings and writings.  This Agreement may be amended, modified, supplemented or changed, and any provision hereof can be waived, only by written instrument duly executed by all of the parties hereto.  Any party hereto may, by written notice to the other parties hereto (a) extend the time for performance of any of the obligations of the other party under this Agreement, (b) waive any inaccuracies in the representations or warranties of the other party contained in this Agreement, (c) waive compliance with any of the conditions or covenants of the other party contained in this Agreement or (d) waive or modify performance of any of the obligations of the other party under this Agreement.  Except as provided in the immediately preceding sentence, no action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach, whether of a similar or dissimilar nature.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

Section 12.6  Notices.  All notices and other communications under this Agreement shall be in writing and, unless otherwise provided in this Agreement, shall be deemed given (a) when delivered personally by hand, (b) when sent by facsimile (confirmed in writing by mail promptly thereafter dispatched), (c) three (3) days after being mailed by certified or registered mail, postage prepaid, return receipt requested or (d) one (1) Business Day following the day sent by a nationally recognized overnight courier service, in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

(a)     If to Purchaser, to:

Visiting Nurse Service of New York
1675 Broadway
New York, New York
Fax:    (212) 794-6357
Attn:   Charles Blum, Vice-President
           Legal and Government Affairs

with a copy to (which shall not constitute notice):

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Fax:    (212) 504-6666
Attn:   Gregory Petrick, Esq.

(b)     If to Pax Christi, to:

Pax Christi Hospice, Inc.
1200 South Avenue
Staten Island, New York 10314
Fax:    (212) 604-2293
Attn:   Mark Toney

with a copy to (which shall not constitute notice):

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Fax:    (212) 715-8000
Attn:   Adam C. Rogoff, Esq.

and

Garfunkel Wild, P.C.
111 Great Neck Road, Suite 503
Great Neck, New York 11021
Fax:    (516) 466-5964
Attn:   Judith A. Eisen, Esq.

Section 12.7   <u>Invalid Provisions</u>.   If any term or other provision of this Agreement is held to be invalid, illegal, or incapable of being enforced under any present or future Law, and if the rights or obligations under this Agreement of Seller on the one hand and Purchaser on the other hand will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or

unenforceable provision or by its severance from this Agreement and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

Section 12.8   Binding Effect; Assignment; Successors and Assigns.   This Agreement shall apply to, be binding in all respects upon and inure to the benefit of the parties and their respective successors, administrators and permitted assigns.   A successor to Pax Christi shall include Pax Christi as a reorganized debtor.   No assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of Law or otherwise) without the prior written consent of Purchaser and Pax Christi and any attempted assignment without the required consents shall be void.   No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.   This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors, administrators and permitted assigns.

Section 12.9   No Personal Liability.   In entering into this Agreement, the parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any party hereto shall be personally liable or responsible to any other party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named parties only (but nothing contained herein shall limit the Liability of any Person for his or her fraudulent acts).

Section 12.10   Execution in Counterparts.   This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original, but all of which together will constitute one (1) and the same agreement.   Any signature delivered by a party via facsimile or delivered electronically in PDF format shall be deemed to be an original signature hereto.

Section 12.11   Survival of Representations and Warranties.   The representations and warranties of the parties contained in this Agreement shall not survive the Closing.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**PAX CHRISTI HOSPICE, INC.**


By:  /s/ Mark E. Toney
     Name: Mark E. Toney
     Title: Authorized Person


**VISITING NURSE SERVICE OF NEW YORK HOSPICE CARE**


By: _____
     Name:
     Title:


**ACKNOWLEDGED AND AGREED TO
SOLELY WITH RESPECT TO
SECTIONS 2.10 AND 8.11:**

**SAINT VINCENTS CATHOLIC MEDICAL
CENTERS OF NEW YORK D/B/A SAINT
VINCENT CATHOLIC MEDICAL CENTER**


By:  /s/ Mark E. Toney
     Name: Mark E. Toney
     Title: Chief Restructuring Officer

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**PAX CHRISTI HOSPICE, INC.**

By: _____
    Name:
    Title:

**VISITING NURSE SERVICE OF NEW YORK HOSPICE CARE**

By: _____
Name: Jeanne Dennis
Title: Senior Vice President and Executive Director

