KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Proposed Counsel for Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- X
In re:                                    :        Chapter 11
                                          :
SAINT VINCENTS CATHOLIC MEDICAL           :        Case No. 10-11963 (CGM)
CENTERS OF NEW YORK, et al.,              :
                                          :
                    Debtors.              :        Jointly Administered
----------------------------------------------------------- X

**NOTICE OF AMENDED PURCHASE AND SALE AGREEMENT (EXHIBIT C) TO
MOTION OF THE DEBTORS FOR (I) AN ORDER (A) APPROVING BIDDING
PROCEDURES AND BIDDER PROTECTIONS WITH RESPECT TO THE SALE OF THE
REAL ESTATE AND PERSONAL PROPERTY LOCATED AT 555 6TH AVENUE AND
ASSIGNMENT OF LEASES RELATED THERETO, (B) SCHEDULING AN AUCTION
AND SALE HEARING RELATED THERETO, (C) APPROVING THE FORM AND
MANNER OF NOTICE OF THE AUCTION AND SALE HEARING, AND (D)
APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (II) AN
ORDER APPROVING SUCH SALE FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS**

PLEASE TAKE NOTICE THAT:

       1.      On April 14, 2010 (the "**Petition Date**"), Saint Vincents Catholic Medical
Centers of New York ("**SVCMC**") and certain of its affiliates, as Chapter 11 debtors and debtors in
possession (each a "**Debtor**" or the "**Debtors**")[1] filed voluntary petitions for relief under chapter 11

---

[1] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop
Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place
Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc.
d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation d/b/a
Holy Family Home; and (viii) SVCMC Professional Registry, Inc.  There are certain affiliates of SVCMC who are not
Debtors.

of title 11 of the United States Code, in the United States Bankruptcy Court for the Southern District of New York (the "**Court**").

2.     On April 23, 2010, the Debtors filed their Motion of the Debtors for (I) an Order (A) Approving Bidding Procedures and Bidder Protections With Respect to the Sale of the Real Estate and Personal Property Located at 555 6th Avenue and Assignment of Leases Related Thereto, (B) Scheduling an Auction and Sale Hearing Related Thereto, (C) Approving the Form and Manner of Notice of the Auction and Sale Hearing, and (D) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) an Order Approving Such Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests (the "**Bidding Procedures Motion**") [Docket No. 126].

3.     Attached hereto is an Amended **Exhibit C** to the Bidding Procedures Motion which is a true copy of the executed Purchase and Sale Agreement with TIP Acquisitions LLC as Purchaser for the sale of Property located at 555 6th Avenue, New York, New York.

4.     The Debtors reserve their right to further amend or supplement **Exhibit C** to the Bidding Procedures Motion as they deem necessary or appropriate.

Dated: New York, New York
        May 14, 2010

                    KRAMER LEVIN NAFTALIS & FRANKEL LLP

                    /s/ Gregory G. Plotko
                    Gregory G. Plotko
                    1177 Avenue of the Americas
                    New York, New York 10036
                    Telephone: (212) 715-9100
                    Facsimile: (212) 715-8000

                    *Proposed Counsel for Debtors and*
                    *Debtors in Possession*

# AMENDED EXHIBIT C

## Purchase and Sale Agreement

# PURCHASE AND SALE AGREEMENT

By and Between

SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK

as Seller

and

TIP ACQUISITIONS LLC

as Purchaser

Dated as of: April 21, 2010

Property

555 Sixth Avenue
New York, New York

# TABLE OF CONTENTS

ARTICLE 1  DEFINITIONS....................................................................................................1

ARTICLE 2  GENERAL TERMS............................................................................................1

    SECTION 2.1.  The Transaction......................................................................................1

    SECTION 2.2.  Purchase Price.........................................................................................2

ARTICLE 3  PERMITTED EXCEPTIONS; TITLE INSURANCE.................................4

    SECTION 3.1.  Sale Subject to........................................................................................4

    SECTION 3.2.  Title Evidence .........................................................................................5

    SECTION 3.3.  Permitted Exceptions .............................................................................5

    SECTION 3.4.  Existing Mortgage..................................................................................7

ARTICLE 4  APPORTIONMENTS AND PAYMENTS ............................................................7

    SECTION 4.1.  Apportionments Relating to the Property .............................................7

    SECTION 4.2.  Taxes and Assessments...........................................................................8

    SECTION 4.3.  Transfer of Utilities................................................................................9

    SECTION 4.4.  Transfer Taxes........................................................................................9

    SECTION 4.5.  Tax Returns ............................................................................................9

    SECTION 4.6.  Title Charges ..........................................................................................9

    SECTION 4.7.  Transaction Expenses............................................................................10

    SECTION 4.8.  Survival .................................................................................................10

ARTICLE 5  COVENANTS REGARDING THE PROPERTY....................................................10

    SECTION 5.1.  Maintenance and Operation of the Property ...........................................10

    SECTION 5.2.  Union Employees ...................................................................................12

ARTICLE 6  REPRESENTATIONS AND WARRANTIES OF PURCHASER ........................12

    SECTION 6.1.  Generally................................................................................................12

    SECTION 6.2.  Closing Conditions; Survival of Representations and Warranties...........13

ARTICLE 7  REPRESENTATIONS AND WARRANTIES OF SELLER .................................14

    SECTION 7.1.  Generally .................................................................................................14

    SECTION 7.2.  Property Representations .......................................................................14

    SECTION 7.3.  Closing Conditions; Survival of Representations and Warranties ..........16

    SECTION 7.4.  Knowledge of Purchaser ......................................................................17

    SECTION 7.5.  Knowledge of Seller ..............................................................................18

ARTICLE 8  CLOSING DATE ...................................................................................................18

    SECTION 8.1.  Closing Date ..........................................................................................18

    SECTION 8.2.  Leaseback of Property ...........................................................................18

ARTICLE 9  CLOSING DOCUMENTS ....................................................................................19

    SECTION 9.1.  Closing. ..................................................................................................19

    SECTION 9.2.  Further Assurances .................................................................................20

ARTICLE 10  NOTICES .............................................................................................................20

    SECTION 10.1.  Notices .................................................................................................20

ARTICLE 11  BROKER ..............................................................................................................21

ARTICLE 12  DEFAULTS; REMEDIES ...................................................................................21

    SECTION 12.1.  Purchaser's Default .............................................................................21

    SECTION 12.2.  Seller's Default ....................................................................................22

ARTICLE 13  CASUALTY; CONDEMNATION ......................................................................22

    SECTION 13.1.  Casualty ...............................................................................................22

    SECTION 13.2.  Condemnation .....................................................................................23

ARTICLE 14  AS-IS; WHERE-IS; DISCLAIMER; WAIVER OF CLAIMS ...........................23

    SECTION 14.1.  Disclaimers; As-Is, Where-Is Condition. ...........................................23

    SECTION 14.2.  Acceptance of Closing Documents; Waivers .......................................24

    SECTION 14.3.  Survival ................................................................................................25

ARTICLE 15  ACCESS ............................................................................................25

    SECTION 15.1.  Inspection of Property ..........................................................25

    SECTION 15.2.  Review of Documents relating to the Property ....................26

ARTICLE 16  ESCROW ........................................................................................27

    SECTION 16.1.  Escrow Terms .......................................................................27

ARTICLE 17  BANKRUPTCY COURT MATTERS ..........................................27

    SECTION 17.1.  Competing Bids....................................................................27

    SECTION 17.2.  Approval of Break-Up Fee ..................................................27

    SECTION 17.3.  Bankruptcy Court Filings ....................................................28

    SECTION 17.4.  Notice of Sale ......................................................................28

ARTICLE 18  MISCELLANEOUS .......................................................................29

    SECTION 18.1.  Entire Agreement .................................................................29

    SECTION 18.2.  Modification .........................................................................29

    SECTION 18.3.  Binding Agreement ..............................................................29

    SECTION 18.4.  Assignment...........................................................................29

    SECTION 18.5.  No Press Releases ................................................................30

    SECTION 18.6.  Illegality ...............................................................................30

    SECTION 18.7.  Choice of Law ......................................................................30

    SECTION 18.8.  Construction .........................................................................30

    SECTION 18.9.  Binding Effect; Assignment; Successors and Assigns..........30

    SECTION 18.10.  Ambiguities ........................................................................31

    SECTION 18.11.  Expenses............................................................................31

    SECTION 18.12.  Counterparts .......................................................................31

    SECTION 18.13.  Waiver of Trial by Jury ......................................................31

    SECTION 18.14.  Third Party Beneficiaries ...................................................31

SECTION 18.15.  Jurisdiction. ........................................................................................................31

SECTION 18.16.  Seller's Constituents ...........................................................................................32

SECTION 18.17.  Purchaser's Constituents .....................................................................................32

SECTION 18.18.  No Recording .......................................................................................................32

SECTION 18.19.  Not an Offer .........................................................................................................32

SECTION 18.20.  Failure of Deposit ...............................................................................................32

SECTION 18.21.  No Waiver ............................................................................................................33

SECTION 18.22.  Severability ..........................................................................................................33

SECTION 18.23.  No Survival ..........................................................................................................33

# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** is entered into by and between SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK, a New York not-for-profit corporation ("**Seller**") and TIP ACQUISITIONS LLC, a Delaware limited liability company ("**Purchaser**") as of the 21st day of April, 2010.

**WHEREAS**, Seller, along with certain of its affiliates (collectively, the "**Debtors**"), are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on April 14, 2010 (the "**Petition Date**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") (Case No. 10-11963(CGM)) (the "**Bankruptcy Case**");

**WHEREAS**, Seller is the owner of the Property (as hereinafter defined); and

**WHEREAS**, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code the Property, all as more specifically provided herein.

**NOW, THEREFORE**, subject to the terms and conditions of this Agreement, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, including the mutual covenants and agreements set forth herein, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

For purposes of this Agreement, all capitalized terms and certain other terms used herein shall have the respective meanings specified in <u>Schedule I</u> attached hereto and made a part hereof.

## ARTICLE 2
## GENERAL TERMS

**SECTION 2.1.    The Transaction**.

2.1.1.  Subject to the terms and conditions of this Agreement and the entry of the Sale Order, Seller agrees to sell, transfer, convey and assign to Purchaser, and Purchaser agrees to purchase and accept from Seller on the Closing Date (as defined herein) free and clear of all liens, subject to Permitted Exceptions, and any other interest to the extent acceptable to Purchaser, as provided in the Sale Order pursuant to Section 363(b) and Section 363(f) of the Bankruptcy Code, Seller's right, title and interest, in and to (i) that certain real property as more particularly described on <u>Schedule II</u> attached hereto and made a part hereof together with the buildings and improvements thereon located at and commonly known as 555 Sixth Avenue, New York, New York (collectively, the **"Real Estate"**), and (ii) the furniture, furnishings, fixtures, equipment and other items of personal property exclusively owned by Seller located in or upon, and used in connection with, the Real Estate (collectively, the **"Personalty"**). The Real Estate

and the Personalty are to be conveyed together with (x) all easements, rights of way, air or development rights, reservations, privileges, appurtenances, and other estates and rights of Seller, if any, pertaining to its interest in the Real Estate, and (y) all right, title and interest of Seller, if any, in and to all alleys adjoining its interest in the Real Estate and in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining its interest in the Real Estate to the center line thereof, and (z) subject to apportionment if required hereunder, all right, title and interest of Seller, if any, in and to any award made for any taking by condemnation or any damages to its interest in the Real Estate by reason of a change of grade of any street, road or avenue (such taking or damages, a **"Condemnation")** or to be made in lieu thereof and in and to any unpaid award for any Condemnation (the Real Estate and the Personalty, together with all of the foregoing, are hereinafter sometimes collectively referred to herein as the **"Property")**.

