KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------- x
In re:                                    :   Chapter 11
                                          :
SAINT VINCENTS CATHOLIC MEDICAL           :   Case No. 10-11963 (CGM)
CENTERS OF NEW YORK, et al.,              :
                                          :
                         Debtors.         :   Jointly Administered
-------------------------------------------------- x
```

**EXPEDITED MOTION OF THE DEBTORS FOR AN ORDER PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS TO (I) ENTER INTO NEW REAL PROPERTY LEASE AGREEMENTS FOR CLINICS LOCATED AT THE O'TOOLE BUILDING; (II) ESTABLISH NOTICE PROCEDURES RELATED TO THE ENTRY OF ADDITIONAL REAL PROPERTY LEASES; (III) APPROVE NEW LEASES WITH MOUNT SINAI AND ST. LUKE'S-ROOSEVELT NUNC PRO TUNC TO MAY 28, 2010; (IV) SELL CERTAIN DE MINIMIS ASSETS RELATED TO THE DEBTORS' HIV CLINIC, AND (V) ENTER INTO CERTAIN MEDICAL RECORDS CUSTODY AGREEMENTS RELATED TO THE DEBTORS' HIV CLINIC**

THE HONORABLE CECELIA G. MORRIS,
UNITED STATES BANKRUPTCY JUDGE:

Saint Vincents Catholic Medical Centers of New York ("**SVCMC**") and certain

of its affiliates, as chapter 11 debtors and debtors in possession (each a "**Debtor**" and

collectively, the "**Medical Centers**" or the "**Debtors**")[1] in the above-referenced chapter 11 cases

---

[1] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation

(the "**Chapter 11 Cases**"), hereby move on an expedited basis (the "**Motion**") pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "**Bankruptcy Code**") for an order, substantially in the form attached hereto as **Exhibit A**, authorizing the Debtors to (i) enter into new non-residential real property lease agreements with qualified new sponsors of the clinics located at the Debtors' building at 26 West Seventh Avenue, New York, New York (the "**O'Toole Building**"); (ii) establish notice procedures for entry of new lease agreements related therewith without further Court approval; (iii) enter into new lease agreements with The Mount Sinai Hospital ("**Mount Sinai**") and The St. Luke's-Roosevelt Hospital Center ("**SLR**")[2] *nunc pro tunc* to May 28, 2010; (iv) sell certain *de minimis* assets related to the pharmacy at HIV Clinic to SLR free and clear of liens, claims and encumbrances; and (v) enter into certain patient, research and prescription records custody agreements with Mount Sinai and SLR in connection with the HIV Clinic.  In support of the Motion, the Debtors respectfully represent as follows:

## SUMMARY OF RELIEF REQUESTED

1.     One of the urgent matters commanding the Debtors' attention is the orderly transition of the Hospital's various outpatient clinics and programs.  This essential task not only preserves continuity of patient care – a critical mission of the Medical Centers – but also avoids the attendant costs to the estates from the disruption and closure of these healthcare services.  In certain instances, outpatient clinical programs run by the Debtors are being taken over by other hospital providers based upon their arrangements with the physicians and staff at these clinics.  As a result of previous arrangements, the physicians and staff of the Debtors'

---

d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc.  There are certain affiliates of SVCMC who are not Debtors.

[2]  Term sheets outlining the material provisions of the lease agreements with Mount Sinai and SLR are attached hereto as **Exhibit C** and **Exhibit D**, respectively.

Comprehensive HIV Center (the "**HIV Clinic**") – located at the O'Toole Building – have been hired partly by Mount Sinai and partly by SLR, which will both be opening up new clinics serving patients who have previously visited the HIV Clinic.  In order to avoid any disruption in healthcare services provided to patients, or to the other clinical programs located in the O'Toole Building, and at the request of the new sponsors of these new clinics, the Debtors have been negotiating short-term leases[3] of space in the O'Toole Building while the new sponsors prepare to relocate these new clinics to different facilities.  As a result, the Debtors seek approval to enter into Lease Agreements (defined below) with qualified third parties who will be operating these clinics at the O'Toole Building.

2.     While the Debtors seek authorization to enter into new leases using a form agreement from time to time[4] as needed to facilitate the operation of clinical programs by new operators, at this time, the Debtors have fully executed substantially similar lease agreements with both with Mount Sinai and SLR for space located within the O'Toole Building.  Accordingly, the Debtors seek authorization to enter into these Lease Agreements *nunc pro tunc* to May 28, 2010.  The Lease Agreements, which expressly provide that the Debtors have the right to terminate the leases on 90-days' notice (which notices may be given at any time after November 30, 2010), are intended to be temporary solutions for the operation of these clinics.  The 90-day termination provisions contained in the Lease Agreements will ensure that the Lease

---

[3]  The Debtors have coordinated these negotiations and a review of the Lease Agreements with the professionals for the Creditors' Committee (defined below) and the post-petition DIP Lender.  While the Creditors' Committee's professionals have been involved in the review of the lease terms with Mount Sinai and SLR, the Debtors understand that the members of the Committee have not, as of the date hereof, fully considered the relief requested in the Motion and/or determined what formal position, if any, to take on the Motion.

[4]  At the present time, the Debtors are in discussions with a potential new sponsor for certain other outpatient services located at the O'Toole Building (such as the Debtors' behavioral health outpatient clinic).  In order to alleviate the burden on the Court and parties of filing a virtually identical motion if and when an agreement is reached for the transitioning of such clinic(s), the Debtors seek approval of the notice procedures described herein.

Agreements will not adversely affect the value of the Debtors' real estate as part of any future real estate disposition and is an integral part of the Debtors' agreement to enter into any short-term leases.

3.      Furthermore, there is certain inventory previously used by the Debtors and located at their clinics, which has little value to the Debtors' estates but could be used by the new sponsors of the new clinics.  As such, the Debtors seek permission, (i) as part of their Lease Agreements, to license the use of certain furniture, fixtures and equipment to the tenant and (ii) to sell certain *de minimis* assets to SLR related to the HIV Clinic's pharmacy (including the Debtors' interests in operating the pharmacy and the pharmaceuticals), free and clear of all liens, claims and encumbrances.  By leasing and/or selling these *de minimis* assets, the Debtors will be providing these new HIV clinic operators with the tools and equipment they will need to immediately begin new clinic operations without any interruption or disruption in service to patients.  It also alleviates any burden on the estates from removing and otherwise disposing of such assets.

4.      Finally, in order to minimize the administrative expense and burden on the Debtors' estates associated with maintaining the patient, research, and prescription records of the HIV Clinic that will be transferred, the Debtors intend to enter into certain custody agreements with Mount Sinai and SLR.  Pursuant to these agreements, the new operators would assume custody of, and responsibility for, the Debtors' applicable patient, research and prescription records.[5]

### JURISDICTION AND VENUE

---

[5]   The Debtors have coordinated with the Consumer Privacy Ombudsman and the Patient Care Ombudsman regarding the medical and research records custody agreements.

5.     The Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

6.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.     The statutory predicate for the relief requested herein is section 363(b) of the Bankruptcy Code.

## GENERAL BACKGROUND

8.     On April 14, 2010 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The cases are being jointly administered for procedural purposes.

9.     The Debtors are operating their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

10.     On April 21, 2010, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "**Creditors' Committee**").

## THE MEDICAL CENTERS' HISTORY AND BUSINESS

11.     Founded by the Sisters of Charity in 1849, the Medical Centers are the only remaining Catholic-sponsored, acute-care hospital network in New York City.  Dedicated to fulfilling a charitable healthcare mission, the Medical Centers are committed to a mission that demands they give "Respect, Integrity, Compassion and Excellence to all who come to us in need, especially the poor."

12.     Until recently, the Medical Centers' core business centered around St. Vincent's Hospital Manhattan (the "**Hospital**"), which is located in the Greenwich Village section of Manhattan.  The Medical Centers operate numerous other services, including a

behavioral health facility, nursing homes, continuing care facilities, a hospice, a home health agency and a military health plan serving active duty dependents, retirees, and their families. Additionally, the Medical Centers operated certain physician-related affiliates, which provide specialized care across 14 clinical departments, and were affiliated with 18 licensed behavioral health and community medicine programs and six ambulatory care providers in Manhattan.

13. SVCMC and its then debtor and non-debtor affiliates emerged from Chapter 11 in the summer of 2007 subject to over $1 billion of liabilities. After emergence, management attempted to increase their revenue, improve their operations, and reduce costs. Despite these efforts, however, the Medical Centers' revenue remained constant, and the Debtors incurred operating losses of approximately $43 million in 2008 and approximately $64 million in 2009. In 2008 and 2009, the Hospital alone had operating losses of approximately $81 and $107 million, respectively.

14. The Medical Centers' poor operating results stem from four principal causes.

- The Hospital's large operating footprint and staffing are not properly aligned with the current state of its business, as significant changes in the healthcare industry have reduced the number of hospital admissions. While certified as a 727-bed hospital, and burdened with all of the attendant costs of a larger physical facility, the Hospital, in 2009, used only approximately 340 beds on a daily basis.

- The Medical Centers' patient mix and reimbursement experience limited their revenues. The Hospital had one of the lowest percentages of higher margin private patients of all private Manhattan hospitals and the highest percentage of Medicare and self-pay (i.e., uninsured) discharges per year. In addition, approximately 56% of the Hospital's inpatient admissions came through its Emergency Department, which is required by law to treat patients without regard to their ability to pay. Moreover, as a stand-alone healthcare provider, the Medical Centers have been unable to negotiate reimbursement rates that are competitive with other private area hospitals.

- The profound financial crisis that has gripped New York and the rest of the Nation over the last several years has magnified the financial

challenges faced by the Medical Centers. In an effort to balance their budgets, New York State and the federal government have repeatedly reduced hospital reimbursement rates over the last several years, a change that disproportionately impacts the Medical Centers because they have a higher government payor population than other New York medical centers.

- The financial and other obligations assumed in connection with the Prior Chapter 11 Plan resulted in annual payment obligations that exceeded what the current Hospital operations could bear.

15. By the end of 2009, the Debtors faced a severe cash crisis. In response, the Board appointed a Special Restructuring Committee in December 2009, hired a chief restructuring officer in late January and other restructuring professionals shortly thereafter, and took steps to cut costs and assess their restructuring alternatives. Despite these efforts, however, the Debtors' liquidity crisis deepened. By early February 2010, only emergency funding provided by their prepetition lenders and the State of New York enabled the Debtors to make payroll and stave off an immediate bankruptcy filing.

16. The Debtors used the respite provided by this emergency financing, subsequent financial assistance from their prepetition lenders, the State of New York, the Sisters of Charity and a Board member, and wage concessions by employees to explore options for preserving their businesses' long-term viability and maximizing the value of their assets. Among other things, the Debtors worked to identify and negotiate with potential new sponsors to preserve operations at the Hospital and potential purchasers for their non-Hospital services and assets. While these efforts led to the entry of non-binding letters of intent for the sale of certain non-Hospital services, they did not yield a transaction that will support the continued operation of the Hospital. Despite an extensive marketing process and several serious indications of interest, negotiations concerning the last potential transaction terminated on March 31, 2010. When it became clear that all potential partners had withdrawn from consideration, the Debtors

concluded that the continued operation of the Hospital was no longer a viable option.

17.     As a result, on April 6, 2010, the Board of Directors of SVCMC voted to approve the closure of the Hospital and the transfer or closure of the outpatient programs and clinics associated with and operated by the Hospital.  In accordance with New York State law, the Debtors submitted their proposed plan of closure on April 9, 2010 (the "**Closure Plan**") (as such may be amended from time to time) to the DOH for approval.  Prior to the Petition Date, the Debtors commenced the process of implementing their Closure Plan.  By orders dated April 16, 2010 and May 14, 2010, the Court authorized the Debtors to continue implementation of the Closure Plan during their Chapter 11 Cases.

## THE CLINICS

18.     The Debtors presently operate certain outpatient clinical programs at the O'Toole Building.  These Clinics include: the HIV Clinic (which includes an infectious disease clinic), the O'Toole Multispecialty Clinic (covering approximately 30 different specialties), the Community Medicine clinic (which includes a Rape Crisis program), various behavioral health clinics and certain other private practices (collectively, the "**Clinics**").

19.     As a part of the closure of the Manhattan Hospital, the Clinics need to be transitioned to new operators; failing such transition, they will be closed to the direct detriment of patients and the Community.  In certain instances, the medical staff running these Clinics have been in discussions (or have entered into agreements) with new hospital providers to take over or open new programs.  For example, Mount Sinai and SLR have reached agreement to hire various members of the medical staff of the Debtors' HIV Clinic to form their own newly-sponsored clinics, which are not a continuation of the Debtors' existing clinics.

20.     As discussed in greater detail below, by this Motion, the Debtors seek to

facilitate the opening of these new clinics by entering into new leases and, with respect to the Debtors' HIV Clinic, selling or leasing certain *de minimis* assets.

**RELIEF REQUESTED**

21.    By this Motion, the Debtors request the entry of an Order, pursuant to sections 105(a) and 363 of the Bankruptcy Code, authorizing the Debtors to: (i) enter, from time to time, into a Form Lease Agreement (defined below) with new qualified sponsors of the Clinics in accordance with certain notice procedures outlined below; (ii) enter into negotiated lease agreements with Mount Sinai and SLR; (iii) sell or transfer certain *de minimis* assets related to the Debtors' HIV Clinic to SLR free and clear of liens, claims and encumbrances; and (iv) enter into medical and research records custody agreements with Mount Sinai and SLR in connection with the HIV Clinic.

***The Proposed Lease Agreements***

22.    In order to facilitate the opening of the newly-sponsored Clinics located at the O'Toole Building, the Debtors propose to enter into new lease agreements with qualified sponsors by utilizing a form of lease agreement that is substantially similar to the form attached hereto as **Exhibit "B"** (the "**Form Lease Agreement**").   The material terms of the Form Lease Agreement are as follows:

| | |
|---|---|
| **Expiration Date:** | June 30, 2011 |
| **Early Termination:** | On 90 days prior notice |
| **Fixed Rent:** | $26.15/SF/annum |
| **Hours of Operation:** | 7:00 a.m. to 7:00 p.m. |
| **Operating Expenses:** | $36.26/SF/annum |
| **Utilities/Services:** | Tenant's pro-rata share of utility and service costs are included Operating Expenses. |

| | |
|---|---|
| **HVAC:** | Landlord shall furnish building standard office heating, ventilating, air condition, and cooling during the hours of 7:00 a.m. and 7:00 p.m. Monday through Friday, excluding holidays. |
| **Landlord's Work:** | None |
| **Access:** | Tenant shall have access to the Premises 24 hours per day, seven days per week, 365 days per year. |
| **Capital Improvements:** | Landlord has certain limited obligations with respect to making capital improvements as set forth in the Lease. |
| **Sublease and Assignment:** | Tenant shall not have the right to sublease all or any portion of the Premises or to assign the lease without Landlord's consent except to affiliates. |
| **Security Deposit:** | 2 monthly installments of Fixed Rent and Operating Expenses. |

23.     At this time, the Debtors have negotiated lease agreements with both with Mount Sinai and SLR for space located within the O'Toole Building relating to the opening of new clinics and seek to entry into these leases *nunc pro tunc* as of May 28, 2010.  The material terms of the proposed lease agreement with Mount Sinai (the "**Mount Sinai Lease Agreement**") are set forth in **Exhibit C** and the material terms of the proposed lease agreement with SLR (the "**SLR Lease Agreement**" and together with the Mount Sinai Lease Agreement and the Form Lease Agreement, the "**Lease Agreements**") are set forth in **Exhibit D**.  *Each lease agreement is substantially similar to the Form Lease Agreement.*[6]  As noted above, neither Mount Sinai nor SLR are taking over the Debtors' HIV Clinic.  Instead, having hired certain medical staff that previously worked at the HIV Clinic, both hospitals are opening new and independent clinics serving the needs of HIV and other patients.

***Entry into the Lease Agreements is a Reasonable Exercise***
***Of the Debtors' Business Judgment***

---

[6]  Copies of the executed versions of the Mount Sinai Lease Agreement and the SLR Lease Agreement have not been filed because of privacy concerns relating to ongoing negotiations with other potential tenants.  However, executed copies have been provided to counsel for the Creditors' Committee and counsel to the Debtors' post-petition DIP lenders.

24.     Section 363(b)(l) of the Bankruptcy Code empowers the Court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(l).  A debtor's decision to lease assets outside the ordinary course of business must be based upon its sound business judgment.  See Official Comm. of Unsecured Creditors of LTV Aerospace and Defense Co. v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from the evidence presented a good business reason to grant such application); see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); In re Global Crossing Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (same); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that standard for determining a section 363(b) motion is "good business reason").

25.     The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).  In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts generally will not entertain objections to the debtor's conduct."  Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts in this jurisdiction have consistently been reluctant to interfere with corporate decisions absent a showing of bad faith, self-interest or gross negligence, and have upheld such decisions as long as they are attributable to any "rational business purpose."  Integrated Res., 147 B.R. at

656 (stating that "courts are loath to interfere with corporate decisions absent a showing of bad faith, self interest or gross negligence") (citations omitted).

26.     The Debtors submit that entry into the Lease Agreements represents a sound exercise of their business judgment.

27.     <u>First</u>, absent a new sponsor taking over the operations of the Debtors' various Clinics, the Medical Centers will be compelled to close these Clinics.  This would not only be detrimental to patient care, but would also result in the estates incurring additional administrative expenses relating to the orderly closure of these outpatient Clinics and any delays in obtaining approval from the DOH to do so.  In the case of Mount Sinai and SLR, their opening new clinics permits the Debtors to proceed to close their existing clinic in coordination with DOH oversight.

28.     <u>Second</u>, while a closure of the Clinics could result in an economic burden to the estates, entering into the leases will actually supplement the estates through the value of the rental income to be provided by the Lease Agreements.  Notably, as discussed above, the Lease Agreements provide for a fixed rent of $26.15 per square foot per annum plus payment on account of operating expenses of $36.26 per square foot per annum.  These revenues will not only defray some of the costs otherwise borne by the Debtors in preserving their real estate assets, but also provides additional revenue to the estates and their postpetition operations.  The Debtors request permission to apply the net rents (i.e., after payment of the costs of providing the services under the Lease Agreements and operating the O'Toole Building) to the repayment of their prepetition senior secured debt or otherwise use the funds as permitted by their DIP Loan facility.

29.     <u>Third</u>, the Debtors, in consultation with their senior secured lenders and the professionals for the Creditors' Committee,[7] have sought to address the concern that entering into the Lease Agreements could impair the estates' future marketing efforts for the owned real estate, including the O'Toole Building.  As such, the Debtors have negotiated that the Lease Agreements are terminable upon 90 days' prior written notice after November 30, 2010.  The Lease Agreements also contain a requirement that, if the non-debtor tenant fails to move out and surrender possession of the leased premises upon termination, the fixed rent and additional rent will increase by 100%.  In addition, the non-debtor tenant will be liable for, and will indemnify the Debtors against, any payment or concessions, any loss of the benefit of the bargain and any claim for damages by any new tenant and/or any purchaser or any prospective purchaser of the O'Toole Building by reason of the non-debtor tenants' failure to move out and surrender possession of the lease premises.  These integral parts of the Lease Agreements protect the estates' interests in the owned real estate.  The Debtors believe that these termination rights and rent increases will permit the Debtors to obtain value for the premises while they are marketing these assets during the chapter 11 cases but will not detrimentally affect the value of their real estate because the Lease Agreements are all terminable upon 90 days' notice.

30.     In light of these considerations, the Debtors, in accordance with their sound business judgment, seek authority to enter into the Lease Agreements.

## *The Notice Procedures are Reasonable and in the Best Interests of the Estates*

31.     In order to transition any additional Clinic(s) in a timely, efficient and cost-effective manner, the Debtors seek the authority to enter into other lease agreements for

---

[7] As noted above, while the professionals for the Creditors' Committee have been involved in the review of the Lease Agreements, as of the date of the Motion, the members of the Creditors' Committee have not determined what position, if any, to take on the Motion.

space at the O'Toole Building, substantially in the form of the Form Lease Agreement, with new

qualified sponsors without further Court approval.[8]    In furtherance thereof, the Debtors

respectfully request approval of the following notice procedures (the "**Notice Procedures**"):

(a)     The Debtors will serve notice of its intention to enter into a lease agreement (the "**Lease Agreement Notice**"), substantially in the form attached hereto as **Exhibit E**, by facsimile, overnight delivery or hand delivery on the following parties: (a) the U.S. Trustee; (b) counsel for the Debtors' postpetition DIP lenders; and (c) counsel to the Creditors' Committee (collectively, the "**Interested Parties**").  The Lease Agreement Notice shall attach a blacklined copy of the proposed lease agreement, which shall be substantially similar to the Form Lease Agreement and shall show the changes to the Form Lease Agreement.

(b)     Interested Parties shall have **seven** days from service of the Lease Agreement Notice (the "**Objection Period**") to serve any objections to the entry into a lease agreement (an "**Objection**"). Any Objection must (i) be in writing (which writing may be delivered electronically), (ii) state with specificity the grounds for the Objection and (iii) be served upon the counsel to the Debtors and the Interested Parties, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the final day of the Objection Period.  Upon request of an Interested Party, but subject to any exigencies of the transfer of the clinical services, the Debtors will agree to a reasonable adjournment of the deadline for one or more Interested Parties to serve an Objection and to attempt to resolve any Objections.

(c)     The Lease Agreement Notice will include the following information: (i) a description of the leased space and the clinic operated therein; (ii) the identity of the lease counterparty; (iii) a description of any material economic terms or conditions that materially deviate from the Form terms and conditions of the Form Lease Agreement; and (iv) instructions regarding the procedures to assert an Objection.  If no Objection is filed and served consistent with these procedures, the Debtors may enter into the noticed Lease Agreement.  No further notice or Court approval shall be required.

(d)     If an Interested Party files and serves an Objection by the Objection Deadline, the Debtors and such objecting party will use good faith efforts to resolve the Objection consensually.  If the

---

[8]   The Debtors are not requesting permission to lease space in any of their other owned real estate by this Motion.

Debtors and the objecting party are unable to resolve the Objection consensually, the Debtors will not enter into the proposed lease agreement without first obtaining Court approval, upon notice and a hearing to be scheduled by the Debtors at their sole discretion on no less than five days notice to the Interested Parties.

(e)     The Debtors may enter into a lease agreement substantially in the form of the Form Lease Agreement prior to expiration of the applicable Objection Period if the Debtors first obtain the written consent of each Interested Party (which writing may be delivered electronically).

32.     Section 105(a) of the Bankruptcy Code provides, in relevant part, that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The Debtors submit that implementation of the proposed Notice Procedures is appropriate in these Chapter 11 Cases and well within the Court's equitable powers under section 105(a) of the Bankruptcy Code. The proposed Notice Procedures are necessary to the efficient administration of the Debtors' estates because they provide the Debtors with a mechanism by which they can transition a Clinic in a timely, efficient, and cost-effective manner. Where such a transition is possible, it not only serves to reduce the administrative and financial burdens on the estates, but, more importantly, it facilitates a continuity of patient care – a core Mission of the Medical Centers.

33.     The Debtors submit that the process contemplated in the Notice Procedures is an exercise of their sound business judgment, is in the best interests of the estates and their creditors, and is authorized pursuant to sections 105(a) and 363(b) of the Bankruptcy Code. Obtaining Court approval prior to entering into each such Form Lease Agreement would result in unnecessary administrative costs attendant to drafting, serving, and filing pleadings, as well as time incurred by attorneys for Court appearances. As set forth above, the major creditor

constituencies will be provided with notice, copies of the executed leases and an opportunity to be heard if there are any objections.

***The Sale of the De Minimis Assets is a Reasonable Exercise of the Debtors'***
***Business Judgment and the Assets Should be Transferred Free and Clear***

34.     The Debtors also seek to sell certain *de minimis* assets to SLR relating to the HIV Clinic's pharmacy operations.   These assets (the "**Pharmacy Assets**") include: the Debtors' interests in operating the pharmacy, all pharmacy inventory, the pharmacy records and other *de minimis* assets located in the pharmacy, including the pharmacy's furniture, fixtures and equipment.  The purchase price is the aggregate of $90,000 plus reimbursement of the Debtors' cost of the pharmacy inventory (based upon an actual inventory taking) for an aggregate cost estimated to be approximately $290,000 (subject to the amount of inventory sold).  The sale will be evidenced by the entry of a bill of sale (the "**Bill of Sale**") in a form substantially similar to the form attached hereto as **Exhibit F**.

