Bidding Procedures Objection Deadline: July 16, 2010 at 4:00 p.m. (prevailing Eastern Time)
Bidding Procedures Hearing: July 22, 2010 at 11:00 a.m. (prevailing Eastern Time)
Sale Objection Deadline: August 5, 2010 at 4:00 p.m. (prevailing Eastern Time)
Sale Hearing: August 19, 2010 at 11:00 a.m. (prevailing Eastern Time

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SAINT VINCENTS CATHOLIC MEDICAL | : | Case No. 10-11963 (CGM) |
| CENTERS OF NEW YORK, et al., | : | |
| | : | |
| Debtors. | : | Jointly Administered |

------------------------------------------------------------ X

### NOTICE OF MOTION OF THE DEBTORS FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES FOR THE AUCTION OF ASSETS RELATED TO THE DEBTORS' LONG TERM HOME HEALTH CARE PROGRAM, (B) SCHEDULING AN AUCTION AND SALE HEARING RELATED THERETO, (C) APPROVING NOTICE OF THE AUCTION AND SALE HEARING, AND (D) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (II) AN ORDER (A) APPROVING SUCH SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS AND (B) AUTHORIZING PAYMENT OF THE BROKERS' TRANSACTION FEE

**PLEASE TAKE NOTICE** that a hearing will be held before the Honorable Cecelia G.

Morris, United States Bankruptcy Judge, in Room 701 of the United States Bankruptcy Court for

the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green,

New York, New York 10004-1408, on **July 22, 2010 at 11:00 a.m. (prevailing Eastern Time)**

("**Hearing**") to consider the Motion of the Debtors for (I) an Order (the "**Bidding Procedures**

**Order**") (A) Approving Bidding Procedures for the Auction of Assets Related to the Debtors' Long Term Home Health Care Program, (B) Scheduling an Auction and Sale Hearing Related Thereto, (C) Approving Notice of the Auction and Sale Hearing, and (D) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (II) an Order (A) Approving Such Sale Free and Clear of Liens, Claims, Encumbrances and other Interests and (B) Authorizing Payment of the Brokers' Transaction Fee (the "**Sale Motion**").

    **PLEASE TAKE FURTHER NOTICE** objections, if any, to entry of the Bidding Procedures Order must: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) counsel to the Debtors, c/o Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021 Attn: Judith Eisen, Esq.; (b) counsel for the Official Committee of Unsecured Creditors, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq.; (c) counsel to Secured Creditors: General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier, Esq.; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; (d) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; and (e) counsel to Metro Jewish, Robert E. Leamer, Esq., General Counsel, 6323 Seventh Avenue, Brooklyn, NY 11220-4742; and Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281, Attn: Paul W. Mourning, Esq., so as to be **actually received by 4:00**

p.m. (prevailing Eastern Time) on July 16, 2010 (the "**Bidding Procedures Objection Deadline**").

PLEASE TAKE FURTHER NOTICE a copy of the Sale Motion can be viewed and obtained on the Court's website http://www.ecf.nysb.uscourts.gov or (without charge) at http://svcmcrestructuring.com. Due to their voluminous nature certain exhibits and schedules to the asset purchaser agreement have been omitted from the Sale Motion, but are available upon request to the Debtors' counsel to the extent they are non-confidential.

PLEASE TAKE FURTHER NOTICE **your rights may be affected by the Sale Motion. You should read these papers carefully and discuss them with your attorney if you have one in these bankruptcy cases. (If you do not have an attorney in these bankruptcy cases, you may wish to consult one.)**

PLEASE TAKE FURTHER NOTICE if you do not want the Court to grant the relief requested in the Sale Motion, or if you want the Court to consider your view on the Sale Motion, you or your attorney must attend the Hearing. **If you or your attorney do not attend the Hearing, the Court may grant the relief requested in the Sale Motion.**

Dated: New York, New York
     July 8, 2010

          KRAMER LEVIN NAFTALIS & FRANKEL LLP

          /s/ Adam C. Rogoff
          Kenneth H. Eckstein
          Adam C. Rogoff
          P. Bradley O'Neill
          1177 Avenue of the Americas
          New York, New York 10036
          Telephone: (212) 715-9100

          *Counsel for Debtors*

Bidding Procedures Objection Deadline: July 16, 2010 at 4:00 p.m. (prevailing Eastern Time)
Bidding Procedures Hearing: July 22, 2010 at 11:00 a.m. (prevailing Eastern Time)
Sale Objection Deadline: August 5, 2010 at 4:00 p.m. (prevailing Eastern Time)
Sale Hearing: August 19, 2010 at 11:00 a.m. (prevailing Eastern Time

