**Bidding Procedures Objection Deadline: August 16, 2010 at 4:00 p.m. (prevailing Eastern Time)**
**Bidding Procedures Hearing: August 19, 2010 at 11:00 a.m. (prevailing Eastern Time)**
**Sale Objection Deadline: September 14, 2010 at 4:00 p.m. (prevailing Eastern Time)**
**Sale Hearing: October 7, 2010 at 11:00 a.m. (prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SAINT VINCENTS CATHOLIC MEDICAL | : | Case No. 10-11963 (CGM) |
| CENTERS OF NEW YORK, <u>et al.</u>, | : | |
| | : | |
| Debtors. | : | Jointly Administered |

----------------------------------------------------------- X

## NOTICE OF DEBTORS' MOTION FOR (I) AN ORDER (A) APPROVING BREAK-UP FEE AND BIDDING PROCEDURES FOR THE AUCTION OF THE BISHOP MUGAVERO ASSETS, (B) SCHEDULING AN AUCTION AND SALE HEARING, AND (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (II) AN ORDER (A) APPROVING THE SALE OF THE BISHOP MUGAVERO ASSETS, (B) AUTHORIZING THE DEBTORS TO ENTER INTO A RECEIVERSHIP AGREEMENT, (C) AUTHORIZING PAYMENT OF THE BROKERS' TRANSACTION FEES, AND (D) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY <u>CONTRACTS AND UNEXPIRED LEASES</u>

**PLEASE TAKE NOTICE** that a hearing will be held before the Honorable Cecelia G.

Morris, United States Bankruptcy Judge, in Room 701 of the United States Bankruptcy Court for

the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green,

New York, New York 10004-1408, on **August 19, 2010 at 11:00 a.m. (prevailing Eastern**

**Time)** to consider the Debtors' Motion for (I) an Order (the "**<u>Bidding Procedures Order</u>**") (a)

Approving Break-Up Fee and Bidding Procedures for the Auction of the Bishop Mugavero Assets, (b) Scheduling an Auction and Sale Hearing, and (c) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) an Order (a) Approving the Sale of the Bishop Mugavero Assets, (b) Authorizing the Debtors to Enter Into a Receivership Agreement, (c) Authorizing Payment of the Brokers' Transaction Fees, and (d) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (the "**Motion**").

**PLEASE TAKE FURTHER NOTICE** objections, if any, to entry of the Bidding Procedures Order must: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq. and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021 Attn: Judith Eisen, Esq.; (b) counsel for the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Stephen Kuhn, Esq. and Sarah Link Schultz, Esq.; (c) counsel to Secured Creditors: General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; (d) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; and (e) counsel to Purchasers, Nutovic & Associates, 488 Madison Avenue, 16th Floor, New York, N.Y. 10022, Attn: Isaac Nutovic, Esq., so as to be **actually received by 4:00 p.m. (prevailing Eastern Time) on August 16, 2010** (the "**Objection Deadline**").

KL2 2661564.1

A copy of the Motion can be viewed and obtained on the Court's website www.ecf.nysb.uscourts.gov or (without charge) at http://chapter11.epiqsystems.com/svcmc2010.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney if you have one in these bankruptcy cases. (If you do not have an attorney in these bankruptcy cases, you may wish to consult one.)**

If you do not want the Court to grant the relief requested in the Motion, or if you want the Court to consider your view on the Motion, you or your attorney must attend the Hearing. **If you or your attorney do not attend the Hearing, the Court may grant the relief requested in the Motion.**

Dated: New York, New York
      August 5, 2010

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/  Adam C. Rogoff
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

*Counsel for Debtors*

KL2 2661564.1

**Bidding Procedures Objection Deadline: August 16, 2010 at 4:00 p.m. (prevailing Eastern Time)**
**Bidding Procedures Hearing: August 19, 2010 at 11:00 a.m. (prevailing Eastern Time)**
**Sale Objection Deadline: September 14, 2010 at 4:00 p.m. (prevailing Eastern Time)**
**Sale Hearing: October 7, 2010 at 11:00 a.m. (prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel for Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SAINT VINCENTS CATHOLIC MEDICAL | : | Case No. 10-11963 (CGM) |
| CENTERS OF NEW YORK, <u>et</u> <u>al.</u>, | : | |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

--------------------------------------------------------- x

**DEBTORS' MOTION FOR (I) AN ORDER (A) APPROVING BREAK-UP FEE AND
BIDDING PROCEDURES FOR THE AUCTION OF THE BISHOP MUGAVERO
ASSETS, (B) SCHEDULING AN AUCTION AND SALE HEARING, AND (C)
APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (II) AN
ORDER (A) APPROVING THE SALE OF THE BISHOP MUGAVERO ASSETS, (B)
AUTHORIZING THE DEBTORS TO ENTER INTO A RECEIVERSHIP AGREEMENT,
(C) AUTHORIZING PAYMENT OF THE BROKERS' TRANSACTION FEES, AND (D)
APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
<u>CONTRACTS AND UNEXPIRED LEASES</u>**

TO THE HONORABLE CECELIA G. MORRIS,
UNITED STATES BANKRUPTCY JUDGE:

      Saint Vincents Catholic Medical Centers of New York ("**SVCMC**") and certain

of its affiliates, as chapter 11 debtors and debtors-in-possession (each a "**Debtor**" and

collectively, the "**Medical Centers**" or the "**Debtors**")[1] in the above-referenced chapter 11 cases

---

[1] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii)
Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort

(the "**Chapter 11 Cases**"), hereby file a motion (the "**Motion**") for (i) an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"), (a) approving a Break-Up Fee (as defined below) and bidding procedures (the "**Bidding Procedures**") for the auction (the "**Auction**") of substantially all of the assets (the "**Bishop Mugavero Assets**") of Bishop Francis J. Mugavero Center for Geriatric Care ("**Bishop Mugavero**" or the "**Seller**"), including a skilled nursing and residential health care facility located at 155 Dean Street, Brooklyn, New York (the "**Facility**"); (b) scheduling the Auction and a hearing approving the sale of the Bishop Mugavero Assets (the "**Sale Hearing**"); and (c) approving certain procedures for the assumption and assignment of certain executory contracts and unexpired leases related to the Bishop Mugavero Assets (the "**Assignment Procedures**"); and (ii) an order, substantially in the form attached hereto as **Exhibit B** (the "**Sale Order**"), (a) approving a sale of the Bishop Mugavero Assets free and clear of liens, claims, encumbrances and other interests to the Purchasers (defined below) or another bidder submitting a higher or better bid at the Auction (the "**Sale Transaction**"), (b) authorizing the Debtors to enter into a Receivership Agreement, (the "**Receivership Agreement**"), (c) authorizing payment of the brokers' Transaction Fees (as defined below), and (d) approving the assumption and assignment of certain executory contracts and unexpired leases (the "**Assumed Contracts and Leases**") in connection with the Sale Transaction.

### SUMMARY OF RELIEF REQUESTED

1.  An important goal of these Chapter 11 Cases is to ensure the orderly and efficient transition of critical healthcare services provided by the Debtors to new sponsors in

---

Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc. There are certain affiliates of SVCMC who are not Debtors. Substantially all of the Bishop Mugavero Assets are owned by one of the Debtors, Bishop Francis J. Mugavero Center for Geriatric Care, Inc.

order to continue meeting the needs of the patients and communities previously served by the Debtors. One of the Debtors' important healthcare services is their skilled nursing and residential health care facilities (collectively, the "**Nursing Homes**"). The Nursing Homes consist of (i) Bishop Mugavero, (ii) St. Jerome's Health Services Corporation d/b/a Holy Family Home ("**Holy Family Home**"), and (iii) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care Rehabilitation Center ("**St. Elizabeth Ann**"). Bishop Mugavero is a 288-bed, skilled nursing and residential health care facility located in the Boerum Hill section of Brooklyn. Holy Family Home is a 200-bed, skilled nursing and residential health care facility located in the Bensonhurst section of Brooklyn. St. Elizabeth Ann is a 300-bed, skilled nursing and rehabilitative care facility located in Staten Island. In addition to long-term care, St. Elizabeth Ann provides highly specialized sub-acute, neuro-behavioral, and extensive AIDS-related services.

2.       Prior to the Debtors' bankruptcy filings, the Debtors undertook significant efforts to commence the marketing of their Nursing Homes as going-concerns. To assist in this process, the Debtors retained Cain Brothers & Company ("**Cain Brothers**") and Loeb & Troper LLP ("**Loeb & Troper**," and together with Cain Brothers, the "**Brokers**") to coordinate and oversee an extensive marketing effort, which included contacting dozens of potential purchasers and negotiating with interested parties. Following this process, the Debtors have determined to enter into a "stalking horse" purchase agreement with the Purchasers for the sale of the Bishop Mugavero Assets.

3.       By this Motion, the Debtors seek approval of (i) customary bidding procedures (including an auction process and payment of break-up fee(s)), (ii) the sale of the Bishop Mugavero Assets to the highest or otherwise best bidder(s), (iii) entry into the

Receivership Agreement for the pre-closing operation of the Facility, and (iv) payment of the Transaction Fees payable to the Debtors' Brokers in connection with the Sale Transaction. The sale of the Bishop Mugavero Assets to the Purchasers will both preserve the quality of care for Bishop Mugavero's patients and allow for a material paydown of the Debtors' secured debt.

