KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel for Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
In re:                                          :      Chapter 11
                                                :
SAINT VINCENTS CATHOLIC MEDICAL      :      Case No. 10-11963 (CGM)
CENTERS OF NEW YORK, et al.,             :
                                                :
                          Debtors.             :      Jointly Administered
------------------------------------------------------- x

**NOTICE OF AUCTION RESULTS IN CONNECTION WITH
THE SALE OF DEBTORS' CERTIFIED HOME
HEALTH AGENCY AND PROCEDURES RELATED THERETO**

PLEASE TAKE NOTICE THAT:

1.      <u>Introduction</u>.  Saint Vincents Catholic Medical Centers of New York
("**SVCMC**") and certain of its affiliates, as chapter 11 debtors and debtors-in-possession in the
above-referenced chapter 11 cases (each a "**Debtor**" and, collectively, the "**Debtors**"),[1]
conducted an auction (the "**Auction**") with respect to the proposed sale (the "**Sale**") of certain of
the assets related to the Debtors' certified home health agency (the "**Assets**" or the "**CHHA**"),
and assignments of certain contracts and leases related thereto, in accordance with the order (the
"**Bidding Procedures Order**") of the Bankruptcy Court of the Southern District of New York
(the "**Bankruptcy Court**"), entered on July 23, 2010, (a) approving the bidding procedures (the
"**Bidding Procedures**"), (b) scheduling the Auction for the Assets and a hearing approving the
Sale of the Assets (the "**Sale Hearing**"), and (c) approving certain procedures related to the
assumption and assignment of those executory contracts and unexpired leases related to the
Assets and whose assignment is contemplated by the Sale.

---

[1]  In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii)
Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort
Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home,
Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation
d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc.  There are certain affiliates of SVCMC who
are not Debtors.

2.     Auction Results.     Upon conclusion of the Auction, the Debtors determined, pursuant to the Bidding Procedures and subject to the Bankruptcy Court's approval, that the highest or otherwise best bidder was North Shore University Hospital (the "**Successful Bidder**") and the second highest or otherwise best bidder was Village Center for Care (the "**Backup Bidder**").  The asset purchase agreements of the Successful Bidder and the Backup Bidder, as these documents were modified by the Successful Bidder and the Backup Bidder at the Auction (respectively, the "**Successful Bid**" and the "**Backup Bid**") are attached hereto as **Exhibit A-1** and **Exhibit A-2**, respectively.

3.     Initial Assignment Notice.  On July 23, 2010, the Debtors served an initial assignment notice that indicated their intent to assume and assign certain agreements to which the Debtors are a party (collectively, the "**Assigned Agreements**"), as well as the cure amount, asserted by the Debtors, that is necessary to cure any default under the relevant Assigned Agreement pursuant to section 365 of the Bankruptcy Code (the "**Cure Amounts**").

4.     Additional Assumed Agreements/Amended Cure Amounts.  Attached as **Exhibit B-1** and **Exhibit B-2** hereto is a list, pursuant to the **Successful Bid** and the **Backup Bid** respectively, of (i) any additional Assigned Agreements along with any associated Cure Amounts and (ii) any amended Cure Amounts with respect to the original Assigned Agreements.

5.     Adequate Assurance of Future Performance.  Attached as **Exhibit C-1** and **Exhibit C-2** hereto is the information with respect to adequate assurance of future performance provided by the Successful Bidder and the Backup Bidder under the Assigned Agreements.

6.     Sale Hearing.  The Bidding Procedures Order provides that the Sale Hearing will be held on **August 19, 2010 at 11:00 a.m. (prevailing Eastern Time)**, before the Honorable Cecelia G. Morris, United States Bankruptcy Judge, in Courtroom 701 at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408.  At the Sale Hearing, the Debtors will request that the Bankruptcy Court enter an order approving the Sale of the Assets to the Successful Bidder.

7.     Objection Deadline.  Any interested party that wishes to object to the modifications to the bid by North Shore in the Successful Bid or to the Backup Bid, or the Backup Bidder's adequate assurance designated in this Notice, such party must file a written objection with the Court no later than **4:00 p.m. on August 13, 2010** (the "**Sale Objection Deadline**"), and serve such an objection (each a "**Sale Objection**") on the following parties (collectively, the "**Objection Parties**"): (a) the Debtors, Saint Vincents Catholic Medical Centers of New York, 170 W. 12th Street, Smith Building, 5th Floor, New York, New York 10011, Attn: Scott Davis (Scott.Davis@gt.com); (b) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq. and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021, Attn: Judith Eisen, Esq.; (c) counsel for the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Stephen Kuhn, Esq. and Sarah Link Schultz, Esq.; (d) counsel to Secured Creditors: General Electric

Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; (e) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; (f) counsel to the Successful Bidder, Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY 10178, Attn: W. Christian Drewes, Esq.; and (g) the Backup Bidder, Village Care of New York, 154 Christopher Street, 1st Floor, New York, New York 10014, Attn: Nancy Schwartz-Weinstock, Esq. so that it is **actually received** by the Sale Objection Deadline. To the extent any party (i) that previously received notice of a Cure Amount in connection with the Sale to North Shore and wishes to object to a modified Cure Amount designated in this Notice or (ii) did not receive notice of a Cure Amount in connection with the Sale to North Shore and wishes to object to its Cure Amount designated in this Notice, such party must file a written objection (each a "**Cure Objection**") with the Court no later than **12:00 p.m. on August 16, 2010** (the "**Cure Objection Deadline**"), and serve such an objection on the Objection Parties, so that it is **actually received** by the Cure Objection Deadline.

        8. **To the extent that any interested party does not timely serve (x) a Sale Objection as set forth above, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Additional Assumed Contract or Additional Assumed Lease; (ii) agreed that the Successful Bidder and the Backup Bidder have provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) agreed to the terms of the Sale Order; and (iv) waived any and all objections in connection with items (i) through (iii) hereof, or (y) a Cure Objection as set forth above, such party will be deemed, as applicable, to have (i) consented to the relevant Additional Cure Amount or Amended Cure Amount, if any; (ii) agreed to the terms of the Sale Order; and (iii) waived any and all objections in connection with items (i) through (ii) hereof.**

        9. A copy of each of the Bidding Procedures Order or any other document referenced herein can be viewed and obtained on the Court's website www.ecf.nysb.uscourts.gov or (without charge) at http://svcmcrestructuring.com.

Dated: New York, New York
      August 10, 2010             KRAMER LEVIN NAFTALIS & FRANKEL LLP

                              /s/ Adam C. Rogoff
                              Kenneth H. Eckstein
                              Adam C. Rogoff
                              P. Bradley O'Neill
                              1177 Avenue of the Americas
                              New York, New York 10036
                              Telephone: (212) 715-9100
                              *Counsel for Debtors*

**EXHIBIT A-1**
Successful Bid

ASSET PURCHASE AGREEMENT

by and between

SAINT VINCENTS CATHOLIC MEDICAL CENTERS

OF NEW YORK

and

NORTH SHORE UNIVERSITY HOSPITAL

Dated as of August 10, 2010

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT ( this "Agreement"), is made and entered into as of August 10, 2010, by and between Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, a New York not-for-profit corporation ("SVCMC" or "Seller") and North Shore University Hospital, a New York not-for-profit corporation ("NSUH" or "Purchaser").

## RECITALS

WHEREAS, Seller, along with certain of its affiliates (collectively, the "Debtors") is a debtor-in-possession under Title 11 of the United States Code 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") on April 14, 2010 ( the "Petition Date"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 10-11963);

WHEREAS, Seller is entering into this Agreement subject to the approval by the Bankruptcy Court;

WHEREAS, Seller is engaged in the business of owning and operating a certified home health agency (the "CHHA"), as identified in Section A of the Seller Disclosure Schedule (the "Business") for home health care services in the New York counties of Westchester, Bronx, New York, Kings, Queens, Richmond, Nassau and Suffolk (the "Service Area"), which certificate was issued by the State of New York Department of Health, Office of Health Systems Management;

WHEREAS, Seller owns and operates other businesses including, without limitation, two hospitals and a long term home health care program, which other businesses are not the subject of this Agreement (the "Other Businesses");

WHEREAS, Seller desires to relinquish the Certificate of Need and underlying license to operate its CHHA as part of the application process through which the Purchaser desires to acquire its own Certificate of Need and license for the provision of home health agency services in the Service Area for the provision of certified home health agency services upon the terms and conditions set forth in this Agreement; and

WHEREAS, subject to the approval of the Bankruptcy Court, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to, inter alia, Sections 105, 363, and 365 of the Bankruptcy Code the Purchased Assets and Assumed Liabilities (each, as defined below), all as more specifically provided herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

1

# ARTICLE I

# DEFINITIONS

Section 1.1    Certain Definitions.

Unless the context otherwise requires or as otherwise defined herein, capitalized terms used in this Agreement shall have the meanings set forth in this Section 1.1:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Antitrust Laws" means the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, the Donnelly Act, as amended, and the Hart-Scott-Rodino Antitrust Improvements Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, Orders, decrees, administrative or judicial doctrines or other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"Bidding Procedures Order" means the July 23, 2010 Order of the Bankruptcy Court approving the bidding procedures for the auction of assets related to the Seller's certified home health agency, attached hereto as Exhibit A.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close.

"CMS" means the Centers for Medicare & Medicaid Services.

"Code" means the Internal Revenue Code of 1986, as amended.

"CON Application" means a Certificate of Need Application with respect to the Business to be submitted by Purchaser to DoH (the CON Application may contemplate either the issuance of a new license to operate the Business to Purchaser, or a modification and expansion of Purchaser's current CHHA license to include the entire Service Area). A request by Purchaser for the issuance of a temporary authorization to conduct the Business on an emergent basis will be deemed to constitute a CON Application.

"CON Approval" means the approval by DoH of the CON Application without contingencies or conditions that have not been satisfied, other than reasonable conditions that may be reasonably expected to be satisfied in accordance with their terms after the Closing. Emergent approval by DoH without contingencies or conditions that have not been satisfied, other than reasonable conditions that may be reasonably expected to be fully satisfied in accordance with their terms after the Closing (including submission of a permanent DoH

2

Application, which Purchaser acknowledges is a reasonable post-Closing contingency), will be deemed to constitute CON Approval.

"Confidentiality Agreement" means the Confidentiality Agreement, dated December 9, 2009, by and between Seller and Purchaser.

"Contemplated Transactions" means the transactions contemplated by this Agreement.

"Contract" means any written contract, indenture, note, bond, lease, license or other agreement, other than a real property lease, a personal property lease or an Intellectual Property License.

"Copyrights" means all copyrights and registrations and applications therefor and works of authorship, and mask work rights.

"Cost Reports" means all cost and other reports filed pursuant to the requirements of Healthcare Programs for payment or reimbursement of amounts due from such programs for services provided.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials exclusively related to the Business or the Purchased Assets, in each case whether or not in electronic form, other than Patient Records.

"DoH" means the Department of Health of the State of New York.

"Employees" means all individuals, as of any date specified herein, who are employed by Seller in the conduct of the Business, together with individuals who are hired in respect of the conduct of the Business after the date hereof and prior to the Closing; provided that "Employees" shall not include (a) any officer of Seller or (b) individuals who regularly perform administrative functions for Seller relating to both the Business and in any material respect any of the Other Businesses except that, at any time before the fifth (5th) Business Day prior to the deadline set forth in the Bidding Procedures Order for the submission of bids, with Seller's consent, Purchaser may request to include the designated individuals described in the foregoing clause (b) as Employees (and subject to the prior consent of Seller, request to make offers of employment to such individuals).

"Environmental Law" means any Law currently in effect relating to the protection of human health and safety or the environment, natural resources or the protection thereof, or relating to hazardous materials, including the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.), and the regulations promulgated pursuant thereto.

3

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Contracts" means every Contract that is not an Assigned Contract or not otherwise specifically identified in Sections 2.2(a) through 2.2(g) hereto as a Purchased Asset.

"Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment (including medical equipment) and leasehold improvements owned by Seller and used by Seller exclusively in the conduct of the Business, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by Seller, the telephone numbers associated therewith used in the Ordinary Course of Business and not used in any of the Other Businesses), cubicles and miscellaneous office furnishings.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Hazardous Material" means any substance, material or waste which is regulated by any Governmental Body including petroleum and its by-products, asbestos, biomedical waste, medical waste and any chemical, material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" under any provision of Environmental Law.

"Healthcare Program Liabilities" means all (i) Liabilities under any applicable Medical Reimbursement Program Law, including any obligations for settlement and retroactive adjustments under the Medicare and Medicaid programs for open periods ending on or before the Closing Date and (ii) Liabilities for violations of the Conditions of Participation for open periods ending on or before the Closing Date.

"Healthcare Regulatory Consents" means in respect of Seller or Purchaser, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body as shall be required to be obtained and such notifications to any Governmental Body as shall be required to be given by such party in order for it to consummate the Contemplated Transactions in compliance with all applicable Laws relating to health care or healthcare services of any kind and shall include obtaining any such consents, approvals, authorizations, waivers, Orders, licenses or Permits, or notices to, the New York State Public

4

Health Council, CMS, DoH and shall include Purchaser obtaining CON Approval from DoH with respect to its operation of the Business and the parties obtaining any consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body needed for them to consummate the Contemplated Transactions and for Purchaser to operate the Business.

"Intellectual Property Licenses" means (a) any grant by Seller to a third Person of any right to use any of the Purchased Intellectual Property owned by Seller and (b) any grant to Seller of a right to use in connection with the Business any Intellectual Property Rights owned by any other Person (other than the SVCMC Marks), to the extent, and only to the extent, such right is transferable by Seller.

"Intellectual Property Rights" means all intellectual property rights available in respect of Copyrights, Marks (other than the SVCMC Marks), Software, trade secrets and Patents, whether registered or unregistered, and whether owned or licensed.

"Inventory" means all medical supplies, drugs, medications, food, janitorial, housekeeping and office supplies and other consumables located in or used in connection with the operation of the Business.

"Knowledge" means the actual knowledge of those officers of Purchaser or of those officers of SVCMC or senior managers of the Business as of or prior to the Closing (each of which is identified in Section 1.1(a) of the Seller Disclosure Schedule), as applicable.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule, regulation or directive enacted or issued by a Governmental Body.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, alternative dispute resolution, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all fines, penalties, costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement and transfer restriction under any agreement.

"Marks" means all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof.

"Material Adverse Effect" means (a) a material adverse effect on the Business (taken as a whole), including its assets, properties, results of operations or condition (financial or otherwise) as conducted on the date hereof other than an effect resulting from an Excluded Matter, (b) a material adverse effect on the Purchased Assets other than an effect resulting from

5

an Excluded Matter, or (c) a material adverse effect on the ability of Seller to consummate the Contemplated Transactions or to perform its obligations under this Agreement. "Excluded Matter" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general that does not materially disproportionately affect Seller; (ii) the effect of any change that generally affects any industry in which Seller operates that does not materially disproportionately affect Seller; (iii) the effect of any changes in national or international political conditions, including any engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack occurring prior to, on or after the date of this Agreement that does not materially disproportionately affect Seller; (iv) the effect of any action taken by Purchaser or its Affiliates with respect to the Contemplated Transactions or with respect to Seller, including its Employees; (v) any matter of which Purchaser has Knowledge on the date hereof or, solely for purposes of determining whether the condition to the Closing set forth in Section 10.1(a) hereto has been satisfied, on the Closing Date, including those matters set forth in Section 1.1(b) of the Seller Disclosure Schedule; (vi) any matter set forth in Section 5.10(b) of the Seller Disclosure Schedule; (vii) the effect of any change in applicable Laws or accounting rules; (viii) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the Contemplated Transactions; (ix) any effect resulting from the filing or pendency of the Bankruptcy Case or Legal Proceedings relating thereto and reasonably anticipated effects thereof; (x) any effect resulting from (x) Purchaser's actions under the Interim Agreement, or (y) advice, direction, or information provided by Purchaser pursuant to the Interim Agreement and relied upon by Seller; or (xi) any reduction in the number of patients receiving services from the Business.

"Medicaid" means any state program for medical assistance administered under Title XIX of the Social Security Act.

"Medical Reimbursement Program" means Medicare, Medicaid, any other federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and any other state sponsored reimbursement program.

"Medical Reimbursement Program Laws" means the Laws governing the Medical Reimbursement Programs, including: 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a- 7b; §§ 1395 through 1395fff; §§ 1396-1396v; the False Claims Act (31 U.S.C. § 3729 et seq.); the False Statements Act (18 U.S.C. § 1001); the Program Fraud Civil Penalties Act (31 U.S.C. § 3801 et seq.); the anti-fraud and abuse provisions of the Health Insurance Portability and Accountability Act of 1996 (18 U.S.C. § 1347, 18 U.S.C. § 669, 18 U.S.C. § 1035, 18 U.S.C. § 1518); and the corresponding reimbursement, fraud and abuse, false claims and anti self-referral Laws of any other Governmental Body.

"Medicare" means the health insurance program administered under Title XVIII of the Social Security Act.

"Multiemployer Plan" means a Plan which is a multiemployer plan within the meaning of Section 3(37) of ERISA or Section 414(f) of the Code.

6

"Multiple Employer Plan" means a Plan which is a single-employer pension plan (within the meaning of Section 4001(a)(15) of ERISA) that is subject to Sections 4063 and 4064 of ERISA.

"Order" means any order, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice, subject, however, to those actions necessary and incident, or otherwise relating, to the Bankruptcy Case, provided, however, that Seller complies with the requirements of the Bankruptcy Code after the filing of the Bankruptcy Case.

"Organizational Documents" means (a) the articles or certificate of incorporation, the bylaws and any shareholders agreement of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and certificate of formation or organization of any limited liability company, (e) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and (f) any amendment to any of the foregoing.

"Patents" means all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon.

"Patient Records" shall mean any documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996, the Health Information Technology for Economic and Clinical Health Act, Title XIII of the American Recovery and Reinvestment Act of 2009 and all regulations promulgated pursuant thereto.

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Body.

"Permitted Liens" means Liens set forth in Section 1.1(c) of the Seller Disclosure Schedule, solely to the extent that such Liens cannot be removed by operation of Sections 105 and/or 363(f) of the Bankruptcy Code.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, association, estate, Governmental Body or other entity.

"Plan" means each material "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other material employee plan or agreement maintained by the Seller.

7

"Pre-Closing Accounts Receivable" means accounts receivable arising out of the rendition of medical, surgical, behavioral, diagnostic or other professional health care services or the sale of medical products in the Ordinary Course of Business for dates of service occurring prior to midnight on the Closing Date.

"PTO Liability" means all vacation, leave, holiday, sick time and personal days of Employees (employed as of the date hereof and who remain employed on the date immediately preceding the Closing Date) accrued either before or after the Petition Date up to a maximum of $508,566.00.

"Purchased Intellectual Property" means all Intellectual Property Rights (other than rights under an Intellectual Property License and other than the SVCMC Marks) owned by Seller and (a) used by Seller exclusively in connection with the Business and (b) not used to a material degree in any of the Other Businesses, including any in the form of or arising from or in respect of Patents, Marks, Copyrights, Software or Technology, except for any that is an Excluded Asset.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching of Hazardous Material into the indoor or outdoor environment, or into or out of any property.

"Representatives" means, with respect to any Person, any of its Affiliates and the directors, trustees, officers, members, employees, consultants, agents, advisors and other representatives of such Person or its Affiliates.

"Sale Motion" means the motion or motions of Seller seeking approval and entry of the Bidding Procedures Order and the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court substantially in the form of Exhibit B hereto, with such changes as are reasonably acceptable to Purchaser and Seller.

"Severance Obligations" means all severance obligations of Seller existing as of or arising on or after the Closing Date with respect to Employees (employed as of the date hereof and who remain employed on the date immediately preceding the Closing Date), whether or not hired by Purchaser, up to a maximum of $761,381.00.

"Software" means, except to the extent generally available for purchase from a third Person, any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (d) all documentation including user manuals and other training documentation related to any of the foregoing, in each case, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business. That portion of the Software that is owned by Seller is referred to herein as the

8

"Proprietary Software," and that portion of the Software that is owned by any Person other than Seller is referred to herein as the "Third-Party Software."

"Tax Authority" means any federal, state or local government, or agency, instrumentality or employee thereof, charged with the administration of any Law relating to Taxes.

"Taxes" means (a) all federal, state, local or foreign taxes, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, unrelated business income, and estimated taxes, whether disputed or not, and (b) all interest, penalties and additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (a).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business, other than any in the form of Software.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended.

Section 1.2    Terms Defined Elsewhere in this Agreement.    For purposes of this Agreement, each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Additional Deposit | 3.2 |
| Agreement | Recitals |
| Allocation | 11.3 |
| Antitrust Bureau | 8.4(b) |
| Antitrust Division | 8.4(b) |
| Assigned Contracts | 2.2(d) |
| Assumed Liabilities | 2.4 |
| Auction | 7.1(a) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |

9

| Term | Section |
|------|---------|
| Break-Up Fee | 7.2(a) |
| Business | Recitals |
| Business Confidential Information | 8.6(b) |
| CBAs | 2.5(g) |
| Certificate of Need | Recitals |
| CHHA | Recitals |
| Closing | 4.1 |
| Closing Date | 4.1 |
| COBRA | 9.1(b) |
| CON Termination Date | 4.4(c)(iv) |
| Competing Bid | 7.1(a) |
| Contingent Medicaid Liability | 2.7(a) |
| Cure Amount | 2.6(b) |
| Deposit Escrow Agreement | 3.2 |
| Early Transfer Adjustment | 3.4(b) |
| Escrow Agent | 3.2 |
| Escrow Funds | 3.2 |
| Excluded Assets | 2.3 |
| Excluded Liabilities | 2.5 |
| Excluded Matter | 1.1 |
| Excluded Owned Property | 2.3(f)(i) |
| Excluded Personal Property Leases | 2.3(e) |
| Excluded Real Property | 2.3(f)(ii) |
| Excluded Real Property Leases | 2.3(f)(ii) |
| FTC | 8.4(b) |
| Healthcare Applications | 8.4(a) |
| Healthcare Programs | 5.12(b) |
| Indemnity Escrow Agreement | 2.7(a) |
| Initial Deposit | 3.2 |
| Interim Agreement | 8.14 |
| Inquiry | 2.7(a) |
| LTHHCP | 2.1(b) |
| Material Contracts | 5.9(a) |
| Medicaid Escrow Fund | 2.7(a) |
| Medicaid Payment | 2.7(a) |
| Medical Records Custody Agreement | 2.11 |
| Nonassignable Assets | 2.8(b) |
| NSUH | Recitals |
| OASIS | 8.13 |
| Other Businesses | Recitals |
| Owned Properties | 5.6(a) |
| Personal Property Leases | 5.7 |
| Petition Date | Recitals |
| Proprietary Software | 1.1 |

NY01/DREWC/1417455.1

| Term | Section |
|---|---|
| Purchase Price | 3.1 |
| Purchased Assets | 2.2 |
| Purchased Intellectual Property Licenses | 2.2(c) |
| Purchased Owned Property | 2.2(a) |
| Purchased Personal Property Leases | 2.2(b)(iii) |
| Purchased Real Property | 2.2(a) |
| Purchased Real Property Leases | 2.2(a) |
| Purchaser | Recitals |
| Purchaser Disclosure Schedule | Article VI |
| Purchaser Documents | 6.2 |
| Real Property Leases | 5.6(a) |
| Seller Confidential Information | 8.6(a) |
| Seller Disclosure Schedule | Article V |
| Seller Documents | 5.2 |
| Seller | Recitals |
| Service Area | Recitals |
| SVCMC | Recitals |
| Seller Marks | 8.9 |
| System | 12.1 |
| Third-Party Software | 1.1 |
| Transfer Taxes | 11.1 |
| Transition Patients | 3.4(a) |

Section 1.3    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Periods.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.  Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

Dollars.  Any reference in this Agreement to currency shall be to, and all payments hereunder shall be paid in, U.S. dollars.

Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

11

Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number shall have the corresponding meanings in the plural and vice versa.

Headings. The provision of a Table of Contents, the division of this Agreement into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All article, section, schedule and exhibit references used in this Agreement are to articles, sections, schedules and exhibits to this Agreement unless otherwise specified.

Herein. The words "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation", whether or not so stated, and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Made Available to Purchaser. The phrase "made available to Purchaser" shall mean made available to Purchaser through posting in SVCMC's electronic data room, via email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

Make Available to Seller. The phrase "make available to Seller" shall mean make available to Seller or its agents through email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

Part of Speech. If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).

Date. The phrase "the date of this Agreement," "date hereof" and terms of similar import, unless the context otherwise requires, shall be deemed to refer to the date set forth in the preamble of this Agreement.

Accounting Terms. All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.

(b)     Each party hereto has been advised by experienced counsel, and the parties hereto have participated jointly, in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto, and no rule of construction shall operate and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

12

# ARTICLE II

# TRANSACTION

Section 2.1    Transaction.

(a)    In reliance on the representations, warranties and covenants contained herein and subject to the terms and conditions hereof, Seller shall, pursuant to the terms and conditions of this Agreement, relinquish to New York State the Certificate of Need and all rights and privileges appurtenant thereto, including without limitation the SVCMC CHHA license for the provision of home health agency services in the Service Area.

(b)    The Purchaser acknowledges that the transaction specifically excludes any transfer by Seller of any of the following:

(i)    Seller's long term home health care program ("LTHHCP"); and

(ii)    any caregivers or other employees of the LTHHCP.

Section 2.2    Purchase and Sale of Assets.    On the terms and subject to the conditions set forth in this Agreement, and subject to entry of the Sale Order, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall, subject to Section 2.6 hereto, sell, transfer, assign, convey and deliver to Purchaser, all of Seller's right, title and interest in, to and under the Purchased Assets, subject to the Permitted Liens, free and clear of any and all Liens, claims or any other interest, to the extent provided in the Sale Order pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code, excepting only such liabilities that Purchaser has expressly agreed to assume as provided in this Agreement. Other than the Permitted Liens, all indebtedness secured by mortgages or other liens on the Purchased Assets shall attach to the proceeds pursuant to Section 363(f) of the Bankruptcy Code so that the Purchased Assets will be sold free and clear of such liens. "Purchased Assets" means all of the assets, rights and properties of Seller exclusively pertaining to or exclusively used in connection with the Business as existing on the Closing Date (wherever located and whether or not required to be reflected on a balance sheet), other than the Excluded Assets, and in each case subject to Section 2.8(b) hereto, including, without limitation, all of Seller's right, title and interest in and to the following:

(a)    all right, title and interest of Seller in and to each Owned Property set forth in Section 5.6(a) of the Seller Disclosure Schedule (other than any identified in Section 2.2(f)(i) hereto as Excluded Owned Property) (the "Purchased Owned Property") and under each Real Property Lease set forth in Section 5.6(a) of the Seller Disclosure Schedule (other than any identified in Section 2.2(f)(ii) hereto as Excluded Real Property Leases) (along with any additional Real Property Leases exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.2 hereto, the "Purchased Real Property Leases", and the real property that is the subject of the Purchased Real Property Leases, collectively with the Purchased Owned Property, the

13

"Purchased Real Property"), together with all improvements and fixtures thereto and other appurtenances and rights in respect thereof (provided that Purchaser shall be permitted to remove any Purchased Real Property Lease listed on Schedule 5.6(a) by notice to Seller at any time on or before the fifth (5th) Business Day prior to the Closing Date); provided, however, that in the event Purchaser elects to remove any Purchased Real Property Lease listed on Schedule 5.6(a), Purchaser shall be liable for any administrative expense claim related thereto for the time period from the date that Purchaser is deemed to be the Successful Bidder pursuant to the Bidding Procedures Order until the date such Purchased Real Property Lease is rejected under the Bankruptcy Code;

(b)     (i) the Furniture and Equipment; (ii) the tools, spare parts, supplies (including all of Seller's Inventory) and all other tangible personal property owned by Seller, used by Seller in the conduct of the Business and set forth on Section 2.2(b) of the Seller Disclosure Schedule; and (iii) the Personal Property Leases identified in Section 5.7 of the Seller Disclosure Schedule, other than any identified in Section 2.2(e) of the Seller Disclosure Schedule as Excluded Personal Property Leases (along with any additional Personal Property Leases exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.2 hereto, the "Purchased Personal Property Leases") (provided that Purchaser shall be permitted to remove any Purchased Personal Property Lease listed on Schedule 5.7(b) by notice to Seller at any time on or before the fifth (5th) Business Day prior to the Closing Date); provided, however, that in the event Purchaser elects to remove any Purchased Personal Property Lease listed on Schedule 2.2(b), Purchaser shall be liable for any administrative expense claim related thereto for the time period from the date that Purchaser is deemed to be the Successful Bidder pursuant to the Bidding Procedures Order until the date such Purchased Personal Property Lease is rejected under the Bankruptcy Code;

(c)     (i) the Purchased Intellectual Property set forth on Section 2.2(c) of the Seller Disclosure Schedule; and (ii) the rights of Seller as licensor under the Intellectual Property Licenses identified in Section 2.2(c) of the Seller Disclosure Schedule and all rights of Seller as licensee under the Intellectual Property Licenses (along with any additional Intellectual Property Licenses exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.2 hereto, the "Purchased Intellectual Property Licenses") (provided that Purchaser shall be permitted to remove any Purchased Intellectual Property License listed on Schedule 2.2(c) by notice to Seller at any time on or before the fifth (5th) Business Day prior to the Closing Date); provided, however, that in the event Purchaser elects to remove any Purchased Intellectual Property License listed on Schedule 2.2(c), Purchaser shall be liable for any administrative expense claim related thereto for the time period from the date that Purchaser is deemed to be the Successful Bidder pursuant to the Bidding Procedures Order until the date such Purchased Intellectual Property License is rejected under the Bankruptcy Code;

(d)     all Contracts set forth in Section 2.2(d) of the Seller Disclosure Schedule, (provided that Purchaser shall be permitted to remove any Contract listed on Schedule 2.2(d) by notice to Seller at any time on or before the fifth (5th) Business Day prior to the Closing Date) and all rights arising out of such Contracts (along with any additional Contracts

14

exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.2 hereto, the "Assigned Contracts"); provided, however, that in the event Purchaser elects to remove any Contract listed on Schedule 2.2(d), Purchaser shall be liable for any administrative expense claim related thereto for the time period from the date that Purchaser is deemed to be the Successful Bidder pursuant to the Bidding Procedures Order until the date such Contract is rejected under the Bankruptcy Code;

(e)     subject to the provisions of Sections 2.11 and 8.7 hereto, all Documents that are exclusively used in, held for use in or intended to be used in, or that arise exclusively out of, the Business, including Documents relating to the services provided by the Business, personnel and employee health files for Transferred Employees (including, to the extent available, pre-employment, criminal background, drug screen, and immigration records) and books, files, invoices, flow sheets and other technical and non technical data and information relating to the operations and services provided by the Business which are owned by Seller and which are exclusively used in and integral to the operation of the Business, but excluding any Documents and Patient Records described in Section 2.3(h) or Section 2.3(i) hereto;

(f)     all Permits exclusively used by Seller in the Business and set forth in Section 2.2(f) of the Seller Disclosure Schedule (to the extent transferable);

(g)     all goodwill and other intangible assets (other than Intellectual Property Rights) owned by Seller and exclusively used in connection with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property; and

(h)     all other assets used exclusively in the Business.

