KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel for Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | **:** | Chapter 11 |
| | **:** | |
| SAINT VINCENTS CATHOLIC MEDICAL | **:** | Case No. 10-11963 (CGM) |
| CENTERS OF NEW YORK, <u>et</u> <u>al.</u>, | **:** | |
| | **:** | |
| Debtors. | **:** | Jointly Administered |

---------------------------------------------------------- x

## NOTICE OF AUCTION RESULTS IN CONNECTION WITH THE SALE OF DEBTORS' LONG TERM HOME HEALTH CARE PROGRAM AND PROCEDURES RELATED THERETO

PLEASE TAKE NOTICE THAT:

       1.   <u>Introduction</u>.  Saint Vincents Catholic Medical Centers of New York ("**SVCMC**") and certain of its affiliates, as chapter 11 debtors and debtors-in-possession in the above-referenced chapter 11 cases (each a "**Debtor**" and, collectively, the "**Debtors**"),[1] conducted an auction (the "**Auction**") with respect to the proposed sale (the "**Sale**") of certain of the assets related to the Debtors' long term home health care program (the "**Assets**" or the "**LTHHCP**"), and assignments of certain contracts and leases related thereto, in accordance with the order (the "**Bidding Procedures Order**") of the Bankruptcy Court of the Southern District of New York (the "**Bankruptcy Court**"), entered on July 23, 2010, (a) approving the bidding procedures (the "**Bidding Procedures**"), (b) scheduling the Auction for the Assets and a hearing approving the Sale of the Assets (the "**Sale Hearing**"), and (c) approving certain procedures related to the assumption and assignment of those executory contracts and unexpired leases related to the Assets and whose assignment is contemplated by the Sale.

---

[1]  In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc. There are certain affiliates of SVCMC who are not Debtors.

2.     <u>Auction Results</u>.     Upon conclusion of the Auction, the Debtors determined, pursuant to the Bidding Procedures and subject to the Bankruptcy Court's approval, that the highest or otherwise best bidder was Visiting Nurse Service of New York Home Care II (the "**Successful Bidder**").  The asset purchase agreement of the Successful Bidder, as modified by the Successful Bidder at the Auction (the "**Successful Bid**"), is attached hereto as **Exhibit A**.

6.     <u>Sale Hearing</u>.     The Bidding Procedures Order provides that the Sale Hearing will be held on **August 19, 2010 at 11:00 a.m. (prevailing Eastern Time)**, before the Honorable Cecelia G. Morris, United States Bankruptcy Judge, in Courtroom 701 at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408.  At the Sale Hearing, the Debtors will request that the Bankruptcy Court enter an order approving the Sale of the Assets to the Successful Bidder.

7.     <u>Objection Deadline</u>.     Any party that wishes to object to the terms of the proposed Sale to the Successful Bidder must file a written objection with the Court no later than **4:00 p.m. on August 13, 2010** (the "**Sale Objection Deadline**"), and serve such an objection (each a "**Sale Objection**") on the following parties (collectively, the "**Objection Parties**"): (a) the Debtors, Saint Vincents Catholic Medical Centers of New York, 170 W. 12th Street, Smith Building, 5th Floor, New York, New York 10011, Attn: Scott Davis (Scott.Davis@gt.com); (b) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq. and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021, Attn: Judith Eisen, Esq.; (c) counsel for the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Stephen Kuhn, Esq. and Sarah Link Schultz, Esq.; (d) counsel to Secured Creditors: General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; (e) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; and (f) counsel to the Successful Bidder, Nixon Peabody LLP, 437 Madison Avenue, New York, New York 10022, Attn: Robert N. H. Christmas, Esq., so that it is **actually received** by the Sale Objection Deadline.

8.     **To the extent that any interested party does not timely serve a Sale Objection as set forth above, such party will be deemed to have agreed to the terms of the Sale.**

9.     A copy of each of the Bidding Procedures Order or any other document referenced herein can be viewed and obtained on the Court's website www.ecf.nysb.uscourts.gov or (without charge) at http://svcmcrestructuring.com.

Dated: New York, New York
       August 11, 2010

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ Adam C. Rogoff
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
*Counsel for Debtors*

# EXHIBIT A
## Successful Bid

ASSET PURCHASE AGREEMENT

by and between

SAINT VINCENTS CATHOLIC MEDICAL CENTERS

OF NEW YORK

and

VISITING NURSE SERVICE OF NEW YORK HOME CARE II, INC.

Dated as of August 11, 2010

# TABLE OF CONTENTS

Page

ARTICLE I      DEFINITIONS.................................................................................1

Section 1.1    Certain Definitions..........................................................................1

Section 1.2    Terms Defined Elsewhere in this Agreement ....................................8

Section 1.3    Other Definitional and Interpretive Matters. ..................................10

ARTICLE II     PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES...................................................................................11

Section 2.1    Purchase and Sale of Assets............................................................11

Section 2.2    Excluded Assets ..............................................................................14

Section 2.3    Assumption of Liabilities.................................................................16

Section 2.4    Excluded Liabilities ........................................................................16

Section 2.5    Assignment and Cure Amounts. .....................................................17

Section 2.6    Contingent Medicaid Liability.........................................................18

Section 2.7    Further Conveyances and Assumptions...........................................19

Section 2.8    Bulk Sales Laws...............................................................................20

Section 2.9    Accounts Receivable........................................................................20

Section 2.10   Agreement Regarding Confidentiality of Patient Information .........21

ARTICLE III    CONSIDERATION ..........................................................................21

Section 3.1    Consideration ..................................................................................21

Section 3.2    Purchase Price Deposit ...................................................................21

Section 3.3    Payment of Purchase Price...............................................................22

ARTICLE IV    CLOSING AND TERMINATION....................................................22

Section 4.1    Closing Date.....................................................................................22

Section 4.2    Deliveries by Seller.........................................................................22

Section 4.3    Deliveries by Purchaser ..................................................................23

Section 4.4    Termination of Agreement...............................................................23

Section 4.5    Procedure for Termination ..............................................................26

Section 4.6    Effect of Termination.......................................................................26

ARTICLE V     REPRESENTATIONS AND WARRANTIES OF SVCMC .........26

Section 5.1    Organization and Good Standing.....................................................27

Section 5.2    Authorization of Agreement ...........................................................27

| Section 5.3 | Consents of Third Parties; Contractual Consents. | 27 |
| Section 5.4 | Financial Information | 28 |
| Section 5.5 | Title to Purchased Assets | 28 |
| Section 5.6 | Real Property. | 28 |
| Section 5.7 | Tangible Personal Property | 28 |
| Section 5.8 | Intellectual Property | 29 |
| Section 5.9 | Material Contracts. | 29 |
| Section 5.10 | Employees; Employee Benefits. | 30 |
| Section 5.11 | Employment and Labor. | 30 |
| Section 5.12 | Compliance with Laws; Permits. | 30 |
| Section 5.13 | Absence of Certain Developments. | 31 |
| Section 5.14 | Taxes | 31 |
| Section 5.15 | Litigation | 31 |
| Section 5.16 | Financial Advisors | 31 |
| Section 5.17 | No Other Representations or Warranties; Schedules | 31 |
| ARTICLE VI | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 32 |
| Section 6.1 | Organization and Good Standing | 32 |
| Section 6.2 | Authorization of Agreement | 32 |
| Section 6.3 | Conflicts; Consents of Third Parties. | 33 |
| Section 6.4 | Litigation | 33 |
| Section 6.5 | Financial Advisors | 33 |
| Section 6.6 | Healthcare Regulatory Compliance Status | 34 |
| Section 6.7 | Acknowledgement Regarding Condition of the Business | 34 |
| Section 6.8 | Financing | 34 |
| Section 6.9 | No Other Representations or Warranties; Schedules | 34 |
| ARTICLE VII | BANKRUPTCY COURT MATTERS | 35 |
| Section 7.1 | Competing Transaction. | 35 |
| Section 7.2 | Bankruptcy Court Filings. | 35 |
| Section 7.3 | Notice of Sale. | 35 |
| Section 7.4 | Treatment of Monetary Obligations. | 35 |
| ARTICLE VIII | COVENANTS | 36 |
| Section 8.1 | Access to Information | 36 |

| Section 8.2 | Conduct of the Business Pending the Closing. | 36 |
| Section 8.3 | Consents; Insurance. | 38 |
| Section 8.4 | Regulatory Approvals. | 38 |
| Section 8.5 | Further Assurances. | 41 |
| Section 8.6 | Confidentiality. | 41 |
| Section 8.7 | Publicity | 43 |
| Section 8.8 | Use of Name | 43 |
| Section 8.9 | Supplementation and Amendment of Schedules. | 44 |
| Section 8.10 | Covenant Not to Compete or Solicit. | 44 |
| Section 8.11 | Cooperation | 45 |
| Section 8.12 | OASIS Forms | 45 |
| Section 8.13 | Management Consulting Agreement | 45 |
| Section 8.14 | Transition Period. | 46 |
| ARTICLE IX | EMPLOYEES AND EMPLOYEE BENEFITS | 48 |
| Section 9.1 | Offers of Employment. | 48 |
| ARTICLE X | CONDITIONS TO CLOSING | 49 |
| Section 10.1 | Conditions Precedent to Obligations of Purchaser | 49 |
| Section 10.2 | Conditions Precedent to Obligations of Seller | 49 |
| Section 10.3 | Conditions Precedent to Obligations of Purchaser and Seller | 50 |
| Section 10.4 | Frustration of Closing Conditions | 51 |
| ARTICLE XI | TAXES | 51 |
| Section 11.1 | Transfer Taxes | 51 |
| Section 11.2 | Prorations | 51 |
| Section 11.3 | Purchase Price Allocation | 51 |
| Section 11.4 | Cooperation on Tax Matters | 51 |
| ARTICLE XII | MISCELLANEOUS | 52 |
| Section 12.1 | Expenses | 52 |
| Section 12.2 | Specific Performance | 52 |
| Section 12.3 | Governing Law; Jurisdiction; Consent to Service of Process | 52 |
| Section 12.4 | WAIVER OF JURY TRIAL | 52 |
| Section 12.5 | Entire Agreement; Amendments and Waivers | 53 |
| Section 12.6 | Notices | 53 |

iii

| Section 12.7 | Invalid Provisions | 54 |
| Section 12.8 | Binding Effect; Assignment; Successors and Assigns | 54 |
| Section 12.9 | No Personal Liability | 55 |
| Section 12.10 | Execution in Counterparts | 55 |
| Section 12.11 | Survival of Representations and Warranties | 55 |

<u>Exhibits</u>
Exhibit A –Bidding Procedures Order
Exhibit B – Form of Sale Order
Exhibit C – Form of Assignment
Exhibit D – Form of Management Consulting Agreement

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), is made and entered into as of August 11, 2010, by and between Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, a New York not-for-profit corporation ("SVCMC" or "Seller") and Visiting Nurse Service of New York Home Care II, Inc., a New York not-for-profit corporation ("Purchaser").

## RECITALS

WHEREAS, Seller, along with certain of its affiliates (collectively, the "Debtors"), is a debtor-in-possession under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") on April 14, 2010 (the "Petition Date"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 10-11963);

WHEREAS, Seller is entering into this Agreement subject to approval by the Bankruptcy Court;

WHEREAS, SVCMC is engaged in the business of owning and operating a long term home health care program (the "LTHHCP"), as identified in Section A of the Seller Disclosure Schedule (the "Business");

WHEREAS, SVCMC owns and operates other businesses including, without limitation, a hospital and a certified home health agency, which other businesses are not the subject of this Agreement (the "Other Businesses"); and

WHEREAS, subject to the approval of the Bankruptcy Court, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to, *inter alia*, Sections 105, 363, and 365 of the Bankruptcy Code all of the Purchased Assets and Assumed Liabilities (each, as defined below), all as more specifically provided herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Certain Definitions.

Unless the context otherwise requires or as otherwise defined herein, capitalized terms used in this Agreement shall have the meanings set forth in this Section 1.1:

1

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Antitrust Laws" means the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, the Donnelly Act, as amended, and the Hart-Scott-Rodino Antitrust Improvements Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, Orders, decrees, administrative or judicial doctrines or other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"Bidding Procedures Order" means the Order of the Bankruptcy Court annexed hereto as Exhibit A.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close.

"CMS" means the Centers for Medicare & Medicaid Services.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means the Confidentiality Agreement, dated December 11, 2009, by and between Seller and Purchaser.

"Contemplated Transactions" means the transactions contemplated by this Agreement.

"Contract" means any written contract, indenture, note, bond, lease, license or other agreement, other than a real property lease, a personal property lease or an Intellectual Property License.

"Copyrights" means all copyrights and registrations and applications therefor and works of authorship, and mask work rights.

"Cost Reports" means all cost and other reports filed pursuant to the requirements of Healthcare Programs for payment or reimbursement of amounts due from such programs for services provided.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web

pages, etc.), and other similar materials exclusively related to the Business or the Purchased Assets, in each case whether or not in electronic form, other than Patient Records.

"DoH" means the Department of Health of the State of New York.

"DoH Application" means an application to be submitted by Purchaser to DoH for authorization to operate the Business.

"DoH Approval" means the approval by the Commissioner of DoH of the DoH Application without contingencies or conditions that have not been satisfied, other than reasonable contingencies or conditions that may be reasonably expected to be fully satisfied in accordance with their terms after the Closing in the reasonable discretion of Purchaser.

"Employees" means all individuals, as of any date specified herein, who are employed by Seller in the conduct of the Business, together with individuals who are hired in respect of the conduct of the Business after the date hereof and prior to the Closing; provided that "Employees" shall not include (a) any officer of Seller or (b) individuals who regularly perform administrative functions for Seller relating to both the Business and in any material respect any of the Other Businesses.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Contracts" means every Contract that is not an Assigned Contract or not otherwise specifically identified in Sections 2.1(a) through 2.1(h) hereto as a Purchased Asset, including without limitation the CBAs and/or the Plans.

"Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment (including medical equipment) and leasehold improvements owned by Seller and used by Seller exclusively in the conduct of the Business, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by Seller, the telephone numbers associated therewith used in the Ordinary Course of Business and not used in any of the Other Businesses), cubicles and miscellaneous office furnishings.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Healthcare Program Liabilities" means all (i) Liabilities under any applicable Medical Reimbursement Program Law, including any obligations for settlement and retroactive

adjustments under the Medicare and Medicaid programs and (ii) Liabilities for violations of the Conditions of Participation.

"Healthcare Regulatory Consents" means in respect of Seller or Purchaser, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body as shall be required to be obtained and such notifications to any Governmental Body as shall be required to be given by such party in order for it to consummate the Contemplated Transactions in compliance with all applicable Laws relating to health care or healthcare services of any kind and shall include obtaining any such consents, approvals, authorizations, waivers, Orders, licenses or Permits, or notices to, CMS, DoH and shall include Purchaser obtaining DoH Approval with respect to its operation of the Business and the parties obtaining any consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body needed for them to consummate the Contemplated Transactions and for Purchaser to operate the Business.

"Intellectual Property Licenses" means (a) any grant by Seller to a third Person of any right to use any of the Purchased Intellectual Property owned by Seller and (b) any grant to Seller of a right to use in connection with the Business any Intellectual Property Rights owned by any other Person (other than the SVCMC Marks), to the extent, and only to the extent, such right is transferable by Seller.

"Intellectual Property Rights" means all intellectual property rights available in respect of Copyrights, Marks (other than the SVCMC Marks), Software, trade secrets and Patents, whether registered or unregistered, and whether owned or licensed.

