KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel to the Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------- x
In re:                                    :   Chapter 11
                                          :
SAINT VINCENTS CATHOLIC MEDICAL           :   Case No. 10-11963 (CGM)
CENTERS OF NEW YORK, et al.,              :
                                          :
                             Debtors.     :   Jointly Administered
-------------------------------------------------- x
```

### DEBTORS' MOTION FOR (I) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL THE DEBTORS' BEHAVIORAL HEALTH ASSETS INCLUDING THE OPERATIONS OF ST. VINCENT'S HOSPITAL WESTCHESTER TO SAINT JOSEPH'S MEDICAL CENTER, AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (II) AN ORDER (A) APPROVING BIDDING PROCEDURES FOR THE AUCTION OF A REAL ESTATE OPTION, AND (B) SCHEDULING AN AUCTION AND REAL ESTATE OPTION SALE HEARING; AND (III) AN ORDER <u>APPROVING THE SALE OF THE REAL ESTATE OPTION</u>

TO THE HONORABLE CECELIA G. MORRIS,
UNITED STATES BANKRUPTCY JUDGE:

Saint Vincents Catholic Medical Centers of New York ("**SVCMC**") and certain

of its affiliates, as chapter 11 debtors and debtors-in-possession (each a "**Debtor**" and

collectively, the "**Medical Centers**" or the "**Debtors**")[1] in the above-referenced chapter 11 cases

---

[1] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation

(the "**Chapter 11 Cases**"), hereby file this motion (the "**Motion**") for (i) an order, substantially in the form attached hereto as **Exhibit A** (the "**Behavioral Health Services Sale Order**"), (a) approving an asset purchase agreement (the "**APA**") for the sale to St. Joseph's Medical Center ("**St. Joseph's**" or "**Purchaser**") of substantially all the assets relating to the Debtors' inpatient and outpatient behavioral health service programs (the "**Behavioral Health Assets**"), including, without limitation, the St. Vincent's Westchester Hospital facility located 275 North Street, Harrison, New York (the "**St. Vincent's Westchester**"), the Chait Housing Development Corporation ("**Chait**") and the Fort Place Housing Development Corporation ("**Fort Place**"), and (b) approving the assumption and assignment[2] to Purchaser of certain executory contracts and unexpired leases related to the Behavioral Health Assets (collectively, the sale of the Behavioral Health Assets and the assignment of the applicable contracts, the "**Behavioral Health Services Sale Transaction**"); (ii) an order substantially in the form attached hereto as **Exhibit B** ("**Bidding Procedures Order**"): (a) approving bidding procedures (the "**Bidding Procedures**") for the auction (the "**Auction**") of an option ("**Real Estate Option**") to purchase certain undeveloped real property at St. Vincent's Westchester ("**Undeveloped Real Property**"); and (b) scheduling the Auction and a hearing to approve the sale of the Real Estate Option (the "**Real Estate Option Sale Hearing**"); and (iii) an order, substantially in the form attached hereto as **Exhibit C** (the "**Real Estate Option Sale Order**"), approving a purchase and sale agreement (the "**Real Estate Option Purchase Agreement**") for a sale of the Real Estate Option ("**Real Estate Option Sale Transaction**") to St. Joseph's or another bidder submitting a higher or better

---

d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc.  There are certain affiliates of SVCMC who are not Debtors.

[2] This Motion requests a waiver of the limitations in Bankruptcy Rule 6006(f) concerning the number of executory contracts and unexpired leases that may be the subject of a single motion.

offer for the Real Estate Option at the Auction ("**Real Estate Option Purchaser**"), and in support of the Motion respectfully represent as follows:

## I. SUMMARY OF RELIEF REQUESTED

1. This Motion represents a critical step towards ensuring the continuation of one of the Debtors' most important health care services – the well-regarded behavioral health hospital in Harrison, New York and related outpatient and residential services located throughout Westchester and New York City. These ongoing services are critical. Among other things, the Debtors' behavioral health services include: (i) one of the largest inpatient providers of behavioral health services in Westchester County and a significant provider of inpatient services to residents of New York City and surrounding counties in the Hudson Valley, (ii) one of the largest hospital based outpatient services for substance abuse and mental health care in New York City and the Hudson Valley with over 600,000 visits annually, and (iii) the only provider to offer a comprehensive range of inpatient, outpatient and residential behavioral health services in Westchester County. The proposed transaction represents one of the most fundamental purposes of these Chapter 11 cases – specifically, the preservation of vital ongoing healthcare services, the absence of which would harm thousands of patients.

2. In seeking to sell the Behavioral Health Assets to a new sponsor, the Debtors had two overriding objectives: first, to preserve the Behavioral Health Assets for the benefit of patients and employees, and second, to maximize the value of the Behavioral Health Assets for the various creditors holding senior liens on different segments of the Behavioral Health Assets.

3. As set forth in more detail below, the potential purchasers for the Behavioral Health Assets were limited because any viable purchaser needed to already be licensed under Article 28 of the New York Public Health Law ("**Article 28**"). In addition, to

3

retain the benefit of the exempt unit rate for psychiatric services under New York's Medicaid program, it was imperative to locate a purchaser that could close on the sale expeditiously.

4.     After a lengthy marketing process that predated these Chapter 11 cases, St. Joseph's emerged as the _only_ viable purchaser of the Behavioral Health Assets who would commit to continuing _all_ of the Debtors' fundamental inpatient and outpatient services and consummating the sale transaction on the Debtors' expedited timeline.  Therefore, the Debtors do _not_ intend to sell the Behavioral Health Assets to St. Josephs subject to a further marketing and auction process.  Rather, the Debtors seek approval of the sale to St. Joseph's as a private transaction.  In the Debtors' business judgment there is virtually no chance that further marketing of the Behavioral Health Assets will lead to a higher or better offer.  Further marketing of the Behavioral Health Assets will only waste estate assets and could possibly jeopardize the current transaction with St. Joseph's.

5.     By the Motion, the Debtors seek authority to sell all the Behavioral Health Assets to St. Joseph's for $18 million in cash and the assumption by St. Joseph's of approximately $5 million in liabilities (including, without limitation, the assumption of the Debtors' collective bargaining agreements).  As set forth in further detail below, the Debtors bifurcated the sale process to address the differing secured claims on the Behavioral Health Assets as follows:  First, the Debtors will receive: (i) $13 million in cash, (ii) the assumption of approximately $5 million in liabilities, and (iii) the Real Estate Option (to purchase the Undeveloped Real Property back from St. Joseph's for $1.00) upon the projected closing of the sale of the Behavioral Health Assets to St. Joseph's in late October 2010.  Second, the Debtors will receive $5 million in additional cash consideration from St. Joseph's for the purchase of the Real Estate Option, subject to higher or better bids at an auction to be completed on or before

June 30, 2011.

6.    Accordingly, by this Motion the Debtors seek three separate sets of relief:

- <u>First</u>, pursuant to a private sale, authorization to sell all the Behavioral Health Assets, including all the Westchester Real Property (as defined below), to St. Joseph's for $13 million plus the assumption of certain liabilities (as specified in the APA). After the sale, however, the Debtors will maintain a Real Estate Option to purchase the Undeveloped Real Property from St. Joseph's for $1.00.

- <u>Second</u>, approval of customary bidding procedures (including an auction process and payment of a break-up fee) for the auction of the Real Estate Option to the highest or best offer. As part of the auction process, St. Joseph's has agreed to enter into the stalking horse Real Estate Option Purchase Agreement to purchase the Real Estate Option from the Debtors for $5 million, subject to higher or better offers at the Auction.

- <u>Third</u>, approval to sell the Real Estate Option to the highest or otherwise best bidder at the Auction. The ultimate purchaser of the Real Estate Option will have the right to purchase the Undeveloped Real Property from St. Joseph's for an exercise price of only $1.00 if the required zoning and related approvals are obtained to subdivide the property.

## II.  JURISDICTION AND VENUE

7.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

8.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

9.    The statutory predicates for the relief requested herein are sections 105(a) 363(b), and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**").

## III.  BACKGROUND

10.    On April 14, 2010 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Chapter 11 cases (the

"**Chapter 11 Cases**") are jointly administered for procedural purposes only.

11.     The Debtors are operating their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

12.     On April 21, 2010, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed (i) an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "**Creditors' Committee**"), (ii) Alan Chapell as consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code (the "**Consumer Privacy Ombudsman**"), and (iii) Daniel T. McMurray as patient care ombudsman pursuant to section 333 of the Bankruptcy Code (the "**Patient Care Ombudsman**").[3]

13.     Founded by the Sisters of Charity in 1849, the Medical Centers are the only remaining Catholic-sponsored, acute-care hospital network in New York City.  The Medical Centers are committed to a charitable healthcare mission that demands they give "Respect, Integrity, Compassion and Excellence to all who come to us in need, especially the poor."

14.     Prior to the Petition Date, the Medical Centers' core business centered around St. Vincent's Hospital Manhattan (the "**Manhattan Hospital**"), which is located in the Greenwich Village section of Manhattan.  The Medical Centers operated – and in some cases, continue to operate – numerous other services, including St. Vincent's Westchester, nursing homes, continuing care facilities, a hospice, a home health agency and a military health plan serving active duty dependents, retirees, and their families.

15.     On April 6, 2010, following a sustained period of poor operating results and unsuccessful efforts to find a strategic partner for the Manhattan Hospital, the Board of

---

[3] On various occasions, the Patient Care Ombudsman has indicated his support for the proposed transaction to the Debtors' management as an important step to the preservation of patient care.

Directors of SVCMC voted to approve the closure of the Hospital and the transfer or closure of the outpatient programs and clinics associated with and operated by the Manhattan Hospital. In accordance with New York State law, on April 9, 2010, the Debtors submitted their proposed plan of closure to the DOH for approval (the "**Closure Plan**," as may be amended from time to time in consultation with the DOH). The Manhattan Hospital was closed under the Closure Plan and the Debtors are currently working closely with the DOH to implement the rest of the Closure Plan.

## IV. ST. VINCENT'S WESTCHESTER

16.     Founded in 1879 by the Sisters of Charity, St. Vincent's Westchester provides mental health care and substance abuse services, on both an inpatient and an outpatient basis, to individuals in all stages of illness and recovery. Located in Harrison, New York, St. Vincent's Westchester provides a 24-hour emergency evaluation and referral center, and has a total of 138 licensed beds dedicated to psychiatric care and alcohol rehabilitation and approximately 600 residential beds throughout Westchester, Brooklyn, the Bronx, Staten Island and Queens for individuals with histories of psychiatric illness/chemical dependency.

