KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel for Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | **:** | Chapter 11 |
| | **:** | |
| SAINT VINCENTS CATHOLIC MEDICAL | **:** | Case No. 10-11963 (CGM) |
| CENTERS OF NEW YORK, <u>et al.</u>, | **:** | |
| | **:** | |
| Debtors. | **:** | Jointly Administered |

------------------------------------------------------------ x

## NOTICE OF AUCTION
## RESULTS IN CONNECTION WITH THE SALE OF THE DEBTORS'
## BISHOP MUGAVERO ASSETS AND PROCEDURES RELATED THERETO

PLEASE TAKE NOTICE THAT:

1.     <u>Introduction</u>.  Saint Vincents Catholic Medical Centers of New York ("**SVCMC**") and certain of its affiliates, as chapter 11 debtors and debtors-in-possession in the above-referenced chapter 11 cases (each a "**Debtor**" and collectively the "**Debtors**"),[1] conducted an auction (the "**Auction**") with respect to the proposed sale (the "**Sale**") of certain real estate assets (the "**Real Property Assets**") and personal property assets (the "**Personal Property Assets**," and with the Real Property Assets, the "**Bishop Mugavero Assets**") related to the Bishop Francis J. Mugavero Center for Geriatric Care, Inc., and assignments of certain contracts and leases related thereto, in accordance with the order (the "**Bidding Procedures Order**") of the Bankruptcy Court of the Southern District of New York (the "**Bankruptcy Court**"), entered on August 20,2010, (a) approving the bidding procedures (the "**Bidding Procedures**"), (b) scheduling the Auction for the Bishop Mugavero Assets and a hearing approving the Sale of the Bishop Mugavero Assets (the "**Sale Hearing**"), and (c) approving certain procedures related to

---

[1]  In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc.  There are certain affiliates of SVCMC who are not Debtors.

the assumption and assignment of those executory contracts and unexpired leases related to the Bishop Mugavero Assets and whose assignment is contemplated by the Sale.

2.  **Auction Results.**  Upon conclusion of the Auction, the Debtors determined, pursuant to the Bidding Procedures and subject to the Bankruptcy Court's approval, that the highest or otherwise best bidder for (i) the Real Property Assets was KFG Land One, LLC and (ii) the Personal Property Assets was KFG Operating I, LLC (collectively, the "**Successful Bidder**") and the second highest or otherwise best bidder was Liebel Rubin (the "**Backup Bidder**").  The asset purchase agreements of the Successful Bidder and the Backup Bidder, as these documents were modified by the Successful Bidder and the Backup Bidder at the Auction (respectively, the "**Successful Bid**" and the "**Backup Bid**") are attached hereto as **Exhibit A-1** and **Exhibit A-2**, respectively.

3. Terms of the Successful Bid.  The following is a summary of the improvement to the terms of the Sale under the Successful bid, as compared to the stalking horse bid approved in the Bidding Procedures Order:

| Contract Term | Successful Bid | Stalking Horse Bid |
|---|---|---|
| **Purchase Price** | $30,767,300.00 | $30,115,000.00 |
| **6% Medicaid Cash Assessment Liability** | Assumed (in an amount not to exceed $69,910.00) | Not Assumed |
| **Medicaid Rate Adjustment Liability** | Assumed up to a cap of $2,910,000.00 | Not Assumed. |
| **PTO Liability** | Assumed without a 75% purchase price adjustment in favor of the Successful Bidder | Assumed subject to a a 75% purchase price credit in favor of the Stalking Horse Bidder |
| **Real Estate Environmental Contingency** | Eliminated | Not Eliminated |
| **Commitment to file CON Application** | 14 days after entry of Sale Order | 45 days after entry of Sale Order |
| **Commitment to Hire Employees** | Commitment to hire all employees meeting objective hiring criteria (as set forth more fully in Section 9.1 of the APA) | No commitment |
| **Medical Records** | Agreement to enter into Medical Records Custody Agreement to retain all medical records that the Debtors' currently maintain under applicable law for past and current patients. | Agreement to enter into Medical Records Custody Agreement limited only to current patient records |

4.  Adequate Assurance of Future Performance.  Attached as **Exhibit B-1** and **Exhibit B-2** hereto is the information with respect to adequate assurance of future performance provided by the Successful Bidder and the Backup Bidder under the Assigned Agreements.

5.  Sale Hearing.  The Bidding Procedures Order provides that the Sale Hearing will be held on **October 7, 2010 at 9:00 a.m. (prevailing Eastern Time)**, before the Honorable Cecelia G. Morris, United States Bankruptcy Judge, in Courtroom 701 at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408.  At the Sale Hearing, the Debtors will request that the Bankruptcy Court enter an order approving the Sale of the Bishop Mugavero Assets to the Successful Bidder.

6.  Adequate Assurance Objection Deadline.  Any interested party that wishes to object to the Successful Bidder's adequate assurance or the Backup Bidder's adequate assurance designated in this Notice, must file a written objection with the Court no later than 4:00 p.m. on September 28, 2010 (the "**Objection Deadline**"), and serve such an objection (each a "**Objection**") on the following parties (collectively, the "**Objection Parties**"): (a) the Debtors, Saint Vincents Catholic Medical Centers of New York, 170 W. 12th Street, Smith Building, 5th Floor, New York, New York 10011, Attn: Scott Davis (Scott.Davis@gt.com); (b) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq. and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021, Attn: Judith Eisen, Esq.; (c) counsel for the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Stephen Kuhn, Esq. and Sarah Link Schultz, Esq.; (d) counsel to Secured Creditors: General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; (e) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; (f) the Successful Bidder, KFG Operating I, LLC, 109-40 Saultell Avenue, Rego Park, NY, 11368, Attention: Abraham Klein; and (g) the Backup Bidder, Liebel Rubin, 1441 59 Street, Brooklyn, New York 11219, so that it is **actually received** by the Objection Deadline.

7.  **To the extent that any interested party does not timely serve (x) an Objection as set forth above, such party will be deemed to have (i) agreed that the Successful Bidder and the Backup Bidder have provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (ii) agreed to the terms of the Sale Order; and (iv) waived any and all objections in connection with items (i) through (ii) hereof.**

8.  A copy of each of the Bidding Procedures Order or any other document referenced herein can be viewed and obtained on the Court's website at https://ecf.nysb.uscourts.gov or (without charge) at http://svcmcrestructuring.com.

Dated: New York, New York
September 22, 2010

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/Adam C. Rogoff
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
*Counsel for Debtors*

# **EXHIBIT A-1**
Successful Bid

**ASSET PURCHASE AGREEMENT**

by and between

**BISHOP FRANCIS J. MUGAVERO
CENTER FOR GERIATRIC CARE, INC.**

and

**KFG OPERATING I, LLC**

Dated as of September 21, 2010

# TABLE OF CONTENTS

ARTICLE I - DEFINITIONS ...............................................................................................2
    Section 1.1 Certain Definitions...................................................................................2
    Section 1.2 Terms Defined Elsewhere in this Agreement ...........................................9
    Section 1.3 Other Definitional and Interpretive Matters. ..........................................10

ARTICLE II - PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES .......12
    Section 2.1 Purchase and Sale of Assets...................................................................12
    Section 2.2 Excluded Assets. ...................................................................................13
    Section 2.3 Assumption of Liabilities.......................................................................15
    Section 2.4 Excluded Liabilities. .............................................................................16
    Section 2.5 Assignment and Cure Amounts. .............................................................17
    Section 2.6 Further Conveyances and Assumptions...................................................17
    Section 2.7 Bulk Sales Laws.....................................................................................18
    Section 2.8 Accounts Receivable..............................................................................18
    Section 2.9 Agreement Regarding Confidentiality of Patient Information ..................19
    Section 2.10 Rate Adjustment Escrow Fund. ............................................................19

ARTICLE III - CONSIDERATION ......................................................................................19
    Section 3.1 Consideration ........................................................................................19
    Section 3.2 Purchase Price Deposit. .........................................................................20
    Section 3.3 Payment of Purchase Price......................................................................20
    Section 3.4 Resident Transition. ...............................................................................21
    Section 3.5 Additional Purchased Assets...................................................................21
Section 3.6 Intentionally Omitted. .................................................................................21

ARTICLE IV - CLOSING AND TERMINATION ..................................................................21
    Section 4.1 Closing Date..........................................................................................21
    Section 4.2 Deliveries by Seller................................................................................22
    Section 4.3 Deliveries by Purchaser .........................................................................22
    Section 4.4 Termination of Agreement......................................................................23
    Section 4.5 Procedure for Termination ......................................................................25
    Section 4.6 Effect of Termination..............................................................................25

ARTICLE V - REPRESENTATIONS AND WARRANTIES OF SELLER................................26
    Section 5.1 Organization and Good Standing.............................................................26
    Section 5.2 Authorization of Agreement ...................................................................26
    Section 5.3 Consents of Third Parties; Contractual Consents. ....................................27
    Section 5.4 Litigation...............................................................................................27
    Section 5.5 Licenses and Governmental Permits........................................................28
    Section 5.6 Intentionally Omitted. ............................................................................28
    Section 5.7 Health Surveys ......................................................................................28
    Section 5.8 Notices .................................................................................................28
    Section 5.9 Financial Statements. .............................................................................28

Section 5.10 Title to Purchased Assets .................................................................28
Section 5.11 Real Property Leases.........................................................................29
Section 5.12 Tangible Personal Property................................................................29
Section 5.13 Intellectual Property..........................................................................29
Section 5.14 Material Contracts..............................................................................29
Section 5.15 Employees; Employee Benefits. .......................................................30
Section 5.16 Employment and Labor.....................................................................30
Section 5.17 Compliance with Laws; Permits. ......................................................30
Section 5.18  Financial Advisors ...........................................................................30
Section 5.19 No Other Representations or Warranties; Schedules.........................31

ARTICLE VI - REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................31
Section 6.1 Organization and Good Standing........................................................31
Section 6.2 Authorization of Agreement ...............................................................31
Section 6.3 Conflicts; Consents of Third Parties...................................................32
Section 6.4 Litigation.............................................................................................33
Section 6.5 Financial Advisors ..............................................................................33
Section 6.6 Healthcare Regulatory Compliance Status. ........................................33
Section 6.7 Acknowledgement Regarding Condition of the Business...................33
Section 6.8 Financing.............................................................................................34
Section 6.9 No Other Representations or Warranties; Schedules...........................34

ARTICLE VII - BANKRUPTCY COURT MATTERS ...............................................34
Section 7.1 Bidding Procedures Order...................................................................34
Section 7.2 Intentionally Omitted. .........................................................................34
Section 7.3 Bankruptcy Court Filings....................................................................35
Section 7.4 Notice of Sale......................................................................................35

ARTICLE VIII - COVENANTS .................................................................................35
Section 8.1 Conveyance.........................................................................................35
Section 8.2 Access to Information ..........................................................................35
Section 8.3 Conduct of the Business Pending the Closing ....................................36
Section 8.4 Satisfaction of Conditions...................................................................37
Section 8.5 Consents; Insurance. ...........................................................................37
Section 8.6 Regulatory Approvals. ........................................................................38
Section 8.7 Further Assurances..............................................................................40
Section 8.8 Confidentiality. ...................................................................................41
Section 8.9 Preservation of Records ......................................................................43
Section 8.10 Publicity ............................................................................................43
Section 8.11 Use of Name ......................................................................................44
Section 8.12 Supplementation and Amendment of Schedules. ..............................44
Section 8.13 Covenant Not to Compete or Solicit.................................................45
Section 8.14 Cooperation.......................................................................................45
Section 8.15 Resident Assets. ................................................................................45
Section 8.16 Indemnification. ................................................................................45
Section 8.17 Purchaser Transition Plan .................................................................46

Section 8.18 Receivership Agreement. ....................................................................................46
Section 8.19 Personal Guaranty of Purchaser Obligations ......................................................47

ARTICLE IX - EMPLOYEES AND EMPLOYEE BENEFITS ...................................................47
Section 9.1 Offers of Employment. ..........................................................................................47
Section 9.2 Employment Terms; Employee Benefits. ...............................................................50

ARTICLE X - CONDITIONS TO CLOSING ...............................................................................49
Section 10.1 Conditions Precedent to Obligations of Purchaser ..............................................49
Section 10.2 Conditions Precedent to Obligations of Seller.....................................................49
Section 10.3 Conditions Precedent to Obligations of Purchaser and Seller. ............................50
Section 10.4 Frustration of Closing Conditions........................................................................50

ARTICLE XI - TAXES ..................................................................................................................51
Section 11.1 Transfer Taxes .....................................................................................................51
Section 11.2 Prorations .............................................................................................................51
Section 11.3 Purchase Price Allocation ...................................................................................51
Section 11.4 Cooperation on Tax Matters. ...............................................................................51

ARTICLE XII - MISCELLANEOUS ............................................................................................52
Section 12.1 Expenses. .............................................................................................................52
Section 12.2 Specific Performance ...........................................................................................52
Section 12.3 Governing Law; Jurisdiction; Consent to Service of Process..............................52
Section 12.4 Waiver of Jury Trial.............................................................................................53
Section 12.5 Entire Agreement; Amendments and Waivers .....................................................53
Section 12.6 Notices .................................................................................................................53
Section 12.7 Invalid Provisions ................................................................................................54
Section 12.8 Binding Effect; Assignment; Successors and Assigns..........................................54
Section 12.9 No Personal Liability ...........................................................................................55
Section 12.10 Execution in Counterparts..................................................................................55
Section 12.11 Survival of Representations, Warranties and Covenants ....................................55

**Exhibits**:

Exhibit A – Bidding Procedures Order
Exhibit B – Form of Sale Order
Exhibit C – Intentionally Omitted
Exhibit D – Form of Medical Records Custody Agreement
Exhibit E – Form of Indemnity Escrow Agreement
Exhibit F – Form of Receiver Agreement – Nursing Home

GWTDOCS 1612340v3

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), is made and entered into as of September 21, 2010, by and between Bishop Francis J Mugavero Center for Geriatric Care, Inc., a New York not-for-profit corporation ("Seller"), and KFG Operating I, LLC, a New York limited liability company ("Purchaser").

## RECITALS

WHEREAS, Seller, along with certain of its Affiliates (collectively, the "Debtors") are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") on April 14, 2010 (the "Petition Date"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 10-11963);

WHEREAS, Seller is entering into this Agreement subject to the approval by the Bankruptcy Court;

WHEREAS, Seller is engaged in the business of owning and operating a licensed 288 bed skilled nursing and residential health care facility under the name Bishop Mugavero (the "Business") at the premises known as 155 Dean Street, Brooklyn, New York 11217 (the "Premises"); and

WHEREAS, Seller's sole member is Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, a New York not-for-profit corporation ("SVCMC"), which entity owns and operates other businesses, which other businesses are not the subject of this Agreement (collectively, the "Other Businesses"); and

WHEREAS, subject to the approval of the Bankruptcy Court, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to, *inter alia*, Sections 105, 363, and 365 of the Bankruptcy Code all of the Purchased Assets and Assumed Liabilities (each, as defined below), all as more specifically provided herein; and

WHEREAS, the Closing (defined below) is contingent upon the closing of the transactions contemplated by the Real Estate Contract (as defined below).

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

GWTDOCS 1612340v3

# ARTICLE I

## DEFINITIONS

Section 1.1      <u>Certain Definitions</u>.

Unless the context otherwise requires or as otherwise defined herein, capitalized terms used in this Agreement shall have the meanings set forth in this <u>Section 1.1</u>:

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Antitrust Laws</u>" means the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, the Donnelly Act, as amended, and the Hart-Scott-Rodino Antitrust Improvements Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, Orders, decrees, administrative or judicial doctrines or other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"<u>Auction</u>" has the meaning ascribed to such term in the Bidding Procedures Order.

"<u>Bidding Procedures Order</u>" means the August 20, 2010 Order of the Bankruptcy Court approving the bidding procedures for the auction of the Purchased Assets, attached to this Agreement as <u>Exhibit A</u>.

"<u>Business Day</u>" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close.

"<u>Closing Effective Date</u>" means the earlier of (a) the Closing Date, or (b) the Receivership Date, if the Receivership Agreement becomes effective in accordance with its term as contemplated by this Agreement.

"<u>CMS</u>" means the Centers for Medicare & Medicaid Services.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>CON Application</u>" means a Certificate of Need application with respect to the Business to be submitted by Purchaser to DoH.

"<u>CON Approval</u>" means the approval by DoH of a CON Application without contingencies or conditions that have not been satisfied, other than contingencies or conditions that may be satisfied in accordance with their terms after the Closing.

"Confidentiality Agreement" means the Confidentiality Agreement between SVCMC and Purchaser dated as of January 18, 2010.

"Contemplated Transactions" means the transactions contemplated by this Agreement.

"Contract" means any written contract, indenture, note, bond, lease, license or other agreement, other than a real property lease, a personal property lease or an Intellectual Property License.

"Copyrights" means all copyrights and registrations and applications therefor and works of authorship, and mask work rights.

"Cost Reports" means all cost and other reports filed pursuant to the requirements of Healthcare Programs for payment or reimbursement of amounts due from such programs for services provided.

"Creditors' Committee" means the official committee of unsecured creditors of Seller appointed in connection with the Bankruptcy Case.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials exclusively related to the Business or the Purchased Assets, in each case whether or not in electronic form, other than Patient Records.

"DoH" means the Department of Health of the State of New York.

"Environmental Law" means any Law currently in effect relating to the protection of human health and safety or the environment, natural resources or the protection thereof, or relating to hazardous materials, including the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.), and the regulations promulgated pursuant thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Contracts" means every Contract that is not an Assigned Contract or not otherwise specifically identified in Sections 2.1(a) through 2.1(k) hereto as a Purchased Asset.

"Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment (including medical equipment) and leasehold improvements owned by Seller and used by Seller exclusively in the conduct of the Business, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by Seller, the telephone numbers

associated therewith used in the Ordinary Course of Business and not used in any of the Other Businesses), cubicles and miscellaneous office furnishings.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Hazardous Material" means any substance, material or waste which is regulated by any Governmental Body including petroleum and its by-products, asbestos, biomedical waste, medical waste and any chemical, material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" under any provision of Environmental Law.

"Healthcare Program Liabilities" means all Liabilities under any Medical Reimbursement Program Law, including any obligations for settlement and retroactive adjustments under the Medicare and Medicaid programs arising from or relating to periods ending on or before the Closing Effective Date, including all fines, penalties, costs and expenses relating thereto.

"Healthcare Regulatory Consents" means in respect of Seller or Purchaser, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body as shall be required to be obtained and such notifications to any Governmental Body as shall be required to be given by such party in order for it to consummate the Contemplated Transactions in compliance with all applicable Laws relating to health care or healthcare services of any kind and shall include obtaining any such consents, approvals, authorizations, waivers, Orders, licenses or Permits, or notices to, the New York State Public Health Council, CMS, and DoH and shall include Purchaser obtaining a Certificate of Need from DoH with respect to its operation of the Business and the parties obtaining any consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body needed for them to consummate the Contemplated Transactions and for Purchaser to operate the Business.

"Intellectual Property Licenses" means (a) any grant by Seller to a third Person of any right to use any of the Purchased Intellectual Property owned by Seller and (b) any grant to Seller of a right to use in connection with the Business any Intellectual Property Rights owned by any other Person (other than the SVCMC Marks), to the extent, and only to the extent, such right is transferable by Seller.

"<u>Intellectual Property Rights</u>" means all intellectual property rights available in respect of Copyrights, Marks (other than the SVCMC Marks), Software, trade secrets and Patents, whether registered or unregistered, and whether owned or licensed.

"<u>Inventory</u>" means all medical supplies, drugs, medications, food, janitorial, housekeeping and office supplies and other consumables located in or used in connection with the operation of the Business.

"<u>IRS</u>" means the Internal Revenue Service.

"<u>Knowledge</u>" means the actual knowledge of those officers or Representatives of Purchaser or of those officers of Seller or senior managers of the Business as of or prior to the Closing, each of which is identified in <u>Section 1.1(a)</u> of the Seller Disclosure Schedule.

"<u>Law</u>" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation enacted or issued by a Governmental Body.

"<u>Legal Proceeding</u>" means any judicial, administrative or arbitral actions, suits, alternative dispute resolution proceedings (public or private), or claims or any proceedings by or before a Governmental Body.

"<u>Liability</u>" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all fines, penalties, interest, costs and expenses relating thereto.

"<u>Lien</u>" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement and transfer restriction under any agreement.

"<u>Marks</u>" means all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof.

"<u>Material Adverse Effect</u>" means (a) a material adverse effect on the Business (taken as a whole), including its assets, properties, results of operations or condition (financial or otherwise) as conducted on the date hereof other than an effect resulting from an Excluded Matter, or (b) a material adverse effect on the ability of Seller to consummate the Contemplated Transactions or to perform its obligations under this Agreement. "<u>Excluded Matter</u>" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general that does not materially disproportionately affect Seller; (ii) the effect of any change that generally affects any industry in which Seller operates (including a general adverse change in medical reimbursement rates); (iii) the effect of any changes in national or international political conditions, including any engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack occurring prior to, on or after the date of this Agreement that does not materially disproportionately affect Seller; (iv) the effect of any

action taken by Purchaser or its Affiliates with respect to the Contemplated Transactions or with respect to Seller, including its employees; (v) any matter of which Purchaser has Knowledge on the date hereof or, solely for purposes of determining whether the condition to the Closing set forth in <u>Section 10.1(a)</u> hereto has been satisfied, on the Closing Date, including those matters set forth in <u>Section 1.1(b)</u> of the Seller Disclosure Schedule; (vi) the effect of any change in applicable Laws or accounting rules; (vii) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the Contemplated Transactions; (viii) the effect of any action taken by Purchaser or its Affiliates under or in connection with the Receivership Agreement; (ix) the effect of any change occurring after the Closing Effective Date, or (x) any effect resulting from the filing or pendency of the Bankruptcy Case or Legal Proceedings relating thereto and reasonably anticipated effects thereof.

"<u>Medicaid</u>" means any state program for medical assistance administered under Title XIX of the Social Security Act.

"<u>Medical Reimbursement Program</u>" means Medicare, Medicaid, any other federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and any state sponsored reimbursement program.

"<u>Medical Reimbursement Program Laws</u>" means the Laws governing the Medical Reimbursement Programs, including but not limited to: 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a-7b and 1395nn; the False Claims Act (31 U.S.C. § 3729 et seq.); the False Statements Act (18 U.S.C. § 1001); the Program Fraud Civil Penalties Act (31 U.S.C. § 3801 et seq.); the anti-fraud and abuse provisions of the Health Insurance Portability and Accountability Act of 1996 (18 U.S.C. § 1347, 18 U.S.C. § 669, 18 U.S.C. § 1035, 18 U.S.C. § 1518; and the corresponding fraud and abuse, false claims and anti self-referral Laws of any other Governmental Body.

"<u>Medicare</u>" means the health insurance program administered under Title XVIII of the Social Security Act.

"<u>Order</u>" means any order, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of a Governmental Body.

"<u>Ordinary Course of Business</u>" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice, subject, however, to those actions necessary and incident, or otherwise relating, to the Bankruptcy Case.

"<u>Organizational Documents</u>" means (a) the articles or certificate of incorporation, the bylaws and any shareholders agreement of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and certificate of formation or organization of any limited liability company, (e) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person, and (f) any amendment to any of the foregoing.

"<u>Patents</u>" means all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon.

"<u>Patient Records</u>" shall mean any documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996, the Health Information Technology for Economic and Clinical Health Act, Title XIII of the American Recovery and Reinvestment Act of 2009 and all regulations promulgated pursuant thereto.

"<u>Permits</u>" means any approvals, authorizations, consents, licenses, permits, provider numbers, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Body.

"<u>Permitted Liens</u>" shall mean those liens set forth in <u>Section 1.1(b)</u> of the Seller Disclosure Schedule.

"<u>Person</u>" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, association, estate, Governmental Body or other entity.

"<u>Plan</u>" means each material "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other material employee plan or agreement maintained by the Seller.

"<u>Pre-Closing Accounts Receivable</u>" means (a) accounts receivable arising out of the rendition of medical, surgical, behavioral, diagnostic or other professional health care services or the sale of medical products in the Ordinary Course of Business for dates of service occurring prior to the Closing Effective Date and (b) any accounts receivable due Seller from Affiliates as of the Closing Date.

"<u>Purchased Intellectual Property</u>" means all Intellectual Property Rights (other than rights under an Intellectual Property License and other than the SVCMC Marks) owned by Seller and (a) used by Seller exclusively in connection with the Business and (b) not used to a material degree in any of the Other Businesses, including any in the form of or arising from or in respect of Patents, Marks, Copyrights, Software or Technology, except for any that is an Excluded Asset.

"<u>Real Estate Contract</u>" means the Purchase and Sale Agreement, dated as of the date hereof, among Seller and KFG Land I, LLC (the "<u>Real Estate Buyer</u>"), pursuant to which the Real Estate Buyer shall purchase the Premises prior to, or contemporaneously with, the purchase of the Purchased Assets by Purchaser hereunder., in accordance with the terms thereof.

"<u>Release</u>" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching of Hazardous Material into the indoor or outdoor environment, or into or out of any property.

"Representatives" means, with respect to any Person, any of its Affiliates and the directors, trustees, officers, members, employees, consultants, agents, advisors and other representatives of such Person or its Affiliates.

"Sale Motion" means the motion or motions of Seller seeking approval and entry of the Bidding Procedures Order and the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court substantially in the form of Exhibit B hereto, with such changes as are reasonably acceptable to Purchaser and Seller.

"Software" means, except to the extent generally available for purchase from a third Person, any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (d) all documentation including user manuals and other training documentation related to any of the foregoing, in each case, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business. That portion of the Software that is owned by Seller is referred to herein as the "Proprietary Software," and that portion of the Software that is owned by any Person other than Seller is referred to herein as the "Third-Party Software."

"Tax Authority" means any federal, state or local government, or agency, instrumentality or employee thereof, charged with the administration of any Law relating to Taxes.

"Taxes" means (a) all federal, state, local or foreign taxes, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, unrelated business income, and estimated taxes, whether disputed or not, and (b) all interest, penalties and additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (a).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business, other than any in the form of Software.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended.

Section 1.2     Terms Defined Elsewhere in this Agreement. For purposes of this Agreement, each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Additional Deposit | 3.2 |
| Additional Purchased Assets | 3.5 |
| Agreement | Recitals |
| Allocation | 11.3 |
| Antitrust Bureau | 8.6(b) |
| Antitrust Division | 8.6(b) |
| Assigned Contracts | 2.1(d) |
| Assignment | 2.5(a) |
| Assumed Liabilities | 2.3 |
| Auction | 7.1(a) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Break-Up Fee | 7.2 |
| Business | Recitals |
| Business Confidential Information | 8.8(b) |
| Closing | 4.1 |
| Closing Date | 4.1 |
| COBRA | 9.2(d) |
| Competing Bid | 7.1(a) |
| CON Termination Date | 4.4(c)(iv) |
| Cure Amounts | 2.5(b) |
| Escrow Agent | 3.2 |
| Escrow Agreement | 3.2 |
| Escrowed Funds | 3.2 |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Excluded Matter | 1.1 |
| Excluded Personal Property Leases | 2.2(e) |
| Excluded Real Property Leases | 2.2(q) |
| Financial Statements | 5.9 |
| FTC | 8.6(b) |
| Healthcare Applications | 8.6(a) |
| Healthcare Programs | 5.17(b) |
| Indemnity Escrow Agreement | 2.10 |
| Initial Deposit | 3.2 |
| Losses | 8.16 |
| Material Contracts | 5.14(a) |

| Term | Section |
| --- | --- |
| Medical Records Custody Agreement | 2.9 |
| Nonassignable Assets | 2.6(b) |
| Other Businesses | Recitals |
| Personal Property Leases | 5.12 |
| Petition Date | Recitals |
| Premises | Recitals |
| Proprietary Software | 1.1 |
| Provider Agreements | 2.1(g) |
| PTO | 9.2(b) |
| Purchase Price | 3.1 |
| Purchased Assets | 2.1 |
| Purchased Intellectual Property Licenses | 2.1(c) |
| Purchased Personal Property Leases | 2.1(b)(ii) |
| Purchased Real Property Leases | 2.1(a) |
| Purchaser | Recitals |
| Purchaser Disclosure Schedule | Article VI |
| Purchaser Documents | 6.2 |
| Rate Adjustment Escrow Fund | 2.10 |
| Rate Adjustment Liabilities | 2.3(e) |
| Receivership Agreement | 8.18 |
| Receivership Date | 8.18 |
| Real Property Leases | 5.11(a) |
| Resident Assets | 8.15 |
| Seller Confidential Information | 8.8(a) |
| Seller Disclosure Schedule | Article V |
| Seller Documents | 5.2 |
| Seller | Recitals |
| SVCMC | Recitals |
| SVCMC Marks | 8.11 |
| Third-Party Software | 1.1 |
| Transition Plan | 8.17 |
| Transfer Taxes | 11.1 |
| Transferred Employees | 9.1(a) |

Section 1.3     Other Definitional and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Periods.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

**Dollars**. Any reference in this Agreement to currency shall be to, and all payments hereunder shall be paid in, U.S. dollars.

**Exhibits/Schedules**. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

**Gender and Number**. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number shall have the corresponding meanings in the plural and vice versa.

**Headings**. The provision of a Table of Contents, the division of this Agreement into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All article, section, schedule and exhibit references used in this Agreement are to articles, sections, schedules and exhibits to this Agreement unless otherwise specified.

**Herein**. The words "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear unless the context otherwise requires.

**Including**. The word "including" or any variation thereof means "including, without limitation", whether or not so stated, and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

**Made Available to Purchaser**. The phrase "made available to Purchaser" shall mean made available to Purchaser through posting in SVCMC's electronic data room, via email, facsimile or other electronic transfer to Purchaser or through other written means to Purchaser for all purposes of this Agreement and at such facsimile numbers and addresses provided by Purchaser.

**Make Available to Seller**. The phrase "make available to Seller" shall mean make available to Seller or its agents through email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

**Part of Speech**. If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).

**Date**. The phrase "the date of this Agreement," "date hereof" and terms of similar import, unless the context otherwise requires, shall be deemed to refer to the date set forth in the preamble of this Agreement.

**Accounting Terms**. All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.

(b)     Each party hereto has been advised by experienced counsel, and the parties hereto have participated jointly, in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto, and no rule of construction shall operate and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1     Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, and subject to entry of the Sale Order, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall, subject to Section 2.5 hereto, sell, transfer, assign, convey and deliver to Purchaser, all of Seller's right, title and interest in, to and under the Purchased Assets, subject to the Permitted Liens, free and clear of any and all Liens or any other interest. "Purchased Assets" means all of the following assets, rights and properties of Seller exclusively pertaining to or exclusively used in connection with the Business as existing on the Closing Effective Date, other than the Excluded Assets, and in each case subject to Section 2.6(b) hereto:

(a)     (i) all right, title and interest of Seller under each Real Property Lease set forth in Section 5.6(a) of the Seller Disclosure Schedule; and (ii) any additional Real Property Leases exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.3 hereto (collectively, the "Purchased Real Property Leases");

(b)     (i) the Furniture and Equipment; (ii) the tools, spare parts, supplies (including all of Seller's Inventory) and all other tangible personal property owned by Seller, used by Seller in the conduct of the Business and set forth on Section 2.1(b) of the Seller Disclosure Schedule; and (iii) the Personal Property Leases identified in Section 5.12 of the Seller Disclosure Schedule, along with any additional Personal Property Leases exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.3 hereto (collectively, the "Purchased Personal Property Leases");

(c)     (i) the Purchased Intellectual Property set forth on Section 2.1(c) of the Seller Disclosure Schedule; and (ii) the rights of Seller as licensor under the Intellectual Property Licenses identified in Section 2.1(c) of the Seller Disclosure Schedule and all rights of Seller as licensee under the Intellectual Property Licenses, along with any additional Intellectual Property Licenses exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.3 hereto (collectively, the "Purchased Intellectual Property Licenses");

(d)     (i) all Contracts set forth in Section 2.1(d) of the Seller Disclosure Schedule and all rights arising out of such Contracts; and (ii) any additional Contracts exclusively pertaining to or exclusively used in connection with the Business that are entered

into after the date hereof but prior to the Closing Effective Date in accordance with <u>Section 8.3</u> hereto (collectively, the "<u>Assigned Contracts</u>");

(e)  subject to the provisions of <u>Section 2.9</u> and Article VII hereto, all Documents that are exclusively used in, held for use in or intended to be used in, or that arise exclusively out of, the Business, including Documents relating to the services provided by the Business, personnel and employee health files for Seller's employees which Purchaser may elect to hire (including, to the extent available, pre-employment, criminal background, drug screen, and immigration records) and books, files, invoices, flow sheets and other technical and non technical data and information relating to the operations and services provided by the Business which are owned by Seller and which are exclusively used in and integral to the operation of the Business, but excluding any Documents and Patient Records described in <u>Section 2.2(g)</u> or <u>Section 2.2(h)</u> hereto;

(f)  all Permits exclusively used by Seller in the Business and set forth in <u>Section 2.1(f)</u> of the Seller Disclosure Schedule (to the extent transferable);

(g)  the Medicare and Medicaid provider numbers for the Business and related provider agreements used in the Business, as identified in <u>Section 2.1(g)</u> of the Seller Disclosure Schedule (collectively, the "<u>Provider Agreements</u>");

(h)  all goodwill and other intangible assets (other than Intellectual Property Rights) owned by Seller and exclusively used in connection with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(i)  all security deposits and prepayments of Business residents, if any, held by Seller for services to be provided on and after the Closing Effective Date;

(j)  all menus, policies and procedures manuals;

(k)  any rights to refunds, settlements and retroactive adjustments arising at any time in connection with the Medicare and Medicaid provider numbers and related participation agreements or any other third-party healthcare payor program of the Business relating to any time period which rights to refunds, settlements and retroactive adjustments are not specified on <u>Schedule 2.2(c)</u> of the Seller Disclosure Schedule in accordance with the provisions of <u>Section 2.2 (c)</u>;

(l)  all accounts receivable generated by the Business on and after the Closing Effective Date and all cash maintained by Purchaser in its capacity as Receiver under the Receivership Agreement, subject, however, to the terms of the Receivership Agreement; and

(m)  all telephone numbers and telefax numbers used by the Business.

Section 2.2  <u>Excluded Assets</u>. Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser or its Affiliates, and Seller shall retain all right, title and interest to, in and under the Excluded Assets. "<u>Excluded Assets</u>" shall mean the following assets, properties, interests and rights of Seller:

(a)     subject to Section 2.1(l), all cash, cash equivalents, bank deposits or similar cash items of Seller, all securities owned by Seller, and all Pre-Closing Accounts Receivable;

(b)     the Excluded Contracts;

(c)     any heretofore rights to refunds, settlements and retroactive adjustments arising in connection with the Medicare and Medicaid provider numbers and related participation agreements or any other third-party healthcare payor program of the Business which rights to refunds, settlements and retroactive adjustments are specified on Schedule 2.2(c) of the Seller Disclosure Schedule, limited to the specific matters, dates and amounts so specified, which Schedule 2.2(c), notwithstanding any provision of this Agreement to the contrary, shall not be subject to any amendment or modification after the Closing Effective Date;

(d)     any other Contract to which Seller is a party or under which it has rights that is not used exclusively in the Business or is used to a material degree in any of the Other Businesses, unless included in Section 2.1(d) of the Seller Disclosure Schedule among the Assigned Contracts;

(e)     the Personal Property Leases identified in Section 2.2(e) of the Seller Disclosure Schedule (the "Excluded Personal Property Leases");

(f)     any Intellectual Property Rights of Seller other than the Purchased Intellectual Property; it being understood that Seller shall not convey, and Purchaser shall not acquire, pursuant to this Agreement any right in or to any website or e-mail address owned or used by Seller (whether or not used in the Business);

(g)     any (i) personnel files for employees of Seller who are not hired by Purchaser; (ii) other books and records that Seller is required by Law to exclusively retain; (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party (other than any patient confidentiality obligation referred to in the foregoing clause (ii) or in Section 2.9 hereto); (iv) books and records and other Documents related to malpractice prevention programs, incident reporting or quality assurance to the extent confidential under applicable Law; (v) Documents relating to proposals to acquire the Business by Persons other than Purchaser or its Affiliates; (vi) any Documents primarily related to or that are required to realize the benefits of any Excluded Assets; (vii) Documents related to Pre-Closing Accounts Receivable; (viii) corporate records and Tax Returns of Seller and (ix) Documents necessary to prepare Tax Returns and Cost Reports;

(h)     any Patient Records; provided that, subject to Section 2.9 hereto, Seller shall provide Purchaser with custody of Patient Records;

(i)     any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for Taxes related to the operation of the Business for any periods prior to the Closing Effective Date, together with any interest due thereon or penalty rebate arising therefrom;

(j)     all insurance policies or rights to proceeds thereof relating to the Business or the Purchased Assets to the extent arising from any date prior to the Closing Effective Date;

(k)     security deposits for rent, electricity, telephone or other utilities and prepaid charges and expenses of Seller to the extent exclusively related to the Business or the Purchased Assets, but in all events subject to adjustment at Closing under this Agreement;

(l)     any rights, claims or causes of action of Seller against third parties relating to assets, properties, business or operations of Seller, including any actions under Chapter 5 of the Bankruptcy Code, provided that with regard to any rights, claims or causes of action against third parties relating to the Purchased Assets or the Business, only to the extent such rights, claims or causes of action exist as of 11:59 p.m. on the day before the Closing Effective Date;

(m)     rights of Seller under this Agreement, the Seller Documents and the Contemplated Transactions;

(n)     any assets of the Other Businesses not otherwise described in Section 2.1 hereto;

(o)     any tangible personal property (i) having religious significance which may be removed from the Purchased Real Property, or (ii) not identified in Section 2.1(b) of the Seller Disclosure Schedule;

(p)     any personal, tangible and intangible property of Seller identified in Section 2.2(p) of the Seller Disclosure Schedule;

(q)     the Real Property Leases identified in Section 2.2(q) of the Seller Disclosure Schedule (the "Excluded Real Property Leases");

(r)     any right to receive or expectancy of Seller in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate), regardless of when received and whether or not designated to be applied or used in respect of the Business; and

(s)     the Premises, and all other assets and properties of Seller that are subject to the Real Estate Contract.

Section 2.3     Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely pay, perform and discharge in accordance with their respective terms, only the following Liabilities (collectively, the "Assumed Liabilities"):

(a)     in each case to the extent and only to the extent specifically provided in Article IX hereto, those Liabilities arising out of, relating to or with respect to the employment by Seller of any employees of Seller on or before the Closing Date;

(b)　　all Liabilities exclusively arising from and after the Closing with respect to the Assigned Contracts, the Purchased Intellectual Property Licenses, the Purchased Real Property Leases and the Purchased Personal Property Leases;

(c)　　all outstanding New York Health Facility Cash Assessment Program Liabilities of Seller as of the Closing Effective Date in an amount not to exceed $69,910.00;

(d)　　all known, unknown and/or contingent Liabilities as of the Closing Effective Date arising from or relating to Healthcare Program Liabilities relating to any period or events or omissions prior to or subsequent to the Closing Effective Date, which known Liabilities of Seller arising from or relating to Healthcare Program Liabilities as of the date hereof Seller represents are described in <u>Section 2.3(d)</u> of the Seller Disclosure Schedule, which Schedule 2.3(d) can be updated by Seller on or before the Closing Effective Date to include any additional such Liabilities that become known between the date hereof and the Closing Effective Date;

(e)　　any Liabilities of Seller to New York State Medicaid outstanding as of the Closing Effective Date and arising from or relating to a pending Medicaid rate adjustment that, when implemented, will be retroactive to January 1, 2009, in an amount not to exceed $2,910,000.00 (the "<u>Rate Adjustment Liabilities</u>"); and

(f)　　the Cure Amounts as required by <u>Section 2.5</u> hereto.

Section 2.4　　<u>Excluded Liabilities</u>. Except for the Assumed Liabilities, Purchaser shall not assume or become liable for the payment or performance of any Liability of Seller of any nature whatsoever, whether accrued or unaccrued, known or unknown, fixed or contingent ("<u>Excluded Liabilities</u>"), including, but not limited to, the following, which shall remain Liabilities of Seller:

(a)　　except as otherwise provided in <u>Section 2.3</u> hereto, any Liability of Seller arising from or relating to the operation of the Business at any time prior to the Closing Effective Date (including, but not limited to, accounts payable) or arising from or relating to the Contemplated Transactions, including, but not limited to Taxes but specifically excluding accounts payable incurred during the Receivership Term while Purchaser acts as the Receiver;

(b)　　any Liability associated with any Excluded Assets;

(c)　　any Liability arising from or relating to any period or events or omissions occurring prior to the Closing Effective Date from or relating to any overpayment, duplicate payment, refunds, discounts or adjustments due to private sector healthcare cost reimbursement program or insurance coverage;

(d)　　any Liability arising from or relating to claims of medical malpractice and/or other professional Liability of Seller, or any of its employees, agents or independent contractors, arising out or relating to any period or events or omissions occurring prior to the Closing Effective Date;

(e)　　intentionally omitted;

(f)     any Liability arising out of or in connection with any Legal Proceedings (whether instituted prior to or after the Closing) to the extent arising from or relating to any period or acts or omissions which occurred prior to the Closing Effective Date (except as otherwise provided by Section 2.3 hereto); and

(g)     except as set forth in Section 2.3(a) above, any Liability arising from or relating to the CBAs, any Plans or  Seller's employees (whether current, former or retired).

Section 2.5     Assignment and Cure Amounts.

(a)     Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing and pursuant to Section 365 of the Bankruptcy Code, Seller shall assume and assign to Purchaser, and Purchaser shall assume from Seller, the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses pursuant to an assignment (the "Assignment") in a form to be mutually agreed to by the parties, if necessary. No contract, lease, or other agreement shall be assumed absent concurrent assignment to Purchaser. Purchaser shall be responsible for satisfying the requirements of "adequate assurance of future performance" as required by Section 365 of the Bankruptcy Code and shall cooperate fully with Seller in seeking such approval from the Bankruptcy Court, including without limitation, Purchaser providing the necessary evidence required as part of the Sale Motion to approve this Agreement and the transactions contemplated herein.

(b)     The cure amounts (collectively, the "Cure Amounts"), if any, as determined by the Bankruptcy Court, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of Seller under the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses shall be paid by Purchaser (or Purchaser shall have delivered into escrow on terms reasonably acceptable to Seller amounts sufficient to pay any claim therefor that remains disputed as of the Closing, as such amount shall have been determined by the Bankruptcy Court) at or before the Closing (except as otherwise agreed to by the other party to the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses) and Seller shall have no Liability for any such cure amount. Purchaser shall indemnify Seller for any such Cure Amount obligations. Purchaser shall not have the right to terminate this Agreement as a result of the failure by Seller or inability of Seller to assign to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof) at the Closing any Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses or Purchaser's decision not to assume any Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses as to which Purchaser has not paid the related Cure Amount in accordance with this section.  To the Knowledge of Seller, an estimate as of the date hereof of the Cure Amounts described in this section is set forth on Section 2.5(b) of the Seller Disclosure Schedule.

Section 2.6     Further Conveyances and Assumptions.

(a)     From time to time following the Closing, each party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents at the Closing and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the Liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents at the Closing, and to otherwise make effective the transactions contemplated hereby and thereby; provided however that nothing herein shall obligate or otherwise require Seller to pay any claims or liabilities arising prior to the Petition Date.  In the event that Purchaser or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Purchaser shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to Seller.  In the event that Seller receives any Purchased Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver such Purchased Assets (or any payments or proceeds related thereto) to Purchaser.

(b)     Except for the assignment of the Provider Agreements, to the extent that the assignment of any Purchased Asset shall require the consent of any other Person and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code (each, a "<u>Nonassignable Asset</u>"), (i) nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained, and (ii) Purchaser shall be obligated to close whether or not the Nonassignable Asset can be transferred and Seller agrees to reasonably cooperate with Purchaser to seek to obtain any required consent; provided however that Seller shall not be required to pay any claims or incur any other obligations in order to obtain such consent.  Notwithstanding anything to the contrary contained herein, Purchaser shall not have the right to terminate this Agreement as a result of the failure by Seller or inability of Seller to assign to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof) at the Closing any Assigned Contract, Purchased Personal Property Lease, Purchased Real Property Lease or Purchased Intellectual Property License.

Section 2.7     <u>Bulk Sales Laws</u>.  The parties hereto hereby waive compliance by Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

Section 2.8     <u>Accounts Receivable</u>.

(a)     All Pre-Closing Accounts Receivable of the Business shall remain the property of Seller. All accounts receivable relating to the operation of the Business based on services rendered on and after the Closing Effective Date shall be the property of Purchaser. For the avoidance of doubt, Seller shall be entitled to bill for and receive all Pre-Closing Accounts Receivable, to the extent permitted by applicable Law, and Purchaser shall be entitled to bill for and receive all amounts collected in respect of services rendered by the Business on and after the

Closing Effective Date. Notwithstanding the foregoing provisions of this Section 2.8, the parties agree to use diligent efforts to agree upon a method to fairly allocate, if necessary, (i) all payments received by Seller prior to the Closing Effective Date which relate to services that will be rendered both by Seller prior to the Closing Effective Date and by Purchaser on and after the Closing Effective Date, and (ii) all payments received on or after the Closing Effective Date by Purchaser which relate both to services rendered by Seller prior to the Closing Effective Date and services rendered by Purchaser on and after the Closing Effective Date. In the event that the parties are unable to agree about the Pre-Closing Accounts Receivable or upon a method of allocation, such matter or matters shall be determined by David Adest or Jesse Frommer of Loeb and Troper LLP, which determination shall be binding upon the parties and the costs of which shall be shared equally by Purchaser and Seller.

(b)     Purchaser shall use its commercially reasonable efforts after the Closing Effective Date to assist Seller in collecting Pre-Closing Accounts Receivable, at no cost to Seller. Except as set forth below, each of Purchaser and Seller agrees that it will pay over or cause to be paid over, insofar as practicable within ten (10) Business Days of receipt, to the other (and until so paid, shall hold in trust for the other) all sums received by it or any of its Affiliates in respect of or on account of the other's receivables (but in the case of Pre-Closing Accounts Receivable, Purchaser shall pay over or cause to be paid over such sums net of six percent (6%) of the Medicaid cash receipts assessments due thereon), and provide therewith information available to it identifying the source of the amounts so paid over so to permit the other to apply correctly such amounts to the other's accounts receivable. Notwithstanding the foregoing, for the first thirty (30) days following the Closing Effective Date, Purchaser shall pay all accounts receivable received by the Business, other than those relating to private pay patients, to Seller within three (3) Business Days of receipt, as the parties acknowledge and agree that all accounts receivable received by the Business during such thirty (30) day period will constitute Pre-Closing Accounts Receivable. In addition, upon reasonable request, each recipient shall allow the other (at the other's cost) to audit, access and copy its records relating to the foregoing. All payments for accounts receivable arising out of the Business received from an obligor after the Closing Effective Date shall be applied to the receivable specifically designated by such obligor; provided that in the event that the obligor does not specifically designate a receivable, the payment shall be applied in the order of the age of the accounts receivable of such obligor, starting with the oldest such accounts receivable. The provisions of this Section 2.8 shall survive the Closing to the extent contemplated herein.

Section 2.9     Agreement Regarding Confidentiality of Patient Information.  Seller shall have no obligation to provide Purchaser with custody of Patient Records upon the Closing until Seller and Purchaser enter into a Medical Records Custody Agreement (the "Medical Records Custody Agreement") in the form attached hereto as Exhibit D, and then any such obligation of Seller is subject to Purchaser's compliance with such Medical Records Custody Agreement.

Section 2.10     Intentionally Omitted.

# ARTICLE III

## CONSIDERATION

Section 3.1    Consideration. The consideration for the Purchased Assets shall be, subject to adjustment as provided in Section 3.5 hereto, (a) Twenty Million Dollars ($20,000,000.00), subject to adjustment in accordance with Section 3.3 hereof (the "Purchase Price"); (b) the assumption by Purchaser of the Assumed Liabilities; and (c) the aggregate Cure Amounts payable or reserved by Purchaser under Section 2.5 hereto; provided that Seller shall also be entitled to receive the amounts provided by Section 2.8 hereto.

Section 3.2    Purchase Price Deposit. Purchaser has already deposited with Garfunkel Wild, P.C., in its capacity as escrow agent (the "Escrow Agent") an amount equal to Two Million Dollars ($2,000,000.00) (the "Initial Deposit"). Upon execution of this Agreement, the Initial Deposit will be held pursuant to the terms of that certain Escrow Agreement, dated as of the date hereof, by and among Purchaser, Seller and the Escrow Agent (the "Escrow Agreement"). Purchaser and Seller acknowledge that Purchaser has been selected as the prevailing bidder at the Auction, and Purchaser shall deposit, if necessary, within one (1) Business Day after the conclusion of the Auction, funds (the "Additional Deposit" and, together with the Initial Deposit, collectively, the "Escrowed Funds") equal to an amount such that together with the Initial Deposit, the Escrow Fund shall be equal to ten percent (10%) of the Purchase Price, as it may be subsequently amended at the Auction, each such deposit to be released by the Escrow Agent and delivered to either Purchaser or Seller, in accordance with the provisions of the Escrow Agreement. Pursuant to the Escrow Agreement, the Escrowed Funds shall be deposited into an interest bearing account and (together with all accrued investment income thereon) distributed as follows:

(a)    upon the Closing, the Escrowed Funds shall be delivered to Seller as partial consideration for the Purchased Assets, and all accrued investment income thereon shall be delivered to Purchaser at the Closing;

(b)    if this Agreement is terminated by Seller pursuant to Section 4.4(b)(ii) or Section 4.4(b)(iii) hereto, the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Seller;

(c)    if this Agreement is terminated pursuant to Section 4.4(c)(v) hereto, the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Seller; or

(d)    if this Agreement is terminated pursuant to Section 7.2(c) or Section 7.2(f) hereto, or pursuant to Section 4.4 hereto for any reason other than pursuant to Section 4.4(b)(ii), Section 4.4(b)(iii), or Section 4.4(c)(v) hereto, the Escrowed Funds, together with all accrued investment income thereon, shall in each case be returned to Purchaser.

Section 3.3    Payment of Purchase Price. On the Closing Date, Purchaser shall pay the Purchase Price, subject to adjustment in accordance with Section 3.5, Section 3.6 and Section 11.2 hereof, and subject to any Purchase Price credit due under the Receivership Agreement, less

(a) an amount equal to the portion of the Escrowed Funds being released to Seller on the Closing Date pursuant to <u>Section 3.2</u> hereto, and (b) the Rate Adjustment Escrow Fund, if any, which shall be paid by Purchaser to the Escrow Agent, as provided in <u>Section 2.10</u> hereof, which net amount shall be paid by wire transfer of immediately available funds of the balance of the Purchase Price into an account designated by Seller. At Closing, Purchaser shall deposit cash in escrow equal to such amount (if any) as is required by <u>Section 2.5</u> hereto.

Section 3.4    <u>Resident Transition</u>. Subject to resident choice, Purchaser shall formally admit all residents of the Business as of midnight on the Closing Date and Seller shall simultaneously discharge them.

Section 3.5    <u>Additional Purchased Assets</u>. If between the date of this Agreement and the Closing Effective Date, Seller acquires in accordance with Section 8.3 hereto any material properties or assets that would be Purchased Assets ("<u>Additional Purchased Assets</u>"), the Purchase Price shall for all purposes of this Agreement be increased by eighty percent (80%) of the aggregate "present value" of such Additional Purchased Assets. The present value of an Additional Purchased Asset shall be determined by taking the original cost of such Additional Purchased Asset (including any Taxes or delivery charges) and depreciating such original cost on a straight line depreciation basis over a five (5) year period. Notwithstanding the foregoing, this provision shall only apply for each such Additional Purchased Asset having a cost in excess of $50,000.00.

Section 3.6    <u>Intentionally Omitted</u>.

## ARTICLE IV

## CLOSING AND TERMINATION

Section 4.1    <u>Closing Date</u>. Subject to the satisfaction of the conditions set forth in <u>Article X</u> hereto (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in <u>Article II</u> hereto (the "<u>Closing</u>") shall take place at the offices of Purchaser's lender or its counsel, otherwise at the offices of Garfunkel Wild, P.C. located at 111 Great Neck Road, Suite 503, Great Neck, NY 11021 (or at such other place as Seller and Purchaser may designate in writing) at 10:00 a.m. (New York time) on a date agreed upon by Seller and Purchaser that is within thirty (30) days following the satisfaction or waiver of the conditions set forth in <u>Article X</u> hereto (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by Seller and Purchaser. Notwithstanding the foregoing, either party may request up to two (2) extensions of the Closing of five (5) Business Days each upon the demonstration of legitimate cause for such extension or extensions, which requests will not be unreasonably delayed, conditioned or withheld by the other party. The date on which the Closing shall be held is referred to in this Agreement as the "<u>Closing Date</u>." With respect to the Closing, unless otherwise agreed by Seller and Purchaser in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of Seller in the assets to be acquired by Purchaser hereunder at the Closing, and any Assumed Liability and all risk of loss with respect to the Business, shall be considered to have

passed to Purchaser as of 12:00 a.m. (New York time) on the Closing Date. Notwithstanding anything to the contrary contained in this Agreement, the Parties acknowledge and agree that the Contemplated Transactions and the transactions contemplated by the Real Estate Contract must close contemporaneously, unless the transactions contemplated by the Real Estate Contract close earlier, in accordance with the terms thereof.

Section 4.2 <u>Deliveries by Seller</u>. At the Closing, Seller shall deliver to Purchaser:

(a) a duly executed bill of sale in a form reasonably acceptable to Purchaser and Seller;

(b) the Assignment, if necessary, duly executed by Seller;

(c) the officer's certificates required to be delivered pursuant to <u>Sections 10.1(a)</u> and <u>10.1(b)</u> hereto;

(d) the Medical Records Custody Agreement between Purchaser and Seller, substantially in the form attached hereto as <u>Exhibit D</u>, duly executed by Seller;

(e) copies of all consents and notices required by <u>Section 10.2(c)</u> hereto for which Seller is responsible;

(f) duly executed documents as may be necessary to assign Seller's Medicaid and Medicare provider numbers and provider agreements to Purchaser;

(g) all other instruments of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser free and clear of all Liens (except Permitted Liens); <u>provided, however</u>, that the Sale Order shall be the only required document to evidence the conveyance and transfer free and clear of such Liens;

(h) the Indemnity Escrow Agreement, if applicable, substantially in the form of <u>Exhibit E</u>, duly executed by Seller and the Escrow Agent; and

(i) such other Documents, instruments and certificates necessary to transfer the Purchased Assets as Purchaser may reasonably request no later than four (4) days before the Closing Date.

Section 4.3 <u>Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to Seller:

(a) the Purchase Price, in immediately available funds, in accordance with <u>Section 3.3</u> hereto;

(b) a duly executed bill of sale in form reasonably acceptable to Purchaser and Seller;

(c) the Assignment, if necessary, duly executed by Purchaser;

(d)     the Medical Records Custody Agreement between Purchaser and Seller, substantially in the form attached hereto as Exhibit D, duly executed by Purchaser;

(e)     the officer's certificates required to be delivered pursuant to Sections 10.2(a) and 10.2(b) hereto;

(f)     copies of all consents and notices required by Section 10.1(d) hereto for which Purchaser is responsible;

(g)     a copy of any notification that Purchaser is required under the Escrow Agreement to deliver to the Escrow Agent in order for the Escrow Agent to release the Escrowed Funds to Seller at the Closing; and

(h)     evidence reasonably acceptable to Seller of Purchaser's deposit in escrow of such amounts (if any) required by Section 2.5 hereto;

(i)     the Indemnity Escrow Agreement, if applicable, substantially in the form of Exhibit E, duly executed by Purchaser; and

(j)     such other Documents, instruments and certificates necessary to transfer the Purchased Assets as Seller may reasonably request no later than four (4) days before the Closing Date.

Section 4.4     Termination of Agreement.

(a)     Termination by Purchaser. Purchaser may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)     if any of the conditions to the obligations of Purchaser to close that are set forth in Sections 10.1 and 10.3 hereto shall have become incapable of fulfillment other than as a result of a material breach by Purchaser or its Affiliates of any covenant or agreement contained in this Agreement, and such condition is not waived in writing by Purchaser; provided that the right to terminate this Agreement pursuant to this Section 4.4(a)(i) shall not apply with respect to the approvals of Governmental Bodies addressed in Sections 4.4(c)(iii) and (c)(iv) hereto, which are addressed and provided for in such Sections;

(ii)     if there shall be a material breach by Seller of any representation or warranty, or any covenant or agreement contained in this Agreement, which breach relates to a matter that is, or would result in, a Material Adverse Effect and cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Purchaser to Seller of such breach; or

(iii)     if the Sale Order is not entered within sixty (60) days from the date of this Agreement, except if the delay in entering the Sale Order is a result of Purchaser's breach of its obligations under this Agreement in any material respect.

(b)     Termination by Seller.  Seller may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)     if any of the conditions to the obligations of Seller to close that are set forth in Sections 10.2 and 10.3 hereto shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller; provided that the right to terminate this Agreement pursuant to this Section 4.4(b)(i) shall not apply with respect to the approvals of Governmental Bodies addressed in Sections 4.4(c)(iii) and (c)(iv) hereto, which are addressed and provided for in such Sections;

(ii)    if there shall be a material breach by Purchaser of any representation or warranty, or by Purchaser of any covenant or agreement contained in this Agreement, which breach would have a material adverse effect on the ability of Purchaser to consummate the Contemplated Transactions or to perform its obligations under this Agreement and cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Seller to Purchaser of such breach; or

(iii)   if the Receivership Agreement is terminated prior to the Closing Date due to a breach or default of Purchaser thereunder.

(c)     Termination by Purchaser or Seller. Either Purchaser or Seller may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)     by mutual written consent of Seller and Purchaser;

(ii)    intentionally omitted;

(iii)   upon twenty (20) Business Days' written notice to the other party after six (6) months from the entry of the Sale Order by the Bankruptcy Court, if either Purchaser or Seller reasonably determines, after consultation with the DoH and the other party, that it is more likely than not that DoH will not provide such CON Approval by the CON Termination Date for reasons that are specific to Purchaser and the contents of its CON Application and not for reasons that are  related to DOH's normal operating procedures in considering the CON Application or DOH's opinion on the financial feasibility of the Contemplated Transactions, it being understood by the parties that DOH's opinion on the financial feasibility of the Contemplated Transactions is a separate and distinct analysis from the DOH's analysis referred to in Section 4.4(c)(v) below of whether Purchaser has sufficient financial resources to fulfill its obligations related to Closing hereunder. Notwithstanding the foregoing, neither Purchaser nor Seller may terminate this Agreement under this Section 4.4(c)(iii) if within such twenty (20) Business Day period DoH provides the CON Approval or either party receives from DoH reasonably satisfactory assurances that Purchaser will receive the CON Approval by the CON Termination Date;

(iv)    upon twenty (20) Business Days' written notice to the other party if the Closing shall not have occurred by the close of business on the date that is twelve (12) months from the entry of the Sale Order (the "CON Termination Date"); provided

that such termination pursuant to this Section 4.4(c)(iv) shall not be effective if within such twenty (20) Business Day period all outstanding required regulatory approvals shall have been obtained and all other Closing conditions shall have been satisfied provided, further, that if the Closing shall not have occurred on or before the CON Termination Date due to an uncured (if curable) material breach of any representations, warranties, covenants, or agreements contained in this Agreement, then the breaching party or its Affiliates may not terminate this Agreement pursuant to this Section 4.4(c)(iv);

(v)    in the event that Purchaser's CON Application is finally rejected by the DoH due to: (1) a character and competency issue after Purchaser has exercised its rights to substitute members, officers, directors, or employees of Purchaser in the CON Application in accordance with Section 8.6(a) hereof, or (2) an inability of Purchaser to demonstrate sufficient financial resources necessary to Close under this Agreement; or

(vi)    in the event the Real Estate Contract is terminated in accordance with its terms prior to the closing of the transactions contemplated thereunder.

(d)    Extension of Time Periods. The time periods for termination of this Agreement set forth in this Section 4.4 may be extended upon the written agreement of the parties without the further consent of the Bankruptcy Court.

(e)    Cross-Default with Real Estate Contract. Subject to any opportunity to cure as may be set forth in this Agreement: (i) a default in any material respect by Seller under the Real Estate Contract prior to closing thereunder shall be deemed a default by Seller under this Agreement, and a default in any material respect by Seller under this Agreement shall be deemed a default by Seller under the Real Estate Contract; (ii) a default in any material respect by the Real Estate Buyer under the Real Estate Contract prior to closing thereunder shall be deemed a default by Buyer under this Agreement and a default in any material respect by Buyer under this Agreement shall be deemed a default by Real Estate Buyer under the Real Estate Contract. In addition, (x) if the Real Estate Buyer is entitled to cancel or terminate the Real Estate Contract or receive the return of the deposit paid thereunder in accordance with its terms, then the Buyer under this Agreement shall have the right to terminate this Agreement upon notice to Seller and pursue its rights and remedies as provided in this Agreement, including but not limited to the right to receive the prompt return of the Escrowed Funds plus accrued interest thereon, or (y) if Seller is entitled to terminate the Real Estate Contract upon a default by Real Estate Buyer thereunder or to receive the deposit paid under the Real Estate Contract, then Seller shall be entitled to terminate this Agreement upon notice to Buyer and shall have the right to receive the Escrowed Funds pursuant to the terms of this Agreement.

Section 4.5    Procedure for Termination. In the event of termination of this Agreement by Purchaser or Seller, or both, pursuant to Section 4.4 hereto, written notice thereof shall forthwith be given to the other party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 4.4 hereto) the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 4.6 hereto, without further action by the parties.

Section 4.6    Effect of Termination.

(a)     In the event that this Agreement is validly or automatically terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any party; provided that the obligations of the parties set forth in the Confidentiality Agreement, Escrow Agreement, Sections 3.2, 4.6, 7.2 and 8.8 hereto and Article XII hereto, and to the extent necessary to effectuate the foregoing enumerated provisions, Article I hereto, and the obligations with respect to the payment of the Escrowed Funds and the Break-Up Fee, as may be applicable, shall survive any such termination and shall be enforceable in accordance with their terms. In addition, if this Agreement is terminated as provided herein, Purchaser shall upon request redeliver to Seller as soon as practicable any or all Documents, work papers and other material relating to the Business, whether obtained before or after the execution hereof, together with written certification by an authorized officer of Purchaser who has supervised its compliance with this sentence that confirms such compliance.

(b)     Nothing in this Section 4.6 shall relieve the parties of any Liability for a breach of this Agreement prior to the date of termination of this Agreement. If this Agreement is terminated in accordance with Sections 4.4 and 4.5 hereto, Purchaser shall not, directly or indirectly, and shall cause its Affiliates not to, for a period of two (2) years from the date of this Agreement, solicit, recruit, employ or contract with any employee of Seller or any member of Seller's professional staff.

(c)     Notwithstanding any provision of this Agreement to the contrary, no party shall be liable to the other for any indirect, special, consequential, or speculative damages, including, without limitation, loss of opportunity, or profits.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as otherwise disclosed to Purchaser in a schedule delivered to Purchaser by Seller prior to the execution of this Agreement (the "Seller Disclosure Schedule"), and except for the effects of the commencement of the Bankruptcy Case, Seller hereby represents and warrants to Purchaser as follows:

Section 5.1     Organization and Good Standing.  Seller is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the State of New York, and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 5.2     Authorization of Agreement.  Subject to entry of the Sale Order, (a) Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action, including approval of its members (as applicable), necessary for it to validly execute and deliver, this Agreement and each other agreement, document, or instrument or certificate contemplated by this Agreement to be executed and delivered by Seller in connection with entering into this Agreement, and (b) subject to the satisfaction of the conditions referred to in Section 5.3 hereto, Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action necessary for it to validly execute and deliver, each

agreement, document, or instrument or certificate contemplated by this Agreement to be executed by Seller in connection with the consummation of the Contemplated Transactions (together with the other Documents, other than this Agreement, referred to in clause (a) of this sentence, the "Seller Documents") and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. This Agreement and each of the Seller Documents contemplated to be executed and delivered in connection with Seller entering into this Agreement have been, and each other Seller Document will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto and the entry of the Sale Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a Legal Proceeding at law or in equity). None of the execution and delivery by Seller of this Agreement and the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Seller.

Section 5.3    Consents of Third Parties; Contractual Consents.

(a)    Except as set forth in Section 5.3 of the Seller Disclosure Schedule, Seller is not required to obtain any consent, waiver, approval, Order, Permit or authorization of, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Seller Documents by Seller, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order, (ii) the Healthcare Regulatory Consents, (iii) approvals under applicable Antitrust Laws, and (iv) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications of which the failure to have obtained or made same would not have a Material Adverse Effect.

(b)    To Seller's Knowledge, and except as set forth in Section 5.3(b) of the Seller Disclosure Schedule, none of the execution and delivery by Seller of this Agreement or any of the Seller Documents, the consummation of the Contemplated Transactions by Seller, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of or a material default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Seller is a party or by which any of the Purchased Assets are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a Material Adverse Effect.

Section 5.4    Litigation. There are no Legal Proceedings pending or, to the Knowledge of Seller, threatened against Seller, or to which Seller is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a

Material Adverse Effect. Seller is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a Material Adverse Effect.

Section 5.5    Licenses and Governmental Permits. Seller is currently established and licensed by the DoH, pursuant to the Public Health Law of the State of New York, to operate the Business as a 288 bed skilled nursing facility. To Seller's Knowledge, Seller possesses all Permits required for the operation of the Business as currently operated, except for any Permits the failure of which to have would not result in a Material Adverse Effect. The Business participates as a provider in the Medicare and Medicaid programs pursuant to Medicare and Medicaid provider agreements.

Section 5.6    Intentionally Omitted.

Section 5.7    Health Surveys. Section 5.7 of the Seller Disclosure Schedule contains the most recent DoH survey or inspection report of the Business and accepted Plan of Correction, if any. Except as may be set forth in said report, and except as set forth in Section 5.7 of the Seller Disclosure Schedule, to Seller's Knowledge, there are no material violations, orders or deficiencies issued or recommended by any Governmental Body, and there are no material inspections, license reviews, investigations or proceedings of any sort pending by or before any such Governmental Body that relate to the Business and that, if adversely determined, would result in a Material Adverse Effect.

Section 5.8    Notices.    Except as set forth in Section 5.8 of the Seller Disclosure Schedule, the Business has not been served with any notice which: (a) requires the performance of any material work or alterations on the Business, or in the streets bounding thereon; or (b) orders the installation, repair or alteration of any improvements on the Business or the streets bounding thereon, in each case including, but not limited to, notices received under the Americans with Disabilities Act of 1990, as amended.

Section 5.9    Financial Statements. Seller has furnished Purchaser with (i) audited financial statements for Seller for the year ended December 31, 2008, (ii) unaudited balance sheet and the related statements of income for the twelve (12) month period ended December 31, 2009 (the "Year End Financial Statements"), and (iii) Seller's unaudited balance sheet for the Business as of June 30, 2010 (the "Interim Balance Sheet" and together with the Year End Financial Statements, the "Financial Statements"). Seller shall provide Purchaser with such additional financial information as Purchaser reasonably requests between the date hereof and the Closing Effective Date. Seller shall deliver to Purchaser such regularly prepared periodic unaudited balance sheet items and/or operating data with respect to the Purchased Assets and/or the Business as and when the same are prepared and/or delivered to Seller and/or its Representatives along with and any Cost Reports that are required to be filed for any periods prior to Closing.

Section 5.10    Title to Purchased Assets.   Except as set forth in Section 5.10 of the Seller Disclosure Schedule, and other than the real property subject to the Real Property Leases, Intellectual Property Licenses, and the personal property subject to the Purchased Personal Property Leases, Seller owns each of the Purchased Assets. Purchaser will be vested with good title to such Purchased Assets, subject to entry of the Sale Order, free and clear of all Liens, to

the fullest extent permissible under Section 363(f) of the Bankruptcy Code. To Seller's Knowledge, no Person has any right or option to acquire the Purchased Assets or any material part thereof.

Section 5.11    Real Property Leases.

(a)    Section 5.11(a) of the Seller Disclosure Schedule sets forth a true, correct and complete list of all real property and interests in real property leased or licensed by Seller and exclusively used in the Business, as lessee, lessor, licensee or licensor (the "Real Property Leases").  Seller has a valid leasehold interest in the Purchased Real Property Leases, subject to entry of the Sale Order, free and clear of all Liens other than Permitted Liens.

(b)    All Purchased Real Property Leases are in full force and effect.  Except as set forth in Section 5.11(b) of the Seller Disclosure Schedule and as otherwise superseded by the applicable provisions of the Bankruptcy Code, Seller has not received written notice of any default which remains uncured, and, to the Knowledge of Seller, the other parties under each of the Purchased Real Property Leases have complied in all material respects therewith, and are not in default thereunder beyond any applicable notice and cure periods.

Section 5.12    Tangible Personal Property.  Section 5.12 of the Seller Disclosure Schedule sets forth all leases of personal property, including Equipment, exclusively used by Seller in the operation of the Business that involve annual payments in excess of $10,000.00. ("Personal Property Leases").

Section 5.13    Intellectual Property.  Seller has licenses to use all material Third-Party Software used in the operation of the Business as now operated.

Section 5.14    Material Contracts.

(a)    Section 5.14(a) of the Seller Disclosure Schedule sets forth a list of all of the following Contracts to which Seller is a party or by which it is bound and that are exclusively related to the Business or by which the Purchased Assets may be currently bound or affected (collectively, the "Material Contracts"):

(i)    Contracts with any labor union or association representing any employees of Seller;

(ii)    Contracts which involve the annual expenditure of more than $75,000.00 in the aggregate or require performance by any party more than one year from the date hereof that, in either case, are not terminable  without penalty on less than thirty (30) days' notice.

(b)    Except (i) as otherwise provided in the Bankruptcy Code, (ii) for events of default arising as a result of the commencement of the Bankruptcy Case, or (iii) for general principles of equity that may limit the specific performance of particular provisions, each Material Contract is a legal, valid and binding obligation of Seller and is enforceable by Seller against the other party or parties to such Material Contract in accordance with its terms.

Section 5.15    Employees; Employee Benefits.

(a)    Section 5.15(a) of the Seller Disclosure Schedule sets forth a true and complete list of all Plans.  Each Plan has been administered and is in compliance with the terms of such Plan and in accordance with all other applicable Laws except where the failure thereof would not have a Material Adverse Effect. Purchaser shall not assume any Plans or any Liabilities associated therewith, unless otherwise expressly set forth herein.

(b)    Except as set forth in Section 5.15(b) of the Seller Disclosure Schedule, no "reportable event" (as such term is used in Section 4043 of ERISA), "prohibited transaction" (as such term is used in Section 406 of ERISA or Section 4975 of the Code) or "accumulated funding deficiency" (as such term is used in Section 412 or 4971 of the Code) has heretofore occurred with respect to any Plan which would have a Material Adverse Effect.

Section 5.16    Employment and Labor.

(a)    Section 5.16(a) of the Seller Disclosure Schedule (i) sets forth a true and complete list of all employees of Seller as of the date set forth therein (ii) shall be updated and delivered by Seller to Purchaser not later than sixty (60) days prior to the Closing and (iii) to the Knowledge of the Seller, accurately sets forth in all material respects the following information: (1) the position; (2) date of hire; (3) current annual salary or hourly wage; (4) accrued vacation, holidays and/or sick leave as a result of the individual's employment with Seller; and (5) the collective bargaining representative, if any, of which the individual is a member. Thereafter and prior to the Closing Effective Date, Seller shall likewise deliver as soon as practicable to Purchaser updates to Section 5.16(a) of the Seller Disclosure Schedule with respect to any individual that is hired by, or transferred to, the Business as an employee consistent with the provisions in Section 8.2 hereto.

(b)    Section 5.16(b) of the Seller Disclosure Schedule identifies each labor or collective bargaining agreement applicable to employees of Seller, none of which shall be assumed by Purchaser (the "CBAs").

Section 5.17    Compliance with Laws; Permits.

(a)    Seller is duly authorized by DoH to operate the Business.

(b)    Seller is eligible to receive payment under Titles XVIII and XIX of the Social Security Act and is a "provider" under existing provider agreements with the Medicare and Medicaid programs (collectively, the "Healthcare Programs") through the applicable intermediaries.

(c)    Except as set forth in Section 5.17(c) of the Seller Disclosure Schedule, to the Knowledge of Seller, Seller is in compliance with all Laws and Permits applicable to the Purchased Assets or the Business, except where the failure to be in compliance would not have a Material Adverse Effect.

Section 5.18    Financial Advisors. Except as set forth in Section 5.18 of the Seller Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial

advisor for Seller in connection with the Contemplated Transactions. Any fees, commissions or like payment due to any such Person shall be paid by Seller and no Person is or shall be entitled to any fee or commission or like payment from Purchaser.

Section 5.19    No Other Representations or Warranties; Schedules. Except for the representations and warranties contained in this Article V (as modified by the Seller Disclosure Schedules), neither Seller nor any other Person makes any other representation or warranty whether express or implied, written or oral, with respect to Seller, the Business, the Purchased Assets, the Assumed Liabilities or the Contemplated Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, its Affiliates or any of their respective officers, directors, members, employees, agents, consultants or other Representatives. Except for the representations and warranties contained in this Article V (as modified by the Seller Disclosure Schedules), Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser or its Representatives by any director, officer, member, employee, agent, consultant or other Representative of Seller or any of its Affiliates). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business. Seller makes no implied representation or warranty as to the condition, merchantability, usage, suitability or fitness for any particular purpose with respect to the Purchased Assets except for the representations and warranties contained in this Article V (as modified by the Seller Disclosure Schedules). The disclosure of any matter or item in any Section of the Seller Disclosure Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect. The representations and warranties of Seller in this Agreement are for diligence purposes only and do not survive the Closing, however their disclaimers survive.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as otherwise disclosed to Seller in a schedule delivered to Seller by Purchaser prior to the execution of this Agreement (the "Purchaser Disclosure Schedule"), Purchaser hereby represents and warrants to Seller, as follows:

Section 6.1    Organization and Good Standing. Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of New York and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 6.2    Authorization of Agreement.  Purchaser has all requisite power, authority and legal capacity to execute and deliver this Agreement, the Receivership Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement and the

Receivership Agreement or to be executed by it in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly and validly authorized by all necessary corporate action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior the Closing, duly and validly executed and delivered by Purchaser, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a Legal Proceeding at law or in equity). None of the execution and delivery by Purchaser of this Agreement and the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Purchaser.

Section 6.3    Conflicts; Consents of Third Parties.

(a)    To Purchaser's Knowledge, except as set forth in Section 6.3(a) of the Purchaser Disclosure Schedule, Purchaser is not required to obtain any consent, approval, authorization, waiver, Order or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) the Healthcare Regulatory Consents, and (ii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications (A) that have already been obtained or made or (B) of which the failure to have obtained or made would not have a Material Adverse Effect or would not reasonably be expected to prevent or materially delay the ability of Purchaser to perform or consummate the Contemplated Transactions.

(b)    To Purchaser's Knowledge, except as set forth in Section 6.3(b) of the Purchaser Disclosure Schedule, none of the execution and delivery by Purchaser of this Agreement or any of the Purchaser Documents, the consummation of the Contemplated Transactions by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser or any of its Affiliates is a party or by which any of the properties or assets of Purchaser or any of its Affiliates are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the Contemplated Transactions.

Section 6.4    Litigation.  There are no Legal Proceedings pending or, to the Knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions. Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions.

Section 6.5    Financial Advisors. Except as set forth in Section 6.5 of the Purchaser Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the Contemplated Transactions and no such Person is entitled to any fee or commission or like payment from Seller in respect thereof.

Section 6.6    Healthcare Regulatory Compliance Status.

(a)    To Purchaser's Knowledge, except as set forth in Section 6.6 of the Purchaser Disclosure Schedule, neither Purchaser nor its members, managers, officers, or employees is involved in any litigation, proceeding or investigation by or with any Governmental Body which, if determined or resolved adversely, would have a material adverse impact on the ability of Purchaser to obtain or maintain any governmental qualifications, registrations, filings, licenses, Permits, Orders, approvals or authorizations necessary for Purchaser to conduct the Business and to own or use the Purchased Assets, as the Business is conducted and the Purchased Assets are owned and used on the date hereof, where the failure to have such qualifications, registrations, filings, licenses, Permits, Orders, approvals or authorizations could reasonably be expected to prevent or materially delay the consummation of the Contemplated Transactions by Purchaser or the performance by Purchaser of any of its material obligations under this Agreement.

(b)    To Purchaser's Knowledge, neither Purchaser nor any of its members, directors, officers or employees has (i) been indicted or convicted of a felony, (ii) been suspended or excluded from the Healthcare Programs or (iii) failed to pass a character and competency or financial feasibility review by DoH or comparable Governmental Body of another State. To Purchaser's Knowledge, there is no reason why Purchaser should fail to successfully obtain CON Approval for reasons relating to the character, competence and/or financial capacity of Purchaser and  its members, managers, officers, or employees.

Section 6.7    Acknowledgement Regarding Condition of the Business. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, whether express or implied or written or oral, beyond those expressly given by Seller to Purchaser in Article V hereto (as modified by the Seller Disclosure Schedule), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred to Purchaser on a "WHERE IS" and, as to physical condition, "AS IS" basis. Purchaser further represents that neither Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, written or oral, as to the

accuracy or completeness of any information regarding Seller, the Business or the Contemplated Transactions not expressly set forth in this Agreement, and neither Seller, any of their Affiliates or any other Person will have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or the use by Purchaser or any of its Affiliates of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its Representatives, or any other document or information in any form provided to Purchaser or its Representatives in connection with the sale of the Business and the Contemplated Transactions. Purchaser acknowledges that it, along with its Representatives, has conducted to its satisfaction, its own independent investigation of the Business and the Purchased Assets and, in making the determination to proceed with the Contemplated Transactions, Purchaser has relied on the results of its own independent investigation.

Section 6.8    <u>Financing</u>. On the Closing Date Purchaser will have sufficient funds on hand to consummate the Contemplated Transactions. On the Closing Effective Date, Purchaser will have sufficient funds to fulfill its obligations under the Receivership Agreement. Purchaser acknowledges that it shall not be a contingency to the obligations of Purchaser to consummate the Contemplated Transactions that Purchaser have sufficient financial resources for payment of the Purchase Price.

Section 6.9    <u>No Other Representations or Warranties; Schedules</u>. Except for the representations and warranties contained in this <u>Article VI</u> (as modified by the Purchaser Disclosure Schedules), neither Purchaser nor any other Person makes any other representation or warranty, whether express or implied, written or oral, with respect to Purchaser or the Contemplated Transactions, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser or any of their respective officers, directors, members, managers, employees, agents, consultants or other Representatives. Except for the representations and warranties contained in this <u>Article VI</u> (as modified by the Purchaser Disclosure Schedules), Purchaser disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Seller by any director, officer, member, manager, employee, agent, consultant, or other Representative of Purchaser or any of its Affiliates). The disclosure of any matter or item in any Section of the Purchaser Disclosure Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material. The representations and warranties of Purchaser in this Agreement shall not survive the Closing, however their disclaimers shall survive.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

Section 7.1    This Agreement is subject to the terms of the Bidding Procedures Order and approval by the Bankruptcy Court.

Section 7.2    <u>Intentionally Omitted</u>.

Section 7.3    Bankruptcy Court Filings. As promptly as practicable following the execution of this Agreement, Seller shall, at its sole costs and expense, file with and seek the approval of the Bankruptcy Court of the Sale Motion. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other Documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Bidding Procedures Order or Sale Order shall be appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.

Section 7.4    Notice of Sale. Notice of the sale of Purchased Assets contemplated in this Agreement shall be served in accordance with the Bidding Procedures Order.

## ARTICLE VIII

## COVENANTS

Seller hereby covenants and agrees with Purchaser as follows:

Section 8.1    Conveyance. At Closing, Seller shall convey the Purchased Assets to Purchaser, free and clear of all violations, liens and encumbrances, except for Permitted Liens or as otherwise provided herein.

Section 8.2    Access to Information. Subject to Section 2.9 hereto and the other provisions of this Section 8.2 and subject to compliance with applicable Antitrust Laws, Seller agrees that, prior to the Closing Effective Date, and at its own expense, Purchaser shall be entitled, through its Representatives, to make such investigation of the assets, properties and operations of the Business and such examination of the books and records of Seller pertaining to the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and, and at its own expense, to make extracts and copies of such books and records; it being understood, however, that the foregoing shall not entitle Purchaser to access (a) the books, records and Documents referred to in Section 2.2(g) hereto or (b) any books, records or Documents the disclosure of which by Seller to Purchaser would (i) notwithstanding Section 2.9 hereto, violate any patient confidentiality obligation of Seller or (ii) any other agreement or any obligation of confidentiality to which Seller is a party or is bound prior to the date hereof or (iii) any obligation of confidentiality by which Seller is bound under applicable Law. In addition, following the issuance of the Sale Order, Purchaser shall be permitted to have access to Patient Records and employee files solely for the purpose of implementing the Transition Plan set forth in Section 8.17 of the Purchaser Disclosure Schedule. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, any request for such examination shall be made to one of the Persons identified in Section 8.1 of the Seller Disclosure Schedule, and Purchaser's access to such information shall be subject to any restrictions on disclosure by Seller to Purchaser or use of the information contained therein by Purchaser applicable pursuant to any agreement to which Seller is a party or is bound prior to the date hereof or under applicable Law.  Seller shall cause its

Representatives to promptly cooperate with Purchaser and its Representatives in connection with such investigation and examination, and Purchaser and its Representatives shall cooperate with Seller and its Representatives and shall use its commercially reasonable efforts to minimize any disruption to Seller's business and operations, including the Business. Notwithstanding anything herein to the contrary, Seller shall not be required to permit any such investigation or examination if, and to the extent that, Seller, upon advice of counsel, determines that such investigation or examination by Purchaser would or is reasonably likely to result in a loss of any attorney-client or attorney work product privilege available to Seller. Notwithstanding any provision of this Agreement to the contrary, Seller shall timely cooperate and provide Purchaser with such information as Purchaser reasonably requires to prepare and file its CON Application and to respond to DoH requests or inquiries and for other legitimate purposes related to the Contemplated Transactions, including, without limitation, in connection with Purchaser finalizing its financing for the Contemplated Transactions (although Purchaser acknowledges and agrees that its obligations to consummate the Contemplated Transactions are not contingent on Purchaser obtaining such financing).

Section 8.3  Conduct of the Business Pending the Closing. Subject to the terms and conditions of the Receivership Agreement, during the period from the date hereof through and including the Closing, except (i) as set forth in Section 8.3 of the Seller Disclosure Schedule, (ii) as required by applicable Law (including without limitation as a result of the commencement of the Bankruptcy Case), or (iii) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Seller shall use commercially reasonable efforts to operate the Business in the Ordinary Course of Business. Without limiting the generality of the foregoing, from the date of this Agreement through and including the Closing Effective Date, Seller shall, except (i) as set forth in Section 8.2 of the Seller Disclosure Schedule, (ii) as required by applicable Law (including without limitation as a result of the commencement of the Bankruptcy Case) or (iii) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), solely as it relates to the Business:

(a)     operate the Business only in the ordinary course, in a businesslike manner and in substantially the same manner as it has heretofore, and in compliance in all material respects with all applicable Federal and State Laws;

(b)     within ten (10) Business Days of receipt or filing, as the case may be, provide Purchaser with copies of all the DoH survey reports and material notices from Governmental Bodies that are received by Seller along with copies of all Seller's responsive correspondence therefor.

(c)     Seller shall timely file plans of correction, if necessary, and shall provide Purchaser with copies of all of the same within ten (10) Business Days of filing;

(d)     not acquire or dispose of any fixed assets with a value of $10,000.00 or more, or make any capital expenditures in excess of $10,000.00 per item for the Business;

(e)     maintain and keep the Purchased Assets in the same condition and working order as exists on the date hereof, including making necessary repairs and replacements, ordinary wear and tear, depreciation and casualty excepted;

(f)     maintain and preserve intact the business organization relating to the Business, to retain adequate staffing of the Business and to maintain the Business's relationship with physicians, employees, residents, residents' families, suppliers, customers, and others having business relationships with the Business so that they shall be preserved for Purchaser on the Closing Effective Date;

(g)     consult with Purchaser and obtain Purchaser's approval in each instance before renewing or entering into any Contracts not terminable by Purchaser, without cost, penalty or liability, it being understood that Purchaser shall not be obligated to assume any Contract entered into or extended after the date hereof which is not terminable without cost or penalty to Purchaser unless Purchaser has specifically hereafter consented in writing to assume such Contract;

(h)     Seller shall afford Purchaser, and its agents, reasonable access to the Business during normal business hours upon prior reasonable request;

(i)     file all Costs Reports required to be filed for any periods prior to the Closing Effective Date and provide Purchaser, within ten (10) Business Days of filing, with copies of any Cost Reports that are required to be filed for any periods prior to the Closing Effective Date;

(j)     maintain all of its books and records in accordance with past practice;

(k)     keep in full force and effect all licenses currently in effect, unless such licenses are no longer necessary for the operation of the Business;

(l)     keep in full force and effect all insurance policies or other comparable policies of insurance currently in effect, or the replacements thereof, unless such licenses are no longer necessary for the operation of the Business;

(m)     promptly advise Purchaser in writing if Seller becomes aware of any threatened or actual claim, action, suit, or proceeding, arbitration or investigation against the Business, any of its employees or the Purchased Assets, which if adversely determined would result in a Material Adverse Effect; and

(n)     subject to the Bidding Procedures Order, not enter into any agreement, other than this Agreement, for the sale of the Purchased Assets.

Section 8.4     <u>Satisfaction of Conditions</u>. Seller shall use reasonable commercial efforts to obtain the satisfaction of the conditions specified in <u>Article X</u> of this Agreement.

Section 8.5     <u>Consents; Insurance</u>.

(a)     Through the filing of the Sale Motion and except as may be satisfied through the entry of the Sale Order, Seller shall use its commercially reasonable efforts, and Purchaser shall cooperate with Seller, including by taking the actions referred to in <u>Section 8.5</u> hereto, to obtain at the earliest practicable date following entry of the Sale Order all necessary consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Seller (including all consents listed in <u>Section 5.3</u> of the Seller Disclosure Schedule), and to give at the earliest practicable date following entry of the Sale Order any notices required to be given by Seller, in order for Seller to consummate the Contemplated Transactions on the terms and in the manner provided hereby; <u>provided</u> that Seller shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than postpetition filing or postpetition application fees payable to any Governmental Body) or to initiate any litigation or Legal Proceedings to obtain any such item except as otherwise provided by <u>Section 8.5</u> hereto. Purchaser shall use its commercially reasonable efforts, and Seller shall cooperate with Purchaser, including by taking the actions referred to in <u>Section 8.5</u> hereto, to obtain at the earliest practicable date following entry of the Sale Order all consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Purchaser, and to give at the earliest practicable date following entry of the Sale Order any notices required to be given by Purchaser, in order for Purchaser to consummate the Contemplated Transactions on the terms and in the manner provided hereby and to operate the Business after the Closing; <u>provided</u> that Purchaser shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any litigation or Legal Proceedings to obtain any such consent or approval except as otherwise provided by <u>Section 8.10</u> hereto.

Section 8.6     <u>Regulatory Approvals</u>.

(a)     Purchaser shall, at its own cost and expense, (i) within five (5) Business Days of the date of this Agreement, cooperate with Seller in initiating informal discussions with DoH concerning the form and substance of the CON Application; (ii) subject to Seller's timely cooperation to the extent reasonably required, within fourteen (14) days after the date hereof, formally submit a complete CON Application to DoH; and (iii) promptly after the entry of the Sale Order, submit to any other Governmental Body all other applications for any Healthcare Regulatory Consents required in order for Purchaser to consummate the Contemplated Transactions and to operate the Business in accordance with applicable Law (collectively with the CON Application, the "<u>Healthcare Applications</u>"), excepting however such applications which are required to be filed after the Closing, and further excepting, such applications for Healthcare Regulatory Consents which are required to be filed by Seller in order to consummate the Contemplated Transactions, which shall be promptly submitted and diligently prosecuted by Seller, at its sole cost and expense, after the entry of the Sale Order by the Bankruptcy Court. Purchaser shall use best efforts to prosecute its Healthcare Applications and shall, subject to the cooperation required of Seller, timely submit all information and Documents requested in connection therewith by DoH and any other Governmental Body. Without limiting the generality of the foregoing, Purchaser shall promptly take such actions as may be reasonably necessary to cure any character or competency objections that DoH may raise to the CON Application, including removing or substituting any members, officers, directors, or employees that fail to obtain character and competency approval from DoH. Each party shall provide the other with prompt written notice of a party's submission of a Healthcare Application. Within five (5)

Business Days of its submission or receipt, a party shall deliver to the other party a complete copy of all correspondence to or from DoH or any other applicable Governmental Body having jurisdiction concerning a Healthcare Application. Each party shall provide the other party with periodic reports of a party's efforts to obtain all Healthcare Regulatory Consents. In addition, Purchaser shall provide Seller with notice as promptly as practicable of its receipt of DoH's approval, contingent approval or a rejection of the CON Application, or of any pending or threatened Legal Proceeding which seeks to challenge the Contemplated Transactions, along with a copy of any documentation related thereto. Purchaser shall not knowingly take any action prior to the Closing intended to disqualify Purchaser as an established and licensed operator of the Business. Purchaser shall timely respond to any "30-day letters" relating to Purchaser's CON Application and shall not seek any extension of the deadline within which Purchaser must respond to any such 30-day letter without the written approval of Seller in each instance, which written approval will not be unreasonably withheld by Seller.

(b)     If necessary, each of Purchaser and Seller shall use its commercially reasonable efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under any of the Antitrust Laws with respect to the Contemplated Transactions (including such submission to the Antitrust Bureau of the Office of the Attorney General of the State of New York (the "Antitrust Bureau") as may be required in connection with the CON Application under the Donnelly Act (New York General Business Law Sections 340 through 347)) as promptly as practicable and, in any event, within five (5) Business Days in connection with all submissions to the Antitrust Bureau in connection with the CON Application and within five (5) Business Days in the case of all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request under any of the Antitrust Laws for information, Documents, or other materials received by each of them or any of their respective Affiliates from the Federal Trade Commission (the "FTC"), the Antitrust Division of the United States Department of Justice (the "Antitrust Division"), the Antitrust Bureau or any other Governmental Body in respect of such filings or the Contemplated Transactions. Each party shall use its commercially reasonable efforts to cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such Documents to the non-filing parties promptly following the submission thereof) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division, the Antitrust Bureau or any other Governmental Body under any of the Antitrust Laws with respect to any such filing or any such transaction.

(c)     If necessary, each of Purchaser and Seller shall use its commercially reasonable efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates in respect of the Contemplated Transactions under any applicable Law, including such filings as are required to obtain the consents, approvals, authorizations, waivers, Orders, licenses or Permits or to provide the notices specified in Section 5.3 of the Seller Disclosure Schedule or Section 6.3(a) of the Purchaser Disclosure Schedule, as promptly as practicable, (ii) comply at the earliest practicable date with any request for additional information, Documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Body in respect of such filings or the Contemplated Transactions and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such Documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in

connection therewith) and in connection with resolving any investigation or other inquiry of any Governmental Body under such Laws with respect to any such filing or any such transaction.

(d) Each of Purchaser and Seller shall use its commercially reasonable efforts to furnish to each other through counsel all information required for any application or other filing to be made pursuant to any applicable Law in connection with the Contemplated Transactions. Each such party shall promptly inform the other parties through counsel of any material oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No such party shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.

(e) Subject to applicable Law, Purchaser and Seller will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under any of the Antitrust Laws. Each such party may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.6 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials.

(f) Each of Purchaser and Seller shall use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the Contemplated Transactions under any of the Antitrust Laws.  In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any of the Contemplated Transactions as in violation of any of the Antitrust Laws, each such party shall cooperate and use its commercially reasonable efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other Order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the Contemplated Transactions, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and Seller decide that litigation is not in their respective reasonable best interests. Each such party shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under any of the Antitrust Laws with respect to such transactions as promptly as possible after the date of this Agreement. In connection with and without limiting the foregoing, each of Purchaser and Seller agrees to use its commercially reasonable efforts to take promptly any and all steps necessary to avoid or eliminate each and every impediment under any of the Antitrust Laws that may be asserted by any Federal, state and local and non-United States antitrust or competition authority, so as to enable Purchaser and Seller to close the Contemplated Transactions as expeditiously as possible.

Section 8.7    Further Assurances.

(a)     Subject to the terms and conditions of this Agreement, each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Contemplated Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Contemplated Transactions. Without limiting the generality of the foregoing, from time to time after the Closing, without additional consideration, each party hereto will (or, if appropriate, cause its Affiliates to) execute and deliver such further instruments and take such other action as may be necessary or reasonably requested by the other party to make effective the Contemplated Transactions and to provide the other party with the intended benefits of this Agreement. In addition, upon the reasonable request of Purchaser, Seller shall execute, acknowledge and deliver all such further assurances, deeds, assignments, powers of attorney and other instruments and paper as may be required to sell, transfer, convey, assign and deliver to Purchaser all right, title and interest in, to and under the Purchased Assets. If any party to this Agreement shall, following the Closing, have in its possession any asset or right which under this Agreement should have been delivered to the others at the Closing, such party shall promptly deliver such asset or right to the others.

(b)     Without limiting the generality of the foregoing, if Purchaser or any of its Affiliates shall at any time after the Closing receive any charitable gift, contribution or bequest that might be an Excluded Asset, or receives any notice that such a charitable gift, contribution or bequest may be received or available to Purchaser, Purchaser shall give prompt written notice thereof to Seller and make available to Seller upon reasonable request such information that Purchaser or any of its Affiliates has available to it regarding such gift, contribution or bequest and will cooperate with Seller in determining whether such gift, contribution or bequest should be characterized as an Excluded Asset. The provisions of this <u>Section 8.7</u> shall survive the Closing.

Section 8.8     <u>Confidentiality</u>.

(a)     From and after the date hereof, Purchaser shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Seller, and not use to the detriment of Seller, any Seller Confidential Information relating to or obtained from Seller or its Representatives. For purposes of this <u>Section 8.8</u>, "<u>Seller Confidential Information</u>" shall mean any information that is confidential or proprietary in nature that is related to the Purchased Assets, the Assumed Liabilities, the Business, the Excluded Assets, the Excluded Liabilities or the Other Businesses, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; <u>provided</u> that Seller Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) is or becomes generally available to the public other than as a result of a disclosure by Purchaser or any of its Representatives, (ii) becomes available to Purchaser on a non-confidential basis from a source other than Seller or its Representatives; <u>provided</u> that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Purchaser from a third party having the right to disseminate the Seller Confidential Information without restriction on disclosure or (iv) can be shown by Purchaser through written Documents or evidence maintained by Purchaser to have been independently developed by either of them; and <u>provided</u>, <u>further</u>, that upon the Closing, the

restrictions contained in this Section 8.8 shall not apply to confidential or proprietary information related primarily to the Business or the Purchased Assets and the Assumed Liabilities. Purchaser may disclose any of the Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. Purchaser shall instruct its Representatives having access to the Seller Confidential Information of such obligation of confidentiality. If Purchaser or anyone to whom it has transmitted Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Confidential Information, Purchaser shall provide Seller with prompt written notice prior to making any disclosure so that such Seller may seek a protective Order or other appropriate remedy. If such protective Order or other remedy is not obtained, Purchaser shall furnish only that portion of the Seller Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed, and Purchaser will exercise commercially reasonable efforts to obtain assurance to the extent possible that confidential treatment will be accorded to that portion of Seller Confidential Information that is being disclosed. In any event, Purchaser will not oppose action by Seller to obtain an appropriate protective Order or other reliable assurance that confidential treatment will be accorded Seller Confidential Information. The restrictions contained hereinabove shall not apply to any disclosures made in connection with obtaining the Regulatory Approvals contemplated under this Article VIII or in connection with any other legitimate purpose of Purchaser related to the Contemplated Transactions, including with regard to Purchaser finalizing its financing for the Contemplated Transactions (although Purchaser acknowledges and agrees that its obligations to consummate the Contemplated Transactions are not contingent on Purchaser obtaining such financing), provided that no disclosures will be made by Purchaser or its Representatives to any party not bound by an obligation of secrecy to Purchaser.

(b)    From and after the Closing Date, unless this Agreement is terminated prior to the Closing, Seller shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Purchaser, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with (i) operating the Other Businesses in the ordinary course before and after the Closing Effective Date, (ii) any investigations by Governmental Bodies, (iii) compliance activities after the Closing related to periods occurring prior the Closing Effective Date, (iv) any Legal Proceedings, (v) enforcing any rights or other claims of Seller under this Agreement, (vi) performing any obligations of Seller under this Agreement, including billing and collecting Pre-Closing Account Receivable and other related activities, or (vii) as permitted by the Medical Records Custody Agreement. For purposes of this Section 8.8(b), "Business Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Business or to the Purchased Assets or the Assumed Liabilities, other than information primarily pertaining to the Excluded Assets, the Excluded Liabilities or the Other Businesses, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided that Business Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Seller or its Representatives, (ii) becomes available to Seller on a non-confidential basis from a source other than Seller or its Representatives; provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Purchaser or (iii) is lawfully

received by Seller from a third party having the right to disseminate the Business Confidential Information without restriction on disclosure. Seller may disclose any of the Business Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. Seller shall instruct its Representatives having access to the Business Confidential Information of such obligation of confidentiality. If Seller or anyone to whom it has transmitted Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information, Seller shall provide Purchaser with prompt notice prior to making any disclosure so that Purchaser may seek a protective Order or other appropriate remedy. If such protective Order or other remedy is not obtained, Seller shall furnish only that portion of the Business Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed, and Seller will exercise commercially reasonable efforts to obtain assurance to the extent possible that confidential treatment will be accorded to that portion of Business Confidential Information that is being disclosed. In any event, Seller will not oppose action by Purchaser to obtain an appropriate protective Order or other reliable assurance that confidential treatment will be accorded Business Confidential Information.

(c)     The obligations contained in this <u>Section 8.8</u> are in addition to any separate confidentiality agreements between any of Seller or SVCMC, on the one hand, and Purchaser or its Affiliates, on the other hand, including, without limitation, the Confidentiality Agreement.

Section 8.9     <u>Preservation of Records</u>.  Purchaser agrees that it shall preserve and keep the records held by it relating to the operation of the Business prior to the Closing Date for a period of seven (7) years from the Closing Date or the maximum period of time required by Law, whichever is longer, and shall, subject to <u>Section 2.9</u> hereto, make such records and personnel available to Seller at Purchaser's sole expense as may be reasonably required by Seller in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or other governmental or healthcare payor investigations or audits of Seller or any of its Affiliates or in order to enable Seller to comply with its obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event Purchaser wishes to destroy such records before or after that time, Purchaser shall first give ninety (90) days prior written notice to Seller and, if it is then existing and functioning, to the Creditors' Committee, and Seller shall have the right at its option and expense, upon prior written notice given to Purchaser within such ninety (90) day period, to take possession of the records within one hundred and thirty (30) days after the date of such notice.

Section 8.10     <u>Publicity</u>.  Each of Seller and Purchaser agrees that it shall not issue any press release or public announcement concerning this Agreement or the Contemplated Transactions without obtaining the prior written approval of either Purchaser or Seller, as applicable, which approval will not be unreasonably withheld, delayed or conditioned, unless, in the judgment of such issuing party upon advice of counsel, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement; <u>provided</u> that such party that intends to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other parties with respect to the text

thereof. Notwithstanding the foregoing, Purchaser understands that Seller will be filing various pleadings, including the Sale Motion, in furtherance of obtaining Bankruptcy Court approval of this Agreement and the Contemplated Transactions and Seller understands that Purchaser will be making various filings in connection with the CON Application and in connection with Purchaser finalizing its financing for the Contemplated Transactions (although Purchaser acknowledges and agrees that its obligations to consummate the Contemplated Transactions are not contingent on Purchaser obtaining such financing).

Section 8.11   Use of Name.  Purchaser agrees that it shall (a) as soon as practicable after the Closing Date and in any event within thirty (30) days following the Closing Date, cease to make any use of the name "Saint Vincents Catholic Medical Centers" or any variation thereon or derivative thereof (including "St. Vincent's"), Bishop Mugavero or any variation thereon or derivative thereof, or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing any of the foregoing, including any name or mark confusingly similar thereto (collectively, the "SVCMC Marks") which are included in the Purchased Assets or otherwise included in materials or assets transferred to Purchaser in connection with the Closing, and (b) immediately after the Closing, cease to hold itself or its Affiliates out as having any affiliation or association with Seller, SVCMC or any of their respective Affiliates. In furtherance thereof, as promptly as practicable but in no event later than sixty (60) days following the Closing Date, Purchaser shall remove, strike over or otherwise obliterate all SVCMC Marks from all materials including any vehicles, business cards, schedules, stationery, packaging materials, displays, signs, promotional materials, manuals, forms, computer Software and other materials transferred to Purchaser on the Closing Date; provided that so long as Purchaser uses any SVCMC Marks and has not removed all SVCMC Marks from all materials, Purchaser shall comply with the Ethical and Religious Directives for Catholic Health Care Services issued by the National Conference of Catholic Bishops, as amended from time to time. Purchaser shall also take, and cooperate with Seller in taking, such actions as are reasonably necessary to change all telephone book listings of the Business.

Section 8.12   Supplementation and Amendment of Schedules.

(a)   Purchaser may, at its option, include in the Purchaser Disclosure Schedule, and Seller may, at its option, include in the Seller Disclosure Schedule, as the case may be, items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information disclosed in the Purchaser Disclosure Schedule or the Seller Disclosure Schedule, as the case may be, shall constitute a disclosure for all purposes of this Agreement notwithstanding any reference to a specific Section in such Disclosure Schedule, and all such information shall be deemed to qualify the entire Agreement and not just such Section.

(b)   Unless otherwise expressly set forth herein, no less than three (3) Business Days prior to the Closing Effective Date, Seller shall deliver to Purchaser an update to the Seller Disclosure Schedule to reflect changes thereto which occur between the date hereof and the Closing Effective Date in the Ordinary Course of Business in accordance with Section 8.3 hereto.

Section 8.13    Covenant Not to Compete or Solicit.

(a)    Throughout the one (1) year period immediately after the Closing Date, Seller shall not, and Seller shall not permit any of its Affiliates to, at any time, directly or indirectly, without the prior written consent of Purchaser, own, operate, manage or control any business or healthcare facility that renders the type of health care services as provided by the Business on the Closing Date within Kings County, New York. Notwithstanding the foregoing and without agreeing (implicitly or otherwise) that the following activities would otherwise be subject to the provisions of this Section 8.13(a), nothing in this Agreement shall preclude, prohibit or restrict a Seller or any of its Affiliates from engaging in any manner in the current and contemplated businesses listed in Section 8.13(a) of the Seller Disclosure Schedule.

(b)    Throughout the one (1) year period immediately after the Closing Date, Seller shall not, and Seller shall not permit any of its Affiliates to, at any time, directly or indirectly, without the prior written consent of Purchaser, solicit, recruit, employ or contract with any Purchaser employee for so long as such employee is employed by Purchaser or its Affiliates; provided that nothing shall prohibit Seller and its Affiliates from performing, or having performed on their behalf, a general solicitation for employees not specifically focused at the Purchaser's employees through the use of media, advertisement, electronic job boards or other general, public solicitations.

Section 8.14    Cooperation. Seller and Purchaser agree to reasonably cooperate with each other, from the date hereof through and following the Closing Date, in good faith, in an effort to satisfy all further conditions, undertakings and agreements contained in this Agreement.

Section 8.15    Resident Assets.

(a)    At the Closing, Seller shall deliver to Purchaser: (i) a schedule of all resident funds held by the Business delineated for each resident  (ii) a check or checks drawn on the residents' accounts maintained by the Business for the full amount of such account(s) which shall be deposited by Purchaser in a new residents' allowance account to be maintained by Purchaser; and (iii) a schedule of all bank accounts maintained by the Business on behalf of its residents (collectively, the "Residents Assets").

(b)    Seller and Purchaser shall promptly give all notices required by applicable Law in connection with the transfer of the Resident Assets.

Section 8.16    Indemnification.

(a)    Seller shall indemnify, defend and hold Purchaser and Purchaser's Affiliates, successors and assigns, harmless from and against any and all Liabilities, including, without limitation, reasonable attorneys fees (collectively, "Losses"), that are actually incurred by Purchaser (net of any Tax benefit received by Purchaser in connection therewith), to the extent that such Losses exclusively arise from or relate to any Excluded Liabilities. Notwithstanding the foregoing, Purchaser shall not be entitled to offset against any Pre-Closing Accounts Receivable received by Purchaser, which are payable to Seller pursuant to Section 2.8(a)(ii) hereof, for Losses that may be subject to indemnification under this Section 8.16(a).

(b)     In the event Purchaser receives notice of a potential claim or the commencement of a Legal Proceeding involving Purchaser relating to any of the Excluded Liabilities, Purchaser shall promptly notify Seller, provide copies to Seller of any correspondence it receives with respect to such claims or Legal Proceedings, and will fully cooperate with Seller (at Seller's expense for any reasonable third party costs actually incurred by Purchaser in providing such cooperation) in connection with the defense and/or settlement thereof. Furthermore, Purchaser shall take no action with regard to any such claim or Legal Proceeding involving Excluded Liabilities that is inconsistent with Seller's sole and exclusive right to litigate, defend, negotiate, and/or resolve any such claim or Legal Proceeding, including, but not limited to, making any payments in respect of any such claim or Legal Proceeding not expressly authorized in writing by Seller. Seller shall, at its own expense, promptly dispute or satisfy any claim involving Excluded Liabilities.

(c)     Notwithstanding any provision of this Agreement to the contrary, if Purchaser (i) fails to promptly notify Seller and provide copies to Seller of any correspondence it receives concerning claims or Legal Proceedings to which Purchaser would be entitled to indemnification from Seller under this Section 8.16, or (ii) makes any payments in respect of any claim or Legal Proceeding to which Purchaser would be entitled to indemnification from Seller under this Section 8.16 not expressly authorized in writing by Seller, then Purchaser shall not be entitled to indemnification from Purchaser under this Section 8.16 for any such claims or Legal Proceedings.

(d)     The provisions of this Section 8.16 shall expire and be of no further force and effect on the earlier of the (i) eighteen (18) month anniversary of the Receivership Date or (ii) twelve (12) month anniversary of the Closing Date.

Section 8.17    Purchaser Transition Plan. Set forth in Section 8.17 of the Purchaser Disclosure Schedule (to be provided by Purchaser no later than thirty (30) days from the date hereof) is Purchaser's plan and timeline for transitioning the Business to Purchaser as of the Closing Date (the "Transition Plan"). The Transition Plan contains milestones for operational matters that Purchaser will address and complete in order to smoothly transition the Business to Purchaser by the Closing Date, and the timeline within which all such matters shall be addressed by Purchaser in order for Purchaser to timely consummate the Contemplated Transactions by the deadline contemplated by Section 4.1 hereof. Notwithstanding any provision of this Agreement to the contrary, Purchaser acknowledges and agrees that any inability of Purchaser to achieve the milestones set forth in the Transition Plan in the time frame contemplated by the Transition Plan shall not excuse Purchaser from consummating the Contemplated Transactions within the time period specified in Section 4.1 hereof.

Section 8.18    Receivership Agreement.

(a)     The parties shall enter into a Receivership Agreement – Nursing Home (the "Receivership Agreement") in the form attached hereto as Exhibit F, pursuant to which Purchaser will assume the management and responsibility for the Business through the Closing Date, to the extent permitted by applicable law and regulations, on and in accordance with the terms and subject to the conditions of such Receivership Agreement. The Receivership Agreement is subject to the prior approval of DoH and shall not become effective unless and

until DoH has approved same, with such changes, if any, as are acceptable to Seller and Purchaser in their discretion. In the event the DoH approves the Receivership Agreement in a form acceptable to the Seller and Purchaser, the parties shall promptly execute and deliver the Receivership Agreement and the Receivership Agreement shall become effective on the date specified therein (the "Receivership Date").

(b)    The parties shall submit the form of Receivership Agreement to DoH for approval promptly following the date hereof, but in no event later than five (5) Business Days following the date hereof. The Receivership Agreement will terminate upon the Closing or otherwise in accordance with its terms.

Section 8.19    Personal Guaranty of Purchaser Obligations. Contemporaneous with the execution of this Agreement, Purchaser shall cause each of Abraham Klein and Bernard Fuchs to execute and deliver to Seller a Personal Guaranty, pursuant to which Mr. Klein and Mr. Fuchs will personally guarantee the performance of Purchaser's obligations under this Agreement, the Real Estate Contract and the Receivership Agreement. Notwithstanding the foregoing, Seller acknowledges and agrees that the Personal Guarantys executed by Mr. Klein and Mr. Fuchs shall not apply in the event this Agreement is terminated in accordance with Section 4.4(c)(iii), Section 4.4(c)(iv) or Section 4.4(c)(v), unless Purchaser is then in material breach (after any applicable cure period has lapsed) of any of its obligations under this Agreement.

# ARTICLE IX

# EMPLOYEES AND EMPLOYEE BENEFITS

Section 9.1    Offers of Employment.

(a)    Purchaser shall offer employment, commencing on the Closing Date, to all of the employees of Seller, including those on vacation, leave of absence, disability or layoff, who were employed by the Seller on the day immediately preceding the Closing Date and who meet Purchaser's objective hiring criteria, at their final hourly wage rate. All such employees who accept Purchaser's offer of employment shall become employees of Purchaser as of the Closing Date (hereinafter collectively referred to as the "Transferred Employees"). Purchaser shall honor Transferred Employees' seniority dates with Seller for purposes of vacation scheduling. Purchaser shall not assume any of Seller's CBAs, but prior to Closing, shall comply with Federal law and will bargain in good faith with the applicable union or unions with respect to the terms and conditions of represented Employees.

(b)    Subject to the provisions of the Receivership Agreement, prior to, or in connection with, the Closing, Purchaser shall take no action to cause Seller or the Business to terminate the employment of any employee, and neither Seller nor the Business shall be under any obligation to terminate any employee prior to or on the Closing Date. As of the Closing Date Seller shall not have any liability or responsibility with respect to any employee benefit plan, program, policy or other arrangement maintained by or contributed to by Purchaser with respect to Transferred Employees. Except as set forth in Section 9.2 below, Purchaser shall not be obligated after the Closing Date for any obligation or liability of Seller to Employees which arises prior to the Closing Date, including but not limited to any and all employee compensation

and benefit obligations or any obligation that may arise from the CBAs or otherwise. Except as set forth in <u>Section 9.2</u> below, Purchaser shall not assume any CBAs, employee compensation and/or benefit obligations or other terms and conditions of employment for any employee pursuant to the CBAs or otherwise. To the extent that Purchaser offers employment to employees of Seller, their rates of pay on and after the Closing Date shall be determined by Purchaser.

Section 9.2    <u>Employment Terms; Employee Benefits</u>.

(a)    As soon as practicable after the Closing Date, Purchaser shall adopt a retirement plan which shall be qualified under Section 501(a) and 401(k) of the Code.

(b)    Purchaser shall assume all wage payment obligations for vacation, holiday time, sick pay, and personal days (but not including any CBA required contributions to any fund related to any such obligations) which were accrued by employees of Seller under the terms of Seller's Plans and the CBAs but not yet taken or paid as of the Closing Effective Date (collectively, the "<u>PTO</u>"), and shall also assume all severance obligations of Seller existing as of or arising on or after the Closing Effective Date with respect to employees of Seller, whether or not hired by Purchaser.

(c)    To the extent Seller becomes subject to any Liabilities under the WARN Act or any comparable state or local Law by reason of the termination of the employment by Purchaser (or any successor thereto) of any Transferred Employee on or after the Closing Date, Purchaser shall be responsible therefor. Without limiting the effect of the foregoing sentence, Purchaser shall be solely responsible for giving any notice required by the WARN Act or any comparable state or local Law to be given to any Transferred Employee whose employment is terminated after the Closing Date.

(d)    Except to the extent otherwise required by applicable Law, Purchaser shall be responsible for providing continuation coverage, as required by Section 4980B(f) of the Code and Part 6 of Title I of ERISA or any similar Law ("<u>COBRA</u>"), under a group health plan to be maintained by Purchaser, to all employees of Seller (and other "qualified beneficiaries" under COBRA with respect to such employees) who for any reason experience a COBRA "qualifying event" within the meaning of Section 4980B of the Code and Part 6 of Title I of ERISA prior to the Closing. Purchaser shall be responsible for any COBRA obligations in respect of Transferred Employees (if any) arising with respect to qualifying events that occur on or after the Closing Date. Additionally, on and after the Closing Date, Purchaser shall provide COBRA continuation coverage to all employees whether or not hired by Purchaser.

(e)    Nothing contained in this Agreement, expressed or implied, shall be construed to confer upon any of the employees or Transferred Employees (including any beneficiary or dependent thereof) any rights or remedies whatsoever including, without limitation, any right to employment or continued employment for any specified period or of any nature or kind under or by reason of this Agreement.

# ARTICLE X

## CONDITIONS TO CLOSING

Section 10.1    <u>Conditions Precedent to Obligations of Purchaser</u>. The obligation of Purchaser to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Seller set forth in this Agreement shall be true and correct (without giving effect to any materiality or Material Adverse Effect qualifiers set forth therein) at and as of the Closing Effective Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date) and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated as of the Closing Date, to the foregoing effect; <u>provided</u> that in the event any such representation or warranty has been breached the condition set forth in this <u>Section 10.1(a)</u> shall nevertheless be deemed satisfied unless the effect of any breach of an individual representation or warranty, or the effect of all such breaches of representations and warranties taken together, result in a Material Adverse Effect;

(b)    Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated as of the Closing Date, to the forgoing effect; <u>provided</u> that the condition set forth in this <u>Section 10.1(b)</u> shall be deemed satisfied unless all such failures to so perform or comply taken together result in a Material Adverse Effect;

(c)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in clauses (a) through (i) of <u>Section 4.2</u> hereto; and

(d)    all notices, consents, approvals, licenses or Permits, or waivers thereof, of the Governmental Bodies set forth in <u>Section 10.1(d)</u> of the Seller Disclosure Schedule and in <u>Section 10.2(c)</u> of the Purchaser Disclosure Schedule shall have been made or obtained, and any applicable waiting period under any Antitrust Laws shall have expired or been terminated.

Section 10.2    <u>Conditions Precedent to Obligations of Seller</u>.  The obligation of Seller to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Purchaser set forth in this Agreement shall be true and correct (without giving effect to any materiality qualifiers set forth therein) at and as of the Closing, except to the extent such representations and warranties relate expressly to an earlier date (in which case such representations and warranties shall be true and correct, on and as of such earlier date) and Seller shall have received a certificate signed by an authorized

officer of Purchaser, dated as of the Closing Date, to the foregoing effect; <u>provided</u> that in the event any such representation or warranty has been breached the condition set forth in this <u>Section 10.2(a)</u> shall nevertheless be deemed satisfied unless the effect of all such breaches of representations and warranties taken together would prevent or materially delay the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions;

(b) Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect; <u>provided</u> that the condition set forth in this <u>Section 10.2(b)</u> shall be deemed satisfied unless all such failures to so perform or comply taken together prevent or materially delay the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions;

(c) all notices, consents, approvals, licenses or Permits, or waivers thereof, of the Governmental Bodies set forth in <u>Section 10.2(c)</u> of the Purchaser Disclosure Schedule and in <u>Section 10.1(d)</u> of the Seller Disclosure Schedule shall have been made or obtained, and any applicable waiting period under any of the Antitrust Laws shall have expired or been terminated;

(d) the closing of the transactions contemplated by the Real Estate Contract have closed or will close simultaneously with the Contemplated Transactions; and

(e) Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in <u>Section 4.3</u> hereto.

Section 10.3 <u>Conditions Precedent to Obligations of Purchaser and Seller</u>. The respective obligations of the parties to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser or Seller, respectively as the case may be, in whole or in part to the extent permitted by applicable Law):

(a) there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions;

(b) the Sale Order shall have been entered by the Bankruptcy Court and not be subject to any stay or the time for an appeal has expired; and

(c) in the event an appeal is taken from the entry of the Sale Order on the grounds that the Sale Order improperly authorized the sale of assets to Purchaser free and clear of all Liens, such appeal shall have been finally decided affirming the entry of the Sale Order and all time to further appeal shall have expired.

Section 10.4 <u>Frustration of Closing Conditions</u>. No party may rely on the failure of any condition set forth in <u>Section 10.1</u>, <u>10.2</u> or <u>10.3</u> hereto, as the case may be, to excuse it from consummating the Contemplated Transactions if the failure of any such condition set forth in

Section 10.1, 10.2 or 10.3 hereto was primarily caused by such party's failure to materially comply with any provision of this Agreement.

## ARTICLE XI

## TAXES

Section 11.1    Transfer Taxes. Seller shall pay any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges (including any interest and penalty thereon) payable in connection with the Contemplated Transactions ("Transfer Taxes"). Seller shall make due and timely payment of any Transfer Tax to the applicable Tax Authority and shall provide Purchaser with a true and complete copy of each Tax Return relating to Transfer Taxes as filed and evidence of the timely filing of such Tax Return and payment of such Transfer Tax.  The parties shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds of Transfer Taxes.

Section 11.2    Prorations. All applicable real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets, if any, for any taxable period that includes the Closing Effective Date and ends after the Closing Effective Date, whether imposed or assessed before or after the Closing Effective Date and payroll due Transferred Employees (including split week), shall be prorated between Seller and Purchaser as of 12:01 a.m. (New York time) on the Closing Effective Date based on the number of days in such period through and including the day prior to the Closing Effective Date and the number of days in such period on and after the Closing Effective Date; provided, however, that nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party. If any Taxes subject to proration are paid by Purchaser, on the one hand, or Seller, on the other hand, the proportionate amount of such Taxes paid (or in the event of a refund of any portion of such Taxes previously paid is received, such refund) shall be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund).

Section 11.3    Purchase Price Allocation. The Purchase Price will be allocated for Tax purposes (the "Allocation") among the Purchased Assets as set forth in Section 11.3 of the Purchaser Disclosure Schedule. The parties agree that no portion of the Purchase Price shall be allocated to the covenants contained in Section 8.17 hereto. The Seller and the Purchaser shall report the Allocation as provided in Section 1060 of the Code, and shall prepare and file all Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Allocation. No party shall take any position (whether in audits, Tax Returns or otherwise) that is inconsistent with the Allocation unless required to do so by applicable law.

Section 11.4    Cooperation on Tax Matters. The parties shall furnish or cause to be furnished to each other, as promptly as practicable following the request therefore, and at the expense of the requesting party, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other filings relating to Tax matters, for the preparation for and defense of any Tax audit, for the preparation of any Tax protest, or for the prosecution or defense of any suit or other proceeding relating to Tax matters.

# ARTICLE XII

## MISCELLANEOUS

Section 12.1 <u>Expenses</u>. Except as otherwise expressly provided in this Agreement, each party shall bear its own costs and expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

Section 12.2 <u>Specific Performance</u>. Seller agrees that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached by Seller, irreparable damage to Purchaser would occur, no adequate remedy at law would exist and damages would be difficult to determine, and that Purchaser shall be entitled to specific performance of the terms hereof (without the posting of any bond), in addition to any other remedy at law or equity. The rights set forth in this <u>Section 12.2</u> shall be in addition to any other rights which Purchaser may have at law or in equity pursuant to this Agreement.

Section 12.3 <u>Governing Law; Jurisdiction; Consent to Service of Process</u>. This Agreement and any disputes arising in connection herewith shall be governed by and construed in accordance with the internal Laws of the State of New York without regard to the conflict of law principles thereof. Without limiting any party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (b) any and all Legal Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations pursuant to <u>Section 12.2</u> hereto; <u>provided</u> that if the Bankruptcy Case has closed, each of the parties hereto irrevocably agrees that any Legal Proceeding with respect to this Agreement or for recognition and enforcement of any judgment in respect hereof shall be brought and determined exclusively in the United States District Court for the Southern District of New York or if such Legal Proceeding may not be brought in such court for jurisdictional purposes, exclusively in the Supreme Court of New York sitting in the County of New York. Each of the parties hereto hereby (a) irrevocably submits with regard to any such Legal Proceeding to the exclusive personal jurisdiction of the aforesaid courts in the event any dispute arises out of this Agreement or any transaction contemplated hereby, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the state or federal courts referenced above. Each of the parties hereto further agrees to accept and acknowledge service of any and all process which may be served in any such Legal Proceeding in said courts in the State of New York, and agrees that service of process upon such party by a method permitted by the applicable Laws of the State of New York to such party's address as set forth in <u>Section 12.6</u> hereto, will be deemed in every respect effective service of process upon such party, in any Legal Proceeding.

Section 12.4 <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY ACTION TO WHICH THEY ARE PARTIES INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

Section 12.5 <u>Entire Agreement; Amendments and Waivers</u>. This Agreement (including the schedules and exhibits hereto), the Confidentiality Agreement, the Escrow Agreement, the Indemnity Escrow Agreement, the Personal Guarantys, and the Receivership Agreement contain the entire understanding and agreement of the parties hereto and thereto with respect to the subject matter hereof and thereof, and supersede all previous written or oral negotiations, commitments, understandings and writings. This Agreement may be amended, modified, supplemented or changed, and any provision hereof can be waived, only by written instrument duly executed by all of the parties hereto. Any party hereto may, by written notice to the other parties hereto (a) extend the time for performance of any of the obligations of the other party under this Agreement, (b) waive any inaccuracies in the representations or warranties of the other party contained in this Agreement, (c) waive compliance with any of the conditions or covenants of the other party contained in this Agreement or (d) waive or modify performance of any of the obligations of the other party under this Agreement. Except as provided in the immediately preceding sentence, no action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach, whether of a similar or dissimilar nature. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

Section 12.6 <u>Notices</u>. All notices and other communications under this Agreement shall be in writing and, unless otherwise provided in this Agreement, shall be deemed given (a) when delivered personally by hand, (b) when sent by facsimile (confirmed in writing by mail promptly thereafter dispatched), (c) three (3) days after being mailed by certified or registered mail, postage prepaid, return receipt requested or (d) one (1) Business Day following the day sent by a nationally recognized overnight courier service, in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

     (a)     If to Purchaser, to:

     KFG Operating I, LLC
     109-40 Saultell Ave.
     Rego Park, NY 11368
     Fax:    (718) 271-4064
     Attn:   Abraham Klein

Managing Member

with a copy to (which shall not constitute notice):

Tenzer & Lunin, LLP
1775 Broadway, Suite 608
New York, NY 10019

Fax:  (212) 262-6959

(b)     If to Seller, to:

Saint Vincent Catholic Medical Centers
170 West 12th Street
New York, New York 10011
Fax:     (212) 356-4990
Attn:    General Counsel

with a copy to (which shall not constitute notice):

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Fax:     (212) 715-8000
Attn:    Adam C. Rogoff, Esq.

And

Garfunkel Wild, P.C.
111 Great Neck Road, Suite 503
Great Neck, New York 11021
Fax:     (516) 466-5964
Attn:    Judith A. Eisen, Esq.

Section 12.7    Invalid Provisions.  If any term or other provision of this Agreement is held to be invalid, illegal, or incapable of being enforced under any present or future Law, and if the rights or obligations under this Agreement of Seller on the one hand and Purchaser on the other hand will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

Section 12.8    Binding Effect; Assignment; Successors and Assigns. This Agreement shall apply to, be binding in all respects upon and inure to the benefit of the parties and their

respective successors, administrators and permitted assigns. A successor to Seller shall include Seller as a reorganized debtor. No assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of Law or otherwise) without the prior written consent of Purchaser and Seller and any attempted assignment without the required consents shall be void. No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors, administrators and permitted assigns.

Section 12.9 <u>No Personal Liability</u>. In entering into this Agreement, the parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any party hereto shall be personally liable or responsible to any other party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named parties only (but nothing contained herein shall limit the Liability of any Person for his or her fraudulent acts).

Section 12.10 <u>Execution in Counterparts</u>. This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original, but all of which together will constitute one (1) and the same agreement. Any counterpart may be executed by facsimile signature, or by electronic mail in "portable document format" (".pdf"), and such facsimile or .pdf signature shall be deemed an original.

Section 12.11 <u>Survival of Representations, Warranties and Covenants</u>. The representations, warranties and covenants of the parties contained in this Agreement shall not survive the Closing; <u>provided</u>, <u>however</u>, that the provisions of <u>Section 2.8</u>, <u>Section 2.10</u>, <u>Section 8.3(i)</u>, and <u>Section 8.16</u> shall survive the Closing in accordance with the terms thereof.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**BISHOP FRANCIS J. MUGAVERO**
**CENTER FOR GERIATRIC CARE, INC.**

By: _____

     Name:

     Title:

**KFG OPERATING I, LLC**

By: _____

     Name: _Charles - Edward Gios_

     Title: _Member_

# PURCHASE AND SALE AGREEMENT

By and Between

## BISHOP FRANCIS J. MUGAVERO CENTER FOR GERIATRIC CARE, INC.

as Seller

and

## KFG LAND I, LLC

as Purchaser

Dated as of: September 21, 2010

Property

155 Dean Street
Brooklyn, New York

# TABLE OF CONTENTS

PAGE

ARTICLE 1 DEFINITIONS..................................................................................................1

ARTICLE 2 GENERAL TERMS.........................................................................................2

    SECTION 2.1. The Transaction........................................................................2

    SECTION 2.2. Purchase Price..........................................................................2

ARTICLE 3 PERMITTED EXCEPTIONS; TITLE INSURANCE.............................................3

    SECTION 3.1. Sale Subject to..........................................................................3

    SECTION 3.2. Title Evidence ..........................................................................3

    SECTION 3.3. Permitted Exceptions ...............................................................4

ARTICLE 4 APPORTIONMENTS AND PAYMENTS ...........................................................6

    SECTION 4.1. Apportionments Relating to the Property ...............................6

    SECTION 4.2. Taxes and Assessments............................................................7

    SECTION 4.3. Transfer of Utilities..................................................................8

    SECTION 4.4. Transfer Taxes..........................................................................8

    SECTION 4.5. Tax Returns...............................................................................8

    SECTION 4.6. Title Charges.............................................................................8

    SECTION 4.7. Transaction Expenses...............................................................8

    SECTION 4.8. Survival ....................................................................................8

ARTICLE 5 COVENANTS REGARDING THE PROPERTY....................................................9

    SECTION 5.1. Maintenance and Operation of the Property ...........................9

ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF PURCHASER............................9

    SECTION 6.1. Generally..................................................................................9

    SECTION 6.2. Closing Conditions; Survival of Representations and Warranties...........10

ARTICLE 7  REPRESENTATIONS AND WARRANTIES OF SELLER ................................11

SECTION 7.1.  Generally ..........................................................................11

SECTION 7.2.  Property Representations .................................................11

SECTION 7.3.  Closing Conditions; Survival of Representations and Warranties ..........12

SECTION 7.4.  Knowledge of Seller ..........................................................13

ARTICLE 8  CLOSING DATE ..........................................................................13

SECTION 8.1.  Closing Date .....................................................................13

ARTICLE 9  CLOSING DOCUMENTS ................................................................13

SECTION 9.1.  Closing. ............................................................................13

SECTION 9.2.  Further Assurances .............................................................13

ARTICLE 10  NOTICES ...................................................................................14

SECTION 10.1.  Notices ............................................................................14

ARTICLE 11  BROKER ...................................................................................15

ARTICLE 12  DEFAULTS; REMEDIES ..............................................................15

SECTION 12.1.  Purchaser's Default ...........................................................15

SECTION 12.2.  Seller's Default .................................................................16

SECTION 12.3.  Cross-Default with Asset Agreement ...................................16

ARTICLE 13  CASUALTY; CONDEMNATION ....................................................16

SECTION 13.1.  Casualty ..........................................................................16

SECTION 13.2.  Condemnation ..................................................................17

ARTICLE 14  AS-IS; WHERE-IS; DISCLAIMER; WAIVER OF CLAIMS ..............18

SECTION 14.1.  Disclaimers; As-Is, Where-Is Condition. ..............................18

SECTION 14.2.  Acceptance of Closing Documents; Waivers ..........................19

SECTION 14.3.  Survival ...........................................................................19

GWTDOCS 1612365v3

ARTICLE 15  ENVIRONMENTAL STUDY .................................................................19

ARTICLE 16  ESCROW .........................................................................................19

    SECTION 16.1.  Escrow Terms ...........................................................................19

ARTICLE 17  BANKRUPTCY COURT MATTERS ...............................................20

ARTICLE 18  MISCELLANEOUS .........................................................................20

    SECTION 18.1.  Entire Agreement ......................................................................20

    SECTION 18.2.  Modification .............................................................................20

    SECTION 18.3.  Binding Agreement ...................................................................20

    SECTION 18.4.  Assignment................................................................................20

    SECTION 18.5.  No Press Releases .....................................................................21

    SECTION 18.6.  Illegality ...................................................................................21

    SECTION 18.7.  Choice of Law ..........................................................................21

    SECTION 18.8.  Construction .............................................................................21

    SECTION 18.9.  Binding Effect; Assignment; Successors and Assigns...........................21

    SECTION 18.10.  Ambiguities ............................................................................22

    SECTION 18.11.  Expenses.................................................................................22

    SECTION 18.12.  Counterparts ...........................................................................22

    SECTION 18.13.  Waiver of Trial by Jury ...........................................................22

    SECTION 18.14.  Third Party Beneficiaries .........................................................22

    SECTION 18.15.  Jurisdiction. ............................................................................22

    SECTION 18.16.  Seller's Constituents ................................................................23

    SECTION 18.17.  Purchaser's Constituents ..........................................................23

    SECTION 18.18.  No Recording ..........................................................................23

    SECTION 18.19.  Not an Offer ...........................................................................23

    SECTION 18.20.  Failure of Deposit....................................................................23

SECTION 18.21. No Waiver ............................................................................................24

SECTION 18.22. Severability .........................................................................................24

SECTION 18.23. No Survival .........................................................................................24

GWTDOCS 1612365v3

# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** is entered into by and between **BISHOP FRANCIS J. MUGAVERO CENTER FOR GERIATRIC CARE, INC.**, a New York not-for-profit corporation ("**Seller**") and **KFG LAND I, LLC**, a New York limited liability company ("**Purchaser**") as of the 21st day of September, 2010.

**WHEREAS**, Seller, along with certain of its affiliates (collectively, the "**Debtors**"), are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on April 14, 2010 (the "**Petition Date**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") (Case No. 10-11963(CGM)) (the "**Bankruptcy Case**");

**WHEREAS**, Seller is the owner of the Property (as hereinafter defined); and

**WHEREAS**, Subject to the approval of the Bankruptcy Court, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code the Property, all as more specifically provided herein.

**WHEREAS**, Simultaneously with the execution and delivery of this Agreement, Seller, as seller, and KFG Operating I, LLC ("**Asset Purchaser**"), as buyer, entered into that certain Asset Purchase Agreement for the purchase and sale of certain assets used in connection with the operation of Bishop Mugavero, a 288 bed skilled nursing facility which is located at the Real Estate (the "**Asset Agreement**").

**WHEREAS**, the Closing (defined below) is contingent upon the closing of the transactions contemplated by the Asset Agreement.

**NOW, THEREFORE**, subject to the terms and conditions of this Agreement, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, including the mutual covenants and agreements set forth herein, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

For purposes of this Agreement, all capitalized terms and certain other terms used herein shall have the respective meanings specified in <u>Schedule I</u> attached hereto and made a part hereof.

## ARTICLE 2
## GENERAL TERMS

### SECTION 2.1.    The Transaction.

2.1.1.  Subject to the terms and conditions of this Agreement and the entry of the Sale Order, Seller agrees to sell, transfer, convey and assign to Purchaser, and Purchaser agrees to purchase and accept from Seller on the Closing Date (as defined herein) free and clear of all liens, tenancies, leases, options, rights of first refusal, claims and all Interests (as defined in the Sale Order), subject only to Permitted Exceptions, and any other interest to the extent acceptable to Purchaser, as provided in the Sale Order pursuant to Section 363(b) and Section 363(f) of the Bankruptcy Code, Seller's right, title and interest, in and to (i) that certain real property as more particularly described on Schedule II attached hereto and made a part hereof together with the buildings and improvements thereon located at and commonly known as 155 Dean Street, Brooklyn, New York (collectively, the **"Real Estate"**), and (ii) the furniture, furnishings, fixtures, equipment and other items of personal property exclusively owned by Seller located in or upon, and used in connection with, the Real Estate (collectively, the **"Personalty"**). The Real Estate and the Personalty are to be conveyed together with (x) all easements, rights of way, air or development rights, reservations, privileges, appurtenances, and other estates and rights of Seller, if any, pertaining to its interest in the Real Estate, and (y) all right, title and interest of Seller, if any, in and to all alleys adjoining its interest in the Real Estate and in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining its interest in the Real Estate to the center line thereof, and (z) subject to apportionment if required hereunder, all right, title and interest of Seller, if any, in and to any award made for any taking by condemnation or any damages to its interest in the Real Estate by reason of a change of grade of any street, road or avenue (such taking or damages, a **"Condemnation"**) or to be made in lieu thereof and in and to any unpaid award for any Condemnation (the Real Estate and the Personalty, together with all of the foregoing, are hereinafter sometimes collectively referred to herein as the **"Property"**).

### SECTION 2.2.    Purchase Price.

2.2.1.  The **"Purchase Price"** for the Property and the various assignments incidental thereto referred to herein is TEN MILLION SEVEN HUNDRED SIXTY-SEVEN THOUSAND AND THREE HUNDRED DOLLARS **(US $10,767,300.00)**. The Purchase Price shall be payable (i) by the payment of the Escrow Deposit in immediate funds, and (ii) the balance in cash (by wire transfer) at the Closing as directed by Seller in writing at least two (2) Business Days prior to the Closing. Seller may direct, among other things, that Purchaser pay a portion of the Purchase Price at the Closing, in an amount or amounts specified by Seller, to persons or entities other than Seller for Seller's purposes, including to the Title Company.

2.2.2.  Purchaser has already deposited with Escrow Agent an amount equal to ONE MILLION SEVENTY-SIX THOUSAND SEVEN HUNDRED THIRTY **(US $1,076,730.00)** (the **"Initial Deposit"**). Purchaser and Seller acknowledge that Purchaser shall deposit, if necessary and as security for the performance of Purchaser's obligations hereunder, within one (1) Business Day after the date hereof, by wire transfer to the account described in Schedule III, a cash earnest money deposit in the amount equal to an amount such

-2-

that together with the Initial Deposit, the Escrow Fund shall be equal to ten percent (10%) of the Purchase Price (the **"Additional Deposit"**; the Initial Deposit together with the Additional Deposit and any interest earned thereon shall be collectively referred to herein as the **"Escrow Deposit"**). The Escrow Deposit shall be held by Escrow Agent, in trust, in an interest bearing account pursuant to and in accordance with the provisions of an Escrow Agreement among Seller, Purchaser and Escrow Agent, a copy of which is attached hereto and made a part hereof as Exhibit A (the "**Escrow Agreement**").

2.2.3. The Parties agree that the Personalty has de minimis value. Accordingly, no portion of the Purchase Price is attributable to the Personalty.

## ARTICLE 3
## PERMITTED EXCEPTIONS; TITLE INSURANCE

**SECTION 3.1.    Sale Subject to.**  Subject to the terms and condition of this Agreement and pursuant to the entry of the Sale Order, Seller shall convey, and Purchaser shall accept fee simple title to the Real Estate, insurable by the Title Company at regular premiums, without exceptions or reservations of any type or kind, except (a) ALTA standard printed exceptions other than those that can be removed by the Sale Order, or by an affidavit of Seller to be provided pursuant to Section 3.2.3 hereof, (b) the Permitted Exceptions, and (c) the obligations expressly assumed by Purchaser under this Agreement.  The parties hereby agree that **"Title Company"** shall mean Kensington Title Company and/or Continental Abstract Corporation underwriting through Fidelity National Title Insurance Company.    Notwithstanding the foregoing to the contrary, Purchaser and Seller each acknowledges and agrees that Purchaser must use and employ Fidelity National Title Insurance Company through Kenneth Cohen to insure at least thirty (30%) percent of the insurance insuring (i) Purchaser's title to the Property and (ii) any mortgage executed and delivered by Purchaser at Closing.

3.1.1. Pursuant to the Sale Order, all monetary liens and claims (the "**Liens**") shall attach to the net proceeds of the sale (the "**Net Proceeds**") to the same extent they encumbered the Property.  To the extent Seller is required to satisfy any of the Liens from the Net Proceeds, Seller shall make such payments in accordance with the Sale Order or by further order of the Bankruptcy Court.  Nothing herein is a waiver of the rights of Seller or any other third party to contest the validity, amount or priority of any Liens and the right of any claimant or lienholder to have their respective liens satisfied from Net Proceeds.

**SECTION 3.2.    Title Evidence.**  Purchaser shall order a title commitment within ten (10) days after the date hereof and shall cause a title report to be delivered to Seller's counsel within thirty (30) days after the date hereof.

3.2.1. If Purchaser's title commitment/report or any update thereto reflects any title exceptions that are not Permitted Exceptions and, therefore, which Purchaser is not required to accept (the **"Non-Permitted Exceptions"**), Seller shall use reasonable efforts, at or prior to Closing, solely through the entry of the Sale Order and as provided in Section 3.1.1 above, to attempt to remove the following: (i) any and all of the Non-Permitted Exceptions that Seller willfully placed of record or consented to be placed of record following the date of the Title Evidence, and (ii) any and all other Non-Permitted Exceptions that may be removed by the entry

-3-

of the Sale Order. Seller shall have no obligation with respect to the clearance of title as required hereunder other than the delivery of the Sale Order. Seller shall have the right to adjourn the Closing Date, from time to time, up to ninety (90) days in the aggregate for the purpose of removing/eliminating such Non-Permitted Exceptions.

3.2.2. In the event that there exist any Non-Permitted Exception which is not removed through the entry of the Sale Order, Purchaser may elect within five (5) Business Days after the entry of the Sale Order, and may also elect within five (5) Business Days after the delivery to Seller's counsel of any update to the title report showing any Non-Permitted Exception which is not removed through the entry of the Sale Order, as the case may be, to either (i) not consummate the transactions contemplated hereby, in which event this Agreement shall be terminated and of no further force and effect, the Escrow Deposit shall be returned to Purchaser and neither of the parties hereto shall have any rights or obligations to the other hereunder or (ii) consummate the transactions contemplated hereby subject to such additional exceptions and proceed to Closing without an abatement of the Purchase Price. Purchaser's failure to timely deliver a notice electing to not consummate the transactions contemplated hereby shall be deemed Purchaser's election to consummate the transaction in accordance with the terms and conditions of this Agreement. Notwithstanding the foregoing, if Purchaser elects to terminate this Agreement as set forth above, Seller shall have the right to void such termination by providing written notice to Purchaser that Seller elects, in its sole discretion, to cure the Non-Permitted Exception by either removing the same at or prior to Closing or providing Purchaser with a credit against the Purchase Price equal to the amount of the cost to cure the Non-Permitted Exception. In the event Seller elects to cure the Non-Permitted Exception or provide such credit, Purchaser shall be obligated to complete the transaction contemplated by this Agreement.

3.2.3. If required by the Title Company, Seller agrees to execute, acknowledge and deliver a standard and customary owner's title affidavit at Closing as modified for a debtor in chapter 11 and such other matters as the Title Company may reasonably require in order to issue a policy of title insurance to Purchaser in the manner required under this Agreement; provided however that Seller shall not be obligated to pay any amounts to or claims of third parties in order to do so (other than as required by the Sale Order or pursuant to Sections 3.1.1 (as and to the extent provided for therein) and 3.2.1 above).

**SECTION 3.3.** **Permitted Exceptions**. **"Permitted Exceptions"** means:

3.3.1. Covenants and Conditions of Waiver of Legal Grade made by Catholic Medical Center of Brooklyn & Queens, Inc. dated October 7, 1992 and recorded October 13, 1992 in Reel 2926 page 391;

3.3.2. the state of facts that an accurate survey of the Property would show (including encroachments, projections, retaining walls and stoops) provided that any such facts shall not materially adversely affect the use of any material portion of the existing improvements for its current use;

3.3.3. liens for unpaid taxes, assessments, charges, rents and any other governmental charges, which are not yet due and payable and are apportioned in accordance with the provisions of Article 4 hereof;

-4-

3.3.4. all rights and easements, for electricity, gas, telephone, water, cable television and any other utilities to maintain and operate lines, cables, poles and distribution boxes in, over and upon the Real Estate;

3.3.5. possible projections and/or encroachments of retaining walls, foundations, stoops, areas, steps, sills, trim, cornices, standpipes, fire escapes, coal chutes, casings, ledges, water tables, lintels, porticos, keystones, windows, hedges, copings, cellar doors, sidewalk elevators, fences, fire escapes and the like, or similar projections or objects upon, under or above any adjoining buildings and/or streets or avenues or those belonging to adjoining premises which encroach upon the Real Estate, or within any set back areas, provided that the Title Company shall insure that such projections or encroachments may remain undisturbed so long as the buildings and improvements shall stand and minor variations between the lines of record title and fences, retaining walls, hedges, and the like;

3.3.6. possible non-material variations between the tax diagram or the tax map and the record description;

3.3.7. (a) any and all violations of building, fire, sanitary, environmental, housing and similar laws, municipal ordinances, orders or requirements affecting the Property from or by any federal, state, county or municipal department, agency, authority or bureau having or asserting jurisdiction (each, a **"Governmental Authority"**) and (b) any lien attaching to the Property as a result of the foregoing described in clause (a) (the foregoing described in clauses (a) and (b) being hereafter referred to collectively as the **"Violations"**);

3.3.8. building, zoning, subdivision and other governmental laws, codes and regulations, and landmark, historic and wetlands designations;

3.3.9. any matter created or caused by Purchaser or its agents; and

3.3.10. any matters which the Title Company may raise, provided that the Title Company shall agree to omit or insure without additional premium to Purchaser against collection of the same out of the Property.

**SECTION 3.4.**    **Existing Mortgage.** At the request of Purchaser, Seller shall endeavor to cause General Electric Capital Corporation (the **"Existing Lender"**), the holder of a mortgage currently encumbering the Property (the **"Existing Mortgage"**) (to the extent the Existing Mortgage is not subject to any then pending challenge in the Bankruptcy Case as to its validity, priority or enforceability) to assign the Existing Mortgage and the promissory note(s) secured thereby to Purchaser's lender (without recourse, representation, or warranty) at Closing; provided, however, (a) Purchaser shall pay all fees, charges, costs and expenses of the Existing Lender in connection with such assignment of the Existing Mortgage and the promissory note(s) secured thereby, and the preparation of the documents effectuating such assignment and the recording thereof, (b) if the Existing Lender agrees to such assignment and such assignment is consummated at Closing, Purchaser shall accept title to the Property subject to (i) the Existing Mortgage assigned at the Closing, the promissory note(s) secured thereby and any financing statements relating thereto and (ii) the other Permitted Exceptions, to the extent that any mortgage obtained by Purchaser in connection with the acquisition of the Premises is exempt

-5-

from mortgage recording tax under Article 11 of the Tax Law, Purchaser shall pay to Seller at Closing an amount equal to fifty percent (50%) of the mortgage recording tax that would have otherwise been due in connection with the recording of Purchaser's mortgage but for the exemption described herein after subtracting the out-of-pocket expenses incurred by Purchaser and described in clause (a) above. Such assignment of the Existing Mortgage and the promissory note(s) secured thereby shall be in compliance with the applicable requirement of Section 275 of the New York Real Property Law. Purchaser acknowledges that Seller shall not be required to request an assignment of mortgage from the Dormitory Authority of the State of New York.

## ARTICLE 4
## APPORTIONMENTS AND PAYMENTS

**SECTION 4.1.** **Apportionments Relating to the Property.** The following shall be apportioned between Seller and Purchaser at the Closing with respect to the Property, as of 11:59 PM of the day immediately preceding the Closing Date (the "**Apportionment Date**"), and the net aggregate amount thereof either shall be paid by Purchaser to Seller or credited to Purchaser towards the Purchase Price, as the case may be, at the Closing (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party);

4.1.1. real property taxes, and any assessments (or installments thereof), including with respect to Business Improvement Districts, on the basis of the fiscal year for which payable; if the Apportionment Date shall be prior to the date on which the real property tax rate is fixed, the apportionment of real property taxes shall be made on the basis of the tax rate for the preceding year applied to the latest assessed valuation;

4.1.2. to the extent not metered: water rates and charges, sewer taxes and rents and electricity and other utility charges;

4.1.3. fuel oil and liquid propane gas, if any, at the cost per gallon most recently charged to Seller, based on the supplier's measurements thereof taken within ten (10) days of the Closing Date;

4.1.4. insurance proceeds received by Seller, if any, and payable to Purchaser pursuant to Article 13 hereof to the extent not applied to repair or restore the Property in accordance with the provisions of this Agreement;

4.1.5. unopened and unused supplies purchased and not consumed for the Property, if any; and

4.1.6. annual municipal permit and inspection fees and other fees for licenses and permits assigned to Purchaser, if any.

**SECTION 4.2.**    **Taxes and Assessments.**

4.2.1. If, on the Closing Date, all or any portion of the Real Estate shall be or shall have been affected by assessments (including Business Improvement District assessments) that are, or which may become, payable in annual installments, of which the first installment is then a charge or lien or has been paid or if any of the improvements to be paid for thereby are in place or commenced, then, for purposes of this Agreement only, the installment(s) which shall have been paid or the installment which shall be then due and payable shall be apportioned between Seller and Purchaser and all of the unpaid installments of any such assessments, including those which are to become due and payable after the date hereof, shall continue to be liens upon the Real Estate, it being understood and agreed that Seller and Purchaser shall be responsible for a pro rata share of such assessment, with Purchaser being responsible for the period from and after the Apportionment Date and Seller being responsible for the period prior to the Apportionment Date, regardless of when such installments are due and payable (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

4.2.2. To the extent that any refund of real property taxes, assessments (including Business Improvement District assessments), water rates and charges, sewer taxes and rents or any other utility made after the Closing Date is applicable to a period before the Closing Date, such refund shall be payable to Seller or returned by Purchaser to Seller, net of the actual costs incurred by Purchaser in obtaining same.

4.2.3. To the extent that any refund of real property taxes, assessments (including Business Improvement District assessments), water rates and charges or sewer taxes and rents made after the Closing Date is applicable to a period after the Closing Date, such refund shall be payable to Purchaser or returned by Seller to Purchaser, subject to the actual costs incurred by Seller in obtaining same (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

4.2.4. From and after the date of this Agreement, (a) Seller shall not, without the prior written consent of Purchaser, which consent may be granted or withheld in Purchaser's sole discretion, withdraw, compromise or settle any certiorari proceedings for any fiscal period subsequent to the period in which the Closing is to occur, and (b) Seller shall not, without the prior written consent of Purchaser, which consent shall not be unreasonably withheld or delayed, withdraw, compromise or settle any certiorari proceedings, if any, for any fiscal period in which the Closing is to occur. Any tax savings or refund for any year or years prior to the tax year in which the Closing herein occurs shall belong solely to Seller. Purchaser or Seller, as the case may be, shall execute all consents, receipts, instruments and documents which may reasonably be requested in order to facilitate in instituting or settling such proceeding, as the case may be, and collecting the amount of any refund or tax savings. The net refund of taxes, if any, for such fiscal tax year in which the Closing occurs shall be divided between Seller and Purchaser in accordance with the apportionment of taxes pursuant to the provisions hereof, after deducting

-7-

therefrom a pro rata share of all reasonable expenses, including reasonable attorneys' fees reasonably and necessarily incurred in obtaining such refund.

**SECTION 4.3.    Transfer of Utilities.**  Purchaser, at its sole cost and expense, shall cause the transfer of all utility services for the Real Estate to Purchaser's name as of the Closing Date and Seller shall cooperate with Purchaser in connection therewith. If utility services shall not have been transferred to Purchaser's name for the Real Estate effective as of the Closing Date, then, at the Closing, any such charges with respect to services not so transferred shall be prorated, based upon the per diem charges obtained by using the most recent period for which readings of such utility services shall then be available. Purchaser, at its sole cost and expense, shall promptly thereafter cause such utility services to be transferred to Purchaser's name, and Seller shall cooperate with Purchaser in connection therewith. Purchaser shall make all required deposits on account with utility companies or on account with municipalities and shall reasonably cooperate with Seller in having any deposits currently held by such companies and municipalities, returned to Seller. However, Seller shall be solely responsible for obtaining the return of its own utility company deposits, if any (provided, however, that nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

**SECTION 4.4.    Transfer Taxes.**  Seller shall be responsible (either by payment or exemption) for any real property transfer taxes, transfer gains taxes, and other similar taxes and fees imposed on Seller by the State, county or municipality in which the Real Estate is located which are imposed in connection with the sale, assignment, transfer and conveyance of the Real Estate to Purchaser as contemplated by the provisions of this Agreement (collectively, the "**Transfer Taxes**"). Seller may pay the Transfer Taxes, if any, from the Purchase Price at the Closing (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

**SECTION 4.5.    Tax Returns.**  At the Closing, Purchaser and Seller shall deliver to the Title Company a New York State Transfer Tax Return (TP-584), City of New York Real Property Transfer Tax Return (NYC-RPT) and Equalization form (RP-5217NYC) (collectively, the "**RE Tax Returns**") and deliver same to the Title Company for delivery to the appropriate authority.

**SECTION 4.6.    Title Charges.**  Purchaser shall pay the cost of Purchaser's title insurance premiums and any title search costs, the cost of a survey for the Property or any update thereto and all recording and filing fees, including, but not limited to, those in connection with the Deed.

**SECTION 4.7.    Transaction Expenses.**  Except as expressly provided herein, each party shall bear its own costs and expenses, including attorney, accountant and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.

**SECTION 4.8.    Survival.**  The provisions of this Article 4 shall survive the Closing.

GWTDOCS 1612365v3

## ARTICLE 5
## COVENANTS REGARDING THE PROPERTY

**SECTION 5.1.** **Maintenance and Operation of the Property.** Subject to the restrictions imposed upon the Seller as a debtor-in-possession to pay any claims arising or otherwise relating to any period prior to the commencement of the Bankruptcy Case, and the parties understanding that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate or require the Seller to pay any amounts relating to such prepetition periods, the parties agree as follows: between the Petition Date and the Closing, Seller shall use commercially reasonable efforts to maintain and operate the Property in substantially the same manner as the Property is currently being maintained and operated and keep the Property in a condition at least as good as its condition as of the date hereof, reasonable wear and tear excepted (it being agreed that Seller shall not be obligated to perform any capital improvements unless required by Law as a postpetition obligation of the debtor-in-possession and further provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party). Seller shall use commercially reasonable efforts to keep and maintain in force and effect all existing licenses and permits affecting the Property without being obligated to pay any prepetition amounts, other than as provided in Section 3.1.1. Seller shall not be obligated to construct any improvements upon the Property except those which Seller reasonably determines necessary because of emergency situations or to comply with Laws. Seller shall maintain insurance coverages similar to those in effect on the date hereof, including casualty insurance in an amount equal to the full replacement value of the Property. Notwithstanding anything to the contrary contained herein, Purchaser acknowledges that Purchaser shall be responsible for certain insurance, repair and maintenance obligations in accordance with that certain Receivership Agreement between the parties, dated as of even date herewith (the **"Receivership Agreement"**), which shall be effective from and after the Receivership Date, as such term is defined in the Receivership Agreement.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

**SECTION 6.1.** **Generally.** Purchaser represents and warrants that:

6.1.1. (a) Purchaser is a duly formed and validly existing limited liability company under the Laws of the state or commonwealth of its formation and is in good standing under the Laws of the state or commonwealth of its formation and, to the extent required by Law, under the Laws of the State of New York, (b) Purchaser has the full right, authority and corporate power to enter into this Agreement, to consummate the transactions contemplated herein and to perform its obligations hereunder and under those Closing Documents to which it is a party, (c) each of the Persons executing this Agreement on behalf of Purchaser is authorized to do so, and (d) this Agreement constitutes a valid and legally binding obligation of Purchaser enforceable against Purchaser in accordance with its terms;

6.1.2. there are no legal or administrative proceedings pending or, to the best of Purchaser's actual knowledge, without investigation, threatened against or affecting Purchaser

-9-

that would adversely affect Purchaser's legal authority or financial ability to perform its obligations under the Closing Documents to which it is a party;

6.1.3. the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the performance by Purchaser of its obligations hereunder and under the Closing Documents to which it is a party, do not and will not (a) violate or conflict with any judgment, decree or order of any court or any Law or permit applicable to it, or (b) breach any provisions of, or constitute a default under, any contract, agreement, instrument or obligation to which it is a party or by which Purchaser is bound;

6.1.4. the execution and delivery of this Agreement by Purchaser does not, and the performance of its obligations hereunder and under the Closing Documents to which it is a party will not, require the consent or approval of any public authority or any other Person other than the New York State Department of Health, or any lender from which Purchaser may seek to obtain financing, as may be applicable provided however that Purchaser acknowledges that its obligations under this Agreement are not contingent upon any such financing;

6.1.5. Purchaser's Federal Tax Identification Number is pending.

**SECTION 6.2.    Closing Conditions; Survival of Representations and Warranties.** The following are conditions precedent to the obligation of Seller to close title under this Agreement, any or all of which may at Seller's option be waived in writing:

6.2.1. Each of the representations and warranties of Purchaser set forth in this Agreement shall be deemed to have been repeated by Purchaser, at and as of the Closing Date with the same force and effect as if first made on and as of such date. It shall be a condition to Seller's obligation to close hereunder that all such representations and warranties of Purchaser be true and correct in all material respects as of the Closing Date.

6.2.2. Purchaser shall have (or, with respect to obligations of Purchaser to be performed on the Closing Date, Purchaser shall be ready, willing and able to perform same on the Scheduled Closing Date) (a) delivered, or caused to be delivered, all of the Closing Documents to which it is a party and all other documents, instruments and other items required to be delivered by Purchaser at or prior to Closing (including, without limitation, pursuant to Section 9.1.2), (b) tendered the Purchase Price in accordance with the terms of this Agreement, and (c) performed in all material respects all other material obligations on Purchaser's part to be performed hereunder on or prior to the Closing Date.

6.2.3. All other conditions precedent expressly set forth herein to Seller's obligation to consummate the transaction contemplated hereby have been satisfied (or waived in writing by Seller).

6.2.4. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order

6.2.5. The representations, warranties and certifications of Purchaser set forth in this Agreement shall not survive the Closing.

-10-

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES OF SELLER

**SECTION 7.1.** **Generally**. Seller represents and warrants that:

7.1.1. (a) it is a duly formed and validly existing not-for-profit corporation under the Laws of the state or commonwealth of its formation and is qualified to conduct and transact business and, other than as a result of the commencement of the Bankruptcy Case, is in good standing under the Laws of the State of New York, (b) subject to the entry of the Bidding Procedures Order, it has the full right, authority and power to enter into this Agreement and, subject to the entry of the Sale Order, to consummate the transactions contemplated herein and to perform its obligations hereunder and under those Closing Documents to which it is a party all of which have been duly authorized by all necessary actions on the part of Seller, (c) each of the Persons executing this Agreement on behalf of Seller is authorized to do so, and (d) subject to the entry of the Sale Order, this Agreement constitutes a valid and legally binding obligation of Seller enforceable against it in accordance with its terms;

7.1.2. the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance by Seller of its obligations hereunder and under the Closing Documents to which it is a party do not and will not conflict with or violate any Law, rule, judgment, regulation, order, writ, injunction or decree of any court or governmental or quasi-governmental entity having jurisdiction over Seller or any of the parties comprising Seller, including the United States of America, the State of New York or any political subdivision of either of the foregoing, or any decision or ruling of any arbitrator to which Seller or any of the parties comprising Seller is a party or by which Seller or any of the parties comprising Seller is bound or affected, or breach any provisions of, or constitute a default under, any contract, agreement, instrument or obligation to which Seller or any of the parties comprising Seller is a party or by which any of them is bound; and

7.1.3. Seller's Federal Tax Identification Number is 11-3097213.

**SECTION 7.2.** **Property Representations**. Seller represents and warrants to Purchaser that, as of the date hereof, with respect to the Property:

7.2.1. There are no leases affecting the Property.

7.2.2. To Seller's knowledge, there is no pending nor has Seller received any notice of any contemplated condemnation proceeding affecting the Real Estate or any part thereof.

7.2.3. To Seller's knowledge, there are no Service Contracts affecting the Property.

7.2.4. Seller is not a "foreign person" (as defined in the Internal Revenue Code).

7.2.5. Seller is the sole owner of the Property.

-11-

7.2.6. Seller has not received any funds under the Hill-Burton Act.

7.2.7. There are no tenancies affecting the Property.

7.2.8. To Seller's knowledge, Seller has not received any notice of any pending assessments against the Property.

7.2.9. There are no tax certiorari proceedings or tax protest proceedings pending with respect to the Property.

**SECTION 7.3.    Closing Conditions; Survival of Representations and Warranties**. The following are conditions precedent to the obligation of Purchaser to close title under this Agreement, any or all of which may at Purchaser's option be waived in writing:

7.3.1. Except to the extent otherwise unnecessary as a result of the Sale Order and except as may be updated by Seller in writing to maintain accuracy due to one or more factual changes arising after the date hereof (it being understood by the parties hereto that Seller shall not have the right to update any of its representations and warranties because of a factual change arising from a breach of Seller's obligations hereunder or a prior material misrepresentation by Seller), each of the representations and warranties of Seller set forth in this Agreement shall be deemed to have been repeated by Seller, at and as of the Closing Date, with the same force and effect as if first made on and as of such date. It shall be a condition to Purchaser's obligation to close hereunder that all such representations and warranties of Seller, as the same may have been so updated by Seller, be true and correct as of the Closing Date in all material respects. As used in this Section 7.3.1, "material" means that the failure of such representations to be true and correct as of the Closing Date results in a diminution in the value of the Property in excess of $250,000 in the aggregate.

7.3.2. Seller shall have delivered all of the documents and other items required pursuant to Section 9.1.1 of this Agreement and shall have performed all other material covenants, undertakings and obligations herein agreed to be performed by it, and complied with all material conditions required by this Agreement to be performed or complied with by Seller at or prior to the Closing.

7.3.3. At the time of the Closing, title to the Real Estate shall be as provided in this Agreement and the Title Company shall be willing to issue fee title insurance policies in favor of Purchaser subject only to the Permitted Exceptions.

7.3.4. The representations, warranties and certifications of Seller set forth in this Agreement shall not survive the Closing.

7.3.5. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order or, if not final, not be subject to a stay on its effectiveness.

7.3.6. The closing under the Asset Agreement shall contemporaneously occur with the Closing under this Agreement.

-12-

**SECTION 7.4.    Knowledge of Seller.**  Whenever a representation or warranty is made in this Agreement on the basis of the knowledge of Seller, such representation and warranty is made solely on the basis of the actual, as distinguished from implied, imputed or constructive, knowledge on the date that such representation and warranty is made, without inquiry or investigation or duty, of Joseph P. Bloss and Lucy Buddensick without attribution to such persons of facts or matters otherwise within the personal knowledge of any other officers, directors or employees of Seller, or third parties.

## ARTICLE 8
## CLOSING DATE

**SECTION 8.1.    Closing Date.**  The consummation of the transactions contemplated by this Agreement (the **"Closing"**) shall take place on the "Closing Date" set forth in the Asset Agreement (the **"Scheduled Closing Date"**).  The Scheduled Closing Date or any such other date to which the Closing may be adjourned by Seller and the Asset Purchaser under the Asset Agreement pursuant to the terms of said agreement or by mutual agreement of Seller and Purchaser (it being agreed that neither party shall have any obligation to agree to any other adjournment of the Closing except as expressly permitted pursuant to the terms of the Asset Agreement or this Agreement), is referred to herein as the **"Closing Date"**.  The Closing shall be held at the offices of Purchaser's lender or such lender's counsel provided such offices are located in New York City or Nassau County, New York, otherwise at the offices of Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck, New York 11021.

## ARTICLE 9
## CLOSING DOCUMENTS

**SECTION 9.1.    Closing.**

9.1.1.  At the Closing, contemporaneously with Purchaser's delivery to Seller of all of the Closing Documents required to be delivered by Purchaser hereunder, Seller shall deliver or cause to be delivered to Purchaser, duly executed by Seller in recordable form, where applicable, those Closing Documents to be delivered by Seller as set forth on Schedule IV attached hereto and made a part hereof.

9.1.2.  At the Closing, contemporaneously with Seller's delivery to Purchaser of all of the Closing Documents required to be delivered by Seller hereunder, Purchaser shall deliver or cause to be delivered to Seller those Closing Documents to be delivered by Purchaser, duly executed by Purchaser in recordable form, where applicable, as set forth on Schedule V attached hereto and made a part hereof (the documents described in this Section 9.1.1 and in Section 9.1.2 and all other documents required to be delivered hereunder are referred to collectively as the **"Closing Documents"**).

**SECTION 9.2.    Further Assurances.**  Seller and Purchaser each agree, at any time and from time to time at or after the Closing, to execute, acknowledge where appropriate, and deliver or cause to be executed, acknowledged and delivered such further instruments and documents and to take such other action as the other of them or the Title Company may

-13-

reasonably request to carry out the intents and purposes of this Agreement. The provisions of this Section 9.2 shall survive the Closing.

# ARTICLE 10
# NOTICES

**SECTION 10.1. Notices.** Any notice, demand or request required or permitted to be given under this Agreement (collectively, "**Notices**") must be in writing and given to the party to whom or which such notice is being sent, (a) by nationally recognized overnight delivery service with receipt acknowledged in writing or (b) by hand delivery, against a signed receipt, in each case, addressed as follows:

| | |
|---|---|
| If to Seller, to: | Bishop Francis J. Mugavero Center for Geriatric Care, Inc.<br>c/o Saint Vincents Catholic Medical Centers of New York<br>Office of Legal Affairs<br>130 West 12th Street<br>New York, NY 10011<br>Attention: Chief Legal officer |
| with a copy to: | Saint Vincents Catholic Medical Centers of New York<br>Corporate Real Estate Services<br>130 West 12th Street<br>New York, NY 10011 |
| with a copy to: | Garfunkel Wild, P.C.<br>111 Great Neck Road, Suite 503<br>Great Neck, New York 11021<br>Attention: Robert A. Wild, Esq. |
| -and- | |
| | Kramer Levin Naftalis & Frankel LLP<br>1177 Avenue of the Americas<br>New York, New York 10036<br>Attention: Adam C. Rogoff, Esq |
| If to Purchaser, to: | KFG Land I, LLC<br>109-40 Saultell Ave.<br>Rego Park, NY 11368<br>Attn: Abraham Klein<br>Managing Member |

-14-

<table>
<tr><td>with a copy to:</td><td>Tenzer & Lunin, LLP<br>1775 Broadway, Suite 608<br>New York, NY 10019</td></tr>
</table>

If to Escrow Agent,
to:

Garfunkel Wild, P.C.
111 Great Neck Road, Suite 503
Great Neck, New York 11021
Attention: Judith A. Eisen, Esq.

In the event of overnight delivery or by hand delivery, notices shall be deemed effective on the next Business Day following deposit with the delivery service or following the day of such hand delivery against appropriate receipt. From time to time either party may designate another or additional addresses for all purposes of this Agreement by giving the other party no less than ten (10) days' prior notice of such change of address in accordance with the provisions of this Article 10. Each party's counsel shall have the right to deliver notices on behalf of its client and any such notice shall be effective as if sent by such party.

## ARTICLE 11
## BROKER

Seller and Purchaser each represents and warrants to the other that it has not dealt with any broker, agent or any other Person in connection with the transaction contemplated by this Agreement other than Loeb and Troper LLP and Cain Brothers (collectively, the "**Seller's Broker**"). Purchaser hereby indemnifies Seller and holds Seller harmless from and against any and all claims for commission, fee or other compensation by any other Person other than Seller's Broker who shall claim to have represented or dealt with Purchaser in connection with this Agreement and for any and all costs incurred by Seller in connection with such claims, including reasonable attorneys' fees and disbursements. The Sale Order shall provide that Purchaser shall have no liability for any and all claims for commission, fee or other compensation by Seller's Broker and any Person who shall claim to have represented Seller in connection with this Agreement. Subject to approval of the Bankruptcy Court, Seller agrees to pay the commission due to the Seller's Broker, if any, in connection with this transaction pursuant to a separate agreement as and when allowed by order of the Bankruptcy Court. The provisions of this Article 11 shall survive the Closing or the sooner termination of this Agreement.

## ARTICLE 12
## DEFAULTS; REMEDIES

**SECTION 12.1. Purchaser's Default**. If Purchaser shall (a) fail or refuse to close as required by the terms of this Agreement, or (b) otherwise be in default hereunder, which default shall continue for twenty (20) Business Days after written notice to Purchaser specifying such default, the parties hereto agree that the damages that Seller would sustain as a result thereof would be substantial, but would be difficult to ascertain. Accordingly, the parties hereto agree that in the event of such default, failure or refusal by Purchaser, Seller's sole remedy shall be to terminate this Agreement and retain the Escrow Deposit in which event Escrow Agent shall

-15-

deliver the Escrow Deposit to or at the direction of Seller, in which event Purchaser and Seller shall have no further rights or obligations under this Agreement, except those expressly provided herein to survive the termination of this Agreement. Nothing contained in this Section shall limit or diminish Purchaser's obligations or liabilities under Sections 11 and 18.11 hereof.

**SECTION 12.2. Seller's Default.** If Seller shall (a) fail or refuse to close as required by the terms of this Agreement or (b) otherwise be in default hereunder, which default shall continue for twenty (20) Business Days after written notice to Seller thereof, then Purchaser shall be entitled: (1) to terminate this Agreement and receive a return of the Escrow Deposit or (2) to seek specific performance by Seller of its obligations under this Agreement provided, however, that Purchaser may only pursue such specific performance after the entry of the Sale Order approving the transactions contemplated by this Agreement. If Purchaser shall not have commenced an action for specific performance within forty-five (45) days after the Schedule Closing Date, Purchaser shall have waived such right and shall have been deemed to have elected clause (1) above. Purchaser expressly agrees however, that Purchaser shall not have the right to seek or recover any actual, consequential or punitive damages or any similar additional sums or amounts against Seller for any breach occurring prior to Closing. Nothing herein shall limit or diminish Seller's obligations or liabilities under Article 11 or Section 18.11 hereof.

**SECTION 12.3. Cross-Default with Asset Agreement.** Subject to any opportunity to cure as may be set forth in this Agreement or in the Asset Agreement: (i) a default in any material respect by Seller under the Asset Agreement shall be deemed a default by Seller under this Agreement, and a default in any material respect by Seller under this Agreement shall be deemed a default by Seller under the Asset Agreement; (ii) a default in any material respect by the Asset Purchaser under the Asset Agreement shall be deemed a default by Purchaser under this Agreement and a default in any material respect by Purchaser under this Agreement shall be deemed a default by Asset Purchaser under the Asset Agreement. In addition, (x) if the Asset Purchaser is entitled to cancel or terminate the Asset Agreement or pursue its remedies thereunder or receive the return of the deposit paid thereunder in accordance with its terms, then Purchaser under this Agreement shall have the right to terminate this Agreement simultaneously therewith upon notice to Seller and/or pursue its rights and remedies as provided in this Agreement, including but not limited to the right to receive the prompt return of the Escrow Deposit, or (y) if Seller is entitled to terminate the Asset Agreement upon a default by Asset Purchaser thereunder, then Seller shall be entitled to terminate this Agreement simultaneously therewith upon notice to Purchaser and shall have the right to receive the Escrow Deposit pursuant to the terms of this Agreement.

### ARTICLE 13
### CASUALTY; CONDEMNATION

**SECTION 13.1. Casualty.** Notwithstanding anything to the contrary at law or otherwise, Purchaser and Seller acknowledge and agree that in the event that prior to Closing, all or any portion of the Property shall be damaged (whether or not such damage or casualty is covered by insurance), Purchaser shall have no right or ability to cancel or terminate this Agreement and Purchaser shall be required to consummate the transactions contemplated hereby and proceed to Closing without abatement of the Purchase Price. Notwithstanding the

-16-

foregoing, if Purchaser is not operating the Property pursuant to the Receivership Agreement and in the event that the Property is materially damaged by fire or the elements or by any cause beyond either party's reasonable control and Seller shall not have restored the same by the Scheduled Closing Date, Purchaser shall have the right, upon notice to Seller delivered within fifteen (15) Business Days after the Scheduled Closing Date, not to consummate the transactions contemplated hereby, in which event this Agreement shall be terminated and of no further force and effect, the Escrow Deposit shall be returned to Purchaser and neither of the parties hereto shall have any rights or obligations to the other hereunder except those expressly stated to survive the termination of this Agreement. In the event Purchaser shall fail to timely deliver such notice of termination, Purchaser shall be obligated to consummate the transaction contemplated hereunder and Seller shall have no obligation to perform any repairs to the Property. Purchaser shall be entitled to receive all insurance proceeds (after deducting any reasonable costs which Seller actually incurred to obtain such proceeds, including reasonable attorneys' fees and disbursements and any out-of-pocket costs of restoration actually incurred by Seller to preserve the life or safety of the occupants at the property or as required by Law) in connection with any such casualty which occurs prior to the Closing Date and Purchaser shall receive a credit against the Purchase Price in the amount of any deductible under Seller's insurance (Seller hereby assigning to Purchaser all of Seller's right, title and interest in and to any such net insurance proceeds). For the purposes of this Section 13.1 "materially damaged" shall mean damage to the Property which would cost more than $3,011,500.00 to restore. This provision shall survive the Closing.

**SECTION 13.2. Condemnation.** If, prior to the Closing, all or a Material Part (as hereinafter defined) of the Property is taken by eminent domain, Purchaser may, by notice to Seller given within fifteen (15) Business Days after notice from Seller to Purchaser of the taking, elect to cancel this Agreement. In the event that Purchaser shall so timely elect, the Escrow Deposit shall be paid to Purchaser and neither of the parties hereto shall have any rights or obligations to the other hereunder except those expressly stated to survive the termination of this Agreement. Unless this Agreement is so canceled, or if less than a Material Part of the Property is taken by eminent domain, this Agreement shall remain in full force and effect in which event Seller shall, on the Closing Date, and upon receipt of the balance of the Purchase Price, pay to Purchaser any sums of money collected by Seller as an award for any taking by eminent domain, after deducting any reasonable amount which Seller may have agreed or been obligated to pay in obtaining such award, including reasonable attorneys' fees and disbursements. Seller shall not negotiate, compromise, or settle any such award without Purchaser's prior consent, which consent shall not be unreasonably withheld, conditioned or delayed. In addition, Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any portion of any condemnation award not yet received by Seller. For purposes of this Section 13.2, **"Material Part"** shall mean a taking of more than ten (10%) percent of the Property. The provisions of this Article 13 are intended to constitute an "express provision to the contrary" within the meaning of Section 5-1311 of the New York General Obligations Law. This provision shall survive the Closing.

-17-

# ARTICLE 14
## AS-IS; WHERE-IS;
## DISCLAIMER; WAIVER OF CLAIMS

SECTION 14.1. **Disclaimers; As-Is, Where-Is Condition.**

14.1.1. PURCHASER ACKNOWLEDGES THAT IT IS A SOPHISTICATED PURCHASER, WITH EXPERIENCE IN OWNING AND OPERATING REAL PROPERTY IN THE NATURE OF THE PROPERTY. PURCHASER REALIZES THE NATURE OF THIS TRANSACTION, UNDERSTANDS AND IS FREELY TAKING ALL RISKS, IF ANY, INVOLVED IN CONNECTION WITH THIS TRANSACTION AND ACKNOWLEDGES THAT THE SAME IS REFLECTED IN THE PURCHASE PRICE AND THE TERMS UPON WHICH PURCHASER IS WILLING TO PURCHASE AND SELLER IS WILLING TO SELL.

14.1.2. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, THE PROPERTY IS BEING SOLD BY SELLER AND PURCHASER AGREES TO ACCEPT THE PROPERTY IN "AS-IS" AND "WHERE-IS" PHYSICAL CONDITION ON THE DATE HEREOF SUBJECT TO REASONABLE WEAR AND TEAR AND SELLER'S OBLIGATIONS HEREIN TO MAINTAIN THE PROPERTY AS PROVIDED FOR IN THIS AGREEMENT. PURCHASER ACKNOWLEDGES, REPRESENTS AND WARRANTS THAT (I) PURCHASER HAS HAD AN OPPORTUNITY TO MAKE AN INDEPENDENT INVESTIGATION AND EXAMINATION OF THE PROPERTY (AND ALL MATTERS RELATED THERETO), AND TO BECOME FULLY FAMILIAR WITH THE PHYSICAL AND ENVIRONMENTAL CONDITION OF THE PROPERTY, AND (II) EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER AND SELLER-RELATED PARTIES HAVE NOT MADE AND SHALL NOT MAKE ANY VERBAL OR WRITTEN REPRESENTATIONS, WARRANTIES OR STATEMENTS OF ANY NATURE OR KIND WHATSOEVER TO PURCHASER, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO THE ABOVE, AND, IN PARTICULAR, EXCEPT AS EXPRESSLY SET FORTH HEREIN, NO REPRESENTATIONS OR WARRANTIES HAVE BEEN MADE OR SHALL BE MADE WITH RESPECT TO (A) THE PHYSICAL CONDITION OR OPERATION OF THE PROPERTY, INCLUDING THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR CONDITIONS THEREON (INCLUDING THE PRESENCE OF ASBESTOS OR ASBESTOS-CONTAINING MATERIALS OR THE RELEASE OR THREATENED RELEASE OF HAZARDOUS SUBSTANCES), (B) THE REVENUES OR EXPENSES OF THE PROPERTY, (C) THE ZONING AND OTHER LEGAL REQUIREMENTS APPLICABLE TO THE PROPERTY OR THE COMPLIANCE OF THE PROPERTY THEREWITH, (D) THE NATURE AND EXTENT OF ANY MATTER AFFECTING TITLE TO THE REAL ESTATE OR TO ANY PERSONALTY, (E) THE QUANTITY, QUALITY, OR CONDITION OF THE PERSONALTY, OR (F) ANY OTHER MATTER OR THING AFFECTING OR RELATING TO THE PROPERTY, OR ANY PORTION THEREOF, THE INTERESTS THEREIN TO BE CONVEYED TO PURCHASER PURSUANT TO THE TERMS OF THE TRANSACTIONS CONTEMPLATED HEREBY.

14.1.3. EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLER HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY, ORAL OR WRITTEN, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW OR OTHERWISE, WITH RESPECT TO THE MATTERS REFERRED TO IN SECTION 14.1.2 ABOVE AND ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IN RESPECT TO THE PROPERTY. PURCHASER DECLARES AND ACKNOWLEDGES THAT THIS EXPRESS DISCLAIMER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND IS REFLECTED IN THE CONSIDERATION PAYABLE BY PURCHASER HEREUNDER AND, AS AN INDUCEMENT FOR SELLER TO PROCEED WITH THIS TRANSACTION, PURCHASER FURTHER DECLARES AND ACKNOWLEDGES THAT THIS DISCLAIMER HAS BEEN BROUGHT TO THE ATTENTION OF PURCHASER AND EXPLAINED IN DETAIL AND THAT PURCHASER HAS VOLUNTARILY AND KNOWINGLY CONSENTED THERETO.

**SECTION 14.2.  Acceptance of Closing Documents; Waivers.**   Except for those matters expressly set forth in this Agreement to survive the Closing and except for the agreements of Seller and Purchaser set forth in the Closing Documents or otherwise entered into at the Closing, Purchaser's acceptance of the Deed and the other Closing Documents shall be and be deemed to be an acknowledgment by Purchaser that Seller has fully performed, discharged and complied with all of Seller's obligations, covenants and agreements hereunder to be performed prior to Closing and that Seller shall have no further liability with respect thereto.

**SECTION 14.3.  Survival.** The provisions of this Article 14 shall survive the Closing.

## ARTICLE 15
## ENVIRONMENTAL STUDY

**SECTION 15.1.  Environmental Study.**   Seller and Purchaser acknowledge that Purchaser has engaged and reviewed that certain Phase I Environmental Site Assessment of the Premises dated September 2010 performed by Preferred Environmental Services, Inc. (the **"Phase I Report"**) and Purchaser acknowledges any environmental conditions which may have been noted therein. Purchaser shall accept the Premises subject to any environmental conditions set forth in the Phase I Report or otherwise existing at, under, on or migrating from the Premises. At Closing, Purchaser shall provide Seller with a credit equal to $3,250.00 plus out-of-pocket expenses of the environmental consultant (the cost of the Phase I Report).

## ARTICLE 16
## ESCROW

**SECTION 16.1.  Escrow Terms.**   The Escrow Deposit shall be held in escrow by Escrow Agent in accordance with the terms of the Escrow Agreement.

## ARTICLE 17
## BANKRUPTCY COURT MATTERS

**SECTION 17.1.** **Bankruptcy Court Filings.** As promptly as practicable following the execution of this Agreement, Seller shall, at its sole costs and expense, file with and seek the approval of the Bankruptcy Court for the transactions contemplated hereby. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order including furnishing affidavits or other Documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order shall be appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.

**SECTION 17.2.** **Notice of Sale.** Notice of the sale of the Property contemplated in this Agreement shall be served in accordance with the Bidding Procedures Order.

## ARTICLE 18
## MISCELLANEOUS

**SECTION 18.1. Entire Agreement.** This Agreement, the Exhibits and Schedules annexed hereto, and any contemporaneously executed agreements, are the entire agreement between Seller and Purchaser concerning the sale of the Property and all understandings and agreements heretofore had or made between the parties hereto are merged in this Agreement which, together with aforementioned agreements and other items, alone fully and completely expresses the agreement of the parties hereto.

**SECTION 18.2. Modification.** Except as otherwise provided herein, this Agreement may not be changed, modified, supplemented or terminated, except by an instrument executed by the parties hereto which are or will be affected by the terms of such change, modification, supplement or termination. Either party hereto may waive any of the terms and conditions of this Agreement made for its benefit, provided such waiver is in writing and signed by the party waiving such term or condition.

**SECTION 18.3. Binding Agreement.** Subject to the provisions of this Agreement, the terms, covenants, agreements, conditions, representations and warranties contained in this Agreement shall inure to the benefit of and be binding upon the respective parties hereto. This Agreement shall not inure to the benefit of or be enforceable by any other Person.

**SECTION 18.4. Assignment.** Without the express written consent of Seller, this Agreement may not be assigned by Purchaser, including any assignment by operation of law. Except as provided for hereunder, any assignment by Purchaser without Seller's prior written consent shall be deemed null and void ab initio and shall be a material default entitling Seller, at its option, to exercise any of its powers, privileges, rights or remedies under this Agreement or at law or in equity. If Seller shall consent to an assignment, any such assignee shall assume all duties and obligations of Purchaser pursuant to this Agreement; provided, however, that any such assignment of Purchaser's interest in this Agreement shall not relieve the original

GWTDOCS 1612365v3

Purchaser of any duties, obligation or liabilities hereunder. Any change in control of Purchaser or of any of the direct or indirect ownership interests in Purchaser, at any level or tier of ownership, whether in one transaction or a series of transactions, shall constitute an assignment for purposes of this Section 18.4. Notwithstanding the foregoing, Purchaser may not assign its interest in this Agreement to any entity unless such entity can satisfy the requirements of adequate protection of future performance for the assignment of any contracts or leases as required by section 365 of the Bankruptcy Code.

**SECTION 18.5. No Press Releases.** Intentionally Omitted.

**SECTION 18.6. Illegality.** If any term or provision of this Agreement or the application thereof to any Person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by Law.

**SECTION 18.7. Choice of Law.** EXCEPT IN SUCH MATTERS AS ARE GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES ANNEXED HERETO, SHALL BE GOVERNED BY, INTERPRETED UNDER, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

**SECTION 18.8. Construction.** The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement. Unless stated to the contrary, all references to Articles, Sections, paragraphs or clauses herein shall be to the specified Article, Section, paragraph or clause of this Agreement, and all references to Exhibits and Schedules shall be to the specified Exhibits and Schedules attached hereto. All Exhibits and Schedules attached hereto are made a part hereof. All terms defined herein shall have the same meaning in the Exhibits and Schedules, except as otherwise provided therein. All references in this Agreement to "**this Agreement**" shall be deemed to include the Exhibits and Schedules attached hereto. The terms "**hereby**", "**hereof**", "**hereto**", "**hereunder**" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used. Whenever in this Agreement provision is made for the payment of attorneys' fees, such provision shall be deemed to mean reasonable attorneys' fees and paralegals' fees. The term "**including**" when used herein shall mean "**including, without limitation.**" Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.

**SECTION 18.9. Binding Effect; Assignment; Successors and Assigns.** This Agreement shall apply to, be binding in all respects upon and inure to the benefit of the parties and their respective successors, administrators and permitted assigns. A successor to Seller shall include Seller as a reorganized debtor. Except to the extent provided for in Section 18.4 of

-21-

this Agreement, no assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of Law or otherwise) without the prior written consent of Purchaser and Seller and any attempted assignment without the required consents shall be void. No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors, administrators and permitted assigns.

SECTION 18.10. **Ambiguities**. Each party acknowledges that it and its counsel have reviewed this Agreement, and the parties hereby agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

SECTION 18.11. **Expenses**. If any legal action or other proceeding is brought for the enforcement of this Agreement or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover its fees and costs, including reasonable attorneys' fees, court costs and other costs incurred in such action or proceeding, in addition to any other relief to which it or they may be entitled. The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

SECTION 18.12. **Counterparts**. This Agreement may be executed in counterparts, each of which together shall be deemed to be an original and all of which shall constitute one and the same Agreement. Any counterpart may be executed by facsimile or PDF signature and such facsimile or PDF signature shall be deemed an original.

SECTION 18.13. **Waiver of Trial by Jury**. THE RESPECTIVE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

SECTION 18.14. **Third Party Beneficiaries**. Except as expressly set forth herein, no Person other than the parties hereto, shall have any rights or claims under this Agreement.

SECTION 18.15. **Jurisdiction**.

18.15.1. FOR THE PURPOSES OF ANY SUIT, ACTION OR PROCEEDING INVOLVING THIS AGREEMENT, PURCHASER AND SELLER EACH HEREBY EXPRESSLY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT AND PURCHASER AND SELLER EACH AGREES THAT SUCH COURT SHALL

-22-

HAVE EXCLUSIVE JURISDICTION OVER ANY SUCH SUIT, ACTION OR PROCEEDING COMMENCED BY EITHER PARTY.

18.15.2. PURCHASER AND SELLER EACH HEREBY IRREVOCABLY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT BROUGHT IN ANY FEDERAL OR STATE COURT SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK AND HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

18.15.3. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

**SECTION 18.16. Seller's Constituents**. Intentionally Omitted.

**SECTION 18.17. Purchaser's Constituents**. Intentionally Omitted.

**SECTION 18.18. No Recording**. Purchaser covenants and agrees that it has no right and in no event will Purchaser record or cause to be recorded this Agreement or any memorandum hereof or affidavit, assignment or other document relating to this Agreement prior to the Closing and, if Purchaser breaches the provisions of this Section, Seller shall have the option of terminating this Agreement and retaining the Escrow Deposit as its liquidated damages.

**SECTION 18.19. Not an Offer**. Notwithstanding anything herein to the contrary, it is to be strictly understood and agreed that (a) the submission by Seller to Purchaser of any drafts of this Agreement or any correspondence with respect thereto shall (i) be deemed submission solely for Purchaser's consideration and not for acceptance and execution, (ii) have no binding force or effect, (iii) not constitute an option for the purchase of the Property or a lease or conveyance of the Property by Seller to Purchaser and (iv) not confer upon Purchaser or any other party any title or estate in the Property, (b) the terms and conditions of this Agreement shall not be binding upon either party hereto in any way unless and until it is unconditionally executed and delivered by both parties in their respective sole and absolute discretion and all conditions precedent to the effectiveness thereof including, but not limited to, the delivery of the Escrow Deposit to Escrow Agent, shall have been fulfilled or waived, and (c) if this Agreement is not so executed and delivered for any reason whatsoever (including, without limitation, either party's willful or other refusal to do so or bad faith), neither party shall be liable to the other with respect to this Agreement on account of any written or parole representations, negotiations, any legal or equitable theory (including, without limitation, part performance, promissory estoppel, or undue enrichment) or otherwise.

**SECTION 18.20. Failure of Deposit**. If the payment made on account of the Escrow Deposit is by check, and if such check fails collection in due course, Seller, at its option, may declare this Agreement null, void and of no force and effect, and may pursue its remedies

GWTDOCS 1612365v3

against Purchaser upon such check or in any other manner permitted by law, such remedies being cumulative.

**SECTION 18.21. No Waiver**. The failure of either party hereto to seek redress for any breach, or to insist upon the strict performance, of any covenant or condition of the Agreement by the other shall not be, or be deemed to be, a waiver of the breach or failure to perform (unless the time specified herein for the exercise of such right, or satisfaction of such condition, has expired), nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms hereof from constituting a default hereunder.

**SECTION 18.22. Severability**. If any term, condition or provision of this Agreement or the application thereof to any circumstance or party hereto, is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement and the applicability of such term, condition or provision to other persons or circumstances shall not be affected thereby. Each term, condition or provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

**SECTION 18.23. No Survival**. The delivery and acceptance of the deed at the Closing shall be deemed to constitute full compliance by Seller with all of the terms, conditions and covenants of this Agreement on Seller's part to be performed, and, except as expressly set forth in this Agreement, the representations, warranties, covenants or other obligations of Seller set forth in this Agreement shall not survive the Closing, and no action based thereon shall be commenced after the Closing.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.
SIGNATURES FOLLOW ON THE NEXT PAGE.**

GWTDOCS 1612365v3

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

SELLER

BISHOP FRANCIS J. MUGAVERO CENTER FOR GERIATRIC CARE, INC.

By: _____
     Name:
     Title:


PURCHASER

KFG LAND I, LLC

By: _____
     Name:
     Title:

GWTDOCS 1612365v3

# SCHEDULE I TO PURCHASE AND SALE AGREEMENT

## DEFINITIONS

For all purposes of this Agreement, the following terms shall have the respective meanings specified below:

"**Additional Deposit**" shall have the meaning set forth in Section 2.2.2.

"**Affiliate**" means a Person that: (a) directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with a specified Person; (b) is a director or officer of a specified Person or of an Affiliate of such specified Person within the meaning of clause (a) above; (c) is a partner, member, beneficiary of a trust or other owner of any stock or other evidence of beneficial ownership in a specified Person or an Affiliate of such specified Person within the meaning of clause (a) above; or (d) is related as an ancestor, descendant, sibling, or is the current spouse of a specified Person or an Affiliate of such specified Person within the meaning of clause (a) above.

"**Agreement**" means this Agreement, the Exhibits and Schedules and all amendments, modifications and extensions hereto and thereto.

"**Apportionment Date**" shall have the meaning set forth in Section 4.1.

"**Business Day**" means each day, except Saturdays, Sundays and all days observed by the federal government as legal holidays.

"**Closing**" shall have the meaning set forth in Section 8.1.

"**Closing Date**" shall have the meaning set forth in Section 8.1.

"**Closing Documents**" shall have the meaning set forth in Section 9.1.2.

"**Condemnation**" shall have the meaning set forth in Section 2.1.

"**Deed**" means the deed to the Real Estate to be delivered by Seller to Purchaser pursuant to Schedule IV.

"**Escrow Agent**" shall mean Garfunkel Wild, P.C.

"**Escrow Agreement**" shall have the meaning set forth in Section 2.2.2.

"**Escrow Deposit**" shall have the meaning set forth in Section 2.2.2.

"**Existing Lender**" shall have the meaning set forth in Section 3.4.

"**Existing Mortgage**" shall have the meaning set forth in Section 3.4.

"**Final Order**" shall mean an order, ruling, or judgment of the Bankruptcy Court (a) that is in full force and effect; (b) that is not stayed; (c) as to which the time to appeal, petition for

certiorari, or move for reargument or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing is then pending; and (d) is no longer subject to review, reversal, modification, or amendment by appeal or writ of certiorari; provided, however, that an order will be deemed a Final Order notwithstanding the filing of a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or other applicable rules.

"**Governmental Authority**" shall have the meaning set forth in Section 3.3.8.

"**Hazardous Material**" shall mean all materials and substances now or hereafter subject to any Environmental Laws, including (i) all substances which are designated pursuant to Section 311(b)(2)(A) of the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 1251, et seq., (ii) any element, compound, mixture, solution, or substance which is designated pursuant to Section 102 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq., (iii) any hazardous waste having the characteristics which are identified under or listed pursuant to Section 3001 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., (iv) any toxic pollutant listed under Section 307(a) of FWPCA, (v) any hazardous air pollutant which is listed under Section 112 of the Clean Air Act, 42 U.S.C. § 7401, et seq., (vi) any imminently hazardous chemical substance or mixture with respect to which action has been taken pursuant to Section 7 of the Toxic Substances Control Act, 15 U.S.C. § 2601, et seq., (vii) "hazardous materials" within the meaning of the Hazardous Materials Transportation Act, 49 U.S.C. § 5101, et seq., (viii) any element or compound contained in the list of hazardous substances adopted by the United States Environmental Protection Agency ("EPA") or by the New York Department of Environmental Conservation ("DEC"), (ix) petroleum or petroleum by-products, (x) ACM, (xi) any radioactive material or substance, (xii) all toxic wastes, hazardous wastes and hazardous substances as defined by, used in, controlled by, or subject to all implementing regulations adopted and publications promulgated pursuant to the foregoing statutes, and (xiii) any other hazardous or toxic substance or pollutant identified in or regulated under any other applicable federal, state or local Environmental Laws.

"**Initial Deposit**" shall have the meaning set forth in Section 2.2.2.

"**Law**" means any law, rule, code, regulation, ordinance, moratorium, injunctive proceeding, restriction or similar matter imposed by any federal, state, municipal or local government or any public or quasi-public board, authority, commission, agency or department thereof having jurisdiction over the Property, or any portion thereof and/or Purchaser or Seller.

"**Liens**" shall have the meaning set forth in Section 3.1.1.

"**Material Part**" shall have the meaning set forth in Section 13.2.

"**Net Proceeds**" shall have the meaning set forth in Section 3.1.1.

"**Non-Permitted Exceptions**" shall have the meaning set forth in Section 3.2.1.

"**Notices**" shall have the meaning set forth in Section 10.1.

-2-

"**Permitted Exceptions**" shall have the meaning set forth in Section 3.3.

"**Person**" means an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, trust, unincorporated organization or the federal government or any state or local government or any agency or political subdivision thereof.

"**Personalty**" shall have the meaning set forth in Section 2.1.1.

"**Phase I Report**" shall have the meaning set forth in Section 15.1.

"**Property**" shall have the meaning set forth in Section 2.1.1.

"**Purchase Price**" shall have the meaning set forth in Section 2.2.1.

"**Purchaser**" means KFG Land I, LLC.

"**Purchaser-Related Parties**" means, individually and collectively, and to the extent applicable, (i) Purchaser, (ii) Affiliates of Purchaser, and (iii) the shareholders, officers, directors, employees, members and constituent partners of Purchaser and/or of any direct or indirect partner or member of or corporate joint-venturer with Purchaser, and/or of any Affiliate of Purchaser.

"**Real Estate**" shall have the meaning set forth in Section 2.1.1.

"**Receivership Agreement**" shall have the meaning set forth in Section 5.1.

"**RE Tax Returns**" shall have the meaning set forth in Section 4.5.

"**Sale Order**" means an order of the Bankruptcy Court substantially in the form of attached to the Asset Agreement as Exhibit B thereto, with such changes as are reasonably acceptable to Purchaser and Seller.

"**Scheduled Closing Date**" shall have the meaning set forth in Section 8.1.

"**Seller**" shall mean Bishop Francis J. Mugavero Center for Geriatric Care, Inc.

"**Seller-Related Parties**" means individually and collectively, Seller and its officers, directors, members, employees, agents, representatives and contractors and Affiliates of Seller.

"**Seller's Broker**" shall have the meaning set forth in Article 11.

"**Service Contracts**" means any written or oral service, maintenance, landscaping, operating, repair, equipment lease, supply, construction or other similar contract or agreement relating to the operation or maintenance of the Property, together with all amendments and modifications thereof in effect on the date hereof. Notwithstanding anything to the contrary, Purchaser shall not be obligated assume any Service Contracts except for such Service Contracts, if any, it designates at any time prior to the Closing.

-3-

"**Title Company**" shall have the meaning set forth in Section 3.1.

"**Transfer Taxes**" shall have the meaning set forth in Section 4.4.

"**Unavoidable Delay**" shall mean any delays due to strikes, acts of God, governmental restrictions, enemy action, civil commotion, fire, unavoidable casualty or other causes similarly beyond the control of Seller; provided, however, that any lack of funds shall not be deemed a cause beyond the control of Seller.

"**Violations**" shall have the meaning set forth in Section 3.3.8.

GWTDOCS 1612365v3

# SCHEDULE II

## PROPERTY DESCRIPTION

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of Dean Street with the easterly side of Hoyt Street;

RUNNING THENCE northerly, along the easterly side of Hoyt Street, 200 feet to the southerly side of Pacific Street;

THENCE easterly along the southerly side of Pacific Street, 275 feet 5 inches;

THENCE southerly parallel with Hoyt Street, 100 feet to the center line of the block;

THENCE westerly along the center line of the block and parallel with Pacific and Dean Streets, 25 feet 5 inches;

THENCE southerly parallel with Hoyt Street, 14 feet 6 inches;

THENCE westerly parallel with Dean and Pacific Street, 50 feet;

THENCE southerly parallel with Hoyt Street, 85 feet 6 inches to the northerly side of Dean Street;

THENCE westerly along the northerly side of Dean Street, 200 feet to the easterly side of Hoyt Street to the point or place of BEGINNING.

# SCHEDULE III

## ESCROW AGENT'S WIRING INSTRUCTIONS

Bank Information:     Citibank, N.A.

Receiver/ABA Number:   02100 0089

Beneficiary Name:     Garfunkel Wild, P.C., Attorney Trust Account

Checking Account Number:  9955527033

## SCHEDULE IV

## CLOSING DOCUMENTS TO BE DELIVERED BY SELLER

1.      Statutory form of bargain and sale deed without covenants (the **"Deed"**) substantially in the form attached hereto as Exhibit B containing the covenant required by Section 13 of the Lien Law, and properly executed and acknowledged so as to convey the title required to be conveyed by Seller under this Agreement.

2.      Bank or certified check(s), payable to the direct order of the appropriate tax collecting agencies or officials, in the amount of all documentary stamp and transfer and transfer gains taxes, and other taxes, fees and charges, payable by reason of or in connection with the conveyance and transfer of the Property by Seller to Purchaser. In lieu of delivering such bank or certified checks, Seller may elect, by written notice to Purchaser given at least two (2) Business Days prior to Closing, to have Purchaser pay any of such taxes and charges and give Purchaser a credit on the Closing Date against the Purchase Price in the amount thereof.

3.      Copies of any required real property transfer tax returns properly executed and acknowledged by Seller and Purchaser, as applicable.

4.      All documents, as shall be reasonably necessary to evidence that Seller has proper authority to sell the Property and deliver the documents required to be delivered by Seller pursuant to this Agreement.

5.      All keys to entrance doors to, and equipment and utility rooms located in, the Property and in Seller's possession.

6.      To the extent such are in the possession of Seller or its managing agent, original executed counterparts (or, where unavailable, copies thereof), of all Assumed Service Contracts.

7.      A certificate of a duly authorized representative of Seller, sworn to under penalties of perjury, setting forth Seller's U.S. tax identification number and stating that Seller is a **"United States person"** within the meaning of Sections 1445(f)(3) and 7701(a)(30) of the Code.

8.      To the extent such are in the possession or control of Seller or its managing agent, original copies of all guarantees and warranties then in effect in respect of the Property.

9.      To the extent such are in the possession or control of Seller or its managing agent, original licenses and permits to be transferred hereunder, except to the extent the same are required to be and located at or are affixed of the Property.

10.     Certificate of an authorized representative of Seller with respect to the authority of the person(s) executing this Agreement and the other Closing Documents on behalf of Seller.

11.     A Bill of Sale, without warranty, recourse or representation, conveying the Personalty to Purchaser substantially in the form attached hereto as <u>Exhibit C.</u>

12.     All existing surveys and building plans for the Property and the improvements thereon to the extent in Seller's possession.

## SCHEDULE V

## PURCHASER'S CLOSING DOCUMENTS

1.    Copies of any required real property transfer tax returns properly executed and acknowledged by Purchaser and Seller.

2.    All documents as shall be reasonably necessary to evidence that Purchaser has proper authority to purchase the Property and deliver the documents required to be delivered by Purchaser pursuant to this Agreement.

3.    Certificate of an authorized representative of Purchaser with respect to the authority of the person(s) executing this Agreement and the other Closing Documents on behalf of Purchaser.

4.    Certificate in form and substance reasonably acceptable to Seller, signed and acknowledged by an authorized representative of Purchaser, restating and attesting, except as otherwise permitted pursuant to the terms of this Agreement, to be true and correct as of the Closing Date each of the representing and warranties of Purchaser set forth in this Agreement.

# EXHIBIT A

## ESCROW AGREEMENT

[See Attached]

# ESCROW AGREEMENT

## BY AND BETWEEN

## BISHOP FRANCIS J. MUGAVERO CENTER FOR GERIATRIC CARE, INC.

### and
### KFG LAND I, LLC

### AND

## GARFUNKEL WILD, P.C., AS ESCROW AGENT

SEPTEMBER 21, 2010

# ESCROW AGREEMENT

**ESCROW AGREEMENT** ("Agreement") made as of September 21, 2010 by and between Bishop Francis J. Mugavero Center for Geriatric Care, Inc., a New York not-for-profit corporation ("Seller"), and KFG Land I, LLC, a New York limited liability company ("Purchaser"), and Garfunkel Wild, P.C., a New York professional corporation with offices at 111 Great Neck Road, Suite 503, Great Neck, New York 11021 (the "Escrow Agent"). All capitalized terms used but not defined herein shall have the meaning assigned to them in the Asset Purchase Agreement (as defined below).

Recitals: The following recitals are hereby incorporated into this Agreement:

**A.** Purchaser and Seller have entered into a Purchase and Sale Agreement, dated as of September 21, 2010 (the "Purchase Agreement"), pursuant to which, among other things, Purchaser has already deposited: One Million Seventy-Six Thousand Seven Hundred Thirty Dollars ($1,076,730.00) (the "Initial Deposit") into escrow with Escrow Agent concurrently upon execution of this Agreement.

**B.** Purchaser and Seller acknowledge that Purchaser shall deposit, if necessary and as security for the performance of Purchaser's obligations under the Purchase Agreement, within one (1) Business Day after the date hereof, an amount equal to an amount such that together with the Initial Deposit, the Escrow Fund shall be equal to ten percent (10%) of the Purchase Price (the "Additional Deposit"; the Initial Deposit together with the Additional Deposit and any interest earned thereon shall be collectively referred to herein as the "Escrow Deposit").

NOW, THEREFORE, the parties hereto as follows:

1. <u>Deposit and Acknowledgment of Receipt.</u>

    1.1 Concurrently with the execution and delivery of this Agreement, Purchaser has delivered to Escrow Agent, and Escrow Agent by its execution hereof acknowledges receipt of, Purchaser's wire transfer in the amount of One Million Seventy-Six Thousand Seven Hundred Thirty Dollars ($1,076,730.00), payable to Escrow Agent.

    1.2 Purchaser shall deliver to Escrow Agent by wire transfer payable to Escrow Agent the Additional Deposit in an amount equal an amount such that together with the Initial Deposit, the Escrow Fund shall be equal to 10% of the Purchase Price pursuant to the Purchase Agreement within one (1) Business Day after the date hereof.

    1.3 Escrow Agent hereby agrees to hold the Escrow Fund in an interest-bearing account pending the disbursement of such Escrow Fund in accordance with the terms of this Agreement.

    1.4 The Escrow Fund shall not be subject to lien or attachment by any creditor of any party hereto and shall be used solely for the purposes set forth in this Agreement. Amounts held in the Escrow Account shall not be available to, and shall not be used by, Garfunkel Wild, P.C. to set off any obligations of either Purchaser or Seller owing to Garfunkel Wild, P.C. in any capacity.

2.  Terms of Escrow.

2.1  Escrow Agent shall disburse amounts from the Escrow Fund, and any accrued interest thereon, upon delivery, by Seller and Purchaser to Escrow Agent, of joint written instructions executed by an authorized officer of both parties directing Escrow Agent to deliver to Seller or Purchaser, as the case may be, an amount equal to the amount to which it is entitled. Upon receipt of the joint written instructions, Escrow Agent shall release by wire transfer to an account or accounts designated by Seller or Purchaser, as the case may be, the amount specified in the joint written instructions.

2.2  Notwithstanding anything to the contrary contained in this Agreement, in the event of a dispute concerning the Escrow Fund, the Escrow Agent shall not disburse any amounts from the Escrow Fund until its receipt of joint written instructions from Seller and Purchaser as set forth hereinabove or an order of a court of competent jurisdiction directing the disbursement of the Escrow Fund.

2.3  Upon the completion of the disbursements as set forth above, Escrow Agent shall have no further duties hereunder.

3.  Obligations and Liabilities of Escrow Agent.

3.1  The duties and obligations of Escrow Agent shall be determined solely by the express provisions of this Agreement.

3.2  Escrow Agent shall not be responsible in any manner whatsoever for any failure or inability of Purchaser or Seller to perform or comply with any of the provisions of the respective agreements between them.

3.3  Escrow Agent shall not be bound by any modification, cancellation or rescission of this Escrow Agreement unless in writing, signed by Purchaser and Seller and expressly consented to in writing by Escrow Agent.

3.4  Escrow Agent's duties hereunder are as a depository only, ministerial in nature, and Escrow Agent shall incur no liability whatsoever hereunder for any error of judgment, or any action taken or omitted hereunder, except for damages directly resulting from Escrow Agent's gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

3.5  Delivery of the Escrow Funds, along with any accrued interest thereon, by Escrow Agent pursuant to the provisions of this Agreement shall constitute a complete discharge and satisfaction of all obligations of Escrow Agent hereunder.

3.6  Nothing contained herein shall be deemed to preclude Escrow Agent at any time and for any reason from depositing the Escrow Fund into a court of competent jurisdiction upon prior notice to the parties hereto, and abiding by the determination of such court with respect thereto. In such event, such delivery shall constitute a complete discharge and release of Escrow Agent of its obligations hereunder.

3.7     Escrow Agent shall be entitled to rely conclusively upon any written notice, waiver, receipt, or other document which Escrow Agent believes in good faith to be genuine, including, without limitation, a written statement by Purchaser or Seller that they have complied with the terms of the Agreement with respect to a demand for payment.

3.8     In the event of any controversy or dispute under this Escrow Agreement or with respect to any question as to the construction hereof or any action to be taken or omitted by Escrow Agent, Escrow Agent shall be entitled to consult with counsel of its own choosing.

3.9     Nothing contained herein shall limit or restrict the right of Escrow Agent to represent Seller with respect to any disputes which may arise in connection with the Purchase Agreement, this Escrow Agreement, or any other matter whatsoever. Seller and Purchaser agree that Escrow Agent's engagement as an attorney by Seller is not and shall not be objectionable for any reason whatsoever. Escrow Agent shall incur no liability whatsoever to Purchaser (or any affiliate or subsidiary thereof) for any legal advice rendered to Seller or any action or inaction by Seller based upon such legal advice.

4.     Expenses of Escrow Agent. Escrow Agent shall serve without compensation, however, Seller shall be liable for one-half (½) and Purchaser shall be liable for one-half (½) of any reasonable out-of-pocket fees and expenses incurred by Escrow Agent in connection with this Agreement, including counsel fees, if any. The parties shall pay any such amounts due Escrow Agent promptly upon its demand.

5.     Indemnification of Escrow Agent. Purchaser and Seller agree, jointly and severally, to indemnify Escrow Agent and hold Escrow Agent harmless from any loss, liability and expenses which it incurs in connection with or arising out of its compliance with the terms of this Agreement, including the fees, costs and expenses of defending itself against any claims of liability hereunder, except for a loss, liability or expense arising solely from Escrow Agent's own gross negligence, willful misconduct or breach of fiduciary duty as determined by a final and non-appealable judgment of a court of competent jurisdiction.

6.     Successor Escrow Agent. In the event Escrow Agent is no longer able or willing to serve, Escrow Agent shall have the right, after consultation with Seller and Purchaser, to appoint a successor Escrow Agent who shall be bound by the terms and conditions set forth herein.

7.     Notices.

7.1     Any notice, request, demand or other communication permitted or required to be given hereunder shall be in writing and shall be deemed to have been given when such notice shall have been (a) sent by United States mail, postage prepaid to the addressee, or (b) delivered by a nationally recognized overnight courier or facsimile (to the extent a facsimile number is provided below) to the addressee; in each case at the address or facsimile number, as applicable, specified below:

If to Seller:

Saint Vincents Catholic Medical Centers of New York
170 West 12th Street
New York, New York 10011
Attn: Mark E. Toney, Chief Restructuring Officer
Fax: (212) 604-3331

With a copy to:

Garfunkel Wild, P.C.
111 Great Neck Road
Great Neck, New York 11021
Attn: Judith A. Eisen, Esq.
Fax: (516) 466-5964

and

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Fax: (212) 715-8000
Attn: Adam C. Rogoff, Esq.

If to Escrow Agent:

Garfunkel Wild, P.C.
111 Great Neck Road, Suite 503
Great Neck, New York 11021
Attn: Judith A. Eisen, Esq.
Fax: (516) 466-5964

If to Purchaser:

KFG Land I, LLC
109-40 Saultell Aver.
Rego Park, NY 11368
Fax: (718) 271-4064
Attn: Abraham Klein
        Managing Member

With a copy to:

Tenzer & Lunin, LLP
1775 Broadway, Suite 608
New York, NY 10019

Fax: (212) 262-6959

Any notice or communication served upon Escrow Agent shall be accompanied by an affidavit of service upon all other parties upon whom such notice is required to be served.

8. Binding Effect; Further Assurances.

8.1 This Agreement shall inure to the benefit of and shall be binding upon the respective heirs, personal representatives, successors, and assigns of the parties hereto.

8.2 Seller and Purchaser hereto covenant that they will execute all instruments and documents and will take all steps which may be necessary in order to implement the provisions of this Agreement.

9. Governing Law; Forum.

9.1 This Agreement shall be construed under and governed by the laws of the State of New York, without regard to its principles of conflicts of laws.

9.2 Each party to this Agreement irrevocably consents and agrees that any dispute arising out of or in any way connected to this Agreement shall only be adjudicated by the Bankruptcy Court, provided that if the Bankruptcy Case has closed, each of the parties hereto irrevocably agrees that any Legal Proceeding with respect to this Agreement shall be brought and determined exclusively in the United States District Court for the Southern District of New York or if such Legal Proceeding may not be brought in such court for jurisdictional purposes, exclusively in the Supreme Court of New York sitting in the County of New York. Each of the parties hereto hereby (a) irrevocably submits with regard to any such Legal Proceeding to the exclusive personal jurisdiction of the aforesaid courts in the event any dispute arises out of this Agreement or any transaction contemplated hereby, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the state or federal courts referenced above. Each of the parties hereto further agrees to accept and acknowledge service of any and all process which may be served in any such Legal Proceeding in said courts in the State of New York, and agrees that service of process upon such party by a method permitted by the applicable Laws of the State of New York to such party's address as set forth in Section 7.1 hereto, will be deemed in every respect effective service of process upon such party, in any Legal Proceeding.

10. Counterparts. This Agreement may be executed in one or more counterparts (whether facsimile or original), each of which when taken together shall be deemed one and the same original instrument.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Escrow Agreement the day and year first above written.

**BISHOP FRANCIS J. MUGAVERO CENTER FOR GERIATRIC CARE, INC.**

By: _____
      Name:
      Title:

**KFG LAND I LLC**

By: _____
      Name:
      Title:

**GARFUNKEL WILD, P.C.**

By: _____
      Name:
      Title:

# **EXHIBIT B**

## **DEED**

[See Attached]

**THIS INDENTURE**, made the _____ day of _____, 20__, BETWEEN

_____, a New York not-for-profit corporation, with offices at _____,

party of the first part, and

_____, a _____ limited liability company, with offices at_____

_____,

party of the second part.

**WITNESSETH**, that the party of the first part, in consideration of Ten Dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

### THE CERTAIN PREMISES AND IMPROVEMENTS SITUATED THEREON AS MORE PARTICULARLY DESCRIBED ON SCHEDULE A ANNEXED HERETO AND MADE A PART HEREOF

**TOGETHER** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above-described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

**AND** the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose. The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

    **IN WITNESS WHEREOF**, the party of the first part has duly executed this deed as of the day and year first above written.

_____

By:_____
      Name:
      Title:

STATE OF NEW YORK  )
                     ) ss:
COUNTY OF)

     On the _____ day of _____, 20__, before me, the undersigned, a Notary Public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on this instrument, the individual, or person upon behalf of which the individual acted, executed the instrument.

                            _____
                            Notary Public

# SCHEDULE A

[See Attached]

*BARGAIN AND SALE DEED*

**Without Covenant Against Grantor's Acts**

_____

*TO*

[ _____ ]

*PREMISES:*

_____

_____, NEW YORK

**BLOCK:** ___
**LOT:** ___

*RECORD AND RETURN TO:*

**Tenzer & Lunin, LLP**
**1775 Broadway, Suite 608**
**New York, NY 10019**

**EXHIBIT C**

**FORM OF BILL OF SALE**

[See attached]

# BILL OF SALE

THIS BILL OF SALE is made and executed as of the ____ day of _____, 20__ from _____, having an address at _____, New York 10011 ("Seller"), to _____ having an address at _____ ("Purchaser").

FOR AND IN CONSIDERATION of the sum of Ten Dollars and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Seller does hereby bargain, sell, convey, deliver, assign, transfer, set over and grant to Purchaser, and to their successors and assigns, all right, title and interest of Seller in and to any and all fixtures, machinery, equipment, furniture and other tangible personal property not owned by any tenant or other occupant of the Property (the "Personalty") affixed or attached to, installed or placed in or upon and to be used for or usable in any present or future enjoyment, occupancy or operation of the building and related improvements comprising the property located at and commonly known as _____, New York.

Title to all the Personalty shall pass to Purchaser upon delivery of this Bill of Sale free and clear of all claims, liens or encumbrances of any kind. Any sales tax, if any, payable in respect of the Personalty shall be the sole responsibility of Purchaser.

Seller makes no warranties or representations whatsoever, including, without limitation, with respect to quality, fitness or merchantability of the Personalty; the Personalty is being transferred "AS IS" physical condition and this Bill of Sale is made without recourse to Seller except that Seller represents and warrants that as of the date hereof, Seller owns all such Personalty free and clear of all claims, liens and encumbrances of any kind.

This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the day and year first written above.

_____

By:_____
       Name:
       Title:

## EXHIBIT A-2
Backup Bid

**ASSET PURCHASE AGREEMENT**

by and between

**BISHOP FRANCIS J. MUGAVERO
CENTER FOR GERIATRIC CARE, INC.**

and

**LIEBEL RUBIN**

Dated as of September 21, 2010

# TABLE OF CONTENTS

Page

ARTICLE I - DEFINITIONS ...................................................................................................2
   Section 1.1 Certain Definitions............................................................................................2
   Section 1.2 Terms Defined Elsewhere in this Agreement ....................................................9
   Section 1.3 Other Definitional and Interpretive Matters. ..................................................10

ARTICLE II - PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES .......12
   Section 2.1 Purchase and Sale of Assets...........................................................................12
   Section 2.2 Excluded Assets. ...........................................................................................13
   Section 2.3 Assumption of Liabilities................................................................................15
   Section 2.4 Excluded Liabilities. ......................................................................................16
   Section 2.5 Assignment and Cure Amounts.......................................................................17
   Section 2.6 Further Conveyances and Assumptions............................................................17
   Section 2.7 Bulk Sales Laws..............................................................................................18
   Section 2.8 Accounts Receivable.......................................................................................18
   Section 2.9 Agreement Regarding Confidentiality of Patient Information ...............................19
   Section 2.10 Rate Adjustment Escrow Fund. .....................................................................19

ARTICLE III - CONSIDERATION .......................................................................................21
   Section 3.1 Consideration .................................................................................................21
   Section 3.2 Purchase Price Deposit. ..................................................................................21
   Section 3.3 Payment of Purchase Price...............................................................................22
   Section 3.4 Resident Transition. .......................................................................................22
   Section 3.5 Additional Purchased Assets............................................................................22

ARTICLE IV - CLOSING AND TERMINATION ...................................................................22
   Section 4.1 Closing Date...................................................................................................22
   Section 4.2 Deliveries by Seller.........................................................................................23
   Section 4.3 Deliveries by Purchaser...................................................................................23
   Section 4.4 Termination of Agreement...............................................................................24
   Section 4.5 Procedure for Termination...............................................................................27
   Section 4.6 Effect of Termination......................................................................................27

ARTICLE V - REPRESENTATIONS AND WARRANTIES OF SELLER................................27
   Section 5.1 Organization and Good Standing.......................................................................27
   Section 5.2 Authorization of Agreement ............................................................................28
   Section 5.3 Consents of Third Parties; Contractual Consents. ..............................................28
   Section 5.4 Litigation........................................................................................................29
   Section 5.5 Licenses and Governmental Permits..................................................................29
   Section 5.6 Intentionally Omitted. .....................................................................................29
   Section 5.7 Health Surveys ...............................................................................................29
   Section 5.8 Notices ..........................................................................................................29
   Section 5.9 Financial Statements. ......................................................................................29
   Section 5.10 Title to Purchased Assets...............................................................................30

Section 5.11 Real Property Leases...................................................................................................30
Section 5.12 Tangible Personal Property.........................................................................................30
Section 5.13 Intellectual Property...................................................................................................30
Section 5.14 Material Contracts.......................................................................................................30
Section 5.15 Employees; Employee Benefits. ................................................................................31
Section 5.16 Employment and Labor...............................................................................................31
Section 5.17 Compliance with Laws; Permits. ...............................................................................31
Section 5.18 Financial Advisors .....................................................................................................32
Section 5.19 No Other Representations or Warranties; Schedules...................................................32

ARTICLE VI - REPRESENTATIONS AND WARRANTIES OF PURCHASER .....................33
Section 6.1 Organization and Good Standing...................................................................................33
Section 6.2 Authorization of Agreement .........................................................................................33
Section 6.3 Conflicts; Consents of Third Parties. ...........................................................................33
Section 6.4 Litigation.......................................................................................................................34
Section 6.5 Financial Advisors ........................................................................................................34
Section 6.6 Healthcare Regulatory Compliance Status. ..................................................................34
Section 6.7 Acknowledgement Regarding Condition of the Business...............................................35
Section 6.8 Financing.......................................................................................................................35
Section 6.9 No Other Representations or Warranties; Schedules.....................................................35

ARTICLE VII - BANKRUPTCY COURT MATTERS .........................................................36
Section 7.1 Competing Transaction..................................................................................................36
Section 7.2 Break-Up Fee................................................................................................................36
Section 7.3 Bankruptcy Court Filings..............................................................................................36
Section 7.4 Notice of Sale................................................................................................................36

ARTICLE VIII - COVENANTS .......................................................................................36
Section 8.1 Conveyance....................................................................................................................36
Section 8.2 Access to Information ....................................................................................................37
Section 8.3 Conduct of the Business Pending the Closing ..............................................................37
Section 8.4 Satisfaction of Conditions.............................................................................................39
Section 8.5 Consents; Insurance.......................................................................................................39
Section 8.6 Regulatory Approvals. ..................................................................................................39
Section 8.7 Further Assurances.........................................................................................................42
Section 8.8 Confidentiality. .............................................................................................................43
Section 8.9 Preservation of Records ................................................................................................44
Section 8.10 Publicity ......................................................................................................................45
Section 8.11 Use of Name ................................................................................................................45
Section 8.12 Supplementation and Amendment of Schedules. ........................................................46
Section 8.13 Covenant Not to Compete or Solicit...........................................................................46
Section 8.14 Cooperation..................................................................................................................46
Section 8.15 Resident Assets. ..........................................................................................................47
Section 8.16 Indemnification. ..........................................................................................................47
Section 8.17 ......................................................................................................................................48
Section 8.18 Receivership Agreement..............................................................................................48

ii

Section 8.19 ...................................................................................................................48

ARTICLE IX - EMPLOYEES AND EMPLOYEE BENEFITS ..................................................49
    Section 9.1 Offers of Employment. .......................................................................................49
    Section 9.2 Employment Terms; Employee Benefits. .............................................................50
ARTICLE X - CONDITIONS TO CLOSING ...............................................................................50
    Section 10.1 Conditions Precedent to Obligations of Purchaser .............................................50
    Section 10.2 Conditions Precedent to Obligations of Seller....................................................51
    Section 10.3 Conditions Precedent to Obligations of Purchaser and Seller. ............................52
    Section 10.4 Frustration of Closing Conditions......................................................................52

ARTICLE XI - TAXES ................................................................................................................52
    Section 11.1 Transfer Taxes .................................................................................................52
    Section 11.2 Prorations .........................................................................................................52
    Section 11.3 Purchase Price Allocation .................................................................................53

ARTICLE XII - MISCELLANEOUS ...........................................................................................53
    Section 12.1 Expenses. .........................................................................................................53
    Section 12.2 Specific Performance .......................................................................................53
    Section 12.3 Governing Law; Jurisdiction; Consent to Service of Process...............................53
    Section 12.4 WAIVER OF JURY TRIAL......,.......................................................................54
    Section 12.5 Entire Agreement; Amendments and Waivers ....................................................54
    Section 12.6 Notices .............................................................................................................55
    Section 12.7 Invalid Provisions .............................................................................................55
    Section 12.8 Binding Effect; Assignment; Successors and Assigns..........................................55
    Section 12.9 No Personal Liability .........................................................................................55
    Section 12.10 Execution in Counterparts................................................................:.............55
    Section 12.11 Survival of Representations, Warranties and Covenants....................................57

**Exhibits**:

Exhibit A – Bidding Procedures Order
Exhibit B – Form of Sale Order
Exhibit C – Intentionally Omitted
Exhibit D – Form of Medical Records Custody Agreement
Exhibit E – Form of Indemnity Escrow Agreement
Exhibit F – Form of Receiver Agreement – Nursing Home

iii

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), is made and entered into as of September 21, 2010, by and between Bishop Francis J Mugavero Center for Geriatric Care, Inc., a New York not-for-profit corporation ("Seller"), and Liebel Rubin ("Purchaser").

## RECITALS

WHEREAS, Seller, along with certain of its Affiliates (collectively, the "Debtors") are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") on April 14, 2010 (the "Petition Date"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 10-11963);

WHEREAS, Seller is entering into this Agreement subject to the approval by the Bankruptcy Court;

WHEREAS, Seller is engaged in the business of owning and operating a licensed 288 bed skilled nursing and residential health care facility under the name Bishop Mugavero (the "Business") at the premises known as 155 Dean Street, Brooklyn, New York 11217 (the "Premises"); and

WHEREAS, Seller's sole member is Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, a New York not-for-profit corporation ("SVCMC"), which entity owns and operates other businesses, which other businesses are not the subject of this Agreement (collectively, the "Other Businesses"); and

WHEREAS, subject to the approval of the Bankruptcy Court, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to, *inter alia*, Sections 105, 363, and 365 of the Bankruptcy Code all of the Purchased Assets and Assumed Liabilities (each, as defined below), all as more specifically provided herein; and

WHEREAS, the Closing (defined below) is contingent upon the closing of the transactions contemplated by the Real Estate Contract (as defined below).

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

# ARTICLE I

## DEFINITIONS

Section 1.1    Certain Definitions.

Unless the context otherwise requires or as otherwise defined herein, capitalized terms used in this Agreement shall have the meanings set forth in this Section 1.1:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Antitrust Laws" means the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, the Donnelly Act, as amended, and the Hart-Scott-Rodino Antitrust Improvements Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, Orders, decrees, administrative or judicial doctrines or other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"Bidding Procedures Order" means the August 20, 2010 Order of the Bankruptcy Court approving the bidding procedures for the auction of the Purchased Assets, attached to this Agreement as Exhibit A.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close.

"Closing Effective Date" means the earlier of (a) the Closing Date, or (b) the Receivership Date, if the Receivership Agreement becomes effective in accordance with its term as contemplated by this Agreement.

"CMS" means the Centers for Medicare & Medicaid Services.

"Code" means the Internal Revenue Code of 1986, as amended.

"CON Application" means a Certificate of Need application with respect to the Business to be submitted by Purchaser to DoH.

"CON Approval" means the approval by DoH of a CON Application without contingencies or conditions that have not been satisfied, other than contingencies or conditions that may be satisfied in accordance with their terms after the Closing.

"Confidentiality Agreement" means the Confidentiality Agreement between SVCMC and Purchaser dated as of January 18, 2010, as amended.

"Contemplated Transactions" means the transactions contemplated by this Agreement.

"Contract" means any written contract, indenture, note, bond, lease, license or other agreement, other than a real property lease, a personal property lease or an Intellectual Property License.

"Copyrights" means all copyrights and registrations and applications therefor and works of authorship, and mask work rights.

"Cost Reports" means all cost and other reports filed pursuant to the requirements of Healthcare Programs for payment or reimbursement of amounts due from such programs for services provided.

"Creditors' Committee" means the official committee of unsecured creditors of Seller appointed in connection with the Bankruptcy Case.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials exclusively related to the Business or the Purchased Assets, in each case whether or not in electronic form, other than Patient Records.

"DoH" means the Department of Health of the State of New York.

"Environmental Law" means any Law currently in effect relating to the protection of human health and safety or the environment, natural resources or the protection thereof, or relating to hazardous materials, including the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.), and the regulations promulgated pursuant thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Contracts" means every Contract that is not an Assigned Contract or not otherwise specifically identified in Sections 2.1(a) through 2.1(k) hereto as a Purchased Asset.

"Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment (including medical equipment) and leasehold improvements owned by Seller and used by Seller exclusively in the conduct of the Business, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by Seller, the telephone numbers associated therewith used in the Ordinary Course of Business and not used in any of the Other Businesses), cubicles and miscellaneous office furnishings.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Hazardous Material" means any substance, material or waste which is regulated by any Governmental Body including petroleum and its by-products, asbestos, biomedical waste, medical waste and any chemical, material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" under any provision of Environmental Law.

"Healthcare Program Liabilities" means all Liabilities under any Medical Reimbursement Program Law, including any obligations for settlement and retroactive adjustments under the Medicare and Medicaid programs arising from or relating to periods ending on or before the Closing Effective Date, including all fines, penalties, costs and expenses relating thereto.

"Healthcare Regulatory Consents" means in respect of Seller or Purchaser, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body as shall be required to be obtained and such notifications to any Governmental Body as shall be required to be given by such party in order for it to consummate the Contemplated Transactions in compliance with all applicable Laws relating to health care or healthcare services of any kind and shall include obtaining any such consents, approvals, authorizations, waivers, Orders, licenses or Permits, or notices to, the New York State Public Health Council, CMS, and DoH and shall include Purchaser obtaining a Certificate of Need from DoH with respect to its operation of the Business and the parties obtaining any consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body needed for them to consummate the Contemplated Transactions and for Purchaser to operate the Business.

"Intellectual Property Licenses" means (a) any grant by Seller to a third Person of any right to use any of the Purchased Intellectual Property owned by Seller and (b) any grant to Seller of a right to use in connection with the Business any Intellectual Property Rights owned by any other Person (other than the SVCMC Marks), to the extent, and only to the extent, such right is transferable by Seller.

"Intellectual Property Rights" means all intellectual property rights available in respect of Copyrights, Marks (other than the SVCMC Marks), Software, trade secrets and Patents, whether registered or unregistered, and whether owned or licensed.

"Inventory" means all medical supplies, drugs, medications, food, janitorial, housekeeping and office supplies and other consumables located in or used in connection with the operation of the Business.

"IRS" means the Internal Revenue Service.

"Knowledge" means the actual knowledge of those officers or Representatives of Purchaser or of those officers of Seller or senior managers of the Business as of or prior to the Closing, each of which is identified in Section 1.1(a) of the Seller Disclosure Schedule.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation enacted or issued by a Governmental Body.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, alternative dispute resolution proceedings (public or private), or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all fines, penalties, interest, costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement and transfer restriction under any agreement.

"Marks" means all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof.

"Material Adverse Effect" means (a) a material adverse effect on the Business (taken as a whole), including its assets, properties, results of operations or condition (financial or otherwise) as conducted on the date hereof other than an effect resulting from an Excluded Matter, or (b) a material adverse effect on the ability of Seller to consummate the Contemplated Transactions or to perform its obligations under this Agreement. "Excluded Matter" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general that does not materially disproportionately affect Seller; (ii) the effect of any change that generally affects any industry in which Seller operates (including a general adverse change in medical reimbursement rates); (iii) the effect of any changes in national or international political conditions, including any engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack occurring prior to, on or after the date of this Agreement that does not materially disproportionately affect Seller; (iv) the effect of any action taken by Purchaser or its Affiliates with respect to the Contemplated Transactions or with respect to Seller, including its employees; (v) any matter of which Purchaser has Knowledge on the date hereof or, solely for purposes of determining whether the condition to the Closing set forth in Section 10.1(a) hereto has been satisfied, on the Closing Date, including those matters

set forth in Section 1.1(b) of the Seller Disclosure Schedule; (vi) the effect of any change in applicable Laws or accounting rules; (vii) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the Contemplated Transactions; (viii) the effect of any action taken by Purchaser or its Affiliates under or in connection with the Receivership Agreement; (ix) the effect of any change occurring after the Closing Effective Date, or (x) any effect resulting from the filing or pendency of the Bankruptcy Case or Legal Proceedings relating thereto and reasonably anticipated effects thereof.

"Medicaid" means any state program for medical assistance administered under Title XIX of the Social Security Act.

"Medical Reimbursement Program" means Medicare, Medicaid, any other federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and any state sponsored reimbursement program.

"Medical Reimbursement Program Laws" means the Laws governing the Medical Reimbursement Programs, including but not limited to: 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a-7b and 1395nn; the False Claims Act (31 U.S.C. § 3729 et seq.); the False Statements Act (18 U.S.C. § 1001); the Program Fraud Civil Penalties Act (31 U.S.C. § 3801 et seq.); the anti-fraud and abuse provisions of the Health Insurance Portability and Accountability Act of 1996 (18 U.S.C. § 1347, 18 U.S.C. § 669, 18 U.S.C. § 1035, 18 U.S.C. § 1518; and the corresponding fraud and abuse, false claims and anti self-referral Laws of any other Governmental Body.

"Medicare" means the health insurance program administered under Title XVIII of the Social Security Act.

"Order" means any order, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice, subject, however, to those actions necessary and incident, or otherwise relating, to the Bankruptcy Case.

"Organizational Documents" means (a) the articles or certificate of incorporation, the bylaws and any shareholders agreement of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and certificate of formation or organization of any limited liability company, (e) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person, and (f) any amendment to any of the foregoing.

"Patents" means all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon.

"Patient Records" shall mean any documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or

behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996, the Health Information Technology for Economic and Clinical Health Act, Title XIII of the American Recovery and Reinvestment Act of 2009 and all regulations promulgated pursuant thereto.

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Body.

"Permitted Designee" means a New York limited liability company controlled by Liebel Rubin and reasonably acceptable to Purchaser in its discretion.

"Permitted Liens" shall mean those liens set forth in Section 1.1(b) of the Seller Disclosure Schedule.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, association, estate, Governmental Body or other entity.

"Plan" means each material "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other material employee plan or agreement maintained by the Seller.

"Pre-Closing Accounts Receivable" means (a) accounts receivable arising out of the rendition of medical, surgical, behavioral, diagnostic or other professional health care services or the sale of medical products in the Ordinary Course of Business for dates of service occurring prior to the Closing Effective Date and (b) any accounts receivable due Seller from Affiliates as of the Closing Date.

"Purchased Intellectual Property" means all Intellectual Property Rights (other than rights under an Intellectual Property License and other than the SVCMC Marks) owned by Seller and (a) used by Seller exclusively in connection with the Business and (b) not used to a material degree in any of the Other Businesses, including any in the form of or arising from or in respect of Patents, Marks, Copyrights, Software or Technology, except for any that is an Excluded Asset.

"Real Estate Contract" means the Purchase and Sale Agreement, dated as of the date hereof, among Seller and Purchaser or his Permitted Designee (the "Real Estate Buyer"), pursuant to which the Real Estate Buyer shall purchase the Premises prior to, or contemporaneously with, the purchase of the Purchased Assets by Purchaser hereunder, in accordance with the terms thereof.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching of Hazardous Material into the indoor or outdoor environment, or into or out of any property.

"Representatives" means, with respect to any Person, any of its Affiliates and the directors, trustees, officers, members, employees, consultants, agents, advisors and other representatives of such Person or its Affiliates.

"Sale Motion" means the motion or motions of Seller seeking approval and entry of the Bidding Procedures Order and the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court substantially in the form of Exhibit B hereto, with such changes as are reasonably acceptable to Purchaser and Seller.

"Software" means, except to the extent generally available for purchase from a third Person, any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (d) all documentation including user manuals and other training documentation related to any of the foregoing, in each case, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business. That portion of the Software that is owned by Seller is referred to herein as the "Proprietary Software," and that portion of the Software that is owned by any Person other than Seller is referred to herein as the "Third-Party Software."

"Tax Authority" means any federal, state or local government, or agency, instrumentality or employee thereof, charged with the administration of any Law relating to Taxes.

"Taxes" means (a) all federal, state, local or foreign taxes, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, unrelated business income, and estimated taxes, whether disputed or not, and (b) all interest, penalties and additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (a).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business, other than any in the form of Software.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended.

Section 1.2    Terms Defined Elsewhere in this Agreement. For purposes of this Agreement, each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|------|---------|
| Additional Deposit | 3.2 |
| Additional Purchased Assets | 3.5 |
| Agreement | Recitals |
| Allocation | 11.3 |
| Antitrust Bureau | 8.6(b) |
| Antitrust Division | 8.6(b) |
| Assigned Contracts | 2.1(d) |
| Assignment | 2.5(a) |
| Assumed Liabilities | 2.3 |
| Auction | 7.1(a) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Break-Up Fee | 7.2 |
| Business | Recitals |
| Business Confidential Information | 8.8(b) |
| Closing | 4.1 |
| Closing Date | 4.1 |
| COBRA | 9.2(d) |
| Competing Bid | 7.1(a) |
| CON Termination Date | 4.4(c)(iv) |
| Cure Amounts | 2.5(b) |
| Escrow Agent | 3.2 |
| Escrow Agreement | 3.2 |
| Escrowed Funds | 3.2 |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Excluded Matter | 1.1 |
| Excluded Personal Property Leases | 2.2(e) |
| Excluded Real Property Leases | 2.2(q) |
| Financial Statements | 5.9 |
| FTC | 8.6(b) |
| Healthcare Applications | 8.6(a) |
| Healthcare Programs | 5.17(b) |
| Indemnity Escrow Agreement | 2.10 |
| Initial Deposit | 3.2 |
| Losses | 8.16 |
| Material Contracts | 5.14(a) |

| Term | Section |
|------|---------|
| Medical Records Custody Agreement | 2.9 |
| Nonassignable Assets | 2.6(b) |
| Other Businesses | Recitals |
| Personal Property Leases | 5.12 |
| Petition Date | Recitals |
| Premises | Recitals |
| Proprietary Software | 1.1 |
| Provider Agreements | 2.1(g) |
| PTO | 9.2(b) |
| Purchase Price | 3.1 |
| Purchased Assets | 2.1 |
| Purchased Intellectual Property Licenses | 2.1(c) |
| Purchased Personal Property Leases | 2.1(b)(ii) |
| Purchased Real Property Leases | 2.1(a) |
| Purchaser | Recitals |
| Purchaser Disclosure Schedule | Article VI |
| Purchaser Documents | 6.2 |
| Rate Adjustment Escrow Fund | 2.10 |
| Rate Adjustment Liabilities | 2.3(c) |
| Receivership Agreement | 8.18 |
| Receivership Date | 8.18 |
| Real Property Leases | 5.11(a) |
| Resident Assets | 8.15 |
| Seller Confidential Information | 8.8(a) |
| Seller Disclosure Schedule | Article V |
| Seller Documents | 5.2 |
| Seller | Recitals |
| SVCMC | Recitals |
| SVCMC Marks | 8.11 |
| Third-Party Software | 1.1 |
| Transition Plan | 8.17 |
| Transfer Taxes | 11.1 |
| Transferred Employees | 9.1(a) |

Section 1.3    Other Definitional and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Periods.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

Dollars. Any reference in this Agreement to currency shall be to, and all payments hereunder shall be paid in, U.S. dollars.

Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number shall have the corresponding meanings in the plural and vice versa.

Headings. The provision of a Table of Contents, the division of this Agreement into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All article, section, schedule and exhibit references used in this Agreement are to articles, sections, schedules and exhibits to this Agreement unless otherwise specified.

Herein. The words "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation", whether or not so stated, and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Made Available to Purchaser. The phrase "made available to Purchaser" shall mean made available to Purchaser through posting in SVCMC's electronic data room, via email, facsimile or other electronic transfer to Purchaser or through other written means to Purchaser for all purposes of this Agreement and at such facsimile numbers and addresses provided by Purchaser.

Make Available to Seller. The phrase "make available to Seller" shall mean make available to Seller or its agents through email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

Part of Speech. If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).

Date. The phrase "the date of this Agreement," "date hereof" and terms of similar import, unless the context otherwise requires, shall be deemed to refer to the date set forth in the preamble of this Agreement.

Accounting Terms. All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.

(b)     Each party hereto has been advised by experienced counsel, and the parties hereto have participated jointly, in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto, and no rule of construction shall operate and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1    Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, and subject to entry of the Sale Order, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall, subject to Section 2.5 hereto, sell, transfer, assign, convey and deliver to Purchaser, all of Seller's right, title and interest in, to and under the Purchased Assets, subject to the Permitted Liens, free and clear of any and all Liens or any other interest. "Purchased Assets" means all of the following assets, rights and properties of Seller exclusively pertaining to or exclusively used in connection with the Business as existing on the Closing Effective Date, other than the Excluded Assets, and in each case subject to Section 2.6(b) hereto:

(a)     (i) all right, title and interest of Seller under each Real Property Lease set forth in Section 5.6(a) of the Seller Disclosure Schedule; and (ii) any additional Real Property Leases exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.3 hereto (collectively, the "Purchased Real Property Leases");

(b)     (i) the Furniture and Equipment; (ii) the tools, spare parts, supplies (including all of Seller's Inventory) and all other tangible personal property owned by Seller, used by Seller in the conduct of the Business and set forth on Section 2.1(b) of the Seller Disclosure Schedule; and (iii) the Personal Property Leases identified in Section 5.12 of the Seller Disclosure Schedule, along with any additional Personal Property Leases exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.3 hereto (collectively, the "Purchased Personal Property Leases");

(c)     (i) the Purchased Intellectual Property set forth on Section 2.1(c) of the Seller Disclosure Schedule; and (ii) the rights of Seller as licensor under the Intellectual Property Licenses identified in Section 2.1(c) of the Seller Disclosure Schedule and all rights of Seller as licensee under the Intellectual Property Licenses, along with any additional Intellectual Property Licenses exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.3 hereto (collectively, the "Purchased Intellectual Property Licenses");

(d)     (i) all Contracts set forth in Section 2.1(d) of the Seller Disclosure Schedule and all rights arising out of such Contracts; and (ii) any additional Contracts exclusively pertaining to or exclusively used in connection with the Business that are entered

into after the date hereof but prior to the Closing Effective Date in accordance with <u>Section 8.3</u> hereto (collectively, the "<u>Assigned Contracts</u>");

(e)     subject to the provisions of <u>Section 2.9</u> and Article VII hereto, all Documents that are exclusively used in, held for use in or intended to be used in, or that arise exclusively out of, the Business, including Documents relating to the services provided by the Business, personnel and employee health files for Seller's employees which Purchaser may elect to hire (including, to the extent available, pre-employment, criminal background, drug screen, and immigration records) and books, files, invoices, flow sheets and other technical and non technical data and information relating to the operations and services provided by the Business which are owned by Seller and which are exclusively used in and integral to the operation of the Business, but excluding any Documents and Patient Records described in <u>Section 2.2(g)</u> or <u>Section 2.2(h)</u> hereto;

(f)     all Permits exclusively used by Seller in the Business and set forth in <u>Section 2.1(f)</u> of the Seller Disclosure Schedule (to the extent transferable);

(g)     the Medicare and Medicaid provider numbers for the Business and related provider agreements used in the Business, as identified in <u>Section 2.1(g)</u> of the Seller Disclosure Schedule (collectively, the "<u>Provider Agreements</u>");

(h)     all goodwill and other intangible assets (other than Intellectual Property Rights) owned by Seller and exclusively used in connection with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(i)     all security deposits and prepayments of Business residents, if any, held by Seller for services to be provided on and after the Closing Effective Date;

(j)     all menus, policies and procedures manuals;

(k)     any rights to refunds, settlements and retroactive adjustments arising at any time in connection with the Medicare and Medicaid provider numbers and related participation agreements or any other third-party healthcare payor program of the Business relating to any time period which rights to refunds, settlements and retroactive adjustments are not specified on <u>Schedule 2.2(c)</u> of the Seller Disclosure Schedule in accordance with the provisions of <u>Section 2.2 (c)</u>;

(l)     all accounts receivable generated by the Business on and after the Closing Effective Date and all cash maintained by Purchaser in its capacity as Receiver under the Receivership Agreement, subject, however, to the terms of the Receivership Agreement; and

(m)     all telephone numbers and telefax numbers used by the Business.

Section 2.2     <u>Excluded Assets</u>. Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser or its Affiliates, and Seller shall retain all right, title and interest to, in and under the Excluded Assets. "<u>Excluded Assets</u>" shall mean the following assets, properties, interests and rights of Seller:

(a)     subject to Section 2.1(l), all cash, cash equivalents, bank deposits or similar cash items of Seller, all securities owned by Seller, and all Pre-Closing Accounts Receivable;

(b)     the Excluded Contracts;

(c)     any heretofore rights to refunds, settlements and retroactive adjustments arising in connection with the Medicare and Medicaid provider numbers and related participation agreements or any other third-party healthcare payor program of the Business which rights to refunds, settlements and retroactive adjustments are specified on Schedule 2.2(c) of the Seller Disclosure Schedule, limited to the specific matters, dates and amounts so specified, which Schedule 2.2(c), notwithstanding any provision of this Agreement to the contrary, shall not be subject to any amendment or modification after the Closing Effective Date;

(d)     any other Contract to which Seller is a party or under which it has rights that is not used exclusively in the Business or is used to a material degree in any of the Other Businesses, unless included in Section 2.1(d) of the Seller Disclosure Schedule among the Assigned Contracts;

(e)     the Personal Property Leases identified in Section 2.2(e) of the Seller Disclosure Schedule (the "Excluded Personal Property Leases");

(f)     any Intellectual Property Rights of Seller other than the Purchased Intellectual Property; it being understood that Seller shall not convey, and Purchaser shall not acquire, pursuant to this Agreement any right in or to any website or e-mail address owned or used by Seller (whether or not used in the Business);

(g)     any (i) personnel files for employees of Seller who are not hired by Purchaser; (ii) other books and records that Seller is required by Law to exclusively retain; (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party (other than any patient confidentiality obligation referred to in the foregoing clause (ii) or in Section 2.9 hereto); (iv) books and records and other Documents related to malpractice prevention programs, incident reporting or quality assurance to the extent confidential under applicable Law; (v) Documents relating to proposals to acquire the Business by Persons other than Purchaser or its Affiliates; (vi) any Documents primarily related to or that are required to realize the benefits of any Excluded Assets; (vii) Documents related to Pre-Closing Accounts Receivable; (viii) corporate records and Tax Returns of Seller and (ix) Documents necessary to prepare Tax Returns and Cost Reports;

(h)     any Patient Records; provided that, subject to Section 2.9 hereto, Seller shall provide Purchaser with custody of Patient Records;

(i)     any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for Taxes related to the operation of the Business for any periods prior to the Closing Effective Date, together with any interest due thereon or penalty rebate arising therefrom;

(j) all insurance policies or rights to proceeds thereof relating to the Business or the Purchased Assets to the extent arising from any date prior to the Closing Effective Date;

(k) security deposits for rent, electricity, telephone or other utilities and prepaid charges and expenses of Seller to the extent exclusively related to the Business or the Purchased Assets, but in all events subject to adjustment at Closing under this Agreement;

(l) any rights, claims or causes of action of Seller against third parties relating to assets, properties, business or operations of Seller, including any actions under Chapter 5 of the Bankruptcy Code, provided that with regard to any rights, claims or causes of action against third parties relating to the Purchased Assets or the Business, only to the extent such rights, claims or causes of action exist as of 11:59 p.m. on the day before the Closing Effective Date;

(m) rights of Seller under this Agreement, the Seller Documents and the Contemplated Transactions;

(n) any assets of the Other Businesses not otherwise described in Section 2.1 hereto;

(o) any tangible personal property (i) having religious significance which may be removed from the Purchased Real Property, or (ii) not identified in Section 2.1(b) of the Seller Disclosure Schedule;

(p) any personal, tangible and intangible property of Seller identified in Section 2.2(p) of the Seller Disclosure Schedule;

(q) the Real Property Leases identified in Section 2.2(q) of the Seller Disclosure Schedule (the "Excluded Real Property Leases");

(r) any right to receive or expectancy of Seller in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate), regardless of when received and whether or not designated to be applied or used in respect of the Business; and

(s) the Premises, and all other assets and properties of Seller that are subject to the Real Estate Contract.

Section 2.3 Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely pay, perform and discharge in accordance with their respective terms, only the following Liabilities (collectively, the "Assumed Liabilities"):

(a) in each case to the extent and only to the extent specifically provided in Article IX hereto, those Liabilities arising out of, relating to or with respect to the employment by Seller of any employees of Seller on or before the Closing Date;

(b)     all Liabilities exclusively arising from and after the Closing with respect to the Assigned Contracts, the Purchased Intellectual Property Licenses, the Purchased Real Property Leases and the Purchased Personal Property Leases;

(c)     all outstanding New York Health Facility Cash Assessment Program Liabilities of Seller as of the Closing Effective Date;

(d)     except as set forth in Section 2.4(e) below, all known, unknown and/or contingent Liabilities as of the Closing Effective Date arising from or relating to Healthcare Program Liabilities relating to any period or events or omissions prior to or subsequent to the Closing Effective Date, which known Liabilities of Seller arising from or relating to Healthcare Program Liabilities as of the date hereof Seller represents are described in Section 2.3(d) of the Seller Disclosure Schedule, which Schedule 2.3(d) can be updated by Seller on or before the Closing Effective Date to include any additional such Liabilities that become known between the date hereof and the Closing Effective Date;

(e)     intentionally omitted; and

(f)     the Cure Amounts as required by Section 2.5 hereto.

Section 2.4     Excluded Liabilities. Except for the Assumed Liabilities, Purchaser shall not assume or become liable for the payment or performance of any Liability of Seller of any nature whatsoever, whether accrued or unaccrued, known or unknown, fixed or contingent ("Excluded Liabilities"), including, but not limited to, the following, which shall remain Liabilities of Seller:

(a)     except as otherwise provided in Section 2.3 hereto, any Liability of Seller arising from or relating to the operation of the Business at any time prior to the Closing Effective Date (including, but not limited to, accounts payable) or arising from or relating to the Contemplated Transactions, including, but not limited to Taxes but specifically excluding accounts payable incurred during the Receivership Term while Purchaser acts as the Receiver;

(b)     any Liability associated with any Excluded Assets;

(c)     any Liability arising from or relating to any period or events or omissions occurring prior to the Closing Effective Date from or relating to any overpayment, duplicate payment, refunds, discounts or adjustments due to private sector healthcare cost reimbursement program or insurance coverage;

(d)     any Liability arising from or relating to claims of medical malpractice and/or other professional Liability of Seller, or any of its employees, agents or independent contractors, arising out or relating to any period or events or omissions occurring prior to the Closing Effective Date;

(e)     any Liabilities of Seller to New York State Medicaid outstanding as of the Closing Date and arising from or relating to a pending Medicaid rate adjustment that, when implemented, will be retroactive to January 1, 2009, but such Liabilities that relate to the period from January 1, 2009 until the Closing Effective Date (the "Rate Adjustment Liabilities");

(f)     any Liability arising out of or in connection with any Legal Proceedings (whether instituted prior to or after the Closing) to the extent arising from or relating to any period or acts or omissions which occurred prior to the Closing Effective Date (except as otherwise provided by Section 2.3 hereto); and

(g)     except as set forth in Section 2.3(a) above, any Liability arising from or relating to the CBAs, any Plans or Seller's employees (whether current, former or retired).

Section 2.5     Assignment and Cure Amounts.

(a)     Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing and pursuant to Section 365 of the Bankruptcy Code, Seller shall assume and assign to Purchaser, and Purchaser shall assume from Seller, the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses pursuant to an assignment (the "Assignment") in a form to be mutually agreed to by the parties, if necessary. No contract, lease, or other agreement shall be assumed absent concurrent assignment to Purchaser. Purchaser shall be responsible for satisfying the requirements of "adequate assurance of future performance" as required by Section 365 of the Bankruptcy Code and shall cooperate fully with Seller in seeking such approval from the Bankruptcy Court, including without limitation, Purchaser providing the necessary evidence required as part of the Sale Motion to approve this Agreement and the transactions contemplated herein.

(b)     The cure amounts (collectively, the "Cure Amounts"), if any, as determined by the Bankruptcy Court, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of Seller under the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses shall be paid by Purchaser (or Purchaser shall have delivered into escrow on terms reasonably acceptable to Seller amounts sufficient to pay any claim therefor that remains disputed as of the Closing, as such amount shall have been determined by the Bankruptcy Court) at or before the Closing (except as otherwise agreed to by the other party to the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses) and Seller shall have no Liability for any such cure amount. Purchaser shall indemnify Seller for any such Cure Amount obligations. Purchaser shall not have the right to terminate this Agreement as a result of the failure by Seller or inability of Seller to assign to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof) at the Closing any Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses or Purchaser's decision not to assume any Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses as to which Purchaser has not paid the related Cure Amount in accordance with this section.  To the Knowledge of Seller, an estimate as of the date hereof of the Cure Amounts described in this section is set forth on Section 2.5(b) of the Seller Disclosure Schedule.

Section 2.6     Further Conveyances and Assumptions.

(a)     From time to time following the Closing, each party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents at the Closing and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the Liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents at the Closing, and to otherwise make effective the transactions contemplated hereby and thereby; provided however that nothing herein shall obligate or otherwise require Seller to pay any claims or liabilities arising prior to the Petition Date. In the event that Purchaser or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Purchaser shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to Seller. In the event that Seller receives any Purchased Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver such Purchased Assets (or any payments or proceeds related thereto) to Purchaser.

(b)     Except for the assignment of the Provider Agreements, to the extent that the assignment of any Purchased Asset shall require the consent of any other Person and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code (each, a "Nonassignable Asset"), (i) nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained, and (ii) Purchaser shall be obligated to close whether or not the Nonassignable Asset can be transferred and Seller agrees to reasonably cooperate with Purchaser to seek to obtain any required consent; provided however that Seller shall not be required to pay any claims or incur any other obligations in order to obtain such consent. Notwithstanding anything to the contrary contained herein, Purchaser shall not have the right to terminate this Agreement as a result of the failure by Seller or inability of Seller to assign to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof) at the Closing any Assigned Contract, Purchased Personal Property Lease, Purchased Real Property Lease or Purchased Intellectual Property License.

Section 2.7     Bulk Sales Laws. The parties hereto hereby waive compliance by Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

Section 2.8     Accounts Receivable.

(a)     All Pre-Closing Accounts Receivable of the Business shall remain the property of Seller. All accounts receivable relating to the operation of the Business based on services rendered on and after the Closing Effective Date shall be the property of Purchaser. For the avoidance of doubt, Seller shall be entitled to bill for and receive all Pre-Closing Accounts Receivable, to the extent permitted by applicable Law, and Purchaser shall be entitled to bill for and receive all amounts collected in respect of services rendered by the Business on and after the

Closing Effective Date. Notwithstanding the foregoing provisions of this Section 2.8, the parties agree to use diligent efforts to agree upon a method to fairly allocate, if necessary, (i) all payments received by Seller prior to the Closing Effective Date which relate to services that will be rendered both by Seller prior to the Closing Effective Date and by Purchaser on and after the Closing Effective Date, and (ii) all payments received on or after the Closing Effective Date by Purchaser which relate both to services rendered by Seller prior to the Closing Effective Date and services rendered by Purchaser on and after the Closing Effective Date. In the event that the parties are unable to agree about the Pre-Closing Accounts Receivable or upon a method of allocation, such matter or matters shall be determined by David Adest or Jesse Frommer of Loeb and Troper LLP, which determination shall be binding upon the parties and the costs of which shall be shared equally by Purchaser and Seller.

(b)    Purchaser shall use its commercially reasonable efforts after the Closing Effective Date to assist Seller in collecting Pre-Closing Accounts Receivable, at no cost to Seller. Except as set forth below, each of Purchaser and Seller agrees that it will pay over or cause to be paid over, insofar as practicable within ten (10) Business Days of receipt, to the other (and until so paid, shall hold in trust for the other) all sums received by it or any of its Affiliates in respect of or on account of the other's receivables (but in the case of Pre-Closing Accounts Receivable, Purchaser shall pay over or cause to be paid over such sums net of six percent (6%) of the Medicaid cash receipts assessments due thereon), and provide therewith information available to it identifying the source of the amounts so paid over so to permit the other to apply correctly such amounts to the other's accounts receivable. Notwithstanding the foregoing, for the first thirty (30) days following the Closing Effective Date, Purchaser shall pay all accounts receivable received by the Business, other than those relating to private pay patients, to Seller within three (3) Business Days of receipt, as the parties acknowledge and agree that all accounts receivable received by the Business during such thirty (30) day period will constitute Pre-Closing Accounts Receivable. In addition, upon reasonable request, each recipient shall allow the other (at the other's cost) to audit, access and copy its records relating to the foregoing. All payments for accounts receivable arising out of the Business received from an obligor after the Closing Effective Date shall be applied to the receivable specifically designated by such obligor; provided that in the event that the obligor does not specifically designate a receivable, the payment shall be applied in the order of the age of the accounts receivable of such obligor, starting with the oldest such accounts receivable. The provisions of this Section 2.8 shall survive the Closing to the extent contemplated herein.

Section 2.9    Agreement Regarding Confidentiality of Patient Information. Seller shall have no obligation to provide Purchaser with custody of Patient Records upon the Closing until Seller and Purchaser enter into a Medical Records Custody Agreement (the "Medical Records Custody Agreement") in the form attached hereto as Exhibit D, and then any such obligation of Seller is subject to Purchaser's compliance with such Medical Records Custody Agreement.

Section 2.10    Rate Adjustment Escrow Fund.

(a)    If any Rate Adjustment Liabilities remain outstanding as of the Closing Date, a portion of the Purchase Price determined by David Adest or Jesse Frommer of Loeb and Troper LLP in consultation with Seller and Purchaser equal to (i) the actual amount of such unpaid Rate Adjustment Liabilities; (ii) a reasonable estimate thereof based on information

available concerning the adjusted Medicaid rate at that time, if the actual amount of such Rate Adjustment Liabilities has not been communicated by New York State as of such date; or (iii) if such amount is subject to a pending dispute or appeal by Seller (the "Rate Adjustment Escrow Fund"), shall be delivered to Garfunkel Wild, P.C. at Closing, in its capacity as Escrow Agent, pursuant to the terms of the Escrow Agreement substantially in the form attached hereto as Exhibit E (the "Indemnity Escrow Agreement"). The Rate Adjustment Escrow Fund will be held until the earlier of (i) the date that the Rate Adjustment Liabilities are paid, or (ii) the date which is eighteen (18) months from the Closing Date; provided, however, that if any Legal Proceedings with respect to the Rate Adjustment Liabilities are commenced, the Rate Adjustment Escrow Fund shall not be released until such Legal Proceedings have been fully and finally resolved.

(b)     The Rate Adjustment Escrow Fund shall be utilized to pay the amount of Rate Adjustment Liabilities no later than when due in accordance with any deadlines established by New York State Medicaid, and/or to reimburse Purchaser upon demand as and when Purchaser actually incurs any Liabilities from such Rate Adjustment Liabilities. Any such reimbursement to Purchase shall not exceed the actual and demonstrable Liabilities incurred by Purchaser in connection with such Rate Adjustment Liabilities. As provided in the Indemnity Escrow Agreement, any amount not paid to the State of New York for Rate Adjustment Liabilities or reimbursed to Purchaser in accordance with the foregoing, together with all accrued investment income thereon, shall be released to Seller upon the earlier of (i) the receipt of joint written instructions of an authorized representative of each of Seller and Purchaser, to be given by each party when all the Rate Adjustment Liabilities are paid, or (ii) the date which is eighteen (18) months from the Closing Date; provided, however, that if any Legal Proceedings with respect to the Rate Adjustment Liabilities are commenced, the Rate Adjustment Escrow Fund shall not be released to Seller until such Legal Proceedings have been fully and finally resolved.

(c)     Seller shall at all times retain the sole and exclusive right to litigate, defend, negotiate and/or resolve, in its sole discretion, the Rate Adjustment Liabilities and to communicate with the State of New York (including, but not limited to, its attorneys, agencies and/or offices) and/or any other individuals and/or entities in respect thereof; provided, however, that in any such litigation, negotiation, resolution or settlement of the Rate Adjustment Liabilities, Seller shall not knowingly cause Purchaser to incur any Liabilities for such Rate Adjustment Liabilities without Purchaser's written consent. Seller shall promptly notify Purchaser with respect to the status of Seller actions and activities relating to the Rate Adjustment Liabilities. Seller shall be solely entitled to any rebate or refund of Rate Adjustment Liabilities paid as a result of Legal Proceedings initiated by Seller or otherwise.

(d)     Purchaser shall take no action inconsistent with Seller's sole and exclusive right to dispute, litigate, defend, negotiate and/or resolve the Rate Adjustment Liabilities, as set forth above, including but not limited to, making any payments in respect of the Rate Adjustment Liabilities not expressly authorized in writing by Seller or SVCMC. Purchaser shall immediately notify Seller, and provide copies to Seller, of any correspondence it receives with respect to the Rate Adjustment Liabilities.

## ARTICLE III

## CONSIDERATION

Section 3.1    Consideration. The consideration for the Purchased Assets shall be, subject to adjustment as provided in Section 3.5 hereto, (a) Twenty Million Dollars ($20,000,000.00), subject to adjustment in accordance with Section 3.3 hereof (the "Purchase Price"); (b) the assumption by Purchaser of the Assumed Liabilities; and (c) the aggregate Cure Amounts payable or reserved by Purchaser under Section 2.5 hereto; provided that Seller shall also be entitled to receive the amounts provided by Section 2.8 hereto.

Section 3.2    Purchase Price Deposit. Purchaser has already deposited with Garfunkel Wild, P.C., in its capacity as escrow agent (the "Escrow Agent") an amount equal to Two Million Dollars ($2,000,000.00) (the "Initial Deposit"). Upon execution of this Agreement, the Initial Deposit will be held pursuant to the terms of that certain Escrow Agreement, dated as of the date hereof, by and among Purchaser, Seller and the Escrow Agent (the "Escrow Agreement"). Purchaser and Seller acknowledge that Purchaser has been selected as the prevailing bidder at the Auction, and Purchaser shall deposit, if necessary, within one (1) Business Day after the conclusion of the Auction, funds (the "Additional Deposit" and, together with the Initial Deposit, collectively, the "Escrowed Funds") equal to an amount such that together with the Initial Deposit, the Escrow Fund shall be equal to ten percent (10%) of the Purchase Price, as it may be subsequently amended at the Auction, each such deposit to be released by the Escrow Agent and delivered to either Purchaser or Seller, in accordance with the provisions of the Escrow Agreement. Pursuant to the Escrow Agreement, the Escrowed Funds shall be deposited into an interest bearing account and (together with all accrued investment income thereon) distributed as follows:

(a)    upon the Closing, the Escrowed Funds shall be delivered to Seller as partial consideration for the Purchased Assets, and all accrued investment income thereon shall be delivered to Purchaser at the Closing;

(b)    if this Agreement is terminated by Seller pursuant to Section 4.4(b)(ii) or Section 4.4(b)(iii) hereto, the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Seller;

(c)    if this Agreement is terminated pursuant to Section 4.4(c)(v) hereto, the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Seller; or

(d)    if this Agreement is terminated pursuant to Section 7.2(c) or Section 7.2(f) hereto, or pursuant to Section 4.4 hereto for any reason other than pursuant to Section 4.4(b)(ii), Section 4.4(b)(iii), or Section 4.4(c)(v) hereto, the Escrowed Funds, together with all accrued investment income thereon, shall in each case be returned to Purchaser.

Notwithstanding the foregoing or any provision of this Agreement to the contrary, in accordance with Section 7.2 of this Agreement, within five (5) Business Days of Seller notifying Purchaser that Seller elects to pursue the transaction contemplated herein with Purchaser (the

"Back-Up Bid Notice"), Purchaser shall, by wire transfer of immediately available funds, deposit, or redeposit in the event Seller has returned the Escrowed Funds, an amount equal to ten percent (10%) of the Purchase Price.

Section 3.3 Payment of Purchase Price. On the Closing Date, Purchaser shall pay the Purchase Price, subject to adjustment in accordance with Section 3.5, Section 3.6 and Section 11.2 hereof, and subject to any Purchase Price credit due under the Receivership Agreement, less (a) an amount equal to the portion of the Escrowed Funds being released to Seller on the Closing Date pursuant to Section 3.2 hereto, and (b) the Rate Adjustment Escrow Fund, if any, which shall be paid by Purchaser to the Escrow Agent, as provided in Section 2.10 hereof, which net amount shall be paid by wire transfer of immediately available funds of the balance of the Purchase Price into an account designated by Seller. At Closing, Purchaser shall deposit cash in escrow equal to such amount (if any) as is required by Section 2.5 hereto.

Section 3.4 Resident Transition. Subject to resident choice, Purchaser shall formally admit all residents of the Business as of midnight on the Closing Date and Seller shall simultaneously discharge them.

Section 3.5 Additional Purchased Assets. If between the date of this Agreement and the Closing Effective Date, Seller acquires in accordance with Section 8.3 hereto any material properties or assets that would be Purchased Assets ("Additional Purchased Assets"), the Purchase Price shall for all purposes of this Agreement be increased by eighty percent (80%) of the aggregate "present value" of such Additional Purchased Assets. The present value of an Additional Purchased Asset shall be determined by taking the original cost of such Additional Purchased Asset (including any Taxes or delivery charges) and depreciating such original cost on a straight line depreciation basis over a five (5) year period. Notwithstanding the foregoing, this provision shall only apply for each such Additional Purchased Asset having a cost in excess of $50,000.00.

Section 3.6 Intentionally Omitted.

## ARTICLE IV

## CLOSING AND TERMINATION

Section 4.1 Closing Date. Subject to the satisfaction of the conditions set forth in Article X hereto (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereto (the "Closing") shall take place at the offices of Purchaser's lender or its counsel, otherwise at the offices of Garfunkel Wild, P.C. located at 111 Great Neck Road, Suite 503, Great Neck, NY 11021 (or at such other place as Seller and Purchaser may designate in writing) at 10:00 a.m. (New York time) on a date agreed upon by Seller and Purchaser that is within thirty (30) days following the satisfaction or waiver of the conditions set forth in Article X hereto (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by Seller and Purchaser. Notwithstanding the foregoing, either party may request up to two (2) extensions of the Closing of five (5) Business Days each upon

the demonstration of legitimate cause for such extension or extensions, which requests will not be unreasonably delayed, conditioned or withheld by the other party. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." With respect to the Closing, unless otherwise agreed by Seller and Purchaser in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of Seller in the assets to be acquired by Purchaser hereunder at the Closing, and any Assumed Liability and all risk of loss with respect to the Business, shall be considered to have passed to Purchaser as of 12:00 a.m. (New York time) on the Closing Date. Notwithstanding anything to the contrary contained in this Agreement, the Parties acknowledge and agree that the Contemplated Transactions and the transactions contemplated by the Real Estate Contract must close contemporaneously, unless the transactions contemplated by the Real Estate Contract close earlier, in accordance with the terms thereof.

Section 4.2    Deliveries by Seller. At the Closing, Seller shall deliver to Purchaser:

(a)    a duly executed bill of sale in a form reasonably acceptable to Purchaser and Seller;

(b)    the Assignment, if necessary, duly executed by Seller;

(c)    the officer's certificates required to be delivered pursuant to Sections 10.1(a) and 10.1(b) hereto;

(d)    the Medical Records Custody Agreement between Purchaser and Seller, substantially in the form attached hereto as Exhibit D, duly executed by Seller;

(e)    copies of all consents and notices required by Section 10.2(c) hereto for which Seller is responsible;

(f)    duly executed documents as may be necessary to assign Seller's Medicaid and Medicare provider numbers and provider agreements to Purchaser;

(g)    all other instruments of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser free and clear of all Liens (except Permitted Liens); provided, however, that the Sale Order shall be the only required document to evidence the conveyance and transfer free and clear of such Liens;

(h)    the Indemnity Escrow Agreement, if applicable, substantially in the form of Exhibit E, duly executed by Seller and the Escrow Agent; and

(i)    such other Documents, instruments and certificates necessary to transfer the Purchased Assets as Purchaser may reasonably request no later than four (4) days before the Closing Date.

Section 4.3    Deliveries by Purchaser. At the Closing, Purchaser shall deliver to Seller:

(a)     the Purchase Price, in immediately available funds, in accordance with Section 3.3 hereto;

(b)     a duly executed bill of sale in form reasonably acceptable to Purchaser and Seller;

(c)     the Assignment, if necessary, duly executed by Purchaser;

(d)     the Medical Records Custody Agreement between Purchaser and Seller, substantially in the form attached hereto as Exhibit D, duly executed by Purchaser;

(e)     the officer's certificates required to be delivered pursuant to Sections 10.2(a) and 10.2(b) hereto;

(f)     copies of all consents and notices required by Section 10.1(d) hereto for which Purchaser is responsible;

(g)     a copy of any notification that Purchaser is required under the Escrow Agreement to deliver to the Escrow Agent in order for the Escrow Agent to release the Escrowed Funds to Seller at the Closing; and

(h)     evidence reasonably acceptable to Seller of Purchaser's deposit in escrow of such amounts (if any) required by Section 2.5 hereto;

(i)     the Indemnity Escrow Agreement, if applicable, substantially in the form of Exhibit E, duly executed by Purchaser; and

(j)     such other Documents, instruments and certificates necessary to transfer the Purchased Assets as Seller may reasonably request no later than four (4) days before the Closing Date.

Section 4.4     Termination of Agreement.

(a)     Termination by Purchaser. Purchaser may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)     if any of the conditions to the obligations of Purchaser to close that are set forth in Sections 10.1 and 10.3 hereto shall have become incapable of fulfillment other than as a result of a material breach by Purchaser or its Affiliates of any covenant or agreement contained in this Agreement, and such condition is not waived in writing by Purchaser; provided that the right to terminate this Agreement pursuant to this Section 4.4(a)(i) shall not apply with respect to the approvals of Governmental Bodies addressed in Sections 4.4(c)(iii) and (c)(iv) hereto, which are addressed and provided for in such Sections;

(ii)     if there shall be a material breach by Seller of any representation or warranty, or any covenant or agreement contained in this Agreement, which breach relates to a matter that is, or would result in, a Material Adverse Effect and cannot be

cured or has not been cured within twenty (20) Business Days after the giving of written notice by Purchaser to Seller of such breach; or

(iii)    if the Sale Order is not entered within sixty (60) days from the date of this Agreement, except if the delay in entering the Sale Order is a result of Purchaser's breach of its obligations under this Agreement in any material respect.

(b)    Termination by Seller. Seller may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)    if any of the conditions to the obligations of Seller to close that are set forth in Sections 10.2 and 10.3 hereto shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller; provided that the right to terminate this Agreement pursuant to this Section 4.4(b)(i) shall not apply with respect to the approvals of Governmental Bodies addressed in Sections 4.4(c)(iii) and (c)(iv) hereto, which are addressed and provided for in such Sections;

(ii)    if there shall be a material breach by Purchaser of any representation or warranty, or by Purchaser of any covenant or agreement contained in this Agreement, which breach would have a material adverse effect on the ability of Purchaser to consummate the Contemplated Transactions or to perform its obligations under this Agreement and cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Seller to Purchaser of such breach; or

(iii)    if the Receivership Agreement is terminated prior to the Closing Date due to a breach or default of Purchaser thereunder.

(c)    Termination by Purchaser or Seller. Either Purchaser or Seller may terminate this Agreement prior to the Closing upon the occurrence of any of the following:

(i)    by mutual written consent of Seller and Purchaser;

(ii)    intentionally omitted;

(iii)    upon twenty (20) Business Days' written notice to the other party after six (6) months from the entry of the Sale Order by the Bankruptcy Court, if either Purchaser or Seller reasonably determines, after consultation with the DoH and the other party, that it is more likely than not that DoH will not provide such CON Approval by the CON Termination Date for reasons that are specific to Purchaser and the contents of its CON Application and not for reasons that are related to DOH's normal operating procedures in considering the CON Application or DOH's opinion on the financial feasibility of the Contemplated Transactions, it being understood by the parties that DOH's opinion on the financial feasibility of the Contemplated Transactions is a separate and distinct analysis from the DOH's analysis referred to in Section 4.4(c)(v) below of whether Purchaser has sufficient financial resources to fulfill its obligations related to Closing hereunder. Notwithstanding the foregoing, neither Purchaser nor Seller may terminate this Agreement under this Section 4.4(c)(iii) if within such twenty (20)

Business Day period DoH provides the CON Approval or either party receives from DoH reasonably satisfactory assurances that Purchaser will receive the CON Approval by the CON Termination Date;

(iv)    upon twenty (20) Business Days' written notice to the other party if the Closing shall not have occurred by the close of business on the date that is twelve (12) months from the entry of the Sale Order (the "CON Termination Date"); provided that such termination pursuant to this Section 4.4(c)(iv) shall not be effective if within such twenty (20) Business Day period all outstanding required regulatory approvals shall have been obtained and all other Closing conditions shall have been satisfied provided, further, that if the Closing shall not have occurred on or before the CON Termination Date due to an uncured (if curable) material breach of any representations, warranties, covenants, or agreements contained in this Agreement, then the breaching party or its Affiliates may not terminate this Agreement pursuant to this Section 4.4(c)(iv);

(v)    in the event that Purchaser's CON Application is finally rejected by the DoH due to: (1) a character and competency issue after Purchaser has exercised its rights to substitute members, officers, directors, or employees of Purchaser in the CON Application in accordance with Section 8.6(a) hereof, or (2) an inability of Purchaser to demonstrate sufficient financial resources necessary to Close under this Agreement; or

(vi)    in the event the Real Estate Contract is terminated in accordance with its terms prior to the closing of the transactions contemplated thereunder.

(d)    Extension of Time Periods. The time periods for termination of this Agreement set forth in this Section 4.4 may be extended upon the written agreement of the parties without the further consent of the Bankruptcy Court.

(e)    Cross-Default with Real Estate Contract. Subject to any opportunity to cure as may be set forth in this Agreement: (i) a default in any material respect by Seller under the Real Estate Contract prior to closing thereunder shall be deemed a default by Seller under this Agreement, and a default in any material respect by Seller under this Agreement shall be deemed a default by Seller under the Real Estate Contract; (ii) a default in any material respect by the Real Estate Buyer under the Real Estate Contract prior to closing thereunder shall be deemed a default by Buyer under this Agreement and a default in any material respect by Buyer under this Agreement shall be deemed a default by Real Estate Buyer under the Real Estate Contract. In addition, (x) if the Real Estate Buyer is entitled to cancel or terminate the Real Estate Contract or receive the return of the deposit paid thereunder in accordance with its terms, then the Buyer under this Agreement shall have the right to terminate this Agreement upon notice to Seller and pursue its rights and remedies as provided in this Agreement, including but not limited to the right to receive the prompt return of the Escrowed Funds plus accrued interest thereon, or (y) if Seller is entitled to terminate the Real Estate Contract upon a default by Real Estate Buyer thereunder or to receive the deposit paid under the Real Estate Contract, then Seller shall be entitled to terminate this Agreement upon notice to Buyer and shall have the right to receive the Escrowed Funds pursuant to the terms of this Agreement.

Section 4.5    Procedure for Termination.   In the event of termination of this Agreement by Purchaser or Seller, or both, pursuant to Section 4.4 hereto, written notice thereof shall forthwith be given to the other party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 4.4 hereto) the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 4.6 hereto, without further action by the parties.

Section 4.6    Effect of Termination.

(a)    In the event that this Agreement is validly or automatically terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any party; provided that the obligations of the parties set forth in the Confidentiality Agreement, Escrow Agreement, Sections 3.2, 4.6, 7.2 and 8.8 hereto and Article XII hereto, and to the extent necessary to effectuate the foregoing enumerated provisions, Article I hereto, and the obligations with respect to the payment of the Escrowed Funds and the Break-Up Fee, as may be applicable, shall survive any such termination and shall be enforceable in accordance with their terms. In addition, if this Agreement is terminated as provided herein, Purchaser shall upon request redeliver to Seller as soon as practicable any or all Documents, work papers and other material relating to the Business, whether obtained before or after the execution hereof, together with written certification by an authorized officer of Purchaser who has supervised its compliance with this sentence that confirms such compliance.

(b)    Nothing in this Section 4.6 shall relieve the parties of any Liability for a breach of this Agreement prior to the date of termination of this Agreement. If this Agreement is terminated in accordance with Sections 4.4 and 4.5 hereto, Purchaser shall not, directly or indirectly, and shall cause its Affiliates not to, for a period of two (2) years from the date of this Agreement, solicit, recruit, employ or contract with any employee of Seller or any member of Seller's professional staff.

(c)    Notwithstanding any provision of this Agreement to the contrary, no party shall be liable to the other for any indirect, special, consequential, or speculative damages, including, without limitation, loss of opportunity, or profits.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as otherwise disclosed to Purchaser in a schedule delivered to Purchaser by Seller prior to the execution of this Agreement (the "Seller Disclosure Schedule"), and except for the effects of the commencement of the Bankruptcy Case, Seller hereby represents and warrants to Purchaser as follows:

Section 5.1    Organization and Good Standing.   Seller is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the State of New York, and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 5.2    Authorization of Agreement.  Subject to entry of the Sale Order, (a) Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action, including approval of its members (as applicable), necessary for it to validly execute and deliver, this Agreement and each other agreement, document, or instrument or certificate contemplated by this Agreement to be executed and delivered by Seller in connection with entering into this Agreement, and (b) subject to the satisfaction of the conditions referred to in Section 5.3 hereto, Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action necessary for it to validly execute and deliver, each agreement, document, or instrument or certificate contemplated by this Agreement to be executed by Seller in connection with the consummation of the Contemplated Transactions (together with the other Documents, other than this Agreement, referred to in clause (a) of this sentence, the "Seller Documents") and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. This Agreement and each of the Seller Documents contemplated to be executed and delivered in connection with Seller entering into this Agreement have been, and each other Seller Document will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order), this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a Legal Proceeding at law or in equity). None of the execution and delivery by Seller of this Agreement and the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Seller.

Section 5.3    Consents of Third Parties; Contractual Consents.

(a)    Except as set forth in Section 5.3 of the Seller Disclosure Schedule, Seller is not required to obtain any consent, waiver, approval, Order, Permit or authorization of, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Seller Documents by Seller, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order, (ii) the Healthcare Regulatory Consents, (iii) approvals under applicable Antitrust Laws, and (iv) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications of which the failure to have obtained or made same would not have a Material Adverse Effect.

(b)    To Seller's Knowledge, and except as set forth in Section 5.3(b) of the Seller Disclosure Schedule, none of the execution and delivery by Seller of this Agreement or any of the Seller Documents, the consummation of the Contemplated Transactions by Seller, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of or a material default (with or without notice or lapse of time, or both) under, or

give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Seller is a party or by which any of the Purchased Assets are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a Material Adverse Effect.

Section 5.4    Litigation. There are no Legal Proceedings pending or, to the Knowledge of Seller, threatened against Seller, or to which Seller is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a Material Adverse Effect. Seller is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a Material Adverse Effect.

Section 5.5    Licenses and Governmental Permits. Seller is currently established and licensed by the DoH, pursuant to the Public Health Law of the State of New York, to operate the Business as a 288 bed skilled nursing facility. To Seller's Knowledge, Seller possesses all Permits required for the operation of the Business as currently operated, except for any Permits the failure of which to have would not result in a Material Adverse Effect. The Business participates as a provider in the Medicare and Medicaid programs pursuant to Medicare and Medicaid provider agreements.

Section 5.6    Intentionally Omitted.

Section 5.7    Health Surveys. Section 5.7 of the Seller Disclosure Schedule contains the most recent DoH survey or inspection report of the Business and accepted Plan of Correction, if any. Except as may be set forth in said report, and except as set forth in Section 5.7 of the Seller Disclosure Schedule, to Seller's Knowledge, there are no material violations, orders or deficiencies issued or recommended by any Governmental Body, and there are no material inspections, license reviews, investigations or proceedings of any sort pending by or before any such Governmental Body that relate to the Business and that, if adversely determined, would result in a Material Adverse Effect.

Section 5.8    Notices. Except as set forth in Section 5.8 of the Seller Disclosure Schedule, the Business has not been served with any notice which: (a) requires the performance of any material work or alterations on the Business, or in the streets bounding thereon; or (b) orders the installation, repair or alteration of any improvements on the Business or the streets bounding thereon, in each case including, but not limited to, notices received under the Americans with Disabilities Act of 1990, as amended.

Section 5.9    Financial Statements. Seller has furnished Purchaser with (i) audited financial statements for Seller for the year ended December 31, 2008, (ii) unaudited balance sheet and the related statements of income for the twelve (12) month period ended December 31, 2009 (the "Year End Financial Statements"), and (iii) Seller's unaudited balance sheet for the Business as of June 30, 2010 (the "Interim Balance Sheet" and together with the Year End Financial Statements, the "Financial Statements"). Seller shall provide Purchaser with such additional financial information as Purchaser reasonably requests between the date hereof and the Closing Effective Date. Seller shall deliver to Purchaser such regularly prepared periodic unaudited balance sheet items and/or operating data with respect to the Purchased Assets and/or the Business as and when the same are prepared and/or delivered to Seller and/or its

Representatives along with and any Cost Reports that are required to be filed for any periods prior to Closing.

Section 5.10    Title to Purchased Assets.  Except as set forth in Section 5.10 of the Seller Disclosure Schedule, and other than the real property subject to the Real Property Leases, Intellectual Property Licenses, and the personal property subject to the Purchased Personal Property Leases, Seller owns each of the Purchased Assets. Purchaser will be vested with good title to such Purchased Assets, subject to entry of the Sale Order, free and clear of all Liens, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. To Seller's Knowledge, no Person has any right or option to acquire the Purchased Assets or any material part thereof.

Section 5.11    Real Property Leases.

(a)    Section 5.11(a) of the Seller Disclosure Schedule sets forth a true, correct and complete list of all real property and interests in real property leased or licensed by Seller and exclusively used in the Business, as lessee, lessor, licensee or licensor (the "Real Property Leases"). Seller has a valid leasehold interest in the Purchased Real Property Leases, subject to entry of the Sale Order, free and clear of all Liens other than Permitted Liens.

(b)    All Purchased Real Property Leases are in full force and effect. Except as set forth in Section 5.11(b) of the Seller Disclosure Schedule and as otherwise superseded by the applicable provisions of the Bankruptcy Code, Seller has not received written notice of any default which remains uncured, and, to the Knowledge of Seller, the other parties under each of the Purchased Real Property Leases have complied in all material respects therewith, and are not in default thereunder beyond any applicable notice and cure periods.

Section 5.12    Tangible Personal Property.  Section 5.12 of the Seller Disclosure Schedule sets forth all leases of personal property, including Equipment, exclusively used by Seller in the operation of the Business that involve annual payments in excess of $10,000.00. ("Personal Property Leases").

Section 5.13    Intellectual Property.  Seller has licenses to use all material Third-Party Software used in the operation of the Business as now operated.

Section 5.14    Material Contracts.

(a)    Section 5.14(a) of the Seller Disclosure Schedule sets forth a list of all of the following Contracts to which Seller is a party or by which it is bound and that are exclusively related to the Business or by which the Purchased Assets may be currently bound or affected (collectively, the "Material Contracts"):

(i)    Contracts with any labor union or association representing any employees of Seller;

(ii)    Contracts which involve the annual expenditure of more than $75,000.00 in the aggregate or require performance by any party more than one year from

the date hereof that, in either case, are not terminable without penalty on less than thirty (30) days' notice.

(b) Except (i) as otherwise provided in the Bankruptcy Code, (ii) for events of default arising as a result of the commencement of the Bankruptcy Case, or (iii) for general principles of equity that may limit the specific performance of particular provisions, each Material Contract is a legal, valid and binding obligation of Seller and is enforceable by Seller against the other party or parties to such Material Contract in accordance with its terms.

Section 5.15 <u>Employees; Employee Benefits</u>.

(a) <u>Section 5.15(a)</u> of the Seller Disclosure Schedule sets forth a true and complete list of all Plans. Each Plan has been administered and is in compliance with the terms of such Plan and in accordance with all other applicable Laws except where the failure thereof would not have a Material Adverse Effect. Purchaser shall not assume any Plans or any Liabilities associated therewith, unless otherwise expressly set forth herein.

(b) Except as set forth in <u>Section 5.15(b)</u> of the Seller Disclosure Schedule, no "reportable event" (as such term is used in Section 4043 of ERISA), "prohibited transaction" (as such term is used in Section 406 of ERISA or Section 4975 of the Code) or "accumulated funding deficiency" (as such term is used in Section 412 or 4971 of the Code) has heretofore occurred with respect to any Plan which would have a Material Adverse Effect.

Section 5.16 <u>Employment and Labor</u>.

(a) <u>Section 5.16(a)</u> of the Seller Disclosure Schedule (i) sets forth a true and complete list of all employees of Seller as of the date set forth therein (ii) shall be updated and delivered by Seller to Purchaser not later than sixty (60) days prior to the Closing and (iii) to the Knowledge of the Seller, accurately sets forth in all material respects the following information: (1) the position; (2) date of hire; (3) current annual salary or hourly wage; (4) accrued vacation, holidays and/or sick leave as a result of the individual's employment with Seller; and (5) the collective bargaining representative, if any, of which the individual is a member. Thereafter and prior to the Closing Effective Date, Seller shall likewise deliver as soon as practicable to Purchaser updates to <u>Section 5.16(a)</u> of the Seller Disclosure Schedule with respect to any individual that is hired by, or transferred to, the Business as an employee consistent with the provisions in <u>Section 8.2</u> hereto.

(b) <u>Section 5.16(b)</u> of the Seller Disclosure Schedule identifies each labor or collective bargaining agreement applicable to employees of Seller, none of which shall be assumed by Purchaser (the "<u>CBAs</u>").

Section 5.17 <u>Compliance with Laws; Permits</u>.

(a) Seller is duly authorized by DoH to operate the Business.

(b) Seller is eligible to receive payment under Titles XVIII and XIX of the Social Security Act and is a "provider" under existing provider agreements with the Medicare

and Medicaid programs (collectively, the "Healthcare Programs") through the applicable intermediaries.

(c)    Except as set forth in Section 5.17(c) of the Seller Disclosure Schedule, to the Knowledge of Seller, Seller is in compliance with all Laws and Permits applicable to the Purchased Assets or the Business, except where the failure to be in compliance would not have a Material Adverse Effect.

Section 5.18    Financial Advisors. Except as set forth in Section 5.18 of the Seller Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the Contemplated Transactions. Any fees, commissions or like payment due to any such Person shall be paid by Seller and no Person is or shall be entitled to any fee or commission or like payment from Purchaser.

Section 5.19    No Other Representations or Warranties; Schedules. Except for the representations and warranties contained in this Article V (as modified by the Seller Disclosure Schedules), neither Seller nor any other Person makes any other representation or warranty whether express or implied, written or oral, with respect to Seller, the Business, the Purchased Assets, the Assumed Liabilities or the Contemplated Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, its Affiliates or any of their respective officers, directors, members, employees, agents, consultants or other Representatives. Except for the representations and warranties contained in this Article V (as modified by the Seller Disclosure Schedules), Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser or its Representatives by any director, officer, member, employee, agent, consultant or other Representative of Seller or any of its Affiliates). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business. Seller makes no implied representation or warranty as to the condition, merchantability, usage, suitability or fitness for any particular purpose with respect to the Purchased Assets except for the representations and warranties contained in this Article V (as modified by the Seller Disclosure Schedules). The disclosure of any matter or item in any Section of the Seller Disclosure Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect. The representations and warranties of Seller in this Agreement are for diligence purposes only and do not survive the Closing, however their disclaimers survive.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as otherwise disclosed to Seller in a schedule delivered to Seller by Purchaser prior to the execution of this Agreement (the "Purchaser Disclosure Schedule"), Purchaser hereby represents and warrants to Seller, as follows:

Section 6.1  Organization and Good Standing. Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of New York and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 6.2  Authorization of Agreement. Purchaser has all requisite power, authority and legal capacity to execute and deliver this Agreement, the Receivership Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement and the Receivership Agreement or to be executed by it in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly and validly authorized by all necessary corporate action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior the Closing, duly and validly executed and delivered by Purchaser, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a Legal Proceeding at law or in equity). None of the execution and delivery by Purchaser of this Agreement and the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Purchaser.

Section 6.3  Conflicts; Consents of Third Parties.

(a)  To Purchaser's Knowledge, except as set forth in Section 6.3(a) of the Purchaser Disclosure Schedule, Purchaser is not required to obtain any consent, approval, authorization, waiver, Order or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) the Healthcare Regulatory Consents, and (ii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications (A) that have already been obtained or made or (B) of which the failure to have

obtained or made would not have a Material Adverse Effect or would not reasonably be expected to prevent or materially delay the ability of Purchaser to perform or consummate the Contemplated Transactions.

(b) To Purchaser's Knowledge, except as set forth in <u>Section 6.3(b)</u> of the Purchaser Disclosure Schedule, none of the execution and delivery by Purchaser of this Agreement or any of the Purchaser Documents, the consummation of the Contemplated Transactions by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser or any of its Affiliates is a party or by which any of the properties or assets of Purchaser or any of its Affiliates are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the Contemplated Transactions.

Section 6.4 <u>Litigation</u>. There are no Legal Proceedings pending or, to the Knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions. Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions.

Section 6.5 <u>Financial Advisors</u>. Except as set forth in <u>Section 6.5</u> of the Purchaser Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the Contemplated Transactions and no such Person is entitled to any fee or commission or like payment from Seller in respect thereof.

Section 6.6 <u>Healthcare Regulatory Compliance Status</u>.

(a) To Purchaser's Knowledge, except as set forth in <u>Section 6.6</u> of the Purchaser Disclosure Schedule, neither Purchaser nor its members, managers, officers, or employees is involved in any litigation, proceeding or investigation by or with any Governmental Body which, if determined or resolved adversely, would have a material adverse impact on the ability of Purchaser to obtain or maintain any governmental qualifications, registrations, filings, licenses, Permits, Orders, approvals or authorizations necessary for Purchaser to conduct the Business and to own or use the Purchased Assets, as the Business is conducted and the Purchased Assets are owned and used on the date hereof, where the failure to have such qualifications, registrations, filings, licenses, Permits, Orders, approvals or authorizations could reasonably be expected to prevent or materially delay the consummation of the Contemplated Transactions by Purchaser or the performance by Purchaser of any of its material obligations under this Agreement.

(b)     To Purchaser's Knowledge, neither Purchaser nor any of its members, directors, officers or employees has (i) been indicted or convicted of a felony, (ii) been suspended or excluded from the Healthcare Programs or (iii) failed to pass a character and competency or financial feasibility review by DoH or comparable Governmental Body of another State. To Purchaser's Knowledge, there is no reason why Purchaser should fail to successfully obtain CON Approval for reasons relating to the character, competence and/or financial capacity of Purchaser and its members, managers, officers, or employees.

Section 6.7     Acknowledgement Regarding Condition of the Business. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, whether express or implied or written or oral, beyond those expressly given by Seller to Purchaser in Article V hereto (as modified by the Seller Disclosure Schedule), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred to Purchaser on a "WHERE IS" and, as to physical condition, "AS IS" basis. Purchaser further represents that neither Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, written or oral, as to the accuracy or completeness of any information regarding Seller, the Business or the Contemplated Transactions not expressly set forth in this Agreement, and neither Seller, any of their Affiliates or any other Person will have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or the use by Purchaser or any of its Affiliates of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its Representatives, or any other document or information in any form provided to Purchaser or its Representatives in connection with the sale of the Business and the Contemplated Transactions. Purchaser acknowledges that it, along with its Representatives, has conducted to its satisfaction, its own independent investigation of the Business and the Purchased Assets and, in making the determination to proceed with the Contemplated Transactions, Purchaser has relied on the results of its own independent investigation.

Section 6.8     Financing. On the Closing Date Purchaser will have sufficient funds on hand to consummate the Contemplated Transactions. On the Closing Effective Date, Purchaser will have sufficient funds to fulfill its obligations under the Receivership Agreement. Purchaser acknowledges that it shall not be a contingency to the obligations of Purchaser to consummate the Contemplated Transactions that Purchaser have sufficient financial resources for payment of the Purchase Price.

Section 6.9     No Other Representations or Warranties; Schedules. Except for the representations and warranties contained in this Article VI (as modified by the Purchaser Disclosure Schedules), neither Purchaser nor any other Person makes any other representation or warranty, whether express or implied, written or oral, with respect to Purchaser or the Contemplated Transactions, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser or any of their respective officers, directors, members, managers, employees, agents, consultants or other Representatives. Except for the representations and warranties contained in this Article VI (as modified by the Purchaser Disclosure Schedules), Purchaser disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished

(orally or in writing) to Seller or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Seller by any director, officer, member, manager, employee, agent, consultant, or other Representative of Purchaser or any of its Affiliates). The disclosure of any matter or item in any Section of the Purchaser Disclosure Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material. The representations and warranties of Purchaser in this Agreement shall not survive the Closing, however their disclaimers shall survive.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

Section 7.1    This Agreement is subject to the terms of the Bidding Procedures Order and approval by the Bankruptcy Court.

Section 7.2    <u>Back-up Bidder</u>. Purchaser agrees and acknowledges that it will act as the back-up bidder ("<u>Back-up Bidder</u>") to the prevailing bidder (the "<u>Prevailing Bidder</u>") selected under the bidding procedures pursuant to the Bidding Procedures Order. In the event the Prevailing Bidder fails to close the transaction contemplated by the Prevailing Bidder's bid, Seller, in its sole and absolute discretion, may elect instead to pursue the transaction contemplated herein with Purchaser. Purchaser agrees that this Agreement shall remain in full force and effect until the earlier of (i) consummation of the transaction with the Prevailing Bidder, or (ii) March 1, 2011.

Section 7.3    <u>Bankruptcy Court Filings</u>. As promptly as practicable following the execution of this Agreement, Seller shall, at its sole costs and expense, file with and seek the approval of the Bankruptcy Court of the Sale Motion. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other Documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Bidding Procedures Order or Sale Order shall be appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.

Section 7.4    <u>Notice of Sale</u>. Notice of the sale of Purchased Assets contemplated in this Agreement shall be served in accordance with the Bidding Procedures Order.

## ARTICLE VIII

## COVENANTS

Seller hereby covenants and agrees with Purchaser as follows:

Section 8.1    <u>Conveyance</u>. At Closing, Seller shall convey the Purchased Assets to Purchaser, free and clear of all violations, liens and encumbrances, except for Permitted Liens or as otherwise provided herein.

Section 8.2    Access to Information. Subject to Section 2.9 hereto and the other provisions of this Section 8.2 and subject to compliance with applicable Antitrust Laws, Seller agrees that, prior to the Closing Effective Date, and at its own expense, Purchaser shall be entitled, through its Representatives, to make such investigation of the assets, properties and operations of the Business and such examination of the books and records of Seller pertaining to the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and, and at its own expense, to make extracts and copies of such books and records; it being understood, however, that the foregoing shall not entitle Purchaser to access (a) the books, records and Documents referred to in Section 2.2(g) hereto or (b) any books, records or Documents the disclosure of which by Seller to Purchaser would (i) notwithstanding Section 2.9 hereto, violate any patient confidentiality obligation of Seller or (ii) any other agreement or any obligation of confidentiality to which Seller is a party or is bound prior to the date hereof or (iii) any obligation of confidentiality by which Seller is bound under applicable Law. In addition, following the issuance of the Sale Order, Purchaser shall be permitted to have access to Patient Records and employee files solely for the purpose of implementing the Transition Plan set forth in Section 8.17 of the Purchaser Disclosure Schedule. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, any request for such examination shall be made to one of the Persons identified in Section 8.1 of the Seller Disclosure Schedule, and Purchaser's access to such information shall be subject to any restrictions on disclosure by Seller to Purchaser or use of the information contained therein by Purchaser applicable pursuant to any agreement to which Seller is a party or is bound prior to the date hereof or under applicable Law. Seller shall cause its Representatives to promptly cooperate with Purchaser and its Representatives in connection with such investigation and examination, and Purchaser and its Representatives shall cooperate with Seller and its Representatives and shall use its commercially reasonable efforts to minimize any disruption to Seller's business and operations, including the Business. Notwithstanding anything herein to the contrary, Seller shall not be required to permit any such investigation or examination if, and to the extent that, Seller, upon advice of counsel, determines that such investigation or examination by Purchaser would or is reasonably likely to result in a loss of any attorney-client or attorney work product privilege available to Seller. Notwithstanding any provision of this Agreement to the contrary, Seller shall timely cooperate and provide Purchaser with such information as Purchaser reasonably requires to prepare and file its CON Application and to respond to DoH requests or inquiries and for other legitimate purposes related to the Contemplated Transactions, including, without limitation, in connection with Purchaser finalizing its financing for the Contemplated Transactions (although Purchaser acknowledges and agrees that its obligations to consummate the Contemplated Transactions are not contingent on Purchaser obtaining such financing).

Section 8.3    Conduct of the Business Pending the Closing. Subject to the terms and conditions of the Receivership Agreement, during the period from the date hereof through and including the Closing, except (i) as set forth in Section 8.3 of the Seller Disclosure Schedule, (ii) as required by applicable Law (including without limitation as a result of the commencement of the Bankruptcy Case), or (iii) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Seller shall use commercially reasonable efforts to operate the Business in the Ordinary Course of Business. Without limiting the generality of the foregoing, from the date of this Agreement through and including the Closing Effective Date, Seller shall, except (i) as set forth in Section 8.2 of the Seller Disclosure

Schedule, (ii) as required by applicable Law (including without limitation as a result of the commencement of the Bankruptcy Case) or (iii) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), solely as it relates to the Business:

(a) operate the Business only in the ordinary course, in a businesslike manner and in substantially the same manner as it has heretofore, and in compliance in all material respects with all applicable Federal and State Laws;

(b) within ten (10) Business Days of receipt or filing, as the case may be, provide Purchaser with copies of all the DoH survey reports and material notices from Governmental Bodies that are received by Seller along with copies of all Seller's responsive correspondence therefor.

(c) Seller shall timely file plans of correction, if necessary, and shall provide Purchaser with copies of all of the same within ten (10) Business Days of filing;

(d) not acquire or dispose of any fixed assets with a value of $10,000.00 or more, or make any capital expenditures in excess of $10,000.00 per item for the Business;

(e) maintain and keep the Purchased Assets in the same condition and working order as exists on the date hereof, including making necessary repairs and replacements, ordinary wear and tear, depreciation and casualty excepted;

(f) maintain and preserve intact the business organization relating to the Business, to retain adequate staffing of the Business and to maintain the Business's relationship with physicians, employees, residents, residents' families, suppliers, customers, and others having business relationships with the Business so that they shall be preserved for Purchaser on the Closing Effective Date;

(g) consult with Purchaser and obtain Purchaser's approval in each instance before renewing or entering into any Contracts not terminable by Purchaser, without cost, penalty or liability, it being understood that Purchaser shall not be obligated to assume any Contract entered into or extended after the date hereof which is not terminable without cost or penalty to Purchaser unless Purchaser has specifically hereafter consented in writing to assume such Contract;

(h) Seller shall afford Purchaser, and its agents, reasonable access to the Business during normal business hours upon prior reasonable request;

(i) file all Costs Reports required to be filed for any periods prior to the Closing Effective Date and provide Purchaser, within ten (10) Business Days of filing, with copies of any Cost Reports that are required to be filed for any periods prior to the Closing Effective Date;

(j) maintain all of its books and records in accordance with past practice;

(k)    keep in full force and effect all licenses currently in effect, unless such licenses are no longer necessary for the operation of the Business;

(l)    keep in full force and effect all insurance policies or other comparable policies of insurance currently in effect, or the replacements thereof, unless such licenses are no longer necessary for the operation of the Business;

(m)    promptly advise Purchaser in writing if Seller becomes aware of any threatened or actual claim, action, suit, or proceeding, arbitration or investigation against the Business, any of its employees or the Purchased Assets, which if adversely determined would result in a Material Adverse Effect; and

(n)    subject to the Bidding Procedures Order, not enter into any agreement, other than this Agreement, for the sale of the Purchased Assets.

Section 8.4    Satisfaction of Conditions. Seller shall use reasonable commercial efforts to obtain the satisfaction of the conditions specified in Article X of this Agreement.

Section 8.5    Consents; Insurance.

(a)    Through the filing of the Sale Motion and except as may be satisfied through the entry of the Sale Order, Seller shall use its commercially reasonable efforts, and Purchaser shall cooperate with Seller, including by taking the actions referred to in Section 8.5 hereto, to obtain at the earliest practicable date following entry of the Sale Order all necessary consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Seller (including all consents listed in Section 5.3 of the Seller Disclosure Schedule), and to give at the earliest practicable date following entry of the Sale Order any notices required to be given by Seller, in order for Seller to consummate the Contemplated Transactions on the terms and in the manner provided hereby; provided that Seller shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than postpetition filing or postpetition application fees payable to any Governmental Body) or to initiate any litigation or Legal Proceedings to obtain any such item except as otherwise provided by Section 8.5 hereto. Purchaser shall use its commercially reasonable efforts, and Seller shall cooperate with Purchaser, including by taking the actions referred to in Section 8.5 hereto, to obtain at the earliest practicable date following entry of the Sale Order all consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Purchaser, and to give at the earliest practicable date following entry of the Sale Order any notices required to be given by Purchaser, in order for Purchaser to consummate the Contemplated Transactions on the terms and in the manner provided hereby and to operate the Business after the Closing; provided that Purchaser shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any litigation or Legal Proceedings to obtain any such consent or approval except as otherwise provided by Section 8.10 hereto.

Section 8.6    Regulatory Approvals.

(a)    Purchaser shall, at its own cost and expense, (i) within five (5) Business Days of the date of this Agreement, cooperate with Seller in initiating informal discussions with

DoH concerning the form and substance of the CON Application; (ii) subject to Seller's timely cooperation to the extent reasonably required, within twenty one (21) days after receipt of notice that Seller desires to proceed with the Contemplated Transactions with Purchaser as Back-up Bidder in accordance with Section 7.2 hereof, formally submit a complete CON Application to DoH; and (iii) promptly after the entry of the Sale Order, submit to any other Governmental Body all other applications for any Healthcare Regulatory Consents required in order for Purchaser to consummate the Contemplated Transactions and to operate the Business in accordance with applicable Law (collectively with the CON Application, the "Healthcare Applications"), excepting however such applications which are required to be filed after the Closing, and further excepting, such applications for Healthcare Regulatory Consents which are required to be filed by Seller in order to consummate the Contemplated Transactions, which shall be promptly submitted and diligently prosecuted by Seller, at its sole cost and expense, after the entry of the Sale Order by the Bankruptcy Court. Purchaser shall use best efforts to prosecute its Healthcare Applications and shall, subject to the cooperation required of Seller, timely submit all information and Documents requested in connection therewith by DoH and any other Governmental Body. Without limiting the generality of the foregoing, Purchaser shall promptly take such actions as may be reasonably necessary to cure any character or competency objections that DoH may raise to the CON Application, including removing or substituting any members, officers, directors, or employees that fail to obtain character and competency approval from DoH. Each party shall provide the other with prompt written notice of a party's submission of a Healthcare Application. Within five (5) Business Days of its submission or receipt, a party shall deliver to the other party a complete copy of all correspondence to or from DoH or any other applicable Governmental Body having jurisdiction concerning a Healthcare Application. Each party shall provide the other party with periodic reports of a party's efforts to obtain all Healthcare Regulatory Consents. In addition, Purchaser shall provide Seller with notice as promptly as practicable of its receipt of DoH's approval, contingent approval or a rejection of the CON Application, or of any pending or threatened Legal Proceeding which seeks to challenge the Contemplated Transactions, along with a copy of any documentation related thereto. Purchaser shall not knowingly take any action prior to the Closing intended to disqualify Purchaser as an established and licensed operator of the Business. Purchaser shall timely respond to any "30-day letters" relating to Purchaser's CON Application and shall not seek any extension of the deadline within which Purchaser must respond to any such 30-day letter without the written approval of Seller in each instance, which written approval will not be unreasonably withheld by Seller.

(b)        If necessary, each of Purchaser and Seller shall use its commercially reasonable efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under any of the Antitrust Laws with respect to the Contemplated Transactions (including such submission to the Antitrust Bureau of the Office of the Attorney General of the State of New York (the "Antitrust Bureau") as may be required in connection with the CON Application under the Donnelly Act (New York General Business Law Sections 340 through 347)) as promptly as practicable and, in any event, within five (5) Business Days in connection with all submissions to the Antitrust Bureau in connection with the CON Application and within five (5) Business Days in the case of all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request under any of the Antitrust Laws for information, Documents, or other materials received by each of them or any of their respective Affiliates from the Federal Trade Commission (the "FTC"), the Antitrust Division of

the United States Department of Justice (the "<u>Antitrust Division</u>"), the Antitrust Bureau or any other Governmental Body in respect of such filings or the Contemplated Transactions. Each party shall use its commercially reasonable efforts to cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such Documents to the non-filing parties promptly following the submission thereof) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division, the Antitrust Bureau or any other Governmental Body under any of the Antitrust Laws with respect to any such filing or any such transaction.

(c)     If necessary, each of Purchaser and Seller shall use its commercially reasonable efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates in respect of the Contemplated Transactions under any applicable Law, including such filings as are required to obtain the consents, approvals, authorizations, waivers, Orders, licenses or Permits or to provide the notices specified in <u>Section 5.3</u> of the Seller Disclosure Schedule or <u>Section 6.3(a)</u> of the Purchaser Disclosure Schedule, as promptly as practicable, (ii) comply at the earliest practicable date with any request for additional information, Documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Body in respect of such filings or the Contemplated Transactions and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such Documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any Governmental Body under such Laws with respect to any such filing or any such transaction.

(d)     Each of Purchaser and Seller shall use its commercially reasonable efforts to furnish to each other through counsel all information required for any application or other filing to be made pursuant to any applicable Law in connection with the Contemplated Transactions. Each such party shall promptly inform the other parties through counsel of any material oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No such party shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.

(e)     Subject to applicable Law, Purchaser and Seller will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under any of the Antitrust Laws. Each such party may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this <u>Section 8.6</u> as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials.

(f)     Each of Purchaser and Seller shall use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to

the Contemplated Transactions under any of the Antitrust Laws. In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any of the Contemplated Transactions as in violation of any of the Antitrust Laws, each such party shall cooperate and use its commercially reasonable efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other Order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the Contemplated Transactions, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and Seller decide that litigation is not in their respective reasonable best interests. Each such party shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under any of the Antitrust Laws with respect to such transactions as promptly as possible after the date of this Agreement. In connection with and without limiting the foregoing, each of Purchaser and Seller agrees to use its commercially reasonable efforts to take promptly any and all steps necessary to avoid or eliminate each and every impediment under any of the Antitrust Laws that may be asserted by any Federal, state and local and non-United States antitrust or competition authority, so as to enable Purchaser and Seller to close the Contemplated Transactions as expeditiously as possible.

Section 8.7    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement, each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Contemplated Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Contemplated Transactions. Without limiting the generality of the foregoing, from time to time after the Closing, without additional consideration, each party hereto will (or, if appropriate, cause its Affiliates to) execute and deliver such further instruments and take such other action as may be necessary or reasonably requested by the other party to make effective the Contemplated Transactions and to provide the other party with the intended benefits of this Agreement. In addition, upon the reasonable request of Purchaser, Seller shall execute, acknowledge and deliver all such further assurances, deeds, assignments, powers of attorney and other instruments and paper as may be required to sell, transfer, convey, assign and deliver to Purchaser all right, title and interest in, to and under the Purchased Assets. If any party to this Agreement shall, following the Closing, have in its possession any asset or right which under this Agreement should have been delivered to the others at the Closing, such party shall promptly deliver such asset or right to the others.

(b)    Without limiting the generality of the foregoing, if Purchaser or any of its Affiliates shall at any time after the Closing receive any charitable gift, contribution or bequest that might be an Excluded Asset, or receives any notice that such a charitable gift, contribution or bequest may be received or available to Purchaser, Purchaser shall give prompt written notice thereof to Seller and make available to Seller upon reasonable request such information that Purchaser or any of its Affiliates has available to it regarding such gift, contribution or bequest and will cooperate with Seller in determining whether such gift, contribution or bequest should be characterized as an Excluded Asset. The provisions of this Section 8.7 shall survive the Closing.

## Section 8.8    Confidentiality.

(a)    From and after the date hereof, Purchaser shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Seller, and not use to the detriment of Seller, any Seller Confidential Information relating to or obtained from Seller or its Representatives. For purposes of this Section 8.8, "Seller Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Purchased Assets, the Assumed Liabilities, the Business, the Excluded Assets, the Excluded Liabilities or the Other Businesses, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided that Seller Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) is or becomes generally available to the public other than as a result of a disclosure by Purchaser or any of its Representatives, (ii) becomes available to Purchaser on a non-confidential basis from a source other than Seller or its Representatives; provided that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Purchaser from a third party having the right to disseminate the Seller Confidential Information without restriction on disclosure or (iv) can be shown by Purchaser through written Documents or evidence maintained by Purchaser to have been independently developed by either of them; and provided, further, that upon the Closing, the restrictions contained in this Section 8.8 shall not apply to confidential or proprietary information related primarily to the Business or the Purchased Assets and the Assumed Liabilities. Purchaser may disclose any of the Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. Purchaser shall instruct its Representatives having access to the Seller Confidential Information of such obligation of confidentiality. If Purchaser or anyone to whom it has transmitted Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Confidential Information, Purchaser shall provide Seller with prompt written notice prior to making any disclosure so that such Seller may seek a protective Order or other appropriate remedy. If such protective Order or other remedy is not obtained, Purchaser shall furnish only that portion of the Seller Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed, and Purchaser will exercise commercially reasonable efforts to obtain assurance to the extent possible that confidential treatment will be accorded to that portion of Seller Confidential Information that is being disclosed. In any event, Purchaser will not oppose action by Seller to obtain an appropriate protective Order or other reliable assurance that confidential treatment will be accorded Seller Confidential Information. The restrictions contained hereinabove shall not apply to any disclosures made in connection with obtaining the Regulatory Approvals contemplated under this Article VIII or in connection with any other legitimate purpose of Purchaser related to the Contemplated Transactions, including with regard to Purchaser finalizing its financing for the Contemplated Transactions (although Purchaser acknowledges and agrees that its obligations to consummate the Contemplated Transactions are not contingent on Purchaser obtaining such financing), provided that no disclosures will be made by Purchaser or its Representatives to any party not bound by an obligation of secrecy to Purchaser.

(b)     From and after the Closing Date, unless this Agreement is terminated prior to the Closing, Seller shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Purchaser, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with (i) operating the Other Businesses in the ordinary course before and after the Closing Effective Date, (ii) any investigations by Governmental Bodies, (iii) compliance activities after the Closing related to periods occurring prior the Closing Effective Date, (iv) any Legal Proceedings, (v) enforcing any rights or other claims of Seller under this Agreement, (vi) performing any obligations of Seller under this Agreement, including billing and collecting Pre-Closing Account Receivable and other related activities, or (vii) as permitted by the Medical Records Custody Agreement. For purposes of this Section 8.8(b), "Business Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Business or to the Purchased Assets or the Assumed Liabilities, other than information primarily pertaining to the Excluded Assets, the Excluded Liabilities or the Other Businesses, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided that Business Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Seller or its Representatives, (ii) becomes available to Seller on a non-confidential basis from a source other than Seller or its Representatives; provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Purchaser or (iii) is lawfully received by Seller from a third party having the right to disseminate the Business Confidential Information without restriction on disclosure. Seller may disclose any of the Business Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. Seller shall instruct its Representatives having access to the Business Confidential Information of such obligation of confidentiality. If Seller or anyone to whom it has transmitted Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information, Seller shall provide Purchaser with prompt notice prior to making any disclosure so that Purchaser may seek a protective Order or other appropriate remedy. If such protective Order or other remedy is not obtained, Seller shall furnish only that portion of the Business Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed, and Seller will exercise commercially reasonable efforts to obtain assurance to the extent possible that confidential treatment will be accorded to that portion of Business Confidential Information that is being disclosed. In any event, Seller will not oppose action by Purchaser to obtain an appropriate protective Order or other reliable assurance that confidential treatment will be accorded Business Confidential Information.

(c)     The obligations contained in this Section 8.8 are in addition to any separate confidentiality agreements between any of Seller or SVCMC, on the one hand, and Purchaser or its Affiliates, on the other hand, including, without limitation, the Confidentiality Agreement.

Section 8.9     Preservation of Records. Purchaser agrees that it shall preserve and keep the records held by it relating to the operation of the Business prior to the Closing Date for a

period of seven (7) years from the Closing Date or the maximum period of time required by Law, whichever is longer, and shall, subject to Section 2.9 hereto, make such records and personnel available to Seller at Purchaser's sole expense as may be reasonably required by Seller in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or other governmental or healthcare payor investigations or audits of Seller or any of its Affiliates or in order to enable Seller to comply with its obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event Purchaser wishes to destroy such records before or after that time, Purchaser shall first give ninety (90) days prior written notice to Seller and, if it is then existing and functioning, to the Creditors' Committee, and Seller shall have the right at its option and expense, upon prior written notice given to Purchaser within such ninety (90) day period, to take possession of the records within one hundred and thirty (30) days after the date of such notice.

Section 8.10    Publicity.   Each of Seller and Purchaser agrees that it shall not issue any press release or public announcement concerning this Agreement or the Contemplated Transactions without obtaining the prior written approval of either Purchaser or Seller, as applicable, which approval will not be unreasonably withheld, delayed or conditioned, unless, in the judgment of such issuing party upon advice of counsel, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement; provided that such party that intends to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other parties with respect to the text thereof. Notwithstanding the foregoing, Purchaser understands that Seller will be filing various pleadings, including the Sale Motion, in furtherance of obtaining Bankruptcy Court approval of this Agreement and the Contemplated Transactions and Seller understands that Purchaser will be making various filings in connection with the CON Application and in connection with Purchaser finalizing its financing for the Contemplated Transactions (although Purchaser acknowledges and agrees that its obligations to consummate the Contemplated Transactions are not contingent on Purchaser obtaining such financing).

Section 8.11    Use of Name.   Purchaser agrees that it shall (a) as soon as practicable after the Closing Date and in any event within thirty (30) days following the Closing Date, cease to make any use of the name "Saint Vincents Catholic Medical Centers" or any variation thereon or derivative thereof (including "St. Vincent's"), Bishop Mugavero or any variation thereon or derivative thereof, or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing any of the foregoing, including any name or mark confusingly similar thereto (collectively, the "SVCMC Marks") which are included in the Purchased Assets or otherwise included in materials or assets transferred to Purchaser in connection with the Closing, and (b) immediately after the Closing, cease to hold itself or its Affiliates out as having any affiliation or association with Seller, SVCMC or any of their respective Affiliates. In furtherance thereof, as promptly as practicable but in no event later than sixty (60) days following the Closing Date, Purchaser shall remove, strike over or otherwise obliterate all SVCMC Marks from all materials including any vehicles, business cards, schedules, stationery, packaging materials, displays, signs, promotional materials, manuals, forms, computer Software and other materials transferred to Purchaser on the Closing Date; provided that so long as Purchaser uses any SVCMC Marks and has not removed all SVCMC Marks from all materials, Purchaser shall comply with the Ethical and Religious Directives for

Catholic Health Care Services issued by the National Conference of Catholic Bishops, as amended from time to time. Purchaser shall also take, and cooperate with Seller in taking, such actions as are reasonably necessary to change all telephone book listings of the Business.

Section 8.12    Supplementation and Amendment of Schedules.

(a)    Purchaser may, at its option, include in the Purchaser Disclosure Schedule, and Seller may, at its option, include in the Seller Disclosure Schedule, as the case may be, items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information disclosed in the Purchaser Disclosure Schedule or the Seller Disclosure Schedule, as the case may be, shall constitute a disclosure for all purposes of this Agreement notwithstanding any reference to a specific Section in such Disclosure Schedule, and all such information shall be deemed to qualify the entire Agreement and not just such Section.

(b)    Unless otherwise expressly set forth herein, no less than three (3) Business Days prior to the Closing Effective Date, Seller shall deliver to Purchaser an update to the Seller Disclosure Schedule to reflect changes thereto which occur between the date hereof and the Closing Effective Date in the Ordinary Course of Business in accordance with Section 8.3 hereto.

Section 8.13    Covenant Not to Compete or Solicit.

(a)    Throughout the one (1) year period immediately after the Closing Date, Seller shall not, and Seller shall not permit any of its Affiliates to, at any time, directly or indirectly, without the prior written consent of Purchaser, own, operate, manage or control any business or healthcare facility that renders the type of health care services as provided by the Business on the Closing Date within Kings County, New York. Notwithstanding the foregoing and without agreeing (implicitly or otherwise) that the following activities would otherwise be subject to the provisions of this Section 8.13(a), nothing in this Agreement shall preclude, prohibit or restrict a Seller or any of its Affiliates from engaging in any manner in the current and contemplated businesses listed in Section 8.13(a) of the Seller Disclosure Schedule.

(b)    Throughout the one (1) year period immediately after the Closing Date, Seller shall not, and Seller shall not permit any of its Affiliates to, at any time, directly or indirectly, without the prior written consent of Purchaser, solicit, recruit, employ or contract with any Purchaser employee for so long as such employee is employed by Purchaser or its Affiliates; provided that nothing shall prohibit Seller and its Affiliates from performing, or having performed on their behalf, a general solicitation for employees not specifically focused at the Purchaser's employees through the use of media, advertisement, electronic job boards or other general, public solicitations.

Section 8.14    Cooperation. Seller and Purchaser agree to reasonably cooperate with each other, from the date hereof through and following the Closing Date, in good faith, in an effort to satisfy all further conditions, undertakings and agreements contained in this Agreement.

Section 8.15    Resident Assets.

(a)    At the Closing, Seller shall deliver to Purchaser: (i) a schedule of all resident funds held by the Business delineated for each resident (ii) a check or checks drawn on the residents' accounts maintained by the Business for the full amount of such account(s) which shall be deposited by Purchaser in a new residents' allowance account to be maintained by Purchaser; and (iii) a schedule of all bank accounts maintained by the Business on behalf of its residents (collectively, the "Residents Assets").

(b)    Seller and Purchaser shall promptly give all notices required by applicable Law in connection with the transfer of the Resident Assets.

Section 8.16    Indemnification.

(a)    Seller shall indemnify, defend and hold Purchaser and Purchaser's Affiliates, successors and assigns, harmless from and against any and all Liabilities, including, without limitation, reasonable attorneys fees (collectively, "Losses"), that are actually incurred by Purchaser (net of any Tax benefit received by Purchaser in connection therewith), to the extent that such Losses exclusively arise from or relate to any Excluded Liabilities. Notwithstanding the foregoing, Purchaser shall not be entitled to offset against any Pre-Closing Accounts Receivable received by Purchaser, which are payable to Seller pursuant to Section 2.8(a)(ii) hereof, for Losses that may be subject to indemnification under this Section 8.16(a).

(b)    In the event Purchaser receives notice of a potential claim or the commencement of a Legal Proceeding involving Purchaser relating to any of the Excluded Liabilities, Purchaser shall promptly notify Seller, provide copies to Seller of any correspondence it receives with respect to such claims or Legal Proceedings, and will fully cooperate with Seller (at Seller's expense for any reasonable third party costs actually incurred by Purchaser in providing such cooperation) in connection with the defense and/or settlement thereof. Furthermore, Purchaser shall take no action with regard to any such claim or Legal Proceeding involving Excluded Liabilities that is inconsistent with Seller's sole and exclusive right to litigate, defend, negotiate, and/or resolve any such claim or Legal Proceeding, including, but not limited to, making any payments in respect of any such claim or Legal Proceeding not expressly authorized in writing by Seller. Seller shall, at its own expense, promptly dispute or satisfy any claim involving Excluded Liabilities.

(c)    Notwithstanding any provision of this Agreement to the contrary, if Purchaser (i) fails to promptly notify Seller and provide copies to Seller of any correspondence it receives concerning claims or Legal Proceedings to which Purchaser would be entitled to indemnification from Seller under this Section 8.16, or (ii) makes any payments in respect of any claim or Legal Proceeding to which Purchaser would be entitled to indemnification from Seller under this Section 8.16 not expressly authorized in writing by Seller, then Purchaser shall not be entitled to indemnification from Purchaser under this Section 8.16 for any such claims or Legal Proceedings.

(d)     The provisions of this Section 8.16 shall expire and be of no further force and effect on the earlier of the (i) eighteen (18) month anniversary of the Receivership Date or (ii) twelve (12) month anniversary of the Closing Date.

Section 8.17   Purchaser Transition Plan. Set forth in Section 8.17 of the Purchaser Disclosure Schedule (to be provided by Purchaser no later than thirty (30) days from the date hereof) is Purchaser's plan and timeline for transitioning the Business to Purchaser as of the Closing Date (the "Transition Plan"). The Transition Plan contains milestones for operational matters that Purchaser will address and complete in order to smoothly transition the Business to Purchaser by the Closing Date, and the timeline within which all such matters shall be addressed by Purchaser in order for Purchaser to timely consummate the Contemplated Transactions by the deadline contemplated by Section 4.1 hereof. Notwithstanding any provision of this Agreement to the contrary, Purchaser acknowledges and agrees that any inability of Purchaser to achieve the milestones set forth in the Transition Plan in the time frame contemplated by the Transition Plan shall not excuse Purchaser from consummating the Contemplated Transactions within the time period specified in Section 4.1 hereof.

Section 8.18   Receivership Agreement.

(a)     The parties shall enter into a Receivership Agreement – Nursing Home (the "Receivership Agreement") in the form attached hereto as Exhibit F, pursuant to which Purchaser will assume the management and responsibility for the Business through the Closing Date, to the extent permitted by applicable law and regulations, on and in accordance with the terms and subject to the conditions of such Receivership Agreement. The Receivership Agreement is subject to the prior approval of DoH and shall not become effective unless and until DoH has approved same, with such changes, if any, as are acceptable to Seller and Purchaser in their discretion. In the event the DoH approves the Receivership Agreement in a form acceptable to the Seller and Purchaser, the parties shall promptly execute and deliver the Receivership Agreement and the Receivership Agreement shall become effective on the date specified therein (the "Receivership Date").

(b)     The parties shall submit the form of Receivership Agreement to DoH for approval promptly following the date hereof, but in no event later than five (5) Business Days following the date hereof. The Receivership Agreement will terminate upon the Closing or otherwise in accordance with its terms.

Section 8.19   Personal Guaranty of Purchaser Obligations. Contemporaneous with the execution of this Agreement, Purchaser shall cause Liebel Rubin to execute and deliver to Seller a Personal Guaranty, pursuant to which Mr. Rubin will personally guarantee the performance of Purchaser's obligations under this Agreement, the Real Estate Contract and the Receivership Agreement. Notwithstanding the foregoing, Seller acknowledges and agrees that the Personal Guaranty executed by Mr. Rubin shall not apply in the event this Agreement is terminated in accordance with Section 4.4(c)(iii), Section 4.4(c)(iv) or Section 4.4(c)(v), unless Purchaser is then in material breach (after any applicable cure period has lapsed) of any of its obligations under this Agreement.

## ARTICLE IX

## EMPLOYEES AND EMPLOYEE BENEFITS

Section 9.1    Offers of Employment.

(a)    Purchaser shall offer employment, commencing on the Closing Date, to all of the employees of Seller, including those on vacation, leave of absence, disability or layoff, who were employed by Seller on the day immediately preceding the Closing Date and who meet Purchaser's objective hiring criteria, at their final hourly wage rate. All such employees who accept Purchaser's offer of employment shall become employees of Purchaser as of the Closing Date (hereinafter collectively referred to as the "Transferred Employees"). Purchaser shall honor Transferred Employees' seniority dates with Seller for purposes of vacation scheduling. Purchaser shall not assume any of Seller's CBAs, but prior to Closing, shall comply with Federal law and will bargain in good faith with the applicable union or unions with respect to the terms and conditions of represented Employees.

(b)    Subject to the provisions of the Receivership Agreement, prior to, or in connection with, the Closing, Purchaser shall take no action to cause Seller or the Business to terminate the employment of any employee, and neither Seller nor the Business shall be under any obligation to terminate any employee prior to or on the Closing Date. As of the Closing Date Seller shall not have any liability or responsibility with respect to any employee benefit plan, program, policy or other arrangement maintained by or contributed to by Purchaser with respect to Transferred Employees. Except as set forth in Section 9.2 below, Purchaser shall not be obligated after the Closing Date for any obligation or liability of Seller to Employees which arises prior to the Closing Date, including but not limited to any and all employee compensation and benefit obligations or any obligation that may arise from the CBAs or otherwise. Except as set forth in Section 9.2 below, Purchaser shall not assume any CBAs, employee compensation and/or benefit obligations or other terms and conditions of employment for any employee pursuant to the CBAs or otherwise. To the extent that Purchaser offers employment to employees of Seller, their rates of pay on and after the Closing Date shall be determined by Purchaser.

Section 9.2    Employment Terms; Employee Benefits.

(a)    As soon as practicable after the Closing Date, Purchaser shall adopt a retirement plan which shall be qualified under Section 501(a) and 401(k) of the Code.

(b)    Purchaser shall assume all wage payment obligations for vacation, holiday time, sick pay, and personal days (but not including any CBA required contributions to any fund related to any such obligations) which were accrued by employees of Seller under the terms of Seller's Plans and the CBAs but not yet taken or paid as of the Closing Effective Date (collectively, the "PTO"), and shall also assume all severance obligations of Seller existing as of or arising on or after the Closing Effective Date with respect to employees of Seller, whether or not hired by Purchaser.

(c)    To the extent Seller becomes subject to any Liabilities under the WARN Act or any comparable state or local Law by reason of the termination of the employment by

Purchaser (or any successor thereto) of any Transferred Employee on or after the Closing Date, Purchaser shall be responsible therefor. Without limiting the effect of the foregoing sentence, Purchaser shall be solely responsible for giving any notice required by the WARN Act or any comparable state or local Law to be given to any Transferred Employee whose employment is terminated after the Closing Date.

(d)     Except to the extent otherwise required by applicable Law, Purchaser shall be responsible for providing continuation coverage, as required by Section 4980B(f) of the Code and Part 6 of Title I of ERISA or any similar Law ("COBRA"), under a group health plan to be maintained by Purchaser, to all employees of Seller (and other "qualified beneficiaries" under COBRA with respect to such employees) who for any reason experience a COBRA "qualifying event" within the meaning of Section 4980B of the Code and Part 6 of Title I of ERISA prior to the Closing. Purchaser shall be responsible for any COBRA obligations in respect of Transferred Employees (if any) arising with respect to qualifying events that occur on or after the Closing Date. Additionally, on and after the Closing Date, Purchaser shall provide COBRA continuation coverage to all employees whether or not hired by Purchaser.

(e)     Nothing contained in this Agreement, expressed or implied, shall be construed to confer upon any of the employees or Transferred Employees (including any beneficiary or dependent thereof) any rights or remedies whatsoever including, without limitation, any right to employment or continued employment for any specified period or of any nature or kind under or by reason of this Agreement.

## ARTICLE X

## CONDITIONS TO CLOSING

Section 10.1     Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Seller set forth in this Agreement shall be true and correct (without giving effect to any materiality or Material Adverse Effect qualifiers set forth therein) at and as of the Closing Effective Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date) and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated as of the Closing Date, to the foregoing effect; provided that in the event any such representation or warranty has been breached the condition set forth in this Section 10.1(a) shall nevertheless be deemed satisfied unless the effect of any breach of an individual representation or warranty, or the effect of all such breaches of representations and warranties taken together, result in a Material Adverse Effect;

(b)     Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it

prior to the Closing Date and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated as of the Closing Date, to the forgoing effect; provided that the condition set forth in this Section 10.1(b) shall be deemed satisfied unless all such failures to so perform or comply taken together result in a Material Adverse Effect;

(c) Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in clauses (a) through (i) of Section 4.2 hereto; and

(d) all notices, consents, approvals, licenses or Permits, or waivers thereof, of the Governmental Bodies set forth in Section 10.1(d) of the Seller Disclosure Schedule and in Section 10.2(c) of the Purchaser Disclosure Schedule shall have been made or obtained, and any applicable waiting period under any Antitrust Laws shall have expired or been terminated.

Section 10.2 Conditions Precedent to Obligations of Seller. The obligation of Seller to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a) the representations and warranties of Purchaser set forth in this Agreement shall be true and correct (without giving effect to any materiality qualifiers set forth therein) at and as of the Closing, except to the extent such representations and warranties relate expressly to an earlier date (in which case such representations and warranties shall be true and correct, on and as of such earlier date) and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect; provided that in the event any such representation or warranty has been breached the condition set forth in this Section 10.2(a) shall nevertheless be deemed satisfied unless the effect of all such breaches of representations and warranties taken together would prevent or materially delay the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions;

(b) Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect; provided that the condition set forth in this Section 10.2(b) shall be deemed satisfied unless all such failures to so perform or comply taken together prevent or materially delay the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions;

(c) all notices, consents, approvals, licenses or Permits, or waivers thereof, of the Governmental Bodies set forth in Section 10.2(c) of the Purchaser Disclosure Schedule and in Section 10.1(d) of the Seller Disclosure Schedule shall have been made or obtained, and any applicable waiting period under any of the Antitrust Laws shall have expired or been terminated;

(d) the closing of the transactions contemplated by the Real Estate Contract have closed or will close simultaneously with the Contemplated Transactions; and

(e)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 4.3 hereto.

Section 10.3     Conditions Precedent to Obligations of Purchaser and Seller. The respective obligations of the parties to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser or Seller, respectively as the case may be, in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions;

(b)     the Sale Order shall have been entered by the Bankruptcy Court and not be subject to any stay or the time for an appeal has expired; and

(c)     in the event an appeal is taken from the entry of the Sale Order on the grounds that the Sale Order improperly authorized the sale of assets to Purchaser free and clear of all Liens, such appeal shall have been finally decided affirming the entry of the Sale Order and all time to further appeal shall have expired.

Section 10.4     Frustration of Closing Conditions. No party may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3 hereto, as the case may be, to excuse it from consummating the Contemplated Transactions if the failure of any such condition set forth in Section 10.1, 10.2 or 10.3 hereto was primarily caused by such party's failure to materially comply with any provision of this Agreement.

## ARTICLE XI

## TAXES

Section 11.1     Transfer Taxes. Seller shall pay any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges (including any interest and penalty thereon) payable in connection with the Contemplated Transactions ("Transfer Taxes"). Seller shall make due and timely payment of any Transfer Tax to the applicable Tax Authority and shall provide Purchaser with a true and complete copy of each Tax Return relating to Transfer Taxes as filed and evidence of the timely filing of such Tax Return and payment of such Transfer Tax. The parties shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds of Transfer Taxes.

Section 11.2     Prorations. All applicable real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets, if any, for any taxable period that includes the Closing Effective Date and ends after the Closing Effective Date, whether imposed or assessed before or after the Closing Effective Date and payroll due Transferred Employees (including split week), shall be prorated between Seller and Purchaser as of 12:01 a.m. (New York time) on the Closing Effective Date based on the number of days in such period through and including the day prior to the Closing Effective Date and the number of days in such period on and after the Closing Effective Date; provided, however, that nothing in this

Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party. If any Taxes subject to proration are paid by Purchaser, on the one hand, or Seller, on the other hand, the proportionate amount of such Taxes paid (or in the event of a refund of any portion of such Taxes previously paid is received, such refund) shall be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund).

Section 11.3  Purchase Price Allocation. The Purchase Price will be allocated for Tax purposes (the "Allocation") among the Purchased Assets as set forth in Section 11.3 of the Purchaser Disclosure Schedule. The parties agree that no portion of the Purchase Price shall be allocated to the covenants contained in Section 8.17 hereto. The Seller and the Purchaser shall report the Allocation as provided in Section 1060 of the Code, and shall prepare and file all Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Allocation. No party shall take any position (whether in audits, Tax Returns or otherwise) that is inconsistent with the Allocation unless required to do so by applicable law.

Section 11.4  Cooperation on Tax Matters. The parties shall furnish or cause to be furnished to each other, as promptly as practicable following the request therefore, and at the expense of the requesting party, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other filings relating to Tax matters, for the preparation for and defense of any Tax audit, for the preparation of any Tax protest, or for the prosecution or defense of any suit or other proceeding relating to Tax matters.

# ARTICLE XII

## MISCELLANEOUS

Section 12.1  Expenses. Except as otherwise expressly provided in this Agreement, each party shall bear its own costs and expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

Section 12.2  Specific Performance. Seller agrees that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached by Seller, irreparable damage to Purchaser would occur, no adequate remedy at law would exist and damages would be difficult to determine, and that Purchaser shall be entitled to specific performance of the terms hereof (without the posting of any bond), in addition to any other remedy at law or equity. The rights set forth in this Section 12.2 shall be in addition to any other rights which Purchaser may have at law or in equity pursuant to this Agreement.

Section 12.3  Governing Law; Jurisdiction; Consent to Service of Process. This Agreement and any disputes arising in connection herewith shall be governed by and construed in accordance with the internal Laws of the State of New York without regard to the conflict of law principles thereof. Without limiting any party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected

with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (b) any and all Legal Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations pursuant to Section 12.2 hereto; provided that if the Bankruptcy Case has closed, each of the parties hereto irrevocably agrees that any Legal Proceeding with respect to this Agreement or for recognition and enforcement of any judgment in respect hereof shall be brought and determined exclusively in the United States District Court for the Southern District of New York or if such Legal Proceeding may not be brought in such court for jurisdictional purposes, exclusively in the Supreme Court of New York sitting in the County of New York. Each of the parties hereto hereby (a) irrevocably submits with regard to any such Legal Proceeding to the exclusive personal jurisdiction of the aforesaid courts in the event any dispute arises out of this Agreement or any transaction contemplated hereby, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the state or federal courts referenced above. Each of the parties hereto further agrees to accept and acknowledge service of any and all process which may be served in any such Legal Proceeding in said courts in the State of New York, and agrees that service of process upon such party by a method permitted by the applicable Laws of the State of New York to such party's address as set forth in Section 12.6 hereto, will be deemed in every respect effective service of process upon such party, in any Legal Proceeding.

Section 12.4    WAIVER OF JURY TRIAL. EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY ACTION TO WHICH THEY ARE PARTIES INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

Section 12.5    Entire Agreement; Amendments and Waivers. This Agreement (including the schedules and exhibits hereto), the Confidentiality Agreement, the Escrow Agreement, the Indemnity Escrow Agreement, the Personal Guarantys, and the Receivership Agreement contain the entire understanding and agreement of the parties hereto and thereto with respect to the subject matter hereof and thereof, and supersede all previous written or oral negotiations, commitments, understandings and writings. This Agreement may be amended, modified, supplemented or changed, and any provision hereof can be waived, only by written instrument duly executed by all of the parties hereto. Any party hereto may, by written notice to the other parties hereto (a) extend the time for performance of any of the obligations of the other party under this Agreement, (b) waive any inaccuracies in the representations or warranties of the other party contained in this Agreement, (c) waive compliance with any of the conditions or covenants of the other party contained in this Agreement or (d) waive or modify performance of any of the obligations of the other party under this Agreement. Except as provided in the immediately preceding sentence, no action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or

as a waiver of any other or subsequent breach, whether of a similar or dissimilar nature. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

Section 12.6    Notices. All notices and other communications under this Agreement shall be in writing and, unless otherwise provided in this Agreement, shall be deemed given (a) when delivered personally by hand, (b) when sent by facsimile (confirmed in writing by mail promptly thereafter dispatched), (c) three (3) days after being mailed by certified or registered mail, postage prepaid, return receipt requested or (d) one (1) Business Day following the day sent by a nationally recognized overnight courier service, in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

   (a)  If to Purchaser, to:

        Liebel Rubin (or his Permitted Designee)
        1441-59th Street
        Brooklyn, New York, 11219
        Fax: (718) 972-1823

   (b)  If to Seller, to:

        Saint Vincent Catholic Medical Centers
        170 West 12th Street
        New York, New York 10011
        Fax: (212) 356-4990
        Attn: General Counsel

        with a copy to (which shall not constitute notice):

        Kramer Levin Naftalis & Frankel LLP
        1177 Avenue of the Americas
        New York, New York 10036
        Fax: (212) 715-8000
        Attn: Adam C. Rogoff, Esq.

        And

        Garfunkel Wild, P.C.
        111 Great Neck Road, Suite 503
        Great Neck, New York 11021
        Fax: (516) 466-5964

Attn: Judith A. Eisen, Esq.

Section 12.7  Invalid Provisions.  If any term or other provision of this Agreement is held to be invalid, illegal, or incapable of being enforced under any present or future Law, and if the rights or obligations under this Agreement of Seller on the one hand and Purchaser on the other hand will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

Section 12.8  Binding Effect; Assignment; Successors and Assigns.  This Agreement shall apply to, be binding in all respects upon and inure to the benefit of the parties and their respective successors, administrators and permitted assigns. A successor to Seller shall include Seller as a reorganized debtor. No assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of Law or otherwise) without the prior written consent of Purchaser and Seller and any attempted assignment without the required consents shall be void, provided that Liebel Rubin shall be permitted to assign his rights hereunder to a Permitted Designee. No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors, administrators and permitted assigns.

Section 12.9  No Personal Liability.  In entering into this Agreement, the parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any party hereto shall be personally liable or responsible to any other party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named parties only (but nothing contained herein shall limit the Liability of any Person for his or her fraudulent acts).

Section 12.10  Execution in Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original, but all of which together will constitute one (1) and the same agreement. Any counterpart may be executed by facsimile signature, or by electronic mail in "portable document format" (".pdf"), and such facsimile or .pdf signature shall be deemed an original.

Section 12.11 <u>Survival of Representations, Warranties and Covenants</u>. The representations, warranties and covenants of the parties contained in this Agreement shall not survive the Closing; <u>provided, however</u>, that the provisions of <u>Section 2.8</u>, <u>Section 2.10</u>, <u>Section 8.3(i)</u>, and <u>Section 8.16</u> shall survive the Closing in accordance with the terms thereof.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**BISHOP FRANCIS J. MUGAVERO**
**CENTER FOR GERIATRIC CARE, INC.**

By: _____

     Name:

     Title:

_____
Liebel Rubin

# PURCHASE AND SALE AGREEMENT

By and Between

## BISHOP FRANCIS J. MUGAVERO CENTER FOR GERIATRIC CARE, INC.

as Seller

and

## LIEBEL RUBIN

as Purchaser

Dated as of: September 21, 2010

Property

155 Dean Street
Brooklyn, New York

# TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS ........................................................................................................1

ARTICLE 2 GENERAL TERMS ...............................................................................................2

    SECTION 2.1. The Transaction .......................................................................................2

    SECTION 2.2. Purchase Price. .........................................................................................2

ARTICLE 3 PERMITTED EXCEPTIONS; TITLE INSURANCE .............................................3

    SECTION 3.1. Sale Subject to .........................................................................................3

    SECTION 3.2. Title Evidence .........................................................................................3

    SECTION 3.3. Permitted Exceptions ..............................................................................4

ARTICLE 4 APPORTIONMENTS AND PAYMENTS .............................................................6

    SECTION 4.1. Apportionments Relating to the Property ..................................................6

    SECTION 4.2. Taxes and Assessments. ...........................................................................7

    SECTION 4.3. Transfer of Utilities .................................................................................8

    SECTION 4.4. Transfer Taxes .........................................................................................8

    SECTION 4.5. Tax Returns .............................................................................................8

    SECTION 4.6. Title Charges ...........................................................................................8

    SECTION 4.7. Transaction Expenses ..............................................................................8

    SECTION 4.8. Survival ...................................................................................................8

ARTICLE 5 COVENANTS REGARDING THE PROPERTY ....................................................9

    SECTION 5.1. Maintenance and Operation of the Property ..............................................9

ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF PURCHASER ...........................9

    SECTION 6.1. Generally .................................................................................................9

    SECTION 6.2. Closing Conditions; Survival of Representations and Warranties ...........10

ARTICLE 7  REPRESENTATIONS AND WARRANTIES OF SELLER...................................11

    SECTION 7.1.  Generally....................................................................................11

    SECTION 7.2.  Property Representations ........................................................11

    SECTION 7.3.  Closing Conditions; Survival of Representations and Warranties...........12

    SECTION 7.4.  Knowledge of Seller................................................................13

ARTICLE 8  CLOSING DATE....................................................................................13

    SECTION 8.1.  Closing Date...........................................................................13

ARTICLE 9  CLOSING DOCUMENTS ......................................................................13

    SECTION 9.1.  Closing. ..................................................................................13

    SECTION 9.2.  Further Assurances.................................................................14

ARTICLE 10  NOTICES............................................................................................14

    SECTION 10.1.  Notices ..................................................................................14

ARTICLE 11  BROKER .............................................................................................15

ARTICLE 12  DEFAULTS; REMEDIES .....................................................................15

    SECTION 12.1.  Purchaser's Default..............................................................15

    SECTION 12.2.  Seller's Default .....................................................................16

    SECTION 12.3.  Cross-Default with Asset Agreement .....................................16

ARTICLE 13  CASUALTY; CONDEMNATION...........................................................16

    SECTION 13.1.  Casualty................................................................................16

    SECTION 13.2.  Condemnation ......................................................................17

ARTICLE 14  AS-IS; WHERE-IS; DISCLAIMER; WAIVER OF CLAIMS .............................17

    SECTION 14.1.  Disclaimers; As-Is, Where-Is Condition................................17

    SECTION 14.2.  Acceptance of Closing Documents; Waivers..........................19

    SECTION 14.3.  Survival .................................................................................19

ARTICLE 15  ENVIRONMENTAL STUDY ............................................................................19

ARTICLE 16  ESCROW .....................................................................................................19

    SECTION 16.1.  Escrow Terms .....................................................................19

ARTICLE 17  BANKRUPTCY COURT MATTERS .................................................................19

ARTICLE 18  MISCELLANEOUS .......................................................................................20

    SECTION 18.1.  Entire Agreement ...............................................................20

    SECTION 18.2.  Modification........................................................................20

    SECTION 18.3.  Binding Agreement .............................................................20

    SECTION 18.4.  Assignment.........................................................................20

    SECTION 18.5.  No Press Releases ...............................................................21

    SECTION 18.6.  Illegality .............................................................................21

    SECTION 18.7.  Choice of Law.....................................................................21

    SECTION 18.8.  Construction.......................................................................21

    SECTION 18.9.  Binding Effect; Assignment; Successors and Assigns.............................21

    SECTION 18.10.  Ambiguities.......................................................................22

    SECTION 18.11.  Expenses...........................................................................22

    SECTION 18.12.  Counterparts .....................................................................22

    SECTION 18.13.  Waiver of Trial by Jury ......................................................22

    SECTION 18.14.  Third Party Beneficiaries ...................................................22

    SECTION 18.15.  Jurisdiction. ......................................................................22

    SECTION 18.16.  Seller's Constituents ..........................................................23

    SECTION 18.17.  Purchaser's Constituents.....................................................23

    SECTION 18.18.  No Recording .....................................................................23

    SECTION 18.19.  Not an Offer ......................................................................23

    SECTION 18.20.  Failure of Deposit................................................................23

SECTION 18.21. No Waiver .......................................................................................... 24

SECTION 18.22. Severability ........................................................................................ 24

SECTION 18.23. No Survival ........................................................................................ 24

# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** is entered into by and between **BISHOP FRANCIS J. MUGAVERO CENTER FOR GERIATRIC CARE, INC.**, a New York not-for-profit corporation ("**Seller**") and **LIEBEL RUBIN** ("**Purchaser**") as of the 21st day of September, 2010.

**WHEREAS**, Seller, along with certain of its affiliates (collectively, the "**Debtors**"), are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**"), and filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on April 14, 2010 (the "**Petition Date**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") (Case No. 10-11963(CGM)) (the "**Bankruptcy Case**");

**WHEREAS**, Seller is the owner of the Property (as hereinafter defined); and

**WHEREAS**, Subject to the approval of the Bankruptcy Court, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code the Property, all as more specifically provided herein.

**WHEREAS**, Simultaneously with the execution and delivery of this Agreement, Seller, as seller, and Liebel Rubin ("**Asset Purchaser**"), as buyer, entered into that certain Asset Purchase Agreement for the purchase and sale of certain assets used in connection with the operation of Bishop Mugavero, a 288 bed skilled nursing facility which is located at the Real Estate (the "**Asset Agreement**").

**WHEREAS**, the Closing (defined below) is contingent upon the closing of the transactions contemplated by the Asset Agreement.

**NOW, THEREFORE**, subject to the terms and conditions of this Agreement, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, including the mutual covenants and agreements set forth herein, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

For purposes of this Agreement, all capitalized terms and certain other terms used herein shall have the respective meanings specified in Schedule I attached hereto and made a part hereof.

## ARTICLE 2
## GENERAL TERMS

**SECTION 2.1.    The Transaction.**

2.1.1.  Subject to the terms and conditions of this Agreement and the entry of the Sale Order, Seller agrees to sell, transfer, convey and assign to Purchaser, and Purchaser agrees to purchase and accept from Seller on the Closing Date (as defined herein) free and clear of all liens, tenancies, leases, options, rights of first refusal, claims and all Interests (as defined in the Sale Order), subject only to Permitted Exceptions, and any other interest to the extent acceptable to Purchaser, as provided in the Sale Order pursuant to Section 363(b) and Section 363(f) of the Bankruptcy Code, Seller's right, title and interest, in and to (i) that certain real property as more particularly described on Schedule II attached hereto and made a part hereof together with the buildings and improvements thereon located at and commonly known as 155 Dean Street, Brooklyn, New York (collectively, the **"Real Estate"**), and (ii) the furniture, furnishings, fixtures, equipment and other items of personal property exclusively owned by Seller located in or upon, and used in connection with, the Real Estate (collectively, the **"Personalty"**). The Real Estate and the Personalty are to be conveyed together with (x) all easements, rights of way, air or development rights, reservations, privileges, appurtenances, and other estates and rights of Seller, if any, pertaining to its interest in the Real Estate, and (y) all right, title and interest of Seller, if any, in and to all alleys adjoining its interest in the Real Estate and in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining its interest in the Real Estate to the center line thereof, and (z) subject to apportionment if required hereunder, all right, title and interest of Seller, if any, in and to any award made for any taking by condemnation or any damages to its interest in the Real Estate by reason of a change of grade of any street, road or avenue (such taking or damages, a **"Condemnation"**) or to be made in lieu thereof and in and to any unpaid award for any Condemnation (the Real Estate and the Personalty, together with all of the foregoing, are hereinafter sometimes collectively referred to herein as the **"Property"**).

**SECTION 2.2.    Purchase Price.**

2.2.1.  The **"Purchase Price"** for the Property and the various assignments incidental thereto referred to herein is TWELVE MILLION AND NO/100s DOLLARS **(US $12,000,000.00)**. The Purchase Price shall be payable (i) by the payment of the Escrow Deposit in immediate funds, and (ii) the balance in cash (by wire transfer) at the Closing as directed by Seller in writing at least two (2) Business Days prior to the Closing. Seller may direct, among other things, that Purchaser pay a portion of the Purchase Price at the Closing, in an amount or amounts specified by Seller, to persons or entities other than Seller for Seller's purposes, including to the Title Company.

2.2.2.  Purchaser has already deposited with Escrow Agent an amount equal to ONE MILLION TWO HUNDRED THOUSAND AND NO/100s DOLLARS **(US $1,200,000.00)** (the **"Initial Deposit"**; the Initial Deposit together with any interest earned thereon shall be collectively referred to herein as the **"Escrow Deposit"**). In the event a Sale Order is entered into by the Court in connection with a sale of the Premises to the Prevailing Bidder, Seller shall cause the Initial Deposit to be returned to Purchaser within three (3) Business

-2-

Days after the date of the entry of such Sale Order. In the event Seller shall deliver a notice to Purchaser notifying Purchaser that Seller elects to pursue the transaction contemplated herein with Purchaser (the "**Back-Up Bid Notice**"), Purchaser shall deposit as security for the performance of Purchaser's obligations hereunder, within five (5) Business Days after the delivery of the Back-Up Bid Notice, by wire transfer to the account described in Schedule III, a cash earnest money deposit in the amount equal to the Initial Deposit. The Escrow Deposit shall be held by Escrow Agent, in trust, in an interest bearing account pursuant to and in accordance with the provisions of an Escrow Agreement among Seller, Purchaser and Escrow Agent, a copy of which is attached hereto and made a part hereof as Exhibit A (the "**Escrow Agreement**").

2.2.3. The Parties agree that the Personalty has de minimis value. Accordingly, no portion of the Purchase Price is attributable to the Personalty.

## ARTICLE 3
## PERMITTED EXCEPTIONS; TITLE INSURANCE

**SECTION 3.1.** **Sale Subject to.** Subject to the terms and condition of this Agreement and pursuant to the entry of the Sale Order, Seller shall convey, and Purchaser shall accept fee simple title to the Real Estate, insurable by the Title Company at regular premiums, without exceptions or reservations of any type or kind, except (a) ALTA standard printed exceptions other than those that can be removed by the Sale Order, or by an affidavit of Seller to be provided pursuant to Section 3.2.3 hereof, (b) the Permitted Exceptions, and (c) the obligations expressly assumed by Purchaser under this Agreement. The parties hereby agree that **"Title Company"** shall mean National Granite Title Insurance Agency Inc underwriting through Fidelity National Title Insurance Company. Notwithstanding the foregoing to the contrary, Purchaser and Seller each acknowledges and agrees that Purchaser must use and employ Fidelity National Title Insurance Company through Kenneth Cohen to insure at least thirty (30%) percent of the insurance insuring (i) Purchaser's title to the Property and (ii) any mortgage executed and delivered by Purchaser at Closing.

3.1.1. Pursuant to the Sale Order, all monetary liens and claims (the "**Liens**") shall attach to the net proceeds of the sale (the "**Net Proceeds**") to the same extent they encumbered the Property. To the extent Seller is required to satisfy any of the Liens from the Net Proceeds, Seller shall make such payments in accordance with the Sale Order or by further order of the Bankruptcy Court. Nothing herein is a waiver of the rights of Seller or any other third party to contest the validity, amount or priority of any Liens and the right of any claimant or lienholder to have their respective liens satisfied from Net Proceeds.

**SECTION 3.2.** **Title Evidence.** Purchaser shall order a title commitment within ten (10) days after the date hereof and shall cause a title report to be delivered to Seller's counsel within thirty (30) days after the date hereof.

3.2.1. If Purchaser's title commitment/report or any update thereto reflects any title exceptions that are not Permitted Exceptions and, therefore, which Purchaser is not required to accept (the **"Non-Permitted Exceptions"**), Seller shall use reasonable efforts, at or prior to Closing, solely through the entry of the Sale Order and as provided in Section 3.1.1 above, to attempt to remove the following: (i) any and all of the Non-Permitted Exceptions that Seller

-3-

willfully placed of record or consented to be placed of record following the date of the Title Evidence, and (ii) any and all other Non-Permitted Exceptions that may be removed by the entry of the Sale Order. Seller shall have no obligation with respect to the clearance of title as required hereunder other than the delivery of the Sale Order. Seller shall have the right to adjourn the Closing Date, from time to time, up to ninety (90) days in the aggregate for the purpose of removing/eliminating such Non-Permitted Exceptions.

3.2.2. In the event that there exist any Non-Permitted Exception which is not removed through the entry of the Sale Order, Purchaser may elect within five (5) Business Days after the entry of the Sale Order, and may also elect within five (5) Business Days after the delivery to Seller's counsel of any update to the title report showing any Non-Permitted Exception which is not removed through the entry of the Sale Order, as the case may be, to either (i) not consummate the transactions contemplated hereby, in which event this Agreement shall be terminated and of no further force and effect, the Escrow Deposit shall be returned to Purchaser and neither of the parties hereto shall have any rights or obligations to the other hereunder or (ii) consummate the transactions contemplated hereby subject to such additional exceptions and proceed to Closing without an abatement of the Purchase Price. Purchaser's failure to timely deliver a notice electing to not consummate the transactions contemplated hereby shall be deemed Purchaser's election to consummate the transaction in accordance with the terms and conditions of this Agreement. Notwithstanding the foregoing, if Purchaser elects to terminate this Agreement as set forth above, Seller shall have the right to void such termination by providing written notice to Purchaser that Seller elects, in its sole discretion, to cure the Non-Permitted Exception by either removing the same at or prior to Closing or providing Purchaser with a credit against the Purchase Price equal to the amount of the cost to cure the Non-Permitted Exception. In the event Seller elects to cure the Non-Permitted Exception or provide such credit, Purchaser shall be obligated to complete the transaction contemplated by this Agreement.

3.2.3. If required by the Title Company, Seller agrees to execute, acknowledge and deliver a standard and customary owner's title affidavit at Closing as modified for a debtor in chapter 11 and such other matters as the Title Company may reasonably require in order to issue a policy of title insurance to Purchaser in the manner required under this Agreement; provided however that Seller shall not be obligated to pay any amounts to or claims of third parties in order to do so (other than as required by the Sale Order or pursuant to Sections 3.1.1 (as and to the extent provided for therein) and 3.2.1 above).

**SECTION 3.3. Permitted Exceptions. "Permitted Exceptions"** means:

3.3.1. Covenants and Conditions of Waiver of Legal Grade made by Catholic Medical Center of Brooklyn & Queens, Inc. dated October 7, 1992 and recorded October 13, 1992 in Reel 2926 page 391;

3.3.2. the state of facts that an accurate survey of the Property would show (including encroachments, projections, retaining walls and stoops) provided that any such facts shall not materially adversely affect the use of any material portion of the existing improvements for its current use;

-4-

3.3.3. liens for unpaid taxes, assessments, charges, rents and any other governmental charges, which are not yet due and payable and are apportioned in accordance with the provisions of Article 4 hereof;

3.3.4. all rights and easements, for electricity, gas, telephone, water, cable television and any other utilities to maintain and operate lines, cables, poles and distribution boxes in, over and upon the Real Estate;

3.3.5. possible projections and/or encroachments of retaining walls, foundations, stoops, areas, steps, sills, trim, cornices, standpipes, fire escapes, coal chutes, casings, ledges, water tables, lintels, porticos, keystones, windows, hedges, copings, cellar doors, sidewalk elevators, fences, fire escapes and the like, or similar projections or objects upon, under or above any adjoining buildings and/or streets or avenues or those belonging to adjoining premises which encroach upon the Real Estate, or within any set back areas, provided that the Title Company shall insure that such projections or encroachments may remain undisturbed so long as the buildings and improvements shall stand and minor variations between the lines of record title and fences, retaining walls, hedges, and the like;

3.3.6. possible non-material variations between the tax diagram or the tax map and the record description;

3.3.7. (a) any and all violations of building, fire, sanitary, environmental, housing and similar laws, municipal ordinances, orders or requirements affecting the Property from or by any federal, state, county or municipal department, agency, authority or bureau having or asserting jurisdiction (each, a **"Governmental Authority"**) and (b) any lien attaching to the Property as a result of the foregoing described in clause (a) (the foregoing described in clauses (a) and (b) being hereafter referred to collectively as the **"Violations"**);

3.3.8. building, zoning, subdivision and other governmental laws, codes and regulations, and landmark, historic and wetlands designations;

3.3.9. any matter created or caused by Purchaser or its agents; and

3.3.10. any matters which the Title Company may raise, provided that the Title Company shall agree to omit or insure without additional premium to Purchaser against collection of the same out of the Property.

**SECTION 3.4.** **Existing Mortgage.** At the request of Purchaser, Seller shall endeavor to cause General Electric Capital Corporation (the **"Existing Lender"**), the holder of a mortgage currently encumbering the Property (the **"Existing Mortgage"**) (to the extent the Existing Mortgage is not subject to any then pending challenge in the Bankruptcy Case as to its validity, priority or enforceability) to assign the Existing Mortgage and the promissory note(s) secured thereby to Purchaser's lender (without recourse, representation, or warranty) at Closing; provided, however, (a) Purchaser shall pay all fees, charges, costs and expenses of the Existing Lender in connection with such assignment of the Existing Mortgage and the promissory note(s) secured thereby, and the preparation of the documents effectuating such assignment and the recording thereof, (b) if the Existing Lender agrees to such assignment and such assignment is

-5-

consummated at Closing, Purchaser shall accept title to the Property subject to (i) the Existing Mortgage assigned at the Closing, the promissory note(s) secured thereby and any financing statements relating thereto and (ii) the other Permitted Exceptions, to the extent that any mortgage obtained by Purchaser in connection with the acquisition of the Premises is exempt from mortgage recording tax under Article 11 of the Tax Law, Purchaser shall pay to Seller at Closing an amount equal to fifty percent (50%) of the mortgage recording tax that would have otherwise been due in connection with the recording of Purchaser's mortgage but for the exemption described herein after subtracting the out-of-pocket expenses incurred by Purchaser and described in clause (a) above. Such assignment of the Existing Mortgage and the promissory note(s) secured thereby shall be in compliance with the applicable requirement of Section 275 of the New York Real Property Law. Purchaser acknowledges that Seller shall not be required to request an assignment of mortgage from the Dormitory Authority of the State of New York.

## ARTICLE 4
## APPORTIONMENTS AND PAYMENTS

**SECTION 4.1.** **Apportionments Relating to the Property**. The following shall be apportioned between Seller and Purchaser at the Closing with respect to the Property, as of 11:59 PM of the day immediately preceding the Closing Date (the "**Apportionment Date**"), and the net aggregate amount thereof either shall be paid by Purchaser to Seller or credited to Purchaser towards the Purchase Price, as the case may be, at the Closing (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party);

4.1.1. real property taxes, and any assessments (or installments thereof), including with respect to Business Improvement Districts, on the basis of the fiscal year for which payable; if the Apportionment Date shall be prior to the date on which the real property tax rate is fixed, the apportionment of real property taxes shall be made on the basis of the tax rate for the preceding year applied to the latest assessed valuation;

4.1.2. to the extent not metered: water rates and charges, sewer taxes and rents and electricity and other utility charges;

4.1.3. fuel oil and liquid propane gas, if any, at the cost per gallon most recently charged to Seller, based on the supplier's measurements thereof taken within ten (10) days of the Closing Date;

4.1.4. insurance proceeds received by Seller, if any, and payable to Purchaser pursuant to Article 13 hereof to the extent not applied to repair or restore the Property in accordance with the provisions of this Agreement;

4.1.5. unopened and unused supplies purchased and not consumed for the Property, if any; and

-6-

4.1.6. annual municipal permit and inspection fees and other fees for licenses and permits assigned to Purchaser, if any.

**SECTION 4.2.     Taxes and Assessments.**

4.2.1. If, on the Closing Date, all or any portion of the Real Estate shall be or shall have been affected by assessments (including Business Improvement District assessments) that are, or which may become, payable in annual installments, of which the first installment is then a charge or lien or has been paid or if any of the improvements to be paid for thereby are in place or commenced, then, for purposes of this Agreement only, the installment(s) which shall have been paid or the installment which shall be then due and payable shall be apportioned between Seller and Purchaser and all of the unpaid installments of any such assessments, including those which are to become due and payable after the date hereof, shall continue to be liens upon the Real Estate, it being understood and agreed that Seller and Purchaser shall be responsible for a pro rata share of such assessment, with Purchaser being responsible for the period from and after the Apportionment Date and Seller being responsible for the period prior to the Apportionment Date, regardless of when such installments are due and payable (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

4.2.2. To the extent that any refund of real property taxes, assessments (including Business Improvement District assessments), water rates and charges, sewer taxes and rents or any other utility made after the Closing Date is applicable to a period before the Closing Date, such refund shall be payable to Seller or returned by Purchaser to Seller, net of the actual costs incurred by Purchaser in obtaining same.

4.2.3. To the extent that any refund of real property taxes, assessments (including Business Improvement District assessments), water rates and charges or sewer taxes and rents made after the Closing Date is applicable to a period after the Closing Date, such refund shall be payable to Purchaser or returned by Seller to Purchaser, subject to the actual costs incurred by Seller in obtaining same (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

4.2.4. From and after the date of this Agreement, (a) Seller shall not, without the prior written consent of Purchaser, which consent may be granted or withheld in Purchaser's sole discretion, withdraw, compromise or settle any certiorari proceedings for any fiscal period subsequent to the period in which the Closing is to occur, and (b) Seller shall not, without the prior written consent of Purchaser, which consent shall not be unreasonably withheld or delayed, withdraw, compromise or settle any certiorari proceedings, if any, for any fiscal period in which the Closing is to occur. Any tax savings or refund for any year or years prior to the tax year in which the Closing herein occurs shall belong solely to Seller. Purchaser or Seller, as the case may be, shall execute all consents, receipts, instruments and documents which may reasonably be requested in order to facilitate in instituting or settling such proceeding, as the case may be, and collecting the amount of any refund or tax savings. The net refund of taxes, if any, for such fiscal tax year in which the Closing occurs shall be divided between Seller and Purchaser in

-7-

accordance with the apportionment of taxes pursuant to the provisions hereof, after deducting therefrom a pro rata share of all reasonable expenses, including reasonable attorneys' fees reasonably and necessarily incurred in obtaining such refund.

**SECTION 4.3.** **Transfer of Utilities.** Purchaser, at its sole cost and expense, shall cause the transfer of all utility services for the Real Estate to Purchaser's name as of the Closing Date and Seller shall cooperate with Purchaser in connection therewith. If utility services shall not have been transferred to Purchaser's name for the Real Estate effective as of the Closing Date, then, at the Closing, any such charges with respect to services not so transferred shall be prorated, based upon the per diem charges obtained by using the most recent period for which readings of such utility services shall then be available. Purchaser, at its sole cost and expense, shall promptly thereafter cause such utility services to be transferred to Purchaser's name, and Seller shall cooperate with Purchaser in connection therewith. Purchaser shall make all required deposits on account with utility companies or on account with municipalities and shall reasonably cooperate with Seller in having any deposits currently held by such companies and municipalities, returned to Seller. However, Seller shall be solely responsible for obtaining the return of its own utility company deposits, if any (provided, however, that nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

**SECTION 4.4.** **Transfer Taxes.** Seller shall be responsible (either by payment or exemption) for any real property transfer taxes, transfer gains taxes, and other similar taxes and fees imposed on Seller by the State, county or municipality in which the Real Estate is located which are imposed in connection with the sale, assignment, transfer and conveyance of the Real Estate to Purchaser as contemplated by the provisions of this Agreement (collectively, the **"Transfer Taxes"**). Seller may pay the Transfer Taxes, if any, from the Purchase Price at the Closing (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

**SECTION 4.5.** **Tax Returns.** At the Closing, Purchaser and Seller shall deliver to the Title Company a New York State Transfer Tax Return (TP-584), City of New York Real Property Transfer Tax Return (NYC-RPT) and Equalization form (RP-5217NYC) (collectively, the **"RE Tax Returns"**) and deliver same to the Title Company for delivery to the appropriate authority.

**SECTION 4.6.** **Title Charges.** Purchaser shall pay the cost of Purchaser's title insurance premiums and any title search costs, the cost of a survey for the Property or any update thereto and all recording and filing fees, including, but not limited to, those in connection with the Deed.

**SECTION 4.7.** **Transaction Expenses.** Except as expressly provided herein, each party shall bear its own costs and expenses, including attorney, accountant and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.

**SECTION 4.8.** **Survival.** The provisions of this Article 4 shall survive the Closing.

## ARTICLE 5
## COVENANTS REGARDING THE PROPERTY

**SECTION 5.1.     Maintenance and Operation of the Property**.     Subject to the restrictions imposed upon the Seller as a debtor-in-possession to pay any claims arising or otherwise relating to any period prior to the commencement of the Bankruptcy Case, and the parties understanding that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate or require the Seller to pay any amounts relating to such prepetition periods, the parties agree as follows: between the Petition Date and the Closing, Seller shall use commercially reasonable efforts to maintain and operate the Property in substantially the same manner as the Property is currently being maintained and operated and keep the Property in a condition at least as good as its condition as of the date hereof, reasonable wear and tear excepted (it being agreed that Seller shall not be obligated to perform any capital improvements unless required by Law as a postpetition obligation of the debtor-in-possession and further provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party). Seller shall use commercially reasonable efforts to keep and maintain in force and effect all existing licenses and permits affecting the Property without being obligated to pay any prepetition amounts, other than as provided in Section 3.1.1. Seller shall not be obligated to construct any improvements upon the Property except those which Seller reasonably determines necessary because of emergency situations or to comply with Laws. Seller shall maintain insurance coverages similar to those in effect on the date hereof, including casualty insurance in an amount equal to the full replacement value of the Property. Notwithstanding anything to the contrary contained herein, Purchaser acknowledges that Purchaser shall be responsible for certain insurance, repair and maintenance obligations in accordance with that certain Receivership Agreement between the parties, dated as of even date herewith (the **"Receivership Agreement"**), which shall be effective from and after the Receivership Date, as such term is defined in the Receivership Agreement.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

**SECTION 6.1.     Generally**. Purchaser represents and warrants that:

6.1.1. (a) Purchaser is an individual, or if assigned in accordance with the terms of this Agreement, a duly formed and validly existing limited liability company under the Laws of the state or commonwealth of its formation and is in good standing under the Laws of the state or commonwealth of its formation and, to the extent required by Law, under the Laws of the State of New York, (b) Purchaser has the full right, authority and corporate power (if applicable) to enter into this Agreement, to consummate the transactions contemplated herein and to perform its obligations hereunder and under those Closing Documents to which it is a party, (c) each of the Persons executing this Agreement on behalf of Purchaser is authorized to do so, and (d) this Agreement constitutes a valid and legally binding obligation of Purchaser enforceable against Purchaser in accordance with its terms;

6.1.2. there are no legal or administrative proceedings pending or, to the best of Purchaser's actual knowledge, without investigation, threatened against or affecting Purchaser

-9-

that would adversely affect Purchaser's legal authority or financial ability to perform its obligations under the Closing Documents to which it is a party;

6.1.3. the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the performance by Purchaser of its obligations hereunder and under the Closing Documents to which it is a party, do not and will not (a) violate or conflict with any judgment, decree or order of any court or any Law or permit applicable to it, or (b) breach any provisions of, or constitute a default under, any contract, agreement, instrument or obligation to which it is a party or by which Purchaser is bound;

6.1.4. the execution and delivery of this Agreement by Purchaser does not, and the performance of its obligations hereunder and under the Closing Documents to which it is a party will not, require the consent or approval of any public authority or any other Person other than the New York State Department of Health, or any lender from which Purchaser may seek to obtain financing, as may be applicable provided however that Purchaser acknowledges that its obligations under this Agreement are not contingent upon any such financing;

6.1.5. Purchaser's Federal Tax Identification Number or social security number is _____.

**SECTION 6.2. Closing Conditions; Survival of Representations and Warranties.** The following are conditions precedent to the obligation of Seller to close title under this Agreement, any or all of which may at Seller's option be waived in writing:

6.2.1. Each of the representations and warranties of Purchaser set forth in this Agreement shall be deemed to have been repeated by Purchaser, at and as of the Closing Date with the same force and effect as if first made on and as of such date. It shall be a condition to Seller's obligation to close hereunder that all such representations and warranties of Purchaser be true and correct in all material respects as of the Closing Date.

6.2.2. Purchaser shall have (or, with respect to obligations of Purchaser to be performed on the Closing Date, Purchaser shall be ready, willing and able to perform same on the Scheduled Closing Date) (a) delivered, or caused to be delivered, all of the Closing Documents to which it is a party and all other documents, instruments and other items required to be delivered by Purchaser at or prior to Closing (including, without limitation, pursuant to Section 9.1.2), (b) tendered the Purchase Price in accordance with the terms of this Agreement, and (c) performed in all material respects all other material obligations on Purchaser's part to be performed hereunder on or prior to the Closing Date.

6.2.3. All other conditions precedent expressly set forth herein to Seller's obligation to consummate the transaction contemplated hereby have been satisfied (or waived in writing by Seller).

6.2.4. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order

-10-

6.2.5. The representations, warranties and certifications of Purchaser set forth in this Agreement shall not survive the Closing.

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES OF SELLER

**SECTION 7.1.** **Generally**. Seller represents and warrants that:

7.1.1. (a) it is a duly formed and validly existing not-for-profit corporation under the Laws of the state or commonwealth of its formation and is qualified to conduct and transact business and, other than as a result of the commencement of the Bankruptcy Case, is in good standing under the Laws of the State of New York, (b) subject to the entry of the Bidding Procedures Order, it has the full right, authority and power to enter into this Agreement, and, subject to the entry of the Sale Order, to consummate the transactions contemplated herein and to perform its obligations hereunder and under those Closing Documents to which it is a party all of which have been duly authorized by all necessary actions on the part of Seller, (c) each of the Persons executing this Agreement on behalf of Seller is authorized to do so, and (d) subject to the entry of the Sale Order, this Agreement constitutes a valid and legally binding obligation of Seller enforceable against it in accordance with its terms;

7.1.2. the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance by Seller of its obligations hereunder and under the Closing Documents to which it is a party do not and will not conflict with or violate any Law, rule, judgment, regulation, order, writ, injunction or decree of any court or governmental or quasi-governmental entity having jurisdiction over Seller or any of the parties comprising Seller, including the United States of America, the State of New York or any political subdivision of either of the foregoing, or any decision or ruling of any arbitrator to which Seller or any of the parties comprising Seller is a party or by which Seller or any of the parties comprising Seller is bound or affected, or breach any provisions of, or constitute a default under, any contract, agreement, instrument or obligation to which Seller or any of the parties comprising Seller is a party or by which any of them is bound; and

7.1.3. Seller's Federal Tax Identification Number is 11-3097213.

**SECTION 7.2.** **Property Representations.** Seller represents and warrants to Purchaser that, as of the date hereof, with respect to the Property:

7.2.1. There are no leases affecting the Property.

7.2.2. To Seller's knowledge, there is no pending nor has Seller received any notice of any contemplated condemnation proceeding affecting the Real Estate or any part thereof.

7.2.3. To Seller's knowledge, there are no Service Contracts affecting the Property.

-11-

7.2.4. Seller is not a "foreign person" (as defined in the Internal Revenue Code).

7.2.5. Seller is the sole owner of the Property.

7.2.6. Seller has not received any funds under the Hill-Burton Act.

7.2.7. There are no tenancies affecting the Property.

7.2.8. To Seller's knowledge, Seller has not received any notice of any pending assessments against the Property.

7.2.9. There are no tax certiorari proceedings or tax protest proceedings pending with respect to the Property.

**SECTION 7.3.    Closing Conditions; Survival of Representations and Warranties.** The following are conditions precedent to the obligation of Purchaser to close title under this Agreement, any or all of which may at Purchaser's option be waived in writing:

7.3.1. Except to the extent otherwise unnecessary as a result of the Sale Order and except as may be updated by Seller in writing to maintain accuracy due to one or more factual changes arising after the date hereof (it being understood by the parties hereto that Seller shall not have the right to update any of its representations and warranties because of a factual change arising from a breach of Seller's obligations hereunder or a prior material misrepresentation by Seller), each of the representations and warranties of Seller set forth in this Agreement shall be deemed to have been repeated by Seller, at and as of the Closing Date, with the same force and effect as if first made on and as of such date. It shall be a condition to Purchaser's obligation to close hereunder that all such representations and warranties of Seller, as the same may have been so updated by Seller, be true and correct as of the Closing Date in all material respects. As used in this Section 7.3.1, "material" means that the failure of such representations to be true and correct as of the Closing Date results in a diminution in the value of the Property in excess of $250,000 in the aggregate.

7.3.2. Seller shall have delivered all of the documents and other items required pursuant to Section 9.1.1 of this Agreement and shall have performed all other material covenants, undertakings and obligations herein agreed to be performed by it, and complied with all material conditions required by this Agreement to be performed or complied with by Seller at or prior to the Closing.

7.3.3. At the time of the Closing, title to the Real Estate shall be as provided in this Agreement and the Title Company shall be willing to issue fee title insurance policies in favor of Purchaser subject only to the Permitted Exceptions.

7.3.4. The representations, warranties and certifications of Seller set forth in this Agreement shall not survive the Closing.

-12-

7.3.5. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order or, if not final, not be subject to a stay on its effectiveness.

7.3.6. The closing under the Asset Agreement shall contemporaneously occur with the Closing under this Agreement.

**SECTION 7.4.** **Knowledge of Seller.** Whenever a representation or warranty is made in this Agreement on the basis of the knowledge of Seller, such representation and warranty is made solely on the basis of the actual, as distinguished from implied, imputed or constructive, knowledge on the date that such representation and warranty is made, without inquiry or investigation or duty, of Joseph P. Bloss and Lucy Buddensick without attribution to such persons of facts or matters otherwise within the personal knowledge of any other officers, directors or employees of Seller, or third parties.

## ARTICLE 8
## CLOSING DATE

**SECTION 8.1.** **Closing Date.** The consummation of the transactions contemplated by this Agreement (the **"Closing"**) shall take place on the "Closing Date" set forth in the Asset Agreement (the **"Scheduled Closing Date"**). The Scheduled Closing Date or any such other date to which the Closing may be adjourned by Seller and the Asset Purchaser under the Asset Agreement pursuant to the terms of said agreement or by mutual agreement of Seller and Purchaser (it being agreed that neither party shall have any obligation to agree to any other adjournment of the Closing except as expressly permitted pursuant to the terms of the Asset Agreement or this Agreement), is referred to herein as the **"Closing Date"**. The Closing shall be held at the offices of Purchaser's lender or such lender's counsel provided such offices are located in New York City or Nassau County, New York, otherwise at the offices of Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck, New York 11021.

## ARTICLE 9
## CLOSING DOCUMENTS

**SECTION 9.1.** **Closing.**

9.1.1. At the Closing, contemporaneously with Purchaser's delivery to Seller of all of the Closing Documents required to be delivered by Purchaser hereunder, Seller shall deliver or cause to be delivered to Purchaser, duly executed by Seller in recordable form, where applicable, those Closing Documents to be delivered by Seller as set forth on Schedule IV attached hereto and made a part hereof.

9.1.2. At the Closing, contemporaneously with Seller's delivery to Purchaser of all of the Closing Documents required to be delivered by Seller hereunder, Purchaser shall deliver or cause to be delivered to Seller those Closing Documents to be delivered by Purchaser, duly executed by Purchaser in recordable form, where applicable, as set forth on Schedule V attached hereto and made a part hereof (the documents described in this Section 9.1.1 and in

-13-

Section 9.1.2 and all other documents required to be delivered hereunder are referred to collectively as the **"Closing Documents"**).

**SECTION 9.2.** **Further Assurances.** Seller and Purchaser each agree, at any time and from time to time at or after the Closing, to execute, acknowledge where appropriate, and deliver or cause to be executed, acknowledged and delivered such further instruments and documents and to take such other action as the other of them or the Title Company may reasonably request to carry out the intents and purposes of this Agreement. The provisions of this Section 9.2 shall survive the Closing.

## ARTICLE 10
## NOTICES

**SECTION 10.1. Notices.** Any notice, demand or request required or permitted to be given under this Agreement (collectively, **"Notices"**) must be in writing and given to the party to whom or which such notice is being sent, (a) by nationally recognized overnight delivery service with receipt acknowledged in writing or (b) by hand delivery, against a signed receipt, in each case, addressed as follows:

| | |
|---|---|
| If to Seller, to: | Bishop Francis J. Mugavero Center for Geriatric Care, Inc. c/o Saint Vincents Catholic Medical Centers of New York Office of Legal Affairs 130 West 12th Street New York, NY 10011 Attention: Chief Legal officer |
| with a copy to: | Saint Vincents Catholic Medical Centers of New York Corporate Real Estate Services 130 West 12th Street New York, NY 10011 |
| with a copy to: | Garfunkel Wild, P.C. 111 Great Neck Road, Suite 503 Great Neck, New York 11021 Attention: Robert A. Wild, Esq. |
| -and- | |
| | Kramer Levin Naftalis & Frankel LLP 1177 Avenue of the Americas New York, New York 10036 Attention: Adam C. Rogoff, Esq |
| If to Purchaser, to: | Liebel Rubin 1441-59th Street Brooklyn, New York 11219 |

-14-

If to Escrow Agent,
to:                    Garfunkel Wild, P.C.
                       111 Great Neck Road, Suite 503
                       Great Neck, New York 11021
                       Attention: Judith A. Eisen, Esq.

In the event of overnight delivery or by hand delivery, notices shall be deemed effective on the next Business Day following deposit with the delivery service or following the day of such hand delivery against appropriate receipt. From time to time either party may designate another or additional addresses for all purposes of this Agreement by giving the other party no less than ten (10) days' prior notice of such change of address in accordance with the provisions of this Article 10. Each party's counsel shall have the right to deliver notices on behalf of its client and any such notice shall be effective as if sent by such party.

## ARTICLE 11
## BROKER

Seller and Purchaser each represents and warrants to the other that it has not dealt with any broker, agent or any other Person in connection with the transaction contemplated by this Agreement other than Loeb and Troper LLP and Cain Brothers (collectively, the "**Seller's Broker**"). Purchaser hereby indemnifies Seller and holds Seller harmless from and against any and all claims for commission, fee or other compensation by any other Person other than Seller's Broker who shall claim to have represented or dealt with Purchaser in connection with this Agreement and for any and all costs incurred by Seller in connection with such claims, including reasonable attorneys' fees and disbursements. The Sale Order shall provide that Purchaser shall have no liability for any and all claims for commission, fee or other compensation by Seller's Broker and any Person who shall claim to have represented Seller in connection with this Agreement. Subject to approval of the Bankruptcy Court, Seller agrees to pay the commission due to the Seller's Broker, if any, in connection with this transaction pursuant to a separate agreement as and when allowed by order of the Bankruptcy Court. The provisions of this Article 11 shall survive the Closing or the sooner termination of this Agreement.

## ARTICLE 12
## DEFAULTS; REMEDIES

**SECTION 12.1. Purchaser's Default.** If Purchaser shall (a) fail or refuse to close as required by the terms of this Agreement, or (b) otherwise be in default hereunder, which default shall continue for twenty (20) Business Days after written notice to Purchaser specifying such default, the parties hereto agree that the damages that Seller would sustain as a result thereof would be substantial, but would be difficult to ascertain. Accordingly, the parties hereto agree that in the event of such default, failure or refusal by Purchaser, Seller's sole remedy shall be to terminate this Agreement and retain the Escrow Deposit in which event Escrow Agent shall deliver the Escrow Deposit to or at the direction of Seller, in which event Purchaser and Seller shall have no further rights or obligations under this Agreement, except those expressly

-15-

provided herein to survive the termination of this Agreement. Nothing contained in this Section shall limit or diminish Purchaser's obligations or liabilities under Sections 11 and 18.11 hereof.

**SECTION 12.2. Seller's Default.** If Seller shall (a) fail or refuse to close as required by the terms of this Agreement or (b) otherwise be in default hereunder, which default shall continue for twenty (20) Business Days after written notice to Seller thereof, then Purchaser shall be entitled: (1) to terminate this Agreement and receive a return of the Escrow Deposit or (2) to seek specific performance by Seller of its obligations under this Agreement provided, however, that Purchaser may only pursue such specific performance after the entry of the Sale Order approving the transactions contemplated by this Agreement. If Purchaser shall not have commenced an action for specific performance within forty-five (45) days after the Schedule Closing Date, Purchaser shall have waived such right and shall have been deemed to have elected clause (1) above. Purchaser expressly agrees however, that Purchaser shall not have the right to seek or recover any actual, consequential or punitive damages or any similar additional sums or amounts against Seller for any breach occurring prior to Closing. Nothing herein shall limit or diminish Seller's obligations or liabilities under Article 11 or Section 18.11 hereof.

**SECTION 12.3. Cross-Default with Asset Agreement.** Subject to any opportunity to cure as may be set forth in this Agreement or in the Asset Agreement: (i) a default in any material respect by Seller under the Asset Agreement shall be deemed a default by Seller under this Agreement, and a default in any material respect by Seller under this Agreement shall be deemed a default by Seller under the Asset Agreement; (ii) a default in any material respect by the Asset Purchaser under the Asset Agreement shall be deemed a default by Purchaser under this Agreement and a default in any material respect by Purchaser under this Agreement shall be deemed a default by Asset Purchaser under the Asset Agreement. In addition, (x) if the Asset Purchaser is entitled to cancel or terminate the Asset Agreement or pursue its remedies thereunder or receive the return of the deposit paid thereunder in accordance with its terms, then Purchaser under this Agreement shall have the right to terminate this Agreement simultaneously therewith upon notice to Seller and/or pursue its rights and remedies as provided in this Agreement, including but not limited to the right to receive the prompt return of the Escrow Deposit, or (y) if Seller is entitled to terminate the Asset Agreement upon a default by Asset Purchaser thereunder, then Seller shall be entitled to terminate this Agreement simultaneously therewith upon notice to Purchaser and shall have the right to receive the Escrow Deposit pursuant to the terms of this Agreement.

## ARTICLE 13
## CASUALTY; CONDEMNATION

**SECTION 13.1. Casualty.** Notwithstanding anything to the contrary at law or otherwise, Purchaser and Seller acknowledge and agree that in the event that prior to Closing, all or any portion of the Property shall be damaged (whether or not such damage or casualty is covered by insurance), Purchaser shall have no right or ability to cancel or terminate this Agreement and Purchaser shall be required to consummate the transactions contemplated hereby and proceed to Closing without abatement of the Purchase Price. Notwithstanding the foregoing, if Purchaser is not operating the Property pursuant to the Receivership Agreement and in the event that the Property is materially damaged by fire or the elements or by any cause

-16-

beyond either party's reasonable control and Seller shall not have restored the same by the Scheduled Closing Date, Purchaser shall have the right, upon notice to Seller delivered within fifteen (15) Business Days after the Scheduled Closing Date, not to consummate the transactions contemplated hereby, in which event this Agreement shall be terminated and of no further force and effect, the Escrow Deposit shall be returned to Purchaser and neither of the parties hereto shall have any rights or obligations to the other hereunder except those expressly stated to survive the termination of this Agreement. In the event Purchaser shall fail to timely deliver such notice of termination, Purchaser shall be obligated to consummate the transaction contemplated hereunder and Seller shall have no obligation to perform any repairs to the Property. Purchaser shall be entitled to receive all insurance proceeds (after deducting any reasonable costs which Seller actually incurred to obtain such proceeds, including reasonable attorneys' fees and disbursements and any out-of-pocket costs of restoration actually incurred by Seller to preserve the life or safety of the occupants at the property or as required by Law) in connection with any such casualty which occurs prior to the Closing Date and Purchaser shall receive a credit against the Purchase Price in the amount of any deductible under Seller's insurance (Seller hereby assigning to Purchaser all of Seller's right, title and interest in and to any such net insurance proceeds). For the purposes of this Section 13.1 "materially damaged" shall mean damage to the Property which would cost more than $3,011,500.00 to restore. This provision shall survive the Closing.

**SECTION 13.2. Condemnation.** If, prior to the Closing, all or a Material Part (as hereinafter defined) of the Property is taken by eminent domain, Purchaser may, by notice to Seller given within fifteen (15) Business Days after notice from Seller to Purchaser of the taking, elect to cancel this Agreement. In the event that Purchaser shall so timely elect, the Escrow Deposit shall be paid to Purchaser and neither of the parties hereto shall have any rights or obligations to the other hereunder except those expressly stated to survive the termination of this Agreement. Unless this Agreement is so canceled, or if less than a Material Part of the Property is taken by eminent domain, this Agreement shall remain in full force and effect in which event Seller shall, on the Closing Date, and upon receipt of the balance of the Purchase Price, pay to Purchaser any sums of money collected by Seller as an award for any taking by eminent domain, after deducting any reasonable amount which Seller may have agreed or been obligated to pay in obtaining such award, including reasonable attorneys' fees and disbursements. Seller shall not negotiate, compromise, or settle any such award without Purchaser's prior consent, which consent shall not be unreasonably withheld, conditioned or delayed. In addition, Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any portion of any condemnation award not yet received by Seller. For purposes of this Section 13.2, **"Material Part"** shall mean a taking of more than ten (10%) percent of the Property. The provisions of this Article 13 are intended to constitute an "express provision to the contrary" within the meaning of Section 5-1311 of the New York General Obligations Law. This provision shall survive the Closing.

### ARTICLE 14
### AS-IS; WHERE-IS;
### DISCLAIMER; WAIVER OF CLAIMS

**SECTION 14.1. Disclaimers; As-Is, Where-Is Condition.**

14.1.1. PURCHASER ACKNOWLEDGES THAT IT IS A SOPHISTICATED PURCHASER, WITH EXPERIENCE IN OWNING AND OPERATING REAL PROPERTY IN THE NATURE OF THE PROPERTY. PURCHASER REALIZES THE NATURE OF THIS TRANSACTION, UNDERSTANDS AND IS FREELY TAKING ALL RISKS, IF ANY, INVOLVED IN CONNECTION WITH THIS TRANSACTION AND ACKNOWLEDGES THAT THE SAME IS REFLECTED IN THE PURCHASE PRICE AND THE TERMS UPON WHICH PURCHASER IS WILLING TO PURCHASE AND SELLER IS WILLING TO SELL.

14.1.2. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, THE PROPERTY IS BEING SOLD BY SELLER AND PURCHASER AGREES TO ACCEPT THE PROPERTY IN "AS-IS" AND "WHERE-IS" PHYSICAL CONDITION ON THE DATE HEREOF SUBJECT TO REASONABLE WEAR AND TEAR AND SELLER'S OBLIGATIONS HEREIN TO MAINTAIN THE PROPERTY AS PROVIDED FOR IN THIS AGREEMENT. PURCHASER ACKNOWLEDGES, REPRESENTS AND WARRANTS THAT (I) PURCHASER HAS HAD AN OPPORTUNITY TO MAKE AN INDEPENDENT INVESTIGATION AND EXAMINATION OF THE PROPERTY (AND ALL MATTERS RELATED THERETO), AND TO BECOME FULLY FAMILIAR WITH THE PHYSICAL AND ENVIRONMENTAL CONDITION OF THE PROPERTY, AND (II) EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER AND SELLER-RELATED PARTIES HAVE NOT MADE AND SHALL NOT MAKE ANY VERBAL OR WRITTEN REPRESENTATIONS, WARRANTIES OR STATEMENTS OF ANY NATURE OR KIND WHATSOEVER TO PURCHASER, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO THE ABOVE, AND, IN PARTICULAR, EXCEPT AS EXPRESSLY SET FORTH HEREIN, NO REPRESENTATIONS OR WARRANTIES HAVE BEEN MADE OR SHALL BE MADE WITH RESPECT TO (A) THE PHYSICAL CONDITION OR OPERATION OF THE PROPERTY, INCLUDING THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR CONDITIONS THEREON (INCLUDING THE PRESENCE OF ASBESTOS OR ASBESTOS-CONTAINING MATERIALS OR THE RELEASE OR THREATENED RELEASE OF HAZARDOUS SUBSTANCES), (B) THE REVENUES OR EXPENSES OF THE PROPERTY, (C) THE ZONING AND OTHER LEGAL REQUIREMENTS APPLICABLE TO THE PROPERTY OR THE COMPLIANCE OF THE PROPERTY THEREWITH, (D) THE NATURE AND EXTENT OF ANY MATTER AFFECTING TITLE TO THE REAL ESTATE OR TO ANY PERSONALTY, (E) THE QUANTITY, QUALITY, OR CONDITION OF THE PERSONALTY, OR (F) ANY OTHER MATTER OR THING AFFECTING OR RELATING TO THE PROPERTY, OR ANY PORTION THEREOF, THE INTERESTS THEREIN TO BE CONVEYED TO PURCHASER PURSUANT TO THE TERMS OF THE TRANSACTIONS CONTEMPLATED HEREBY.

14.1.3. EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLER HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY, ORAL OR WRITTEN, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW OR OTHERWISE, WITH RESPECT TO THE MATTERS REFERRED TO IN SECTION 14.1.2 ABOVE AND ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IN RESPECT TO

-18-

THE PROPERTY. PURCHASER DECLARES AND ACKNOWLEDGES THAT THIS EXPRESS DISCLAIMER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND IS REFLECTED IN THE CONSIDERATION PAYABLE BY PURCHASER HEREUNDER AND, AS AN INDUCEMENT FOR SELLER TO PROCEED WITH THIS TRANSACTION, PURCHASER FURTHER DECLARES AND ACKNOWLEDGES THAT THIS DISCLAIMER HAS BEEN BROUGHT TO THE ATTENTION OF PURCHASER AND EXPLAINED IN DETAIL AND THAT PURCHASER HAS VOLUNTARILY AND KNOWINGLY CONSENTED THERETO.

**SECTION 14.2. Acceptance of Closing Documents; Waivers.** Except for those matters expressly set forth in this Agreement to survive the Closing and except for the agreements of Seller and Purchaser set forth in the Closing Documents or otherwise entered into at the Closing, Purchaser's acceptance of the Deed and the other Closing Documents shall be and be deemed to be an acknowledgment by Purchaser that Seller has fully performed, discharged and complied with all of Seller's obligations, covenants and agreements hereunder to be performed prior to Closing and that Seller shall have no further liability with respect thereto.

**SECTION 14.3. Survival.** The provisions of this Article 14 shall survive the Closing.

## ARTICLE 15
## ENVIRONMENTAL STUDY

**SECTION 15.1. Environmental Study.** Seller and Purchaser acknowledge that Purchaser has engaged and reviewed that certain Phase I Environmental Site Assessment of the Premises dated September 2010 performed by Preferred Environmental Services, Inc. (the **"Phase I Report"**) and Purchaser acknowledges any environmental conditions which may have been noted therein. Purchaser shall accept the Premises subject to any environmental conditions set forth in the Phase I Report or otherwise existing at, under, on or migrating from the Premises. At Closing, Purchaser shall provide Seller with a credit equal to $3,250.00 plus out-of-pocket expenses of the environmental consultant (the cost of the Phase I Report).

## ARTICLE 16
## ESCROW

**SECTION 16.1. Escrow Terms.** The Escrow Deposit shall be held in escrow by Escrow Agent in accordance with the terms of the Escrow Agreement.

## ARTICLE 17
## BANKRUPTCY COURT MATTERS

**SECTION 17.1. Bankruptcy Court Filings.** As promptly as practicable following the execution of this Agreement, Seller shall, at its sole costs and expense, file with and seek the approval of the Bankruptcy Court for the transactions contemplated hereby. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order including furnishing affidavits or other Documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser

-19-

is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order shall be appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.

**SECTION 17.2.** **Notice of Sale.** Notice of the sale of the Property contemplated in this Agreement shall be served in accordance with the Bidding Procedures Order.

**SECTION 17.3.** **Back-up Bid.** Purchaser agrees and acknowledges that it will act as the back-up bidder to the prevailing bidder (the "**Prevailing Bidder**") selected under the bidding procedures pursuant to the Bidding Procedures Order. In the event the Prevailing Bidder fails to close the transaction contemplated by the Prevailing Bidder's bid, Seller, in its sole and absolute discretion, may elect instead to pursue the transaction contemplated herein with Purchaser. Purchaser agrees that this Agreement shall remain in full force and effect until the earlier of (i) consummation of the transaction with the Prevailing Bidder, or (ii) March 1, 2011.

## ARTICLE 18
## MISCELLANEOUS

**SECTION 18.1. Entire Agreement.** This Agreement, the Exhibits and Schedules annexed hereto, and any contemporaneously executed agreements, are the entire agreement between Seller and Purchaser concerning the sale of the Property and all understandings and agreements heretofore had or made between the parties hereto are merged in this Agreement which, together with aforementioned agreements and other items, alone fully and completely expresses the agreement of the parties hereto.

**SECTION 18.2. Modification.** Except as otherwise provided herein, this Agreement may not be changed, modified, supplemented or terminated, except by an instrument executed by the parties hereto which are or will be affected by the terms of such change, modification, supplement or termination. Either party hereto may waive any of the terms and conditions of this Agreement made for its benefit, provided such waiver is in writing and signed by the party waiving such term or condition.

**SECTION 18.3. Binding Agreement.** Subject to the provisions of this Agreement, the terms, covenants, agreements, conditions, representations and warranties contained in this Agreement shall inure to the benefit of and be binding upon the respective parties hereto. This Agreement shall not inure to the benefit of or be enforceable by any other Person.

**SECTION 18.4. Assignment.** Without the express written consent of Seller, this Agreement may not be assigned by Purchaser, including any assignment by operation of law. Except as provided for hereunder, any assignment by Purchaser without Seller's prior written consent shall be deemed null and void ab initio and shall be a material default entitling Seller, at its option, to exercise any of its powers, privileges, rights or remedies under this Agreement or at law or in equity. If Seller shall consent to an assignment, any such assignee shall assume all duties and obligations of Purchaser pursuant to this Agreement; provided, however, that any such assignment of Purchaser's interest in this Agreement shall not relieve the original Purchaser of any duties, obligation or liabilities hereunder. Any change in control of Purchaser

-20-

or of any of the direct or indirect ownership interests in Purchaser, at any level or tier of ownership, whether in one transaction or a series of transactions, shall constitute an assignment for purposes of this Section 18.4. Notwithstanding the foregoing, Purchaser may not assign its interest in this Agreement to any entity unless such entity can satisfy the requirements of adequate protection of future performance for the assignment of any contracts or leases as required by section 365 of the Bankruptcy Code.

**SECTION 18.5. No Press Releases**. Intentionally Omitted.

**SECTION 18.6. Illegality**. If any term or provision of this Agreement or the application thereof to any Person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by Law.

**SECTION 18.7. Choice of Law**. EXCEPT IN SUCH MATTERS AS ARE GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES ANNEXED HERETO, SHALL BE GOVERNED BY, INTERPRETED UNDER, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

**SECTION 18.8. Construction**. The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement. Unless stated to the contrary, all references to Articles, Sections, paragraphs or clauses herein shall be to the specified Article, Section, paragraph or clause of this Agreement, and all references to Exhibits and Schedules shall be to the specified Exhibits and Schedules attached hereto. All Exhibits and Schedules attached hereto are made a part hereof. All terms defined herein shall have the same meaning in the Exhibits and Schedules, except as otherwise provided therein. All references in this Agreement to **"this Agreement"** shall be deemed to include the Exhibits and Schedules attached hereto. The terms **"hereby"**, **"hereof"**, **"hereto"**, **"hereunder"** and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used. Whenever in this Agreement provision is made for the payment of attorneys' fees, such provision shall be deemed to mean reasonable attorneys' fees and paralegals' fees. The term **"including"** when used herein shall mean **"including, without limitation."** Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.

**SECTION 18.9. Binding Effect; Assignment; Successors and Assigns**. This Agreement shall apply to, be binding in all respects upon and inure to the benefit of the parties and their respective successors, administrators and permitted assigns. A successor to Seller shall include Seller as a reorganized debtor. Except to the extent provided for in Section 18.4 of this Agreement, no assignment of this Agreement or of any rights or obligations hereunder may

-21-

be made by any party (by operation of Law or otherwise) without the prior written consent of Purchaser and Seller and any attempted assignment without the required consents shall be void. No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors, administrators and permitted assigns.

**SECTION 18.10. Ambiguities**. Each party acknowledges that it and its counsel have reviewed this Agreement, and the parties hereby agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

**SECTION 18.11. Expenses**. If any legal action or other proceeding is brought for the enforcement of this Agreement or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover its fees and costs, including reasonable attorneys' fees, court costs and other costs incurred in such action or proceeding, in addition to any other relief to which it or they may be entitled. The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

**SECTION 18.12. Counterparts**. This Agreement may be executed in counterparts, each of which together shall be deemed to be an original and all of which shall constitute one and the same Agreement. Any counterpart may be executed by facsimile or PDF signature and such facsimile or PDF signature shall be deemed an original.

**SECTION 18.13. Waiver of Trial by Jury**. THE RESPECTIVE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

**SECTION 18.14. Third Party Beneficiaries**. Except as expressly set forth herein, no Person other than the parties hereto, shall have any rights or claims under this Agreement.

**SECTION 18.15. Jurisdiction**.

18.15.1. FOR THE PURPOSES OF ANY SUIT, ACTION OR PROCEEDING INVOLVING THIS AGREEMENT, PURCHASER AND SELLER EACH HEREBY EXPRESSLY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT AND PURCHASER AND SELLER EACH AGREES THAT SUCH COURT SHALL

HAVE EXCLUSIVE JURISDICTION OVER ANY SUCH SUIT, ACTION OR PROCEEDING COMMENCED BY EITHER PARTY.

18.15.2. PURCHASER AND SELLER EACH HEREBY IRREVOCABLY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT BROUGHT IN ANY FEDERAL OR STATE COURT SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK AND HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

18.15.3. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

**SECTION 18.16. Seller's Constituents**. Intentionally Omitted.

**SECTION 18.17. Purchaser's Constituents**. Intentionally Omitted.

**SECTION 18.18. No Recording**. Purchaser covenants and agrees that it has no right and in no event will Purchaser record or cause to be recorded this Agreement or any memorandum hereof or affidavit, assignment or other document relating to this Agreement prior to the Closing and, if Purchaser breaches the provisions of this Section, Seller shall have the option of terminating this Agreement and retaining the Escrow Deposit as its liquidated damages.

**SECTION 18.19. Not an Offer**. Notwithstanding anything herein to the contrary, it is to be strictly understood and agreed that (a) the submission by Seller to Purchaser of any drafts of this Agreement or any correspondence with respect thereto shall (i) be deemed submission solely for Purchaser's consideration and not for acceptance and execution, (ii) have no binding force or effect, (iii) not constitute an option for the purchase of the Property or a lease or conveyance of the Property by Seller to Purchaser and (iv) not confer upon Purchaser or any other party any title or estate in the Property, (b) the terms and conditions of this Agreement shall not be binding upon either party hereto in any way unless and until it is unconditionally executed and delivered by both parties in their respective sole and absolute discretion and all conditions precedent to the effectiveness thereof including, but not limited to, the delivery of the Escrow Deposit to Escrow Agent, shall have been fulfilled or waived, and (c) if this Agreement is not so executed and delivered for any reason whatsoever (including, without limitation, either party's willful or other refusal to do so or bad faith), neither party shall be liable to the other with respect to this Agreement on account of any written or parole representations, negotiations, any legal or equitable theory (including, without limitation, part performance, promissory estoppel, or undue enrichment) or otherwise.

**SECTION 18.20. Failure of Deposit**. If the payment made on account of the Escrow Deposit is by check, and if such check fails collection in due course, Seller, at its option, may declare this Agreement null, void and of no force and effect, and may pursue its remedies

-23-

against Purchaser upon such check or in any other manner permitted by law, such remedies being cumulative.

**SECTION 18.21. No Waiver.** The failure of either party hereto to seek redress for any breach, or to insist upon the strict performance, of any covenant or condition of the Agreement by the other shall not be, or be deemed to be, a waiver of the breach or failure to perform (unless the time specified herein for the exercise of such right, or satisfaction of such condition, has expired), nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms hereof from constituting a default hereunder.

**SECTION 18.22. Severability.** If any term, condition or provision of this Agreement or the application thereof to any circumstance or party hereto, is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement and the applicability of such term, condition or provision to other persons or circumstances shall not be affected thereby. Each term, condition or provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

**SECTION 18.23. No Survival.** The delivery and acceptance of the deed at the Closing shall be deemed to constitute full compliance by Seller with all of the terms, conditions and covenants of this Agreement on Seller's part to be performed, and, except as expressly set forth in this Agreement, the representations, warranties, covenants or other obligations of Seller set forth in this Agreement shall not survive the Closing, and no action based thereon shall be commenced after the Closing.

### THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK. SIGNATURES FOLLOW ON THE NEXT PAGE.

GWTDOCS 1612367v3

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

SELLER

BISHOP FRANCIS J. MUGAVERO CENTER FOR GERIATRIC CARE, INC.

By: _____

Name:

Title:

PURCHASER

_____

Liebel Rubin

GWTDOCS 1612367v3

## SCHEDULE I TO PURCHASE AND SALE AGREEMENT

## DEFINITIONS

For all purposes of this Agreement, the following terms shall have the respective meanings specified below:

"**Affiliate**" means a Person that: (a) directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with a specified Person; (b) is a director or officer of a specified Person or of an Affiliate of such specified Person within the meaning of clause (a) above; (c) is a partner, member, beneficiary of a trust or other owner of any stock or other evidence of beneficial ownership in a specified Person or an Affiliate of such specified Person within the meaning of clause (a) above; or (d) is related as an ancestor, descendant, sibling, or is the current spouse of a specified Person or an Affiliate of such specified Person within the meaning of clause (a) above.

"**Agreement**" means this Agreement, the Exhibits and Schedules and all amendments, modifications and extensions hereto and thereto.

"**Apportionment Date**" shall have the meaning set forth in Section 4.1.

"**Back-Up Bid Notice**" shall have the meaning set forth in Section 2.2.2.

"**Business Day**" means each day, except Saturdays, Sundays and all days observed by the federal government as legal holidays.

"**Closing**" shall have the meaning set forth in Section 8.1.

"**Closing Date**" shall have the meaning set forth in Section 8.1.

"**Closing Documents**" shall have the meaning set forth in Section 9.1.2.

"**Condemnation**" shall have the meaning set forth in Section 2.1.

"**Deed**" means the deed to the Real Estate to be delivered by Seller to Purchaser pursuant to Schedule IV.

"**Escrow Agent**" shall mean Garfunkel Wild, P.C.

"**Escrow Agreement**" shall have the meaning set forth in Section 2.2.2.

"**Escrow Deposit**" shall have the meaning set forth in Section 2.2.2.

"**Existing Lender**" shall have the meaning set forth in Section 3.4.

"**Existing Mortgage**" shall have the meaning set forth in Section 3.4.

"**Final Order**" shall mean an order, ruling, or judgment of the Bankruptcy Court (a) that is in full force and effect; (b) that is not stayed; (c) as to which the time to appeal, petition for

certiorari, or move for reargument or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing is then pending; and (d) is no longer subject to review, reversal, modification, or amendment by appeal or writ of certiorari; provided, however, that an order will be deemed a Final Order notwithstanding the filing of a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or other applicable rules.

"**Governmental Authority**" shall have the meaning set forth in Section 3.3.8.

"**Hazardous Material**" shall mean all materials and substances now or hereafter subject to any Environmental Laws, including (i) all substances which are designated pursuant to Section 311(b)(2)(A) of the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 1251, et seq., (ii) any element, compound, mixture, solution, or substance which is designated pursuant to Section 102 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq., (iii) any hazardous waste having the characteristics which are identified under or listed pursuant to Section 3001 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., (iv) any toxic pollutant listed under Section 307(a) of FWPCA, (v) any hazardous air pollutant which is listed under Section 112 of the Clean Air Act, 42 U.S.C. § 7401, et seq., (vi) any imminently hazardous chemical substance or mixture with respect to which action has been taken pursuant to Section 7 of the Toxic Substances Control Act, 15 U.S.C. § 2601, et seq., (vii) "hazardous materials" within the meaning of the Hazardous Materials Transportation Act, 49 U.S.C. § 5101, et seq., (viii) any element or compound contained in the list of hazardous substances adopted by the United States Environmental Protection Agency ("EPA") or by the New York Department of Environmental Conservation ("DEC"), (ix) petroleum or petroleum by-products, (x) ACM, (xi) any radioactive material or substance, (xii) all toxic wastes, hazardous wastes and hazardous substances as defined by, used in, controlled by, or subject to all implementing regulations adopted and publications promulgated pursuant to the foregoing statutes, and (xiii) any other hazardous or toxic substance or pollutant identified in or regulated under any other applicable federal, state or local Environmental Laws.

"**Initial Deposit**" shall have the meaning set forth in Section 2.2.2.

"**Law**" means any law, rule, code, regulation, ordinance, moratorium, injunctive proceeding, restriction or similar matter imposed by any federal, state, municipal or local government or any public or quasi-public board, authority, commission, agency or department thereof having jurisdiction over the Property, or any portion thereof and/or Purchaser or Seller.

"**Liens**" shall have the meaning set forth in Section 3.1.1.

"**Material Part**" shall have the meaning set forth in Section 13.2.

"**Net Proceeds**" shall have the meaning set forth in Section 3.1.1.

"**Non-Permitted Exceptions**" shall have the meaning set forth in Section 3.2.1.

"**Notices**" shall have the meaning set forth in Section 10.1.

-2-

"**Permitted Exceptions**" shall have the meaning set forth in Section 3.3.

"**Person**" means an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, trust, unincorporated organization or the federal government or any state or local government or any agency or political subdivision thereof.

"**Personalty**" shall have the meaning set forth in Section 2.1.1.

"**Phase I Report**" shall have the meaning set forth in Section 15.1.

"**Prevailing Bidder**" shall have the meaning set forth in Section 17.3.

"**Property**" shall have the meaning set forth in Section 2.1.1.

"**Purchase Price**" shall have the meaning set forth in Section 2.2.1.

"**Purchaser**" means Liebel Rubin.

"**Purchaser-Related Parties**" means, individually and collectively, and to the extent applicable, (i) Purchaser, (ii) Affiliates of Purchaser, and (iii) the shareholders, officers, directors, employees, members and constituent partners of Purchaser and/or of any direct or indirect partner or member of or corporate joint-venturer with Purchaser, and/or of any Affiliate of Purchaser.

"**Real Estate**" shall have the meaning set forth in Section 2.1.1.

"**Receivership Agreement**" shall have the meaning set forth in Section 5.1.

"**RE Tax Returns**" shall have the meaning set forth in Section 4.5.

"**Sale Order**" means an order of the Bankruptcy Court substantially in the form of attached to the Asset Agreement as Exhibit B thereto, with such changes as are reasonably acceptable to Purchaser and Seller.

"**Scheduled Closing Date**" shall have the meaning set forth in Section 8.1.

"**Seller**" shall mean Bishop Francis J. Mugavero Center for Geriatric Care, Inc.

"**Seller-Related Parties**" means individually and collectively, Seller and its officers, directors, members, employees, agents, representatives and contractors and Affiliates of Seller.

"**Seller's Broker**" shall have the meaning set forth in Article 11.

"**Service Contracts**" means any written or oral service, maintenance, landscaping, operating, repair, equipment lease, supply, construction or other similar contract or agreement relating to the operation or maintenance of the Property, together with all amendments and modifications thereof in effect on the date hereof. Notwithstanding anything to the contrary,

-3-

Purchaser shall not be obligated assume any Service Contracts except for such Service Contracts, if any, it designates at any time prior to the Closing.

"**Title Company**" shall have the meaning set forth in Section 3.1.

"**Transfer Taxes**" shall have the meaning set forth in Section 4.4.

"**Unavoidable Delay**" shall mean any delays due to strikes, acts of God, governmental restrictions, enemy action, civil commotion, fire, unavoidable casualty or other causes similarly beyond the control of Seller; provided, however, that any lack of funds shall not be deemed a cause beyond the control of Seller.

"**Violations**" shall have the meaning set forth in Section 3.3.8.

GWTDOCS 1612367v3

## SCHEDULE II

## PROPERTY DESCRIPTION

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of Dean Street with the easterly side of Hoyt Street;

RUNNING THENCE northerly, along the easterly side of Hoyt Street, 200 feet to the southerly side of Pacific Street;

THENCE easterly along the southerly side of Pacific Street, 275 feet 5 inches;

THENCE southerly parallel with Hoyt Street, 100 feet to the center line of the block;

THENCE westerly along the center line of the block and parallel with Pacific and Dean Streets, 25 feet 5 inches;

THENCE southerly parallel with Hoyt Street, 14 feet 6 inches;

THENCE westerly parallel with Dean and Pacific Street, 50 feet;

THENCE southerly parallel with Hoyt Street, 85 feet 6 inches to the northerly side of Dean Street;

THENCE westerly along the northerly side of Dean Street, 200 feet to the easterly side of Hoyt Street to the point or place of BEGINNING.

## SCHEDULE III

## ESCROW AGENT'S WIRING INSTRUCTIONS

Bank Information:                    Citibank, N.A.

Receiver/ABA Number:                 02100 0089

Beneficiary Name:                    Garfunkel Wild, P.C., Attorney Trust Account

Checking Account Number:             9955527033

## SCHEDULE IV

## CLOSING DOCUMENTS TO BE DELIVERED BY SELLER

1.     Statutory form of bargain and sale deed without covenants (the **"Deed"**) substantially in the form attached hereto as Exhibit B containing the covenant required by Section 13 of the Lien Law, and properly executed and acknowledged so as to convey the title required to be conveyed by Seller under this Agreement.

2.     Bank or certified check(s), payable to the direct order of the appropriate tax collecting agencies or officials, in the amount of all documentary stamp and transfer and transfer gains taxes, and other taxes, fees and charges, payable by reason of or in connection with the conveyance and transfer of the Property by Seller to Purchaser. In lieu of delivering such bank or certified checks, Seller may elect, by written notice to Purchaser given at least two (2) Business Days prior to Closing, to have Purchaser pay any of such taxes and charges and give Purchaser a credit on the Closing Date against the Purchase Price in the amount thereof.

3.     Copies of any required real property transfer tax returns properly executed and acknowledged by Seller and Purchaser, as applicable.

4.     All documents, as shall be reasonably necessary to evidence that Seller has proper authority to sell the Property and deliver the documents required to be delivered by Seller pursuant to this Agreement.

5.     All keys to entrance doors to, and equipment and utility rooms located in, the Property and in Seller's possession.

6.     To the extent such are in the possession of Seller or its managing agent, original executed counterparts (or, where unavailable, copies thereof), of all Assumed Service Contracts.

7.     A certificate of a duly authorized representative of Seller, sworn to under penalties of perjury, setting forth Seller's U.S. tax identification number and stating that Seller is a **"United States person"** within the meaning of Sections 1445(f)(3) and 7701(a)(30) of the Code.

8.     To the extent such are in the possession or control of Seller or its managing agent, original copies of all guarantees and warranties then in effect in respect of the Property.

9.     To the extent such are in the possession or control of Seller or its managing agent, original licenses and permits to be transferred hereunder, except to the extent the same are required to be and located at or are affixed of the Property.

10.    Certificate of an authorized representative of Seller with respect to the authority of the person(s) executing this Agreement and the other Closing Documents on behalf of Seller.

11.    A Bill of Sale, without warranty, recourse or representation, conveying the Personalty to Purchaser substantially in the form attached hereto as Exhibit C.

12.    All existing surveys and building plans for the Property and the improvements thereon to the extent in Seller's possession.

## SCHEDULE V

## PURCHASER'S CLOSING DOCUMENTS

1.    Copies of any required real property transfer tax returns properly executed and acknowledged by Purchaser and Seller.

2.    All documents as shall be reasonably necessary to evidence that Purchaser has proper authority to purchase the Property and deliver the documents required to be delivered by Purchaser pursuant to this Agreement.

3.    Certificate of an authorized representative of Purchaser with respect to the authority of the person(s) executing this Agreement and the other Closing Documents on behalf of Purchaser.

4.    Certificate in form and substance reasonably acceptable to Seller, signed and acknowledged by an authorized representative of Purchaser, restating and attesting, except as otherwise permitted pursuant to the terms of this Agreement, to be true and correct as of the Closing Date each of the representing and warranties of Purchaser set forth in this Agreement.

# EXHIBIT A

## ESCROW AGREEMENT

[See Attached]

# ESCROW AGREEMENT

## BY AND BETWEEN

## BISHOP FRANCIS J. MUGAVERO CENTER FOR GERIATRIC CARE, INC.

and
### LIEBEL RUBIN

### AND

## GARFUNKEL WILD, P.C., AS ESCROW AGENT

SEPTEMBER 21, 2010

# ESCROW AGREEMENT

**ESCROW AGREEMENT** ("Agreement") made as of September 21, 2010 by and between Bishop Francis J. Mugavero Center for Geriatric Care, Inc., a New York not-for-profit corporation ("Seller"), and Liebel Rubin ("Purchaser"), and Garfunkel Wild, P.C., a New York professional corporation with offices at 111 Great Neck Road, Suite 503, Great Neck, New York 11021 (the "Escrow Agent"). All capitalized terms used but not defined herein shall have the meaning assigned to them in the Purchase Agreement (as defined below).

Recitals: The following recitals are hereby incorporated into this Agreement:

**A.** Purchaser and Seller have entered into a Purchase and Sale Agreement, dated as of September 21, 2010 (the "Purchase Agreement"), pursuant to which, among other things, Purchaser has already deposited: One Million Two Hundred Thousand Dollars ($1,200,000.00) (the "Initial Deposit", the Initial Deposit together with any interest earned thereon shall be collectively referred to herein as the "Escrow Fund" ) into escrow with Escrow Agent concurrently upon execution of this Agreement.

NOW, THEREFORE, the parties hereto as follows:

1.     Deposit and Acknowledgment of Receipt.

1.1     Concurrently with the execution and delivery of this Agreement, Purchaser has delivered to Escrow Agent, and Escrow Agent by its execution hereof acknowledges receipt of, Purchaser's wire transfer in the amount of One Million Two Hundred Thousand Dollars ($1,200,000.00), payable to Escrow Agent.

1.2     In the event a Sale Order is entered into by the Court in connection with a sale of the Premises to the Prevailing Bidder, Escrow Agent shall return the Escrow Deposit to Purchaser within three (3) Business Days after the date of the entry of such Sale Order. In the event Seller shall deliver the Back-Up Bid Notice pursuant to Section 17.3 of the Purchase Agreement, Purchaser shall deposit as security for the performance of Purchaser's obligations thereunder, within five (5) Business Days after the delivery of the Backup Bid Notice.

1.3     Escrow Agent hereby agrees to hold the Escrow Fund in an interest-bearing account pending the disbursement of such Escrow Fund in accordance with the terms of this Agreement.

1.4     The Escrow Fund shall not be subject to lien or attachment by any creditor of any party hereto and shall be used solely for the purposes set forth in this Agreement. Amounts held in the Escrow Account shall not be available to, and shall not be used by, Garfunkel Wild, P.C. to set off any obligations of either Purchaser or Seller owing to Garfunkel Wild, P.C. in any capacity.

2.     Terms of Escrow.

2.1     Escrow Agent shall disburse amounts from the Escrow Fund, and any accrued interest thereon, upon delivery, by Seller and Purchaser to Escrow Agent, of joint

1

written instructions executed by an authorized officer of both parties directing Escrow Agent to deliver to Seller or Purchaser, as the case may be, an amount equal to the amount to which it is entitled. Upon receipt of the joint written instructions, Escrow Agent shall release by wire transfer to an account or accounts designated by Seller or Purchaser, as the case may be, the amount specified in the joint written instructions.

2.2     Notwithstanding anything to the contrary contained in this Agreement, in the event of a dispute concerning the Escrow Fund, the Escrow Agent shall not disburse any amounts from the Escrow Fund until its receipt of joint written instructions from Seller and Purchaser as set forth hereinabove or an order of a court of competent jurisdiction directing the disbursement of the Escrow Fund.

2.3     Upon the completion of the disbursements as set forth above, Escrow Agent shall have no further duties hereunder.

3.     Obligations and Liabilities of Escrow Agent.

3.1     The duties and obligations of Escrow Agent shall be determined solely by the express provisions of this Agreement.

3.2     Escrow Agent shall not be responsible in any manner whatsoever for any failure or inability of Purchaser or Seller to perform or comply with any of the provisions of the respective agreements between them.

3.3     Escrow Agent shall not be bound by any modification, cancellation or rescission of this Escrow Agreement unless in writing, signed by Purchaser and Seller and expressly consented to in writing by Escrow Agent.

3.4     Escrow Agent's duties hereunder are as a depository only, ministerial in nature, and Escrow Agent shall incur no liability whatsoever hereunder for any error of judgment, or any action taken or omitted hereunder, except for damages directly resulting from Escrow Agent's gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

3.5     Delivery of the Escrow Funds, along with any accrued interest thereon, by Escrow Agent pursuant to the provisions of this Agreement shall constitute a complete discharge and satisfaction of all obligations of Escrow Agent hereunder.

3.6     Nothing contained herein shall be deemed to preclude Escrow Agent at any time and for any reason from depositing the Escrow Fund into a court of competent jurisdiction upon prior notice to the parties hereto, and abiding by the determination of such court with respect thereto. In such event, such delivery shall constitute a complete discharge and release of Escrow Agent of its obligations hereunder.

3.7     Escrow Agent shall be entitled to rely conclusively upon any written notice, waiver, receipt, or other document which Escrow Agent believes in good faith to be genuine, including, without limitation, a written statement by Purchaser or Seller that they have complied with the terms of the Agreement with respect to a demand for payment.

3.8     In the event of any controversy or dispute under this Escrow Agreement or with respect to any question as to the construction hereof or any action to be taken or omitted by Escrow Agent, Escrow Agent shall be entitled to consult with counsel of its own choosing.

3.9     Nothing contained herein shall limit or restrict the right of Escrow Agent to represent Seller with respect to any disputes which may arise in connection with the Purchase Agreement, this Escrow Agreement, or any other matter whatsoever. Seller and Purchaser agree that Escrow Agent's engagement as an attorney by Seller is not and shall not be objectionable for any reason whatsoever. Escrow Agent shall incur no liability whatsoever to Purchaser (or any affiliate or subsidiary thereof) for any legal advice rendered to Seller or any action or inaction by Seller based upon such legal advice.

4.      Expenses of Escrow Agent. Escrow Agent shall serve without compensation, however, Seller shall be liable for one-half (½) and Purchaser shall be liable for one-half (½) of any reasonable out-of-pocket fees and expenses incurred by Escrow Agent in connection with this Agreement, including counsel fees, if any. The parties shall pay any such amounts due Escrow Agent promptly upon its demand.

5.      Indemnification of Escrow Agent. Purchaser and Seller agree, jointly and severally, to indemnify Escrow Agent and hold Escrow Agent harmless from any loss, liability and expenses which it incurs in connection with or arising out of its compliance with the terms of this Agreement, including the fees, costs and expenses of defending itself against any claims of liability hereunder, except for a loss, liability or expense arising solely from Escrow Agent's own gross negligence, willful misconduct or breach of fiduciary duty as determined by a final and non-appealable judgment of a court of competent jurisdiction.

6.      Successor Escrow Agent. In the event Escrow Agent is no longer able or willing to serve, Escrow Agent shall have the right, after consultation with Seller and Purchaser, to appoint a successor Escrow Agent who shall be bound by the terms and conditions set forth herein.

7.      Notices.

7.1     Any notice, request, demand or other communication permitted or required to be given hereunder shall be in writing and shall be deemed to have been given when such notice shall have been (a) sent by United States mail, postage prepaid to the addressee, or (b) delivered by a nationally recognized overnight courier or facsimile (to the extent a facsimile number is provided below) to the addressee; in each case at the address or facsimile number, as applicable, specified below:

If to Seller:

Saint Vincents Catholic Medical Centers of New York
170 West 12th Street
New York, New York 10011
Attn: Mark E. Toney, Chief Restructuring Officer
Fax: (212) 604-3331

With a copy to:

Garfunkel Wild, P.C.
111 Great Neck Road
Great Neck, New York 11021
Attn: Judith A. Eisen, Esq.
Fax: (516) 466-5964

and

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Fax: (212) 715-8000
Attn: Adam C. Rogoff, Esq.

If to Escrow Agent:

Garfunkel Wild, P.C.
111 Great Neck Road, Suite 503
Great Neck, New York 11021
Attn: Judith A. Eisen, Esq.
Fax: (516) 466-5964

If to Purchaser:

Liebel Rubin
1441-59th Street
Brooklyn, New York, 11219
Fax: (718) 972-1823

Any notice or communication served upon Escrow Agent shall be accompanied by an affidavit of service upon all other parties upon whom such notice is required to be served.

8.    Binding Effect; Further Assurances.

8.1    This Agreement shall inure to the benefit of and shall be binding upon the respective heirs, personal representatives, successors, and assigns of the parties hereto.

8.2     Seller and Purchaser hereto covenant that they will execute all instruments and documents and will take all steps which may be necessary in order to implement the provisions of this Agreement.

## 9.     Governing Law; Forum.

9.1     This Agreement shall be construed under and governed by the laws of the State of New York, without regard to its principles of conflicts of laws.

9.2     Each party to this Agreement irrevocably consents and agrees that any dispute arising out of or in any way connected to this Agreement shall only be adjudicated by the Bankruptcy Court, provided that if the Bankruptcy Case has closed, each of the parties hereto irrevocably agrees that any Legal Proceeding with respect to this Agreement shall be brought and determined exclusively in the United States District Court for the Southern District of New York or if such Legal Proceeding may not be brought in such court for jurisdictional purposes, exclusively in the Supreme Court of New York sitting in the County of New York. Each of the parties hereto hereby (a) irrevocably submits with regard to any such Legal Proceeding to the exclusive personal jurisdiction of the aforesaid courts in the event any dispute arises out of this Agreement or any transaction contemplated hereby, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the state or federal courts referenced above. Each of the parties hereto further agrees to accept and acknowledge service of any and all process which may be served in any such Legal Proceeding in said courts in the State of New York, and agrees that service of process upon such party by a method permitted by the applicable Laws of the State of New York to such party's address as set forth in Section 7.1 hereto, will be deemed in every respect effective service of process upon such party, in any Legal Proceeding.

10.     Counterparts. This Agreement may be executed in one or more counterparts (whether facsimile or original), each of which when taken together shall be deemed one and the same original instrument.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Escrow Agreement the day and year first above written.

**BISHOP FRANCIS J. MUGAVERO CENTER FOR GERIATRIC CARE, INC.**

By: _____

     Name:

     Title:

**LIEBEL RUBIN**

_____

Liebel Rubin

**GARFUNKEL WILD, P.C.**

By: _____

     Name:

     Title:

## EXHIBIT B

## DEED

[See Attached]

**THIS INDENTURE**, made the _____ day of _____, 2010, BETWEEN

_____, a New York
not-for-profit corporation, with offices at _____,

party of the first part, and

_____, a _____ limited liability company, with offices at_____
_____,

party of the second part.

**WITNESSETH**, that the party of the first part, in consideration of Ten Dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

## THE CERTAIN PREMISES AND IMPROVEMENTS SITUATED THEREON AS MORE PARTICULARLY DESCRIBED ON SCHEDULE A ANNEXED HERETO AND MADE A PART HEREOF

**TOGETHER** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above-described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

**AND** the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose. The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

**IN WITNESS WHEREOF**, the party of the first part has duly executed this deed as of the day and year first above written.

_____

By:_____
        Name:
        Title:

STATE OF NEW YORK )
                                  ) ss:
COUNTY OF)

     On the _____ day of _____, 20__, before me, the undersigned, a Notary Public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on this instrument, the individual, or person upon behalf of which the individual acted, executed the instrument.

                                      _____
                                      Notary Public

## SCHEDULE A

[See Attached]

*BARGAIN AND SALE DEED*

**Without Covenant Against Grantor's Acts**

---

*TO*

[_____]

*PREMISES:*

_____, NEW YORK

**BLOCK:** ___
**LOT:** ___

*RECORD AND RETURN TO:*

**Caller and Lebovits**

**266 Broadway Suite 304**

**Brooklyn, New York 11211.**

# EXHIBIT C

## FORM OF BILL OF SALE

[See attached]

# BILL OF SALE

THIS BILL OF SALE is made and executed as of the ____ day of _____, 20__ from _____, having an address at _____, New York 10011 ("Seller"), to _____ having an address at _____ ("Purchaser").

FOR AND IN CONSIDERATION of the sum of Ten Dollars and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Seller does hereby bargain, sell, convey, deliver, assign, transfer, set over and grant to Purchaser, and to their successors and assigns, all right, title and interest of Seller in and to any and all fixtures, machinery, equipment, furniture and other tangible personal property not owned by any tenant or other occupant of the Property (the "Personalty") affixed or attached to, installed or placed in or upon and to be used for or usable in any present or future enjoyment, occupancy or operation of the building and related improvements comprising the property located at and commonly known as _____, New York.

Title to all the Personalty shall pass to Purchaser upon delivery of this Bill of Sale free and clear of all claims, liens or encumbrances of any kind. Any sales tax, if any, payable in respect of the Personalty shall be the sole responsibility of Purchaser.

Seller makes no warranties or representations whatsoever, including, without limitation, with respect to quality, fitness or merchantability of the Personalty; the Personalty is being transferred "AS IS" physical condition and this Bill of Sale is made without recourse to Seller except that Seller represents and warrants that as of the date hereof, Seller owns all such Personalty free and clear of all claims, liens and encumbrances of any kind.

This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the day and year first written above.

_____

By:_____
        Name:
        Title:

# **EXHIBIT B-1**
Successful Bidder Adequate Assurance

The only executory contracts or leases being assumed by the Successful Bidder are the Medicare and Medicaid provider agreements relating to Bishop Mugavero.  The principals of the Successful Bidder are currently the owners of 11 other nursing homes and has been approved as an acceptable Medicare and Medicaid provider as recently as July 2010.  The principals of the Purchasers further demonstrate adequate financial strength having closed on $18 million in loans in the last 6 months.

**<u>EXHIBIT B-2</u>**
Backup Bidder Adequate Assurance

The only executory contracts or leases being assumed by the Successful Bidder are the Medicare and Medicaid provider agreements relating to Bishop Mugavero. The principal of the Backup Bidder is currently the owner of 5 other nursing homes and has been approved as an acceptable Medicare and Medicaid provider in the past 18 months. The principals of the Purchasers further demonstrate adequate financial strength having closed on $15 million in loans in the last 6 months.