KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
|                                        | :   |                          |
|----------------------------------------|-----|--------------------------|
| In re:                                 | :   | Chapter 11               |
|                                        | :   |                          |
| SAINT VINCENTS CATHOLIC MEDICAL        | :   | Case No. 10-11963 (CGM)  |
| CENTERS OF NEW YORK, <u>et al.</u>,    | :   |                          |
|                                        | :   |                          |
|                         Debtors.       | :   | Jointly Administered     |
|                                        | :   |                          |
---------------------------------------------------------- X

**NOTICE OF DEBTORS' SECOND MOTION PURSUANT TO
SECTION 1121(d) OF THE BANKRUPTCY CODE TO EXTEND THE
EXCLUSIVE PERIODS FOR THE FILING OF A CHAPTER 11 PLAN
<u>AND SOLICITATION OF ACCEPTANCE THEREOF</u>**

PLEASE TAKE NOTICE OF THE FOLLOWING:

1.      A hearing to consider the Debtors' Second Motion Pursuant to Section 1121(d) of the Bankruptcy Code to Extend the Exclusive Periods for the Filing of a Chapter 11 Plan and Solicitation of Acceptance Thereof (the "<u>Motion</u>"), filed by the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), shall be held before the Honorable Cecelia G. Morris, United States Bankruptcy Judge, in Room 701 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, or such other courtroom as may be announced on the date of the hearing, on

**January 20, 2011 at 2:30 p.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard.

        2.      Objections, if any, to the relief sought in the Motion must be made in writing, with a hard copy to chambers, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York and be filed with the Bankruptcy Court and served so as to be actually received by (a) the Debtors, Saint Vincents Catholic Medical Centers of New York, 450 W. 33rd Street, New York, New York 10001, Attn: Jennifer Coffey; (b) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Kenneth H. Eckstein, Esq. and Adam C. Rogoff, Esq.; (c) counsel for the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., and Sarah Link Schultz, Esq.; (d) counsel to Senior Secured Creditors, General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; and (e) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq., no later than **December 17, 2010 at 12:00 pm (prevailing Eastern Time).**

Dated: New York, New York
December 10, 2010

KRAMER LEVIN NAFTALIS & FRANKEL LLP

 /s/  Adam C. Rogoff
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
*Counsel for Debtors and Debtors in Possession*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------- X
                                          :
In re:                                    :        Chapter 11
                                          :
SAINT VINCENTS CATHOLIC MEDICAL           :        Case No. 10-11963 (CGM)
CENTERS OF NEW YORK, et al.,              :
                                          :
                        Debtors.          :        Jointly Administered
                                          :
-------------------------------------------------------- X
```

**DEBTORS' SECOND MOTION PURSUANT TO SECTION 1121(d)**
**OF THE BANKRUPTCY CODE TO EXTEND THE EXCLUSIVE**
**PERIODS FOR THE FILING OF A CHAPTER 11 PLAN**
**AND SOLICITATION OF ACCEPTANCE THEREOF**

TO THE HONORABLE CECELIA G. MORRIS,
UNITED STATES BANKRUPTCY JUDGE:

Saint Vincents Catholic Medical Centers of New York ("**SVCMC**") and certain

of its affiliates, as chapter 11 debtors and debtors in possession (each a "**Debtor**" and

collectively, the "**Medical Centers**" or the "**Debtors**")[1] in the above-referenced chapter 11 cases

---

[1] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation

(the "**Chapter 11 Cases**"), hereby move (the "**Motion**") pursuant to sections 1121(d) of title 11 of the United States Code (the "**Bankruptcy Code**") for an order, substantially in the form attached hereto as **Exhibit A**, further extending (i) the Debtors' exclusive period within which to file a chapter 11 plan (the "**Exclusive Plan Period**") for an additional 120 days through and including **April 11, 2011**[2] and (ii) the Debtors' exclusive period to solicit acceptances with respect of such plan (the "**Exclusive Solicitation Period**" and together with the Exclusive Plan Period, the "**Exclusive Periods**") for an additional 120 days through and including **June 8, 2011**. In support of the Motion, the Debtors respectfully represent as follows:

<u>**Summary of Relief Requested**</u>

This is the Debtors' second request to extend the Exclusive Plan Period and the Exclusive Solicitation Period which is set to expire on December 10, 2010 and February 8, 2011, respectively (the "**Initial Exclusive Period**").