**ACKNOWLEDGED AND AGREED TO SOLELY WITH RESPECT TO SECTIONS 2.10 AND 8.11:**

**SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK D/B/A SAINT VINCENT CATHOLIC MEDICAL CENTER**

By: _____
Name:
Title:

**For a copy of any non-confidential exhibits or schedules to the Assert Purchase Agreement, please contact Joseph A. Shifer, Esq. of Kramer Levin Naftalis & Frankel LLP at (212) 715-9100 or via email at jshifer@kramerlevin.com.**

**<ins>Exhibit C</ins>**

**Appraiser Engagement Letter**



April 20, 2010

Pax Christi Hospice, Inc.
c/o St. Vincent Catholic Medical Centers
170 W 12th Street
New York, New York, 10011

**RE:    Proposal for Valuation Consulting Services**
**        Pax Christi Hospice, Inc.**

Dear Sir or Madam:

We are pleased to propose our valuation consulting services to St. Vincent Catholic
Medical Center pertaining to Pax Christi Hospice, Inc. ("PCH"), located in New York,
New York.  The purpose of our analysis will be to provide a valuation indication of  PCH
at a control level under agreed upon procedures as of a current date.

The results of our study should not be used, in whole or in part, for any other purpose or
distributed to third parties, with the exception of any corporate, governmental, regulatory
or other agencies in connceciton with the sale or other corporate purposes of PCH
without the express written consent of VMG Health, LLC ("VMG"). Our valuation
analysis does not constitute a fairness opinion or a fair market value opinion in that we
will not conduct all of the steps necessary to issue such opinions.

The obligation of VMG is solely a corporate obligation, and no officer, principal, director,
employee, agent, shareholder, or controlling person shall be subjected to any personal
liability whatsoever to any person or entity, nor will any such claim be asserted by or on
behalf of any other party to this agreement or any person relying on the opinion.

Our investigation and analysis will be conducted as follows:

1.    **Investigation.** We will utilize information provided by PCH and
        conduct discussions with management or their representatives
        concerning past, present, and prospective operating results of
        PCH.

2.    **Analysis.** We will analyze the historical operating and financial data
        in order to gain an understanding of the operations of PCH. This
        will allow us to determine the underlying dynamic factors pertinent
        to the projected operation of PCH.

Three Galleria Tower          3100 West End Avenue
13155 Noel Road              Suite 940
Suite 2400                   Nashville, Tennessee 37203
Dallas, Texas 75240          **P** 615.777.7300
**P** 214.369.4888             **F** 615.777.7301
**F** 214.369.0541             www.vmghealth.com

3. **Valuation.** We will estimate the value of PCH utilizing agreed upon procedures. Based on our understanding, the analysis will consist of (1) a discounted cash flow method based upon the revenues earnings and operating costs of PCH and (2) a cost approach method which will utilize balance sheet data and identifies the cost to recreate a business similar to PCH. We will consider these methods and will utilize the most appropriate method or methods in forming our value estimate.

4. **Documentation.** Our deliverable will be a letter which outlines the result of our agreed upon procedures value indication along with accompanying schedules. This project is limited in nature in that VMG will not perform all the steps required to provide a valuation opinion. We will accumulate and maintain in our files the requisite source data supporting our recommendations.

Our professional fee for this engagement is $10,000 plus reasonable out of pocket expenses related to the engagement, including allocated administrative expenses of $300 related to courier services, long distance charges, and document preparation services. If there is a need for a detailed fixed asset inventory and analysis, this would entail additional fees for the fair market value of the fixed assets.

We plan to initiate work on this assignment immediately after your acceptance of this confirmation and anticipate completion of the engagement within two weeks of receipt of the information requested in the attached information request.

Attached is a description of services that are applicable in the analysis as well as services considered outside the scope of that analysis. If the engagement as described in this proposal letter conforms to your understanding and desires, please indicate your acceptance of our services by returning an executed copy of this document along with a retainer of $5,000 to Vincent M. Kickirillo at the following address:

VMG Health, LLC
13155 Noel Road, Suite 2400
Dallas, Texas 75240
(214) 369-4888
(214) 369-0541 fax

We look forward to working with you on this engagement.  Please feel free to contact me with any questions or comments you may have.