2.1.2.  Subject to the terms and condition of this Agreement and the entry of the Sale Order, at the Closing, Seller shall assume and assign to Purchaser all of Seller's right and title to, and interest in, the Assumed Service Contracts and Surviving Leases pursuant to an assignment (the "**Assignment**") in the form annexed hereto as Exhibit F.  No Assumed Services Contracts or Surviving Leases shall be assumed absent concurrent assignment to Purchaser. Purchaser shall be responsible for satisfying the requirements of "adequate assurance of future performance" as required by section 365 of the Bankruptcy Code and shall cooperate fully with Seller in seeking such approval from the Bankruptcy Court, including without limitation, Purchaser providing the necessary evidence required as part of the Motion to approve this Agreement and the transactions contemplated herein.

2.1.3.  The cure amounts, if any, (as determined by the Bankruptcy Court, by agreement of the parties or otherwise) necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults of the part of Seller under the Assumed Service Contracts and Surviving Leases referred to in Section 2.1.2 (including any adjustments that are determined after the Closing) (collectively, the "**Cure Amounts**") shall be paid by Purchaser (or Purchaser shall have delivered into escrow on terms reasonably acceptable to Seller and Purchaser amounts sufficient to pay any claim therefor that remains disputed as of the Closing, as such amount shall have been determined by the Bankruptcy Court) at or before the Closing, (except as otherwise agreed to by the other party to the Assumed Service Contracts and Surviving Leases and Purchaser) and Seller shall have no liability for any such Cure Amount.  Purchaser shall not have the right to terminate this Agreement as a result of the failure by Seller or inability of Seller to assign to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof) at the Closing any Assumed Service Contracts and Surviving Leases or Purchaser's decision not to assume any Assumed Service Contracts as to which Purchaser has not paid the related Cure Amount in accordance with this section.  Seller represents to Purchaser that, to Seller's knowledge, a true, correct and complete estimate as of the date hereof of the Cure Amounts described in this section is set forth on Schedule V.

**SECTION 2.2.    Purchase Price**.

2.2.1.  The **"Purchase Price"** for the Property and the various assignments incidental thereto referred to herein is FORTY-EIGHT MILLION AND NO/100s DOLLARS **(US $48,000,000.00)**.  The Purchase Price shall be payable (i) by the payment of the Escrow

Deposit in immediate funds, and (ii) the balance in cash (by wire transfer) at the Closing as directed by Seller in writing at least two (2) Business Days prior to the Closing. Seller may direct, among other things, that Purchaser pay a portion of the Purchase Price at the Closing, in an amount or amounts specified by Seller, to persons or entities other than Seller for Seller's purposes, including to the Title Company. Seller's wiring instructions are set forth on Schedule III-A attached hereto and made a part hereof.

2.2.2. Concurrently with the execution and delivery hereof, Seller and Purchaser have agreed that, as security for the performance of Purchaser's obligations hereunder, Purchaser shall deposit with Escrow Agent, by wire transfer to the account described in Schedule III-B, a cash earnest money deposit in the amount of THREE MILLION AND NO/100s DOLLARS (**US $3,000,000.00**) (together with any interest thereon, the "**Cash Deposit**"), which Cash Deposit shall be held by Escrow Agent, in trust, pursuant to and in accordance with the provisions of an Escrow Agreement among Seller, Purchaser and Escrow Agent, a copy of which is attached hereto and made a part hereof as Exhibit A (the "**Escrow Agreement**"). Purchaser shall have the right at any time upon at least five (5) Business Days' prior notice to Seller to deposit with Escrow Agent a clean, unconditional and irrevocable letter of credit in an amount equal to THREE MILLION AND NO/100s DOLLARS (**US $3,000,000.00**) (payable on sight draft) with a term of at least twelve (12) months (together with any replacements or substitutes therefor, the "**Letter of Credit**"), naming Escrow Agent, in trust, as the sole beneficiary thereof, in substitution for the Cash Deposit, which Letter of Credit, any proceeds from any draw thereon, and any interest earned on such proceeds, shall be held by Escrow Agent, in trust, pursuant to and in accordance with the provisions of the Escrow Agreement. The Letter of Credit shall be issued by a commercial bank that (a) is a member of the New York Clearinghouse Association, (b) is not an affiliate of Purchaser, (c) has a long-term senior debt rating by Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc., or any successor thereto, of not less than "A" and (d) has a long-term senior debt rating by Moody's Investor Services, or any successor thereto, of not less than "A2". The form of the Letter of Credit shall be subject to the approval of Seller, which approval shall not be unreasonably withheld, delayed or conditioned. Purchaser shall cause the Letter of Credit to remain valid and effective at all times that the Escrow Deposit is held by Escrow Agent in the form of the Letter of Credit. Upon Escrow Agent's receipt of the Letter of Credit and notice from Seller that the form of Letter of Credit is acceptable, the Cash Deposit and any interest earned thereon shall be returned to Purchaser. Notwithstanding the foregoing to the contrary, on the date upon which any other potential bidders are required to post a deposit in connection with a Competing Bid or if there is no other bidder, prior to the date of the hearing for the entry of the Sale Order, Purchaser shall be required to deposit an additional ONE MILLION EIGHT HUNDRED THOUSAND AND NO/100S DOLLARS (**US $1,800,000.00**) into escrow to increase the Cash Deposit, or if applicable, increase the Letter of Credit to, FOUR MILLION EIGHT HUNDRED THOUSAND AND NO/100S DOLLARS (**US $4,800,000.00**). The Cash Deposit, the Letter of Credit, any proceeds from any draw of the Letter Credit permitted hereunder and under the Escrow Agreement and any interest earned on such Cash Deposit or proceeds of the Letter of Credit as the same may have been increased are herein referred to, collectively, the "**Escrow Deposit**".

2.2.3. Upon payment in full of the Purchase Price at Closing, subject to adjustment pursuant to the terms and conditions of this Agreement, the Letter of Credit shall be returned to Purchaser if Escrow Agent then holds the Letter of Credit; provided, however, if the

Escrow Deposit is held in the form of cash at Closing (e.g., the Letter of Credit is not substituted for the Cash Deposit, or the Letter of Credit has been substituted for the Cash Deposit and Escrow Agent has made a draw on the Letter of Credit in accordance with the terms of the Escrow Agreement), then at Closing (a) the Escrow Deposit held by Escrow Agent as cash funds (e.g., the initial Cash Deposit or the proceeds from a draw on the Letter of Credit and any interest earned on the Cash Deposit or Letter of Credit proceeds) shall be paid by Escrow Agent to, or as directed by, Seller on account of the Purchase Price, and (b) Purchaser shall receive a credit against the total Purchase Price, as adjusted pursuant to the terms and conditions of this Agreement, in an amount equal to such cash funds paid to, or as directed by, Seller on account of the Purchase Price.

2.2.4. The Parties agree that the Personalty has de minimis value. Accordingly, no portion of the Purchase Price is attributable to the Personalty.

2.2.5. Purchaser shall pay (or escrow if a Cure Amount is disputed at the time of the Closing) the aggregate Cure Amounts payable or reserved by the Purchaser under Section 2.1.3.

## ARTICLE 3
## PERMITTED EXCEPTIONS; TITLE INSURANCE

**SECTION 3.1.** **Sale Subject to.** Subject to the terms and condition of this Agreement and the entry of the Sale Order, Seller shall convey, and Purchaser shall accept fee simple title to the Real Estate, insurable by the Title Company at regular premiums, without exceptions or reservations of any type or kind, except (a) ALTA standard printed exceptions other than those that can be removed by the Sale Order, or by an affidavit of Seller to be provided pursuant to Section 3.2.3 hereof, (b) the Permitted Exceptions, and (c) the obligations expressly assumed by Purchaser under this Agreement. The parties hereby agree that **"Title Company"** shall mean Fidelity National Title Insurance Company. Purchaser and Seller each acknowledges and agrees that (i) Purchaser shall use and employ the Title Company as the lead title company for purposes of insuring Purchaser's title to the Property and any mortgage executed and delivered by Purchaser at Closing; provided that First American Title Insurance Company of New York and/or Title Associates may provide up to thirty percent (30%), in the aggregate, of the insurance insuring title to Purchaser. Notwithstanding the foregoing, in no event shall Purchaser be required to purchase insurance from any title company that is unwilling to provide the same coverage that is made available to Purchaser from another reputable insurer selected by Purchaser.

3.1.1. Pursuant to the Sale Order, all monetary liens and claims (the "**Liens**") shall attach to the net proceeds of the sale (the "**Net Proceeds**") to the same extent they encumbered the Property. To the extent Seller is required to satisfy any of the Liens from the Net Proceeds, Seller shall make such payments in accordance with the Sale Order or by further order of the Bankruptcy Court. Nothing herein is a waiver of the rights of Seller or any other third party to contest the validity, amount or priority of any Liens and the right of any claimant or lienholder to have their respective liens satisfied from Net Proceeds.

**SECTION 3.2.    Title Evidence**.  Purchaser acknowledges that (i) it has received and reviewed the Title Evidence and (ii) it approves the Permitted Exceptions.

3.2.1.  If any update to the Title Evidence reflects any title exceptions that are not Permitted Exceptions and, therefore, which Purchaser is not required to accept (the **"Non-Permitted Exceptions"**), Purchaser shall give written notice thereof to Seller within ten (10) Business Days of Purchaser's receipt of such update, or at hearing to approve the Sale, if earlier.  Seller shall use reasonable efforts, at or prior to Closing, solely through the entry of the Sale Order and as provided in Section 3.1.1 above, to attempt to remove the following: (i) any and all of the Non-Permitted Exceptions that Seller willfully placed of record or consented to be placed of record following the date of the Title Evidence, and (ii) any and all other Non-Permitted Exceptions that may be removed by the entry of the Sale Order.  Seller shall have no obligation with respect to the clearance of title as required hereunder other than the delivery of the Sale Order.  Seller shall have the right to adjourn the Closing Date, from time to time, up to ninety (90) days in the aggregate for the purpose of removing/eliminating such Non-Permitted Exceptions.

3.2.2.  In the event that there exist any material Non-Permitted Exceptions which is not removed through the entry of the Sale Order, Purchaser may elect within five (5) Business Days after entry of the Sale Order to either (i) not consummate the transactions contemplated hereby, in which event this Agreement shall be terminated and of no further force and effect, the Escrow Deposit shall be returned to Purchaser and neither of the parties hereto shall have any rights or obligations to the other hereunder or (ii) consummate the transactions contemplated hereby subject to such additional exceptions and proceed to Closing without an abatement of the Purchase Price.  Purchaser's failure to timely deliver a notice electing to not consummate the transactions contemplated hereby shall be deemed Purchaser's election to consummate the transaction in accordance with the terms and conditions of this Agreement.  For purposes of this provision, a material Non-Permitted Exception shall be a Non-Permitted Exception(s) which, in the aggregate, cannot be removed without the payment of a liquidated sum in the amount in excess of $500,000 (the "**Material Threshold**").  Notwithstanding the foregoing, if Purchaser elects to terminate this Agreement as set forth above, Seller shall have the right to void such termination by providing written notice to Purchaser that Seller elects to provide Purchaser with a credit against the Purchase Price equal to the amount the cost to cure the Non-Permitted Exception exceeds the Material Threshold.  In the event Seller elects to provide such credit, Purchaser shall be obligated to complete the transaction contemplated by this Agreement.

3.2.3.  If required by the Title Company, Seller agrees to execute, acknowledge and deliver a standard and customary owner's title affidavit at Closing as modified for a debtor in chapter 11 and such other matters as the Title Company may reasonably require in order to issue a policy of title insurance to Purchaser in the manner required under this Agreement; provided however that Seller shall not be obligated to pay any amounts to or claims of third parties in order to do so (other than as required by the Sale Order or pursuant to Sections 3.1.1 (as and to the extent provided for therein) and 3.2.1 above).