35.     Bankruptcy Code section 363(b) governs transactions involving property of the debtor's estate outside the ordinary course of business. As noted above, that section provides, in relevant part, that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b).

36.     As noted above, under applicable case law, a transaction must represent a reasonable exercise of business judgment on the part of the debtor in possession to be approved under section 363(b) of the Bankruptcy Code. See, e.g., In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 772 F.2d 1063, 1071 (2d Cir. 1983). See also In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) ("the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in

good faith and in the honest belief that the action was in the best interests of the company'") (quoting <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985).

37.     Pursuant to section 363(f) of the Bankruptcy Code, the Court may authorize the sale of assets free and clear of liens, claims, and encumbrances if any of the following conditions are satisfied:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); <u>see</u> <u>In re Smart World Tech., LLC</u>, 423 F.3d 166, 169 n.3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests.  It thus allows purchasers . . . to acquire assets [from a debtor] without any accompanying liabilities."); <u>In re Dundee Equity Corp.</u>, No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.").

38.     Here, section 363(f)(2) of the Bankruptcy Code is satisfied as to those parties that consent or do not object to the proposed transfer of the Debtors' interests in the Pharmacy Assets.  In addition, all parties-in-interest will be given sufficient opportunity to object to the relief requested in this Motion, and any such entity that does not object should be deemed to have consented.  <u>See</u> <u>FutureSource LLC v. Reuters Ltd.</u>, 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest

holder, and lack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); In re Enron Corp., 2004 WL 5361245 at *2 (Bankr. S.D.N.Y. 2004) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).

39. Section 363(f)(5) of the Bankruptcy Code is also satisfied. Any entity that is holding a lien, claim or encumbrance against the Pharmacy Assets could be compelled to accept a monetary satisfaction of such interest. Furthermore, the Debtors propose that any interest in the transferred assets shall attach to the net proceeds resulting from the transfer of the Debtors' interests in the Pharmacy Assets, subject to any claims and defenses the Debtors may possess with respect thereto, in the priority they had before the transfer. As such, the transfer of the Debtors' interests in the Pharmacy Assets free and clear of all interests satisfies section 363(f)(5) of the Bankruptcy Code.

40. The Pharmacy Assets have little on-going value to the estates. They represent pharmaceutical and other miscellaneous inventory used by the HIV Clinics or used furniture, fixtures and equipment located at the premises to be leased. The Debtors believe that the sale of the Pharmacy Assets free of claims and encumbrances will maximize any value of these assets. In addition, the sale of the Pharmacy Assets provides the Debtors' estates with additional cash and eliminates administrative and other costs associated with relocating and

disposing of the Pharmacy Assets. The Debtors therefore submit that selling the Pharmacy Assets to SLR is a reasonable exercise of the Debtors' sound business judgment. Accordingly, the Debtors' interests in the Pharmacy Assets should be transferred to SLR free and clear of all liens, claims and encumbrances.

### *Extraordinary Provisions Of The Proposed Sale Order*

41. Pursuant to General Order M-383 of the United States Bankruptcy Court for the Southern District of New York, dated November 18, 2009, establishing this Court's Guidelines for the Conduct of Asset Sales (the "**Sale Guidelines**"), the Debtors are required to highlight any "extraordinary provisions" in a separate section of a motion seeking to sell estate assets. The extraordinary provisions are as follows:

    (a)    Private Transfer. For the reasons discussed herein, the Debtors are seeking to transfer the Pharmacy Assets without holding an auction. The Debtors submit that such relief is appropriate under the circumstances.

    (b)    Relief from Bankruptcy Rule 6004(h). The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy Rule 6004(h). The Debtors submit that such relief is appropriate under the circumstances.

    (c)    Records Retention. To the extent any medical, pharmacy or research records related to the HIV Center are not transferred to Mount Sinai and SLR, subject to further order of the Court and the Debtors' rights under the Bankruptcy Code, the Debtors will comply with their obligations under applicable nonbankruptcy law to retain custody and management over these records.

    (d)    Use of Proceeds. The Debtors propose that the net proceeds of the transfer of their interests in the Pharmacy Assets will be transferred to the lenders under the Debtors' pre-petition credit facility.

### *Entry into the Medical Records Custody Agreements is a Reasonable Exercise Of the Debtors' Business Judgment*

42. The Debtors also seek authority to enter into a various custody agreements with Mount Sinai and SLR concerning (i) patient medical records, (ii) clinical study and research records and (iii) pharmacy prescription records (collectively, the "**Records**").

43.     In connection with the transfer of patient medical records, the Debtors seek authority to enter into a "**Medical Records Custody Agreement**" with both Mount Sinai and SLR in substantially the form attached hereto as **Exhibit G**.   The Medical Records Custody Agreement effectuates the transfer of patient medical records and relieves the Debtors' estates from the burden of storing such records for a lengthy period of time as required by applicable non-bankruptcy law.   In addition, as part of the Medical Records Custody Agreement to be entered into with Mount Sinai, the Debtors seek to transfer certain computer equipment and servers owned by the Debtors and used to maintain such records.  This equipment is old and has little or no value other than for the continued storage of the patient records.  Mount Sinai has agreed to maintain, use and acquire such equipment and continue to provide access to the medical records as set forth more fully in its Medical Records Custody Agreement.

44.     Furthermore, in connection with the transfer of clinical study and other research records, the Debtors seek authority to enter into a "**Research Records Custody Agreement**" with both Mount Sinai and SLR in substantially the form attached hereto as **Exhibit H**.   The Research Records Custody Agreement effectuates the transfer of clinical study and research records and relieves the Debtors' estates from the burden of storing such records for a lengthy period of time as required by applicable non-bankruptcy law.

45.     Finally, in connection with the transfer of the Pharmacy Assets to SLR, the Debtors seek authority to enter into a "**Pharmacy Records Custody Agreemen**t" with SLR in substantially the form attached hereto as **Exhibit I**.  Similar to the other agreements indicated above, the Pharmacy Records Custody Agreement effectuates the transfer of pharmacy prescription records and relieves the Debtors' estates from the burden of storing such records for a lengthy period of time as required by applicable non-bankruptcy law.

46.     The Debtors submit that entry into the Medical Records Custody Agreements, Research Records Custody Agreement and the Pharmacy Records Custody Agreement (collectively, the "**Custody Agreements**") represents a sound exercise of their business judgment.  The Custody Agreements are necessary to (i) effectuate the transfer of the confidential and sensitive Records and (ii) protect the Debtors' estates form the administrative burden of maintaining Records for the lengthy period of time required by applicable nonbankruptcy law.

47.     To ensure that the Records are properly transferred, the Debtors will provide the Consumer Privacy Ombudsman and the Patient Care Ombudsman with notice of this Motion and a copy of the Custody Agreements.  Additionally, the Debtors agree to cooperate with the Consumer Privacy Ombudsman and the Patient Care Ombudsman to provide each with information that will be reasonably requested.  Accordingly, entry into the Custody Agreements is a sound exercise of the Debtors' business judgment and should be approved.

### *Waiver of 14-Day Stay Under Bankruptcy Rule 6004(h) is Appropriate*

48.     Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing a sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of such order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  The Debtors believe that such waiver is appropriate here with respect to the relief requested herein for the reasons set forth in this Motion.  As noted above, both Mount Sinai and SLR are in a position to take over the operations at the HIV Clinic as of May 28, 2010.  The ability of the Debtors to facilitate the transfer the operations of its Clinics, and essentially, to transfer to qualified third

parties the ability to provide patient care on an immediate basis is critical to preserving the high quality services offered by the Clinics to their patients.

## NOTICE

49.     No trustee or examiner has been appointed in the Chapter 11 Cases.  In accordance with the Final Administrative Order Establishing Case Management and Scheduling Procedures (the **"Case Management Order"**), entered on May 13, 2010, notice of this Motion has been given to the parties identified on the General Service List and the Special Service List (as such terms are identified in the Case Management Order) as well as Mount Sinai and SLR. The Debtors submit that no further notice of the Motion need be given.

50.     No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Order granting the relief requested and such other or further relief as is just.

Dated: New York, New York
          May 27, 2010

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/  Adam Charles Rogoff
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

*Counsel for Debtors and Debtors in Possession*

**Exhibit A**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
                                   :

In re:                           :          Chapter 11
                                   :

SAINT VINCENTS CATHOLIC MEDICAL  :        Case No. 10-11963 (CGM)
CENTERS OF NEW YORK, <u>et al</u>.,         :
                                   :

                    Debtors.    :          Jointly Administered
                                   :
---------------------------------------------------------- X

**ORDER PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE
AUTHORIZING THE DEBTORS TO (I) ENTER INTO NEW REAL PROPERTY
LEASE AGREEMENTS FOR CLINICS LOCATED AT THE O'TOOLE BUILDING; (II)
ESTABLISH NOTICE PROCEDURES RELATED TO THE ENTRY OF ADDITIONAL
REAL PROPERTY LEASES; (III) APPROVE NEW LEASES WITH MOUNT SINAI
AND ST. LUKE'S- ROOSEVELT _NUNC PRO TUNC_ TO MAY 28, 2010; (IV) SELL
CERTAIN DE MINIMIS ASSETS RELATED TO THE DEBTOR'S HIV CLINIC, AND
(V) ENTER INTO CERTAIN MEDICAL RECORDS CUSTODY AGREEMENTS
<u>RELATED TO THE DEBTORS' HIV CLINIC</u>**

Upon the Motion (the "**<u>Motion</u>**")[1] of Saint Vincents Catholic Medical Centers of

New York ("**<u>SVCMC</u>**") and certain of its affiliates, as Chapter 11 debtors and debtors in

possession (each a "**<u>Debtor</u>**" and collectively, the "**<u>Debtors</u>**")[2] in the above-referenced Chapter

11 cases (the "**<u>Chapter 11 Cases</u>**") for an order, substantially in the form attached hereto as

**<u>Exhibit A</u>**, authorizing the Debtors to (i) enter into new non-residential real property lease

agreements with qualified new sponsors of the clinics located at the Debtors' building at 26 West

Seventh Avenue, New York, New York (the "**<u>O'Toole Building</u>**"); (ii) establish notice

---

[1] Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion.

[2] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii)
Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort
Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home,
Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation
d/b/a Holy Family Home; and (viii) and SVCMC Professional Registry, Inc. There are certain affiliates of SVCMC
who are not Debtors.

procedures for entry of new lease agreements related therewith without further Court approval; (iii) enter into new lease agreements with The Mount Sinai Hospital ("**Mount Sinai**") and The St. Luke's-Roosevelt Hospital Center ("**SLR**") *nunc pro tunc* to May 28, 2010; (iv) sell certain *de minimis* assets related to the pharmacy at HIV Clinic to SLR free and clear of all liens, claims and encumbrances; and (v) enter into certain patient, research and prescription records custody agreements with Mount Sinai and SLR in connection with the HIV Clinic; and the Court having subject matter jurisdiction to consider the Motion and the relief request therein pursuant to 28 U.S.C. § 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.); and the Motion being a core proceeding under 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance with the Case Management Order to the parties identified on the General Service List and the Special Service List; and no other or further notice needing to be provided; and the relief requested in the Motion being in the best interests of the Debtors and their estates and creditors; and the Court having reviewed the Motion; and upon the record of the hearing before the Court (the "**Hearing**"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED THAT:

1.       The Motion is granted to the extent provided herein.

2.    The Debtors have articulated good, sufficient, and sound business reasons for consummating the Lease Agreements and the Custody Agreements and all of the transactions contemplated thereby.

3.    The Debtors are authorized to enter into lease agreements substantially in the form of the Form Lease Agreements pursuant to section 363(b) of the Bankruptcy Code in accordance with the process described in the Motion and the Notice Procedures.

4.    The Debtors are authorized to enter into and consummate the Mount Sinai Lease Agreement pursuant to section 363(b) of the Bankruptcy Code.

5.    The Debtors are authorized to enter into and consummate the SLR Lease Agreement pursuant to section 363(b) of the Bankruptcy Code.

6.    The Debtors are authorized to enter into the Medical Records Custody Agreements with Mount Sinai and SLR and have, to the extent necessary, satisfied the requirements of section 363(b)(1).

7.    The Debtors are authorized to enter into the Research Records Custody Agreements with Mount Sinai and SLR and have, to the extent necessary, satisfied the requirements of section 363(b)(1).

8.    The Debtors are authorized to enter into the Pharmacy Records Custody Agreement with SLR and have, to the extent necessary, satisfied the requirement of section 363(b)(1).

9.    The Debtors have articulated good, sufficient, and sound business reasons to consummate and are authorized to sell the Pharmacy Assets to SLR pursuant to section 363(f) of the Bankruptcy Code.  The transfers of the Pharmacy Assets to SLR will be a legal, valid, and effective transfer of the Pharmacy Assets, and will vest SLR with all right, title, and interest of

the Debtors in and to the Pharmacy Assets free and clear of all liens, claims, interests, obligations, rights and encumbrances.

10.     There Debtors are authorized to consummate the sale of the Pharmacy Assets by entering into a Bill of Sale substantially in the form attached to the Motion as **Exhibit E**.

11.     The following Notice Procedures are approved in all respects and are good, sufficient, and appropriate under the particular circumstances:

(a)     The Debtors will serve notice of its intention to enter into a lease agreement (the "**Lease Agreement Notice**"), substantially in the form attached to the Motion as **Exhibit F**, by facsimile, overnight delivery or hand delivery on the following parties: (a) the U.S. Trustee; (b) counsel for the Debtors' postpetition DIP lenders; and (c) counsel to the Creditors' Committee (collectively, the "**Interested Parties**"). The Lease Agreement Notice shall attach a blacklined copy of the proposed lease agreement, which shall be substantially similar to the Form Lease Agreement and shall show the changes to the Form Lease Agreement.

(b)     Interested Parties shall have **seven** days from service of the Lease Agreement Notice (the "**Objection Period**") to serve any objections to the entry into a lease agreement (an "**Objection**"). Any Objection must (i) be in writing (which writing may be delivered electronically), (ii) state with specificity the grounds for the Objection, and (iii) be served upon the counsel to the Debtors and the Interested Parties, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the final day of the Objection Period. Upon request of an Interested Party, but subject to any exigencies of the transfer of the clinical services, the Debtors will agree to a reasonable adjournment of the deadline for one or more Interested Parties to serve an Objection and to attempt to resolve any Objections.

(c)     The Lease Agreement Notice will include the following information: (i) a description of the leased space and the clinic operated therein; (ii) the identity of the lease counterparty; (iii) a description of any material economic terms or conditions that materially deviate from the terms and conditions of the Form Lease Agreement; and (iv) instructions regarding the procedures to assert an Objection. If no Objection is filed and served consistent with

these procedures, the Debtors may enter into the noticed Lease Agreement. No further notice or Court approval shall be required.

(d) If an Interested Party files and serves an Objection by the Objection Deadline, the Debtors and such objecting party will use good faith efforts to resolve the Objection consensually. If the Debtors and the objecting party are unable to resolve the Objection consensually, the Debtors will not enter into the proposed lease agreement without first obtaining Court approval, upon notice and a hearing to be scheduled by the Debtors at their sole discretion on no less than five days notice to the Interested Parties.

(e) The Debtors may enter into a lease agreement substantially in the form of the Form Lease Agreement prior to expiration of the applicable Objection Period if the Debtors first obtain the written consent of each Interested Party (which writing may be delivered electronically).

12. Notice of the Motion as provided for therein shall be deemed good and sufficient notice and the requirements of Bankruptcy Rule 4001(d) are waived.

13. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry pursuant to Bankruptcy Rule 6004(h).

14. The requirements set forth in Bankruptcy Rule 6004(a) are hereby waived.

15. This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order and the transactions contemplated by the Motion.

Dated: New York, New York
      June ___ 2010

_____
THE HONORABLE CECELIA G. MORRIS
UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

## SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK

Landlord

TO

[_____]

Tenant

_____

Lease

_____

Dated as of _____ ____, 2010

# TABLE OF CONTENTS

Page

ARTICLE 1      Demised Premises; Term; Use ............................................................4
     1.01      Demise .................................................................................4
     1.02      Term; Termination Option ..................................................4
     1.03      Commencement Date ...........................................................4
     1.04      Use ......................................................................................5

ARTICLE 2      Rent ............................................................................................5
     2.01      Rent ....................................................................................5
     2.02      Fixed Rent ..........................................................................5
     2.03      Additional Rent ..................................................................5
     2.04      Intentionally Deleted ..........................................................5
     2.05      Operating Expenses ............................................................5
     2.06      Intentionally Deleted ..........................................................6
     2.07      Manner of Payment ............................................................6
     2.08      Security ...............................................................................6

ARTICLE 3      Services .....................................................................................7
     3.01      Services ...............................................................................7
     3.02      Service Interruptions ..........................................................7

ARTICLE 4      Leasehold Improvements; Tenant Covenants ............................9
     4.01      Conditions of Premises .......................................................9
     4.02      Alterations ..........................................................................9
     4.03      Landlord's and Tenant's Property .....................................10
     4.04      Access and Changes to Building ......................................11
     4.05      Maintenance of Demised Premises ...................................12
     4.06      Compliance with Laws .....................................................13
     4.07      Right to Perform Tenant Covenants ..................................14
     4.08      Wireless Network ..............................................................14
     4.09      [Telephone Contract ..........................................................15

ARTICLE 5      Assignment and Subletting .....................................................15
     5.01      Assignment; Etc ................................................................15
     5.02      Assignment and Subletting Procedures .............................16
     5.03      General Provisions ............................................................16
     5.04      Assignment and Sublease Profits ......................................18

ARTICLE 6      Subordination; Default; Indemnity .........................................18
     6.01      Subordination ....................................................................18
     6.02      Estoppel Certificate ..........................................................20
     6.03      Default ...............................................................................20
     6.04      Re-entry by Landlord ........................................................21

i

| 6.05 | Damages | 21 |
| 6.06 | Other Remedies | 22 |
| 6.07 | Right to Injunction | 23 |
| 6.08 | Certain Waivers | 23 |
| 6.09 | No Waiver | 23 |
| 6.10 | Holding Over | 23 |
| 6.11 | Attorneys' Fees | 24 |
| 6.12 | Nonliability and Indemnification | 24 |
| | | |
| ARTICLE 7 | Insurance; Casualty; Condemnation | 25 |
| 7.01 | Compliance with Insurance Standards | 25 |
| 7.02 | Tenant's Insurance | 25 |
| 7.03 | Subrogation Waiver | 26 |
| 7.04 | Condemnation | 26 |
| 7.05 | Casualty | 28 |
| | | |
| ARTICLE 8 | Miscellaneous Provisions | 29 |
| 8.01 | Notice | 29 |
| 8.02 | Building Rules | 29 |
| 8.03 | Severability | 29 |
| 8.04 | Certain Definitions | 29 |
| 8.05 | Quiet Enjoyment | 30 |
| 8.06 | Limitation of Landlord's Personal Liability | 30 |
| 8.07 | Counterclaims | 30 |
| 8.08 | Survival | 30 |
| 8.09 | Certain Remedies | 30 |
| 8.10 | No Offer | 31 |
| 8.11 | Captions; Construction | 31 |
| 8.12 | Amendments | 31 |
| 8.13 | Broker | 31 |
| 8.14 | Merger | 31 |
| 8.15 | Successors | 31 |
| 8.16 | Applicable Law | 31 |
| 8.17 | No Development Rights | 32 |
| 8.18 | Signage | 32 |
| 8.19 | Adjacent Excavation Shoring | 32 |
| 8.20 | No Recording | 32 |
| 8.21 | Representations | 32 |
| 8.22 | Landlord's Bankruptcy; Bankruptcy Court's Approval; Grant of License Until Bankruptcy Court's Approval | 32 |
| 8.23 | Access | 33 |
| 8.24 | OFAC Certification and Indemnification. | 33 |
| 8.25 | [Personal Property | 34 |

Table of Contents
(continued)

8.26    Department of Health Notice ..............................................................................35
8.27    Counterparts ......................................................................................................35

EXHIBITS
A    Floor Plan of the demised premises
B    Rules and Regulations
C    Cleaning Specifications
D    Landlord's Services
E    Certain Services Costs

LEASE, dated as of _____ ___, 2010 (the "lease"), between SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK ("Landlord"), whose address is 170 West 12th Street, New York, New York 10011 and [_____] ("Tenant"), a _____ corporation having a principal address at _____.

<h3 style="text-align:center">W I T N E S S E T H:</h3>

WHEREAS, Landlord is willing to lease to Tenant and Tenant is willing to hire from Landlord, on the terms hereinafter set forth, certain space on the _____ (__) floor in the building located at _____ (the "Building") on that certain land (the "Land"; the Land and the Building and all plazas, sidewalks and curbs adjacent thereto are collectively called the "Project").

NOW, THEREFORE, Landlord and Tenant agree as follows:

### ARTICLE 1

### Demised Premises; Term; Use

**1.01    Demise.**    Landlord hereby leases to Tenant and Tenant hereby hires from Landlord, subject to the terms and conditions of this lease, the premises, as shown hatched on the plan attached as Exhibit A and made a part hereof (the "demised premises").

(b)    Landlord and Tenant confirm that the demised premises consist of rentable square feet.

**1.02    Term; Termination Option.**    (a)  The term of this lease (the "Term") shall commence on _____ (the "Commencement Date") and shall end, unless sooner terminated as herein provided, on _____ (such date is called the "Expiration Date").

(b)    Landlord and Tenant shall have the right, by unconditional and irrevocable written notice (the "Termination Notice") given to the non-terminating party by the terminating party at any time during the Term after _____, to terminate this lease.  In the event that Landlord or Tenant gives the other party the Termination Notice pursuant to the immediately preceding sentence: (i) this lease and the Term and estate hereby granted to Tenant in the demised premises shall terminate as of the date that is ninety (90) days after the date the terminating party delivers the Termination Notice to the other as if such date were the Expiration Date; (ii) Tenant shall vacate and surrender possession of the demised premises to Landlord in the condition required hereunder for surrender of the demised premises; and (iii) neither party hereto shall thereafter have any rights, estates or obligations under this lease except those which by the express provisions of this lease survive the expiration or termination of the Term.

**1.03    Commencement Date.**    (a) Subject to any FF&E (as hereinafter defined) located in the demised premises, Landlord shall deliver the demised premises to Tenant vacant, broom clean and free of all tenants and occupants on the Commencement Date.

(b)　　　　If for any reason Landlord shall be unable to deliver possession of the demised premises to Tenant on any date specified in this lease for such delivery, Landlord shall have no liability to Tenant therefor and the validity of this lease shall not be impaired, nor shall the Term be extended, by reason thereof.  This Section 1.03 shall be an express provision to the contrary for purposes of Section 223-a of the New York Real Property Law and any other law of like import now or hereafter in effect.

**1.04**　**Use.**　(a) The demised premises shall be used and occupied by Tenant (and its permitted licensees) solely for _____, provided, however, Tenant shall not be permitted to provide any medical services in any portion of the demised premises other than _____ without Landlord's prior consent, which consent shall be granted or denied by Landlord in its sole and absolute discretion.  The demised premises shall not be used for any purpose which would lower the character of the Building, create unreasonable or excessive elevator or floor loads, impair or interfere with any of the Building operations or the proper and economic heating, ventilation, air-conditioning, cleaning or other servicing of the Building, constitute a public or private nuisance, interfere with, annoy or disturb the use of the other areas of the Building by any other tenants or occupants, or impair the appearance of the Building and community medicine.

## ARTICLE 2

## Rent

**2.01**　**Rent.**　"Rent" shall consist of Fixed Rent (as hereinafter defined) and Additional Rent (as hereinafter defined).

**2.02**　**Fixed Rent.**　The fixed rent ("Fixed Rent") shall be $_____ per rentable square foot (i.e., $_____ per annum ($_____ per month)).

Annual Fixed Rent shall be payable by Tenant in equal monthly installments in the amounts set forth above, in advance on the Commencement Date and on the first day of each calendar month thereafter; provided that Tenant shall pay, upon the execution and delivery of this lease by Tenant, a monthly installment of Fixed Rent to be applied against the first full monthly installment of Fixed Rent; and provided further, that if the Commencement Date is not the first day of a month, then Fixed Rent for the month in which the Commencement Date occurs shall be prorated on a per diem basis and paid on the Commencement Date.