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------- x
In re:                                                  :  Chapter 11
                                                        :
SAINT VINCENTS CATHOLIC MEDICAL                         :  Case No. 10-11963 (CGM)
CENTERS OF NEW YORK, et al.,                            :
                                                        :
Debtors.                                                :  Jointly Administered
------------------------------------------------------- x
```

## MOTION OF THE DEBTORS FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES FOR THE AUCTION OF ASSETS RELATED TO THE DEBTORS' LONG TERM HOME HEALTH CARE PROGRAM, (B) SCHEDULING AN AUCTION AND SALE HEARING RELATED THERETO, (C) APPROVING NOTICE OF THE AUCTION AND SALE HEARING, AND (D) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (II) AN ORDER (A) APPROVING SUCH SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS AND (B) AUTHORIZING PAYMENT OF THE BROKERS' TRANSACTION FEE

TO THE HONORABLE CECELIA G. MORRIS,
UNITED STATES BANKRUPTCY JUDGE:

Saint Vincents Catholic Medical Centers of New York ("**SVCMC**") and certain

of its affiliates, as chapter 11 debtors and debtors in possession (each a "**Debtor**" and

collectively, the "**Medical Centers**" or the "**Debtors**" or the "**Seller**")[1] in the above-referenced

---

[1] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home,

chapter 11 cases (the "**Chapter 11 Cases**"), hereby file a motion (the "**Motion**") for (i) an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"), (a) approving bidding procedures substantially in the form attached to the Bidding Procedures Order as **Annex 1** (the "**Bidding Procedures**") for the auction (the "**Auction**") of certain of the assets related to Debtors' long term home health care program (the "**LTHHCP**," or the "**Assets**"); (b) scheduling the Auction and a hearing approving the sale of the Assets (the "**Sale Hearing**"); (c) approving the form and manner of the notice of the Auction and Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Annex 2** (the "**Auction and Sale Hearing Notice**"); and (d) approving certain procedures for the assumption and assignment of certain executory contracts and unexpired leases related to the Assets, substantially in the form annexed to the Bidding Procedures Order as **Annex 3** (the "**Assignment Procedures**"); and (ii) an order, substantially in the form attached hereto as **Exhibit B** (the "**Sale Order**"), approving a sale of the Assets free and clear of liens, claims, encumbrances and other interests to Metropolitan Jewish Home Care, Inc., a New York not-for-profit corporation (the "**Purchaser**" or "**Metro Jewish**") or another bidder submitting a higher or better offer at the Auction (the "**Sale Transaction**"), and (b) authorizing the payment of the brokers' Transaction Fee (as defined below) in connection with the Sale Transaction.

## SUMMARY OF RELIEF REQUESTED

1.     An important goal of these Chapter 11 Cases is to ensure the orderly and efficient transition of critical healthcare services provided by the Debtors to new sponsors in order to continue meeting the needs of the patients and communities previously served by the Debtors. One of the Debtors' important healthcare services are their home health services, which

---

Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc. There are certain affiliates of SVCMC who are not Debtors.

provide skilled nursing and rehabilitative services to patients in their homes throughout the five boroughs of New York City and Nassau and Suffolk counties. The home health services consist of the LTHHCP and a certified home health agency program (the "**CHHA**"). The LTHHCP is a program unique to New York State which provides nursing home-eligible Medicaid patients with clinical services safely at their homes as an alternative to institutionalization. The CHHA provides traditional home care services for those with heart conditions, diabetes, asthma and orthopedic problems in addition to maternal and early intervention programs for children. Approximately 100% of the LTHHCP patients and 60% of all CHHA patients receive Medicaid benefits.

2. Prior to the Debtors' bankruptcy filings, the Debtors undertook significant efforts to market their home health services as going-concerns. To assist in this process, the Debtors retained Cain Brothers and Shattuck Hammond Partners to oversee an extensive marketing effort which included contacting dozens of potential purchasers and negotiating with interested parties. Following this process, the Debtors have determined to enter into a "stalking horse" purchase agreement with Metro Jewish for the sale of the LTHHCP. On June 30, 2010, the Debtors filed a motion seeking approval of bidding procedures in connection with a sale of the CHHA.

3. By this Motion, the Debtors seek approval of (i) customary bidding procedures (including an auction process and payment of a break-up fee), (ii) the sale of the LTHHCP to the highest or otherwise best bidder, and (iii) payment of the Transaction Fee payable to the Debtors' brokers in connection with the sale. The Debtors propose to implement the bidding procedures and sale of the LTHCCP on substantially the same timeline as the CHHA Sale. The sale of the LTHHCP to the Purchaser will both preserve the quality of care for the LTHHCP's patients and allow for a material paydown of the Debtors' secured debt.

- 3 -

4.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

5.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

6.    The statutory predicates for the relief requested herein are sections 105(a) 363(b), and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**").

## BACKGROUND

7.    On April 14, 2010 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases are jointly administered for procedural purposes only.

8.    The Debtors are operating their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9.    On April 21, 2010, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed (i) an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "**Creditors' Committee**"), (ii) Alan Chapell as consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code (the "**Consumer Privacy Ombudsman**"), and (iii) Daniel T. McMurray as patient care ombudsman pursuant to section 333 of the Bankruptcy Code (the "**Patient Care Ombudsman**").

10.    On the Petition Date, the Medical Centers were the only remaining Catholic-sponsored, acute-care hospital network in New York City. Dedicated to fulfilling a charitable healthcare mission, the Medical Centers are committed to a mission that demands they

- 4 -

give "Respect, Integrity, Compassion and Excellence to all who come to us in need, especially the poor."

11. Prior to the Petition Date, the Medical Centers' core business centered around St. Vincent's Hospital Manhattan (the "**Hospital**"), which is located in the Greenwich Village section of Manhattan. The Medical Centers operate numerous other services, including a behavioral health facility, nursing homes, continuing care facilities, a hospice, a home health agency and a military health plan serving active duty dependents, retirees, and their families. Additionally, the Medical Centers operate certain physician-related affiliates, provide specialized care across 14 clinical departments, and are affiliated with 18 licensed behavioral health and community medicine programs and six ambulatory care providers in Manhattan, including the Comprehensive Cancer Center, an HIV center, and a wound care center.

12. On April 6, 2010, following a sustained period of poor operating results and unsuccessful efforts to find a strategic partner for the Hospital, the Board of Directors of SVCMC voted to approve the closure of the Hospital and the transfer or closure of the outpatient programs and clinics associated with and operated by the Hospital. In accordance with New York State law, the Debtors submitted to the New York State Department of Health ("**DOH**") for approval their proposed plan of closure on April 9, 2010 (the "**Closure Plan**," as may be amended from time to time in consultation with the DOH). The Hospital was closed under the Closure Plan and the Debtors are currently working closely with the DOH to implement the rest of the Closure Plan.

13. On June 28, 2010, the Debtors and North Shore University Hospital entered into an asset purchase agreement for the sale of the CHHA service, subject to the solicitation of higher or otherwise better bids (the "**CHHA Sale**"). On June 30, 2010, the Debtors filed a motion seeking approval of bidding procedures substantially identical to those

- 5 -

proposed herein in connection with the CHHA Sale and to sell the CHHA to the highest or otherwise best bidder. Further, for ease sake, the motion to approve the CHHA Sale and this Motion are virtually identical other than changes necessary to conform the relief herein to this specific Sale Transaction.

### THE SALE OF THE LTHHCP

14. The Debtors have engaged in an extensive process to sell the LTHHCP on the most favorable terms, including the solicitation of several offers from interested bidders. Initially, it was contemplated that a sale of the LTHHCP would occur prior to the commencement of these Chapter 11 Cases. However, because the Debtors were forced to file for bankruptcy before they could enter into a purchase agreement for the LTHHCP, the determination was made to identify the most appropriate bidder for the LTHHCP and enter into a stalking horse agreement, subject to higher or better bids.

15. Prior to the Petition Date, the Debtors commenced their efforts to sell the LTHHCP, retaining Cain Brothers & Company ("**Cain Brothers**") as investment banker and Shattuck Hammond Partners ("**Shattuck**") as broker to facilitate the transfer of the LTHHCP as a going concern. In coordination with the Debtors' senior management and Grant Thornton, the Debtors' crisis managers, Cain Brothers and Shattuck contacted approximately 32 potential purchasers and assisted 28 potential purchasers in conducting due diligence in connection with a sale of the LTHHCP.

16. On July 8, 2010, the Debtors and Metro Jewish entered into that certain Asset Purchase Agreement attached hereto as **Exhibit C** (the "**APA**") for the sale of the LTHHCP. The APA is explicitly conditioned on the approval of this Court and the necessary regulatory approval, and remains subject to the Debtors' solicitation of higher or better bids in accordance with the Bidding Procedures. The APA is also subject to several conditions,