4. Contemporaneously herewith, the Debtors are also filing a motion seeking approval of substantially identical purchase agreements for the sale of Holy Family Home. For ease sake, the motion to approve the sale of the Holy Family Home assets and this motion are virtually identical other than changes necessary to conform the relief requested herein to this specific Sale Transaction. In addition, the bidding procedures, assignment procedures, and other relief sought in both motions are also substantially identical.[2]

### JURISDICTION AND VENUE

5. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

6. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The statutory predicates for the relief requested herein are sections 105(a), 363(b), and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**").

---

[2] In addition, the proposed Bidding Procedures, Assignment Procedures and other relief sought herein are substantially identical to the procedures and relief sought in connection with the sale of the Debtors' interests in their Home Health services. By orders dated July 23, 2010, this Court has approved similar procedures in these Chapter 11 cases. See Docket Nos. 641 and 642.

8.    On April 14, 2010 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases are jointly administered for procedural purposes only.

9.    The Debtors are operating their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

10.    On April 21, 2010, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed (i) an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "**Creditors' Committee**"), (ii) Alan Chapell as consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code (the "**Consumer Privacy Ombudsman**"), and (iii) Daniel T. McMurray as patient care ombudsman pursuant to section 333 of the Bankruptcy Code (the "**Patient Care Ombudsman**").

11.    On the Petition Date, the Medical Centers were the only remaining Catholic-sponsored, acute-care hospital network in New York City. Dedicated to fulfilling a charitable healthcare mission, the Medical Centers are committed to a mission that demands they give "Respect, Integrity, Compassion and Excellence to all who come to us in need, especially the poor."

12.    Prior to the Petition Date, the Medical Centers' core business centered around St. Vincent's Hospital Manhattan (the "**Hospital**"), which is located in the Greenwich Village section of Manhattan. The Medical Centers operated numerous other services, including a behavioral health facility, skilled nursing facilities, continuing care facilities, a hospice, a home health agency and a military health plan serving active duty dependents, retirees, and their families. Additionally, the Medical Centers operated certain physician-related affiliates, provide specialized care across 14 clinical departments, and are affiliated with 18 licensed behavioral

- 5 -

health and community medicine programs and six ambulatory care providers in Manhattan, including the Comprehensive Cancer Center, an HIV center, and a wound care center.

13.     On April 6, 2010, following a sustained period of poor operating results and unsuccessful efforts to find a strategic partner for the Hospital, the Board of Directors of SVCMC voted to approve the closure of the Hospital and the transfer or closure of the outpatient programs and clinics associated with and operated by the Hospital.  In accordance with New York State law, the Debtors submitted to the New York State Department of Health ("**DOH**") for approval their proposed plan of closure on April 9, 2010 (the "**Closure Plan**," as may be amended from time to time in consultation with the DOH).  The Hospital was closed under the Closure Plan and the Debtors are currently working closely with the DOH to implement the rest of the Closure Plan.

### THE SALE OF THE BISHOP MUGAVERO ASSETS

14.     Prior to the Petition Date, the Debtors commenced – and have continued – an extensive process to sell the Bishop Mugavero Assets as a going-concern health care service on the most favorable terms, including the solicitation of several offers from potential operators. Initially, it was contemplated that a sale of the Bishop Mugavero Assets would occur prior to the commencement of these Chapter 11 Cases.  However, because the Debtors were forced to file for bankruptcy before they could enter into a purchase agreement for the Bishop Mugavero Assets, the determination was made to identify the most appropriate operator for the Bishop Mugavero Assets and enter into a stalking horse agreement, subject to higher or better bids.

15.     Prior to the Petition Date, the Debtors commenced their efforts to transfer and sell the Bishop Mugavero Assets, retaining Cain Brothers as investment banker and Loeb & Troper as broker to facilitate the transfer of the Bishop Mugavero Assets as a going concern.  In

coordination with the Debtors' senior management and Grant Thornton, the Debtors' crisis managers, Cain Brothers and Loeb & Troper contacted approximately 114 potential purchasers and assisted 34 potential purchasers in conducting due diligence in connection with a sale of the Bishop Mugavero Assets. Since the Petition Date, the Debtors have continued to market the Bishop Mugavero Assets while negotiating definitive documentation with the Purchasers and other interested parties.

16. On August 5, 2010, the Debtors accepted a joint offer from SV Operating I, LLC (the "**Nursing Home Purchaser**") and SV Land I, LLC (the "**Real Estate Purchaser**," together with the Nursing Home Purchasers, the "**Purchasers**") to act as a stalking horse in the sale of the Bishop Mugavero Assets and entered into the following agreements: (a) the Asset Purchase Agreement for the sale of the personal property assets (the "**Personal Property Assets**") of Bishop Mugavero with the Nursing Home Purchaser (the "**Nursing Home APA**" attached hereto as **Exhibit D-1**), and (b) the Asset Purchase Agreement for the sale of the real estate assets (the "**Real Property Assets**") of Bishop Mugavero with the Real Estate Purchaser (the "**Real Estate APA**" attached hereto as **Exhibit D-2**, together with the Nursing Home APA, the "**APAs**"). The APAs are explicitly conditioned on the approval of this Court and any necessary regulatory approvals, and remain subject to the Debtors' solicitation of higher or better bids in accordance with the Bidding Procedures. The APAs are also subject to several conditions, including entry of the Bidding Procedures Order and the Sale Order, and approval of the Break-Up Fee (defined below). The APAs constitute a single joint bid by the Purchasers, and termination of any of the APAs will result in the termination of the other.[3]

---

[3] The Debtors reserve their discretion in evaluating the structure of additional bids.

17.     The Nursing Home Purchaser and the Real Estate Purchaser are newly-formed entities controlled by Kenneth Rozenberg and Daryl Hagler, respectively (collectively, the "**Purchaser Principals**").  The Purchaser Principals are well-known nursing home operators, controlling approximately 10 other nursing homes in the New York metropolitan area.  The Purchaser Principals are generally regarded in the industry as among the best and most qualified buyers of nursing homes and are known as quality nursing home operators.  The Purchaser Principals have personally guaranteed the obligations of the Purchasers under the APAs and the Receivership Agreement.

### A.  The APAs

18.     Below is a summary of the material provisions of the APAs.  The summary is intended solely to give the Court and interested parties an overview of the material terms of the APAs.  Interested parties should refer to the APAs for the complete terms thereof.[4]

(a)  Purchase Price.  The combined purchase price to be paid by the Purchasers to the Seller for the Real Estate Assets and the Nursing Home Assets is $30,115,000.

(b)  Deposit.  The Purchasers shall deposit with an escrow agent (a) an amount equal to 5% of the Purchase Price (as that term is defined in the APAs) upon execution of the APAs, and (b) an amount equal to 5% of the Purchase Price if the Purchasers are selected as the prevailing bidder at the Auction, with an increased deposit equal to 10% of the final purchase price if increased at the Auction (collectively, the "**Deposit**").  The Deposit will be released to the Debtors at Closing.

(c)  Assumed Liabilities.  The Purchasers shall assume (i) all accrued employee paid time off ("**PTO**") (subject to a 75% Purchase Price credit at closing), (ii) all severance obligations to employees, and (iii) all known and unknown healthcare program liabilities, other than liabilities associated with a pending Medicaid rate adjustment (the "**Rate Adjustment Liability**"), effective as of the closing of the Sale Transaction (the "**Closing**").  At Closing, an amount equal to the

---

[4] To the extent there are any inconsistencies between the summary description of the APAs contained herein and the terms and conditions of the APAs, the terms of the APAs control.  Capitalized terms contained in the summary description of the APAs that are not defined in this Motion shall have the meanings ascribed to them in the APAs.

estimated Rate Adjustment Liability will be escrowed if such liability has not already been paid, and the Debtors will control any payments on account of the Rate Adjustment Liability out of the escrow, which payments will be paid when due. The Debtors will also control any dispute or appeal process in connection with such payments and will receive the benefit of any successful dispute or appeal.

(d) <u>Purchased Assets</u>. The Purchasers shall purchase substantially all of the assets of Bishop Mugavero, including the Real Property Assets and the Personal Property Assets as described more fully in the APAs.

(e) <u>Assumed and Assigned Contracts and/or Leases</u>. The only contracts and/or leases contemplated by the APAs to be assumed by the Debtors and assigned to the Purchasers are the Seller's Medicare and Medicaid provider agreements.

(f) <u>Excluded Assets</u>. The Debtors shall retain all right, title and interest to, in and under the assets, properties, interests and rights of the Debtors, defined in the APAs as excluded assets, which include, among other things, all cash, bank deposits or similar cash items of the Debtors and any accounts receivable or trade receivables owned by the Debtors as of the date of the Closing.

(g) <u>Representations and Warranties</u>. The APAs include customary representations and warranties related to the Bishop Mugavero Assets by the Purchasers and the Seller, including representations related to consents and approvals.

(h) <u>Bankruptcy Approval</u>. The sale is conditioned upon entry of the Sale Order and the solicitation of a higher or otherwise best bid pursuant to the Bidding Procedures.

19.     As is customary in a sale transaction of this nature, the APAs permit the

Debtors' consideration of higher or otherwise better competing bids for the Bishop Mugavero

Assets (each a "**Competing Bid**") pursuant to the Bidding Procedures. Similarly, in

consideration of the Purchasers having expended considerable time and money in negotiating the

APAs, the APAs provide that upon consummation of a transaction, with respect to one or more

of the Bishop Mugavero Assets, resulting from a Competing Bid, the Debtors will pay the

Purchasers a fee equal to 2% of the purchase price as a result of a Competing Bid (the "**Break-**

**Up Fee**").  The Break-Up Fee is only payable upon consummation of a Competing Bid or in the event the Competing Bid does not close, through a chapter 11 plan or chapter 7 liquidation.