Section 2.3     Excluded Assets.    Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser or its Affiliates, and Seller shall retain all right, title and interest to, in and under the Excluded Assets. "Excluded Assets" shall mean the following assets, properties, interests and rights of Seller:

(a)     all cash, cash equivalents, bank deposits or similar cash items of Seller, all securities owned by Seller and any accounts receivable or trade receivables owned by Seller, including Pre-Closing Accounts Receivable and related party receivables;

(b)     the Excluded Contracts;

(c)     any rights to refunds, settlements and retroactive adjustments arising in connection with the Medicare and Medicaid provider numbers and related participation agreements or any other third-party healthcare payor program of the Business;

(d)     any other Contract to which Seller is a party or under which it has rights that is not used exclusively in the Business or is used to a material degree in any of the Other Businesses, unless included in Section 2.2(d) of the Seller Disclosure Schedule among the Assigned Contracts;

15

(e) the Personal Property Leases identified in <u>Section 2.3(e)</u> of the Seller Disclosure Schedule (the "<u>Excluded Personal Property Leases</u>");

(f) (i) the Owned Property identified in <u>Section 2.3(f)(i)</u> of the Seller Disclosure Schedule (collectively the "<u>Excluded Owned Property</u>"), and (ii) the Real Property Leases identified in <u>Section 2.3(f)(ii)</u> of the Seller Disclosure Schedule (the "<u>Excluded Real Property Leases</u>", and the real property that is the subject of the Excluded Real Property Leases, collectively with the Excluded Owned Property, the "<u>Excluded Real Property</u>");

(g) any Intellectual Property Rights of Seller other than the Purchased Intellectual Property; it being understood that Seller shall not convey, and Purchaser shall not acquire, pursuant to this Agreement any right in or to any website or e-mail address owned or used by Seller (whether or not used in the Business);

(h) any (i) personnel files for Employees of Seller who do not accept an offer of employment from Purchaser; (ii) other books and records that Seller is required by Law to retain (provided that Purchaser shall have a right to make and retain copies of such books and records that relate to the Business at its sole expense, to the extent permitted by applicable Law or subject to any contractual confidentiality obligation owed to a third party); (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party (other than any patient confidentiality obligation referred to in the foregoing clause (ii) or in <u>Section 2.11</u> hereto); (iv) books and records and other Documents related to malpractice prevention programs, incident reporting or quality assurance to the extent confidential under applicable Law; (v) Documents relating to proposals to acquire the Business by Persons other than Purchaser or its Affiliates; (vi) any Documents primarily related to or that are required to realize the benefits of any Excluded Assets; (vii) Documents related to Pre-Closing Accounts Receivable; (viii) corporate records and Tax Returns of Seller and (ix) Documents necessary to prepare Tax Returns and Cost Reports;

(i) any Patient Records; <u>provided</u> that, subject to <u>Section 2.11</u> hereto, Seller shall provide Purchaser with custody of Patient Records;

(j) any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom;

(k) all insurance policies or rights to proceeds thereof relating to the Business or the Purchased Assets;

(l) all deposits (including customer deposits and security deposits for rent, electricity, telephone or other utilities and deposits posted under any Assigned Contract) and prepaid charges and expenses of Seller;

(m) any rights, claims or causes of action of Seller against third parties relating to assets, properties, business or operations of Seller, including any actions under Chapter 5 of the Bankruptcy Code;

16

(n)     the amounts described in Section 2.10(a) hereto and all other rights of Seller under this Agreement, the Seller Documents and the Contemplated Transactions;

(o)     any assets of the Other Businesses not otherwise described in Section 2.2 hereto;

(p)     any tangible personal property having religious significance which may be removed from the Purchased Real Property identified in Section 2.3(p) of the Seller Disclosure Schedule;

(q)     any personal, tangible and intangible property of Seller identified in Section 2.2(q) of the Seller Disclosure Schedule;

(r)     any right to receive or expectancy of Seller in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate), regardless of when received and whether or not designated to be applied or used in respect of the Business;

(s)     the Medicare and Medicaid provider numbers for the Business and related provider agreements used in the Business, as identified in Section 2.3(s) of the Seller Disclosure Schedule; and

(t)     any marketable securities of Seller.

Section 2.4     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely pay, perform and discharge in accordance with their respective terms, only the following Liabilities (collectively, the "Assumed Liabilities"):

(a)     all Liabilities accruing from and after the Closing with respect to the Assigned Contracts and the Purchased Real Property Leases;

(b)     the Cure Amounts as required by Section 2.6 hereto;

(c)     the Contingent Medicaid Liability, if any, as required by Section 2.7 hereto;

(d)     all Severance Obligations; and

(e)     all PTO Liability.

Section 2.5     Excluded Liabilities.  Except for the Assumed Liabilities, Purchaser shall not assume or become liable for the payment or performance of any Liability of Seller of any nature whatsoever, whether accrued or unaccrued, known or unknown, fixed or contingent ("Excluded Liabilities"), including the following, which shall remain Liabilities of Seller:

17

(a)     except as otherwise provided in <u>Section 2.4(c)</u> hereto, any Liability for Taxes of Seller arising from the operation of the Business for periods prior to the Closing;

(b)     any Liability associated with any Excluded Assets;

(c)     any Liability arising out of events or omissions occurring prior to the Closing Date from or relating to any overpayment, duplicate payment, refunds, discounts or adjustments due to private sector healthcare cost reimbursement program or insurance coverage;

(d)     any Liability related to claims of medical malpractice and/or other professional Liability of Seller, or any of its Employees, agents or independent contractors to the extent incurred prior to the Closing Date arising out of events or omissions occurring prior to the Closing Date;

(e)     except otherwise provided in <u>Section 2.4(c)</u> hereto, all Healthcare Program Liabilities arising from events prior to the Closing Date and subsequent to the Closing Date for services provided under the Seller's Provider Numbers;

(f)     any Liability arising out of or in connection with any Legal Proceedings (whether instituted prior to or after the Closing) to the extent arising from acts or omissions which occurred prior to the Closing Date (except as otherwise provided by <u>Section 2.3</u> hereto); and

(g)     any Liability relating to Seller's Employees (whether current, former or retired), including without limitation any Liability under any Plan or collective bargaining agreement ("CBA").

Section 2.6     <u>Assignment and Cure Amounts.</u>

(a)     Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing and pursuant to Section 365 of the Bankruptcy Code, Seller shall assume and assign to Purchaser, and Purchaser shall take assignment from Seller, the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses pursuant to an assignment (the "<u>Assignment</u>") in the form annexed hereto as <u>Exhibit D</u>.  No contract, lease, or other agreement shall be assumed absent concurrent assignment to Purchaser.  Purchaser shall be responsible for satisfying the requirements of "adequate assurance of future performance" as required by section 365 of the Bankruptcy Code and shall cooperate fully with Seller in seeking such approval from the Bankruptcy Court, including without limitation, Purchaser providing the necessary evidence required as part of the Sale Motion to approve this Agreement and the transactions contemplated herein.

(b)     The cure amounts (collectively, the "<u>Cure Amounts</u>"), if any, as determined by the Bankruptcy Court, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of Seller under the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses shall be paid by Purchaser (or Purchaser shall have

18

delivered into escrow on terms reasonably acceptable to Seller amounts sufficient to pay any claim therefor that remains disputed as of the Closing, as such amount shall have been determined by the Bankruptcy Court) at or before the Closing (except as otherwise agreed to by the other party to the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses) and Seller shall have no Liability for any such cure amount, provided, however, that the aggregate Cure Amounts payable by or reserved to Purchaser hereunder shall be applied as a credit against the Purchase Price at Closing pursuant to Section 3.3(c) hereto. Except as provided for in Section 4.4(a)(i) hereto, Purchaser shall not have the right to terminate this Agreement as a result of the failure by Seller or inability of Seller to assign to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof) at the Closing any Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses or Purchaser's decision not to assume any Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses as to which Purchaser has not paid the related Cure Amount in accordance with this section. Consistent with the Sale Procedures Order, if requested by the Purchaser, the Seller will commence and prosecute to conclusion, in expedited proceedings before the Bankruptcy Court, objection(s) to the cure amount(s) claimed by the counterparty to any contract, lease or license; provided, however, that Purchaser will reimburse all of the actual and necessary expenses incurred by Seller in connection therewith. A good faith estimate as of the date hereof of the Cure Amounts described in this section, based on the Knowledge of Seller, is set forth on Section 2.6(b) of the Seller Disclosure Schedule. At least fifteen (15) Business Days prior to the Closing Date, the Seller shall prepare and deliver to Purchaser an updated Section 2.6(b) of the Seller Disclosure Schedule setting forth the Cure Amounts. Nothing contained in this Section 2.6 shall restrict or prohibit Purchaser's right to remove any item identified in Section 2.2(a), 2.2(b), 2.2(c), or 2.2(d) of the Seller Disclosure Schedule pursuant to the corresponding Sections thereto.

Section 2.7    Contingent Medicaid Liability.

(a)    Seller and Purchaser are aware that Seller received inquiries (the "Inquiry") from the New York State Attorney General's Medicaid Fraud Control Unit in respect of Seller's receipt of Medicaid payments from the State of New York for the provision of services by certain staff of the Business contracted from outside vendors which staff, at the time they provided the services, are alleged to have lacked the required licensure and/or certification to provide the services for which such Medicaid payments were made (the "Medicaid Payments"). Seller has not been asked, nor has any demand been made for Seller, to make any repayment in respect of the Medicaid Payments, and if such a request or demand is made, Seller shall endeavor to resolve such request or demand with the State of New York prior to the Closing Date. Subject to Section 2.7(b) hereof, if the Inquiry is not fully resolved prior to the Closing Date: (i) Purchaser shall assume and shall timely pay any monetary liability in respect of the Inquiry (the "Contingent Medicaid Liability"); and (ii) a portion of the Purchase Price equal to One Million Five Hundred Thousand Dollars ($1,500,000.00) shall, on the Closing Date, be delivered to Garfunkel Wild, P.C., in its capacity as escrow agent, pursuant to the terms of the Escrow Agreement, substantially in the form attached hereto as Exhibit E (the "Indemnity Escrow Agreement"), to fund all amounts required to be paid by the Seller pursuant to Section 2.7(c) hereof (the "Medicaid Escrow Fund") until the earlier of (x) such time as the Inquiry is

19

resolved, and (y) the date which is three (3) years from the Closing Date (the "Escrow End Date."); provided, however, that in the event that any litigation or other legal proceeding with respect to the Inquiry is commenced, the Medicaid Escrow Fund shall not be released until such proceeding has been fully and finally resolved. Pursuant to the Indemnity Escrow Agreement, any amount not paid to the Purchaser, together with all accrued investment income thereon, shall be released to the Seller upon the earlier of (A) the receipt by the Escrow Agent of a joint written instruction of an authorized representative of each of Seller and Purchaser and (B) subject to the foregoing subsection (y), the Escrow End Date.

Comment [k1]:

(b)     Notwithstanding anything to the contrary contained herein, Seller shall at all times retain the sole and exclusive right to litigate, defend, negotiate and/or resolve, in its sole discretion, the Inquiry and to communicate with the State of New York (including, but not limited to, its attorneys, agencies and/or offices) and/or any other individuals and/or entities in respect thereof, except if (i) the amount at issue in the Inquiry exceeds the Medicaid Escrow Fund, or (ii) the Inquiry remains unresolved one (1) year prior to the Escrow End Date, in either of which cases Purchaser shall be entitled at any time to participate in the litigation, defense, negotiation and/or resolution of the Inquiry with counsel of its own choice and at its sole cost and expense, and the parties agree to cooperate fully with one another in connection with the defense and/or settlement thereof. In any case, Seller shall use commercially reasonable efforts consistent with industry standards in connection with the defense and resolution of the Inquiry, including but not limited to, timely responses to all communications initiated by the State of New York and/or any other individuals and/or entities in respect thereof. In addition, Seller shall maintain and preserve and shall cause its counsel to maintain and preserve all existing records related to the Inquiry (including but not limited to documents and electronically stored information). Except as provided above, Purchaser shall take no action inconsistent with Seller's sole and exclusive right to litigate, defend, negotiate and/or resolve the Inquiry, as set forth above, including but not limited to, making any payments in respect of the Inquiry not expressly authorized in writing by Seller. Purchaser shall immediately notify Seller, and provide copies to Seller, of any correspondence it receives with respect to the Inquiry. Notwithstanding the foregoing, or any other term(s) of this Agreement, Seller does not admit to any liability in respect of the Inquiry, and Seller expressly reserves any and all rights and/or defenses, of any kind and/or nature, that it has and/or may have in connection with the Inquiry, the Medicaid Payments and/or any and all claims relating thereto, and it does not waive any of the foregoing, either in whole or in part (but this sentence shall not affect Seller's obligations under Section 2.7(c) below).

(c)     Seller hereby agrees to indemnify and hold harmless Purchaser to the extent Purchaser pays any amounts to the Medicaid Program in respect of the Contingent Medicaid Liability. Any claim for indemnification by the Purchaser pursuant to this Section 2.7 shall not exceed the amount of the Medicaid Escrow Fund and shall be satisfied exclusively by the Medicaid Escrow Fund.

Section 2.8     Further Conveyances and Assumptions.

(a)     From time to time following the Closing, each party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further

20

conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents at the Closing and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the Liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents at the Closing, and to otherwise make effective the transactions contemplated hereby and thereby; provided however that nothing herein shall obligate or otherwise require Seller to pay any claims or liabilities arising prior to the Petition Date. In the event that Purchaser or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Purchaser shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to Seller. In the event that Seller receives any Purchased Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver such Purchased Assets (or any payments or proceeds related thereto) to Purchaser.

(b)     To the extent that the assignment of any Purchased Asset shall require the consent of any other Person and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code (each, a "Nonassignable Asset"), (i) nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained, and (ii) except as provided for in Section 4.4(a)(i) hereto, Purchaser shall be obligated to close whether or not the Nonassignable Asset can be transferred and Seller agrees to reasonably cooperate with Purchaser to seek to obtain any required consent; provided however that Seller shall not be required to pay any claims or incur any other obligations in order to obtain such consent. Notwithstanding anything to the contrary contained herein, Purchaser shall not have the right to terminate this Agreement as a result of the failure by Seller or inability of Seller to assign to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof) at the Closing any Assigned Contract, Purchased Personal Property Lease, Purchased Real Property Lease or Purchased Intellectual Property License.

Section 2.9     Bulk Sales Laws.  The parties hereto hereby waive compliance by Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

Section 2.10     Accounts Receivable.

(a)     All Pre-Closing Accounts Receivable of the Business shall remain the property of Seller following the Closing. All accounts receivable relating to the operation of the Business based on services rendered after midnight on the Closing Date shall be the property of Purchaser.  For the avoidance of doubt, Seller shall be entitled to bill for and receive all amounts collected, to the extent permitted by applicable Law, in respect of services rendered by the Business before the Closing, and Purchaser shall be entitled to bill for and receive all amounts collected in respect of services rendered by the Business after the Closing.

21

(b)     Subject to Section 3.4 hereto, at Seller's request, Purchaser shall use its commercially reasonable efforts for a period of one hundred and twenty (120) days after the Closing Date to assist Seller in collecting any accounts receivable arising out of the Business before the Closing Date, at no cost to Seller. Each of Purchaser and Seller agrees that it will pay over or cause to be paid over, insofar as practicable within three (3) Business Days of receipt, to the other (and until so paid, shall hold in trust for the other) all sums received by it or any of its Affiliates in respect of or on account of the other's receivables, and provide therewith information available to it identifying the source of the amounts so paid over so to permit the other to apply correctly such amounts to the other's accounts receivable. In addition, upon reasonable request, each recipient shall allow the other (at the other's cost) to audit, access and copy any of its records relating thereto. All payments for accounts receivable arising out of the Business received from an obligor after the Closing shall be applied to the receivable specifically designated by such obligor; provided that in the event that the obligor does not specifically designate a receivable, the payment shall be applied in the order of the age of the accounts receivable of such obligor, starting with the oldest such accounts receivable provided that no undesignated payments shall be applied to any receivable aged more than two hundred and seventy (270) days. The provisions of this Section 2.10 shall survive the Closing to the extent contemplated herein.

Section 2.11     Agreement Regarding Confidentiality of Patient Information. Seller shall have no obligation to provide Purchaser with custody of Patient Records upon the Closing until Seller and Purchaser enter into a Medical Records Custody Agreement (the "Medical Records Custody Agreement") in the form attached hereto as Exhibit C, and then any such obligation of Seller is subject to Purchaser's compliance with such Medical Records Custody Agreement.

## ARTICLE III

## CONSIDERATION

Section 3.1     Consideration.

The consideration for the Purchased Assets and the performance of the agreed upon obligations shall be, subject to adjustment as provided in Section 10.1(d) hereto, the sum of (a) Seventeen Million Dollars ($17,000,000.00) (the "Purchase Price") and (b) the assumption by Purchaser of the Assumed Liabilities (subject to credit against the Purchase Price and indemnification by Seller as and to the extent provided in Section 2.7 with respect to the Contingent Medicaid Liability). In addition, Purchaser shall pay to Seller an amount equal to the Early Transfer Adjustment per Section 3.4(b) hereto.

Section 3.2     Purchase Price Deposit. Purchaser shall immediately deposit with Garfunkel Wild, P.C., in its capacity as escrow agent (the "Escrow Agent"), pursuant to that certain Escrow Agreement, dated as of the date hereof, by and among Purchaser, Seller and the Escrow Agent (the "Deposit Escrow Agreement"), by wire transfer of immediately available funds, an amount equal to five percent (5%) of the Purchase Price upon execution of this Agreement (the "Initial Deposit"). Purchaser and Seller acknowledge that Purchaser has been selected as the prevailing bidder at the Auction, and shall deposit within one (1) Business Day

22

after the conclusion of the Auction, an amount (the "Additional Deposit", if any, together with the Initial Deposit, the "Escrow Funds") equal to an amount such that together with the Initial Deposit, the Escrow Fund shall be equal to 10% of the Purchase Price, as it may be subsequently amended at the Auction, each such deposit to be released by the Escrow Agent and delivered to either Purchaser or Seller, in accordance with the provisions of the Deposit Escrow Agreement. Pursuant to the Deposit Escrow Agreement, the Escrowed Funds shall be deposited into an interest bearing account and (together with all accrued investment income thereon) distributed as follows:

(a)    upon the Closing, the Escrow Funds shall be delivered to Seller as partial consideration for the Purchased Assets, and all accrued investment income thereon shall be delivered to Purchaser at the Closing;

(b)    if this Agreement is terminated pursuant to Section 4.4(c)(ii), the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Purchaser;

(c)    if this Agreement is terminated by Seller pursuant to Section 4.4(b)(ii) hereto, the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Seller; or

(d)    if this Agreement is terminated pursuant to Section 4.4 hereto, other than by Seller pursuant to Section 4.4(b)(ii) hereto, the Escrowed Funds, together with all accrued investment income thereon, shall in each case be returned to Purchaser.

Section 3.3    Payment of Purchase Price.  On the Closing Date, Purchaser shall (a) pay the Purchase Price (less an amount equal to the sum of (i) the aggregate Cure Amounts payable by Purchaser, and/or required to be deposited in escrow by Purchaser, under Section 2.6 hereof; (ii) the Escrow Funds being released to SVCMC on the Closing Date pursuant to Section 3.2 hereto; and (iii) the amount of the Medicaid Escrow Fund) at the Closing by wire transfer of immediately available funds into an account designated by Seller; (b) pay the amount of the Medicaid Escrow Fund, if any, at the Closing by wire transfer of immediately available funds to an escrow account maintained by the Escrow Agent as provided in Section 2.7 and the Indemnification Escrow Agreement; and (c) deposit cash in escrow equal to such amount (if any) as is required by Section 2.6 hereto.

Section 3.4    Transition Billing.

(a)    With respect to patients who are admitted to the Business before midnight on the Closing Date and whose care shall continue after midnight on the Closing Date (such patients being referred to herein as "Transition Patients"), between thirty (30) and forty-five (45) days before the Closing Date, Seller shall prepare cut-off billings for all Transition Patients, provided that the New York State Public Health Council contingent approval of the transactions contemplated in this Agreement and the operation of the Business by the Purchaser has been received.  Seller shall be entitled to bill for and receive all amounts collected in respect of such cut-off billings and Purchaser shall have no right thereto.  Subject to patient choice,

23

Purchaser shall admit such patients immediately following midnight on the Closing Date and Seller shall simultaneously discharge them in accordance with the Transition Plan referred to in Section 8.15 hereto.

(b)     Purchaser, independently and in its role as manager following the effective date of the Interim Agreement, shall use its reasonable commercial efforts to encourage patients to choose to continue their care with Seller's Business up until the Closing Date, whether they select to continue their care after the Closing Date with Purchaser or another provider. Purchaser agrees that it will not transfer Transition Patients to its own care prior to Closing. If Purchaser transfers patients to its own care prior to Closing, Purchaser agrees to reimburse Seller, as a Closing adjustment, for all of Seller's (i) direct and indirect costs and expenses, and (ii) lost revenues associated with the care of such patient prior to Closing (collectively, the "Early Transfer Adjustment"). Prior to filing a motion with the Bankruptcy Court to approve this Agreement, the parties shall agree upon a formula for calculating the Early Transfer Adjustment, including allocating the revenue and expenses associated with those Transition Patients who are transferred to Purchaser prior to the Closing Date, so that the Seller's estate is reimbursed for the costs and revenues relating to such patients. Nothing herein shall limit Seller's rights and remedies under Section 4.4(b) hereto and elsewhere in this Agreement.

## ARTICLE IV

## CLOSING AND TERMINATION

Section 4.1     Closing Date. Subject to the satisfaction of the conditions set forth in Article X hereto (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereto (the "Closing") shall take place at the offices of Garfunkel Wild, P.C. located at 111 Great Neck Road, Suite 503, Great Neck, NY 11021 (or at such other place as Seller and Purchaser may designate in writing) at 10:00 a.m. (New York time) on a date agreed upon by Seller and Purchaser that is not less than three (3) or more than seven (7) Business Days following the satisfaction or waiver of the conditions set forth in Article X hereto (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) unless another time or date, or both, are agreed to in writing by Seller and Purchaser. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." With respect to the Closing, unless otherwise agreed by Seller and Purchaser in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of Seller in the assets to be acquired by Purchaser hereunder at the Closing, and any Assumed Liability and all risk of loss with respect to the Business, shall be considered to have passed to Purchaser as of 11:59 p.m. (New York time) on the Closing Date.

Section 4.2     Deliveries by Seller. At the Closing, Seller shall deliver to Purchaser:

(a)     a duly executed bill of sale in a form reasonably acceptable to Purchaser and Seller;

24

(b)     the Assignment, substantially in the form of Exhibit D, duly executed by Seller;

(c)     the Indemnity Escrow Agreement, if any, substantially in the form of Exhibit E, duly executed by Seller;

(d)     the officer's certificates required to be delivered pursuant to Sections 10.1(a) and 10.1(b) hereto;

(e)     the Medical Records Custody Agreement between Purchaser and Seller, substantially in the form attached hereto as Exhibit C, duly executed by Seller;

(f)     copies of all consents and notices required by Section 10.2(c) hereto for which Seller is responsible;

(g)     all other instruments of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser free and clear of all Liens (except Permitted Liens) (provided however that the Sale Order shall be the only required document to evidence the conveyance and transfer free and clear of such Liens); and

(h)     such other Documents, instruments and certificates necessary to transfer the Purchased Assets as Purchaser may reasonably request no later than four (4) days before Closing.

Section 4.3     Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to Seller:

(a)     the Purchase Price, in immediately available funds, in accordance with Section 3.3 hereto;

(b)     a duly executed bill of sale in form reasonably acceptable to Purchaser and Seller;

(c)     the Assignment, substantially in the form of Exhibit D, duly executed by Purchaser;

(d)     the Indemnity Escrow Agreement, if any, substantially in the form of Exhibit E, duly executed by Purchaser;

(e)     the Medical Records Custody Agreement between Purchaser and Seller, substantially in the form attached hereto as Exhibit C, duly executed by Purchaser;

(f)     the officer's certificates required to be delivered pursuant to Sections 10.2(a) and 10.2(b) hereto;

(g)     copies of all consents and notices required by Section 10.1(d) hereto for which Purchaser is responsible;

25

(h)     a copy of any notification that Purchaser is required under the Deposit Escrow Agreement to deliver to the Escrow Agent in order for the Escrow Agent to release the Escrowed Funds to Seller at the Closing;

(i)     evidence reasonably acceptable to Seller of Purchaser's deposit in escrow of such amounts (if any) required by Section 2.6 hereto; and

(j)     such other Documents, instruments and certificates necessary to transfer the Purchased Assets as Seller may reasonably request no later than four (4) days before Closing.

Section 4.4     Termination of Agreement.

(a)     Termination by Purchaser.     Purchaser may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)     if Seller fails or is unable to assign to Purchaser those Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses listed on Section 4.4(a)(i) of the Purchaser Disclosure Schedule;

(ii)     if any of the conditions to the obligations of Purchaser to close that are set forth in Sections 10.1 and 10.3 hereto shall have become incapable of fulfillment other than as a result of a breach by Purchaser or its Affiliates of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser; provided that the right to terminate this Agreement pursuant to this Section 4.4(a)(ii) shall not apply with respect to the approvals of Governmental Bodies addressed in Sections 4.4(c)(iii) and (c)(iv) hereto, which are addressed and provided for in such Sections;

(iii)     if there shall be a breach by Seller of any representation or warranty, or any covenant or agreement contained in this Agreement, which breach would result in a Material Adverse Effect and cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Purchaser to Seller of such breach;

(iv)     so long as Purchaser is not then in breach of its obligations under this Agreement in any material respect, if the Sale Order is not entered within sixty (60) days from the date the Sale Motion is filed; or

(v)     if the Sale Order or Bidding Procedures Order has been vacated, reversed or modified in a material manner with respect to Purchaser's rights or protections thereunder without Purchaser's prior written consent.

(b)     Termination by Seller.     Seller may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)     if any of the conditions to the obligations of Seller to close that are set forth in Sections 10.2 and 10.3 hereto shall have become incapable of fulfillment

26

other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller; provided that the right to terminate this Agreement pursuant to this Section 4.4(b)(i) shall not apply with respect to the approvals of Governmental Bodies addressed in Sections 4.4(c)(iii) and (c)(iv) hereto, which are addressed and provided for in such Sections;

(ii)     if there shall be a breach by Purchaser of any representation or warranty, or by Purchaser of any covenant or agreement contained in this Agreement, which breach would preclude the Purchaser from consummating the Contemplated Transactions or performing its obligations under this Agreement and cannot be cured or has not been cured by within twenty (20) Business Days after the giving of written notice by Seller to Purchaser of such breach; or

(iii)     if the Bidding Procedures Order or the Sale Order are reversed or materially modified (other than a reversal or modification sought by Seller.

(c)     Termination by Purchaser or Seller. Either Purchaser or Seller may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)     by mutual written consent of Seller and Purchaser;

(ii)     if the Bankruptcy Court shall enter an Order approving a Competing Bid and a transaction associated with that bid actually closes, subject to the provisions of the Bidding Procedures Order and the Sale Order;

(iii)     upon twenty (20) Business Days' written notice to the other party after the later of either (A) November 15, 2010 or (B) three (3) months after the entry of the Sale Order by the Bankruptcy Court, if either Purchaser or Seller reasonably determines, after consultation with the other party, that insufficient progress is being made on the CON Application so that it is more likely than not that DoH will not provide such CON Approval by the CON Termination Date. Notwithstanding the foregoing, neither Purchaser nor Seller may terminate this Agreement under this Section 4.4(c)(iii) if within such twenty (20) Business Day period DoH provides the CON Approval or Seller receives from DoH reasonably satisfactory assurances that Purchaser will receive the CON Approval by the CON Termination Date;

(iv)     upon twenty (20) Business Days' written notice to the other party if the Closing shall not have occurred by the close of business on November 15, 2010, (the "CON Termination Date"); provided that such termination pursuant to this Section 4.4(c)(iv) shall not be effective if within such twenty (20) Business Day period all outstanding required regulatory approvals shall have been obtained and all other closing conditions shall have been satisfied; provided, further, that if the Closing shall not have occurred on or before the CON Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement, then the breaching party or its Affiliates may not terminate this Agreement pursuant to this Section 4.4(c)(iv); or

27

(v)　upon twenty (20) Business Days' prior written notice to the other party if DoH revokes its agreement to waive any Medicaid successor liability of Purchaser for Healthcare Program Liabilities arising from events prior to the Closing Date (other than the Contingent Medicaid Liability) in connection with the issuance of emergent CON Approval, as reasonably determined by Purchaser and Seller.

(d)　Extension of Time Periods. The time periods for termination of this Agreement set forth in this Section 4.4 may be extended upon the written agreement of the parties without the further consent of the Bankruptcy Court.

Section 4.5　Procedure for Termination. In the event of termination of this Agreement by Purchaser or Seller, or both, pursuant to Section 4.4 hereto, written notice thereof shall forthwith be given to the other party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 4.4 hereto) the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 4.6 hereto, without further action by the parties.

Section 4.6　Effect of Termination.

(a)　In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any party; provided that the obligations of the parties set forth in the Confidentiality Agreement, Deposit Escrow Agreement, Indemnity Escrow Agreement, Sections 3.2, 4.6, 7.1, 7.2 and 8.6 hereto and Article XII hereto, and to the extent necessary to effectuate the foregoing enumerated provisions, Article I hereto, shall survive any such termination and shall be enforceable in accordance with their terms. In addition, if this Agreement is terminated as provided herein, Purchaser shall upon request redeliver to Seller as soon as practicable any or all Documents, work papers and other material relating to the Business, whether obtained before or after the execution hereof, together with written certification by an authorized officer of Purchaser who has supervised its compliance with this sentence that confirms such compliance.

(b)　Nothing in this Section 4.6 shall relieve the parties of any Liability for a breach of this Agreement prior to the date of termination of this Agreement. If this Agreement is terminated in accordance with Sections 4.4 and 4.5 hereto, Purchaser shall not, directly or indirectly, and shall cause its Affiliates not to, for a period of one (1) year from the date of this Agreement, solicit, or recruit, any Employee of Seller, or any member of Seller's professional staff principally engaged in the Business, without Seller's consent; it being understood that routine job postings and solicitations of a generalized nature do not constitute such direct solicitations.