"Inventory" means all medical supplies, drugs, medications, food, janitorial, housekeeping and office supplies and other consumables located in or used in connection with the operation of the Business.

"Knowledge" means the actual knowledge of those officers of Purchaser or of those officers of SVCMC or senior managers of the Business as of or prior to the Closing (each of which is identified in Section 1.1(a) of the Seller Disclosure Schedule and Section 1.1(a) of the Purchaser Disclosure Schedule), as applicable.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule, regulation or directive enacted or issued by a Governmental Body.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, alternative dispute resolution, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all fines, penalties, costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement and transfer restriction under any agreement.

"Marks" means all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof.

"Material Adverse Effect" means (a) a material adverse effect on the Business (taken as a whole), including its assets, properties, results of operations or condition (financial or otherwise) as conducted on the date hereof other than an effect resulting from an Excluded Matter, (b) a material adverse effect on the Purchased Assets other than an effect resulting from an Excluded Matter, or (c) a material adverse effect on the ability of SVCMC to consummate the Contemplated Transactions or to perform its obligations under this Agreement. "Excluded Matter" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general that does not materially disproportionately affect Seller; (ii) the effect of any change that generally affects any industry in which Seller operates that does not materially disproportionately affect Seller; (iii) the effect of any changes in national or international political conditions, including any engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack occurring prior to, on or after the date of this Agreement that does not materially disproportionately affect Seller; (iv) the effect of any change in applicable Laws or accounting rules that does not materially disproportionately affect Seller; (v) the effect of any action taken by Purchaser or its Affiliates with respect to the Contemplated Transactions or with respect to Seller or its Employees, including with respect to the Interim Agreement or the Transition Plan, which action is a substantial cause of the Material Adverse Effect; (vi) any matter set forth in Section 1.1(b) of the Seller Disclosure Schedule; and (vii) any effect reasonably anticipated from the filing or pendency of the Bankruptcy Case; provided, that the extent of the Material Adverse Effect would have been reasonably anticipated prior to the Petition Date.

"Medicaid" means any state program for medical assistance administered under Title XIX of the Social Security Act.

"Medical Reimbursement Program" means Medicare, Medicaid, any other federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and any other state sponsored reimbursement program.

"Medical Reimbursement Program Laws" means the Laws governing the Medical Reimbursement Programs, including: 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a- 7b; §§ 1395 through 1395fff; §§ 1396-1396v; the False Claims Act (31 U.S.C. § 3729 et seq.); the False Statements Act (18 U.S.C. § 1001); the Program Fraud Civil Penalties Act (31 U.S.C. § 3801 et seq.); the anti-fraud and abuse provisions of the Health Insurance Portability and Accountability Act of 1996 (18 U.S.C. § 1347, 18 U.S.C. § 669, 18 U.S.C. § 1035, 18 U.S.C. § 1518); and the corresponding reimbursement, fraud and abuse, false claims and anti self-referral Laws of any other Governmental Body.

"Medicare" means the health insurance program administered under Title XVIII of the Social Security Act.

"Order" means any order, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice, subject, however, to those actions necessary and incident, or otherwise relating, to the Bankruptcy Case, provided, however, that Seller complies with the requirements of the Bankruptcy Code after the filing of the Bankruptcy Case.

"Organizational Documents" means (a) the articles or certificate of incorporation, the bylaws and any shareholders agreement of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and certificate of formation or organization of any limited liability company, (e) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and (f) any amendment to any of the foregoing.

"Patents" means all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon.

"Patient Records" shall mean any documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996, the Health Information Technology for Economic and Clinical Health Act, Title XIII of the American Recovery and Reinvestment Act of 2009 and all regulations promulgated pursuant thereto.

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Body.

"Permitted Liens" means Liens set forth in Section 1.1(c) of the Seller Disclosure Schedule, solely to the extent that such Liens cannot be removed by operation of Sections 105 and/or 363(f) of the Bankruptcy Code.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, association, estate, Governmental Body or other entity.

"Plan" means each "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee plan or agreement maintained by the Seller.

"Pre-Closing Accounts Receivable" means accounts receivable arising out of the rendition of medical, surgical, behavioral, diagnostic or other professional health care services or the sale of medical products by Seller in the Ordinary Course of Business for dates of service occurring prior to midnight on the Closing Date.

"PTO Liability" means all vacation, leave, holiday, sick time and personal days of Employees (employed as of the date hereof and who remain employed on the date immediately preceding the Closing Date) accrued either before or after the Petition Date up to a maximum of $170,000.00.

"Purchased Intellectual Property" means all Intellectual Property Rights (other than rights under an Intellectual Property License and other than the SVCMC Marks) owned by Seller and (a) used by Seller exclusively in connection with the Business and (b) not used to a material degree in any of the Other Businesses, including any in the form of or arising from or in respect of Patents, Marks, Copyrights, Software or Technology, except for any that is an Excluded Asset.

"Representatives" means, with respect to any Person, any of its Affiliates and the directors, trustees, officers, members, employees, consultants, agents, advisors and other representatives of such Person or its Affiliates.

"Sale Motion" means the motion or motions of Seller seeking approval and entry of the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court substantially in the form of Exhibit B hereto, with such changes as are reasonably acceptable to Purchaser and SVCMC.

"Severance Obligations" means all severance obligations of Seller existing as of or arising on or after the Closing Date with respect to Employees (employed as of the date hereof and who remain employed on the date immediately preceding the Closing Date), whether or not hired by Purchaser, up to a maximum of $230,000.00.

"Software" means, except to the extent generally available for purchase from a third Person, any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (d) all documentation including user manuals and other training documentation related to any of the foregoing, in each case, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business. That portion of the Software that is owned by Seller is referred to herein as the "Proprietary Software," and that portion of the Software that is owned by any Person other than Seller is referred to herein as the "Third-Party Software."

"Tax Authority" means any federal, state or local government, or agency, instrumentality or employee thereof, charged with the administration of any Law relating to Taxes.

"Taxes" means (a) all federal, state, local or foreign taxes, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, unrelated business income, and

estimated taxes, whether disputed or not, and (b) all interest, penalties and additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (a).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business, other than any in the form of Software.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and the New York State Worker Adjustment and Retraining Notification Act.

Section 1.2    Terms Defined Elsewhere in this Agreement.    For purposes of this Agreement, each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|---|---|
| Additional Deposit | 3.2 |
| Agreement | Recitals |
| Allocation | 11.3 |
| Antitrust Bureau | 8.4(b) |
| Antitrust Division | 8.4(b) |
| Assigned Contracts | 2.1(d) |
| Assumed Liabilities | 2.3 |
| Auction | 7.1(a) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Business Confidential Information | 8.6(b) |
| CBAs | 5.11(c) |
| CHHA Inquiry | 2.6(d) |
| Closing | 4.1 |
| Closing Date | 4.1 |
| COBRA | 9.2(g) |
| Competing Bid | 7.1(a) |
| Contingent Medicaid Liability | 2.6 |
| Cure Amount | 2.5 |
| Deposit Escrow Funds | 3.2 |
| Early Transfer Adjustment | 8.14(d) |

| Term | Section |
|---|---|
| Escrow Agent | 3.2 |
| Escrow Agreement | 3.2 |
| Escrow Funds | 3.2 |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Excluded Matter | 1.1 |
| Excluded Owned Property | 2.2(f)(i) |
| Excluded Personal Property Leases | 2.2(e) |
| Excluded Real Property | 2.2(f)(ii) |
| Excluded Real Property Leases | 2.2(f)(ii) |
| FTC | 8.4(b) |
| Healthcare Applications | 8.4(a) |
| Healthcare Programs | 5.12(b) |
| Incentive Payments | 8.2 |
| Initial Deposit | 3.2 |
| Inquiry | 2.6 |
| Interim Agreement | 8.14 |
| Interim Transfer Adjustment Period Date | 8.14(d) |
| Interim Trial Balance | 5.4 |
| Interim Balance Sheet | 5.4 |
| LTHHCP | Recitals |
| Material Contracts | 5.9(a) |
| Medicaid Payments | 2.6 |
| Nonassignable Assets | 2.6(b) |
| OASIS | 8.13 |
| Other Businesses | Recitals |
| Owned Properties | 5.6(a) |
| Personal Property Leases | 5.7 |
| Petition Date | Recitals |
| Proprietary Software | 1.1 |
| Purchase Price | 3.1 |
| Purchased Assets | 2.1 |
| Purchased Intellectual Property Licenses | 2.1(c) |
| Purchased Owned Property | 2.1(a) |
| Purchased Personal Property Leases | 2.1(b)(iii) |
| Purchased Real Property | 2.1(a) |
| Purchased Real Property Leases | 2.1(a) |
| Purchaser | Recitals |
| Purchaser Disclosure Schedule | Article VI |
| Purchaser Documents | 6.2 |
| Real Property Leases | 5.6(a) |
| Retention Bonus | 9.1(a) |
| Seller Confidential Information | 8.6(a) |
| Seller Disclosure Schedule | Article V |
| Seller Documents | 5.2 |
| Seller | Recitals |

| Term | Section |
|------|---------|
| SVCMC | Recitals |
| SVCMC Marks | 8.8 |
| Termination Date | 4.4(c)(iii) |
| Third-Party Software | 1.1 |
| Transfer Adjustment Period Commencement Date | 8.14(d) |
| Transfer Adjustment Period Termination Date | 8.14(d) |
| Transfer Taxes | 11.1 |
| Transition Adjustment Period | 8.14(d) |
| Transition Plan | 8.14 |
| Trial Balances | 5.4 |
| Year End Financial Statements | 5.4 |
| Year End Trial Balance | 5.4 |

Section 1.3    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Periods.   When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.  Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

Dollars.   Any reference in this Agreement to currency shall be to, and all payments hereunder shall be paid in, U.S. dollars.

Exhibits/Schedules.   All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.   Any reference in this Agreement to gender shall include all genders, and words imparting the singular number shall have the corresponding meanings in the plural and vice versa.

Headings.   The provision of a Table of Contents, the division of this Agreement into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All article, section, schedule and exhibit references used in this Agreement are to articles, sections, schedules and exhibits to this Agreement unless otherwise specified.

Herein. The words "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation", whether or not so stated, and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Made Available to Purchaser. The phrase "made available to Purchaser" shall mean made available to Purchaser through posting in SVCMC's electronic data room, via email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

Make Available to Seller. The phrase "make available to Seller" shall mean make available to Seller or its agents through email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

Part of Speech. If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).

Date. The phrase "the date of this Agreement," "date hereof" and terms of similar import, unless the context otherwise requires, shall be deemed to refer to the date set forth in the preamble of this Agreement.

Accounting Terms. All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.

(b)     Each party hereto has been advised by experienced counsel, and the parties hereto have participated jointly, in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto, and no rule of construction shall operate and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1    Purchase and Sale of Assets. On the terms and subject to the conditions set forth in this Agreement, and subject to entry of the Sale Order, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall, subject to Section 2.5 hereto, sell, transfer, assign, convey and deliver to Purchaser, all of Seller's right, title and interest in, to and under the Purchased Assets, subject to the Permitted Liens, free and clear of any and all Liens, claims or any other interest, to the extent provided in the Sale Order pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code, excepting only such liabilities that Purchaser has expressly agreed to assume as provided in this Agreement. Other than the Permitted Liens, all indebtedness secured by mortgages or other Liens on the Purchased Assets shall attach to the

proceeds pursuant to Section 363(f) of the Bankruptcy Code so that the Purchased Assets will be sold free and clear of such Liens. "Purchased Assets" means all of the assets, rights and properties of Seller exclusively pertaining to or exclusively used in connection with the Business as existing on the Closing Date (wherever located and whether or not required to be reflected on a balance sheet), other than the Excluded Assets, and in each case subject to Section 2.7(b) hereto, including, without limitation, all of Seller's right, title and interest in and to the following:

(a)     all right, title and interest of Seller in and to each Owned Property set forth in Section 5.6(a) of the Seller Disclosure Schedule (other than any identified in Section 2.2(f)(i) hereto as Excluded Owned Property) (the "Purchased Owned Property") and under each Real Property Lease set forth in Section 2.1(a) of the Seller Disclosure Schedule (other than any identified in Section 2.2(f)(ii) hereto as Excluded Real Property Leases) (along with any additional Real Property Leases exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.2 hereto, the "Purchased Real Property Leases", and the real property that is the subject of the Purchased Real Property Leases, collectively with the Purchased Owned Property, the "Purchased Real Property"), together with all improvements and fixtures thereto and other appurtenances and rights in respect thereof (provided that Purchaser shall be permitted to remove any Purchased Real Property Lease listed on Schedule 2.1(a) by notice to Seller at any time on or before the fifth (5th) Business Day prior to the Closing Date); provided, however, that in the event Purchaser elects to remove any Purchased Real Property Lease listed on Schedule 2.1(a), except as provided in Section 2.5(b) hereto, Purchaser shall be liable for any administrative expense claim related thereto for the time period from the date that Purchaser is deemed to be the Successful Bidder pursuant to the Bidding Procedures Order until the date such Purchased Real Property Lease is rejected under the Bankruptcy Code;

(b)     (i) the Furniture and Equipment; (ii) the tools, spare parts, supplies (including all of Seller's Inventory) and all other tangible personal property owned by Seller, used by Seller in the conduct of the Business and set forth on Section 2.1(b) of the Seller Disclosure Schedule; and (iii) the Personal Property Leases identified in Section 2.1(b) of the Seller Disclosure Schedule, other than any identified in Section 2.2(e) of the Seller Disclosure Schedule as Excluded Personal Property Leases (along with any additional Personal Property Leases exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.2 hereto, the "Purchased Personal Property Leases") (provided that Purchaser shall be permitted to remove any Purchased Personal Property Lease listed on Schedule 2.1(b) by notice to Seller at any time on or before the fifth (5th) Business Day prior to the Closing Date); provided, however, that in the event Purchaser elects to remove any Purchased Personal Property Lease listed on Schedule 2.1(b), except as provided in Section 2.5(b) hereto, Purchaser shall be liable for any administrative expense claim related thereto for the time period from the date that Purchaser is deemed to be the Successful Bidder pursuant to the Bidding Procedures Order until the date such Purchased Personal Property Lease is rejected under the Bankruptcy Code;

(c)     (i) the Purchased Intellectual Property set forth on Section 2.1(c) of the Seller Disclosure Schedule; and (ii) the rights of Seller as licensor under the Intellectual Property Licenses identified in Section 2.1(c) of the Seller Disclosure Schedule and all rights of Seller as

licensee under the Intellectual Property Licenses (along with any additional Intellectual Property Licenses exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.2 hereto, the "Purchased Intellectual Property Licenses") (provided that Purchaser shall be permitted to remove any Purchased Intellectual Property License listed on Schedule 2.1(c) by notice to Seller at any time on or before the fifth (5th) Business Day prior to the Closing Date); provided, however, that in the event Purchaser elects to remove any Purchased Intellectual Property License listed on Schedule 2.1(c), except as provided in Section 2.5(b) hereto, Purchaser shall be liable for any administrative expense claim related thereto for the time period from the date that Purchaser is deemed to be the Successful Bidder pursuant to the Bidding Procedures Order until the date such Purchased Intellectual Property License is rejected under the Bankruptcy Code;

(d) all Contracts set forth in Section 2.1(d) of the Seller Disclosure Schedule (provided that Purchaser shall be permitted to remove any Contract listed on Schedule 2.1(d) by notice to Seller at any time on or before the fifth (5th) Business Day prior to the Closing Date) and all rights arising out of such Contracts (along with any additional Contracts exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.2 hereto, the "Assigned Contracts"); provided, however, that in the event Purchaser elects to remove any Contract listed on Schedule 2.1(d), except as provided in Section 2.5(b) hereto, Purchaser shall be liable for any administrative expense claim related thereto for the time period from the date that Purchaser is deemed to be the Successful Bidder pursuant to the Bidding Procedures Order until the date such Contract is rejected under the Bankruptcy Code;

(e) subject to the provisions of Sections 2.9 and 8.7 hereto, all Documents that are exclusively used in, held for use in or intended to be used in, or that arise exclusively out of, the Business, including Documents relating to the services provided by the Business, personnel and employee health files for Employees who accept an offer of employment from Purchaser (including, to the extent available, pre-employment, criminal background, drug screen, and immigration records) and books, files, invoices, flow sheets and other technical and non technical data and information relating to the operations and services provided by the Business which are owned by Seller and which are exclusively used in and integral to the operation of the Business, but excluding any Documents and Patient Records described in Section 2.2(h) or Section 2.2(i) hereto;

(f) all Permits exclusively used by Seller in the Business and set forth in Section 2.1(f) of the Seller Disclosure Schedule (to the extent transferable);

(g) all goodwill and other intangible assets (other than Intellectual Property Rights) owned by Seller and exclusively used in connection with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(h) any rights, claims or causes of action of Seller against third parties relating to or arising from actions or omissions which were the subject of the Inquiry described in Section 2.6 hereto, including any right, claim or cause of action against any vendors that are alleged to have provided services to the Business using staff who lacked the required licensure and/or certification to provide the services for which Medicaid payments were made; and

(i)     all other assets used exclusively in the Business.