17.     With close to 2,882 discharges in 2009, St. Vincent's Westchester provides for more psychiatric inpatient admissions of Westchester adult residents than any other hospital. It also meets critical inpatient needs of residents in nearby counties as evidenced by the emergency approval of 5 additional inpatient psychiatric beds at St. Vincent's Westchester in May 2010 in order to help meet inpatient needs of New York City residents after the closure of the Manhattan Hospital and other facilities.

18.     In 2009, St. Vincent's Westchester provided over 622,000 outpatient visits at its main campus and at other sites in Westchester, Queens and Brooklyn. The total number of annual behavioral care outpatient visits under the direction of St Vincent's Westchester is more

than five times the annual number of outpatient behavioral visits at the Manhattan Hospital prior to its closure. St. Vincent's Westchester also employs approximately 900 employees, many of whom work directly with the patients and are keenly aware of their special needs. St. Vincent's Westchester maintains significant community funded programs, including intensive case management, supportive housing, assertive community treatment, and various other peer and outreach programs. St. Vincent's Westchester's broad range of inpatient, outpatient, and residential services is unique in the New York Metropolitan area and makes it an irreplaceable part of the psychiatric and substance abuse services in the many counties that it services. St. Vincent's Westchester had total revenues of approximately $85 million in 2009. St. Vincent's Westchester was not included in the Closure Plan.

19. As part of the sale to St. Joseph's, the Debtors are selling substantially all the assets of Chait and Fort Place, two debtor not-for-profit corporations, and the Debtors' interests in Immaculata Hall Housing Development Corporation ("**Immaculata Hall**") and St. Mary's Supportive Housing Development Fund Corporation (a/k/a Bishop Sullivan Residence) ("**Bishop Sullivan**"), two entities in which SCVMC owns all of the membership interests. Chait is a "Housing Development Corporation" (an "**HDC**") that was formed to acquire two 15-bed community residences located in Staten Island, New York. Fort Place is an HDC that was formed to acquire a 59-unit residence located in Staten Island, New York (the "**Fort Place Real Estate**").[4] Immaculata Hall owns the general partner of Immaculata Hall, LP, which owns a 100-unit supportive housing facility with on-site supportive services to homeless adults with serious mental illness. Bishop Sullivan owns the general partner of St. Mary's Supportive

---

[4] Neither Chait nor Fort Place has operations beyond providing certain administrative services (e.g., payment of salaries) related to the management of the respective real estate, which is managed and operated by St. Vincent's Westchester (pursuant to a contract with the New York State Office of Mental Health, the "**OMH**").

Housing LP, which owns a 78-unit supportive housing facility with on-site supportive services for homeless adults with serious mental illness and/or HIV/AIDS.[5]

## V. SECURED INDEBTEDNESS ON THE BEHAVIORAL HEALTH ASSETS

20.     There are separate liens upon the Debtors' behavioral health business and the real property underlying St. Vincent's Westchester (the "**Westchester Real Property**").[6] The Westchester Real Property is encumbered by a first mortgage and security interest and assignment of leases and rents (the "**Sun Life First Lien**") in favor of Sun Life Assurance Company of Canada ("**Sun Life**") pursuant to a Promissory Note in the principal amount of $17.5 million dated as of August 30, 2007 (the "**Sun Life Note**").  As of the Petition Date, approximately $16.4 million in principal remains outstanding on the Sun Life Note.

21.     In addition, Sun Life also held a second mortgage and security interest and assignment of leases and rents ("**Sun Life Second Lien**") pursuant to a Promissory Note in the principal amount of $40 million (the "**Sun Life Second Note**").  The Sun Life Second Note, which Sun Life sold to a third party, will be repaid with the proceeds from the sale of the real estate and personal property located at 555 6th Avenue, New York, New York, commonly referred to by the Debtors as the "Staff House."  The Court entered an order approving the sale of the Staff House on July 2, 2010, and the sale closed on July 22, 2010.

22.     Pursuant to the plan of reorganization confirmed in the Debtors' prior

---

[5] The operating budgets of Immaculata Hall and Bishop Sullivan are funded through the New York City Department of Health and Mental Hygiene, the New York City Department of Homeless Services, and/or the New York City HIV/AIDS Administration.  This funding purchases services, including staff salaries, from St. Vincent's Westchester which are mandated to be provided in these buildings.

[6] The Westchester Real Property is a single, undivided lot of approximately 66 acres.  Only a portion of this property, consisting of approximately 29 acres, is currently developed and being used by the Debtors in the operation of the Westchester hospital (the "**Developed Real Property**").  The balance, consisting of approximately 37 acres, is the Undeveloped Real Property, which is not presently used in the ongoing operation of the hospital itself.

Chapter 11 Cases, the Debtors agreed to fund three separate medical malpractice trusts (the "**MedMal Trusts**") to cover liability for medical malpractice claims against the Debtors' physicians and employees.  To secure the contractual obligations of the Debtors to the MedMal Trusts, the Debtors granted the MedMal Trusts a third priority mortgage on the Westchester Real Property (the "**MedMal Trusts Third Lien**") (together with the Sun Life First Lien, the "**Westchester Real Property Liens**").[7]   The Debtors estimate that the MedMal Trusts are owed approximately $113 million as of the Petition Date.[8]

        23.     The Behavioral Health Assets other than the Westchester Real Property – those relating to the operation of the "business" – are encumbered by (i) a lien and security interest (the "**Prepetition Senior Lien**") in favor of General Electric Capital Corporation ("**GE Capital**") as agent (in such capacity, the "**Prepetition Agent**") under a Credit Agreement dated as of August 30, 2007 (the "**Prepetition Credit Facility**") entered into by the Medical Centers, as borrowers, GE Capital, as agent, and GE Capital and TD Bank, N.A. as lenders (together with any other persons becoming lenders thereunder, the "**Prepetition Lenders**"), securing certain prepetition obligations (the "**Prepetition Obligations**") in the original principal amount of $320,000,000; and (ii) a lien and security interest (the "**DIP Agent Lien**") in favor of GE Capital as agent under a Debtor-in-Possession Credit Agreement dated as of April 16, 2010 (the "**DIP Credit Facility**") entered into by the Debtors, as borrowers, GE Capital, as agent (in such capacity, the "**DIP Agent**"), and GE Capital and TD Bank, N.A. as lenders (together with any other persons becoming lenders thereunder the "**DIP Lenders**"), securing certain postpetition

---

[7] As part of GE Capital's Prepetition Credit Facility, GE Capital, as agent, has a fourth priority mortgage and security interest in, and an assignment of the leases and rents of, the Westchester Real Property.

[8] The Debtors have been advised that there may be a dispute between Sun Life and the MedMal Trusts as to the priority of their respective liens on a portion of the Westchester Real Property.

obligations of the Debtors (the "**DIP Loan**") approved by an earlier order of the Court (the "**DIP Order**").  The agents and the lenders under the Prepetition Credit Facility and the DIP Credit Facility are referred to as the "**Secured Creditors**."

24.     In addition to the liens described above, certain real property owned by the Debtors underlying 12 community residencies and outpatient centers (including Chait, Fort Place, Immaculata Hall, and St. Mary's Supportive Housing) are encumbered by mortgages and/or state aid grants or other liens in favor of DASNY, OMH and/or the Office of Alcoholism and Substance Abuse Services ("**OASAS**") (as agent for DASNY), and/or various other state and local governmental entities.  The mortgage interests in favor of OASAS are recourse while those in favor of OMH are non-recourse.  Many of these properties have restricted use provisions.  The mortgage interests were granted to secure loans that OMH, OASAS, and DASNY made to the Debtors to facilitate the acquisition, construction, or equipping of these community residencies and outpatient centers.  The mortgage payments for these properties are funded directly by the State of New York to OMH or OASAS as agent for DASNY.  As part of the Behavioral Health Services Sale Transaction, the Debtors are working cooperatively with the OMH and OASAS to transfer these properties and their attendant mortgage interests to St. Joseph's.

## VI.  THE SALE OF THE BEHAVIORAL HEALTH ASSETS

25.     The marketing process for the Behavioral Health Assets commenced before the filing of these Chapter 11 Cases and has been ongoing. Before the Petition Date, the Debtors retained Cain Brothers & Company ("**Cain Brothers**") as investment banker and Shattuck Hammond Partners ("**Shattuck**") as broker to facilitate the sale of the Behavioral Health Assets as a going concern.  In coordination with the Debtors' senior management and Grant Thornton, Cain Brothers, and Shattuck contacted approximately 25 potential purchasers

and assisted 12 potential purchasers in conducting due diligence in connection with a sale of the Behavioral Health Assets.

26.     The Debtors' priority has been to locate a suitable operator to continue the critical services of St. Vincent's Westchester and its related behavioral health services. With 34 separate behavioral health services, St. Vincent's Westchester provides critical care to thousands of patients on an inpatient, residential and outpatient basis. A closure of St. Vincent's Westchester would leave many of these patients with no continued care and would impose an untenable financial burden on the Chapter 11 estates. The Debtors estimate that it would cost approximately $16 million to close St. Vincent's Westchester and the related behavioral health programs.

27.     Complicating the sale of the Behavioral Health Assets are certain statutes and regulations that (i) will materially reduce the reimbursement rates for behavioral health services in New York, (ii) limit the viable purchasers for the Behavioral Health Assets, and (iii) dictate the unique timing of this transaction.

28.     First, starting in October 2010, certain changes to the reimbursement rates for psychiatric services under New York's Medicaid program will go into effect. These changes will significantly reduce the reimbursement rates for psychiatric services on a state wide basis and impact the financial feasibility of assuming operation of the Debtors' Behavioral Health Assets. This change substantially reduces the number of providers who both are able and willing to take over this operation.

29.     Second, under certain regulations by the Centers for Medicare and Medicaid Services ("**CMS**"), for a psychiatric facility to be reimbursed under Medicaid for patients between 21 years to 65 years old, it must be considered "provider-based." To be

12

"provider based" in New York, a psychiatric facility must be substantially tied to an acute care hospital licensed under Article 28 of the NYS Public Health Law (the "**CMS Rules**").  As a substantial portion of the revenue generated from the Behavioral Health Assets arises from serving Medicaid patients (approximately 50%), it was thus imperative that the Debtors find a purchaser for the Behavioral Health Assets with an Article 28 license.

30.     Third, in addition to having an Article 28 license, under the CMS Rules a purchaser of the Behavioral Health Assets must obtain a CMS sanctioned physical survey of the Debtors' behavioral health programs by year end or the purchaser will be reimbursed from Medicaid at significantly reduced rates for all of 2011.  Typically, it takes a number of weeks to obtain a CMS sanctioned physical survey.  Thus, in order to ensure completion of the CMS sanctioned physical survey by year end, the sale to St. Joseph's must close no later than October 31, 2010.