During the Initial Exclusive Period, in furtherance of the wind down of the operations, the Debtors made substantial progress advancing these Chapter 11 Cases by, *inter alia*, pursuing the sales of a majority of their ongoing health care services to third party providers, who will continue to operate these services as going concerns and provide important health care services to the communities the Debtors served while also maximizing recoveries for the Debtors' estates and ensuring patient care and safety. During the last 120 days, the Debtors, along with their professionals, obtained approval from the Court and/or have consummated the sale of the Debtors' (i) Certified Home Health Agency; (ii) Long-Term Home Health Care

---

d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc. There are certain affiliates of SVCMC who are not Debtors.

[2] One-hundred twenty days from December 10, 2010 is April 9, 2011, which falls on a Saturday. Pursuant to Rule 9006(a)(1)(c) of the Federal Rules of Bankruptcy Procedure, where the last day of the period falls on a Saturday, the period continues to run until the end of the next day which is not a Saturday, Sunday or a holiday, which would be Monday April 11, 2011.

Program; (iii) the inpatient and outpatient behavioral health program at St. Vincent's Westchester Hospital; (iv) the nursing home known as Bishop Francis J. Mugavero Center for Geriatric Care; (v) the nursing home known as Holy Family Home and (vi) completed the transfer of seven behavioral health clinics with over 3,000 active patients.

Additionally, during this time period, the Debtors took numerous steps to further the case administration, including reduction of costs and expenses, implementing operational wind down, and analyzing certain of the larger administrative expense claims filed.

The Debtors are continuing the process of marketing their remaining health care services and other assets including, St. Elizabeth Ann's Health Care and Rehabilitation Center in Staten Island ("**St. Elizabeth Ann**"). To date, the Debtors' primary focus has been on patient care. While this focus continues, given the tremendous successes by the estates in transferring or obtaining approval to sell several of their health care services, the Debtors' attention has expanded to the estates' remaining assets, including their Manhattan real estate.

While the Debtors are in a better position to begin contemplating the architecture of a potential chapter 11 plan, the remaining ongoing businesses and real estate assets are complex in nature. The administration of these remaining services and assets continues to demand significant attention by the Debtors' management and professionals, while also having to address the day to day demands of the Debtors' operations and the chapter 11 process. As such, the Debtors' respectfully request a second extension of (i) the Exclusive Plan Period, currently set to expire on December 10, 2010; and (ii) the Exclusive Solicitation Period, currently set to expire 60 days after the Exclusive Plan Period (i.e., February 8, 2010). The Debtors request a further extension of the Exclusive Periods by 120 days (i.e., an extension of the Exclusive Plan Period to April 11, 2011, and the Exclusive Solicitation Period to June 8,

2011).  These Chapter 11 Cases are among the most complex health care cases ever filed. The Debtors submit that this extension is reasonable under the circumstances.

## Background

1.     On April 14, 2010 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases are jointly administered for procedural purposes only.

2.     The Debtors are operating their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.     On April 21, 2010, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed (i) an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "**Creditors' Committee**"), (ii) Alan Chapell as consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code (the "**Consumer Privacy Ombudsman**"), and (iii) Daniel T. McMurray as patient care ombudsman pursuant to section 333 of the Bankruptcy Code (the "**Patient Care Ombudsman**").

## Jurisdiction

4.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

5.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     The statutory predicates for the relief requested herein are sections 105(a) of the United States Bankruptcy Code (the "**Bankruptcy Code**") and Rules 6004 and 9006(c) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## The Medical Center's History and Business

7.     Founded by the Sisters of Charity in 1849, the Medical Centers were the only remaining Catholic-sponsored, acute-care hospital network in New York City.  Dedicated to

fulfilling a charitable healthcare mission, the Medical Centers were committed to a mission that demands they give "Respect, Integrity, Compassion and Excellence to all who come to us in need, especially the poor."