Respectfully submitted,

Vincent M. Kickirillo, CFA AVA
Principal
VMG Health, LLC


APPROVED and ACCEPTED this _____ day of _____, 2010.


By:    _____
          Pax Christi Representative

**<u>Limited Scope Pricing Analysis - Steps and Procedures</u>**

1. Develop understanding of structure of the business
2. Request of information
3. Evaluate historical financial results and relationships
4. Analyze historical operational results and relationships
   - Charges Collections and Volumes
   - Payor and service mix
   - Managed care relationships
   - Growth in volume and services
5. Prepare prospective operational and financial analysis
   - Volume growth
   - Payor mix and reimbursement
   - Cost projections
   - Capital expenditure requirements
   - Working capital requirements
   - Discount rate analysis, risk of cash flow projections
6. Estimate of value range
7. Review preliminary analysis with yourself or your representative
8. Preparation of letter and exhibits outlining our findings
9. Archival documentation of analysis and findings

**<u>Advisory Services Beyond the Scope of the Pricing Analysis</u>**

1. Fair Market Value Opinion
2. Assessment of alternative growth scenarios
3. Assessment/impact of different deal structures
4. Impact of changing compensation structures
5. Assistance in reaching any transactional agreement
6. Strategic planning
7. Operational budgeting

<u>**Exhibit D**</u>

**Appraiser Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

In re:                                                    :        Chapter 11
                                                          :
SAINT VINCENTS CATHOLIC MEDICAL                           :        Case No. 10-11963 (CGM)
CENTERS OF NEW YORK, <u>et al.</u>,                        :
                                                          :        Jointly Administered
                                 Debtors.                 :

---------------------------------------------------------- x

**DECLARATION OF VINCENT M. KICKIRILLO**
**IN SUPPORT OF RETENTION OF VMG HEALTH LLC AS APPRAISER**
**IN CONNECTION WITH THE SALE OF ASSETS OF PAX CHRISTI HOSPICE, INC**

VINCENT M. KICKIRILLO, under the penalty of perjury, deposes and says:

1.      I am a partner with VMG Health LLC ("**VMG**").   I submit this

Declaration on behalf of VMG in support of the Motion[1] of Saint Vincents Catholic Medical

Centers of New York ("**SVCMC**") and certain of its affiliates, as Chapter 11 debtors and debtors

in possession (each a "**Debtor**" and collectively, the "**Medical Centers**" or the "**Debtors**")[2]

seeking an order, *inter alia*, approving the sale (the "**Sale**") of certain assets related to the

Debtors' hospice services (the "**Hospice**," or the "**Assets**") owned and operated by Debtor Pax

Christi Hospice, Inc. ("**Pax Christi**") and approving the retention of VMG as an appraiser in

connection with the Sale in order to comply with New York state law requirements (the

"**Engagement**").   Unless otherwise stated in this Declaration, I have personal knowledge of the

facts hereinafter set forth.    To the extent that any information disclosed herein requires

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

[2] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc.  There are certain affiliates of SVCMC who are not Debtors.

subsequent amendment or modification upon VMG's completion of further analysis or as additional creditor information becomes available to it, one or more supplemental declarations will be submitted to the court reflecting the same.

2.     The terms and conditions of VMG's retention by the Debtors are set forth in that certain letter agreement dated as of April 20, 2010, attached to the Motion as **Exhibit [ ]** (the "**Engagement Letter**"), which terms and conditions are summarized herein.

## QUALIFICATION OF PROFESSIONALS

3.     The Debtors seek to retain VMG as appraiser in connection with the Sale. I understand that as part of the process mandated by New York Not For Profit Corporation Law, the Debtors are required to submit an appraisal of the Assets (the "**Appraisal**") to the New York Attorney General and the New York Supreme Court (the "**State Approval Process**").  VMG is eminently qualified to provide the Appraisal.