**SECTION 3.3.    Permitted Exceptions**.  "**Permitted Exceptions**" means:

3.3.1.  all matters set forth in the Title Evidence with respect to the Real Estate and any other matters set forth in any update thereof which other matters are not objected to in writing by Purchaser in accordance with Section 3.2.1;

3.3.2.  the state of facts shown on the Survey;

3.3.3.  the state of facts that an accurate update of the Survey would show (including encroachments, projections, retaining walls and stoops) provided that any such change in facts from the last date of the Survey shall not materially adversely affect the use of any material portion of the existing improvements for its current use;

3.3.4. liens for unpaid taxes, assessments, charges, rents and any other governmental charges, which are not yet due and payable and are apportioned in accordance with the provisions of Article 4 hereof;

3.3.5. all rights and easements, for electricity, gas, telephone, water, cable television and any other utilities to maintain and operate lines, cables, poles and distribution boxes in, over and upon the Real Estate;

3.3.6.  possible non-material variations between the tax diagram or the tax map and the record description;

3.3.7.  any and all violations of building, fire, sanitary, environmental, housing and similar laws, municipal ordinances, orders or requirements affecting the Property (collectively as the **"Violations"**) from or by any federal, state, county or municipal department, agency, authority or bureau having or asserting jurisdiction (each, a **"Governmental Authority"**) existing as of the date of Closing, whether or not noted or issued, but excluding any monetary fines, charges, penalties, judgments, liens and/or fees, together with any interest accruing thereon imposed as a result of or relating to such Violations;

3.3.8.  building, zoning, subdivision and other governmental laws, codes and regulations, and landmark, historic and wetlands designations;

3.3.9.  any matter created or caused by Purchaser or its agents;

3.3.10.  any matters which the Title Company may raise, provided that the Title Company shall agree to omit or insure without additional premium to Purchaser against collection of the same out of the Property;

3.3.11.  Assumed Service Contracts, if any; and

3.3.12.  the Master Lease (if applicable), the IT lease, any and all subleases to the Master Lease (if applicable), and any and all existing leases on the Property, including the five (5) existing leases to rent stabilized tenants, the garage tenant and the laundry service provider, all as more particularly shown on the Schedule of Leases attached hereto as <u>Schedule IV</u> which remain in existence on the Closing Date, (collectively, the **"Remaining Leases"**), along with the Stipulations of Settlement shown on <u>Schedule IV</u>.

**SECTION 3.4.**     **Existing Mortgage.**  At the request of Purchaser, Seller shall endeavor to cause Sun Life Assurance Company of Canada (U.S.) (the "**Existing Lender**"), the holder of the Existing Mortgage (to the extent the Existing Mortgage is not subject to any then pending challenge in the Bankruptcy Case as to its validity, priority or enforceability) to assign the Existing Mortgage and the promissory note(s) secured thereby to Purchaser's lender (without recourse, representation, or warranty) at Closing; provided, however, (a) Purchaser shall pay all fees, charges, costs and expenses of Seller and the Existing Lender in connection with such assignment of the Existing Mortgage and the promissory note(s) secured thereby, and the preparation of the documents effectuating such assignment and the recording thereof, (b) if the Existing Lender agrees to such assignment and such assignment is consummated at Closing, Purchaser shall accept title to the Property subject to (i) the Existing Mortgage assigned at the Closing, the promissory note(s) secured thereby and any and all documentation and financing statements relating thereto and (ii) the other Permitted Exceptions, and (c) that the failure or refusal of the Existing Lender to so assign to Purchaser's lender the Existing Mortgage, for any or no reason whatsoever, shall not affect the obligation of Purchaser to consummate the transaction hereunder.  Such assignment of the Existing Mortgage and the promissory note(s) secured thereby shall be in compliance with the applicable requirement of Section 275 of the New York Real Property Law.

# ARTICLE 4
# APPORTIONMENTS AND PAYMENTS

**SECTION 4.1.**     **Apportionments Relating to the Property**.  The following shall be apportioned between Seller and Purchaser at the Closing with respect to the Property, as of 11:59 PM of the day immediately preceding the Closing Date (the "**Apportionment Date**"), and the net aggregate amount thereof either shall be paid by Purchaser to Seller or credited to Purchaser towards the Purchase Price, as the case may be, at the Closing (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party);

4.1.1. real property taxes, and any assessments (or installments thereof), including with respect to Business Improvement Districts, on the basis of the fiscal year for which payable; if the Apportionment Date shall be prior to the date on which the real property tax rate is fixed, the apportionment of real property taxes shall be made on the basis of the tax rate for the preceding year applied to the latest assessed valuation;

4.1.2. water rates and charges, sewer taxes and rents and electricity and other utility charges;

4.1.3. fuel oil and liquid propane gas, if any, at the cost per gallon most recently charged to Seller, based on the supplier's measurements thereof taken within ten (10) days of the Closing Date;

4.1.4. insurance proceeds received by Seller, if any, and payable to Purchaser pursuant to Article 13 hereof to the extent not applied to repair or restore the Property in accordance with the provisions of this Agreement;

-7-

4.1.5. unopened and unused supplies purchased and not consumed for the Property, if any;

4.1.6. charges and payments under Assumed Service Contracts or permitted renewals or replacements thereof, and any deposits made thereunder, transferred to Purchaser pursuant to this Agreement except that any Cure Amounts shall be paid by Purchaser;

4.1.7. annual municipal permit and inspection fees and other fees for licenses and permits assigned to Purchaser, if any; and

4.1.8. rents and other amounts payable with respect to the Remaining Leases.

**SECTION 4.2.     Taxes and Assessments**.

4.2.1. If, on the Closing Date, all or any portion of the Real Estate shall be or shall have been affected by assessments (including Business Improvement District assessments) that are, or which may become, payable in annual installments, of which the first installment is then a charge or lien or has been paid or if any of the improvements to be paid for thereby are in place or commenced, then, for purposes of this Agreement only, the installment(s) which shall have been paid or the installment which shall be then due and payable shall be apportioned between Seller and Purchaser and all of the unpaid installments of any such assessments, including those which are to become due and payable after the date hereof, shall continue to be liens upon the Real Estate, it being understood and agreed that Seller and Purchaser shall be responsible for a pro rata share of such assessment, with Purchaser being responsible for the period from and after the Apportionment Date and Seller being responsible for the period prior to the Apportionment Date, regardless of when such installments are due and payable (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

4.2.2. To the extent that any refund of real property taxes, assessments (including Business Improvement District assessments), water rates and charges, sewer taxes and rents or any other utility made after the Closing Date is applicable to a period before the Closing Date, such refund shall be payable to Seller or returned by Purchaser to Seller, net of the actual costs incurred by Purchaser in obtaining same.

4.2.3. To the extent that any refund of real property taxes, assessments (including Business Improvement District assessments), water rates and charges or sewer taxes and rents made after the Closing Date is applicable to a period after the Closing Date, such refund shall be payable to Purchaser or returned by Seller to Purchaser, subject to the actual costs incurred by Seller in obtaining same (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

4.2.4. From and after the date of this Agreement, (a) Seller shall not, without the prior written consent of Purchaser, which consent may be granted or withheld in Purchaser's sole discretion, withdraw, compromise or settle any certiorari proceedings for any fiscal period subsequent to the period in which the Closing is to occur, and (b) Seller shall not, without the

-8-

prior written consent of Purchaser, which consent shall not be unreasonably withheld or delayed, withdraw, compromise or settle any certiorari proceedings, if any, for any fiscal period in which the Closing is to occur.  Any tax savings or refund for any year or years prior to the tax year in which the Closing herein occurs shall belong solely to Seller.  Purchaser or Seller, as the case may be, shall execute all consents, receipts, instruments and documents which may reasonably be requested in order to facilitate in instituting or settling such proceeding, as the case may be, and collecting the amount of any refund or tax savings.  The net refund of taxes, if any, for such fiscal tax year in which the Closing occurs shall be divided between Seller and Purchaser in accordance with the apportionment of taxes pursuant to the provisions hereof, after deducting therefrom a pro rata share of all reasonable expenses, including reasonable attorneys' fees reasonably and necessarily incurred in obtaining such refund.

SECTION 4.3.    **Transfer of Utilities**.  Purchaser, at its sole cost and expense, shall cause the transfer of all utility services for the Real Estate to Purchaser's name as of the Closing Date and Seller shall cooperate with Purchaser in connection therewith. If utility services shall not have been transferred to Purchaser's name for the Real Estate effective as of the Closing Date, then, at the Closing, any such charges with respect to services not so transferred shall be prorated, based upon the per diem charges obtained by using the most recent period for which readings of such utility services shall then be available. Purchaser, at its sole cost and expense, shall promptly thereafter cause such utility services to be transferred to Purchaser's name, and Seller shall cooperate with Purchaser in connection therewith.  Purchaser shall make all required deposits on account with utility companies or on account with municipalities and shall reasonably cooperate with Seller in having any deposits currently held by such companies and municipalities, returned to Seller. However, Seller shall be solely responsible for obtaining the return of its own utility company deposits, if any (provided, however, that nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

SECTION 4.4.    **Transfer Taxes**.  Seller shall be responsible (either by payment or exemption) for any real property transfer taxes, transfer gains taxes, and other similar taxes and fees imposed on Seller by the State, county or municipality in which the Real Estate is located which are imposed in connection with the sale, assignment, transfer and conveyance of the Real Estate to Purchaser as contemplated by the provisions of this Agreement (collectively, the "**Transfer Taxes**").  Seller may pay the Transfer Taxes, if any, from the Purchase Price at the Closing (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

SECTION 4.5.    **Tax Returns**.  At the Closing, Purchaser and Seller shall deliver to the Title Company a New York State Transfer Tax Return (TP-584), City of New York Real Property Transfer Tax Return (NYC-RPT) and Equalization form (RP-5217NYC) (collectively, the "**RE Tax Returns**") and deliver same to the Title Company for delivery to the appropriate authority.

SECTION 4.6.    **Title Charges**.  Purchaser shall pay the cost of Purchaser's title insurance premiums and any title search costs, the cost of updating the Survey and all recording and filing fees, including, but not limited to, those in connection with  the Deed.

-9-

**SECTION 4.7.    Transaction Expenses**.  Except as expressly provided herein, each party shall bear its own costs and expenses, including attorney, accountant and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.

**SECTION 4.8.    Arrearages**.  Rents under Remaining Leases shall be adjusted and prorated on an if, as and when collected basis.  Rents collected by Purchaser or Seller after the Closing Date from tenants or licensees who owe rents for calendar months prior to the Closing Date or for the calendar month during which the Closing Date occurs, shall be applied (1) first to all rents due and payable by such tenant or licensee for the calendar month in which the closing date occurred, (2) second to all delinquent rents due and payable by such tenant or licensee for the calendar months preceding the month in which the Closing Date occurred, and (3) third to all rents due and payable by such tenant or licensee for the calendar months following the calendar month in which the Closing Date occurred.  Each such amount, less Purchaser's collection costs (including, without limitation, reasonable attorney's fees and expenses), shall be adjusted and prorated as provided above, and the party receiving such amount shall, within five (5) Business Days, pay to the other party the portion thereof to which it is so entitled.    For purposes hereof, "rents" shall include late charges thereon. Notwithstanding anything to the contrary contained herein, Purchaser's and Seller's obligations to enforce the terms of the Remaining Leases following the Closing Date shall be as set forth in the Master Lease.  To the extent that Purchaser, as landlord under the Master Lease, enters into, or causes Seller, as tenant under the Master Lease, to enter into any termination agreement similar to the termination agreements that provide for the Termination Payments, or any other similar surrender agreement with any tenant, and such termination agreement or surrender agreement provides for the forgiveness by Purchaser, as landlord under the Master Lease, or Seller, as the tenant under the Master Lease, of rent payable by the tenant under the lease, sublease or license agreement to which such termination agreement or surrender agreement relates, then Purchaser shall within five (5) Business Days following the date of such termination agreement or surrender agreement reimburse Seller the amount of any such forgiven rent that is allocable to Seller's period of ownership of the Property; provided, that Purchaser's obligation to so reimburse Seller shall not exceed the greater of (i) $50,000 in the aggregate, and (ii) an amount equal to 75% of such forgiven rent that is allocable to Seller's period of ownership.