**2.03**　**Additional Rent.**　"Additional Rent" means the payments payable by Tenant under Section 2.05 and all sums of money, other than Fixed Rent, at any time payable by Tenant under this lease, all of which Additional Rent shall be deemed to be Rent.

**2.04**　**Intentionally Deleted.**

**2.05**　**Operating Expenses.**　In lieu of Tenant's payment of its share of Landlord's costs and expenses incurred in respect of the provision by Landlord of the services required pursuant to this lease and other expenses incurred by Landlord (and in addition to Fixed Rent), to compensate Landlord therefor, Tenant shall pay Landlord $_____ per annum, which shall be payable monthly ($_____) as and when Fixed Rent is payable pursuant to this lease.

**2.06   Intentionally Deleted.**

**2.07   Manner of Payment.**  Tenant shall pay all Rent as the same shall become due and payable under this lease either by wire transfer of immediately available federal funds as directed by Landlord or by check (subject to collection) drawn on a New York Clearing House Association member bank, in each case at the times provided herein without notice or demand and, except as otherwise expressly set forth herein, without abatement, setoff or counterclaim.  All Rent shall be paid in lawful money of the United States of America to Landlord at its office or such other place as Landlord may from time to time designate.  If Tenant fails timely to pay any Rent, Tenant shall pay interest thereon from the date when such Rent became due to the date of Landlord's receipt thereof at the Interest Rate.  "Interest Rate" means the lesser of:  (i) the Base Rate (as hereinafter defined) plus 4%; and (ii) the maximum rate permitted by law.  Any Additional Rent for which no due date is specified in this lease shall be due and payable on the 10th day after the date of invoice.  All bills, invoices and statements rendered to Tenant with respect to this lease shall be binding and conclusive on Tenant unless, within 30 Business Days (as hereinafter defined) after receipt of same, Tenant notifies Landlord that it is disputing same.  For purposes of this lease, the "Base Rate" shall be the so called prime or base rate from time to time in effect at Citibank, N.A. or any successor thereto, or if no successor, as announced by the Wall Street Journal.

**2.08   Security.**  (a) Tenant has delivered to Landlord, as security for the performance of Tenant's obligations under this lease, either:  (i) the sum of $_____, in certified or official bank check (the "Security Deposit"); or (ii) an unconditional, irrevocable letter of credit in the amount of $_____, in a form and issued by a bank satisfactory to Landlord (the "Letter of Credit").  The Letter of Credit shall provide that it is drawable upon a bank in New York City, at sight, upon Landlord's demand, and without further evidence, and that it is assignable by Landlord without charge and shall either:  (A) expire on the date which is 60 days after the expiration or earlier termination of this lease (the "LC Date"); or (B) be automatically self-renewing until the LC Date.  Partial draws shall be permitted.  If any Letter of Credit is not renewed at least 45 days prior to the expiration thereof (if such expiration shall occur prior to the LC Date) or if Tenant holds over in the demised premises without the consent of Landlord after the expiration or termination of this lease, Landlord may draw upon the Letter of Credit and hold the proceeds thereof as security for the performance of Tenant's obligations under this lease.  Landlord may draw on the Security Deposit or Letter of Credit (or the proceeds thereof) to remedy defaults by Tenant in the payment or performance of any of Tenant's obligations under this lease which shall continue beyond any applicable notice or cure periods  If Landlord shall have so drawn upon the Security Deposit or the Letter of Credit (or the proceeds thereof), Tenant shall, within five (5) days after demand, deposit with Landlord a sum equal to the amount so drawn by Landlord.  Failure to do so shall be deemed a failure to pay Fixed Rent.  Any proceeds of a Letter of Credit, shall, until applied, be deemed a Security Deposit.  Any Security Deposit shall be held by Landlord in a bank or other institution of its selection, unsegregated from other funds of Landlord, and Tenant shall not be entitled to any interest thereon, except in each case to the extent otherwise required by applicable Law.  In such event any permitted fees or deduction payable to Landlord by Law shall be so payable by Tenant, or at Landlord's election, recoverable from the Security Deposit.  Application of any Security Deposit or proceeds of a Letter of Credit shall not be a bar against pursuant by Landlord of any other remedy permitted under the lease.

(b)  Provided that Tenant is not in default under this lease and Tenant has surrendered the demised premises to Landlord in accordance with all of the terms and conditions of this lease, on or

before the LC Date: (i) Landlord shall return to Tenant the Security Deposit or Letter of Credit (or the proceeds thereof) then held by Landlord; or (ii) if Landlord shall have drawn upon such Security Deposit or Letter of Credit (or the proceeds thereof) to remedy defaults by Tenant in the payment or performance of any of Tenant's obligations under this lease, Landlord shall return to Tenant that portion, if any, of such Security Deposit or the proceeds of the Letter of Credit remaining in Landlord's possession.

**ARTICLE 3**

**Services**

 **3.01** **Services.** During the Term, Landlord shall furnish Tenant with the services specified on, and in accordance with the terms of, Exhibit D attached hereto and made a part hereof (collectively, "Landlord Services").

 **3.02** **Service Interruptions.** (a) Landlord may stop or interrupt any Landlord Service or other service to be provided to Tenant under this Article 3 and may stop or interrupt the use of any Building facilities and systems at such times as may be necessary and for as long as may reasonably be required by reason of an Unavoidable Delay (as hereinafter defined); or by reason of any other cause beyond the reasonable control of Landlord. Landlord shall have no liability to Tenant by reason of any stoppage or interruption of any Landlord Service, electricity or other service or defect in the supply of electricity or any other service or the use of any Building facilities and systems for any reason and such interruption or stoppage shall not constitute an eviction, actual or constructive, nor entitle Tenant to any abatement of Rent, or other compensation. Landlord shall use reasonable diligence (which shall not include incurring overtime charges) to make such repairs as may be required to machinery or equipment within the Project to provide restoration of any Landlord Service and, where the cessation or interruption of such Landlord Service has occurred due to circumstances or conditions beyond the Project boundaries, to cause the same to be restored by diligent application or request to the provider. In addition Landlord shall not be liable if the normal operations of the Building's HVAC system fails to adequately cool the demised premises if Tenant's equipment or occupancy levels exceed the system's design specifications, or because of the manner or method Tenant has partitioned the demised premises.

 (b) Without limiting any of Landlord's other rights and remedies, if Tenant shall be in default beyond any applicable grace period, Landlord shall not be obligated to furnish to the demised premises any service outside of Business Hours on Business Days, and Landlord shall have no liability to Tenant by reason of any failure to provide, or discontinuance of, any such service.

 (c) Except as expressly specified on Exhibit D, Landlord shall not be required to provide any services to the demised premises.

 (d) Landlord reserves the right to discontinue furnishing electricity to Tenant in the demised premises on not less than one hundred twenty (120) days' notice to Tenant. If Landlord exercises such right to discontinue; or is compelled by applicable Laws or otherwise to discontinue furnishing electricity to Tenant, this lease shall continue in full force and effect and shall be unaffected thereby, except only that from and after the effective date of such discontinuance, Landlord shall not be obligated to furnish electricity to Tenant; and Tenant shall have no further obligation to pay

Landlord for electricity supplied to the demised premises. If Landlord so discontinues furnishing electricity to Tenant, Tenant shall arrange to obtain electricity directly from the utility or other company servicing the Building. Landlord will not discontinue furnishing electricity to Tenant until Tenant is able to obtain electricity directly from the utility or other company servicing the Building, provided that Tenant uses reasonable efforts to obtain such electricity. Such electricity may be furnished to Tenant by means of the then existing electrical facilities serving the demised premises to the extent that the same are suitable and safe for such purposes and to the extent of Tenant's then existing connected load. All meters and all additional panel boards, feeders, risers, wiring and other equipment which may be required by Tenant to obtain electricity directly from the utility shall be installed by Landlord. The cost thereof shall be amortized over the useful life of such equipment and Tenant shall pay the portion of the cost so amortizable over the remaining portion of the Term, as Additional Rent, in equal monthly installments equal to one-twelfth of the annual amortization of such cost, with interest thereon at the Base Rate, except that if Landlord voluntarily discontinues furnishing electricity to the demised premises, Landlord shall bear such cost and expense; and in all events Tenant shall have the right to use existing Building feeders and risers in common with other tenants or occupants at no cost to Tenant.

(e)     Subject to Section 8.06, if Landlord shall fail to provide cleaning services, medical waste removal services, pest control services or snow removal services as required pursuant to the provisions of this lease (subject to Unavoidable Delays) and such failure continues for more than ten (10) days after notice thereof from Tenant to Landlord, then, as Tenant's sole and exclusive remedy therefor, Tenant shall be entitled to perform such services on Landlord's behalf. Tenant shall only be entitled to perform such services on Landlord's behalf if the following conditions shall be satisfied: (i) Tenant shall deliver notice (a "Tenant Notice") to Landlord stating the nature of such services not being performed and that Tenant intends to perform the same, (ii) Landlord shall fail to deliver a notice to Tenant within 10 days following Tenant's delivery to Landlord of the Tenant Notice stating that Landlord intends to perform such services (which notice shall set forth in reasonable detail the steps Landlord intends to take), (iii) Landlord shall fail within such 10-day period to commence performing such services, and (iv) performance of such services do not affect the Building systems. The extent of the services performed by Tenant on Landlord's behalf shall not exceed the services required pursuant to this lease and the amount payable to Tenant by Landlord with respect to such services shall not exceed the amounts with respect thereto specifically set forth on Exhibit E prorated for the period covered by Tenant's self-help. In the event Tenant shall perform such services properly in accordance with the provisions of this Section 3.02(e), then Landlord shall reimburse Tenant for the reasonable out-of-pocket costs incurred by Tenant (not to exceed the amounts set forth on Exhibit E prorated for the period covered by Tenant's self-help) in performing such services within 30 days following the provision of an invoice therefor (together with reasonable substantiation), unless Landlord is disputing Tenant's right to have performed such services or Landlord's obligation to reimburse Tenant therefor, in which case such dispute shall be resolved by a single arbitrator appointed in accordance with the American Arbitration Association Arbitration Rules for the Real Estate Industry. Landlord shall have no obligation to reimburse Tenant until and unless such dispute is finally resolved in favor of Tenant. If Landlord shall thereafter fail to timely pay the amount due hereunder, Tenant shall have the right to deduct such amounts against the next payment(s) of Fixed Rent due hereunder (which deductions shall in no event exceed the amounts set forth on Exhibit E with respect to the services being performed by Tenant prorated for the period covered by Tenant's self-help).

## ARTICLE 4

## Leasehold Improvements; Tenant Covenants

**4.01     Conditions of Premises.**  On the Commencement Date, Landlord shall deliver to Tenant and Tenant shall accept the demised premises from Landlord vacant (other than any FF&E), broom clean, free of all tenants and occupants and otherwise in its "as is" condition as of the date hereof.  "Unavoidable Delay" shall mean strikes, labor disputes, accidents, governmental preemption in connection with a national emergency, Laws (as hereinafter defined), conditions of supply and demand, war, other emergency, fire or other casualty, acts of God or any other similar or dissimilar cause beyond Landlord's reasonable control.

**4.02     Alterations.**  (a) Tenant shall make no improvements, changes or alterations in or to the demised premises ("Alterations") without Landlord's prior approval, which approval may be given or withheld in Landlord's sole and absolute discretion; provided, however, with respect to decorative alterations (such as painting and carpeting), Landlord's consent shall not be unreasonably withheld.

(b)     If an Alteration is approved, Tenant, in connection with such Alteration, shall comply with any and all rules and regulations as may be from time to time established by Landlord.  Tenant shall not proceed with any Alteration unless and until Landlord approves Tenant's plans and specifications therefor.  Any review or approval by Landlord of plans and specifications with respect to any Alteration is solely for Landlord's benefit, and without any representation or warranty to Tenant with respect to the adequacy, correctness or efficiency thereof, its compliance with Laws (as hereafter defined) or otherwise.  All plans and specification shall be on auto CAD or other method of presentation selected by Landlord and shall show, among other things, the exact location of all conduits, wires and cabling, all of which shall be properly labeled.

(c)     Tenant shall pay to Landlord upon demand Landlord's reasonable actual out of pocket costs and expenses (including, without limitation, the reasonable fees of any architect or engineer employed by Landlord or any Superior Lessor or Superior Mortgagee for such purpose) for reviewing plans and specifications and inspecting Alterations.

(d)     Tenant shall obtain (and furnish copies to Landlord of) all necessary governmental permits and certificates for the performance of Alterations and for final approval thereof upon completion, and shall cause Alterations to be performed in compliance therewith, and in compliance with all Laws and, with the plans and specifications approved by Landlord.  Alterations shall be diligently performed in a good and workerlike manner, using new materials and equipment at least equal in quality and class to the then standards for the Building.  All Alterations shall be performed by architects, engineers and contractor(s) first approved by Landlord (which approval shall not be unreasonably withheld, conditioned or delayed).  The performance of any Alteration shall not be done in a manner which would violate Landlord's union contracts affecting the Project, or create any work stoppage, picketing, labor disruption, disharmony or dispute or any material interference with the business of Landlord or any tenant or occupant of the Building.  Tenant shall immediately stop the performance of any Alteration if Landlord notifies Tenant that continuing such Alteration would violate Landlord's union contracts affecting the Project, or create any work stoppage, picketing, labor disruption, disharmony or dispute or any material interference with the business of Landlord or any

tenant or occupant of the Building. Tenant shall not resume the performance of such Alteration until such time as such Alteration may be performed in a manner which shall not violate such union contracts or create such work stoppage, picketing, labor disruption, disharmony or dispute or interference.

(e) During the performance of Alterations, Tenant shall carry worker's compensation insurance in statutory limits, "all risk" Builders Risk coverage and general liability insurance, with completed operation endorsement, for any occurrence in or about the Project, under which Landlord and its agent and any Superior Lessor and Superior Mortgagee whose name and address have been furnished to Tenant shall be named as parties insured, in such limits as Landlord may reasonably require, with insurers reasonably satisfactory to Landlord. Tenant shall furnish Landlord with evidence that such insurance is in effect at or before the commencement of Alterations and, on request, at reasonable intervals thereafter during the continuance of Alterations.

(f) Should any mechanics' or other liens be filed against any portion of the Project by reason of the acts or omissions of, or because of a claim against, Tenant or anyone claiming under or through Tenant, Tenant shall cause the same to be canceled or discharged of record by bond or otherwise within 30 days after notice (but in all events prior to the expiration or early termination of the Term if such date is earlier than 30 days after notice). If Tenant shall fail to cancel or discharge said lien or liens within said 30 day period, Landlord may cancel or discharge the same and, upon Landlord's demand, Tenant shall reimburse Landlord for all reasonable costs incurred in canceling or discharging such liens, together with interest thereon at the Interest Rate from the date incurred by Landlord to the date of payment by Tenant, such reimbursement to be made within ten (10) Business Days after receipt by Tenant of a written statement from Landlord as to the amount of such costs. Tenant shall indemnify and hold Landlord harmless from and against all costs (including, without limitation, attorneys' fees and disbursements and costs of suit), losses, liabilities or causes of action arising out of or relating to any Alteration, including, without limitation, any mechanics' or other liens asserted in connection with such Alteration.

(g) Tenant shall deliver to Landlord, within 30 days after the completion of an Alteration, "as-built" drawings thereof, if any. During the Term, Tenant shall keep records of Alterations, including plans and specifications, copies of contracts, invoices, evidence of payment and all other records customarily maintained in the real estate business relating to Alterations and the cost thereof and shall, within 30 days after demand by Landlord, furnish to Landlord copies of such records.

(h) All Alterations to and Fixtures installed by Tenant in the demised premises shall be fully paid for by Tenant in cash and shall not be subject to conditional bills of sale, chattel mortgages, or other title retention agreements.

**4.03    Landlord's and Tenant's Property.**  (a)  All Alterations, fixtures, equipment, improvements and appurtenances attached to or built into the demised premises, whether or not at the expense of Tenant (collectively, "Fixtures"), shall be and remain a part of the demised premises and shall not be removed by Tenant except as set forth herein. All Fixtures constituting Improvements and Betterments (as hereinafter defined) shall be the property of Tenant during the Term and, upon expiration or earlier termination of this lease, shall become the property of Landlord. All Fixtures

other than Improvements and Betterments shall, upon installation, be the property of Landlord. "Improvements and Betterments" mean all Fixtures, if any, installed at the expense of Tenant.

(b)        Notwithstanding anything to the contrary in Section 4.03(a), all movable partitions, business and trade fixtures, machinery and equipment, and all furniture, furnishings and other articles of movable personal property owned by Tenant and located in the demised premises (collectively, "Tenant's Property") shall be and shall remain the property of Tenant and may be removed by Tenant at any time during the Term; provided that if any of Tenant's Property is removed, Tenant shall repair any damage to the demised premises or to the Building resulting from the installation and/or removal thereof.

(c)        At or before the Expiration Date, Tenant, at Tenant's expense, shall remove Tenant's Property from the demised premises (except such items thereof as Landlord shall have expressly permitted to remain, which shall become the property of Landlord), and Tenant shall repair any damage to the demised premises or the Building resulting from any installation and/or removal of Tenant's Property.  Any items of Tenant's Property which remain in the demised premises after the Expiration Date, may, at the option of Landlord, be deemed to have been abandoned, and may be retained by Landlord as Landlord's property or disposed of by Landlord, without accountability, in such manner as Landlord shall determine, all at Tenant's expense.

        4.04        **Access and Changes to Building.**  (a)  Landlord reserves the right, at any time, to make such changes in or to the Project as Landlord may deem reasonably necessary or desirable, including, without limitation, changes to entrances, exits, common areas and elevators, and Landlord shall have no liability to Tenant therefor, provided any such change does not materially and adversely affect Tenant's access to the Building or the demised premises.  Landlord may install and maintain pipes, fans, ducts, wires and conduits within or through the demised premises, provided Landlord shall use good faith efforts to install said item within or through the walls, floors or ceilings of the demised premises.  In exercising its rights under this Section 4.04, Landlord shall use reasonable efforts to minimize interference with Tenant's use of the demised premises for the ordinary conduct of Tenant's business.  Tenant shall not have any easement for light, views or air, or any other easement or right in or to the use of any door or any passage or any concourse or any plaza connecting the Building with any other building or to any public conveniences or streets, and the use of such doors, passages, concourses, plazas and conveniences may, without notice to Tenant, be regulated or discontinued at any time by Landlord.

(b)        Except for the space within the inside surfaces of all walls, hung ceilings, floors, windows and doors bounding the demised premises, and common areas to the extent designated as available for use to tenants, all of the other portions of the Building, including, without limitation, exterior Building walls, core corridor walls and doors and any core corridor entrance, space above hung ceilings, any terraces or roofs adjacent to the demised premises, and any space in or adjacent to the demised premises used for shafts, stacks, pipes, conduits, fan rooms, ducts, electric or other utilities, sinks or other Building facilities, and the use thereof, as well as access thereto through the demised premises, are reserved to Landlord and Tenant shall have no access thereto.

(c)        Landlord shall have no liability to Tenant if at any time any windows of the demised premises are either temporarily darkened or obstructed by reason of any repairs, improvements, maintenance and/or cleaning (or permanently darkened or obstructed if required by

Law) or covered by any translucent material for the purpose of energy conservation, or if any part of the Building, other than the demised premises, is temporarily or permanently closed or inoperable. No easement of light or air is hereby granted.

(d)        Landlord and persons authorized by Landlord shall have the right, at reasonable times upon reasonable prior notice to Tenant (except in an emergency, when no prior notice shall be required), to enter the demised premises (together with any necessary materials and/or equipment), to inspect, clean or perform such work or repairs as Landlord may reasonably deem necessary or to exhibit the demised premises to prospective lenders or purchasers, or, during the last 3 months of the Term, to prospective tenants, or for any other purpose that Landlord may deem necessary or desirable. Landlord shall have no liability to Tenant by reason of any such entry. Landlord shall not be required to make any improvements or repairs of any kind or character to the demised premises during the Term.

(e)        Subject to Section 4.05 below, Landlord shall operate, maintain and make all necessary repairs (both structural and nonstructural) to (i) the Buildings Systems up to the point of Tenant's distribution system in the demised premises and (ii) common areas of the Project, both exterior and interior.

(f)        Tenant's right to use the common areas (including, without limitation, loading dock area) shall be in the nature of a temporary, non-exclusive, revocable license and Tenant's use thereof shall be limited to that which is necessary and incidental to its normal business, and shall be on a non-reserved basis.

**4.05**   **Maintenance of Demised Premises.**  (a) Tenant shall keep the non-structural elements of the demised premises, and all doors, windows and glass in and about the demised premises (including, without limitation, all Fixtures and supplemental HVAC equipment within the demised premises or serving the demised premises), in good condition and repair, free of vermin and, upon expiration or earlier termination of the Term, Tenant shall surrender the same to Landlord in the same condition as when first occupied, reasonable wear and tear and damage due to fire or other casualty excepted. Tenant's obligation shall include, without limitation, the obligation to repair all damage caused by Tenant, its agents, employees, invitees and licensees to the equipment and other installations in the demised premises or anywhere in the Building. Any maintenance, repair or replacement to the windows (including, without limitation, any solar film attached thereto), the Building systems, the Building's structural components or any areas outside the demised premises and which is Tenant's obligation to perform pursuant to the terms of this lease, shall be performed by Landlord at Tenant's expense.

(b)        Tenant shall not commit or allow to be committed any waste or damage to any portion of the demised premises or the Building.

(c)        Tenant shall not place a load upon any floor of the demised premises exceeding the floor load per square foot which such floor was designed (or previously reinforced) to carry (unless Tenant has installed suitable reinforcement, subject to the provisions of Article 4). If any safe, heavy equipment, business machines, freight, bulky matter or fixtures to be moved into or out of the Building requires special handling, Tenant shall give Landlord reasonable prior notice thereof; and shall employ only persons holding a Master Rigger's license to do such work.

(d)        If, on or prior to _____, Landlord reasonably determines that any capital improvement, capital repair or alteration to the demised premises or the Building, as applicable, is necessary or appropriate to be performed for Tenant to reasonably conduct its business in the demised premises or to reasonably maintain the Building (such capital improvement, capital repair or alteration, a "Major CI"): (i) to the extent that Landlord's reasonable estimate of the cost of such Major CI ("Landlord's Major CI Estimate") does not exceed $_____ (less, in each case, amounts previously expended for a Major CI) ("Threshold"), Landlord shall perform such Major CI and complete same as soon as reasonably practicable; and (ii) to the extent that Landlord's Major CI Estimate exceeds the Threshold, Landlord shall notify Tenant thereof and Landlord shall not be required to perform such Major CI until and unless: (x) Tenant pays Landlord the difference between Landlord's Major CI Estimate and the Threshold in the case of any Major CI that benefits only the demised premises; or (y) Tenant pays Landlord Tenant's Proportionate Share of the difference between Landlord's Major CI Estimate and the Threshold in the case of any Major CI that benefits the Building (whether or not including the demised premises).  If Tenant pays the specified amount in accordance with the immediately preceding sentence, Landlord shall perform such Major CI and complete same as soon as reasonably practicable.  For the purpose hereof, Tenant's Proportionate Share shall mean __%.  Tenant shall make such payment within thirty (30) days after demand therefor and, if Tenant shall fail to do so, Landlord shall have the right, among all other remedies available to it at law or in equity, to terminate this lease upon thirty (30) days notice.

(e)        If after _____, this lease remains in effect, and Landlord reasonably determines that a Major CI is necessary or appropriate to be performed ("Landlord's Determination") and: (i) to the extent that Landlord's Major CI Estimate does not exceed the sum of: (x) 50% of the amount of installments of Fixed Rent remaining to be paid by Tenant through the balance of the Term (not to exceed 90 days); and (y) 50% of the amount of Fixed Rent paid by Tenant to Landlord under this lease up to the month in which the date of Landlord's Determination occurs, to the extent that such amounts of Fixed Rent have not been (and are not contemplated to be) expended pursuant to the terms of Section 4.05(d) or this Section 4.04(e) (such sum, "Major CI Available Amount"), Landlord shall perform such Major CI and complete same as soon as reasonably practicable; and (ii) to the extent that Landlord's Major CI Estimate exceeds the Major CI Available Amount, Landlord shall notify Tenant thereof and Landlord shall not be required to perform such Major CI until and unless: (x) Tenant pays Landlord the difference between Landlord's Major CI Estimate and the Major CI Available Amount in the case of any Major CI that benefits only the demised premises; or (y) Tenant pays Landlord Tenant's Proportionate Share of the difference between Landlord's Major CI Estimate and the Major CI Available Amount in the case of any Major CI that benefits the Building (whether or not including the demised premises).  If Tenant pays the specified amount in accordance with the immediately preceding sentence, Landlord shall perform such Major CI and complete same as soon as practicable.  Tenant shall make such payment within thirty (30) days after demand therefor and, if Tenant shall fail to do so, Landlord shall have the right, among all other remedies available to it at law or on equity, to terminate this lease upon thirty (30) days notice.