including entry of the Bidding Procedures Order and the Sale Order, and approval of the Break-Up Fee (defined below).

17.     Metro Jewish is a multi-faceted health system that serves over 40,000 residents in seven counties, including Westchester County, the five boroughs of New York City and Nassau County. Metro Jewish provides three main lines of business (long term care, hospice and homecare and managed care) via a number of different entities. Metro Jewish has sufficient capitalization for the proposed acquisition of LTHHCP, in addition to possessing significant experience operating a LTHHCP within a complex, not-for-profit, mission-driven health system. Metro Jewish also includes the Metropolitan Jewish Health System Foundation which has cash, cash equivalent and investment assets of over $62 million.

### A. The Asset Purchase Agreement

18.     Below is a summary of the material provisions of the APA. The summary is intended solely to give the Court and interested parties an overview of the material terms of the APA. Interested parties should refer to the APA for the complete terms thereof.[2]

(a)     Purchase Price. The purchase price to be paid by the Purchaser to SVCMC for the Assets is $17.1 million.

(b)     Deposit. Purchaser shall deposit with an escrow agent, by wire transfer of immediately available funds, (a) 5% of the Purchase Price upon execution of the APA, (b) 5% of the Purchaser Price after Purchaser is selected as the prevailing bidder, and (c) 10% of the Purchaser Price upon entry of the Sale Order.

(c)     The Assets. The Purchaser shall purchase substantially all of the assets used to operate the LTHHCP, including the license to operate a long-term home health care program, the personal property, and related assets as described more fully in the APA.

(d)     Excluded Assets. The Debtors shall retain all right, title and interest to, in and under the assets, properties, interests and rights

---

[2] To the extent there are any inconsistencies between the summary description of the APA contained herein and the terms and conditions of the APA, the terms of the APA control. Capitalized terms contained in the summary description of the APA that are not defined in this Motion shall have the meanings ascribed to them in the APA.

of the Debtors, defined in the APA as Excluded Assets, which include, among other things, all cash, bank deposits or similar cash items of the Debtors and any accounts receivable or trade receivables owned by the Debtors as of the date of the Closing.

(e) Assumed Liabilities. On the terms and subject to the conditions set forth in the APA, the Purchaser shall assume, effective as of the Closing of the APA, and shall timely pay, perform and discharge in accordance with their respective terms, (i) the liabilities defined in the APA as Assumed Liabilities, and (ii) any monetary liability arising out of an inquiry by the New York State Attorney General's Office, Medicaid Fraud Control Unit, concerning provision of services to Medicaid beneficiaries on behalf of the LTHHCP by home health aids that were allegedly not appropriately credentialed (the "**Inquiry**").

(f) Permitted Liens. The Purchaser will take the Assets subject to certain Permitted Liens.

(g) Representations and Warranties. SVCMC provides customary representations and warranties related to the Assets, including representations related to consents and approvals.

(h) Bankruptcy Approval. The sale is conditioned upon entry of an order of the Court authorizing the sale of the Assets free and clear of liens, encumbrances, pledges, mortgages, deeds of trust, security interests, claims, leases, charges, options, rights of first refusal, easements, servitudes, proxies, voting trusts or agreements, and transfer restrictions under any agreement.

19.     As is customary in a sale transaction of this nature, the APA permits the Debtors' consideration of higher or otherwise better competing bids (each a "**Competing Bid**") pursuant to the Bidding Procedures.     In consideration of the Purchaser having expended considerable time and money in negotiating the APA, the APA provides that upon consummation of a transaction resulting from a Competing Bid, the Debtors will pay the Purchaser a fee equal to 2% of the Purchase Price, or $342,000 (the "**Break-Up Fee**"). The Break-Up Fee will only be payable upon consummation of a sale resulting from a Competing Bid and solely from the proceeds of a transaction resulting from a Competing Bid.

- 8 -

## B. Pre-Closing Management Agreement

20.     In order to transition the LTHHCP from the Debtors to Metro Jewish between entry of the Sale Order and the Closing, the APA provides that the parties will enter into the Management Consulting Agreement attached as an exhibit to the APA (the "**Management Agreement**"). The Management Agreement provides that Metro Jewish will assume day-to-day management of the LTHHCP within two days after entry of the Sale Order and prior to the closing under the APA. After the parties enter into the Management Agreement, the parties will work together to implement a transition plan (attached as one of the schedules to the APA) whereby patients will be transitioned from the Debtors to the Purchaser or another provider of the patient's choosing.

21.     The Management Agreement is subject to approval of the DOH in accordance with the DOH's State Hospital Code. See 10 N.Y. Comp. Codes R. & Regs. ("**NYCCRR**") § 763.11. SVCMC may only delegate responsibility for the operation of the LTHHCP pursuant to a management contract that meets certain requirements. See 10 NYCCRR §763.11(d). The criteria for determining whether SVCMC has improperly delegated its authority under the Management Agreement include whether it retains or delegates its authority (i) to hire or fire the administrator; (ii) for the maintenance and control of the books and records; (iii) over the disposition of assets and the incurring of liabilities on behalf of the agency; or (iv) over the adoption and enforcement of policies regarding the operation of the agency. See 10 NYCCRR §763.11(c)(1)-(4).

22.     The significant terms of the Management Agreement include the following:[3]

---

[3] To the extent there are any inconsistencies between the summary description of the Management Agreement contained herein and the terms and conditions of the Management Agreement, the terms of the Management

(a)     Metro Jewish Responsibilities.  Metro Jewish will manage the day-to-day operation of the LTHHCP business on behalf of SVCMC in accordance with the provisions of the Management Agreement, the policies, rules and regulations of SVCMC, and the laws, rules and regulations of all governmental authorities having jurisdiction over the LTHHCP, including providing or arranging for the provision of those services specified in the Management Agreement and such other services as are agreed to in writing by the parties from time to time which are necessary for the day-to-day management and operation of the LTHHCP; provided, however, that SVCMC shall retain on-going responsibility for statutory and regulatory compliance.  At all times relevant, Metro Jewish shall be subject to the general supervision and direction of SVCMC.  Metro Jewish shall have no authority to bind SVCMC to any contract.  Metro Jewish will also provide a full-time on-site manager who will support the administrator of the LTHHCP in the clinical and administrative aspects of the day-to-day operations of the LTHHCP.

(b)     SVCMC Responsibilities.  SVCMC will retain the authority to (i) hire or fire the administrator of the LTHHCP; (ii) dispose of assets outside of the ordinary course of business; (iii) adopt internal policies; (iv) comply with applicable statutes or regulations; (v) ensure the quality of care offered by the LTHHCP; and (vi) ensure adherence to the LTHHCP's plan of care for patients.  SVCMC will also use commercially-reasonable efforts to allow Metro Jewish access to and consultation with the Patient Care Ombudsman.

(c)     Fee.  No fee will be payable by SVCMC or any of the Debtors to Metro Jewish for the services furnished pursuant to the Management Agreement.

(d)     Term.  The term of the Management Agreement commences upon approval of the Court and the DOH, and ends on the earlier of (i) the Closing under the APA; or (ii) upon the termination of the APA, subject to the approval of the DOH.

(e)     Termination.  SVCMC may terminate the Management Agreement without cause on 90 days' prior written notice to Metro Jewish, and either party may terminate on 30 day's written notice of a material breach or default of the other party, with such breach or default remaining uncured for 30 days after such notice.  The parties may also terminate the Management Agreement on mutual consent.

Agreement control.  Capitalized terms contained in the summary description of the Management Agreement that are not defined in the Management Agreement shall have the meanings ascribed to them in the APA.

### C. Liens on the LTHHCP

23.     The LTHHCP is encumbered by (i) a lien and security interest (the "**Prepetition Senior Lien**") in favor of General Electric Capital Corporation ("**GE Capital**") as agent (in such capacity, the "**Prepetition Agent**") under a Credit Agreement dated as of August 30, 2007 (the "**Prepetition Credit Facility**") entered into by the Medical Centers, as borrowers, GE Capital, as agent, and GE Capital and TD Bank, N.A. as lenders (together with any other persons becoming lenders thereunder, the "**Prepetition Lenders**"), securing certain prepetition obligations (the "**Prepetition Obligations**") in the original principal amount of $320,000,000; and (ii) a lien and security interest (the "**DIP Agent Lien**") in favor of GE Capital as agent under a Debtor in Possession Credit Agreement dated as of April 16, 2010 (the "**DIP Credit Facility**") entered into by the Debtors, as borrowers, GE Capital, as agent (in such capacity, the "**DIP Agent**"), and GE Capital and TD Bank, N.A. as lenders (together with any other persons becoming lenders thereunder the "**DIP Lenders**") securing certain postpetition obligations of the Debtors (the "**DIP Loan**") approved by an earlier order of the Court (the "**DIP Order**"). The agents and the lenders under the Prepetition Credit Facility and the DIP Credit Facility are referred to as the "**Secured Creditors**." The sale of the LTHHCP will enable the Debtors to make a material payment on account of the Prepetition Obligations.