      **B.  Receivership Agreement**

      20.    Due to the necessity of obtaining regulatory approval for the transfer of the nursing home operations, there could be a considerable period of time between the approval of the APAs and the actual closing of the Sale Transaction.  Although the Debtors, the State and the other parties hope to move expeditiously to obtain such approval, such approval could take up to one year to obtain.  However, in order to ensure that quality of patient care is maintained during this preclosing period, the APAs contemplate that after entry of the Sale Order, Bishop Mugavero and the Purchasers would enter into a receivership agreement, attached as Exhibit F to the Nursing Home APA (the "**Receivership Agreement**"), for the preclosing operation of the Bishop Mugavero nursing home facility.  The Receivership Agreement provides that the Purchasers will act as a receiver for the Facility, including (i) funding all operations of the Facility from and after the date that the Receivership Agreement is effective, (ii) ensuring that the Facility has sufficient funds to satisfy its operating expenses, including, without limitation, any severance obligations and benefit continuation obligations of employees of Bishop Mugavero whose employment is terminated during the term of the receivership, and (iii) funding all sums necessary to maintain the Facility in good repair during the term of the receivership.

      21.    The purpose of the Receivership Agreement – which will be subject to regulatory approval under applicable New York law – is to shift the economic burdens and benefits of operating the Facility to the Purchasers shortly following the entry of the Sale Order (when the Receivership Agreement becomes effective), rather than imposing the risk of such

operations upon the Debtors' estates during the preclosing period. The following is a summary of the key terms of the Receivership Agreement:[5]

    (a) <u>Term</u>. The Receivership Agreement contemplates that the Purchasers will commence the term of the receivership from the effective date of the Receivership Agreement until twelve months after entry of the Sale Order.

    (b) <u>Employees</u>. The Purchasers will be liable for all accounts payable and other liabilities, including taxes, and employee severance and benefit obligations arising out of or relating to the operation of the business during the term of the receivership.

    (c) <u>Revenues and Expenses</u>. The Purchasers will be entitled to all revenues from the Bishop Mugavero Assets during the receivership and such revenues shall not be property of the Debtors' bankruptcy estate. The Purchasers will be obligated to pay all expenses and liabilities arising out of, and relating to, the operation of the business located at the Facility exclusively during the term of the receivership.

    (d) <u>Rejection of Contracts</u>. The Receivership Agreement provides that the Purchasers may designate executory contracts and unexpired leases for rejection by the Debtors.

    (e) <u>Representations and Warranties</u>. The Receivership Agreement provides the customary representations and warranties between the parties.

    (f) <u>Bankruptcy Court Approval</u>. The Receivership Agreement provides that it is subject to and shall only become effective upon entry of the Sale Order.

### C. Liens on the Bishop Mugavero Assets

22. On January 28, 1993, the Dormitory Authority of the State of New York ("**DASNY**") (through its predecessor, the New York State Medical Care Facilities Finance Agency ("**MCFFA**")) issued its Hospital and Nursing Home Insured Mortgage Revenue Bonds, 1993 Series A (the "**1993 Series A Bonds**"). On April 21, 1993, a portion of the proceeds of the 1993 Series A Bonds was loaned to Bishop Mugavero. To evidence this loan, Bishop Mugavero issued a Mortgage Note (the "**Bishop Mugavero Note**") in the principal amount of

---

[5] To the extent there are any inconsistencies between the summary description of the Receivership Agreement contained herein and the terms and conditions of the Receivership Agreement, the terms of the Receivership Agreement control. Capitalized terms contained in the summary description of the Receivership Agreement that are not defined in this Motion shall have the meanings ascribed to them in the Receivership Agreement.

approximately $27 million in favor of MCFFA. The Bishop Mugavero Note is secured by a first priority mortgage (the "**Bishop Mugavero Mortgage**") on the Facility, and a first priority lien on all equipment, furniture and fixtures located at the Facility (the "**DASNY Collateral**"). The Bishop Mugavero Note matures on February 1, 2025. As of the Petition Date, approximately $20 million in principal remains outstanding on the Bishop Mugavero Note.[6]

      23. Certain of the Bishop Mugavero Assets are also encumbered by (i)(x) a second priority lien and security interest on the Real Estate Property, equipment, furniture, and fixtures related to Bishop Mugavero and (y) a first priority lien and security interest on the personal property related to Bishop Mugavero (the "**GE Collateral**") other than equipment, furniture and fixtures (the "**Prepetition Senior Lien**") in favor of General Electric Capital Corporation ("**GE Capital**") as agent (in such capacity, the "**Prepetition Agent**") under a Credit Agreement dated as of August 30, 2007 (the "**Prepetition Credit Facility**") entered into by the Medical Centers, as borrowers, GE Capital, as agent, and GE Capital and TD Bank, N.A., as lenders (together with any other persons becoming lenders thereunder, the "**Prepetition Lenders**"), securing certain prepetition obligations (the "**Prepetition Obligations**") with an approximate principal balance on the Petition Date of $313,000,000; and (ii) a lien and security interest (the "**DIP Agent Lien**") in favor of GE Capital as agent under a Debtor in Possession Credit Agreement dated as of April 16, 2010 (the "**DIP Credit Facility**") entered into by the

---

[6] In connection with the Bishop Mugavero Note, Bishop Mugavero established a "depreciation reserve fund" maintained at HSBC Bank, N.A. to service the amounts due under the Bishop Mugavero Note. As of the date hereof, the depreciation reserve fund contains $2,434,009. In addition, Bishop Mugavero established an additional escrow fund maintained at Prudential Bank for the maintenance of the Facility. As of the date hereof, the additional escrow fund contains $9,766,290. Accordingly, the Debtors expect the Bishop Mugavero Note to be completely satisfied through the proceeds of the DASNY Collateral from the Sale Transaction, the depreciation reserve fund, and the additional escrow fund. The Debtors and DASNY are in discussions to enter into a stipulation and request entry of an order to facilitate the application of (i) a portion of the proceeds of the sale of the Bishop Mugavero Assets, (ii) certain funds and accounts held by the trustee for 1993 Series A Bonds, and (iii) certain other moneys to defease and redeem the 1993 Series A Bonds.

Debtors, as borrowers, GE Capital, as agent (in such capacity, the "**DIP Agent**"), and GE Capital and TD Bank, N.A., as lenders (together with any other persons becoming lenders thereunder, the "**DIP Lenders**") securing certain postpetition obligations of the Debtors (the "**DIP Loan**") approved by an earlier order of the Court (the "**DIP Order**"). The agents and the lenders under the Prepetition Credit Facility and the DIP Credit Facility, together with DASNY, are referred to as the "**Secured Creditors**." The sale of the Bishop Mugavero Assets will enable the Debtors to repay the Bishop Mugavero Note to DASNY and also make a material payment on account of the Prepetition Obligations.

### D. **Avoidance and Successor Liability**

24.     The parties intend that the transfer of the Bishop Mugavero Assets to the Purchasers (i) will not constitute avoidable transfers under the Bankruptcy Code or under applicable bankruptcy or non-bankruptcy law and (ii) will not subject the Purchasers to any liability other than the Assumed Liabilities with respect to the operation of the Debtors' business prior to the closing of the Sale Transaction or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability. The foregoing shall not apply to any obligations expressly assumed by the Purchasers under the Receivership Agreement for preclosing liabilities.

### E. **DOH Regulatory Approval Process**

25.     Approval of the transfer of the Bishop Mugavero Assets requires approval from the DOH. See N.Y. Pub. Health Law § 2801-a, et seq. In accordance with section 2801-a of the New York Public Health Law, an applicant proposing to establish and operate a nursing home must make written application for authorization (the "**DOH Application**") to the

Commissioner of the DOH (the "**Commissioner**").  The Commissioner will not act on the DOH Application until it is approved by the Public Health Council, the relevant health systems agency, and the State Hospital Review and Planning Council.  The Commissioner will only approve an application if it is satisfied as to: (a) the public need for the nursing home; (b) the financial resources of the proposed nursing home; (c) the character, competence, and standing in the community of the proposed incorporators, directors, sponsors, stockholders, members or operators of the proposed nursing home; and (d) such other matters as it shall deem pertinent. See N.Y. Pub. Health § 2801-a.

26.     Accordingly, the APAs provide that the Purchasers shall, at their own cost and expense, (i) within five business days of the date of the APAs, cooperate with the Seller in initiating informal discussions with DOH concerning the form and substance of the DOH Application; (ii) within the later of 45 days from signing the APAs or two business days after the Purchasers' receipt of notice of the entry of the Sale Order formally submit the DOH Application; and (iii) promptly after the entry of the Sale Order by the Court, submit to any other governmental body all other applications for any healthcare regulatory consents required on the part of the Purchasers in order for the Purchasers to consummate the sale and to operate the business in accordance with applicable law (collectively with the DOH Application, the "**Healthcare Applications**").

27.     In addition, the parties shall cooperate in the preparation and prosecution of the Healthcare Applications.  The Purchasers shall use best efforts to prosecute the Healthcare Applications and to timely submit all information and documents requested in connection therewith by DOH and any other governmental body.  The Purchasers shall promptly take such actions as may be reasonably necessary to cure any character or competency objection that DOH

may raise to the DOH Application, including removing or replacing any officer or director that fails to obtain character and competency approval from DOH. Both the Purchasers and the Seller will provide the other with prompt written notice of a party's submission of a Healthcare Application. Each party shall provide the other party with periodic reports of a party's efforts to obtain all Healthcare Regulatory Approvals. In addition, the Purchasers shall provide the Seller with notice as promptly as practicable of their receipt of DOH's approval, contingent approval or a rejection of the DOH Application, along with a copy of any documentation related thereto. The Purchasers shall not knowingly take any action prior to the closing intended to disqualify the Purchasers as an established and licensed operator of the business. As noted, this approval process is anticipated to last up to one year following the entry of the Sale Order, which is why the parties are seeking to enter into the Receivership Agreement.