28

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as otherwise disclosed to Purchaser in a schedule delivered to Purchaser by Seller prior to the execution of this Agreement (the "Seller Disclosure Schedule"), and except for the effects of the commencement of the Bankruptcy Case, Seller hereby represents and warrants to Purchaser as follows:

Section 5.1  Organization and Good Standing.  Seller is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the State of New York, and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 5.2  Authorization of Agreement.  Subject to entry of the Sale Order, (a) Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action, including approval of its members (as applicable), necessary for it to validly execute and deliver, this Agreement and each other agreement, document, or instrument or certificate contemplated by this Agreement to be executed and delivered by Seller in connection with entering into this Agreement and (b) subject to the satisfaction of the conditions referred to in Section 5.3 hereto, Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action necessary for it to validly execute and deliver, each agreement, document, or instrument or certificate contemplated by this Agreement to be executed by Seller in connection with the consummation of the Contemplated Transactions (together with the other Documents, other than this Agreement, referred to in clause (a) of this sentence, the "Seller Documents") and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  This Agreement and each of the Seller Documents contemplated to be executed and delivered in connection with Seller entering into this Agreement have been, and each other Seller Document will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Sale Order, and, with respect to Seller's obligations under Section 7.1 hereto, the entry of the Bidding Procedures Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a Legal Proceeding at law or in equity).  None of the execution and delivery by Seller of this Agreement and the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Seller.

29

Section 5.3    Consents of Third Parties; Contractual Consents.

(a)    Except as set forth in <u>Section 5.3</u> of the Seller Disclosure Schedule, Seller is not required to obtain any consent, waiver, approval, Order, Permit or authorization of, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Seller Documents by Seller, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order, (ii) the entry of the Bidding Procedures Order with respect to Seller's obligations under <u>Section 7.1</u> hereto,  (iii) the Healthcare Regulatory Consents, and (iv) approvals under applicable Antitrust Laws.

(b)    Except as set forth on <u>Section 5.3(b)</u> of the Seller Disclosure Schedule and as otherwise superseded by the applicable provisions of the Bankruptcy Code, none of the execution and delivery by Seller of this Agreement or any of the Seller Documents, the consummation of the Contemplated Transactions by Seller, or compliance by Seller with any provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Assigned Contract or Permit applicable to the Business.

Section 5.4    <u>Financial Information.</u>  SVCMC has made available to Purchaser (i) Seller's unaudited trial balance for Home Health Business as of December 31, 2009, December 31, 2008 and December 31, 2007 (collectively, the "Year End Trial Balance"), and (ii) Seller's unaudited trial balance as of January 31, 2010 (the "Interim Trial Balance"), and together with the Year End Trial Balance, the "Trial Balances").  The Trial Balances have been compiled from the books and records of the Home Health Business as at the date and correctly reflect, in all material respects, the revenues and direct expenses of the Business for each of the three years ended December 31, 2009 and for the month ended January 31, 2010.

Section 5.5    <u>Title to Purchased Assets.</u>  Except as set forth in <u>Section 5.5</u> of the Seller Disclosure Schedule, and other than the real property subject to the Real Property Leases, intellectual property licensed to Seller and the personal property subject to the Personal Property Leases, Seller owns each of the Purchased Assets, and Purchaser will, as of the time set forth in the last sentence of Section 4.1, be vested with good title to such Purchased Assets, subject to entry of the Sale Order, free and clear of all Liens, other than Permitted Liens, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

Section 5.6    <u>Real Property.</u>

(a)    <u>Section 5.6(a)</u> of the Seller Disclosure Schedule sets forth a true, correct and complete list of (i) all real property and interests in real property owned in fee by Seller and exclusively used in the Business (the "<u>Owned Properties</u>"), and (ii) all real property and interests in real property leased or licensed by Seller and exclusively used in the Business, as lessee, lessor, licensee or licensor (the "<u>Real Property Leases</u>").  Seller has (A) insurable fee simple title to all Purchased Owned Property, free and clear of all Liens except Liens set forth in

30

<u>Section 5.6(a)</u> of the Seller Disclosure Schedule and Permitted Liens and (B) a valid leasehold interest in the Purchased Real Property Leases, subject to entry of the Sale Order, free and clear of all Liens other than Permitted Liens.

(b)     All Purchased Real Property Leases are in full force and effect. Except as set forth in <u>Section 5.6(b)</u> of the Seller Disclosure Schedule and as otherwise superseded by the applicable provisions of the Bankruptcy Code, Seller has not received written notice of any default which remains uncured, and, to the Knowledge of Seller, the other parties under each of the Purchased Real Property Leases have complied in all material respects therewith, and are not in default thereunder beyond any applicable notice and cure periods.

(c)     Except as set forth in <u>Section 5.6(c)</u> of the Seller Disclosure Schedule, to the Knowledge of Seller, there is no pending or threatened legal action affecting the Purchased Real Property, including any condemnation actions.

Section 5.7     <u>Tangible Personal Property</u>.  Section 5.7 of the Seller Disclosure Schedule sets forth all leases of personal property, including Equipment, exclusively used by Seller in the operation of the Business ("<u>Personal Property Leases</u>") that involve annual payments in excess of $10,000.  Except as set forth in <u>Section 5.7</u> of the Seller Disclosure Schedule, Seller is not in material breach or default thereunder.

Section 5.8     <u>Intellectual Property</u>.  Seller has licenses to use all Third-Party Software used in the operation of the Business as now operated.

Section 5.9     <u>Material Contracts.</u>

(a)     <u>Section 5.9(a)</u> of the Seller Disclosure Schedule sets forth a list of all of the following Contracts to which Seller is a party or by which it is bound and that are exclusively related to the Business or by which the Purchased Assets may be bound or affected and that are Assigned Contracts (collectively, the "<u>Material Contracts</u>"):

(i)     Contracts with any Affiliate or current or former officer or director of Seller;

(ii)     Any clinical affiliation agreements with healthcare providers relating to the Business;

(iii)     Contracts with any labor union or association representing any Employees of Seller;

(iv)     Any written employment, confidentiality, non-competition, severance or termination agreements as to employees or consultants of the Business;

(v)     Contracts with a Governmental Body;

(vi)     Contracts which involve the annual expenditure of more than $100,000 in the aggregate or require performance by any party more than one year from the

31

date hereof that, in either case, are not terminable by Seller without penalty on less than one hundred eighty (180) days' notice.

(b)     True and complete copies of the Material Contracts have been made available to Purchaser by Seller prior to the date of this Agreement.

(c)     Except (i) as otherwise provided in the Bankruptcy Code, (ii) for events of default arising as a result of the commencement of the Bankruptcy Case, or (iii) for general principles of equity that may limit the specific performance of particular provisions, each Material Contract is a legal, valid and binding obligation of Seller and is enforceable by Seller against the other party or parties to such Material Contract in accordance with its terms, and Seller is not in material breach or default thereunder.

Section 5.10   Employees; Employee Benefits.

(a)     Section 5.10(a) of the Seller Disclosure Schedule sets forth a true and complete list of all Plans. Each Plan has been administered and is in compliance with the terms of such Plan and in accordance with all other applicable Laws where the failure thereof would have a Material Adverse Effect.

(b)     Except as set forth in Section 5.10(b) of the Seller Disclosure Schedule, no "reportable event" (as such term is used in Section 4043 of ERISA), "prohibited transaction" (as such term is used in Section 406 of ERISA or Section 4975 of the Code) or "accumulated funding deficiency" (as such term is used in Section 412 or 4971 of the Code) has heretofore occurred with respect to any Plan which would have a Material Adverse Effect.

Section 5.11   Employment and Labor.

(a)     Section 5.11(a) of the Seller Disclosure Schedule (i) sets forth a true and complete list of all Employees as of the date set forth therein (ii) shall be delivered by Seller to Purchaser not later than three (3) Business Days after the entry of the Sale Order and (iii) to the Knowledge of the Seller, accurately sets forth in all material respects the following information: (1) the name and position; (2) date of hire; (3) current annual salary or hourly wage; (4) average number of hours worked per week; (5) date of last salary increase; if any. Thereafter and prior to the Closing Date, Seller shall likewise deliver as soon as practicable to Purchaser updates to Section 5.11(a) of the Seller Disclosure Schedule.

(b)     Seller will make available to Purchaser complete and accurate copies of each material employment, consulting or similar agreements between Seller and any service provider to the Business.

Section 5.12   Compliance with Laws; Permits.

(a)     Seller is duly authorized by DoH to operate the Business. The operating certificate issued to the Business authorizes the operation of the CHHA in the following Counties: Bronx, Kings, Nassau, New York, Queens, Richmond, Suffolk and Westchester.

32

(b)     Seller is eligible to receive payment under Titles XVIII and XIX of the Social Security Act and is a "provider" under existing provider agreements with the Medicare and Medicaid programs (collectively, the "Healthcare Programs") through the applicable intermediaries. Except as set forth in Section 5.12(b) of the Seller Disclosure Schedule, there is no pending or to Seller's Knowledge, threatened Legal Proceeding under the Healthcare Programs involving the Business.

(c)     Except as set forth in Section 5.12(c) of the Seller Disclosure Schedule and except with respect to the Purchased Real Property, to the Knowledge of Seller, Seller is in compliance in all material respects with Laws and Permits applicable to the Purchased Assets or the Business.

(d)     Except as a result of the Bankruptcy Case, there are no outstanding Orders, injunctions or decrees of any Governmental Body that apply to the Business or the Purchased Assets.

(e)     The Seller has all Permits that are necessary to enable it to own, lease or otherwise hold the Purchased Assets and to operate the Business as currently conducted. Such permits are in full force and effect and to Seller's Knowledge, no proceedings are pending or threatened that would have the effect of revoking or limiting the transfer of the Permits.

Section 5.13   Absence of Certain Developments.   Except as expressly contemplated by this Agreement or as set forth on Section 5.13 of the Seller Disclosure Schedule, since December 31, 2009 the Seller has conducted the Business in the Ordinary Course of Business and has made commercially reasonable efforts to preserve the goodwill of the Business and its relationship with patients and suppliers with whom it deals in connection with the Business.

Section 5.14   Taxes.   Seller is an entity exempt from federal income tax under Section 501(c)(3) of the Code and exempt from New York State income, corporate or franchise tax under the comparable provisions of the Tax Law of the State of New York, and to Seller's Knowledge, there is no action pending by any Tax Authority to revoke its tax-exempt status.

Section 5.15   Litigation.   Except as set forth in Section 5.15 of the Seller Disclosure Schedule, there are no Legal Proceedings pending or, to the Knowledge of Seller, threatened against Seller involving the Business or the Purchased Assets.

Section 5.16   Financial Advisors.   Except as set forth in Section 5.16 of the Seller Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the Contemplated Transactions and no Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

Section 5.17   No Other Representations or Warranties; Schedules.   Except for the representations and warranties contained in this Article V (as modified by the Seller Disclosure Schedules), neither Seller nor any other Person makes any other representation or warranty whether express or implied, written or oral, with respect to Seller, the Business, the Purchased Assets, the Assumed Liabilities or the Contemplated Transactions, and Seller disclaims any other

33

representations or warranties, whether made by Seller, its Affiliates or any of their respective officers, directors, members, employees, agents, consultants or other Representatives. Except for the representations and warranties contained in this Article V (as modified by the Seller Disclosure Schedules), Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser or its Representatives by any director, officer, member, employee, agent, consultant or other Representative of Seller or any of its Affiliates). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business. Seller makes no implied representation or warranty as to the condition, merchantability, usage, suitability or fitness for any particular purpose with respect to the Purchased Assets except for the representations and warranties contained in this Article V (as modified by the Seller Disclosure Schedules). The disclosure of any matter or item in any Section of the Seller Disclosure Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect. The representations and warranties of Seller in this Agreement are for diligence purposes only and do not survive the Closing, however their disclaimers survive.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as otherwise disclosed to Seller in a schedule delivered to Seller by Purchaser prior to the execution of this Agreement (the "Purchaser Disclosure Schedule"), Purchaser hereby represents and warrants to Seller as follows:

Section 6.1    Organization and Good Standing. Purchaser is a not-for-profit corporation duly organized, validly existing and in good standing under the Laws of the State of New York and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 6.2    Authorization of Agreement. Purchaser has all requisite power, authority and legal capacity to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by it in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly and validly authorized by all necessary corporate action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior the Closing, duly and validly executed and delivered by Purchaser, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the

34

legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a Legal Proceeding at law or in equity). None of the execution and delivery by Purchaser of this Agreement and the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Purchaser.

Section 6.3     Conflicts; Consents of Third Parties.

(a)      Except as set forth in Section 6.3(a) of the Purchaser Disclosure Schedule, Purchaser is not required to obtain any consent, approval, authorization, waiver, Order or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) the Healthcare Regulatory Consents, (ii) approvals under applicable Antitrust Laws and (iii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications (A) that have already been obtained or made or (B) of which the failure to have obtained or made would not have a Material Adverse Effect or would not reasonably be expected to prevent or materially delay the ability of Purchaser to perform or consummate the Contemplated Transactions.

(b)      Except as set forth in Section 6.3(b) of the Purchaser Disclosure Schedule, none of the execution and delivery by Purchaser of this Agreement or any of the Purchaser Documents, the consummation of the Contemplated Transactions by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser or any of its Affiliates is a party or by which any of the properties or assets of Purchaser or any of its Affiliates are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the Contemplated Transactions.

Section 6.4     Litigation. There are no Legal Proceedings pending or, to the Knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions. Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions.

35

Section 6.5    Financial Advisors.    Except as set forth in Section 6.5 of the Purchaser Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the Contemplated Transactions and no Person is entitled to any fee or commission or like payment from Seller in respect thereof.

Section 6.6    Healthcare Regulatory Compliance Status.

(a)    To Purchaser's Knowledge, no fact exists that would cause DoH to recommend disapproval of its CON Application on the basis of character, competency or financial feasibility or which could reasonably be expected to prevent or materially delay the consummation of the Contemplated Transactions by Purchaser.

Section 6.7    Acknowledgement Regarding Condition of the Business.    Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, whether express or implied or written or oral, beyond those expressly given by Seller to Purchaser in Article V hereto (as modified by the Seller Disclosure Schedule), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred to Purchaser on a "WHERE IS" and, as to condition, "AS IS" basis.    Purchaser further represents that neither Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, written or oral, as to the accuracy or completeness of any information regarding Seller, the Business or the Contemplated Transactions not expressly set forth in this Agreement, and neither Seller, any of their Affiliates or any other Person will have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or the use by Purchaser or any of its Affiliates of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its Representatives, or any other document or information in any form provided to Purchaser or its Representatives in connection with the sale of the Business and the Contemplated Transactions.    Purchaser acknowledges that it, along with its Representatives, has conducted to its satisfaction, its own independent investigation of the Business and the Purchased Real Property and, in making the determination to proceed with the Contemplated Transactions, Purchaser has relied on the results of its own independent investigation.    The Purchased Real Property is being sold by Seller and Purchaser agrees to accept the Purchased Real Property in "as-is" and "where-is" condition on the Closing Date.

Section 6.8    Financing.    Purchaser has and on the Closing Date Purchaser will have sufficient funds on hand to consummate the Contemplated Transactions.    Purchaser acknowledges that it shall not be a condition to the obligations of Purchaser to consummate the Contemplated Transactions that Purchaser have sufficient financial resources for payment of the Purchase Price.

Section 6.9    No Other Representations or Warranties; Schedules.    Except for the representations and warranties contained in this Article VI (as modified by the Purchaser Disclosure Schedules), neither Purchaser nor any other Person makes any other representation or warranty, whether express or implied, written or oral, with respect to Purchaser or the

36

Contemplated Transactions, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser or any of their respective officers, directors, members, managers, employees, agents, consultants or other Representatives. Except for the representations and warranties contained in this Article VI (as modified by the Purchaser Disclosure Schedules), Purchaser disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Seller by any director, officer, member, manager, employee, agent, consultant, or other Representative of Purchaser or any of its Affiliates). The disclosure of any matter or item in any Section of the Purchaser Disclosure Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

Section 7.1    Competing Transaction.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or otherwise better competing bids (each a "Competing Bid") in accordance with the Bidding Procedures Order. If one or more Competing Bids are received, Seller shall conduct an auction of the Purchased Property in accordance with the Bidding Procedures Order (the "Auction").

(b)    Seller is permitted to cause its representatives and affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person (in addition to Purchaser and its affiliates, agents and representatives) in connection with any sale or other disposition of all or any part of the Purchased Assets. In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Purchased Assets to prospective purchasers.

Section 7.2    Break-Up Fee.

(a)    In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, in the event that Seller does not consummate the transaction contemplated by this Agreement with Purchaser by reason of Seller's consummation of a Competing Bid, Purchaser shall be entitled to a break-up fee in an amount equal to Three Hundred Thousand Dollars ($300,000.00) (the "Break-Up Fee").

(b)    The Break-Up Fee shall be due and payable to Purchaser on the first Business Day following the date of the closing of a transaction that is the subject of a Competing Bid, and shall only be payable from the proceeds of such a transaction. In addition, in the event the Auction occurs, on the first Business Day following the conclusion of the

37

Auction, the Escrow Agent shall return the Initial Deposit (it being understood that the Additional Deposit will not yet have been paid) upon receipt by Seller of a similar deposit from the party making the successful Competing Bid.

(c)     Seller acknowledges and agrees that (a) the approval of the Break-Up Fee is an integral part of the transactions contemplated by this Agreement, (b) in the absence of Seller's obligation to pay the Break-Up Fee and its agreement to request such status, Purchaser would not have entered into this Agreement, (c) the entry of Purchaser into this Agreement is necessary for preservation of the estate of Seller and is beneficial to Seller and (d) the Break-Up Fee is reasonable in relation to Purchaser's efforts and to the magnitude of the Contemplated Transactions..

Section 7.3   Bankruptcy Court Filings.  No later than five (5) Business Days after the execution of this Agreement, Seller shall file with and seek the approval of the Bankruptcy Court of the Sale Motion, including the Break-Up Fee.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other Documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  In the event the entry of the Bidding Procedures Order or Sale Order shall be appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.

Section 7.4   Notice of Sale.  Notice of the sale of Purchased Assets contemplated in this Agreement shall be served in accordance with the Bidding Procedures Order.

Section 7.5   Treatment of Monetary Obligations.  All monetary obligations of the Seller to Purchaser, including but not limited to the Break-Up Fee and the obligation of the Seller in respect of Transfer Taxes (if any), shall be entitled to administrative expense priority in the Bankruptcy Case.

## ARTICLE VIII

## COVENANTS

Section 8.1   Access to Information.  Subject to Section 2.11 hereto and the other provisions of this Section 8.1 and subject to compliance with applicable Antitrust Laws, Seller agrees that, prior to the Closing Date, and at its own expense, Purchaser shall be entitled, through its Representatives, to make such investigation of the assets, properties and operations of the Business and such examination of the books and records of Seller pertaining to the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and, and at its own expense, to make extracts and copies of such books and records; it being understood, however, that the foregoing shall not entitle Purchaser to access (a) the books, records and Documents referred to in Section 2.3(h) hereto, or (b) any books, records or Documents the disclosure of which by Seller to Purchaser would (i) notwithstanding Section 2.11 hereto, violate any patient

38

confidentiality obligation of Seller or (ii) any other agreement or any obligation of confidentiality to which Seller is a party or is bound prior to the date hereof or (iii) any obligation of confidentiality by which Seller is bound under applicable Law. In addition, if Purchaser is the successful bidder at Auction, Purchaser shall be permitted to have access to Patient Records and employee files solely for the purpose of implementing the Transition Plan set forth in Section 8.15 of the Purchaser Disclosure Schedule. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, any request for such examination shall be made to one of the Persons identified in Section 8.1 of the Seller Disclosure Schedule, and Purchaser's use of the information disclosed by Seller shall be subject to any applicable agreement to which Seller is a party or is bound prior to the date hereof or under applicable Law. Seller shall cause its Representatives to cooperate with Purchaser and its Representatives in connection with such investigation and examination, and Purchaser and its Representatives shall cooperate with Seller and its Representatives and shall use its commercially reasonable efforts to minimize any disruption to Seller's business and operations, including the Business. Notwithstanding anything herein to the contrary, Seller shall not be required to permit any such investigation or examination if, and to the extent that, Seller, upon advice of counsel, determines that such investigation or examination by Purchaser would or is reasonably likely to result in a loss of any attorney-client or attorney work product privilege available to Seller.

Section 8.2    Conduct of the Business Pending the Closing.

(a)    Subject to the terms and conditions of the Interim Agreement, during the period from the date hereof through and including the Closing, except (i) as set forth in Section 8.2 of the Seller Disclosure Schedule, (ii) as required by applicable Law (including without limitation as a result of the commencement of the Bankruptcy Case), (iii) as otherwise expressly provided in this Agreement, or (iv) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Seller shall use commercially reasonable efforts to:

(A)    operate the Business in the Ordinary Course of Business;

(B)    (I) maintain the Purchased Assets consistent with past practice, ordinary wear and tear excepted and (II) maintain commercially reasonable insurance coverage in place with respect to the Purchased Assets;

(C)    perform when due all material obligations under the Assigned Contracts, the Purchased Intellectual Property Licenses, the Purchased Real Property Leases and the Purchased Personal Property Leases except to the extent such performance is excused under the Bankruptcy Code or by order of the Bankruptcy Court;

(D)    maintain the books and records of the Business in the Ordinary Course of Business;

(E)    maintain the Permits applicable to the Business; and

39

(F)     retain staff employed in the Business with the goal of maintaining the ongoing operation thereof. In connection with such efforts, however, Seller will not be obligated to make any retention or severance payments or pay any other amounts or incur any other obligations.

(b)     Without limiting the generality of the foregoing, from the date of this Agreement through and including the Closing, Seller shall not, except (i) as set forth in Section 8.2 of the Seller Disclosure Schedule, (ii) as required by applicable Law (including without limitation as a result of the commencement of the Bankruptcy Case), (iii) as otherwise expressly provided in this Agreement or (iv) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), solely as it relates to the Business:

(A)     other than in the Ordinary Course of Business, including, but not limited to, as may be required by a CBA materially increase the annual level of compensation of any Employee, (II) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any Employee, or (III) with respect to any Employee, increase the coverage or benefits available under any (or create any new) Plan except, in each case, as required by applicable Law from time to time in effect or by any of the Plans or the Employee pension plans maintained by Seller;

(B)     sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets (except pursuant to an existing Contract in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets); or

(C)     agree to do anything prohibited by this Section 8.2.

Section 8.3     Consents; Insurance.

(a)     Through the filing of the Sale Motion and except as may be satisfied through the entry of the Sale Order, Seller shall use its commercially reasonable efforts, and Purchaser shall cooperate with Seller, including by taking the actions referred to in Section 8.4 hereto, to obtain at the earliest practicable date following entry of the Sale Order all necessary consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Seller (including all consents listed in Section 5.3 of the Seller Disclosure Schedule), and to give at the earliest practicable date following entry of the Sale Order any notices required to be given by Seller, in order for Seller to consummate the Contemplated Transactions on the terms and in the manner provided hereby; provided that Seller shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than postpetition filing or postpetition application fees payable to any Governmental Body) or to initiate any litigation or Legal Proceedings to obtain any such item except as otherwise provided by Section 8.4 hereto. Purchaser shall use its commercially reasonable efforts, and Seller shall cooperate with Purchaser, including by taking the actions referred to in Section 8.4 hereto, to obtain at the earliest practicable date following entry of the Sale Order all consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Purchaser, and to give at the earliest practicable date following entry of the

40

Sale Order any notices required to be given by Purchaser, in order for Purchaser to consummate the Contemplated Transactions on the terms and in the manner provided hereby and to operate the Business after the Closing; provided that Purchaser shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any litigation or Legal Proceedings to obtain any such consent or approval except as otherwise provided by Section 8.4 hereto.

(b)     As of the Closing, Purchaser shall have appropriate insurance coverage in place with respect to the Business consistent with what would be maintained under good industry business practices.

Section 8.4     Regulatory Approvals.

(a)     Purchaser shall, at its own cost and expense, submit to DoH a request for the issuance of a temporary authorization to conduct the Business on an emergent basis, subject to submission by Purchaser to DoH of a permanent DoH Application thereafter, within two (2) Business Days after the entry of the Sale Order. Purchaser shall, at its own cost and expense, (i) within the later of thirty (30) Business Days after the date of this Agreement or five (5) Business Days after entry of the Sale Order by the Bankruptcy Court, provide to Seller a draft of the CON Application and consult with Seller regarding such application; (ii) within five (5) Business Days after the entry of the Bidding Procedures Order by the Bankruptcy Court, cooperate with Seller in initiating informal discussions with DoH concerning the form and substance of the CON Application; (iii) within the later of five (5) Business Days after submission of a draft CON Application to Seller by Purchaser pursuant to Section 8.4(a)(i) or twenty (20) Business Days after the entry of the Sale Order by the Bankruptcy Court, formally submit the CON Application to DoH; and (iv) promptly after the entry of the Sale Order by the Bankruptcy Court, submit to any other Governmental Body all other applications for any Healthcare Regulatory Consents required in order for Purchaser to consummate the Contemplated Transactions and to operate the Business in accordance with applicable Law (collectively with the CON Application, the "Healthcare Applications"). Purchaser shall provide Seller with an opportunity to review the Healthcare Applications in advance of filing, and both parties shall cooperate in the preparation and prosecution of the Healthcare Applications. Purchaser shall use best efforts to prosecute the Healthcare Applications and shall timely submit all information and Documents requested in connection therewith by DoH and any other Governmental Body. Without limiting the generality of the foregoing, Purchaser shall immediately take such actions as may be reasonably necessary to cure any character or competency objection that DoH may raise to the CON Application, including removing or replacing any officer or director that fails to obtain character and competency approval from DoH. Purchaser shall provide Seller with prompt written notice of Purchaser's submission of a Healthcare Application. Within three (3) Business Days of its submission or receipt, Purchaser shall deliver to Seller a complete copy of all correspondence to or from DoH or any other applicable Governmental Body having jurisdiction concerning a Healthcare Application. Purchaser shall provide Seller with periodic reports of Purchaser's efforts to obtain all Healthcare Regulatory Approvals. In addition, Purchaser shall provide Seller with notice as promptly as practicable of its receipt of DoH's approval, contingent approval or a rejection of the

41

CON Application, along with a copy of any documentation related thereto. Purchaser shall not knowingly take any action prior to the Closing intended to disqualify Purchaser as an established and licensed operator of the Business.

(b)     If necessary, each of Purchaser and Seller shall use its commercially reasonable efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under any of the Antitrust Laws with respect to the Contemplated Transactions (including such submission to the Antitrust Bureau of the Office of the Attorney General of the State of New York (the "Antitrust Bureau") as may be required in connection with the CON Application under the Donnelly Act (New York General Business Law Sections 340 through 347)) as promptly as practicable and, in any event, within five (5) Business Days in connection with all submissions to the Antitrust Bureau in connection with the CON Application and within five (5) Business Days in the case of all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request under any of the Antitrust Laws for information, Documents, or other materials received by each of them or any of their respective Affiliates from the Federal Trade Commission (the "FTC"), the Antitrust Division of the United States Department of Justice (the "Antitrust Division"), the Antitrust Bureau or any other Governmental Body in respect of such filings or the Contemplated Transactions and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such Documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division, the Antitrust Bureau or any other Governmental Body under any of the Antitrust Laws with respect to any such filing or any such transaction.

(c)     If necessary, each of Purchaser and Seller shall use its commercially reasonable efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates in respect of the Contemplated Transactions under any applicable Law, other than those referred to in Section 8.4(a) or 8.4(b) hereto, including such filings as are required to obtain the consents, approvals, authorizations, waivers, Orders, licenses or Permits or to provide the notices specified in Section 5.3 of the Seller Disclosure Schedule or Section 6.3(a) of the Purchaser Disclosure Schedule, as promptly as practicable, (ii) comply at the earliest practicable date with any request for additional information, Documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Body in respect of such filings or the transactions contemplated by this Agreement and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such Documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any Governmental Body under such Laws with respect to any such filing or any such transaction.

(d)     Each of Purchaser and Seller shall use its commercially reasonable efforts to furnish to each other through counsel all information required for any application or other filing to be made pursuant to any applicable Law in connection with the Contemplated Transactions. Each such party shall promptly inform the other parties through counsel of any material oral communication with, and provide copies of written communications with, any

42

Governmental Body regarding any such filings or any such transaction. No such party shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.

(e)     Subject to applicable Law, Purchaser and Seller will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under any of the Antitrust Laws. Each such party may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.4 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials.

(f)     Each of Purchaser and Seller shall use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the Contemplated Transactions under any of the Antitrust Laws. In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement as in violation of any of the Antitrust Laws, each such party shall cooperate and use its commercially reasonable efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other Order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the Contemplated Transactions, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and Seller decide that litigation is not in their respective reasonable best interests. Each such party shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under any of the Antitrust Laws with respect to such transactions as promptly as possible after the date of this Agreement. In connection with and without limiting the foregoing, each of Purchaser and Seller agrees to use its commercially reasonable efforts to take promptly any and all steps necessary to avoid or eliminate each and every impediment under any Antitrust Laws that may be asserted by any Federal, state and local and non-United States antitrust or competition authority, so as to enable Purchaser and Seller to close the Contemplated Transactions as expeditiously as possible.

Section 8.5     Further Assurances.

(a)     Each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Contemplated Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Contemplated Transactions. Without limiting the generality of the foregoing, from time to time after the Closing, without additional consideration, each party

43

hereto will (or, if appropriate, cause its Affiliates to) execute and deliver such further instruments and take such other action as may be necessary or reasonably requested by the other party to make effective the Contemplated Transactions and to provide the other party with the intended benefits of this Agreement. In addition, upon the reasonable request of Purchaser, Seller shall execute, acknowledge and deliver all such further assurances, deeds, assignments, powers of attorney and other instruments and paper as may be required to sell, transfer, convey, assign and deliver to Purchaser all right, title and interest in, to and under the Purchased Assets. If any party to this Agreement shall, following the Closing, have in its possession any asset or right which under this Agreement should have been delivered to the others at the Closing, such party shall promptly deliver such asset or right to the others.

(b)     Without limiting the generality of the foregoing, if Purchaser or any of its Affiliates shall at any time after the Closing receive any charitable gift, contribution or bequest that might be an Excluded Asset, or receives any notice that such a charitable gift, contribution or bequest may be received or available to Purchaser, Purchaser shall give prompt written notice thereof to Seller and make available to Seller upon reasonable request such information that Purchaser or any of its Affiliates has available to it regarding such gift, contribution or bequest and will cooperate with Seller in determining whether such gift, contribution or bequest should be characterized as an Excluded Asset. The provisions of this Section 8.5 shall survive the Closing.

Section 8.6     Confidentiality.

(a)     From and after the date hereof, Purchaser shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Seller, and not use to the detriment of Seller, any Seller Confidential Information relating to or obtained from Seller or its Representatives. For purposes of this Section 8.6, "Seller Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Purchased Assets, the Assumed Liabilities, the Business, the Excluded Assets, the Excluded Liabilities or the Other Businesses, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided that Seller Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Purchaser or any of its Representatives, (ii) becomes available to Purchaser on a non-confidential basis from a source other than Seller or its Representatives; provided that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Purchaser from a third party having the right to disseminate the Seller Confidential Information without restriction on disclosure or (iv) can be shown by Purchaser through written Documents or evidence maintained by Purchaser to have been independently developed by either of them; and provided, further, that upon the Closing, the restrictions contained in this Section 8.6 shall not apply to confidential or proprietary information related primarily to the Business or the Purchased Assets and the Assumed Liabilities. Purchaser may disclose any of the Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential.