Section 2.2     Excluded Assets.   Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser or its Affiliates, and Seller shall retain all right, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean the following assets, properties, interests and rights of Seller:

(a)     all cash, cash equivalents, bank deposits or similar cash items of Seller, all securities owned by Seller and any accounts receivable or trade receivables owned by Seller, including Pre-Closing Accounts Receivable and related party receivables;

(b)     the Excluded Contracts, including, but not limited to the CBAs and the Plans;

(c)     any rights to refunds, settlements and retroactive adjustments arising in connection with the Medicare and Medicaid provider numbers and related participation agreements or any other third-party healthcare payor program of the Business relating to the operation of the Business on or prior to the Closing;

(d)     any other Contract to which Seller is a party or under which it has rights that is not used exclusively in the Business or is used to a material degree in any of the Other Businesses, unless included in Section 2.1(d) of the Seller Disclosure Schedule among the Assigned Contracts;

(e)     the Personal Property Leases identified in Section 2.2(e) of the Seller Disclosure Schedule (the "Excluded Personal Property Leases");

(f)     (i) the Owned Property identified in Section 2.2(f)(i) of the Seller Disclosure Schedule (collectively the "Excluded Owned Property"), and (ii) the Real Property Leases identified in Section 2.2(f)(ii) of the Seller Disclosure Schedule (the "Excluded Real Property Leases", and the real property that is the subject of the Excluded Real Property Leases, collectively with the Excluded Owned Property, the "Excluded Real Property");

(g)     any Intellectual Property Rights of Seller other than the Purchased Intellectual Property; it being understood that Seller shall not convey, and Purchaser shall not acquire, pursuant to this Agreement any right in or to any website or e-mail address owned or used by Seller (whether or not used in the Business);

(h)     any (i) personnel files for Employees of Seller who do not accept an offer of employment from Purchaser; (ii) other books and records that Seller is required by Law to retain (provided that Purchaser shall have a right to make and retain copies of such books and records that relate to the Business at its sole expense, to the extent permitted by applicable Law or subject to any contractual confidentiality obligation owed to a third party); (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party (other than any patient confidentiality obligation referred to in the foregoing clause (ii) or in Section 2.10 hereto); (iv) books and records and other Documents related to malpractice prevention programs, incident reporting or quality assurance to the extent confidential under applicable Law; (v) Documents relating to proposals to acquire the Business

14

by Persons other than Purchaser or its Affiliates; (vi) any Documents primarily related to or that are required to realize the benefits of any Excluded Assets; (vii) Documents related to Pre-Closing Accounts Receivable; (viii) corporate records and Tax Returns of Seller, other than Tax Returns relating to the Purchased Assets and (ix) Documents necessary to prepare Tax Returns and Cost Reports (provided that Purchaser shall have a right to make and retain copies of such Documents, at Purchaser's sole expense, as necessary to prepare Cost Reports that relate to the Business, to the extent permitted by applicable Law or subject to any contractual confidentiality obligation owed to a third party);

(i)     any Patient Records;

(j)     any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom;

(k)     all insurance policies or rights to proceeds thereof relating to the Business or the Purchased Assets on or prior to the Closing;

(l)     all deposits (including customer deposits and security deposits for rent, electricity, telephone or other utilities and deposits posted under any Assigned Contract) and prepaid charges and expenses of Seller;

(m)     any rights, claims or causes of action of Seller against third parties relating to assets, properties, business or operations of Seller, including any actions under Chapter 5 of the Bankruptcy Code, except for the rights, claims and causes of action described in Section 2.1(h);

(n)     the amounts described in Section 2.9(a) hereto and all other rights of Seller under this Agreement, the Seller Documents and the Contemplated Transactions;

(o)     any assets of the Other Businesses not otherwise described in Section 2.1 hereto;

(p)     any tangible personal property having religious significance which may be removed from the Purchased Real Property identified in Section 2.2(p) of the Seller Disclosure Schedule;

(q)     any personal, tangible and intangible property of Seller identified in Section 2.2(q) of the Seller Disclosure Schedule;

(r)     any right to receive or expectancy of Seller in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate), regardless of when received and whether or not designated to be applied or used in respect of the Business;

(s)     the Medicare and Medicaid provider numbers for the Business and related provider agreements used in the Business, as identified in Section 2.2(s) of the Seller Disclosure Schedule; and

(t)     any marketable securities of Seller.

Section 2.3    Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing Date, and shall timely pay, perform and discharge in accordance with their respective terms, only the following Liabilities (collectively, the "Assumed Liabilities"):

(a)     all Liabilities accruing after the Closing Date with respect to the Assigned Contracts, the Purchased Intellectual Property Licenses, the Purchased Real Property Leases and the Purchased Personal Property Leases;

(b)     the Cure Amounts as required by Section 2.5 hereto;

(c)     the Contingent Medicaid Liability, if any, as required by Section 2.6 hereto;

(d)     those liabilities, if any, set forth on Schedule 2.3;

(e)     all Severance Obligations; and

(f)     all PTO Liability.

Section 2.4    Excluded Liabilities.  Except for the Assumed Liabilities, Purchaser shall not assume or become liable for the payment or performance of any Liability of Seller of any nature whatsoever, whether accrued or unaccrued, known or unknown, fixed or contingent ("Excluded Liabilities"), including the following, which shall remain Liabilities of Seller:

(a)     except as otherwise provided in Section 2.3(a) hereto, any Liability for Taxes of Seller arising from the operation of the Business for periods prior to and including the Closing;

(b)     any Liability associated with any Excluded Assets;

(c)     any Liability arising out of events or omissions occurring on or prior to the Closing Date from or relating to any overpayment, duplicate payment, refunds, discounts or adjustments due to private sector healthcare cost reimbursement program or insurance coverage;

(d)     any Liability related to claims of medical malpractice and/or other professional Liability of Seller, or any of its Employees, agents or independent contractors to the extent incurred on or prior to the Closing Date or arising out of events or omissions occurring on or prior to the Closing Date;

(e)     except as otherwise provided in Section 2.3(c) hereto, all Healthcare Program Liabilities arising from events on or prior to the Closing Date;

(f)     any Liability arising out of or in connection with any Legal Proceedings (whether instituted prior to or after the Closing) to the extent arising from acts or omissions

which occurred on or prior to the Closing Date (except as otherwise provided by Section 2.3 hereto);

(g)     any Liability relating to Employees (whether current, former or retired) on or prior to the Closing Date; and

(h)     any Liability relating to the CHAA Inquiry, if any, as defined in Section 2.6(d).

Section 2.5     Assignment and Cure Amounts.

(a)     Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing and pursuant to Section 365 of the Bankruptcy Code, Seller shall assume and assign to Purchaser, and Purchaser shall take assignment from Seller, the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses pursuant to an assignment (the "Assignment") in the form annexed hereto as Exhibit C. No contract, lease, or other agreement shall be assumed absent concurrent assignment to Purchaser. Purchaser shall be responsible for satisfying the requirements of "adequate assurance of future performance" as required by Section 365 of the Bankruptcy Code and shall cooperate fully with Seller in seeking such approval from the Bankruptcy Court, including without limitation, Purchaser providing the necessary evidence required as part of the Sale Motion to approve this Agreement and the transactions contemplated herein.

(b)     The cure amounts (collectively, the "Cure Amounts"), if any, as determined by the Bankruptcy Court, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of Seller under the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses shall be paid by Purchaser (or Purchaser shall have delivered into escrow on terms reasonably acceptable to SVCMC amounts sufficient to pay any claim therefor that remains disputed as of the Closing, as such amount shall have been determined by the Bankruptcy Court) at or before the Closing (except as otherwise agreed to by the other party to the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses) and Seller shall have no Liability for any such cure amount. Except as provided for in Section 4.4(a)(i) and Article X hereto, Purchaser shall not have the right to terminate this Agreement as a result of the failure by Seller or inability of Seller to assign to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof) at the Closing any Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses or Purchaser's decision not to assume any Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses as to which Purchaser has not paid the related Cure Amount in accordance with this section. Consistent with the Sale Order, Purchaser, with the reasonable cooperation of the Seller will commence and prosecute to conclusion, in expedited proceedings before the Bankruptcy Court, objection(s) to the cure amount(s) claimed by any counterparty of Seller in respect of any of the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases or Purchased Intellectual Property Licenses; provided, however, that Purchaser will reimburse all of the actual and necessary expenses incurred by Seller in connection therewith. A good faith

estimate as of the date hereof of the Cure Amounts described in this section, based on the Knowledge of Seller, is set forth on Section 2.5(b) of the Seller Disclosure Schedule. At least fifteen (15) Business Days prior to the Closing Date, the Seller shall prepare and deliver to Purchaser an updated Section 2.5(b) of the Seller Disclosure Schedule setting forth the Cure Amounts. Nothing contained in this Section 2.5 shall restrict or prohibit Purchaser's right to remove any item identified in Section 2.1(a), 2.1(b), 2.1(c), or 2.1(d) of the Seller Disclosure Schedule pursuant to the corresponding Sections thereto; provided, however, that in the event Purchaser elects to remove any such item, Purchaser shall not be liable for any administrative expense claim related thereto for the time period from the date that Purchaser is deemed to be the Successful Bidder pursuant to the Bidding Procedures Order until the date such item is rejected under the Bankruptcy Code, if the Cure Amount described on the updated Section 2.5(b) of the Seller Disclosure Schedule is higher than the Cure Amount described on Section 2.5(b) of the Seller Disclosure Schedule as of the date hereof.

Section 2.6    Contingent Medicaid Liability.

(a)    Seller and Purchaser are aware that Seller received inquiries from the New York State Attorney General's, Medicaid Fraud Control Unit in respect of Seller's receipt of Medicaid payments from the State of New York for the provision of services by certain staff of the Business contracted from outside vendors which staff, at the time they provided the services, are alleged to have lacked the required licensure and/or certification to provide the services for which such Medicaid payments (the "Medicaid Payments") were made as described in more detail in Section 1.1(b) of the Seller Disclosure Schedule (the "Inquiry"). Seller has not been asked, nor has any demand been made for Seller, to make any repayment in respect of the Medicaid Payments. If such a request or demand is made, Seller shall promptly notify Purchaser, and provide copies to Purchaser, of any correspondence it receives with respect to the Inquiry. Purchaser shall be entitled to participate in any efforts made by Seller to resolve such request or demand with the State of New York prior to the Closing Date at Purchaser's sole cost and expense. Subject to Section 2.6(b) hereof, if the Inquiry is not fully resolved prior to the Closing Date, Purchaser shall assume and shall timely pay any monetary liability of the Seller to the State of New York or its offices or agencies in respect of the Inquiry (the "Contingent Medicaid Liability").

(b)    Except as expressly set forth herein, upon the Closing Purchaser shall assume the sole and exclusive right to litigate, defend, negotiate and/or resolve, in its sole discretion, the Inquiry and to communicate with the State of New York (including, but not limited to, its attorneys, agencies and/or offices) and/or any other individuals and/or entities in respect thereof. Seller shall be entitled at any time to participate in the litigation, defense, negotiation and/or resolution of the Inquiry with counsel of its own choice and at its sole cost and expense, and the parties agree to cooperate fully with one another in connection with the defense and/or settlement thereof. In any case, Purchaser shall use commercially reasonable efforts consistent with industry standards in connection with the defense and resolution of the Inquiry, including but not limited to, timely responses to all communications initiated by the State of New York and/or any other individuals and/or entities in respect thereof. In addition, Purchaser and Seller shall maintain, preserve and deliver copies to the other party and shall each cause its counsel to maintain, preserve and deliver copies to the other party all existing records related to the Inquiry (including but not limited to documents and electronically stored

information but excluding records protected by the attorney-client privilege) until such time as the Inquiry is fully resolved. Seller shall use best efforts to deliver a log to Purchaser of all records relating to the Inquiry which are protected by the attorney-client privilege within eight (8) weeks of the date hereof. Except as expressly set forth herein, Seller shall take no action inconsistent with Purchaser's sole and exclusive right to litigate, defend, negotiate and/or resolve the Inquiry, as set forth above, including but not limited to, making any payments in respect of the Inquiry not expressly authorized in writing by Purchaser. Each party shall immediately notify the other party, and provide copies to the other party, of any correspondence it receives with respect to the Inquiry. Notwithstanding the foregoing, or any other term(s) of this Agreement, Seller does not admit to any liability in respect of the Inquiry, and Seller expressly reserves any and all rights and/or defenses, of any kind and/or nature, that it has and/or may have in connection with the Inquiry, the Medicaid Payments and/or any and all claims relating thereto, and it does not waive any of the foregoing, either in whole or in part.

(c)     Upon the Closing Purchaser shall defend, indemnify and hold harmless Seller from and against any and all claims, suits, demands, damages, losses and liabilities (including reasonable costs and expenses and attorneys' fees on account thereof) that arise from or relate to any claim or demand made by a third party to the extent resulting or arising from, or alleged to be resulting or arising from, the Contingent Medicaid Liability.

(d)     Notwithstanding anything to the contrary contained herein, Purchaser acknowledges that Seller also received inquiries from the New York State Attorney General's, Medicaid Fraud Control Unit in respect of Seller's receipt of Medicaid payments from the State of New York for the provision of services by certain staff of its certified home health agency contracted from outside vendors which staff, at the time they provided the services, are alleged to have lacked the required licensure and/or certification to provide the services for which such Medicaid payments were made (the "CHHA Inquiry"). Purchaser shall not assume or become liable for the payment or performance of any liability relating to the CHAA Inquiry, which shall remain with the Seller. Seller does not admit to any liability in respect of the CHHA Inquiry, and expressly reserves any and all rights and/or defenses and/or claims, of any kind and/or nature that it has and/or may have in connection with the CHHA Inquiry, the Medicaid payments in respect thereof and/or any and all claims relating thereto, and it does not waive any of the foregoing, either in whole or in part. Further, Purchaser agrees that Seller shall have full right and authority to litigate, defend, negotiate and/or resolve the CHHA Inquiry. Without limiting Purchaser's rights set forth in Section 2.6(b), following the Closing Purchaser agrees to reasonably cooperate with Seller in connection with the CHHA Inquiry. Further, Seller and Purchaser shall discuss a potential joint defense agreement with respect to the Inquiry and the CHHA Inquiry; however, neither party shall be obligated to enter into such an agreement.