31.     In addition, in marketing the Behavioral Health Assets, the Debtors were faced with competing interests from their secured creditors.  As noted, Sun Life and the MedMal Trusts have liens on the Westchester Real Property only, while GE Capital as agent has liens on all of the Behavioral Health Assets with junior liens on the Westchester Real Property.   In structuring the sale transaction, the Debtors were intent on alleviating the competing interests of their secured creditors.

32.     In the face of these many and varied considerations – patient care, business continuity, regulatory requirements, and maximization of value for competing creditor constituencies – the Debtors determined that the best course of action was to pursue a going-concern sale all of the Behavioral Health Assets to an Article 28 provider with that part of the purchase price related to the Undeveloped Real Property to remain in escrow for six to nine

months so that the Debtors can attempt to maximize the value of the Undeveloped Real Property for the benefit of the secured creditors.

33.     On August 18, 2010, the Debtors and St. Joseph's entered into the APA attached hereto as **Exhibit D** for the sale of the Behavioral Health Assets.[9]   Under the sale transaction, St. Joseph's agreed to pay the Debtors $18 million in cash and assume approximately $5 million in liabilities relating to the Debtors' Behavioral Health Assets (including, without limitation, the assumption of the Debtors' collective bargaining agreements) as consideration for the Behavioral Health Assets.

34.     St. Joseph's is an acute-care hospital with 192-beds located in Yonkers, New York.  Like SVCMC, St. Joseph's was founded by the Sisters of Charity in 1888[10] and provides similarly licensed services such as a nursing home and various outpatient clinical services to approximately 7,000 patients annually.  St. Joseph's is a community-based hospital providing care for the pediatric to the elderly with an Article 28 operating license.  Inpatient and outpatient mental health services are amongst the specialties that St. Joseph's offers.  St. Joseph's is a financially strong hospital with an operating budget of approximately $115 million. St. Joseph's has also informed the Debtors that it has received a commitment for the financing of the purchase of the Behavioral Health Assets and the Real Estate Option.[11]

35.     As part of the APA, the Debtors negotiated for the Real Estate Option to purchase back the Undeveloped Real Property from St. Joseph's for One Dollar ($1.00).[12]   The

---

[9] The APA is explicitly conditioned on the approval of this Court and the necessary regulatory approval.

[10] The Sisters of Charity are also the founders of SVCMC and continue to be one of the Debtors' two sponsors.

[11] More information on St. Joseph's can be obtained from its website at: www.saintjosephs.org.

[12] Initially, the Debtors considered subdividing the Westchester Real Property into two lots: first, the Developed Real Estate would be sold as part of the continuation of the hospital, and second, the Undeveloped Real Property would be marketed separately to the highest or best bidder who could seek to subdivide and develop this property

Real Estate Option is intended to accommodate the specific interests of Sun Life and the MedMal Trusts in the Undeveloped Real Property. The intent of the parties in granting the Debtors the Real Estate Option is to allow the Debtors the right to auction off the Real Estate Option to a third-party to maximize the opportunity to realize the value of the Undeveloped Real Property. St. Joseph's has also entered into the stalking-horse Real Estate Option Purchase Agreement to purchase the Real Estate Option from the Debtors for $5 million in additional consideration, subject to higher or better bids at an auction.

36. Thus, under the sale transaction, the Debtors will receive the first $13 million in cash consideration and the assumption of liabilities in late October when the sale of the Behavioral Health Assets is projected to close and the remaining $5 million in cash consideration by no later than June 30, 2011 when the Real Estate Option Purchase Agreement is projected to close.

A. **The APA**

37. Below is a summary of the material provisions of the APA. The summary is intended solely to give the Court and interested parties an overview of the material terms of the APA. Interested parties should refer to the APA for the complete terms thereof.[13]

(a) Purchase Price. The purchase price to be paid by St. Joseph's to the Debtors for the Behavioral Health Assets is $13 million plus the assumption of various Assumed Liabilities.

---

under applicable laws. Ultimately, the Debtors determined that to subdivide the Developed Real Estate from the Undeveloped Real Property is not presently possible. To subdivide the lot requires a lengthy (i.e., one to two year) and uncertain approval process. Among other things, the Debtors would have had to file an application with the Town of Harrison, New York, potentially undergo a full review under the New York State Environmental Quality Review Act, obtain a wetland permit, obtain county approval, and obtain roadway cuts and traffic cuts. This also assumes that there would be no opposition from the local residents and others in the community to conversion of the undeveloped parcel into a residential or commercial use.

[13] To the extent there are any inconsistencies between the summary description of the APA contained herein and the terms and conditions of the APA, the terms of the APA control. Capitalized terms contained in the summary description of the APA that are not defined in this Motion shall have the meanings ascribed to them in the APA.

(b)    <u>Deposit</u>.  The Purchaser shall deposit with an escrow agent, by wire transfer of immediately available funds, (a) an amount equal to $650,000 upon execution of the APA, and (b) an amount equal to $650,000 on or prior to one business day prior to the Behavioral Health Services Sale Order.

(c)    <u>The Real Estate Option</u>.  The Purchaser shall grant the Debtors the Real Estate Option to acquire the Undeveloped Real Property for One Dollar ($1.00).  The Real Estate Option provides for any purchaser other than SVCMC to reimburse the Purchaser for its operating costs incurred in connection with the maintenance and ownership of the Undeveloped Real Property.  The operating costs include general liability insurance and real estate taxes.

(d)    <u>The Assets</u>.  The Purchaser shall purchase the Behavioral Health Assets, including all of the Westchester Real Property,[14] the personal property, rights in other real property used in the behavioral health program, real property leases, SVCMC's collective bargaining agreements related to the Behavioral Health Assets (which will be assumed), and related assets, all as described more fully in the APA.

(e)    <u>Excluded Assets</u>.  The Debtors shall retain all right, title and interest to, in and under the assets, properties, interests and rights of the Debtors, defined in the APA as Excluded Assets, which include, among other things, all cash, bank deposits or similar cash items of the Debtors and any accounts receivable or trade receivables owned by the Debtors as of the date of the Closing.

(f)    <u>Assumed Liabilities</u>.  The Purchaser shall assume only the following liabilities: (i) all Liabilities accruing from and after the Closing with respect to the Assigned Contracts and the Purchased Real Property Leases; (ii) the Cure Amounts as required by Section 2.5 of the APA; (iii) all mortgage indebtedness related to mortgages subsidized by OMH, OASAS or another State Agency; (iv) all real estate and other contracts associated with the residential housing and opioid treatment programs of St. Vincent's Westchester, as well as the subsidized mortgage indebtedness related to such programs; (v) applicable Transfer Taxes; and (vi) Employee-related Liabilities agreed upon, including assumption of Assumed CBAs, and offers of employment to certain non-union employees as more fully described in Article IX.

---

[14] As noted, the entirety of the Westchester Real Property needs to be conveyed at the closing under the APA because the parcels have not previously been subdivided.

(g)     Permitted Liens.  The Purchaser will take the Behavioral Health Assets subject to certain Permitted Liens as set forth in Section 1.1(c) of the Seller Disclosure Schedule to the APA.

(h)     Representations and Warranties.  SVCMC provides customary representations and warranties related to the Behavioral Health Assets, including representations related to consents and approvals.

(i)     Bankruptcy Approval.  The sale is conditioned upon entry of an order of the Court authorizing the sale of the Behavioral Health Assets free and clear of liens, encumbrances, pledges, mortgages, deeds of trust, security interests, claims, leases, charges, options, rights of first refusal, easements, servitudes, proxies, voting trusts or agreements, and transfer restrictions under any agreement.

## B.  Avoidance and Successor Liability

38.     The parties intend that the transfer of the Behavioral Health Assets to St. Joseph's (i) will not constitute avoidable transfers under the Bankruptcy Code or under applicable bankruptcy or non-bankruptcy law, and (ii) will not subject St. Joseph's to any liability other than the Assumed Liabilities with respect to the operation of the Debtors' business prior to the closing of the sale or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability.

## C.  Assumed and Assigned Contracts and Leases

39.     In conjunction with the Behavioral Health Services Sale Transaction, the Debtors have determined that approximately 460 executory contracts and unexpired leases will be assumed and assigned to St. Joseph's pursuant to section 365 of the Bankruptcy Code and Bankruptcy Rule 6006 in an effort to facilitate business continuity.  These leases and contracts include: (i) physician, lab, and radiology services; (ii) information technology services and software; (iii) managed care services; (iv) collective bargaining agreements; and (v) various

contracts related to offsite residential housing for patients (the "**Assumed Contracts and Leases**").  The assumption and assignment will provide for a seamless transition of the patients and business from the Debtors to St. Joseph's. As of the date of this Motion, the Assumed Contracts and Leases remain in effect and have not expired or terminated according to their respective terms.

40.     **Parties that are receiving this Motion and whose Assumed Contract or Assumed Lease is subject to assumption hereby can locate their name and the contract or lease to be assumed on the Assumed Contracts and Leases Schedule attached as Exhibit E to the Motion (the "Assumed Contracts and Leases Schedule").**[15] Pursuant to section 365(b)(1)(A) of the Bankruptcy Code, the Purchaser shall assume and pay to each Assumed Contracts and Leases counterparty the applicable amount identified on the Assumed Contracts and Leases Schedule (each, a "**Cure Amount**") to cure any and all defaults under each Assumed Contract and Lease, as required by section 365(b) of the Bankruptcy Code.

41.     The Debtors and the Purchaser have determined, based on the information currently available, that the assumption of the Assumed Contracts and Leases is appropriate under the circumstances.  The Assumed Contracts and Leases are necessary to the future business operations of St. Vincent's Westchester and the related behavioral health programs.

42.     Although the parties have made efforts to identify the universe of contracts and leases to be assumed, this evaluation is on-going by St. Joseph's.  Accordingly, the Debtors reserve the right to modify the Assumed Contracts and Leases Schedule prior to the hearing on the Motion.  The Debtors and the Purchaser reserve the right to add or remove one or

---

[15] As discussed below, out of an abundance or caution, the Debtors are requesting a waiver of Bankruptcy Rule 6006(f), which limits the number of contracts that may be assumed and assigned in a single motion.

more Assumed Contracts and Leases from the Assumed Contracts and Leases Schedule (a "**Redesignated Contract or Lease**") by filing with the Court and serving on the counterparty to the Redesignated Contract or Lease a written notice of such decision on or prior to the hearing on the Motion (a "**Redesignation Notice**"). If a Redesignation Notice is filed and served, the applicable Redesignated Contract or Lease will not be assumed.

43. In the event that a counterparty to an Assumed Contract or Lease files a timely objection to this Motion challenging the proposed Cure Amount (a "**Cure Objection**") and the parties are not able to reach a resolution prior to the hearing on this Motion, the Debtors may (i) proceed with a hearing on the assumption of the underlying contract or lease at the hearing on the Motion and (ii) schedule the Cure Objection to be heard at a later scheduled omnibus hearing or on such other omnibus hearing date as is mutually agreed upon by the parties. Any counterparty to an Assumed Contract and Lease that does not timely file a Cure Objection is deemed to consent to, and shall be bound by, the proposed Cure Amount as set forth in the Assumed Contracts and Leases Schedule.