8.     Prior to the Petition Date, the Medical Centers' core business centered around St. Vincent's Hospital Manhattan (the "**Hospital**"), which is located in the Greenwich Village section of Manhattan. The Medical Centers operated numerous other services, including a behavioral health facility, nursing homes, continuing care facilities, a hospice, a home health agency and a military health plan serving active duty dependents, retirees, and their families. Additionally, the Medical Centers operated certain physician-related affiliates, which provide specialized care across 14 clinical departments, and were affiliated with 18 licensed behavioral health and community medicine programs and six ambulatory care providers in Manhattan.

9.     SVCMC and its then debtor and non-debtor affiliates emerged from Chapter 11 in the summer of 2007 subject to over $1 billion of liabilities. After emergence, management attempted to increase their revenue, improve their operations, and reduce costs. Despite these efforts, however, the Medical Centers' revenue remained constant, and the Debtors incurred operating losses of approximately $43 million in 2008 and approximately $64 million in 2009. In 2008 and 2009, the Hospital alone had operating losses of approximately $81 and $107 million, respectively.

10.    The Medical Centers' poor operating results stemmed from four principal causes.

- The Hospital's large operating footprint and staffing were not properly aligned with the current state of its business, as significant changes in the healthcare industry reduced the number of hospital admissions. While certified as a 727-bed hospital, and burdened with all of the attendant costs of a larger physical facility, the Hospital, in 2009, used only approximately 340 beds on a daily basis.

- The Medical Centers' patient mix and reimbursement experience limited their revenues. The Hospital had one of the lowest percentages of higher margin private patients of all private Manhattan hospitals and the highest percentage of Medicare and self-pay (i.e., uninsured) discharges per year. In addition, approximately 56% of the Hospital's inpatient admissions came through its Emergency Department, which is required by law to treat patients without regard to their ability to pay. Moreover, as a stand-alone healthcare provider, the Medical Centers had been unable to negotiate reimbursement rates that are competitive with other private area hospitals.

- The profound financial crisis that has gripped New York and the rest of the Nation over the last several years had magnified the financial challenges faced by the Medical Centers. In an effort to balance their budgets, New York State and the federal government have repeatedly reduced hospital reimbursement rates over the last several years, a change that disproportionately impacts the Medical Centers because they have a higher government payor population than other New York medical centers.

- The financial and other obligations assumed in connection with the Prior Chapter 11 Plan resulted in annual payment obligations that exceeded what the Hospital operations could bear.

11. By the end of 2009, the Debtors faced a severe cash crisis. In response, the Board appointed a Special Restructuring Committee in December 2009, hired a chief restructuring officer in late January and other restructuring professionals shortly thereafter, and took steps to cut costs and assess their restructuring alternatives. Despite these efforts, however, the Debtors' liquidity crisis deepened. By early February 2010, only emergency funding provided by their prepetition lenders and the State of New York enabled the Debtors to make payroll and stave off an immediate bankruptcy filing.

12. The Debtors used the respite provided by this emergency financing, subsequent financial assistance from their prepetition lenders, the State of New York, the Sisters of Charity and a Board member, and wage concessions by employees to explore options for preserving their businesses' long-term viability and maximizing the value of their assets. Among other things, the Debtors worked to identify and negotiate with potential new sponsors to

preserve operations at the Hospital and potential purchasers for their non-Hospital services and assets. While these efforts led to the entry of non-binding letters of intent for the sale of certain non-Hospital services, they did not yield a transaction that will support the continued operation of the Hospital. Despite an extensive marketing process and several serious indications of interest, negotiations concerning the last potential transaction terminated on March 31, 2010. When it became clear that all potential partners had withdrawn from consideration, the Debtors concluded that the continued operation of the Hospital was no longer a viable option.

13. As a result, on April 6, 2010, the Board of Directors of SVCMC voted to approve the closure of the Hospital and the transfer or closure of the outpatient programs and clinics associated with and operated by the Hospital. In accordance with New York State law, the Debtors submitted their proposed plan of closure on April 9, 2010 (the "**Closure Plan**") (as such may be amended from time to time) to the DOH for approval. Prior to the Petition Date, the Debtors commenced the process of implementing their Closure Plan. By orders dated April 16, 2010 and May 14, 2010, the Court authorized the Debtors to continue implementation of the Closure Plan during their Chapter 11 Cases.