4.     VMG is recognized by leading healthcare providers and investors as one of the most trusted valuation and transaction advisors in the United States.  VMG focuses exclusively on healthcare services, and possess an in-depth understanding of the critical financial, operational, and legal issues that impact value in the healthcare environment.  VMG performs more than 500 healthcare valuations each year throughout the United States and abroad.  VMG has obtained national recognition for determining and understanding fair market value in today's healthcare regulatory environment through publications such as *Healthcare Financial Management*, *Compliance Today*, *SurgiStrategies*, *The PHA Pulse*, and *Health Lawyers Weekly*.

5.     I will be the VMG principal primarily responsible with the preparation of the Appraisal.  I specialize in providing financial, valuation and transaction advisory services to

clients in the health care industry, including hospitals, health systems, ambulatory surgery centers, imaging centers, catherterization labs, radiation therapy centers and other healthcare entities, and have provided expert testimony related to the value of companies in the healthcare industry. Prior to joining VMG, I worked as a Director for FTI Consulting, Inc., a Director in KPMG's Valuation and Litigation practices, and as a staff and senior analyst in the Financial Advisory Services practice at Ernst & Young. In addition to a Bachelor of Business Administration from the University of Texas at Austin, and a Master of Business Administration from Southern Methodist University, I hold the Chartered Financial Analyst designation, and I am an Accredited Valuation Analyst.

## SERVICES TO BE RENDERED IN CONNECTION WITH THE SALE

6.       As more fully described in the Engagement Letter, VMG will provide the Appraisal pursuant to an investigation analysis conducted as follows:

(a)      <u>Investigation</u>. VMG will utilize information provided by Pax Christi and conduct discussions with management or their representatives concerning past, present, and prospective operating results of the Hospice.

(b)      <u>Analysis</u>. VMG will analyze the historical operating and financial data in order to gain an understanding of the operations of the hospice. This will allow us to determine the underlying dynamic factors pertinent to the projected operation of the Hospice.

(c)      <u>Valuation</u>. VMG will estimate the value of the Hospice utilizing agreed upon procedures. Based on VMG's understanding, the analysis will consist of (1) a discounted cash flow method based upon the revenues earnings and operating costs of the Hospice and (2) a cost approach method which will utilize balance sheet data and identifies the cost to recreate a business similar to the Hospice. VMG will consider these methods and will utilize the most appropriate method or methods in forming a value estimate.

(d)      <u>Documentation</u>. VMG's deliverable will be a letter which outlines the result of the agreed upon procedures value indication along with accompanying schedules. This project is limited in nature in that VMG will not perform all the steps required to provide a

valuation opinion. VMG will accumulate and maintain in its files the requisite source data supporting our recommendations.

7.    To my knowledge, the services that will be rendered by VMG in connection with the sale are not duplicative with the services to be performed by any other individual or entity retained by the Debtors.

## PROFESSIONAL COMPENSATION

8.    Pursuant to the Engagement Letter, VMG will receive a fee of $10,000 plus reasonable out of pocket expenses related to the engagement, including allocated administrative expenses of $300 related to courier services, long distance charges, and document preparation services (the "**Fee**").  If there is a need for a detailed fixed asset inventory and analysis, this would entail additional fees for the fair market value of the fixed assets.  Upon execution of the Engagement, VMG received a retainer of $5,000 which will be credited against the Fee at the conclusion of the Engagement, , and will be payable from the proceeds of the sale.

## PRIOR COMPENSATION

9.    VMG has not received nor are owed any prepetition fees or expenses, and did not perform prepetition services to the Debtors.

10.    In accordance with section 504 of the Bankruptcy Code, VMG has informed the Debtors that there is no agreement or understanding between VMG and any other entity, other than employees of VMG, for the sharing of compensation received or to be received for services rendered in connection with this case.

## DISINTERESTEDNESS OF PROFESSIONALS

11.    In connection with this proposed retention, VMG reviewed a comprehensive list of the types of entities who may have contacts with the Debtors which was developed through consultation with senior management of the Debtors and their advisors (the

"**Retention Checklist**").  A copy of the Retention Checklist is attached hereto as **Schedule 1**. VMG then searched its client database to determine whether they had any relationships with the entities identified by the Debtors and their advisors as being responsive to the Retention Checklist (collectively, the "**Potential Parties in Interest**").   Based on this search, VMG has provided services to, or has a connection to, the entities described on **Schedule 2** (the "**Disclosed Parties**").