**SECTION 4.9.    Survival**.  The provisions of this Article 4 shall survive the Closing.

## ARTICLE 5
## COVENANTS REGARDING THE PROPERTY

**SECTION 5.1.    Maintenance and Operation of the Property**.  Subject to the restrictions imposed upon the Seller as a debtor-in-possession to pay any claims arising or otherwise relating to any period prior to the commencement of the Bankruptcy Case, and the parties understanding that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate or require the Seller to pay any amounts relating to such prepetition periods, the parties agree as follows: between the Petition Date and the Closing, Seller shall maintain and operate the Property in substantially the same manner as the Property is currently being maintained and operated and keep the Property in a condition at least as good as its condition as

-10-

of the date hereof, reasonable wear and tear excepted (it being agreed that Seller shall not be obligated to perform any capital improvements unless required by Law as a postpetition obligation of the debtor-in-possession and further provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party). Seller shall maintain the Existing Insurance (with no change in the deductibles thereunder) with respect to the Property. Seller shall use commercially reasonable efforts to keep and maintain in force and effect all existing licenses and permits affecting the Property without being obligated to pay any prepetition amounts, other than as provided in Section 3.1.1. Seller shall make all requisite filings required in connection with any rent stabilization laws or federal housing programs applicable to the Property. Seller shall promptly notify Purchaser of (i) the commencement or the express threat in writing of any legal action in any court with jurisdiction over the Property, or any administrative proceeding before any agency with jurisdiction over the Property, of which action or proceeding Seller has actual knowledge, which action or administrative proceeding, if successful, would interfere with Seller's ability to convey the Property in accordance with the provisions of this Agreement or affect the rents payable by the tenants under the Leases or otherwise materially adversely affect the Property and (ii) any other material notice affecting the Property; provided however that the foregoing shall only apply to actions or proceedings which are not stayed under section 362 of the Bankruptcy Code. Seller shall not construct any improvements upon the Property except those which Seller reasonably determines necessary because of emergency situations or to comply with Laws; provided, that before performing any capital improvement that is estimated to cost in excess of $50,000.00, Seller shall consult with Purchaser regarding the plans and specifications for such work. If Seller shall perform any capital improvements, Purchaser shall reimburse Seller at Closing for the unamortized value of such improvements which shall be amortized on a straight-line basis over the useful life of such improvement. Seller shall not hire any new employees at the Property. Seller shall terminate the employment of all Property personnel except to the extent prohibited under applicable labor Laws. Seller shall seek to terminate the Lease with Central Parking Corporation, the garage tenant, and with Metered Appliances, Inc., the laundry service provider, provided, however, Seller shall have no liability with respect to such termination, the failure of Seller to be able to negotiate such terminations, or for the failure of either or both tenants to vacate the premises occupied thereby on or before the Closing Date. Purchaser shall remain obligated to close hereunder notwithstanding the continued occupancy by such tenants. Except as set forth above, Seller shall not enter into any agreement of any kind relating to the Property, including, without limitation, any Service Contract or other contract, Lease, license agreement or any other occupancy agreement, or any agreements for the renewal, extension, amendment, modification, restatement or replacement thereof (unless required by the terms of the existing agreements), unless terminable on not more than thirty (30) days notice. Notwithstanding the foregoing to the contrary, Seller shall be permitted to enter into lease modifications with any or all of the residential tenants under the Leases, which modifications shall be substantially in the form attached hereto as Exhibit C and the rental amounts payable thereunder (net of any of the abatement described in the modification) shall be equal to the "non-employee" rental amounts shown on the Schedule of Leases attached as Schedule IV. Without limiting the foregoing, Seller shall not enter into or grant any new easements, covenants, restrictions or rights of way affecting the Property not required by law and further provided that same will not render Seller in default under any existing easements, covenants,

restrictions or rights of way affecting the Property; provided however that the foregoing shall not apply to anything which may be cured by the Sale Order. As an accommodation to Purchaser, Seller shall make the final payments under the two executed termination agreements with two of the rent stabilized tenants as noted on the Schedule of Leases attached hereto as <u>Schedule IV</u> (the "**Termination Payments**") utilizing its own funds, or if unavailable, Purchaser hereby authorizes Seller to utilize, and directs Escrow Agent to release, a portion of the Escrow Deposit to make the Termination Payments. If Seller utilizes its own funds, Seller shall receive a credit from Purchaser at Closing for the amount of the Termination Payments made by Seller. If Seller utilizes a portion of the Escrow Deposit to make the Termination Payments and Purchaser is entitled to a return of the Escrow Deposit in accordance with the terms of this Agreement, Seller shall reimburse Purchaser for the amount of the Escrow Deposit utilized by Seller at the time the balance of the Escrow Deposit is released to Purchaser by Escrow Agent.

**SECTION 5.2.    Façade Work**. To Seller's knowledge, Seller has completed all Local Law 11 façade repair work at the Property in compliance with all Laws. To Seller's knowledge, Seller's contractor has filed the necessary paperwork to obtain the sign-offs and approvals from the applicable Governmental Authority.

**SECTION 5.3.    Union Employees**. Purchaser shall not assume any obligations with respect to the union employees of the Seller under any union contracts or agreements and the Sale Order shall provide that Purchaser shall have no obligations under any such union contracts or agreements.

**ARTICLE 6**
**<u>REPRESENTATIONS AND WARRANTIES OF PURCHASER</u>**

**SECTION 6.1.    Generally**. Purchaser represents and warrants that:

6.1.1. (a) Purchaser is a duly formed and validly existing limited liability company under the Laws of the state or commonwealth of its formation and is in good standing under the Laws of the state or commonwealth of its formation and, to the extent required by Law, under the Laws of the State of New York, (b) Purchaser has the full right, authority and corporate power to enter into this Agreement, to consummate the transactions contemplated herein and to perform its obligations hereunder and under those Closing Documents to which it is a party, (c) each of the Persons executing this Agreement on behalf of Purchaser is authorized to do so, and (d) this Agreement constitutes a valid and legally binding obligation of Purchaser enforceable against Purchaser in accordance with its terms;

6.1.2. there are no legal or administrative proceedings pending or, to the best of Purchaser's actual knowledge, without investigation, threatened against or affecting Purchaser that would adversely affect Purchaser's legal authority or financial ability to perform its obligations under the Closing Documents to which it is a party;

6.1.3. the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the performance by Purchaser of its obligations hereunder and under the Closing Documents to which it is a party, do not and will not (a) violate or conflict

with any judgment, decree or order of any court or any Law or permit applicable to it, or (b) breach any provisions of, or constitute a default under, any contract, agreement, instrument or obligation to which it is a party or by which Purchaser is bound;

6.1.4. the execution and delivery of this Agreement by Purchaser does not, and the performance of its obligations hereunder and under the Closing Documents to which it is a party will not, require the consent or approval of any public authority or any other Person;

6.1.5. Purchaser represents and warrants that the individuals and/or entities set forth on Exhibit B are its sole shareholders, members or partners (as the case may be) on the date hereof (collectively, **"Purchaser's Principals"**).

6.1.6. Purchaser's Federal Tax Identification Number is 20-2695783.

**SECTION 6.2.** **Closing Conditions; Survival of Representations and Warranties.** The following are conditions precedent to the obligation of Seller to close title under this Agreement, any or all of which may at Seller's option be waived in writing:

6.2.1. Each of the representations and warranties of Purchaser set forth in this Agreement shall be deemed to have been repeated by Purchaser, at and as of the Closing Date with the same force and effect as if first made on and as of such date. It shall be a condition to Seller's obligation to close hereunder that all such representations and warranties of Purchaser be true and correct as of the Closing Date.

6.2.2. Purchaser shall have (or, with respect to obligations of Purchaser to be performed on the Closing Date, Purchaser shall be ready, willing and able to perform same on the Scheduled Closing Date) (a) delivered, or caused to be delivered, all of the Closing Documents to which it is a party and all other documents, instruments and other items required to be delivered by Purchaser at or prior to Closing (including, without limitation, pursuant to Section 9.1.2), (b) tendered the Purchase Price in accordance with the terms of this Agreement, and (c) performed in all material respects all other material obligations on Purchaser's part to be performed hereunder on or prior to the Closing Date.

6.2.3. All other conditions precedent expressly set forth herein to Seller's obligation to consummate the transaction contemplated hereby have been satisfied (or waived in writing by Seller).

6.2.4. The Bankruptcy Court shall have entered the Bidding Procedures Order.

6.2.5. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order.

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES OF SELLER

**SECTION 7.1.** **Generally**.  Seller represents and warrants that:

7.1.1. (a)   it is a duly formed and validly existing not-for-profit hospital corporation under the Laws of the state or commonwealth of its formation and is qualified to conduct and transact business and, other than as a result of the commencement of the Bankruptcy Case, is in good standing under the Laws of the State of New York, (b) subject to the entry of the Bidding Procedures Order, it has the full right, authority and power to enter into this Agreement, and, subject to the entry of the Sale Order, to consummate the transactions contemplated herein and to perform its obligations hereunder and under those Closing Documents to which it is a party all of which have been duly authorized by all necessary actions on the part of Seller, (c) each of the Persons executing this Agreement on behalf of Seller is authorized to do so, and (d) subject to the entry of the Sale Order, this Agreement constitutes a valid and legally binding obligation of Seller enforceable against it in accordance with its terms;

7.1.2.  the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance by Seller of its obligations hereunder and under the Closing Documents to which it is a party do not and will not conflict with or violate any Law, rule, judgment, regulation, order, writ, injunction or decree of any court or governmental or quasi-governmental entity having jurisdiction over Seller or any of the parties comprising Seller, including the United States of America, the State of New York or any political subdivision of either of the foregoing, or any decision or ruling of any arbitrator to which Seller or any of the parties comprising Seller is a party or by which Seller or any of the parties comprising Seller is bound or affected, or breach any provisions of, or constitute a default under, any contract, agreement, instrument or obligation to which Seller or any of the parties comprising Seller is a party or by which any of them is bound; and

7.1.3.  Seller's Federal Tax Identification Number is 13-4077996.

**SECTION 7.2.** **Property Representations**.   Seller represents and warrants to Purchaser that, as of the date hereof, with respect to the Property:

7.2.1.  subject to the entry of the Sale Order, there are no leases affecting the Property to which Seller is a party, except for the leases (the "**Leases**") as shown on the rent roll attached hereto as Schedule IV and made a part hereof (the "**Schedule of Leases**") and to all the subleases, licenses, and occupancies thereunder (for which Seller gives no representation).  The Schedule of Leases is true, correct and complete in all material respects.  The Schedule of Leases constitute all of the agreements (and all amendments, renewals, extensions and modifications thereof) which relate to, affect the occupancy of, or create rights to the occupancy of, the Property or any portion thereof other than the subleases, licenses, and occupancies thereunder (for which Seller gives no representation).  Seller has provided Purchaser with true copies of all leases affecting the Property, including any amendments or modifications thereto.

7.2.2.  To Seller's knowledge without investigation, except as set forth on the Schedule of Leases, no individual is in occupancy of the premises demised under such lease other than the named tenant and its spouse, significant other, domestic partner or family member.