**4.06    Compliance with Laws.**  (a)  Tenant shall comply with all laws, ordinances, rules, orders and regulations (present, future, ordinary, extraordinary, foreseen or unforeseen) of any governmental, public or quasi-public authority and of the New York Board of Underwriters, the New York Fire Insurance Rating Organization and any other entity performing similar functions, and Landlord's insurance policies at any time in force (collectively "Laws"), attributable to any work, installation, occupancy, use or manner of use by Tenant of the demised premises or any part thereof.

Nothing contained in this Section 4.06 shall require Tenant to make any structural changes unless the same are necessitated by reason of Tenant's performance of any Alterations, Tenant's manner of use of the demised premises or the use by Tenant of the demised premises for purposes other than normal and customary medical clinic and medical office purposes.  Tenant shall procure and maintain all licenses and permits required for its business.

(b)　　　Tenant shall not cause or permit any Hazardous Materials (as hereinafter defined) to be brought upon, kept or used in or about the demised premises and/or the Building by Tenant, its agents, employees, contractors or invitees, except normal quantities of such materials (including, without limitation, an _____) and office use in connection therewith, in compliance with all Laws.  For purposes hereof, "Hazardous Materials" shall mean (i) any "hazardous substance" as defined in § 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601(14), as amended; (ii) any "hazardous waste" as defined in § 27-1301(1) of the New York Environmental Conservation Law; (iii) petroleum or petroleum products, crude oil or any by-products thereof, natural gas or synthetic gas used for fuel; and (iv) any additional substances or materials which at such time are classified or considered to be hazardous or toxic under the laws of the United States or the State of New York or any other Laws.

**4.07**　　**Right to Perform Tenant Covenants.**　If Tenant fails to perform any of its obligations under this lease and same continues beyond the lapse of applicable notice and grace periods, Landlord, any Superior Lessor or any Superior Mortgagee (each, a "Curing Party") may perform the same at the expense of Tenant:  (a) immediately and without notice in the case of emergency or in case such failure materially interferes with the reasonable use of space by any other tenant or occupant in the Building or with the efficient operation of the Building or may reasonably result in a violation of any Law or in a cancellation of any insurance policy maintained by Landlord; and (b) in any other case if such failure continues beyond any applicable notice and grace period.  If a Curing Party performs any of Tenant's obligations under this lease in accordance with this Section 4.07, Tenant shall pay to Landlord (as Additional Rent) the costs thereof, together with interest at the Interest Rate from the date incurred by the Curing Party until paid by Tenant, within 15 days after receipt by Tenant of a statement as to the amounts of such costs.  If the Curing Party effects such cure by bonding any lien which Tenant is required to bond or otherwise discharge, Tenant shall obtain and substitute a bond for the Curing Party's bond and shall reimburse the Curing Party for the cost of the Curing Party's bond.

**4.08**　**Wireless Network**.　(a)　　　Tenant agrees that no network communication, internet or data processing system, nor any equipment used in connection therewith (whether owned by Tenant or others) (collectively, the "Network") shall cause any radio, electromagnetic or other interference to any other tenant or occupant of the Building, or any other party.  Upon notice from Landlord Tenant shall promptly cease using the Network or any equipment therefor if such Network or equipment does, or Landlord reasonably believes may, cause material interference to any other person or entity.

(b)　　　Tenant acknowledges that Landlord has granted, or may in the future grant, other tenants, occupants or others the right to install or use networks, on terms similar or dissimilar to these terms, as Landlord determines in its sole discretion.

**4.09    [Telephone Contract.** Landlord agrees to maintain with the existing provider at Tenant's sole cost and expense Landlord's existing contract for telephone services (the "Telephone Contract") at the demised premises for up to sixty (60) days after the Commencement Date and Tenant shall pay Landlord the cost of the Telephone Contract within fifteen (15) days after demand. Landlord shall be entitled to terminate the Telephone Contract at any time after the date that is the sixtieth (60th) day after the Commencement Date or such earlier date as shall be requested by Tenant (it being agreed that Tenant shall not be required to pay any amounts hereunder with respect to any period from and after Tenant's request for Landlord to terminate the Telephone Contract).]

## ARTICLE 5

## Assignment and Subletting

**5.01    Assignment; Etc.** (a)  Subject to the further provisions of this Article 5, neither this lease nor the term and estate hereby granted, nor any part hereof or thereof, shall be assigned, mortgaged, pledged, encumbered or otherwise transferred voluntarily, involuntarily, by operation of law or otherwise, and neither the demised premises, nor any part thereof, shall be subleased, licensed, used or occupied by any person or entity other than Tenant, or encumbered in any manner by reason of any act or omission on the part of Tenant, and no rents or other sums receivable by Tenant under any sublease of all or any part of the demised premises shall be assigned or otherwise encumbered, without the prior consent of Landlord which consent may be granted or withheld by Landlord in Landlord's sole and absolute discretion. The dissolution or direct or indirect transfer of a majority of the interest in, or control of, Tenant (however accomplished including, by way of example, the addition of new partners or members or withdrawal of existing partners or members, or transfers of interests in distributions of profits or losses of Tenant, issuance of additional stock, redemption of stock, stock voting agreement, or change in classes of stock) shall be deemed an assignment of this lease regardless of whether the transfer is made in or by one or more transactions, or whether one or more persons or entities hold the controlling interest prior to the transfer or afterwards.  An agreement under which another person or entity becomes responsible for all or a portion of Tenant's obligations under this lease shall be deemed an assignment of this lease.  No assignment or other transfer of this lease and the term and estate hereby granted, and no subletting of all or any portion of the demised premises shall relieve Tenant of its liability under this lease or of the obligation to obtain Landlord's prior consent to any further assignment, other transfer or subletting.  Any attempt to assign this lease or sublet all or any portion of the demised premises in violation of this Article 5 shall be null and void and a default under this lease.

(b)        Notwithstanding Section 5.01(a), without the consent of Landlord, this lease may be assigned to:  (i) an entity created by merger, reorganization or recapitalization of or with Tenant; or (ii) a purchaser of all or substantially all of Tenant's assets or stock or other beneficial ownership interest; provided, in the case of both clause (i) and clause (ii), that:  (A) Landlord shall have received 5 days' prior notice of such assignment from Tenant; (B) the assignee assumes by written instrument reasonably satisfactory to Landlord all of Tenant's obligations under this lease; (C) such assignment is for a valid business purpose and not to avoid any obligations under this lease; and (D) the assignee is a reputable entity of good character and shall have, immediately after giving effect to such assignment, an aggregate net worth (computed in accordance with generally accepted accounting principles) at least equal to the aggregate net worth (as so computed) of Tenant immediately prior to such assignment or on the date of this lease, whichever is greater.

(c)     Notwithstanding Section 5.01(a), without the consent of Landlord, Tenant may assign this lease or sublet all or any part of the demised premises to an Affiliate (as hereinafter defined) of Tenant; provided, that (i) Landlord shall have received 10 days' prior notice of such assignment or sublease from Tenant; and (ii) in the case of any such assignment:  (A) the assignment is for a valid business purpose and not to avoid any obligations under this lease; and (B) the assignee assumes by written instrument reasonably satisfactory to Landlord all of Tenant's obligations under this lease; (iii) in the case of any such sublease:  (A) the sublease is for a term that is shorter than the Term; (B) the sublease is subject and subordinate to this lease (and to all things to which this lease is subject) in all respects; and (C) the sublease otherwise comports with the provisions of Section 5.04(d); and (iv) such entity at all times remains an Affiliate of Tenant named herein.  "Affiliate" means, as to any designated person or entity, any other person or entity which controls, is controlled by, or is under common control with, such designated person or entity.  "Control" (and the correlative meaning, "controlled by" and "under common control with") means ownership or voting control, directly or indirectly, of 50% or more of the voting stock, partnership interests or other beneficial ownership interests of the entity in question.

     **5.02**   **Assignment and Subletting Procedures.**  (a)  With respect to any proposed assignment, sublease or other transfer, Tenant shall deliver to Landlord a request for consent (a "Transfer Notice"), which Transfer Notice shall be accompanied by:  (i) an original of the proposed assignment or sublease and all related agreements, the effective date of which shall be expressly subject to Landlord's consent; (ii) a statement setting forth in reasonable detail the identity of the proposed assignee or subtenant and confirmation that the use of the demised premises shall not change; (iii) current financial information with respect to the proposed assignee or subtenant, including without limitation, its most recent financial statements; and (iv) such other information as Landlord may reasonably request.  Landlord's consent to the proposed assignment or sublease shall be granted or denied by Landlord in Landlord's sole and absolute discretion.

     (b)     Tenant shall reimburse Landlord on demand for any reasonable costs incurred by Landlord in connection with any requested assignment or sublease, including, without limitation, the costs of making investigations as to the acceptability of the proposed assignee or subtenant, and reasonable legal costs incurred in connection with the granting of any requested consent, whether or not consent is granted.  Tenant hereby acknowledges and agrees that because Landlord is a debtor-in-possession (as described in Section 8.22), the costs payable by Tenant to Landlord hereunder shall include any costs incurred by Landlord (or which are payable by Landlord) to obtain consent to any proposed assignment or sublease from the Bankruptcy Court (as hereinafter defined) or any secured lenders or the unsecured creditors committee.

     **5.03**   **General Provisions.**  (a)  If this lease is assigned, whether or not in violation of this lease, Landlord may collect rent from the assignee.  If the demised premises or any part thereof are sublet or occupied by anybody other than Tenant, whether or not in violation of this lease, Landlord may, after default by Tenant, and expiration of Tenant's time to cure such default, collect rent from the subtenant or occupant.  In either event, Landlord may apply the net amount collected against Rent, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of any of the provisions of Section 5.01(a), or the acceptance of the assignee, subtenant or occupant as tenant, or a release of Tenant from the performance of Tenant's obligations under this lease.

(b)　　　　No assignment or transfer shall be effective until the assignee delivers to Landlord: (i) evidence that the assignee, as Tenant hereunder, has complied with the requirements of Sections 7.02 and 7.03; and (ii) an agreement in form and substance reasonably satisfactory to Landlord whereby the assignee assumes Tenant's obligations under this lease, and an executed Landlord consent form.

(c)　　　　Notwithstanding any assignment or transfer, whether or not in violation of this lease, and notwithstanding the acceptance of any Rent by Landlord from an assignee, transferee, or any other party, the original named Tenant and each successor Tenant shall remain fully liable for the payment of the Rent and the performance of all of Tenant's other obligations under this lease. The joint and several liability of Tenant and any immediate or remote successor in interest of Tenant shall not be discharged, released or impaired in any respect by any agreement made by Landlord extending the time to perform, or otherwise modifying, any of the obligations of Tenant under this lease, or by any waiver or failure of Landlord to enforce any of the obligations of Tenant under this lease.

(d)　　　　Each subletting by Tenant shall be subject to the following:

(i)　　　　No subletting shall be for a term (including any renewal or extension options contained in the sublease) ending later than one day prior to the Expiration Date.

(ii)　　　　No sublease shall be valid, and no subtenant shall take possession of the demised premises or any part thereof, until there has been delivered to Landlord, both:  (A) an executed counterpart of such sublease and Landlord consent form; and (B) a certificate of insurance evidencing that:  (x) Landlord (and all other required parties) are each an additional insured under the insurance policies required to be maintained by occupants of the demised premises pursuant to Section 7.02; and (y) there is in full force and effect, the insurance otherwise required by Section 7.02.

(iii)　　　　Each sublease shall provide that it is subject and subordinate to this lease, and that in the event of termination, reentry or dispossess by Landlord under this lease Landlord may, at its option, take over all of the right, title and interest of Tenant, as sublessor, under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall not be liable for, subject to or bound by any item of the type that a Successor Landlord is not so liable for, subject to or bound by in the case of an attornment by Tenant to a Successor Landlord under Section 6.01(a).

(e)　　　　Each sublease shall provide that the subtenant may not assign its rights thereunder or further sublet the space demised under the sublease, in whole or in part, without Landlord's consent and without complying with all of the terms and conditions of this Article 5 which for purposes of this Section 5.02(e) shall be deemed to be appropriately modified to take into account that the transaction in question is an assignment of the sublease or a further subletting of the space demised under the sublease, as the case may be.

(f)　　　　Tenant shall not publicly advertise the availability of the demised premises or any portion thereof as sublet space or by way of an assignment of this lease, without first obtaining Landlord's consent, which consent shall be granted or denied by Landlord in its sole and absolute discretion.

**5.04  Assignment and Sublease Profits.**  (a)  If the aggregate of the amounts payable as fixed rent and as additional rent on account of taxes, operating expenses and electricity by a subtenant under a sublease of any part of the demised premises and the amount of any Other Sublease Consideration (as hereinafter defined) payable to Tenant by such subtenant, whether received in a lump-sum payment or otherwise shall be in excess of Tenant's Basic Cost (as hereinafter defined) therefor at that time then, promptly after the collection thereof, Tenant shall pay to Landlord in monthly installments as and when collected, as Additional Rent, 50% of such excess.  Tenant shall deliver to Landlord within 30 days after the end of each calendar year and within 30 days after the expiration or earlier termination of this lease a statement specifying each sublease in effect during such calendar year or partial calendar year, the rentable area demised thereby, the term thereof and a computation in reasonable detail showing the calculation of the amounts paid and payable by the subtenant to Tenant, and by Tenant to Landlord, with respect to such sublease for the period covered by such statement.  "Tenant's Basic Cost" for sublet space at any time means the sum of:  (i) the portion of the Fixed Rent and the payments payable under Section 2.05 which is attributable to the sublet space; plus (ii) the amount payable by Tenant on account of electricity in respect of the sublet space; plus (iii) the amount of any costs reasonably incurred by Tenant in making changes in the layout and finish of the sublet space for the subtenant amortized on a straight-line basis over the term of the sublease; plus (iv) the amount of any reasonable brokerage commissions and reasonable legal fees paid by Tenant in connection with the sublease amortized on a straight-line basis over the term of the sublease.  "Other Sublease Consideration" means all sums paid for the furnishing of services by Tenant or Landlord and the sale or rental of Tenant's Fixtures, leasehold improvements, equipment, furniture or other personal property less, in the case of the sale thereof, the then net unamortized or undepreciated cost thereof determined on the basis of Tenant's federal income tax returns.

(b)  Upon any assignment of this lease, Tenant shall pay to Landlord 50% of the Assignment Consideration (as hereinafter defined) received by Tenant for such assignment, after deducting therefrom customary and reasonable closing expenses.  "Assignment Consideration" means an amount equal to all sums and other consideration paid to Tenant by the assignee for or by reason of such assignment (including, without limitation, sums paid for the furnishing of services by Tenant and the sale or rental of Tenant's fixtures, leasehold improvements, equipment, furniture, furnishings or other personal property, less, in the case of a sale thereof, the then net unamortized or undepreciated cost thereof determined on the basis of Tenant's federal income tax returns).

## ARTICLE 6

## Subordination; Default; Indemnity

**6.01  Subordination.**  (a)  This lease is subject and subordinate to each mortgage (a "Superior Mortgage") and each underlying lease (a "Superior lease") which may now or hereafter affect all or any portion of the Project or any interest therein.  The lessor under a Superior lease is called a "Superior Lessor" and the mortgagee under a Superior Mortgage is called a "Superior Mortgagee".  Tenant shall execute, acknowledge and deliver any instrument reasonably requested by Landlord, a Superior Lessor or Superior Mortgagee to evidence such subordination, but no such instrument shall be necessary to make such subordination effective.  Tenant shall execute any amendment of this lease requested by a Superior Mortgagee or a Superior Lessor, provided such amendment shall not result in a material increase in Tenant's obligations under this lease or a material reduction in the benefits available to Tenant.  In the event of the enforcement by a Superior Mortgagee

of the remedies provided for by law or by such Superior Mortgage, or in the event of the termination or expiration of a Superior lease, Tenant, upon request of such Superior Mortgagee, Superior Lessor or any person succeeding to the interest of such mortgagee or lessor (each, a "Superior Landlord"), shall automatically become the tenant of such Successor Landlord without change in the terms or provisions of this lease (it being understood that Tenant shall, if requested, enter into a new lease on terms identical to those in this lease); provided that Successor Landlord shall not be: (i) liable for any act, omission or default of any prior landlord (including, without limitation, Landlord); (ii) liable for the return of any moneys paid to or on deposit with any prior landlord (including, without limitation, Landlord), except to the extent such moneys or deposits are delivered to such Successor Landlord; (iii) subject to any offset, claims or defense that Tenant might have against any prior landlord (including, without limitation, Landlord); (iv) bound by any Rent which Tenant might have paid for more than the current month to any prior landlord (including, without limitation, Landlord) unless actually received by such Successor Landlord; (v) bound by any covenant to perform or complete any construction in connection with the Project or the demised premises or to pay any sums to Tenant in connection therewith; or (vi) bound by any waiver or forbearance under, or any amendment, modification, abridgment, cancellation or surrender of, this lease made without the consent of such Successor Landlord. Upon request by such Successor Landlord, Tenant shall execute and deliver an instrument or instruments, reasonably requested by such Successor Landlord, confirming the attornment provided for herein, but no such instrument shall be necessary to make such attornment effective.

(b)        Tenant shall give each Superior Mortgagee and each Superior Lessor a copy of any notice of default served upon Landlord, provided that Tenant has been notified of the address of such mortgagee or lessor. If Landlord fails to cure any default as to which Tenant is obligated to give notice within the time provided for in this lease, then each such mortgagee or lessor shall have an additional 30 days after receipt of such notice within which to cure such default or if such default cannot be cured within that time, then such additional time as may be necessary if, within such 30 days, any such mortgagee or lessor has commenced and is diligently pursuing the remedies necessary to cure such default, in which event this lease shall not be terminated and Tenant shall not exercise any other rights or remedies under this lease or otherwise while such remedies are being so diligently pursued in accordance with the terms hereof. Nothing herein shall be deemed to imply that Tenant has any right to terminate this lease or any other right or remedy, except as may be otherwise expressly provided for in this lease. Each such mortgagee or lessor may elect to cure such default or not in its sole and absolute discretion, and shall have no obligation to commence to cure a default, or, once commenced, to complete such cure.

(c)        Without limiting Tenant's obligations under Section 6.01(a), Tenant covenants and agrees that if by reason of a default under any Superior lease through which Landlord derives its leasehold estate in the Project, the Superior Lease and the leasehold estate of the Landlord in the Project is terminated, Tenant will attorn to the Successor Landlord and will recognize the Successor Landlord as Tenant's landlord under this lease, at the election of such Successor Landlord. Tenant agrees to execute and deliver, at any time and from time to time, upon the request of the Landlord or of the Successor Landlord any reasonable instrument which may be necessary or appropriate to evidence such attornment and Tenant hereby irrevocably appoints the Landlord or the Successor Landlord under such Superior Lease the attorney-in-fact of Tenant to execute and deliver for and on behalf of Tenant any such instrument. Tenant further waives the provisions of any statute or rule or law now or hereafter in effect which may give or purport to give Tenant any right of election to terminate this lease or to surrender possession of the demised premises in the event any proceeding is brought by the

Superior Lessor to terminate the Superior lease, and agrees that unless and until the Superior Lessor, in connection with any such proceeding, shall elect to terminate this lease and the rights of the Tenant hereunder, this lease shall not be affected in any way whatsoever by any such proceeding.

6.02    **Estoppel Certificate.**    Each party shall, at any time and from time to time, within 10 days after request by the other party, execute and deliver to the requesting party (or to such person or entity as the requesting party may designate) a statement certifying that this lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), certifying the Commencement Date, Expiration Date and the dates to which the Fixed Rent and Additional Rent have been paid and stating whether or not, to the actual knowledge of such party, the other party is in default in performance of any of its obligations under this lease, and, if so, specifying each such default of which such party has actual knowledge, it being intended that any such statement shall be deemed a representation and warranty to be relied upon by the party to whom such statement is addressed.  Tenant also shall include or confirm in any such statement such other information concerning this lease as Landlord may reasonably request.

6.03    **Default.**    This lease and the term and estate hereby granted are subject to the limitation that:

(a)        if Tenant defaults in the payment of any Fixed Rent and such default continues for 5 days after Landlord gives to Tenant a notice specifying such default;

(b)        if Tenant defaults in the payment of any Additional Rent and such default continues for 5 days after Landlord gives to Tenant a notice specifying such default;

(c)        if Tenant files a voluntary petition in bankruptcy or insolvency, or is adjudicated a bankrupt or insolvent, or files any petition or answer seeking a reorganization, liquidation, dissolution or similar relief under any present or future federal or state bankruptcy or other act or law or makes an assignment for the benefit of creditors or seeks or consent to or acquiesces in the appointment of any trustee, receiver, liquidator or other similar official for Tenant or for all or any part of Tenant's property;

(d)        If, within 60 days after the commencement of any proceeding against Tenant, whether by the filing of a petition or otherwise, seeking bankruptcy, insolvency, reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy act or any other federal or state statute or law, such proceeding shall not have been dismissed, or if, within 60 days after the appointment of any trustee, receiver, liquidator or other similar official for Tenant, or for all or any party of Tenant's property, without the consent or acquiescence of the Tenant, such appointment shall not have been vacated or otherwise discharged, or if any lien, execution or attachment or other similar filing shall be made or issued against Tenant or any of Tenant's property pursuant to which the demised premises shall be taken or occupied or attempted to be taken or occupied by someone other than Tenant;

(e)        if Tenant defaults in the keeping, observance or performance of any covenant or agreement, (other than a default of the character referred to in Sections 6.03(a), (b), (c), (d), (f), (g), (h), (i) or (j)) and if such default continues and is not cured within 15 days after Landlord gives to

Tenant a notice specifying the same, or, in the case of a default which can be cured but for causes beyond Tenant's reasonable control cannot with due diligence be cured within such period of 15 days, if Tenant shall not immediately upon the receipt of such notice: (i) notify Landlord of Tenant's intention duly to institute all steps necessary to cure such default; and (ii) institute and thereafter diligently prosecute to completion all steps necessary to cure the same,

(f)　　　　if this lease or the estate hereby granted would or does, by operation of law or otherwise, devolve upon or pass to any person or entity other than Tenant, except as permitted by Article 5;

(g)　　　　if Tenant shall abandon the demised premises (and the fact that any of Tenant's Property remains in the demised premises shall not be evidence that Tenant has not abandoned the demised premises);

(h)　　　　if Tenant or any Affiliate of Tenant defaults under any other lease with Landlord or any Affiliate of Landlord, which default shall continue beyond any applicable grace period provided under such other lease;

(i)　　　　if a default of the kind set forth in Section 6.03(a), (b) or (e) shall occur and have been cured, and if a similar default shall occur more than once within the next 365 days, whether or not such similar defaults are cured within the applicable grace period; or

then, in any of such cases, in addition to any other remedies available to Landlord at law or in equity, Landlord shall be entitled to give to Tenant a notice of intention to end the Term at the expiration of 5 days from the date of the giving of such notice, and, in the event such notice is given, this lease and the term and estate hereby granted shall terminate upon the expiration of such 5 days with the same effect as if the last of such 5 days were the Expiration Date, but Tenant shall remain liable for damages as provided herein or pursuant to law.

**6.04**　　**Re-entry by Landlord**.  If Tenant defaults in the payment of any Rent and such default continues for 5 days, or if this lease shall terminate as in Section 6.03 provided, Landlord or Landlord's agents and servants may immediately or at any time thereafter re-enter into or upon the demised premises, or any part thereof, either by summary dispossess proceedings or by any suitable action or proceeding at law, without being liable to indictment, prosecution or damages therefor, and may repossess the same, and may remove any persons therefrom, to the end that Landlord may have, hold and enjoy the demised premises.  The words "re-enter" and "re-entering" as used in this lease are not restricted to their technical legal meanings.  Upon such termination or re-entry, Tenant shall pay to Landlord any Rent then due and owing (in addition to any damages payable under Section 6.05).