### D. Avoidance and Successor Liability

24.     The parties intend that the transfer of the Assets to the Purchaser (i) will not constitute avoidable transfers under the Bankruptcy Code or under applicable bankruptcy or non-bankruptcy law and (ii) will not subject the Purchaser to any liability other than the Assumed Liabilities with respect to the operation of the Debtors' business prior to the closing of the sale or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly,

on any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability.

### E. DOH Regulatory Approval Process

25.     Approval of the transfer of the LTHHCP requires approval from the DOH. See N.Y. Pub. Health Law § 3610 (prescribing regulatory approval process for authorization to provide a long term home health care program). A long term home health care program may be provided only by a certified home health agency, a residential health care facility or a hospital. In accordance with section 3610 of the New York Public Health Law, an applicant proposing to operate a long term home health care program must make written application for authorization to the Commissioner of the DOH ("**DOH Application**" and the "**Commissioner**," respectively). The Commissioner will not act on the application until it is approved by both the relevant health systems agency and the State Hospital Review and Planning Council. The Commissioner will only approve an application if he is satisfied as to: (a) the public need for the long term home health care program; (b) the financial resources of the provider of the proposed program and its sources of future revenues; (c) the ability of the proposed program to meet standards for participation as a home health agency under the Medicare program; and (d) such other matters as it shall deem pertinent. See N.Y. Pub. Health § 3610(2).[4]

26.     Accordingly, the APA provides that the Purchaser will, at its own cost and expense, (i) within the later of 20 days after the execution of the APA provide to SVCMC a draft of the DOH Application and consult with SVCMC regarding such application; (ii) within five

---

[4] While the Debtors recognize that certain aspects of the sale may require regulatory approvals under applicable state law, the Debtors reserve the right to contend whether any specific criteria of such approval is preempted by the Bankruptcy Code and subject to this Court's jurisdiction. Nothing here or in the participation of the Debtors in the state approval process constitutes a waiver of such right.

business days after the entry of the Bidding Procedures Order by the Court, cooperate with SVCMC in initiating informal discussions with DOH concerning the form and substance of the DOH Application; (iii) within 2 business days after the Purchaser is selected as the prevailing bidder, formally submit the DOH Application to DOH; and (iv) promptly after the entry of the Sale Order by the Court, submit to any other governmental body all other applications for any healthcare regulatory consents required in order for the Purchaser to consummate the sale and to operate the LTHHCP in accordance with applicable law (collectively with the DOH Application, the "**Healthcare Applications**").

27.     In addition, the Purchaser shall provide SVCMC with an opportunity to review the Healthcare Applications in advance of filing, and both parties shall cooperate in the preparation and prosecution of the Healthcare Applications.     The Purchaser shall use commercially reasonable efforts to prosecute the Healthcare Applications and shall timely submit all information and documents requested in connection therewith by DOH and any other governmental body. The Purchaser shall provide SVCMC with prompt written notice of the Purchaser's submission of a Healthcare Application.     Within three business days of its submission or receipt, the Purchaser shall deliver to SVCMC a complete copy of all correspondence to or from DOH or any other applicable governmental body having jurisdiction concerning a Healthcare Application. The Purchaser shall provide SVCMC with periodic reports of Purchaser's efforts to obtain all healthcare regulatory approvals. In addition, the Purchaser shall provide SVCMC with notice as promptly as practicable of its receipt of DOH's approval, contingent approval or a rejection of the DOH Application, along with a copy of any documentation related thereto. The Purchaser shall not knowingly take any action prior to the closing intended to disqualify the Purchaser as an authorized and licensed operator of the Business.

28.     By this Motion, the Debtors respectfully request the entry of two orders related to the disposition of the LTHHCP.   First, the Debtors seek entry of the Bidding Procedures Order, which approves (i) the Bidding Procedures by which the Debtors will solicit and consider additional Qualified Bids (defined below) for the Assets; (ii) the conduct of the Auction in the event the Debtors receive more than one Qualified Bid; (iii) the scheduling of the Sale Hearing to approve the sale of the Assets to the Successful Bidder (defined below) at the Auction; (iv) approving the form of the Auction and Hearing Notice; and (v) approving the Assignment Procedures.   The Bidding Procedures requested herein are substantially similar to those requested in connection with the CHHA Sale.

29.     Second, in order to effectuate the sale of the Assets to the Successful Bidder (defined below), the Debtors seek entry of the Sale Order to approve (i) the conveyance of the Assets to the Successful Bidder free and clear of liens, claims, encumbrances and other interests; (ii) the assumption and assignment of those executory contracts and unexpired leases being assigned to the Successful Bidder pursuant to its bid; (iii) payment of the Transaction Fee payable to Cain Brothers and Shattuck in connection with the sale; and (iv) payment of the net proceeds of the sale on account of the obligations secured by the Prepetition Senior Lien.

## F.  Bidding Procedures

30.     The Debtors seek entry of the Bidding Procedures Order and approval of the Bidding Procedures to ensure that the maximum value is obtained for the Assets.   The following is a summary of certain provisions of the Bidding Procedures pertaining to the solicitation of Competing Bids and the conduct of the Auction:[5]

---

[5] To the extent that there are any inconsistencies between the summary description of the Bidding Procedures contained herein and (i) the terms and conditions of the APA and/or (ii) the Bidding Procedures, the terms of the Bidding Procedures control.

(a)     Qualification of Bids and Bidders. In order to participate in the bidding process and to have a bid considered by the Debtors, each potential bidder must deliver a written offer or group of offers satisfying the below criteria. A "**Qualified Bidder**" is a potential bidder that delivers a binding bid that, in the Debtors' discretion after consultation with the Secured Creditors and the Committee, satisfies certain requirements set forth in the Bidding Procedures.

(b)     Minimum Bid. The amount of the purchase price in such bid must provide for net cash (or cash equivalent) that is at least $50,000 more than the purchase price contained in the APA plus the amount of the Break-Up Fee (the "**Minimum Bid**").

(c)     Deposit. A potential bidder must deposit 10% of the initial purchase price set forth in the Modified APA with an escrow agent selected by the Debtors (the "**Deposit Agent**") in the form of a certified check or wire transfer at least three business days before the Auction (the "**Deposit**").

(d)     Auction. In the event that the Debtors timely receive more than one Qualified Bid, the Debtors shall conduct the Auction with respect to the Assets. The Auction will take place at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036 on August 11, 2010, starting at 9:00 a.m. (prevailing Eastern Time), or at such other place, date and time as may be designated by the Debtors at or prior to the Auction. The Debtors retain their discretion, with the reasonable consent of the Committee and the Secured Creditors, to conduct the Auction (i) openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid, or (ii) though the submission of closed bids with the results being openly announced at the conclusion of the Auction.[6]

(e)     Bidding. Bidding at the Auction shall commence at the amount of the highest or otherwise best Qualified Bid submitted prior to the Auction; Qualified Bidders may then submit successive bids in increments of $50,000 (the "**Bid Increment**"); provided, however, that the Debtors shall retain the right, subject to the consent of the Committee and Secured Creditors, to modify the Bid Increment at the Auction.

---

[6] The Debtors reserve their right to conduct the Auction on August 10, 2010 concurrently with the CHHA Sale auction, in the event that the Debtors receive a Qualified Bid that contemplates a bidder purchasing both the CHHA and the LTHHCP.

(f)    Higher or Better. The Debtors reserve the right, in their discretion (in consultation with the Secured Creditors and the Committee) to determine whether any bid is better, if not higher, than another bid submitted during the Auction. The Debtors may consider a variety of factors in making this decision, including, without limitation, the ability of the applicable Qualified Bidder to obtain the necessary regulatory approvals, any proposed conditions to closing, and timing of any closure of the proposed transaction.

(g)    Successful Bid. The Auction shall continue until there is only one offer that the Debtors determine, in their discretion (after consultation with the Secured Creditors and the Committee) and subject to Court approval, is the highest or otherwise best offer from among the Qualified Bids submitted at the Auction (the "**Successful Bid**"). The bidder submitting such Successful Bid shall become the "**Successful Bidder**," and shall have such rights and responsibilities of the purchaser, as set forth in the Modified APA, or the APA, as applicable.