**F. State Approval Process**

28. In addition to complying with the DOH regulatory approval process, the New York Not-for-Profit Corporation Law ("**N-PCL**") requires certain conditions must be met when a not-for-profit disposes of substantially all of its assets. Section 510 of the N-PCL provides that the board of a "Type B" not-for-profit corporation must request permission of the New York Supreme Court in the jurisdiction where the corporation is located prior to the sale, lease, exchange or other disposition of all, or substantially all, the assets of such a corporation.[7] N-PCL § 510(a). Bishop Mugavero is a "Type B" not-for-profit corporation, and the assets being sold pursuant to the APAs constitute substantially all of its assets. As described in greater

---

[7] The purpose of this provision is to provide for judicial oversight. Absent bankruptcy, the applicable court would be the New York State Supreme Court. As noted, under section 363(d), this Court may make the required substantive findings under the N-PCL. By seeking approval of the New York State Supreme Court, the Debtors are not waiving any rights to claim that this Court has the sole and exclusive jurisdiction to make the required determination under section 363(d) of the Bankruptcy Code and any applicable state law contemplated thereby. See 28 U.S.C. §§ 157(b) and 1334.

detail below, the Debtors are in the process of petitioning the New York Supreme Court for approval under the N-PCL and believe the Sale Transaction complies with applicable non-bankruptcy law.

## RELIEF REQUESTED

29.     By this Motion, the Debtors respectfully request the entry of two orders related to the transfer of the Bishop Mugavero Assets.  First, the Debtors seek entry of the Bidding Procedures Order, which approves (i) the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as **Annex 1**, by which the Debtors will solicit and consider additional bids for the Auction of the Bishop Mugavero Assets; (ii) the scheduling of the Sale Hearing to approve the sale of the Bishop Mugavero Assets at the Auction; (iii) the form of the auction and sale hearing notice, substantially in the form annexed to the Bidding Procedures Order as **Annex 2** (the "**Auction and Sale Hearing Notice**"); and (iv) approving the Assignment Procedures, substantially in the form annexed to the Bidding Procedures Order as **Annex 3**.  The Bidding Procedures requested herein are substantially similar to those requested in connection with the sale of Holy Family Home (as well as those previously approved by the Court in these Chapter 11 cases for the sale of the Debtors' Home Health services).

30.     Second, in order to effectuate the sale of the Bishop Mugavero Assets to the Successful Bidder (defined below), the Debtors seek entry of the Sale Order to approve (i) the conveyance of the Bishop Mugavero Assets to the Successful Bidder free and clear of liens, claims, encumbrances and other interests; (ii) the assumption and assignment of those executory contracts and unexpired leases being assigned to the Successful Bidder pursuant to its bid; (iii) payment of the Transaction Fees payable to the Brokers in connection with the Sale Transaction; and (iv) payment of the net proceeds of the sale on account of the obligations held by the

Secured Creditors.  The Debtors are also requesting permission to enter into the Receivership

Agreement for the preclosing operations of the Facility.

### G. **Bidding Procedures**

31.     The Debtors seek entry of the Bidding Procedures Order and approval of

the Bidding Procedures to ensure that the maximum value is obtained for the Bishop Mugavero

Assets.  The following is a summary of certain provisions of the Bidding Procedures pertaining

to the solicitation of Competing Bids and the conduct of the Auction:[8]

> (a) <u>Qualification of Bids and Bidders</u>.  In order to participate in the bidding
> process and to have a bid considered by the Debtors, each potential bidder
> must deliver a written offer or group of offers satisfying criteria set forth
> in the Bidding Procedures.  A "**Qualified Bidder**" is a potential bidder
> that delivers a binding bid that in the Debtors' discretion after consultation
> with the Secured Creditors and the Committee satisfies such criteria.
>
> (b) <u>Minimum Bid</u>.  The amount of the purchase price in such bid must provide
> for net cash that is at least $50,000 more than the purchase price contained
> in the APAs plus the amount of the Break-Up Fee (the "**Minimum Bid**").
>
> (c) <u>Deposit</u>. A potential bidder must deposit 10% of the initial purchase price
> set forth in its modified purchase agreement with an escrow agent selected
> by the Debtors at least three business days before the Auction.
>
> (d) <u>Auction</u>.  In the event that there is more than one Qualified Bidder for the
> Bishop Mugavero Assets, the Debtors shall conduct the Auction.  The
> Auction will take place at the offices of Kramer Levin Naftalis & Frankel
> LLP, 1177 Avenue of the Americas, New York, New York 10036 on
> September 21, 2010, starting at 9:00 a.m. (prevailing Eastern Time), or at
> such other place, date and time as may be designated by the Debtors at or
> prior to the Auction.  The Debtors retain their discretion, with the
> reasonable consent of the Committee and the Secured Creditors, to
> conduct the Auction (i) <u>openly</u> with the proceeding being transcribed and
> each Qualified Bidder being informed of the terms of the previous bid, or
> (ii) through the submission of <u>closed bids</u> with the results being
> announced at the conclusion of the Auction.
>
> (e) <u>Bidding</u>.  Bidding at the Auction shall commence at the amount of the
> highest or otherwise best Qualified Bid submitted prior to the Auction;

---

[8] To the extent that there are any inconsistencies between the summary description of the Bidding Procedures
contained herein and (i) the terms and conditions of the APAs and/or (ii) the Bidding Procedures, the terms of the
Bidding Procedures control.

Qualified Bidders may then submit successive bids in increments of $50,000 (the "**Bid Increment**"); provided, however, that the Debtors shall retain the right, subject to the consent of the Committee and Secured Creditors, to modify the Bid Increment at the Auction.

(f) Higher or Better. The Debtors reserve the right, in their discretion (in consultation with the Secured Creditors and the Committee) to determine whether any bid is better, if not higher, than another bid submitted during the Auction. The Debtors may consider a variety of factors in making this decision, including, without limitation, the ability of the applicable Qualified Bidder to obtain the necessary regulatory approvals, any proposed conditions to closing, and timing of any closure of the proposed transaction.

(g) Successful Bid. The Auction shall continue until there is only one offer that the Debtors determine, in their discretion (after consultation with the Secured Creditors and the Committee) and subject to Court approval, is the highest or otherwise best offer from among the Qualified Bids submitted at the Auction (the "**Successful Bid**"). The bidder submitting such Successful Bid shall become the "**Successful Bidder**," and shall have such rights and responsibilities of the Purchasers, as set forth in the modified APAs, or the APAs, as applicable.

(h) Backup Bid. At the conclusion of the Auction, the Debtors also intend to announce the second highest or otherwise best bid, from among the Qualified Bids submitted at the Auction (the "**Backup Bid**"). The bidder(s) submitting such Backup Bid shall become the "**Backup Bidder**," and shall have such rights and responsibilities of the Purchasers, as set forth in the modified APAs or the APAs, as applicable. The Backup Bid shall remain open and irrevocable until entry of the Sale Order.

**H. Auction and Sale Hearing Notice**

32.     Within three business days of entry of the Bidding Procedures Order, the Debtors will serve copies of the Bidding Procedures and the Auction and Sale Hearing Notice on the following parties: (a) the Special and General Service Lists as those terms are defined in the Final Administrative Order Establishing Case Management Procedures (the "**Case Management Order**") entered by the Bankruptcy Court on May 13, 2010, (b) all counterparties to the Assumed Contracts and Leases, (c) all potential purchasers for the Bishop Mugavero Assets identified by the Debtors, and (d) any other party known to the Debtors to have or assert an

interest in any of the Bishop Mugavero Assets. The Debtors also propose to publish the Auction and Sale Notice in the Local Edition of the <u>New York Times</u> pursuant to Bankruptcy Rule 2002(l). In addition, in order to obtain the agreement of the New York State Attorney General's office to waive the requirements of notice to creditors and a hearing under the N-PCL (which will permit seeking ex parte approval of the transaction from the New York State Supreme Court), the Debtors will send the General Creditor Notice (as defined below) to all known creditors listed on the schedules of liability for Bishop Francis J. Mugavero Center for Geriatric Care, Inc., which is the applicable Debtor that owns the not-for-profit assets being sold.

### I. **Assumed Contracts and the Assignment Procedures**

33.     Pursuant to sections 2.3 and 2.5 of the Nursing Home Agreement, the Assumed Contracts and Leases consist of certain executory contracts (the "**Assumed Contracts**") and unexpired leases (the "**Assumed Leases**," together with the Assumed Contracts, the "**Assumed Contracts and Leases**") designated to be assumed by the Debtors and assigned to the Purchasers.[9] In order to ensure the orderly assignment of the Assumed Contracts and Leases and the timely resolution of objections thereto, the Debtors seek approval of the Assignment Procedures. The following is a summary of certain provisions of the Assignment Procedures:[10]

(a) <u>Initial Notice of Assumed Contracts and Leases</u>. Within three business days, after entry of the Bidding Procedures Order, the Debtors will serve by first class mail an omnibus notice (the "**Initial Assignment Notice**") on each counterparty ("**Counterparty**") to the Assumed Contracts and Leases, substantially in the form attached as **Annex 4** to the Bidding Procedures Order. The Initial Assignment Notice shall include an exhibit

---

[9] As noted above, the APAs contemplate the assumption and assignment of only Bishop Mugavero's Medicaid and Medicare provider agreements. However, the Debtors seek establishment of the Assignment Procedures in the event a Competing Bid contemplates the assumption and assignment of additional executory contracts or unexpired leases.