44

Purchaser shall instruct its Representatives having access to the Seller Confidential Information of such obligation of confidentiality. If Purchaser or anyone to whom it has transmitted Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Confidential Information, Purchaser shall provide Seller with prompt written notice prior to making any disclosure so that such Seller may seek a protective Order or other appropriate remedy. If such protective Order or other remedy is not obtained, Purchaser shall furnish only that portion of the Seller Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed, and Purchaser will exercise commercially reasonable efforts to obtain assurance to the extent possible that confidential treatment will be accorded to that portion of Seller Confidential Information that is being disclosed. In any event, Purchaser will not oppose action by Seller to obtain an appropriate protective Order or other reliable assurance that confidential treatment will be accorded Seller Confidential Information.

(b) From and after the Closing Date, unless this Agreement is terminated prior to the Closing, Seller shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Purchaser, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with (i) operating the Other Businesses in the ordinary course before and after the Closing Date, (ii) any investigations by Governmental Bodies, (iii) compliance activities after the Closing related to periods occurring prior the Closing Date, (iv) any Legal Proceedings, (v) enforcing any rights or other claims of Seller under this Agreement, (vi) performing any obligations of Seller under this Agreement, including billing and collecting Pre-Closing Account Receivable and other related activities, or (vii) as permitted by the Medical Records Custody Agreement. For purposes of this Section 8.6(b), "Business Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Business or to the Purchased Assets or the Assumed Liabilities, other than information primarily pertaining to the Excluded Assets, the Excluded Liabilities or the Other Businesses, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided that Business Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Seller or its Representatives, (ii) becomes available to Seller on a non-confidential basis from a source other than Seller or its Representatives; provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Purchaser or (iii) is lawfully received by Seller from a third party having the right to disseminate the Business Confidential Information without restriction on disclosure. Seller may disclose any of the Business Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. Seller shall instruct its Representatives having access to the Business Confidential Information of such obligation of confidentiality. If Seller or anyone to whom it has transmitted Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information, Seller shall provide Purchaser with prompt notice prior to making any disclosure so that Purchaser may seek a

45

protective Order or other appropriate remedy. If such protective Order or other remedy is not obtained, Seller shall furnish only that portion of the Business Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed, and Seller will exercise commercially reasonable efforts to obtain assurance to the extent possible that confidential treatment will be accorded to that portion of Business Confidential Information that is being disclosed. In any event, Seller will not oppose action by Purchaser to obtain an appropriate protective Order or other reliable assurance that confidential treatment will be accorded Business Confidential Information.

(c)     The obligations contained in this Section 8.6 are in addition to any separate confidentiality agreements between any of Seller and Purchaser or its Affiliates.

Section 8.7     Preservation of Records. Purchaser agrees that it shall preserve and keep the records held by it relating to the operation of the Business prior to the Closing Date for a period of seven (7) years from the Closing Date or the maximum period of time required by Law, whichever is longer, and shall, subject to Section 2.11 hereto, make such records and personnel available to Seller as may be reasonably required by Seller in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or other governmental or healthcare payor investigations or audits of Seller or any of its Affiliates or in order to enable Seller to comply with its obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In connection therewith, Seller shall reimburse Purchaser for Purchaser's out-of-pocket expenses.

Section 8.8     Publicity. Each of Seller and Purchaser agrees that it shall not issue any press release or public announcement concerning this Agreement or the Contemplated Transactions without obtaining the prior written approval of either Purchaser or Seller, as applicable, which approval will not be unreasonably withheld, delayed or conditioned, unless, in the judgment of such issuing party upon advice of counsel, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement; provided that such party that intends to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other parties with respect to the text thereof. Notwithstanding the foregoing, Purchaser understands that Seller will be filing various pleadings, including the Sale Motion, in furtherance of obtaining Bankruptcy Court approval of this Agreement and the Contemplated Transactions.

Section 8.9     Use of Name. Purchaser agrees that it shall (a) as soon as practicable after the Closing Date and in any event within thirty (30) days following the Closing Date, cease to make any use of the name "Saint Vincents Catholic Medical Centers" or any variation thereon or derivative thereof (including "St. Vincent's") or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing any of the foregoing, including any name or mark confusingly similar thereto (collectively, the "Seller Marks") which are included in the Purchased Assets or otherwise included in materials or assets transferred to Purchaser in connection with the Closing, and (b) immediately after the Closing, cease to hold itself or its Affiliates out as having any affiliation or association with Seller or any of its Affiliates. In furtherance thereof, as promptly as practicable but in no event later than

46

thirty (30) days following the Closing Date, Purchaser shall remove, strike over or otherwise obliterate all SVCMC Marks from all materials including any vehicles, business cards, schedules, stationery, packaging materials, displays, signs, promotional materials, manuals, forms, computer Software and other materials transferred to Purchaser on the Closing Date; provided that so long as Purchaser uses any SVCMC Marks and has not removed all SVCMC Marks from all materials, Purchaser shall comply with the Ethical and Religious Directives for Catholic Health Care Services issued by the National Conference of Catholic Bishops, as amended from time to time. Purchaser shall also take, and cooperate with Seller in taking, such actions as are reasonably necessary to change all telephone book listings of the Business. Notwithstanding any of the foregoing, Seller agrees that as of the Closing and for the length of the covenants set forth in Section 8.11 hereto, Seller shall not use the words "certified home health agency" or any variation thereon or derivative thereof in any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing any of the foregoing.

Section 8.10    Supplementation and Amendment of Schedules.

(a)    Purchaser may, at its option, include in the Purchaser Disclosure Schedule, and Seller may, at its option, include in the Seller Disclosure Schedule, as the case may be, items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement.

(b)    No less than three (3) Business Days prior to the Closing Date, Seller shall deliver to Purchaser an update to the Seller Disclosure Schedule to reflect changes thereto which occur between the date hereof and the Closing Date in the Ordinary Course of Business in accordance with Section 8.2 hereto.

47

Section 8.11    Covenant Not to Compete or Solicit.

(a)    Throughout the three (3) year period immediately after the Closing Date, Seller shall not, and Seller shall not permit any of its Affiliates which it controls to, at any time, directly or indirectly, without the prior written consent of Purchaser, own, operate, manage or control any business or healthcare facility that renders the type of health care services as provided by the Business on the Closing Date within the following New York State counties: Bronx, Kings, Nassau, New York, Queens, Richmond, Suffolk and Westchester. Notwithstanding the foregoing and without agreeing (implicitly or otherwise) that the following activities would otherwise be subject to the provisions of this Section 8.11(a), nothing in this Agreement shall preclude, prohibit or restrict Seller or any of its Affiliates from engaging in any manner in the current and contemplated businesses listed in Section 8.11(a) of the Seller Disclosure Schedule.

(b)    Throughout the two (2) year period immediately after the Closing Date, Seller shall not, and Seller shall not permit any of its Affiliates which it controls to, at any time, directly or indirectly, without the prior written consent of Purchaser, solicit, recruit, employ or contract with any employee employed by Seller at Closing Date who is subsequently hired by Purchaser for so long as such employee is employed by Purchaser or its Affiliates; provided that nothing shall prohibit Seller and its Affiliates from performing, or having performed on their behalf, a general solicitation for employees not specifically focused at the Transferred Employees through the use of media, advertisement, electronic job boards or other general, public solicitations.

Section 8.12    Cooperation.    Seller and Purchaser agree to reasonably cooperate with each other, from the date hereof through and following the Closing Date, in good faith, in an effort to satisfy all further conditions, undertakings and agreements contained in this Agreement.

Section 8.13    OASIS Forms.    Purchaser shall prepare Outcome and Assessment Information Set ("OASIS") intake forms for all patients of the Business who consent to receive home care services from Purchaser after the Closing.

Section 8.14    Interim Agreement.    Within two (2) days of entry of the Sale Order by the Bankruptcy Court, the parties shall enter into a Management Agreement substantially in the form attached hereto as Exhibit F under which Purchaser has agreed to assume the day-to-day management responsibility of the Business, to the extent allowed by applicable law and regulations through the Closing Date (the "Interim Agreement"). The parties shall submit the Interim Agreement to DoH for notice or approval in all events. Subject to Bankruptcy Court approval of the Interim Agreement and entry of the Sale Order, the Interim Agreement will become effective upon both (i) its approval by DoH, if appropriate and (ii) the execution and delivery of the Interim Agreement, and will terminate upon the Closing or according to its terms. For the period of time between the date hereof and the effective date of the Interim Agreement, Seller shall (i) schedule and conduct regular meetings involving Purchaser's and Seller's respective senior management staff to discuss the Business; (ii) allow Purchaser's senior

48

management staff reasonable access to the Business and its personnel for periodic monitoring of the conduct of the Business consistent with Sections 8.1 and 8.6 hereof; (iii) consult with Purchaser prior to making any material business decisions affecting the Business other than in the Ordinary Course of Business; and (iv) use good faith efforts to assist Purchaser in planning the transition of patients from the Business to Purchaser.

Section 8.15    Transition Plan.

(a)    Set forth in Section 8.15 of the Purchaser Disclosure Schedule is Purchaser's plan and timeline for transitioning the Business and its patients to Purchaser as of the Closing Date (the "Transition Plan"). Purchaser represents and warrants to Seller that the Transition Plan contains all milestones for operational, financial and regulatory matters that Purchaser must address and complete in order to transition the Business to Purchaser by the Closing Date, and the timeline within which all such matters shall be addressed by Purchaser in order for Purchaser to timely consummate the Contemplated Transactions. Purchaser warrants and covenants that it shall commence the implementation of the Transition Plan set forth in Section 8.15 of the Purchaser Disclosure Schedule on or before the effective date of the Interim Agreement, and shall fully implement each step of the Transition Plan in a timely manner in accordance therewith. Purchaser represents and warrants that (i) the access to information permitted under this Agreement, and (ii) the authority granted to Purchaser under this Agreement and the Interim Agreement, are sufficient for it to carry out all aspects of the Transition Plan in a timely fashion. Notwithstanding any provision of this Agreement to the contrary, Purchaser acknowledges and agrees that any inability of Purchaser to achieve the milestones set forth in the Transition Plan in the timeframe contemplated by the Transition Plan shall not excuse Purchaser from timely consummating the Contemplated Transactions.

# ARTICLE IX

# EMPLOYEES AND EMPLOYEE BENEFITS

Section 9.1    Offers of Employment.

(a)    Purchaser shall offer employment, commencing on the Closing Date, to all of the Employees of the Business (who are employed as of the date hereof and who remain employed on the date immediately preceding the Closing Date) at their final hourly wage rate on the Closing Date who meet Purchaser's objective hiring criteria. To the extent that Seller severs the employment of any Employees of the Business prior to the Closing Date, Seller shall give Purchaser notice of same as soon as reasonably practicable. Within a reasonable period of time prior to the Closing Date but not later than five (5) Business Days prior to the Closing Date, Purchaser shall deliver an offer of employment effective as of the Closing Date to each Employee listed in section 5.11 (a) of the Seller Disclosure Schedule who meets Purchaser's objective hiring criteria, who was employed by the Seller on the day immediately preceding the Closing Date. All such Employees who accept Purchaser's offer of employment shall become employees of Purchaser as of such date. As of the Closing Date, Seller shall not have any liability or responsibility with respect to any employee benefit plan, program, policy, or other arrangement maintained by or contributed to by Purchaser with respect to Employees employed

49

by Purchaser. Seller shall remain obligated after the Closing Date for any obligation or liability to Employees which arises prior to the Closing Date, except to the extent that the Purchaser has assumed the PTO Liability and the Severance Obligations. Purchaser shall not assume any CBAs, Employee compensation and/or benefit obligations or other terms and conditions of employment for any Employee pursuant to the CBAs or otherwise. Affiliates of the Purchaser have a history of strong, cooperative relationships with many labor unions, including the 1199 and NYSNA, and the Purchaser pledges to work cooperatively with the unions during the transition of the Business from Seller to Purchaser.

(b)     Seller shall be responsible for providing continuation coverage, as required by Section 4980B(f) of the Code and Part 6 of Title I of ERISA or any similar Law ("COBRA") to Employees of the Business who, for any reason, experience a COBRA "qualifying event" within the meaning of Section 4980B of the Code or Part 6 of Title I of ERISA prior to the Closing Date.

Section 9.2    No Express or Implied Rights or Remedies.

(a)     Nothing contained in this Agreement, express or implied, shall be construed to confer upon any Employee (including any beneficiary or dependent thereof) any rights or remedies whatsoever including, without limitation, any right to employment or continued employment for any specified period or of any nature or kind under or by reason of this Agreement.

(b)     Notwithstanding anything that may be to the contrary herein, it is expressly understood and agreed that all Employees hired by Purchaser shall be immediately available for participation in Purchaser's group health plan and certain other welfare benefit plans as designated by Purchaser.

# ARTICLE X

# CONDITIONS TO CLOSING

Section 10.1    Conditions Precedent to Obligations of Purchaser.    The obligation of Purchaser to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of SVCMC set forth in this Agreement shall be true and correct (without giving effect to any materiality or Material Adverse Effect qualifiers set forth therein) at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date) and Purchaser shall have received a certificate signed by an authorized officer of SVCMC, dated as of the Closing Date, to the foregoing effect; provided that in the event any such representation or warranty has been breached the condition set forth in this Section 10.1(a) shall nevertheless be

50

deemed satisfied unless the effect of all such breaches of representations and warranties taken together result in a Material Adverse Effect;

(b)     Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date and Purchaser shall have received a certificate signed by an authorized officer of SVCMC, dated as of the Closing Date, to the forgoing effect; provided that the condition set forth in this Section 10.1(b) shall be deemed satisfied unless all such failures to so perform or comply taken together result in a Material Adverse Effect;

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in clauses (a) through (h) of Section 4.2 hereto; and

(d)     a Material Adverse Effect shall not have occurred with respect to the Business or the Purchased Assets, which Material Adverse Effect cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Purchaser to Seller of such Material Adverse Effect; provided, however, that in such event Seller and Purchaser shall negotiate in good faith to adjust the Purchase Price proportionately to the extent of the Material Adverse Effect and if an agreement is reached, this condition to Closing shall be deemed satisfied; and

(e)     all notices, consents, approvals, licenses or Permits, or waivers thereof, set forth in Section 10.1(e) of the Purchaser Disclosure Schedule shall have been made or obtained by Purchaser, and any applicable waiting period under any of the Antitrust Laws shall have expired or been terminated.

Section 10.2   Conditions Precedent to Obligations of Seller.  The obligation of Seller to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by SVCMC in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchaser set forth in this Agreement shall be true and correct (without giving effect to any materiality qualifiers set forth therein) at and as of the Closing, except to the extent such representations and warranties relate expressly to an earlier date (in which case such representations and warranties shall be true and correct, on and as of such earlier date) and SVCMC shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect; provided that in the event any such representation or warranty has been breached the condition set forth in this Section 10.2(a) shall nevertheless be deemed satisfied unless the effect of all such breaches of representations and warranties taken together would prevent or materially delay the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and SVCMC shall have received a

51

certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect; provided that the condition set forth in this Section 10.2(b) shall be deemed satisfied unless all such failures to so perform or comply taken together prevent or materially delay the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions;

(c)     all notices, consents, approvals, licenses or Permits, or waivers thereof, set forth in Section 10.2(c) of the Seller Disclosure Schedule shall have been made or obtained by Seller, and any applicable waiting period under any of the Antitrust Laws shall have expired or been terminated; and

(d)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 4.3 hereto.

Section 10.3   Conditions Precedent to Obligations of Purchaser and Seller.   The respective obligations of the parties to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser or SVCMC in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions;

(b)     the Bankruptcy Court shall have approved the Break-Up Fee; and

(c)     the Bidding Procedures Order and the Sale Order shall have been entered by the Bankruptcy Court and (i) the time for appealing each Order has expired and no party has taken an appeal or (ii) any appeal taken of either Order has been fully and finally terminated by dismissal or a decision affirming each Order appealed from, and the time for taking any further appeal has expired.

Section 10.4   Frustration of Closing Conditions.   No party may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3 hereto, as the case may be, to excuse it from consummating the Contemplated Transactions if such failure was caused by such party's failure to comply with any provision of this Agreement.

## ARTICLE XI

## TAXES

Section 11.1   Transfer Taxes.   Seller shall pay any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges (including any interest and penalty thereon) payable in connection with the Contemplated Transactions ("Transfer Taxes").   Seller shall make due and timely payment of any Transfer Tax to the applicable Tax Authority and shall provide Purchaser with a true and complete copy of each Tax Return relating to Transfer Taxes as filed and evidence of the timely filing of such Tax Return

52

and payment of such Transfer Tax. The parties shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds of Transfer Taxes.

Section 11.2  Prorations. All real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets, if any, for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between Seller and Purchaser as of 11:59 p.m. (New York time) on the Closing Date based on the number of days in such period through and including the Closing Date and the number of days in such period after the Closing Date; provided, however, that nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party. If any Taxes subject to proration are paid by Purchaser, on the one hand, or Seller, on the other hand, the proportionate amount of such Taxes paid (or in the event of a refund of any portion of such Taxes previously paid is received, such refund) shall be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund).

Section 11.3  Purchase Price Allocation. The Purchase Price will be allocated for Tax purposes (the "Allocation") among the Purchased Assets in accordance with GAAP and as set forth in Section 11.3 of the Seller Disclosure Schedule. The Seller and the Purchaser shall report the Allocation as provided in Section 1060 of the Code, and shall prepare and file all Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Allocation. No party shall take any position (whether in audits, Tax Returns or otherwise) that is inconsistent with the Allocation unless required to do so by applicable law.

Section 11.4  Cooperation on Tax Matters. The parties shall furnish or cause to be furnished to each other, as promptly as practicable following the request therefore, and at the expense of the requesting party, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other filings relating to Tax matters, for the preparation for and defense of any Tax audit, for the preparation of any Tax protest, or for the prosecution or defense of any suit or other proceeding relating to Tax matters.

# ARTICLE XII

# MISCELLANEOUS

Section 12.1  Assignment. Purchaser may transfer or assign this Agreement to another entity under common control with Purchaser or the North Shore-Long Island Jewish Health System, Inc. ("System") or to another entity that acquires all of the assets of the System, or a member hospital of the System, upon receipt of Seller's prior written consent which shall not be unreasonably withheld.

Section 12.2  Expenses. Except as otherwise expressly provided in this Agreement, each party shall bear its own costs and expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

53

Section 12.3  Specific Performance.  The parties hereto agree that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine, and that the parties hereto shall be entitled to specific performance of the terms hereof (without the posting of any bond), in addition to any other remedy at law or equity. The rights set forth in this Section 12.2 shall be in addition to any other rights which a party may have at law or in equity pursuant to this Agreement.

Section 12.4  Governing Law; Jurisdiction; Consent to Service of Process.  This Agreement and any disputes arising in connection herewith shall be governed by and construed in accordance with the internal Laws of the State of New York without regard to the conflict of law principles thereof.  Without limiting any party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (b) any and all Legal Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations pursuant to Section 12.2 hereto; provided that if the Bankruptcy Case has closed, each of the parties hereto irrevocably agrees that any Legal Proceeding with respect to this Agreement or for recognition and enforcement of any judgment in respect hereof shall be brought and determined exclusively in the United States District Court for the Southern District of New York or if such Legal Proceeding may not be brought in such court for jurisdictional purposes, exclusively in the Supreme Court of New York sitting in the County of New York.  Each of the parties hereto hereby (a) irrevocably submits with regard to any such Legal Proceeding to the exclusive personal jurisdiction of the aforesaid courts in the event any dispute arises out of this Agreement or any transaction contemplated hereby, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the state or federal courts referenced above.  Each of the parties hereto further agrees to accept and acknowledge service of any and all process which may be served in any such Legal Proceeding in said courts in the State of New York, and agrees that service of process upon such party, mailed by certified mail to such party's address as set forth in Section 12.6 hereto, will be deemed in every respect effective service of process upon such party, in any Legal Proceeding.

Section 12.5  WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY ACTION TO WHICH THEY ARE PARTIES INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

Section 12.6  Entire Agreement; Amendments and Waivers. This Agreement (including the schedules and exhibits hereto), the Confidentiality Agreement, the Deposit Escrow Agreement and the Indemnity Escrow Agreement, contain the entire understanding and agreement of the parties hereto and thereto with respect to the subject matter hereof and thereof,

54

and supersede all previous written or oral negotiations, commitments, understandings and writings. This Agreement may be amended, modified, supplemented or changed, and any provision hereof can be waived, only by written instrument duly executed by all of the parties hereto. Any party hereto may, by written notice to the other parties hereto (a) extend the time for performance of any of the obligations of the other party under this Agreement, (b) waive any inaccuracies in the representations or warranties of the other party contained in this Agreement, (c) waive compliance with any of the conditions or covenants of the other party contained in this Agreement or (d) waive or modify performance of any of the obligations of the other party under this Agreement. Except as provided in the immediately preceding sentence, no action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach, whether of a similar or dissimilar nature. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

Section 12.7 <u>Notices</u>. All notices and other communications under this Agreement shall be in writing and, unless otherwise provided in this Agreement, shall be deemed given (a) when delivered personally by hand, (b) when sent by facsimile (confirmed in writing by mail promptly thereafter dispatched), (c) three (3) days after being mailed by certified or registered mail, postage prepaid, return receipt requested or (d) one (1) Business Day following the day sent by a nationally recognized overnight courier service, in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

(a)    If to Purchaser, to:

North Shore University Hospital
Home Care
972 Brush Hollow Road
Westbury, New York 11972
Fax: (516) 876-7888
Attn:   Merryl Siegel

with a copy to (which shall not constitute notice):

North Shore-Long Island Jewish Health System, Inc.
Office of Legal Affairs
145 Community Drive

55

Great Neck, New York 11021
Fax: (516) 465-8013
Attn: Laurence A. Kraemer, Esq.

(b)    If to Seller, to:

Saint Vincents Catholic Medical Centers
450 West 33rd Street
New York, New York 10001
Fax:   (212) 356-4990
Attn:  General Counsel

with a copy to (which shall not constitute notice):

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Fax:   (212) 715-8000
Attn:  Adam C. Rogoff, Esq.

and

Garfunkel Wild, P.C.
111 Great Neck Road, Suite 503
Great Neck, New York 11021
Fax: (516) 466-5964
Attn: Judith A. Eisen, Esq.

Section 12.8  Invalid Provisions.  If any term or other provision of this Agreement is held to be invalid, illegal, or incapable of being enforced under any present or future Law, and if the rights or obligations under this Agreement of Seller on the one hand and Purchaser on the other hand will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

Section 12.9  Binding Effect; Assignment; Successors and Assigns.  This Agreement shall apply to, be binding in all respects upon and inure to the benefit of the parties and their respective successors, administrators and permitted assigns.  A successor to SVCMC shall include SVCMC as a reorganized debtor.  No assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of Law or otherwise) without the prior written consent of Purchaser and Seller and any attempted assignment without the required

56

consents shall be void. No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors, administrators and permitted assigns.

Section 12.10 No Personal Liability. In entering into this Agreement, the parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any party hereto shall be personally liable or responsible to any other party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named parties only (but nothing contained herein shall limit the Liability of any Person for his or her fraudulent acts).

Section 12.11 Execution in Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original, but all of which together will constitute one (1) and the same agreement. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

Section 12.12 Survival of Representations and Warranties. The representations and warranties of the parties contained in this Agreement shall not survive the Closing.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

NY01/DREWC/1417455.1

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK D/B/A SAINT VINCENT CATHOLIC MEDICAL CENTERS**

By: _____
    Name:
    Title:

**NORTH SHORE UNIVERSITY HOSPITAL**

By: _____
    Name: _Mark J. Solazzo_
    Title: _Exec VP and Chief Operating Officer_

58

## Table of Contents

|  |  | Page |
|---|---|---|
| ARTICLE I DEFINITIONS | ..................................................................... | 2 |
| Section 1.1 | Certain Definitions. ........................................................ | 2 |
| Section 1.2 | Terms Defined Elsewhere in this Agreement. ................................ | 9 |
| Section 1.3 | Other Definitional and Interpretive Matters. ................................ | 11 |
| ARTICLE II TRANSACTION | ..................................................................... | 13 |
| Section 2.1 | Transaction. ..................................................................... | 13 |
| Section 2.2 | Purchase and Sale of Assets. ................................................ | 13 |
| Section 2.3 | Excluded Assets. ............................................................. | 15 |
| Section 2.4 | Assumption of Liabilities. .................................................. | 17 |
| Section 2.5 | Excluded Liabilities. ......................................................... | 17 |
| Section 2.6 | Assignment and Cure Amounts. ............................................ | 18 |
| Section 2.7 | Contingent Medicaid Liability. ............................................. | 19 |
| Section 2.8 | Further Conveyances and Assumptions........................................ | 20 |
| Section 2.9 | Bulk Sales Laws.  T ........................................................... | 21 |
| Section 2.10 | Accounts Receivable........................................................... | 21 |
| Section 2.11 | Agreement Regarding Confidentiality of Patient Information. ...................... | 22 |
| ARTICLE III CONSIDERATION | ..................................................................... | 22 |
| Section 3.1 | Consideration. .................................................................. | 22 |
| Section 3.2 | Purchase Price Deposit. ...................................................... | 22 |
| Section 3.3 | Payment of Purchase Price. ................................................. | 23 |
| Section 3.4 | Transition Patients. ........................................................... | 23 |
| ARTICLE IV CLOSING AND TERMINATION | ..................................................................... | 24 |
| Section 4.1 | Closing Date. .................................................................. | 24 |
| Section 4.2 | Deliveries by Seller. ......................................................... | 24 |
| Section 4.3 | Deliveries by Purchaser. .................................................... | 25 |
| Section 4.4 | Termination of Agreement..................................................... | 26 |
| Section 4.5 | Procedure for Termination. ................................................. | 28 |
| Section 4.6 | Effect of Termination.......................................................... | 28 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER | ..................................... | 29 |

i

Section 5.1    Organization and Good Standing. ...................................................29
Section 5.2    Authorization of Agreement. ..........................................................29
Section 5.3    Consents of Third Parties; Contractual Consents. ...........................30
Section 5.4    Financial Information. ...................................................................30
Section 5.5    Title to Purchased Assets. .............................................................30
Section 5.6    Real Property. ...............................................................................30
Section 5.7    Tangible Personal Property. ..........................................................31
Section 5.8    Intellectual Property. .....................................................................31
Section 5.9    Material Contracts.........................................................................31
Section 5.10   Employees; Employee Benefits. ....................................................32
Section 5.11   Employment and Labor..................................................................32
Section 5.12   Compliance with Laws; Permits. ...................................................32
Section 5.13   Absence of Certain Developments. ................................................33
Section 5.14   Taxes. ...........................................................................................33
Section 5.15   Litigation. ......................................................................................33
Section 5.16   Financial Advisors. ........................................................................33
Section 5.17   No Other Representations or Warranties; Schedules. .....................33
ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER........................34
Section 6.1    Organization and Good Standing. ..................................................34
Section 6.2    Authorization of Agreement. ..........................................................34
Section 6.3    Conflicts; Consents of Third Parties. ..............................................35
Section 6.4    Litigation. ......................................................................................35
Section 6.5    Financial Advisors. ........................................................................36
Section 6.6    Healthcare Regulatory Compliance Status. ....................................36
Section 6.7    Acknowledgement Regarding Condition of the Business. . ............36
Section 6.8    Financing. ......................................................................................36
Section 6.9    No Other Representations or Warranties; Schedules. .....................36
ARTICLE VII BANKRUPTCY COURT MATTERS.................................................................37
Section 7.1    Competing Transaction. .................................................................37

ii

Section 7.2    Break-Up Fee. .................................................................37
Section 7.3    Bankruptcy Court Filings. ....................................................38
Section 7.4    Notice of Sale. .................................................................38
Section 7.5    Treatment of Monetary Obligations. ...........................................38
ARTICLE VIII COVENANTS.................................................................................38
Section 8.1    Access to Information. ........................................................38
Section 8.2    Conduct of the Business Pending the Closing. .................................39
Section 8.3    Consents; Insurance. ..........................................................40
Section 8.4    Regulatory Approvals. .........................................................41
Section 8.5    Further Assurances.............................................................43
Section 8.6    Confidentiality. ..............................................................44
Section 8.7    Preservation of Records. ......................................................46
Section 8.8    Publicity. ....................................................................46
Section 8.9    Use of Name. ..................................................................46
Section 8.10   Supplementation and Amendment of Schedules. ..................................47
Section 8.11   Covenant Not to Compete or Solicit............................................48
Section 8.12   Cooperation. ..................................................................48
Section 8.13   OASIS Forms. ..................................................................48
Section 8.14   Interim Agreement. ............................................................48
ARTICLE IX EMPLOYEES AND EMPLOYEE BENEFITS ...........................................................49
Section 9.1    Offers of Employment. .........................................................49
Section 9.2    No Express or Implied Rights or Remedies.......................................50
ARTICLE X CONDITIONS TO CLOSING.......................................................................50
Section 10.1   (a) Conditions Precedent to Obligations of Purchaser. .........................50
Section 10.2   Conditions Precedent to Obligations of Seller. ...............................51
Section 10.3   Conditions Precedent to Obligations of Purchaser and Seller. ..................52
Section 10.4   Frustration of Closing Conditions. ............................................52
ARTICLE XI TAXES......................................................................................52
Section 11.1   Transfer Taxes. ...............................................................52

iii

                                                                                    Page

Section 11.2    Prorations. ..........................................................................................53
Section 11.3    Purchase Price Allocation. ...............................................................53
Section 11.4    Cooperation on Tax Matters. ..........................................................53
ARTICLE XII MISCELLANEOUS.........................................................................53
Section 12.1    Assignment. ......................................................................................53
Section 12.2    Expenses. ..........................................................................................53
Section 12.3    Specific Performance. ......................................................................54
Section 12.4    Governing Law; Jurisdiction; Consent to Service of Process. ........54
Section 12.5    WAIVER OF JURY TRIAL. ............................................................54
Section 12.6    Entire Agreement; Amendments and Waivers. ................................54
Section 12.7    Notices. .............................................................................................55
Section 12.8    Invalid Provisions. ...........................................................................56
Section 12.9    Binding Effect; Assignment; Successors and Assigns. ...................56
Section 12.10   No Personal Liability. ......................................................................57
Section 12.11   Execution in Counterparts. ..............................................................57
Section 12.12   Survival of Representations and Warranties. ...................................57

Exhibits

Exhibit A –Bidding Procedures Order
Exhibit B – Form of Sale Order
Exhibit C – Form of Medical Records Custody Agreement
Exhibit D – Form of Assignment
Exhibit E – Form of Indemnity Escrow Agreement
Exhibit F – Form of Interim Agreement

iv

**For a copy of any non-confidential exhibits or schedules to the Assert Purchase Agreement, please contact Joseph A. Shifer, Esq. of Kramer Levin Naftalis & Frankel LLP at (212) 715-9100 or via email at jshifer@kramerlevin.com.**

# **EXHIBIT A-2**
Backup Bid

ASSET PURCHASE AGREEMENT

by and between

SAINT VINCENTS CATHOLIC MEDICAL CENTERS

OF NEW YORK

and

VILLAGE CENTER FOR CARE

Dated as of August 10, 2010

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT ( this "Agreement"), is made and entered into as of August 10, 2010, by and between Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, a New York not-for-profit corporation ("SVCMC" or "Seller") and Village Center for Care, a New York not-for-profit corporation ("Purchaser").