Section 2.7    Further Conveyances and Assumptions.

(a)     From time to time following the Closing, each party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents

at the Closing and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the Liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents at the Closing, and to otherwise make effective the transactions contemplated hereby and thereby; provided however that nothing herein shall obligate or otherwise require Seller to pay any claims or liabilities arising prior to the Petition Date. In the event that Purchaser or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Purchaser shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to SVCMC. In the event that Seller receives any Purchased Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver such Purchased Assets (or any payments or proceeds related thereto) to Purchaser.

(b)     To the extent that the assignment of any Purchased Asset shall require the consent of any other Person and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code (each, a "Nonassignable Asset"), (i) nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained, and (ii) except as provided for in Section 4.4(a)(i) and Article X hereto, Purchaser shall be obligated to close whether or not the Nonassignable Asset can be transferred and Seller agrees to reasonably cooperate with Purchaser to seek to obtain any required consent; provided however that Seller shall not be required to pay any claims or incur any other obligations in order to obtain such consent. Except as provided for in Section 4.4(a)(i) and Article X hereto, notwithstanding anything to the contrary contained herein, Purchaser shall not have the right to terminate this Agreement as a result of the inability of Seller to assign to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof) at the Closing any Assigned Contract, Purchased Personal Property Lease, Purchased Real Property Lease or Purchased Intellectual Property License.

Section 2.8     Bulk Sales Laws.  The parties hereto hereby waive compliance by Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

Section 2.9     Accounts Receivable.

(a)     All Pre-Closing Accounts Receivable of the Business shall remain the property of SVCMC following the Closing.  All accounts receivable relating to the operation of the Business based on services rendered after midnight on the Closing Date shall be the property of Purchaser.  For the avoidance of doubt, SVCMC shall be entitled to bill for and receive all amounts collected, to the extent permitted by applicable Law, in respect of services rendered by the Business before the Closing, and Purchaser shall be entitled to bill for and receive all amounts collected in respect of services rendered by the Business after the Closing.

(b)     Purchaser shall cooperate with Seller for a period of one hundred and twenty (120) days after the Closing Date in Seller's efforts to collect its accounts receivable arising out of the Business before the Closing Date, at no cost to Seller.  Each of Purchaser and SVCMC agrees that it will pay over or cause to be paid over, insofar as practicable within three

(3) Business Days of receipt, to the other (and until so paid, shall hold in trust for the other) all sums received by it or any of its Affiliates in respect of or on account of the other's receivables, and provide therewith information available to it identifying the source of the amounts so paid over so to permit the other to apply correctly such amounts to the other's accounts receivable. In addition, upon reasonable request, each recipient shall allow the other (at the other's cost) to audit, access and copy any of its records relating thereto. All payments for accounts receivable arising out of the Business received from an obligor after the Closing shall be applied to the receivable specifically designated by such obligor; provided that in the event that the obligor does not specifically designate a receivable, the payment shall be applied in the order of the age of the accounts receivable of such obligor, starting with the oldest such accounts receivable. The provisions of this Section 2.9 shall survive the Closing to the extent contemplated herein.

Section 2.10    Agreement Regarding Confidentiality of Patient Information. Seller shall have no obligation to make available to Purchaser copies of any Patient Records upon the Closing unless and until such patient has agreed to a transfer to Purchaser.

## ARTICLE III

## CONSIDERATION

Section 3.1    Consideration. The consideration for the Purchased Assets shall be, subject to adjustment as provided in Section 8.2 hereto, (a) Thirty Million and One Hundred Fifty Thousand Dollars ($30,150,000.00) (the "Purchase Price"); (b) the assumption by Purchaser of the Assumed Liabilities, and (c) the aggregate Cure Amounts payable or reserved by Purchaser under Section 2.5 hereto. In addition, Purchaser shall pay to Seller an amount equal to the Early Transfer Adjustment as set forth in Section 8.14(d) hereto.

Section 3.2    Purchase Price Deposit. Purchaser has deposited with Garfunkel Wild, P.C., in its capacity as escrow agent (the "Escrow Agent"), pursuant to that certain Escrow Agreement by and among Purchaser, SVCMC and the Escrow Agent (the "Escrow Agreement"), by wire transfer of immediately available funds, Two Million One Hundred Thousand Dollars ($2,100,000.00) (the "Initial Deposit"). Purchaser and Seller acknowledge that Purchaser has been selected as the prevailing bidder at the Auction, and shall (a) deposit on or prior to the earlier of: (i) one (1) Business Day prior to the date of the sale hearing; (ii) three (3) Business Days after the Purchaser is selected as the prevailing bidder; and (iii) three (3) Business Days after the conclusion of the Auction, an amount (the "Additional Deposit", together with the Initial Deposit, the "Deposit Escrow Funds") equal to an amount such that together with the Initial Deposit, the Deposit Escrow Funds shall be equal to twenty percent (20%) of the Purchase Price, and (b) within one (1) Business Day of entry of the Sale Order, an amount such that together with the Deposit Escrow Funds shall be equal to one third (1/3) of the Purchase Price (together with the Deposit Escrow Funds, the "Escrow Funds"), each such deposit to be released by the Escrow Agent and delivered to either Purchaser or SVCMC, in accordance with the provisions of this Agreement and the Escrow Agreement. Pursuant to the Escrow Agreement, the Escrow Funds shall be deposited into an interest bearing account and (together with all accrued investment income thereon) distributed as follows:

(a) the Escrow Funds, together with all accrued investment income thereon, shall be delivered to SVCMC as partial consideration for the Purchased Assets at the Closing;

(b) if this Agreement is terminated by SVCMC pursuant to Section 4.4(b)(ii) hereto, the Escrow Funds, together with all accrued investment income thereon, shall be delivered to SVCMC; or

(c) if this Agreement is terminated pursuant to Section 4.4 hereto, other than by SVCMC pursuant to Section 4.4(b)(ii) hereto, the Escrow Funds, together with all accrued investment income thereon, shall in each case be returned to Purchaser.

Section 3.3    Payment of Purchase Price.  On the Closing Date, Purchaser shall (a) pay the Purchase Price (less an amount equal to the portion of the Escrow Funds being released to SVCMC on the Closing Date pursuant to Section 3.2 hereto), which shall be paid by wire transfer of immediately available funds into an account designated by SVCMC, and (b) deposit cash in escrow equal to such amount (if any) as is required by Section 2.5 hereto.

## ARTICLE IV

## CLOSING AND TERMINATION

Section 4.1    Closing Date.  Subject to the satisfaction of the conditions set forth in Article X hereto (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereto (the "Closing") shall take place at the offices of Garfunkel Wild, P.C. located at 111 Great Neck Road, Suite 503, Great Neck, NY 11021 (or at such other place as SVCMC and Purchaser may designate in writing) at 10:00 a.m. (New York time) on a date agreed upon by SVCMC and Purchaser that is not less than three (3) nor more than seven (7) Business Days following the satisfaction or waiver of the conditions set forth in Article X hereto (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by SVCMC and Purchaser.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."  With respect to the Closing, unless otherwise agreed by SVCMC and Purchaser in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of SVCMC in the assets to be acquired by Purchaser hereunder at the Closing, and any Assumed Liability and all risk of loss with respect to the Business, shall be considered to have passed to Purchaser as of 11:59 p.m. (New York time) on the Closing Date.

Section 4.2    Deliveries by Seller.  At the Closing, Seller shall deliver to Purchaser:

(a) a duly executed bill of sale in a form reasonably acceptable to Purchaser and Seller;

(b) the Assignment, substantially in the form of Exhibit C, duly executed by Seller;

(c)     the officer's certificates required to be delivered pursuant to Sections 10.1(a) and 10.1(b) hereto;

(d)     copies of all consents and notices required by Section 10.2(c) hereto for which Seller is responsible;

(e)     all other instruments of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser free and clear of all Liens (except Permitted Liens) (provided however that the Sale Order shall be the only required document to evidence the conveyance and transfer free and clear of such Liens); and

(f)     such other Documents, instruments and certificates necessary to transfer the Purchased Assets as Purchaser may reasonably request no later than four (4) days before the Closing.

Section 4.3     Deliveries by Purchaser. At the Closing, Purchaser shall deliver to Seller:

(a)     the Purchase Price, in immediately available funds, in accordance with Section 3.3 hereto;

(b)     a duly executed bill of sale in form reasonably acceptable to Purchaser and Seller;

(c)     the Assignment, substantially in the form of Exhibit C, duly executed by Purchaser;

(d)     the officer's certificates required to be delivered pursuant to Sections 10.2(a) and 10.2(b) hereto;

(e)     copies of all consents and notices required by Section 10.1(d) hereto for which Purchaser is responsible;

(f)     a copy of any notification that Purchaser is required under the Escrow Agreement to deliver to the Escrow Agent in order for the Escrow Agent to release the Escrow Funds to SVCMC at the Closing;

(g)     evidence reasonably acceptable to SVCMC of Purchaser's deposit in escrow of such amounts (if any) required by Section 2.5 hereto; and

(h)     such other Documents, instruments and certificates necessary to transfer the Purchased Assets as SVCMC may reasonably request no later than four (4) days before the Closing.

Section 4.4     Termination of Agreement.

(a)     Termination by Purchaser. Purchaser may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)      if Seller fails or is unable to assign to Purchaser those Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses listed on Section 4.4(a)(i) of the Purchaser Disclosure Schedule;

(ii)      if any of the conditions to the obligations of Purchaser to close that are set forth in Sections 10.1 and 10.3 hereto shall have become incapable of fulfillment other than as a result of a breach by Purchaser or its Affiliates of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser; provided that the right to terminate this Agreement pursuant to this Section 4.4(a)(ii) shall not apply with respect to the approvals of Governmental Bodies addressed in Sections 4.4(c)(iii) and (c)(iv) hereto, which are addressed and provided for in such Sections;

(iii)      if there shall be a breach by Seller of any representation or warranty, or any covenant or agreement contained in this Agreement, which breach would result in a Material Adverse Effect (or, in the case of a breach by Seller of its obligations under Section 4.2, results in a failure to consummate the Contemplated Transactions) and cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Purchaser to SVCMC of such breach;

(iv)      so long as Purchaser is not then in breach of its obligations under this Agreement in any material respect, if (A) the Bidding Procedures Order is not entered within thirty (30) days from the date the Sale Motion is filed or (B) the Sale Order is not entered within sixty (60) days from the date the Sale Motion is filed;

(v)      upon twenty (20) Business Days' prior written notice to Seller if DoH advises Purchaser that Purchaser must agree to assume any Healthcare Program Liabilities, including any Medicaid successor liability relating to the Business, arising from events prior to the Closing Date (except as set forth in Section 2.3(c)) in connection with the issuance of the DoH Approval, provided, however, that (i) Purchaser must immediately notify Seller of such communication from DoH, and (ii) Purchaser must provide written notice of its intent to terminate this Agreement pursuant to this Section 4.4(a)(v) or confirmation of its intent to assume such Healthcare Program Liability to Seller within five (5) Business Days of such communication by DoH; or

(vi)      if the Sale Order or Bidding Procedures Order has been vacated, reversed or modified in a material manner with respect to Purchaser's rights or protections thereunder without Purchaser's prior written consent.

(b)      Termination by SVCMC. SVCMC may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)      if any of the conditions to the obligations of Seller to close that are set forth in Sections 10.2 and 10.3 hereto shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by SVCMC; provided that the right to terminate this Agreement pursuant to this Section 4.4(b)(i) shall not apply with respect to

24

the approvals of Governmental Bodies addressed in Sections 4.4(c)(iii) and (c)(iv) hereto, which are addressed and provided for in such Sections;

(ii)     if there shall be a breach by Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement, which breach would preclude the Purchaser from consummating the Contemplated Transactions or have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement and cannot be cured or has not been cured by within twenty (20) Business Days after the giving of written notice by SVCMC to Purchaser of such breach;

(iii)     upon twenty (20) Business Days' prior written notice to Purchaser if the events in 4.4(a)(v) take place and Purchaser fails to provide to Seller written notice of its intent to terminate this Agreement within the time period prescribed by Section 4.4(a)(v) or confirmation of its intent to assume the Healthcare Program Liability within the time period prescribed by Section 4.4(a)(v); or

(iv)     if the Bidding Procedures Order or the Sale Order are subject to a stay other than a stay sought by Seller and such stay remains in effect for more than five (5) days.

(c)     Termination by Purchaser or SVCMC. Either Purchaser or SVCMC may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)     by mutual written consent of SVCMC and Purchaser;

(ii)     if the Bankruptcy Court shall enter an Order approving a Competing Bid and a transaction associated with that bid actually closes, subject to the provisions of the Bidding Procedures Order and the Sale Order;

(iii)     upon twenty (20) Business Days' written notice to the other party if two (2) months after the entry of the Sale Order by the Bankruptcy Court, either Purchaser or SVCMC reasonably determines, after consultation with the other party, that progress is not being made on the DoH Application so that it is more likely than not that DoH will not provide such DoH Approval by the Termination Date, as defined below. Notwithstanding the foregoing, neither Purchaser nor SVCMC may terminate this Agreement under this Section 4.4(c)(iii) if within such twenty (20) Business Day period DoH provides the DoH Approval or provides reasonably satisfactory assurances that Purchaser will receive the DoH Approval by the Termination Date; or

(iv)     upon twenty (20) Business Days' written notice to the other party if the Closing shall not have occurred by the close of business on February 15, 2011 (the "Termination Date"); provided that such termination pursuant to this Section 4.4(c)(iv) shall not be effective if within such twenty (20) Business Day period all outstanding required regulatory approvals shall have been obtained and all other closing conditions shall have been satisfied, provided, further, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement, then the breaching

party or its Affiliates may not terminate this Agreement pursuant to this Section 4.4(c)(iv).

(d) <u>Extension of Time Periods</u>. The time periods for termination of this Agreement set forth in this <u>Section 4.4</u> may be extended upon the written agreement of the parties without the further consent of the Bankruptcy Court.

Section 4.5 <u>Procedure for Termination</u>. In the event of termination of this Agreement by Purchaser or SVCMC, or both, pursuant to <u>Section 4.4</u> hereto, written notice thereof shall forthwith be given to the other party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in <u>Section 4.4</u> hereto) the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by <u>Section 4.6</u> hereto, without further action by the parties.

Section 4.6 <u>Effect of Termination</u>.

(a) In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any party; <u>provided</u> that the obligations of the parties set forth in the Confidentiality Agreement, Escrow Agreement, <u>Sections 3.2</u>, <u>4.6</u>, <u>7.1</u>, and <u>8.6</u> hereto and <u>Article XII</u> hereto, and to the extent necessary to effectuate the foregoing enumerated provisions, <u>Article I</u> hereto, shall survive any such termination and shall be enforceable in accordance with their terms. In addition, if this Agreement is terminated as provided herein, Purchaser shall upon request redeliver to Seller as soon as practicable any or all Documents, work papers and other material relating to the Business, whether obtained before or after the execution hereof, together with written certification by an authorized officer of Purchaser who has supervised its compliance with this sentence that confirms such compliance.