### D. DOH Regulatory Approval of the Sale of the Behavioral Health Assets

44. The transfer of Behavioral Health Assets to the Purchaser requires approval from the DOH. <u>See</u> N.Y. Pub. Health Law § 2801-a, et seq. In accordance with sections 2801-a, et seq. of the New York Public Health Law, an applicant proposing to operate a hospital must make a written application (the "**DOH Application**") to the Commissioner of the DOH (the "**Commissioner**"). The Commissioner will not act on the DOH Application until it is approved by OMH, OASAS, the relevant health systems agency, the State Hospital Review and Planning Council and the Public Health Council. The Commissioner will only approve an application if it is satisfied as to: (a) the public need for the hospital; (b) the character, competence and standing in the community of the proposed owners or operators; (c) the financial

resources of the hospital and its sources of future revenues; and (d) such other matters as it shall deem pertinent. <u>See</u> N.Y. Pub. Health § 2801-a.[16]

45.     The Purchaser has already submitted the DOH Application, consulted with the Debtors prior to the submission of the DOH Application, and provided to the Debtors a copy the DOH Application.  The Purchaser and the Debtors have also initiated informal discussions with DOH concerning the DOH Application and have commenced preparation of all other applications for any other healthcare regulatory consents of any other governmental bodies required on the part of the Purchaser in order for Purchaser to consummate the sale and to operate the Behavioral Health Assets in accordance with applicable law (collectively with the CON Application, the "**Healthcare Applications**").  The Purchaser has agreed to use best efforts to prosecute the Healthcare Applications and to timely submit all information and documents requested in connection therewith by DOH and any other governmental body.

46.     In addition, the DOH, OMH and OASAS have repeatedly indicated their strenuous objection to any closure of the Debtors' various inpatient and outpatient behavioral health programs and indeed have taken substantive steps to encourage, expedite and facilitate the transfer of St. Vincent's Westchester and its related programs and services as a whole to a qualified purchaser.  As stated above, because of certain federal regulations, a purchaser of the Behavioral Health Assets must (i) be an Article 28 licensed acute care hospital (or it could not service Medicaid adults age 21 through 65), and (ii) be able to obtain all State Healthcare Approvals in hand by the end of October 2010 so that CMS can survey the facility as provider-based before year end. Failing this, the purchaser of the behavioral health programs would be

---

[16] While the Debtors recognize that certain aspects of the sale may require regulatory approvals under applicable state law, the Debtors reserve the right to contend that any specific criteria of such approval is preempted by the Bankruptcy Code and subject to this Court's jurisdiction. Nothing herein or in the participation of the Debtors in the state approval process constitutes a waiver of such right.

reimbursed for services at a substantially lower rate for the entirety of 2011, thereby risking that such purchaser would not be financially feasible to operate the programs, which, in turn, would compel closure of the programs.

47.     When St. Joseph's was identified as the *only* willing qualified purchaser, DOH, OMH and OASAS readily agreed to fast track the approval process whereby St. Joseph's would immediately submit the DOH Application (and other relevant Healthcare Applications) and DOH, OMH and OASAS would expedite their review of these applications and move to get this matter on the calendars of the two (2) necessary councils by the end of September.  If this ambitious calendar proves not to be feasible, the DOH has indicated that it will issue an emergency approval to the Purchaser as an alternative.  This aggressive and highly unusual approach underscores how vital this facility is to meeting the healthcare needs of the community. Because of substantial transfer issues and psychiatric bed shortages and insufficiency of a myriad of outpatient behavioral health services, the closure of St. Vincent's Westchester would result in a healthcare crisis.

### E.  The Real Estate Option Purchase Agreement

48.     Below is a summary of the material provisions of the Real Estate Option Purchase Agreement.  The summary is intended solely to give the Court and interested parties an overview of the material terms of the Real Estate Option Purchase Agreement.  Interested parties should refer to the Real Estate Option Purchase Agreement for the complete terms thereof.[17]

> (a)     Purchase Price.  The purchase price to be paid by the Purchaser to the Debtors for the Real Estate Option is $5 million.

---

[17] To the extent there are any inconsistencies between the summary description of the Option Purchase Agreement contained herein and the terms and conditions of the Option Purchase Agreement, the terms of the Option Purchase Agreement control.  Capitalized terms contained in the summary description of the Option Purchase Agreement that are not defined in this Motion shall have the meanings ascribed to them in the Option Purchase Agreement.

(b)     <u>Deposit</u>. The Purchaser shall deposit $250,000 upon execution of the Real Estate Option Purchase Agreement and $4,750,000 on the closing of the APA.

(c)     <u>The Real Estate Option Expiration Date</u>. The Real Estate Option Expiration Date is August 18, 2013, which is three years from the date of execution of the APA. If the Real Estate Option is not exercised by such date or a subdivision is not effectuated, the Real Estate Option is null and void and shall be of no force.

(d)     <u>Representations and Warranties</u>. SVCMC provides customary representations and warranties related to the Real Estate Option, including representations related to consents and approvals.

(e)     <u>Bankruptcy Approval</u>. The sale is conditioned upon entry of an order of the Court authorizing the sale of the Real Estate Option free and clear of liens, encumbrances, pledges, mortgages, deeds of trust, security interests, claims, leases, charges, options, rights of first refusal, easements, servitudes, proxies, voting trusts or agreements, and transfer restrictions under any agreement.

49.     The Real Estate Option Purchase Agreement permits the Debtors' consideration of higher or otherwise better competing bids (each a "**Competing Bid**") pursuant to the Bidding Procedures. In consideration of the Purchaser having expended considerable time and money in negotiating the Real Estate Option Purchase Agreement and its commitment to escrow the entire purchase price ($5 million) at the closing under the APA (which will be far in advance of the auction of the Real Estate Option), the Real Estate Option Purchase Agreement provides that upon consummation of a transaction resulting from a Competing Bid, the Debtors will pay the Purchaser a fee equal to the sum of (a) $100,000.00; (b) the reasonable out-of-pocket operating costs incurred by Purchaser in connection with the maintenance and ownership of the Undeveloped Real Property from the closing of the Behavioral Health Services Sale Transaction until the closing of the Real Estate Option Sale Transaction (the "**Operating Costs**"); and (c) the commercially reasonable borrowing expenses actually paid by Purchaser for the amounts borrowed to fund the Real Estate Option Purchase Price from the closing of the Behavioral

Health Services Sale Transaction until the closing of the Real Estate Option Sale Transaction (the "**Cost of Capital**", collectively, the sum of (a), (b), (c), the "**Break-Up Fee**").  The Break-Up Fee will only be payable upon consummation of a sale resulting from a Competing Bid and solely from the proceeds of a transaction resulting from a Competing Bid.

### F.  Proposed Bidding Procedures for the Auction of Real Estate Option

50.    The Debtors seek entry of the Bidding Procedures Order and approval of the Bidding Procedures to ensure that there is an opportunity to seek additional value for the Real Estate Option.  The following is a summary of certain provisions of the Bidding Procedures pertaining to the solicitation of Competing Bids and the conduct of the Auction:[18]

(a)    <u>Qualification of Bids and Bidders</u>.  In order to participate in the bidding process and to have a bid considered by the Debtors, each potential bidder must deliver a written offer or group of offers satisfying the below criteria.  A "**Qualified Bidder**" is a potential bidder that delivers a binding bid that, in the Debtors' discretion (after consultation with GE Capital, Sun Life, the MedMal Trusts and the Committee), satisfies certain requirements set forth in the Bidding Procedures.

(b)    <u>Minimum Bid</u>.  The amount of the purchase price in such bid must provide for net cash (or cash equivalent) that is at least $100,000 more than the purchase price contained in the Real Estate Option Purchase Agreement <u>plus</u> the amount of the Break-Up Fee (the "**Minimum Bid**").

(c)    <u>Deposit</u>. A potential bidder must deposit $250,000 as set forth in the Real Estate Option Purchase Agreement with an escrow agent selected by the Debtors (the "**Deposit Agent**") in the form of a certified check or wire transfer at least three business days before the Auction (the "**Deposit**").

(d)    <u>Auction</u>.  The Debtors have until June 30, 2011 to complete the auction process and close on a competing bid.  In the event that the Debtors timely receive more than one Qualified Bid, the Debtors

---

[18] To the extent that there are any inconsistencies between the summary description of the Bidding Procedures contained herein and (i) the terms and conditions of the Option Purchase Agreement and/or (ii) the Bidding Procedures, the terms of the Bidding Procedures control.

shall conduct the Auction with respect to the Assets. The date of the Auction will be designated by the Debtors (after consultation with GE Capital, Sun Life, the MedMal Trusts, and the Committee), and the Debtors shall provide at least four weeks prior notice of such date.[19] The Auction will take place at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036. The Debtors retain their discretion (after consultation with GE Capital, Sun Life, the MedMal Trusts and the Committee), to conduct the Auction (i) *openly* with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid, or (ii) though the submission of *closed* bids with the results being announced at the conclusion of the Auction.

(e)     Bidding.  In the event of an "open" (e.g., outcry bidding) auction, bidding at the Auction shall commence at the amount of the highest or otherwise best Qualified Bid submitted prior to the Auction; Qualified Bidders may then submit successive bids in increments of $50,000 (the "**Bid Increment**"); provided, however, that the Debtors shall retain the right (after consultation with GE Capital, Sun Life, the MedMal Trusts and the Committee), to modify the Bid Increment at the Auction.  The Bid Increment need not apply in the event of a "closed" auction process.

(f)     Higher or Better.  The Debtors reserve the right, in their discretion (after consultation with GE Capital, Sun Life, the MedMal Trusts and the Committee) to determine whether any bid is better, if not higher, than another bid submitted during the Auction.  The Debtors may consider a variety of factors in making this decision, including without limitation, the ability of a Successful Bidder to obtain the necessary regulatory approvals, any proposed conditions to closing, and timing of any closure of the proposed transaction.

(g)     Successful Bid.  The Auction shall continue until the Debtors determine, in their discretion (after consultation with GE Capital, Sun Life, the MedMal Trusts and the Committee), and subject to Court approval, that one offer is the highest or otherwise best offer from among the Qualified Bids submitted at the Auction (the "**Successful Bid**").  Subject to Court approval, the bidder submitting such Successful Bid shall become the "**Successful Bidder**," and shall have such rights and responsibilities of the

---

[19] Because the Auction process needs to be completed nearly ten months from now, the Debtors believe that there is time to set the specific Auction date.