**Basis for Relief Requested**

14. Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days after the commencement of a chapter 11 case during which a debtor has the exclusive right to propose and file a chapter 11 plan. See 11 U.S.C. § 1121(b). Section 1121(c)(3) of the Bankruptcy Code provides that, if a debtor files a plan within the 120-day Exclusive Plan Period, it has a period of 180 days after the commencement of the case to obtain acceptance of such plan, during which time competing plans may not be filed. See id. § 1121(c)(3). The Exclusive Periods are intended to afford a debtor a full and fair opportunity to propose a plan and solicit

acceptances of such plan without the deterioration and disruption that is likely to be caused by the filing of competing plans by non-debtor parties.

15.     Pursuant to section 1121(d) of the Bankruptcy Code, where the initial 120-day and 180-day Exclusive Periods provided for in the Bankruptcy Code prove to be an unrealistic time frame for proposal and solicitation of a plan, the Court may extend a debtor's Exclusive Periods for cause. See id. § 1121(d).  Although the Bankruptcy Code does not define the term "cause," the legislative history indicates it is intended to be a flexible standard to balance the competing interests of a debtor and its creditors.  See H.R. REP. NO. 95-595, at 231-32 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6191 (noting that Congress intended to give bankruptcy courts flexibility to protect a debtor's interests by allowing unimpeded opportunity to negotiate settlement of debts without interference from other parties in interest).

16.     In determining whether cause exists to extend the Exclusive Periods, a court may consider a variety of factors to assess the totality of circumstances in each case.  See In re Adelphia Commc'ns Corp., 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006) (stating that the decision to extend or terminate exclusivity is within the discretion of the bankruptcy court, and is fact-specific); In re McLean Indus., Inc., 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) (identifying the factors used by courts to determine whether cause exists to extend exclusivity); In re Dow Corning Corp., 208 B.R. 661, 664, 670 (Bankr. E.D. Mich. 1997); In re Express One Int'l, Inc., 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996).  Those factors include, without limitation:

> (a)     the size and complexity of the debtor's case;
>
> (b)     the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;
>
> (c)     the existence of good-faith progress towards reorganization;
>
> (d)     the fact that the debtor is paying its bills as they come due;

(e)     whether the debtor has demonstrated reasonable prospects for filing a viable plan;

(f)     whether the debtor has made progress in negotiations with its creditors;

(g)     the amount of time which has elapsed in the case;

(h)     whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and

(i)     the existence of an unresolved contingency.

In re Adelphia Commc'ns Corp., 352 B.R. at 587; see also In re R&G Props., Inc., No. 08-10876, 2009 WL 269696, at * 1 (Bankr. D.Vt. Jan. 28, 2009) (applying the above-mentioned factors and finding cause to grant the Debtor an extension of its exclusivity periods); In re Lionel L.L.C., No. 04-17324, 2007 WL 226159, at * 6 (Bankr. S.D.N.Y. Aug. 3, 2007) (identifying a variety of the abovementioned factors as relevant to the "totality of the circumstances" in determining whether cause exists); accord In re Express One Int'l, Inc., 194 B.R. at 100 (identifying four factors, among others, as relevant in determining whether "cause" exists to extend exclusivity); In re United Press Int'l, Inc., 60 B.R. 265, 269 (Bankr. D.D.C. 1986) (holding that the debtor had shown "cause" to extend its exclusivity period based upon certain of the above-quoted factors).

## Cause Exists to Further Extend the Exclusive Periods

17.     An application of the aforementioned standard to the facts of these Chapter 11 Cases demonstrates sufficient "cause" to grant the Debtors' requested second extension of the Exclusive Periods so that they may have a full and fair opportunity to continue taking the necessary steps that would permit them to propose a feasible plan and solicit acceptances thereon.

## A. **The Debtors' Cases are Large and Complex**

18. It is well established that courts regularly extend the exclusive periods for filing a chapter 11 plan under section 1121(d) of the Code in large and complex chapter 11 cases. See In re Texaco, Inc., 76 B.R. 322, 325-27 (Bankr. S.D.N.Y. 1987) (noting that "[t]he large size of the debtor and the consequent difficulty in forming a plan of reorganization for a huge debtor with a complex financial structure are important factors which generally constitute cause for extending the exclusivity periods," and holding that the size and complexity of the case warranted extension of the exclusivity periods); In re McLean Indus., Inc., 87 B.R. at 834-35 (discussing the complexities of the case as constituting cause for the extension of exclusivity); Gaines v. Perkins (In re Perkins), 71 B.R. 294 (W.D. Tenn. 1987) (holding that because the case was large and complex, among other factors, cause existed to extend the exclusivity period) see also H.R. Rep. No. 95-595, at 231-32 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6191.