12.    To the best of my knowledge, information and belief, formed after reasonable inquiry, none of the services rendered by VMG to the Disclosed Parties have been in connection with the Debtors or these Chapter 11 Cases.  VMG believes that these relationships will not impair VMG's ability to perform professional services objectively on behalf of the Debtors.  VMG will not accept any engagement that would require VMG to represent an interest materially adverse to the Debtors.

13.    To the best of my knowledge, the professionals of VMG (i) do not have any connection to the Debtors or their respective affiliates, creditors, or any other party in interest, or their respective attorneys and accountants, and (ii) do not hold or represent any interest adverse to the Debtors' estates.

14.    Neither I nor any other professional at VMG is or was a creditor or is or was a holder of any interest in the Debtors.  In addition, neither I nor any other professional at VMG is or was, within two years before the commencement of these Chapter 11 Cases, a director, officer, or employee of any Debtor.

15.    I am not related, and to the best of my knowledge, no VMG professional is related to the United States Trustee for the Southern District of New York or any employee of the United States Trustee's office.

16.     As part of its practice, VMG appears in cases, proceedings and transactions involving many different attorneys, financial advisors and creditors, some of which may represent or be claimants and/or parties-in-interest in these cases.  VMG will have no relationship with any such entity, attorney or financial advisor that would be materially adverse to the Debtor.

17.     To the best of my knowledge and information, the annual fees paid to VMG by any of the Disclosed Parties and their respective affiliates for either of the last two calendar years did not exceed 1% (one percent) of the annual gross revenue of VMG for either such year.

18.     Despite the efforts described above to identify and disclose connections with parties-in-interest in these cases, because the Debtors are a large enterprise with numerous creditors and other relationships, VMG is unable to state with certainty that every client representation or other connection of VMG has been disclosed.  If VMG discovers additional information requiring disclosure, VMG will file supplemental disclosures with the Court as promptly as possible.

19.     To the best of my knowledge, information and belief formed after reasonable inquiry, VMG does not hold nor represent any interest materially adverse to the Debtors in the matter for which VMG is proposed to be retained.  The proposed employment of VMG is not prohibited by or improper under Bankruptcy Rule 5002. Accordingly, I believe VMG is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code and is otherwise qualified to represent the Debtors as their real estate broker under section 327(a) of the Bankruptcy Code.

Dated: New York, New York
April 26, 2010

/s/ Vincent M. Kickirillo
Vincent M. Kickirillo, CFA AVA

# <u>SCHEDULE 1</u>

## Retention Checklist

**Retention Checklist**

1.      Debtor and Non-Debtor Affiliates
1.      Trade Names
2.      SVCMC Members
3.      Business Affiliations of Directors
4.      Letter of Credit Beneficiaries
5.      Federal and State Regulatory Agencies
6.      SVCMC Current D&Os (debtors and affiliates)
7.      Shareholders, Officers, Directors for Affiliates
8.      Former D&Os
9.      Unions
10.     Sponsors
11.     Secured Lenders, Creditors, and Mortgagees
12.     Other Parties-in-Interest
13.     Professionals
14.     Insurance and Benefits Carriers and Administrators
15.     Utilities
16.     Equipment Lessors
17.     Banks
18.     Landlords
19.     Mortgage Insurers and Custodians
20.     UCC Search Parties
21.     Vendors and Professionals
22.     Medical Malpractice Litigation Adversaries
23.     Other Litigation Adversaries
24.     Workers Compensation Claimants
25.     50 Largest Creditors
27.     Official Committee of Unsecured Creditors and its Professionals
28.     The Office of United States Trustee for the Southern District of New York
29.     The United States Bankruptcy Judge Cecelia G. Morris

## SCHEDULE 2

### Retention Checklist

| Interested Party | Relation to the Debtors | Description of Relationship |
|---|---|---|
| KPMG LLP | Retained Professional | Prior employer on matters unrelated to the Debtors |
| FTI Consulting | Vendor & Professionals | Prior employer on matters unrelated to the Debtors |
| Garfunkel Wild | Retained Professional | Client on matters unrelated to the Debtors |