7.2.3.  Except as set forth on the Schedule of Leases, to Seller's knowledge, no units are vacant, and no units are subject to any outstanding new leases, licenses or other occupancy agreements, or any lease renewal offers, except as may be required by law.

7.2.4.  Except as set forth on the Schedule of Leases, to Seller's knowledge, all tenants, licensees and other occupants of space at the Property are or were employed by Seller or its affiliates.

7.2.5.  No tenant under the Leases has been given any concession, abatement or consideration for the rental of any space except for any subsidies which may be provided by Seller or as set forth in the Leases, as same may be amended by the modifications contemplated hereunder.

7.2.6.  No tenant or other person or entity has any lease, option or agreement conferring any rights to purchase the Property or any portion thereof (including, without limitation, any rights of first refusal or rights of first offer).

7.2.7.  There are no prepaid rents under the Leases.

7.2.8.  No tenant under the Leases has any option to renew its Lease other than pursuant to renewal rights conferred by applicable rent laws or as expressly set forth in such tenant's Lease.

7.2.9.  To Seller's knowledge, there are no arrearages in the payment of any amounts due under any of the Surviving Leases except as set forth on the Schedule of Leases.

7.2.10.  Seller has not received any written or other notice of default from any tenant under the Leases which remain outstanding.

7.2.11.  To Sellers' knowledge, and except as may be the result of the commencement of the Bankruptcy Case, Seller is not in default under the Leases and Seller has not received any written or other notice of default from any tenant under the Leases.

7.2.12.  To Seller's knowledge, no tenant is in default under the Leases, except by reason of the arrearages set forth on the Schedule of Leases, if any.

7.2.13.  The only security deposits held by Seller for the account of tenants under the Leases are those listed on the Schedule of Leases.  Except as designated on the Schedule of Leases, all security deposits are in the form of cash.

7.2.14.  To Seller's knowledge, there are no proceedings under Article 7A of the NY Real Property Actions and Proceedings Laws as of the date of this Agreement.

-15-

7.2.15.  To Seller's knowledge, there are no agreements for the payment of leasing commissions in connection with the Leases.  In addition, (x) there are no brokerage commissions or tenant allowances or abatements due in connection with any of the Leases and no such commissions, tenant allowances or abatements will be due after Closing in connection with any of the Leases for the period prior to the Closing or for the period after the Closing and (y) there are no brokerage agreements affecting the Property pursuant to which any amounts remain unpaid or may become payable.

7.2.16.  To Seller's knowledge, there is no pending nor has Seller received any notice of any contemplated condemnation proceeding affecting the Real Estate or any part thereof.

7.2.17.  Annexed hereto as <u>Schedule V</u> and made a part hereof is a true and complete list of all Service Contracts entered into by Seller in effect with respect to the Property, true and complete copies of which have been delivered to Purchaser.  To Seller's knowledge, no default exists under the Service Contracts.

7.2.18.  Seller is not a "foreign person" (as defined in the Internal Revenue Code).

7.2.19.  Seller is the sole owner of the Property.

7.2.20.  Seller has not presented an offering plan regarding the Property within the last five (5) years to the New York State Attorney General and no such offering plan will be presented by the Seller to the New York State Attorney General prior to Closing.

7.2.21.  Seller has not entered into a contract of sale or other contract which authorized to act, or acknowledged that the purchaser under said prior contract of sale or other contract was authorized to act, or intended to act, as the sponsor of an offering plan or plans to convert to cooperative and/or condominium form of ownership all or any portion of the Property.

7.2.22.  To Seller's knowledge, Seller has not received any notice of any pending assessments against the Property.

7.2.23.  There are no tax certiorari proceedings or tax protest proceedings pending with respect to the Property.

7.2.24.  Annexed hereto as <u>Schedule VI</u> and made a part hereof is a correct and complete list of the types and amounts of insurance coverage maintained by Seller and in force with respect to the Property (the "**Existing Insurance**").

**SECTION 7.3.    Closing Conditions; Survival of Representations and Warranties**.  The following are conditions precedent to the obligation of Purchaser to close title under this Agreement, any or all of which may at Purchaser's option be waived in writing:

7.3.1.  Except to the extent otherwise unnecessary as a result of the Sale Order and except as may be updated by Seller in writing to maintain accuracy due to one or more factual changes arising after the date hereof (it being understood by the parties hereto that Seller

-16-

shall not have the right to update any of its representations and warranties because of a factual change arising from a breach of Seller's obligations hereunder or a prior material misrepresentation by Seller) or as otherwise noted herein, each of the representations and warranties of Seller set forth in this Agreement shall be deemed to have been repeated by Seller, at and as of the Closing Date, with the same force and effect as if first made on and as of such date. It shall be a condition to Purchaser's obligation to close hereunder that all such representations and warranties of Seller, as the same may have been so updated by Seller, be true and correct as of the Closing Date in all material respects. As used in this Section 7.3.1, "material" means that the failure of such representation to be true and correct as of the Closing Date results in a diminution in the value of the Property in excess of $1,000,000.

7.3.2. Seller shall have delivered all of the documents and other items required pursuant to Section 9.1.1 of this Agreement and shall have performed all other material covenants, undertakings and obligations herein agreed to be performed by it, and complied with all material conditions required by this Agreement to be performed or complied with by Seller at or prior to the Closing.

7.3.3. At the time of the Closing, title to the Real Estate shall be as provided in this Agreement and the Title Company shall be willing to issue fee title insurance policies in favor of Purchaser subject only to the Permitted Exceptions and as otherwise provided in this Agreement.

7.3.4. The representations, warranties and certifications of Seller set forth in this Agreement shall not survive the Closing.

7.3.5. The Bankruptcy Court shall have entered the Bidding Procedures Order.

7.3.6. Purchaser shall not have any obligations with respect to the Service Contracts other than the Assumed Service Contracts and the Sale Order shall provide that Purchaser shall have no obligations under any such Service Contracts.

7.3.7. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order or, if not final, not be subject to a stay on its effectiveness.

7.3.8. To the extent that the Sale Order requires Seller to execute, deliver and/or file Uniform Commercial Code termination statements, lien releases, discharges, financing change statements and such other documents, notices or instruments, Seller shall have executed, delivered and/or filed or authorized the Purchaser to file such termination statements, lien releases, discharges, financing change statements or other documents, notices or other instruments as the Purchaser may reasonably deem necessary to release all Non-Permitted Exceptions.

**SECTION 7.4.     Knowledge of Purchaser.**  Notwithstanding anything to the contrary contained herein, to the extent any of Seller's representations and warranties set forth in this Agreement shall be inconsistent with any Due Diligence Documents delivered to Charles Bendit and Peter Febo, then such representations or warranties shall be deemed modified as provided in such Due Diligence Documents and Seller shall not have made, nor be deemed to have made,

-17-

any misrepresentation to the extent of such inconsistency, nor be deemed to be in default hereunder by reason thereof. .

SECTION 7.5.    **Knowledge of Seller**.  Whenever a representation or warranty is made in this Agreement on the basis of the knowledge of Seller, such representation and warranty is made solely on the basis of the actual, as distinguished from implied, imputed or constructive, knowledge on the date that such representation and warranty is made, without inquiry or investigation or duty, of Jennifer Coffey and Danny Arroyo without attribution to such persons of facts or matters otherwise within the personal knowledge of any other officers, directors or employees of Seller, or third parties.

## ARTICLE 8
## CLOSING DATE

SECTION 8.1.    **Closing Date**.  The consummation of the transactions contemplated by this Agreement (the **"Closing"**) shall take place on the date (the **"Scheduled Closing Date"**) that is (a) ten (10) Business Days after the date on which the Sale Order shall become a Final Order or, if not final, not be subject to a stay on its effectiveness, provided that, if such date is not a Business Day, the Business Day immediately following such date, or (b) subject to Bankruptcy Court approval, such earlier Business Day as may be designated by Purchaser by written notice given to Seller not less than five (5) Business Days prior to such Business Day designated by Purchaser.  TIME SHALL BE OF THE ESSENCE as to the Scheduled Closing Date with respect to Purchaser's obligations hereunder, subject, however, to Purchaser's right to extend the Closing for an additional three (3) Business Days in the aggregate (the **"Final Closing Date"**) by giving notice thereof at least three (3) Business Days prior to the Scheduled Closing Date, which Final Closing Date shall be TIME OF THE ESSENCE with respect to Purchaser's obligations hereunder.  The Scheduled Closing Date, the Final Closing Date or any such other date to which the Closing may be adjourned by Seller and Purchaser pursuant to the terms of this Agreement or by mutual agreement of Seller and Purchaser (it being agreed that neither party shall have any obligation to agree to any other adjournment of the Closing except as expressly permitted pursuant to the terms of this Agreement), is referred to herein as the **"Closing Date"** (which shall be the date on which the Closing actually takes place).  The Closing shall be held at the offices of Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck, New York 11021 or at the offices of Purchaser's lender provided such offices are located in New York City or Nassau County, New York.

SECTION 8.2.    **Leaseback of Property**.  Notwithstanding anything to the contrary contained herein, in the event the Closing shall occur prior to the tenants, subtenants, licensees, or other occupants under all of the Leases vacating the units demised thereunder, Seller shall, at Purchaser's election delivered at least three (3) Business Days prior to Closing, enter into a lease covering those units that remain occupied on the Closing Date (other than with respect to the five (5) rent stabilized tenants, the garage tenant and the laundry tenant which may remain in possession at Closing but shall become direct leases with Purchaser) pursuant to the terms and conditions of a lease in substantially the form attached hereto as <u>Exhibit D</u> and made a part hereof (the "**Master Lease**").  In the event Purchaser elects not to cause Seller to enter into the Master Lease, Purchaser shall accept title to the Property subject to any Leases and the occupancies thereunder as of the Closing Date and the continued occupancy of the Property

-18-

after the Closing Date pursuant to the occupants under the Leases shall not be deemed a default of any of Seller's obligations hereunder and shall in no event permit Purchaser to extend the Closing Date nor reduce the Purchase Price, except as expressly set forth above. In the event the Master Lease is entered into by the parties, after the Closing, the Leases as shown on the rent roll attached hereto as Exhibit B to the Master Lease shall be deemed subleases under the Master Lease and all representations of Seller hereunder shall be so modified; provided however that the Sale Order shall provide that such subleases are not assumed by Seller and shall not otherwise become administrative obligations of Seller's bankruptcy estate.

**SECTION 8.3.    IT Lease**.  Seller, and its successors and/or assigns, shall be permitted to lease a portion of the Property consisting of the existing computer room located on the retail level of the Property totaling approximately 2,000 rentable square feet of space from the Closing Date through and including December 31, 2010 at no cost to Seller (the "**IT Lease**").  Purchaser shall provide electricity and air conditioning to the computer room throughout the term of the IT Lease and Seller shall reimburse Purchaser for its allocable share of the cost of such services.  In addition, Seller and its successors and/or assigns shall have 24/7 access to the computer room and shall be permitted to station a security guard at the Property to monitor the computer room. Purchaser acknowledges that the computer room houses a computer backup system which is required in connection with the operation of the U.S. Family Health Plan program administered by Seller and the continued operation of the computer backup system is an integral part of the operation of such program.  Accordingly, Purchaser acknowledges that it shall use commercially reasonable efforts to not disturb the operation of the computer backup system. Purchaser and Seller shall enter into an agreement at Closing to memorialize the IT Lease in form and substance reasonably acceptable to Purchaser and Seller.  Seller shall maintain general liability insurance coverage with respect to Seller's use of the computer room in amounts reasonably satisfactory to Purchaser during the term of the IT Lease.  The provisions of this Section 8.3 shall survive the Closing.