**6.05**　　**Damages**.  If this lease is terminated under Section 6.03, or if Landlord re-enters the demised premises under Section 6.04, Tenant shall pay to Landlord as damages, at the election of Landlord, either:

(a)　　　　all Rent and other amounts due to Landlord and unpaid as of the date of termination or re-entry, plus, a sum which, at the time of such termination or re-entry, represents the then value (using a discount rate equal to the Base Rate minus one percent (1%)) of the excess, if any, of:  (1) the aggregate of the Rent which, had this lease not terminated, would have been payable hereunder by Tenant (and not paid under Subsection (b) below) for the period commencing on the day

following the date of such termination or re-entry to and including the Expiration Date; over (2) the aggregate fair rental value of the demised premises for the same period, as reasonably determined by Landlord (for the purposes of this <u>clause (a)</u> the amount of Additional Rent which would have been payable by Tenant under <u>Sections 2.04</u> and <u>2.05</u> shall, for each calendar year ending after such termination or re-entry, be deemed to be an amount equal to 105% of the amount of such Additional Rent payable by Tenant for the calendar year immediately preceding the calendar year in which such termination or re-entry shall occur in the case of the first such calendar year and the immediately prior calendar year in the case of each succeeding calendar year); or

(b)        all Rent and other amounts due to Landlord and unpaid as of the date of termination or re-entry, plus, sums equal to the Rent that would have been payable by Tenant through and including the Expiration Date had this lease not terminated or had Landlord not re-entered the demised premises, payable upon the due dates therefor specified in this lease; <u>provided</u>, that if Landlord shall relet all or any part of the demised premises for all or any part of the period commencing on the day following the date of such termination or re-entry to and including the Expiration Date, either alone or with other premises (all of which Landlord may do in its sole and absolute discretion) Landlord shall credit Tenant with the net rents received by Landlord from such reletting, such net rents to be determined by first deducting from the gross rents as and when received by Landlord from such reletting the expenses incurred or paid by Landlord in terminating this lease and of re-entering the demised premises and of securing possession thereof, as well as the expenses of reletting, including, without limitation, altering and preparing the demised premises for new tenants, brokers' commissions, and all other expenses properly chargeable against the demised premises and the rental therefrom in connection with such reletting, it being understood that any such reletting may be for a period equal to or shorter or longer than said period; <u>provided</u>, <u>further</u>, that: (i) in no event shall Tenant be entitled to receive any excess of such net rents over the sums payable by Tenant to Landlord under this lease; (ii) in no event shall Tenant be entitled, in any suit for the collection of damages pursuant to this <u>Section 6.05(b)</u>, to a credit in respect of any net rents from a reletting except to the extent that such net rents are actually received by Landlord prior to the commencement of such suit; (iii) if the demised premises or any part thereof should be relet in combination with other space, then proper apportionment on a square foot rentable area basis shall be made of the rent received from such reletting and of the expenses of reletting; and (iv) Landlord shall have no obligation to so relet the demised premises and Tenant hereby waives any right Tenant may have, at law or in equity, to require Landlord to so relet the demised premises.

Suit or suits for the recovery of any damages payable hereunder by Tenant, or any installments thereof, may be brought by Landlord from time to time at its election, and nothing contained herein shall require Landlord to postpone suit until the date when the Term would have expired but for such termination or re-entry. Landlord may bring suit under Subsection (a) above at any time, and suits brought under Subsection (b) above shall not be deemed a waiver of Landlord's right to subsequently bring suit under Subsection (a) above.

      **6.06**    **Other Remedies.**  Nothing contained in this lease shall be construed as limiting or precluding the recovery by Landlord against Tenant of any sums or damages to which, in addition to the damages particularly provided above, Landlord may lawfully be entitled by reason of any default hereunder on the part of Tenant. Anything in this lease to the contrary notwithstanding, during the continuation of any default by Tenant, Tenant shall not be entitled to exercise any rights or options, or to receive any funds or proceeds being held, under or pursuant to this lease.

**6.07    Right to Injunction.**  In the event of a breach or threatened breach by Tenant of any of its obligations under this lease, Landlord shall also have the right of injunction.  The specified remedies to which Landlord may resort hereunder are cumulative and are not intended to be exclusive of any other remedies or means of redress to which Landlord may lawfully be entitled, and Landlord may invoke any remedy allowed at law or in equity as if specific remedies were not herein provided for.

**6.08    Certain Waivers.**  Tenant waives and surrenders all right and privilege that Tenant might have under or by reason of any present or future law to redeem or re-enter or repossess the demised premises or to have a continuance of this lease after Tenant is dispossessed or ejected therefrom by process of law or under the terms of this lease or after any termination of this lease.  Tenant also waives the provisions of any law relating to notice and/or delay in levy of execution in case of any eviction or dispossession for nonpayment of rent, and the provisions of any successor or other law of like import.  Landlord and Tenant each waive trial by jury in any action in connection with this lease.

**6.09    No Waiver.**  Failure by either party to declare any default immediately upon its occurrence or delay in taking any action in connection with such default shall not waive such default but such party shall have the right to declare any such default at any time thereafter.  Any amounts paid by Tenant to Landlord may be applied by Landlord, in Landlord's discretion, to any items then owing by Tenant to Landlord under this lease.  Receipt by Landlord of a partial payment shall not be deemed to be an accord and satisfaction (notwithstanding any endorsement or statement on any check or any letter accompanying any check or payment) nor shall such receipt constitute a waiver by Landlord of Tenant's obligation to make full payment.  No act or thing done by Landlord or its agents shall be deemed an acceptance of a surrender of the demised premises, and no agreement to accept such surrender shall be valid unless in writing and signed by Landlord and by each Superior Lessor and Superior Mortgagee whose lease or mortgage provides that any such surrender may not be accepted without its consent.

**6.10    Holding Over.**  (a)  If Tenant holds over without the consent of Landlord after expiration or termination of this lease, starting on the date on which such holdover commences (the "Holdover Date"), Tenant shall pay as a use and occupancy charge for each month of the holdover tenancy 200% multiplied by the Holdover Amount.  The "Holdover Amount" shall be the Rent which Tenant was obligated to pay for the month immediately preceding the end of the Term (including all Additional Rent).  In addition, Tenant shall be liable to Landlord for and shall indemnify, defend and hold Landlord harmless from and against:  (1) (A) any payment or rent concession which Landlord may be required to make to any tenant obtained by Landlord for all or any part of the demised premises (a "New Tenant") by reason of the late delivery of space to the New Tenant as a result of Tenant's holding over or in order to induce such New Tenant not to terminate its lease by reason of the holding over by Tenant, (B) the loss of the benefit of the bargain if any New Tenant shall terminate its lease by reason of the holding over by Tenant, and (C) any claim for damages by any New Tenant; and (2) (x) any payment or concession which Landlord may be required to make to any purchaser or prospective purchaser of the Land or the Building  (a "Purchaser") by reason of Landlord's inability to deliver vacant possession of the Premises to such Purchaser, (y) the loss of the benefit of the bargain if any Purchaser shall terminate its purchase agreement by reason of the holding over by Tenant, and (z) any claim for damages by any Purchaser.  No holding over by Tenant after the Term shall operate to extend the Term.  Notwithstanding the foregoing, the acceptance of any use and occupancy charges

paid by Tenant pursuant to this Section 6.10 shall not preclude Landlord from commencing and prosecuting a holdover or summary eviction proceeding.

(b)        Tenant expressly waives, for itself and for any person claiming through or under Tenant, any rights which Tenant or any such person may have under the provisions of Section 2201 of the New York Civil Practice Law and Rules and any successor Law of like import then in force, in connection with any holdover summary proceedings which Landlord may institute to enforce the foregoing provisions of this Section 6.10.

(c)        Nothing herein shall be deemed to permit Tenant to retain possession of the demised premises after the Expiration Date or earlier Termination of this lease and no acceptance by Landlord of payments from Tenant after the Expiration Date or sooner termination of this lease shall be deemed to be other than on account of the amounts to be paid by Tenant in accordance with the provisions of Section 6.10.  Tenant's obligations under this Section shall survive the expiration or termination of this lease.

**6.11    Attorneys' Fees.**  If Landlord places the enforcement of this lease or any part thereof, or the collection of any Rent due or to become due hereunder, or recovery of the possession of the demised premises, in the hands of an attorney, or files suit upon the same, or in the event any bankruptcy, insolvency or other similar proceeding is commenced involving Tenant, Tenant shall, upon demand, pay Landlord for any reasonable attorneys' fees and disbursements and court costs incurred by Landlord.

**6.12    Nonliability and Indemnification.**  (a)  None of Landlord, any Superior Lessor, any Superior Mortgagee or any direct or indirect member, partner, director, officer, shareholder, policyholders, principal, agent, servant or employee of Landlord, any Superior Lessor or any Superior Mortgagee (whether disclosed or undisclosed), shall be liable to Tenant for:  (i) any loss, injury or damage to Tenant or to any other person, or to its or their property, irrespective of the cause of such injury, damage or loss, nor shall the aforesaid parties be liable for any loss of or damage to property of Tenant or of others entrusted to employees of Landlord; provided, that, except to the extent of the release of liability and waiver of subrogation provided in Section 7.03, the foregoing shall not be deemed to relieve Landlord of any liability to the extent resulting from the negligence of Landlord, its agents, servants or employees in the operation or maintenance of the demised premises or the Building; (ii) any loss, injury or damage described in clause (i) above caused by other tenants, occupants or persons in, upon or about the Building, or caused by operations in construction of any private, public or quasi-public work; or (iii) even if negligent, consequential damages arising out of any loss of use of the demised premises or any equipment, facilities or other Tenant's Property therein or otherwise.

(b)        Tenant shall indemnify and hold harmless Landlord, all Superior Lessors and all Superior Mortgagees and each of their respective direct and indirect members, partners, directors, officers, shareholders, policyholders, principals, agents and employees (each, an "Indemnified Party"), from and against any and all claims arising from or in connection with:  (i) the conduct or management of the demised premises or of any business therein, or any work or thing done, or any condition created, in or about the demised premises; (ii) any act, omission or negligence of Tenant or any person claiming through or under Tenant or any of their respective direct or indirect members, partners, shareholders, directors, officers, agents, employees or contractors; (iii) any accident, injury or damage occurring in, at or upon the demised premises; (iv) any default by Tenant in the performance of

Tenant's obligations under this lease; and (v) any brokerage commission or similar compensation claimed to be due by reason of any proposed subletting or assignment by Tenant (irrespective of the exercise by Landlord of any of the options in Section 5.02(b)); together with all costs, expenses and liabilities incurred in connection with each such claim or action or proceeding brought thereon, including, without limitation, all reasonable attorneys' fees and disbursements; provided, that the foregoing indemnity shall not apply to the extent that any such claim results from the negligence (other than negligence to which the release of liability and waiver of subrogation provided in Section 7.03 applies) or willful misconduct of the Indemnified Party.  If any action or proceeding is brought against any Indemnified Party by reason of any such claim, Tenant, upon notice from such Indemnified Party shall resist and defend such action or proceeding (by counsel reasonably satisfactory to such Indemnified Party).

**ARTICLE 7**

**Insurance; Casualty; Condemnation**

**7.01**    **Compliance with Insurance Standards.**  (a)  Tenant shall not violate, or permit the violation of, any condition imposed by any insurance policy then issued in respect of the Project and shall not do, or permit anything to be done, or keep or permit anything to be kept in the demised premises, which would subject Landlord, any Superior Lessor or any Superior Mortgagee to any liability or responsibility for personal injury or death or property damage, or which would increase any insurance rate in respect of the Project over the rate which would otherwise then be in effect or which would result in insurance companies of good standing refusing to insure the Project in amounts reasonably satisfactory to Landlord, or which would result in the cancellation of, or the assertion of any defense by the insurer in whole or in part to claims under, any policy of insurance in respect of the Project.

(b)    If, by reason of any failure of Tenant to comply with this lease, the premiums on Landlord's insurance on the Project shall be higher than they otherwise would be, Tenant shall reimburse Landlord, on demand, for that part of such premiums attributable to such failure on the part of Tenant.  A schedule or "make up" of rates for the Building, Project or the demised premises, as the case may be, issued by the New York Fire Insurance Rating Organization or other similar body making rates for insurance for the Project or the demised premises, as the case may be, shall be conclusive evidence of the facts therein stated and of the several items and charges in the insurance rate then applicable to the Project or the demised premises, as the case may be.

**7.02**    **Tenant's Insurance.**  Tenant shall maintain at all times during the Term: (a) "all risk" property insurance covering all present and future Tenant's Property (including, without limitation, Fixtures and Improvements and Betterments to a limit of not less than the full replacement cost thereof; (b) commercial general liability insurance, including a contractual liability endorsement, and personal injury liability coverage, in respect of the demised premises and the conduct or operation of business therein, with Landlord, its managing agent, if any, each Superior Lessor and Superior Mortgagee, and any other party whose name and address shall have been furnished to Tenant, as additional insureds, with limits of not less than $5,000,000 combined single limit for bodily injury and property damage liability in any one occurrence; (c) boiler and machinery, if there is a boiler, supplemental air conditioning unit or pressure object or similar equipment in the demised premises, with Landlord, its managing agent, if any, each Superior Lessor and Superior Mortgagee and any other

party whose name and address shall have been furnished to Tenant, as additional insureds, with limits of not less than $5,000,000; and (d) when Alterations are in process, the insurance specified in Section 4.02(f); (e) Workers Compensation insurance as required by Law; and (f) business interruption insurance. The limits of such insurance shall not limit the liability of Tenant. Tenant shall deliver to Landlord and any additional insureds, prior to the Commencement Date, such fully paid-for policies or certificates of insurance, in form reasonably satisfactory to Landlord issued by the insurance company or its authorized agent. Tenant shall procure and pay for renewals of such insurance from time to time before the expiration thereof, and Tenant shall deliver to Landlord and any additional insureds such renewal policy or a certificate thereof at least 30 days before the expiration of any existing policy. All such policies shall be issued by companies of recognized responsibility licensed to do business in New York State and rated by Best's Insurance Reports or any successor publication of comparable standing as A/XII or better or the then equivalent of such rating, and all such policies shall contain a provision whereby the same cannot be canceled, allowed to lapse or modified unless Landlord and any additional insureds are given at least 30 days prior written notice of such cancellation, lapse or modification. Tenant shall cooperate with Landlord in connection with the collection of any insurance moneys that may be due in the event of loss and Tenant shall execute and deliver to Landlord such proofs of loss and other instruments which may be required to recover any such insurance moneys. Landlord may from time to time require that the amount and types of the insurance to be maintained by Tenant under this Section 7.02 be reasonably increased or modified, so that the amount and types thereof adequately protect Landlord's interest.

7.03 **Subrogation Waiver.** Landlord and Tenant shall each include in each of its insurance policies (insuring the Building in case of Landlord, and insuring Tenant's Property, Fixtures and Improvements and Betterments in the case of Tenant, against loss, damage or destruction by fire or other casualty) a waiver of the insurer's right of subrogation against the other party or, if such waiver should be unobtainable or unenforceable: (a) an express agreement that such policy shall not be invalidated if the assured waives the right of recovery against any party responsible for a casualty covered by the policy before the casualty; or (b) any other form of permission for the release of the other party, each to the extent commercially available. Each party hereby releases the other party with respect to any claim (including a claim for negligence) which it might otherwise have against the other party for loss, damage or destruction with respect to its property occurring during the Term to the extent to which it is insured under a policy or policies required to be maintained pursuant to the terms of this lease or should have been insured pursuant to the terms of the lease. Each party shall promptly notify the other if a waiver of subrogation or other release of liability is not commercially available. Nothing contained in this Section 7.03 shall be deemed to relieve either party of any duty imposed elsewhere in this lease to repair, restore or rebuild or to nullify any abatement of rents provided for elsewhere in this lease.

7.04 **Condemnation.** (a) If there shall be a total taking of the Building in condemnation proceedings or by any right of eminent domain, this lease and the term and estate hereby granted shall terminate as of the date of taking of possession by the condemning authority and all Rent shall be prorated and paid as of such termination date. If there shall be a taking of any material (in Landlord's reasonable judgment) portion of the Land or the Building (whether or not the demised premises are affected by such taking), then Landlord may terminate this lease and the term and estate granted hereby by giving notice to Tenant within 60 days after the date of taking of possession by the condemning authority. If there shall be a taking of the demised premises of such scope (but in no event less than 20% thereof) that the untaken part of the demised premises would in Tenant's

reasonable judgment be uneconomic to operate, then Tenant may terminate this lease and the term and estate granted hereby by giving notice to Landlord within 60 days after the date of taking of possession by the condemning authority, or should have been insured pursuant to the terms of the lease. If either Landlord or Tenant shall give a termination notice as aforesaid, then this lease and the term and estate granted hereby shall terminate as of the date of such notice and all Rent shall be prorated and paid as of such termination date. In the event of a taking of the demised premises which does not result in the termination of this lease: (i) the term and estate hereby granted with respect to the taken part of the demised premises shall terminate as of the date of taking of possession by the condemning authority and all Rent with respect to such taken portion shall be appropriately abated for the period from such date to the Expiration Date; and (ii) Landlord shall with reasonable diligence restore the remaining portion of the demised premises (exclusive of Tenant's Fixtures, Improvements and Betterments and Tenant's Property) as nearly as practicable to its condition prior to such taking.

(b)        In the event of any taking of all or a part of the Building, Landlord shall be entitled to receive the entire award in the condemnation proceeding, including, without limitation, any award made for the value of the estate vested by this lease in Tenant or any value attributable to the unexpired portion of the Term, and Tenant hereby assigns to Landlord any and all right, title and interest of Tenant now or hereafter arising in or to any such award or any part thereof, and Tenant shall be entitled to receive no part of such award; provided, that nothing shall preclude Tenant from intervening in any such condemnation proceeding to claim or receive from the condemning authority any compensation to which Tenant may otherwise lawfully be entitled in such case in respect of Tenant's Property or moving expenses, provided the same do not include any value of the estate vested by this lease in Tenant or of the unexpired portion of the Term and do not reduce the amount available to Landlord or delay the payment thereof.

(c)        If all or any part of the demised premises shall be taken for a limited period, Tenant shall be entitled, except as hereinafter set forth, to that portion of the award for such taking which represents compensation for the use and occupancy of the demised premises, for the taking of Tenant's Property and for moving expenses, and Landlord shall be entitled to that portion which represents reimbursement for the cost of restoration of the demised premises. This lease shall remain unaffected by such taking and Tenant shall continue responsible for all of its obligations under this lease to the extent such obligations are not affected by such taking and shall continue to pay in full all Rent when due. If the period of temporary use or occupancy shall extend beyond the Expiration Date, that part of the award which represents compensation for the use and occupancy of the demised premises shall be apportioned between Landlord and Tenant as of the Expiration Date. Any award for temporary use and occupancy for a period beyond the date to which the Rent has been paid shall be paid to, held and applied by Landlord as a trust fund for payment of the Rent thereafter becoming due.

(d)        In the event of any taking which does not result in termination of this lease: (i) Landlord shall proceed with reasonable diligence to repair the remaining parts of the Building and the demised premises (other than those parts of the demised premises which constitute Tenant's Property, Fixtures and Improvements and Betterments) to substantially their former condition to the extent that the same may be feasible (subject to reasonable changes which Landlord deems desirable) and so as to constitute a complete and rentable building; and (ii) Tenant shall proceed with reasonable diligence to repair the remaining parts of the demised premises which constitute Tenant's Property, Fixtures and Improvements and Betterments, to substantially their former condition to the extent that the same may be feasible, subject to reasonable changes which shall be deemed Alterations.

**7.05** __Casualty.__ (a) If the Building or the demised premises shall be partially or totally damaged or destroyed by fire or other casualty (each, a "Casualty") and if this lease is not terminated as provided below, then: (i) Landlord shall repair and restore the Building and the demised premises (excluding Tenant's Improvements and Betterments, Tenant's Property and Fixtures) with reasonable dispatch (but Landlord shall not be required to perform the same on an overtime or premium pay basis) after notice to Landlord of the Casualty and the collection of the insurance proceeds attributable to such Casualty; and (ii) Tenant shall repair and restore in accordance with Section 4.02 all Tenant's Improvements and Betterments, Tenant's Property and Fixtures with reasonable dispatch after the Casualty.

(b) If all or part of the demised premises shall be rendered untenantable by reason of a Casualty, the Fixed Rent and Additional Rent shall be abated in the proportion that the untenantable area of the demised premises bears to the total area of the demised premises, for the period from the date of the Casualty to the earlier of: (i) the date the demised premises is made tenantable but in no event beyond 90 days from the date the demised premises are returned to Tenant and Tenant has a reasonable means of access to the demised premises (provided, that if the demised premises would have been tenantable at an earlier date but for Tenant having failed diligently to prosecute repairs or restoration, then the demised premises shall be deemed to have been made tenantable on such earlier date and the abatement shall cease); or (ii) the date Tenant or any subtenant reoccupies a portion of the demised premises for the ordinary conduct of business (in which case the Fixed Rent and the Additional Rent allocable to such reoccupied portion shall be payable by Tenant from the date of such occupancy). Landlord's determination of the date the demised premises is tenantable shall be controlling unless Tenant disputes same by notice to Landlord within 10 days after such determination by Landlord and pending resolution of such dispute, Tenant shall pay Rent in accordance with Landlord's determination. Notwithstanding the foregoing, if by reason of any act or omission by Tenant, any subtenant or any of their respective partners, directors, officers, servants, employees, agents or contractors, Landlord, any Superior Lessor or any Superior Mortgagee shall be unable to collect all of the insurance proceeds (including, without limitation, rent insurance proceeds) applicable to the Casualty, then, without prejudice to any other remedies which may be available to Landlord, there shall be no abatement of Rent. Nothing contained in this Section 7.05 shall relieve Tenant from any liability that may exist as a result of any Casualty.

(c) If by reason of a Casualty: (i) the Building shall be totally damaged or destroyed; (ii) the Building or the demised premises shall be so damaged or destroyed (whether or not, with respect to the Building, the demised premises are damaged or destroyed) that Landlord's repair or restoration shall require more than 30 days or the expenditure of more than $200,000.00 (as estimated in any such case by a reputable contractor, architect or engineer designated by Landlord) then in any such case Landlord or Tenant may terminate this lease by notice given to the other party within 90 days after the Casualty.

(d) Landlord shall not carry any insurance on Tenant's Property, Tenant's Improvements and Betterments or Fixtures and shall not be obligated to repair or replace Tenant's Property, Tenant's Improvements and Betterments or Fixtures. Tenant shall look solely to its insurance for recovery of any damage to or loss of Tenant's Property, Tenant's Improvements and Betterments or Fixtures. Tenant shall notify Landlord promptly of any Casualty in or affecting the demised premises.

(e)     This <u>Section 7.05</u> shall be deemed an express agreement governing any damage or destruction of the demised premises by fire or other casualty, and Section 227 of the New York Real Property Law providing for such a contingency in the absence of an express agreement, and any other law of like import now or hereafter in force, shall have no application.

## ARTICLE 8

## <u>Miscellaneous Provisions</u>

**8.01     <u>Notice</u>.**  All notices, demands, consents, approvals, advises, waivers or other communications which may or are required to be given by either party to the other under this lease (each, "<u>Notice</u>") shall be in writing and shall be delivered by:  (a) personal delivery; (b) the United States Postal Service, certified or registered, postage prepaid, return receipt requested; or (c) a nationally recognized overnight courier, in each case addressed to the party to be notified at the address for such party specified in the first paragraph of this lease (in the case of each Notice to Landlord to the attention of _____ and with a copy of each Notice to Tenant to _____ or to such other place as the party to be notified may from time to time designate by at least 5 Business Days notice to the notifying party.  Notices from Landlord may be given by Landlord's managing agent, if any.  Each Notice shall be deemed to have been given on the date such Notice is actually received as evidenced by a receipt therefor, or when delivery is first refused, and in the event of failure to deliver by reason of changed address of which no Notice was given or refusal to accept delivery, as of the date of such failure.