(h)    Backup Bid. At the conclusion of the Auction, the Debtors will also announce the second highest or otherwise best bid from among the Qualified Bids submitted at the Auction (the "**Backup Bid**"); provided that the Purchaser may be designated the Backup Bidder (as defined below) only if it consents to such designation in its sole and absolute discretion. The bidder submitting such Backup Bid shall become the "**Backup Bidder**," and shall have such rights and responsibilities of the Purchaser, as set forth in the Modified APA or the APA, as applicable. The Backup Bid shall remain open and irrevocable until one business day following the closing of the sale to the Successful Bidder.

### G. Auction and Sale Hearing Notice

31.    Within three business days of entry of the Bidding Procedures Order, the Debtors will serve copies of the Bidding Procedures, the Bidding Procedures Order, and the Auction and Sale Hearing Notice on the following parties (collectively, the "**Notice Parties**"): (a) all potential purchasers identified by the Debtors or their agents; (b) the United States Trustee for the Southern District of New York; (c) the Debtors' material prepetition and postpetition secured lenders or any agent therefor; (d) the Office of the United States Attorney; (e) the Office of New York State Attorney General; (f) the New York State Department of Health; (g) the Internal Revenue Service; (h) the Creditors' Committee; (i) the United States Attorney General;

(j) the United States Department of Health and Human Services; (k) the parties-in-interest who have requested notice pursuant to Bankruptcy Rule 2002; (l) all counterparties to the Assumed Contracts and Leases (defined below); and (m) all parties asserting an interest in the Property.

## H. Assumed Contracts and the Assignment Procedures

32.     Pursuant to sections 2.3 and 2.5 of the APA, the Assumed Contracts and Leases consist of certain executory contracts (the "**Assumed Contracts**") and unexpired leases (the "**Assumed Leases**"; together, the "**Assumed Contracts and Leases**") designated to be assumed by the Debtors and assigned to the Purchaser. In order to ensure the orderly assignment of the Assumed Contracts and Leases and the timely resolution of objections thereto, the Debtors seek approval of the Assignment Procedures. The following is a summary of certain provisions of the Assignment Procedures:[7]

> (a)     Initial Notice of Assumed Contracts and Leases. Within three business days, after entry of the Bidding Procedures Order, the Debtors will serve by first class mail an omnibus notice (the "**Initial Assignment Notice**") on each counterparty ("**Counterparty**") to the Assumed Contracts and Leases, substantially in the form attached as **Annex 4** to the Bidding Procedures Order. The Initial Assignment Notice shall include an exhibit with, among other things, the cure amount asserted by the Debtors that is necessary to cure any default under the relevant Assumed Contract or Assumed Lease pursuant to section 365 of the Bankruptcy Code (the "**Cure Amount**").

> (b)     Initial Objections. To the extent that any interested party wishes to object to any matter pertaining to the assumption and assignment of an Assumed Contract or Assumed Lease, then such interested party must file a written objection with the Court no later than August 5, 2010 (the "**Initial Objection Deadline**"). To the extent that any party-in-interest does not timely serve an Initial Objection, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Assumed Contract or Assumed

---

[7] To the extent that there are any inconsistencies between the summary description of the Assignment Procedures contained herein and (i) the terms and conditions of the APA and/or (ii) the Assignment Procedures, the terms of the Assignment Procedures control.

Lease; (ii) agreed that the Purchaser has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) consented to the relevant Cure Amount, if any; and (iv) agreed to the terms of the Bidding Procedures Order and the Sale Order and (v) waived any and all objections in connection with items (i) through (iv) hereof.

(c) Supplemental Notice of Assumed Contracts and Leases. Within one business day after the conclusion of the Auction, the Debtors will serve by overnight mail and email or facsimile, where possible, and file with the Court an omnibus notice of the Auction results (the "**Auction Results Notice**"), substantially in the form attached as **Annex 5** to the Bidding Procedures Order, upon each of the Counterparties. If, as a result of the Auction, new executory contracts (each an "**Additional Assumed Contract**") or new unexpired leases (each an "**Additional Assumed Lease**") are to be assumed and assigned by the Debtors, or a different Cure Amount is determined than the one listed in the Initial Assignment Notice (such Cure Amount, an "**Amended Cure Amount**"), then the Auction Results Notice shall include an exhibit setting forth such changes.

(d) Supplemental Objections. To the extent that any interested party wishes to object to the assumption and assignment of such newly added agreements or the Amended Cure Amount, then such party must file a written objection with the Court no later than August 13, 2010 (the "**Supplemental Objection Deadline**"). To the extent that a party does not timely serve an objection, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Additional Assumed Contract or Additional Assumed Lease; (ii) agreed that the Successful Bidder and the Backup Bidder have provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) consented to the relevant Amended Cure Amount, if any; and (iv) agreed to the terms of the Bidding Procedures Order and the Sale Order; and (v) waived any and all objections in connection with items (i) through (iv) hereof.

(e) Resolution and Adjudication of Objections. Upon filing of an objection by a Counterparty, the Debtors and/or the Purchaser will contact the objecting Counterparty to attempt to consensually resolve any timely served objection. If the Debtors and/or the Purchaser are unable to resolve an objection in response to the Initial Assignment Notice or the Auction Results Notice, (i) to the extent such objections (each an "**Adequate Assurance Objection**") relate to the adequate assurance of future performance by the Purchaser, such objections will be heard at the Sale Hearing

or (ii) to the extent such objections relate to a Cure Amount, Additional Cure Amount, or Amended Cure Amount, such objections will be heard at a hearing to be scheduled by the Court at the Sale Hearing (the "**Cure Objection Hearing**").

## I. Pre-Closing Management Agreement

33. As described more fully above, because the LTHHCP is a complex operation, and because any transition of ownership must be accomplished as seamlessly as possible, SVCMC and the Purchaser will enter into the Management Agreement, subject to DOH approval. The need for the Purchaser to assume immediate oversight under the Management Agreement is a critical part of the overall transaction and the need for the parties to move expeditiously. The Management Agreement would only be in place until the closing, which is expected to occur within approximately 60 days following this Court's approval of the Sale Order. The Management Agreement is intended to protect patient care as part of the sale process to ensure that patients continue to receive high-quality care throughout the transfer. Accordingly, the Debtors seek separate authorization under section 363(b) of the Bankruptcy Code to enter into the Management Agreement.

## J. Objections to Sale

34. The Debtors propose that objections, if any, to entry of the Sale Order (other than objections with respect to cure amounts or adequate assurance of future performance under the Assumed Contracts and Leases, which are subject to the Assignment Procedures) and any filed supplements thereto, must (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq., and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021, Attn: Judith Eisen, Esq.; (b) counsel for the Creditors'

Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Stephen Kuhn, Esq. and Sarah Link Schultz, Esq.; (c) counsel to Secured Creditors, General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; (d) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; (e) the Consumer Privacy Ombudsman, Alan Chapell & Associates LLC, 297 Driggs Avenue, Suite 3A, Brooklyn, New York 11222; (f) counsel to the Patient Care Ombudsman, Neubert, Pepe & Montiethe, P.C., 195 Church Street, 13th Floor, New Haven, Connecticut 06510, Attn: Mark I. Fishman; (g) the Successful Bidder; and (h) the Backup Bidder, so as to be actually received by 4:00 p.m. (prevailing Eastern Time) on August 5, 2010 (the "**Objection Deadline**").

35.     In the event the Debtors choose a Successful Bidder other than the Purchaser at the Auction, the Debtors propose the Objection Deadline solely with respect to the Debtors' choice of such alternative Successful Bidder will be August 13, 2010 at 4:00 p.m. (prevailing Eastern Time).

### K. Sale Hearing

36.     The Successful Bid and the Backup Bid will be subject to entry of the Sale Order after the Sale Hearing that the Debtors propose to take place on August 19, 2010 at 11:00 a.m. (prevailing Eastern Time). The Sale Hearing may be adjourned from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court. Upon approval of the Backup Bid by the Court, the Backup Bid shall remain open and irrevocable until the consummation of the Successful Bid.

- 20 -

## L. **Payment of the Investment Bankers' Transaction Fee**

37.     As described in greater detail in the Debtors' application to retain Cain Brothers and Shattuck, upon the successful closing of the sale, each of Cain Brothers and Shattuck will be entitled to a transaction fee equal to 1% of the aggregate transaction value of the sale as calculated in accordance with their respective engagement letters and the Court's order approving their retention (the "**Transaction Fee**"). By this Motion, the Debtors seek to pay the Transaction Fee upon the closing of the sale of the LTHHCP and without the necessity of further order of the Court.

## EXTRAORDINARY PROVISIONS OF THE PROPOSED SALE ORDER

38.     Pursuant to General Order M-383 of the United States Bankruptcy Court for the Southern District of New York, dated November 18, 2009, establishing this Court's Guidelines for the Conduct of Asset Sales, the Debtors are required to highlight any "extraordinary provisions" in a separate section of a motion seeking to sell the estates' assets. The extraordinary provisions are as follows:

(a)     Use of Proceeds. Under the APA, proceeds from a sale pursuant to a Competing Bid will be used to pay the Break-Up Fee. The Sale Order also provides that liens existing on the Assets will attach to the net proceeds of the sale after taking into account the costs of the sale. Sale costs will include costs directly relating to the transaction, including the Transaction Fee, other brokerage commissions, if any, and the Debtors' legal fees.

(b)     Relief from Bankruptcy Rule 6004(h). The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy rule 6004(h). The Debtors submit that such relief is appropriate under the circumstances.

(c)     Successor Liability. The proposed form of Sale Order contains findings and provisions limiting the Purchaser's successor liability. The Debtors believe that a finding that the sale can be made free and clear of successor liability claims in the Sale Order complies with applicable principles of sales free and clear of successor liability claims pursuant to section 363(f) of the Bankruptcy Code

and applicable non-bankruptcy law. In addition, the Debtors are providing notice of the sale as set forth herein (including publication notice).

**BASIS FOR RELIEF**

## A. The Bidding Procedures Should Be Approved

39.     The Bidding Procedures, which are standard for the sale of assets in large chapter 11 cases, will ensure that the Debtors' estates receives the greatest benefit available from the sale of the Assets. The Bidding Procedures have been structured to attract the maximum number of Qualified Bids for the Assets while allowing the Debtors the flexibility to select the bid that provides maximum value to the Debtors' estates. Finally, the Bidding Procedures set out a timeframe that will allow potential purchasers sufficient time to conduct due diligence, arrange financing, and construct and submit informed Competing Bids, while still providing for the expeditious Sale of the Assets. The Debtors submit that the Bidding Procedures are reasonably designed to ensure that the Debtors and their estates receive the maximum benefit available from the sale of the Assets, and therefore warrant Court approval.

## B. The Break-Up Fee Should Be Approved

40.     The Debtors are also requesting approval of the provisions of the APA and the Bidding Procedures regarding the Break-Up Fee in the amount of $342,000 (i.e., 2% of the Purchase Price). The Break-Up Fee is only payable upon consummation of a Competing Bid and solely payable from the proceeds of a sale pursuant to a Competing Bid.

41.     The Purchaser required the inclusion of these provisions in the APA to be willing to serve as a stalking horse bidder. As set forth herein, the Purchaser's bid establishes an appropriate floor value for the Assets after months of marketing and discussions with numerous potentially interested bidders.

- 22 -

42. Bankruptcy courts have approved bidding incentives similar to the Break-Up Fee under the "business judgment rule," and such arrangements are presumptively valid provided that (i) the Debtors' decision to agree to the break-up fee is not tainted by bad faith or self-dealing, (ii) the break-up fee does not hamper bidding, and (iii) the amount of the break-up fee is reasonable. See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656-57 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). A break-up fee serves as an "incentive payment" offered to an unsuccessful bidder who places the debtor's property in a "sales configuration mode," thereby attracting other bidders to the auction. Specifically, break-up fees (i) attract or retain a potentially successful bid, (ii) establish a bid standard or minimum for other bidders to follow, and (iii) attract additional bidders. Integrated Res. at 661-62.

43. In the instant case, the Break-Up Fee is the product of good faith, arm's-length negotiations between the Debtors and the Purchaser, each of whom was represented by counsel. The Break-Up Fee provides a material benefit to the estates by enabling the Debtors to obtain the commitment of the Purchaser which has and will continue to expend money, time and effort formulating and negotiating an offer for the Assets, notwithstanding that the APA is subject to higher or better offers. In the Debtors' business judgment, the Break-Up Fee is fair and reasonable when considering the time, effort, cost, and expense that the Purchaser has incurred in negotiating the APA. Indeed, the sale contemplated by the APA is higher and better than any other expression of interest for the Assets to date. If higher or better offers for the Assets are received, such offers are the direct result of the Purchaser serving as a "stalking horse bidder" for those assets.

44. Moreover, the Break-Up Fee does not hamper any other party's ability to offer a higher or better bid for the Assets. Given the size of the Break-Up Fee relative to the

total amount of consideration provided for the Assets pursuant to the APA, and relative to the "overbid" requirements set forth in the Bidding Procedures, the fee is not so large as to have a "chilling effect" on other prospective bidders' interest in the Assets. Because the APA has created a floor for any additional bids, the Purchaser has provided significant value to the Debtors' estates. The Debtors submit that the Break-Up Fee is appropriate under these unusual circumstances.

45.     Finally, the Break-Up Fee is reasonable in relation to the size of the proposed sale and under the unique facts and uncertainties of this transaction. The Break-Up Fee is equal to 2% of the Purchase Price, an amount similar to other break-up fees approved in the Southern District of New York in other large chapter 11 cases. See, e.g., In re Cabrini Med. Ctr. Case No. 09-14398 (AJG) (Bankr. S.D.N.Y. Dec. 30, 2009) (approving a break-up fee of 3.75% of $80 million sale); In re Bearingpoint, Inc., No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) (approving a break-up fee of 3% of a $350 million sale); In re Loral Space & Commc'ns Ltd., No. 03-41710 (RDD) (Bankr. S.D.N.Y. Aug. 18, 2003) (approving a break-up fee of 2% of $1 billion sale); In re Magellan Health Servs., Inc., No. 03-40515 (PCB) (Bankr. S.D.N.Y. Apr. 7, 2003) (approving discrete termination and commitment fees of 2% and 3%, respectively, in connection with a $30-$50 million equity commitment); In re Adelphia Bus. Solutions, Inc., No. 02-11389 (REG) (Bankr. S.D.N.Y. Dec. 16, 2002) (approving a termination fee of 2.5% of $10.7 million sale); In re Bradlees Stores, Inc., No. 00-16035 (BRL) (Bankr. S.D.N.Y. Jan. 11, 2001) (approving a termination fee of 2% of $150 million sale); Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 662 (S.D.N.Y. 1992) (approving termination fee of 3.2% of the $190 million out-of-pocket costs for $565 million sale), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).

## C. **The Auction and Sale Hearing Notice Should Be Approved**

46.     Pursuant to Bankruptcy Rules 2002(c) and 6004, the Debtors are required to give 21 days' notice of any proposed sale of property not in the ordinary course of business. Bankruptcy Rule 2002(c) further provides that such notice must include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale. The Auction and Hearing Notice sets forth all the information a potential bidder and any other party-in-interest should require about the bidding process for the Assets, including: notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; the Bid Deadline; the time, date, and location of the Auction; and the time, date, and location of the Sale Hearing.

47.     The Debtors submit that the Auction and Hearing Notice as provided for herein complies fully with Bankruptcy Rule 2002, Local Bankruptcy Rule 2002-1 and General Order M-331, and constitutes good and adequate notice of the sale and the proceedings with respect thereto.     Because the Debtors are providing notice of this Motion, the Bidding Procedures, and the Assignment Procedures to the Notice Parties and the Counterparties in advance of the Auction, the Debtors submit that the notice requirements of Bankruptcy Rules 2002(2) and 6004 are satisfied. The Debtors also propose to publish the Auction and Sale Notice in the Local Edition of the New York Times pursuant to Bankruptcy Rule 2002(l). Therefore, the Debtors respectfully request that the Court approve the Auction and Hearing Notice and the notice procedures proposed above.

## D. **The Sale of the Assets Should Be Approved**

48.     Section 363(b) of the Bankruptcy Code governs transactions outside the ordinary course of business involving property of the debtor's estate. Specifically, that section provides, in relevant part, that, "[t]he trustee, after notice and a hearing, may use, sell, or lease,

other than in the ordinary course of business, property of the estate..." The Debtors' sale or use of property of the estates outside the ordinary course of business should be approved by the Court if the Debtors can demonstrate a sound business justification for the proposed transaction. See In re Chrysler LLC, 576 F.3d 108, 117-18 (2d Cir. 2009), citing In re Iridium Operating LLC, 478 F.3d 452, 466 (2d Cir. 2007) ("In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.'" (citing Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)); see also In re Gen. Motors Corp., 407 B.R. 463, 494-5 (Bankr. S.D.N.Y. 2009) (noting that sales under § 363(b) are "commonly" approved subject to the business judgment rule).

49.     In addition, section 105(a) of the Bankruptcy Code grants the Court the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." This provision is "the basis for a broad exercise of power [by the Court] in the administration of a bankruptcy case." 2 Collier on Bankruptcy ¶ 105.01 (Lawrence P. King, et al. eds., 15th ed. rev. rel. 2000).

50.     A sound business justification exists for the sale here because it will allow the Debtors to: (i) monetize the Assets for the benefit of the Debtors' estates and creditors, and (ii) avoid the incurrence of any carrying costs associated with the Assets. Moreover, given (i) the thorough marketing of the Assets, (ii) the significant cash Purchase Price and Deposit being offered by the Purchaser; (iii) the Purchaser's willingness to promptly consummate the sale on an "as is, where is" basis; and (iv) the further market testing of the Assets at the Auction proposed herein, with the possibility of higher and better bids, the Debtors submit that the sale of the Assets is fair, reasonable, and in the best interests of the Debtors' estates.