[10] To the extent that there are any inconsistencies between the summary description of the Assignment Procedures contained herein and (i) the terms and conditions of the APAs and/or (ii) the Assignment Procedures, the terms of the Assignment Procedures control.

with, among other things, the cure amount asserted by the Debtors that is necessary to cure any default under the relevant Assumed Contract or Assumed Lease pursuant to section 365 of the Bankruptcy Code (the "**Cure Amount**").

(b) <u>Initial Objections</u>.  To the extent that any interested party wishes to object to any matter pertaining to the assumption and assignment of an Assumed Contract or Assumed Lease, then such interested party must file a written objection with the Court no later than September 14, 2010 at 4:00 p.m. (prevailing Eastern Time) (the "**Initial Objection Deadline**").

(c) <u>Supplemental Notice of Assumed Contracts and Leases</u>.  Within one business day after the conclusion of the Auction, the Debtors will serve by overnight mail and email or facsimile, where possible, and file with the Court an omnibus notice of the Auction results (the "**Auction Results Notice**"), substantially in the form attached as **Annex 5** to the Bidding Procedures Order, upon each of the Counterparties.  If, as a result of the Auction, new executory contracts (each an "**Additional Assumed Contract**") or new unexpired leases (each an "**Additional Assumed Lease**") are to be assumed and assigned by the Debtors, or a different Cure Amount is determined than the one listed in the Initial Assignment Notice (such Cure Amount, an "**Amended Cure Amount**"), then the Auction Results Notice shall include an exhibit setting forth such changes.

(d) <u>Supplemental Objections</u>.  To the extent that any interested party wishes to object to the assumption and assignment of such newly added agreements or the Amended Cure Amount, then such party must file a written objection with the Court no later than September 28, 2010 at 4:00 p.m. (prevailing Eastern Time) (the "**Supplemental Objection Deadline**").

(e) <u>Resolution and Adjudication of Objections</u>.  Upon filing of an objection by a Counterparty, the Debtors and/or the Purchasers will contact the objecting Counterparty to attempt to consensually resolve any timely served objection.  If the Debtors and/or the Purchasers are unable to resolve an objection in response to the Initial Assignment Notice or the Auction Results Notice, (i) to the extent such objections (each an "**Adequate Assurance Objection**") relate to the adequate assurance of future performance by the Purchasers, such objections will be heard at the Sale Hearing or (ii) to the extent such objections relate to a Cure Amount, Additional Cure Amount, or Amended Cure Amount, such objections will be heard at a hearing to be scheduled by the Court at the Sale Hearing (the "**Cure Objection Hearing**").

### J.  **Receivership Agreement**

34.     As described more fully above, because the closing of the Sale Transaction will not occur immediately after entry of the Sale Order, the Debtors and Purchasers have agreed to enter into the Receivership Agreement, subject to DOH approval, within 2 business days of entry of the Sale Order.  The need to transfer the economics of the sale prior to closing and have the Purchasers assume immediate oversight under the Receivership Agreement is a critical part of the overall transaction.  The Receivership Agreement will be in place until the actual closing of the Sale Transaction, which is expected to occur within one year following this Court's approval of the Sale Order.  Importantly, the Receivership Agreement also facilitates the continuity of patient care during the preclosing period and ensures that patients continue to receive high-quality care pending the Closing.   Accordingly, the Debtors seek separate authorization under section 363(b) of the Bankruptcy Code to enter into the Receivership Agreement.

### K.  **Objections to Sale**

35.     The Debtors propose that objections, if any, to entry of the Sale Order (other than objections with respect to cure amounts or adequate assurance of future performance under the Assumed Contracts and Leases, which are subject to the Assignment Procedures), must (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq. and Stephen Zide, Esq., and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021, Attn: Judith Eisen, Esq.; (b) counsel for the Creditors' Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Stephen Kuhn, Esq. and Sarah Link Schultz, Esq.; (c) counsel to Secured Creditors,

General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier, Esq.; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; (d) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; (e) the Consumer Privacy Ombudsman, Alan Chapell & Associates LLC, 297 Driggs Avenue, Suite 3A, Brooklyn, New York 11222; (f) counsel to the Patient Care Ombudsman, Neubert, Pepe & Montiethe, P.C., 195 Church Street, 13th Floor, New Haven, Connecticut 06510, Attn: Mark I. Fishman; and (g) the Purchasers, Nutovic & Associates, 488 Madison Avenue, 16th Floor, New York, N.Y. 10022, Attn: Isaac Nutovic, Esq., so as to be actually received by 4:00 p.m. (prevailing Eastern Time) on September 14, 2010 (the "**Objection Deadline**").

36.     In the event the Debtors choose a Successful Bidder or Back-Up Bidder other than the Purchasers at the Auction or the terms of the proposed Sale are modified at the time of the Auction, the Debtors propose the Objection Deadline solely with respect to the Debtors' choice of such alternative Successful Bidder or Back-Up Bidder, or the modifications to the terms of the Sale to the Successful Bidder will be September 28, 2010 at 4:00 pm. (prevailing Eastern Time).

**L.  Sale Hearing**

37.     The Successful Bid and the Backup Bid will be subject to entry of the Sale Order after the Sale Hearing that the Debtors propose to take place on October 7, 2010 at 11:00 a.m. (prevailing Eastern Time).  The Debtors further request the discretion to adjourn the Sale Hearing from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court.

## M.  Payment of the Brokers' Transaction Fees

38.     As described in greater detail in the Debtors' application to retain Cain Brothers and Loeb & Troper, upon the successful closing of the sale, Cain Brothers and Loeb & Troper will each be entitled to transaction fees equal to 0.9% of the aggregate transaction value of the sale, subject to a minimum transaction fee equal to the lesser of (x) $350,000 or (y) 2.5% of the aggregate transaction value as calculated in accordance with the Court's order approving their retention (the "**Transaction Fees**").   By this Motion, the Debtors seek to pay the Transaction Fees upon the closing of the sale of the Bishop Mugavero Assets and without the necessity of further order of the Court.

## EXTRAORDINARY PROVISIONS OF THE PROPOSED SALE ORDER

39.     Pursuant to General Order M-383 of the United States Bankruptcy Court for the Southern District of New York, dated November 18, 2009, establishing this Court's Guidelines for the Conduct of Asset Sales, the Debtors are required to highlight any "extraordinary provisions" in a separate section of a motion seeking to sell the estate's assets. The extraordinary provisions are as follows:

(a) Use of Proceeds.   Under the APAs, proceeds from a sale pursuant to a Competing Bid will be used to pay the Break-Up Fee.  The Sale Order also provides that liens existing on the Bishop Mugavero Assets will attach to the net proceeds of the sale after taking into account the costs of the sale.  Sale costs will include costs directly relating to the transaction, including the Transaction Fees.

(b) Interim Arrangements with Proposed Buyer.   As described above, the Debtors may enter into the Receivership Agreement with the Purchasers. As prescribed by the Sale Guidelines, the Debtors seek separate authority to enter into the Receivership Agreement.

(c) Relief from Bankruptcy Rule 6004(h).  The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy Rule 6004(h).  The Debtors submit that such relief is appropriate under the circumstances.

(d) <u>Successor Liability</u>. The proposed form of Sale Order contains findings and provisions limiting the Purchasers' successor liability. The Debtors believe that a finding that the sale can be made free and clear of successor liability claims in the Sale Order complies with applicable principles of sales free and clear of successor liability claims pursuant to section 363(f) of the Bankruptcy Code and applicable non-bankruptcy law. In addition, the Debtors are providing notice of the sale as set forth herein (including publication notice).

<div align="center"><b><span style="font-variant:small-caps">Basis for Relief</span></b></div>

**A.  The Bidding Procedures Should Be Approved**

40.     The Bidding Procedures, which are standard for the sale of assets in large chapter 11 cases, will ensure that the Debtors' estates receive the greatest benefit available from the sale of the Bishop Mugavero Assets. The Bidding Procedures have been structured to attract the maximum number of Qualified Bids for the Bishop Mugavero Assets while allowing the Debtors the flexibility to select the bid that provides maximum value to the Debtors' estates. Finally, the Bidding Procedures set out a timeframe that will allow potential purchasers sufficient time to conduct due diligence, arrange financing, and construct and submit informed Competing Bids, while still providing for the expeditious sale of the Bishop Mugavero Assets. The Debtors submit that the Bidding Procedures are reasonably designed to ensure that the Debtors and their estates receive the maximum benefit available from the sale of the Bishop Mugavero Assets, and therefore warrant Court approval. Importantly, these Bidding Procedures conform to those recently approved by the Court in these Chapter 11 cases for the Home Health services. <u>See</u> Docket Nos. 641 and 642.

**B.  The Break-Up Fee Should Be Approved**

41.     The Debtors are also requesting approval of the provisions of the APAs and the Bidding Procedures regarding the Break-Up Fee in the amount of $602,300.00 (<u>i.e.</u>, 2% of the Purchase Price). The Break-Up Fee is only payable upon consummation of a Competing

Bid or in the event the Competing Bid does not close, through a chapter 11 plan or chapter 7 liquidation. The Purchasers required the inclusion of these provisions in the APAs to be willing to serve as a stalking horse bidder. As set forth herein, the Purchasers' joint bid establishes an appropriate floor value for the Bishop Mugavero Assets after months of marketing and discussions with numerous potentially interested bidders.