## RECITALS

WHEREAS, Seller, along with certain of its affiliates (collectively, the "Debtors") is a debtor-in-possession under Title 11 of the United States Code 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") on April 14, 2010 ( the "Petition Date"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 10-11963);

WHEREAS, Seller is entering into this Agreement subject to the approval by the Bankruptcy Court;

WHEREAS, Seller is engaged in the business of owning and operating a certified home health agency (the "CHHA"), as identified in Section A of the Seller Disclosure Schedule (the "Business") for home health care services in the New York counties of Westchester, Bronx, New York, Kings, Queens, Richmond, Nassau and Suffolk (the "Service Area"), which certificate was issued by the State of New York Department of Health, Office of Health Systems Management;

WHEREAS, Seller owns and operates other businesses including, without limitation, two hospitals and a long term home health care program, which other businesses are not the subject of this Agreement (the "Other Businesses");

WHEREAS, Seller desires to relinquish the Certificate of Need and underlying license to operate its CHHA as part of the application process through which the Purchaser desires to acquire its own Certificate of Need and license for the provision of home health agency services in the Service Area for the provision of certified home health agency services upon the terms and conditions set forth in this Agreement; and

WHEREAS, subject to the approval of the Bankruptcy Court, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to, inter alia, Sections 105, 363, and 365 of the Bankruptcy Code the Purchased Assets and Assumed Liabilities (each, as defined below), all as more specifically provided herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

1

# ARTICLE I

## DEFINITIONS

Section 1.1    Certain Definitions.

Unless the context otherwise requires or as otherwise defined herein, capitalized terms used in this Agreement shall have the meanings set forth in this Section 1.1:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Antitrust Laws" means the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, the Donnelly Act, as amended, and the Hart-Scott-Rodino Antitrust Improvements Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, Orders, decrees, administrative or judicial doctrines or other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"Bidding Procedures Order" means the July 23, 2010 Order of the Bankruptcy Court approving the bidding procedures for the auction of assets related to the Seller's certified home health agency , attached hereto as Exhibit A,.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close.

"CMS" means the Centers for Medicare & Medicaid Services.

"Code" means the Internal Revenue Code of 1986, as amended.

"CON Application" means a Certificate of Need Application with respect to the Business to be submitted by Purchaser to DoH (the CON Application may contemplate either the issuance of a new license to operate the Business to Purchaser, or a modification and expansion of Purchaser's current CHHA license to include the entire Service Area). A request by Purchaser for the issuance of a temporary authorization to conduct the Business on an emergent basis will be deemed to constitute a CON Application.

"CON Approval" means the approval by DoH of the CON Application without contingencies or conditions that have not been satisfied, other than reasonable conditions that may be reasonably expected to be satisfied in accordance with their terms after the Closing. Emergent approval by DoH without contingencies or conditions that have not been satisfied, other than reasonable conditions that may be reasonably expected to be fully satisfied in

accordance with their terms after the Closing (including submission of a permanent DoH Application, which Purchaser acknowledges is a reasonable post-Closing contingency), will be deemed to constitute CON Approval.

"Confidentiality Agreement" means the Confidentiality Agreement, dated December 9, 2009, by and between Seller and Purchaser.

"Contemplated Transactions" means the transactions contemplated by this Agreement.

"Contract" means any written contract, indenture, note, bond, lease, license or other agreement, other than a real property lease, a personal property lease or an Intellectual Property License.

"Copyrights" means all copyrights and registrations and applications therefor and works of authorship, and mask work rights.

"Cost Reports" means all cost and other reports filed pursuant to the requirements of Healthcare Programs for payment or reimbursement of amounts due from such programs for services provided.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials exclusively related to the Business or the Purchased Assets, in each case whether or not in electronic form, other than Patient Records.

"DoH" means the Department of Health of the State of New York.

"Employees" means all individuals, as of any date specified herein, who are employed by Seller in the conduct of the Business, together with individuals who are hired in respect of the conduct of the Business after the date hereof and prior to the Closing; provided that "Employees" shall not include (a) any officer of Seller or (b) individuals who regularly perform administrative functions for Seller relating to both the Business and in any material respect any of the Other Businesses except that, at any time before the fifth (5th) Business Day prior to the deadline set forth in the Bidding Procedures Order for the submission of bids, with Seller's consent, Purchaser may request to include the designated individuals described in the foregoing clause (b) as Employees (and subject to the prior consent of Seller, request to make offers of employment to such individuals).

"Environmental Law" means any Law currently in effect relating to the protection of human health and safety or the environment, natural resources or the protection thereof, or

2662990v.2
NY01/DREWC/1417455.1
300132622.1

relating to hazardous materials, including the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.), and the regulations promulgated pursuant thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Contracts" means every Contract that is not an Assigned Contract or not otherwise specifically identified in Sections 2.2(a) through 2.2(g) hereto as a Purchased Asset.

"Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment (including medical equipment) and leasehold improvements owned by Seller and used by Seller exclusively in the conduct of the Business, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by Seller, the telephone numbers associated therewith used in the Ordinary Course of Business and not used in any of the Other Businesses), cubicles and miscellaneous office furnishings.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Hazardous Material" means any substance, material or waste which is regulated by any Governmental Body including petroleum and its by-products, asbestos, biomedical waste, medical waste and any chemical, material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" under any provision of Environmental Law.

"Healthcare Program Liabilities" means all (i) Liabilities under any applicable Medical Reimbursement Program Law, including any obligations for settlement and retroactive adjustments under the Medicare and Medicaid programs for open periods ending on or before the Closing Date and (ii) Liabilities for violations of the Conditions of Participation for open periods ending on or before the Closing Date.

"Healthcare Regulatory Consents" means in respect of Seller or Purchaser, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body as shall be required to be obtained and such notifications to any Governmental Body as shall be required to be given by such party in order for it to consummate

4

the Contemplated Transactions in compliance with all applicable Laws relating to health care or healthcare services of any kind and shall include obtaining any such consents, approvals, authorizations, waivers, Orders, licenses or Permits, or notices to, the New York State Public Health Council, CMS, DoH and shall include Purchaser obtaining CON Approval from DoH with respect to its operation of the Business and the parties obtaining any consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body needed for them to consummate the Contemplated Transactions and for Purchaser to operate the Business.

"Intellectual Property Licenses" means (a) any grant by Seller to a third Person of any right to use any of the Purchased Intellectual Property owned by Seller and (b) any grant to Seller of a right to use in connection with the Business any Intellectual Property Rights owned by any other Person (other than the SVCMC Marks), to the extent, and only to the extent, such right is transferable by Seller.

"Intellectual Property Rights" means all intellectual property rights available in respect of Copyrights, Marks (other than the SVCMC Marks), Software, trade secrets and Patents, whether registered or unregistered, and whether owned or licensed.

"Inventory" means all medical supplies, drugs, medications, food, janitorial, housekeeping and office supplies and other consumables located in or used in connection with the operation of the Business.

"Knowledge" means the actual knowledge of those officers of Purchaser or of those officers of SVCMC or senior managers of the Business as of or prior to the Closing (each of which is identified in Section 1.1(a) of the Seller Disclosure Schedule), as applicable.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule, regulation or directive enacted or issued by a Governmental Body.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, alternative dispute resolution, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all fines, penalties, costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement and transfer restriction under any agreement.

"Marks" means all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof.

5

"Material Adverse Effect" means (a) a material adverse effect on the Business (taken as a whole), including its assets, properties, results of operations or condition (financial or otherwise) as conducted on the date hereof other than an effect resulting from an Excluded Matter, (b) a material adverse effect on the Purchased Assets other than an effect resulting from an Excluded Matter, or (c) a material adverse effect on the ability of Seller to consummate the Contemplated Transactions or to perform its obligations under this Agreement. "Excluded Matter" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general that does not materially disproportionately affect Seller; (ii) the effect of any change that generally affects any industry in which Seller operates that does not materially disproportionately affect Seller; (iii) the effect of any changes in national or international political conditions, including any engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack occurring prior to, on or after the date of this Agreement that does not materially disproportionately affect Seller; (iv) the effect of any action taken by Purchaser or its Affiliates with respect to the Contemplated Transactions or with respect to Seller, including its Employees; (v) any matter of which Purchaser has Knowledge on the date hereof or, solely for purposes of determining whether the condition to the Closing set forth in Section 10.1(a) hereto has been satisfied, on the Closing Date, including those matters set forth in Section 1.1(b) of the Seller Disclosure Schedule; (vi) any matter set forth in Section 5.10(b) of the Seller Disclosure Schedule; (vii) the effect of any change in applicable Laws or accounting rules; (viii) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the Contemplated Transactions; (ix) any effect resulting from the filing or pendency of the Bankruptcy Case or Legal Proceedings relating thereto and reasonably anticipated effects thereof; (x) any effect resulting from (x) Purchaser's actions under the Interim Agreement, or (y) advice, direction, or information provided by Purchaser pursuant to the Interim Agreement and relied upon by Seller; or (xi) any reduction in the number of patients receiving services from the Business.

"Medicaid" means any state program for medical assistance administered under Title XIX of the Social Security Act.

"Medical Reimbursement Program" means Medicare, Medicaid, any other federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and any other state sponsored reimbursement program.

"Medical Reimbursement Program Laws" means the Laws governing the Medical Reimbursement Programs, including: 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a- 7b; §§ 1395 through 1395fff; §§ 1396-1396v; the False Claims Act (31 U.S.C. § 3729 et seq.); the False Statements Act (18 U.S.C. § 1001); the Program Fraud Civil Penalties Act (31 U.S.C. § 3801 et seq.); the anti-fraud and abuse provisions of the Health Insurance Portability and Accountability Act of 1996 (18 U.S.C. § 1347, 18 U.S.C. § 669, 18 U.S.C. § 1035, 18 U.S.C. § 1518); and the corresponding reimbursement, fraud and abuse, false claims and anti self-referral Laws of any other Governmental Body.

"Medicare" means the health insurance program administered under Title XVIII of the Social Security Act.

2662990v.2
NY01/DREWC/1417455.1
300132622.1

"Multiemployer Plan" means a Plan which is a multiemployer plan within the meaning of Section 3(37) of ERISA or Section 414(f) of the Code.

"Multiple Employer Plan" means a Plan which is a single-employer pension plan (within the meaning of Section 4001(a)(15) of ERISA) that is subject to Sections 4063 and 4064 of ERISA.

"Order" means any order, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice, subject, however, to those actions necessary and incident, or otherwise relating, to the Bankruptcy Case, provided, however, that Seller complies with the requirements of the Bankruptcy Code after the filing of the Bankruptcy Case.

"Organizational Documents" means (a) the articles or certificate of incorporation, the bylaws and any shareholders agreement of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and certificate of formation or organization of any limited liability company, (e) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and (f) any amendment to any of the foregoing.

"Patents" means all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon.

"Patient Records" shall mean any documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996, the Health Information Technology for Economic and Clinical Health Act, Title XIII of the American Recovery and Reinvestment Act of 2009 and all regulations promulgated pursuant thereto.

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Body.

"Permitted Liens" means Liens set forth in Section 1.1(c) of the Seller Disclosure Schedule, solely to the extent that such Liens cannot be removed by operation of Sections 105 and/or 363(f) of the Bankruptcy Code.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, association, estate, Governmental Body or other entity.

2662990v.2
NY01/DREWC/1417455.1
300132622.1

"Plan" means each material "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other material employee plan or agreement maintained by the Seller.

"Pre-Closing Accounts Receivable" means accounts receivable arising out of the rendition of medical, surgical, behavioral, diagnostic or other professional health care services or the sale of medical products in the Ordinary Course of Business for dates of service occurring prior to midnight on the Closing Date.

"Purchased Intellectual Property" means all Intellectual Property Rights (other than rights under an Intellectual Property License and other than the SVCMC Marks) owned by Seller and (a) used by Seller exclusively in connection with the Business and (b) not used to a material degree in any of the Other Businesses, including any in the form of or arising from or in respect of Patents, Marks, Copyrights, Software or Technology, except for any that is an Excluded Asset.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching of Hazardous Material into the indoor or outdoor environment, or into or out of any property.

"Representatives" means, with respect to any Person, any of its Affiliates and the directors, trustees, officers, members, employees, consultants, agents, advisors and other representatives of such Person or its Affiliates.

"Sale Motion" means the motion or motions of Seller seeking approval and entry of the Bidding Procedures Order and the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court substantially in the form of Exhibit B hereto, with such changes as are reasonably acceptable to Purchaser and Seller.

"Software" means, except to the extent generally available for purchase from a third Person, any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (d) all documentation including user manuals and other training documentation related to any of the foregoing, in each case, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business. That portion of the Software that is owned by Seller is referred to herein as the "Proprietary Software," and that portion of the Software that is owned by any Person other than Seller is referred to herein as the "Third-Party Software."

"Tax Authority" means any federal, state or local government, or agency, instrumentality or employee thereof, charged with the administration of any Law relating to Taxes.

8

"Taxes" means (a) all federal, state, local or foreign taxes, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, unrelated business income, and estimated taxes, whether disputed or not, and (b) all interest, penalties and additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (a).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business, other than any in the form of Software.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended.

Section 1.2    Terms Defined Elsewhere in this Agreement.    For purposes of this Agreement, each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Additional Deposit | 3.2 |
| Agreement | Recitals |
| Allocation | 11.3 |
| Antitrust Bureau | 8.4(b) |
| Antitrust Division | 8.4(b) |
| Assigned Contracts | 2.2(d) |
| Assumed Liabilities | 2.4 |
| Auction | 7.1(a) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Business Confidential Information | 8.6(b) |
| CBAs | 2.5(g) |
| Certificate of Need | Recitals |
| CHHA | Recitals |
| Closing | 4.1 |

9

| Term | Section |
|------|---------|
| Closing Date | 4.1 |
| COBRA | 9.1(b) |
| CON Termination Date | 4.4(c)(iv) |
| Competing Bid | 7.1(a) |
| Contingent Medicaid Liability | 2.7(a) |
| Cure Amount | 2.6(b) |
| Deposit Escrow Agreement | 3.2 |
| Early Transfer Adjustment | 3.4(b) |
| Escrow Agent | 3.2 |
| Escrow Funds | 3.2 |
| Excluded Assets | 2.3 |
| Excluded Liabilities | 2.5 |
| Excluded Matter | 1.1 |
| Excluded Owned Property | 2.3(f)(i) |
| Excluded Personal Property Leases | 2.3(e) |
| Excluded Real Property | 2.3(f)(ii) |
| Excluded Real Property Leases | 2.3(f)(ii) |
| FTC | 8.4(b) |
| Healthcare Applications | 8.4(a) |
| Healthcare Programs | 5.12(b) |
| Indemnity Escrow Agreement | 2.7(a) |
| Initial Deposit | 3.2 |
| Interim Agreement | 8.14 |
| Inquiry | 2.7(a) |
| LTHHCP | 2.1(b) |
| Material Contracts | 5.9(a) |
| Medicaid Escrow Fund | 2.7(a) |
| Medicaid Payment | 2.7(a) |
| Medical Records Custody Agreement | 2.11 |
| Nonassignable Assets | 2.8(b) |
| OASIS | 8.13 |
| Other Businesses | Recitals |
| Owned Properties | 5.6(a) |
| Personal Property Leases | 5.7 |
| Petition Date | Recitals |
| Proprietary Software | 1.1 |
| Purchase Price | 3.1 |
| Purchased Assets | 2.2 |
| Purchased Intellectual Property Licenses | 2.2(c) |
| Purchased Owned Property | 2.2(a) |
| Purchased Personal Property Leases | 2.2(b)(iii) |
| Purchased Real Property | 2.2(a) |
| Purchased Real Property Leases | 2.2(a) |

2662990v.2
NY01/DREWC/1417455.1
300132622.1

| Term | Section |
|------|---------|
| Purchaser | Recitals |
| Purchaser Disclosure Schedule | Article VI |
| Purchaser Documents | 6.2 |
| Real Property Leases | 5.6(a) |
| Seller Confidential Information | 8.6(a) |
| Seller Disclosure Schedule | Article V |
| Seller Documents | 5.2 |
| Seller | Recitals |
| Service Area | Recitals |
| SVCMC | Recitals |
| Seller Marks | 8.9 |
| System | 12.1 |
| Third-Party Software | 1.1 |
| Transfer Taxes | 11.1 |
| Transition Patients | 3.4(a) |

Section 1.3    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Periods.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.  Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

Dollars.  Any reference in this Agreement to currency shall be to, and all payments hereunder shall be paid in, U.S. dollars.

Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number shall have the corresponding meanings in the plural and vice versa.

Headings.  The provision of a Table of Contents, the division of this Agreement into articles, sections and other subdivisions and the insertion of headings are for convenience of

2662990v.2
NY01/DREWC/1417455.1
300132622.1

reference only and shall not affect or be utilized in construing or interpreting this Agreement. All article, section, schedule and exhibit references used in this Agreement are to articles, sections, schedules and exhibits to this Agreement unless otherwise specified.

Herein. The words "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation", whether or not so stated, and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Made Available to Purchaser. The phrase "made available to Purchaser" shall mean made available to Purchaser through posting in SVCMC's electronic data room, via email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

Make Available to Seller. The phrase "make available to Seller" shall mean make available to Seller or its agents through email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

Part of Speech. If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).

Date. The phrase "the date of this Agreement," "date hereof" and terms of similar import, unless the context otherwise requires, shall be deemed to refer to the date set forth in the preamble of this Agreement.

Accounting Terms. All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.

(b) Each party hereto has been advised by experienced counsel, and the parties hereto have participated jointly, in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto, and no rule of construction shall operate and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## TRANSACTION

Section 2.1    Transaction.

(a) In reliance on the representations, warranties and covenants contained herein and subject to the terms and conditions hereof, Seller shall, pursuant to the

12

terms and conditions of this Agreement, relinquish to New York State the Certificate of Need and all rights and privileges appurtenant thereto, including without limitation the SVCMC CHHA license for the provision of home health agency services in the Service Area.

(b) The Purchaser acknowledges that the transaction specifically excludes any transfer by Seller of any of the following:

(i) Seller's long term home health care program ("LTHHCP"); and

(ii) any caregivers or other employees of the LTHHCP.

Section 2.2 <u>Purchase and Sale of Assets</u>. On the terms and subject to the conditions set forth in this Agreement, and subject to entry of the Sale Order, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall, subject to <u>Section 2.6</u> hereto, sell, transfer, assign, convey and deliver to Purchaser, all of Seller's right, title and interest in, to and under the Purchased Assets, subject to the Permitted Liens, free and clear of any and all Liens, claims or any other interest, to the extent provided in the Sale Order pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code, excepting only such liabilities that Purchaser has expressly agreed to assume as provided in this Agreement. Other than the Permitted Liens, all indebtedness secured by mortgages or other liens on the Purchased Assets shall attach to the proceeds pursuant to Section 363(f) of the Bankruptcy Code so that the Purchased Assets will be sold free and clear of such liens. "<u>Purchased Assets</u>" means all of the assets, rights and properties of Seller exclusively pertaining to or exclusively used in connection with the Business as existing on the Closing Date (wherever located and whether or not required to be reflected on a balance sheet), other than the Excluded Assets, and in each case subject to <u>Section 2.8(b)</u> hereto, including, without limitation, all of Seller's right, title and interest in and to the following:

(a) all right, title and interest of Seller in and to each Owned Property set forth in <u>Section 5.6(a)</u> of the Seller Disclosure Schedule (other than any identified in <u>Section 2.2(f)(i)</u> hereto as Excluded Owned Property) (the "<u>Purchased Owned Property</u>") and under each Real Property Lease set forth in <u>Section 5.6(a)</u> of the Seller Disclosure Schedule (other than any identified in <u>Section 2.2(f)(ii)</u> hereto as Excluded Real Property Leases) (along with any additional Real Property Leases exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with <u>Section 8.2</u> hereto, the "<u>Purchased Real Property Leases</u>", and the real property that is the subject of the Purchased Real Property Leases, collectively with the Purchased Owned Property, the "<u>Purchased Real Property</u>"), together with all improvements and fixtures thereto and other appurtenances and rights in respect thereof (provided that Purchaser shall be permitted to remove any Purchased Real Property Lease listed on <u>Schedule 5.6(a)</u> by notice to Seller at any time on or before the fifth (5th) Business Day prior to the Closing Date); <u>provided</u>, <u>however</u>, that in the event Purchaser elects to remove any Purchased Real Property Lease listed on <u>Schedule 5.6(a)</u>, Purchaser shall be liable for any administrative expense claim related thereto for the time period from the date that Purchaser is deemed to be the Successful Bidder pursuant to the Bidding

13

Procedures Order until the date such Purchased Real Property Lease is rejected under the Bankruptcy Code;

(b)    (i) the Furniture and Equipment; (ii) the tools, spare parts, supplies (including all of Seller's Inventory) and all other tangible personal property owned by Seller, used by Seller in the conduct of the Business and set forth on Section 2.2(b) of the Seller Disclosure Schedule; and (iii) the Personal Property Leases identified in Section 5.7 of the Seller Disclosure Schedule, other than any identified in Section 2.2(e) of the Seller Disclosure Schedule as Excluded Personal Property Leases (along with any additional Personal Property Leases exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.2 hereto, the "Purchased Personal Property Leases") (provided that Purchaser shall be permitted to remove any Purchased Personal Property Lease listed on Schedule 5.7(b) by notice to Seller at any time on or before the fifth (5th) Business Day prior to the Closing Date); provided, however, that in the event Purchaser elects to remove any Purchased Personal Property Lease listed on Schedule 2.2(b), Purchaser shall be liable for any administrative expense claim related thereto for the time period from the date that Purchaser is deemed to be the Successful Bidder pursuant to the Bidding Procedures Order until the date such Purchased Personal Property Lease is rejected under the Bankruptcy Code;

(c)    (i) the Purchased Intellectual Property set forth on Section 2.2(c) of the Seller Disclosure Schedule; and (ii) the rights of Seller as licensor under the Intellectual Property Licenses identified in Section 2.2(c) of the Seller Disclosure Schedule and all rights of Seller as licensee under the Intellectual Property Licenses (along with any additional Intellectual Property Licenses exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.2 hereto, the "Purchased Intellectual Property Licenses") (provided that Purchaser shall be permitted to remove any Purchased Intellectual Property License listed on Schedule 2.2(c) by notice to Seller at any time on or before the fifth (5th) Business Day prior to the Closing Date); provided, however, that in the event Purchaser elects to remove any Purchased Intellectual Property License listed on Schedule 2.2(c), Purchaser shall be liable for any administrative expense claim related thereto for the time period from the date that Purchaser is deemed to be the Successful Bidder pursuant to the Bidding Procedures Order until the date such Purchased Intellectual Property License is rejected under the Bankruptcy Code;

(d)    all Contracts set forth in Section 2.2(d) of the Seller Disclosure Schedule, (provided that Purchaser shall be permitted to remove any Contract listed on Schedule 2.2(d) by notice to Seller at any time on or before the fifth (5th) Business Day prior to the Closing Date) and all rights arising out of such Contracts (along with any additional Contracts exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.2 hereto, the "Assigned Contracts"); provided, however, that in the event Purchaser elects to remove any Contract listed on Schedule 2.2(d), Purchaser shall be liable for any administrative expense claim related thereto for the time period from the date that Purchaser is deemed to be the Successful Bidder pursuant to the Bidding Procedures Order until the date such Contract is rejected under the Bankruptcy Code;

14

(e)    subject to the provisions of Sections 2.11 and 8.7 hereto, all Documents that are exclusively used in, held for use in or intended to be used in, or that arise exclusively out of, the Business, including Documents relating to the services provided by the Business, personnel and employee health files for Transferred Employees (including, to the extent available, pre-employment, criminal background, drug screen, and immigration records) and books, files, invoices, flow sheets and other technical and non technical data and information relating to the operations and services provided by the Business which are owned by Seller and which are exclusively used in and integral to the operation of the Business, but excluding any Documents and Patient Records described in Section 2.3(h) or Section 2.3(i) hereto;

(f)    all Permits exclusively used by Seller in the Business and set forth in Section 2.2(f) of the Seller Disclosure Schedule (to the extent transferable);

(g)    all goodwill and other intangible assets (other than Intellectual Property Rights) owned by Seller and exclusively used in connection with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property; and

(h)    ι all other assets used exclusively in the Business.

Section 2.3    Excluded Assets.    Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser or its Affiliates, and Seller shall retain all right, title and interest to, in and under the Excluded Assets. "Excluded Assets" shall mean the following assets, properties, interests and rights of Seller:

(a)    all cash, cash equivalents, bank deposits or similar cash items of Seller, all securities owned by Seller and any accounts receivable or trade receivables owned by Seller, including Pre-Closing Accounts Receivable and related party receivables;

(b)    the Excluded Contracts;

(c)    any rights to refunds, settlements and retroactive adjustments arising in connection with the Medicare and Medicaid provider numbers and related participation agreements or any other third-party healthcare payor program of the Business;

(d)    any other Contract to which Seller is a party or under which it has rights that is not used exclusively in the Business or is used to a material degree in any of the Other Businesses, unless included in Section 2.2(d) of the Seller Disclosure Schedule among the Assigned Contracts;

(e)    the Personal Property Leases identified in Section 2.3(e) of the Seller Disclosure Schedule (the "Excluded Personal Property Leases");

(f)    (i) the Owned Property identified in Section 2.3(f)(i) of the Seller Disclosure Schedule (collectively the "Excluded Owned Property"), and (ii) the Real Property Leases identified in Section 2.3(f)(ii) of the Seller Disclosure Schedule (the "Excluded Real

2662990v.2
NY01/DREWC/1417455.1
300132622.1

Property Leases", and the real property that is the subject of the Excluded Real Property Leases, collectively with the Excluded Owned Property, the "Excluded Real Property");

(g)     any Intellectual Property Rights of Seller other than the Purchased Intellectual Property; it being understood that Seller shall not convey, and Purchaser shall not acquire, pursuant to this Agreement any right in or to any website or e-mail address owned or used by Seller (whether or not used in the Business);

(h)     any (i) personnel files for Employees of Seller who do not accept an offer of employment from Purchaser; (ii) other books and records that Seller is required by Law to retain (provided that Purchaser shall have a right to make and retain copies of such books and records that relate to the Business at its sole expense, to the extent permitted by applicable Law or subject to any contractual confidentiality obligation owed to a third party); (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party (other than any patient confidentiality obligation referred to in the foregoing clause (ii) or in Section 2.11 hereto); (iv) books and records and other Documents related to malpractice prevention programs, incident reporting or quality assurance to the extent confidential under applicable Law; (v) Documents relating to proposals to acquire the Business by Persons other than Purchaser or its Affiliates; (vi) any Documents primarily related to or that are required to realize the benefits of any Excluded Assets; (vii) Documents related to Pre-Closing Accounts Receivable; (viii) corporate records and Tax Returns of Seller and (ix) Documents necessary to prepare Tax Returns and Cost Reports;

(i)     any Patient Records; provided that, subject to Section 2.11 hereto, Seller shall provide Purchaser with custody of Patient Records;

(j)     any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom;

(k)     all insurance policies or rights to proceeds thereof relating to the Business or the Purchased Assets;

(l)     all deposits (including customer deposits and security deposits for rent, electricity, telephone or other utilities and deposits posted under any Assigned Contract) and prepaid charges and expenses of Seller;

(m)     any rights, claims or causes of action of Seller against third parties relating to assets, properties, business or operations of Seller, including any actions under Chapter 5 of the Bankruptcy Code;

(n)     the amounts described in Section 2.10(a) hereto and all other rights of Seller under this Agreement, the Seller Documents and the Contemplated Transactions;

(o)     any assets of the Other Businesses not otherwise described in Section 2.2 hereto;

16

(p)     any tangible personal property having religious significance which may be removed from the Purchased Real Property identified in Section 2.3(p) of the Seller Disclosure Schedule;

(q)     any personal, tangible and intangible property of Seller identified in Section 2.2(q) of the Seller Disclosure Schedule;

(r)     any right to receive or expectancy of Seller in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate), regardless of when received and whether or not designated to be applied or used in respect of the Business;

(s)     the Medicare and Medicaid provider numbers for the Business and related provider agreements used in the Business, as identified in Section 2.3(s) of the Seller Disclosure Schedule; and

(t)     any marketable securities of Seller.

Section 2.4     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely pay, perform and discharge in accordance with their respective terms, only the following Liabilities (collectively, the "Assumed Liabilities"):

(a)     all Liabilities accruing from and after the Closing with respect to the Assigned Contracts and the Purchased Real Property Leases;

(b)     the Cure Amounts as required by Section 2.6 hereto; and

(c)     the Contingent Medicaid Liability, if any, as required by Section 2.7 hereto.

Section 2.5     Excluded Liabilities.  Except for the Assumed Liabilities, Purchaser shall not assume or become liable for the payment or performance of any Liability of Seller of any nature whatsoever, whether accrued or unaccrued, known or unknown, fixed or contingent ("Excluded Liabilities"), including the following, which shall remain Liabilities of Seller:

(a)     except as otherwise provided in Section 2.4(c) hereto, any Liability for Taxes of Seller arising from the operation of the Business for periods prior to the Closing;

(b)     any Liability associated with any Excluded Assets;

(c)     any Liability arising out of events or omissions occurring prior to the Closing Date from or relating to any overpayment, duplicate payment, refunds, discounts or adjustments due to private sector healthcare cost reimbursement program or insurance coverage;

(d)     any Liability related to claims of medical malpractice and/or other professional Liability of Seller, or any of its Employees, agents or independent contractors to the

17

extent incurred prior to the Closing Date arising out of events or omissions occurring prior to the Closing Date;

(e)     except otherwise provided in Section 2.4(c) hereto, all Healthcare Program Liabilities arising from events prior to the Closing Date and subsequent to the Closing Date for services provided under the Seller's Provider Numbers;

(f)     any Liability arising out of or in connection with any Legal Proceedings (whether instituted prior to or after the Closing) to the extent arising from acts or omissions which occurred prior to the Closing Date (except as otherwise provided by Section 2.3 hereto); and

(g)     any Liability relating to Seller's Employees (whether current, former or retired), including without limitation any Liability under any Plan or collective bargaining agreement ("CBA").

Section 2.6     Assignment and Cure Amounts.