(b) Nothing in this <u>Section 4.6</u> shall relieve the parties of any Liability for a breach of this Agreement prior to the date of termination of this Agreement. If this Agreement is terminated in accordance with <u>Sections 4.4</u> and <u>4.5</u> hereto, Purchaser shall not and shall cause its Affiliates not to directly solicit for employment any Employee of Seller without the prior approval of Seller, for a period of one (1) year from the date of this Agreement, it being understood that routine job postings of open positions and solicitations of a generalized nature (e.g., newspaper advertisements, mass mailings, and job fairs) do not constitute such direct solicitations.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SVCMC

Except as otherwise disclosed to Purchaser in a schedule delivered to Purchaser by SVCMC prior to the execution of this Agreement (the "<u>Seller Disclosure Schedule</u>"), and except for the effects of the commencement of the Bankruptcy Case, SVCMC hereby represents and warrants to Purchaser as follows:

Section 5.1    Organization and Good Standing.  SVCMC is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the State of New York, and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 5.2    Authorization of Agreement.  Subject to entry of the Sale Order, (a) Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action, including approval of its members (as applicable), necessary for it to validly execute and deliver, this Agreement and each other agreement, document, or instrument or certificate contemplated by this Agreement to be executed and delivered by Seller in connection with entering into this Agreement and (b) subject to the satisfaction of the conditions referred to in Section 5.3 hereto, Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action necessary for it to validly execute and deliver, each agreement, document, or instrument or certificate contemplated by this Agreement to be executed by Seller in connection with the consummation of the Contemplated Transactions (together with the other Documents, other than this Agreement, referred to in clause (a) of this sentence, the "Seller Documents") and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  This Agreement and each of the Seller Documents contemplated to be executed and delivered in connection with Seller entering into this Agreement have been, and each other Seller Document will be at or prior to the Closing, duly and validly executed and delivered by Seller and this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, subject to due authorization, execution and delivery by the other parties hereto, the entry of the Sale Order, and, with respect to Seller's obligations under Section 7.1 hereto, the entry of the Bidding Procedures Order.  None of the execution and delivery by Seller of this Agreement and the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Seller.

Section 5.3    Consents of Third Parties; Contractual Consents.

(a)    Except as set forth in Section 5.3 of the Seller Disclosure Schedule, Seller is not required to obtain any consent, waiver, approval, Order, Permit or authorization of, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Seller Documents by Seller, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order, (ii) the entry of the Bidding Procedures Order with respect to Seller's obligations under Section 7.1 hereto, (iii) the Healthcare Regulatory Consents, and (iv) approvals under applicable Antitrust Laws, if any.

(b)    Except as set forth on Section 5.3(b) of the Seller Disclosure Schedule and as otherwise superseded by the applicable provisions of the Bankruptcy Code, none of the execution and delivery by Seller of this Agreement or any of the Seller Documents, the consummation of the Contemplated Transactions by Seller, or compliance by Seller with any

provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Assigned Contract or Permit applicable to the Business.

Section 5.4    Financial Information.    SVCMC has made available to Purchaser (i) Seller's unaudited trial balance for the Business and Seller's certified home health agency as of December 31, 2009, December 31, 2008 and December 31, 2007 (collectively, the "Year End Trial Balance"), and (ii) Seller's unaudited trial balance for the Business and Seller's certified home health agency as of January 31, 2010 (the "Interim Trial Balance" and together with the Year End Trial Balance, the "Trial Balances"). The Trial Balances have been compiled from the books and records of the Business and Seller's certified home health agency as at the date and for the period then ended and correctly reflect, in all material respects, the revenues and direct expenses of the Business and Seller's certified home health agency for the periods covered thereby.

Section 5.5    Title to Purchased Assets.    Except as set forth in Section 5.5 of the Seller Disclosure Schedule, and other than the real property subject to the Real Property Leases, intellectual property licensed to Seller and the personal property subject to the Personal Property Leases, Seller owns each of the Purchased Assets, and Purchaser will be vested with good title to such Purchased Assets, subject to entry of the Sale Order, free and clear of all Liens, other than Permitted Liens, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

Section 5.6    Real Property.

(a)    Section 5.6(a) of the Seller Disclosure Schedule sets forth a true, correct and complete list of (i) all real property and interests in real property owned in fee by Seller and exclusively used in the Business (the "Owned Properties"), and (ii) all real property and interests in real property leased or licensed by Seller and used in any material degree in the Business, as lessee, lessor, licensee or licensor (the "Real Property Leases"). Seller has (A) insurable fee simple title to all Purchased Owned Property, free and clear of all Liens except Liens set forth in Section 5.6(a) of the Seller Disclosure Schedule and Permitted Liens and (B) a valid leasehold interest in the Purchased Real Property Leases, subject to entry of the Sale Order, free and clear of all Liens other than Permitted Liens.

(b)    All Purchased Real Property Leases are in full force and effect. Except as set forth in Section 5.6(b) of the Seller Disclosure Schedule and as otherwise superseded by the applicable provisions of the Bankruptcy Code, to the Knowledge of Seller, Seller is not in material breach or default, and, to the Knowledge of Seller, the other parties under each of the Purchased Real Property Leases have complied in all material respects therewith, and are not in default thereunder beyond any applicable notice and cure periods.

(c)    Except as set forth in Section 5.6(c) of the Seller Disclosure Schedule, to the Knowledge of Seller, there is no pending or threatened legal action affecting the Purchased Real Property, including any condemnation actions.

Section 5.7    Tangible Personal Property. Section 5.7 of the Seller Disclosure Schedule sets forth all leases of personal property, including Equipment, exclusively used by Seller in the

operation of the Business ("Personal Property Leases") that involve annual payments in excess of $10,000. Except as set forth in Section 5.7 of the Seller Disclosure Schedule, Seller is not in material breach or default, and, to the Knowledge of Seller, the other parties under each of the Personal Property Leases have complied in all material respects therewith, and are not in default thereunder.

Section 5.8    Intellectual Property. Seller has licenses to use all Third-Party Software used in the operation of the Business as now operated.

Section 5.9    Material Contracts.

(a)    Section 5.9(a) of the Seller Disclosure Schedule sets forth a list of all of the following Contracts to which Seller is a party or by which it is bound and that are exclusively related to the Business or by which the Purchased Assets may be bound or affected and that are Assigned Contracts (collectively, the "Material Contracts"):

(i)    Contracts with any Affiliate or current or former officer or director of Seller;

(ii)    Any clinical affiliation agreements with healthcare providers relating to the Business;

(iii)    Contracts with any labor union or association representing any Employees of Seller;

(iv)    Any written employment, confidentiality, non-competition, severance or termination agreements as to employees or consultants of the Business;

(v)    Contracts that in any way could limit the freedom of Purchaser to engage in any line of business or to compete in any area or territory;

(vi)    Contracts with a Governmental Body; and

(vii)    Contracts which involve the annual expenditure of more than $100,000 in the aggregate or require performance by any party more than one year from the date hereof that, in either case, are not terminable by Seller without penalty on less than one hundred eighty (180) days' notice.

(b)    True and complete copies of the Material Contracts have been made available to Purchaser by Seller prior to the date of this Agreement.

(c)    Except (i) as otherwise provided in the Bankruptcy Code, (ii) for events of default arising as a result of the commencement of the Bankruptcy Case, or (iii) for general principles of equity that may limit the specific performance of particular provisions, each Material Contract is a legal, valid and binding obligation of Seller and is enforceable by Seller against the other party or parties to such Material Contract in accordance with its terms, and Seller is not in material breach or default thereunder.

Section 5.10    Employees; Employee Benefits.

(a)    Section 5.10(a) of the Seller Disclosure Schedule sets forth a true and complete list of all Plans. Each Plan has been administered and is in compliance with the terms of such Plan and in accordance with all other applicable Laws where the failure thereof would have a Material Adverse Effect. Purchaser shall not assume any responsibility or liability in connection with the operation, administration or funding of any of Seller's Plans.

(b)    Except as set forth in Section 5.10(b) of the Seller Disclosure Schedule, no "reportable event" (as such term is used in Section 4043 of ERISA), "prohibited transaction" (as such term is used in Section 406 of ERISA or Section 4975 of the Code) or "accumulated funding deficiency" (as such term is used in Section 412 or 4971 of the Code) has heretofore occurred with respect to any Plan which would have a Material Adverse Effect.

Section 5.11    Employment and Labor.

(a)    To the Knowledge of Seller, the list annexed hereto as Section 5.11(a) of the Seller Disclosure Schedule is a true and complete list of all Employees of the Business as of the date hereof and accurately sets forth in all material respects the following information: (i) the name and position; (ii) date of hire; (iii) current annual salary, hourly wage or visit-based wage; (iv) the average number of hours worked per week; and (v) the collective bargaining unit, if any, of which the Employee is a member. Thereafter and at least twenty (20) Business Days prior to the Closing Date, Seller shall likewise deliver as soon as practicable to Purchaser updates to Section 5.11(a) of the Seller Disclosure Schedule.

(b)    To the Knowledge of Seller, Seller has made available to Purchaser complete and accurate copies of each material employment, consulting or other similar agreements between Seller and any service provider to the Business.

(c)    Section 5.11(b) of the Seller Disclosure Schedule identifies each labor or collective bargaining agreement applicable to Employees of the Business (the "CBAs").

Section 5.12    Compliance with Laws; Permits.

(a)    SVCMC is duly authorized by DoH to operate the Business. The operating certificate issued to the Business authorizes the operation of the LTHHCP in the following Counties and number of patients: Bronx (50), Kings (575), Nassau (34), New York (200) and Queens (150), although SVCMC subsequently received approval to operate the Business for an additional fifty six (56) patients in Queens County.

(b)    SVCMC is eligible to receive payment under Titles XVIII and XIX of the Social Security Act and is a "provider" under existing provider agreements with the Medicare and Medicaid programs (collectively, the "Healthcare Programs") through the applicable intermediaries. Except as set forth in Section 5.12(b) of the Seller Disclosure Schedule, there is no pending or to Seller's Knowledge, threatened Legal Proceeding under the Healthcare Programs involving the Business.

(c)     Except as set forth in <u>Section 5.12(c)</u> of the Seller Disclosure Schedule and except with respect to the Purchased Real Property, to the Knowledge of Seller, Seller is in compliance in all material respects with Laws and Permits applicable to the Purchased Assets or the Business.

(d)     Except as a result of the Bankruptcy Case, there are no outstanding Orders, injunctions or decrees of any Governmental Body that apply to the Business or the Purchased Assets.

(e)     The Seller has all Permits that are necessary to enable it to own, lease or otherwise hold the Purchased Assets and to operate the Business as currently conducted. <u>Section A</u> of the Seller Disclosure Schedule lists all Permits of Seller for the operation of the Business, such permits are in full force and effect and to Seller's Knowledge, no proceedings are pending or threatened that would have the effect of revoking or limiting the transfer of the Permits.

Section 5.13   <u>Absence of Certain Developments</u>.   Except as expressly contemplated by this Agreement or as set forth on <u>Section 5.13</u> of the Seller Disclosure Schedule, since December 31, 2009 the Seller has conducted the Business in the Ordinary Course of Business and has made commercially reasonable efforts to preserve the goodwill of the Business and its relationship with patients and suppliers with whom it deals in connection with the Business.

Section 5.14   <u>Taxes</u>.   Seller is an entity exempt from federal income tax under Section 501(c)(3) of the Code and exempt from New York State income, corporate or franchise tax under the comparable provisions of the Tax Law of the State of New York, and to Seller's Knowledge, there is no action pending by any Tax Authority to revoke its tax-exempt status.

Section 5.15   <u>Litigation</u>.   Except as set forth in <u>Section 5.15</u> of the Seller Disclosure Schedule, there are no Legal Proceedings pending or, to the Knowledge of Seller, threatened against Seller involving the Business or the Purchased Assets.

Section 5.16   <u>Financial Advisors</u>.   Except as set forth in <u>Section 5.16</u> of the Seller Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the Contemplated Transactions and no Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

Section 5.17   <u>No Other Representations or Warranties; Schedules</u>.   Except for the representations and warranties contained in this <u>Article V</u> (as modified by the Seller Disclosure Schedules), neither Seller nor any other Person makes any other representation or warranty whether express or implied, written or oral, with respect to Seller, the Business, the Purchased Assets, the Assumed Liabilities or the Contemplated Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, its Affiliates or any of their respective officers, directors, members, employees, agents, consultants or other Representatives. Except for the representations and warranties contained in this <u>Article V</u> (as modified by the Seller Disclosure Schedules), Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all

Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser or its Representatives by any director, officer, member, employee, agent, consultant or other Representative of Seller or any of its Affiliates). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business. Seller makes no implied representation or warranty as to the condition, merchantability, usage, suitability or fitness for any particular purpose with respect to the Purchased Assets except for the representations and warranties contained in this Article V (as modified by the Seller Disclosure Schedules). The disclosure of any matter or item in any Section of the Seller Disclosure Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect. The representations and warranties of Seller in this Agreement are for diligence purposes and constitute grounds for termination pursuant to Section 4.4(a)(iii) and conditions to Closing pursuant to the terms of Section 10.1(a) hereof and do not survive the Closing, however their disclaimers survive.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as otherwise disclosed to Seller in a schedule delivered to Seller by Purchaser prior to the execution of this Agreement (the "Purchaser Disclosure Schedule"), Purchaser hereby represents and warrants to Seller as follows:

Section 6.1 Organization and Good Standing. Purchaser is a not-for-profit corporation duly organized, validly existing and in good standing under the Laws of the State of New York and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 6.2 Authorization of Agreement. Purchaser has all requisite power, authority and legal capacity to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by it in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly and validly authorized by all necessary corporate action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior the Closing, duly and validly executed and delivered by Purchaser, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a Legal Proceeding at law or in equity). None of the execution and delivery by Purchaser of this

Agreement and the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Purchaser.

Section 6.3 <u>Conflicts; Consents of Third Parties</u>.

(a) Except as set forth in <u>Section 6.3(a)</u> of the Purchaser Disclosure Schedule, Purchaser is not required to obtain any consent, approval, authorization, waiver, Order or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) the Healthcare Regulatory Consents, (ii) approvals under applicable Antitrust Laws, if any and (iii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications (A) that have already been obtained or made or (B) of which the failure to have obtained or made would not have a Material Adverse Effect or would not reasonably be expected to prevent or materially delay the ability of Purchaser to perform or consummate the Contemplated Transactions.

(b) Except as set forth in <u>Section 6.3(b)</u> of the Purchaser Disclosure Schedule, none of the execution and delivery by Purchaser of this Agreement or any of the Purchaser Documents, the consummation of the Contemplated Transactions by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser or any of its Affiliates is a party or by which any of the properties or assets of Purchaser or any of its Affiliates are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the Contemplated Transactions.

Section 6.4 <u>Litigation</u>. There are no Legal Proceedings pending or, to the Knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions. Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions.

Section 6.5 <u>Financial Advisors</u>. Except as set forth in <u>Section 6.5</u> of the Purchaser Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the Contemplated Transactions and no Person is entitled to any fee or commission or like payment from Seller in respect thereof.

Section 6.6    Healthcare Regulatory Compliance Status. Purchaser is a certified home health agency. To Purchaser's Knowledge, no fact exists that would cause DoH to recommend disapproval of its DoH Application on the basis of character, competency or financial feasibility.