Purchaser, as set forth in the Real Estate Option Purchase Agreement.

(h)    <u>Backup Bid</u>.  At the conclusion of the Auction, the Debtors reserve the right to announce the second highest or otherwise best bid from among the Qualified Bids submitted at the Auction (the "**Backup Bid**").  The bidder submitting such Backup Bid shall become the "**Backup Bidder**," and shall have such rights and responsibilities of the Purchaser, as set forth in the Real Estate Option Purchase Agreement.  The Backup Bid shall remain open and irrevocable until one business day following the closing of the sale to the Successful Bidder.

### G.  <u>Notice of the Auction and Sale of the Real Estate Option</u>

51.    No later than a month prior to the Auction, the Debtors will serve copies of the Bidding Procedures, the Bidding Procedures Order, and the Auction and Real Estate Option Sale Hearing Notice on the following parties (collectively, the "**Notice Parties**"): (a) all potential purchasers for the Real Estate Option identified by the Debtors or their agents; (b) the United States Trustee for the Southern District of New York; (c) the Debtors' material prepetition and postpetition secured lenders or any agent therefor; (d) the Office of the United States Attorney; (e) the Office of New York State Attorney General; (f) the New York State Department of Health; (g) the Internal Revenue Service; (h) the Creditors' Committee; (i) the United States Attorney General; (j) the United States Department of Health and Human Services; (k) the parties-in-interest who have requested notice pursuant to Bankruptcy Rule 2002; and (l) all parties known to the Debtors to have or assert an interest in the Real Estate Option.

### H.  <u>Objections to the Sale of the Real Estate Option</u>

52.    The Debtors propose that objections, if any, to entry of the Real Estate Option Sale Order and any filed supplements thereto, must: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP and Garfunkel Wild,

P.C.; (b) counsel for the Creditors' Committee, c/o Akin Gump Strauss Hauer & Feld LLP; (c) counsel to Secured Creditors, General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP; (d) Sun Life Assurance Company of Canada c/o Kelley Drye & Warren LLP; (e) MedMal Trust Monitor, c/o Cooley LLP; (f) the Office of the United States Trustee for the Southern District of New York; (e) the Consumer Privacy Ombudsman, Alan Chapell & Associates LLC; (f) counsel to the Patient Care Ombudsman, Neubert, Pepe & Montieth, P.C.; and (g) counsel to the Purchaser, Nixon Peabody LLP by a date to be determined prior to the hearing on the Motion.

53.     In the event the Debtors choose a Successful Bidder other than the Purchaser at the Auction, the Debtors propose the Objection Deadline solely with respect to the Debtors' choice of such alternative Successful Bidder will be extended accordingly.

### I.  The Proposed Hearing on the Sale of the Real Estate Option

54.     The Successful Bid and the Backup Bid will be subject to entry of the Real Estate Option Sale Order after the Real Estate Option Sale Hearing.  The Real Estate Option Sale Hearing may be adjourned from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court.  Upon approval of the Backup Bid by the Court, the Backup Bid shall remain open and irrevocable until the consummation of the Successful Bid.

### VI.  RELIEF REQUESTED

55.     By this Motion, the Debtors respectfully request the entry of three orders related to the transfer of the Behavioral Health Assets.

56.     First, the Debtors respectfully request the entry of the Behavioral Health Services Sale Order to (a) approve the transfer and Sale of the Behavioral Health Assets to St. Joseph's free and clear of liens, claims, encumbrances, and other interests, including successor

liability and (b) authorize the assumption and assignment of the Assumed Contracts and Leases to St. Joseph's.[20]

57.     Second, the Debtors seek entry of the Bidding Procedures Order, which approves (i) the Bidding Procedures by which the Debtors will solicit and consider additional bids for the Real Estate Option; (ii) the conduct of the Auction in the event the Debtors receive more than one bid; (iii) the scheduling of the Real Estate Option Sale Hearing to approve the sale of the Real Estate Option to the Successful Bidder (defined below); and (iv) the form of the Auction and Real Estate Option Sale Hearing Notice.

58.     Third, in order to effectuate the sale of the Real Estate Option to the Successful Bidder (defined below), the Debtors seek entry of the Real Estate Option Sale Order to approve the conveyance of the Real Estate Option to the Successful Bidder.

## VII.  EXTRAORDINARY PROVISIONS IN THE PROPOSED SALE OF THE BEHAVIORAL HEALTH ASSETS AND THE AUCTION AND SALE OF THE REAL ESTATE OPTION

59.     Pursuant to General Order M-383 of the United States Bankruptcy Court for the Southern District of New York, dated November 18, 2009, establishing this Court's Guidelines for the Conduct of Asset Sales, the Debtors are required to highlight any "extraordinary provisions" in a separate section of a motion seeking to sell estate assets.  The extraordinary provisions are as follows:

(a)     Use of Proceeds. Under the APA, the Sale Order provides that liens existing on the Behavioral Health Assets will attach to the net proceeds of the sale after taking into account the costs of the sale. In addition, under the Real Estate Option Purchase Agreement, proceeds from a sale pursuant to a Competing Bid will be used to

---

[20] Any contracts not being assumed and assigned to St. Joseph's will be rejected in the ordinary course of the Debtors' business and pursuant to the procedures set forth in the Order Establishing Procedures for the Rejection of Executory Contracts and Unexpired Leases dated May 27, 2010.

pay the Break-Up Fee. The Real Estate Option Sale Order also provides that liens existing on the Undeveloped Real Property will attach to the net proceeds of the sale of the Real Estate Option.

(b)  Relief from Bankruptcy Rule 6004(h). The proposed form of Behavioral Health Assets Sale Order and the Real Estate Option Sale Order contain a waiver of the stay imposed by Bankruptcy rule 6004(h). The Debtors submit that such relief is appropriate under the circumstances.

(c)  Relief from Bankruptcy Rule 6006(f). The proposed form of Behavioral Health Assets Sale Order contains a waiver of the limits on the number of contracts or leases that may be assumed in one motion imposed by Rule 6006(f). The Debtors will be serving notices with no more than 100 contracts or leases attached. However, out of an abundance of caution, the Debtors simultaneously request the waiver.

(d)  Successor Liability. The proposed form of Sale Order contains findings and provisions limiting the Purchaser's successor liability. The Debtors believe that a finding that the sale can be made free and clear of successor liability claims in the Sale Order complies with applicable principles of sales free and clear of successor liability claims pursuant to section 363(f) of the Bankruptcy Code and applicable non-bankruptcy law. In addition, the Debtors are providing notice of the sale as set forth herein (including publication notice).

## VIII.  BASIS FOR RELIEF REQUESTED

### A.  The Sale of the Behavioral Health Assets

*(i)  The Sale of the Behavioral Health Assets in a Private Sale Should Be Approved*

60.  Section 363(b) of the Bankruptcy Code governs transactions outside the ordinary course of business involving property of the debtors' estates. Specifically, that section provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate..." 11 U.S.C. § 363(b). The Debtors' sale or use of property of the estates outside the ordinary course of business should be approved by the Court if the Debtors can demonstrate a sound business justification for the proposed transaction. See In re Chrysler LLC, 576 F.3d 108, 117-18 (2d Cir. 2009), citing In re

<u>Iridium Operating LLC</u>, 478 F.3d 452, 466 (2d Cir. 2007) ("In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.'" (citing <u>Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063, 1071 (2d Cir. 1983)); <u>see also</u> <u>In re Gen. Motors Corp.</u>, 407 B.R. 463, 494-5 (Bankr. S.D.N.Y. 2009) (noting that sales under § 363(b) are "commonly" approved subject to the business judgment rule).

61.     Section 105(a) of the Bankruptcy Code grants the Court the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  This provision is "the basis for a broad exercise of power [by the Court] in the administration of a bankruptcy case."  2 <u>Collier on Bankruptcy</u> ¶ 105.01 (Lawrence P. King, et al. eds., 15th ed. rev. rel. 2000).

62.     Here, the sale of the Behavioral Health Assets as a going concern in a private transaction with St. Joseph's is in the best interests of the Debtors' creditors and the estates.

63.     First, St. Joseph's offered the highest total consideration ($18 million in cash and approximately $5 million in assumed liabilities)[21] for the Behavioral Health Assets and is the only viable purchaser for the Behavioral Health Assets after an extensive marketing process.  Prior to selecting St. Joseph's, the Debtors contacted approximately 25 potential purchasers and assisted 12 potential purchasers in conducting due diligence in connection with a

---

[21] The assumed liabilities include $2.9 million in severance obligations, $1.8 million in paid time off, and certain pension obligations.  In addition to these employee-related obligations, St. Joseph's will be taking certain real property of the Debtors (other than the Westchester Real Property) subject to mortgages in favor of various state agencies securing approximately $22.6 million in debt.  Certain of these mortgages are non-recourse.

sale of the Behavioral Health Assets. St. Joseph's emerged as the only interested purchaser with an Article 28 license and the desire and ability to move in an accelerated fashion. In the Debtors' business judgment there is virtually no chance that further marketing of the behavioral health assets will lead to a higher or better offer. As noted, the failure to complete this transaction by October 2010 (including the CMS survey) will effectively preclude the sale of the Behavioral Health Assets to St. Joseph's. As a practical matter, no other party could enter the process at this time and successfully complete it on this ambitious timeline. As such, further marketing of the Behavioral Health assets will only waste estate assets and could possibly jeopardize the current transaction with St. Joseph's.

64. Second, St. Joseph's will be offering employment to all of the Debtors' employees in the behavioral health business and assuming the Debtors' collective bargaining agreement in connection therewith. Thus, the sale to St. Joseph's will preserve the employment of over 900 employees and eliminate potentially substantial claims that would be asserted from the termination of the employees.

65. Third, the sale to St. Joseph's will ensure the continuation of all of the Debtors' critical inpatient and outpatient behavioral health services. As noted above, St. Vincent's Westchester provides critical mental health care and substance abuse services to thousands of patients on an inpatient and outpatient basis. In evaluating its business judgment to proceed with the sale to St. Joseph's, the Debtors – and this Court – are entitled to consider the important health care mission being preserved by this going concern sale. In United Healthcare System, the court was required to give credence to the potential prevailing public health emergency that would result if the pediatric hospital had been sold solely to a purchaser offering only the highest price, as opposed to the best use. See In re United Healthcare System, Inc., Civ.