19. Without doubt, these Chapter 11 Cases are among the most complex health care bankruptcy cases ever filed, involving thousands of patients and employees, and numerous health care services that are being transferred in multiple, independent transactions as going concern sales to various third parties. The Debtors' health care services generally, and various sale transactions specifically, are subject to several types of regulatory approvals, further complicating these transactions and Chapter 11 Cases. As noted, to date, the Debtors' top priority has been, and remains, maintaining high-quality patient care while navigating the necessary transfers and the bankruptcy process. These actions are in addition to the substantial time devoted by the Debtors in Possession to the efficient and orderly administration of their cases.

20.     Since the inception of these Chapter 11 Cases, numerous motions, notices, and orders have been filed (both by and against the Debtors), and addressing these motions in addition to frequent creditor, employee, and patient inquiries has required extensive time and resources.  In fact, the multitude of motions and inquiries that need to be addressed demonstrates the size and complexity of these Chapter 11 Cases and the appropriateness of a second extension of the Debtors' Exclusive Periods.

21.     In cases of this size and complexity, the current Exclusivity Periods are inadequate to reconcile claims against the estate necessary to resolve for confirmation of a feasible plan, prepare a disclosure statement containing adequate information or, even, to adequately develop a chapter 11 plan. Indeed, courts in this district have routinely granted a second extension of the Exclusive Periods in cases of similar size and complexity.  See In re Mesa Air Group, Inc., Case No. 10-10018 (MG) (Bankr. S.D.N.Y. Aug. 12, 2010) (second extension of exclusivity for 90 days); In re Finlay Enters., Inc., Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Apr. 27, 2010) (second extension of exclusivity for six months); In re Motors Liquidation Co., No. 09-50026 (REG) (Bankr. S.D.N.Y. Jan. 20, 2010) (second extension of exclusivity for four months); In re Tronox, Inc., No. 09-10156 (ALG) (Bankr. S.D.N.Y. Sept. 16, 2009) (second extension of exclusivity for approximately 4 months); In re Value City Holdings, Inc., Case No. 08-14197 (JMP) (Bankr. S.D.N.Y. June 17, 2009) (second extension of exclusivity for 120 days); In re Frontier Airlines Holdings, Inc., Case No. 08-11298 (RDD) (Bankr. S.D.N.Y. Jan. 21, 2009) (second extension of exclusivity for 120 days).

## B.  **Debtors have Made Substantial Good Faith Progress**

22.      Since the First Extension Order, the Debtors have continued to make substantial progress in these Chapter 11 Cases. Over the past four months the Debtors have, among other things:

- Completed the sale of the certain health care services and other assets including the Certified Home Health Agency ("**CHHA**"), and Long Term Home Health Care Program ("**LTHHCP**"), and completed the contested sale of St. Vincent's Westchester to St. Josephs;

- Obtained approval for the sale of Bishop Francis J. Mugavero Center for Geriatric Care, Inc. ("**Bishop Mugavero**") and St. Jerome's Health Services Corporation d/b/a Holy Family Home ("**Holy Family Home**");

- Continued working with the purchasers of the CHHA, LTHHCP, St. Vincent's Westchester, Bishop Mugavero and Holy Family Home to facilitate the transfer of the services to those purchasers;

- Completed the transfer of seven behavioral health clinics with over 3,000 active patients to new sponsors;

- Continued negotiations for the transfer of the Debtors' remaining health care services including, St. Elizabeth Ann's Health Care and Rehabilitation Center in Staten Island;

- Begun the process of analyzing the alternatives for the Debtors' real estate interests in Manhattan as well at the Debtors' Bayley Seton campus in Staten Island;

- Addressed an $18 million administrative expense claim motion filed by a group of former attending physicians and The Committee of Interns and Residents at the Manhattan Hospital for tail insurance coverage, that ultimately resulted in a global settlement agreement to address tail insurance coverage, which has been approved by this Court;

- Analyzed numerous contracts and have, to date, filed eleven omnibus notices to reject certain unexpired leases and executory contracts;

- Begun reviewing the approximately 4,300 proofs of claim filed in these Chapter 11 Cases and have started the process of analyzing and processing claims;

- Addressed numerous requests for relief from the automatic stay brought by tort claimants;

- Begun analyzing the Debtors' long term medical record retention requirements under both non-bankruptcy and bankruptcy law in order to develop an appropriate record retention strategy for over 330,000 cubic feet of patient records; and

- Responded to countless inquiries related to the status of these cases.