### ARTICLE 9
### CLOSING DOCUMENTS

**SECTION 9.1.    Closing**.

9.1.1.  At the Closing, contemporaneously with Purchaser's delivery to Seller of all of the Closing Documents required to be delivered by Purchaser hereunder, Seller shall deliver or cause to be delivered to Purchaser, duly executed by Seller in recordable form, where applicable, those Closing Documents to be delivered by Seller as set forth on <u>Schedule VII</u> attached hereto and made a part hereof.

9.1.2.  At the Closing, contemporaneously with Seller's delivery to Purchaser of all of the Closing Documents required to be delivered by Seller hereunder, Purchaser shall deliver or cause to be delivered to Seller those Closing Documents to be delivered by Purchaser, duly executed by Purchaser in recordable form, where applicable, as set forth on <u>Schedule VIII</u> attached hereto and made a part hereof (the documents described in this Section 9.1.1 and in Section 9.1.2 and all other documents required to be delivered hereunder are referred to collectively as the **"Closing Documents"**).

**SECTION 9.2.** **Further Assurances**. Seller and Purchaser each agree, at any time and from time to time at or after the Closing, to execute, acknowledge where appropriate, and deliver or cause to be executed, acknowledged and delivered such further instruments and documents and to take such other action as the other of them or the Title Company may reasonably request to carry out the intents and purposes of this Agreement. The provisions of this Section 9.2 shall survive the Closing.

**ARTICLE 10**
**NOTICES**

**SECTION 10.1.** **Notices.** Any notice, demand or request required or permitted to be given under this Agreement (collectively, "**Notices**") must be in writing and given to the party to whom or which such notice is being sent, (a) by nationally recognized overnight delivery service with receipt acknowledged in writing or (b) by hand delivery, against a signed receipt, in each case, addressed as follows:

| | |
|---|---|
| If to Seller, to: | Saint Vincents Catholic Medical Centers of New York<br>Office of Legal Affairs<br>130 West 12th Street<br>New York, NY 10011<br>Attention: Chief Legal officer |
| with a copy to: | Saint Vincents Catholic Medical Centers of New York<br>Corporate Real Estate Services<br>130 West 12th Street<br>New York, NY 10011 |
| with a copy to: | Garfunkel Wild, P.C.<br>111 Great Neck Road, Suite 503<br>Great Neck, New York 11021<br>Attention:  Robert A. Wild, Esq. |
| -and- | |
| | Kramer Levin Naftalis & Frankel LLP<br>1177 Avenue of the Americas<br>New York, New York  10036<br>Attention:  Adam C. Rogoff, Esq |
| If to Purchaser, to: | TIP Acquisitions, LLC<br>c/o Taconic Investment Partners, LLC<br>111 Eighth Avenue, Suite 1500<br>New York, New York 10011<br>Attention: Mr. Charles Bendit |

| with a copy to: | Fried, Frank, Harris, Shriver & Jacobson LLP |
| | One New York Plaza |
| | New York, New York 10004 |
| | Attention: Jonathan L. Mechanic, Esq. |
| | |
| If to Escrow Agent, to: | Fidelity National Title Insurance Company |
| | One Park Avenue |
| | New York, New York 10016 |
| | Attention: Thomas A. Glatthaar, Esq. |

In the event of overnight delivery or by hand delivery, notices shall be deemed effective on the next Business Day following deposit with the delivery service or following the day of such hand delivery against appropriate receipt. From time to time either party may designate another or additional addresses for all purposes of this Agreement by giving the other party no less than ten (10) days' prior notice of such change of address in accordance with the provisions of this Article 10. Each party's counsel shall have the right to deliver notices on behalf of its client and any such notice shall be effective as if sent by such party.

## ARTICLE 11
## BROKER

Seller and Purchaser each represents and warrants to the other that it has not dealt with any broker, agent or any other Person in connection with the transaction contemplated by this Agreement other than Sierra Realty Corporation (the "**Purchaser's Broker**") and Grubb & Ellis New York, Inc. (the "**Seller's Broker**"). Purchaser hereby indemnifies Seller and holds Seller harmless from and against any and all claims for commission, fee or other compensation by Purchaser's Broker and any other Person other than Seller's Broker who shall claim to have represented or dealt with Purchaser in connection with this Agreement and for any and all costs incurred by Seller in connection with such claims, including reasonable attorneys' fees and disbursements. The Sale Order shall provide that Purchaser shall have no liability for any and all claims for commission, fee or other compensation by Seller's Broker and any Person other than Purchaser's Broker who shall claim to have represented Seller in connection with this Agreement. Purchaser agrees to pay the commission due to the Purchaser's Broker in connection with this transaction pursuant to a separate agreement. Subject to approval of the Bankruptcy Court, Seller agrees to pay the commission due to the Seller's Broker, if any, in connection with this transaction pursuant to a separate agreement as and when allowed by order of the Bankruptcy Court. The provisions of this Article 11 shall survive the Closing or the sooner termination of this Agreement.

## ARTICLE 12
## DEFAULTS; REMEDIES

**SECTION 12.1. Purchaser's Default**. If Seller shall have performed all of its obligations under this Agreement in all material respects and all conditions to Purchaser's obligation to proceed with the Closing shall have been satisfied in all material respects or

waived, and if Purchaser shall (a) fail or refuse to close as required by the terms of this Agreement, or (b) otherwise be in default hereunder, which default shall continue for five (5) Business Days after written notice to Purchaser, the parties hereto agree that the damages that Seller would sustain as a result thereof would be substantial, but would be difficult to ascertain. Accordingly, the parties hereto agree that in the event of such default, failure or refusal by Purchaser, Seller's sole remedy (except as hereinafter provided) shall be to terminate this Agreement and retain the Escrow Deposit in which event Escrow Agent shall deliver the Escrow Deposit to or at the direction of Seller, in which event Purchaser and Seller shall have no further rights or obligations under this Agreement, except those expressly provided herein to survive the termination of this Agreement. Nothing contained in this Section shall limit or diminish Purchaser's obligations or liabilities under Sections 11 and 18.11 hereof.

SECTION 12.2. **Seller's Default**. If Purchaser shall have performed all of its obligations under this Agreement and all conditions to Seller's obligation to proceed with the Closing shall have been satisfied or waived, and if Seller shall (a) fail or refuse to close as required by the terms of this Agreement or (b) otherwise be in default hereunder, which default shall continue for five (5) Business Days after written notice from Purchaser to Seller thereof, then Purchaser shall be entitled: (1) to terminate this Agreement and receive a return of the Escrow Deposit or (2) to seek specific performance by Seller of its obligations under this Agreement provided, however, that Purchaser may only pursue such specific performance after the entry of the Sale Order approving the transactions contemplated by this Agreement. If Purchaser shall not have commenced an action for specific performance within forty-five (45) days after the Schedule Closing Date, Purchaser shall have waived such right and shall have been deemed to have elected clause (1) above. Purchaser expressly agrees however, that Purchaser shall not have the right to seek or recover any actual, consequential or punitive damages or any similar additional sums or amounts against Seller for any breach occurring prior to Closing. Nothing herein shall limit or diminish Seller's obligations or liabilities under Article 11 or Section 18.11 hereof.

## ARTICLE 13
## CASUALTY; CONDEMNATION

SECTION 13.1. **Casualty**. Notwithstanding anything to the contrary at law or otherwise, Purchaser and Seller acknowledge and agree that in the event at the time of Closing, all or any portion of the Property shall be damaged (whether or not such damage or casualty is covered by insurance), Purchaser shall have no right or ability to cancel or terminate this Agreement and Purchaser shall be required to consummate the transactions contemplated hereby and proceed to Closing without abatement of the Purchase Price; it being acknowledged, however, that in the event that the Property is materially damaged by fire or the elements or by any cause beyond either party's control and Seller shall not have restored the same by Closing, Purchaser shall have the right, upon notice to Seller delivered within ten (10) days after Purchaser obtained the knowledge thereof, not to consummate the transactions contemplated hereby, in which event this Agreement shall be terminated and of no further force and effect, the Escrow Deposit shall be returned to Purchaser and neither of the parties hereto shall have any rights or obligations to the other hereunder except those expressly stated to survive the termination of this Agreement. In the event Purchaser shall fail to timely deliver such notice of termination, Purchaser shall be obligated to consummate the transaction contemplated hereunder

-22-

and Seller shall have no obligation to perform any repairs to the Property. Purchaser shall be entitled to receive all insurance proceeds (after deducting any reasonable costs which Seller actually incurred to obtain such proceeds, including reasonable attorneys' fees and disbursements and any out-of-pocket costs of restoration actually incurred by Seller to preserve the life or safety of the occupants at the property or as required by Law) in connection with any such casualty which occurs prior to the Closing Date and Purchaser shall receive a credit against the Purchase Price in the amount of any deductible under Seller's insurance (Seller hereby assigning to Purchaser all of Seller's right, title and interest in and to any such net insurance proceeds). For the purposes of this Section 13.1 "materially damaged" shall mean damage to the Property which would cost more than $4,800,000.00 to restore.

**SECTION 13.2. Condemnation**. If, prior to the Closing, all or a Material Part (as hereinafter defined) of the Property is taken by eminent domain, Purchaser may, by notice to Seller given within ten (10) Business Days after notice to Purchaser of the taking, elect to cancel this Agreement. In the event that Purchaser shall so timely elect, the Escrow Deposit shall be paid to Purchaser and neither of the parties hereto shall have any rights or obligations to the other hereunder except those expressly stated to survive the termination of this Agreement. Unless this Agreement is so canceled, or if less than a Material Part of the Property is taken by eminent domain, this Agreement shall remain in full force and effect in which event Seller shall, on the Closing Date, and upon receipt of the balance of the Purchase Price, pay to Purchaser any sums of money collected by Seller as an award for any taking by eminent domain, after deducting any reasonable amount which Seller may have agreed or been obligated to pay in obtaining such award, including reasonable attorneys' fees and disbursements. Seller shall not negotiate, compromise, or settle any such award without Purchaser's prior consent, which consent shall not be unreasonably withheld, conditioned or delayed. In addition, Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any portion of any condemnation award not yet received by Seller. For purposes of this Section 13.2, **"Material Part"** shall mean a taking of more than ten (10%) percent of the Property. The provisions of this Article 13 are intended to constitute an "express provision to the contrary" within the meaning of Section 5-1311 of the New York General Obligations Law.

## ARTICLE 14
## AS-IS; WHERE-IS;
## DISCLAIMER; WAIVER OF CLAIMS

**SECTION 14.1. Disclaimers; As-Is, Where-Is Condition.**

14.1.1. PURCHASER ACKNOWLEDGES THAT IT IS A SOPHISTICATED PURCHASER, WITH EXPERIENCE IN OWNING AND OPERATING REAL PROPERTY IN THE NATURE OF THE PROPERTY. PURCHASER REALIZES THE NATURE OF THIS TRANSACTION, UNDERSTANDS AND IS FREELY TAKING ALL RISKS, IF ANY, INVOLVED IN CONNECTION WITH THIS TRANSACTION AND ACKNOWLEDGES THAT THE SAME IS REFLECTED IN THE PURCHASE PRICE AND THE TERMS UPON WHICH PURCHASER IS WILLING TO PURCHASE AND SELLER IS WILLING TO SELL.