**8.02     <u>Building Rules</u>.**  Tenant shall comply with, and Tenant shall cause its licensees, employees, contractors, agents and invitees to comply with, the rules and regulations of the Building set forth in <u>Exhibit B</u> attached hereto and made a part hereof, as the same may be reasonably modified or supplemented by Landlord from time to time ("<u>Rules and Regulations</u>") for construction practices, and the safety, security, maintenance, care and cleanliness of the demised premises and the Building and for preservation of good order therein.  Landlord shall not be obligated to enforce the Rules and Regulations against Tenant or any other tenant or occupant of the Building or any other party, and Landlord shall have no liability to Tenant by reason of the violation by any tenant or other party of the rules of the Building; <u>provided</u>, that Landlord shall not enforce the Rules and Regulations in a manner which discriminates against Tenant.  If any rule of the Building shall conflict with any provision of this lease, such provision of this lease shall govern.

**8.03     <u>Severability</u>.**  If any term or provision of this lease, or the application thereof to any person or circumstances shall to any extent be invalid or unenforceable, the remainder of this lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected, and each provision of this lease shall be valid and shall be enforceable to the extent permitted by law.

**8.04     <u>Certain Definitions</u>.**  (a)  "<u>Landlord</u>" means only the owner, at the time in question, of the Building or that portion of the Building of which the demised premises are a part, or of a lease of the Building or that portion of the Building of which the demised premises are a part, so that in the event of any transfer or transfers of title to the Building or of Landlord's interest in a lease of the Building or such portion of the Building, the transferor shall be and hereby is relieved and freed of all obligations of Landlord under this lease accruing after such transfer, and it shall be deemed, without

further agreement, that such transferee has assumed all obligations of Landlord during the period it is the holder of Landlord's interest under this lease.

(b) "Landlord shall have no liability to Tenant" or words of similar import mean that Tenant is not entitled to terminate this lease, or to claim actual or constructive eviction, partial, or total, or to receive any abatement or diminution of Rent, or to be relieved in any manner or any of its other obligations under this lease, or to be compensated for loss or injury suffered or to enforce any other right or kind of liability whatsoever against Landlord under or with respect to this lease or with respect to Tenant's use or occupancy of the demised premises.

**8.05    Quiet Enjoyment.**  Tenant shall and may peaceably and quietly have, hold and enjoy the demised premises, subject to the other terms of this lease and to the Superior Leases and Superior Mortgages, provided that Tenant pays the Fixed Rent and Additional Rent to be paid by Tenant and performs all of Tenant's covenants and agreements contained in this lease.

**8.06    Limitation of Landlord's Personal Liability.**  Tenant shall have no right to seek any damages from Landlord, including, without limitation, any actual, special, punitive or consequential damages, for any reason, in an amount in excess of (i) the Fixed Rent paid by Tenant hereunder, minus (ii) the aggregate amount paid by Landlord for each Major CI (such amount in clause (i) less the amount in clause (ii) is hereinafter referred to as the "Maximum Amount").  In no event shall Tenant have any claims (1) for loss of business, loss of revenue or similar claims, or (2) for any damages in excess of actual damages that exceed the Maximum Amount, all of which claims are hereby waived by Tenant in full.  Subject to the foregoing provisions of this Section 8.06, Tenant shall look solely to Landlord's interest in the Building for the recovery of any judgment against Landlord, and no other property or assets of Landlord or Landlord's partners, members, officers, directors, shareholders, policyholders, or principals, direct or indirect, disclosed or undisclosed, shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this lease (as such remedies are otherwise limited pursuant to this Section 8.06 or otherwise).

**8.07    Counterclaims.**  If Landlord commences any summary proceeding or action for nonpayment of Rent or to recover possession of the demised premises, Tenant shall not interpose any counterclaim of any nature or description in any such proceeding or action, unless Tenant's failure to interpose such counterclaim in such proceeding or action would result in the waiver of Tenant's right to bring such claim in a separate proceeding under applicable law.

**8.08    Survival.**  All obligations and liabilities of Landlord or Tenant to the other which accrued before the expiration or other termination of this lease and all such obligations and liabilities which by their nature or under the circumstances can only be, or by the provisions of this lease may be, performed after such expiration or other termination, shall survive the expiration or other termination of this lease.  Without limiting the generality of the foregoing, the rights and obligations of the parties with respect to any indemnity under this lease, and with respect to any amounts payable under this lease, shall survive the expiration or other termination of this lease.

**8.09    Certain Remedies.**  If Tenant requests Landlord's consent and Landlord fails or refuses to give such consent, Tenant shall not be entitled to any damages for any withholding by Landlord of its consent, it being intended that Tenant's sole remedy shall be an action for specific

performance or injunction, and that such remedy shall be available only in those cases where this lease provides that Landlord shall not unreasonably withhold its consent. No dispute relating to this lease or the relationship of Landlord and Tenant under this lease shall be resolved by arbitration unless this lease expressly provides for such dispute to be resolved by arbitration.

8.10    **No Offer.**  The submission by Landlord of this lease in draft form shall be solely for Tenant's consideration and not for acceptance and execution. Such submission shall have no binding force or effect and shall confer no rights nor impose any obligations, including brokerage obligations, on either party unless and until both Landlord and Tenant shall have executed a lease and duplicate originals thereof shall have been delivered to the respective parties.

8.11    **Captions; Construction.**  The table of contents, captions, headings and titles in this lease are solely for convenience of reference and shall not affect its interpretation. This lease shall be construed without regard to any presumption or other rule requiring construction against the party causing this lease to be drafted. Each covenant, agreement, obligation or other provision of this lease on Tenant's part to be performed, shall be deemed and construed as a separate and independent covenant of Tenant, not dependent on any other provision of this lease.

8.12    **Amendments.**  This lease may not be altered, changed or amended, except by an instrument in writing signed by the party to be charged.

8.13    **Broker.**  Each party represents to the other that such party has dealt with no broker in connection with this lease, and each party shall indemnify and hold the other harmless from and against all loss, cost, liability and expense (including, without limitation, reasonable attorneys' fees and disbursements) arising out of any claim for a commission or other compensation by any broker who has dealt with the indemnifying party in connection with this lease. The provisions of this Section 8.13 shall survive the expiration or earlier termination of this lease.

8.14    **Merger.**  Tenant acknowledges that Landlord has not made and is not making, and Tenant, in executing and delivering this lease, is not relying upon, any warranties, representations, promises or statements, except to the extent that the same are expressly set forth in this lease. This lease embodies the entire understanding between the parties with respect to the subject matter hereof, and all prior agreements, understanding and statements, oral or written, with respect thereto are merged in this lease.

8.15    **Successors.**  This lease shall be binding upon and inure to the benefit of Landlord, its successors and assigns, and shall be binding upon and inure to the benefit of Tenant, its successors, and to the extent that an assignment may be approved by Landlord, Tenant's assigns.

8.16    **Applicable Law.**  This lease shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any principles of conflicts of laws. Landlord and Tenant agree that all disputes arising directly or directly under this lease, and all actions to enforce this lease shall be heard and adjudicated in the state courts of the State of New York or the federal courts for the southern district of New York, and Landlord and Tenant each be expressly and irrevocably submits itself to such jurisdiction. Each party hereto hereby waives any argument that such forum is inconvenient or inappropriate or that such court does not retain jurisdiction over such party.

**8.17    No Development Rights.**   Tenant acknowledges that it has no rights to any development rights, air rights or comparable rights appurtenant to the Project, and consents, without further consideration, to any utilization of such rights by Landlord.   Tenant shall promptly execute and deliver any instruments which may be requested by Landlord, including instruments merging zoning lots, evidencing such acknowledgment and consent.   The provisions of this Section 8.17 shall be construed as an express waiver by Tenant of any interest Tenant may have as a party in interest in the Project.

**8.18    Signage.**  (a)Subject to all of the terms of this lease, Tenant shall have the right to install identifying signs containing its corporate name at the entrance to Tenant's demised premises and directional signs within the Building to the demised premises as reasonably approved by Landlord. All signage installed by Tenant shall be subject to Landlord's approval as to size, content, location, place, installation, design, material, color and appearance and shall be removed by Tenant at its sole cost and expense at the expiration or termination of the Term.   Upon such removal Tenant shall restore the area of the sign to the condition existing prior to installation of such sign.

(b)      Subject to all the terms of this lease, Landlord will, at the request of Tenant, and at Tenant's sole cost and expense, maintain listings on the directory board (to the extent one is maintained by Landlord) of the names of Tenant and any other person, firm, association or corporation in occupancy of the demised premises in compliance with this lease, provided, however, the number of names so listed shall not exceed Tenant's share of the total number of names that are included in the directory from time to time.

**8.19    Adjacent Excavation Shoring.**   If an excavation shall be made, or shall be authorized to be made, upon land adjacent to the Project, Tenant shall, upon notice, afford to the person causing or authorized to cause such excavation license to enter upon the demised premises for purpose of doing such work as such person shall deem necessary or appropriate to preserve the walls or the Building from damage and to support the Building by proper foundations.   In connection with such license, Tenant shall have no right to claim any damages or indemnity against Landlord, or seek diminution of Rent or other concession, provided that Tenant shall continue to have access to the demised premises.

**8.20    No Recording.**   This lease shall not be recorded; provided, however, at Landlord's request, Tenant shall promptly execute, acknowledge and delivery a memorandum of this lease sufficient for recording and, at Landlord's option, Landlord may record such memorandum. Tenant shall have no right to record a memorandum of this lease.

**8.21    Representations.**   Tenant represents and warrants that it has duly authorized, executed and delivered this lease, and that this lease is a binding obligation of Tenant, enforceable in accordance with its terms, subject only to bankruptcy, moratorium, fraudulent conveyances and similar limitations affecting creditors generally.

**8.22    Landlord's Bankruptcy; Bankruptcy Court's Approval; Grant of License Until Bankruptcy Court's Approval**.   Tenant acknowledges that Landlord is a debtor-in-possession under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on April 14, 2010 in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No.

10-11963).  Notwithstanding anything to the contrary contained herein, the obligations of Landlord and Tenant under this lease are subject to and this lease shall become effective only upon the date Landlord delivers to Tenant the written approval to this lease from the Bankruptcy Court.  This lease is in all respects also subject to the approval of Landlord's secured creditors and of its unsecured creditors committee.  If all approvals required hereunder are not received by _____, either party may cancel this lease upon notice to the other.

        **8.23**   **Access**.  Subject to the provisions of this lease, including, without limitation Article 4, Tenant shall have access to the Premises 24 hours per day, seven days per week, 365 days per year.

        **8.24**   **OFAC Certification and Indemnification.**

        (a)  Tenant represents, warrants and certifies to and for the benefit of Landlord that Tenant is not now and has never been nor shall it be at any time prior to the mutual execution and delivery of this lease an individual, corporation, partnership, limited partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity (collectively, a "<u>Person</u>") with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories (collectively, a "<u>U.S. Person</u>"), is prohibited from transacting business of the type contemplated by this lease, whether such prohibition arises under United States law, regulation, executive orders and lists published by the Office of Foreign Assets Control, Department of the Treasury ("<u>OFAC</u>") (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC ("<u>Specially Designated Nationals and Blocked Persons</u>")) or otherwise.  Neither Tenant nor any Person who owns an interest in Tenant (collectively, a "<u>Tenant Party</u>") is now or has ever been, nor shall be at any time prior to the mutual execution and delivery of this lease, a Person with whom a U.S. Person, including a "financial institution" as defined in 31 U.S.C. 5312 (a)(z), as periodically amended ("<u>Financial Institution</u>"), is prohibited from transacting business of the type contemplated by this lease, whether such prohibition arises under United States law, regulation, executive orders and lists published by the OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.

        (b)  Tenant represents, warrants and certifies to and for the benefit of Landlord that it has taken, and shall continue to take until the expiration or any earlier termination of the term of this lease, such measures as are required by applicable law to assure that the funds used to pay Tenant Fixed Rent, Additional Rent and any other charges due hereunder are derived: (i) from transactions that do not violate United States law nor, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under United States law and, to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated.

        (c)  Tenant represents, warrants and certifies to and for the benefit of Landlord that neither Tenant nor any Tenant Party or any Person providing funds to Tenant: (i) is under investigation

by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws (as hereinafter defined); (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) has had any of its funds seized or forfeited in any action under any Anti Money Laundering Laws. For purposes of subclause (i) of the previous sentence, the term "Anti-Money Laundering Laws" shall mean all applicable laws, regulations and sanctions, state and federal, criminal and civil, that: (w) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (x) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (y) require identification and documentation of the parties with whom a Financial Institution conducts business; or (z) are designed to disrupt the flow of funds to terrorist organizations. Such laws, regulations and sanctions shall be deemed to include, without limitation, the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "Patriot Act"), the Bank Secrecy Act of 1970, as amended, 31 U.S.C. Section 5311 et. seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

(d)   Tenant represents, warrants and certifies to and for the benefit of Landlord that it is in compliance with any and all applicable provisions of the Patriot Act.

(e)   For a period of two (2) years after the expiration or any earlier termination of the term of this lease, Tenant agrees to cooperate with Landlord, and to cause each Tenant Party to cooperate with Landlord, in providing such additional information and documentation respecting Tenant's and each Tenant Party's legal or beneficial ownership, policies, procedures (to the extent required by applicable laws) and sources of funds as Landlord deems reasonably necessary or prudent to enable Landlord to comply with Anti-Money Laundering Laws now in existence or hereafter enacted or amended.

(f)   Tenant hereby agrees to forever defend, indemnify and hold harmless Landlord from and against any and all claims, damages, costs, fines, penalties, losses, risks, liabilities and expenses (including, without limitation, attorneys' fees and costs) arising from or related to a breach of any of the foregoing representations, warranties, certifications and agreements

### 8.25   [Personal Property.

(a)      Landlord hereby grants Tenant, and Tenant hereby accepts from Landlord, a license to use the fixtures, furniture and equipment listed on Exhibit F attached hereto and made a part hereof (the "FF&E") during the period (the "FF&E License Period") commencing on the Commencement Date and ending on _____.   If Exhibit F is not attached hereto, the FF&E shall be the fixtures, furniture and equipment located in the demised premises on the Commencement Date that is owned by Landlord.  During the FF&E License Period, Tenant shall keep and maintain the FF&E in good condition.  If Landlord and Tenant shall not have entered into a separate agreement for Tenant to purchase from Landlord all or any portion of the FF&E (the "FF&E Purchase Agreement") on or prior to the expiration of the FF&E License Period, Landlord shall have the right to enter into the demised premises at reasonable times on reasonable prior notice to Tenant to

remove from the demised premises the FF&E (or that portion that is not subject to the FF&E Purchase Agreement). Tenant shall return the FF&E (to the extent not purchased pursuant to the FF&E Purchase Agreement) to Landlord on the expiration of the FF&E License Period in the same condition as it existed on the Commencement Date, reasonable wear and tear and damage by fire or other casualty excepted. THE FF&E IS BEING LICENSED "AS IS", "WHERE IS", AND "WITH ALL FAULTS" AND WITHOUT RECOURSE, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED. LANDLORD HAS MADE NO AGREEMENT TO ALTER REPAIR OR IMPROVE ANY OF THE FF&E.

(b)     Tenant shall be solely responsible for all costs, expenses and obligations of every kind and nature incurred, directly or indirectly, in connection with the use of the FF&E, and Tenant shall indemnify, defend and hold harmless Landlord, Landlord's agents, employees, contractors and principals from and against any losses, damages, claims or expenses arising out of or related to, directly or indirectly, Tenant's use of the FF&E.]

**8.26** **Department of Health Notice**. Notwithstanding any contrary provision contained herein, Landlord acknowledges that its rights of reentry into the demised premises set forth in this lease does not confer on it the authority to operate a hospital as defined in Article 28 of the Public Health Law on the demised premises and agrees that it will give the New York State Department of Health, Tower Building, Empire State Plaza, Albany, New York 12237, notification by certified mail of its intent to reenter the demised premises or to initiate dispossess proceedings or that this lease is due to expire, at least thirty (30) days prior to the date on which Landlord intends to exercise a right of reentry or to initiate such proceedings or at least sixty (60) days before expiration of this lease. Upon receipt of notice from Landlord of its intent to exercise its right of reentry or upon the service of process in dispossess proceedings and sixty (60) days prior to the expiration of this lease, Tenant shall immediately notify by certified mail the New York State Department of Health, Tower Building, Empire State Plaza, Albany, New York 12237 of the receipt of such notice or service of such process or that the Lease is about to expire.

**8.27** **Counterparts**. This lease may be executed in multiple counterparts which, when taken together, shall constitute one original. An executed electronic version of this lease shall be deemed to be an original.

IN WITNESS WHEREOF, Landlord and Tenant have executed this lease as of the day and year first written above.

Landlord:                      SAINT VINCENTS CATHOLIC MEDICAL CENTERS
OF NEW YORK

By:_____
    Name:
    Title:

Tenant:                    [_____]

By:_____
    Name:
    Title:

**EXHIBIT A**

**FLOOR PLAN OF THE DEMISED PREMISES**

# EXHIBIT B

## RULES AND REGULATIONS

1.        No tenant shall obstruct or encumber, or use for any purpose other than ingress to and egress from its premises, the sidewalks, driveways, entrances, passages, courts, lobbies, esplanade areas, atrium, plazas, elevators, escalators, stairways, vestibules, corridors, halls and other public portions of the Building (the "<u>Public Areas</u>"), and no tenant shall permit any of its employees, agents, licensees or invitees to congregate or loiter in any of the Public Areas.  No tenant shall invite to, or permit to visit, its premises persons in such numbers or under such conditions as may unreasonably interfere with the use and enjoyment by others of the Public Areas.  Fire exits and stairways are for emergency use only, and they shall not be used for any other purposes by any tenant, or the employees, agents, licensees or invitees of any tenant.  Landlord reserves the right to control and operate, and to restrict and regulate the use of the Public Areas and the public facilities, and access to and egress from the Building and Project, as well as facilities furnished for the common use of the tenants, in such manner as it deems best for the benefit of the tenants generally, including the right to allocate certain entrances and elevators for delivery service and persons making deliveries in the Building.  No doormat, garbage or garbage receptacle, showcase, furniture, decoration or sculpture or other article of any kind whatsoever shall be placed or left in the Public Areas or outside any tenant's premises.

2.        No awnings or other projections shall be attached to the outside walls of the Building.  Curtains, blinds, shades, louvered openings and screens shall (i) not be attached to or hung in, or used in connection with, any window or door of any tenant's premises, without the prior written consent of Landlord, (ii) be of a quality, type, design and color, and attached in the manner, approved by Landlord, and (iii) once attached, hung or used with the consent of Landlord, not be thereafter removed or changed without Landlord's consent.  In order to maintain a uniform exterior appearance of the Building, each tenant occupying the perimeter areas of the Building shall unless consented to by Landlord, (a) use only Building Standard lighting in areas where lighting is visible from the outside of the Building and (b) use only Building Standard blinds in window areas which are visible from the outside of the Building.

3.        Signs, advertisements, graphics and notices visible from the Public Areas or the exterior of the Building shall be subject to Landlord's written approval.  Such signs shall, at the expense of the tenant, be inscribed, painted or affixed by signmakers approved by Landlord.  Landlord shall have the right to prohibit any advertising or identifying sign by any tenant which, in Landlord's reasonable judgment, tends to impair the reputation or desirability of the Building, and upon written notice from Landlord, such tenant shall refrain from and discontinue such advertising or identifying sign.  In the event of the violation of any of the foregoing by any tenant, Landlord may remove the same without any liability, and may charge the expense incurred in such removal to the tenant violating this rule.  Lettering on doors visible from Public Areas, elevator cab designations, if any and the Building or floor lobby directory shall, if and when approved by Landlord, be inscribed, painted or affixed for each tenant by Landlord, at the expense of such tenant, and shall be of a size, color, content and style reasonably acceptable to Landlord.

4.        No tenant shall (a) cover or obstruct the sashes, sash doors, skylights or windows that reflect or admit light and air into the halls, passageways or other public places in the

Building or the heating, ventilating and air conditioning vents and doors, or (b) place any bottles, parcels or other articles on the window sills or on the peripheral heating enclosures.

5.     Each tenant, before closing and leaving its premises at any time, shall see that all lights are turned out.  All entrance doors in each tenant's premises shall be kept locked and all windows shall be left closed by such tenant when its premises are not in use.  Entrance doors shall not be left open at any time.

6.     All windows in each tenant's demised premises shall be kept closed, and all blinds therein above the ground floor shall be lowered as reasonably required because of the position of the sun, during the operation of the Building air conditioning system to cool or ventilate the tenant's demised premises.  If Landlord shall elect to install any energy saving film on the windows of the demised premises, or to install energy saving windows in place of the existing windows, tenant shall cooperate with the reasonable requirements of Landlord in connection with such installation and thereafter the maintenance and replacement of the film and/or windows and permit Landlord to have access to the tenant's demised premises at reasonable times during Business Hours to perform such work.

7.     Nothing shall be done or permitted in any tenant's demised premises, and nothing shall be brought into or kept in any tenant's demised premises, which would impair or interfere with any of the Building's services or the proper or economic heating, ventilating, air conditioning, cleaning or other servicing of the Building or the demised premises, or the use or enjoyment by any other tenant or occupant of any other demised premises, nor shall there be installed by any tenant any ventilating, air conditioning, electrical or other equipment of any kind which, in the reasonable judgment of Landlord, might cause any such impairment or interference.

8.     No tenant shall (a) discharge, or permit to be discharged, acids, harmful vapors or other hazardous materials into the waste lines, vents or flues of the Building; (b) use the water and wash closets and other plumbing fixtures for any purposes other than those for which they were designed and constructed, or throw or deposit therein sweepings, rubbish, rags, acids or other foreign substances; or (c) sweep or throw anything into the Public Areas or other areas of the Building, or into or upon adjoining buildings or land or the street.  All damages resulting from any misuse of the fixtures shall be borne by the tenant who, or whose servants, employees, agents, visitors or licensees shall have, caused the same.

9.     No tenant or occupant, nor the employees, agents, licensees or invitees of any tenant or occupant, shall at any time bring or keep upon its premises any inflammable, combustible or explosive fluid, chemical or substance.

10.     Tenant shall not cause or permit any unusual or objectionable fumes, vapors or odors to emanate from the demised premises which would annoy other tenants or occupants or create a public or private nuisance.  No cooking shall be carried out in the demised premises.

11.     No tenant shall damage, or in any way deface, any part of the Building.  No boring, cutting or stringing of wires shall be permitted in any part of the Building, except with the prior written consent of, and as directed by, Landlord.  Tenant shall not attach or affix any screws or fasteners to the exterior curtain wall of the Building or install, except with the prior written consent of

Landlord, any materials that will come in contact with the exterior curtain wall of the Building. No telecommunications wires or systems, or other wires shall be introduced into the Building by any tenant except in a manner consented to by Landlord. Except as consented to by Landlord in connection with the performance of Alterations requiring Landlord's consent, no tenant shall install linoleum, or other similar floor covering, so that the same shall come in direct contact with the floor of its premises, and, if linoleum or other similar floor covering is desired to be used, an interlining of builder's deadening felt shall be first affixed to the floor, by a paste or other material, soluble in water, the use of cement or other similar adhesive material being expressly prohibited.

12. No tenant shall bring into or keep in or about its premises any bicycles, vehicles or animals (except seeing eye dogs), fish or birds of any kind.

13. No noise, including, without limitation, music or the playing of musical instruments, recordings, radios or television, which, in the reasonable judgment of Landlord, might disturb other tenants or occupants in the Building, shall be made or permitted by any tenant. Nothing shall be done or permitted in the demised premises of any tenant which would impair or interfere with the use or enjoyment by any other tenant or occupant of any space in the Building.

14. No tenant shall (a) place or affix any additional locks or bolts of any kind upon any of the doors or windows of its premises or the Building or (b) make any changes in locks or the mechanism thereof which shall make such locks inoperable by the Grand Master Key for the Building. Duplicate keys for any tenant's premises and toilet rooms shall be procured only from Landlord, and Landlord may make a reasonable charge therefor. Each tenant shall, upon the expiration or sooner termination of the Lease of which these Rules and Regulations are a part, turn over to Landlord all keys to stores, offices and toilet rooms, either furnished to, or otherwise procured by, such tenant, and in the event of the loss of any keys furnished by Landlord, such tenant shall pay to Landlord the cost of replacement locks.