51.    The Debtors also believe that the Purchase Price is fair and reasonable. Finally, any concern that the Debtors may be able to sell the Assets on better overall terms than those provided for in the APA should be allayed by the fact that the primacy of the APA will be tested through the Bidding Procedures, and at the Auction. As such, the Debtors submit that the sale of the Assets offers the greatest financial benefits to the Debtors' estates, and is an exercise of the Debtors' sound business judgment and warrants approval by the Court.

### E.  The Assets Should Be Sold Free and Clear

52.    Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property under section 363(b) of the Bankruptcy Code free and clear of liens, claims and encumbrances if one of the following conditions is satisfied:

1.  applicable nonbankruptcy law permits sale of such property free and clear of such interest;

2.  the entity holding the lien, claim or encumbrance consents to the sale;

3.  the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property;

4.  the interest is in bona fide dispute; or

5.  the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See In re Smart World Tech., LLC, 423 F.3d 166, 169 n.3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests... It thus allows purchasers... to acquire assets [from a debtor] without any accompanying liabilities."); In re Dundee Equity Corp., No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.")

53.    Pursuant to the APA, the Debtors request that the Court authorize the sale of the Assets free and clear of all interests, other than the "Permitted Liens" described in the

APA. Thus, the sale of the Assets pursuant to the Bidding Procedures will satisfy section 363(f)(1) of the Bankruptcy Code because any entities holding interests in the Assets will have received notice of this Motion and the Auction and Hearing Notice.

54. Section 363(f)(2) of the Bankruptcy Code is satisfied as to those parties that consent or do not object to the proposed sale. Here, all parties-in-interest will be given sufficient opportunity to object to the relief requested in this Motion, and any such entity that does not object to the sale should be deemed to have consented. See Futuresource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent... It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); In re Enron Corp., 2004 WL 5361245 at *2 (Bankr. S.D.N.Y. 2004) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)). As such, to the extent that no party holding an interest objects to the relief requested in this Motion, the sale of the Assets free and clear of all interests except the Permitted Liens satisfies section 363(f)(2) of the Bankruptcy Code.

55. Section 363(f)(3) of the Bankruptcy Code is satisfied because the price at which the Debtors' property is to be sold is greater than the economic value of the liens on the Assets. While the face value of the liens asserted against the Assets exceeds the Purchase Price currently offered by the Purchaser, the economic value of the Assets has been determined by the

market and there is the possibility that an auction will result in a higher and better bid. A sale can be made free and clear of any liens pursuant to section 363(f)(3) of the Bankruptcy Code so long as the purchase price exceeds "the aggregate value of all liens on such property." While the interpretation of section 363(f)(3) has produced some division in the courts, this Court has adopted the better-reasoned view that the "aggregate value of all liens" means the actual economic value placed on the liens – not the face amount of the liens. In re Levitz Home Furnishings, Inc., No. 05-45189 (BRL) (Bankr. S.D.N.Y. Dec. 14, 2005) (rejecting creditor's "face value" argument, finding requirements of section 363(f) satisfied and interest of secured creditors adequately protected by attachment of their liens to sales proceeds); In re Oneida Lake Dev., Inc., 114 B.R. 352, 356-57 (Bankr. N.D.N.Y. 1990) (value and not amount of liens is what the court must look at in applying section 363(f)(3)). Here, the value offered under the APA is greater than the amount offered by any other party-in-interest and remains subject to higher and better offers after what has been a thorough marketing effort. Accordingly, section 363(f)(3) is satisfied.

56.     Lastly, section 363(f)(5) of the Bankruptcy Code is also satisfied. Any entity holding an interest in the Assets not included in the Permitted Liens could be compelled to accept a monetary satisfaction of its interest. Furthermore, the Debtors propose that any interest in the Assets that is not included in the Permitted Liens shall attach to the net proceeds of the sale of those Assets subject to any claims and defenses the Debtors may possess with respect thereto, in the priority they had before the sale. As such, the sale of the Assets free and clear of all interests other than Permitted Liens satisfies section 363(f)(5) of the Bankruptcy Code.

57.     The Debtors do not believe that there are any liens held or asserted on the Assets other than Permitted Liens, the Prepetition Senior Lien, and the DIP Agent Lien. The

Debtors anticipate that they will receive consent to the Sale from the holder of the Prepetition Senior Lien and the holder of the DIP Agent Lien.

### F. Successor Liability

58.     The Debtors also seek to sell the Assets free and clear of any successor liability claims related to the Assets, other than monetary liability arising out of the Inquiry, which the Purchaser has agreed to assume. Notwithstanding reference to the conveyance free and clear of "any interest" in section 363(f), that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims, as well. See, e.g., In re Gen. Motors Corp. (n/k/a Motors Liquidation Corp.), Case No. 09-50026 (REG) (Bankr. S.D.N.Y. Jul. 5, 2009) (authorizing sale of assets free and clear of successor liability claims); In re Old Carco LLC (f/k/a/ Chrysler LLC), Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Jun. 1, 2009) (same); see also In re Trans World Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program).

59.     Here, the Sale Transaction is dependent on the ability of the Debtors to transfer the Assets free and clear from successor liability, other than monetary liability, if any, arising out of the Inquiry. In order to be able to dispose of their various non-hospital business segments, the Debtors must be able to transfer these assets free and clear from potential successor liability claims, other than monetary liability, if any, arising out of the Inquiry. Indeed, the transfer of the Assets free and clear of successor liability claims is a critical inducement for the Purchaser to enter into the Sale Transaction. See Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997) (stating that a sale pursuant to § 363 of the Bankruptcy Code "maximizes the purchase price of assets because without this assurance of finality,

purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property").

60.     Furthermore, pursuant to New York law and traditional common law, a purchaser of another company's assets will be found to be liable for the seller's liabilities only where (i) the successor expressly or impliedly assumes the predecessor's tort liability, (ii) the seller and purchaser merged or otherwise consolidated, (iii) the purchaser is a mere continuation of the seller, or (iv) the transaction is fraudulent. See N.Y. v. Nat'l Serv. Indus., Inc., 460 F.3d 201, 209 (2d Cir. 2006). Because, except for Purchaser's assumption of monetary liability arising out of the Inquiry, if any, none of these circumstances apply to the Sale Transaction, a finding by the Court that the transfer of the Assets is free and clear of any successor liability claims is proper. See Douglas v. Stamco, Case No. 09-1390-cv, 2010 WL 337043 (2d Cir. Feb. 1, 2010) (holding that sale pursuant to § 363 extinguished successor liability claims where there was no (i) assumption of such liability, (ii) merger of the parties, (iii) mere continuation of the seller, or (iv) fraud).

61.     Accordingly, the Assets should be transferred to the Purchaser free and clear of all liens, claims, encumbrances and other interests, including rights or claims based on any successor liability, except for the Assumed Liabilities.

## G.  The Purchaser is a Good Faith Purchaser

62.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) was later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [subsection 363(b)]... does not affect the validity of a sale... to an entity that purchased... such property in good faith, whether or not such entity knew of the pendency of the appeal,

> unless such authorization and such sale... were
> stayed pending appeal."

See Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m)...

provides that good faith transfers of property will not be affected by the reversal or modification

on appeal of an unstayed order, whether or not the transferee knew of the pendency of the

appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11

U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless

there is a stay pending appeal").

> 63.  Although the Bankruptcy Code does not define "good faith," the Second

Circuit, in In re Gucci, has held:

> Good faith of a purchaser is shown by the integrity
> of his conduct during the course of the sale
> proceedings; where there is a lack of such integrity,
> a good faith finding may not be made. A
> purchaser's good faith is lost by "fraud, collusion
> between the purchaser and other bidders or the
> trustee, or an attempt to take grossly unfair
> advantage of other bidders."

126 F.3d at 390 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)

(interpreting Bankruptcy Rule 805, the precursor of section 363(m) of the Bankruptcy Code));

see also Bace v. Babbitt, No. 07 Civ. 2420 (WHP), 2008 WL 800579, at *3 (S.D.N.Y. Mar. 25,

2008) (same; quoting Gucci).

> 64.  The Second Circuit has indicated that a party would have to show fraud or

collusion between a buyer and the debtor-in-possession or trustee in order to demonstrate a lack

of good faith. See Kabro Assocs. of West Islip, LLC, v. Colony Hill Assocs. (In re Colony Hill

Assocs.), 111 F.3d 269, 276, (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a

purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser

and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders");

see also In re Angelika Films 57th, Inc., Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. 1997); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

65.     Here, Metro Jewish – who is not an "insider" of the Debtors under section 101(31) of the Bankruptcy Code – and the Debtors, have satisfied the requirements of section 363(m). The APA is the result of extended arm's-length, good faith negotiations between the Debtors and Metro Jewish, each represented by their respective professionals. Accordingly, Metro Jewish is a "good-faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and should be entitled to its protection. Therefore, the Debtors request that the Court make a finding that Metro Jewish is entitled to the protections of section 363(m) of the Bankruptcy Code.

66.     To the extent that Metro Jewish is not the Successful Bidder(s) at the Auction, the Debtors will seek a finding from the Court at the Sale Hearing that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code, as well as an identical finding with regard to the Backup Bidder.

## H. The Sale Complies with Applicable Nonbankruptcy Law

67.     Sections 363(d) and 541(f) of the Bankruptcy Code require that the transfer of property by a not-for-profit corporation comply with applicable nonbankruptcy law governing such a transfer. Specifically, section 363(d) provides that "[t]he trustee may use, sell or lease property under subsection (b) or (c) of this section only – (1) in accordance with applicable nonbankruptcy law that governs the transfer of property by a corporation that is not a moneyed, business or commercial corporation..." Section 541(f) further provides that "property that is held by a debtor that is a corporation described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code may be transferred to an entity that is not such a corporation, but only under the same conditions as

- 33 -

would apply if the debtor had not filed a case..." Pursuant to section 1221 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, sections 363(d) and 541(f) of the Bankruptcy Code are applicable to all cases pending or filed on or after April 20, 2005.

68. As described above, approval of the transfer of the LTHHCP requires approval of the DOH. As noted above, pursuant to the APA the Purchaser shall provide to SVCMC a draft of its DOH Application and consult with SVCMC regarding such application, cooperate with SVCMC in initiating informal discussions with DOH concerning the form and substance of the DOH Application, formally submit the DOH Application to DOH, and promptly after the entry of the Sale Order by the Court, submit to any other governmental body all other applications for any healthcare regulatory consents required on the part of Purchaser in order for the Purchaser to consummate the sale and to operate the LTHHCP in accordance with applicable law. The Debtors therefore submit that the sale complies with applicable nonbankruptcy law. Furthermore, the APA provides that it is enforceable only to the extent permitted by law.

69. The Debtors submit, therefore, that the terms of the APA comply with all applicable not-for-profit laws, including the not-for-profit laws of the State of New York, and applicable federal law. As such, the APA satisfies the requirements of sections 363(d) and 541(f) of the Bankruptcy Code.

## I. **Assumption of the Assumed Contracts and Leases and the Assignment Procedures Should be Approved**

70. Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

71. The "business judgment" test is the standard applied by courts in determining whether an executory contract or unexpired lease should be assumed. See, e.g., In

re Old Carco LLC (f/k/a/ Chrysler LLC), 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009); see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures), 4 F.3d 1095, 1099 (2d Cir. 1993); see also Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985) ("[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.") A court should approve the assumption of a contract under section 365(a) of the Bankruptcy Code if it finds that a debtor has exercised its sound business judgment in determining that assumption of an agreement is in the best interests of its estate. See, e.g., Old Carco, 406 B.R. at 196-97; In re Child World, Inc., 142 B.R. 87, 89-90 (Bankr. S.D.N.Y. 1992); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr. S.D.N.Y. 1989); see also Sharon Steel Corp. v. National Fuel Gast Distrib. Corp (In re Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989).

72.     When assuming an executory contract, section 365(b) of the Bankruptcy Code requires the debtor to cure any defaults under the contract or provide adequate assurance that it will promptly cure such defaults. If there has been a default, the debtor must also provide adequate assurance of future performance under the contract.

73.     Assuming and assigning the Assumed Contracts and Leases to the Purchaser or the Successful Bidder pursuant to the Assignment Procedures is an appropriate exercise of the Debtors' business judgment. As the Debtors are selling the Assets, the Assumed Contracts and Leases will no longer have any value to the Debtors. By assuming and assigning the Assumed Contracts and Leases to the Purchaser or the Successful Bidder, the Debtors' estates will benefit from avoiding the rejection damages claims that would arise from rejecting the Assumed Contracts and Leases.

74. In addition, the Purchaser has sufficient capital and financing commitments to provide adequate assurance of future performance on all the Assumed Contracts and Leases and the Debtors are requiring any Qualified Bidder similarly to demonstrate its ability to provide adequate assurance of future performance. As noted above, Metro Jewish includes the Metropolitan Jewish Health System Foundation which has cash, cash equivalents and investment assets of over $62 million.

75. The Assignment Procedures proposed by the Debtors for determining Cure Amounts and providing the Counterparties to the Assumed Contracts and Leases notice and an opportunity to object to the assumption and assignment and/or the Cure Amounts are fair to all parties and satisfy the notice requirements of Bankruptcy Rule 6006(c).

76. Therefore, because assuming and assigning the Assumed Contracts and Leases to the Successful Bidder(s) avoids the costs of rejecting those executory contracts and unexpired leases and increases the value to be realized from the sale of the Assets, assumption and assignment to the Successful Bidder(s) of the Assumed Contracts and Leases (as amended by the Supplemental Notice of Assumed Contracts and Leases) is clearly an exercise of the Debtors' sound business judgment which warrants approval by this Court.

## J. Entry into the Management Agreement Should Be Approved

77. The Management Agreement is fundamental to the preservation of the LTHHCP services and an orderly transition of the LTHHCP to Purchaser. The Debtors entry into the Management Agreement is in their reasonable business judgment. See In re Chrysler LLC, 576 F.3d 108, 117-18 (2d Cir. 2009) (citations omitted). The "business judgment" test is met when the debtor shows that the proposed use of property would be beneficial to the estate. Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

78. Once the debtor articulates a valid business justification, the business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)) (the business judgment rule is satisfied where the debtor acts "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.") Thus, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts generally will not entertain objections to the debtor's conduct". Comm. Of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns Manville Corp.), 60 B.R. 612, 616 (Bank. S.D.N.Y. 1986).

79. The debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Del. 2001) (quoting In re Logical Software, 66 B.R. 683, 686 (Bankr. D. Mass. 1986)); Integrated Resources, 147 B.R. at 656 ("Courts are loath to interfere with corporate decisions absent a showing of bad faith, self interest or gross negligence") (citations omitted).

80. Here, entering into the Management Agreement represents a sound exercise of the Debtors' business judgment and should be approved as in the best interests of the Debtors' estates, their creditors and other parties in interest. The Management Agreement is necessary to preserve the value of the LTHHCP services prior to closing and effectuate the sale. The Management Agreement, which is subject to DOH approval, also ensures adequate

management resources to transition the LTHHCP to Purchaser. This Management Agreement is essential to preserving the high quality of patient care and LTHHCP service values.

### K. **Waiver of 14-Day Stay under Bankruptcy Rule 6004(h)**

81.     Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing a sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of such order. The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). The Debtors believe that such waiver is appropriate here with respect to the Sale Order because all parties that have expressed interest in the Assets will have (i) received notice of this Motion and any entry of the Bidding Procedures Order and (ii) had the opportunity to participate in the Auction at which the Debtors propose to sell the Assets.

### NOTICE

82.     No trustee or examiner has been appointed in these Chapter 11 Cases. In accordance with the Final Administrative Order Establishing Case Management Procedures (the "**Case Management Order**"), entered on May 13, 2010, notice of this Motion has been given to the parties identified on the General Service List and the Special Service List (as such terms are identified in the Case Management Order). The Debtors submit that no other notice need be given.

### NO PREVIOUS REQUEST

83.     No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested and such other or further relief as is just.

Dated: New York, New York
      July 8, 2010

              KRAMER LEVIN NAFTALIS & FRANKEL LLP

              /s/ Adam Charles Rogoff
              Kenneth H. Eckstein
              Adam C. Rogoff
              P. Bradley O'Neill
              1177 Avenue of the Americas
              New York, New York 10036
              Telephone: (212) 715-9100

              *Counsel for Debtors*