42. Bankruptcy courts have approved bidding incentives similar to the Break-Up Fee under the "business judgment rule," and such arrangements are presumptively valid provided that (i) the Debtors' decision to agree to the break-up fee is not tainted by bad faith or self-dealing, (ii) the break-up fee does not hamper bidding, and (iii) the amount of the break-up fee is reasonable. See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656-57 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). A break-up fee serves as an "incentive payment" offered to an unsuccessful bidder who places the debtor's property in a "sales configuration mode," thereby attracting other bidders to the auction. Specifically, break-up fees (i) attract or retain a potentially successful bid, (ii) establish a bid standard or minimum for other bidders to follow, and (iii) attract additional bidders. Integrated Res. at 661-62.

43. In the instant case, the Break-Up Fee is the product of good faith, arm's-length negotiations between the Debtors and the Purchasers, each of whom was represented by counsel. The Break-Up Fee provides a material benefit to the estates by enabling the Debtors to obtain the commitment of the Purchasers which has and will continue to expend money, time and effort formulating and negotiating an offer for the Bishop Mugavero Assets, notwithstanding that the APAs are subject to higher or better offers. In the Debtors' business judgment, the Break-Up Fee is fair and reasonable when considering the time, effort, cost, and expense that the

Purchasers incurred in negotiating the APAs. Indeed, the sale contemplated by the APAs is higher and better than any other expression of interest for the Bishop Mugavero Assets to date. If higher or better offers for the Bishop Mugavero Assets are received, such offers are the direct result of the Purchasers serving as a "stalking horse bidder" for those assets.

44. Moreover, the Break-Up Fee does not hamper any other party's ability to offer a higher or better bid for the Bishop Mugavero Assets. Given the size of the Break-Up Fee relative to the total amount of consideration provided for the Bishop Mugavero Assets pursuant to the APAs, and relative to the "overbid" requirements set forth in the Bidding Procedures, the fee is not so large as to have a "chilling effect" on other prospective bidders' interest in the Bishop Mugavero Assets. Because the APAs have created a floor for any additional bids, the Purchasers provided significant value to the Debtors' estates. The Debtors submit that the Break-Up Fee is appropriate under these unusual circumstances.

45. Finally, the Break-Up Fee is reasonable in relation to the size of the proposed sale and under the facts and uncertainties of this transaction. The Break-Up Fee is 2% of the Purchase Price, an amount similar to other break-up fees approved in the Southern District of New York in other large chapter 11 cases. See, e.g., In re Cabrini Med. Ctr., Case No. 09-14398 (AJG) (Bankr. S.D.N.Y. Dec. 30, 2009) (approving a break-up fee of 3.75% of $80 million sale); In re Bearingpoint, Inc., No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) (approving a break-up fee of 3% of a $350 million sale); In re Loral Space & Commc'ns Ltd., No. 03-41710 (RDD) (Bankr. S.D.N.Y. Aug. 18, 2003) (approving a break-up fee of 2% of $1 billion sale); In re Magellan Health Servs., Inc., No. 03-40515 (PCB) (Bankr. S.D.N.Y. Apr. 7, 2003) (approving discrete termination and commitment fees of 2% and 3%, respectively, in connection with a $30-$50 million equity commitment); In re Adelphia Bus. Solutions, Inc., No.

02-11389 (REG) (Bankr. S.D.N.Y. Dec. 16, 2002) (approving a termination fee of 2.5% of $10.7 million sale); In re Bradlees Stores, Inc., No. 00-16035 (BRL) (Bankr. S.D.N.Y. Jan. 11, 2001) (approving a termination fee of 2% of $150 million sale); Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 662 (S.D.N.Y. 1992) (approving termination fee of 3.2% of the $190 million out-of-pocket costs for $565 million sale), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).  Finally, the size of the proposed Break-Up Fee is consistent with the other break-up fees approved by the Court in these Chapter 11 Cases.  See Docket Nos. 292, 641, and 642.

### C. **The Auction and Sale Hearing Notice Should Be Approved**

46.     Pursuant to Bankruptcy Rules 2002(c) and 6004, the Debtors are required to give 21 days' notice of any proposed sale of property not in the ordinary course of business. Bankruptcy Rule 2002(c) further provides that such notice must include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale.  The Auction and Sale Hearing Notice sets forth all the information a potential bidder and any other party-in-interest should require about the bidding process for the Bishop Mugavero Assets, including: notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; the Bid Deadline; the time, date, and location of the Auction; and the time, date, and location of the Sale Hearing.

47.     The Debtors submit that the Auction and Sale Hearing Notice as provided for herein complies fully with Bankruptcy Rule 2002, Local Bankruptcy Rule 2002-1 and General Order M-331, and constitutes good and adequate notice of the sale and the proceedings with respect thereto.  Because the Debtors are providing notice of this Motion, the Bidding Procedures, and the Assignment Procedures to the Notice Parties and the Counterparties in advance of the Auction, the Debtors submit that the notice requirements of Bankruptcy Rules

2002(2) and 6004 are satisfied. The Debtors also propose to publish the Auction and Sale Notice in the Local Edition of the New York Times pursuant to Bankruptcy Rule 2002(l). Therefore, the Debtors respectfully request that the Court approve the Auction and Hearing Notice and the notice procedures proposed above. As noted, in order to obtain the agreement of the New York State Attorney General's office to waive the requirements of notice to creditors and a hearing under the N-PCL, the Debtors will send the General Creditor Notice (as defined below) to all known creditors listed on the schedules of liability for Bishop Mugavero, which is the applicable Debtor that owns the not-for-profit assets being sold.

### D. The Sale of the Bishop Mugavero Assets Should Be Approved

48. Section 363(b) of the Bankruptcy Code governs transactions outside the ordinary course of business involving property of a debtor's estate. Specifically, that section provides, in relevant part, that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate..." The Debtors' sale or use of property of the estates outside the ordinary course of business should be approved by the Court if the Debtors can demonstrate a sound business justification for the proposed transaction. See In re Chrysler LLC, 576 F.3d 108, 117-18 (2d Cir. 2009), citing In re Iridium Operating LLC, 478 F.3d 452, 466 (2d Cir. 2007) ("In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.'" (citing Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)); see also In re Gen. Motors Corp., 407 B.R. 463, 494-5 (Bankr. S.D.N.Y. 2009) (noting that sales under § 363(b) are "commonly" approved subject to the business judgment rule).

49.     In addition, section 105(a) of the Bankruptcy Code grants the Court the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  This provision is "the basis for a broad exercise of power [by the Court] in the administration of a bankruptcy case."  2 Collier on Bankruptcy ¶ 105.01 (Lawrence P. King, et al. eds., 15th ed. rev. rel. 2000).

50.     A sound business justification exists for the sale here because it will allow the Debtors to: (i) monetize the Bishop Mugavero Assets for the benefit of the Debtors' estates and creditors, and (ii) avoid the incurrence of any carrying costs associated with the Bishop Mugavero Assets.  Moreover, given (i) the thorough marketing of the Bishop Mugavero Assets, (ii) the significant cash Purchase Price and Deposit being offered by the Purchasers; (iii) the Purchasers' willingness to promptly consummate the sale on an "as is, where is" basis; and (iv) the further market testing of the Bishop Mugavero Assets at the Auction proposed herein, with the possibility of higher and better bids, the Debtors submit that the sale of the Bishop Mugavero Assets is fair, reasonable, and in the best interests of the Debtors' estates.

51.     The Debtors also believe that the Purchase Price is fair and reasonable. Finally, any concern that the Debtors may be able to sell the Bishop Mugavero Assets on better overall terms than those provided for in the APAs should be allayed by the fact that the transaction will be tested through the Bidding Procedures, and at the Auction.  As such, the Debtors submit that the sale of the Bishop Mugavero Assets is an exercise of the Debtors' sound business judgment and warrants approval by the Court.

**E.  The Bishop Mugavero Assets Should Be Sold Free and Clear**

52.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property under section 363(b) of the Bankruptcy Code free and clear of liens, claims and encumbrances if one of the following conditions is satisfied:

- 29 -

1. applicable nonbankruptcy law permits sale of such property free and clear of such interest;

2. the entity holding the lien, claim or encumbrance consents to the sale;

3. the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property;

4. the interest is in bona fide dispute; or

5. the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). See In re Smart World Tech., LLC, 423 F.3d 166, 169 n.3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests... It thus allows purchasers… to acquire assets [from a debtor] without any accompanying liabilities."); In re Dundee Equity Corp., No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.").

53.    Pursuant to the APAs, the Debtors request that the Court authorize the sale of the Bishop Mugavero Assets free and clear of all interests, other than the "Permitted Liens" described in the APAs. Thus, the sale of the Bishop Mugavero Assets pursuant to the Bidding Procedures will satisfy section 363(f)(1) of the Bankruptcy Code because any entities holding interests in the Bishop Mugavero Assets will have received notice of this Motion and the Auction and Sale Hearing Notice.

54.    Section 363(f)(2) of the Bankruptcy Code is satisfied as to those parties that consent or do not object to the proposed sale. Here, all parties-in-interest will be given sufficient opportunity to object to the relief requested in this Motion, and any such entity that does not object to the sale should be deemed to have consented. See Futuresource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits

the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent... It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); In re Enron Corp., 2004 WL 5361245 at *2 (Bankr. S.D.N.Y. 2004) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)). As such, to the extent that no party holding an interest objects to the relief requested in this Motion, the sale of the Bishop Mugavero Assets free and clear of all interests except the Permitted Liens satisfies section 363(f)(2) of the Bankruptcy Code.