(a)     Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing and pursuant to Section 365 of the Bankruptcy Code, Seller shall assume and assign to Purchaser, and Purchaser shall take assignment from Seller, the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses pursuant to an assignment (the "Assignment") in the form annexed hereto as Exhibit D.  No contract, lease, or other agreement shall be assumed absent concurrent assignment to Purchaser.  Purchaser shall be responsible for satisfying the requirements of "adequate assurance of future performance" as required by section 365 of the Bankruptcy Code and shall cooperate fully with Seller in seeking such approval from the Bankruptcy Court, including without limitation, Purchaser providing the necessary evidence required as part of the Sale Motion to approve this Agreement and the transactions contemplated herein.

(b)     The cure amounts (collectively, the "Cure Amounts"), if any, as determined by the Bankruptcy Court, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of Seller under the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses shall be paid by Purchaser (or Purchaser shall have delivered into escrow on terms reasonably acceptable to Seller amounts sufficient to pay any claim therefor that remains disputed as of the Closing, as such amount shall have been determined by the Bankruptcy Court) at or before the Closing (except as otherwise agreed to by the other party to the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses) and Seller shall have no Liability for any such cure amount, provided, however, that the aggregate Cure Amounts payable by or reserved to Purchaser hereunder shall be applied as a credit against the Purchase Price at Closing pursuant to Section 3.3(c) hereto.  Except as provided for in Section 4.4(a)(i) hereto, Purchaser shall not have the right to terminate this Agreement as a result of the failure by Seller or inability of Seller to assign to Purchaser (on terms and conditions no less favorable than those in existence

18

as of the date hereof) at the Closing any Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses or Purchaser's decision not to assume any Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses as to which Purchaser has not paid the related Cure Amount in accordance with this section. Consistent with the Sale Procedures Order, if requested by the Purchaser, the Seller will commence and prosecute to conclusion, in expedited proceedings before the Bankruptcy Court, objection(s) to the cure amount(s) claimed by the counterparty to any contract, lease or license; provided, however, that Purchaser will reimburse all of the actual and necessary expenses incurred by Seller in connection therewith. A good faith estimate as of the date hereof of the Cure Amounts described in this section, based on the Knowledge of Seller, is set forth on Section 2.6(b) of the Seller Disclosure Schedule. At least fifteen (15) Business Days prior to the Closing Date, the Seller shall prepare and deliver to Purchaser an updated Section 2.6(b) of the Seller Disclosure Schedule setting forth the Cure Amounts. Nothing contained in this Section 2.6 shall restrict or prohibit Purchaser's right to remove any item identified in Section 2.2(a), 2.2(b), 2.2(c), or 2.2(d) of the Seller Disclosure Schedule pursuant to the corresponding Sections thereto.

Section 2.7    Contingent Medicaid Liability.

(a)    Seller and Purchaser are aware that Seller received inquiries (the "Inquiry") from the New York State Attorney General's Medicaid Fraud Control Unit in respect of Seller's receipt of Medicaid payments from the State of New York for the provision of services by certain staff of the Business contracted from outside vendors which staff, at the time they provided the services, are alleged to have lacked the required licensure and/or certification to provide the services for which such Medicaid payments were made (the "Medicaid Payments"). Seller has not been asked, nor has any demand been made for Seller, to make any repayment in respect of the Medicaid Payments, and if such a request or demand is made, Seller shall endeavor to resolve such request or demand with the State of New York prior to the Closing Date. Subject to Section 2.7(b) hereof, if the Inquiry is not fully resolved prior to the Closing Date: (i) Purchaser shall assume and shall timely pay any monetary liability in respect of the Inquiry (the "Contingent Medicaid Liability"); and (ii) a portion of the Purchase Price equal to One Million Five Hundred Thousand Dollars ($1,500,000.00) shall, on the Closing Date, be delivered to Garfunkel Wild, P.C., in its capacity as escrow agent, pursuant to the terms of the Escrow Agreement, substantially in the form attached hereto as Exhibit E (the "Indemnity Escrow Agreement"), to fund all amounts required to be paid by the Seller pursuant to Section 2.7(c) hereof (the "Medicaid Escrow Fund") until the earlier of (x) such time as the Inquiry is resolved, and (y) the date which is three (3) years from the Closing Date (the "Escrow End Date."); provided, however, that in the event that any litigation or other legal proceeding with respect to the Inquiry is commenced, the Medicaid Escrow Fund shall not be released until such proceeding has been fully and finally resolved. Pursuant to the Indemnity Escrow Agreement, any amount not paid to the Purchaser, together with all accrued investment income thereon, shall be released to the Seller upon the earlier of (A) the receipt by the Escrow Agent of a joint written instruction of an authorized representative of each of Seller and Purchaser and (B) subject to the foregoing subsection (y), the Escrow End Date.

2662990v.2
NY01/DREWC/1417455.1
300132622.1

(b)     Notwithstanding anything to the contrary contained herein, Seller shall at all times retain the sole and exclusive right to litigate, defend, negotiate and/or resolve, in its sole discretion, the Inquiry and to communicate with the State of New York (including, but not limited to, its attorneys, agencies and/or offices) and/or any other individuals and/or entities in respect thereof, except if (i) the amount at issue in the Inquiry exceeds the Medicaid Escrow Fund, or (ii) the Inquiry remains unresolved one (1) year prior to the Escrow End Date, in either of which cases Purchaser shall be entitled at any time to participate in the litigation, defense, negotiation and/or resolution of the Inquiry with counsel of its own choice and at its sole cost and expense, and the parties agree to cooperate fully with one another in connection with the defense and/or settlement thereof.  In any case, Seller shall use commercially reasonable efforts consistent with industry standards in connection with the defense and resolution of the Inquiry, including but not limited to, timely responses to all communications initiated by the State of New York and/or any other individuals and/or entities in respect thereof.  In addition, Seller shall maintain and preserve and shall cause its counsel to maintain and preserve all existing records related to the Inquiry (including but not limited to documents and electronically stored information).  Except as provided above, Purchaser shall take no action inconsistent with Seller's sole and exclusive right to litigate, defend, negotiate and/or resolve the Inquiry, as set forth above, including but not limited to, making any payments in respect of the Inquiry not expressly authorized in writing by Seller.  Purchaser shall immediately notify Seller, and provide copies to Seller, of any correspondence it receives with respect to the Inquiry.  Notwithstanding the foregoing, or any other term(s) of this Agreement, Seller does not admit to any liability in respect of the Inquiry, and Seller expressly reserves any and all rights and/or defenses, of any kind and/or nature, that it has and/or may have in connection with the Inquiry, the Medicaid Payments and/or any and all claims relating thereto, and it does not waive any of the foregoing, either in whole or in part (but this sentence shall not affect Seller's obligations under Section 2.7(c) below).

(c)     Seller hereby agrees to indemnify and hold harmless Purchaser to the extent Purchaser pays any amounts to the Medicaid Program in respect of the Contingent Medicaid Liability.  Any claim for indemnification by the Purchaser pursuant to this <u>Section 2.7</u> shall not exceed the amount of the Medicaid Escrow Fund and shall be satisfied exclusively by the Medicaid Escrow Fund.

Section 2.8     <u>Further Conveyances and Assumptions.</u>

(a)     From time to time following the Closing, each party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents at the Closing and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the Liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents at the Closing, and to otherwise make effective the transactions contemplated hereby and thereby; provided however that nothing herein shall obligate or otherwise require Seller to pay any claims or liabilities arising prior to the Petition

Date. In the event that Purchaser or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Purchaser shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to Seller. In the event that Seller receives any Purchased Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver such Purchased Assets (or any payments or proceeds related thereto) to Purchaser.

(b)     To the extent that the assignment of any Purchased Asset shall require the consent of any other Person and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code (each, a "Nonassignable Asset"), (i) nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained, and (ii) except as provided for in Section 4.4(a)(i) hereto, Purchaser shall be obligated to close whether or not the Nonassignable Asset can be transferred and Seller agrees to reasonably cooperate with Purchaser to seek to obtain any required consent; provided however that Seller shall not be required to pay any claims or incur any other obligations in order to obtain such consent. Notwithstanding anything to the contrary contained herein, Purchaser shall not have the right to terminate this Agreement as a result of the failure by Seller or inability of Seller to assign to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof) at the Closing any Assigned Contract, Purchased Personal Property Lease, Purchased Real Property Lease or Purchased Intellectual Property License.

Section 2.9     Bulk Sales Laws.  The parties hereto hereby waive compliance by Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

Section 2.10     Accounts Receivable.

(a)     All Pre-Closing Accounts Receivable of the Business shall remain the property of Seller following the Closing.  All accounts receivable relating to the operation of the Business based on services rendered after midnight on the Closing Date shall be the property of Purchaser.  For the avoidance of doubt, Seller shall be entitled to bill for and receive all amounts collected, to the extent permitted by applicable Law, in respect of services rendered by the Business before the Closing, and Purchaser shall be entitled to bill for and receive all amounts collected in respect of services rendered by the Business after the Closing.

(b)     Subject to Section 3.4 hereto, at Seller's request, Purchaser shall use its commercially reasonable efforts for a period of one hundred and twenty (120) days after the Closing Date to assist Seller in collecting any accounts receivable arising out of the Business before the Closing Date, at no cost to Seller.  Each of Purchaser and Seller agrees that it will pay over or cause to be paid over, insofar as practicable within three (3) Business Days of receipt, to the other (and until so paid, shall hold in trust for the other) all sums received by it or any of its Affiliates in respect of or on account of the other's receivables, and provide therewith information available to it identifying the source of the amounts so paid over so to permit the

21

other to apply correctly such amounts to the other's accounts receivable. In addition, upon reasonable request, each recipient shall allow the other (at the other's cost) to audit, access and copy any of its records relating thereto. All payments for accounts receivable arising out of the Business received from an obligor after the Closing shall be applied to the receivable specifically designated by such obligor; provided that in the event that the obligor does not specifically designate a receivable, the payment shall be applied in the order of the age of the accounts receivable of such obligor, starting with the oldest such accounts receivable provided that no undesignated payments shall be applied to any receivable aged more than two hundred and seventy (270) days. The provisions of this Section 2.10 shall survive the Closing to the extent contemplated herein.

Section 2.11    Agreement Regarding Confidentiality of Patient Information. Seller shall have no obligation to provide Purchaser with custody of Patient Records upon the Closing until Seller and Purchaser enter into a Medical Records Custody Agreement (the "Medical Records Custody Agreement") in the form attached hereto as Exhibit C, and then any such obligation of Seller is subject to Purchaser's compliance with such Medical Records Custody Agreement.

## ARTICLE III

## CONSIDERATION

Section 3.1    Consideration.

The consideration for the Purchased Assets and the performance of the agreed upon obligations shall be, subject to adjustment as provided in Section 10.1(d) hereto, the sum of (a) Sixteen Million Five Hundred Thousand Dollars ($16,500,000.00) (the "Purchase Price") and (b) the assumption by Purchaser of the Assumed Liabilities (subject to credit against the Purchase Price and indemnification by Seller as and to the extent provided in Section 2.7 with respect to the Contingent Medicaid Liability). In addition, Purchaser shall pay to Seller an amount equal to the Early Transfer Adjustment per Section 3.4(b) hereto.

Section 3.2    Purchase Price Deposit. Purchaser shall immediately deposit with Garfunkel Wild, P.C., in its capacity as escrow agent (the "Escrow Agent"), pursuant to that certain Escrow Agreement, dated as of the date hereof, by and among Purchaser, Seller and the Escrow Agent (the "Deposit Escrow Agreement"), by wire transfer of immediately available funds, (a) an amount equal to five percent (5%) of the Purchase Price upon execution of this Agreement (the "Initial Deposit"), and (b) in the event that Purchaser is selected as the prevailing or back-up bidder at the Auction, within one (1) Business Day after the conclusion of the Auction, an amount (the "Additional Deposit", if any, together with the Initial Deposit, the "Escrow Funds") equal to an amount such that together with the Initial Deposit, the Escrow Fund shall be equal to 10% of the Purchase Price, as it may be subsequently amended at the Auction, each such deposit to be released by the Escrow Agent and delivered to either Purchaser or Seller, in accordance with the provisions of the Deposit Escrow Agreement. Pursuant to the Deposit Escrow Agreement, the Escrowed Funds shall be deposited into an interest bearing account and (together with all accrued investment income thereon) distributed as follows:

2662990v.2
NY01/DREWC/1417455.1
300132622.1

(a)     upon the Closing, the Escrow Funds shall be delivered to Seller as partial consideration for the Purchased Assets, and all accrued investment income thereon shall be delivered to Purchaser at the Closing;

(b)     if this Agreement is terminated pursuant to Section 4.4(c)(ii), the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Purchaser;

(c)     if this Agreement is terminated by Seller pursuant to Section 4.4(b)(ii) hereto, the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Seller; or

(d)     if this Agreement is terminated pursuant to Section 4.4 hereto, other than by Seller pursuant to Section 4.4(b)(ii) hereto, the Escrowed Funds, together with all accrued investment income thereon, shall in each case be returned to Purchaser.

Section 3.3     Payment of Purchase Price.  On the Closing Date, Purchaser shall (a) pay the Purchase Price (less an amount equal to the sum of (i) the aggregate Cure Amounts payable by Purchaser, and/or required to be deposited in escrow by Purchaser, under Section 2.6 hereof; (ii) the Escrow Funds being released to SVCMC on the Closing Date pursuant to Section 3.2 hereto; and (iii) the amount of the Medicaid Escrow Fund) at the Closing by wire transfer of immediately available funds into an account designated by Seller; (b) pay the amount of the Medicaid Escrow Fund, if any, at the Closing by wire transfer of immediately available funds to an escrow account maintained by the Escrow Agent as provided in Section 2.7 and the Indemnification Escrow Agreement; and (c) deposit cash in escrow equal to such amount (if any) as is required by Section 2.6 hereto.

Section 3.4     Transition Billing.

(a)     With respect to patients who are admitted to the Business before midnight on the Closing Date and whose care shall continue after midnight on the Closing Date (such patients being referred to herein as "Transition Patients"), between thirty (30) and forty-five (45) days before the Closing Date, Seller shall prepare cut-off billings for all Transition Patients, provided that the New York State Public Health Council contingent approval of the transactions contemplated in this Agreement and the operation of the Business by the Purchaser has been received.  Seller shall be entitled to bill for and receive all amounts collected in respect of such cut-off billings and Purchaser shall have no right thereto.  Subject to patient choice, Purchaser shall admit such patients immediately following midnight on the Closing Date and Seller shall simultaneously discharge them in accordance with the Transition Plan referred to in Section 8.15 hereto.

(b)     Purchaser, independently and in its role as manager following the effective date of the Interim Agreement, shall use its reasonable commercial efforts to encourage patients to choose to continue their care with Seller's Business up until the Closing Date, whether they select to continue their care after the Closing Date with Purchaser or another provider.  Purchaser agrees that it will not transfer Transition Patients to its own care prior to

2662990v.2
NY01/DREWC/1417455.1
300132622.1

Closing. If Purchaser transfers patients to its own care prior to Closing, Purchaser agrees to reimburse Seller, as a Closing adjustment, for all of Seller's (i) direct and indirect costs and expenses, and (ii) lost revenues associated with the care of such patient prior to Closing (collectively, the "Early Transfer Adjustment"). Prior to filing a motion with the Bankruptcy Court to approve this Agreement, the parties shall agree upon a formula for calculating the Early Transfer Adjustment, including allocating the revenue and expenses associated with those Transition Patients who are transferred to Purchaser prior to the Closing Date, so that the Seller's estate is reimbursed for the costs and revenues relating to such patients. Nothing herein shall limit Seller's rights and remedies under Section 4.4(b) hereto and elsewhere in this Agreement.

## ARTICLE IV

## CLOSING AND TERMINATION

Section 4.1    Closing Date. Subject to the satisfaction of the conditions set forth in Article X hereto (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereto (the "Closing") shall take place at the offices of Garfunkel Wild, P.C. located at 111 Great Neck Road, Suite 503, Great Neck, NY 11021 (or at such other place as Seller and Purchaser may designate in writing) at 10:00 a.m. (New York time) on a date agreed upon by Seller and Purchaser that is not less than three (3) or more than seven (7) Business Days following the satisfaction or waiver of the conditions set forth in Article X hereto (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) unless another time or date, or both, are agreed to in writing by Seller and Purchaser. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." With respect to the Closing, unless otherwise agreed by Seller and Purchaser in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of Seller in the assets to be acquired by Purchaser hereunder at the Closing, and any Assumed Liability and all risk of loss with respect to the Business, shall be considered to have passed to Purchaser as of 11:59 p.m. (New York time) on the Closing Date.

Section 4.2    Deliveries by Seller. At the Closing, Seller shall deliver to Purchaser:

(a)    a duly executed bill of sale in a form reasonably acceptable to Purchaser and Seller;

(b)    the Assignment, substantially in the form of Exhibit D, duly executed by Seller;

(c)    the Indemnity Escrow Agreement, if any, substantially in the form of Exhibit E, duly executed by Seller;

(d)    the officer's certificates required to be delivered pursuant to Sections 10.1(a) and 10.1(b) hereto;

24

(e)    the Medical Records Custody Agreement between Purchaser and Seller, substantially in the form attached hereto as Exhibit C, duly executed by Seller;

(f)    copies of all consents and notices required by Section 10.2(c) hereto for which Seller is responsible;

(g)    all other instruments of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser free and clear of all Liens (except Permitted Liens) (provided however that the Sale Order shall be the only required document to evidence the conveyance and transfer free and clear of such Liens); and

(h)    such other Documents, instruments and certificates necessary to transfer the Purchased Assets as Purchaser may reasonably request no later than four (4) days before Closing.

Section 4.3    Deliveries by Purchaser. At the Closing, Purchaser shall deliver to Seller:

(a)    the Purchase Price, in immediately available funds, in accordance with Section 3.3 hereto;

(b)    a duly executed bill of sale in form reasonably acceptable to Purchaser and Seller;

(c)    the Assignment, substantially in the form of Exhibit D, duly executed by Purchaser;

(d)    the Indemnity Escrow Agreement, if any, substantially in the form of Exhibit E, duly executed by Purchaser;

(e)    the Medical Records Custody Agreement between Purchaser and Seller, substantially in the form attached hereto as Exhibit C, duly executed by Purchaser;

(f)    the officer's certificates required to be delivered pursuant to Sections 10.2(a) and 10.2(b) hereto;

(g)    copies of all consents and notices required by Section 10.1(d) hereto for which Purchaser is responsible;

(h)    a copy of any notification that Purchaser is required under the Deposit Escrow Agreement to deliver to the Escrow Agent in order for the Escrow Agent to release the Escrowed Funds to Seller at the Closing;

(i)    evidence reasonably acceptable to Seller of Purchaser's deposit in escrow of such amounts (if any) required by Section 2.6 hereto; and

2662990v.2
NY01/DREWC/1417455.1
300132622.1

(j)    such other Documents, instruments and certificates necessary to transfer the Purchased Assets as Seller may reasonably request no later than four (4) days before Closing.

Section 4.4    Termination of Agreement.

(a)    Termination by Purchaser.    Purchaser may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)    if Seller fails or is unable to assign to Purchaser those Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses listed on Section 4.4(a)(i) of the Purchaser Disclosure Schedule;

(ii)    if any of the conditions to the obligations of Purchaser to close that are set forth in Sections 10.1 and 10.3 hereto shall have become incapable of fulfillment other than as a result of a breach by Purchaser or its Affiliates of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser; provided that the right to terminate this Agreement pursuant to this Section 4.4(a)(ii) shall not apply with respect to the approvals of Governmental Bodies addressed in Sections 4.4(c)(iii) and (c)(iv) hereto, which are addressed and provided for in such Sections;

(iii)    if there shall be a breach by Seller of any representation or warranty, or any covenant or agreement contained in this Agreement, which breach would result in a Material Adverse Effect and cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Purchaser to Seller of such breach;

(iv)    so long as Purchaser is not then in breach of its obligations under this Agreement in any material respect, if the Sale Order is not entered within sixty (60) days from the date the Sale Motion is filed; or

(v)    if the Sale Order or Bidding Procedures Order has been vacated, reversed or modified in a material manner with respect to Purchaser's rights or protections thereunder without Purchaser's prior written consent.

(b)    Termination by Seller.    Seller may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)    if any of the conditions to the obligations of Seller to close that are set forth in Sections 10.2 and 10.3 hereto shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller; provided that the right to terminate this Agreement pursuant to this Section 4.4(b)(i) shall not apply with respect to the approvals of Governmental Bodies addressed in Sections 4.4(c)(iii) and (c)(iv) hereto, which are addressed and provided for in such Sections;

26

(ii)    if there shall be a breach by Purchaser of any representation or warranty, or by Purchaser of any covenant or agreement contained in this Agreement, which breach would preclude the Purchaser from consummating the Contemplated Transactions or performing its obligations under this Agreement and cannot be cured or has not been cured by within twenty (20) Business Days after the giving of written notice by Seller to Purchaser of such breach; or

(iii)    if the Bidding Procedures Order or the Sale Order are reversed or materially modified (other than a reversal or modification sought by Seller).

(c)    Termination by Purchaser or Seller. Either Purchaser or Seller may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)    by mutual written consent of Seller and Purchaser;

(ii)    if the Bankruptcy Court shall enter an Order approving a Competing Bid and a transaction associated with that bid actually closes, subject to the provisions of the Bidding Procedures Order and the Sale Order;

(iii)    upon twenty (20) Business Days' written notice to the other party after the later of either (A) November 15, 2010 or (B) three (3) months after the entry of the Sale Order by the Bankruptcy Court, if either Purchaser or Seller reasonably determines, after consultation with the other party, that insufficient progress is being made on the CON Application so that it is more likely than not that DoH will not provide such CON Approval by the CON Termination Date. Notwithstanding the foregoing, neither Purchaser nor Seller may terminate this Agreement under this Section 4.4(c)(iii) if within such twenty (20) Business Day period DoH provides the CON Approval or Seller receives from DoH reasonably satisfactory assurances that Purchaser will receive the CON Approval by the CON Termination Date;

(iv)    upon twenty (20) Business Days' written notice to the other party if the Closing shall not have occurred by the close of business on November 15, 2010, (the "CON Termination Date"); provided that such termination pursuant to this Section 4.4(c)(iv) shall not be effective if within such twenty (20) Business Day period all outstanding required regulatory approvals shall have been obtained and all other closing conditions shall have been satisfied; provided, further, that if the Closing shall not have occurred on or before the CON Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement, then the breaching party or its Affiliates may not terminate this Agreement pursuant to this Section 4.4(c)(iv); or

(v)    upon twenty (20) Business Days' prior written notice to the other party if DoH revokes its agreement to waive any Medicaid successor liability of Purchaser for Healthcare Program Liabilities arising from events prior to the Closing Date (other than the Contingent Medicaid Liability) in connection with the issuance of emergent CON Approval, as reasonably determined by Purchaser and Seller.

2662990v.2
NY01/DREWC/1417455.1
300132622.1

(d)     Extension of Time Periods.  The time periods for termination of this Agreement set forth in this Section 4.4 may be extended upon the written agreement of the parties without the further consent of the Bankruptcy Court.

Section 4.5     Procedure for Termination.  In the event of termination of this Agreement by Purchaser or Seller, or both, pursuant to Section 4.4 hereto, written notice thereof shall forthwith be given to the other party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 4.4 hereto) the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 4.6 hereto, without further action by the parties.

Section 4.6     Effect of Termination.

(a)     In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any party; provided that the obligations of the parties set forth in the Confidentiality Agreement, Deposit Escrow Agreement, Indemnity Escrow Agreement, Sections 3.2, 4.6, 7.1, and 8.6 hereto and Article XII hereto, and to the extent necessary to effectuate the foregoing enumerated provisions, Article I hereto, shall survive any such termination and shall be enforceable in accordance with their terms. In addition, if this Agreement is terminated as provided herein, Purchaser shall upon request redeliver to Seller as soon as practicable any or all Documents, work papers and other material relating to the Business, whether obtained before or after the execution hereof, together with written certification by an authorized officer of Purchaser who has supervised its compliance with this sentence that confirms such compliance.

(b)     Nothing in this Section 4.6 shall relieve the parties of any Liability for a breach of this Agreement prior to the date of termination of this Agreement.  If this Agreement is terminated in accordance with Sections 4.4 and 4.5 hereto, Purchaser shall not, directly or indirectly, and shall cause its Affiliates not to, for a period of one (1) year from the date of this Agreement, solicit, or recruit, any Employee of Seller, or any member of Seller's professional staff principally engaged in the Business, without Seller's consent; it being understood that routine job postings and solicitations of a generalized nature do not constitute such direct solicitations.

# ARTICLE V

# REPRESENTATIONS AND WARRANTIES OF SELLER

Except as otherwise disclosed to Purchaser in a schedule delivered to Purchaser by Seller prior to the execution of this Agreement (the "Seller Disclosure Schedule"), and except for the effects of the commencement of the Bankruptcy Case, Seller hereby represents and warrants to Purchaser as follows:

Section 5.1     Organization and Good Standing.  Seller is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the State of New York,

2662990v.2
NY01/DREWC/1417455.1
300132622.1

and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 5.2    Authorization of Agreement.  Subject to entry of the Sale Order, (a) Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action, including approval of its members (as applicable), necessary for it to validly execute and deliver, this Agreement and each other agreement, document, or instrument or certificate contemplated by this Agreement to be executed and delivered by Seller in connection with entering into this Agreement and (b) subject to the satisfaction of the conditions referred to in Section 5.3 hereto, Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action necessary for it to validly execute and deliver, each agreement, document, or instrument or certificate contemplated by this Agreement to be executed by Seller in connection with the consummation of the Contemplated Transactions (together with the other Documents, other than this Agreement, referred to in clause (a) of this sentence, the "Seller Documents") and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  This Agreement and each of the Seller Documents contemplated to be executed and delivered in connection with Seller entering into this Agreement have been, and each other Seller Document will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Sale Order, and, with respect to Seller's obligations under Section 7.1 hereto, the entry of the Bidding Procedures Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a Legal Proceeding at law or in equity).  None of the execution and delivery by Seller of this Agreement and the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Seller.

Section 5.3    Consents of Third Parties; Contractual Consents.

(a)    Except as set forth in Section 5.3 of the Seller Disclosure Schedule, Seller is not required to obtain any consent, waiver, approval, Order, Permit or authorization of, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Seller Documents by Seller, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order, (ii) the entry of the Bidding Procedures Order with respect to Seller's obligations under Section 7.1 hereto,  (iii) the Healthcare Regulatory Consents, and (iv) approvals under applicable Antitrust Laws.

2662990v.2
NY01/DREWC/1417455.1
300132622.1

(b)     Except as set forth on Section 5.3(b) of the Seller Disclosure Schedule and as otherwise superseded by the applicable provisions of the Bankruptcy Code, none of the execution and delivery by Seller of this Agreement or any of the Seller Documents, the consummation of the Contemplated Transactions by Seller, or compliance by Seller with any provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Assigned Contract or Permit applicable to the Business.

Section 5.4     Financial Information.     SVCMC has made available to Purchaser (i) Seller's unaudited trial balance for Home Health Business as of December 31, 2009, December 31, 2008 and December 31, 2007 (collectively, the "Year End Trial Balance"), and (ii) Seller's unaudited trial balance as of January 31, 2010 (the "Interim Trial Balance"), and together with the Year End Trial Balance, the "Trial Balances"). The Trial Balances have been compiled from the books and records of the Home Health Business as at the date and correctly reflect, in all material respects, the revenues and direct expenses of the Business for each of the three years ended December 31, 2009 and for the month ended January 31, 2010.

Section 5.5     Title to Purchased Assets.     Except as set forth in Section 5.5 of the Seller Disclosure Schedule, and other than the real property subject to the Real Property Leases, intellectual property licensed to Seller and the personal property subject to the Personal Property Leases, Seller owns each of the Purchased Assets, and Purchaser will, as of the time set forth in the last sentence of Section 4.1, be vested with good title to such Purchased Assets, subject to entry of the Sale Order, free and clear of all Liens, other than Permitted Liens, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

Section 5.6     Real Property.

(a)     Section 5.6(a) of the Seller Disclosure Schedule sets forth a true, correct and complete list of (i) all real property and interests in real property owned in fee by Seller and exclusively used in the Business (the "Owned Properties"), and (ii) all real property and interests in real property leased or licensed by Seller and exclusively used in the Business, as lessee, lessor, licensee or licensor (the "Real Property Leases"). Seller has (A) insurable fee simple title to all Purchased Owned Property, free and clear of all Liens except Liens set forth in Section 5.6(a) of the Seller Disclosure Schedule and Permitted Liens and (B) a valid leasehold interest in the Purchased Real Property Leases, subject to entry of the Sale Order, free and clear of all Liens other than Permitted Liens.

(b)     All Purchased Real Property Leases are in full force and effect. Except as set forth in Section 5.6(b) of the Seller Disclosure Schedule and as otherwise superseded by the applicable provisions of the Bankruptcy Code, Seller has not received written notice of any default which remains uncured, and, to the Knowledge of Seller, the other parties under each of the Purchased Real Property Leases have complied in all material respects therewith, and are not in default thereunder beyond any applicable notice and cure periods.

2662990v.2
NY01/DREWC/1417455.1
300132622.1

(c)     Except as set forth in Section 5.6(c) of the Seller Disclosure Schedule, to the Knowledge of Seller, there is no pending or threatened legal action affecting the Purchased Real Property, including any condemnation actions.

Section 5.7     Tangible Personal Property.  Section 5.7 of the Seller Disclosure Schedule sets forth all leases of personal property, including Equipment, exclusively used by Seller in the operation of the Business ("Personal Property Leases") that involve annual payments in excess of $10,000.  Except as set forth in Section 5.7 of the Seller Disclosure Schedule, Seller is not in material breach or default thereunder.

Section 5.8     Intellectual Property.  Seller has licenses to use all Third-Party Software used in the operation of the Business as now operated.

Section 5.9     Material Contracts.

(a)     Section 5.9(a) of the Seller Disclosure Schedule sets forth a list of all of the following Contracts to which Seller is a party or by which it is bound and that are exclusively related to the Business or by which the Purchased Assets may be bound or affected and that are Assigned Contracts (collectively, the "Material Contracts"):

(i)     Contracts with any Affiliate or current or former officer or director of Seller;

(ii)     Any clinical affiliation agreements with healthcare providers relating to the Business;

(iii)     Contracts with any labor union or association representing any Employees of Seller;

(iv)     Any written employment, confidentiality, non-competition, severance or termination agreements as to employees or consultants of the Business;

(v)     Contracts with a Governmental Body;

(vi)     Contracts which involve the annual expenditure of more than $100,000 in the aggregate or require performance by any party more than one year from the date hereof that, in either case, are not terminable by Seller without penalty on less than one hundred eighty (180) days' notice.

(b)     True and complete copies of the Material Contracts have been made available to Purchaser by Seller prior to the date of this Agreement.