Section 6.7    Acknowledgement Regarding Condition of the Business. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, whether express or implied or written or oral, beyond those expressly given by SVCMC to Purchaser in Article V hereto (as modified by the Seller Disclosure Schedule), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred to Purchaser on a "WHERE IS" and, as to condition, "AS IS" basis. Purchaser further represents that neither Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, written or oral, as to the accuracy or completeness of any information regarding Seller, the Business or the Contemplated Transactions not expressly set forth in this Agreement, and neither Seller, any of their Affiliates or any other Person will have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or the use by Purchaser or any of its Affiliates of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its Representatives, or any other document or information in any form provided to Purchaser or its Representatives in connection with the sale of the Business and the Contemplated Transactions. Purchaser acknowledges that it, along with its Representatives, has conducted to its satisfaction, its own independent investigation of the Business and the Purchased Real Property and, in making the determination to proceed with the Contemplated Transactions, Purchaser has relied on the results of its own independent investigation. The Purchased Real Property is being sold by Seller and Purchaser agrees to accept the Purchased Real Property in "as-is" and "where-is" condition on the Closing Date.

Section 6.8    Financing. On the Closing Date Purchaser will have sufficient funds on hand to consummate the Contemplated Transactions. Purchaser acknowledges that it shall not be a condition to the obligations of Purchaser to consummate the Contemplated Transactions that Purchaser have sufficient financial resources for payment of the Purchase Price.

Section 6.9    No Other Representations or Warranties; Schedules. Except for the representations and warranties contained in this Article VI (as modified by the Purchaser Disclosure Schedules), neither Purchaser nor any other Person makes any other representation or warranty, whether express or implied, written or oral, with respect to Purchaser or the Contemplated Transactions, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser or any of their respective officers, directors, members, managers, employees, agents, consultants or other Representatives. Except for the representations and warranties contained in this Article VI (as modified by the Purchaser Disclosure Schedules), Purchaser disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Seller by any director, officer, member, manager, employee, agent, consultant, or other Representative of Purchaser or any of its Affiliates). The disclosure of any matter or item in any Section of the Purchaser Disclosure

Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

Section 7.1    Competing Transaction.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by SVCMC of higher or otherwise better competing bids for the Purchased Assets, (each a "Competing Bid" and each party submitting such a Competing Bid, a "Competing Bidder") in accordance with the Bidding Procedures Order. If one or more Competing Bids are received, Seller shall conduct an auction of the Purchased Assets in accordance with the Bidding Procedures Order (the "Auction").

(b)    SVCMC is permitted to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person (in addition to Purchaser and its affiliates, agents and representatives) in connection with any sale or other disposition of all or any part of the Purchased Assets. In addition, SVCMC shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Purchased Assets to prospective purchasers.

Section 7.2    Bankruptcy Court Filings. Purchaser agrees that it will promptly take such actions as are reasonably requested by SVCMC to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other Documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Bidding Procedures Order or Sale Order shall be appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.

Section 7.3    Notice of Sale. Notice of the sale of Purchased Assets contemplated in this Agreement shall be served in accordance with the Bidding Procedures Order.

Section 7.4    Treatment of Monetary Obligations. All monetary obligations of the Seller to Purchaser under this Agreement, including but not limited to the obligation of the Seller in respect of Transfer Taxes (if any), shall be entitled to administrative expense priority in the Bankruptcy Case.

# ARTICLE VIII

## COVENANTS

Section 8.1    Access to Information.    Subject to Section 2.10 hereto and the other provisions of this Section 8.1 and subject to compliance with applicable Antitrust Laws, Seller agrees that, prior to the Closing Date, and at its own expense, Purchaser shall be entitled, through its Representatives, to make such investigation of the assets, properties and operations of the Business and such examination of the books and records of Seller pertaining to the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and, and at its own expense, to make extracts and copies of such books and records; it being understood, however, that the foregoing shall not entitle Purchaser to access (a) the books, records and Documents referred to in Section 2.2(h) hereto, or (b) any books, records or Documents the disclosure of which by Seller to Purchaser would (i) notwithstanding Section 2.10 hereto, violate any patient confidentiality obligation of Seller or (ii) any other agreement or any obligation of confidentiality to which Seller is a party or is bound prior to the date hereof or (iii) any obligation of confidentiality by which Seller is bound under applicable Law.  In addition, if Purchaser is the successful bidder at Auction, Purchaser shall be permitted to have access to Patient Records and employee files solely for the purpose of implementing the Transition Plan set forth in Section 8.14 of the Purchaser Disclosure Schedule.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, any request for such examination shall be made to one of the Persons identified in Section 8.1 of the Seller Disclosure Schedule, and Purchaser's use of the information disclosed by Seller shall be subject to any applicable agreement to which Seller is a party or is bound prior to the date hereof or under applicable Law.  Seller shall cause its Representatives to cooperate with Purchaser and its Representatives in connection with such investigation and examination, and Purchaser and its Representatives shall cooperate with Seller and its Representatives and shall use its commercially reasonable efforts to minimize any disruption to Seller's business and operations, including the Business.  Notwithstanding anything herein to the contrary, Seller shall not be required to permit any such investigation or examination if, and to the extent that, SVCMC, upon advice of counsel, determines that such investigation or examination by Purchaser would or is reasonably likely to result in a loss of any attorney-client or attorney work product privilege available to Seller.

Section 8.2    Conduct of the Business Pending the Closing.

(a)    Subject to the terms and conditions of the Interim Agreement and the Transition Plan, during the period from the date hereof through and including the Closing Date, except (i) as set forth in Section 8.2 of the Seller Disclosure Schedule, (ii) as required by applicable Law (including without limitation as a result of the commencement of the Bankruptcy Case), (iii) as otherwise expressly provided in this Agreement, or (iv) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Seller shall use commercially reasonable efforts to:

(A)    operate the Business in the Ordinary Course of Business and in accordance with Law in all material respects;

36

(B)    (I) maintain the Purchased Assets consistent with past practice, ordinary wear and tear excepted and (II) maintain commercially reasonable insurance coverage in place with respect to the Purchased Assets;

(C)    perform when due all material obligations under the Assigned Contracts, the Purchased Intellectual Property Licenses, the Purchased Real Property Leases and the Purchased Personal Property Leases except to the extent such performance is excused under the Bankruptcy Code or by order of the Bankruptcy Court;

(D)    maintain the books and records of the Business in the Ordinary Course of Business;

(E)    maintain the Permits applicable to the Business; and

(F)    retain staff employed in the Business with the goal of maintaining the ongoing operation thereof. In connection with such efforts, however, Seller will not be obligated to make any retention or severance payments or pay any other amounts or incur any other obligations.

(b)    Without limiting the generality of the foregoing, subject to the terms and conditions of the Transition Plan, from the date of this Agreement through and including the Closing Date, Seller shall not, except (i) as set forth in Section 8.2 of the Seller Disclosure Schedule, (ii) as required by applicable Law (including without limitation as a result of the commencement of the Bankruptcy Case), (iii) as otherwise expressly provided in this Agreement, or (iv) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), solely as it relates to the Business:

(A)    other than in the Ordinary Course of Business, including, but not limited to, as may be required by a collective bargaining agreement, (I) materially increase the annual level of compensation of any Employee, (II) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any Employee, or (III) with respect to any Employee, increase the coverage or benefits available under any (or create any new) Plan except, in each case, as required by applicable Law from time to time in effect or by any of the Plans or the Employee pension plans maintained by Seller;

(B)    sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets (except pursuant to an existing Contract in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets); or

(C)    agree to do anything prohibited by this Section 8.2.

(c)    Without limiting the generality of the foregoing, subject to the terms and conditions of the Transition Plan and subject to the approval of DoH, from three (3) Business Days after the Purchaser is selected as the prevailing bidder through and including the Closing Date, Seller shall not, except with the prior written consent of Purchaser, admit any new patients to the Business.

Notwithstanding the foregoing, Seller and Purchaser shall work to develop a mutually agreeable plan regarding the retention of employees, during the period from the date hereof through and including the Closing Date, who both parties deem to be essential to the effective ongoing operation of the Business. In connection with such efforts, Purchaser shall be permitted to offer and pay signing bonuses or other incentive payments to staff employed by Seller in the operation of the Business and who Purchaser contemplates employing after the Closing Date (collectively, "Incentive Payments"). In the event that Purchaser makes any Incentive Payments, the Purchase Price shall be reduced by the lesser of: (i) the amount of the aggregate Incentive Payments, and (ii) Five Hundred Thousand Dollars ($500,000.00).

Section 8.3    Consents; Insurance.

(a)    Through the filing of the Sale Motion and except as may be satisfied through the entry of the Sale Order, Seller shall use its commercially reasonable efforts, and Purchaser shall cooperate with Seller, including by taking the actions referred to in Section 8.4 hereto, to obtain at the earliest practicable date following entry of the Sale Order all necessary consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Seller (including all consents listed in Section 5.3 of the Seller Disclosure Schedule), and to give at the earliest practicable date following entry of the Sale Order any notices required to be given by Seller, in order for Seller to consummate the Contemplated Transactions on the terms and in the manner provided hereby; provided that Seller shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than postpetition filing or postpetition application fees payable to any Governmental Body) or to initiate any litigation or Legal Proceedings to obtain any such item except as otherwise provided by Section 8.4 hereto. Purchaser shall use its commercially reasonable efforts, and Seller shall cooperate with Purchaser, including by taking the actions referred to in Section 8.4 hereto, to obtain at the earliest practicable date following entry of the Sale Order all consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Purchaser, and to give at the earliest practicable date following entry of the Sale Order any notices required to be given by Purchaser, in order for Purchaser to consummate the Contemplated Transactions on the terms and in the manner provided hereby and to operate the Business after the Closing; provided that Purchaser shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any litigation or Legal Proceedings to obtain any such consent or approval except as otherwise provided by Section 8.4 hereto.

(b)    As of the Closing, Purchaser shall have appropriate insurance coverage in place with respect to the Business consistent with what would be maintained under good industry business practices.

Section 8.4    Regulatory Approvals.

(a)    Purchaser shall, at its own cost and expense, (i) provide to SVCMC a draft of the DoH Application on August 13, 2010 and consult with SVCMC regarding such application beginning on August 13, 2010; (ii) cooperate with SVCMC in initiating informal discussions with DoH concerning the form and substance of the DoH Application on August 12, 2010; (iii) within two (2) Business Days after the Purchaser is selected as the prevailing bidder,

formally submit the DoH Application to DoH; and (iv) promptly after the entry of the Sale Order by the Bankruptcy Court, submit to any other Governmental Body all other applications for any Healthcare Regulatory Consents required in order for Purchaser to consummate the Contemplated Transactions and to operate the Business in accordance with applicable Law (collectively with the DoH Application, the "Healthcare Applications"). Purchaser shall provide SVCMC with an opportunity to review the Healthcare Applications in advance of filing, and both parties shall cooperate in the preparation and prosecution of the Healthcare Applications. Purchaser shall use commercially reasonable efforts to prosecute the Healthcare Applications and shall timely submit all information and Documents requested in connection therewith by DoH and any other Governmental Body to the extent such information and Documents are within Purchaser's control. Purchaser shall provide SVCMC with prompt written notice of Purchaser's submission of a Healthcare Application. Within three (3) Business Days of its submission or receipt, Purchaser shall deliver to SVCMC a complete copy of all correspondence to or from DoH or any other applicable Governmental Body having jurisdiction concerning a Healthcare Application. Purchaser shall provide SVCMC with periodic reports of Purchaser's efforts to obtain all Healthcare Regulatory Approvals. In addition, Purchaser shall provide SVCMC with notice as promptly as practicable of its receipt of DoH's approval, contingent approval or a rejection of the DoH Application, along with a copy of any documentation related thereto. Purchaser shall not knowingly take any action prior to the Closing intended to disqualify Purchaser as an authorized and licensed operator of the Business.

(b)     If necessary, each of Purchaser and Seller shall use its commercially reasonable efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under any of the Antitrust Laws with respect to the Contemplated Transactions (including such submission to the Antitrust Bureau of the Office of the Attorney General of the State of New York (the "Antitrust Bureau") as may be required in connection with the DoH Application under the Donnelly Act (New York General Business Law Sections 340 through 347)) as promptly as practicable and, in any event, within five (5) Business Days in connection with all submissions to the Antitrust Bureau in connection with the DoH Application and within five (5) Business Days in the case of all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request under any of the Antitrust Laws for information, Documents, or other materials received by each of them or any of their respective Affiliates from the Federal Trade Commission (the "FTC"), the Antitrust Division of the United States Department of Justice (the "Antitrust Division"), the Antitrust Bureau or any other Governmental Body in respect of such filings or the Contemplated Transactions and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such Documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division, the Antitrust Bureau or any other Governmental Body under any of the Antitrust Laws with respect to any such filing or any such transaction.

(c)     If necessary, each of Purchaser and Seller shall use its commercially reasonable efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates in respect of the Contemplated Transactions under any applicable Law, other than those referred to in Section 8.4(a) or 8.4(b) hereto, including such filings as are required to obtain the consents, approvals, authorizations, waivers, Orders, licenses or Permits or

to provide the notices specified in <u>Section 5.3</u> of the Seller Disclosure Schedule or <u>Section 6.3(a)</u> of the Purchaser Disclosure Schedule, as promptly as practicable, (ii) comply at the earliest practicable date with any request for additional information, Documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Body in respect of such filings or the transactions contemplated by this Agreement and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such Documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any Governmental Body under such Laws with respect to any such filing or any such transaction.

(d)     Each of Purchaser and Seller shall use its commercially reasonable efforts to furnish to each other through counsel all information required for any application or other filing to be made pursuant to any applicable Law in connection with the Contemplated Transactions. Each such party shall promptly inform the other parties through counsel of any material oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No such party shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.

(e)     Subject to applicable Law, Purchaser and Seller will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under any of the Antitrust Laws. Each such party may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this <u>Section 8.4</u> as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials.

(f)     Each of Purchaser and Seller shall use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the Contemplated Transactions under any of the Antitrust Laws. In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement as in violation of any of the Antitrust Laws, each such party shall cooperate and use its commercially reasonable efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other Order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the Contemplated Transactions, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and SVCMC decide that litigation is not in their respective reasonable best interests. Each such party shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under any of the Antitrust Laws with respect to such transactions as promptly as possible after the date of this Agreement. In connection with and without limiting the foregoing, each of Purchaser and

Seller agrees to use its commercially reasonable efforts to take promptly any and all steps necessary to avoid or eliminate each and every impediment under any Antitrust Laws that may be asserted by any Federal, state and local and non-United States antitrust or competition authority, so as to enable Purchaser and Seller to close the Contemplated Transactions as expeditiously as possible.

Section 8.5    Further Assurances.

(a)    Each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Contemplated Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Contemplated Transactions. Without limiting the generality of the foregoing, from time to time after the Closing, without additional consideration, each party hereto will (or, if appropriate, cause its Affiliates to) execute and deliver such further instruments and take such other action as may be necessary or reasonably requested by the other party to make effective the Contemplated Transactions and to provide the other party with the intended benefits of this Agreement. In addition, upon the reasonable request of Purchaser, Seller shall execute, acknowledge and deliver all such further assurances, deeds, assignments, powers of attorney and other instruments and paper as may be required to sell, transfer, convey, assign and deliver to Purchaser all right, title and interest in, to and under the Purchased Assets. If any party to this Agreement shall, following the Closing, have in its possession any asset or right which under this Agreement should have been delivered to the others at the Closing, such party shall promptly deliver such asset or right to the others.