No. 97-1159, 1997 U.S. Dist. LEXIS 5090, *17-18 (D.N.J. Mar. 26, 1997).  In reversing the decision of the bankruptcy court to select the higher bidder (as opposed to the bidder selected by the debtors and the regulatory agency), the district court held that the bankruptcy court could not substitute its judgment for the expertise of the state health commissioner, who worked closely on the preservation of the pediatric health care services as a group and provided significant funding to support its views.  Id. at *20-21.  "Courts are not experts in public health and safety issues and this Court bows to the knowledge of the Commissioner in those areas.  If the Commissioner felt that there was a public need for the Children's Hospital to be operated as a unit in northern New Jersey, federal courts should accept it as such."  Id. at *21.  These words ring equally true here – there is a public need to preserve Debtors' behavioral health care services.  New York State, including DOH and OMH, are in support of the sale of the Behavioral Health Assets to St. Joseph's and that judgment should be respected for the health and safety of patients.

66.     Fourth, a sale of the Behavioral Health Assets as a going concern is the only feasible option for the transfer of the Behavioral Health Assets given that closure of the behavioral health programs will generate substantial administrative costs and will be actively opposed by numerous state regulatory agencies.  It could take 6 to 9 months to proceed with an approved closure plan of St. Vincent's Westchester and transfer all of the inpatient and outpatient services.  During this time, the Debtors would still need to continue to operate at considerable expense to their chapter 11 estates.  The Debtors estimate that it will cost approximately $16 million to close St. Vincent's Westchester and the related behavioral health programs.  The absence of nearby available other facilities to "absorb" the inpatient and outpatient services of St. Vincent's Westchester would only exacerbate the delays and costs to the estates and underscores the health care crisis that would ensue in New York State – one of

the very reasons why New York State has worked so closely and cooperatively with both the Debtors and St. Joseph's to preserve and transfer these health care services.

67. In addition, the Debtors believe that it would be unlikely (if not impossible) to obtain the necessary approval of the numerous state regulatory agencies for closure in the face of a viable alternative that allows for the going concern transfer of these health care services to St. Joseph's. A closure of St. Vincent's Westchester and its related services would leave many of these patients with no continued care. The state agencies charged with regulatory oversight of the facility – the OMH and the OASAS – made it clear to the Debtors that closure of St. Vincent's Westchester would be opposed. Attempting to close the facility when there is a viable Purchaser and in the face of opposition from these state regulatory agencies would be foolhardy. St. Joseph's is an operator acceptable to the State of New York and willing to commit to continuing the critical care services presently being operated. The DOH has stated that it would consider St. Joseph's DOH Application on an expedited basis and issue an emergency CON, if necessary, to protect patient care.

68. Lastly, St. Joseph's agreed to a subdivision of the Westchester Real Property and the creation and marketing of the Real Estate Option to maximize the value of the Undeveloped Real Property. This represents the best way (in the Debtors' business judgment) to balance the legitimate interests of the Debtors' patients, numerous state agencies, the Debtors' financial ability, GE Capital, Sun Life and the MedMal Trusts.

69. In sum, given (i) the thorough marketing of the Behavioral Health Assets, (ii) the substantial consideration ($18 million in cash and approximately $5 million in assumed liabilities) for the Behavioral Health Assets being offered by the Purchaser; (iii) the Purchaser's willingness to promptly consummate the sale on an "as is, where is" basis; (iv) the substantial

risk to the Debtors' patients that would result from the closure of St. Vincent's Westchester, (v) the stated opposition of numerous state agencies to the closure of St. Vincent's Westchester, and (vi) St. Joseph's agreement to grant the Debtors the Real Estate Option to purchase the Undeveloped Real Property for $1.00 and enter into the Real Estate Option Purchase Agreement, the Debtors submit that the sale of the Behavioral Health Assets to St. Joseph's is fair, reasonable, and in the best interests of the Debtors' estates.

*(ii) The Behavioral Health Assets Should Be Sold Free and Clear*

70.     Pursuant to the APA, the Debtors request that the Court authorize the sale of the Behavioral Health Assets free and clear of all interests, other than the "Permitted Liens" described in the APA.  Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property under section 363(b) of the Bankruptcy Code free and clear of liens, claims and encumbrances if one of the following conditions is satisfied:

1.  applicable nonbankruptcy law permits sale of such property free and clear of such interest;

2.  the entity holding the lien, claim or encumbrance consents to the sale;

3.  the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property;

4.  the interest is in bona fide dispute; or

5.  the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See In re Smart World Tech., LLC, 423 F.3d 166, 169 n.3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests. . . It thus allows purchasers. . . to acquire assets [from a debtor] without any accompanying liabilities."); In re Dundee Equity Corp., No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned

may occur if any one of the conditions of § 363(f) have been met.")

71.     Any entity holding interests in the Behavioral Health Assets will have received notice of this Motion.  Thus, section 363(f)(2) of the Bankruptcy Code is satisfied as to those parties that consent or do not object to the proposed sale.  Here, all parties-in-interest will be given sufficient opportunity to object to the relief requested in this Motion, and any such entity that does not object to the sale should be deemed to have consented.  See Futuresource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided, of course, there is notice) counts as consent. . . It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); In re Enron Corp., 2004 WL 5361245 at *2 (Bankr. S.D.N.Y. 2004) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).  As such, to the extent that no party holding an interest objects to the relief requested in this Motion, the sale of the Behavioral Health Assets free and clear of all interests except the Permitted Liens satisfies section 363(f)(2) of the Bankruptcy Code.

72.     Section 363(f)(3) of the Bankruptcy Code is satisfied because the price at which the Debtors' property is to be sold is greater than the economic value of the liens on the Behavioral Health Assets.  While the face value of the liens asserted against the Behavioral

Health Assets exceeds the Purchase Price currently offered by the Purchaser, the economic value of the Behavioral Health Assets has been determined by the market prior to the entry of the APA. A sale can be made free and clear of any liens pursuant to section 363(f)(3) of the Bankruptcy Code so long as the purchase price exceeds "the aggregate value of all liens on such property." While the interpretation of section 363(f)(3) has produced some division in the courts, this Court has adopted the better-reasoned view that the "aggregate value of all liens" means the actual economic value placed on the liens – not the face amount of the liens. In re Levitz Home Furnishings, Inc., No. 05-45189 (BRL) (Bankr. S.D.N.Y. Dec. 14, 2005) (rejecting creditor's "face value" argument, finding requirements of section 363(f) satisfied and interest of secured creditors adequately protected by attachment of their liens to sales proceeds); In re Oneida Lake Dev., Inc., 114 B.R. 352, 356-57 (Bankr. N.D.N.Y. 1990) (value and not amount of liens is what the court must look at in applying section 363(f)(3)). Here, the value offered under the APA is greater than the amount offered by any other party-in-interest after extensive marketing efforts to secure a purchaser with an Article 28 license to continue the Behavioral Health Assets without disruption to the inpatient and outpatient behavioral health care provided. See In re United Healthcare Sys., Inc., 1997 U.S. Dist. LEXIS 5090, *1 (D.N.J. Mar. 26 1997) (holding that decision by debtor to sell medical assets cannot ignore the public interest in health services and focus solely on value). Accordingly, section 363(f)(3) is satisfied.

73. Lastly, section 363(f)(5) of the Bankruptcy Code is also satisfied. Any entity holding an interest in the Behavioral Health Assets not included in the Permitted Liens could be compelled to accept a monetary satisfaction of its interest. Furthermore, the Debtors propose that any interest in the Behavioral Health Assets that is not included in the Permitted Liens shall attach to the net proceeds of the sale of those Assets subject to any claims and

defenses the Debtors may possess with respect thereto, in the priority they had before the sale. As such, the sale of the Behavioral Health Assets free and clear of all interests other than Permitted Liens satisfies section 363(f)(5) of the Bankruptcy Code.

74.     The Debtors do not believe that there are any liens held or asserted on the Behavioral Health Assets other than Permitted Liens, the Prepetition Senior Lien, the Real Estate Liens, and the DIP Agent Lien.  The Debtors anticipate that they will receive consent to the sale from the holders of the Real Estate Liens, the Prepetition Senior Lien and the holder of the DIP Agent Lien.

### (iii) *The Behavioral Health Assets Should be Sold Free and Clear of any Successor Liability Claims*

75.     The Debtors seek to sell the Behavioral Health Assets free and clear of any successor liability claims.  Notwithstanding reference to the conveyance free and clear of "any interest" in section 363(f), that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims, as well.  See, e.g., In re Gen. Motors Corp. (n/k/a Motors Liquidation Corp.), Case No. 09-50026 (REG) (Bankr. S.D.N.Y. Jul. 5, 2009) (authorizing sale of assets free and clear of successor liability claims); In re Old Carco LLC (f/k/a/ Chrysler LLC), Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Jun. 1, 2009) (same); see also In re Trans World Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program).

76.     Here, the sale is dependent on the ability of the Debtors to transfer free and clear from successor liability.  The transfer of the Behavioral Health Assets free and clear of successor liability claims is a critical inducement for the Purchaser to enter into the Behavioral Health Services Sale Transaction.  See Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d

380, 387 (2d Cir. 1997) (stating that a sale pursuant to § 363 of the Bankruptcy Code "maximizes the purchase price of assets because without this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property").

77.     Furthermore, pursuant to New York law and traditional common law, a purchaser of another company's assets will be found to be liable for the seller's liabilities only where (i) the successor expressly or impliedly assumes the predecessor's tort liability, (ii) the seller and purchaser merged or otherwise consolidated, (iii) the purchaser is a mere continuation of the seller, or (iv) the transaction is fraudulent.  See N.Y. v. Nat'l Serv. Indus., Inc., 460 F.3d 201, 209 (2d Cir. 2006).  Because none of these circumstances apply to the Behavioral Health Services Sale Transaction, a finding by the Court that the transfer is free and clear of any successor liability claims is proper.  See Douglas v. Stamco, Case No. 09-1390-cv, 2010 WL 337043 (2d Cir. Feb. 1, 2010) (holding that sale pursuant to section 363 extinguished successor liability claims where there was no (i) assumption of such liability, (ii) merger of the parties, (iii) mere continuation of the seller, or (iv) fraud).

78.     Accordingly, the Behavioral Health Assets should be transferred to the Purchaser free and clear of all liens, claims, encumbrances and other interests, including rights or claims based on any successor liability, except for the Assumed Liabilities.

### (iv)    *The Purchaser is a Good Faith Purchaser*

79.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) was later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)]. . . does not affect the validity of a sale. . . to an entity that

> purchased. . . such property in good faith, whether
> or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale. . .
> were stayed pending appeal."

See Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m). . .

provides that good faith transfers of property will not be affected by the reversal or modification

on appeal of an unstayed order, whether or not the transferee knew of the pendency of the

appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("[P]ursuant to 11

U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless

there is a stay pending appeal.").

       80.    Although the Bankruptcy Code does not define "good faith," the Second

Circuit, in In re Gucci, has held:

> Good faith of a purchaser is shown by the integrity
> of his conduct during the course of the sale
> proceedings; where there is a lack of such integrity,
> a good faith finding may not be made. A
> purchaser's good faith is lost by "fraud, collusion
> between the purchaser and other bidders or the
> trustee, or an attempt to take grossly unfair
> advantage of other bidders."