23. As the foregoing list demonstrates, the Debtors have made considerable progress in these Chapter 11 Cases, and have made progress towards developing a chapter 11 plan.

## C. **Debtors are Continuing to Pay Postpetition Obligations**

24. The Debtors have continued to make timely payments of their undisputed postpetition obligations, and expect that they will continue to be able to do so in the future. As such, the requested extension will not prejudice creditors or parties in interest, and will afford such parties a meaningful opportunity to negotiate with the Debtors as they formulate their chapter 11 plan.

## D. **Debtors have Made Progress Negotiating with Creditors**

25. On November 9, 2010, the Debtors held their second in-person meeting with all of the members of the Creditors' Committee and each of their professionals. At this meeting, the Debtors provided the Creditors' Committee with an update of the transfers of the Debtors ongoing health care services, a detailed summary of the proceeds realized and liabilities assumed as a result of these sales and the status of the ongoing negotiations to transfer the remaining ongoing health care services and sell their remaining assets including the Manhattan real estate.

26. In addition, the Debtors are currently negotiating with General Electric Capital Corporation, as the agent and lender, and TD Bank, N.A. as lender (together, the "**DIP**

**Lenders**") for the consensual use of cash collateral and/or an amendment to the debtor in possession loan facility, as the current term loan expires on December 31, 2010.

27.    As communication has proven to be the key to these Chapter 11 Cases and as evidenced by the above, the Debtors have been and continue to communicate with the major stakeholders in these Chapter 11 Cases including the Patient Care Ombudsman and Consumer Privacy Ombudsman.  Moreover, the Creditors' Committee and the DIP Lenders are kept abreast of all significant developments and negotiations on sales transactions and contested matters.  The Debtors believe that this will continue as the architecture of a chapter 11 plan is developed with an eye towards a consensually proposed plan further warranting an extension of the Exclusive Periods.

### E.    Debtors have Demonstrated Reasonable Prospects for Filing a Viable Chapter 11 Plan

28.    As discussed briefly above, the Debtors have made significant progress in these Chapter 11 Cases by transferring important services and selling major assets, and have, in each case, met or exceeded the original expectations of the sales.  In addition, there still remain certain important assets to be sold, including St. Elizabeth Ann.  The Debtors believe that, based on their estimates of what is reasonable to achieve in the sale of these remaining assets, the proceeds of these sales would provide a basis to fund the Debtors' chapter 11 plan.  Further steps need to be taken, however, to pursue these important transactions.

29.    Thus, the Debtors presently believe based on their progress to date and the potential proceeds from the sale of the remaining assets, that their prospects for proposing and filing a viable chapter 11 plan warrant an extension of the exclusivity period.

**F. Debtors are not Seeking an Extension of Exclusivity in Order To Pressure Creditors to Submit to the Debtors' Reorganization Demands**

30.     As discussed above, the Debtors have made substantial progress in the Chapter 11 Cases and are not seeking the extension of the Exclusive Periods as a means to exert pressure on creditors or other parties in interest. The Debtors submit that the granting of the requested extensions of the Exclusivity Periods will not harm the Debtors' creditors, and will allow the Debtors to continue to work with their creditors and other parties in interest to develop and build consensus for a chapter 11 plan.

**G. Contingencies Still Need to be Resolved**

31.     Where unresolved contingencies exist, the resolution of which will affect the debtor's ability to propose a confirmable chapter 11 plan, an extension of the Debtors' Exclusive Periods should be granted. See, e.g., In re Swatara Coal Co., 49 B.R. 898 (Bankr. E.D. Pa. 1985) (finding that negotiations for a business arrangement constituted an unresolved contingency and warranted an extension of the exclusive periods); see also In re Sportsman's Link, Inc., No. 07-10454, 2007 WL 7023830 (finding cause to extend exclusive periods and noting that "the single most important factor in determining cause to extend the exclusivity period [was] . . . the unresolved contingency" of whether the debtor had timely assumed a lease). While the Debtors have made substantial progress in the Chapter 11 Cases, there remain numerous issues that require the further extension of the Exclusive Periods.  Importantly, the Debtors are continuing to evaluate options for their remaining healthcare businesses and other assets, including their Manhattan real estate.  Moreover, because it has been a mere six weeks since the General Bar Date has passed, the Debtors are still in the process of evaluating all claims against the estates.