14.1.2.  EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, THE PROPERTY IS BEING SOLD BY SELLER AND PURCHASER AGREES TO ACCEPT THE PROPERTY IN "AS-IS" AND "WHERE-IS" CONDITION ON THE DATE HEREOF SUBJECT TO REASONABLE WEAR AND TEAR AND SELLER'S OBLIGATIONS HEREIN TO MAINTAIN THE PROPERTY AS PROVIDED FOR IN THIS AGREEMENT.   PURCHASER ACKNOWLEDGES, REPRESENTS AND WARRANTS THAT (I) PURCHASER HAS HAD AN OPPORTUNITY TO MAKE AN INDEPENDENT INVESTIGATION AND EXAMINATION OF THE PROPERTY (AND ALL MATTERS RELATED THERETO), AND TO BECOME FULLY FAMILIAR WITH THE PHYSICAL AND ENVIRONMENTAL CONDITION OF THE PROPERTY, AND (II) EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER AND SELLER-RELATED PARTIES HAVE NOT MADE AND SHALL NOT MAKE ANY VERBAL OR WRITTEN REPRESENTATIONS, WARRANTIES OR STATEMENTS OF ANY NATURE OR KIND WHATSOEVER TO PURCHASER, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO THE ABOVE, AND, IN PARTICULAR, EXCEPT AS EXPRESSLY SET FORTH HEREIN, NO REPRESENTATIONS OR WARRANTIES HAVE BEEN MADE OR SHALL BE MADE WITH RESPECT TO (A) THE PHYSICAL CONDITION OR OPERATION OF THE PROPERTY, INCLUDING THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR CONDITIONS THEREON (INCLUDING PRESENCE OF ASBESTOS OR ASBESTOS-CONTAINING MATERIALS OR THE RELEASE OR THREATENED RELEASE OF HAZARDOUS SUBSTANCES), (B) THE REVENUES OR EXPENSES OF THE PROPERTY, (C) THE ZONING AND OTHER LEGAL REQUIREMENTS APPLICABLE TO THE PROPERTY OR THE COMPLIANCE OF THE PROPERTY THEREWITH, (D) THE NATURE AND EXTENT OF ANY MATTER AFFECTING TITLE TO THE REAL ESTATE OR TO ANY PERSONALTY, (E) THE QUANTITY, QUALITY, OR CONDITION OF THE PERSONALTY, OR (F) ANY OTHER MATTER OR THING AFFECTING OR RELATING TO THE PROPERTY, OR ANY PORTION THEREOF, THE INTERESTS THEREIN TO BE CONVEYED TO PURCHASER PURSUANT TO THE TERMS OF THE TRANSACTIONS CONTEMPLATED HEREBY.

14.1.3.  EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLER HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY, ORAL OR WRITTEN, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW OR OTHERWISE, WITH RESPECT TO THE MATTERS REFERRED TO IN SECTION 14.1.2 ABOVE AND ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IN RESPECT TO THE PROPERTY. PURCHASER DECLARES AND ACKNOWLEDGES THAT THIS EXPRESS DISCLAIMER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND IS REFLECTED IN THE CONSIDERATION PAYABLE BY PURCHASER HEREUNDER AND, AS AN INDUCEMENT FOR SELLER TO PROCEED WITH THIS TRANSACTION, PURCHASER FURTHER DECLARES AND ACKNOWLEDGES THAT THIS DISCLAIMER HAS BEEN BROUGHT TO THE ATTENTION OF PURCHASER AND EXPLAINED IN DETAIL AND THAT PURCHASER HAS VOLUNTARILY AND KNOWINGLY CONSENTED THERETO.

**SECTION 14.2.  Acceptance of Closing Documents; Waivers**.  Except for those matters expressly set forth in this Agreement to survive the Closing and except for the

agreements of Seller and Purchaser set forth in the Closing Documents or otherwise entered into at the Closing, Purchaser's acceptance of the Deed and the other Closing Documents shall be and be deemed to be an acknowledgment by Purchaser that Seller has fully performed, discharged and complied with all of Seller's obligations, covenants and agreements hereunder to be performed prior to Closing and that Seller shall have no further liability with respect thereto.

**SECTION 14.3. Survival**. The provisions of this Article 14 shall survive the Closing.

**ARTICLE 15**
**ACCESS**

**SECTION 15.1. Inspection of Property.** During the period between the date hereof and Closing, Purchaser and its authorized agents, employees, representatives, partners, investors, officers, consultants, appraisers, insurers, lenders and attorneys, as well as the agents, employees and representatives of any of the foregoing, shall be entitled to enter upon the Property at all reasonable times upon reasonable prior notice and accompanied by an agent of Seller for purposes of performing non-invasive inspections, tests and studies thereon, including, but not limited to, (a) conducting non-invasive environmental surveys, tests and investigations; and (b) non-invasive evaluating the physical condition of the Property, provided that Purchaser:

(i) shall, except to the extent of their own negligence or misconduct, indemnify, defend and hold Seller and Seller-Related Parties free and harmless from and against all liabilities, damages, suits, obligations, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) asserted against or incurred by Seller and/or Seller-Related Parties arising out of or in connection with any acts of Purchaser, its agents, employees and representatives, in connection with any such inspections;

(ii) shall promptly repair any damage resulting from any such inspections;

(iii) shall fully comply with all laws, ordinances, rules and regulations in connection with any such inspections and any reasonable rules of Seller;

(iv) shall not permit any inspections, investigations or other due diligence activities to result in any liens, judgments or other encumbrances being filed against the Property and shall, at its sole cost and expense, promptly discharge of record any such liens or encumbrances that are so filed or recorded;

(v) shall not permit any borings, drillings or samplings to be done without the prior written consent of Seller, which consent shall not be unreasonably withheld or delayed;

(vi) shall maintain, with insurance companies reasonably satisfactory to Seller, a policy of comprehensive general public liability insurance of at least $5,000,000.00, with a broad form contractual liability endorsement covering Purchaser's indemnification obligations hereunder and which shall be reasonably satisfactory to Seller in all respects (certificates of which shall be given to Seller prior to the first entry on the Property); and

-25-

(vii) shall be solely responsible for the payment of all costs incurred by Purchaser in connection with any such inspection(s). Purchaser agrees that it hereby indemnifies and holds Seller harmless from and against any and all claims, liabilities, fees, suits, damages, losses, penalties, costs and expenses (including attorneys' fees and disbursements and court costs) arising or resulting from, or in connection with, directly or indirectly, Purchaser's entry onto the Property or conduct of any such inspection, other than Seller's administrative costs, if any, incurred in facilitating Purchaser's entry or inspection.

15.1.2. Purchaser shall have the right to perform or cause to be performed minimal samplings of materials located at the Property, provided that such samplings are taken, performed and conducted by a licensed environmental testing/inspection service, subject to procedures reasonably approved by Seller and in compliance with all Laws, and provided further that no asbestos containing material (**"ACM"**), other than the amounts removed for testing, shall be disturbed or released; in the event that any ACM is disturbed or released, Purchaser, at its sole cost and expense, shall immediately take all remedial and corrective action.

15.1.3. Purchaser agrees that such inspections, studies, appraisals, and reviews, materials, books, reports and records (including, but not limited to, any of the foregoing which are provided to Purchaser by Seller) examined by or on behalf of Purchaser with respect to the Property (collectively, the **"Inspection Materials"**) shall (i) be held in strict confidence by Purchaser and Purchaser's representatives, employees, agents, lenders and investors, (ii) not be used for any purpose other than the investigation and evaluation of the Property by Purchaser and Purchaser's representatives, employees, agents, lenders and investors, and (iii) not be disclosed, divulged or otherwise furnished to any other person or entity except to Purchaser's agents or as required by law.

15.1.4. Purchaser shall not have the right to terminate this Agreement as of a result of any of its inspections, tests, studies and due diligence hereunder or for any reason whatsoever except as otherwise explicitly set forth elsewhere in this Agreement.

**SECTION 15.2. Review of Documents relating to the Property.** During the period between the date hereof and the Closing Date, Seller agrees to allow Purchaser and its authorized agents, employees, representatives, partners, investors, officers, consultants, appraisers, insurers, lenders and attorneys, as well as the agents, employees and representatives of any of the foregoing, to inspect and, at Purchaser's sole cost and expense, make copies of, at reasonable times and upon reasonable advance written notice, all documents and other materials, including the title documents, plans, surveys, plans and specifications, tax bills, utility bills, building permits, certificates of occupancy, books, records, operating statements, environmental reports, rent rolls, files, notices or correspondence with respect to the Property, all other records, statements and accounts in Seller's and Seller's managing agent's possession or control relating to the Property and the operation thereof, if any, and any other documents required to be delivered under this Agreement (collectively, the **"Documents"**), if any, which are in Seller's or Seller's managing agent's possession. Purchaser agrees that the Documents are proprietary and confidential in nature and will be delivered solely to assist Purchaser in connection with this transaction. If this Agreement is terminated for any reason, Purchaser shall return to Seller all Documents upon Seller's written request.

-26-

15.2.1.  The provisions of this Article 15 shall survive the Closing or the earlier termination of this Agreement.

## ARTICLE 16
## ESCROW

**SECTION 16.1.  Escrow Terms**.  The Escrow Deposit shall be held in escrow by Escrow Agent in accordance with the terms of the Escrow Agreement.

## ARTICLE 17
## BANKRUPTCY COURT MATTERS

**SECTION 17.1.  Competing Bids.**

17.1.1.  This Agreement is subject to entry by the Bankruptcy Court of the Bidding Procedures Order and Seller's obligation to consummate the transaction contemplated hereunder is subject to approval by the Bankruptcy Court by entry of the Sale Order and the consideration by Seller of higher or otherwise better competing bids as provided in the Bidding Procedures Order (each, a "**Competing Bid**").  If one or more Competing Bids are received, Seller shall conduct a competitive sale of the Property in accordance with Bidding Procedures and the Bidding Procedures Order (the "**Sale**").  Purchaser will not be given copies of the Competing Bids, but will be given every reasonable opportunity to increase its bid to provide the highest or otherwise best offer for the Property, provided that every bid submitted by Purchaser is a binding bid in accordance with the Bidding Procedures.

17.1.2.  Seller is permitted to cause its representatives, agents and affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person (in addition to Purchaser and its affiliates, agents and representatives) in connection with any sale or other disposition of all or any part of the Property.  In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Property and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Property to prospective purchasers.

**SECTION 17.2.  Approval of Break-Up Fee**.  In the event that Seller does not consummate the transaction contemplated by this Agreement with Purchaser by reason of Seller's acceptance or selection, and the Bankruptcy Court's approval, of a Competing Bid (provided the Purchaser is not in default of this Agreement and is ready, willing and able to close), in consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, Purchaser shall be entitled to receive a break-up fee in an amount equal to $870,000.00, which includes up to $150,000.00 in expenses (the "**Break-Up Fee**").  The Break-Up Fee shall be due and payable to Purchaser upon consummation of a transaction resulting from a Competing Bid, and shall only be payable from the proceeds of such a transaction.  Purchaser acknowledges that, notwithstanding the fact that a Competing Bid may be selected and such bidder may obtain the right to purchase the Property, in the event that Purchaser shall constitute the only Backup Bidder (as defined in the form of Bidding Procedures), Purchaser shall proceed and shall be prepared to close the transaction in

accordance with the terms of this Agreement in the event that such prevailing bidder shall fail to close on the acquisition of the Property; provided, however, that Purchaser shall be relieved of any such obligations, this Agreement shall terminate, the Escrow Deposit shall promptly be returned to Purchaser and neither party shall have any further rights or obligations hereunder except such rights and obligations that are expressly stated in this Agreement to survive the termination hereof upon the earlier to occur of (i) the consummation of the sale transaction with the prevailing bidder or (ii) sixty (60) days following the date of the Sale Order unless Seller shall provide written notice to Purchaser prior to such sixtieth (60th) day that the prevailing bidder has failed to close and that Purchaser shall be obligated to proceed to Closing within ten (10) days after the delivery of such written notice and otherwise in accordance with the terms of this Agreement. The provisions of this Agreement regarding the payment of the Break-Up Fee shall be subject to the approval of the Bankruptcy Court and the terms of such approval shall be expressly stated in the Bidding Procedures Order. The Bidding Procedures Order shall expressly reserve the rights of Seller and its prepetition mortgagees to modify the bid procedures to maximize the value of the Property; however, such modifications shall not include the right to modify the terms on which the Break-Up Fee will be paid or the time during which Purchaser must remain obligated to close hereunder as the Backup Bidder.