15. All removals, or the carrying in or out of any safes, freight, furniture, large boxes or crates, or any other large or heavy object or matter shall take place (a) only during such hours (including non-Business Hours) as Landlord may from time to time reasonably determine and (b) using such entrances and such elevators as Landlord may from time to time determine in its sole discretion. Each tenant shall reimburse Landlord for extra costs incurred by Landlord on such tenant's behalf, including the cost of any overtime work. No hand trucks shall be used for such purposes except those equipped with rubber tires, side guards and such other safeguards as Landlord shall reasonably require. No hand trucks shall be used in passenger elevators. Tenants shall not use the elevators during Business Hours on Business Days for haulage or removal of construction materials or debris. Persons employed to move safes and other heavy objects shall be reasonably acceptable to Landlord and, if so required by Legal Requirements, shall hold a Master Rigger's license. Arrangements must be made with Landlord by tenant for moving large quantities of furniture and equipment into or out of the Building. All labor and engineering costs incurred by Landlord in connection with any moving specified in this rule, including a reasonable charge for overhead, shall be paid by tenants to Landlord as Additional Charges on demand.

16. Landlord shall have the right to prescribe the weight and position of safes and other objects of excessive weight, and no safe or other object whose weight exceeds the lawful load for the area upon which it would stand shall be brought into or kept on any tenant's demised premises. If,

in the reasonable judgment of Landlord, it is necessary to distribute the concentrated weight of any heavy object, the work involved in such distribution shall be done at the expense of the tenant and in such manner as Landlord shall determine.

17.     No machinery or mechanical equipment other than ordinary portable business machines may be installed or operated in any tenant's demised premises without Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed, and in no case (even if the same are a type so excepted or as so consented to by Landlord) shall any machines or mechanical equipment be so placed or operated as to disturb other tenants or occupants; but machines and mechanical equipment which may be permitted to be installed and used in a tenant's demised premises shall be so equipped, installed and maintained by such tenant as to prevent any disturbing noise, vibration or electrical or other interference from being transmitted from such demised premises to any other area of the Building.

18.     Except as otherwise expressly permitted pursuant to, and in accordance with, the terms of the Lease, no tenant shall use or occupy, or permit any portion of its premises to be used or occupied, as an office for a public stenographer or public typist, or for the possession, storage, manufacture or sale of liquor, tobacco or any controlled substance (other than as reasonably required in connection with the use permitted hereunder) or as a barber, beauty or manicure shop, telephone or telegraph agency, telephone or secretarial service, messenger service, travel or tourist agency, retail service shop, labor union, company engaged in the business of renting office or desk space, public finance (personal loan) business, hiring employment agency, or stock brokerage.  No tenant shall advertise for laborers giving an address at the Building.

19.     Subject to Landlord's obligations specifically set forth in the lease, Landlord may institute, revise and discontinue such security measures, systems and requirements as Landlord shall deem appropriate.  Landlord reserves the right to inspect all objects and matter to be brought into the Building and to exclude from the Building all objects and matter which violate any of these Rules and Regulations or the lease of which these Rules and Regulations are a part.  Landlord may require any person leaving the Building with any package or other object or matter to submit a pass, listing such package or object or matter, from the tenant from whose premises the package or object or matter is being removed, but the establishment and enforcement or non-enforcement of such requirement shall not impose any responsibility or liability on Landlord for the protection of any tenant against the removal of property from the premises of such tenant.  Landlord reserves the right to exclude from the Building all employees of any tenant who do not present a pass to the Building signed by such tenant.  Landlord reserves the right to limit or control access to the Building, including, without limitation, closing certain entrances and exits in its discretion.  Landlord or its agent will promptly furnish passes to persons for whom any tenant requests same in writing.  Landlord reserves the right to require all other persons entering the Building to sign a register, to be announced to the tenant such person is visiting, and to be accepted as a visitor by such tenant or to be otherwise properly identified (and, if not so accepted or identified, reserves the right to exclude such persons from the Building) and to require persons leaving the Building to sign a register or to surrender a pass given to such person by the tenant visited.  Each tenant shall be responsible for all persons for whom it requests any such pass or any person who such tenant accepts, and such tenant shall be liable to Landlord for all acts or omissions of such persons.  Any person whose presence in the Building at any time shall, in the judgment of Landlord, be prejudicial to the safety, character, security, reputation or interests of the Building or the tenants of the Building may be denied access to the Building or may be ejected from the Building.  In

the event of invasion, riot, public excitement or other commotion, Landlord may prevent all access to the Building during the continuance of the same by closing the doors or otherwise, if reasonably necessary for the safety of tenants and the protection of property in the Building. Landlord shall in no way be liable to any tenant for damages or loss arising from the admission, exclusion or ejection of any person, objects or matters to or from its premises or the Building under the provisions of this Rule.

20.     Each tenant shall, at the expense of such tenant, provide light, power and water for the employees of Landlord, and the agents, contractors and employees of Landlord, while doing janitor service or other cleaning in the premises demised to such tenant and while making repairs or alterations in its premises.

21.     No tenant shall use its premises for lodging or sleeping or for any immoral or illegal purpose.

22.     The requirements of tenants will be attended to only upon application at the office of the Building. Employees of Landlord shall not perform any work or do anything outside of their regular duties, unless under special instructions from Landlord.

23.     Canvassing, soliciting and peddling in the Building are prohibited and each tenant shall cooperate to prevent the same.

24.     Only Landlord or persons approved by Landlord shall be permitted to furnish to the demised premises barbering, bootblacking, floor polishing, lighting, maintenance, cleaning, or other similar services. Such services shall be furnished only at such hours, and under such reasonable regulations, as may be fixed by Landlord from time to time. All messenger services and similar services (excluding services related to lab specimen pick-ups) shall be subject to Landlord's approval, which may include, without limitation, limiting access by messenger and similar companies to certain designated Building areas, from which tenants shall then pick-up its packages.

25.     If the demised premises be or become infested with vermin as a result of the use or any misuse or neglect of the demised premises by tenant, its agents, employees, visitors or licensees, tenant shall at tenant's expense cause the same to be exterminated from time to time to the reasonable satisfaction of Landlord and shall employ such exterminator and such exterminating company or companies as shall be designated by Landlord, or if none is so designated as reasonably approved by Landlord.

26.     All paneling, doors, trim or other wood products not considered furniture shall, to the extent required by law, be of fire-retardant materials. Before installation of any such materials, certification of such materials' fire-retardant characteristics shall be submitted to and consented to by Landlord, and such materials shall be installed in a manner consented to by Landlord.

27.     Tenants shall comply with any and all recycling measures required by law or by Landlord.

28.     Landlord reserves the right to add to, or amend or delete any of the Rules and Regulations of the Building at any time.

29.     To the extent there is a conflict between the provisions contained in the lease or this <u>Exhibit B</u> annexed thereto, the provisions of the lease shall govern and control.

## EXHIBIT C

## CLEANING SPECIFICATIONS

Basic janitorial services and supplies as well as waste removal and carting will be included in the operating expenses payable under Section 2.05 of the lease.

Evening Services-

- Vacuum and clean all carpeted areas
- Sweep and mop all tiled or rubberized floor areas
- Dust desks, chairs, tables, sills. Radiators, and any visible areas
- Remove trash (General and regulated medical waste)
- Clean and stock all restrooms

Day Services

- Sweep sidewalk in the AM
- Sweep several time a day cigarette butts and empty ashtrays as needed
- Empty garbage cans from lobbies
- Respond to calls as needed.

Replace sharps containers as needed

# EXHIBIT D

## LANDLORD'S SERVICES

Landlord shall furnish Tenant with the services:

1.      heat, ventilation and air-conditioning to the demised premises during Business Hours (as hereinafter defined) on Business Days (as hereafter defined) during such times of the year as Landlord shall determine as appropriate for reasonably comfortable occupancy of the demised premises, subject to Tenant's compliance with design conditions, including occupancy and electric load criteria established by Landlord; if Tenant shall require heat, ventilation or air conditioning services at any other times, Landlord shall furnish such service:  (i) in the case of a Business Day, upon receiving notice from Tenant by 2:00 p.m. of such Business Day; and (ii) in the case of a day other than a Business Day, upon receiving notice from Tenant by 4:00 p.m. of the immediately preceding Business Day] and Tenant shall pay to Landlord promptly upon demand as Additional Rent Landlord's established charges for such additional service (x) at the rate of $300 per day per floor.

2.      reasonable quantities of hot and cold water to the demised premises for Building standard lavatory and cleaning purposes only and to such other locations as water is being provided on the date hereof; if Tenant requires water for any other purpose, Landlord may furnish cold water and if so,  the cost of heating such water, as well as the cost of piping and supplying such water to the demised premises, shall be paid by Tenant; Landlord may install and maintain, at Tenant's expense, meters to measure Tenant's consumption of cold water for such other purposes in which event Tenant shall reimburse Landlord for the quantities of cold water and hot water shown on such meters (including Landlord's standard charge for the production of such hot water, if produced by Landlord), on demand;

3.      electric energy on a so called "rent inclusion" basis (i.e., the cost is included in the amounts payable pursuant to Section 2.05 of the lease) for Tenant's reasonable use of lighting and medical equipment, appliances and other electric equipment consistent with typical medical clinic and medical offices use.  In no event shall Tenant's consumption of electricity exceed the capacity of existing feeders to the Building or the risers or wiring serving the demised premises, as reasonably determined by Landlord.  Tenant, upon notice from Landlord, shall immediately cease using any machines or equipment that, in Landlord's reasonable judgment, create a violation of this subsection;

4.      cleaning services on Business Days in accordance with Exhibit C attached hereto and made a part hereof.  Tenant shall pay to Landlord on demand the costs incurred by Landlord for: (i) extra cleaning work in the demised premises required because of:  (w) carelessness, indifference, misuse or neglect on the part of Tenant, its subtenants or their respective employees or visitors; (x) interior glass partitions or an unusual quantity of interior glass surfaces; and/or (y) non-building standard materials or finishes installed in the demised premises; and (ii) removal from the demised premises and the Building of any refuse of Tenant in excess of that ordinarily accumulated in medical clinic occupancy.  Landlord's cleaning contractor shall have access to the demised premises after 7:00 p.m. and before 8:00 a.m. (or such other times as shall be required to perform the cleaning work described on Exhibit C) and shall have the right to use, without charge therefor, all light, power and water in the demised premises reasonably required to clean the demised premises;

5.　　　　(i) passenger elevator service to each floor of the demised premises at all times with at least one passenger elevator, and (ii) freight elevator service to the demised premises on a first come-first served basis (i.e., no advance scheduling) during Business Hours on Business Days, in accordance with the Rules and Regulations.  During Business Hours use of the freight elevator for construction or move-in related deliveries is precluded.  At all other times use of the freight elevator is on a reserved basis upon the payment of Landlord's then established charges therefor.  Tenant's use of all elevators shall be on a non-exclusive basis;

6.　　　　commercially reasonable security of the Building, without any liability for any failure thereof.

7.　　　　weekly inspection and pest control services; and

8.　　　　snow removal services.

For the purpose hereof, "<u>Business Hours</u>" means 7:00 a.m. to 7:00 p.m. on Business Days. "<u>Business Days</u>" means all days except Saturday, Sundays, New Year's Day, Martin Luther King Day, President's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving, the day following Thanksgiving, Christmas and any other days which are now or hereafter observed by both the federal and the state governments as legal holidays.

**EXHIBIT E**

**CERTAIN SERVICES COSTS**

| Service | Cost Per Rentable Square Foot Per Annum |
|---|---|
| Salaries -Housekeeping | $2.60 |
| Pest control | $0.05 |
| Medical Waste | $0.33 |
| Sharps containers | $0.19 |
| Garbage Pick-up | $0.38 |
| Housekeeping Supplies | $0.41 |

**Exhibit C**

# Lease Summary – Mt. Sinai
## 26 West Seventh Avenue, New York, New York 10011

| | |
|---|---|
| **Tenant:** | The Mount Sinai Hospital |
| **Landlord:** | Saint Vincents Catholic Medical Centers of New York |
| **Term:** | Approximately one (1) year and one (1) month commencing on the Commencement Date and ending on the Expiration Date (with no renewal option). |
| **Commencement Date:** | May 29, 2010 |
| **Rent Commencement Date:** | May 29, 2010 |
| **Expiration Date:** | June 30, 2011 |
| **Early Termination:** | On 90 days prior notice after November 30, 2010 (mutual) |
| **Rentable Square Feet:** | Approximately 25,733  rentable square feet on the first floor approximately 1,044 rentable square feet on the fifth floor |
| **Pro Rata Share:** | 27% |
| **Use:** | Premises will be used for an infectious disease clinic providing HIV medical services and/or one or more community medicine clinics providing community medicine services and for general and doctor's offices in connection with such infections disease clinic and/or community medicine clinic |
| **Fixed Rent:** | $26.15/SF/annum |
| **Hours of Operation:** | 7:00 a.m. to 7:00 p.m. |
| **Operating Expenses:** | $36.26/SF/annum |
| **Utilities/Services:** | Tenant's pro-rata share of utility and service costs are included Operating Expenses. |
| **HVAC:** | Landlord shall furnish building standard office heating, ventilating, air condition, and cooling during the hours of 7:00 a.m. and 7:00 p.m., Monday through Friday, excluding holidays. |
| **Landlord's Work:** | None |
| **Access:** | Tenant shall have access to the Premises 24 hours per day, seven days per week, 365 days per year. |
| **Signage:** | Tenant shall have the right to install signage on the 12th Street entrance to the Building (which shall be the same size as the signage existing on such entrance as of the date hereof), subject to compliance with law. |

**Capital Improvements:** Landlord has certain limited obligations with respect to making capital improvements as set forth in the Lease.

**Sublease
and Assignment:** Tenant shall not have the right to sublease all or any portion of the Premises or to assign the lease without Landlord's consent except to affiliates. Tenant shall have the right to sublease a portion of the Premises to Lutheran Medical Center for purposes of operating a community medicine clinic.

**Security Deposit:** 2 monthly installments of Fixed Rent and Operating Expenses.

**Parking:** Tenant shall rent 15 parking spaces from Landlord for $450 per month per space.

**Exhibit D**

| | |
|---|---|
| **Tenant:** | The St. Luke's-Roosevelt Hospital Center |
| **Landlord:** | Saint Vincents Catholic Medical Centers of New York |
| **Term:** | Approximately one (1) year and one (1) month commencing on the Commencement Date and ending on the Expiration Date (with no renewal option). |
| **Commencement Date:** | May 29, 2010 |
| **Rent Commencement Date:** | May 29, 2010 |
| **Expiration Date:** | June 30, 2011 |
| **Early Termination:** | On 90 days prior notice after November 30, 2010 (mutual) |
| **Rentable Square Feet:** | Approximately 732 rentable square feet on the 1st floor, 3,434 rentable square on the 2nd Floor and 635 rentable square feet on the 4th Floor |
| **Pro Rata Share:** | 6% |
| **Use:** | Premises will be used for a pharmacy, an infectious disease clinic providing HIV medical services and a rape crisis center. |
| **Fixed Rent:** | $26.15/SF/annum |
| **Hours of Operation:** | 7:00 a.m. to 7:00 p.m. |
| **Operating Expenses:** | $36.26/SF/annum |
| **Pharmacy Entrance Security Costs:** | $5,000/month |
| **Utilities/Services:** | Tenant's pro-rata share of utility and service costs are included Operating Expenses. |
| **HVAC:** | Landlord shall furnish building standard office heating, ventilating, air condition, and cooling during the hours of 7:00 a.m. and 7:00 p.m., Monday through Friday, excluding holidays. |
| **Landlord's Work:** | None |
| **Access:** | Tenant shall have access to the Premises 24 hours per day, seven days per week, 365 days per year. |
| **Signage:** | Subject to Landlord's reasonable approval, Tenant shall have the right to install identifying signs containing its name at the entrance to Tenant's demised premises and directional signs within the Building to the demised premises, subject to compliance with law. |

**Capital Improvements:** Landlord has certain limited obligations with respect to making capital improvements as set forth in the Lease.


**Sublease and Assignment:** Tenant shall not have the right to sublease all or any portion of the Premises or to assign the lease without Landlord's consent except to affiliates.

**Security Deposit:** 2 monthly installments of Fixed Rent, Operating Expenses and Pharmacy Entrance Security Costs

# **Exhibit E**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
In re: : Chapter 11
 :
SAINT VINCENTS CATHOLIC MEDICAL : Case No. 10-11963 (CGM)
CENTERS OF NEW YORK, et al., :
 :
                              Debtors. : Jointly Administered
---------------------------------------------------------- x

## NOTICE OF ENTRY INTO LEASE AGREEMENT

PLEASE TAKE NOTICE OF THE FOLLOWING:

      1.     On [DATE], the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered an order (the "**Lease Agreement Order**")[1] approving the motion of St. Vincents Catholic Medical Centers of New York ("**SVCMC**") and its affiliated debtors in the above-referenced chapter 11 cases (collectively, the "**Debtors**")[2] for an order, among other things, establishing procedures for the entry into short-term lease agreements (the "**Lease Agreements**") with qualified sponsors intending to take over the operations of the Debtors' medical clinics and/or physician practices (the "**Medical Clinics**") located at 26 West Seventh Avenue, New York, New York (the "**O'Toole Building**") and for providing notice thereof (the "**Notice Procedures**").

      2.     Pursuant to the Notice Procedures and the Lease Agreement Order, the Debtors hereby give notice of their intention to enter into the proposed Lease Agreement attached hereto. As set forth in the Notice procedures, attached as **Annex 1** is a blacklined copy of the proposed Lease Agreement to demonstrate the changes to the approved Form Lease Agreement.

      3.     The material terms of the Lease Agreement are as follows:

---

[1] Capitalized terms used but not otherwise defined hereon shall have the meanings ascribed to them in the Lease Agreement Order.

[2] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc. There are certain affiliates of SVCMC who are not Debtors.

(i)     Description of lease space and associated clinic:

(ii)    Identity of lease counterparty:

(iii)   Material economic terms that materially deviate from the Form Lease Agreement:

4.      Pursuant to the Notice Procedures and the Lease Agreement Order, any objection to the entry into the Lease Agreement must (i) be in writing (which writing may be delivered electronically), (ii) state with specificity the grounds for the Objection and (iii) be served upon (a) counsel to the Debtors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq. and Gregory G. Plotko, Esq and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021 Attn: Judith Eisen, Esq., (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq., (c) counsel to the Debtors' postpetition DIP lenders: General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802 Attn: Randy Rogers, Esq.; and (d) counsel for the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq. and Sarah Link Schultz, Esq., so as to be received no later than **4:00 p.m. (prevailing Eastern Time) on [DATE]**, provided, however, that such deadline may be extended in accordance with the terms of the Lease Agreement Order.

5.      If no Objection is received, the Debtors shall be authorized to enter into the Lease Agreement without further court approval.

6.      A copy of the Lease Agreement Order, the Notice Procedures and other document referenced herein can be viewed and obtained on the Court's website www.ecf.nysb.uscourts.gov or (without charge) at http://svcmcrestructuring.com.

Dated: _____, 2010
       New York, New York

                        KRAMER LEVIN NAFTALIS & FRANKEL LLP

                        _____
                        Kenneth H. Eckstein
                        Adam C. Rogoff
                        P. Bradley O'Neill
                        1177 Avenue of the Americas
                        New York, New York 10036
                        Telephone: (212) 715-9100
                        Facsimile: (212) 715-8000

                        *Counsel for Debtors and Debtors in Possession*

**Exhibit F**

## BILL OF SALE

**BILL OF SALE,** effective as of June __, 2010, by SAINT VINCENTS CATHOLIC MEDICAL CENTERS, a New York State not-for-profit corporation having an address at c/o Saint Vincents Catholic Medical Centers, 170 West 12th Street, New York, New York 10001 (the "Seller"), and THE ST. LUKE'S-ROOSEVELT HOSPITAL CENTER, a New York not-for-profit corporation having a principal address at 1111 Amsterdam Avenue, New York, New York 10019 (the "Buyer").

## WITNESSETH:

**THAT FOR AND IN CONSIDERATION** of the payment of _____ Dollars ($_____) paid by Buyer to the Seller, the receipt and sufficiency of which are hereby acknowledged, the Seller does hereby sell, transfer, convey, assign and deliver to Buyer in accordance with the ORDER PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS TO (I) ENTER INTO NEW REAL PROPERTY LEASE AGREEMENTS FOR CLINICS LOCATED AT THE O'TOOLE BUILDING; (II) ESTABLISH NOTICE PROCEDURES RELATED TO THE ENTRY OF ADDITIONAL REAL PROPERTY LEASES; (III) SELL CERTAIN DE MINIMIS ASSETS RELATED TO THE DEBTOR'S HIV CLINIC, AND (IV) ENTER INTO CERTAIN MEDICAL RECORDS CUSTODY AGREEMENTS RELATED TO THE DEBTORS' HIV CLINIC dated June __, 2010 all of its right, title and interest in and to all of the medicines, instruments and other pharmacy inventory, located at _____ as further set forth in Exhibit A annexed hereto (collectively, the "Inventory"), free and clear of all liens, claims and encumbrances whatsoever.

The Buyer recognizes and agrees that, other than as explicitly set forth in this Bill of Sale, the Seller makes no representations, warranties and/or covenants concerning the Inventory.

**IN WITNESS WHEREOF,** the Seller has executed this Bill of Sale effective as of date set forth above.

SAINT VINCENTS CATHOLIC
MEDICAL CENTERS OF NEW YORK

By:_____
Name:
Title:

**EXHIBIT A**

**Inventory List**

**Exhibit G**

**Medical Records Custodial Agreement**

     This Medical Records Custodial Agreement (the "Agreement") is entered into this ___ day of June, 2010 by and between Saint Vincents Catholic Medical Centers of New York ("SVCMC") and The Mount Sinai Hospital ("Provider").

     **WHEREAS**, SVCMC will cease operation of its HIV Center located in various properties, including but not limited to 36 Seventh Avenue, New York, New York, 20 Seventh Avenue, New York, New York, and 222 West Fourteenth Street, New York, New York (the "Program"), effective June ____, 2010 (the "Effective Date"), and Provider has agreed, subject to patient choice, to provide care and treatment to the patients of the Program following the Effective Date;

     **WHEREAS**, SVCMC wishes to ensure that Patient Records (as defined below) may be accessed readily by health care providers that will provide treatment to Program patients after Program termination, upon each patient's written authorization for release of their respective Patient Records to their respective health care provider; and

     **WHEREAS**, Provider has agreed to assume custody and storage of certain Patients Records after Program termination.

     **NOW, THEREFORE**, in consideration of the mutual promises contained herein, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Transfer and Custody of Patient Records</u>.

     a.    Upon the Effective Date, SVCMC will transfer to Provider custody of all paper medical records, charts and films for all patients who have received health care services from those Program providers set forth in <u>Exhibit A</u> who will be employed by Provider after Program termination (collectively, the "Paper Records"), and all electronic medical records for all Program patients ("EMR," which, together with Paper Records, are collectively referred to as the "Patient Records"). SVCMC hereby appoints Provider, and Provider agrees to serve during the term of this Agreement, as custodian for the maintenance, safekeeping, inspection and copying of the Patient Records.

     b.    In connection with the responsibilities that Provider agrees to assume hereunder as custodian of the Patient Records, Provider further agrees to maintain and operate the computer system software and equipment that currently houses EMR used by the Program ("EMR System") after the Effective Date (on condition that the server for the EMR System shall be leased to the Provider by SVCMC it being understood and agreed that SVCMC shall allow Provider reasonable access to such server), until the transfer of the EMR System to Provider is completed pursuant to such terms and conditions as the Provider and SVCMC may mutually agree (provided that if no such agreement is made within sixty (60) days after the Effective Date, SVCMC may, its option, continue the arrangement set forth in this Section 1(b) with the Provider or be free to dispose of the EMR System as it may determine). Provider agrees to maintain the

records on the EMR System regardless of the provider of the services documented by such records. Provider agrees to provide, at no cost, access to and copies of the records stored in the EMR System to SVCMC and St. Lukes (as such term is defined below) and access to and copies of such records to any other provider of services documented by such records (subject to compliance with applicable laws, rules and regulations). Provider shall be held harmless for any failures or interruptions of the EMR System and shall not be required to repair the EMR System if Provider deems the EMR System unsalvageable. Provider shall make reasonable efforts to retain the data on the EMR System for as long as feasible.

c.     The parties agree that the Patient Records are being transferred for custodial purposes to Provider hereunder for purposes of the care and treatment of Program patients by Provider, its employees and staff.

d.     Provider shall store and maintain the Patient Records in accordance with applicable Federal, State and local laws, rules and regulations, including those laws, rules and regulations governing the confidentiality of patient protected health information, and Provider shall take reasonable measures to protect the Patient Records from theft, loss, unauthorized destruction and unauthorized access. Provider shall at all times safeguard the safety of the Patient Records.