55.     Section 363(f)(3) of the Bankruptcy Code is satisfied because the price at which the Debtors' property is to be sold is greater than the economic value of the liens on the Bishop Mugavero Assets. While the face value of the liens asserted against the Bishop Mugavero Assets exceeds the Purchase Price currently offered by the Purchasers, the economic value of the Bishop Mugavero Assets has been determined by the market and there is the possibility that an auction will result in a higher and better bid. A sale can be made free and clear of any liens pursuant to section 363(f)(3) of the Bankruptcy Code so long as the purchase price exceeds "the aggregate value of all liens on such property." While the interpretation of section 363(f)(3) has produced some division in the courts, this Court has adopted the better-reasoned view that the "aggregate value of all liens" means the actual economic value placed on

the liens – not the face amount of the liens.  In re Levitz Home Furnishings, Inc., No. 05-45189

(BRL) (Bankr. S.D.N.Y. Dec. 14, 2005) (rejecting creditor's "face value" argument, finding

requirements of section 363(f) satisfied and interest of secured creditors adequately protected by

attachment of their liens to sales proceeds); In re Oneida Lake Dev., Inc., 114 B.R. 352, 356-57

(Bankr. N.D.N.Y. 1990) (value and not amount of liens is what the court must look at in

applying section 363(f)(3)).  Here, the value offered under the APAs is greater than the amount

offered by any other party-in-interest and remains subject to higher and better offers after what

has been a thorough marketing effort.  Accordingly, section 363(f)(3) is satisfied.

      56.    Lastly, section 363(f)(5) of the Bankruptcy Code is also satisfied.  Any

entity holding an interest in the Bishop Mugavero Assets not included in the Permitted Liens (as

defined in the APA) could be compelled to accept a monetary satisfaction of its interest.

Furthermore, the Debtors propose that any interest in the Bishop Mugavero Assets that is not

included in the Permitted Liens shall attach to the net proceeds of the sale of those Bishop

Mugavero Assets subject to any claims and defenses the Debtors may possess with respect

thereto, in the priority they had before the sale.  As such, the sale of the Bishop Mugavero Assets

free and clear of all interests other than Permitted Liens satisfies section 363(f)(5) of the

Bankruptcy Code.

      57.    The Debtors do not believe that there are any valid liens held or asserted

on the Bishop Mugavero Assets other than Permitted Liens and the liens held by the Secured

Creditors.  The Debtors anticipate that they will receive consent to the Sale Transaction from the

Secured Creditors.

**F.  Successor Liability**

      58.    The Debtors also seek to sell the Bishop Mugavero Assets free and clear

of any successor liability claims related to the Bishop Mugavero Assets, other than monetary

liability arising out of the Inquiry and any preclosing liabilities being assumed under the Receivership Agreement, which the Purchasers agreed to assume. Notwithstanding reference to the conveyance free and clear of "any interest" in section 363(f), that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims, as well. See, e.g., In re Gen. Motors Corp. (n/k/a Motors Liquidation Corp.), Case No. 09-50026 (REG) (Bankr. S.D.N.Y. Jul. 5, 2009) (authorizing sale of assets free and clear of successor liability claims); In re Old Carco LLC (f/k/a/ Chrysler LLC), Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Jun. 1, 2009) (same); see also In re Trans World Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program).

59.     Here, the Sale Transaction is dependent on the ability of the Debtors to transfer the Bishop Mugavero Assets free and clear from successor liability, other than monetary liability, if any, arising out of the Inquiry and any preclosing liabilities being assumed under the Receivership Agreement. In order to be able to dispose of their various non-hospital business segments, the Debtors must be able to transfer these assets free and clear from potential successor liability claims, other than monetary liability, if any, arising out of the Inquiry and any preclosing liabilities being assumed under the Receivership Agreement. Indeed, the transfer of the Bishop Mugavero Assets free and clear of successor liability claims is a critical inducement for the Purchasers to enter into the Sale Transaction. See Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997) (stating that a sale pursuant to § 363 of the Bankruptcy Code "maximizes the purchase price of assets because without this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property").

60. Furthermore, pursuant to New York law and traditional common law, a purchaser of another company's assets will be found to be liable for the seller's liabilities only where (i) the successor expressly or impliedly assumes the predecessor's tort liability, (ii) the seller and purchaser merged or otherwise consolidated, (iii) the purchaser is a mere continuation of the seller, or (iv) the transaction is fraudulent. See N.Y. v. Nat'l Serv. Indus., Inc., 460 F.3d 201, 209 (2d Cir. 2006). A finding by the Court that the transfer of the Bishop Mugavero Assets is free and clear of any successor liability claims is proper because, except for Purchasers' assumption of monetary liability, if any, arising out of the Inquiry and any preclosing liabilities being assumed under the Receivership Agreement, none of these circumstances apply to the Sale Transaction. See Douglas v. Stamco, Case No. 09-1390-cv, 2010 WL 337043 (2d Cir. Feb. 1, 2010) (holding that sale pursuant to § 363 extinguished successor liability claims where there was no (i) assumption of such liability, (ii) merger of the parties, (iii) mere continuation of the seller, or (iv) fraud).

61. Accordingly, the Bishop Mugavero Assets should be transferred to the Purchasers free and clear of all liens, claims, encumbrances and other interests, including rights or claims based on any successor liability, except for the Assumed Liabilities and any preclosing liabilities being assumed under the Receivership Agreement.

**G. The Purchasers are Good Faith Purchasers**

62. Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) was later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)]… does not affect the validity of a sale… to an entity that purchased… such property in good faith, whether or not such entity knew of the pendency of the appeal,

> unless such authorization and such sale… were
> stayed pending appeal."

See Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m)…

provides that good faith transfers of property will not be affected by the reversal or modification

on appeal of an unstayed order, whether or not the transferee knew of the pendency of the

appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11

U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless

there is a stay pending appeal").

      63.    Although the Bankruptcy Code does not define "good faith," the Second

Circuit, in In re Gucci, has held:

> Good faith of a purchaser is shown by the integrity
> of his conduct during the course of the sale
> proceedings; where there is a lack of such integrity,
> a good faith finding may not be made. A
> purchaser's good faith is lost by "fraud, collusion
> between the purchaser and other bidders or the
> trustee, or an attempt to take grossly unfair
> advantage of other bidders."

126 F.3d at 390 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)

(interpreting Bankruptcy Rule 805, the precursor of section 363(m) of the Bankruptcy Code));

see also Bace v. Babbitt, No. 07 Civ. 2420 (WHP), 2008 WL 800579, at *3 (S.D.N.Y. Mar. 25,

2008) (same; quoting Gucci).

      64.    The Second Circuit has indicated that a party would have to show fraud or

collusion between a buyer and the debtor-in-possession or trustee in order to demonstrate a lack

of good faith.  See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill

Assocs.), 111 F.3d 269, 276, (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a

purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser

and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders");

see also In re Angelika Films 57th, Inc., Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. 1997); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

65.     Here, the Purchasers – who are not "insiders" of the Debtors under section 101(31) of the Bankruptcy Code – and the Debtors, have satisfied the requirements of section 363(m).  The APAs are the result of extended arm's-length, good faith negotiations between the Debtors and the Purchasers, each represented by their respective professionals.  Accordingly, the Purchasers are "good-faith" purchasers within the meaning of section 363(m) of the Bankruptcy Code and should be entitled to its protection.  Therefore, the Debtors request that the Court make a finding that the Purchasers are entitled to the protections of section 363(m) of the Bankruptcy Code.

66.     To the extent that the Purchasers are not the Successful Bidder(s) at the Auction, the Debtors will seek a finding from the Court at the Sale Hearing that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code, as well as an identical finding with regard to the Backup Bidder.

**H.  The Sale Complies with Applicable Nonbankruptcy Law**

67.     Sections 363(d) and 541(f) of the Bankruptcy Code require that the transfer of property by a not-for-profit corporation comply with applicable nonbankruptcy law governing such a transfer.  Specifically, section 363(d) provides that "[t]he trustee may use, sell or lease property under subsection (b) or (c) of this section only – (1) in accordance with applicable nonbankruptcy law that governs the transfer of property by a corporation that is not a moneyed, business or commercial corporation..."  Section 541(f) further provides that "property that is held by a debtor that is a corporation described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code may be transferred to an entity that is not such a corporation, but only under the same conditions as

would apply if the debtor had not filed a case..." Pursuant to section 1221 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("**BAPCPA**"), sections 363(d) and 541(f) of the Bankruptcy Code are applicable to all cases pending or filed on or after April 20, 2005.

68.     Section 511 of the N-PCL sets forth the substantive requirements for judicial approval, which includes providing notice of the Sale Transaction to the New York Attorney General (the "**NY AG**"), a proper party-in-interest for the Motion.  N-PCL § 511(a)-(b).  Additionally, section 511 of the N-PCL requires "[a] description, with reasonable certainty, of the assets to be sold. . .or a statement that it is proposed to sell. . .all or substantially all the corporate assets . . ., a statement of the fair value of such assets, and the amount of the corporation's debts and liabilities and how secured."  N-PCL § 511(a)(4).

69.     Courts have interpreted Section 511 of the N-PCL to require a finding that the disposition of substantially all assets is for consideration that is fair and reasonable.  See In re Application of Society for the Prevention of Cruelty to Animals of Upstate, New York, Inc., 2 Misc. 3d 644, 644, 773 N.Y.S.2d 789, 790 (Sup. Ct. Saratoga County 2003).   The Sale Transaction represents fair and reasonable value, as required by Bankruptcy Code section 363(b), N-PCL 510 and N-PCL 511.  As noted above, the Sale Transaction will be subject to competitive bidding through the Auction.   It is well-recognized that the sale of assets pursuant to court-approved auction procedures establishes the fair and reasonable value for such assets.  See In re Gen. Motors. Corp., 407 B.R. 463, 496 (Bankr. S.D.N.Y. 2009)  ("The value generated through the Court approved auction process reflects the market value of [the] assets and the conversion of the assets into cash is the contemplated result under § 363(b).") (citing In re Trans World Airlines, Inc., 2001 Bankr. LEXIS 980, *11 (Bankr. D. Del. Apr. 2, 2001)).   Here, the value

generated from the sale of the Assets is greater (or equal to) fair market value and all of the net sale proceeds will be used to pay the allowed claims of creditors in these cases. There will be no excess funds available after payment of these allowed claims.

70. Courts have also interpreted Section 511 of the N-PCL to require the sale is in the best interests of the corporation and its beneficiaries. See 64th Assocs., L.L.C. v. Manhattan Eye, Ear, and Throat Hosp., 2 N.Y.3d 585, 591, 813 N.E.2d 887, 890 (2004). The Court "should be guided primarily by whether those ends would be realized in light of conditions prevailing at the time the issue is presented to the court." Manhattan Theatre Club, Inc. v. Bohemian Benevolent & Literary Ass'n of City of N.Y., 120 Misc. 2d 1094, 1097, 467 N.Y.S.2d 143, 146 (Sup. Ct. N.Y. County 1983). Here, the Sale Transaction is in the best interest of the corporation and its beneficiaries. First, the prevailing conditions are that the Debtor is insolvent and, together with its affiliates, is winding up its business affairs through these Chapter 11 cases. All of the net proceeds from the Sale Transaction will be applied to reduce the valid, allowed claims of creditors as part of the Chapter 11 cases. Second, the Sale Transaction provides for a going-concern sale of the Debtor's health care services. The sale not only benefits creditors from a material paydown of debt but, more importantly, benefits patients by providing for continuity of health care services. Failure to approve the Sale Transaction would likely result in a liquidation of the business and piecemeal disposition of its assets – resulting in potentially lower net sale proceeds and, importantly, negatively affecting patient care. These adverse consequences would not be in the best interest of the corporation and its beneficiaries.

71. In short, the Debtors submit that the standards required by N-PCL are consistent with those of the Bankruptcy Code in evaluating a transaction of this nature. While the Debtors are in the process of submitting a petition to the New York Supreme Court seeking

approval of the Sale Transaction, the Debtors reserve their right to have the Court decide all issues related to the Sale Transaction, including the Debtors' compliance with the N-PCL. Section 1221(e) of BAPCPA explicitly states that "[n]othing in this section shall be construed to require the court in which a case under chapter 11 of title 11, United States Code, is pending to remand or refer any proceeding, issue, or controversy to any other court or to require the approval of any other court for the transfer of property." Pub. L. No. 109-8, § 1221(e) (2005); see also 3 COLLIER ON BANKRUPTCY ¶ 363.04. Accordingly, this Court has the jurisdiction to resolve any issues regarding the Debtors' compliance with N-PCL.

72.     In order to obtain the requirements of waiver of notice and a hearing (and thus proceed on an ex parte basis) before the New York state court, the Debtors will serve the notice of this Motion and the Sale Transaction in the form attached to the Bidding Procedures Order as **Annex 6** (the "**General Creditor Notice**") on all known creditors listed on the schedules of liability for Bishop Mugavero, which is the applicable Debtor that owns the not-for-profit assets being sold.

## I. Assumption of the Assumed Contracts and Leases and the Assignment Procedures Should be Approved

73.     Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor-in-possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

74.     The "business judgment" test is the standard applied by courts in determining whether an executory contract or unexpired lease should be assumed. See, e.g., In re Old Carco LLC (f/k/a/ Chrysler LLC), 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009); see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures), 4 F.3d 1095, 1099 (2d Cir. 1993); see also Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir.

1985) ("[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.") A court should approve the assumption of a contract under section 365(a) of the Bankruptcy Code if it finds that a debtor has exercised its sound business judgment in determining that assumption of an agreement is in the best interests of its estate. See, e.g., Old Carco, 406 B.R. at 196-97; In re Child World, Inc., 142 B.R. 87, 89-90 (Bankr. S.D.N.Y. 1992); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr. S.D.N.Y. 1989); see also Sharon Steel Corp. v. National Fuel Gast Distrib. Corp (In re Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989).

75.     When assuming an executory contract, section 365(b) of the Bankruptcy Code requires the debtor to cure any defaults under the contract or provide adequate assurance that it will promptly cure such defaults. If there has been a default, the debtor must also provide adequate assurance of future performance under the contract.

76.     Assuming and assigning the Assumed Contracts and Leases to the Purchasers or the Successful Bidder pursuant to the Assignment Procedures is an appropriate exercise of the Debtors' business judgment. As the Debtors are selling the Bishop Mugavero Assets, the Assumed Contracts and Leases will no longer have any value to the Debtors. By assuming and assigning the Assumed Contracts and Leases to the Purchasers or the Successful Bidder, the Debtors' estate will benefit from avoiding the rejection damages claims that would arise from rejecting the Assumed Contracts and Leases.

77.     In addition, as noted above the Debtors will not be assuming and assigning any contracts under the APAs other than the Debtors' Medicare and Medicaid provider agreements. The Purchasers have sufficient capital and financing commitments to provide

adequate assurance of future performance on all the Assumed Contracts and Leases and the Debtors are requiring any Qualified Bidder similarly to demonstrate its ability to provide adequate assurance of future performance.

78.     The Assignment Procedures proposed by the Debtors for determining Cure Amounts and providing the Counterparties to the Assumed Contracts and Leases notice and an opportunity to object to the assumption and assignment and/or the Cure Amounts are fair to all parties and satisfy the notice requirements of Bankruptcy Rule 6006(c).

79.     Therefore, because assuming and assigning the Assumed Contracts and Leases to the Successful Bidder(s) avoids the costs of rejecting those executory contracts and unexpired leases and increases the value to be realized from the sale of the Bishop Mugavero Assets, assumption and assignment to the Successful Bidder(s) of the Assumed Contracts and Leases (as amended by the Supplemental Notice of Assumed Contracts and Leases) is clearly an exercise of the Debtors' sound business judgment which warrants approval by this Court.

**J.  Entry into the Receivership Agreement Should be Approved**

80.     During the period between entry of the Sale Order and the Closing, the Receivership Agreement is fundamental to both the preservation of Facility's services to its residents and patients and to protect the Debtors' estates from the administrative expense of operating the Bishop Mugavero Assets.  The Debtors may enter into the Receivership Agreement in their reasonable business judgment.   See In re Chrysler LLC, 576 F.3d 108, 117-18 (2d Cir. 2009) (citations omitted).  The "business judgment" test is met when the debtor shows that the proposed use of property would be beneficial to the estate.  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures  Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

81.     Once the debtor articulates a valid business justification, the business judgment rule creates "a presumption that in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)) (the business judgment rule is satisfied where the debtor acts "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."). Thus, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts generally will not entertain objections to the debtor's conduct." Comm. Of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns Manville Corp.), 60 B.R. 612, 616 (Bank. S.D.N.Y. 1986).

82.     The debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Del. 2001) (quoting In re Logical Software, 66 B.R. 683, 686 (Bankr. D. Mass. 1986)); Integrated Resources, 147 B.R. at 656 ("Courts are loath to interfere with corporate decisions absent a showing of bad faith, self interest or gross negligence") (citations omitted).

83.     Here, entering into the Receivership Agreement represents a sound exercise of the Debtors' business judgment and should be approved as in the best interests of the Debtors' estates, their creditors and other parties-in-interest. The Receivership Agreement is necessary to preserve the value of the Facility's services prior to the Closing and to effectuate the Sale Transaction due to the delay in obtaining regulatory approval for the Closing. Furthermore, under the Receivership Agreement, the Purchasers agree to assume the administrative expense of

operating the Facility prior to the Closing, thereby insulating the Debtors' estates from a possible cash drain in the event the Debtors were required to continue to operate the Facility.

### K.  **Payment of the Brokers' Transaction Fees Should be Approved**

84.     The Debtors should be permitted to pay the Transaction Fees.  Pursuant to the Court's orders approving the retention of Cain Brothers and Loeb & Troper, the Court approved the Debtors' respective fee arrangements with Cain Brothers and Loeb & Troper that provide for the payment of the Transaction Fees upon consummation of the underlying asset sales.  See Docket Nos. 457 and 458.  Accordingly, the Debtors seek authority to pay the Transaction Fees upon consummation and out of the proceeds of the Sale Transaction without the necessity of further order of the Court.

### L.  **Waiver of 14-Day Stay under Bankruptcy Rule 6004(h)**

85.     Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing a sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of such order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  The Debtors believe that such waiver is appropriate here with respect to the Sale Order because all parties that have expressed interest in the Bishop Mugavero Assets will have (i) received notice of this Motion and any entry of the Bidding Procedures Order and (ii) had the opportunity to participate in the Auction at which the Debtors propose to sell the Bishop Mugavero Assets.

### NOTICE

86.     No trustee or examiner has been appointed in these Chapter 11 Cases.  In accordance with the Final Administrative Order Establishing Case Management Procedures (the "**Case Management Order**"), entered on May 13, 2010, notice of this Motion has been given to

the parties identified on the General Service List and the Special Service List (as such terms are identified in the Case Management Order).  The Debtors submit that no other notice need be given.

<p style="text-align:center">**N<small>O</small> P<small>REVIOUS</small> R<small>EQUEST</small>**</p>

87.     No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested and such other or further relief as is just.

Dated: New York, New York
August 5, 2010

<div style="margin-left:40%">

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ Adam Charles Rogoff
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
*Counsel for Debtors*

</div>