(c)     Except (i) as otherwise provided in the Bankruptcy Code, (ii) for events of default arising as a result of the commencement of the Bankruptcy Case, or (iii) for general principles of equity that may limit the specific performance of particular provisions, each Material Contract is a legal, valid and binding obligation of Seller and is enforceable by Seller

31

against the other party or parties to such Material Contract in accordance with its terms, and Seller is not in material breach or default thereunder.

Section 5.10    Employees; Employee Benefits.

(a)    Section 5.10(a) of the Seller Disclosure Schedule sets forth a true and complete list of all Plans. Each Plan has been administered and is in compliance with the terms of such Plan and in accordance with all other applicable Laws where the failure thereof would have a Material Adverse Effect.

(b)    Except as set forth in Section 5.10(b) of the Seller Disclosure Schedule, no "reportable event" (as such term is used in Section 4043 of ERISA), "prohibited transaction" (as such term is used in Section 406 of ERISA or Section 4975 of the Code) or "accumulated funding deficiency" (as such term is used in Section 412 or 4971 of the Code) has heretofore occurred with respect to any Plan which would have a Material Adverse Effect.

Section 5.11    Employment and Labor.

(a)    Section 5.11(a) of the Seller Disclosure Schedule (i) sets forth a true and complete list of all Employees as of the date set forth therein (ii) shall be delivered by Seller to Purchaser not later than three (3) Business Days after the entry of the Sale Order and (iii) to the Knowledge of the Seller, accurately sets forth in all material respects the following information: (1) the name and position; (2) date of hire; (3) current annual salary or hourly wage; (4) average number of hours worked per week; (5) date of last salary increase; if any. Thereafter and prior to the Closing Date, Seller shall likewise deliver as soon as practicable to Purchaser updates to Section 5.11(a) of the Seller Disclosure Schedule.

(b)    Seller will make available to Purchaser complete and accurate copies of each material employment, consulting or similar agreements between Seller and any service provider to the Business.

Section 5.12    Compliance with Laws; Permits.

(a)    Seller is duly authorized by DoH to operate the Business. The operating certificate issued to the Business authorizes the operation of the CHHA in the following Counties:   Bronx, Kings, Nassau, New York, Queens, Richmond, Suffolk and Westchester.

(b)    Seller is eligible to receive payment under Titles XVIII and XIX of the Social Security Act and is a "provider" under existing provider agreements with the Medicare and Medicaid programs (collectively, the "Healthcare Programs") through the applicable intermediaries. Except as set forth in Section 5.12(b) of the Seller Disclosure Schedule, there is no pending or to Seller's Knowledge, threatened Legal Proceeding under the Healthcare Programs involving the Business.

2662990v.2
NY01/DREWC/1417455.1
300132622.1

(c)     Except as set forth in <u>Section 5.12(c)</u> of the Seller Disclosure Schedule and except with respect to the Purchased Real Property, to the Knowledge of Seller, Seller is in compliance in all material respects with Laws and Permits applicable to the Purchased Assets or the Business.

(d)     Except as a result of the Bankruptcy Case, there are no outstanding Orders, injunctions or decrees of any Governmental Body that apply to the Business or the Purchased Assets.

(e)     The Seller has all Permits that are necessary to enable it to own, lease or otherwise hold the Purchased Assets and to operate the Business as currently conducted. Such permits are in full force and effect and to Seller's Knowledge, no proceedings are pending or threatened that would have the effect of revoking or limiting the transfer of the Permits.

Section 5.13   <u>Absence of Certain Developments</u>.  Except as expressly contemplated by this Agreement or as set forth on <u>Section 5.13</u> of the Seller Disclosure Schedule, since December 31, 2009 the Seller has conducted the Business in the Ordinary Course of Business and has made commercially reasonable efforts to preserve the goodwill of the Business and its relationship with patients and suppliers with whom it deals in connection with the Business.

Section 5.14   <u>Taxes</u>.  Seller is an entity exempt from federal income tax under Section 501(c)(3) of the Code and exempt from New York State income, corporate or franchise tax under the comparable provisions of the Tax Law of the State of New York, and to Seller's Knowledge, there is no action pending by any Tax Authority to revoke its tax-exempt status.

Section 5.15   <u>Litigation</u>.  Except as set forth in <u>Section 5.15</u> of the Seller Disclosure Schedule, there are no Legal Proceedings pending or, to the Knowledge of Seller, threatened against Seller involving the Business or the Purchased Assets.

Section 5.16   <u>Financial Advisors</u>.  Except as set forth in <u>Section 5.16</u> of the Seller Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the Contemplated Transactions and no Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

Section 5.17   <u>No Other Representations or Warranties; Schedules</u>.  Except for the representations and warranties contained in this <u>Article V</u> (as modified by the Seller Disclosure Schedules), neither Seller nor any other Person makes any other representation or warranty whether express or implied, written or oral, with respect to Seller, the Business, the Purchased Assets, the Assumed Liabilities or the Contemplated Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, its Affiliates or any of their respective officers, directors, members, employees, agents, consultants or other Representatives. Except for the representations and warranties contained in this <u>Article V</u> (as modified by the Seller Disclosure Schedules), Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all

2662990v.2
NY01/DREWC/1417455.1
300132622.1

Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser or its Representatives by any director, officer, member, employee, agent, consultant or other Representative of Seller or any of its Affiliates). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business. Seller makes no implied representation or warranty as to the condition, merchantability, usage, suitability or fitness for any particular purpose with respect to the Purchased Assets except for the representations and warranties contained in this Article V (as modified by the Seller Disclosure Schedules). The disclosure of any matter or item in any Section of the Seller Disclosure Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect. The representations and warranties of Seller in this Agreement are for diligence purposes only and do not survive the Closing, however their disclaimers survive.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as otherwise disclosed to Seller in a schedule delivered to Seller by Purchaser prior to the execution of this Agreement (the "Purchaser Disclosure Schedule"), Purchaser hereby represents and warrants to Seller as follows:

Section 6.1 <u>Organization and Good Standing</u>. Purchaser is a not-for-profit corporation duly organized, validly existing and in good standing under the Laws of the State of New York and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 6.2 <u>Authorization of Agreement</u>. Purchaser has all requisite power, authority and legal capacity to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by it in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly and validly authorized by all necessary corporate action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior the Closing, duly and validly executed and delivered by Purchaser, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a Legal Proceeding at law or in equity). None of the execution and delivery by Purchaser of this Agreement and the Purchaser Documents, the consummation of the transactions contemplated

2662990v.2
NY01/DREWC/1417455.1
300132622.1

hereby or thereby, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Purchaser.

Section 6.3    Conflicts; Consents of Third Parties.

(a)    Except as set forth in Section 6.3(a) of the Purchaser Disclosure Schedule, Purchaser is not required to obtain any consent, approval, authorization, waiver, Order or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) the Healthcare Regulatory Consents, (ii) approvals under applicable Antitrust Laws and (iii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications (A) that have already been obtained or made or (B) of which the failure to have obtained or made would not have a Material Adverse Effect or would not reasonably be expected to prevent or materially delay the ability of Purchaser to perform or consummate the Contemplated Transactions.

(b)    Except as set forth in Section 6.3(b) of the Purchaser Disclosure Schedule, none of the execution and delivery by Purchaser of this Agreement or any of the Purchaser Documents, the consummation of the Contemplated Transactions by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser or any of its Affiliates is a party or by which any of the properties or assets of Purchaser or any of its Affiliates are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the Contemplated Transactions.

Section 6.4    Litigation. There are no Legal Proceedings pending or, to the Knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions. Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions.

Section 6.5    Financial Advisors. Except as set forth in Section 6.5 of the Purchaser Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the Contemplated Transactions and no Person is entitled to any fee or commission or like payment from Seller in respect thereof.

Section 6.6    Healthcare Regulatory Compliance Status.

2662990v.2
NY01/DREWC/1417455.1
300132622.1

(a)     To Purchaser's Knowledge, no fact exists that would cause DoH to recommend disapproval of its CON Application on the basis of character, competency or financial feasibility or which could reasonably be expected to prevent or materially delay the consummation of the Contemplated Transactions by Purchaser.

Section 6.7     Acknowledgement Regarding Condition of the Business. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, whether express or implied or written or oral, beyond those expressly given by Seller to Purchaser in Article V hereto (as modified by the Seller Disclosure Schedule), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred to Purchaser on a "WHERE IS" and, as to condition, "AS IS" basis. Purchaser further represents that neither Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, written or oral, as to the accuracy or completeness of any information regarding Seller, the Business or the Contemplated Transactions not expressly set forth in this Agreement, and neither Seller, any of their Affiliates or any other Person will have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or the use by Purchaser or any of its Affiliates of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its Representatives, or any other document or information in any form provided to Purchaser or its Representatives in connection with the sale of the Business and the Contemplated Transactions. Purchaser acknowledges that it, along with its Representatives, has conducted to its satisfaction, its own independent investigation of the Business and the Purchased Real Property and, in making the determination to proceed with the Contemplated Transactions, Purchaser has relied on the results of its own independent investigation. The Purchased Real Property is being sold by Seller and Purchaser agrees to accept the Purchased Real Property in "as-is" and "where-is" condition on the Closing Date.

Section 6.8     Financing. Purchaser has and on the Closing Date Purchaser will have sufficient funds on hand to consummate the Contemplated Transactions. Purchaser acknowledges that it shall not be a condition to the obligations of Purchaser to consummate the Contemplated Transactions that Purchaser have sufficient financial resources for payment of the Purchase Price.

Section 6.9     No Other Representations or Warranties; Schedules. Except for the representations and warranties contained in this Article VI (as modified by the Purchaser Disclosure Schedules), neither Purchaser nor any other Person makes any other representation or warranty, whether express or implied, written or oral, with respect to Purchaser or the Contemplated Transactions, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser or any of their respective officers, directors, members, managers, employees, agents, consultants or other Representatives. Except for the representations and warranties contained in this Article VI (as modified by the Purchaser Disclosure Schedules), Purchaser disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller or its Representatives (including any opinion, information,

36

projection, or advice that may have been or may be provided to Seller by any director, officer, member, manager, employee, agent, consultant, or other Representative of Purchaser or any of its Affiliates). The disclosure of any matter or item in any Section of the Purchaser Disclosure Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

Section 7.1    Competing Transaction.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or otherwise better competing bids (each a "Competing Bid") in accordance with the Bidding Procedures Order. If one or more Competing Bids are received, Seller shall conduct an auction of the Purchased Property in accordance with the Bidding Procedures Order (the "Auction").

(b)    Seller is permitted to cause its representatives and affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person (in addition to Purchaser and its affiliates, agents and representatives) in connection with any sale or other disposition of all or any part of the Purchased Assets. In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Purchased Assets to prospective purchasers.

Section 7.2    Bankruptcy Court Filings. No later than five (5) Business Days after the execution of this Agreement, Seller shall file with and seek the approval of the Bankruptcy Court of the Sale Motion,. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other Documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Bidding Procedures Order or Sale Order shall be appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.

Section 7.3    Notice of Sale. Notice of the sale of Purchased Assets contemplated in this Agreement shall be served in accordance with the Bidding Procedures Order.

Section 7.4    Treatment of Monetary Obligations. All monetary obligations of the Seller to Purchaser, including but not limited to the obligation of the Seller in respect of Transfer Taxes (if any), shall be entitled to administrative expense priority in the Bankruptcy Case.

37

# ARTICLE VIII

## COVENANTS

Section 8.1    Access to Information.    Subject to Section 2.11 hereto and the other provisions of this Section 8.1 and subject to compliance with applicable Antitrust Laws, Seller agrees that, prior to the Closing Date, and at its own expense, Purchaser shall be entitled, through its Representatives, to make such investigation of the assets, properties and operations of the Business and such examination of the books and records of Seller pertaining to the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and, and at its own expense, to make extracts and copies of such books and records; it being understood, however, that the foregoing shall not entitle Purchaser to access (a) the books, records and Documents referred to in Section 2.3(h) hereto, or (b) any books, records or Documents the disclosure of which by Seller to Purchaser would (i) notwithstanding Section 2.11 hereto, violate any patient confidentiality obligation of Seller or (ii) any other agreement or any obligation of confidentiality to which Seller is a party or is bound prior to the date hereof or (iii) any obligation of confidentiality by which Seller is bound under applicable Law. In addition, if Purchaser is the successful bidder at Auction, Purchaser shall be permitted to have access to Patient Records and employee files solely for the purpose of implementing the Transition Plan set forth in Section 8.15 of the Purchaser Disclosure Schedule. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, any request for such examination shall be made to one of the Persons identified in Section 8.1 of the Seller Disclosure Schedule, and Purchaser's use of the information disclosed by Seller shall be subject to any applicable agreement to which Seller is a party or is bound prior to the date hereof or under applicable Law. Seller shall cause its Representatives to cooperate with Purchaser and its Representatives in connection with such investigation and examination, and Purchaser and its Representatives shall cooperate with Seller and its Representatives and shall use its commercially reasonable efforts to minimize any disruption to Seller's business and operations, including the Business. Notwithstanding anything herein to the contrary, Seller shall not be required to permit any such investigation or examination if, and to the extent that, Seller, upon advice of counsel, determines that such investigation or examination by Purchaser would or is reasonably likely to result in a loss of any attorney-client or attorney work product privilege available to Seller.

Section 8.2    Conduct of the Business Pending the Closing.

(a)    Subject to the terms and conditions of the Interim Agreement, during the period from the date hereof through and including the Closing, except (i) as set forth in Section 8.2 of the Seller Disclosure Schedule, (ii) as required by applicable Law (including without limitation as a result of the commencement of the Bankruptcy Case), (iii) as otherwise expressly provided in this Agreement, or (iv) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Seller shall use commercially reasonable efforts to:

(A)    operate the Business in the Ordinary Course of Business;

2662990v.2
NY01/DREWC/1417455.1
300132622.1

(B)    (I) maintain the Purchased Assets consistent with past practice, ordinary wear and tear excepted and (II) maintain commercially reasonable insurance coverage in place with respect to the Purchased Assets;

(C)    perform when due all material obligations under the Assigned Contracts, the Purchased Intellectual Property Licenses, the Purchased Real Property Leases and the Purchased Personal Property Leases except to the extent such performance is excused under the Bankruptcy Code or by order of the Bankruptcy Court;

(D)    maintain the books and records of the Business in the Ordinary Course of Business;

(E)    maintain the Permits applicable to the Business; and

(F)    retain staff employed in the Business with the goal of maintaining the ongoing operation thereof. In connection with such efforts, however, Seller will not be obligated to make any retention or severance payments or pay any other amounts or incur any other obligations.

(b)    Without limiting the generality of the foregoing, from the date of this Agreement through and including the Closing, Seller shall not, except (i) as set forth in Section 8.2 of the Seller Disclosure Schedule, (ii) as required by applicable Law (including without limitation as a result of the commencement of the Bankruptcy Case), (iii) as otherwise expressly provided in this Agreement or (iv) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), solely as it relates to the Business:

(A)    other than in the Ordinary Course of Business, including, but not limited to, as may be required by a CBA materially increase the annual level of compensation of any Employee, (II) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any Employee, or (III) with respect to any Employee, increase the coverage or benefits available under any (or create any new) Plan except, in each case, as required by applicable Law from time to time in effect or by any of the Plans or the Employee pension plans maintained by Seller;

(B)    sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets (except pursuant to an existing Contract in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets); or

(C)    agree to do anything prohibited by this Section 8.2.

Section 8.3    Consents; Insurance.

(a)    Through the filing of the Sale Motion and except as may be satisfied through the entry of the Sale Order, Seller shall use its commercially reasonable efforts, and Purchaser shall cooperate with Seller, including by taking the actions referred to in Section

2662990v.2
NY01/DREWC/1417455.1
300132622.1

8.4 hereto, to obtain at the earliest practicable date following entry of the Sale Order all necessary consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Seller (including all consents listed in Section 5.3 of the Seller Disclosure Schedule), and to give at the earliest practicable date following entry of the Sale Order any notices required to be given by Seller, in order for Seller to consummate the Contemplated Transactions on the terms and in the manner provided hereby; provided that Seller shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than postpetition filing or postpetition application fees payable to any Governmental Body) or to initiate any litigation or Legal Proceedings to obtain any such item except as otherwise provided by Section 8.4 hereto. Purchaser shall use its commercially reasonable efforts, and Seller shall cooperate with Purchaser, including by taking the actions referred to in Section 8.4 hereto, to obtain at the earliest practicable date following entry of the Sale Order all consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Purchaser, and to give at the earliest practicable date following entry of the Sale Order any notices required to be given by Purchaser, in order for Purchaser to consummate the Contemplated Transactions on the terms and in the manner provided hereby and to operate the Business after the Closing; provided that Purchaser shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any litigation or Legal Proceedings to obtain any such consent or approval except as otherwise provided by Section 8.4 hereto.

(b) As of the Closing, Purchaser shall have appropriate insurance coverage in place with respect to the Business consistent with what would be maintained under good industry business practices.

Section 8.4    Regulatory Approvals.

(a) Purchaser shall, at its own cost and expense, submit to DoH a request for the issuance of a temporary authorization to conduct the Business on an emergent basis, subject to submission by Purchaser to DoH of a permanent DoH Application thereafter, within two (2) Business Days after the entry of the Sale Order. Purchaser shall, at its own cost and expense, (i) within the later of thirty (30) Business Days after the date of this Agreement or five (5) Business Days after entry of the Sale Order by the Bankruptcy Court, provide to Seller a draft of the CON Application and consult with Seller regarding such application; (ii) within five (5) Business Days after the entry of the Bidding Procedures Order by the Bankruptcy Court, cooperate with Seller in initiating informal discussions with DoH concerning the form and substance of the CON Application; (iii) within the later of five (5) Business Days after submission of a draft CON Application to Seller by Purchaser pursuant to Section 8.4(a)(i) or twenty (20) Business Days after the entry of the Sale Order by the Bankruptcy Court, formally submit the CON Application to DoH; and (iv) promptly after the entry of the Sale Order by the Bankruptcy Court, submit to any other Governmental Body all other applications for any Healthcare Regulatory Consents required in order for Purchaser to consummate the Contemplated Transactions and to operate the Business in accordance with applicable Law (collectively with the CON Application, the "Healthcare Applications"). Purchaser shall provide Seller with an opportunity to review the Healthcare Applications in advance of filing, and both

40

parties shall cooperate in the preparation and prosecution of the Healthcare Applications. Purchaser shall use best efforts to prosecute the Healthcare Applications and shall timely submit all information and Documents requested in connection therewith by DoH and any other Governmental Body. Without limiting the generality of the foregoing, Purchaser shall immediately take such actions as may be reasonably necessary to cure any character or competency objection that DoH may raise to the CON Application, including removing or replacing any officer or director that fails to obtain character and competency approval from DoH. Purchaser shall provide Seller with prompt written notice of Purchaser's submission of a Healthcare Application. Within three (3) Business Days of its submission or receipt, Purchaser shall deliver to Seller a complete copy of all correspondence to or from DoH or any other applicable Governmental Body having jurisdiction concerning a Healthcare Application. Purchaser shall provide Seller with periodic reports of Purchaser's efforts to obtain all Healthcare Regulatory Approvals. In addition, Purchaser shall provide Seller with notice as promptly as practicable of its receipt of DoH's approval, contingent approval or a rejection of the CON Application, along with a copy of any documentation related thereto. Purchaser shall not knowingly take any action prior to the Closing intended to disqualify Purchaser as an established and licensed operator of the Business.

(b) If necessary, each of Purchaser and Seller shall use its commercially reasonable efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under any of the Antitrust Laws with respect to the Contemplated Transactions (including such submission to the Antitrust Bureau of the Office of the Attorney General of the State of New York (the "Antitrust Bureau") as may be required in connection with the CON Application under the Donnelly Act (New York General Business Law Sections 340 through 347)) as promptly as practicable and, in any event, within five (5) Business Days in connection with all submissions to the Antitrust Bureau in connection with the CON Application and within five (5) Business Days in the case of all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request under any of the Antitrust Laws for information, Documents, or other materials received by each of them or any of their respective Affiliates from the Federal Trade Commission (the "FTC"), the Antitrust Division of the United States Department of Justice (the "Antitrust Division"), the Antitrust Bureau or any other Governmental Body in respect of such filings or the Contemplated Transactions and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such Documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division, the Antitrust Bureau or any other Governmental Body under any of the Antitrust Laws with respect to any such filing or any such transaction.

(c) If necessary, each of Purchaser and Seller shall use its commercially reasonable efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates in respect of the Contemplated Transactions under any applicable Law, other than those referred to in Section 8.4(a) or 8.4(b) hereto, including such filings as are required to obtain the consents, approvals, authorizations, waivers, Orders, licenses or Permits or to provide the notices specified in Section 5.3 of the Seller Disclosure Schedule or

Section 6.3(a) of the Purchaser Disclosure Schedule, as promptly as practicable, (ii) comply at the earliest practicable date with any request for additional information, Documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Body in respect of such filings or the transactions contemplated by this Agreement and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such Documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any Governmental Body under such Laws with respect to any such filing or any such transaction.

(d)     Each of Purchaser and Seller shall use its commercially reasonable efforts to furnish to each other through counsel all information required for any application or other filing to be made pursuant to any applicable Law in connection with the Contemplated Transactions. Each such party shall promptly inform the other parties through counsel of any material oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No such party shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.

(e)     Subject to applicable Law, Purchaser and Seller will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under any of the Antitrust Laws. Each such party may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.4 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials.

(f)     Each of Purchaser and Seller shall use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the Contemplated Transactions under any of the Antitrust Laws. In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement as in violation of any of the Antitrust Laws, each such party shall cooperate and use its commercially reasonable efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other Order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the Contemplated Transactions, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and Seller decide that litigation is not in their respective reasonable best interests. Each such party shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under any of the Antitrust Laws with respect to such transactions as promptly as possible after the date of this Agreement. In connection with and without limiting the

42

foregoing, each of Purchaser and Seller agrees to use its commercially reasonable efforts to take promptly any and all steps necessary to avoid or eliminate each and every impediment under any Antitrust Laws that may be asserted by any Federal, state and local and non-United States antitrust or competition authority, so as to enable Purchaser and Seller to close the Contemplated Transactions as expeditiously as possible.

Section 8.5    Further Assurances.

(a)    Each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Contemplated Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Contemplated Transactions. Without limiting the generality of the foregoing, from time to time after the Closing, without additional consideration, each party hereto will (or, if appropriate, cause its Affiliates to) execute and deliver such further instruments and take such other action as may be necessary or reasonably requested by the other party to make effective the Contemplated Transactions and to provide the other party with the intended benefits of this Agreement. In addition, upon the reasonable request of Purchaser, Seller shall execute, acknowledge and deliver all such further assurances, deeds, assignments, powers of attorney and other instruments and paper as may be required to sell, transfer, convey, assign and deliver to Purchaser all right, title and interest in, to and under the Purchased Assets. If any party to this Agreement shall, following the Closing, have in its possession any asset or right which under this Agreement should have been delivered to the others at the Closing, such party shall promptly deliver such asset or right to the others.

(b)    Without limiting the generality of the foregoing, if Purchaser or any of its Affiliates shall at any time after the Closing receive any charitable gift, contribution or bequest that might be an Excluded Asset, or receives any notice that such a charitable gift, contribution or bequest may be received or available to Purchaser, Purchaser shall give prompt written notice thereof to Seller and make available to Seller upon reasonable request such information that Purchaser or any of its Affiliates has available to it regarding such gift, contribution or bequest and will cooperate with Seller in determining whether such gift, contribution or bequest should be characterized as an Excluded Asset. The provisions of this Section 8.5 shall survive the Closing.

Section 8.6    Confidentiality.

(a)    From and after the date hereof, Purchaser shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Seller, and not use to the detriment of Seller, any Seller Confidential Information relating to or obtained from Seller or its Representatives. For purposes of this Section 8.6, "Seller Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Purchased Assets, the Assumed Liabilities, the Business, the Excluded Assets, the Excluded Liabilities or the Other Businesses, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how,

marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided that Seller Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Purchaser or any of its Representatives, (ii) becomes available to Purchaser on a non-confidential basis from a source other than Seller or its Representatives; provided that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Purchaser from a third party having the right to disseminate the Seller Confidential Information without restriction on disclosure or (iv) can be shown by Purchaser through written Documents or evidence maintained by Purchaser to have been independently developed by either of them; and provided, further, that upon the Closing, the restrictions contained in this Section 8.6 shall not apply to confidential or proprietary information related primarily to the Business or the Purchased Assets and the Assumed Liabilities. Purchaser may disclose any of the Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. Purchaser shall instruct its Representatives having access to the Seller Confidential Information of such obligation of confidentiality. If Purchaser or anyone to whom it has transmitted Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Confidential Information, Purchaser shall provide Seller with prompt written notice prior to making any disclosure so that such Seller may seek a protective Order or other appropriate remedy. If such protective Order or other remedy is not obtained, Purchaser shall furnish only that portion of the Seller Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed, and Purchaser will exercise commercially reasonable efforts to obtain assurance to the extent possible that confidential treatment will be accorded to that portion of Seller Confidential Information that is being disclosed. In any event, Purchaser will not oppose action by Seller to obtain an appropriate protective Order or other reliable assurance that confidential treatment will be accorded Seller Confidential Information.

(b)     From and after the Closing Date, unless this Agreement is terminated prior to the Closing, Seller shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Purchaser, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with (i) operating the Other Businesses in the ordinary course before and after the Closing Date, (ii) any investigations by Governmental Bodies, (iii) compliance activities after the Closing related to periods occurring prior the Closing Date, (iv) any Legal Proceedings, (v) enforcing any rights or other claims of Seller under this Agreement, (vi) performing any obligations of Seller under this Agreement, including billing and collecting Pre-Closing Account Receivable and other related activities, or (vii) as permitted by the Medical Records Custody Agreement. For purposes of this Section 8.6(b), "Business Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Business or to the Purchased Assets or the Assumed Liabilities, other than information primarily pertaining to the Excluded Assets, the Excluded Liabilities or the Other Businesses, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or

44

proprietary matters; provided that Business Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Seller or its Representatives, (ii) becomes available to Seller on a non-confidential basis from a source other than Seller or its Representatives; provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Purchaser or (iii) is lawfully received by Seller from a third party having the right to disseminate the Business Confidential Information without restriction on disclosure. Seller may disclose any of the Business Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. Seller shall instruct its Representatives having access to the Business Confidential Information of such obligation of confidentiality. If Seller or anyone to whom it has transmitted Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information, Seller shall provide Purchaser with prompt notice prior to making any disclosure so that Purchaser may seek a protective Order or other appropriate remedy. If such protective Order or other remedy is not obtained, Seller shall furnish only that portion of the Business Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed, and Seller will exercise commercially reasonable efforts to obtain assurance to the extent possible that confidential treatment will be accorded to that portion of Business Confidential Information that is being disclosed. In any event, Seller will not oppose action by Purchaser to obtain an appropriate protective Order or other reliable assurance that confidential treatment will be accorded Business Confidential Information.

(c)     The obligations contained in this Section 8.6 are in addition to any separate confidentiality agreements between any of Seller and Purchaser or its Affiliates.

Section 8.7     Preservation of Records. Purchaser agrees that it shall preserve and keep the records held by it relating to the operation of the Business prior to the Closing Date for a period of seven (7) years from the Closing Date or the maximum period of time required by Law, whichever is longer, and shall, subject to Section 2.11 hereto, make such records and personnel available to Seller as may be reasonably required by Seller in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or other governmental or healthcare payor investigations or audits of Seller or any of its Affiliates or in order to enable Seller to comply with its obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In connection therewith, Seller shall reimburse Purchaser for Purchaser's out-of-pocket expenses.

Section 8.8     Publicity. Each of Seller and Purchaser agrees that it shall not issue any press release or public announcement concerning this Agreement or the Contemplated Transactions without obtaining the prior written approval of either Purchaser or Seller, as applicable, which approval will not be unreasonably withheld, delayed or conditioned, unless, in the judgment of such issuing party upon advice of counsel, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement; provided that such party that intends to make such release shall use its commercially reasonable efforts consistent with such applicable

Law or Bankruptcy Court requirement to consult with the other parties with respect to the text thereof. Notwithstanding the foregoing, Purchaser understands that Seller will be filing various pleadings, including the Sale Motion, in furtherance of obtaining Bankruptcy Court approval of this Agreement and the Contemplated Transactions.

Section 8.9    <u>Use of Name</u>. Purchaser agrees that it shall (a) as soon as practicable after the Closing Date and in any event within thirty (30) days following the Closing Date, cease to make any use of the name "Saint Vincents Catholic Medical Centers" or any variation thereon or derivative thereof (including "St. Vincent's") or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing any of the foregoing, including any name or mark confusingly similar thereto (collectively, the "<u>Seller Marks</u>") which are included in the Purchased Assets or otherwise included in materials or assets transferred to Purchaser in connection with the Closing, and (b) immediately after the Closing, cease to hold itself or its Affiliates out as having any affiliation or association with Seller or any of its Affiliates. In furtherance thereof, as promptly as practicable but in no event later than thirty (30) days following the Closing Date, Purchaser shall remove, strike over or otherwise obliterate all SVCMC Marks from all materials including any vehicles, business cards, schedules, stationery, packaging materials, displays, signs, promotional materials, manuals, forms, computer Software and other materials transferred to Purchaser on the Closing Date; <u>provided</u> that so long as Purchaser uses any SVCMC Marks and has not removed all SVCMC Marks from all materials, Purchaser shall comply with the Ethical and Religious Directives for Catholic Health Care Services issued by the National Conference of Catholic Bishops, as amended from time to time. Purchaser shall also take, and cooperate with Seller in taking, such actions as are reasonably necessary to change all telephone book listings of the Business. Notwithstanding any of the foregoing, Seller agrees that as of the Closing and for the length of the covenants set forth in <u>Section 8.11</u> hereto, Seller shall not use the words "certified home health agency" or any variation thereon or derivative thereof in any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing any of the foregoing.

Section 8.10    <u>Supplementation and Amendment of Schedules.</u>

(a)    Purchaser may, at its option, include in the Purchaser Disclosure Schedule, and Seller may, at its option, include in the Seller Disclosure Schedule, as the case may be, items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement.

(b)    No less than three (3) Business Days prior to the Closing Date, Seller shall deliver to Purchaser an update to the Seller Disclosure Schedule to reflect changes thereto which occur between the date hereof and the Closing Date in the Ordinary Course of Business in accordance with <u>Section 8.2</u> hereto.

2662990v.2
NY01/DREWC/1417455.1
300132622.1

Section 8.11    Covenant Not to Compete or Solicit.

(a)    Throughout the three (3) year period immediately after the Closing Date, Seller shall not, and Seller shall not permit any of its Affiliates which it controls to, at any time, directly or indirectly, without the prior written consent of Purchaser, own, operate, manage or control any business or healthcare facility that renders the type of health care services as provided by the Business on the Closing Date within the following New York State counties: Bronx, Kings, Nassau, New York, Queens, Richmond, Suffolk and Westchester. Notwithstanding the foregoing and without agreeing (implicitly or otherwise) that the following activities would otherwise be subject to the provisions of this Section 8.11(a), nothing in this Agreement shall preclude, prohibit or restrict Seller or any of its Affiliates from engaging in any manner in the current and contemplated businesses listed in Section 8.11(a) of the Seller Disclosure Schedule.

(b)    Throughout the two (2) year period immediately after the Closing Date, Seller shall not, and Seller shall not permit any of its Affiliates which it controls to, at any time, directly or indirectly, without the prior written consent of Purchaser, solicit, recruit, employ or contract with any employee employed by Seller at Closing Date who is subsequently hired by Purchaser for so long as such employee is employed by Purchaser or its Affiliates; provided that nothing shall prohibit Seller and its Affiliates from performing, or having performed on their behalf, a general solicitation for employees not specifically focused at the Transferred Employees through the use of media, advertisement, electronic job boards or other general, public solicitations.

Section 8.12    Cooperation.    Seller and Purchaser agree to reasonably cooperate with each other, from the date hereof through and following the Closing Date, in good faith, in an effort to satisfy all further conditions, undertakings and agreements contained in this Agreement.

Section 8.13    OASIS Forms.    Purchaser shall prepare Outcome and Assessment Information Set ("OASIS") intake forms for all patients of the Business who consent to receive home care services from Purchaser after the Closing.

Section 8.14    Interim Agreement.    Within two (2) days of entry of the Sale Order by the Bankruptcy Court, the parties shall enter into a Management Agreement substantially in the form attached hereto as Exhibit F under which Purchaser has agreed to assume the day-to-day management responsibility of the Business, to the extent allowed by applicable law and regulations through the Closing Date (the "Interim Agreement").    The parties shall submit the Interim Agreement to DoH for notice or approval in all events.    Subject to Bankruptcy Court approval of the Interim Agreement and entry of the Sale Order, the Interim Agreement will become effective upon both (i) its approval by DoH, if appropriate and (ii) upon the execution and delivery of the Interim Agreement, and will terminate upon the Closing or according to its terms. For the period of time between the date hereof and the effective date of the Interim Agreement, Seller shall (i) schedule and conduct regular meetings involving Purchaser's and Seller's respective senior management staff to discuss the Business; (ii) allow Purchaser's senior

2662990v.2
NY01/DREWC/1417455.1
300132622.1

management staff reasonable access to the Business and its personnel for periodic monitoring of the conduct of the Business consistent with Sections 8.1 and 8.6 hereof; (iii) consult with Purchaser prior to making any material business decisions affecting the Business other than in the Ordinary Course of Business; and (iv) use good faith efforts to assist Purchaser in planning the transition of patients from the Business to Purchaser.

Section 8.15    Transition Plan.

(a)    Set forth in Section 8.15 of the Purchaser Disclosure Schedule is Purchaser's plan and timeline for transitioning the Business and its patients to Purchaser as of the Closing Date (the "Transition Plan"). Purchaser represents and warrants to Seller that the Transition Plan contains all milestones for operational, financial and regulatory matters that Purchaser must address and complete in order to transition the Business to Purchaser by the Closing Date, and the timeline within which all such matters shall be addressed by Purchaser in order for Purchaser to timely consummate the Contemplated Transactions. Purchaser warrants and covenants that it shall commence the implementation of the Transition Plan set forth in Section 8.15 of the Purchaser Disclosure Schedule on or before the effective date of the Interim Agreement, and shall fully implement each step of the Transition Plan in a timely manner in accordance therewith. Purchaser represents and warrants that (i) the access to information permitted under this Agreement, and (ii) the authority granted to Purchaser under this Agreement and the Interim Agreement, are sufficient for it to carry out all aspects of the Transition Plan in a timely fashion. Notwithstanding any provision of this Agreement to the contrary, Purchaser acknowledges and agrees that any inability of Purchaser to achieve the milestones set forth in the Transition Plan in the timeframe contemplated by the Transition Plan shall not excuse Purchaser from timely consummating the Contemplated Transactions.

## ARTICLE IX

## EMPLOYEES AND EMPLOYEE BENEFITS

Section 9.1    Offers of Employment.

(a)    Purchaser intends, but is not obligated to, offer employment, commencing on the Closing Date, to some of the employees on the professional staff and clerical staff of the Business on the terms and conditions in effect for similarly situated employees of Purchaser's organization on the Closing Date. To the extent that Seller severs the employment of any Employees of the Business prior to the Closing Date, Seller shall give Purchaser notice of same as soon as reasonably practicable. Within a reasonable period of time prior to the Closing Date but not later than five (5) Business Days prior to the Closing Date, Purchaser shall deliver an offer of employment effective as of the Closing Date to each Employee listed in section 5.11 (a) of the Seller Disclosure Schedule to whom Purchaser chooses to offer employment, who was employed by the Seller on the day immediately preceding the Closing Date. All such Employees who accept Purchaser's offer of employment shall become employees of Purchaser as of such date. As of the Closing Date, Seller shall not have any liability or responsibility with respect to any employee benefit plan, program, policy, or other arrangement maintained by or contributed to by Purchaser with respect to Employees employed by Purchaser. Seller shall remain obligated

48

after the Closing Date for any obligation or liability to Employees which arises prior to the Closing Date, including but not limited to all accrued but unpaid vacation leave, sick time and personal days of Employees and any and all compensation and benefit obligations or any obligations that may arise from a CBA or otherwise. Purchaser shall not assume any CBAs, Employee compensation and/or benefit obligations or other terms and conditions of employment for any Employee pursuant to the CBAs or otherwise.

(b)  Seller shall be responsible for providing continuation coverage, as required by Section 4980B(f) of the Code and Part 6 of Title I of ERISA or any similar Law ("COBRA") to Employees of the Business who, for any reason, experience a COBRA "qualifying event" within the meaning of Section 4980B of the Code or Part 6 of Title I of ERISA prior to the Closing Date.

Section 9.2    No Express or Implied Rights or Remedies.

(a)  Nothing contained in this Agreement, express or implied, shall be construed to confer upon any Employee (including any beneficiary or dependent thereof) any rights or remedies whatsoever including, without limitation, any right to employment or continued employment for any specified period or of any nature or kind under or by reason of this Agreement.

(b)  Notwithstanding anything that may be to the contrary herein, it is expressly understood and agreed that all Employees hired by Purchaser shall be immediately available for participation in Purchaser's group health plan and certain other welfare benefit plans as designated by Purchaser.

## ARTICLE X

## CONDITIONS TO CLOSING

Section 10.1    Conditions Precedent to Obligations of Purchaser.  The obligation of Purchaser to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)  the representations and warranties of SVCMC set forth in this Agreement shall be true and correct (without giving effect to any materiality or Material Adverse Effect qualifiers set forth therein) at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date) and Purchaser shall have received a certificate signed by an authorized officer of SVCMC, dated as of the Closing Date, to the foregoing effect; provided that in the event any such representation or warranty has been breached the condition set forth in this Section 10.1(a) shall nevertheless be deemed satisfied unless the effect of all such breaches of representations and warranties taken together result in a Material Adverse Effect;

49

(b)     Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date and Purchaser shall have received a certificate signed by an authorized officer of SVCMC, dated as of the Closing Date, to the forgoing effect; provided that the condition set forth in this Section 10.1(b) shall be deemed satisfied unless all such failures to so perform or comply taken together result in a Material Adverse Effect;

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in clauses (a) through (h) of Section 4.2 hereto; and

(d)     a Material Adverse Effect shall not have occurred with respect to the Business or the Purchased Assets, which Material Adverse Effect cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Purchaser to Seller of such Material Adverse Effect; provided, however, that in such event Seller and Purchaser shall negotiate in good faith to adjust the Purchase Price proportionately to the extent of the Material Adverse Effect and if an agreement is reached, this condition to Closing shall be deemed satisfied; and

(e)     all notices, consents, approvals, licenses or Permits, or waivers thereof, set forth in Section 10.1(e) of the Purchaser Disclosure Schedule shall have been made or obtained by Purchaser, and any applicable waiting period under any of the Antitrust Laws shall have expired or been terminated.

Section 10.2     Conditions Precedent to Obligations of Seller. The obligation of Seller to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by SVCMC in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchaser set forth in this Agreement shall be true and correct (without giving effect to any materiality qualifiers set forth therein) at and as of the Closing, except to the extent such representations and warranties relate expressly to an earlier date (in which case such representations and warranties shall be true and correct, on and as of such earlier date) and SVCMC shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect; provided that in the event any such representation or warranty has been breached the condition set forth in this Section 10.2(a) shall nevertheless be deemed satisfied unless the effect of all such breaches of representations and warranties taken together would prevent or materially delay the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and SVCMC shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect; provided that the condition set forth in this Section 10.2(b) shall be deemed satisfied unless all such failures to so perform or comply taken together prevent or materially

2662990v.2
NY01/DREWC/1417455.1
300132622.1

delay the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions;

(c)     all notices, consents, approvals, licenses or Permits, or waivers thereof, set forth in Section 10.2(c) of the Seller Disclosure Schedule shall have been made or obtained by Seller, and any applicable waiting period under any of the Antitrust Laws shall have expired or been terminated; and

(d)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 4.3 hereto.

Section 10.3     Conditions Precedent to Obligations of Purchaser and Seller.     The respective obligations of the parties to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser or SVCMC in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions; and

(b)     the Bidding Procedures Order and the Sale Order shall have been entered by the Bankruptcy Court and (i) the time for appealing each Order has expired and no party has taken an appeal or (ii) any appeal taken of either Order has been fully and finally terminated by dismissal or a decision affirming each Order appealed from, and the time for taking any further appeal has expired.

Section 10.4     Frustration of Closing Conditions.     No party may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3 hereto, as the case may be, to excuse it from consummating the Contemplated Transactions if such failure was caused by such party's failure to comply with any provision of this Agreement.

## ARTICLE XI

## TAXES

Section 11.1     Transfer Taxes.     Seller shall pay any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges (including any interest and penalty thereon) payable in connection with the Contemplated Transactions ("Transfer Taxes"). Seller shall make due and timely payment of any Transfer Tax to the applicable Tax Authority and shall provide Purchaser with a true and complete copy of each Tax Return relating to Transfer Taxes as filed and evidence of the timely filing of such Tax Return and payment of such Transfer Tax. The parties shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds of Transfer Taxes.

2662990v.2
NY01/DREWC/1417455.1
300132622.1

Section 11.2   Prorations.   All real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets, if any, for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between Seller and Purchaser as of 11:59 p.m. (New York time) on the Closing Date based on the number of days in such period through and including the Closing Date and the number of days in such period after the Closing Date; provided, however, that nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party.  If any Taxes subject to proration are paid by Purchaser, on the one hand, or Seller, on the other hand, the proportionate amount of such Taxes paid (or in the event of a refund of any portion of such Taxes previously paid is received, such refund) shall be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund).

Section 11.3   Purchase Price Allocation.   The Purchase Price will be allocated for Tax purposes (the "Allocation") among the Purchased Assets in accordance with GAAP and as set forth in Section 11.3 of the Seller Disclosure Schedule.  The Seller and the Purchaser shall report the Allocation as provided in Section 1060 of the Code, and shall prepare and file all Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Allocation. No party shall take any position (whether in audits, Tax Returns or otherwise) that is inconsistent with the Allocation unless required to do so by applicable law.

Section 11.4   Cooperation on Tax Matters.   The parties shall furnish or cause to be furnished to each other, as promptly as practicable following the request therefore, and at the expense of the requesting party, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other filings relating to Tax matters, for the preparation for and defense of any Tax audit, for the preparation of any Tax protest, or for the prosecution or defense of any suit or other proceeding relating to Tax matters.

## ARTICLE XII

## MISCELLANEOUS

Section 12.1   Assignment.   Purchaser may transfer or assign this Agreement to another entity under common control with Purchaser or to another entity that acquires all of the assets of the Purchaser, , upon receipt of Seller's prior written consent which shall not be unreasonably withheld.

Section 12.2   Expenses.   Except as otherwise expressly provided in this Agreement, each party shall bear its own costs and expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

Section 12.3   Specific Performance.   The parties hereto agree that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and

52

damages would be difficult to determine, and that the parties hereto shall be entitled to specific performance of the terms hereof (without the posting of any bond), in addition to any other remedy at law or equity. The rights set forth in this Section 12.2 shall be in addition to any other rights which a party may have at law or in equity pursuant to this Agreement.

Section 12.4    Governing Law; Jurisdiction; Consent to Service of Process.    This Agreement and any disputes arising in connection herewith shall be governed by and construed in accordance with the internal Laws of the State of New York without regard to the conflict of law principles thereof. Without limiting any party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (b) any and all Legal Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations pursuant to Section 12.2 hereto; provided that if the Bankruptcy Case has closed, each of the parties hereto irrevocably agrees that any Legal Proceeding with respect to this Agreement or for recognition and enforcement of any judgment in respect hereof shall be brought and determined exclusively in the United States District Court for the Southern District of New York or if such Legal Proceeding may not be brought in such court for jurisdictional purposes, exclusively in the Supreme Court of New York sitting in the County of New York. Each of the parties hereto hereby (a) irrevocably submits with regard to any such Legal Proceeding to the exclusive personal jurisdiction of the aforesaid courts in the event any dispute arises out of this Agreement or any transaction contemplated hereby, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the state or federal courts referenced above. Each of the parties hereto further agrees to accept and acknowledge service of any and all process which may be served in any such Legal Proceeding in said courts in the State of New York, and agrees that service of process upon such party, mailed by certified mail to such party's address as set forth in Section 12.6 hereto, will be deemed in every respect effective service of process upon such party, in any Legal Proceeding.

Section 12.5    WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY ACTION TO WHICH THEY ARE PARTIES INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

Section 12.6    Entire Agreement; Amendments and Waivers.    This Agreement (including the schedules and exhibits hereto), the Confidentiality Agreement, the Deposit Escrow Agreement and the Indemnity Escrow Agreement, contain the entire understanding and agreement of the parties hereto and thereto with respect to the subject matter hereof and thereof, and supersede all previous written or oral negotiations, commitments, understandings and writings. This Agreement may be amended, modified, supplemented or changed, and any provision hereof can be waived, only by written instrument duly executed by all of the parties

2662990v.2
NY01/DREWC/1417455.1
300132622.1

hereto. Any party hereto may, by written notice to the other parties hereto (a) extend the time for performance of any of the obligations of the other party under this Agreement, (b) waive any inaccuracies in the representations or warranties of the other party contained in this Agreement, (c) waive compliance with any of the conditions or covenants of the other party contained in this Agreement or (d) waive or modify performance of any of the obligations of the other party under this Agreement. Except as provided in the immediately preceding sentence, no action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach, whether of a similar or dissimilar nature. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

Section 12.7 Notices. All notices and other communications under this Agreement shall be in writing and, unless otherwise provided in this Agreement, shall be deemed given (a) when delivered personally by hand, (b) when sent by facsimile (confirmed in writing by mail promptly thereafter dispatched), (c) three (3) days after being mailed by certified or registered mail, postage prepaid, return receipt requested or (d) one (1) Business Day following the day sent by a nationally recognized overnight courier service, in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

(a) If to Purchaser, to:

Village Center for Care
154 Christopher Street
New York, New York 10014
Fax: (212) 366-5528
Attn: Emma DeVito, President and Chief Executive Officer

with a copy to (which shall not constitute notice):

Village Center for Care.

154 Christopher Street
New York, New York 10014
Fax: (212) 366-5528
Attn: Nancy Schwartz-Weinstock, Esq., General Counsel and
Vice President

2662990v.2
NY01/DREWC/1417455.1
300132622.1

with a copy to (which shall not constitute notice):

Manatt, Phelps & Phillips, LLP
7 Times Square
New York, New York 10036
Fax: (21) 830-7354 •
Attn: Peter F. Olberg, Esq.

    (b)    If to Seller, to:

Saint Vincents Catholic Medical Centers
450 West 33rd Street
New York, New York 10001
Fax:    (212) 356-4990
Attn:   General Counsel

with a copy to (which shall not constitute notice):

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Fax:    (212) 715-8000
Attn:   Adam C. Rogoff, Esq.

and

Garfunkel Wild, P.C.
111 Great Neck Road, Suite 503
Great Neck, New York 11021
Fax: (516) 466-5964
Attn: Judith A. Eisen, Esq.

Section 12.8   Invalid Provisions.  If any term or other provision of this Agreement is held to be invalid, illegal, or incapable of being enforced under any present or future Law, and if the rights or obligations under this Agreement of Seller on the one hand and Purchaser on the other hand will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

2662990v.2
NY01/DREWC/1417455.1
300132622.1

Section 12.9  Binding Effect; Assignment; Successors and Assigns.  This Agreement shall apply to, be binding in all respects upon and inure to the benefit of the parties and their respective successors, administrators and permitted assigns.  A successor to SVCMC shall include SVCMC as a reorganized debtor.  No assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of Law or otherwise) without the prior written consent of Purchaser and Seller and any attempted assignment without the required consents shall be void.  No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations.  Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.  This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors, administrators and permitted assigns.

Section 12.10  No Personal Liability.  In entering into this Agreement, the parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any party hereto shall be personally liable or responsible to any other party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named parties only (but nothing contained herein shall limit the Liability of any Person for his or her fraudulent acts).

Section 12.11  Execution in Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original, but all of which together will constitute one (1) and the same agreement.  Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

Section 12.12  Survival of Representations and Warranties.  The representations and warranties of the parties contained in this Agreement shall not survive the Closing.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

2662990v.2
NY01/DREWC/1417455.1
300132622.1

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK D/B/A SAINT VINCENT CATHOLIC MEDICAL CENTERS**

By: _____
     Name:
     Title:


**VILLAGE CENTER FOR CARE**

By: _____
     Name:
     Title:

57

## Table of Contents

ARTICLE I DEFINITIONS .................................................................................2

Section 1.1    Certain Definitions. .......................................................2

Section 1.2    Terms Defined Elsewhere in this Agreement. ..................9

Section 1.3    Other Definitional and Interpretive Matters. ...................11

ARTICLE II TRANSACTION.............................................................................12

Section 2.1    Transaction. ...................................................................12

Section 2.2    Purchase and Sale of Assets. .........................................13

Section 2.3    Excluded Assets. ...........................................................15

Section 2.4    Assumption of Liabilities. .............................................17

Section 2.5    Excluded Liabilities. .....................................................17

Section 2.6    Assignment and Cure Amounts. ....................................18

Section 2.7    Contingent Medicaid Liability. .....................................19

Section 2.8    Further Conveyances and Assumptions..........................20

Section 2.9    Bulk Sales Laws.  T .......................................................21

Section 2.10   Accounts Receivable......................................................21

Section 2.11   Agreement Regarding Confidentiality of Patient Information. ...................22

ARTICLE III CONSIDERATION .......................................................................22

Section 3.1    Consideration. ...............................................................22

Section 3.2    Purchase Price Deposit. ................................................22

Section 3.3    Payment of Purchase Price. ...........................................23

Section 3.4    Transition Patients. .......................................................23

ARTICLE IV CLOSING AND TERMINATION..................................................24

Section 4.1    Closing Date. .................................................................24

Section 4.2    Deliveries by Seller. ......................................................24

Section 4.3    Deliveries by Purchaser. ................................................25

Section 4.4    Termination of Agreement.............................................26

Section 4.5    Procedure for Termination. ...........................................28

Section 4.6    Effect of Termination.....................................................28

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER .................28

i

Table of Contents
(continued)

Section 5.1     Organization and Good Standing. .................................................................28

Section 5.2     Authorization of Agreement. ...........................................................................29

Section 5.3     Consents of Third Parties; Contractual Consents. ...........................................29

Section 5.4     Financial Information. .....................................................................................30

Section 5.5     Title to Purchased Assets. ...............................................................................30

Section 5.6     Real Property. ..................................................................................................30

Section 5.7     Tangible Personal Property. ............................................................................31

Section 5.8     Intellectual Property. .......................................................................................31

Section 5.9     Material Contracts. ..........................................................................................31

Section 5.10    Employees; Employee Benefits. ......................................................................32

Section 5.11    Employment and Labor. ..................................................................................32

Section 5.12    Compliance with Laws; Permits. ....................................................................32

Section 5.13    Absence of Certain Developments. .................................................................33

Section 5.14    Taxes. ...............................................................................................................33

Section 5.15    Litigation. .........................................................................................................33

Section 5.16    Financial Advisors. ..........................................................................................33

Section 5.17    No Other Representations or Warranties; Schedules. .....................................33

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER .......................34

Section 6.1     Organization and Good Standing. ...................................................................34

Section 6.2     Authorization of Agreement. ...........................................................................34

Section 6.3     Conflicts; Consents of Third Parties. ..............................................................35

Section 6.4     Litigation. .........................................................................................................35

Section 6.5     Financial Advisors. ..........................................................................................35

Section 6.6     Healthcare Regulatory Compliance Status. ....................................................35

Section 6.7     Acknowledgement Regarding Condition of the Business. . ............................36

Section 6.8     Financing. .........................................................................................................36

Section 6.9     No Other Representations or Warranties; Schedules. .....................................36

ARTICLE VII BANKRUPTCY COURT MATTERS ...............................................................37

Section 7.1     Competing Transaction. ...................................................................................37

2662990v.2
NY01/DREWC/1417455.1
300132622.1

| | | |
|---|---|---|
| Section 7.3 | Bankruptcy Court Filings. | 37 |
| Section 7.4 | Notice of Sale. | 37 |
| Section 7.5 | Treatment of Monetary Obligations. | 37 |
| ARTICLE VIII COVENANTS | | 38 |
| Section 8.1 | Access to Information. | 38 |
| Section 8.2 | Conduct of the Business Pending the Closing. | 38 |
| Section 8.3 | Consents; Insurance. | 39 |
| Section 8.4 | Regulatory Approvals. | 40 |
| Section 8.5 | Further Assurances. | 43 |
| Section 8.6 | Confidentiality. | 43 |
| Section 8.7 | Preservation of Records. | 45 |
| Section 8.8 | Publicity. | 45 |
| Section 8.9 | Use of Name. | 46 |
| Section 8.10 | Supplementation and Amendment of Schedules. | 46 |
| Section 8.11 | Covenant Not to Compete or Solicit. | 47 |
| Section 8.12 | Cooperation. | 47 |
| Section 8.13 | OASIS Forms. | 47 |
| Section 8.14 | Interim Agreement. | 47 |
| ARTICLE IX EMPLOYEES AND EMPLOYEE BENEFITS | | 48 |
| Section 9.1 | Offers of Employment. | 48 |
| Section 9.2 | No Express or Implied Rights or Remedies. | 49 |
| ARTICLE X CONDITIONS TO CLOSING | | 49 |
| Section 10.1 | (a) Conditions Precedent to Obligations of Purchaser. | 49 |
| Section 10.2 | Conditions Precedent to Obligations of Seller. | 50 |
| Section 10.3 | Conditions Precedent to Obligations of Purchaser and Seller. | 51 |
| Section 10.4 | Frustration of Closing Conditions. | 51 |
| ARTICLE XI TAXES | | 51 |
| Section 11.1 | Transfer Taxes. | 51 |
| Section 11.2 | Prorations. | 52 |

2662990v.2
NY01/DREWC/1417455.1
300132622.1

Section 11.3    Purchase Price Allocation. ..................................................................52

Section 11.4    Cooperation on Tax Matters. . ...............................................................52

ARTICLE XII MISCELLANEOUS..................................................................................52

Section 12.1    Assignment. ........................................................................................52

Section 12.2    Expenses. ...........................................................................................52

Section 12.3    Specific Performance. .........................................................................52

Section 12.4    Governing Law; Jurisdiction; Consent to Service of Process. .......................53

Section 12.5    WAIVER OF JURY TRIAL. ...............................................................53

Section 12.6    Entire Agreement; Amendments and Waivers. ....................................53

Section 12.7    Notices. ..............................................................................................54

Section 12.8    Invalid Provisions. .............................................................................55

Section 12.9    Binding Effect; Assignment; Successors and Assigns. ........................56

Section 12.10   No Personal Liability. .........................................................................56

Section 12.11   Execution in Counterparts. .................................................................56

Section 12.12   Survival of Representations and Warranties. ......................................56

Exhibits

Exhibit A – July 23, 2010 Bidding Procedures Order
Exhibit B – Form of Sale Order
Exhibit C – Form of Medical Records Custody Agreement
Exhibit D – Form of Assignment
Exhibit E – Form of Indemnity Escrow Agreement
Exhibit F – Form of Interim Agreement

2662990v 2
NY01/DREWC/1417455.1
300132622.1

**For a copy of any non-confidential exhibits or schedules to the Assert Purchase Agreement, please contact Joseph A. Shifer, Esq. of Kramer Levin Naftalis & Frankel LLP at (212) 715-9100 or via email at jshifer@kramerlevin.com.**

**EXHIBIT B-1**
Successful Bid Amended Cure Amount

| Counter-Party Notice Address | Agreement | Premises | Original Cure Amount | Amended Cure Amount |
|---|---|---|---|---|
| Nicotra 1200, LLC<br>1110 South Avenue<br>Staten Island, New York 10314<br><br>Kudman Trachten Aloe LLP<br>350 Fifth Avenue<br>Suite 4400<br>NY, NY 10118<br>Attn.: John S. Lego, Esq. | Lease dated as of November 6, 2007 between Nicotra 1200, LLC and Saint Vincents CatholicMedical Centers ofNew York for Suites 303-304 in the Building commonly known as TheAtrium, 1200 South Avenue, Staten Island | 1200 South Avenue, Staten Island, NY | $68,884.40 | $78,685.78 |

## EXHIBIT B-2
Backup Bid Amended Cure Amount

| Counter-Party Notice Address | Agreement | Premises | Original Cure Amount | Amended Cure Amount |
|---|---|---|---|---|
| Nicotra 1200, LLC<br>1110 South Avenue<br>Staten Island, New York 10314<br><br>Kudman Trachten Aloe LLP<br>350 Fifth Avenue<br>Suite 4400<br>NY, NY 10118<br>Attn.: John S. Lego, Esq. | Lease dated as of November 6, 2007 between Nicotra 1200, LLC and Saint Vincents CatholicMedical Centers ofNew York for Suites 303-304 in the Building commonly known as TheAtrium, 1200 South Avenue, Staten Island | 1200 South Avenue, Staten Island, NY | $68,884.40 | $78,685.78 |

# **EXHIBIT C-1**
Successful Bidder Adequate Assurance

## NORTH SHORE-LIJ HEALTH SYSTEM OVERVIEW

## North Shore-LIJ Health System Overview

The North Shore-LIJ Health System is the nation's second-largest, non-profit, secular health system based on the number of beds. It is the nation's 16th largest, integrated healthcare network, based on net patient revenue, and the largest in New York State. In 2010, North Shore-LIJ Health System was awarded the National Quality Forum's National Quality Health Care Award.

The North Shore-LIJ Health System has a strong financial position. The North Shore-LIJ Health System is a $5.1 billion health system in operating revenues, serving 7 million people in Long Island, Manhattan, Queens and Staten Island. The Health System has bond rating of A- with a stable outlook rating from Standard & Poor's and Fitch Ratings and 94 days cash on hand.

The North Shore-LIJ Health System has more than 42,000 employees, the largest employer on Long Island and the ninth largest in New York City. The Health System is affiliated with over 9,000 physicians, has more than 10,000 nurses and over 3,200 volunteers.

The North Shore-LIJ Health System is a not-for-profit corporation established pursuant to Article 28 of the Public Health Law to operate other Article 28 facilities formed in 1997 with the merger of North Shore Health System (NSUH) and Long Island Jewish Medical Center (LIJ). The North Shore-LIJ Health System recently acquired a fourth tertiary care facility in 2010, Lenox Hill Hospital in Manhattan. The North Shore-LIJ Health System now operates more than 5,600 hospital and long-term beds, provides about 4 million patient contacts, including:

- 25,100 babies delivered
- 278,000 inpatients treated
- 137,000 ambulatory surgeries performed
- 605,000 emergency visits
- 817,000 home health visits

The North Shore-LIJ Health System incorporates the following entities:

- 15 hospitals (including four tertiary hospitals, 2 specialty care hospitals and 8 community hospitals)
- 1 affiliate hospitals
- a long-term care network including: 2 owned long term care facilities, 15 affiliate long term care facilities and affiliations with assisted living facilities
- the Home Care Network
- numerous specialized Centers of Innovation and Centers of Progressive Care

**North Shore University Hospital**

North Shore University Hospital is an 812-bed acute care hospital located in Manhasset, New York. North Shore University Hospital provides over 55,000 discharges in 2009. In 2009, North Shore University Hospital also provided over 51,600 emergency room visits and almost 38,000 ambulatory surgeries. Also financially strong, North Shore University Hospital had over $1 billion in operating revenues in 2009.

As part of its license, North Shore University Hospital has a certified home care agency, known as, the North Shore Home Care, which is a sub-set of the North Shore-LIJ Home Care Network (HCN).

**North Shore-LIJ Home Care Network (HCN)**

The North Shore-LIJ Home Care Network (HCN), of which the North Shore Home Care is a part, has provided quality in-home care for over 25 years in New York State throughout Queens, Nassau and Suffolk counties. HCN is one of the largest providers of home care services in the region with over 24,000 admissions and 531,000 visits in 2009. In 2009, the HCN's combined agencies generated over $108 million in operating revenue. Key aspects of the HCN include the following:

- The HCN continuum provides the full spectrum of home care services including: nursing care, social work, rehabilitation therapies, infusion therapy, and paraprofessional services.

- The HCN infrastructure encompasses a Management Authority that provides centralized services to the North Shore CHHA, Franklin CHHA and LIJ CHHAs including, intake and referral, quality management, education and training, billing and collection, information systems and marketing. Each site director is responsible for the day-to-day operations of their nursing and ancillary staff's provision of home care to its patients.

- The HCN has developed a comprehensive and rigorous Quality Management and Education program which has consistently scored above the benchmark in both the New York State and National CMS Home Health Compare indicators.

- The HCN utilizes a robust clinical and financial information system.

- The HCN continues to be on the forefront of technology provided in the home through its telehealth video monitoring programs. Annually, 175 patients are served through this technology. It assists in improving care specific to congestive heart failure, cardiopulmonary issues diabetes and wound care. The HCN was awarded two programmatic grants to support telehealth, one from the Department of Health and one from the Fan Fox and Leslie R. Samuels Foundation.

- Home care specialty programs include: Pediatrics, Maternal/Child, Psychiatric, and Oncology.

- Disease management programs are offered in heart failure, joint replacement, diabetes, stroke, sickle cell and cystic fibrosis.

- The HCN operates a Long Term Home Health Care Lombardi Program (LTHHCP) through Franklin Hospital Home Care and serves over 400 Medicaid patients who require nursing home-level care in their homes.

**EXHIBIT C-2**
Backup Bidder Adequate Assurance

Contract counterparties may obtain adequate assurance of future performance by reviewing the Backup Bidder's 2010 annual report at:
http://www.villagecare.org/uploads/File/2010Reporttothecommunity.pdf