(b)    Without limiting the generality of the foregoing, if Purchaser or any of its Affiliates shall at any time after the Closing receive any charitable gift, contribution or bequest that might be an Excluded Asset, or receives any notice that such a charitable gift, contribution or bequest may be received or available to Purchaser, Purchaser shall give prompt written notice thereof to SVCMC and make available to SVCMC upon reasonable request such information that Purchaser or any of its Affiliates has available to it regarding such gift, contribution or bequest and will cooperate with SVCMC in determining whether such gift, contribution or bequest should be characterized as an Excluded Asset. To the extent that any such charitable gift, contribution or bequest received after the Closing is an Excluded Asset and Purchaser or any of its Affiliates shall request that such gift, contribution or bequest be transferred to Purchaser, neither Seller nor its Affiliates shall take a position contrary to the position of Purchaser and/or its Affiliates if such transfer is consistent with the donor's intent. Further, any such transfer shall be subject to the approval of any applicable Governmental Body, including, but not limited to, the Charities Bureau of the New York State Attorney General's Office, if applicable. The provisions of this Section 8.5 shall survive the Closing.

Section 8.6    Confidentiality.

(a)    From and after the date hereof, Purchaser shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Seller, and not use to the detriment of Seller, any Seller Confidential Information relating to or obtained from Seller or its Representatives. For purposes of this Section 8.6, "Seller Confidential Information" shall mean any information that is confidential or

proprietary in nature that is related to the Purchased Assets, the Assumed Liabilities, the Business, the Excluded Assets, the Excluded Liabilities or the Other Businesses, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided that Seller Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Purchaser or any of its Representatives, (ii) becomes available to Purchaser on a non-confidential basis from a source other than Seller or its Representatives; provided that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Purchaser from a third party having the right to disseminate the Seller Confidential Information without restriction on disclosure or (iv) can be shown by Purchaser through written Documents or evidence maintained by Purchaser to have been independently developed by either of them; and provided, further, that upon the Closing, the restrictions contained in this Section 8.6 shall not apply to confidential or proprietary information related primarily to the Business or the Purchased Assets and the Assumed Liabilities. Purchaser may disclose any of the Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. Purchaser shall instruct its Representatives having access to the Seller Confidential Information of such obligation of confidentiality. If Purchaser or anyone to whom it has transmitted Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Confidential Information, Purchaser shall provide Seller with prompt written notice prior to making any disclosure so that such Seller may seek a protective Order or other appropriate remedy. If such protective Order or other remedy is not obtained, Purchaser shall furnish only that portion of the Seller Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed, and Purchaser will exercise commercially reasonable efforts to obtain assurance to the extent possible that confidential treatment will be accorded to that portion of Seller Confidential Information that is being disclosed. In any event, Purchaser will not oppose action by Seller to obtain an appropriate protective Order or other reliable assurance that confidential treatment will be accorded Seller Confidential Information.

(b)    From and after the Closing Date, unless this Agreement is terminated prior to the Closing, Seller shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Purchaser, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with (i) operating the Other Businesses in the ordinary course before and after the Closing Date, (ii) any investigations by Governmental Bodies, (iii) compliance activities after the Closing related to periods occurring prior the Closing Date, (iv) any Legal Proceedings, (v) enforcing any rights or other claims of Seller under this Agreement, or (vi) performing any obligations of Seller under this Agreement, including billing and collecting Pre-Closing Account Receivable and other related activities. For purposes of this Section 8.6(b), "Business Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Business or to the Purchased Assets or the Assumed Liabilities, other than information primarily pertaining to the Excluded Assets, the Excluded Liabilities or the Other Businesses, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized

information or proprietary matters; provided that Business Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Seller or its Representatives, (ii) becomes available to Seller on a non-confidential basis from a source other than Seller or its Representatives; provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Purchaser or (iii) is lawfully received by Seller from a third party having the right to disseminate the Business Confidential Information without restriction on disclosure. Seller may disclose any of the Business Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. Seller shall instruct its Representatives having access to the Business Confidential Information of such obligation of confidentiality. If Seller or anyone to whom it has transmitted Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information, Seller shall provide Purchaser with prompt notice prior to making any disclosure so that Purchaser may seek a protective Order or other appropriate remedy. If such protective Order or other remedy is not obtained, Seller shall furnish only that portion of the Business Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed, and Seller will exercise commercially reasonable efforts to obtain assurance to the extent possible that confidential treatment will be accorded to that portion of Business Confidential Information that is being disclosed. In any event, Seller will not oppose action by Purchaser to obtain an appropriate protective Order or other reliable assurance that confidential treatment will be accorded Business Confidential Information.

(c)     The obligations contained in this Section 8.6 are in addition to any separate confidentiality agreements between any of Seller and Purchaser or its Affiliates.

Section 8.7     Publicity. Each of Seller and Purchaser agrees that it shall not issue any press release or public announcement concerning this Agreement or the Contemplated Transactions without obtaining the prior written approval of either Purchaser or SVCMC, as applicable, which approval will not be unreasonably withheld, delayed or conditioned, unless, in the judgment of such issuing party upon advice of counsel, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement; provided that such party that intends to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other parties with respect to the text thereof. Notwithstanding the foregoing, Purchaser understands that Seller will be filing various pleadings, including the Sale Motion, in furtherance of obtaining Bankruptcy Court approval of this Agreement and the Contemplated Transactions.

Section 8.8     Use of Name. Purchaser agrees that it shall (a) as soon as practicable after the Closing Date and in any event within thirty (30) days following the Closing Date, cease to make any use of the name "Saint Vincents Catholic Medical Centers" or any variation thereon or derivative thereof (including "St. Vincent's") or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing any of the foregoing, including any name or mark confusingly similar thereto (collectively, the "SVCMC Marks") which are included in the Purchased Assets or otherwise included in materials or assets

transferred to Purchaser in connection with the Closing, and (b) immediately after the Closing, cease to hold itself or its Affiliates out as having any affiliation or association with SVCMC or any of its Affiliates. In furtherance thereof, as promptly as practicable but in no event later than thirty (30) days following the Closing Date, Purchaser shall remove, strike over or otherwise obliterate all SVCMC Marks from all materials including any vehicles, business cards, schedules, stationery, packaging materials, displays, signs, promotional materials, manuals, forms, computer Software and other materials transferred to Purchaser on the Closing Date; provided that so long as Purchaser uses any SVCMC Marks and has not removed all SVCMC Marks from all materials, Purchaser shall comply with the Ethical and Religious Directives for Catholic Health Care Services issued by the National Conference of Catholic Bishops, as amended from time to time. Purchaser shall also take, and cooperate with Seller in taking, such actions as are reasonably necessary to change all telephone book listings of the Business. Notwithstanding any of the foregoing, Seller agrees that as of the Closing and for the length of the covenants set forth in Section 8.10 hereto, Seller shall not use the words "long term home health care" or any variation thereon or derivative thereof in any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing any of the foregoing.

Section 8.9    Supplementation and Amendment of Schedules.

(a)    Purchaser may, at its option, include in the Purchaser Disclosure Schedule, and Seller may, at its option, include in the Seller Disclosure Schedule, as the case may be, items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement.

(b)    No less than three (3) Business Days prior to the Closing Date, Seller shall deliver to Purchaser an update to the Seller Disclosure Schedule to reflect changes thereto which occur between the date hereof and the Closing Date in the Ordinary Course of Business in accordance with Section 8.2 hereto.

Section 8.10    Covenant Not to Compete or Solicit.

(a)    Throughout the ten (10) year period immediately after the Closing Date, Seller shall not, and Seller shall not permit any of its Affiliates which it controls to, at any time, directly or indirectly, without the prior written consent of Purchaser, own, operate, manage or control any business or healthcare facility that renders the type of health care services as provided by the Business on the Closing Date except as set forth in Section 8.10(a) of the Seller Disclosure Schedule within the following New York State counties: Bronx, Kings, Nassau, New York, Queens and Westchester. Notwithstanding the foregoing and without agreeing (implicitly or otherwise) that the following activities would otherwise be subject to the provisions of this Section 8.10(a), nothing in this Agreement shall preclude, prohibit or restrict Seller or any of its Affiliates from engaging in any manner in the current and contemplated businesses listed in Section 8.10(a) of the Seller Disclosure Schedule.

(b)     From the date hereof and throughout the two (2) year period immediately after the Closing Date, Seller shall not, and Seller shall not permit any of its Affiliates which it controls to, at any time, directly or indirectly, without the prior written consent of Purchaser, solicit, recruit, employ or contract with any Employee, provided, that except as expressly provided in this Agreement, nothing in this Agreement shall preclude SVCMC or any of its Affiliates, including Seller, from continuing any employment relationships with Employees existing on the date hereof.

(c)     From the date hereof and throughout the two (2) year period immediately after the Closing Date, Seller shall not, and Seller shall not permit any of its Affiliates which it controls to, at any time, directly or indirectly, without the prior written consent of Purchaser, solicit, recruit, employ or contract with any employee of the Purchaser; provided that nothing shall prohibit SVCMC or its Affiliates from performing, or having performed on their behalf, a general solicitation for employees not specifically focused at the employees of the Purchaser through the use of media, advertisement, electronic job boards or other general, public solicitations.

(d)     From the date hereof until the Closing Date, Purchaser shall not and shall cause its Affiliates not to, directly or indirectly, without the prior written consent of Seller, solicit, recruit, employ or contract with any Employee; provided that nothing shall prohibit Purchaser or its Affiliates from (1) soliciting or recruiting Employees for employment in connection with the Business, and (2) performing, or having performed on their behalf, a general solicitation for employees not specifically focused at the Employees, through the use of media, advertisement, electronic job boards or other general, public solicitations.

Section 8.11   Cooperation.   Seller and Purchaser agree to reasonably cooperate with each other, from the date hereof through and following the Closing Date, in good faith, in an effort to satisfy all further conditions, undertakings and agreements contained in this Agreement.

Section 8.12   OASIS Forms.   Purchaser shall prepare Outcome and Assessment Information Set ("OASIS") intake forms for all patients of the Business who consent to receive home care services from Purchaser after the Closing.

Section 8.13   Management Consulting Agreement.   Within five (5) Business Days of entry of the Sale Order by the Bankruptcy Court, the parties shall enter into a Management Consulting Agreement substantially in the form attached hereto as Exhibit D under which Purchaser has agreed to assume the day-to-day management responsibility of the Business, to the extent allowed by applicable law and regulations through the Closing Date (the "Interim Agreement"). The parties shall submit the Interim Agreement to DoH for notice or approval, if appropriate. Subject to Bankruptcy Court approval of the Interim Agreement and entry of the Sale Order, the Interim Agreement will become effective upon both (i) its approval by DoH, if appropriate and (ii) the execution and delivery of the Interim Agreement, and will terminate upon the Closing or according to its terms. In the event that the parties do not enter into the Interim Agreement and for the period of time between the date hereof and the effective date of the Interim Agreement, Seller shall (i) schedule and conduct regular meetings involving Purchaser's and Seller's respective senior management staff to discuss the Business; (ii) allow Purchaser's senior management staff reasonable access to the Business and its personnel for

periodic monitoring of the conduct of the Business consistent with <u>Sections 8.1</u> and <u>8.6</u> hereof; (iii) consult with Purchaser prior to making any material business decisions affecting the Business other than in the Ordinary Course of Business; and (iv) use good faith efforts to transition patients from the Business to the provider of their choice.

Section 8.14   <u>Transition Period</u>.

(a)   Set forth in <u>Section 8.14</u> of the Purchaser Disclosure Schedule is Purchaser's plan and timeline for transitioning the Business and its patients to Purchaser as of the Closing Date (the "<u>Transition Plan</u>"). The Transition Plan is subject to change upon the mutual agreement of Purchaser and Seller. Purchaser warrants and covenants that it shall commence the implementation of the Transition Plan on or before the effective date of the Interim Agreement, and, subject to any approvals contemplated by the Transition Plan and any changes to the Transition Plan agreed to by Seller, shall use commercially reasonable efforts to fully implement each step of the Transition Plan in a timely manner in accordance therewith. Seller shall use commercially reasonable efforts to cooperate with Purchaser in Purchaser's efforts to implement the Transition Plan at no cost to Purchaser, including in connection with the transitioning of patients as contemplated by the Transition Plan. Seller and Purchaser shall use commercially reasonable efforts to coordinate the transitioning of patients in a manner which will minimize costs to the Seller. Purchaser represents and warrants that, to its knowledge (i) the access to information permitted under this Agreement, and (ii) the authority granted to Purchaser under this Agreement and the Interim Agreement, are sufficient for it to carry out all aspects of the Transition Plan in a timely fashion. Except as otherwise expressly provided in this Agreement, Purchaser acknowledges and agrees that any inability of Purchaser to achieve the milestones set forth in the Transition Plan in the timeframe contemplated by the Transition Plan for reasons within the reasonable control of Purchaser shall not excuse Purchaser from timely consummating the Contemplated Transactions.

(b)   If: (i) all of Purchaser's conditions precedent to Closing set forth in Section 10.1 have been satisfied, including, but not limited to, receipt of DoH Approval; (ii) the Closing shall not have occurred by the close of business on the date that is five (5) days after the receipt of DoH Approval; and (iii) such failure to consummate the Contemplated Transactions is within the reasonable control of Purchaser, upon three (3) days prior written notice to Purchaser, Purchaser shall pay the following amounts to Seller on the following due dates:

(A)   If the Closing has not occurred by the close of business on the third (3rd) day after Purchaser's receipt of such written notice, for reasons within the reasonable control of Purchaser, Thirty Thousand Dollars ($30,000.00); and

(B)   If the Closing has not occurred by the close of business on the thirteenth (13th) day after Purchaser's receipt of such written notice, for reasons within the reasonable control of Purchaser, an additional Eighty Thousand Dollars ($80,000.00); and

(C)   So long as the failure to consummate the Contemplated Transactions remains within the reasonable control of Purchaser, Eighty Thousand Dollars ($80,000.00) every fifteenth (15th) day thereafter until such time as the Closing occurs or the termination of this Agreement.

Such payment shall only become due and payable as of the close of business on the respective due date and no partial payment shall become due in the event the Closing occurs prior to the close of business on such respective due date. Purchaser shall pay any such amounts by wire transfer of immediately available funds to Seller within one (1) day of the respective due dates.

(c)     Notwithstanding anything to the contrary set forth herein, Purchaser and Seller shall, in accordance with this Section 8.14, use commercially reasonable efforts to transition patients from the Business to the provider of their choice so that as of the Closing Date, all of the patients of the Business shall have been transitioned to the provider of their choice.

(d)     On the date of entry of the Sale Order Seller shall provide Purchaser with the then current patient census for the Business. For the period commencing on the first day after the date of the entry of the Sale Order that the patient census of the Business is reduced to six hundred thirty (630) (the "Transfer Adjustment Period Commencement Date") until the date that the patient census of the Business is reduced to twenty-five (25) patients (the "Interim Transfer Adjustment Period Date"), Purchaser agrees to pay Seller an amount equal to $9.17 per day multiplied by the number of patients of the Business, as of the applicable day, who have transitioned from the Business to another provider of their choice from the date of entry of the Sale Order; provided, however, that in no event shall Purchaser be obligated to make payments to Seller with respect to more than six hundred seventy-five (675) patients for any day prior to the Interim Transfer Adjustment Period Date. Commencing on the Interim Transfer Adjustment Period Date until the earlier of (i) the Closing, (ii) the termination of this Agreement, or (iii) the seventy-fifth (75th) day after the Interim Transfer Adjustment Period Date (such earliest date, the "Transfer Adjustment Period Termination Date"), Purchaser agrees to pay to Seller an amount equal to $5 per day multiplied by the number of patients of the Business, as of the applicable day, who have transitioned from the Business to another provider of their choice from the date of entry of the Sale Order; provided, however, that in no event shall Purchaser be obligated to make payments to Seller with respect to more than seven hundred (700) patients for any day during the period from the Interim Transfer Adjustment Period Date to the Transfer Adjustment Period Termination Date. (The payments to be made by Purchaser to Seller pursuant to the previous two sentences are referred to herein collectively as the "Early Transfer Adjustment" and the period from the Transfer Adjustment Period Commencement Date to the Transfer Adjustment Period Termination Date is referred to herein as the "Transition Adjustment Period"). Purchaser shall make the Early Transfer Adjustment payments on a monthly basis according to the following procedure. For each month during the Transfer Adjustment Period Seller shall provide notice to Purchaser of the number of patients who have transitioned from the Business to another provider since the Transfer Adjustment Period Commencement Date, the date of each such transfer, the provider to which the patient has been transferred and the amount of Early Transfer Adjustment due for such month. Purchaser shall pay to Seller all undisputed Early Transfer Adjustment amounts due within five (5) Business Days of receiving such notice from Seller of the amount thereof. Purchaser agrees to promptly notify Seller of any dispute with respect to the amount of the Early Transfer Adjustment due. To the extent that the Early Transfer Adjustment can not be finally calculated on or before the Closing Date, Purchaser shall deliver into escrow on terms reasonably acceptable to Seller amounts sufficient to pay any part of the Early Transfer Adjustment that remains outstanding as of the Closing, as such amount shall have been reasonably estimated by Seller at or before the Closing and the aggregate undisputed amount

thereof shall be released from escrow and paid to Seller (and any excess returned to Purchaser) within ten (10) days of notice by Seller to Purchaser of the final calculation thereof, which notice shall be provided no later than 45 days following the Closing Date.

## ARTICLE IX

## EMPLOYEES AND EMPLOYEE BENEFITS

Section 9.1    Offers of Employment.

(a)    Purchaser shall offer employment, commencing on the Closing Date, to all of the Employees of the Business (who are employed as of the date hereof and who remain employed on the date immediately preceding the Closing Date) at wage rates in accordance with Purchaser's collective bargaining agreements with its bargaining representatives for Purchaser's employees and/or Purchaser's policies and procedures; provided that Purchaser shall pay said Employees retention bonuses to make each Employee's first year annual base salary equal to their annual base salary as of the date immediately preceding the Closing Date (the "Retention Bonus"). The Retention Bonus shall be payable in two (2) equal installments. One half (1/2) of the Retention Bonus shall be paid to each applicable Employee then in the employ of Purchaser on or prior to the six (6) month anniversary of the Closing Date. The balance of the Retention Bonus shall be paid to each applicable Employee then in the employ of Purchaser on or prior to the twelve (12) month anniversary of the Closing Date.

(b)    To the extent that Seller severs the employment of any Employees prior to the Closing Date, Seller shall give Purchaser prior notice of same as soon as practicable and Purchaser may, but is not obligated to, offer employment to any such Employee. Seller shall terminate all Employees as of the Closing Date. All such Employees who accept Purchaser's offer of employment shall be terminated by Seller as of the Closing Date and shall become employees of Purchaser as of such date. As of the Closing Date, Seller shall not have any liability or responsibility with respect to any employee benefit plan, program, policy or other arrangement maintained by or contributed to by Purchaser with respect to Employees employed by Purchaser. Seller shall remain obligated after the Closing Date for any obligation or liability to Employees which arises prior to the Closing Date, except to the extent that the Purchaser has assumed the PTO Liability and the Severance Obligations. Purchaser shall not assume any CBAs. Except for the Assumed Liabilities, Purchaser shall not assume any Employee compensation and/or benefit obligations or other terms and conditions of employment for any Employee pursuant to the CBAs or otherwise.

(c)    Seller shall be responsible for providing continuation coverage, as required by Section 4980B(f) of the Code and Part 6 of Title I of ERISA or any similar Law ("COBRA") to Employees of the Business, who for any reason experience a COBRA "qualifying event" within the meaning of Section 4980B of the Code and Part 6 of Title I of ERISA prior to the Closing Date.

(d)    Except for the Assumed Liabilities, Seller shall bear sole responsibility for any Liabilities under WARN with respect to the termination of the employment of any Employees up to the Closing Date. On and after the date hereof, Seller shall not effect a "plant

48

closing" or "mass layoff" with respect to the Business as those terms are defined by WARN without notifying Purchaser in advance and obtaining advance approval from Purchaser, and complying with all provisions of WARN.

(e)     Nothing contained in this Agreement, expressed or implied, shall be construed to confer upon any Employee (including any beneficiary or dependent thereof) any rights or remedies whatsoever including, without limitation, any right to employment or continued employment for any specified period or of any nature or kind under or by reason of this Agreement.

## ARTICLE X

## CONDITIONS TO CLOSING

Section 10.1    Conditions Precedent to Obligations of Purchaser.  The obligation of Purchaser to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of SVCMC set forth in this Agreement shall be true and correct (without giving effect to any materiality or Material Adverse Effect qualifiers set forth therein) at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date) and Purchaser shall have received a certificate signed by an authorized officer of SVCMC, dated as of the Closing Date, to the foregoing effect; provided that in the event any such representation or warranty has been breached the condition set forth in this Section 10.1(a) shall nevertheless be deemed satisfied unless the effect of all such breaches of representations and warranties taken together result in a Material Adverse Effect;

(b)     Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date and Purchaser shall have received a certificate signed by an authorized officer of SVCMC, dated as of the Closing Date, to the forgoing effect; provided that the condition set forth in this Section 10.1(b) shall be deemed satisfied unless all such failures to so perform or comply taken together result in a Material Adverse Effect;

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in clauses (a) through (f) of Section 4.2 hereto; and

(d)     all notices, consents, approvals, licenses or Permits, or waivers thereof, set forth in Section 10.1(d) of the Purchaser Disclosure Schedule shall have been made or obtained by Purchaser, including DoH Approval, and any applicable waiting period under any of the Antitrust Laws shall have expired or been terminated.

Section 10.2    Conditions Precedent to Obligations of Seller.  The obligation of Seller to consummate the Contemplated Transactions as provided by this Agreement is subject to the

fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by SVCMC in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchaser set forth in this Agreement shall be true and correct (without giving effect to any materiality qualifiers set forth therein) at and as of the Closing, except to the extent such representations and warranties relate expressly to an earlier date (in which case such representations and warranties shall be true and correct, on and as of such earlier date) and SVCMC shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect; provided that in the event any such representation or warranty has been breached the condition set forth in this Section 10.2(a) shall nevertheless be deemed satisfied unless the effect of all such breaches of representations and warranties taken together would prevent or materially delay the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and SVCMC shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect; provided that the condition set forth in this Section 10.2(b) shall be deemed satisfied unless all such failures to so perform or comply taken together prevent or materially delay the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions;

(c)     all notices, consents, approvals, licenses or Permits, or waivers thereof, set forth in Section 10.2(c) of the Seller Disclosure Schedule shall have been made or obtained by Seller, and any applicable waiting period under any of the Antitrust Laws shall have expired or been terminated; and

(d)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 4.3 hereto.

Section 10.3     Conditions Precedent to Obligations of Purchaser and Seller.     The respective obligations of the parties to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser or SVCMC in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions; and

(b)     the Bidding Procedures Order and the Sale Order shall have been entered by the Bankruptcy Court and (i) the time for appealing the Sale Order has expired and no party has taken an appeal or (ii) the Sale Order shall not be subject to a stay in connection with such an appeal.

Section 10.4   Frustration of Closing Conditions.  No party may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3 hereto, as the case may be, to excuse it from consummating the Contemplated Transactions if such failure was caused by such party's failure to comply with any provision of this Agreement.

## ARTICLE XI

## TAXES

Section 11.1   Transfer Taxes.  Seller shall pay any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges (including any interest and penalty thereon) payable in connection with the Contemplated Transactions ("Transfer Taxes").  Seller shall make due and timely payment of any Transfer Tax to the applicable Tax Authority and shall provide Purchaser with a true and complete copy of each Tax Return relating to Transfer Taxes as filed and evidence of the timely filing of such Tax Return and payment of such Transfer Tax.  The parties shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds of Transfer Taxes.

Section 11.2   Prorations.  All real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets, if any, for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between Seller and Purchaser as of 11:59 p.m. (New York time) on the Closing Date based on the number of days in such period through and including the Closing Date and the number of days in such period after the Closing Date; provided, however, that nothing in this Agreement shall obligate the Seller to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party.  If any Taxes subject to proration are paid by Purchaser, on the one hand, or Seller, on the other hand, the proportionate amount of such Taxes paid (or in the event of a refund of any portion of such Taxes previously paid is received, such refund) shall be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund).

Section 11.3   Purchase Price Allocation.  The Purchase Price will be allocated for Tax purposes (the "Allocation") among the Purchased Assets in accordance with GAAP and as mutually agreed upon by the parties at or prior to the Closing.  The Seller and the Purchaser shall report the Allocation as provided in Section 1060 of the Code, and shall prepare and file all Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Allocation.  No party shall take any position (whether in audits, Tax Returns or otherwise) that is inconsistent with the Allocation unless required to do so by applicable law.

Section 11.4   Cooperation on Tax Matters.  The parties shall furnish or cause to be furnished to each other, as promptly as practicable following the request therefore, and at the expense of the requesting party, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other filings relating to Tax matters, for the preparation for and defense of any Tax audit, for the preparation of any Tax protest, or for the prosecution or defense of any suit or other proceeding relating to Tax matters.

# ARTICLE XII

## MISCELLANEOUS

Section 12.1  <u>Expenses</u>.  Except as otherwise expressly provided in this Agreement, each party shall bear its own costs and expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

Section 12.2  <u>Specific Performance</u>.  The parties hereto agree that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine, and that the parties hereto shall be entitled to specific performance of the terms hereof (without the posting of any bond), in addition to any other remedy at law or equity.  The rights set forth in this <u>Section 12.2</u> shall be in addition to any other rights which a party may have at law or in equity pursuant to this Agreement.

Section 12.3  <u>Governing Law; Jurisdiction; Consent to Service of Process</u>.  This Agreement and any disputes arising in connection herewith shall be governed by and construed in accordance with the internal Laws of the State of New York without regard to the conflict of law principles thereof.  Without limiting any party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (b) any and all Legal Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations pursuant to <u>Section 12.2</u> hereto; <u>provided</u> that if the Bankruptcy Case has closed, each of the parties hereto irrevocably agrees that any Legal Proceeding with respect to this Agreement or for recognition and enforcement of any judgment in respect hereof shall be brought and determined exclusively in the United States District Court for the Southern District of New York or if such Legal Proceeding may not be brought in such court for jurisdictional purposes, exclusively in the Supreme Court of New York sitting in the County of New York.  Each of the parties hereto hereby (a) irrevocably submits with regard to any such Legal Proceeding to the exclusive personal jurisdiction of the aforesaid courts in the event any dispute arises out of this Agreement or any transaction contemplated hereby, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the state or federal courts referenced above.  Each of the parties hereto further agrees to accept and acknowledge service of any and all process which may be served in any such Legal Proceeding in said courts in the State of New York, and agrees that service of process upon such party, mailed by certified mail to such party's address as set forth in <u>Section 12.6</u> hereto, will be deemed in every respect effective service of process upon such party, in any Legal Proceeding.

Section 12.4  <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY ACTION TO WHICH THEY ARE PARTIES

INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

Section 12.5 <u>Entire Agreement; Amendments and Waivers</u>. This Agreement (including the schedules and exhibits hereto), the Confidentiality Agreement, the Interim Agreement and the Escrow Agreement, contain the entire understanding and agreement of the parties hereto and thereto with respect to the subject matter hereof and thereof, and supersede all previous written or oral negotiations, commitments, understandings and writings. This Agreement may be amended, modified, supplemented or changed, and any provision hereof can be waived, only by written instrument duly executed by all of the parties hereto. Any party hereto may, by written notice to the other parties hereto (a) extend the time for performance of any of the obligations of the other party under this Agreement, (b) waive any inaccuracies in the representations or warranties of the other party contained in this Agreement, (c) waive compliance with any of the conditions or covenants of the other party contained in this Agreement or (d) waive or modify performance of any of the obligations of the other party under this Agreement. Except as provided in the immediately preceding sentence, no action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach, whether of a similar or dissimilar nature. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

Section 12.6 <u>Notices</u>. All notices and other communications under this Agreement shall be in writing and, unless otherwise provided in this Agreement, shall be deemed given (a) when delivered personally by hand, (b) when sent by facsimile (confirmed in writing by mail promptly thereafter dispatched), (c) three (3) days after being mailed by certified or registered mail, postage prepaid, return receipt requested or (d) one (1) Business Day following the day sent by a nationally recognized overnight courier service, in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

    (a)    If to Purchaser, to:

> Visiting Nurse Service of New York Home Care II, ~~Inc.~~
> 107 East 70th Street
> New York, New York 10021
> Fax: (212) 794-6357
> Attn: Charles Blum, Sr. Vice President
> Legal and Government Affairs

> With a copy to:

53

Nixon Peabody LLP
50 Jericho Quadrangle
Suite 300
Jericho, New York 11753
Fax:    (866) 947-2125
Attn:   Michael J. Taubin, Esq.

(b)    If to SVCMC, to:

Saint Vincents Catholic Medical Centers
450 West 33rd Street
New York, New York 10001
Fax:    (212) 604-3331
Attn:   Mark E. Toney

with a copy to (which shall not constitute notice):

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Fax:    (212) 715-8000
Attn:   Adam C. Rogoff, Esq.

and

Garfunkel Wild, P.C.
111 Great Neck Road, Suite 503
Great Neck, New York 11021
Fax: (516) 466-5964
Attn: Judith A. Eisen, Esq.

Section 12.7   Invalid Provisions.   If any term or other provision of this Agreement is held to be invalid, illegal, or incapable of being enforced under any present or future Law, and if the rights or obligations under this Agreement of Seller on the one hand and Purchaser on the other hand will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

Section 12.8   Binding Effect; Assignment; Successors and Assigns.   This Agreement shall apply to, be binding in all respects upon and inure to the benefit of the parties and their respective successors, administrators and permitted assigns.   A successor to SVCMC shall include SVCMC as a reorganized debtor.   No assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of Law or otherwise) without the

54

prior written consent of Purchaser and SVCMC and any attempted assignment without the required consents shall be void. No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors, administrators and permitted assigns.

Section 12.9  No Personal Liability.  In entering into this Agreement, the parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any party hereto shall be personally liable or responsible to any other party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named parties only (but nothing contained herein shall limit the Liability of any Person for his or her fraudulent acts).

Section 12.10  Execution in Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original, but all of which together will constitute one (1) and the same agreement. Any signature delivered by a party via facsimile or delivered electronically in PDF format shall be deemed to be an original signature hereto.

Section 12.11  Survival of Representations and Warranties.  The representations and warranties of the parties contained in this Agreement shall not survive the Closing.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK D/B/A SAINT VINCENT CATHOLIC MEDICAL CENTERS**

By: _Mark E. Toney_

Name: MARK E. TONEY

Title: CRO

**VISITING NURSE SERVICE OF NEW YORK HOME CARE II, INC.**

By: _Charles F. Klun, on behalf of_

Name: Joan Marren

Title: President, Visiting Nurse Service of New York Home Care II

**For a copy of any non-confidential exhibits or schedules to the Assert Purchase Agreement, please contact Joseph A. Shifer, Esq. of Kramer Levin Naftalis & Frankel LLP at (212) 715-9100 or via email at jshifer@kramerlevin.com.**