126 F.3d at 390 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)

(interpreting Bankruptcy Rule 805, the precursor of section 363(m) of the Bankruptcy Code));

see also Bace v. Babbitt, No. 07 Civ. 2420 (WHP), 2008 WL 800579, at *3 (S.D.N.Y. Mar. 25,

2008) (same; quoting Gucci).

       81.    The Second Circuit has indicated that a party would have to show fraud or

collusion between a buyer and the debtor-in-possession or trustee in order to demonstrate a lack

of good faith.  See Kabro Assocs. of West Islip, LLC, v. Colony Hill Assocs. (In re Colony Hill

Assocs.), 111 F.3d 269, 276, (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a

purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser

and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders");

see also In re Angelika Films 57th, Inc., Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997

WL 283412, at *7 (S.D.N.Y. 1997); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

82.     Here, St. Joseph's – which is not an "insider" of the Debtors under section

101(31) of the Bankruptcy Code – and the Debtors, have satisfied the requirements of section

363(m).  The APA is the result of extended arm's-length, good faith negotiations between the

Debtors and St. Joseph's, each represented by their respective professionals.  Accordingly, St.

Joseph's is a "good-faith" purchaser within the meaning of section 363(m) of the Bankruptcy

Code and should be entitled to its protection.  Therefore, the Debtors request that the Court make

a finding that St. Joseph's is entitled to the protections of section 363(m) of the Bankruptcy

Code.

*(v)  The Sale of the Behavioral Health Assets Complies with Applicable Nonbankruptcy Law*

83.     Sections 363(d) and 541(f) of the Bankruptcy Code require that the

transfer of property by a not-for-profit corporation comply with applicable nonbankruptcy law

governing such a transfer.  Specifically, section 363(d) provides that "[t]he trustee may use, sell

or lease property under subsection (b) or (c) of this section only – (1) in accordance with

applicable nonbankruptcy law that governs the transfer of property by a corporation that is not a

moneyed, business or commercial corporation. . ."  Section 541(f) further provides that "property

that is held by a debtor that is a corporation described in section 501(c)(3) of the Internal

Revenue Code of 1986 and exempt from tax under section 501(a) of such Code may be

transferred to an entity that is not such a corporation, but only under the same conditions as

would apply if the debtor had not filed a case . . ."  Pursuant to section 1221 of the Bankruptcy

Abuse Prevention and Consumer Protection Act of 2005, sections 363(d) and 541(f) of the

Bankruptcy Code are applicable to all cases pending or filed on or after April 20, 2005.

84.     As described above, approval of the transfer of the Behavioral Health Assets requires approval of the DOH, and authorization by the Public Health Council through the Certificate of Need process in addition to the approvals of OMH and OASAS. The Purchaser has provided the Debtors a copy of the CON Application it submitted and will consult with the Debtors regarding such application and cooperate with the Debtors in initiating informal discussions with DOH concerning the CON Application. Further, the Purchaser is working diligently to submit to any other governmental body all other applications for any healthcare regulatory consents required on the part of the Purchaser in order for the Purchaser to consummate the sale and to operate the Behavioral Health Assets in accordance with applicable law. The APA also provides that it is enforceable only to the extent permitted by law. The Debtors submit, therefore, that the terms of the APA comply with all applicable not-for-profit laws, including the not-for-profit laws of the State of New York, and applicable federal law. As such, the APA satisfies the requirements of sections 363(d) and 541(f) of the Bankruptcy Code.

85.     In addition, the Debtors are selling substantially all of the assets of Chait and Fort Place. Section 511 of the N-PCL sets forth the substantive requirements for judicial approval, which includes providing notice of the Business Sale Transaction to the New York Attorney General (the "**NY AG**"), a proper party-in-interest for the Motion. N-PCL § 511(a)-(b). Additionally, section 511 of the N-PCL requires "[a] description, with reasonable certainty, of the assets to be sold. . .or a statement that it is proposed to sell. . .all or substantially all the corporate assets . . ., a statement of the fair value of such assets, and the amount of the corporation's debts and liabilities and how secured." N-PCL § 511(a)(4). Courts have interpreted Section 511 of the N-PCL to require a finding that the disposition of substantially all

assets is for consideration that is fair and reasonable.  See In re Application of Society for the Prevention of Cruelty to Animals of Upstate New York, Inc., 2 Misc. 3d 644, 644, 773 N.Y.S.2d 789, 790 (Sup. Ct. Saratoga County 2003).

86.     The sale of the assets of Chait and Fort Place is for fair and reasonable value, as required by the Bankruptcy Code section 363(b), N-PCL 510 and N-PCL 511.  The Behavioral Health Assets are being sold to St. Joseph's without delay of an auction after an exhaustive marketing process to 25 potential purchasers, 12 of whom conducted significant due diligence.  St. Joseph's is the only viable purchaser with an Article 28 operating license while also agreeing to serve as the "stalking horse" for the Real Estate Option.  A private sale is the most prudent way to preserve estate assets, facilitate an orderly transition of patient care without the continued attendant costs of running the Behavioral Health Assets.  All of the net proceeds from this sale will be used to pay the allowed claims of creditors in these cases.  There will be no excess funds available after payment of these allowed claims.

87.     Courts have also interpreted Section 511 of the N-PCL to require the sale is in the best interests of the corporation and its beneficiaries.  See 64th Assocs., L.L.S. v. Manhattan Eye, Ear, and Throat Hosp., 2 N.Y.3d 585, 591, 813 N.E.2d 887, 890 (2004).  The Court "should be guided primarily by whether those ends would be realized in light of conditions prevailing at the time the issue is presented to the court."  Manhattan Theatre Club, Inc. v. Bohemian Benevolent & Literary Ass'n of City of N.Y., 120 Misc. 2d 1094, 1097, 467 N.Y.S.2d 143, 146 (Sup. Ct. N.Y. County 1983).  Here, the Behavioral Health Sale Transaction is in the best interest of the corporation and its beneficiaries.  First, the prevailing conditions are that the Chait and Fort Place are insolvent and, together with their affiliates, are winding up their business affairs through these Chapter 11 Cases. All of the net proceeds from the sale will be

applied to reduce the valid, allowed claims of creditors. Second, the sale not only benefits creditors from a material paydown of debt but, more importantly, benefits patients by providing for continuity of health care services. Failure to approve the sale would likely result in a liquidation of the business and piecemeal disposition of its assets – resulting in potentially lower net sale proceeds and, importantly, negatively affecting patient care. These adverse consequences would not be in the best interest of the corporation and its beneficiaries.

88. In short, the Debtors submit that the standards required by N-PCL are consistent with those of the Bankruptcy Code in evaluating a transaction of this nature. While the Debtors are in the process of submitting a petition to the New York Supreme Court seeking approval of the sale, the Debtors reserve their right to have the Court decide all issues related to the sale, including the Debtors' compliance with the N-PCL. Section 1221(e) of BAPCPA explicitly states that "[n]othing in this section shall be construed to require the court in which a case under chapter 11 of title 11, United States Code, is pending to remand or refer any proceeding, issue, or controversy to any other court or to require the approval of any other court for the transfer of property." Pub. L. No. 109-8, § 1221(e) (2005); see also 3 COLLIER ON BANKRUPTCY ¶ 363.04. Accordingly, this Court has the jurisdiction to resolve any issues regarding the Debtors' compliance with N-PCL.

89. In order to obtain the requirements of waiver of notice and a hearing (and thus proceed on an ex parte basis) before the New York state court, the Debtors will serve the notice of this Motion and the sale in the form attached to the Motion as **Exhibit F** (the "**General Creditor Notice**") on all known creditors listed on the schedules of liability for Chait and Fort Place, which are the applicable Debtors that are subject to N-PCL §§ 510 and 511 in connection with the Behavioral Health Services Sale Transaction.

*(vi)* *Debtors Seek a Waiver of Bankruptcy Rule 6006(f)*

90.     For efficiency purposes, the Debtors seek a waiver of Bankruptcy Rule 6006(f) which requires no more than 100 leases to be assumed or rejected in an omnibus motion for such relief.  In this instance, the Debtors are assuming and assigning approximately [300] executory contracts and unexpired leases to St. Joseph's.  Rather than file several, virtually identical and duplicate applications seeking the identical relief in conjunction with the Motion, the Debtors respectfully request this waiver in order to facilitate the same ultimate outcome.

91.     When serving the notices of assumption and assignment, the Debtors will limit the notice to no more than 100 contracts.  Therefore, the Debtors believe they are in compliance with Bankruptcy Rule 6006(f).  However, out of an abundance of caution, the Debtors simultaneously request the waiver.  For the reasons discussed below, the Debtors believe that the assumption and assignment of these contracts and leases should be approved.

*(vii)* *Assumption of Contracts and Leases and the Assignment to the Purchaser Should be Approved*

92.     The "business judgment" test is the standard applied by courts in determining whether an executory contract or unexpired lease should be assumed under section 365(a) of the Bankruptcy Code.  See, e.g., In re Old Carco LLC (f/k/a/ Chrysler LLC), 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009); see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures), 4 F.3d 1095, 1099 (2d Cir. 1993); Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).  A court should approve the assumption of a contract if it finds that a debtor has exercised its sound business judgment in determining that assumption of an agreement is in the best interests of its estate.  See, e.g., Old Carco, 406 B.R. at 196-97; In re Child World, Inc., 142 B.R. 87, 89-90 (Bankr. S.D.N.Y. 1992); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr. S.D.N.Y. 1989); see also Sharon Steel Corp. v. National Fuel Gas

Distrib. Corp (In re Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989).

93.    Assuming and assigning the Assumed Contracts and Leases to the Purchaser is an appropriate exercise of the Debtors' business judgment.  As the Debtors are selling the Behavioral Health Assets, the Assumed Contracts and Leases will no longer have any value to the Debtors.  By assuming and assigning the Assumed Contracts and Leases to the Purchaser, the Debtors' estates will benefit from avoiding the rejection damages claims that would arise from rejecting the Assumed Contracts and Leases.

94.    The Debtors are current on all pre-petition and post-petition payments due to their counterparties with respect to the Assumed Contracts and Leases except for the Cure Amounts.  To the extent that any actual pecuniary losses to the counterparties to the Assumed Contracts and Leases are known to the Debtors, the amount of these losses are included in the Cure Amounts.  Following entry of an order approving the assumption of the Assumed Contracts and Leases, the Purchaser has agreed to promptly pay the Cure Amounts to the contract and lease counterparties, thus fulfilling the requirements outlined in section 365(b)(1)(A) and (B).  The Debtors submit that the payment of the Cure Amounts will fully satisfy the Debtors' obligations to cure outstanding defaults under the Assumed Contracts and Leases, pursuant to section 365(b) of the Bankruptcy Code, and should be approved.

95.    In addition, the Purchaser has sufficient capital and financing commitments to provide adequate assurance of future performance on all the Assumed Contracts and Leases. As noted, St. Joseph's is a financially strong hospital with an operating budget of $115 million.

96.    Therefore, because assuming and assigning the Assumed Contracts and Leases to St. Joseph's avoids the costs of rejecting those executory contracts and unexpired

leases and increases the value to be realized from the sale of the Behavioral Health Assets, assumption and assignment to St. Joseph's of the Assumed Contracts and Leases is clearly an exercise of the Debtors' sound business judgment which warrants approval by this Court.

**B. The Bidding Procedures and Break-Up Fee**

*(i) The Bidding Procedures and Break-Up Fee for the Real Estate Option Should be Approved*

97. The Bidding Procedures, which are standard for the sale of assets in large chapter 11 cases, will ensure that the Debtors' estates receives the greatest benefit available from the sale of the Real Estate Option. The Bidding Procedures have been structured to attract bids for the Real Estate Option while allowing the Debtors the flexibility to select the bid that provides appropriate realizable value to the Debtors' estates. Finally, the Bidding Procedures set out a timeframe that will allow potential purchasers sufficient time to proceed while still providing for the timely sale of the Real Estate Option. The Debtors submit that the Bidding Procedures are reasonable and therefore warrant Court approval.

*(ii) The Break-Up Fee Should Be Approved*

98. The Debtors are also requesting approval of the provisions of the Real Estate Option Purchase Agreement and the Bidding Procedures regarding the Break-Up Fee in the amount of $100,000 (i.e., 2% of the Purchase Price) plus the Operating Costs and the Cost of Capital. The Break-Up Fee is only payable upon consummation of a Competing Bid and solely payable from the proceeds of a sale pursuant to a Competing Bid.

99. The Purchaser required the inclusion of these provisions in the Real Estate Option Purchase Agreement to be willing to serve as a stalking horse bidder. The Purchaser's bid establishes an appropriate floor value for the Real Estate Option. The Purchaser was also amenable to entry into the Real Estate Option Purchase Agreement warranting these Bidding

Procedures and Break-Up Fee in addition to the APA it entered into for the Behavioral Health Assets.

100.    Bankruptcy courts have approved bidding incentives similar to the Break-Up Fee under the "business judgment rule," and such arrangements are presumptively valid provided that (i) the Debtors' decision to agree to the break-up fee is not tainted by bad faith or self-dealing, (ii) the break-up fee does not hamper bidding, and (iii) the amount of the break-up fee is reasonable.  See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656-57 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).  A break-up fee serves as an "incentive payment" offered to an unsuccessful bidder who places the debtor's property in a "sales configuration mode," thereby attracting other bidders to the auction.  Specifically, break-up fees (i) attract or retain a potentially successful bid, (ii) establish a bid standard or minimum for other bidders to follow, and (iii) attract additional bidders.  Integrated Res. at 661-62.

101.    In the instant case, the Break-Up Fee is the product of good faith, arm's-length negotiations between the Debtors and the Purchaser, each of whom was represented by counsel.  The Break-Up Fee provides a material benefit to the estates by enabling the Debtors to obtain the commitment of the Purchaser which has expended money, time and effort formulating and negotiating the Real Estate Option Purchase Agreement, notwithstanding that the Real Estate Option Purchase Agreement is subject to higher or better offers.   In the Debtors' business judgment, the Break-Up Fee is fair and reasonable when considering the time, effort, cost, and expense that the Purchaser has incurred in negotiating the Real Estate Option Purchase Agreement.

102.    Finally, the Break-Up Fee is reasonable in relation to the size of the

proposed sale and under the unique facts and uncertainties of this transaction. The Break-Up Fee is similar to other break-up fees approved in the Southern District of New York in other large chapter 11 cases. See, e.g., In re Cabrini Med. Ctr., Case No. 09-14398 (AJG) (Bankr. S.D.N.Y. Dec. 30, 2009) (approving a break-up fee of 3.75% of $80 million sale); In re Bearingpoint, Inc., No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) (approving a break-up fee of 3% of a $350 million sale). It is also consistent with the break-up fees previously approved by the Court in these Chapter 11 Cases. Moreover, the Break-Up Fee, including the Operating Costs and Cost of Capital, is reasonable in light of the fact that St. Joseph's is committing funds for approximately nine months in order to facilitate a marketing of the Real Estate Option.

*(iii) The Auction and Real Estate Option Sale Hearing Notice Should be Approved*

103. Pursuant to Bankruptcy Rules 2002(c) and 6004, the Debtors are required to give 21 days' notice of any proposed sale of property not in the ordinary course of business. Bankruptcy Rule 2002(c) further provides that such notice must include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale. The Auction and Real Estate Option Sale Hearing Notice sets forth all the information a potential bidder and any other party-in-interest should require about the bidding process for the Real Estate Option, including: notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; the Bid Deadline; the time, date, and location of the Auction; and the time, date, and location of the Real Estate Option Sale Hearing.

104. The Debtors submit that the Auction and Real Estate Option Sale Hearing Notice as provided for herein complies fully with Bankruptcy Rule 2002, Local Bankruptcy Rule 2002-1 and General Order M-331, and constitutes good and adequate notice of the sale and the proceedings with respect thereto. Because the Debtors are providing notice of this Motion, the Debtors submit that the notice requirements of Bankruptcy Rules 2002(2) and 6004 are satisfied.

47

Therefore, the Debtors respectfully request that the Court approve the Auction and Real Estate Option Sale Hearing Notice and the notice procedures proposed above.

### C. The Sale of the Real Estate Option

#### (i) The Sale of the Real Estate Option Should be Approved

105.     A sound business justification exists for the sale of the Real Estate Option because it will allow the Debtors to transfer their Behavioral Health Assets to St. Joseph's, which is able to continue the services seamlessly, while seeking to enhance the value of the Undeveloped Real Property.  The Debtors also believe that the Purchase Price for the Real Estate Option is fair and reasonable.  Any concern that the Debtors may be able to sell the Real Estate Option on better overall terms than those provided for in the Real Estate Option Purchase Agreement should be allayed by the fact that the value of the Real Estate Option Purchase Agreement will be tested through the Bidding Procedures and at the Auction.  As such, the Debtors submit that the sale of the Real Estate Option offers greater financial benefits to the Debtors' estates, and is an exercise of the Debtors' sound business judgment and warrants approval by the Court.

#### (ii) The Real Estate Option Should Be Sold Free and Clear

106.     Based on the legal standard above and pursuant to the Real Estate Option Purchase Agreement, the Debtors request that the Court authorize the sale of the Real Estate Option free and clear of all interests.  Thus, the sale of the Real Estate Option pursuant to the Bidding Procedures will satisfy section 363(f)(1) of the Bankruptcy Code because any entities holding interests in the Real Estate Option will have received notice of this Motion and the Auction and Real Estate Option Sale Hearing Notice.  The Debtors will be able to establish the propriety of any sale under section 363(f) in the event of an objection from a lien holder as part of the sale hearing.

*(iii)* <u>*The Purchaser is a Good Faith Purchaser*</u>

107.  As described above, section 363(m) protects good faith purchaser's interests.  Here, St. Joseph's – which is not an "insider" of the Debtors under section 101(31) of the Bankruptcy Code – and the Debtors, have satisfied the requirements of section 363(m).  The Real Estate Option Purchase Agreement is the result of extended arm's-length, good faith negotiations between the Debtors and St. Joseph's, each represented by their respective professionals.  Accordingly, St. Joseph's is a "good-faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and should be entitled to its protection.  Therefore, the Debtors request that the Court make a finding that St. Joseph's is entitled to the protections of section 363(m) of the Bankruptcy Code.

108.  To the extent that St. Joseph's is not the Successful Bidder at the Auction, the Debtors will seek a finding from the Court at the Real Estate Option Sale Hearing that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code, as well as an identical finding with regard to the Backup Bidder.

*(iv)* <u>*The Sale of the Real Estate Option Complies with Applicable Nonbankruptcy Law*</u>

109.  Sections 363(d) and 541(f) of the Bankruptcy Code require that the transfer of property by a not-for-profit corporation comply with applicable nonbankruptcy law governing such a transfer.  Specifically, section 363(d) provides that "[t]he trustee may use, sell or lease property under subsection (b) or (c) of this section only – (1) in accordance with applicable nonbankruptcy law that governs the transfer of property by a corporation that is not a moneyed, business or commercial corporation..."  Section 541(f) further provides that "property that is held by a debtor that is a corporation described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code may be transferred to an entity that is not such a corporation, but only under the same conditions as

would apply if the debtor had not filed a case . . ."  Pursuant to section 1221 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, sections 363(d) and 541(f) of the Bankruptcy Code are applicable to all cases pending or filed on or after April 20, 2005.

110.     The sale of the Real Estate Option requires the Successful Bidder(s) to seek the subdivision of the Undeveloped Real Property from the Behavioral Health Asset to create a valid, legal tax and zoning lot.  In connection with the application for subdivision, the parties shall grant to the other easements, rights-of-way or any other rights as required by the relevant governmental authorities in order to facilitate the subdivision process.  Because any transaction will require approval under applicable local laws, the Debtors submit that section 363(d) shall be satisfied.[22]

## IX.  WAIVER OF 14-DAY STAY UNDER BANKRUPTCY RULE 6004(h)

111.     Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing a sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of such order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  The Debtors believe that such waiver is appropriate here with respect to the Behavioral Health Services Sale Order and the Real Estate Option Sale Order because all parties that have expressed interest in the Assets will have (i) received notice of this Motion to transfer the Behavioral Health Assets through a private transaction; (ii) received notice of entry of the Bidding Procedures Order for the sale of the Real Estate Option; and (iii) had the opportunity to participate in the Auction at

---

[22] Section 541(f) is not implicated by a sale transaction with St. Joseph's.  The Debtors will address the applicability of this section to a competing bidder if applicable and necessary.

which the Debtors propose to sell the Real Estate Option.

## X. NOTICE

112.    No trustee or examiner has been appointed in these Chapter 11 Cases.  In accordance with the Final Administrative Order Establishing Case Management Procedures (the "**Case Management Order**"), entered on May 13, 2010, notice of this Motion has been given to the parties identified on the General Service List and the Special Service List (as such terms are identified in the Case Management Order).  The Debtors submit that no other notice need be given.

## XI. NO PREVIOUS REQUEST

113.    No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested and such other or further relief as is just.

Dated: New York, New York
       August 25, 2010

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/  Kenneth H. Eckstein
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
*Counsel to the Debtors*