32.     The Debtors are also continuing to respond to information requests from the creditor constituencies and negotiating with numerous creditors regarding business operations. Despite spending time on the above, as well as other, more routine (but nonetheless time-consuming) aspects present in any chapter 11 case, the Debtors require a further extension of the Exclusive Periods to continue to develop their strategy for an exit from these Chapter 11 Cases.

## Conclusion

33.     In sum, the Debtors have made significant progress in these Chapter 11 Cases, and are working diligently to advance the wind down process. The Debtors should be afforded a full and fair opportunity to negotiate, propose, and seek acceptance of a chapter 11 plan. The Debtors submit that the requested extension is appropriate and necessary, will not prejudice the legitimate interest of creditors and any parties in interest, and will afford them a meaningful opportunity to formulate a chapter 11 plan, as contemplated by chapter 11 of the Bankruptcy Code.

34.     Accordingly, the Debtors request that the Court extend the Exclusive Periods as provided herein.

## Notice

35.     No trustee or examiner has been appointed in the Chapter 11 Cases. In accordance with the First Amended Final Administrative Order Establishing Case Management and Scheduling Procedures (the "**Case Management Order**"), entered on September 3, 2010, notice of this Motion has been given to the parties identified on the General Service List and the Special Service List (as such terms are identified in the Case Management Order). The Debtors submit that no other notice of this Motion need be given.

WHEREFORE the Debtors respectfully request entry of an order extending the

Exclusive Plan Period to April 11, 2011 and the Exclusive Solicitation Period to June 8, 2011,

and such other and further relief as it deems just and proper.

Dated:    New York, New York
          December 10, 2010

KRAMER LEVIN NAFTALIS & FRANKEL LLP

  /s/  Adam C. Rogoff
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

*Counsel for Debtors and Debtors in Possession*

**EXHIBIT A**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                 :

In re:                       :        Chapter 11
                                   :

SAINT VINCENTS CATHOLIC MEDICAL  :        Case No. 10-11963 (CGM)
CENTERS OF NEW YORK, <u>et al.</u>,     :
                                   :

                    Debtors.     :        Jointly Administered
                                   :
-------------------------------------------------------- X

### ORDER PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY CODE TO EXTEND THE EXCLUSIVE PERIODS FOR THE FILING OF A CHAPTER 11 PLAN AND SOLICITATION OF ACCEPTANCE THEREOF

Upon the motion (the "**Motion**")[3] filed by the debtors and debtors in possession in the above captioned cases (collectively, the "**Debtors**"), pursuant to section 1121(d)(4) of title 11 of the United States Code (the "**Bankruptcy Code**"), to extend the exclusive periods for the filing of a chapter 11 plan and solicitation of acceptance thereof, as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and the Court having entered an order extending the exclusive periods previously to December 10, 2010 ("**First Extension Order**"); and the relief requested in the Motion being in the best interests of the Debtors and their estates and creditors; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "**Hearing**"); and the Court having determined that the legal and factual bases set forth in the

---

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefore, it is

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that, pursuant to section 1121(d) of the Bankruptcy Code, each of the Debtor's Exclusive Plan Period is further extended through and including April 11, 2011; and it is further

ORDERED that, pursuant to section 1121(d) of the Bankruptcy Code, each of the Debtor's Exclusive Solicitation Period is further extended through and including June 8, 2011; and it is further

ORDERED that the extension of the Exclusive Periods granted herein is without prejudice to such future requests for further extensions by the Debtors that may be made pursuant to section 1121(d) of the Bankruptcy Code.

Dated:    New York, New York
           _____, 2010

           _____
           THE HONORABLE CECELIA G. MORRIS
           UNITED STATES BANKRUPTCY JUDGE

KL2 2676594.6