**SECTION 17.3. Bankruptcy Court Filings**. As promptly as practicable following the execution of this Agreement and the commencement of the Bankruptcy Case, and in any event no later than five (5) business days after the commencement of the Bankruptcy Case, Seller shall file a motion seeking the approval of the Bankruptcy Court of the sale of the Property, and the entry by the Bankruptcy Court of the Bidding Procedures Order approving the payment of the Break-Up Fee and subsequent entry of the Sale Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and the Bidding Procedures Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. Seller shall use commercially reasonable efforts to obtain the entry of the Bidding Procedures Order and Sale Order as soon as practicable following the date hereof; provided, however, Seller will not be requesting relief from the Bankruptcy Court on shortened time nor making motions to shorten due process or notice requirements. This Agreement shall terminate, the Escrow Deposit shall promptly be returned to Purchaser and neither party shall have any further rights or obligations hereunder except such rights and obligations that are expressly stated in this Agreement to survive the termination hereof in the event that (i) the Bidding Procedures Order is not entered on or prior to the expiration of a 30 day period following the filing of the Sale Motion and/or (ii) the Sale Order is not entered on or prior to the expiration of the 90 day period following the entry of the Bidding Procedures Order.

**SECTION 17.4. Notice of Sale**. Notice of the sale of Property contemplated in this Agreement shall be served in accordance with the Bidding Procedures Order.

# ARTICLE 18
## MISCELLANEOUS

**SECTION 18.1.  Entire Agreement**.  This Agreement, the Exhibits and Schedules annexed hereto, and any contemporaneously executed agreements, are the entire agreement between Seller and Purchaser concerning the sale of the Property and all understandings and agreements heretofore had or made between the parties hereto are merged in this Agreement which, together with aforementioned agreements and other items, alone fully and completely expresses the agreement of the parties hereto.

**SECTION 18.2.  Modification**.  Except as otherwise provided herein, this Agreement may not be changed, modified, supplemented or terminated, except by an instrument executed by the parties hereto which are or will be affected by the terms of such change, modification, supplement or termination. Either party hereto may waive any of the terms and conditions of this Agreement made for its benefit, provided such waiver is in writing and signed by the party waiving such term or condition.

**SECTION 18.3.  Binding Agreement**.  Subject to the provisions of this Agreement, the terms, covenants, agreements, conditions, representations and warranties contained in this Agreement shall inure to the benefit of and be binding upon the respective parties hereto. This Agreement shall not inure to the benefit of or be enforceable by any other Person.

**SECTION 18.4.  Assignment**.  Without the express written consent of Seller, this Agreement may not be assigned by Purchaser, including any assignment by operation of law. Except as provided for hereunder, any assignment by Purchaser without Seller's prior written consent shall be deemed null and void <u>ab</u> <u>initio</u> and shall be a material default entitling Seller, at its option, to exercise any of its powers, privileges, rights or remedies under this Agreement or at law or in equity.  Notwithstanding the foregoing, Purchaser shall have the right, after giving written notice to Seller, to assign this Agreement to any corporation, limited liability company or a partnership, provided that any such assignee is affiliated with the Purchaser.  For purposes of this Section 18.4, **"affiliated"** means, as to any designated person or entity, any other person or entity which controls, is controlled by or is under common control with, such designated person or entity and **"control"** (and with correlative meaning, **"controlled by"** and "under common control with") means ownership and control by Purchaser, directly or indirectly, of 51% or more of the stock, partnership interests or other beneficial ownership interests of the entity in question and the power to direct the management and affairs of such entity (provided, however, that the Purchaser named herein may own less than 51% of any such entity and still be deemed in control if (x) it has at least a 15% capital or beneficial interest in such entity and either the Purchaser named herein or an entity controlled by the Purchaser named herein serves as the operating or managing partner or member of such entity (subject to such approvals over major decisions as is customary with majority equity investments).  Such written notice shall include the name and address of such entity, and shall set forth all shareholders and officers, in the event such assignee is a corporation, all members, in the event such assignee is a limited liability company, or all partners, both general and limited, in the event such assignee is a partnership, and the percentage ownership of each of such shareholders, members or partners, and Purchaser shall also be obligated to provide such other information or documentation as Seller may deem appropriate in connection with any such assignment.  Any such assignee shall

assume all duties and obligations of Purchaser pursuant to this Agreement; provided, however, that any such assignment of Purchaser's interest in this Agreement shall not relieve the original Purchaser of any duties, obligation or liabilities hereunder.  Any change in control of Purchaser or of any of the direct or indirect ownership interests in Purchaser, at any level or tier of ownership, whether in one transaction or a series of transactions, shall constitute an assignment for purposes of this Section 18.4.  Notwithstanding the foregoing, Purchaser may not assign its interest in this Agreement to any entity unless such entity can satisfy the requirements of adequate protection of future performance for the assignment of any contracts or leases as required by section 365 of the Bankruptcy Code.

SECTION 18.5.  **No Press Releases**.  Intentionally Omitted.

SECTION 18.6.  **Illegality**.  If any term or provision of this Agreement or the application thereof to any Person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by Law.

SECTION 18.7.  **Choice of Law**.  EXCEPT IN SUCH MATTERS AS ARE GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES ANNEXED HERETO, SHALL BE GOVERNED BY, INTERPRETED UNDER, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

SECTION 18.8.  **Construction**.  The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement. Unless stated to the contrary, all references to Articles, Sections, paragraphs or clauses herein shall be to the specified Article, Section, paragraph or clause of this Agreement, and all references to Exhibits and Schedules shall be to the specified Exhibits and Schedules attached hereto. All Exhibits and Schedules attached hereto are made a part hereof. All terms defined herein shall have the same meaning in the Exhibits and Schedules, except as otherwise provided therein. All references in this Agreement to "**this Agreement**" shall be deemed to include the Exhibits and Schedules attached hereto. The terms "**hereby**", "**hereof**", "**hereto**", "**hereunder**" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used. Whenever in this Agreement provision is made for the payment of attorneys' fees, such provision shall be deemed to mean reasonable attorneys' fees and paralegals' fees. The term "**including**" when used herein shall mean "**including, without limitation**." Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.

SECTION 18.9.  **Binding Effect; Assignment; Successors and Assigns.**  This Agreement shall apply to, be binding in all respects upon and inure to the benefit of the parties

and their respective successors, administrators and permitted assigns. A successor to Seller shall include Seller as a reorganized debtor. Except to the extent provided for in Section 18.4 of this Agreement, no assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of Law or otherwise) without the prior written consent of Purchaser and Seller and any attempted assignment without the required consents shall be void. No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors, administrators and permitted assigns.

SECTION 18.10. **Ambiguities**. Each party acknowledges that it and its counsel have reviewed this Agreement, and the parties hereby agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

SECTION 18.11. **Expenses**. If any legal action or other proceeding is brought for the enforcement of this Agreement or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover its fees and costs, including reasonable attorneys' fees, court costs and other costs incurred in such action or proceeding, in addition to any other relief to which it or they may be entitled. The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

SECTION 18.12. **Counterparts**. This Agreement may be executed in counterparts, each of which together shall be deemed to be an original and all of which shall constitute one and the same Agreement. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

SECTION 18.13. **Waiver of Trial by Jury**. THE RESPECTIVE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

SECTION 18.14. **Third Party Beneficiaries**. Except as expressly set forth herein, no Person other than the parties hereto, shall have any rights or claims under this Agreement.

SECTION 18.15. **Jurisdiction**.

18.15.1. FOR THE PURPOSES OF ANY SUIT, ACTION OR PROCEEDING INVOLVING THIS AGREEMENT, PURCHASER AND SELLER EACH

HEREBY EXPRESSLY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT AND PURCHASER AND SELLER EACH AGREES THAT SUCH COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY SUCH SUIT, ACTION OR PROCEEDING COMMENCED BY EITHER PARTY.

18.15.2. PURCHASER AND SELLER EACH HEREBY IRREVOCABLY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT BROUGHT IN ANY FEDERAL OR STATE COURT SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK AND HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

18.15.3. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

**SECTION 18.16. Seller's Constituents**.  Intentionally Omitted.

**SECTION 18.17. Purchaser's Constituents**.  Intentionally Omitted.

**SECTION 18.18. No Recording**.  Purchaser covenants and agrees that it has no right and in no event will Purchaser record or cause to be recorded this Agreement or any memorandum hereof or affidavit, assignment or other document relating to this Agreement and, if Purchaser breaches the provisions of this Section, Seller shall have the option of terminating this Agreement and retaining the Escrow Deposit as liquidated damages in addition to any other rights or remedies that Seller may have.

**SECTION 18.19. Not an Offer**.  Notwithstanding anything herein to the contrary, it is to be strictly understood and agreed that (a) the submission by Seller to Purchaser of any drafts of this Agreement or any correspondence with respect thereto shall (i) be deemed submission solely for Purchaser's consideration and not for acceptance and execution, (ii) have no binding force or effect, (iii) not constitute an option for the purchase of the Property or a lease or conveyance of the Property by Seller to Purchaser and (iv) not confer upon Purchaser or any other party any title or estate in the Property, (b) the terms and conditions of this Agreement shall not be binding upon either party hereto in any way unless and until it is unconditionally executed and delivered by both parties in their respective sole and absolute discretion and all conditions precedent to the effectiveness thereof including, but not limited to, the delivery of the Escrow Deposit to Escrow Agent, shall have been fulfilled or waived, and (c) if this Agreement is not so executed and delivered for any reason whatsoever (including, without limitation, either party's willful or other refusal to do so or bad faith), neither party shall be liable to the other with respect to this Agreement on account of any written or parole representations, negotiations, any legal or equitable theory (including, without limitation, part performance, promissory estoppel, or undue enrichment) or otherwise.

**SECTION 18.20. Failure of Deposit**.  If the payment made on account of the Escrow Deposit is by check, and if such check fails collection in due course, Seller, at its option, may

declare this Agreement null, void and of no force and effect, and may pursue its remedies against Purchaser upon such check or in any other manner permitted by law, such remedies being cumulative.

**SECTION 18.21. No Waiver**.  The failure of either party hereto to seek redress for any breach, or to insist upon the strict performance, of any covenant or condition of the Agreement by the other shall not be, or be deemed to be, a waiver of the breach or failure to perform (unless the time specified herein for the exercise of such right, or satisfaction of such condition, has expired), nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms hereof from constituting a default hereunder.

**SECTION 18.22. Severability**.  If any term, condition or provision of this Agreement or the application thereof to any circumstance or party hereto, is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement and the applicability of such term, condition or provision to other persons or circumstances shall not be affected thereby.  Each term, condition or provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

**SECTION 18.23. No Survival**.  The delivery and acceptance of the deed at the Closing shall be deemed to constitute full compliance by Seller with all of the terms, conditions and covenants of this Agreement on Seller's part to be performed, and, except as expressly set forth in this Agreement, the representations, warranties, covenants or other obligations of Seller set forth in this Agreement shall not survive the Closing, and no action based thereon shall be commenced after the Closing.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.
SIGNATURES FOLLOW ON THE NEXT PAGE.**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

SELLER

SAINT VINCENTS CATHOLIC MEDICAL
CENTERS OF NEW YORK

By: _____
    Name:
    Title:

PURCHASER

TIP ACQUISITIONS LLC

By: _____
    Name:
    Title:

**For a copy of any non-confidential exhibits or schedules to the Purchase and Sale Agreement, please contact Joseph A. Shifer, Esq. of Kramer Levin Naftalis & Frankel LLP at (212) 715-9100 or via email at jshifer@kramerlevin.com.**