e.     All Patient Records transferred to Provider hereunder shall be retained by Provider for the time period required by applicable law or regulation. Notwithstanding the foregoing, in the event that SVCMC notifies Provider of an actual or potential claim, investigation or litigation, including, without limitation, a third-party audit, regarding a particular patient, Provider shall retain the Patient Records for that individual until SVCMC notifies Provider that such Patient Records can be destroyed. Subject to the previous sentence, nothing herein shall prohibit Provider from transferring the Patient Records to off-site storage facilities and/or destroying the Patient Records following the end of the applicable minimum retention period specified in this Section.

f.     Information relating to treatment provided to patients by the Provider on or after the Effective Date shall be maintained separately from the Patient Records except that medical information relating to care of a particular patient pre-and post-Effective Date may be maintained in the same file provided that the file is divided to clearly reflect treatment rendered before and after that date.

2.     <u>Patient Communication and Access</u>.

a.     Provider shall provide timely access to, and photocopies of, the Patient Records to patients and their legal representatives to the extent required by laws, rules or regulations applicable to the parties, and to other individuals, entities, and governmental agencies that have the right to access and/or receive photocopies of Patient Records. Such access and copies shall be provided within the time periods required by applicable laws, rules and regulations. Provider may charge appropriate copying fees, consistent with its then-existing policies and procedures and the requirements of applicable laws, rules and regulations. The form of authorization/release for Patient Records which shall

be utilized for such purpose shall be a written, signed authorization from the patient substantially in the form attached as <u>Exhibit B</u> and compliant with applicable federal and state law.   Any party who requests access to and copies of Patient Record shall agree to hold Provider harmless for failure to maintain such Patient Records.

b.      Provider shall promptly provide SVCMC with access to the Patient Records upon request during regular business hours, at no cost to SVCMC.  Provider shall provide copies of Patient Records to SVCMC upon written request at no cost.  SVCMC shall not request access to or copies of any Patient Records, or portions thereof, which SVCMC is not entitled to receive from Provider in accordance with applicable state and federal law and regulations in effect as of the time of request.

c.      As a third party beneficiary to this Agreement, St. Lukes-Roosevelt Hospital Center ("St. Lukes") may upon written request receive from Provider copies of applicable Patient Records for purposes of treating a patient of the Program who elects to receive services from a physician or other individual affiliated with St. Lukes rather than Provider.  Any written request by St. Lukes for Patient Records must be accompanied by a written, signed authorization from the patient substantially in the form attached as Exhibit C.  By making such request, St. Lukes agrees to hold Provider harmless for failure to maintain such Patient Records.  Provider shall provide copies of Patient Records at no cost to St. Lukes within five (5) business days of Provider's receipt of St. Lukes' written request and the attached patient authorization.  St. Lukes shall not request access to or copies of any Patient Records, or portions thereof, which St. Lukes is not entitled to receive from Provider in accordance with applicable state and federal law and regulations in effect as of the time of request.

3.      <u>Legal and HIPAA Compliance</u>.

a.      Provider acknowledges that the Patient Records being transferred hereunder are confidential.  In the event that a patient or other appropriate person under applicable laws, rules or regulations (including, without limitation, a committee for an incompetent, a conservator, or other person pursuant to court order) requests that a copy of a patient's Patient Records be provided to such person or to another health care provider, upon submission of a written, signed authorization substantially in the form attached as <u>Exhibit B</u>, Provider shall promptly forward, or shall cause its designee to forward, a copy of the Patient Records; provided, however, that in all instances, Provider or its designee shall comply with all provisions of applicable law, rules and regulations with respect to the confidentiality of such Patient Records.

b.      With respect to the Patient Records transferred to Provider hereunder, Provider shall abide by all applicable laws, rules and regulations applicable to such records, including, without limitation, the Federal Health Insurance Portability and Accountability Act of 1996 and its related regulations.

c.      No physician or other individual affiliated in any manner with the Provider shall have access to any of the information contained in the Patient Records

without a written, signed authorization from the patient substantially in the form attached as Exhibit B.

4.  Term and Termination.  This Agreement shall take effect upon execution by the parties hereto and shall remain in effect indefinitely unless terminated by mutual agreement.

5.  Miscellaneous.

a.  Neither party may assign this Agreement without the express prior written consent of the other party, and any attempt to assign this Agreement without such consent shall be void.

b.  Neither party shall be authorized to act as agent for the other or to incur any liability in the name of or on behalf of the other, unless specifically authorized in this Agreement or in a writing executed by the party that would be responsible for the obligation.

c.  This Agreement shall be governed by the laws of the State of New York, exclusive of conflict of law rules.  Each party to this Agreement hereby agrees and consents that any dispute with respect to this Agreement shall only be adjudicated by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  By execution and delivery of this Agreement, each such party hereby: (i) accepts the jurisdiction of the Bankruptcy Court; (ii) waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the venue set forth above; and (iii) further waives any claim that the Bankruptcy Court is an inconvenient forum.

d.  Nothing express or implied in this Agreement is intended to confer, nor shall anything herein confer, upon any person other than a party hereto any rights, remedies, obligations or liabilities whatsoever.

e.  This Agreement is the entire agreement between the parties concerning the subject matter hereof and supersedes all prior agreements, whether written or oral, concerning the subject matter hereof.  This Agreement shall not be changed or modified, except by a writing signed by both of the parties hereto or their respective successors. Except as otherwise provided herein, all rights and remedies set forth in this Agreement shall be in addition to and not exclusive of any other rights or remedies now or hereafter existing at law or in equity.

f.  All notices and other communications required or permitted to be given hereunder shall be in writing, and shall be deemed duly given if delivered by hand or overnight courier service, or if mailed by certified mail, return receipt requested, to a party at its address stated below or to such other address as may be designated by written notice complying as to delivery with the terms of this provision.  Notices shall be sent to the address of the parties stated below:

To Seller:

Saint Vincents Catholic Medical Centers of New York
450 West 33rd Street
New York, New York 10001
Attn:  Chief Executive Officer

With a copy to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attn:   Adam C. Rogoff, Esq.

Garfunkel Wild, P.C.
111 Great Neck Road
Great Neck, New York 11021
Attn:  Judith A. Eisen, Esq.

Provider:

The Mount Sinai Hospital
One Gustave Levy Place
New York, NY 10029
Box 1099
Attn:  General Counsel's Office

With a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
4                              Times                         Sq
New York, NY 10036
Attn:  J. Gregory Milmoe, Esq.


g.     If any provision of this Agreement or the application of any provision hereof to any person or circumstances is held to be legally invalid, inoperative or unenforceable, then the remainder of this Agreement shall not be affected unless the invalid provision substantially impairs the benefits of the remaining portions of this Agreement to the other party or parties.

h.     Any consent or waiver executed in writing by a party hereto shall be binding upon such party from and after the date of execution thereof unless a later or earlier date is specified therein.  No delay or failure to exercise any remedy or right occurring upon any default shall be construed as a waiver of such remedy or right, or an acquiescence in such default, nor shall it affect any subsequent default of the same or a different nature.

i.      All headings and captions in this Agreement are for convenience only. They shall not be deemed part of this Agreement and shall in no way define, limit, extend or describe the scope or intent of any provisions hereof.

j.      The parties hereto shall execute and deliver all documents, provide all information and take or forbear from all such action as may reasonably be necessary or appropriate to achieve the purposes set forth in this Agreement.

k.      This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

l.      This Agreement may be executed in counterparts and each such counterpart, when taken together, shall constitute a single and binding agreement.

**IN WITNESS WHEREOF**, this Medical Records Custodial Agreement is signed as of the day and year first above written.


**SAINT      VINCENTS      CATHOLIC      THE MOUNT SINAI HOSPITAL
MEDICAL CENTERS OF NEW YORK**


By:_____      By: _____
Name:                                     Name:
Title:                                    Title:

**EXHIBIT A**

Edwin Calderon, PA
Rita Chow, MD
Keith Degi, MD
Livette Johnson, MD
Barbara E. Johnston, MD
David Kaufman, MD
Oscar Klein, MD
Luz Lugo, MD
Jill Nord, MD
Steven Rapaport, MD
Scot Shapiro, MD
Frederick P. Siegal, MD
David Sivesind, PhD
Brian Stevens, PhD
Glenn Turett, MD

**EXHIBIT B**

[HIPAA Authorization Form- see attachment]

**Exhibit H**

# RESEARCH RECORDS CUSTODY AGREEMENT

This Research Records Custody Agreement (the "Agreement") is made and entered into this ___ day of June, 2010 by and between Saint Vincents Catholic Medical Centers of New York ("SVCMC") and The Mount Sinai School of Medicine of New York University ("Custodian").

**WHEREAS**, SVCMC will cease operation of its HIV Center located in various properties, including but not limited to 36 Seventh Avenue, New York, New York, 20 Seventh Avenue, New York, New York, and 222 West Fourteenth Street, New York, New York (the "Program"), effective June ___, 2010 (the "Effective Date");

**WHEREAS**, SVCMC and certain physicians (the "Investigators") at the HIV Center have conducted clinical studies (the "Studies") in conjunction with various clinical study sponsors (the "Sponsors") and in accordance with the terms and conditions of those certain clinical trial agreements (the "Clinical Trial Agreements");

**WHEREAS**, certain Investigators are becoming Custodian employees (the "Custodian Physicians");

**WHEREAS**, pursuant to the terms of the Clinical Trial Agreements, SVCMC has agreed to maintain the custody of the records associated with the Studies conducted by the Custodian Physicians and developed in accordance with the Clinical Trial Agreements (the "Records");

**WHEREAS**, SVCMC wishes to provide for the smooth transfer of the Records to Custodian so that the Records may be accessed readily by the Investigators, Sponsors and other applicable parties to conduct the Studies; and

**WHEREAS,** Custodian also has agreed to assume the custody and storage of the Records pursuant to applicable law and the Clinical Trial Agreements.

**NOW, THEREFORE**, in consideration of the mutual promises contained herein, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Transfer and Custody of Patient Records.

a.    As of the date hereof, SVCMC will transfer to Custodian custody of its Records related to the Studies set forth in Exhibit A annexed hereto. The Records consist of two categories: (i) records for Studies conducted by the Custodian Physicians which have closed (the "Closed Records") to the extent requested by Custodian in accordance with Section 1(d) below; and (ii) records for Studies conducted by the Custodian Physicians which are ongoing (the "Open Records"). SVCMC hereby appoints Custodian, and Custodian agrees to serve during the term of this Agreement, as custodian for the maintenance, safekeeping, inspection and copying of the Records in accordance with the terms of this Agreement.

b.      The parties agree that the Records are being transferred for custodial purposes to Custodian hereunder so that the Investigators may conduct the Studies, as applicable, in accordance with the Clinical Trial Agreements.

c.      Custodian shall store and maintain the Records in accordance with the Clinical Trial Agreements and applicable federal, state and local laws, rules and regulations, including those laws, rules and regulations governing the confidentiality of protected health information, and Custodian shall take reasonable measures to protect the Records from theft, loss, unauthorized destruction and unauthorized access.  Custodian shall at all times safeguard the safety of the Records.

d.      To the extent Closed Records are requested by the Custodian, all Closed Records transferred to Custodian hereunder shall be retained by Custodian as custodian until the later of (1) the time period for the retention of records specified in the Clinical Trial Agreement, or (2) the time period required by applicable law or regulation (the "Required Custody Date"), unless Custodian transfers the Closed Records to itself pursuant to the process set forth in Section 1(e) below.

e.      With respect to the Open Records, all Open Records transferred to Custodian hereunder shall be retained by Custodian as custodian until the later of (1) the time period for the retention of records specified in the Clinical Trial Agreement, or (2) the Required Custody Date, unless Custodian transfers the Open Records to itself pursuant to (a) a valid patient authorization executed in connection with the applicable Study and approved by the Institutional Review Board providing oversight for the Study and the Sponsor of the Study and (b) an agreement between Custodian, SVCMC and the Sponsor of such Study.

f.      Custodian acknowledges and agrees that it must arrange for the transfer of all Records from SVCMC pursuant to this Agreement by the Effective Date.

2.      Patient Communication and Access.  Custodian shall provide timely access to, and photocopies of, the Records to SVCMC, the Investigator and Sponsor conducting a Study, patients participating in a Study and their legal representatives, and entities and governmental agencies that have oversight responsibilities with respect to the Study, to the extent: (1) permitted in a valid HIPAA authorization executed by the patient or his or her legal representative in connection with the Study, (2) required by the Clinical Trial Agreement, and (3) required by laws, rules or regulations applicable to the parties and the Study.  Such access and copies shall be provided within the time periods required by the Clinical Trial Agreement and applicable laws, rules and regulations.

3.      Legal and HIPAA Compliance.  Custodian acknowledges that the Records being transferred hereunder are confidential.  In the event that a patient or other appropriate person under applicable laws, rules or regulations (including, without limitation, a committee for an incompetent, a conservator, or other person pursuant to court order) requests that a copy of a patient's Records be provided to such person or to another health care provider, Custodian shall promptly forward, or shall cause its designee to forward, a copy of the Records, if such access is permitted under a HIPAA authorization executed by the patient in connection with participation in the Study; provided, however, that in all instances, Custodian or its designee shall comply

with all provisions of the Clinical Trial Agreement and applicable law, rules and regulations with respect to the confidentiality of such Records. With respect to the Records transferred to Custodian hereunder, Custodian shall abide by all applicable laws, rules and regulations applicable to such records, including, without limitation, the Federal Health Insurance Portability and Accountability Act of 1996 and its related regulations.

4.    Term and Termination.

a.    This Agreement shall take effect upon execution by the parties hereto and shall remain in effect for as long as Custodian retains custody of any Records transferred hereunder.

b.    This Agreement may be terminated at any time by the mutual written agreement of the parties.

5.    Miscellaneous.

a.    Neither party may assign this Agreement without the express prior written consent of the other party, and any attempt to assign this Agreement without such consent shall be void.

b.    Neither party shall be authorized to act as agent for the other or to incur any liability in the name of or on behalf of the other, unless specifically authorized in this Agreement or in a writing executed by the party that would be responsible for the obligation.

c.    This Agreement shall be governed by the laws of the State of New York, exclusive of conflict of law rules. Each party to this Agreement hereby agrees and consents that any dispute with respect to this Agreement shall only be adjudicated in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). By execution and delivery of this Agreement, each such party hereby: (i) accepts the jurisdiction of the Bankruptcy Court; (ii) waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the venue set forth above; and (iii) further waives any claim that the Bankruptcy Court is an inconvenient forum.

d.    Nothing express or implied in this Agreement is intended to confer, nor shall anything herein confer, upon any person other than a party hereto any rights, remedies, obligations or liabilities whatsoever.

e.    This Agreement is the entire agreement between the parties concerning the subject matter hereof and supersedes all prior agreements, whether written or oral, concerning the subject matter hereof. This Agreement shall not be changed or modified, except by a writing signed by both of the parties hereto or their respective successors. Except as otherwise provided herein, all rights and remedies set forth in this Agreement shall be in addition to and not exclusive of any other rights or remedies now or hereafter existing at law or in equity.

f.    Any notice, request, instruction or document to be given hereunder by any party to another shall be in writing and delivered personally or mailed, first class registered or certified mail, postage prepaid, or by reputable overnight courier, to the address of such other party stated below:

To SVCMC:

Saint Vincents Catholic Medical Centers of New York
450 West 33rd Street
New York, New York 10001
Attn: Mark E. Toney, Chief Restructuring Officer

With a copy to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Fax:    (212) 715-8000
Attn:   Adam C. Rogoff, Esq.

Garfunkel Wild, P.C.
111 Great Neck Road
Great Neck, New York  11021
Attn:  Judith A. Eisen, Esq.

To Custodian:

The Mount Sinai School of Medicine of New York University
One Gustave Levy Place
New York, NY 10029
Box 1099
Attn:  General Counsel's Office

With a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Sq
New York, NY 10036
Attn:  J. Gregory Milmoe, Esq.

Each party hereto shall have the right to give notice to the other party changing its address as stated above and such address shall thereupon be deemed to be changed accordingly.

g.      If any provision of this Agreement or the application of any provision hereof to any person or circumstances is held to be legally invalid, inoperative or unenforceable, then the remainder of this Agreement shall not be affected unless the invalid provision substantially impairs the benefits of the remaining portions of this Agreement to the other party or parties.

h.      Any consent or waiver executed in writing by a party hereto shall be binding upon such party from and after the date of execution thereof unless a later or earlier date is specified therein.  No delay or failure to exercise any remedy or right occurring upon any default shall be

construed as a waiver of such remedy or right, or an acquiescence in such default, nor shall it affect any subsequent default of the same or a different nature.

i.      All headings and captions in this Agreement are for convenience only. They shall not be deemed part of this Agreement and shall in no way define, limit, extend or describe the scope or intent of any provisions hereof.

j.      The parties hereto shall execute and deliver all documents, provide all information and take or forbear from all such action as may reasonably be necessary or appropriate to achieve the purposes set forth in this Agreement.

k.      This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

l.      This Agreement may be executed in counterparts and each such counterpart, when taken together, shall constitute a single and binding agreement.

**IN WITNESS WHEREOF,** this Research Records Custody Agreement is signed as of the day and year first above written.

**SAINT VINCENTS CATHOLIC**      **THE MOUNT SINAI SCHOOL OF**
**MEDICAL CENTERS OF NEW YORK**      **MEDICINE OF NEW YORK UNIVERSITY**


By: _____      By: _____
 Name:      Name:
 Title:      Title:

# **Exhibit I**

# CUSTODIAL AGREEMENT

**CUSTODIAL AGREEMENT** made as of the _____ day of June, 2010 by and between **SAINT VINCENTS CATHOLIC MEDICAL CENTERS**, a New York not-for-profit corporation with offices at 450 West 33rd Street, New York, New York 10001 ("SVCMC"), and _____, a New York not-for-profit corporation with offices at _____ ("St. Lukes").

## W I T N E S S E T H:

**WHEREAS,** concurrently herewith, St. Lukes purchased from SVCMC certain assets and records of a pharmacy located at _____; and

**WHEREAS,** in order to assure the confidentiality and integrity of the records of the customers' medical and prescription information ("Customer Records") which were maintained in connection with the operation of the pharmacy by SVCMC, SVCMC wishes to transfer custody of such items to St. Lukes.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. <u>Preambles</u>.  The preambles set forth above are incorporated herein as if set forth at length.

2. <u>Transfer of Custody</u>.  Custody of Customer Records shall be transferred, as of the date hereof, from SVCMC to St. Lukes for safekeeping and to facilitate the continuation of pharmaceutical services to customers who are the subject of such Customer Records.  St. Lukes shall remain the custodian of such Customer Records for all purposes until, subject to applicable law, such time as the customer requests a different disposition of his or her Customer Record. The Customer Records are being transferred in their "as is" condition and no representation is made as to the completeness of the Customer Records.

3. <u>Retention of Customer Records by St. Lukes</u>.

   (a)     St. Lukes, as custodian of SVCMC's Customer Records, shall accept, retain and store such Customer Records in accordance with all legal and ethical requirements.

   (b)     In addition to that which is set forth in Section 3(a), above, St. Lukes shall respond to requests for Customer Records from the customers of SVCMC in accordance with applicable law and regulation and the provisions hereof.  Whenever St. Lukes responds to a request for Customer Records, St. Lukes shall note the date said items were sent and to whom; shall maintain a copy of the request for records; and shall maintain a copy of the items sent, or the originals, if copies are sent.

4. <u>Confidentiality</u>.  St. Lukes acknowledges that the Customer Records being transferred hereunder are confidential and agrees to maintain the confidentiality of each such Customer Record until such time as the customer consents to St. Lukes' use of his or her

Customer Record.  Customer Records are to be maintained by St. Lukes for the earlier of (i) such period of time as required by applicable law, rules and/or regulations, or (ii) the transfer of such Customer Records in accordance with Section 2 or Section 3 hereof.  In the event a customer, or other appropriate person under state and federal law (including, without limitation, a parent or guardian of an infant, a committee for an incompetent, a conservator, or other person pursuant to court order), requests that a copy of a Customer's Records be provided to such person, St. Lukes shall promptly forward a copy of the Customer's Records; provided, however, that in all instances, St. Lukes shall comply with all provisions of state and federal law with respect to the confidentiality of such Customer Records.

       5.    <u>Access to SVCMC</u>.  St. Lukes shall promptly provide SVCMC with access to the Customer Records upon request during regular business hours, at no cost to SVCMC.  St. Lukes shall provide copies of Customer Records to SVCMC upon written request at no cost.  SVCMC shall not request access to or copies of any Customer Records, or portions thereof, which SVCMC is not entitled to receive from St. Lukes in accordance with applicable state and federal law and regulations in effect as of the time of request.

       5.    <u>Miscellaneous</u>.

       (a)    Neither party may assign this Agreement without the express prior written consent of the other party, and any attempt to assign this Agreement without such consent shall be void.

       (b)    Neither party shall be authorized to act as agent for the other or to incur any liability in the name of or on behalf of the other, unless specifically authorized in this Agreement or in a writing executed by the party that would be responsible for the obligation.

       (c)    This Agreement shall be governed by the laws of the State of New York, exclusive of conflict of law rules.  Each party to this Agreement hereby agrees and consents that any dispute with respect to this Agreement shall only be adjudicated by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  By execution and delivery of this Agreement, each such party hereby: (i) accepts the jurisdiction of the Bankruptcy Court; (ii) waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the venue set forth above; and (iii) further waives any claim that the Bankruptcy Court is an inconvenient forum.

       (d)    Nothing express or implied in this Agreement is intended to confer, nor shall anything herein confer, upon any person other than a party hereto any rights, remedies, obligations or liabilities whatsoever.

       (e)    This Agreement is the entire agreement between the parties concerning the subject matter hereof and supersedes all prior agreements, whether written or oral, concerning the subject matter hereof.  This Agreement shall not be changed or modified, except by a writing signed by both of the parties hereto or their respective successors.  Except as otherwise provided herein, all rights and remedies set forth in this Agreement shall be in addition to and not exclusive of any other rights or remedies now or hereafter existing at law or in equity.

(f)     All notices and other communications required or permitted to be given hereunder shall be in writing, and shall be deemed duly given if delivered by hand or overnight courier service, or if mailed by certified mail, return receipt requested, to a party at its address stated below or to such other address as may be designated by written notice complying as to delivery with the terms of this provision.  Notices shall be sent to the address of the parties stated below:

To SVCMC:

       Saint Vincents Catholic Medical Centers of New York
       450 West 33rd Street
       New York, New York 10001
       Attn:  Chief Executive Officer

       With a copy to:

       Kramer Levin Naftalis & Frankel LLP
       1177 Avenue of the Americas
       New York, New York 10036
       Attn:   Adam C. Rogoff, Esq.

       Garfunkel Wild, P.C.
       111 Great Neck Road
       Great Neck, New York 11021
       Attn:  Judith A. Eisen, Esq.

To St. Lukes:

       _____
       _____
       _____

(g)     If any provision of this Agreement or the application of any provision hereof to any person or circumstances is held to be legally invalid, inoperative or unenforceable, then the remainder of this Agreement shall not be affected unless the invalid provision substantially impairs the benefits of the remaining portions of this Agreement to the other party or parties.

(h)     Any consent or waiver executed in writing by a party hereto shall be binding upon such party from and after the date of execution thereof unless a later or earlier date is specified therein.  No delay or failure to exercise any remedy or right occurring upon any default shall be construed as a waiver of such remedy or right, or an acquiescence in such default, nor shall it affect any subsequent default of the same or a different nature.

(i)     All headings and captions in this Agreement are for convenience only. They shall not be deemed part of this Agreement and shall in no way define, limit, extend or describe the scope or intent of any provisions hereof.

(j)     The parties hereto shall execute and deliver all documents, provide all information and take or forbear from all such action as may reasonably be necessary or appropriate to achieve the purposes set forth in this Agreement.

(k)     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

(l)     This Agreement may be executed in counterparts and each such counterpart, when taken together, shall constitute a single and binding agreement.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first set forth above.

SAINT     VINCENTS     CATHOLIC MEDICAL CENTERS

By:_____
Name:
Title:

_____

By:_____
Name:
Title: