**Bidding Procedures Objection Deadline: June 23, 2011 at 4:00 p.m. (prevailing Eastern Time)**
**Bidding Procedures Hearing: June 30, 2011 at 11:00 a.m. (prevailing Eastern Time)**
**Sale Objection Deadline: July 8, 2011 at 4:00 p.m. (prevailing Eastern Time)**
**Sale Hearing: July 21, 2011 at 11:00 a.m. (prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel for Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK, et al., | : | Case No. 10-11963 (CGM) |
| | : | |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

--------------------------------------------------------- x

**NOTICE OF DEBTORS' MOTION FOR (I) AN ORDER (A) APPROVING
BREAK-UP FEE AND BIDDING PROCEDURES FOR THE AUCTION OF
ST. ELIZABETH ANN'S ASSETS, (B) SCHEDULING AN AUCTION
AND SALE HEARING, AND (C) APPROVING PROCEDURES FOR
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (II) AN ORDER (A)
APPROVING THE SALE OF THE ST. ELIZABETH ANN'S ASSETS, (B)
AUTHORIZING THE DEBTORS TO ENTER INTO A RECEIVERSHIP
AGREEMENT, (C) APPROVING ENTRY INTO THE BAYLEY SETON
LEASE, AND (D) APPROVING THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**PLEASE TAKE NOTICE** that a hearing will be held before the Honorable

Cecelia G. Morris, United States Bankruptcy Judge, in Room 701 of the United States

Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House,

One Bowling Green, New York, New York 10004-1408, on **June 30, 2011 at 11:00 a.m.**

**(prevailing Eastern Time)** to consider the Debtors' Motion ("**Motion**") for (I) an Order (A)

Approving Break-Up Fee and Bidding Procedures for the Auction of St. Elizabeth Ann's Assets,

(B) Scheduling an Auction and Sale Hearing, and (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) an Order (A) Approving the Sale of the St. Elizabeth Ann's Assets, (B) Authorizing the Debtors to Enter into a Receivership Agreement, (C) Approving Entry into the Bayley Seton Lease, and (D) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (the "**Bidding Procedures Order**"). **Please note that the time and location of the hearing on the Sale Motion are subject to change.**

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to entry of the Bidding Procedures Order must: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq., and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021, Attn: Judith Eisen, Esq.; (b) counsel for the Official Committee of Unsecured Creditors, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Stephen Kuhn, Esq. and Sarah Link Schultz, Esq.; (c) counsel to General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166-4193, Attn: David Neier, Esq.; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; (d) counsel to the Pension Benefit Guarantee Corporation, 1200 K Street, N.W., Washington, D.C. 20005-4026, Attn: Chief Counsel, Joel W. Ruderman, Esq. and Kelly R. Cusick, Esq.; (e) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; and (f) counsel to the Purchasers, Nutovic & Associates, 488 Madison Avenue, 16th Floor,

New York, New York 10022, Attn: Isaac Nutovic, Esq.; so as to be **actually received by 4:00**

**p.m. (prevailing Eastern Time**) on June 23, 2011 (the "**Objection Deadline**").

A copy of the Motion can be viewed and obtained on the Court's website www.ecf.nysb.uscourts.gov or (without charge) at http://chapter11.epiqsystems.com/svcmc2010.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney if you have one in these bankruptcy cases. (If you do not have an attorney in these bankruptcy cases, you may wish to consult one.)**

If you do not want the Court to grant the relief requested in the Sale Motion, or if you want the Court to consider your view on the Sale Motion, you or your attorney must attend the Hearing. **If you or your attorney do not attend the Hearing, the Court may grant the relief requested in the Motion.**

Dated: New York, New York
       June 9, 2011

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ Adam Charles Rogoff
Kenneth H. Eckstein
Adam C. Rogoff
Gregory G. Plotko
Anupama Yerramalli
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

*Counsel for Debtors and Debtors in Possession*

**Bidding Procedures Objection Deadline: June 23, 2011 at 4:00 p.m. (prevailing Eastern Time)**
**Bidding Procedures Hearing: June 30, 2011 at 11:00 a.m. (prevailing Eastern Time)**
**Sale Objection Deadline: July 8, 2011 at 4:00 p.m. (prevailing Eastern Time)**
**Sale Hearing: July 21, 2011 at 11:00 a.m. (prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel for Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SAINT VINCENTS CATHOLIC MEDICAL | : | Case No. 10-11963 (CGM) |
| CENTERS OF NEW YORK, <u>et al.</u>, | : | |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

-------------------------------------------------------- x

**DEBTORS' MOTION FOR (I) AN ORDER (A) APPROVING BREAK-UP
FEE AND BIDDING PROCEDURES FOR THE AUCTION OF
ST. ELIZABETH ANN'S ASSETS, (B) SCHEDULING AN AUCTION
AND SALE HEARING, AND (C) APPROVING PROCEDURES FOR
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (II) AN ORDER (A)
APPROVING THE SALE OF THE ST. ELIZABETH ANN'S ASSETS, (B)
AUTHORIZING THE DEBTORS TO ENTER INTO A RECEIVERSHIP
AGREEMENT, (C) APPROVING ENTRY INTO THE BAYLEY SETON
LEASE, AND (D) APPROVING THE ASSUMPTION AND ASSIGNMENT
<u>OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>**

TO THE HONORABLE CECELIA G. MORRIS,
UNITED STATES BANKRUPTCY JUDGE:

Saint Vincents Catholic Medical Centers of New York ("**<u>SVCMC</u>**") and certain

of its affiliates, as chapter 11 debtors and debtors-in-possession (each a "**<u>Debtor</u>**" and

collectively the "**Debtors**")[1] in the above-referenced chapter 11 cases (the "**Chapter 11 Cases**"),

submit this motion (the "**Motion**") for (i) an order, substantially in the form attached hereto as

**Exhibit A** (the "**Bidding Procedures Order**"), (a) approving a Break-Up Fee (as defined below)

and bidding procedures (the "**Bidding Procedures**") for the auction (the "**Auction**") of

substantially all of the assets (the "**SEA Assets**")[2] of the Debtor Sisters of Charity Health Care

System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center ("**St.**

**Elizabeth Ann's**" or the "**Seller**"), including a skilled nursing and residential health care facility

located at 91 Tompkins Avenue, Staten Island, New York (the "**Facility**"); (b) scheduling the

Auction and a hearing approving the sale of the SEA Assets (the "**Sale Hearing**"); and (c)

approving certain procedures for the assumption and assignment of certain executory contracts

and unexpired leases related to the SEA Assets (the "**Assignment Procedures**"), and (ii) an

order, substantially in the form attached hereto as **Exhibit B** (the "**Sale Order**"), (a) approving a

sale of the SEA Assets to the Purchasers (defined below) or another bidder submitting a higher

or better bid at the Auction, (b) authorizing the Debtors to enter into a receivership agreement

(the "**Receivership Agreement**"), (c) approving the lease to the Purchasers (or another bidder

submitting a higher or better bid at the Auction) of the land, building, and equipment (the

"**Bayley Seton Lease**") related to the Debtor's Bayley Seton campus (the "**Bayley Seton**

---

[1] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii)
Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort
Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home,
Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation
d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc. There are certain affiliates of SVCMC who
are not Debtors.

[2] As used herein, the term "**SEA Assets**" shall refer to the assets being transferred to the Purchasers (defined herein)
pursuant to (i) the APAs (as defined herein) and (ii) in the event (x) the Debtors exercise the put option (the "**Put**
**Option**") contained in the Bayley Seton Lease (defined herein), or (y) the Ground Lessee (defined herein) exercises
its purchase option (the "**Call Option**") contained in the Bayley Seton Lease, those assets transferred to the
Purchasers pursuant to the Put Option or the Call Option.

**Campus**"), and (d) approving the assumption and assignment of certain executory contracts and unexpired leases (the "**Assumed Contracts and Leases**") in connection with the sale transaction.

<u>S</u>UMMARY OF <u>R</u>ELIEF <u>R</u>EQUESTED

1.        An important goal of these liquidating Chapter 11 Cases is to ensure the orderly and efficient transition of critical healthcare services provided by the Debtors to new sponsors in order to continue meeting the needs of the patients and communities previously served by the Debtors.  One of the Debtors' healthcare services is their skilled nursing and residential health care facility, St. Elizabeth Ann's.[3]  St. Elizabeth Ann's is a 300-bed, skilled nursing and rehabilitative care facility located in Staten Island, New York.  In addition to long-term care, St. Elizabeth Ann's provides highly specialized sub-acute, neuro-behavioral, and extensive AIDS-related services.

2.        The Debtors also own the Bayley Seton Campus[4], which is adjacent to St. Elizabeth Ann's.  The Debtors have no current operations at the Bayley Seton Campus; however, a portion of the premises is leased to Richmond University Medical Center ("**RUMC**")[5] and St. Elizabeth Ann's, which uses the space for 72 neurobehavioral beds.  As discussed below, the costs of maintaining the Bayley Seton Campus, among other costs associated with the real estate,

---

[3] On October 12, 2010, the Court entered orders approving the sale of the nursing homes operated by St. Jerome's Health Services Corporation d/b/a Holy Family Home ("**Holy Family Home**") and Bishop Francis J. Mugavero Center for Geriatric Care, Inc. ("**Bishop Mugavero**").

[4]  Bayley Seton takes its name from Dr. Richard Bayley, New York City's first Public Health Service Officer, and St. Elizabeth Ann Seton, his daughter and foundress of the Sisters of Charity in America.  The Bayley Seton Campus contains several abandoned buildings, including the Staten Island's first hospital, the Seaman's Retreat Hospital which was constructed in 1831 and was a part of the Marine Hospital Service.  The facility was expanded in the early 1900s and became part of the United States Public Health Service System.  In 1981, when the federal government transferred former Public Health Service hospitals and clinics to private non-profit or other public entities, the New York Sisters of Charity assumed the sponsorship of the facility and renamed it Bayley Seton.

[5] By its terms, RUMC's lease (the "**RUMC Lease**") expires and terminates on December 31, 2011.

KL2 2673486.30

exceed the lease revenues. The transaction provides for entering into the Bayley Seton Lease pursuant to which the tenant will assume various costs and obligations relating to the Bayley Seton Campus. Assumption and alleviation of these liabilities is beneficial to the estate.

3.      As part of the Debtors' liquidation and closure process, they have undertaken significant efforts to transfer St. Elizabeth Ann's to a new sponsor in order to preserve patient care of these important services. To assist in this process, the Debtors retained Cain Brothers & Company ("**Cain Brothers**") and Loeb & Troper LLP ("**Loeb & Troper**," together with Cain Brothers, the "**Brokers**")[6] to coordinate and oversee the marketing effort, which included contacting more than a hundred potential purchasers and negotiating with interested parties. In coordination with the Debtors' senior management and Grant Thornton, the Debtors' crisis managers, the Brokers contacted approximately 122 potential purchasers and assisted 21 potential purchasers with due diligence on the SEA Assets. Following this marketing process, the Debtors determined to enter into a "stalking horse" purchase agreement with the Purchasers (defined below) for the sale of the SEA Assets and the Bayley Seton Lease. The Debtors believe that the Brokers have already identified the appropriate group of potential bidders and, immediately following the filing of this Motion, the Brokers will be sending the stalking horse agreements to such potential bidders.

---

[6] Currently pending before the Court is the Debtors' separate application to amend the retention of Cain Brothers and Shattuck Hammond Partners ("**Shattuck**"), previously a division of, but now know as, Morgan Keegan & Company ("**Morgan Keegan**") [Docket No. 1684]. At the outset of these cases, the Debtors retained three advisory firms to assist in the marketing and disposition of the Debtors' patient care services: Cain, Brothers, Shattuck, and Loeb & Troper. Shattuck and Loeb & Troper were responsible for marketing specific patient services with Cain Brothers maintaining overall responsibility. Since prior to the Petition Date, Mr. Thomas M. Barry, then at Cain Brothers was tasked with oversight over all marketing efforts. As Mr. Barry has now joined Morgan Keegan as a managing director, the Debtors seek to continue the services of Mr. Barry and expand the scope of Morgan Keegan's retention. As explained in greater detail in the separate retention application, under the terms of the amended engagement, Morgan Keegan will receiver one-third of any transaction fee otherwise payable to Cain Brothers on account of a sale of the SEA Assets.

4.     By this Motion, the Debtors seek approval of (i) customary bidding procedures (including an auction process and payment of a break-up fee), (ii) the sale of the SEA Assets to the highest or otherwise best bidder(s), (iii) the Receivership Agreement for the pre-closing operation of the Facility, and (iv) the Bayley Seton Lease with the Purchasers (or another bidder submitting a higher or better bid at the Auction).   The Debtors also seek approval to assume and assign, subject to the conditions of the relevant transaction documents, a lease between SEA, as tenant, and SVCMC, as landlord in connection with the housing of certain residents in the 72 neurobehavioral beds located on the Bayley Seton Campus (the "**Patient Bed Lease**").  The sale of the SEA Assets and entering into the Bayley Seton Lease to the Purchasers will both preserve the quality of care for the patients of St. Elizabeth Ann's and allow for a material paydown of the Debtors' secured debt.

5.     As described in greater detail herein, the Bayley Seton Lease includes (i) a put option (the "**Put Option**") that allows the Debtors to put the Bayley Seton Campus to the Ground Tenant, and a call option (the "**Call Option**") that allows the ground tenant under the Bayley Seton Lease, under certain conditions, to require that the Debtors transfer the Bayley Seton Campus to the ground tenant.  As part of the relief requested by this Motion, the Debtors seek authority to enter into the Bayley Seton Lease, exercise the Put Option at their discretion, and comply with the Call Option without the need for a further order of the Court.  To the extent that (i) the Debtors exercise the Put Option, or (ii) the ground tenant under the Bayley Seton Lease exercises the Call Option, the transfer of the Bayley Seton Campus will be subject to all the provisions of the Sale Order[7], including that the Bayley Seton campus will be transferred free and clear of all liens, claims, encumbrances and interests.

---

[7] The Debtors have submitted only one form of Sale Order at the present time for ease sake.  In the event that the Bayley Seton Lease transaction proceeds separately from the sale of the SEA Assets, and the successful bidder is not

KL2 2673486.30

6. The Motion requests approval of proposed Bidding Procedures that will afford flexibility to the estates in assessing other qualified bids. *While the transaction with the stalking horse bidder is a "packaged" transaction (which includes the SEA Assets, the Patient Bed Lease and the Bayley Seton Lease), the Debtors will consider qualified bids for the "package" as well as qualified bids for only (i) the SEA Assets[8] **or** (ii) the Bayley Seton Lease. Consistent with other Chapter 11 case auctions involving packaged bids compared with individual component bidding, however, the total consideration from separate component bids must exceed the consideration from the packaged bid.*

7. Previously in these cases, the Debtors obtained Court approval for the substantially similar purchase agreements for the sale of Bishop Mugavero and the Holy Family Home. For the sake of efficiency, this Motion and the prior motions to approve the sale of the Bishop Mugavero and Holy Family Home assets, and the related documents (e.g., the bidding procedures and assignment procedures), are virtually identical other than those changes necessary to conform to this specific transaction (e.g., inclusion of the Bayley Seton Lease and assumption of the Patient Bed Lease).

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

9. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

---

the Ground Tenant, there will be a separate sale order submitted to the Court for the Bayley Seton Lease (including the exercise of the Put and Call Option) as part of the Sale Hearing. At the present time, since there is only one packaged transaction, there is only one form of the Sale Order. Any separate order for the Bayley Seton Lease would be generally consistent with the form of the Sale Order.

[8] In addition, in order to allow for full consideration of the value(s) of the SEA Assets and related operations, any qualified bidder wishing to submit a bid for the SEA Assets alone must submit a bid with and without continuation of the Patient Bed Lease for the 72-beds located on the Bayley Seton Campus.

10.     The statutory predicates for the relief requested herein are sections 105(a), 363(b), and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**").

<u>**BACKGROUND**</u>

11.     On April 14, 2010 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases are jointly administered for procedural purposes only.

12.     The Debtors are operating their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

13.     On April 21, 2010, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed (i) an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "**Creditors' Committee**"), (ii) Alan Chapell as consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code (the "**Consumer Privacy Ombudsman**"), and (iii) Daniel T. McMurray as patient care ombudsman pursuant to section 333 of the Bankruptcy Code (the "**Patient Care Ombudsman**").

14.     Founded by the Sisters of Charity in 1849, the Debtors, at the Petition Date, were the only remaining Catholic-sponsored, acute-care hospital network in New York City.  Dedicated to fulfilling a charitable healthcare mission, the Debtors are committed to a mission that demands they give "Respect, Integrity, Compassion and Excellence to all who come to us in need, especially the poor."

15.    Prior to the Petition Date, the Debtors' core business centered around St. Vincent's Hospital Manhattan (the "**Hospital**"), which was located in the Greenwich Village section of Manhattan.  The Debtors operated numerous other services, including a behavioral health facility, skilled nursing facilities, continuing care facilities, a hospice, a home health agency and a military health plan serving active duty dependents, retirees, and their families. Additionally, the Debtors operated certain physician-related affiliates, provided specialized care across 14 clinical departments, and were affiliated with 18 licensed behavioral health and community medicine programs and six ambulatory care providers in Manhattan, including the Comprehensive Cancer Center, an HIV center, and a wound care center.

16.    On April 6, 2010, following a sustained period of poor operating results and unsuccessful efforts to find a strategic partner for the Hospital, the board of directors of SVCMC voted to approve the closure of the Hospital and the transfer or closure of the outpatient programs and clinics associated with and operated by the Hospital.  In accordance with New York State law, the Debtors submitted to the New York State Department of Health ("**DOH**") for approval their proposed plan of closure on April 9, 2010 (the "**Closure Plan**," as amended from time to time in consultation with the DOH).  The Hospital was closed under the Closure Plan and the Debtors have been currently working closely with the DOH to implement the rest of the Closure Plan.

### THE SALE OF THE SEA ASSETS

17.    Following the marketing process summarized above, shortly prior to the filing of this Motion, the Debtors accepted a joint offer from SV Operating Three, LLC (the "**Nursing Home Purchaser**") and SV Land Three, LLC (the "**Real Estate Purchaser**") to act as a stalking horse bidder in the sale of the SEA Assets and entered into the following agreements:

(a) the Asset Purchase Agreement for the sale of the personal property assets (the "**Personal Property Assets**") of St. Elizabeth Ann's (the "**Nursing Home APA**" attached hereto as **Exhibit C-1**), (b) the Asset Purchase Agreement for the sale of the real estate assets (the "**Real Property Assets**") of St. Elizabeth Ann's with the Real Estate Purchaser (the "**Real Estate APA**" attached hereto as **Exhibit C-2**, together with the Nursing Home APA, the "**APAs**"), and (c) the Bayley Seton Lease (attached hereto as **Exhibit C-3**) with SV Land I, LLC (the "**Ground Tenant**," together with the Nursing Home Purchaser and the Real Estate Purchaser, the "**Purchasers**") with respect to the Bayley Seton Campus. The Debtors explicitly conditioned the APAs and the Bayley Seton Lease on the approval of this Court, any necessary regulatory approvals, and they are subject to the Debtors' solicitation of higher or better bids in accordance with the Bidding Procedures.

18.     The APAs are also subject to several conditions, including entry of the Bidding Procedures Order and the Sale Order, approval of the Debtors' ability to enter into a receivership agreement, and approval of the Break-Up Fee (defined below). The APAs and the Bayley Seton Lease constitute a single joint bid by the Purchasers, and termination of any of the APAs or the Bayley Seton Lease as a result of the auction process will result in the termination of the others. As noted, the Bidding Procedures allow for consideration of separate qualified bids for the SEA Assets and/or the Bayley Seton Lease.

19.     The Nursing Home Purchaser, the Real Estate Purchaser, and the Ground Tenant under the Bayley Seton Lease are newly-formed entities controlled by established nursing home operators, controlling approximately 10 other nursing homes in the New York metropolitan area (collectively, the "**Purchaser Principals**"). The Debtors have been advised that the Purchaser Principals are generally well-regarded in the industry. While the Purchasers

are newly-formed entities, consistent with the structure of the prior nursing home sales, the Purchaser Principals have personally guaranteed the obligations of the Purchasers under the APAs, and the Receivership Agreement, and have personally indemnified the Debtors for the obligations under the Bayley Seton Lease.

**L**IENS ON THE **SEA A**SSETS AND THE **B**AYLEY **S**ETON **C**AMPUS

**A.  Liens on the SEA Assets**

20.     The Personal Property Assets are encumbered by (i) a lien and security interest ("the "**Prepetition Personal Property Lien**") in favor of General Electric Capital Corporation ("**GE Capital**") as agent (in such capacity, the "**Prepetition Agent**") under a Credit Agreement dated as of August 30, 2007 (the "**Prepetition Credit Facility**") entered into by the Debtors, as borrowers, GE Capital, as agent, and GE Capital and TD Bank, N.A., as lenders (together with any other persons becoming lenders thereunder, the "**Prepetition Lenders**"), securing certain prepetition obligations (the "**Prepetition Obligations**") with an approximate principal balance on the Petition Date of $313,000,000 and (ii) a lien and security interest (the "**DIP Agent Lien**" in favor of GE Capital as agent under a Debtor-in-Possession Credit Agreement dated as of April 16, 2010 (the "**DIP Credit Facility**") entered into by the Debtors, as borrowers, GE Capital, as agent (in such capacity, the "**DIP Agent**"), and GE Capital and TD Bank, N.A., as lenders (together with any other persons becoming lenders thereunder, the "**DIP Lenders**") securing certain postpetition obligations of the Debtors (the "**DIP Loan**") approved by an earlier order of the Court (the "**DIP Order**").

21.     The Real Estate Assets are encumbered by a prepetition senior lien in favor of the Pension Benefit Guarantee Corporation ("**PBGC**").  At the time of the prior chapter 11 cases (the "**Prior Chapter 11 Cases**"), SVCMC sponsored the Saint Vincents Catholic Medical Centers Retirement Plan (the "**Pension Plan**").  The Pension Plan was subject to certain

minimum funding requirements of ERISA and the Internal Revenue Code. Pursuant to the plan

of reorganization entered into in the Prior Chapter 11 Cases, SVCMC was required to pay $13.5

million to the Pension Plan during each of calendar years 2008 through 2010. As a result of the

Debtors' failure to make a required $5 million quarterly payment on January 15, 2010, a

statutory first priority lien was imposed on the Debtors' Real Estate Assets (the "**Senior Real**

**Estate Lien**") in favor of the PBGC as security for the $5 million claim. The PBGC perfected

this statutory lien on or about February 3, 2010. In addition, GE Capital, as Prepetition Agent

under the DIP Loan, has a lien and security interest (the "**Junior Real Estate Lien**") on the Real

Estate Assets that is junior to the Senior Real Estate Lien. The PBGC and the agents and the

lenders under the Prepetition Credit Facility and the DIP Credit Facility are referred to as the

"**Secured Creditors**."

22.     The sale of the SEA Assets will enable the Debtors to make a material

payment in satisfaction of the Senior Real Estate Lien and the Prepetition Obligations.

## B.  Liens on the Bayley Seton Campus

23.     The Bayley Seton Campus is encumbered by the following liens (the

"**Bayley Seton Liens**," and such underlying obligations, the "**Bayley Seton Obligations**"): (i) in

connection with SVCMC's emergence from its prior bankruptcy case, the Bayley Seton Campus

is encumbered by (i) a first priority lien and security interest in favor of the Trade Claims

Monitor (as that term is defined in the First Amended Chapter 11 Plan of Reorganization for

Saint Vincents Catholic Medical Catholic Medical Centers of New York d/b/a Saint Vincent

Catholic Medical Centers (the "**Plan**") dated June 5, 2007) of up to $20 million, securing certain

of SVCMC's obligations under the Plan, (ii) a second priority lien and security interest in favor

of the Prepetition Agent under the Prepetition Credit Facility securing the Prepetition

Obligations, and (iii) a third priority lien and security interest in favor of the DIP Agent under the DIP Credit Facility securing the DIP Loan.

24.     Pursuant to the Bayley Seton Lease, and subject to the auction process, the Bayley Seton Campus will be subject to a Put Option and a Call Option that will allow the transfer of the Bayley Seton Campus to the Purchasers for a purchaser price of $1.00.[9]  More significantly, the Purchaser will assume the ongoing carry costs and other specified liabilities associated with the real estate, which are material obligations in excess of $2 million annually for the carry costs alone.   Because of the material consideration to be received through the assumption of operating expenses and other liabilities associated with the property, but subject to the results of the auction process, any subsequent transfer of the Bayley Seton Campus will not result in any further consideration and, based upon the stalking horse transaction, will not result in additional available proceeds relating to the paydown of the Bayley Seton Obligations. The Debtors do not believe that there is material additional value to the Bayley Seton Campus beyond the assumption of certain liabilities and carrying costs under the terms of the Bayley Seton Lease.   Much of the Bayley Seton Campus consists of empty buildings and poorly maintained landscaping that are unsuitable for any commercial use without a significant investment being made to redevelop the property.   In addition, the Bayley Seton Campus is heated by an outdated heating system that is inefficient to operate.   Each year, after taking into account rental income, the Debtors incur net operating expenses associated with this real estate in excess of $2 million, including employing a maintenance staff commensurate with operating such a large campus.   There are also other liabilities associated with the ownership and poor

_____

[9] There are certain factors affecting the ultimate disposition of the Bayley Seton Campus that arise from the right of the Debtors to operate a health plan for the benefit of certain military beneficiaries which will need to be addressed by the Debtors' estates prior to either the Put Option or Call Option being exercisable.

condition of the property, which affects any significant additional value in the property. The Bayley Seton Campus has been the subject of several environmental assessments and investigations since 2004, relating to an open spill from underground fuel storage tanks, as well as other environmental conditions related to other underground storage tanks, hydraulic lift systems, a maintenance pit, a chemical waste/sewer line, a catch basin, and electrical transformers. Hazardous materials investigations performed in November 2006 revealed the presence of asbestos-containing material, mold, lead-based paint, PCBs and/or biological concerns in all of the buildings. Accordingly, the potential right of the Debtors to transfer the Bayley Seton Campus to the Purchasers (or another qualified bidder) for the assumption of carrying costs and environmental and other liabilities alone provides meaningful consideration to the estates.

## RELIEF REQUESTED

25. By this Motion, the Debtors respectfully request the entry of two orders related to the transfer of the SEA Assets. First, the Debtors seek entry of the Bidding Procedures Order, which approves (i) the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as **Annex 1**, by which the Debtors will solicit and consider additional bids for the Auction of the SEA Assets and/or entry into the Bayley Seton Lease; (ii) the scheduling of the Sale Hearing to approve the sale of the SEA Assets and/or entry into the Bayley Seton Lease; (iii) the form of the auction and sale hearing notice, substantially in the form annexed to the Bidding Procedures Order as **Annex 2** (the "**Auction and Sale Hearing Notice**"); and (iv) approving the Assignment Procedures, substantially in the form annexed to the Bidding Procedures Order as **Annex 3**. The Bidding Procedures requested herein are substantially similar to those requested in connection with the sale of Bishop Mugavero and Holy

Family Home (as well as those previously approved by the Court in these Chapter 11 cases for the sale of the Debtors' home health services).

26. <u>Second</u>, the Debtors seek entry of the Sale Order(s) to approve, as applicable,[10] (i) the conveyance of the SEA Assets to the Successful Bidder (defined below) at the Auction free and clear of liens, claims, encumbrances and other interests; (ii) the assumption and assignment of those executory contracts and unexpired leases being assigned to the Successful Bidder pursuant to its bid, including the Patient Bed Lease;[11] (iii) payment of the net proceeds of the sale on account of the obligations held by the Secured Creditors; (iv) the Debtor's ability to enter into the Receivership Agreement; (v) entry into the Bayley Seton Lease and approval of the terms of such lease including the Put Option and Call Option pursuant to which the Bayley Seton Campus would be sold free and clear of liens, claims, encumbrances and other interests, including leasehold and occupancy interests (other than the remainder of the existing term of the RUMC lease through December 2011 and the Patient Bed Lease),[12] and (vi) entry into the Patient Bed Lease Amendment.

---

[10] As noted, if necessary based upon the outcome of the Auction, there would be a separate sale order for the SEA Assets and related transactions and the Bayley Seton Lease.

[11] As part of the assignment of the Patient Bed Lease, the Debtors have agreed, pursuant to that certain First Amendment to Lease dated the date hereof (the "**Patient Bed Lease Amendment**") to the extend the term of the Patient Bed Lease by the earlier of (i) 15 years or (ii) the date at which the Purchaser serves notice of intention to vacate on one year's notice. A copy of the Patient Bed Lease Amendment is attached hereto as **Exhibit C-4**.

[12] Nothing herein constitutes an entitlement for RUMC to remain in the leased premises after the expiration of the term of its lease and the Debtors and any Purchaser reserve their rights in connection therewith, including the right to enforce the Sale Order under section 363 of the Bankruptcy Code for any failure to timely vacate the premises.

A. **The APAs**

27.    Below is a summary of the material provisions of the APAs.   The summary is intended solely to give the Court and interested parties an overview of the material terms of the APAs.  Interested parties should refer to the APAs for the complete terms thereof.[13]

(a) <u>Purchase Price</u>.  The purchase prices to be paid by the Purchasers to the Seller is $15,000,000.00 for the Real Estate Assets and $19,000,000.00 for the Nursing Home Assets, with a combined purchase price of $34,000,000.00 (subject to the Expedited Closing Credit (as defined below).

(b) <u>Deposit</u>.  The Purchasers shall deposit with an escrow agent (a) an amount equal to 5% of the Purchase Price (as that term is defined in the APAs) upon execution of the APAs, and (b) an amount equal to 5% of the Purchase Price if the Purchasers are selected as the prevailing bidder at the Auction, with an increased deposit equal to 10% of the final purchase price if increased at the Auction (collectively, the "**Deposit**").   The Deposit will be released to the Debtors at Closing.

(c) <u>Assumed Liabilities</u>.  The Purchasers shall assume (i) all known, unknown and/or contingent Liabilities arising from or relating to all liabilities under any Medical Reimbursement Program Law (as that term is defined in the Nursing Home APA) relating to any period or events or omissions prior to or subsequent to the Closing (including any liabilities of the Debtors to New York State Medicaid as the result of a pending Medicaid rate adjustment) (ii) all accrued employee paid time off ("**PTO**"), and (iii) all severance obligations to employees, effective as of the closing of the transaction (the "**Closing**") (collectively, the "**Assumed Liabilities**").

(d) <u>Purchased Assets</u>.  The Purchasers shall purchase substantially all of the assets of St. Elizabeth Ann's, including the Real Property Assets and the Personal Property Assets as described more fully in the APAs.

(e) <u>Assumed and Assigned Contracts and/or Leases</u>.   The only contracts and/or leases contemplated by the APAs to be assumed by the Debtors and assigned to the Purchasers are the Seller's Medicare and Medicaid provider agreements.

(f) <u>Excluded Assets</u>.  The Debtors shall retain all right, title and interest to, in and under the assets, properties, interests and rights of the Debtors, defined in the APAs as excluded assets, which include, among other

---

[13] To the extent there are any inconsistencies between the summary description of the APAs contained herein and the terms and conditions of the APAs, the terms of the APAs control.  Capitalized terms contained in the summary description of the APAs that are not defined in this Motion shall have the meanings ascribed to them in the APAs.

things, all cash, bank deposits or similar cash items of the Debtors and any accounts receivable or trade receivables owned by the Debtors as of the date of the Closing.

(g) <u>Representations and Warranties</u>. The APAs include customary representations and warranties related to the SEA Assets by the Purchasers and the Seller, including representations related to consents and approvals.

(h) <u>Closing</u>. The Purchasers have agreed to close within thirty (30) days of the conditions to closing being satisfied or waived. However, Purchasers have also agreed to use their best efforts to (i) submit their CON Application immediately following entry of the Sale Order, (ii) obtain CON Approval by September 1, 2011 and (iii) obtain a financing commitment from TD Bank, N.A. or its affiliates, all of the foregoing so as to close on or before September 15, 2011. In the event that, despite their best efforts to do so, Purchasers are unable to close on or before September 15, 2011 because (x) the CON Approval has not been obtained or (y) Purchasers have not obtained a commitment from TD Bank, N.A. or its affiliates to finance the purchase, Purchasers shall continue to use their best efforts to proceed expeditiously to closing and shall close within a thirty (30) day period following the issuance of the CON Approval and the financing commitment from TD Bank, N.A. or its affiliates or another lender. In the event that the Closing occurs on or prior to September 15, 2011, Purchasers shall be issued a credit against the Purchase Price of two hundred fifty thousand dollars ($250,000) (the "<u>Expedited Closing Credit</u>").

(i) <u>Bankruptcy Approval</u>. The sale is conditioned upon entry of the Sale Order and the solicitation of a higher or otherwise best bid pursuant to the Bidding Procedures.

28. As is customary in a transaction of this nature, the APAs permit the Debtors' consideration of higher or otherwise better competing bids for the SEA Assets (each a "**Competing Bid**") pursuant to the Bidding Procedures. Similarly, in consideration of the Purchasers having expended considerable time and money in negotiating the APAs, the APAs provide that upon consummation of a transaction for the SEA Assets resulting from a Competing Bid, the Debtors will pay the Purchasers a fee equal to $680,000.00, which is 2% of the cash purchase price, as a result of a Competing Bid for the SEA Assets (the "**Break-Up Fee**"). The Break-Up Fee is only payable upon consummation of a Competing Bid for the SEA Assets. In

the event a Competing Bid is entered into but is not consummated for the SEA Assets, the Purchaser will be entitled to an administrative expense claim for the Break-Up Fee.

**B. Receivership Agreement**

29.     Due to the necessity of obtaining regulatory approval for the transfer of the SEA Assets, despite the Purchasers' agreement to use their best efforts to close on or before September 15, 2011, there could be a period of time between the Bankruptcy Court's approval of the APAs and the closing of the transaction.  Thus, to ensure that quality of patient care is maintained during this preclosing period, the APAs contemplate that after entry of the Sale Order, St. Elizabeth Ann's and the Purchasers would have the ability to enter into a receivership agreement, attached as Exhibit D to the Nursing Home APA (the "**Receivership Agreement**"), for the preclosing operation of the Facility.  The Receivership Agreement provides that the Purchasers will act as a receiver for the Facility, including (i) funding all operations of the Facility from and after the date that the Receivership Agreement is effective, (ii) ensuring that the Facility has sufficient funds to satisfy its operating expenses, including, without limitation, any severance obligations and benefit continuation obligations of employees of St. Elizabeth Ann's whose employment is terminated during the term of the receivership in accordance with applicable law and any agreements governing the Debtors, and (iii) funding all sums necessary to maintain the Facility in good repair during the term of the receivership.

30.     The purpose of the Receivership Agreement – which will be subject to regulatory approval under applicable New York law – is to shift the economic burdens and benefits of operating the Facility to the Purchasers following the entry of the Sale Order (when the Receivership Agreement becomes effective), rather than imposing the costs of such operations upon the Debtors' estates during the preclosing period.

31.     The ability to transfer the economics of the sale prior to closing and have the Purchasers assume pre-closing oversight under the Receivership Agreement is an important part of the overall transaction. The Receivership Agreement would be in place until the actual closing of the transaction. Importantly, the Receivership Agreement also facilitates the continuity of patient care during the preclosing period and ensures that patients continue to receive high-quality care pending the Closing. Accordingly, the Debtors seek separate authorization under section 363(b) of the Bankruptcy Code to enter into the Receivership Agreement.

32.     Set forth below is a summary of the key terms of the Receivership Agreement: [14]

(a)  Term. The Receivership Agreement contemplates that the Purchasers will commence the term of the receivership from the effective date of the Receivership Agreement until twelve months after entry of the Sale Order.

(b)  Employees. The Purchasers will be liable for all accounts payable and other liabilities, including taxes, and employee severance and benefit obligations arising out of or relating to the operation of the business during the term of the receivership. During the term of the Receivership Agreement, the Purchasers will comply with and take all action necessary to ensure St. Elizabeth Ann's' compliance with all contractual obligations St. Elizabeth Ann's owes to any employees, obligations under any applicable collective bargaining agreements, and all laws and regulations concerning employment of employees.

(c)  Revenues and Expenses. The Purchasers will be entitled to all revenues from the SEA Assets during the receivership and such revenues shall not be property of the Debtors' bankruptcy estates. The Purchasers will be obligated to pay all expenses and liabilities arising out of, and relating to, the operation of the business located at the Facility exclusively during the term of the receivership.

---

[14] To the extent there are any inconsistencies between the summary description of the Receivership Agreement contained herein and the terms and conditions of the Receivership Agreement, the terms of the Receivership Agreement control. Capitalized terms contained in the summary description of the Receivership Agreement that are not defined in this Motion shall have the meanings ascribed to them in the Receivership Agreement.

(d) <u>Rejection of Contracts</u>.  The Receivership Agreement provides that the Purchasers may designate executory contracts and unexpired leases for rejection by the Debtors.[15]

(e) <u>Representations and Warranties</u>.  The Receivership Agreement provides the customary representations and warranties between the parties.

(f) <u>Bankruptcy Court Approval</u>.  The Receivership Agreement provides that it is subject to and shall only become effective upon entry of the Sale Order.

## C.  Leases of the Bayley Seton Campus

33.  The Debtors request authority to enter into the Bayley Seton Lease with, and provide for the assumption and assignment of the Patient Bed Lease to, the Purchasers.  The purpose of these lease transactions is threefold.  First, approximately 72 of St. Elizabeth Ann's specialized care (neurobehavioral) patients are located on the Bayley Seton Campus.  Although (prior to the Petition Date) St. Elizabeth Ann's received preliminary regulatory approval to expand its own facilities to allow for the transfer of these patients from the Bayley Seton Campus site to an annex to be built on its owned real estate, this did not occur.  As such, maximize value for the SEA Assets can only be obtained by continuing to allow any purchaser of St. Elizabeth Ann's services to lease space from the Bayley Seton Campus.  The Patient Bed Lease allows the Purchasers to continue to utilize existing patient care space to provide critical care to those patients located there while the Purchasers continue with the expansion project.  Accordingly, the Nursing Home APA provides that the Debtors will assume the Patient Bed Lease and assign St. Elizabeth Ann's leasehold interest to the Purchasers.  Furthermore, the Bayley Seton Lease provides that SVCMC, subject to the terms and conditions of the Bayley Seton Lease, will transfer its rights and obligations as landlord under the Patient Bed Lease to the Ground Tenant.

---

[15]  Under the Receivership Agreement, the Purchaser shall not have the right to designate any collective bargaining agreement for rejection.

34.     Second, the net cost (loss) of operating the Bayley Seton Campus is in excess of $2 million per year. These costs include, without limitation, salaries and wages, insurance, and maintenance costs.  To alleviate these costs, the parties seek to enter into the Bayley Seton Lease, which is a "triple net lease," with the Ground Tenant assuming all material obligations of the Debtors in connection with operating the Bayley Seton Campus.

35.     Third, the Bayley Seton Campus has been historically associated with the Uniformed Services Family Health Plan (the "**USFHP**"), a military health plan serving active duty dependents, retirees and their families.  The USFHP is sponsored by the U.S. Department of Defense.  The Debtors have not yet determined whether the transfer of the Bayley Seton Campus will be included in any transfer of the USFHP to a new operator.  The Debtors therefore require the flexibility to continue to own the Bayley Seton Campus, while eliminating the administrative costs of maintaining the Bayley Seton Campus.

36.     In this connection, the Bayley Seton Lease includes the Put Option and Call Option that would allow the Debtors to put the Bayley Seton Campus to the Purchasers for the sum of $1.00.  Given the costs imposed on the Debtors' estates from operating the Bayley Seton Campus, and the general condition of the property itself, the Bayley Seton Campus does not hold any material value for the Debtors' estates in excess of the "triple net" obligations being assumed and paid by the Ground Tenant.  Accordingly, the Debtors seek authority to exercise the Put Option, on notice to the DIP Agent and the Creditors' Committee, in their discretion without the need to seek further relief from the Court.  Pursuant to the Bidding Procedures and as explained in greater detail below, the Debtors (in consultation with the Secured Creditors and the Creditors' Committee) will consider qualified bids for the Bayely Seton Lease that do not

KL2 2673486.30

include a bid for the SEA Assets. This will allow a bidder who believes that there is additional

value in the Bayley Seton Campus to submit a competing offer).

37. Below is a summary of the material provisions of the Bayley Seton Lease:[16]

(a) <u>Parties</u>. This Bayley Seton Lease is between SVCMC and the Ground Tenant.

(b) <u>Property</u>. The property which is the subject of the Bayley Seton Lease is the land, building, and building equipment (as more fully described in the Bayley Seton Lease) of the Debtor's Bayley Seton Campus, located at 75 Vanderbilt Avenue, Staten Island, New York.

(c) <u>Rent</u>. The Ground Tenant will pay SVCMC one dollar ($1.00) per annum in fixed rent ("**Basic Rent**") payable in advance of the first day of each lease year. Any and all other charges or reimbursements made by SVCMC, as well as other obligations assumed by the Ground Tenant pursuant to the Bayley Seton Lease, will be paid by the Ground Tenant to SVCMC as additional rent ("**Additional Rent**").

(d) <u>Term</u>. The term of the Bayley Seton Lease is five years commencing on the Closing Effective Date under the Nursing Home APA (the "**Commencement Date**"), and expires on the last day of the month in which the fifth anniversary of the Commencement Date occurs. The term of the lease is extendable by either party for up to two additional five year terms.

(e) <u>Triple Net Lease</u>. The payment of rent is absolutely net to SVCMC. The Ground Tenant is responsible for all taxes, assessments, charges, utilities, hazard insurance, insurance, property repair and maintenance, and any and all charges or expenses associated with the Bayley Seton Campus after the Commencement Date.

(f) <u>Assumption of Obligations</u>. Other than pre-Commencement Date operational expenses and certain specifically excluded matters, the Ground Tenant will assume the liabilities associated with the operation of the Bayley Seton Campus, including the current leases existing on the Bayley Seton Campus, all documents currently of record against the

---

[16] The summary is intended solely to give the Court and interested parties an overview of the material terms of the Lease. Interested parties should refer to the Lease for the complete terms thereof. To the extent there are any inconsistencies between the summary description of the Lease contained herein and the terms and conditions of the Lease, the terms of the Lease control. Capitalized terms contained in the summary description of the Lease that are not defined in this Motion shall have the meanings ascribed to them in the Lease.

Bayley Seton Campus, all easements, leases, contracts and other agreements entered into on or after the Commencement Date, and certain other obligations specified in the Bayley Seton Lease.

(g) <u>Indemnification</u>. The Bayley Seton Lease provides that Ground Tenant must indemnify SVCMC for its obligations under the Bayley Seton Lease.

(h) <u>USFHP</u>. Pursuant to a contract (the "**USFHP Contract**") with the United States Department of Defense, the Debtors currently operate the USFHP. The Ground Tenant may not use or occupy, nor permit or suffer the Premises or any part thereof to be used or occupied, for any purpose which would cause a default under the USFHP Contract or otherwise impair SVCMC's ability to continue to perform under the USFHP Contract.

(i) <u>Put Option</u>. Pursuant to the Put Option, SVCMC may cause the Ground Tenant to acquire fee title to the Bayley Seton Campus at any time during the term of the Bayley Seton Lease by delivering, at its sole discretion, a quit claim deed to the Ground Tenant, who will be obligated to pay $1.00 in consideration therefor. In the event that the Debtors exercise the Put Option, the Bayley Seton Campus will be transferred to the Ground Tenant free and clear of claims, liens, or encumbrances, as provided for in the Sale Order.

(j) <u>Call Option</u>. Pursuant to the Call Option, in the event the Debtors, in their sole and absolute but good faith discretion, determine that continued ownership of the Bayley Seton Campus is no longer a requirement of the USFHP Contract or of the Debtors' right to the USFHP Contract, and that a transfer of the Bayley Seton Campus is not a violation of the USFHP Contract or would not call into question Debtors' right to the USFHP Contract or its right to assign the USFHP Contract to a party other than the Ground Tenant following exercise of the Call Option, the Ground Tenant will have the option to purchase the Bayley Seton Campus for $1.00 in consideration therefor. In the event that the Ground Tenant exercises the Call Option, the Bayley Seton Campus will be transferred to the Ground Tenant free and clear of claims, liens, or encumbrances, as provided for in the Sale Order.

**D. Avoidance and Successor Liability**

38. Other than the obligations expressly assumed by the Purchasers under the APAs, Receivership Agreement, the Patient Bed Lease, and the Bayley Seton Lease for preclosing liabilities, the parties intend that the transfer of the SEA Assets and entry into the Bayley Seton Lease to the Purchasers (i) will not constitute avoidable transfers under applicable

bankruptcy or non-bankruptcy law and (ii) will not subject the Purchasers to any liability other than the Assumed Liabilities with respect to the operation of the Debtors' business prior to the closing by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability. Without limiting the foregoing, Purchaser will not be liable (i) as a successor, (ii) under the APA, or (iii) under any other basis for any liabilities or responsibility with respect to the Pension Plan, including without limitation, for any and all claims under any provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), including Title IV of ERISA, or under any other statute, regulation or common law principle, whether such liability or claim arose prior to the Closing Date (as defined in the APA) or arises on or after the Closing Date. Nothing in the Sale Order is intended to affect any independent rights that the PBGC may have against such purchasers beyond the sale transaction described herein.

### E. DOH Regulatory Approval Process

39. Approval of the transfer of the SEA Assets requires approval from the DOH.[17] See N.Y. Pub. Health Law § 2801-a, et seq. In accordance with section 2801-a of the New York Public Health Law, an applicant proposing to establish and operate a nursing home must make written application for authorization (the "DOH Application") to the Commissioner of the DOH (the "Commissioner"). The Commissioner will not act on the DOH Application

---

[17] In addition to the transfer of the SEA Asset, the Receivership Agreement is subject to approval by the DOH. See N.Y. Pub. Health Law § 2810. Pursuant to section 2810 of the New York Public Health Law, at the request of a nursing home operator, the DOH may approve the appointment of a receiver. In reviewing the Receivership Agreement, the DOH evaluates the character and competence of the receiver and its shareholders and financial feasibility of the proposed receivership. The DOH also considers a commitment by the receiver to make an application to become the permanent operator.

until it is approved by the Public Health Council. The Commissioner will only approve an application if it is satisfied as to: (a) the public need for the nursing home; (b) the financial resources of the proposed nursing home; (c) the character, competence, and standing in the community of the proposed incorporators, directors, sponsors, stockholders, members or operators of the proposed nursing home; and (d) such other matters as it shall deem pertinent. See N.Y. Pub. Health § 2801-a.

40. Accordingly, the APAs provide that the Purchasers shall, at their own cost and expense, (i) within five business days of the date of the APAs, cooperate with the Seller in initiating informal discussions with DOH concerning the form and substance of the DOH Application; (ii) within the later of 45 days from signing the APAs or two business days after the Purchasers' receipt of notice of the entry of the Sale Order formally submit the DOH Application; and (iii) promptly after the entry of the Sale Order by the Court, submit to any other governmental body all other applications for any healthcare regulatory consents required on the part of the Purchasers in order for the Purchasers to consummate the sale and to operate the business in accordance with applicable law (collectively with the DOH Application, the "**Healthcare Applications**").[18]

41. In addition, the parties shall cooperate in the preparation and prosecution of the Healthcare Applications. The Purchasers shall use best efforts to prosecute the Healthcare Applications and to timely submit all information and documents requested in connection therewith by DOH and any other governmental body. The Purchasers shall promptly take such actions as may be reasonably necessary to cure any character or competency objection that DOH

---

[18] An important part of the stalking horse bid is the agreement of the Purchasers to use their best efforts to obtain regulatory approvals and closed on or before September 15, 2011. The Debtors will factor this agreement to proceed expeditiously in evaluating any competing qualified bids.

may raise to the DOH Application, including removing or replacing any officer or director that fails to obtain character and competency approval from DOH. Both the Purchasers and the Seller will provide the other with prompt written notice of a party's submission of a Healthcare Application. Each party shall provide the other party with periodic reports of a party's efforts to obtain all Healthcare Regulatory Approvals. In addition, the Purchasers shall provide the Seller with notice as promptly as practicable of their receipt of DOH's approval, contingent approval or a rejection of the DOH Application, along with a copy of any documentation related thereto. The Purchasers shall not knowingly take any action prior to the closing intended to disqualify the Purchasers as an established and licensed operator of the business.

**F. Applicable Non-Bankruptcy Law**

42. In addition to complying with the DOH regulatory approval process, the New York Not-for-Profit Corporation Law ("**N-PCL**") provides certain findings must be made when a not-for-profit disposes of substantially all of its assets as a matter of applicable non-bankruptcy law.[19] Section 510 of the N-PCL provides that the board of a "Type D" not-for-profit corporation must request permission of the New York Supreme Court in the jurisdiction where the corporation is located prior to the sale, lease, exchange or other disposition of all, or substantially all, the assets of such a corporation.[20] See, N-PCL §§ 201(c) and 510(a)(3). St. Elizabeth Ann's is a "Type D" not-for-profit corporation, and the assets being sold pursuant to the APAs constitute substantially all of its assets. However, when a case is commenced under the Bankruptcy Code, under section 363(d), this Court may make the required substantive

---

[19] The provisions of the N-PCL do not contemplate that the selling entity would already be subject to a judicial proceeding and oversight, such as being a debtor under the Bankruptcy Code.

[20] The purpose of this provision is to provide for judicial oversight. Absent bankruptcy, the applicable court would be the New York State Supreme Court. However, in a bankruptcy proceeding, this Court has the standing to make such an adjudication. See 28 U.S.C. §§ 157(b) and 1334.

findings under the N-PCL and any applicable state law contemplated thereby. See 28 U.S.C. §§ 157(b) and 1334. As described in greater detail below, the Debtors believe the transaction complies with applicable non-bankruptcy law.

### G. **Bidding Procedures**

43. Prior to the filing of this Motion, the Brokers contacted approximately 122 potential purchasers and assisted 21 potential purchasers with due diligence on the SEA Assets. The Brokers believe that they have identified the group of potential competing bidders. Immediately following the filing of this Motion, the Brokers will be sending this Motion and the stalking horse agreements to the potential bidders to ascertain their continued interest. Accordingly, the marketing process – which has been ongoing – will be continuing promptly with the filing of this Motion (and the Brokers will not be awaiting the entry of the Bidding Procedures Order to continue their marketing efforts).

44. The Debtors seek approval of the Bidding Procedures to ensure that the maximum value is obtained for the SEA Assets. The following is a summary of certain provisions of the Bidding Procedures pertaining to the solicitation of Competing Bids and the conduct of the Auction:[21]

> (a) Qualification of Bids and Bidders. In order to participate in the bidding process and to have a bid considered by the Debtors, each potential bidder must deliver a written offer or group of offers satisfying criteria set forth in the Bidding Procedures. A "**Qualified Bidder**" is a potential bidder that delivers a binding bid that in the Debtors' discretion after consultation with the Secured Creditors and the Committee satisfies such criteria.

> (b) Individual Bids. The Debtors reserve the right, in their discretion (in consultation with the Secured Creditors and the Creditors' Committee), to accept bids for the SEA Assets and/or the Bayley Seton Lease together or separately. As such, the Debtors will consider Qualified Bids for (i) the

---

[21] To the extent that there are any inconsistencies between the summary description of the Bidding Procedures contained herein and (i) the terms and conditions of the APAs and/or (ii) the Bidding Procedures, the terms of the Bidding Procedures control.

SEA Assets alone, (ii) the Bayley Seton Lease alone, or (iii) both of the SEA Assets and the Bayley Seton Lease; provided however, that any bid that provides for the purchase of the SEA Assets alone must submit a bid for (x) a sale transaction that includes the continued operation of the 72 neurobehavioral beds located on the Bayley Seton Campus under the Patient Bed Lease and (y) a sale transaction that does not include the continued operation of the 72 neurobehavioral beds located on the Bayley Seton Campus under the Patient Bed Lease. In the event that bids are considered that provide (i) solely for entry into the Bayley Seton Lease without the purchase of the SEA Assets or (ii) solely for the purchase of the SEA Assets without entry into the Bayley Seton Lease, the Debtors (in consultation with the Secured Creditors and the Committee) shall establish the required Minimum Bid (defined below) and the Bid Increment (defined below) for each such bids.

(c) Minimum Bid. The amount of the purchase price in any bid for all of the Assets (i.e., both the SEA Assets and the Bayley Seton Lease) must provide for net cash (or cash equivalent) that is at least $50,000 more than the purchase price contained in the APAs and Bayley Seton Lease plus the amount of the Break-Up Fee (the "**Minimum Bid**"). In the event that individual bids are submitted for less than all of the Assets (i.e., either the SEA Assets or the Bayley Seton Lease), the aggregate of the purchase price of such bids for (i) the SEA Assets and (ii) the Bayley Seton Lease must equal the Minimum Bid. If competing bids are submitted only for the SEA Assets or only for the Bayley Seton Lease, then the purchase price for such bid(s) must equal the Minimum Bid. Any bid for the SEA Assets must comply with the requirements of paragraph 6(c) above (i.e., a bid with and a bid without the continued operation of the 72 neurobehavioral beds located on the Bayley Seton Campus under the Patient Bed Lease).

(d) Deposit. A potential bidder for the SEA Assets (with or without the Bayley Seton Lease as a part of such bid) must deposit 10% of the initial purchase price set forth in its modified purchase agreement with an escrow agent selected by the Debtors at least three business days before the Auction. A potential bidder for the Bayley Seton Lease alone must deposit $500,000 with the Deposit Agent in the form of a certified check or wire transfer at least three business days before the Auction (the "Bayley Seton Deposit" together with the SEA Deposit, the "**Deposit**").

(e) Auction. In the event that there is more than one Qualified Bidder for the SEA Assets and/or the Bayley Seton Lease, the Debtors shall conduct the Auction. The Auction will take place at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036 on July 19, 2011 starting at 9:00 a.m. (prevailing Eastern Time), or at such other place, date and time as may be designated by the Debtors at or prior to the Auction. July 19th will be 40 days notice to

potential bidders from the filing of the Motion. The Auction will be conducted openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid.

(f) <u>Bidding</u>. Bidding at the Auction shall commence at the amount of the highest or otherwise best Qualified Bid submitted prior to the Auction; Qualified Bidders for all of the assets (including the SEA Assets and entry into the Bayley Seton Lease) may then submit successive bids in increments of $50,000 (the "**Bid Increment**"); provided, however, that the Debtors shall retain the right, subject to the reasonable consent of the Committee and Secured Creditors, to modify the Bid Increment at the Auction. In the event that there are Qualified Bids for only the SEA Assets or only the Bayley Seton Lease, the Debtors, in consultation with the Committee and the Secured Creditors, will establish the Bid Increment for the SEA Assets and/or the Bayley Seton Lease (as applicable) at the Auction.

(g) <u>Higher or Better</u>. The Debtors reserve the right, in their discretion (in consultation with the Secured Creditors and the Committee) to determine whether any bid is better, if not higher, than another bid submitted during the Auction. The Debtors may consider a variety of factors in making this decision, including, without limitation, the ability of the applicable Qualified Bidder to obtain the necessary regulatory approvals, any proposed conditions to closing, and timing of any closure of the proposed transaction.

(h) <u>Successful Bid</u>. The Auction shall continue until the Debtors determine, in their discretion (after consultation with the Secured Creditors and the Committee) and subject to Court approval, which offer is (or in the case of separate offers for the SEA Assets and the Bayley Seton Lease, which offers are) the highest or otherwise best offer from among the Qualified Bids submitted at the Auction (such bid or bids, as applicable, the "**Successful Bid(s)**"). The bidder submitting such Successful Bid(s) shall become the "**Successful Bidder**," and shall have such rights and responsibilities of the Purchasers, as set forth in the modified APAs, or the APAs, as applicable.

(i) <u>Backup Bid</u>. At the conclusion of the Auction, the Debtors also intend to announce the second highest or otherwise best bid(s), from among the Qualified Bids submitted at the Auction (the "**Backup Bid**"). The bidder(s) submitting such Backup Bid(s) shall become the "**Backup Bidder**," and shall have such rights and responsibilities of the Purchasers, as set forth in the Modified APAs, Modified Bayley Seton Lease or the APAs, as applicable. The Backup Bid shall remain open and irrevocable until five business days following entry of the Sale Order.

### H.  Auction and Sale Hearing Notice

45.    Within three business days of entry of the Bidding Procedures Order, the Debtors will serve copies of the Bidding Procedures and the Auction and Sale Hearing Notice on the following parties: (a) the Special and General Service Lists as those terms are defined in the First Amended Final Administrative Order Establishing Case Management Procedures (the "**Case Management Order**") entered by the Court on September 3, 2010, (b) all counterparties to the Assumed Contracts and Leases, (c) all potential purchasers for the SEA Assets and/or Bayley Seton Lease identified by the Debtors,[22] and (d) any other party known to the Debtors to have or assert an interest in any of the SEA Assets and/or the Bayley Seton Lease.  The Debtors also propose to publish the Auction and Sale Notice in the Local Edition of the New York Times pursuant to Bankruptcy Rule 2002(l).  In addition, the Debtors will send the General Creditor Notice (as defined below) to all known creditors listed on the schedules of liability for St. Elizabeth Ann's.

### I.  Assumed Contracts and the Assignment Procedures

46.    Pursuant to the Nursing Home Agreement, the Assumed Contracts and Leases consist of certain executory contracts (the "**Assumed Contracts**") and unexpired leases (the "**Assumed Leases**," together with the Assumed Contracts, the "**Assumed Contracts and Leases**") designated to be assumed by the Debtors and assigned to the Purchasers.[23]  In order to ensure the orderly assignment of the Assumed Contracts and Leases and the timely resolution of

---

[22] As noted above, the Brokers will also send the Motion and stalking horse agreements to such potential purchasers promptly following the filing of the Motion.

[23]  As noted above, the APAs contemplate the assumption and assignment of only St. Elizabeth Ann's Medicaid and Medicare provider agreements.  However, the Debtors seek establishment of the Assignment Procedures in the event a Competing Bid contemplates the assumption and assignment of additional executory contracts or unexpired leases.

objections thereto, the Debtors seek approval of the Assignment Procedures. The following is a summary of certain provisions of the Assignment Procedures:[24]

(a) Initial Notice of Assumed Contracts and Leases. Within three business days, after entry of the Bidding Procedures Order, the Debtors will serve by first class mail an omnibus notice (the "**Initial Assignment Notice**") on each counterparty ("**Counterparty**") to the Assumed Contracts and Leases, substantially in the form attached as **Annex 4** to the Bidding Procedures Order. The Initial Assignment Notice shall include an exhibit with, among other things, the cure amount asserted by the Debtors that is necessary to cure any default under the relevant Assumed Contract or Assumed Lease pursuant to section 365 of the Bankruptcy Code (the "**Cure Amount**").

(b) Initial Objections. To the extent that any interested party wishes to object to any matter pertaining to the assumption and assignment of an Assumed Contract or Assumed Lease, then such interested party must file a written objection with the Court no later than July 8, 2011 at 4:00 p.m. (prevailing Eastern Time) (the "**Initial Objection Deadline**").

(c) Supplemental Notice of Assumed Contracts and Leases. Within one business day after the conclusion of the Auction, the Debtors will serve by overnight mail and email or facsimile, where possible, and file with the Court an omnibus notice of the Auction results (the "**Auction Results Notice**"), substantially in the form attached as **Annex 5** to the Bidding Procedures Order, upon each of the Counterparties. If, as a result of the Auction, new executory contracts (each an "**Additional Assumed Contract**") or new unexpired leases (each an "**Additional Assumed Lease**") are to be assumed and assigned by the Debtors, or a different Cure Amount is determined than the one listed in the Initial Assignment Notice (such Cure Amount, an "**Amended Cure Amount**"), then the Auction Results Notice shall include an exhibit setting forth such changes.

(d) Supplemental Objections. To the extent that any interested party wishes to object to the assumption and assignment of such newly added agreements or the Amended Cure Amount, then such party must file a written objection with the Court no later than July 20, 2011 at 12:00 p.m. (prevailing Eastern Time) (the "**Supplemental Objection Deadline**").

(e) Resolution and Adjudication of Objections. Upon filing of an objection by a Counterparty, the Debtors and/or the Purchasers will contact the objecting Counterparty to attempt to consensually resolve any timely

---

[24] To the extent that there are any inconsistencies between the summary description of the Assignment Procedures contained herein and (i) the terms and conditions of the APAs and/or (ii) the Assignment Procedures, the terms of the Assignment Procedures control.

KL2 2673486.30

served objection. If the Debtors and/or the Purchasers are unable to resolve an objection in response to the Initial Assignment Notice or the Auction Results Notice, (i) to the extent such objections (each an "**Adequate Assurance Objection**") relate to the adequate assurance of future performance by the Purchasers, such objections will be heard at the Sale Hearing or (ii) to the extent such objections relate to a Cure Amount, Additional Cure Amount, or Amended Cure Amount, such objections will be heard at a hearing to be scheduled by the Court at the Sale Hearing (the "**Cure Objection Hearing**").

(f) <u>Further Assignments</u>. During the period between the Auction and the Closing, the Purchasers may designate additional executory contracts or unexpired leases for assumption by the Debtors and assignment to the Purchasers (the "**Further Assignments**"). The Debtors shall serve by first class mail an omnibus notice (the "**Further Assignments Notice**") on each counterparty to the Further Assignments, substantially in the form attached as **Annex 7** to the Bidding Procedures Order. To the extent that any interested party wishes to object to any matter pertaining to the Further Assignments, then such interested party must file a written objection (a "**Further Assignment Objection**") with the Court no later than at 4:00 p.m. (prevailing Eastern Time) on the fifteenth day after service of the Further Assignments Notice. In the event a Further Assignment Objection is filed, such objections will be heard at a hearing to be scheduled by the Court.

### J. **Objections to Sale**

47.     The Debtors propose that objections, if any, to entry of the Sale Order (other than objections with respect to cure amounts or adequate assurance of future performance under the Assumed Contracts and Leases, which are subject to the Assignment Procedures), must (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on the Special Service List, as defined in the First Amended Final Administrative Order Establishing Case Management Procedures (the "**Case Management Order**") entered by the Court on September 3, 2010, and the Purchasers, Nutovic & Associates, 488 Madison Avenue, 16th Floor, New York, New York 10022, Attn: Isaac Nutovic, Esq., so as to be actually received by 4:00 p.m. (prevailing Eastern Time) on July 8, 2011 (the "**Objection Deadline**").

48.     In the event the Debtors choose a Successful Bidder or Back-Up Bidder other than the Purchasers at the Auction or the terms of the proposed Sale are modified at the time of the Auction, the Debtors propose the Objection Deadline solely with respect to the Debtors' choice of such alternative Successful Bidder or Back-Up Bidder, or the modifications to the terms of the Sale to the Successful Bidder will be July 20, 2011 at 12:00 pm. (prevailing Eastern Time).

### K. **Sale Hearing**

49.     The Debtors request that the Sale Hearing take place on July 21, 2011 at 11:00 a.m. (prevailing Eastern Time).  The Debtors further request the discretion to adjourn the Sale Hearing from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court.  At the Sale Hearing, the Debtors reserve the right to seek approval for a transaction for the sale of the SEA Assets <u>and</u> the Bayley Seton

Lease together or separate transactions for each of (i) the SEA Assets and (ii) the Bayley Seton Lease.

## EXTRAORDINARY PROVISIONS OF THE PROPOSED SALE ORDER

50.     Pursuant to General Order M-383 of the United States Bankruptcy Court for the Southern District of New York, dated November 18, 2009, establishing this Court's Guidelines for the Conduct of Asset Sales, the Debtors are required to highlight any "extraordinary provisions" in a separate section of a motion seeking to sell the estate's assets. The extraordinary provisions are as follows:

(a) Use of Proceeds.  Under the APAs, proceeds from a sale pursuant to a Competing Bid will be used to pay the Break-Up Fee.  The Sale Order also provides that liens existing on the SEA Assets will attach to the net proceeds of the sale after taking into account the costs of the sale.  As described in greater detail in the Debtors' application to retain Cain Brothers[25] and Loeb & Troper, upon the successful closing of the sale, Cain Brothers and Loeb & Troper will each be entitled to transaction fees equal to 0.9% of the aggregate transaction value of the sale, subject to a minimum transaction fee equal to the lesser of (x) $350,000 in the case of Cain Brothers or $300,000 in the case of Loeb & Troper, or (y) 2.5% of the aggregate transaction value as calculated in accordance with the Court's order approving their retention (the "**Transaction Fees**"). The sale costs will include costs directly relating to the transaction, including the Transaction Fees.

(b) Interim Arrangements with Proposed Buyer.  As described above, the Debtors may enter into the Receivership Agreement with the Purchasers. As prescribed by the Sale Guidelines, the Debtors seek separate authority to enter into the Receivership Agreement.

(c) Relief from Bankruptcy Rule 6004(h).  The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy Rule 6004(h).  The Debtors submit that such relief is appropriate under the circumstances.

(d) Successor Liability. The proposed form of Sale Order contains findings and provisions limiting the Purchasers' successor liability. The Debtors

---

[25] As noted above, subject to approval of the Court through a separate application, references to the Transaction Fee payable to Cain Brothers will include that portion of the fee to be paid to Cain Brothers (two-thirds) and that portion payable to Morgan Keegan (one-third).

believe that a finding that the sale can be made free and clear of successor liability claims in the Sale Order complies with applicable principles of sales free and clear of successor liability claims pursuant to section 363(f) of the Bankruptcy Code and applicable non-bankruptcy law. In addition, the Debtors are providing notice of the sale as set forth herein (including publication notice).

**BASIS FOR RELIEF**

**A. The Bidding Procedures Should Be Approved**

51.     The Bidding Procedures, which are standard for the sale of assets in large chapter 11 cases, will ensure that the Debtors' estates receive the greatest benefit available from the sale of the SEA Assets and entry into the Bayley Seton Lease. The Bidding Procedures have been structured to attract the maximum number of Qualified Bids for the SEA Assets and/or the Bayley Seton Lease while allowing the Debtors the flexibility to select the bid that provides maximum value to the Debtors' estates. Finally, the Bidding Procedures set out a timeframe that will allow potential purchasers sufficient time to conduct due diligence, arrange financing, and construct and submit informed Competing Bids, while still providing for the expeditious sale of the SEA Assets and/or entry into the Bayley Seton Lease. The Brokers have previously reached out to potential bidders – having contacted more than 120 potential purchasers and assisted 21 potential purchasers with due diligence on the SEA Assets. From the filing of the Motion until the proposed Auction, bidders will have had approximately 40 days' notice of the stalking horse agreements against which to submit a qualified bid. The Debtors submit that the Bidding Procedures are reasonably designed to ensure that the Debtors and their estates receive the maximum benefit available from the sale of the SEA Assets and/or entry into the Bayley Seton Lease, and therefore warrant Court approval. Importantly, these Bidding Procedures conform to those recently approved by the Court in these Chapter 11 cases for Holy Family Home and Bishop Mugavero. See Docket Nos. 771 and 772.

KL2 2673486.30

### B. **The Break-Up Fee Should Be Approved**

52. The Debtors are also requesting approval of the Break-Up Fee in the amount of $680,000 (i.e., 2% of the cash Purchase Price). The Break-Up Fee is only payable upon consummation of a Competing Bid with respect to the SEA Assets or in the event the Competing Bid does not close, through a chapter 11 plan or chapter 7 liquidation. The Purchasers required the inclusion of this customary break-up fee to be willing to serve as a stalking horse bidder. As set forth herein, the Purchasers' joint bid establishes an appropriate floor value for the SEA Assets and entry into the Bayley Seton Lease after months of marketing and discussions with numerous potentially interested bidders.

53. Bankruptcy courts have approved bidding incentives similar to the Break-Up Fee under the "business judgment rule," and such arrangements are presumptively valid provided that (i) the Debtors' decision to agree to the break-up fee is not tainted by bad faith or self-dealing, (ii) the break-up fee does not hamper bidding, and (iii) the amount of the break-up fee is reasonable. See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656-57 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). A break-up fee serves as an "incentive payment" offered to an unsuccessful bidder who places the debtor's property in a "sales configuration mode," thereby attracting other bidders to the auction. Specifically, break-up fees (i) attract or retain a potentially successful bid, (ii) establish a bid standard or minimum for other bidders to follow, and (iii) attract additional bidders. Integrated Res. at 661-62.

54. In the instant case, the Break-Up Fee is the product of good faith, arm's-length negotiations between the Debtors and the Purchasers, each of whom was represented by counsel. The Break-Up Fee provides a material benefit to the estates by enabling the Debtors to obtain the commitment of the Purchasers which has and will continue to expend money, time and

effort formulating and negotiating an offer for the SEA Assets and entry into the Bayley Seton Lease, notwithstanding that the APAs and the Bayley Seton Lease, together or separately, are subject to higher or better offers. In the Debtors' business judgment, the Break-Up Fee is fair and reasonable when considering the time, effort, cost, and expense that the Purchasers incurred in negotiating the transaction. Indeed, the sale contemplated by the transaction is higher and better than any other expression of interest for the SEA Assets alone to date. If higher or better offers for the SEA Assets are received, such offers are the direct result of the Purchasers serving as a "stalking horse bidder" for those assets.

55. Moreover, the Break-Up Fee does not hamper any other party's ability to offer a higher or better bid. Given the size of the Break-Up Fee relative to the total amount of consideration, and relative to the "overbid" requirements set forth in the Bidding Procedures, the fee is not so large as to have a "chilling effect" on other prospective bidders' interest. Because they have created a floor for any additional bids, the Purchasers provided significant value to the Debtors' estates. The Debtors submit that the Break-Up Fee is appropriate under these unusual circumstances.

56. In addition, the Break-Up Fee is reasonable in relation to the size of the proposed sale and under the facts and uncertainties of this transaction. The Break-Up Fee is 2% of the cash purchase price, an amount similar to other break-up fees approved in the Southern District of New York in other large chapter 11 cases. See, e.g., In re Cabrini Med. Ctr., Case No. 09-14398 (AJG) (Bankr. S.D.N.Y. Dec. 30, 2009) (approving a break-up fee of 3.75% of $80 million sale); In re Bearingpoint, Inc., No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) (approving a break-up fee of 3% of a $350 million sale); In re Loral Space & Commc'ns Ltd., No. 03-41710 (RDD) (Bankr. S.D.N.Y. Aug. 18, 2003) (approving a break-up fee of 2% of $1

billion sale); <u>In re Magellan Health Servs., Inc.</u>, No. 03-40515 (PCB) (Bankr. S.D.N.Y. Apr. 7, 2003) (approving discrete termination and commitment fees of 2% and 3%, respectively, in connection with a $30-$50 million equity commitment); <u>In re Adelphia Bus. Solutions, Inc.</u>, No. 02-11389 (REG) (Bankr. S.D.N.Y. Dec. 16, 2002) (approving a termination fee of 2.5% of $10.7 million sale); <u>In re Bradlees Stores, Inc.</u>, No. 00-16035 (BRL) (Bankr. S.D.N.Y. Jan. 11, 2001) (approving a termination fee of 2% of $150 million sale); <u>Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)</u>, 147 B.R. 650, 662 (S.D.N.Y. 1992) (approving termination fee of 3.2% of the $190 million out-of-pocket costs for $565 million sale), <u>appeal dismissed</u>, 3 F.3d 49 (2d Cir. 1993).

57. Finally, the size of the proposed Break-Up Fee is consistent with the other break-up fees approved by the Court in these Chapter 11 Cases. <u>See</u> Docket Nos. 292, 641, 642, 771, and 772.

### C. The Auction and Sale Hearing Notice Should Be Approved

58. Pursuant to Bankruptcy Rules 2002(c) and 6004, the Debtors are required to give 21 days' notice of any proposed sale of property not in the ordinary course of business. Bankruptcy Rule 2002(c) further provides that such notice must include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale. The Auction and Sale Hearing Notice sets forth all the information a potential bidder and any other party-in-interest should require about the bidding process, including: notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; the Bid Deadline; the time, date, and location of the Auction; and the time, date, and location of the Sale Hearing.

59. The Debtors submit that the Auction and Sale Hearing Notice complies fully with Bankruptcy Rule 2002, Local Bankruptcy Rule 2002-1 and General Order M-331, and constitutes good and adequate notice of the sale and the proceedings with respect thereto.

Because the Debtors are providing notice of this Motion, the Bidding Procedures, and the Assignment Procedures to the Notice Parties and the Counterparties in advance of the Auction, the Debtors submit that the notice requirements of Bankruptcy Rules 2002(2) and 6004 are satisfied.

60.     The Debtors also propose to publish the Auction and Sale Notice in the Local Edition of the <u>New York Times</u> pursuant to Bankruptcy Rule 2002(l).  Therefore, the Debtors respectfully request that the Court approve the Auction and Hearing Notice and the notice procedures proposed above.  The Debtors will also send the General Creditor Notice (as defined below) to all known creditors listed on the schedules of liability for St. Elizabeth Ann's, which is the applicable Debtor that owns the not-for-profit assets being sold.

### D.  <u>The Sale of the SEA Assets Should Be Approved</u>

61.     Section 363(b) of the Bankruptcy Code governs transactions outside the ordinary course of business involving property of a debtor's estate.  Specifically, that section provides, in relevant part, that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate..."  The Debtors' sale or use of property of the estates outside the ordinary course of business should be approved by the Court if the Debtors can demonstrate a sound business justification for the proposed transaction. See <u>In re Chrysler LLC</u>, 576 F.3d 108, 117-18 (2d Cir. 2009), citing <u>In re Iridium Operating LLC</u>, 478 F.3d 452, 466 (2d Cir. 2007) ("In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.'" (citing <u>Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063, 1071 (2d Cir. 1983)); <u>see</u> <u>also</u> <u>In re Gen. Motors Corp.</u>, 407 B.R. 463,

494-5 (Bankr. S.D.N.Y. 2009) (noting that sales under § 363(b) are "commonly" approved subject to the business judgment rule).

62.     In addition, section 105(a) of the Bankruptcy Code grants the Court the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  This provision is "the basis for a broad exercise of power [by the Court] in the administration of a bankruptcy case."  2 COLLIER ON BANKRUPTCY ¶105.01 (Lawrence P. King, et al. eds., 15th ed. rev. rel. 2000).

63.     A sound business justification exists for the sale here because it will allow the Debtors to: (i) monetize the SEA Assets for the benefit of the Debtors' estates and creditors, and (ii) avoid the incurrence of any carrying costs associated with the SEA Assets and the Bayley Seton Campus.  Moreover, given (i) the thorough marketing of the SEA Assets, (ii) the significant cash Purchase Price and Deposit being offered by the Purchasers; (iii) the Purchasers' willingness to promptly consummate the sale on an "as is, where is" basis; and (iv) the further market testing of the transactions at the Auction proposed herein, the Debtors submit that the sale of the SEA Assets and related transactions, including entering into the Bayley Seton Lease, is fair, reasonable, and in the best interests of the Debtors' estates.

64.     Finally, any concern that the Debtors may be able to sell the SEA Assets on better overall terms than those provided for in the APAs should be allayed by the fact that the transaction, including entry into the Bayley Seton Lease, will be tested through the Bidding Procedures and at the Auction.  As such, the Debtors submit that the sale of the SEA Assets and related transactions is an exercise of the Debtors' sound business judgment and warrants approval by the Court.

KL2 2673486.30

### E. The Assets Should Be Sold Free and Clear

65.    Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property under section 363(b) of the Bankruptcy Code free and clear of liens, claims and encumbrances if one of the following conditions is satisfied:

1.    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

2.    the entity holding the lien, claim or encumbrance consents to the sale;

3.    the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property;

4.    the interest is in bona fide dispute; or

5.    the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See In re Smart World Tech., LLC, 423 F.3d 166, 169 n.3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests...  It thus allows purchasers… to acquire assets [from a debtor] without any accompanying liabilities."); In re Dundee Equity Corp., No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.").

66.    The Debtors request that the Court authorize the sale of the SEA Assets (and the exercise of the Put Option and Call Option under the Bayley Seton Lease) free and clear of all interests, other than those identified in the APAs and the Bayley Seton Lease (the "**Permitted Liens**").  Thus, the sale of the SEA Assets and related transactions pursuant to the Bidding Procedures will satisfy section 363(f)(1) of the Bankruptcy Code because any entities holding interests in the SEA Assets and related assets will have received notice of this Motion and the Auction and Sale Hearing Notice.

- 40 -

67. Section 363(f)(2) of the Bankruptcy Code is satisfied as to those parties that consent or do not object to the proposed sale. Here, all parties-in-interest will be given sufficient opportunity to object to the relief requested in this Motion, and any such entity that does not object to the sale should be deemed to have consented. See Futuresource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent... It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); In re Enron Corp., 2004 WL 5361245 at *2 (Bankr. S.D.N.Y. 2004) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)). As such, to the extent that no party holding an interest objects to the relief requested in this Motion, the sale of the SEA Assets and related assets (including the exercise of the Put Option and Call Option under the Bayley Seton Lease) free and clear of all interests except the Permitted Liens satisfies section 363(f)(2) of the Bankruptcy Code.

68. Section 363(f)(3) of the Bankruptcy Code is satisfied because the price at which the Debtors' property is to be sold is greater than the economic value of the liens on the SEA Assets and related assets (including the exercise of the Put Option and Call Option under the Bayley Seton Lease). While the face value of the liens asserted against the SEA Assets and

related assets (including the exercise of the Put Option and Call Option under the Bayley Seton Lease) exceeds the Purchase Price currently offered by the Purchasers, the economic value of the SEA Assets and related assets has been determined by the market and there is the possibility that an auction will result in a higher and better bid. A sale can be made free and clear of any liens pursuant to section 363(f)(3) of the Bankruptcy Code so long as the purchase price exceeds "the aggregate value of all liens on such property." While the interpretation of section 363(f)(3) has produced some division in the courts, this Court has adopted the better-reasoned view that the "aggregate value of all liens" means the actual economic value placed on the liens – not the face amount of the liens. In re Levitz Home Furnishings, Inc., No. 05-45189 (BRL) (Bankr. S.D.N.Y. Dec. 14, 2005) (rejecting creditor's "face value" argument, finding requirements of section 363(f) satisfied and interest of secured creditors adequately protected by attachment of their liens to sales proceeds); In re Oneida Lake Dev., Inc., 114 B.R. 352, 356-57 (Bankr. N.D.N.Y. 1990) (value and not amount of liens is what the court must look at in applying section 363(f)(3)). Here, the value offered under the transaction documents is greater than the amount offered by any other party-in-interest and remains subject to higher and better offers after what has been a thorough marketing effort. Accordingly, section 363(f)(3) is satisfied.

69.     Lastly, section 363(f)(5) of the Bankruptcy Code is also satisfied. Any entity holding an interest in the SEA Assets and related assets not included in the Permitted Liens could be compelled to accept a monetary satisfaction of its interest. Furthermore, the Debtors propose that any interest in the SEA Assets and related assets that is not included in the Permitted Liens shall attach to the net proceeds of the sale of those SEA Assets and related assets subject to any claims and defenses the Debtors may possess with respect thereto, in the priority they had before the sale. As such, the sale of the SEA Assets and related assets (including the

exercise of the Put Option and Call Option under the Bayley Seton Lease) free and clear of all interests other than Permitted Liens satisfies section 363(f)(5) of the Bankruptcy Code.

**F. Successor Liability**

70.     The Debtors also seek to sell the SEA Assets and related assets free and clear of any successor liability claims related to the SEA Assets and related assets, other than monetary liability arising out of the Assumed Liabilities and any preclosing liabilities being assumed under the Receivership Agreement, which the Purchasers agreed to assume. Notwithstanding the reference to a conveyance free and clear of "any interest" in section 363(f), that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims, as well.  See, e.g., In re Gen. Motors Corp. (n/k/a Motors Liquidation Corp.), Case No. 09-50026 (REG) (Bankr. S.D.N.Y. Jul. 5, 2009) (authorizing sale of assets free and clear of successor liability claims); In re Old Carco LLC (f/k/a/ Chrysler LLC), Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Jun. 1, 2009) (same); see also In re Trans World Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program).

71.     Here, the sale is dependent on the ability of the Debtors to transfer the SEA Assets and related assets (including the exercise of the Put Option and Call Option under the Bayley Seton Lease) free and clear from successor liability, other than monetary liability, if any, arising out of the Assumed Liabilities and any preclosing liabilities being assumed under the Receivership Agreement.  In order to be able to dispose of their various non-hospital business segments, the Debtors must be able to transfer these assets free and clear from potential successor liability claims, other than monetary liability, if any, arising out of the Assumed Liabilities and any preclosing liabilities being assumed under the Receivership Agreement. Indeed, the transfer of the SEA Assets and related assets (including the exercise of the Put

Option and Call Option under the Bayley Seton Lease) free and clear of successor liability claims is a critical inducement for the Purchasers to enter into the transaction. See Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997) (stating that a sale pursuant to § 363 of the Bankruptcy Code "maximizes the purchase price of assets because without this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property").

72.     Furthermore, pursuant to New York law and traditional common law, a purchaser of another company's assets will be found to be liable for the seller's liabilities only where (i) the successor expressly or impliedly assumes the predecessor's tort liability, (ii) the seller and purchaser merged or otherwise consolidated, (iii) the purchaser is a mere continuation of the seller, or (iv) the transaction is fraudulent. See N.Y. v. Nat'l Serv. Indus., Inc., 460 F.3d 201, 209 (2d Cir. 2006). A finding by the Court that the transfer of the SEA Assets and related assets is free and clear of any successor liability claims is proper because, except for Purchasers' assumption of monetary liability, if any, arising out of the Assumed Liabilities and any preclosing liabilities being assumed under the Receivership Agreement, none of these circumstances apply to the transaction. See Douglas v. Stamco, Case No. 09-1390-cv, 2010 WL 337043 (2d Cir. Feb. 1, 2010) (holding that sale pursuant to § 363 extinguished successor liability claims where there was no (i) assumption of such liability, (ii) merger of the parties, (iii) mere continuation of the seller, or (iv) fraud).

73.     Accordingly, the SEA Assets and related assets (including the exercise of the Put Option and Call Option under the Bayley Seton Lease) should be transferred to the Purchasers free and clear of all liens, claims, encumbrances and other interests, including rights

or claims based on any successor liability, except for the Assumed Liabilities and any preclosing liabilities being assumed under the Receivership Agreement.

74.     Nothing in the Sale Order is intended to affect any independent rights that the PBGC may have against the purchaser(s) beyond the sale transaction described herein.

**G.   The Purchasers are Good Faith Purchasers**

75.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) was later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)]… does not affect the validity of a sale… to an entity that purchased… such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale… were stayed pending appeal."

See Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m)… provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

76.     Although the Bankruptcy Code does not define "good faith," the Second Circuit, in In re Gucci, has held:

> Good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the

> trustee, or an attempt to take grossly unfair advantage of other bidders."

126 F.3d at 390 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m) of the Bankruptcy Code)); see also Bace v. Babbitt, No. 07 Civ. 2420 (WHP), 2008 WL 800579, at *3 (S.D.N.Y. Mar. 25, 2008) (same; quoting Gucci).

77.    The Second Circuit has indicated that a party would have to show fraud or collusion between a buyer and the debtor-in-possession or trustee in order to demonstrate a lack of good faith.  See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276, (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); see also In re Angelika Films 57th, Inc., Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. 1997); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

78.    Here, the Purchasers – who are not "insiders" of the Debtors under section 101(31) of the Bankruptcy Code – and the Debtors satisfied the requirements of section 363(m). The APAs, the Bayley Seton Lease, and other transaction documents are the result of extended arm's-length, good faith negotiations between the Debtors and the Purchasers, and their respective professionals represented each party.  Accordingly, the Purchasers are "good-faith" purchasers within the meaning of section 363(m) of the Bankruptcy Code and should be entitled to its protection.  Therefore, the Debtors request that the Court make a finding that the Purchasers are entitled to the protections of section 363(m) of the Bankruptcy Code.

79.    To the extent that the Purchasers are not the Successful Bidder(s) at the Auction, the Debtors will seek a finding from the Court at the Sale Hearing that the Successful

Bidder(s) is (are) good faith purchaser(s) entitled to the protections of section 363(m) of the Bankruptcy Code, as well as an identical finding with regard to the Backup Bidder.

### H.  The Sale Complies with Applicable Nonbankruptcy Law

80.     Sections 363(d) and 541(f) of the Bankruptcy Code require that the transfer of property by a not-for-profit corporation comply with applicable nonbankruptcy law governing such a transfer.  Specifically, section 363(d) provides that "[t]he trustee may use, sell or lease property under subsection (b) or (c) of this section only – (1) in accordance with applicable nonbankruptcy law that governs the transfer of property by a corporation that is not a moneyed, business or commercial corporation. . ."  Section 541(f) further provides that "property that is held by a debtor that is a corporation described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code may be transferred to an entity that is not such a corporation, but only under the same conditions as would apply if the debtor had not filed a case . . ."  Pursuant to section 1221 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, sections 363(d) and 541(f) of the Bankruptcy Code are applicable to all cases pending or filed on or after April 20, 2005.

81.     As described above, approval of the transfer of the SEA Assets requires approval of the DOH through the Certificate of Need process.  Pursuant to section 8.6 of the Nursing Home APA, the Purchasers will provide the Debtors a copy of their CON Application and will consult with the Debtors regarding such application and cooperate with the Debtors in initiating informal discussions with DOH concerning the CON Application.  Further, the Purchasers are working diligently to submit to any other governmental body all other applications for any healthcare regulatory consents required on the part of the Purchasers in order for the Purchasers to consummate the sale and to operate the SEA Assets in accordance with applicable law.  The APAs also provide that they are enforceable only to the extent permitted by

law.  The Debtors submit, therefore, that the terms of the APAs comply with all applicable not-for-profit laws, including the not-for-profit laws of the State of New York, and applicable federal law.  As such, the APAs satisfy the requirements of sections 363(d) and 541(f) of the Bankruptcy Code.

82.     In addition, the transaction involves the sale of substantially all of the assets of St. Elizabeth Ann's.  Section 511 of the N-PCL sets forth the substantive requirements for judicial approval in a non-bankruptcy context, which includes providing notice of the sale transaction to the New York Attorney General (the "**NY AG**").    N-PCL § 511(a)-(b).  Additionally, section 511 of the N-PCL requires "[a] description, with reasonable certainty, of the assets to be sold. . .or a statement that it is proposed to sell. . .all or substantially all the corporate assets . . ., a statement of the fair value of such assets, and the amount of the corporation's debts and liabilities and how secured."  N-PCL § 511(a)(4).

83.     Courts have interpreted section 511 of the N-PCL to require (i) a finding that the disposition of substantially all assets is for consideration that is fair and reasonable and (ii) the sale is in the best interests of the corporation and its beneficiaries.  See In re Application of Society for the Prevention of Cruelty to Animals of Upstate New York, Inc., 2 Misc. 3d 644, 644, 773 N.Y.S.2d 789, 790 (Sup. Ct. Saratoga County 2003); 64th Assocs., L.L.C. v. Manhattan Eye, Ear, and Throat Hosp., 2 N.Y.3d 585, 591, 813 N.E.2d 887, 890 (2004).  The standards applied by a court in a non-bankruptcy context under the N-PCL are virtually identical to the factors that this Court considers under section 363 of the Bankruptcy Code when the selling entity is a debtor under the Bankruptcy Code.

84.     Here, the transaction represents fair and reasonable value.  As noted above, the sale will be subject to competitive bidding through the Auction.  It is well-recognized

that the sale of assets pursuant to court-approved auction procedures establishes the fair and reasonable value for such assets.  See In re Gen. Motors. Corp., 407 B.R. 463, 496 (Bankr. S.D.N.Y. 2009)  ("The value generated through the Court approved auction process reflects the market value of [the] assets and the conversion of the assets into cash is the contemplated result under § 363(b).") (citing In re Trans World Airlines, Inc., 2001 Bankr. LEXIS 980, *11 (Bankr. D. Del. Apr. 2, 2001)).  Thus, the value generated from the sale of the SEA Assets and related assets is greater (or equal to) fair market value and all of the net sale proceeds will be used to pay the allowed claims of creditors in these cases.  There will be no excess funds available after payment of these allowed claims to creditors.

85.     In addition, the transaction is in the best interest of the corporation and its beneficiaries in light of prevailing conditions at this time.  See Manhattan Theatre Club, Inc. v. Bohemian Benevolent & Literary Ass'n of City of N.Y., 120 Misc. 2d 1094, 1097, 467 N.Y.S.2d 143, 146 (Sup. Ct. N.Y. County 1983) (holding that a court "should be guided primarily by whether those ends would be realized in light of conditions prevailing at the time the issue is presented to the court" in determining satisfaction of section 511 of the N-PCL ).  First, the selling Debtor is insolvent and, together with its affiliates, is winding up its business affairs through these Chapter 11 Cases. All of the net proceeds from the transaction will be applied to reduce the valid, allowed claims of creditors as part of the Chapter 11 cases.  Second, the transaction provides for a transfer of the Debtor's health care services.  The sale not only benefits creditors from a material paydown of debt but also benefits patients by providing for continuity of health care services.  Failure to approve the transaction would likely result in a closure of the health care services and subsequent piecemeal disposition of its assets – resulting in potentially

lower net sale proceeds and, importantly, negatively affecting patient care. These adverse consequences would not be in the best interest of the corporation and its beneficiaries.

86. As noted, the Debtors submit that the standards required by N-PCL are consistent with those of the Bankruptcy Code in evaluating a transaction of this nature. Section 1221(e) of BAPCPA explicitly states that *"[n]othing in this section shall be construed to require the court in which a case under chapter 11 of title 11, United States Code, is pending to remand or refer any proceeding, issue, or controversy to any other court or to require the approval of any other court for the transfer of property."* Pub. L. No. 109-8, § 1221(e) (2005); <u>see also</u> 3 COLLIER ON BANKRUPTCY ¶ 363.04 (emphasis added). Accordingly, this Court has the jurisdiction to resolve any issues regarding the Debtors' compliance with N-PCL.

87. Finally, the Debtors will serve the notice of this Motion and the transaction in the form attached to the Bidding Procedures Order as **Annex 6** (the "**General Creditor Notice**") on all known creditors listed on the schedules of liability for St. Elizabeth Ann's, which is the applicable Debtor that owns the not-for-profit assets being sold.

**I. Assumption of the Assumed Contracts and Leases and the Assignment Procedures Should be Approved**

88. Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor-in-possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

89. The "business judgment" test is the standard applied by courts in determining whether an executory contract or unexpired lease should be assumed. <u>See</u>, <u>e.g.</u>, <u>In re Old Carco LLC (f/k/a/ Chrysler LLC)</u>, 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009); <u>see also</u> <u>Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures)</u>, 4 F.3d 1095, 1099 (2d Cir. 1993); <u>see also</u> <u>Richmond Leasing Co. v. Capital Bank, N.A.</u>, 762 F.2d 1303, 1311 (5th Cir.

1985) ("[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.")  A court should approve the assumption of a contract under section 365(a) of the Bankruptcy Code if it finds that a debtor has exercised its sound business judgment in determining that assumption of an agreement is in the best interests of its estate.  See, e.g., Old Carco, 406 B.R. at 196-97; In re Child World, Inc., 142 B.R. 87, 89-90 (Bankr. S.D.N.Y. 1992); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr. S.D.N.Y. 1989); see also Sharon Steel Corp. v. National Fuel Gast Distrib. Corp (In re Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989).

90.     When assuming an executory contract, section 365(b) of the Bankruptcy Code requires the debtor to cure any defaults under the contract or provide adequate assurance that it will promptly cure such defaults.  If there has been a default, the debtor must also provide adequate assurance of future performance under the contract.

91.     Assuming and assigning the Assumed Contracts and Leases to the Purchasers or the Successful Bidder pursuant to the Assignment Procedures is an appropriate exercise of the Debtors' business judgment.  As the Debtors are selling the SEA Assets, the Assumed Contracts and Leases will no longer have any value to the Debtors.  By assuming and assigning the Assumed Contracts and Leases to the Purchasers or the Successful Bidder, the Debtors' estate will benefit from avoiding the rejection damages claims that would arise from rejecting the Assumed Contracts and Leases.

92.     As noted above the Debtors will not be assuming and assigning any contracts under the APAs other than the Debtors' Medicare and Medicaid provider agreements.[26]

---

[26] For the avoidance of doubt, the Debtors will not be assuming and assigning the RUMC Lease, which expired by its own terms at the end of this year.

The Purchasers have sufficient capital and financing commitments to provide adequate assurance of future performance on all the Assumed Contracts and Leases and the Debtors are requiring any Qualified Bidder similarly to demonstrate its ability to provide adequate assurance of future performance.

93.     The Assignment Procedures proposed by the Debtors for determining Cure Amounts and providing the Counterparties to the Assumed Contracts and Leases notice and an opportunity to object to the assumption and assignment and/or the Cure Amounts are fair to all parties and satisfy the notice requirements of Bankruptcy Rule 6006(c).

94.     Therefore, because assuming and assigning the Assumed Contracts and Leases to the Successful Bidder(s) avoids the costs of rejecting those executory contracts and unexpired leases and increases the value to be realized from the sale of the SEA Assets, assumption and assignment to the Successful Bidder(s) of the Assumed Contracts and Leases (as amended by the Supplemental Notice of Assumed Contracts and Leases) is clearly an exercise of the Debtors' sound business judgment which warrants approval by this Court.

95.     In addition, as discussed in greater detail above, the assumption and assignment of the Patient Bed Lease pursuant to the terms and conditions of the Nursing Home APA is an important element of the sale transaction to maximize the value of the SEA Assets by ensuring the continued care of those patients who are currently housed on the Bayley Seton Campus. Accordingly, assumption and assignment of the Patient Bed Lease, subject to the terms and conditions of the Nursing Home APA and the Sale Order, should be approved by this Court.

**J.    Entry into the Receivership Agreement Should be Approved**

96.     During the period between entry of the Sale Order and the Closing, the Receivership Agreement is important to both the preservation of Facility's services to its residents and patients and to alleviate the Debtors' estates of the ongoing administrative expense

of operating the Facility. The Debtors seek permission to enter into the Receivership Agreement in their reasonable business judgment. See In re Chrysler LLC, 576 F.3d 108, 117-18 (2d Cir. 2009) (citations omitted). The "business judgment" test is met when the debtor shows that the proposed use of property would be beneficial to the estate. Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

97. Once the debtor articulates a valid business justification, the business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)) (the business judgment rule is satisfied where the debtor acts "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."). Thus, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts generally will not entertain objections to the debtor's conduct." Comm. Of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns Manville Corp.), 60 B.R. 612, 616 (Bank. S.D.N.Y. 1986).

98. The debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Del. 2001) (quoting In re Logical Software, 66 B.R. 683, 686 (Bankr. D. Mass. 1986)); Integrated Resources, 147 B.R. at 656 ("Courts are loath to interfere with corporate decisions absent a showing of bad faith, self interest or gross negligence") (citations omitted).

99.     Here, the ability to enter into the Receivership Agreement represents a sound exercise of the Debtors' business judgment and should be approved. The Receivership Agreement is an important aspect of the transition process, allowing for preservation of value of the Facility prior to the Closing and effectuation of the transaction due to any delay in obtaining regulatory approval for the Closing. Furthermore, under the Receivership Agreement, the Purchasers agree to assume the administrative expense of operating the Facility prior to the Closing, thereby insulating the Debtors' estates from a possible cash drain in the event the Debtors were required to continue to operate the Facility.

**K.  Entry into the Bayley Seton Lease Should be Approved**

100.     The Debtors should be permitted to enter into the Bayley Seton Lease with the Ground Tenant subject to the solicitation of higher or better bids as detailed in the Bidding Procedures. As discussed in greater detail above, the Bayley Seton Lease will immediately eliminate the cash loss upon the estates – approximately $2.5 million in net operating expenses – associated with maintaining the Bayley Seton Campus. The ability to enter into the Bayley Seton Lease shifts these operating costs and, thus, is beneficial. In addition, the Ground Tenant will assume certain liabilities associated with the Bayley Seton property, including environmental liabilities. In light of the costs upon the estates from preserving and operating the Bayley Seton property, the poor condition of the property, and significant costs that would be required to renovate the property for commercial or other use, the Court should therefore approve the Bayley Seton Lease because it is in the best interests of the estates and the creditors.

**L.  Entry into the Patient Bed Lease Amendment Should be Approved**

101.     The Debtors should be permitted to enter into the Patient Bed Lease Amendment. As discussed in greater detail above, the 72 patient beds covered by the Patient Bed Lease represents an important aspect of the healthcare services provided St. Elizabeth

Ann's. Furthermore, the continued operation of the 72 patient beds is necessary to maximize the value of the SEA Assets and health care services. The Patient Bed Lease Amendment will ensure that the Purchasers' may continue to operate the 72 patient beds pending the expansion of the St. Elizabeth Ann's physical plant and relocation of these beds from the Bayley Seton Campus.

**M.  Waiver of 14-Day Stay under Bankruptcy Rule 6004(h)**

102.    Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing a sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of such order. The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). The Debtors believe that such waiver is appropriate here with respect to the Sale Order because all parties that have expressed interest in the SEA Assets will have (i) received notice of this Motion and any entry of the Bidding Procedures Order and (ii) had the opportunity to participate in the Auction at which the Debtors propose to sell the SEA Assets.

**NOTICE**

103.    No trustee or examiner has been appointed in these Chapter 11 Cases. In accordance with the Case Management Order, notice of this Motion has been given to the parties identified on the General Service List and the Special Service List (as such terms are identified in the Case Management Order). The Debtors submit that no other notice need be given.

**NO PREVIOUS REQUEST**

104.    No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested and such other or further relief as is just.

Dated: New York, New York
June 9, 2011

KRAMER LEVIN NAFTALIS & FRANKEL LLP

 /s/  Adam Charles Rogoff
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
*Counsel for Debtors*

# EXHIBIT A TO MOTION

# BIDDING PROCEDURES ORDER

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
In re:                                    :        Chapter 11
                                          :
SAINT VINCENTS CATHOLIC MEDICAL           :        Case No. 10-11963 (CGM)
CENTERS OF NEW YORK, <u>et al.</u>,       :
                                          :
                              Debtors.    :        Jointly Administered
-------------------------------------------------------------X

## ORDER (A) APPROVING BREAK-UP FEE AND BIDDING PROCEDURES FOR THE AUCTION OF THE DEBTORS' ASSETS RELATED TO ST. ELIZABETH ANN'S AND BAYLEY SETON LEASE, (B) SCHEDULING AN AUCTION AND SALE HEARING, AND (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Upon the Motion, (the "**Motion**")[1] of Saint Vincents Catholic Medical Centers of

New York ("**SVCMC**") and certain of its affiliates, as Chapter 11 debtors and debtors-in-

possession (each a "**Debtor**" and collectively, the "**Debtors**")[2] in the above-referenced Chapter

11 cases (the "**Chapter 11 Cases**") for an order (A) approving a Break-Up Fee and bidding

procedures (the "**Bidding Procedures**") for the auction of substantially all of the assets (the

"**SEA Assets**")[3] of Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth

Ann's Health Care & Rehabilitation Center ("**St. Elizabeth Ann's**") and the Bayley Seton Lease

(as defined below), (B) scheduling an auction and sale hearing related thereto, and (C) approving

procedures for the assumption and assignment of certain executory contracts and unexpired

---

[1] Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion.

[2] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc.

[3] As used herein, the term "**SEA Assets**" shall refer to the assets being transferred to the Purchasers (defined herein) pursuant to (i) the APAs (as defined herein) and (ii) in the event (x) the Debtors exercise the put option (the "**Put Option**") contained in section [22.1] of the Bayley Seton Lease (defined herein), or (y) the Ground Lessee (defined herein) exercises its purchase option (the "**Call Option**") contained in section [22.4] of the Bayley Seton Lease, those assets transferred to the Purchasers pursuant to the Put Option or the Call Option.

leases related thereto (the "**Assignment Procedures**"), all as more fully set forth in the Motion; and the Debtors having entered into asset purchase agreements (the "**APAs**") with SV Operating Three, LLC and SV Land Three, LLC, and having entered into the lease of the Bayley Seton Campus (the "**Bayley Seton Lease**," and together with the APAs and all exhibits and annexes thereto, the "**Transaction Documents**") with SV Land I, LLC (the "**Lessee,**" together with the counterparties to the APAs, the "**Purchasers**"); and the Court having subject matter jurisdiction to consider the Motion and the relief request therein pursuant to 28 U.S.C. § 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.); and the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to (a) the Office of the United States Trustee for the Southern District of New York, (b) counsel to General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., (c) the Pension Benefit Guarantee Corporation, (d) the Office of the United States Attorney, (e) the Office of the New York State Attorney General, (f) the New York State Department of Health, (g) the Internal Revenue Service, (h) counsel to the Creditors' Committee, (i) all parties identified on the General Service List and the Special Service List, as those terms are defined in the First Amended Final Administrative Order Establishing Case Management Procedures (the "**Case Management Order**") entered by the Bankruptcy Court on September 3, 2010, and (j) counsel to the Purchasers; and no other or further notice needing to be provided; and the relief requested in the Motion being in the best interests of the Debtors and their estates and creditors; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "**Hearing**"); and the Court having

determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefore, it is hereby FOUND AND DETERMINED THAT

A.      The Debtors have articulated good and sufficient reasons for approving the Bidding Procedures.

B.      The Bidding Procedures are reasonable and appropriate and represent the best method for maximizing the return for the SEA Assets and the Bayley Seton Lease.

C.      The Purchasers have expended, and likely will continue to expend, considerable time, money and energy pursuing the purchase of the SEA Assets and the Bayley Seton Lease and have engaged in extended arm's-length and good faith negotiations. The Transaction Documents are the culmination of these efforts.

D.      Recognizing this expenditure of time, energy and resources, the Debtors have agreed to pay the Break-Up Fee to Purchasers under certain terms and conditions. The Break-Up Fee is (i) an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of Bankruptcy Code section 503(b); (ii) commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Purchasers; (iii) reasonable and appropriate in light of the size and nature of the proposed sale, comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Purchasers; and (iv) necessary to induce the Purchasers to continue to pursue the purchase of the SEA Assets and enter into the Bayley Seton Lease and to be bound by the Transaction Documents.

E.    The Debtors have demonstrated a sound business justification for authorizing the payment of the Break-Up Fee to the Purchasers.  The Break-Up Fee has been negotiated at arm's-length and is reasonable under the circumstances.

THEREFORE IT IS HEREBY ORDERED THAT:

1.    The Bidding Procedures attached hereto as **Annex 1** are hereby authorized and approved in all respects.

2.    The form and sufficiency of the Auction and Hearing Notice attached hereto as **Annex 2** are approved.

3.    The Assignment Procedures attached hereto as **Annex 3** are authorized and approved in all respects.

4.    The form and sufficiency of the Initial Assignment Notice attached hereto as **Annex 4** are approved.

5.    The form and sufficiency of the Auction Results Notice attached hereto as **Annex 5** are approved.

6.    The form and sufficiency of the Creditor Notice attached hereto as **Annex 6** are approved.

7.    The form and sufficiency of the Further Assignments Notice attached hereto as **Annex 7** are approved.

8.    The Break-Up Fee is approved in its entirety.  The Debtors shall pay the Break-Up Fee to the Purchasers pursuant to the terms and conditions set forth in the Transaction Documents without need for further order of the Court.

9.    Objections, if any, to the sale of the SEA Assets (other than objections as to a Cure Amount, Additional Cure Amount, or Amended Cure Amount, with such objections

governed by the Assignment Procedures) and the Bayley Seton Lease and any filed supplements thereto, shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq., and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021, Attn: Judith Eisen, Esq.; (b) counsel for the Official Committee of Unsecured Creditors, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Stephen Kuhn, Esq. and Sarah Link Schultz, Esq.; (c) counsel to General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166-4193, Attn: David Neier, Esq.; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; (d) counsel to the Pension Benefit Guarantee Corporation, 1200 K Street, N.W., Washington, D.C. 20005-4026, Attn: Chief Counsel, Joel W. Ruderman, Esq. and Kelly R. Cusick, Esq.; (e) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; and (f) counsel to the Purchasers, Nutovic & Associates, 488 Madison Avenue, 16th Floor, New York, New York 10022, Attn: Isaac Nutovic, Esq., so as to be actually received by 4:00 p.m. (prevailing Eastern Time) on July 8, 2011 (the "**Objection Deadline**").

10.     In the event the Debtors choose a Successful Bidder or Bidders other than the Purchasers at the Auction, the Objection Deadline solely with respect to the Debtors' choice of such alternative Successful Bidder(s) will be July 20, 2011 at 12:00 p.m. (prevailing Eastern Time).

11.     The Court shall conduct the Sale Hearing and consider any unresolved objections to the Sale on July 21, 2011 at 11:00 a.m. (prevailing Eastern Time) or at such other time ordered by the Court.

12.     This Court shall retain exclusive jurisdiction over any matter or dispute relating to the sale of the SEA Assets, the Bayley Seton Lease, the Break-Up Fee, the Transaction Documents, the Bidding Procedures, the Assignment Procedures, the Sale Hearing, the Auction, the Successful Bid, the Back-Up Bid, and/or any other matter that in any way relates to the foregoing.

13.     Notwithstanding the possible applicability of Fed. R. Bankr. P. 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and no automatic stay of execution shall apply to this Order.

Dated: New York, New York

_____, 2011

_____
THE HONORABLE CECELIA G. MORRIS
UNITED STATES BANKRUPTCY JUDGE

KL2 2687284.9

**<u>ANNEX 1 TO THE BIDDING PROCEDURES ORDER</u>**
**Bidding Procedures**

# BIDDING PROCEDURES FOR ST. ELIZABETH ANN'S ASSETS SALE

Saint Vincents Catholic Medical Centers of New York ("**SVCMC**" or the "**Seller**") and certain of its affiliates, as Chapter 11 debtors and debtors-in-possession (each a "**Debtor**" and collectively, the "**Debtors**")[1] have entered into (i) that certain Asset Purchase Agreement (the "**Nursing Home APA**") for the sale of the personal property assets (the "**Personal Property Assets**") of Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center ("**St. Elizabeth Ann's**") with SV Operating Three, LLC (the "**Nursing Home Purchaser**"), (ii) that certain Purchase and Sale Agreement (the "**Real Estate APA**," together with the Nursing Home APA, the "**APAs**") for the sale of the real estate (the "**Real Property Assets**", together with the Personal Property Assets, the "**SEA Assets**")[2] of St. Elizabeth Ann's with SV Land Three, LLC (the "**Real Estate Purchaser**") and (iii) that certain lease of land, building, and equipment related to the Debtor's Bayley Seton campus (the "**Bayley Seton Lease**") with SV Land I, LLC (the "**Lessee**" and together with the Nursing Home Purchaser and the Real Property Purchaser, the "**Purchasers**"). The transaction with the Purchasers is referred to as the "**Sale**". The Debtors are currently soliciting other higher or better bids for the sale of the SEA Assets and/or entry into the Bayley Seton Lease.

On June 30, 2011, the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") granted the Debtors' motion (the "**Motion**")[3] for an order approving the following bidding procedures (the "**Bidding Procedures**") to be employed in connection with the solicitation for higher or better bids at an auction (the "**Auction**") for the sale of the Assets and/or entry into the Bayley Seton Lease (the "**Bidding Procedures Order**"), if necessary. The Bidding Procedures Order also approved certain procedures (the "**Assignment Procedures**") relating to the assumption and assignment of certain executory contracts and unexpired leases, the assumption and assignment of which will be a condition to closing the transactions contemplated by the APAs (collectively, the "**Assumed Contracts and Leases**").

---

[1] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc. There are certain affiliates of SVCMC who are not Debtors.

[2] As used herein, the term "**SEA Assets**" shall refer to the assets being transferred to the Purchasers (defined herein) pursuant to (i) the APAs (as defined herein) and (ii) in the event (x) the Debtors exercise the put option (the "**Put Option**") contained in the Bayley Seton Lease (defined herein), or (y) the Ground Lessee (defined herein) exercises its purchase option (the "**Call Option**") contained in the Bayley Seton Lease, those assets transferred to the Purchasers pursuant to the Put Option or the Call Option.

[3] Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion.

1.  **Important Dates**

| | |
|---|---|
| **Bid Deadline** | **July 15, 2011 at 5:00 p.m. (prevailing Eastern Time)** |
| **Objection Deadline** | **July 8, 2011 at 4:00 p.m. (prevailing Eastern Time)** |
| **Auction** | **July 19, 2011 at 9:00 a.m. (prevailing Eastern Time)** |
| **Supplemental Objection Deadline** | **July 20, 2011 at 12:00 p.m. (prevailing Eastern Time)** |
| **Sale Hearing** | **July 21, 2011 at 11:00 a.m. (prevailing Eastern Time)** |

2.  **Assets to be Sold Free and Clear**

The Debtors are offering for sale the Assets (as defined more specifically in the APAs) and entry into the Bayley Seton Lease, as defined more specifically in the APAs and the Bayley Seton Lease.  Except as otherwise provided in definitive documentation with respect to the Sale and the Bayley Seton Lease, all of the Seller's rights, title and interest in and to the Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "**Claims and Interests**").

3.  **Stalking Horse**

The APAs and the Bayley Seton Lease provide that the Purchasers shall act as the "stalking horse bidder" in the Auction and shall be entitled to a break-up fee of 2.0% of the purchase price contemplated by the APAs, in the amount of $680,000.00 (the "**Break-Up Fee**"), which shall be payable by the Seller as set forth in the APAs.

4.  **Mailing the Auction and Hearing Notice**

On a date no later than three business days following entry by the Bankruptcy Court of the Bidding Procedures Order, the Debtors shall mail the notice of the proposed sale of the Assets (the "**Auction and Hearing Notice**") in the form approved by the Bankruptcy Court in the Bidding Procedures Order by first class mail, postage prepaid, to (a) the Special and General Service Lists as those terms are defined in the Fist Amended Final Administrative Order Establishing Case Management Procedures (the "**Case Management Order**") entered by the Bankruptcy Court on September 3, 2010, (b) all counterparties to the Assumed Contracts and Leases, (c) all potential purchasers identified by the Debtors or their agent, and (d) any other party known to the Debtors to have or assert an interest in any of the Assets.

Any other party-in-interest that wishes to receive a copy of the Bidding Procedures Order and/or the Motion shall make such request in writing to Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Stephen Zide, Esq., Telephone: (212) 715-9492, Facsimile: (212) 715-8000, Email: szide@kramerlevin.com; and Joseph A. Shifer, Esq., Telephone (212) 715-9517, Facsimile: (212) 715-8105, Email, jshifer@kramerlevin.com. Additionally, copies may be downloaded from the Court's docket at http://ecf.nysb.uscourts.gov and from the Debtors' restructuring website at http://svcmcrestructuring.com.

### 5. Confidentiality Agreement / Due Diligence

The Debtors may afford any interested party the opportunity to conduct a reasonable due diligence review in the manner determined by the Debtors in their discretion, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**") and representatives of (x) the Pension Benefit Guaranty Corporation and (y) General Electric Corporation as Agent for itself and TD Bank, N.A. (collectively with the Pension Benefit Guaranty Corporation, the "**Secured Creditors**"). The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (defined below).

**Parties interested in conducting due diligence should contact Loeb & Troper LLP, 655 Third Avenue, 17th Floor, New York, New York 10017, Attn: David Adest, telephone: 212-697-3000, facsimile: 212-697-8893, email: dadest@loebandtroper.com, and Morgan Keegan, 630 Fifth Avenue, Suite 2950, New York, New York 10011, Attn: Thomas M. Barry, telephone 212-314-0367, email: tbarry@morgankeegan.com.**

Any entity that wishes to conduct due diligence with respect to the SEA Assets and/or the Bayley Seton Lease must deliver to (i) the Debtors, at Saint Vincents Catholic Medical Centers of New York, 450 West 33 Street, New York, New York 10001, Attn: Scott Davis (Scott.Davis@svcmcny.org); (ii) Loeb & Troper LLP, 655 Third Avenue, 17th Floor, New York, New York 10017, Attn: David Adest (dadest@loebandtroper.com); and (iii) Morgan Keegan, 630 Fifth Avenue, Suite 2950, New York, New York 10011, Attn: Thomas M. Barry (tbarry@morgankeegan.com), the following: (a) an executed confidentiality agreement in form and substance satisfactory to the Debtors, in consultation with the Committee and the Secured Creditors, and (b) at the Debtors' discretion, the Debtors may require a written statement of interest demonstrating to the Debtors' satisfaction a bona fide interest to purchase the SEA Assets and/or the Bayley Seton Lease and the ability to make a Qualified Bid (as defined below), which includes, *inter alia*, a purchase price range, the proposed structure and financing, if any, of the transaction, any additional conditions to closing that such entity may wish to impose, and the nature and extent of additional due diligence such entity may wish to conduct.

Any party delivering such a confidentiality agreement and, if necessary, a statement of interest may be deemed by the Debtors, in consultation with representatives of the Committee and Secured Creditors to be reasonably likely to be able to close a proposed transaction, if selected as the Successful Bidder (as defined below), within a time frame acceptable to the Debtors (such person or entity, a "**Potential Bidder**"). After compliance with the foregoing, the Debtors may allow Potential Bidders to conduct due diligence with respect to the SEA Assets and/or the Bayley Seton Lease.

6.    **Qualification of Bids and Bidders**

In order to participate in the bidding process and to have a bid considered by the Debtors, each Potential Bidder must deliver a written offer or group of offers satisfying the below criteria. A "**Qualified Bidder**" is a Potential Bidder that delivers a binding bid that in the Debtors' discretion after consultation with the Committee and the Secured Creditors satisfies the following criteria (a "**Qualified Bid**"):

(a)    Bid Deadline. Each bid package must be delivered in written and electronic form (where available) to: (i) Saint Vincents Catholic Medical Centers of New York, 450 West 33 Street, New York, New York 10001, Attn: Scott Davis (Scott.Davis@svcmcny.org); (ii) Loeb & Troper LLP, 655 Third Avenue, 17th Floor, New York, New York 10017, Attn: David Adest, (dadest@loebandtroper.com); (iii) Morgan Keegan, 630 Fifth Avenue, Suite 2950, New York, New York 10011, Attn: Thomas M. Barry (tbarry@morgankeegan.com); (iv) Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq. (arogoff@kramerlevin.com); (v) Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021, Attn: Judith Eisen (jeisen@garfunkelwild.com); (vi) General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier, Esq. (dneier@winston.com); and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq. (rrogers@winston.com); (vii) the Pension Benefit Guarantee Corporation, 1200 K Street, N.W., Washington, D.C. 20005-4026, Attn: Chief Counsel, Joel W. Ruderman, Esq. and Kelly R. Cusick, Esq.; and (viii) counsel for the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Stephen Kuhn, Esq. and Sarah Link Schultz, Esq. (sschultz@akingump.com), so as to **actually be received no later than July 15, 2011 at 5:00 p.m. (prevailing Eastern Time) (the "Bid Deadline")**.

(b)    Bid Package. Each bid must include (collectively, the "**Bid Package**"): (i) a written and signed irrevocable and binding offer letter stating that (w) the bidder offers to consummate a sale transaction on terms and conditions no less favorable than those found in the APAs and/or the Bayley Seton Lease[4] and in an amount at least equal to the Minimum Bid (as defined below), (x)

---

[4] References herein to the "APAs and/or Bayley Seton Lease" are as may be applicable to each such asset based upon individual or combined bids.

confirming that the bid will remain irrevocable and binding until five business days following the entry of the Sale Order, (y) that the Bidder has had the opportunity to conduct due diligence prior to its offer and does not require further due diligence, has relied solely upon its own independent review and investigation and did not rely on any written or oral representations except as expressly set forth in the Modified APAs and Modified Lease (defined below), and (z) the Bidder shall serve as the Backup Bidder (defined below) until five business days following the entry of the Sale Order; (ii) an executed copy of the APAs and/or the Bayley Seton Lease as modified by the Potential Bidder in accordance with its bid ("**Modified APAs**" and "**Modified Lease**" respectively); (iii) an electronic markup of the APAs and/or Bayley Seton Lease showing the revisions in the Modified APAs and/or Modified Lease; and (iv) a CD-ROM containing a clean copy of the Modified APAs and/or the Modified Lease (formatted as a Microsoft Word document or such other word processing format acceptable to the Debtors) and the electronic markup of the APAs and/or Bayley Seton Lease. The Debtors shall, in consultation with the Committee and the Secured Creditors, determine whether any Modified APAs and/or Modified Lease that modify the APAs and/or the Bayley Seton Lease in any respect beyond the identity of the purchasers and the purchase price under the APAs and/or the Bayley Seton Lease is a Qualified Bid.

(c)     <u>Individual Bids</u>. The Debtors reserve the right, in their discretion (in consultation with the Secured Creditors and the Committee), to accept bids for the SEA Assets and/or the Bayley Seton Lease <u>together or separately.</u> As such, the Debtors will consider Qualified Bids for (i) the SEA Assets alone, (ii) the Bayley Seton Lease alone, or (iii) both of the SEA Assets and the Bayley Seton Lease; <u>provided</u> <u>however</u>, that any bid that provides for the purchase of the SEA Assets alone <u>must</u> submit a bid for (x) a sale transaction that includes the continued operation of the 72 neurobehavioral beds located on the Bayley Seton Campus under that certain lease between SVCMC as landlord and St. Elizabeth Ann's as tenant (the "**Patient Bed Lease**") and (y) a sale transaction that does <u>not</u> include the continued operation of the 72 neurobehavioral beds located on the Bayley Seton Campus under the Patient Bed Lease. In the event that bids are considered that provide (i) solely for entry into the Bayley Seton Lease without the purchase of the SEA Assets or (ii) solely for the purchase of the SEA Assets without entry into the Bayley Seton Lease, the Debtors (in consultation with the Secured Creditors and the Committee) shall establish the required Minimum Bid (defined below) and the Bid Increment (defined below) for each such bids.

(d)    <u>Minimum Bid</u>. The amount of the purchase price in any bid for all of the Assets (i.e., both the SEA Assets and the Bayley Seton Lease) must provide for net cash (or cash equivalent) that is at least $50,000 more than the purchase price contained in the APAs and Bayley Seton Lease plus the amount of the Break-Up Fee (the "**<u>Minimum Bid</u>**"). In the event that individual bids are submitted for less than all of the Assets (i.e., either the SEA Assets or the Bayley Seton Lease), the aggregate of the purchase price of such bids for (i) the SEA Assets and (ii) the Bayley Seton Lease must equal the Minimum Bid. If competing bids are submitted only for the SEA Assets or only for the Bayley Seton Lease, then the purchase price for such bid(s) must equal the Minimum Bid. Any bid for the SEA Assets must comply with the requirements of paragraph 6(c) above (i.e., a bid with and a bid without the continued operation of the 72 neurobehavioral beds located on the Bayley Seton Campus under the Patient Bed Lease).

(e)    <u>Financial Information</u>. The Bid Package must contain such financial and other information that will allow the Debtors, in consultation with the Committee and the Secured Creditors, to make a determination as to the bidder's financial wherewithal and its ability to consummate the transactions contemplated by the Modified APAs and/or the Modified Lease, including evidence of adequate financing, any proposed conditions to closing and adequate assurance of such bidder's ability to perform under any of the Assumed Contracts and Leases and to pay all cure amounts required to assume and assign any such Assumed Contracts and Leases.

(f)    <u>Regulatory Approvals</u>. The Bid Package must describe all regulatory approvals the bidder will need and provide evidence of the bidder's ability to obtain all necessary regulatory approvals in a timely manner, if applicable.

(g)    <u>Executory Contracts and Unexpired Leases</u>. The Modified APAs and/or Modified Lease must identify with particularity each and every proposed Assumed Contract and Lease.

(h)    <u>Additional Bid Protections</u>. The bid must not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment, or propose to modify any of the Bidding Procedures.

(i)    <u>Identity of Bidders</u>. Each Potential Bidder must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such bid, including the names and addresses of any members or individuals with an interest in the

entity, and the complete terms of any such participation, as well as disclose the organization form and the business conducted by each entity. Any Potential Bidder shall be required to provide such additional information as the Debtors may reasonably require regarding a Potential Bidder's ability to satisfy the requirements of the applicable regulatory authorities.

(j)  Due Diligence. The bid must not contain any due diligence or financing contingencies of any kind, and must affirmatively acknowledge that the bidder (i) had an opportunity to conduct due diligence regarding the SEA Assets and/or the Bayley Seton Lease prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the SEA Assets and/or the Bayley Seton Lease in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the SEA Assets and/or the Bayley Seton Lease, or the completeness of any information provided in connection therewith.

(k)  Consents. Each Potential Bidder must represent that it obtained all necessary organizational approvals to make its competing bid and to enter into and perform the Modified APAs and/or the Modified Lease and include evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified APAs and/or Modified Lease.

(l)  Deposit. A Potential Bidder for the SEA Assets (with or without the Bayley Seton Lease as a part of such bid) must deposit 10% of the initial purchase price set forth in the Modified APAs with an escrow agent selected by the Debtors (the "**Deposit Agent**") in the form of a certified check or wire transfer at least three business days before the Auction (the "**SEA Deposit**"). A Potential Bidder for the Bayley Seton Lease alone must deposit $500,000 with the Deposit Agent in the form of a certified check or wire transfer at least three business days before the Auction (the "**Bayley Seton Deposit**" together with the SEA Deposit, the "**Deposit**"). The Potential Bidder shall forfeit the Deposit if (i) the Potential Bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein before the Bankruptcy Court approves the Debtors' selection of the Successful Bidder, or (ii) the bidder is the Successful Bidder and (x) withdraws the bid without the Debtors' consent (which consent shall not be granted without the consent of the Committee and the Secured Creditors, which consent of the Committee and the Secured Creditors shall not be

unreasonably withheld) before the consummation of the sale contemplated by the bid, or (y) breaches the Modified APAs and/or the Bayley Seton Lease associated with such bid. The Deposit shall be returned to the Potential Bidder (i) as soon as practicable if the Potential Bidder is not determined to be a Qualified Bidder or (ii) no later than five business days after entry of the Sale Order if the bidder is a Qualified Bidder (who has not otherwise forfeited its Deposit), but is not determined to be the Successful Bidder or the Backup Bidder (defined below). The Debtors will not be required to maintain any Deposit in an interest bearing account, but any interest earned on any Deposit will be remitted to the appropriate Qualified Bidder if the Deposit is returned to the Qualified Bidder pursuant to the above.

The Debtors shall have the right, in their discretion (after consultation with the Committee and the Secured Creditors), to determine whether a bid is a Qualified Bid and shall notify bidders whether their bids have been determined to be Qualified Bids, as soon as possible, and prior to the Auction. The Debtors may (after consultation with the Committee and the Secured Creditors) reject any bid that is on terms more burdensome or conditional than the APAs and/or the Bayley Seton Lease or is otherwise contrary to the best interests of the Debtors and their estates. In addition to the requirements above, the Debtors may, after consultation with the Committee and the Secured Creditors, request any additional information from any Potential Bidder to assist them in making their determination as to whether a bid is a Qualified Bid. For the avoidance of doubt, the Purchasers are a Qualified Bidder and the APAs and the Bayley Seton Lease are a Qualified Bid.

7.   **Expedited Relief**

If, prior to the Auction, there is a dispute between the Debtors and either the Committee or the Secured Creditors regarding who is a "Qualified Bidder," the parties consent to the submission of that dispute to the Court on an expedited basis.

8.   **As Is, Where Is**

The sale of any or all of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or their estates except to the extent set forth in the applicable APAs, Modified APAs, or Modified Lease of the Successful Bidder(s) as approved by the Bankruptcy Court.

9.   **Only One Qualified Bid**

If no Qualified Bid other than Purchasers' is submitted, the Debtors shall not hold the Auction, but may proceed with the Sale Hearing to seek approval of the sale of the Assets to the Purchasers.

10. **<u>Auction</u>**

In the event that the Debtors timely receive more than one Qualified Bid meeting the Minimum Bid, the Debtors shall conduct the Auction with respect to the SEA Assets and/or the Bayley Seton Lease.  The Auction will take place at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036 on July 19, 2011, starting at 9:00 a.m. (prevailing Eastern Time), or at such other place, date and time as may be designated by the Debtors, in consultation with the Committee and the Secured Creditors, at or prior to the Auction.  The Auction shall be governed by the following procedures:

(a)     <u>Participation</u>.  Only the Qualified Bidders shall be entitled to participate in the Auction, and each Qualified Bidder shall appear in person at the Auction, or through a duly authorized representative.  **Each Qualified Bidder must be accompanied by counsel in order to participate in the Auction**.  At least one day prior to the commencement of the Auction, each Qualified Bidder must confirm in writing that it will participate in this Auction; <u>provided</u>, <u>however</u>, that in the event a Qualified Bidder does not attend the Auction, the relevant Qualified Bid shall nonetheless remain fully enforceable against that Qualified Bidder in accordance herewith.

(b)     <u>Anti-Collusion</u>.  At the commencement of the Auction, each Qualified Bidder shall be required to confirm that it has not engaged and will not engage in any collusion with any other Qualified Bidder with respect to the bidding or the Sale.

(c)     <u>Conduct of Auction</u>.  The Auction will be conducted openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid; <u>provided</u>, <u>however</u>, that nothing contained herein shall prohibit the Debtors from meeting privately with any Qualified Bidder to negotiate the terms of its bid.

(d)     <u>Bidding</u>.  Bidding at the Auction shall commence at the amount of the highest or otherwise best Qualified Bid submitted prior to the Auction; Qualified Bidders for all of the Assets may then submit successive bids in increments of $50,000 (the "**<u>Bid Increment</u>**"); <u>provided</u>, <u>however</u>, that the Debtors shall retain the right, with the consent of the Committee and the Secured Creditors (which consent shall not be unreasonably withheld), to modify the Bid Increment at the Auction.  In the event that there are Qualified Bids for only the SEA Assets or only the Bayley Seton Lease, the Debtors, in consultation with the Committee and the Secured Creditors, will establish the Bid Increment for the SEA Assets and/or the Bayley Seton Lease (as applicable) at the Auction.  Any bid submitted after the conclusion of the Auction shall not be

considered for any purpose unless an order of the Bankruptcy Court is entered directing that such bid be considered, and neither the Debtors nor any other person shall have the obligation to seek any such order from the Bankruptcy Court.

(e) <u>Higher or Better</u>. The Debtors reserve the right, in their discretion (in consultation with the Committee and the Secured Creditors), to determine whether any bid is better, if not higher, than another bid submitted during the Auction. The Debtors may consider a variety of factors in making this decision, including, without limitation, the ability of the applicable Qualified Bidder to obtain the necessary regulatory approvals, any proposed conditions to closing, and the timing of the closing of the proposed transaction. The Debtors' unions have indicated that in the event a Potential Bidder submits a bid that will result in the continued employment of the Debtors' current employees and the recognition of the unions and other conditions, the Debtors' unions will consider waiving claims for severance and related severance benefits (the "**<u>Severance Waiver</u>**") for such employees. In the event that a Potential Bidder shall submit a bid that results in a Severance Waiver, the Debtors (in consultation with the Secured Lenders and the Committee) will take into consideration the amount of the Severance Waiver in analyzing which bid is a higher or better bid. Nothing herein is to be deemed an admission by the Debtors on any matter, nor is it to be deemed a waiver of any of the unions' rights under the relevant collective bargaining agreements or applicable law.

(f) <u>Successful Bid</u>. The Auction shall continue until the Debtors determine, in their discretion (after consultation with the Committee and the Secured Creditors) and subject to Court approval, which offer (or in the case of separate offers for the SEA Assets and the Bayley Seton Lease, which offers) is (are) the highest or otherwise best offer(s) from among the Qualified Bids submitted at the Auction (such bid or bids, as applicable, the "**<u>Successful Bid</u>**"). The Qualified Bidder(s) submitting such Successful Bid(s) shall become the "**<u>Successful Bidder</u>**," and shall have such rights and responsibilities of the purchaser, as set forth in the applicable Modified APAs and/or Modified Lease , as applicable, together with any changes made thereto by the Successful Bidder at the Auction. Within one business day after the conclusion of the Auction, but in any event prior to the commencement of the Sale Hearing (as defined below), the Successful Bidder shall (i) complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made, and (ii) supplement its Deposit by wire transfer or other

immediately available funds so that, to the extent necessary, such deposit equals 10% of the Successful Bid.

(g) <u>Backup Bid</u>. At the conclusion of the Auction, the Debtors will also announce the second highest or otherwise best bid(s) from among the Qualified Bids submitted at the Auction (the "**Backup Bid**"). The Qualified Bidder(s) submitting such Backup Bid(s) shall become the "**Backup Bidder**," and shall have such rights and responsibilities of the purchaser, as set forth in the applicable Modified APAs and/or the Modified Lease, together with any changes made thereto by the Backup Bidder at the Auction. ***The Backup Bid shall remain open and irrevocable until five business days following the entry of the Sale Order.*** Within one business day after the conclusion of the Auction, but in any event prior to the commencement of the Sale Hearing (as defined below), the Backup Bidder shall (i) complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Backup Bid was made, and (ii) supplement its Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such deposit equals 10% of the Backup Bid. In the event the Backup Bidder fails to comply with the requirements of this paragraph, it will be deemed to have forfeited its Deposit. The Backup Bidder's Deposit will be returned by the Debtors upon entry of the Sale Order. Notwithstanding the above, the Purchasers' obligations as a Backup Bidder are specifically outlined in the APAs and the Bayley Seton Lease and not as provided in these Bidding Procedures.

11. **Sale Hearing**

The Successful Bid and the Backup Bid will be subject to approval by entry of an order (the "**Sale Order**") by the Bankruptcy Court after a hearing (the "**Sale Hearing**") that will take place **July 21, 2011** at 11:00 a.m. (prevailing Eastern Time). The Debtors, in consultation with the Committee and the Secured Creditors, may adjourn the Sale Hearing from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court. Upon approval of the Backup Bid by the Bankruptcy Court, the Backup Bid shall remain open and irrevocable until five business days following the entry of the Sale Order.

Objections, if any, to the Sale Motion (other than objections with respect to cure amounts or adequate assurance of future performance under the Assumed Contracts and Leases, which are subject to the Assignment Procedures) and any filed supplements thereto, shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq.

and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021, Attn: Judith Eisen, Esq.; (b) counsel for the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Stephen Kuhn, Esq. and Sarah Link Schultz, Esq.; (c) counsel to General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; (d) counsel to the Pension Benefit Guarantee Corporation, 1200 K Street, N.W., Washington, D.C. 20005-4026, Attn: Chief Counsel; (e) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; and (f) counsel to the Purchasers, Nutovic & Associates, 488 Madison Avenue, 16th Floor, New York, New York 10022, Attn: Isaac Nutovic, Esq., so as to be actually received by 4:00 p.m. (prevailing Eastern Time) on July 8, 2011 (the "**Objection Deadline**").

### 12. **Supplemental Objections**

In the event the Debtors choose a Successful Bidder or Back-Up Bidder other than the Purchasers at the Auction or the terms of the proposed Sale are modified at the time of the Auction, the Objection Deadline solely with respect to (i) the Debtors' choice of such alternative Successful Bidder or Back-Up Bidder, or the modifications to the terms of the Sale to the Successful Bidder and (ii) to the extent such party did not receive notice of such cure amounts prior to the Auction, cure amounts under the Assumed Leases and Contracts, will be **July 20, 2011** at 4:00 p.m. (prevailing Eastern Time).

### 13. **Consummation of the Sale**

Following the Sale Hearing, if for any reason the Successful Bidder fails to consummate the purchase of the Assets, then the Backup Bidder will automatically be deemed to have submitted the highest or otherwise best bid. Thereafter, the Debtors and the Backup Bidder are authorized to immediately effect the sale of the Assets to the Backup Bidder on the terms of the Backup Bid as soon as is commercially reasonable without further order of the Bankruptcy Court. If such failure to consummate the purchase is the result of a breach by the Successful Bidder, its Deposit shall be forfeited to the Debtors and the Debtors specifically reserve the right to seek all available damages from the defaulting bidder.

### 14. **Extension of Deadlines and Modification of Bid Procedures**

The Debtors reserve their rights to modify the Bidding Procedures in their discretion (with the consent of the Committee and the Secured Creditors, which consent shall not be unreasonably withheld) at or prior to the Auction, including, without limitation, extending the deadlines set forth in the Auction procedures, modifying bidding increments, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; provided, however, that the Purchasers' consent will be required for any modifications to the terms on which the Break-Up Fee will be paid.

15. **Jurisdiction**

The Bankruptcy Court shall retain exclusive jurisdiction over any matter or dispute relating to the Sale of the Assets, the Bidding Procedures, the Sale Hearing, the Auction, the Successful Bid, the Backup Bid, and/or any other matter that in any way relates to the foregoing.

KL2 2687284.9

**<u>ANNEX 2 TO THE BIDDING PROCEDURES ORDER</u>**
**Auction & Hearing Notice**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel for Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SAINT VINCENTS CATHOLIC MEDICAL | : | Case No. 10-11963 (CGM) |
| CENTERS OF NEW YORK, et al., | : | |
| | : | |
| Debtors. | : | Jointly Administered |

------------------------------------------------------- x

**NOTICE OF AUCTION AND HEARING TO**
**CONSIDER APPROVAL OF THE SALE OF THE**
**DEBTORS' ASSETS RELATED TO ST. ELIZABETH**
**ANN'S AND PROCEDURES RELATED THERETO**

PLEASE TAKE NOTICE THAT:

       1.       <u>Introduction</u>. On June 30, 2011, the Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), upon the motion (the "**Motion**") of Saint Vincents Catholic Medical Centers of New York ("**SVCMC**") and certain of its affiliates, as chapter 11 debtors and debtors-in-possession in the above-referenced chapter 11 cases (each a "**Debtor**" and collectively the "**Debtors**"),[1] entered an order (the "**Bidding Procedures Order**"): (a) approving the bidding procedures and bidder protections (the "**Bidding Procedures**") with respect to the sale (the "**Sale**") of certain real estate and personal property assets (together, the "**SEA Assets**")[2] related to Sisters of Charity Health Care System Nursing

---

[1]  In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc. There are certain affiliates of SVCMC who are not Debtors.

[2] [2]  As used herein, the term "**SEA Assets**" shall refer to the assets being transferred to the Purchasers (defined herein) pursuant to (i) the APAs (as defined herein) and (ii) in the event (x) the Debtors exercise the put option (the "**Put Option**") contained in the Bayley Seton Lease (defined herein), or (y) the Ground Lessee (defined herein)

Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center ("**St. Elizabeth Ann's**") and entering into the Lease (as defined below); (b) scheduling an auction (the "**Auction**") for the SEA Assets and/or the Lease and a hearing approving the sale of the SEA Assets and entering into the Lease (the "**Sale Hearing**"); and (c) approving certain procedures (the "**Assignment Procedures**") related to the assumption and assignment of those executory contracts and unexpired leases related to the SEA Assets and whose assignment is contemplated by the Sale (the "**Assumed Contracts and Leases**"). A copy of the Bidding Procedures is annexed hereto as **Exhibit A**.

2.    Important Dates. Pursuant to the Bidding Procedures and the Assignment Procedures, the Bankruptcy Court has established the following dates:

| | |
|---|---|
| **Bid Deadline** | **July 15, 2011 at 5:00 p.m. (prevailing Eastern Time)** |
| **Initial Objection Deadline** | **July 8, 2011 at 4:00 p.m. (prevailing Eastern Time)** |
| **Auction** | **July 19, 2011 at 9:00 a.m. (prevailing Eastern Time)** |
| **Supplemental Cure Objection and Sale Objection Deadline** | **July 20, 2011 at 12:00 p.m. (prevailing Eastern Time)** |
| **Sale Hearing** | **July 21, 2011 at 11:00 a.m. (prevailing Eastern Time)** |

3.    The APAs. The Debtors have entered into (i) that certain Asset Purchase Agreement for the sale of the personal property assets of St. Elizabeth Ann's (the "**Nursing Home APA**") with SV Operating Three, LLC (the "**Nursing Home Purchaser**") and the assignment of certain contracts and leases related thereto, (ii) that certain Purchase and Sale Agreement for the sale of the real estate of St. Elizabeth Ann's (the "**Real Estate APA**," together with the Nursing Home APA, the "**APAs**") with SV Land Three, LLC (the "**Real Estate Purchaser**," and (iii) the lease of land, building, and equipment related to the Debtor's Bayley Seton campus (the "**Lease**") with SV Land I, LLC (the "**Lessee**" and together with the Nursing Home Purchaser and Real Estate Purchaser, the "**Purchasers**")). As set forth in the Bidding Procedures, the Sale of the SEA Assets and entry into the Lease remain subject to competing offers from any prospective bidder. The Debtors will consider qualified bids for (i) the packaged transaction – meaning the SEA Assets and the Lease – or (ii) for only the SEA Assets or only the right to enter into the Lease as independent transactions.

4.    Due Diligence. Parties interested in conducting due diligence should contact Loeb & Troper LLP, 655 Third Avenue, 17th Floor, New York, New York 10017, Attn:

---

exercises its purchase option (the "**Call Option**") contained in the Bayley Seton Lease, those assets transferred to the Purchasers pursuant to the Put Option or the Call Option.

KL2 2687284.9

David Adest, telephone: 212-697-3000, facsimile: 212-697-8893, email: dadest@loebandtroper.com, and Morgan Keegan, 630 Fifth Avenue, Suite 2950, New York, New York 1011, Attn: Thomas M. Barry, telephone 212-314-0367, email: tbarry@morgankeegan.com.

5.    Submission of Bids.  To participate in the bidding process and to have a bid considered by the Debtors, each potential bidder must deliver a written offer or group of offers satisfying the criteria prescribed in the Bidding Procedures.  Each bid package must be delivered in written and electronic form (where available) to: (i) Saint Vincents Catholic Medical Centers of New York, 450 West 33 Street, New York, New York 10001, Attn: Scott Davis (Scott.Davis@svcmcny.org); (ii) Loeb & Troper LLP, 655 Third Avenue, 17th Floor, New York, New York 10017, Attn: David Adest (dadest@loebandtroper.com); (iii) Morgan Keegan, 630 Fifth Avenue, New York, New York 10011, Attn: Thomas M. Barry (tbarry@morgankeegan.com); (iv) Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff (arogoff@kramerlevin.com); (v) Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021, Attn: Judith Eisen (jeisen@garfunkelwild.com); (vi) General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166-4193, Attn: David Neier, Esq. (dneier@winston.com); and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq. (rrogers@winston.com; (vii) General Counsel, PBGC, 1200 K Street, N.W., Washington, D.C. 20005-4026, Attn: Chief Counsel, Joel W. Ruderman, Esq. and Kelly R. Cusick, Esq.; and (viii) counsel for the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Stephen Kuhn, Esq. and Sarah Link Schultz, Esq. (sschultz@akingump.com), so as to **actually be received no later than July 15, 2011 at 5:00 p.m. (prevailing Eastern Time)** (the "**Bid Deadline**").

6.    Sale Hearing.  The Bidding Procedures Order provides that the Sale Hearing will be held on **July 21, 2011 at 11:00 a.m. (prevailing Eastern Time)**, before the Honorable Cecelia G. Morris, United States Bankruptcy Judge, in Courtroom 701 at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408.  At the Sale Hearing, the Debtors will request that the Bankruptcy Court enter an order approving the Sale of the SEA Assets and entering into the Lease to the prevailing bidder(s) at the Auction.

7.    Auction.  In the event that the Debtors receive a qualified bid for the SEA Assets or the right to enter into the Lease, the Debtors intend to conduct the Auction with respect to such assets.  The Auction will take place at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, on July 19, 2011 starting at 9:00 a.m. (prevailing Eastern Time) or at such other place, date, and time as may be designated by the Debtors at or prior to the Auction.

8.    Objections.  Objections, if any, to the Motion (other than objections with respect to cure amounts or adequate assurance of future performance under the Assumed Contracts and Leases, which are subject to the Assignment Procedures) and any filed supplements thereto, shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) Debtors' counsel,

Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq. and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021, Attn: Judith Eisen, Esq.; (b) counsel for the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Stephen Kuhn, Esq. and Sarah Link Schultz, Esq.; (c) counsel to General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166-4193, Attn: David Neier; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; (d) counsel to the Pension Benefit Guarantee Corporation, Pension Benefit Guarantee Corporation, 1200 K Street, N.W., Washington, D.C. 20005-4026, Attn: Chief Counsel, Joel W. Ruderman, Esq. and Kelly R. Cusick, Esq.; (e) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; and (f) counsel to the Purchasers, Nutovic & Associates, 488 Madison Avenue, 16th Floor, New York, New York 10022, Attn: Isaac Nutovic, Esq., so as to be **actually received by 4:00 p.m. (prevailing Eastern Time) on July 8, 2011** (the "**Objection Deadline**").

9.  **Supplemental Objections**.  Only in the event the Debtors choose a Successful Bidder or Back-Up Bidder other than the Purchasers at the Auction or the terms of the proposed Sale are modified at the time of the Auction, the Objection Deadline solely with respect to (i) the Debtors' choice of such alternative Successful Bidder or Back-Up Bidder, or the modifications to the terms of the Sale and Lease to the Successful Bidder will be **July 20, 2011 at 12:00 p.m. (prevailing Eastern Time)**, and (ii) to the extent such party did not receive notice of such cure amounts prior to the Auction, cure amounts under the Assumed Leases and Contracts will be due July 20, 2011 at 4:00 p.m. (prevailing Eastern Time).  These deadlines are not opportunities to file a late objection to the Motion.

10.  A copy of the Bidding Procedures Order or any other document referenced herein can be viewed and obtained on the Bankruptcy Court's website at https://ecf.nysb.uscourts.gov or (without charge) at http://svcmcrestructuring.com.

Dated: New York, New York
[DATE], 2011

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ Adam C. Rogoff_____
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
*Counsel for Debtors*

# ANNEX 3 TO THE BIDDING PROCEDURES ORDER
## Assignment Procedures

# ASSIGNMENT PROCEDURES FOR THE ST. ELIZABETH ANN'S ASSETS

Saint Vincents Catholic Medical Centers of New York ("**SVCMC**" or the "**Seller**") and certain of its affiliates, as Chapter 11 debtors and debtors-in-possession (each a "**Debtor**" and collectively, the "**Debtors**")[1] have entered into (i) that certain Asset Purchase Agreement (the "**Nursing Home APA**") for the sale of the personal property assets (the "**Personal Property Assets**") of Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center ("**St. Elizabeth Ann's**") with SV Operating Three, LLC (the "**Nursing Home Purchaser**"), (ii) that certain Purchase and Sale Agreement (the "**Real Estate APA**," together with the Nursing Home APA, the "**APAs**") for the sale of the real estate (the "**Real Property Assets**", together with the Personal Property Assets, the "**SEA Assets**")[2] of St. Elizabeth Ann's with SV Land Three, LLC (the "**Real Estate Purchaser**,"), and (iii) the lease of land, building, and equipment (the "**Lease**") related to the Debtors' Bayley Seton campus (the "**Bayley Seton Campus**") with SV Land I, LLC (the "**Lessee**" and together with the Nursing Home Purchaser and Real Estate Purchaser, the "**Purchasers**"). The Debtors are currently soliciting other higher or better bids for the sale of the SEA Assets (the "**Sale**").

On June 30, 2011, the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") granted the Debtors' motion (the "**Motion**")[3] for an order (the "**Bidding Procedures Order**") approving, *inter alia*, (i) the following procedures (the "**Assignment Procedures**") relating to the assumption and assignment to the Purchasers of certain executory contracts and unexpired leases by the Debtors as contemplated by the Sale (the "**Assumed Contracts and Leases**"), including procedures for providing notice of assignment to parties to such Assumed Contracts and Leases (each, a "**Counterparty**") and (ii) certain bidding procedures (the "**Bidding Procedures**") to be employed in connection with the solicitation for higher or better bids at an auction (the "**Auction**") of the SEA Assets and/or Lease. The Motion also sought an order approving the Sale subject to the results of the Auction (the "**Sale Order**").

---

[1] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc. There are certain affiliates of SVCMC who are not Debtors.

[2] As used herein, the term "**SEA Assets**" shall refer to the assets being transferred to the Purchasers (defined herein) pursuant to (i) the APAs (as defined herein) and (ii) in the event (x) the Debtors exercise the put option (the "**Put Option**") contained in the Bayley Seton Lease (defined herein), or (y) the Ground Lessee (defined herein) exercises its purchase option (the "**Call Option**") contained in the Bayley Seton Lease, those assets transferred to the Purchasers pursuant to the Put Option or the Call Option.

[3] Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion.

A.    **Important Dates**

| | |
|---|---|
| **Bid Deadline** | **July 15, 2011 at 5:00 p.m.** |
| | **(prevailing Eastern Time)** |
| | |
| **Objection Deadline** | **July 8, 2011 at 4:00 p.m.** |
| | **(prevailing Eastern Time)** |
| | |
| **Auction** | **July 19, 2011 at 9:00 a.m.** |
| | **(prevailing Eastern Time)** |
| | |
| **Supplemental Objection Deadline** | **July 20, 2011 at 12:00 p.m.** |
| | **(prevailing Eastern Time)** |
| | |
| **Sale Hearing** | **July 21, 2011 at 11:00 a.m.** |
| | **(prevailing Eastern Time)** |
| | |
| **Cure Objection Hearing** | **TBD** |

B.    **Assumed Contracts and Leases**

Pursuant to the Nursing Home APA, the Assumed Contracts and Leases consist of (i) certain executory contracts (the "**Assumed Contracts**") and (ii) unexpired leases (the "**Assumed Leases**") designated to be assumed by the Debtors and assigned to the Purchasers.

C.    **Initial Notice of Assumed Contracts and Leases**

Within three business days after entry of the Bidding Procedures Order, the Debtors will serve by first class mail an omnibus notice (the "**Initial Assignment Notice**") on each Counterparty to the Assumed Contracts and Assumed Leases, substantially in the form attached as **Annex 4** to the Bidding Procedures Order (and such party's attorney, if such attorney has filed a notice of appearance in the Debtors' chapter 11 proceedings) at the last known address available to the Debtors and the notice address of such counterparty provided in each such contract or lease, if applicable. The Initial Assignment Notice shall include an exhibit that identifies (i) the name and address of the Counterparty, (ii) the specific Assumed Contract or Assumed Lease being specified, (iii), for each Assumed Lease, the premises relating to the Assumed Lease, and (iv) the cure amount asserted by the Debtors that is necessary to cure any default under the relevant Assumed Contract or Assumed Lease pursuant to section 365 of the Bankruptcy Code (the "**Cure Amount**").

The Initial Assignment Notice shall also include (i) a description of the Purchasers and a statement as to the Purchasers' ability to perform the Debtors' obligations under the Assumed Contracts and/or Assumed Leases ("**Purchasers' Adequate Assurance**"), (ii) the date of the Initial Objection Deadline (defined below), (iii) the date of the Auction, and (iv) the date of the Sale Hearing.

The Initial Assignment Notice shall also be served upon (a) counsel to the Purchasers, Nutovic & Associates, 488 Madison Avenue, 16th Floor, New York, New York 10022, Attn: Isaac Nutovic, Esq; (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; (c) counsel to General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier, Esq.; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; (d) counsel to the Pension Benefit Guarantee Corporation, 1200 K Street, N.W., Washington, D.C. 20005-4026, Attn: Chief Counsel, Joel W. Ruderman, Esq. and Kelly R. Cusick, Esq.; (e) the Office of the United States Attorney; (f) the Office of the New York State Attorney General; (g) the New York State Department of Health; (g) the Internal Revenue Service; and (h) counsel for the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Stephen Kuhn, Esq. and Sarah Link Schultz, Esq. (collectively, the "**Notice Parties**").

D. **Initial Objections**

To the extent that any interested party wishes to object to any matter pertaining to the sale of the SEA Assets or the assumption and assignment of an Assumed Contract or Assumed Lease, including, without limitation, Purchasers' Adequate Assurance or the Cure Amount designated in the Initial Assignment Notice, then such interested party must file a written objection (the "**Initial Objection**") with the Court no later than **July 8, 2011 at 4:00 p.m.** (prevailing Eastern Time) (the "**Initial Objection Deadline**"), and simultaneously serve such Initial Objection on the following parties (the "**Objection Parties**"): (a) the Debtors, Saint Vincents Catholic Medical Centers of New York, 450 West 33 Street, New York, New York 10001, Attn: Scott Davis (Scott.Davis@svcmcny.org); (b) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq. and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021, Attn: Judith Eisen, Esq.; and (c) the Notice Parties, so that it is **actually received** by each of the foregoing parties by the Initial Objection Deadline.

To the extent that any party-in-interest does not timely serve an Initial Objection as set forth above, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Assumed Contract or Assumed Lease; (ii) agreed that the Purchasers have provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) consented to the relevant Cure Amount, if any; (iv) agreed to the terms of the Sale Order; and (v) waived any and all objections in connection with items (i) through (iv) hereof.

E. **Supplemental Notice of Assumed Contracts and Leases**

Within one business day of the conclusion of the Auction, the Debtors will serve by overnight mail and email or facsimile, where possible, and file with the Court an omnibus notice (the "**Auction Results Notice**"), substantially in the form attached as **Annex 5** to the Bidding Procedures Order, upon the Notice Parties and each of the Counterparties (and their attorneys, if an attorney has filed a notice of appearance in the Debtors' chapter 11 proceedings) at the last known address available to the Debtors and the notice address of such Counterparty

provided in each such contract or lease, if applicable. The Auction Results Notice shall, *inter alia*, identify the successful bidder (the "**Successful Bidder**") and the back-up bidder (the "**Back-Up Bidder**")[4] chosen at the Auction in accordance with the Bidding Procedures and such other information as hereinafter provided.

If and only if the bid submitted by the Successful Bidder (the "**Successful Bid**") or the bid submitted by the Back-Up Bidder (the "**Back-Up Bid**") includes (i) new executory contracts (each an "**Additional Assumed Contract**") or new unexpired leases (each an "**Additional Assumed Lease**") to be assumed and assigned by the Debtors to either the Successful Bidder or the Back-Up Bidder (as the case may be), or (ii) a different Cure Amount than the one listed in the Initial Assignment Notice (such Cure Amount, an "**Amended Cure Amount**"), then the Auction Results Notice shall include an exhibit that (a) identifies the name and address of the Counterparty, (b) identifies the specific Additional Assumed Contract and/or Additional Assumed Lease being assumed and assigned, (c) identifies, for each Additional Assumed Lease, the premises relating to the Additional Assumed Lease, and (d) the cure amount asserted by the Debtors that is necessary to cure any default under the relevant Additional Assumed Contract or Additional Assumed Leases pursuant to section 365 of the Bankruptcy Code (the "**Additional Cure Amount**"). For each Amended Cure Amount, the Auction Results Notice shall include an exhibit that identifies (w) the name and address of the Counterparty, (x) the relevant Assumed Contract or Assumed Lease, (y) for each Assumed Lease, the premises relating to the relevant Assumed Lease, and (z) the Amended Cure Amount.

The Auction Results Notice shall include, to the extent the Successful Bidder or Back-Up Bidder is not the Purchasers or with respect to the Additional Assumed Contracts and the Additional Assumed Leases, a description of the Successful Bidder and the Back-Up Bidder and a statement as to the ability of the Successful Bidder or the Back-Up Bidder to perform the Debtors' obligations under the Assumed Contracts and Assumed Leases (and, to the extent applicable, the Additional Assumed Contracts and the Additional Assumed Leases) (the "**Successful Bidder's Adequate Assurance**" or the "**Back-Up Bidder's Adequate Assurance**").

F.     **Supplemental Objections**

To the extent that any interested party wishes to object to (i) the assumption of an Additional Assumed Contract or Additional Assumed Lease; (ii) if the Successful Bidder or Back-Up Bidder is not the Purchasers, to the Successful Bidder's or the Back-Up Bidder's Adequate Assurance designated in the Auction Results Notice; or (iii) to the selection of an alternative purchaser as a result of the Auction, such party shall file a written objection (the "**Supplemental Sale Objection**") with the Court no later than **July 20, 2011 at 12:00 p.m.** (prevailing Eastern Time) (the "**Supplemental Sale Objection Deadline**"), and serve such an objection on the Objection Parties so that it is **actually received** by the Supplemental Sale Objection Deadline.

---

[4]  After entry of the Sale Order all references herein to the Purchaser shall refer to the Successful Bidder. In the event that the Back-Up Bidder is substituted for the Successful Bidder pursuant to the Sale Order, all references to the Purchaser shall refer to the Back-Up Bidder. Similarly, after entry of the Sale Order, all references herein to the APAs shall refer to the bid submitted by the Successful Bidder.

To the extent that any interested party wishes to object to an Amended Cure Amount or Additional Cure Amount, such party shall file a written objection (the "**Supplemental Cure Objection**") with the Court no later than **July 20, 2011 at 12:00 p.m.** (prevailing Eastern Time) (the "**Supplemental Cure Objection Deadline**"), and serve such an objection on the Objection Parties so that it is actually received by the Supplemental Cure Objection Deadline.

To the extent that any interested party does not timely serve (x) a Supplemental Sale Objection as set forth above, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Additional Assumed Contract or Additional Assumed Lease; (ii) agreed that the Successful Bidder and the Back-Up Bidder have provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) agreed to the terms of the Sale Order; and (iv) waived any and all objections in connection with items (i) through (iii) hereof, or (y) a Supplemental Cure Objection as set forth above, such party will be deemed, as applicable, to have (i) consented to the relevant Additional Cure Amount or Amended Cure Amount, if any; (ii) agreed to the terms of the Sale Order; and (iii) waived any and all objections in connection with items (i) through (ii) hereof.

G.     **Further Assignments**

During the period between the Auction and the Closing, the Purchasers may designate additional executory contracts or unexpired leases for assumption by the Debtors and assignment to the Purchasers (the "**Further Assignments**"). The Debtors shall serve by first class mail an omnibus notice (the "**Further Assignments Notice**") on each Counterparty to the Further Assignments, substantially in the form attached as **Annex 7** to the Bidding Procedures Order. To the extent that any interested party wishes to object to any matter pertaining to the Further Assignments, then such interested party must file a written objection (a "Further Assignment Objection") with the Court no later than at 4:00 p.m. (prevailing Eastern Time) on the fifteenth day after service of the Further Assignments Notice. In the event a Further Assignment Objection is filed, such objections will be heard at a hearing to be scheduled by the Court.

H.     **Resolution and Adjudication of Objections**

Upon filing of an objection by a Counterparty, the Debtors and/or the Purchasers will contact the objecting Counterparty to attempt to consensually resolve any timely served objection. If the Debtors and/or the Purchasers are unable to resolve an objection in response to the Initial Assignment Notice or the Auction Results Notice, (i) to the extent such objections relate to the adequate assurance of future performance by the Purchasers (each an "**Adequate Assurance Objection**"), such objections will be heard at the Sale Hearing (except in the case of an Adequate Assurance Objection to a Further Assignment, with a hearing on such an objection to be scheduled by the Court) or (ii) to the extent such objections relate to a Cure Amount, Additional Cure Amount, or Amended Cure Amount, such objections will be heard at a hearing (the "**Cure Objection Hearing**") to be scheduled by the Court at the Sale Hearing (except in the case of an Adequate Assurance Objection to a Further Assignment, with a hearing on such an objection to be scheduled by the Court).

KL2 2687284.9

In the event an objection relates solely as to a Cure Amount, Additional Cure Amount, or Amended Cure Amount, (each a "**Cure Objection**"), then such objecting party will be deemed to consent to the assumption of the related executory contract or unexpired lease and its assignment to the Purchasers, notwithstanding such objection. In the event the Debtors and/or the Purchasers are unable to resolve the Cure Objection prior to the Cure Objection Hearing, the Purchasers may elect not to request assumption and assignment of the related executory contract or unexpired lease as part of the Sale.

On or as promptly after the Closing as practical, the Cure Amounts, Amended Cure Amounts, or Additional Cure Amounts to which no objections have been filed, or to which the Purchasers and applicable Counterparties have agreed shall be paid by the Purchasers.

Payment of the undisputed cure amounts shall be deemed to discharge the obligation of the Debtors and the Purchasers to: (i) cure any defaults under the Assumed Contracts and Leases; and (ii) compensate, or provide adequate assurance that the Debtors will promptly compensate, any non-Debtor party to the Assumed Contracts and Leases for any actual pecuniary loss resulting from any default thereunder. Pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall have no liabilities for any claims arising or relating to or accruing post-Closing under any of the Assumed Contracts and Leases.

I.    **Reservation of Rights**

The Debtors' decision to assume and assign any of the Assumed Contracts and Leases is subject to Court approval and consummation of the Sale. Accordingly, the Debtors shall be deemed to have assumed and assigned Assumed Contracts and Leases ultimately identified under the APAs as of and effective only upon the Closing (as defined in the APAs). Absent a Closing that includes such Assumed Contracts and Leases, each of the Assumed Contracts and Leases shall be deemed neither assumed nor assigned/subleased and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.

The Purchasers shall have no rights in and to a particular executory contract or unexpired lease until such time as the particular executory contract or unexpired lease is assumed and assigned in accordance with the procedures set forth herein. In the event that the Purchasers are not a Successful Bidder at the Auction, the Debtors reserve the right to modify these Assignment Procedures. Under no circumstances will the Debtors be deemed to have assumed an executory contract or unexpired lease without a corresponding assignment of such an executory contract or unexpired lease to the Purchasers pursuant to the terms of the APAs and an order of the Bankruptcy Court approving such assumption and assignment. The Debtors reserve the right to cancel the assumption of any executory contract or unexpired lease no later than ten business days after a final order determining a cure amount greater than that proposed by the Debtors.

**<u>ANNEX 4 TO THE BIDDING PROCEDURES ORDER</u>**
**Initial Assignments Notice**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel for Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x
In re:                                 :        Chapter 11
                                        :
SAINT VINCENTS CATHOLIC MEDICAL    :        Case No. 10-11963 (CGM)
CENTERS OF NEW YORK, <u>et al.</u>,           :
                                        :
                    Debtors.      :        Jointly Administered
-------------------------------------------------------- x

**NOTICE OF ASSUMPTION AND ASSIGNMENT OF CERTAIN**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT**
<u>**TO THE SALE OF THE DEBTORS' ST ELIZABETH ANN'S ASSETS**</u>

PLEASE TAKE NOTICE THAT:

        1.        On June 30, 2011, the Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), upon the motion (the "**Motion**") of Saint Vincents Catholic Medical Centers of New York ("**SVCMC**") and certain of its affiliates, as chapter 11 debtors and debtors-in-possession in the above-referenced chapter 11 cases (each a "**Debtor**" and collectively the "**Debtors**")[1], entered an order (the "**Bidding Procedures Order**") (a) approving the bidding procedures and bidder protections with respect to the sale (the "**Sale**") of certain real estate and personal property assets (together the "**SEA Assets**")[2] related to Sisters of Charity

---

[1]  In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc.  There are certain affiliates of SVCMC who are not Debtors.

[2]  As used herein, the term "**SEA Assets**" shall refer to the assets being transferred to the Purchasers (defined herein) pursuant to (i) the APAs (as defined herein) and (ii) in the event (x) the Debtors exercise the put option (the "**Put Option**") contained in the Bayley Seton Lease (defined herein), or (y) the Ground Lessee (defined herein) exercises its purchase option (the "**Call Option**") contained in the Bayley Seton Lease, those assets transferred to the Purchasers pursuant to the Put Option or the Call Option.

Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center ("**St. Elizabeth Ann's**") and entering into the Lease (defined below), and assignments of certain contracts and leases related thereto; (b) scheduling an auction (the "**Auction**") and a hearing (the "**Sale Hearing**") for the Sale of the SEA Assets and entering into the Lease; and (c) approving certain procedures (the "**Assignment Procedures**") related to the assumption and assignment of those executory contracts and unexpired leases related to the SEA Assets and whose assignment is contemplated by the Sale (the "**Assumed Contracts**" and the "**Assumed Leases**").

      2.    The Debtors have entered into (i) that certain Asset Purchase Agreement for the sale of the personal property assets of St. Elizabeth Ann's (the "**Nursing Home APA**") with SV Operating Three, LLC (the "**Nursing Home Purchaser**") and the assignment of certain contracts and leases related thereto, (ii) that certain Purchase and Sale Agreement for the sale of the real estate of St. Elizabeth Ann's (the "**Real Estate APA**," together with the Nursing Home APA, the "**APAs**") with SV Land Three, LLC (the "**Real Estate Purchaser**,"), and (iii) that certain lease (the "**Lease**") of land, building, and equipment related to the Debtor's Bayley Seton campus (the "**Bayley Seton Campus**") with SV Land I, LLC (the "**Lessee**," together with the Nursing Home Purchaser and the Real Estate Purchaser, the "**Purchasers**"). As set forth in the Bidding Procedures, the sale of the SEA Assets and/or entry into the Lease remains subject to competing offers from any prospective bidder.

      3.    In the event that the Debtors receive a bid for the SEA Assets, the Debtors intend to conduct the Auction with respect to the SEA Assets. The Auction will take place at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, on July 19, 2011 starting at 9:00 a.m. (prevailing Eastern Time) or at such other place, date, and time as may be designated by the Debtors at or prior to the Auction.

      4.    Attached as **Annex A** hereto is a description of the Purchasers that demonstrates the Purchasers' ability to perform the Debtors' obligations under the Assumed Contracts and/or the Assumed Leases ("**Purchasers' Adequate Assurance**").

      5.    The Debtors hereby provide notice of their intent to assume and assign certain agreements to which the Debtors are a party, including at least one or more such agreements to which the Debtors believe you or your predecessor in interest are a party, which agreements are identified in **Annex B** hereto (singularly or collectively, the "**Assumed Agreements**"). Annex B also identifies, for each Assumed Agreement, the effective day of assignment; a description of the Assumed Agreement; the premises relating to the Assumed Agreement (if the relevant Assumed Agreement is an Assumed Lease); and the cure amount, asserted by the Debtors, that is necessary to cure any default under the relevant Assumed Agreement pursuant to section 365 of the Bankruptcy Code (the "**Cure Amount**").

      6.    Nothing contained in this Notice is to be construed as an admission by the Debtors as to the character of any document denominated as an Assumed Agreement, as an executory contract or unexpired lease, or to the rights of any parties thereto. The sale of the SEA Assets, and assumption and assignment of the Assumed Agreements will take place pursuant to the Bidding Procedures Order.

7.     To the extent that any interested party wishes to object to any matter pertaining to the assumption and assignment of an Assumed Contract or an Assumed Lease, including, without limitation, Purchasers' Adequate Assurance or the Cure Amount designated in this Notice, then such interested party must file a written objection (an "**Objection**") with the Bankruptcy Court no later than **July 8, 2011 at 4:00 p.m.** (prevailing Eastern Time) (the "**Objection Deadline**"), and simultaneously serve such an Objection on the following parties: (a) the Debtors, Saint Vincents Catholic Medical Centers of New York, 450 West 33 Street, New York, New York 10001, Attn: Scott Davis; (b) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq., and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021, Attn: Judith Eisen, Esq.; (c) counsel for the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Stephen Kuhn, Esq. and Sarah Link Schultz, Esq.; (d) counsel to General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166-4193, Attn: David Neier, Esq.; and Winston & Strawn LLP, 101 California Street, San Francisco CA 94111-5802, Attn: Randy Rogers, Esq.; (e) counsel for the Pension Benefit Guarantee Corporation, 1200 K Street, N.W., Washington, D.C. 20005-4026, Attn: Chief Counsel, Joel W. Ruderman, Esq. and Kelly R. Cusick, Esq.; (f) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; and (g) counsel to the Purchasers, Nutovic & Associates, 488 Madison Avenue, 16th Floor, New York, New York 10022, Attn: Isaac Nutovic, Esq., so that it is <u>actually received</u> by the Objection Deadline.

8.     In the event the Debtors choose a Successful Bidder or Back-Up Bidder other than the Purchasers at the Auction or the terms of the proposed Sale are modified at the time of the Auction, the Objection Deadline solely with respect to (i) the Debtors' choice of such alternative Successful Bidder or Back-Up Bidder, or the modifications to the terms of the Sale to the Successful Bidder and (ii) any additional or modified Cure Amounts will be July 20, 2011 at 4:00 p.m. (prevailing Eastern Time).

9.     To the extent that any party-in-interest does not timely serve an Objection as set forth above, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Assumed Agreement; (ii) agreed that the Purchasers have provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) consented to the relevant Cure Amount, if any; and (iv) agreed to the terms of the Motion.

10.     A copy of the Bidding Procedures Order or any other document referenced herein can be viewed and obtained on the Bankruptcy Court's website at <u>https://ecf.nysb.uscourts.gov</u> or (without charge) at <u>http://svcmcrestructuring.com</u>.

Dated: New York, New York
      [_____], 2011

                                            KRAMER LEVIN NAFTALIS & FRANKEL LLP

                                            /s/      Adam C. Rogoff
                                            Kenneth H. Eckstein
                                            Adam C. Rogoff
                                            P. Bradley O'Neill
                                          1177 Avenue of the Americas
                                            New York, New York 10036
                                            Telephone: (212) 715-9100
                                            *Counsel for Debtors*

KL2 2687284.9

**ANNEX 5 TO THE BIDDING PROCEDURES ORDER**
**Auction Results Notice**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel for Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

In re:                                       :        Chapter 11
                                             :
SAINT VINCENTS CATHOLIC MEDICAL              :        Case No. 10-11963 (CGM)
CENTERS OF NEW YORK, et al.,                 :
                                             :
                        Debtors.             :        Jointly Administered

---------------------------------------------------------- x

**NOTICE OF AUCTION**
**RESULTS IN CONNECTION WITH THE SALE OF THE DEBTORS'**
**ST. ELIZABETH ANN'S ASSETS, AND PROCEDURES RELATED THERETO**

PLEASE TAKE NOTICE THAT:

　　　　1.　　*Introduction.*　Saint Vincents Catholic Medical Centers of New York
("**SVCMC**") and certain of its affiliates, as chapter 11 debtors and debtors-in-possession in the
above-referenced chapter 11 cases (each a "**Debtor**" and collectively the "**Debtors**"),[1] conducted
an auction (the "**Auction**") with respect to the proposed sale (the "**Sale**") of certain real estate
assets and personal property assets related to the Sisters of Charity Health Care System Nursing
Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center ("**St. Elizabeth**
**Ann's**" and "**SEA Assets**" respectively),[2] in accordance with the order (the "**Bidding**

---

[1]  In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii)
Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort
Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home,
Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation
d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc.  There are certain affiliates of SVCMC who
are not Debtors.

[2]  As used herein, the term "**SEA Assets**" shall refer to the assets being transferred to the Purchasers (defined herein)
pursuant to (i) the APAs (as defined herein) and (ii) in the event (x) the Debtors exercise the put option (the "**Put**
**Option**") contained in the Bayley Seton Lease (defined herein), or (y) the Ground Lessee (defined herein) exercises
its purchase option (the "**Call Option**") contained in the Bayley Seton Lease, those assets transferred to the
Purchasers pursuant to the Put Option or the Call Option.

**Procedures Order**") of the Bankruptcy Court of the Southern District of New York (the "**Bankruptcy Court**"), entered on June 30, 2011, (a) approving the bidding procedures (the "**Bidding Procedures**"), (b) scheduling the Auction and a hearing (the "**Sale Hearing**") for the Sale of the SEA Assets and entering into the Lease, and (c) approving certain procedures related to the assumption and assignment of those executory contracts and unexpired leases related to the SEA Assets and whose assignment is contemplated by the Sale.

        2.     Auction Results.    Upon conclusion of the Auction, the Debtors determined, pursuant to the Bidding Procedures and subject to the Bankruptcy Court's approval, that the highest or otherwise best bidder was [ ] (the "**Successful Bidder**") and the second highest or otherwise best bidder was [ ] (the "**Backup Bidder**").  The asset purchase agreements of the Successful Bidder and the Backup Bidder, as these documents were modified by the Successful Bidder and the Backup Bidder at the Auction (respectively, the "**Successful Bid**" and the "**Backup Bid**") are attached hereto as **Exhibit A-1** and **Exhibit A-2**, respectively.

        3.     Initial Assignment Notice.   On [DATE], the Debtors served an initial assignment notice that indicated their intent to assume and assign certain agreements to which the Debtors are a party (collectively, the "**Assigned Agreements**"), as well as the cure amount, asserted by the Debtors, that is necessary to cure any default under the relevant Assigned Agreement pursuant to section 365 of the Bankruptcy Code (the "**Cure Amounts**").

        4.     Additional Assumed Agreements/Amended Cure Amounts.  Attached as **Exhibit B-1** and **Exhibit B-2** hereto is a list, pursuant to the **Successful Bid** and the **Backup Bid**, respectively, of (i) any additional Assigned Agreements along with any associated Cure Amounts and (ii) any amended Cure Amounts with respect to the original Assigned Agreements.

        5.     Adequate Assurance of Future Performance.  Attached as **Exhibit C-1** and **Exhibit C-2** hereto is the information with respect to adequate assurance of future performance provided by the Successful Bidder and the Backup Bidder under the Assigned Agreements.

        6.     Sale Hearing.  The Bidding Procedures Order provides that the Sale Hearing will be held on **July 21, 2011 at 11:00 a.m. (prevailing Eastern Time)**, before the Honorable Cecelia G. Morris, United States Bankruptcy Judge, in Courtroom 701 at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408.  At the Sale Hearing, the Debtors will request that the Bankruptcy Court enter an order approving the Sale of the SEA Assets to the Successful Bidder.

        7.     Objection Deadline.  Any interested party that wishes to object to the Successful Bidder's adequate assurance or the Backup Bidder's adequate assurance designated in this Notice, must file a written objection with the Court no later than 4:00 p.m. on July 8, 2011 (the "**Sale Objection Deadline**"), and serve such an objection (each a "**Sale Objection**") on the following parties (collectively, the "**Objection Parties**"): (a) the Debtors, Saint Vincents Catholic Medical Centers of New York, 450 West 33 Street, New York, New York 10001, Attn: Scott Davis; (b) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq. and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021, Attn: Judith Eisen, Esq.; (c)

counsel for the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Stephen Kuhn, Esq. and Sarah Link Schultz, Esq.; (d) counsel to General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier, Esq.; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; (e) the Pension Benefit Guarantee Corporation, 1200 K Street, N.W., Washington, D.C. 20005-4026, Attn: Chief Counsel, Joel W. Ruderman, Esq. and Kelly R. Cusick, Esq.; (f) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; (g) the Successful Bidder; and (h) the Backup Bidder, so that it is **actually received** by the Sale Objection Deadline. To the extent any party (i) that previously received notice of a Cure Amount in connection with the Sale and wishes to object to a modified Cure Amount designated in this Notice or (ii) did not receive notice of a Cure Amount in connection with the Sale and wishes to object to its Cure Amount designated in this Notice, such party must file a written objection (each a "**Cure Objection**") with the Court no later than 4:00 p.m. on July 8, 2011 (the "**Cure Objection Deadline**"), and serve such an objection on the Objection Parties, so that it is actually received by the Cure Objection Deadline.

8.      To the extent that any interested party does not timely serve (x) a Sale Objection as set forth above, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Additional Assumed Contract or Additional Assumed Lease; (ii) agreed that the Successful Bidder and the Backup Bidder have provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) agreed to the terms of the Sale Order; and (iv) waived any and all objections in connection with items (i) through (iii) hereof, or (y) a Cure Objection as set forth above, such party will be deemed, as applicable, to have (i) consented to the relevant Additional Cure Amount or Amended Cure Amount, if any; (ii) agreed to the terms of the Sale Order; and (iii) waived any and all objections in connection with items (i) through (ii) hereof.

9.      A copy of each of the Bidding Procedures Order or any other document referenced herein can be viewed and obtained on the Court's website at https://ecf.nysb.uscourts.gov or (without charge) at http://svcmcrestructuring.com.


Dated: New York, New York
          [_____], 2011                    KRAMER LEVIN NAFTALIS & FRANKEL LLP

                                             /s/      Adam C. Rogoff
                                             Kenneth H. Eckstein
                                             Adam C. Rogoff
                                             P. Bradley O'Neill
                                             1177 Avenue of the Americas
                                             New York, New York 10036
                                             Telephone: (212) 715-9100
                                             *Counsel for Debtors*

# ANNEX 6 TO THE BIDDING PROCEDURES ORDER
## Creditor Notice

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel for Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- X
In re:                                   :        Chapter 11
                                         :
SAINT VINCENTS CATHOLIC MEDICAL          :        Case No. 10-11963 (CGM)
CENTERS OF NEW YORK, et al.,             :
                                         :
                          Debtors.       :        Jointly Administered
--------------------------------------------------------- X

**NOTICE OF DEBTORS' MOTION FOR (I) AN ORDER**
**(A) APPROVING BREAK-UP FEE AND BIDDING PROCEDURES**
**FOR THE AUCTION RELATED TO THE DEBTOR'S ST. ELIZABETH**
**ANN'S ASSETS, (B) SCHEDULING AN AUCTION AND SALE HEARING,**
**AND (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND**
**ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED**
**LEASES; AND (II) AN ORDER (A) APPROVING THE ASSET SALE, (B)**
**AUTHORIZING THE DEBTORS TO ENTER INTO A RECEIVERSHIP**
**AGREEMENT, (C) APPROVING ENTRY INTO THE BAYLEY SETON**
**LEASE, AND (D) APPROVING THE ASSUMPTION AND ASSIGNMENT**
**OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

PLEASE TAKE NOTICE OF THE FOLLOWING:

        1.    <u>Introduction</u>.  On June 9, 2011, Saint Vincents Catholic Medical Centers
of New York ("**SVCMC**") and certain of its affiliates, as chapter 11 debtors and debtors-in-
possession (collectively, the "**Debtors**")[1] in the above-referenced chapter 11 cases (the "**Chapter
11 Cases**"), filed a motion (the "**Motion**") for (i) an order (the "**Bidding Procedures Order**"),

---

[1] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii)
Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort
Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home,
Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation
d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc.  There are certain affiliates of SVCMC who
are not Debtors.

(a) approving the bidding procedures and bidder protections (the "**Bidding Procedures**") with respect to the sale (the "**Sale**") of substantially all the real estate and personal property assets (the "**SEA Assets**")[2] of Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center ("**St. Elizabeth Ann's**"), and assignments of certain contracts and leases related thereto, and the right to enter into the Lease (as defined below); (b) scheduling an auction (the "**Auction**") for the SEA Assets and the right to enter into the Lease and a hearing approving the transactions (the "**Sale Hearing**"); and (c) approving certain procedures (the "**Assignment Procedures**") related to the assumption and assignment of those executory contracts and unexpired leases related to the SEA Assets and whose assignment is contemplated by the Sale (the "**Assumed Contracts and Leases**"); and (ii) an order (the "**Sale Order**"), (a) approving the Sale of the SEA Assets and entry into the lease of the land, building, and equipment (the "**Lease**") related to the Debtor's Bayley Seton campus (the "**Bayley Seton Campus**"), (b) authorizing the Debtors to enter into a Receivership Agreement (the "**Receivership Agreement**"), (c) authorizing payment of the brokers' transaction fees, and (d) approving the assumption and assignment of the Assumed Contracts and Leases.

2.      <u>APAs and Lease</u>.  The Debtors have entered into (i) that certain Asset Purchase Agreement for the sale of the personal property assets of St. Elizabeth Ann's (the "**Nursing Home APA**") with SV Operating Three, LLC (the "**Nursing Home Purchaser**") and the assignment of certain contracts and leases related thereto, (ii) that certain Purchase and Sale Agreement for the sale of the real estate of St. Elizabeth Ann's (the "**Real Estate APA**," together with the Nursing Home APA, the "**APAs**") with SV Land Three, LLC (the "**Real Estate Purchaser**"), and (iii) the Lease with SV Land I, LLC (the "**Lessee**," together with the Nursing Home Purchaser and Real Estate Purchaser, the "**Purchasers**").  As set forth in the Bidding Procedures, the sale of the SEA Assets remains subject to competing offers from any prospective bidder.

3.      <u>Important Dates</u>.  Pursuant to the Motion, the Debtors have requested approval of the following relevant dates for the Auction and approval of the Sale of the SEA Assets:

| | |
|---|---|
| **Deadline to Object to Proposed Bidding Procedures** | **June 23, 2011 at 4:00 p.m. (prevailing Eastern Time)** |
| **Bidding Procedures Hearing** | **June 30, 2011 at 11:00 a.m. (prevailing Eastern Time)** |
| **Bid Deadline** | **July 15, 2011 at 5:00 p.m. (prevailing Eastern Time)** |

---

[2]  As used herein, the term "**SEA Assets**" shall refer to the assets being transferred to the Purchasers (defined herein) pursuant to (i) the APAs (as defined herein) and (ii) in the event (x) the Debtors exercise the put option (the "**Put Option**") contained in the Bayley Seton Lease (defined herein), or (y) the Ground Lessee (defined herein) exercises its purchase option (the "**Call Option**") contained in the Bayley Seton Lease, those assets transferred to the Purchasers pursuant to the Put Option or the Call Option.

| | |
|---|---|
| **Initial Objection Deadline** | **July 8, 2011 at 4:00 p.m. (prevailing Eastern Time)** |
| **Auction** | **July 19, 2011 at 9:00 a.m. (prevailing Eastern Time)** |
| **Supplemental Cure Objection and Sale Objection Deadline** | **July 20, 2011 at 12:00 p.m. (prevailing Eastern Time)** |
| **Sale Hearing** | **July 21, 2011 at 11:00 a.m. (prevailing Eastern Time)** |

4. <u>Bidding Procedures Hearing</u>. A hearing on the requested Bidding Procedures is scheduled for **June 30, 2011**, before the Honorable Cecelia G. Morris, United States Bankruptcy Judge, in Courtroom 701 at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408. At the Bidding Procedures hearing, the Debtors will request that the Bankruptcy Court enter an order approving the proposed Bidding Procedures and schedule the Auction to take place on **July 19, 2011** (or such later date as may be scheduled by the Debtors).

5. <u>Objections to the Bidding Procedures</u>. Objections, if any, to the Bidding Procedures shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on the following parties (the "**Notice Parties**"): (a) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq. and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503, Great Neck, New York 11021, Attn: Judith Eisen, Esq.; (b) counsel for the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Stephen Kuhn, Esq. and Sarah Link Schultz, Esq.; (c) counsel to General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier, Esq.; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; (d); counsel to the Pension Benefit Guarantee Corporation, 1200 K Street, N.W., Washington, D.C. 20005-4026, Attn: Chief Counsel, Joel W. Ruderman, Esq. and Kelly R. Cusick, Esq.; (e) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; and (f) counsel to the Purchasers, Nutovic & Associates, 488 Madison Avenue, 16th Floor, New York, New York 10022, Attn: Isaac Nutovic, Esq., so as to be **actually received by 4:00 p.m. (prevailing Eastern Time) on June 23, 2011** (the "**Bidding Procedures Objection Deadline**").

6. <u>Auction</u>. In the event that the Debtors receive a qualified bid for the SEA Assets or the right to enter into the Lease, the Debtors intend to conduct the Auction with respect to such assets. The Auction will take place at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036 on July 19, 2011, starting at

9:00 a.m. (prevailing Eastern Time), or at such other place, date and time as may be designated by the Debtors at or prior to the Auction.

7.    <u>Sale Hearing</u>. The Sale Hearing is scheduled for **July 21, 2011 at 11:00 a.m. (prevailing Eastern Time)**, before the Honorable Cecelia G. Morris, United States Bankruptcy Judge, in Courtroom 701 at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408. At the Sale Hearing, the Debtors will request that the Bankruptcy Court enter an order approving the Sale of the SEA Assets and the right to enter into the Lease to the prevailing bidder(s) of the Auction.

8.    <u>Objections to the Sale</u>. Objections, if any, to the Sale shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on the Notice Parties, the Successful Bidder (as determined in the Auction), and the Backup Bidder (as determined in the Auction), so as to be **actually received by 4:00 p.m. (prevailing Eastern Time) on July 8, 2011** (the "**<u>Sale Objection Deadline</u>**"). Only in the event that the Debtors choose a Successful Bidder other than the Purchasers at the Auction, the Sale Objection Deadline solely with respect to the Debtors' choice of such alternative Successful Bidder will be **12:00 p.m. (prevailing Eastern Time) on July 20, 2011** (the "**<u>Supplemental Objection Deadline</u>**"). The Supplemental Objection Deadline is NOT an opportunity to file a late Objection to the Motion and the objection must be limited to objections concerning the Successful Bidder if not the Purchasers. In addition, in the event that the Successful Bidder designates any additional Assumed Contracts and Leases, any objection to such assumption and assignment must be received by the Supplemental Objection Deadline.

9.    <u>PLEASE NOTE</u>: This is the ONLY NOTICE of the sale of the SEA Assets that will be mailed to ALL KNOWN GENERAL CREDITORS of St. Elizabeth Ann's under any applicable law (Federal and New York State law). Further updates regarding the sale process and a copy of the Motion, the APAs, the Lease, the Bidding Procedures, the Assignment Procedures, or any other document referenced herein can be viewed and obtained on the Court's website at www.ecf.nysb.uscourts.gov or (without charge) at http://svcmcrestructuring.com. You may also contact counsel for the Debtors, Joseph A. Shifer, Esq. (jshifer@kramerlevin.com) to request copies of the Motion or any other document.

Dated: New York, New York
      June 9, 2011

KRAMER LEVIN NAFTALIS & FRANKEL LLP

<u>/s/ Adam Charles Rogoff</u>
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
*Counsel for Debtors*

**ANNEX 7 TO THE BIDDING PROCEDURES ORDER**
Further Assignments Notice

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel for Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------- x
```
| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SAINT VINCENTS CATHOLIC MEDICAL | : | Case No. 10-11963 (CGM) |
| CENTERS OF NEW YORK, <u>et al.</u>, | : | |
| | : | |
| Debtors. | : | Jointly Administered |

```
-------------------------------------------------------- x
```

**NOTICE OF FURTHER ASSUMPTION AND ASSIGNMENT OF**
**ADDITIONAL EXECUTORY CONTRACTS AND UNEXPIRED LEASES**
<u>**PURSUANT TO THE SALE OF THE DEBTORS' ST ELIZABETH ANN'S ASSETS**</u>

PLEASE TAKE NOTICE THAT:

       1.    <u>Introduction</u>.  Saint Vincents Catholic Medical Centers of New York ("**SVCMC**") and certain of its affiliates, as chapter 11 debtors and debtors-in-possession in the above-referenced chapter 11 cases (each a "**Debtor**" and collectively the "**Debtors**"), conducted an auction (the "**Auction**") with respect to the proposed sale (the "**Sale**") of certain real estate assets and personal property assets related to the Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center ("**St. Elizabeth Ann's**" and "**SEA Assets**" respectively), in accordance with the order (the "**Bidding Procedures Order**") of the Bankruptcy Court of the Southern District of New York (the "**Bankruptcy Court**"), entered on June 30, 2011, (a) approving the bidding procedures (the "**Bidding Procedures**"), (b) scheduling the Auction and a hearing (the "**Sale Hearing**") for the Sale of the SEA Assets and entering into the Lease; and (c) approving certain procedures related to the assumption and assignment of those executory contracts and unexpired leases related to the SEA Assets and whose assignment is contemplated by the Sale.

       2.    <u>Auction Results</u>.  Upon conclusion of the Auction, the Debtors determined, pursuant to the Bidding Procedures and subject to the Bankruptcy Court's approval, that the highest or otherwise best bidder was [ ] (the "**Successful Bidder**") and the second highest or otherwise best bidder was [ ] (the "**Backup Bidder**"). The asset purchase agreements of the Successful Bidder and the Backup Bidder, as these documents were modified by the

Successful Bidder and the Backup Bidder at the Auction (respectively, the "**Successful Bid**" and the "**Backup Bid**") are attached hereto as **Exhibit A-1** and **Exhibit A-2**, respectively.

      3.     <u>Initial Assignment Notice</u>.  On <mark>[DATE]</mark>, the Debtors served an initial assignment notice that indicated their intent to assume and assign certain agreements to which the Debtors are a party (collectively, the "**Assigned Agreements**"), as well as the cure amount, asserted by the Debtors, that is necessary to cure any default under the relevant Assigned Agreement pursuant to section 365 of the Bankruptcy Code (the "**Initial Assignment Cure Amounts**").

      4.     <u>Additional Assignment Notice</u>.  On [DATE], the Debtors served an additional assignment notice that indicated their intent to assume and assign certain agreements to which the Debtors are a party (collectively, the "**Additional Assigned Agreements**"), as well as the cure amount, asserted by the Debtors, that is necessary to cure any default under the relevant Additional Assigned Agreement pursuant to section 365 of the Bankruptcy Code (the "**Additional Assignment Cure Amounts**").

      5.     Attached as **Annex A** hereto is a description of the Purchasers that demonstrates the Purchasers' ability to perform the Debtors' obligations under the Further Assignments ("**Purchasers' Adequate Assurance**").

      6.     The Debtors hereby provide notice of their intent to assume and assign certain agreements to which the Debtors are a party, which agreements are identified in **Annex B** hereto (singularly or collectively, the "**Further Assumed Agreements**").  Annex B also identifies, for each Further Assumed Agreement, the effective day of assignment; a description of the Further Assumed Agreement; the premises relating to the Further Assumed Agreement (if the relevant Further Assumed Agreement is an Assumed Lease); and the cure amount, asserted by the Debtors, that is necessary to cure any default under the relevant Further Assumed Agreement pursuant to section 365 of the Bankruptcy Code (the "**Further Assignment Cure Amounts**", and together with the Initial Assignment Cure Amounts and the Additional Assignment Cure Amounts, the "**Cure Amounts**").

      7.     Nothing contained in this Notice is to be construed as an admission by the Debtors as to the character of any document denominated as a Further Assumed Agreement, as an executory contract or unexpired lease, or to the rights of any parties thereto.  The sale of the SEA Assets, and assumption and assignment of the Further Assumed Agreements will take place pursuant to the Bidding Procedures Order.

      8.     To the extent that any interested party wishes to object to any matter pertaining to the Further Assignments, then such interested party must file a written objection (an "**Further Assignments Objection**") with the Bankruptcy Court no later than at 4:00 p.m. (prevailing Eastern Time) on the fifteenth day after service of the Further Assignments Notice (the "**Further Assignments Objection Deadline**"), and simultaneously serve such an Objection on the following parties: (a) the Debtors, Saint Vincents Catholic Medical Centers of New York, 450 West 33 Street, New York, New York 10001, Attn: Scott Davis; (b) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Adam C. Rogoff, Esq., and Garfunkel Wild, P.C., 111 Great Neck Road, Suite 503,

Great Neck, New York 11021, Attn: Judith Eisen, Esq.; (c) counsel for the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Stephen Kuhn, Esq. and Sarah Link Schultz, Esq.; (d) counsel to General Electric Capital Corporation, as Agent for itself and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166-4193, Attn: David Neier, Esq.; and Winston & Strawn LLP, 101 California Street, San Francisco CA 94111-5802, Attn: Randy Rogers, Esq.; (e) counsel for the Pension Benefit Guarantee Corporation, 1200 K Street, N.W., Washington, D.C. 20005-4026, Attn: Chief Counsel, Joel W. Ruderman, Esq. and Kelly R. Cusick, Esq.; (f) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Serene Nakano, Esq.; and (g) counsel to the Purchasers [], so that it is <u>actually received</u> by the Further Assignments Objection Deadline. Such objections will be heard at a hearing to be scheduled by the Court.

9.      To the extent that any party-in-interest does not timely serve a Further Assignments Objection as set forth above, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Further Assumed Agreement; (ii) agreed that the Purchasers have provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) consented to the relevant Cure Amounts, if any; and (iv) agreed to the terms of the Motion.

10.      A copy of the Bidding Procedures Order or any other document referenced herein can be viewed and obtained on the Bankruptcy Court's website at https://ecf.nysb.uscourts.gov or (without charge) at http://svcmcrestructuring.com.

Dated: New York, New York
      [_____], 2011

                              KRAMER LEVIN NAFTALIS & FRANKEL LLP

                              /s/      Adam C. Rogoff
                              Kenneth H. Eckstein
                              Adam C. Rogoff
                              P. Bradley O'Neill
                              1177 Avenue of the Americas
                              New York, New York 10036
                              Telephone: (212) 715-9100
                              *Counsel for Debtors*

KL2 2687284.9

# EXHIBIT B TO MOTION


# SALE ORDER

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
In re:                                              :         Chapter 11
                                                    :
SAINT VINCENTS CATHOLIC MEDICAL          :         Case No. 10-11963 (CGM)
CENTERS OF NEW YORK, et al.,             :
                                                    :
              Debtors.                   :         Jointly Administered
-------------------------------------------------------------X

**ORDER (A) APPROVING THE SALE**
**OF THE ST. ELIZABETH ANN'S ASSETS, (B)**
**AUTHORIZING THE DEBTORS TO ENTER INTO A RECEIVERSHIP**
**AGREEMENT, (C) APPROVING ENTRY INTO THE BAYLEY SETON**
**LEASE, AND (D) APPROVING THE ASSUMPTION AND ASSIGNMENT**
**OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES[1]**

**[Relates to Docket No. _____ ]**

Upon the Motion (the "**Motion**")[2] of Saint Vincents Catholic Medical Centers of

New York ("**SVCMC**") and certain of its affiliates, as Chapter 11 debtors and debtors-in-

possession (each a "**Debtor**" and collectively, the "**Debtors**")[3] in the above-referenced Chapter

11 cases (the "**Chapter 11 Cases**") for (I) an order (the "**Bidding Procedures Order**") (A)

approving bidding procedures (the "**Bidding Procedures**") for the auction of substantially all the

---

[1] [*Please note that, as provided for in the Motion, in the event that the SEA Assets and the Bayley Seton Lease are transferred separately, and not as part of the stalking horse's packaged bid, this proposed form of Sale Order will be conformed to one relating to the SEA Assets and one relating to the Bayley Seton Lease, as applicable. This footnote is for informational purposes only and will not part part of the actual Sale Order(s).*]

[2] Unless otherwise indicated, capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion. The terms "**Prepetition Agent**," "**Prepetition Lenders**," "**Prepetition Obligations**," "**DIP Loan**," "**DIP Obligations**," "**DIP Agent**," and "**DIP Lenders**" shall have the meanings ascribed to them in the Final Order (I) Authorizing Debtors to Incur Postpetition Indebtedness; (II) Granting Senior Security Interests and Superpriority Claims; (III) Authorizing the Debtors to Use Cash Collateral; (IV) Granting Adequate Protection; and (V) Providing Related Relief [Docket No. 285] (the "**DIP Order**").

[3] In addition to SVCMC, the Debtors are as follows: (i) 555 6th Avenue Apartment Operating Corporation; (ii) Bishop Francis J. Mugavero Center for Geriatric Care, Inc.; (iii) Chait Housing Development Corporation; (iv) Fort Place Housing Corporation; (v) Pax Christi Hospice, Inc.; (vi) Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center; (vii) St. Jerome's Health Services Corporation d/b/a Holy Family Home; and (viii) SVCMC Professional Registry, Inc. There are certain affiliates of SVCMC who are not Debtors.

assets (the "**SEA Assets**")[4] of Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center ("**St. Elizabeth Ann's**"), (B) scheduling an auction and sale hearing related thereto, and (C) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases related thereto (the "**Assignment Procedures**"); and (II) an order (the "**Sale Order**") (A) approving the sale of the SEA Assets, (B) authorizing the Debtors to enter into a Receivership Agreement (the "**Receivership Agreement**"), attached as **Exhibit F** to the Nursing Home APA (defined below), (C) approving the Lease of Land, Building, and Equipment of the land, building, equipment of the Bayley Seton Campus (the "**Bayley Seton Lease**"), and (D) approving the assumption and assignment of certain executory contracts and unexpired leases, all as more fully set forth in the Motion; and the Court having approved the Bidding Procedures and Assignment Procedures at a hearing held on June 30, 2011 (the "**Bidding Procedures Hearing**"), and having entered the Bidding Procedures Order on June 30, 2011; and the auction for the SEA Assets and the Bayley Seton Lease (both as individual assets as well as part of a packaged transaction) having been held on July 19, 2011 in accordance with the bidding procedures approved by this Court; and the Debtors having determined that (i) the joint bid from (a) SV Operating Three, LLC (the "**Nursing Home Purchaser**") for the sale of the personal property assets of St. Elizabeth Ann's pursuant to that certain Asset Purchase Agreement between St. Elizabeth Ann's and the Nursing Home Purchaser (the "**Nursing Home APA**" attached hereto as **Annex 1-A**), and (b) SV Land Three, LLC (the "**Real Estate Purchaser**," and together with the Nursing Home Purchaser, the

---

[4] As used herein, the term "**SEA Assets**" shall refer to the assets being transferred to the Purchasers (defined herein) pursuant to (i) the APAs (as defined herein) and (ii) in the event (x) the Debtors exercise the put option (the "**Put Option**") contained in the Bayley Seton Lease (defined herein), or (y) the Ground Lessee (defined herein) exercises its purchase option (the "**Call Option**") contained in the Bayley Seton Lease, those assets transferred to the Purchasers pursuant to the Put Option or the Call Option.

Real Estate Purchaser, and the tenant (the "**Ground Lessee**") under the Bayley Seton Lease, the "**Purchasers**") for the sale of the real estate of St. Elizabeth Ann's pursuant to that certain Purchase and Sale Agreement between St. Elizabeth Ann's and the Real Estate Purchaser (the "**Real Estate APA**" attached hereto as **Annex 1-B**, together with the Nursing Home APA, the "**APAs**," and with the APAs, the Receivership Agreement, the Bayley Seton Lease between SVCMC and the Real Estate Purchaser, attached hereto as **Annex 1-C**, and all exhibits and annexes thereto, the "**Transaction Documents**"),was the highest or otherwise best offer for the SEA Assets, and (ii) the bid from (x) [          ] (the "**Back-Up Nursing Home Bidder**") for the sale of the personal property assets of St. Elizabeth Ann's pursuant to that certain Asset Purchase Agreement between St. Elizabeth Ann's and the Back-Up Nursing Home Bidder (the "**Back-Up Nursing Home APA**" attached hereto as **Annex 2-A**), and (y) [          ] (the "**Back-Up Real Estate Bidder**," and with the Back-Up Nursing Home Bidder, the "**Back-Up Bidders**") for the sale of the real estate of St. Elizabeth Ann's pursuant to that certain Asset Purchase Agreement between St. Elizabeth Ann's and the Back-Up Real Estate Bidder (the "**Back-Up Real Estate APA**" attached hereto as **Annex 2-B**, together with the Back-Up Nursing Home APA, the "**Back-Up APAs**," and with the Back-Up APAs, the back-up Bayley Seton Lease between SVCMC and the Back-Up Real Estate Bidder, attached hereto as **Annex 2-C**, and all exhibits and annexes thereto, the "**Back-Up Transaction Documents**") was the second highest or otherwise best offer for the SEA Assets; and the Court having conducted a sale hearing on July 21, 2011 (the "**Sale Hearing**") to consider approval of the sale of the SEA Assets to the Purchasers pursuant to the Transaction Documents, and approval of the Back-Up Transaction Documents; and all parties-in-interest having been heard or had the opportunity to be heard regarding the approval of the Transaction Documents and the transactions contemplated thereby;

and upon the Motion and supporting documentation filed in connection therewith; and the Court

having reviewed and considered the Motion and any objections or responses thereto; and upon

the record of the Bidding Procedures Hearing, the Sale Hearing and the full record of these

cases; and the Court having determined that the relief sought in the Motion is in the best interests

of the Debtors, their estates and creditors, and all parties-in-interest and that the legal and factual

bases set forth in the Motion establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND

DETERMINED THAT:[5]

A.     Jurisdiction and Venue.  The Court has subject matter jurisdiction over the

Motion and the relief requested therein pursuant to 28 U.S.C. section 1334 and the Standing

Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern

District of New York, dated July 19, 1984 (Ward, Acting C.J.).  The Motion is a core proceeding

pursuant to 28 U.S.C. section 157(b); and venue is proper before the Court pursuant to 28 U.S.C.

sections 1408 and 1409.

B.     Statutory Predicates.   The statutory predicates for this Sale Order are

sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and

6006.

C.     Notice.  Proper, timely, adequate and sufficient notice of the Motion and

the relief requested therein, the auction, the Sale Hearing, the assumption and assignment of the

Assumed Contracts and Leases and related transactions described in the Transaction Documents

---

[5] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.

(all such transactions being collectively referred to as the "**Sale Transaction**"), has been provided in accordance with sections 102(1) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 and in compliance with the Bidding Procedures Order, and such notice was good, sufficient, and appropriate under the particular circumstances. Moreover, such notice has also been provided to the New York Attorney General ("**NY AG**"), which is a proper party-in-interest. No other or further notice of the Motion, the relief requested therein and all matters relating thereto, the Auction, the Sale Hearing, the Sale Transaction or entry of this Sale Order is or shall be required.

D.    Opportunity to Object and Bid. Creditors, parties-in-interest and other entities (including, without limitation, the New York State Attorney General) have been afforded a reasonable opportunity to object to the Sale Transaction. A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

E.    Compliance with General Order. As detailed herein, the Debtors have complied in all respects with General Order M-383 of the United States Bankruptcy Court for the Southern District of New York, dated November 18, 2009, establishing guidelines for the conduct of asset sales.

F.    Prompt Consummation. It is in the best interests of the Debtors and their estates to sell the SEA Assets within the time constraints set forth in the Motion and the Transaction Documents. The Sale Transaction must be approved and consummated promptly as provided herein in order to maximize the value of the SEA Assets for the Debtors' estates.

G.    Compliance with Bidding Procedures Order. As demonstrated by (i) the testimony and/or other evidence proffered or adduced at the Sale Hearing and (ii) the

representations of counsel made on the record at the Sale Hearing, the Debtors have marketed the SEA Assets and conducted the sale process in compliance with the Bidding Procedures Order.

H.    <u>Marketing Process</u>.  The marketing and bidding processes implemented by the Debtors, as set forth in the Motion, the Bidding Procedures Order, and supporting documentation filed in connection therewith, were fair, proper, complete, provided an adequate opportunity for interested parties to submit improved bids, and were reasonably calculated to result in the best value received for the SEA Assets.

I.    <u>Corporate Authority</u>.  The Debtors have full corporate power and authority to consummate the Sale Transaction pursuant to the Transaction Documents, and all other documents contemplated thereby, and no consents or approvals, other than those expressly provided for in the Transaction Documents, are required for the Debtors to consummate the Sale Transaction.

J.    <u>Business Justification</u>.  The Debtors have articulated good, sufficient, and sound business reasons for entering into the Transaction Documents and consummating the Sale Transaction outside a plan of reorganization.  It is a reasonable exercise of the Debtors' business judgment to consummate the Sale Transaction.

K.    <u>Best Interests</u>.    Approval of the Transaction Documents and the consummation of the Sale Transaction are in the best interests of the Debtors, their estates, their creditors and other parties-in-interest under applicable bankruptcy and nonbankruptcy law (specifically including Sections 510 and 511 of the New York Not-for-Profit Corporation Law).

L.    <u>Highest or Otherwise Best</u>.  The Purchasers' bid for the SEA Assets, as memorialized in the Transaction Documents, is the highest or otherwise best offer received for the SEA Assets.  The purchase price to be paid by the Purchasers pursuant to the Transaction

Documents is fair consideration and constitutes reasonably equivalent value for the SEA Assets, as determined by the marketing and auction process and satisfies the requirements under applicable bankruptcy and nonbankruptcy law (specifically including Sections 510 and 511 of the New York Not-for-Profit Corporation Law).

M.    <u>Arm's-Length Transaction</u>.  The Transaction Documents were negotiated, proposed and entered into by the Debtors and the Purchasers without collusion, in good faith and from arm's-length bargaining positions.  The Purchasers are not "insiders" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.    Neither the Debtors nor the Purchasers have engaged in any conduct that would cause or permit the Transaction Documents avoided or be the basis for an award f monetary damages under Bankruptcy Code section 363(n). Specifically, the Purchasers have not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders.

N.    <u>Good Faith</u>.  All of the actions taken by the Purchasers and their officers, directors, employees, counsel and other professionals in connection with the APAs and the Bayley Seton Lease, the auction process and this proceeding have been taken in good faith.  The Purchasers are good faith purchasers of the SEA Assets within the meaning of Bankruptcy Code section 363(m) and are entitled to all of the protections afforded thereby.  The auction was conducted in accordance with the Bidding Procedures Order in good faith within the meaning of section 363(m) of the Bankruptcy Code.  The Purchasers proceeded in good faith in all respects in connection with the Sale Transaction in that: (i) the Purchasers in no way induced or caused the chapter 11 filing of the Debtors; (ii) the Purchasers recognized that the Debtors were free to deal with any other party interested in acquiring the SEA Assets; (iii) the Purchasers complied with the provisions in the Bidding Procedures Order; (iv) the Purchasers agreed to subject their

bid to the competitive bidding procedures set forth in the Bidding Procedures Order; and (v) all payments to be made to the Purchasers pursuant to the Transaction Documents in connection with the Sale Transaction have been disclosed.

O.  Free and Clear.  The SEA Assets constitute property of the Debtors' estates. The transfer of the SEA Assets to the Purchasers will be a legal, valid, and effective transfer of the SEA Assets, and will vest the Purchasers with all right, title, and interest of the Debtors in and to the SEA Assets free and clear of all liens, claims, interests, obligations, rights and encumbrances, except as otherwise specifically provided in the Transaction Documents. Except as specifically provided in the Transaction Documents, the Purchasers shall have no liability for any claims against the Debtors or their estates or any liabilities or obligations of the Debtors or their estates.  Accordingly, the Debtors may sell the SEA Assets free and clear of all liens, encumbrances, pledges, mortgages, deeds of trust, security interests, claims, leases, charges, options, rights of first refusal, easements, servitudes, proxies, voting trusts or agreements, and transfer restrictions under any agreement in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed  (collectively, the "**Interests**") and adverse claims, except as provided in the Transaction Documents because one or more of the standards set forth in section 363(f)(1)–(5) has been satisfied with regard to each such Interest or adverse claim.  Those non-Debtor parties with Interests or adverse claims in or with respect to the SEA Assets who did not object, or who withdrew their objections, to the Sale Transaction or the Motion are deemed to have consented to the sale of the SEA Assets free and clear of those non-debtor parties' Interests in the SEA Assets

pursuant to section 363(f) of the Bankruptcy Code. Those holders of Interests in any SEA Assets who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Interests, if any, attach to the proceeds derived from the Sale Transaction. The Purchasers would not have entered into the Transaction Documents, and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates, and their creditors, if the sale of the SEA Assets to the Purchasers, and the assumption and assignment of the Assumed Contracts and Leases to the Purchasers were not free and clear of all Interests of any kind or nature whatsoever, or if the Purchasers would, or in the future could, be liable for any of the Interests.

P.     <u>Adequate Assurance</u>.  The assumption and assignment of the Assumed Contracts and Leases pursuant to the terms of the Assignment Procedures and this Sale Order is integral to the Sale Transaction and is in the best interests of the Debtors and their estates, creditors and all other parties-in-interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors. The Purchasers provided adequate assurance of their future performance under the Assumed Contracts and Leases within the meaning of sections 365(b)(1)(c) and (f)(2)(B) of the Bankruptcy Code. Any counterparty to any of the Assumed Contracts and Leases that has not objected to the assumption and assignment to the Purchasers of the applicable contract or lease, or that has withdrawn its objection, is deemed to have consented to the assumption and assignment of such Assumed Contract, Assumed Lease, Additional Assumed Contract and/or Additional Assumed Lease.

Q.     <u>Avoidance and Successor Liability</u>.  The transfer of the SEA Assets (including any individual elements of the Sale Transaction) to the Purchasers or entry into the Bayley Seton Lease (i) does not constitute any avoidable transfers under the Bankruptcy Code or

- 9 -

under applicable bankruptcy or non-bankruptcy law and (ii) except as otherwise set forth in the Transaction Documents does not, and will not, subject the Purchasers to any liability whatsoever, including claims for any liabilities of the Debtors related to Medicare and Medicaid, with respect to the operation of the Debtors' business prior to the closing of the Sale Transaction or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability. Without limiting the foregoing, Purchaser will not be liable (i) as a successor, (ii) under the Transaction Documents, or (iii) under any other basis for any liabilities or responsibility with respect to the Saint Vincents Catholic Medical Centers Retirement Plan, including without limitation, for any and all claims under any provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), including Title IV of ERISA, or under any other statute, regulation or common law principle, whether such liability or claim arose prior to the Closing (as defined in the APAs) or arises on or after the Closing Date.

R.    Compliance with Non-Bankruptcy Law. In satisfaction of sections 363(d) and 541(f) of the Bankruptcy Code, the transfer of property as contemplated by the Sale Transaction complies with applicable non-bankruptcy law governing such a transfer, and specifically complies with Sections 510 and 511 of the New York Not-for-Profit Corporation Law.

S.    Receivership Agreement. Concurrent with the Seller and the Purchasers entering into the other Transaction Documents, the Receiver (as that term is defined in the Receivership Agreement) and Seller have agreed to enter into the Receivership Agreement. The Purchasers would not have entered into the Transaction Documents, and would not consummate

the Sale Transaction, thus adversely affecting the Debtors, their estates, and their creditors, if the assignment by the Debtors to the Receiver of the revenues and receivables, in each instance, generated from the Receiver's operations from and after the effective date of the Receivership Agreement (the "**Receivership Revenues**") were not free and clear of all Interests of any kind or nature whatsoever (including, without limitation, Interests created by prior orders of this Court in this case) or if the Receiver would, or in the future could, be liable for any of the Interests.

    T. <u>Legal and Factual Bases</u>. The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

    NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

    1. <u>Motion</u>. The Motion is hereby granted as provided herein.

    2. <u>Objections</u>. All objections to the Motion and the relief requested therein that have not been withdrawn, waived or settled, and all reservations of rights included in such objections, other than objections to disputed Cure Amounts, are hereby overruled on the merits and denied.

    3. <u>Sale Approval</u>. The Sale Transaction and all of the terms and conditions and transactions contemplated by the Transaction Documents are hereby authorized and approved pursuant to sections 105(a), 363(b), 363(f) and 365(a) of the Bankruptcy Code. Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized and directed to consummate the Sale Transaction pursuant to and in accordance with the terms and conditions of the Transaction Documents.  The Debtors are authorized to execute and deliver, and empowered to perform under, consummate, and implement the Transaction Documents, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale Transaction, and to effectuate the provisions of this Sale Order and the

transactions approved hereby, and to take all further actions as may be requested by the Purchasers for the purpose of assigning, transferring, granting, conveying and conferring to the Purchasers or reducing to possession, the SEA Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Transaction Documents. The failure to specifically include any particular provision of the Transaction Documents in this Sale Order shall not diminish or impair the efficacy of such provision, it being the intent of this Court that the Transaction Documents and each and every provision, term and condition thereof be authorized and approved in its entirety.

4.     Transfer of the SEA Assets.  As of the closing dates under the applicable Transaction Document (the "**Closing**"), the Sale Transaction effects a legal, valid, enforceable and effective sale and transfer of the SEA Assets to the Purchasers, and shall vest the Purchasers with all right, title, and interest of the Debtors in and to the SEA Assets.

5.     Expedited Closing Credit.  In the event that the Closing occurs on or before September 15, 2011, the Purchasers shall be issued a credit against the Purchaser Price of two hundred fifty thousand dollars ($250,000).

6.     Free and Clear.  Except as otherwise provided for in the Transaction Document, the transfer of the SEA Assets shall vest the Purchasers with all right, title, and interest of the Debtors in the SEA Assets pursuant to section 363(f) of the Bankruptcy Code, free and clear of any and all Interests, whether arising by statute or otherwise and whether arising before or after the commencement of these Chapter 11 Cases, whether known or unknown, including, but not limited to, Interests of or asserted by any of the creditors, vendors, employees, suppliers, or lessors of the Debtors or any other third party.  Except as expressly provided for in the Transaction Documents, the Purchaser shall take the SEA Assets free and clear of all leases

of real property irrespective of any rights of the tenants under section 365(h) of the Bankruptcy Code, if any, and such tenants shall be required to vacate the leased premises prior to the Closing. Any and all such Interests shall attach to the net proceeds of the Sale Transaction, with the same priority, validity, force, and effect as they now have against the SEA Assets. Except as set forth in the Transaction Documents, the Purchasers will not subject the Purchasers to any liability for any Interests whatsoever, including, without limitation, statutory claims, that any of the foregoing parties or any other third party may have against the Debtors, including claims for liabilities of the Debtors related to their participation in Medicare and Medicaid programs, with respect to the operation of the Debtors' business prior to the closing of the Sale Transaction or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability. All persons and entities asserting or holding any Interests in or with respect to the SEA Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), howsoever arising, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such Interests against the Purchasers. Subject to the Interests attaching to the proceeds of the Sale Transaction, this Sale Order shall be effective as a determination that, as of the Closing, all Interests of any kind or nature whatsoever existing as to the SEA Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected. Following the Closing, no holder of an Interest in the SEA Assets shall interfere with the Purchasers' title to or use and enjoyment of the SEA Assets based on or related to such Interest. Each and every federal, state, and local

governmental agency, recording office or department and all other parties, persons or entities is hereby directed to accept for recordation this Sale Order, and any and all documents or instruments necessary or appropriate to effectuate the transactions contemplated by this Sale Order and the Transaction Documents, as conclusive evidence of the free and clear and unencumbered transfer of title to the SEA Assets conveyed to the Purchasers. This Sale Order shall be binding upon and govern the conduct of all such federal, state, and local government agencies or departments, including any filing agents, filing officers, title agents, recording agencies or offices, secretaries of state, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the SEA Assets.

7.      Surrender of SEA Assets.  All entities who are presently, or who as of the Closing may be, in possession of some or all of the SEA Assets hereby are directed to surrender possession of the SEA Assets to the Purchasers as of the Closing.  On the Closing and subject to the Interests attaching to the proceeds of the Sale Transaction as provided for in this Sale Order, each of the Debtors' creditors is authorized to execute such documents and take all other actions as may be reasonably necessary to release its Interests in the SEA Assets, if any, as such Interests may have been recorded or may otherwise exist.

8.      No Successor Liability. Neither Purchaser is a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Purchasers shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates, other than the Assumed Liabilities, with respect to the SEA Assets or otherwise, including, but not limited to, under any bulk sales law, doctrine or theory of

- 14 -

successor liability, or similar theory or basis of liability except for the assumption of the Assumed Contracts and Assumed Leases and the Assumed Liabilities as expressly provided in the Transaction Documents. Except to the extent the Purchasers assume the Assumed Contracts and Leases and liabilities pursuant to the Transaction Documents, neither the purchase of the SEA Assets by the Purchasers or any of their affiliates nor the fact that the Purchasers or any of their affiliates are using any of the SEA Assets previously operated by the Debtors will cause the Purchasers or any of their affiliates to be deemed a successor in any respect to the Debtors' businesses or incur any liability derived therefrom within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

9.      Bulk Sale Laws Inapplicable. No bulk sale law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction and the transactions contemplated by the Transaction Documents.

10.      Good Faith. The Sale Transaction has been undertaken by the Debtors and the Purchasers at arm's-length, without collusion. The Purchasers will acquire the SEA Assets pursuant to the Transaction Documents in good faith under section 363(m) of the Bankruptcy Code and the Purchasers shall be entitled to all of the protections in accordance therewith. The consideration provided by the Purchasers for the SEA Assets under the Transaction Documents is fair and reasonable, and neither the Sale Transaction nor any element of the Sale Transaction, may be avoided or be the basis for an award of monetary damages under section 363(n) of the Bankruptcy Code. The sale of the SEA Assets and the consideration

provided by the Purchasers shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

11.     Required Permits.  The Debtors are hereby authorized to assign all state and federal licenses and permits used in connection with the SEA Assets to the Purchasers in accordance with the terms of the Transaction Documents.

12.     Assumption and Assignment of Assumed Contracts and Leases.  Pursuant to section 365(b), (c) and (f) of the Bankruptcy Code, the Debtors are authorized to assume and assign the Assumed Contracts and Leases designated for assignment to the Purchasers pursuant to the APAs, subject to the Assignment Procedures approved in the Bidding Procedures Order; provided, however, that there shall be no assumption of any such contract or lease absent simultaneous assignment thereof to the Purchasers.  In accordance with sections 365(b)(2) and (f) of the Bankruptcy Code, upon transfer of the Assumed Contracts and Leases to the Purchasers, (i) the Purchasers shall have all of the rights of the Debtors thereunder and each provision of such Assumed Contracts and Leases shall remain in full force and effect for the benefit of the Purchasers notwithstanding any provision in any such contract, lease, or in applicable law that prohibits, restricts or limits in any way such assignment or transfer, and (ii) none of the Assumed Contracts and Leases may be terminated, or the rights of any party modified in any respect, including pursuant to any "change of control" clause, by any other party thereto as a result of the Sale Transaction.

13.     Payment of Undisputed Cure Amounts.   On or as promptly after the Closing as is practical, the Cure Amounts to which no objections have been filed, or to which the Purchasers, the Debtors and an applicable non-Debtor contract party have agreed as to the

allowed Cure Amount, shall be paid.  There are no disputed Cure Amounts.

14. _Cure Payments_.  The Purchasers' payment of the undisputed Cure Amounts shall be deemed to discharge the Debtors' obligation to: (i) cure any defaults under the Assumed Contracts and Leases; and (ii) compensate, or provide adequate assurance that the Purchasers will promptly compensate, any non-debtor party to any of the Assumed Contracts and Leases for any actual pecuniary loss resulting from any default under any of the Assumed Contracts and Leases.  Pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall have no liabilities for any claims arising or relating to or accruing post-Closing under any of the Assumed Contracts and Leases.

15. _Use of Sale Proceeds_.  As used in this paragraph, "**Net Sale Proceeds**" shall mean all amounts paid or payable by the Purchasers to the Debtors with respect to the Sale Transaction after taking into account (a) pro-rations and any other adjustments that affect the final purchase prices specified in the APAs, (b) a reserve for the payment of the Transaction Fees payable to the Debtors' investment bankers arising from the Sale, (c) the New York City Payment (defined below); and (d) payment of the Break-Up Fee.  If at the time of Closing a Chapter 11 Plan has been confirmed by an order of this Court and the effective date of such Chapter 11 Plan has occurred before the Closing or is occurring concurrently with the Closing (an "**Effective Confirmed Plan**"), the Debtors are authorized and directed to disburse the Net Sale Proceeds as required by such an Effective Confirmed Plan.  If at the time of Closing no Effective Confirmed Plan exists, the Net Sale Proceeds shall be disbursed as follows: _First_, if there are any mechanics liens or other liens that are or asserted to be senior in priority to the PBGC Lien (as defined below) and/or to the lien of the Prepetition Agent, an amount equal to the amount of such liens shall be retained in escrow for the benefit of the holders of such liens until

resolution of the validity and priority of such liens. <u>Second</u>, if at the time of Closing the Pension Benefit Guaranty Corporation ("**PBGC**") then holds a valid prepetition lien or security interest on any of the SEA Assets (the "**PBGC Lien**"), Net Sale Proceeds in an amount equal to the amount of the PBGC Lien for contributions due before the Petition Date, calculated in accordance with Internal Revenue Code § 430(k) (2008) which takes into account all other amounts received by the PBGC on account of the PBGC Lien shall be remitted to the PBGC in full satisfaction of the PBGC Lien, or in the event the PBGC's prepetition lien on any of the SEA Assets is disputed at the time of Closing, or if the Debtors and the PBGC dispute the amount of such lien, then the Debtors shall (x) reserve an amount equal to the amount of the PBGC Lien for contributions due before the Petition Date, calculated in accordance with Internal Revenue Code § 430(k) (2008) which takes into account all other amounts received by the PBGC on account of the PBGC Lien for the benefit of the PBGC, or (y) reserve an amount established by separate order of the Court from the Net Sale Proceeds for the benefit of the PBGC. <u>Third</u>, if at the time of Closing, the Prepetition Obligations remain outstanding, all other Net Sale Proceeds shall be remitted to the Prepetition Agent on account of the Prepetition Obligations, provided that, if the DIP Obligations remain outstanding, if requested by the DIP Agent, the Net Sale Proceeds shall be remitted to the DIP Agent on account of the DIP Obligations. Any amounts remitted to the DIP Agent pursuant to this Sale Order shall be applied in accordance with the DIP Loan Documents and the DIP Order (or any subsequent documents or orders that supersede or supplement the DIP Loan Documents and the DIP Order). Any amounts remitted to the Prepetition Agent pursuant to this Sale Order shall be applied in accordance with the underlying agreements and applicable law by the Prepetition Agent and the Prepetition Lenders on account of the Prepetition Obligations; provided that the Court retains the authority to modify the

foregoing. Any amounts remitted to the Prepetition Agent pursuant to this Sale Order (including the following paragraph) shall not prejudice any rights of the Creditors' Committee to investigate, challenge or avoid any prepetition liens, claims or security interests of the Prepetition Agent and Prepetition Lenders pursuant to the provisions of the DIP Order.

16.    Remittance of Excess Cash.  As used in this paragraph, "**Excess Cash**" shall mean (i) all funds on deposit in any deposit accounts of St. Elizabeth Ann's, and (ii) the net proceeds of all accounts, intangibles, and other assets of St. Elizabeth Ann's that remain part of St. Elizabeth Ann's' bankruptcy estate as and when received by St. Elizabeth Ann's.  If at the time the Receivership Agreement goes into effect, an Effective Confirmed Plan exists, such Excess Cash shall be disbursed as required by such Effective Confirmed Plan.  If no Effective Confirmed Plan exists, the Debtors are authorized and directed to remit the Excess Cash to the DIP Agent or to the Prepetition Agent (as instructed by the DIP Agent), as soon as practical after the Receivership Agreement goes into effect, but only after reserving such funds as the Debtors determine are reasonably necessary to pay the administrative costs and expenses of St. Elizabeth Ann's and any other obligations approved by the Court; provided, however, that the Court retains authority to modify the provisions of this paragraph.

17.    Rights of DIP Agent.  The Court finds that (a) the SEA Assets are subject to a lien and security interest in favor of the DIP Agent for the benefit of the DIP Lenders, (b) by the terms of the DIP Order, the lien and security interest of the DIP Agent is junior in priority to any Permitted Prior Senior Liens (as defined in the DIP Order), and (c) the DIP Agent and the DIP Lenders may consent to the Sale of the SEA Assets free and clear of the liens of the DIP Agent and to remittance of the Net Sale Proceeds to the Prepetition Agent on account of its Permitted Prior Senior Lien.  If this Court shall subsequently determine that the payments made

to the Prepetition Agent pursuant to this Sale Order are to be returned or disgorged, the lien of the DIP Agent shall immediately and automatically attach to any amounts returned or disgorged in a first priority position.

18.     <u>New York City Liens</u>.  To the extent not satisfied upon the closing of the Sale Transaction or otherwise satisfied pursuant to an Effective Confirmed Plan, the Debtors shall pay to the Water Board and the New York City Department of Finance, out of the gross proceeds of the sale, such valid amounts due and owing as of the closing of the Sale Transaction (the "**<u>New York City Payment</u>**") for unpaid water and sewer charges and real estate taxes and related charges in connection with the transfer of the SEA Assets due as of the Closing; <u>provided</u>, <u>however</u>, that such payment by the Debtors shall not constitute an admission of any liability by the Debtors or serve as precedent for future sale transactions in these Chapter 11 Cases.

19.     <u>Receivership Agreement</u>.  The Debtors are authorized but not directed to enter into the Receivership Agreement, and to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers contemplated thereby.   Upon the effective date of the Receivership Agreement, the Debtors shall be deemed to have assigned to the Receiver all of their interests in the Receivership Revenues free and clear of any Interests, (including, without limitation, Interests created by prior orders of this Court in this case).  The Receivership Revenues shall not be property of the Debtors' estates.  Upon the effective date of the Receivership Agreement, the Receiver may file an amendment to any financing statement (using national official form UCC3) naming St. Elizabeth Ann's as debtor to take effect immediately so long as such amendment (a) does not contain any mark in Part 2 of the form amendment entitled "Termination" or otherwise purport to terminate such financing statement,

- 20 -

(b) does not contain any mark in Parts 3, 4, 5, 6, or 7 of the form amendment (entitled "Continuation," "Assignment," "Amendment (Party Information)," "Current Record Information," and "Changed (New) or Added Information," respectively) or otherwise purport to change any of the items covered by such parts, and (c) in Part 8 of the form amendment, entitled "Amendment (Collateral Change)," checks only the box in the middle of the language "Describe collateral □ deleted" and contains only the following language within the blank portion of Part 8: "any assets of Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center (the "Debtor") that are receivables or revenues with respect to the St. Elizabeth Ann's nursing home business which relate to the period on or subsequent to the Receivership Date as such term is defined in any Receivership Agreement by and between the Buyer or its designee as Receiver and the New York State Department of Health including, but not limited to, any accounts receivable arising from rate adjustments which relate to the period subsequent to the Receivership Date; provided that if the receivership terminates and, under the terms of the Receivership Agreement, the Receiver does not have an interest in receivables or revenues arising after such termination (or the Receiver otherwise relinquishes any interest in any receivables or revenues), the deletion of collateral shall not cover the receivables or revenues that are owned by the Debtor and in which the Receiver has no interest."  Subject to the consent of the secured creditor (provided it is not unreasonably withheld), the Receiver is hereby authorized to file any other documents and take any and all other action necessary to remove any security interest, lien or encumbrance on Receivership Revenues.  The Receiver shall, upon filing any such financing statement amendment or the filing of any other document or the taking of any other action, provide prompt notice to the secured party (and to such secured party's counsel, if known to the Receiver) and the Debtors of such filing or action and deliver a

copy of the relevant amendment or document. The Receiver shall have no obligation to pay any U.S. Trustee fees or have any reporting requirements except as otherwise specifically required pursuant to the Receivership Agreement or applicable non-bankruptcy law. Notwithstanding any other provision of this Order, if the Receivership Agreement shall become effective, but the Sale Transaction shall fail to close, this Court reserves the right to enter such orders as are appropriate to protect the interests of all parties affected by this Order.

20. _Bayley Seton Lease_. The Debtors are authorized to enter into the Bayley Seton Lease, and to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers contemplated thereby; including without limitation (i) the assignment of the rights and obligations as landlord under the Spaces Leases (as that term s defined in the Bayley Seton Lease), including the Patient Bed Lease, as modified pursuant to the Transaction Documents, (ii) complying with the Call Option, and (iii) the full discretion to exercise the Put Option, all in accordance with the terms of the Bayley Seton Lease and without any further order of the Court. Upon the exercise of the Put Option by the Debtors or the Call Option by the Ground Lessee, all provisions of this order relating to the conveyance of the SEA Assets shall apply with full force and effect to the conveyance of the Bayley Seton Campus to the Ground Lessee, including without limitation, those provisions relating to the conveyances of the SEA Assets free and clear of any Interests.; The Debtors shall provide counsel to the DIP Agent and the Creditors' Committee with five (5) business days written notice of the Debtors' intention to exercise of the Put Option, and the Purchasers shall provide counsel to the DIP Agent and the Creditors' Committee with five (5) business days written notice of the Purchasers' intention to exercise of the Call Option.

21. _Patient Bed Lease_. As of the Closing Date, (i) the Debtors, as landlord

and tenant under the Patient Bed Lease are authorized to assume the Patient Bed Lease and modify that lease in accordance with the terms of lease amendment attached as Exhibit [x] to the Nursing Home APA; and (ii) the Debtors are authorized to assign the Patient Bed Lease as modified to the Purchasers as tenant pursuant to the terms and conditions of the Nursing Home APA. No order shall be entered in these Chapter 11 Cases concerning the Debtors' subsequent disposition of its ownership interests in the Bayley Seton real property that shall be inconsistent with Purchasers' rights under the Patient Bed Lease in accordance with its terms. There shall be no assumption of the Patient Bed Lease without concurrent assignment thereof to the Purchasers as tenant.

22. <u>Employee Liabilities</u>. The assumption by the Purchasers of liability for severance and PTO (as that terms is defined in the Nursing Home APA) as provided for in the Nursing Home APA and to the extent provided for in the Nursing Home APA, does not relieve the Debtors of any obligations therefor in the event that the Purchaser defaults in its obligation to make such payments or the allowed amount of such payments exceeds the assumed amounts in the Nursing Home APA. Further, neither the Nursing Home APA nor the Receivership Agreement shall modify the Debtors' obligations under their CBAs as and to the extent provided for under applicable law, and, for the avoidance of doubt, the Receiver shall comply with the terms of Debtors' CBAs during the term of the receivership unless otherwise agreed to between the Receiver, New York State Nurses Association, and 1199 SEIU United Healthcare Workers East.

23. <u>Rate Adjustment Liabilities</u>. The assumption by the Nursing Home Purchaser of the New York Health Facilities Cash Assessments Program Liabilities and the Rate Adjustment Liabilities (as those terms are defined in the Nursing Home APA) as and to the

extent provided for in the Nursing Home APA does not relieve the Debtors of any liability in the event and to the extent the amount of such claims recovered or to be recovered from the Nursing Home Purchaser exceeds the assumed amounts in the Nursing Home APA.

24.     Resident Funds.  With regard to any and all personal funds of residents of St. Elizabeth Ann's that are deposited and entrusted to the Purchaser (collectively, the "**Resident Funds**"), the Purchaser acknowledges and agrees that Purchaser shall well and truly hold separately and in trust the Resident Funds and shall administer said funds on behalf of said residents in the manner directed by 42 U.S.C. §§ 1396r (c) (6) and 10 NY CRR § 415.26 (h) (s) (v) and all other applicable law.  Upon the Closing, any and all bonds issued to or on behalf of the Debtors or their affiliates associated with the Resident Funds shall be terminated (and all sureties are hereby granted relief from stay under 11 U.S.C. § 362(a) to effect such termination), so that such bonds shall be null and void and the Debtors, its estate and its sureties shall have no further liability therefor.

25.     Modifications.  The Transaction Documents and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in writing signed by both parties, and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and provided further that no such modifications, amendments, or supplements may be made except following two (2) business days written notice to, or with the prior consent of (i) General Electric Capital Corporation, as Agent for itself, and TD Bank, N.A., c/o Winston & Strawn LLP, 200 Park Avenue, New York, New York, 10166-4193, Attn: David Neier, Esq.; and Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5802, Attn: Randy Rogers, Esq.; and (ii) the Creditors'

Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: David H. Botter, Esq., Stephen Kuhn, Esq., and Sarah Link Schultz, Esq.

26.     <u>Back-Up Bidder</u>.     In the event the Purchasers fail to close the Sale Transaction, the Debtors, with the consent of the Back-Up Bidder, may elect instead to sell the SEA Assets to the Back-Up Bidder in accordance with the terms of the Back-Up Transaction Documents without any further order of the Court, and all references in this Sale Order to the Purchasers shall in all regards be understood to refer to the Back-Up Bidders, and all references in this Sale Order to the Transaction Documents shall in all regards be understood to respectively refer to the Back-Up Transaction Documents.

27.     <u>Binding Order</u>.     This Sale Order and the Transaction Documents shall be binding upon and govern the acts of all persons and entities, including, without limitation, the Debtors and the Purchasers, their respective successors and permitted assigns, including, without limitation, any trustee appointed in a Chapter 7 case if this case is converted from Chapter 11, and all creditors of any of the Debtors (whether known or unknown).

28.     <u>Non-Severability</u>.     The provisions of this Sale Order (other than paragraphs 15-17 above) are non-severable and mutually dependent.

29.     <u>Order Immediately Effective</u>.     Notwithstanding Bankruptcy Rules 6004(h), 6006(d) and 7062, this Sale Order shall be effective and enforceable immediately upon its entry, and the sale approved by this Sale Order may close immediately upon entry of this Sale Order, notwithstanding any otherwise applicable waiting periods.

30.     <u>Retention of Jurisdiction</u>.     This Court shall retain jurisdiction on all matters pertaining to the relief granted herein, including to interpret, implement, and enforce the terms and provisions of this Sale Order and the Transaction Documents, adjudicate any dispute

relating to the Sale Transaction or the proceeds thereof, and the assumption, assignment and cure of any of the Assumed Contracts and Leases.

Dated:    New York, New York
          _____, 2011


          _____
          THE HONORABLE CECELIA G. MORRIS

KL2 2686582.17

**EXHIBIT C-1 TO MOTION**

**NURSING HOME APA**

**ASSET PURCHASE AGREEMENT**

by and between

**SISTERS OF CHARITY HEALTH CARE SYSTEM NURSING HOME, INC.,
D/B/A ST. ELIZABETH ANN'S HEALTH CARE & REHABILITATION CENTER**

and

**SV OPERATING [THREE], LLC**

Dated as of May 12, 2011

# TABLE OF CONTENTS

**Page**

ARTICLE I   DEFINITIONS ......................................................................................2
Section 1.1

Certain Definitions................................................................................................2
Section 1.2

Terms Defined Elsewhere in this Agreement ...........................................................8
Section 1.3

Other Definitional and Interpretive Matters. ........................................................10
ARTICLE II   PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES .......12
Section 2.1

Purchase and Sale of Assets.................................................................................12
Section 2.2

Excluded Assets ..................................................................................................14
Section 2.3

Assumption of Liabilities......................................................................................15
Section 2.4

Excluded Liabilities .............................................................................................16
Section 2.5

Assignment and Cure Amounts. ...........................................................................17
Section 2.6

Further Conveyances and Assumptions.................................................................18
Section 2.7

Bulk Sales Laws..................................................................................................19
Section 2.8

Accounts Receivable............................................................................................19
Section 2.9

Agreement Regarding Confidentiality of Patient Information ..................................20
ARTICLE III   CONSIDERATION .............................................................................20
Section 3.1

Consideration ......................................................................................................20

Section 3.2

Purchase Price Deposit ................................................................................................20
Section 3.3

Payment of Purchase Price...........................................................................................21
Section 3.4

Resident Transition .......................................................................................................21
Section 3.5

Additional Purchased Assets........................................................................................21
Section 3.6


ARTICLE IV   CLOSING AND TERMINATION....................................................................22
Section 4.1

Closing Date..................................................................................................................22
Section 4.2

Deliveries by Seller.......................................................................................................22
Section 4.3

Deliveries by Purchaser ................................................................................................23
Section 4.4

Termination of Agreement............................................................................................24
Section 4.5

Procedure for Termination ...........................................................................................27
Section 4.6

Effect of Termination....................................................................................................27
ARTICLE V   REPRESENTATIONS AND WARRANTIES OF SELLER ...............................28
Section 5.1

Organization and Good Standing..................................................................................28
Section 5.2

Authorization of Agreement .........................................................................................28
Section 5.3

Consents of Third Parties; Contractual Consents. .......................................................28

1649461v.19

Section 5.4

Litigation.........................................................................................................................29
Section 5.5

Licenses and Governmental Permits..................................................................................29
Section 5.6

Intentionally Omitted........................................................................................................29
Section 5.7

Health Surveys..................................................................................................................29
Section 5.8

Notices ..............................................................................................................................30
Section 5.9

Financial Statements ........................................................................................................30
Section 5.10

Title to Purchased Assets..................................................................................................30
Section 5.11

Real Property Leases.........................................................................................................30
Section 5.12

Tangible Personal Property...............................................................................................31
Section 5.13

Intellectual Property..........................................................................................................31
Section 5.14

Material Contracts.............................................................................................................31
Section 5.15

Employees; Employee Benefits. .......................................................................................31
Section 5.16

Employment and Labor.....................................................................................................31
Section 5.17

Compliance with Laws; Permits. ......................................................................................32
Section 5.18

Financial Advisors ............................................................................................................32

Section 5.19

No Other Representations or Warranties; Schedules ....................................................32
ARTICLE VI    REPRESENTATIONS AND WARRANTIES OF PURCHASER .....................33
Section 6.1

Organization and Good Standing ..........................................................................33
Section 6.2

Authorization of Agreement ................................................................................33
Section 6.3

Conflicts; Consents of Third Parties. ....................................................................34
Section 6.4

Litigation ........................................................................................................34
Section 6.5

Financial Advisors ............................................................................................34
Section 6.6

Healthcare Regulatory Compliance Status. ............................................................34
Section 6.7

Acknowledgement Regarding Condition of the Business .........................................35
Section 6.8

Financing .......................................................................................................35
Section 6.9

No Other Representations or Warranties; Schedules ................................................36
ARTICLE VII    BANKRUPTCY COURT MATTERS ......................................................36
Section 7.1

Competing Transactions. ...................................................................................36
Section 7.2

Break-Up Fee. .................................................................................................36
Section 7.3

Bankruptcy Court Filings ...................................................................................38
Section 7.4

Notice of Sale ..................................................................................................38
ARTICLE VIII    COVENANTS ............................................................................38

Section 8.1

Conveyance.................................................................................................38
Section 8.2

Access to Information....................................................................................38
Section 8.3

Conduct of the Business Pending the Closing .........................................39
Section 8.4

Satisfaction of Conditions...........................................................................41
Section 8.5

Consents; Insurance. ....................................................................................41
Section 8.6

Regulatory Approvals. ..................................................................................41
Section 8.7

Further Assurances.......................................................................................44
Section 8.8

Confidentiality. .............................................................................................44
Section 8.9

Preservation of Records ...............................................................................46
Section 8.10

Publicity ........................................................................................................47
Section 8.11

Use of Name ..................................................................................................47
Section 8.12

Supplementation and Amendment of Schedules. .....................................47
Section 8.13

Covenant Not to Compete or Solicit...........................................................48
Section 8.14

Cooperation...................................................................................................48
Section 8.15

Resident Assets. ............................................................................................48

Section 8.16

Indemnification.................................................................................................49

Section 8.17

Purchaser Transition Plan .................................................................................49

Section 8.18

Receivership Agreement....................................................................................50

Section 8.19

Personal Guaranty of Purchaser Obligations ....................................................50

ARTICLE IX   EMPLOYEES AND EMPLOYEE BENEFITS ................................................50

Section 9.1

Offers of Employment. .....................................................................................50

Section 9.2

Employment Terms; Employee Benefits. ..........................................................51

ARTICLE X   CONDITIONS TO CLOSING................................................................52

Section 10.1

Conditions Precedent to Obligations of Purchaser ............................................52

Section 10.2

Conditions Precedent to Obligations of Seller...................................................53

Section 10.3

Conditions Precedent to Obligations of Purchaser and Seller ...........................54

Section 10.4

Frustration of Closing Conditions......................................................................54

ARTICLE XI   TAXES.........................................................................................54

Section 11.1

Transfer Taxes ..................................................................................................54

Section 11.2

Prorations.........................................................................................................54

Section 11.3

Purchase Price Allocation .................................................................................55

Section 11.4

Cooperation on Tax Matters .............................................................................55

ARTICLE XII   MISCELLANEOUS..........................................................................55

Section 12.1

Expenses ..................................................................................................................55
Section 12.2

Specific Performance ...............................................................................................55
Section 12.3

Governing Law; Jurisdiction; Consent to Service of Process....................................55
Section 12.4

WAIVER OF JURY TRIAL.......................................................................................56
Section 12.5

Entire Agreement; Amendments and Waivers ........................................................56
Section 12.6

Notices .....................................................................................................................57
Section 12.7

Invalid Provisions ....................................................................................................58
Section 12.8

Binding Effect; Assignment; Successors and Assigns...............................................58
Section 12.9

No Personal Liability ...............................................................................................58
Section 12.10

Execution in Counterparts........................................................................................58
Section 12.11

Survival of Representations, Warranties and Covenants..........................................59

**Exhibits**
Exhibit A - Form of Bidding Procedures Order
Exhibit B - Form of Sale Order
Exhibit C - Form of Medical Records Custody Agreement
Exhibit D - Form of Receivership Agreement - Nursing Home
Exhibit E - HHS Stipulation

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), is made and entered into as of May 12, 2011, by and between Sisters of Charity Health Care System Nursing Home, Inc., d/b/a St. Elizabeth Ann's Health Care Rehabilitation Center, a New York not-for-profit corporation ("Seller"), and SV Operating Three, LLC, a New York limited liability company ("Purchaser").

## RECITALS

WHEREAS, Seller, along with certain of its Affiliates (collectively, the "Debtors") are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") on April 14, 2010 (the "Petition Date"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 10-11963);

WHEREAS, Seller is entering into this Agreement subject to the approval by the Bankruptcy Court;

WHEREAS, Seller is engaged in the business of owning and operating (a) a licensed 300 bed skilled nursing and residential health care facility under the name St. Elizabeth Ann's Health Care and Rehabilitation Center at the premises known as 91 Tompkins Avenue, Staten Island, New York 10304 (the "Premises"), and at the premises known as 75 Vanderbilt Avenue, Building No. 1., Staten Island, New York ("Bayley Seton"), where 72 licensed neurobehavioral beds of Seller's 300 total licensed beds are located pursuant to a lease with Seller as tenant thereunder, as amended as of the date herewith (the "72 Bed Bayley Seton Lease"), and (b) an adult day health care program that is conducted at the Premises (collectively, the "Business"); and

WHEREAS, Seller's sole member is Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, a New York not-for-profit corporation ("SVCMC"), which entity owns and operates other businesses, which other businesses are not the subject of this Agreement (collectively, the "Other Businesses"); and

WHEREAS, subject to the approval of the Bankruptcy Court, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to, *inter alia*, Sections 105, 363, and 365 of the Bankruptcy Code all of the Purchased Assets and Assumed Liabilities (each, as defined below), all as more specifically provided herein; and

WHEREAS, the Closing (defined below) is contingent upon the closing of the transactions contemplated by the Real Estate Contract (as defined below).

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

# ARTICLE I

# DEFINITIONS

Section 1.1    Certain Definitions.

Unless the context otherwise requires or as otherwise defined herein, capitalized terms used in this Agreement shall have the meanings set forth in this Section 1.1:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Antitrust Laws" means the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, the Donnelly Act, as amended, and the Hart-Scott-Rodino Antitrust Improvements Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, Orders, decrees, administrative or judicial doctrines or other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"Bidding Procedures Order" means an Order of the Bankruptcy Court, substantially in the form of Exhibit A hereto, with such changes as are reasonably acceptable to Purchaser and Seller.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close.

"Closing Effective Date" means the earlier of (a) the Closing Date, or (b) the Receivership Date, if the Receivership Agreement becomes effective in accordance with its term as contemplated by this Agreement.

"CMS" means the Centers for Medicare & Medicaid Services.

"Code" means the Internal Revenue Code of 1986, as amended.

"CON Application" means a Certificate of Need application with respect to the Business to be submitted by Purchaser to DOH.

"CON Approval" means the approval by DOH of a CON Application without contingencies or conditions that have not been satisfied, other than contingencies or conditions that may be satisfied in accordance with their terms after the Closing.

"Confidentiality Agreement" means the Confidentiality Agreement between SVCMC and Purchaser dated as of January 20, 2010.

"Contemplated Transactions" means the transactions contemplated by this Agreement.

"Contract" means any written contract, indenture, note, bond, lease, license or other agreement, other than a real property lease, a personal property lease or an Intellectual Property License.

"Copyrights" means all copyrights and registrations and applications therefor and works of authorship, and mask work rights.

"Cost Reports" means all cost and other reports filed pursuant to the requirements of Healthcare Programs for payment or reimbursement of amounts due from such programs for services provided.

"Creditors' Committee" means the official committee of unsecured creditors of Seller appointed in connection with the Bankruptcy Case.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials exclusively related to the Business or the Purchased Assets, in each case whether or not in electronic form, other than Patient Records.

"DOH" means the Department of Health of the State of New York.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Contracts" means every Contract that is not an Assigned Contract or not otherwise specifically identified in Sections 2.1(a) through 2.1(k) hereto as a Purchased Asset.

"Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment (including medical equipment) and leasehold improvements owned by Seller and used by Seller exclusively in the conduct of the Business, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by Seller, the telephone numbers associated therewith used in the Ordinary Course of Business and not used in any of the Other Businesses), cubicles and miscellaneous office furnishings.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Ground Lease" means that certain lease between Saint Vincents Catholic Medical Centers of New York ("SVCMC") and SV Land I, LLCN (the "Tenant") of 75 Vanderbilt Avenue, Staten Island, New York  (the "Premises") dated _____, 2011.

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Healthcare Program Liabilities" means all Liabilities under any Medical Reimbursement Program Law, including but not limited to any Liabilities arising at any time in connection with any rebasing, trend factor adjustments or medicaid case mix adjustments relating to the Medicare and Medicaid provider numbers and related participation agreements any other third-party healthcare payor program of the Business and any Medicaid programs including, costs and expenses relating thereto but not including any fines or penalties related thereto arising from or relating to periods ending before, on or after the Closing Date.

"Healthcare Regulatory Consents" means in respect of Seller or Purchaser, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body as shall be required to be obtained and such notifications to any Governmental Body as shall be required to be given by such party in order for it to consummate the Contemplated Transactions in compliance with all applicable Laws relating to health care or healthcare services of any kind and shall include obtaining any such consents, approvals, authorizations, waivers, Orders, licenses or Permits, or notices to, the New York State Public Health Council, CMS, and DOH and shall include Purchaser obtaining a Certificate of Need from DOH with respect to its operation of the Business and the parties obtaining any consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body needed for them to consummate the Contemplated Transactions and for Purchaser to operate the Business.

"HHS Stipulation" means a stipulation among the Debtors, Purchaser, and the United States Department of Health and Human Services, the form of which is attached hereto as Exhibit E, with respect to the assumption and assignment of Seller's Medicare Provider Agreement and related provider number to Purchaser.

"Intellectual Property Licenses" means (a) any grant by Seller to a third Person of any right to use any of the Purchased Intellectual Property owned by Seller and (b) any grant to Seller of a right to use in connection with the Business any Intellectual Property Rights owned by any other Person (other than the SVCMC Marks), to the extent, and only to the extent, such right is transferable by Seller.

"Intellectual Property Rights" means all intellectual property rights available in respect of Copyrights, Marks (other than the SVCMC Marks), Software, trade secrets and Patents, whether registered or unregistered, and whether owned or licensed.

"Inventory" means all medical supplies, drugs, medications, food, janitorial, housekeeping and office supplies and other consumables located in or used in connection with the operation of the Business.

"IRS" means the Internal Revenue Service.

"Knowledge" means the actual knowledge of those officers or Representatives of Purchaser or of those officers of Seller or senior managers of the Business as of or prior to the Closing, each of which is identified in Section 1.1(a) of the Seller Disclosure Schedule.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation enacted or issued by a Governmental Body.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, alternative dispute resolution proceedings (public or private), or claims or any proceedings by or before a Governmental Body.

"Liability or Liabilities" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all fines, penalties, interest, costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement and transfer restriction under any agreement.

"Marks" means all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof.

"Material Adverse Effect" means (a) a material adverse effect on the Business (taken as a whole), including its assets, properties, results of operations or condition (financial or otherwise) as conducted on the date hereof other than an effect resulting from an Excluded Matter, or (b) a material adverse effect on the ability of Seller to consummate the Contemplated Transactions or to perform its obligations under this Agreement. "Excluded Matter" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general that does not materially disproportionately affect Seller; (ii) the effect of any change that generally affects any industry in which Seller operates (including a general adverse change in medical reimbursement rates); (iii) the effect of any changes in national or international political conditions, including any engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack occurring prior to, on or after the date of this Agreement that does not materially disproportionately affect Seller; (iv) the effect of any action taken by Purchaser or its Affiliates with respect to the Contemplated Transactions or with respect to Seller, including its employees; (v) any matter of which Purchaser has Knowledge on the date hereof or, solely for purposes of determining whether the condition to the Closing set forth in Section 10.1(a) hereto has been satisfied, on the Closing Date, including those matters

set forth in <u>Section 1.1(b)</u> of the Seller Disclosure Schedule; (vi) the effect of any change in applicable Laws or accounting rules; (vii) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the Contemplated Transactions; (viii) the effect of any action taken by Purchaser or its Affiliates under or in connection with the Receivership Agreement; (ix) the effect of any change occurring on or after the Closing Effective Date, or (x) any effect resulting from the filing or pendency of the Bankruptcy Case or Legal Proceedings relating thereto and reasonably anticipated effects thereof.

"<u>Medicaid</u>" means any state program for medical assistance administered under Title XIX of the Social Security Act.

"<u>Medical Reimbursement Program</u>" means Medicare, Medicaid, any other federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and any state sponsored reimbursement program.

"<u>Medical Reimbursement Program Laws</u>" means the Laws governing the Medical Reimbursement Programs, including but not limited to: 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a-7b and 1395nn; the False Claims Act (31 U.S.C. § 3729 et seq.); the False Statements Act (18 U.S.C. § 1001); the Program Fraud Civil Penalties Act (31 U.S.C. § 3801 et seq.); the anti-fraud and abuse provisions of the Health Insurance Portability and Accountability Act of 1996 (18 U.S.C. § 1347, 18 U.S.C. § 669, 18 U.S.C. § 1035, 18 U.S.C. § 1518; and the corresponding fraud and abuse, false claims and anti self-referral Laws of any other Governmental Body.

"<u>Medicare</u>" means the health insurance program administered under Title XVIII of the Social Security Act.

"<u>Order</u>" means any order, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of a Governmental Body.

"<u>Ordinary Course of Business</u>" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice, subject, however, to those actions necessary and incident, or otherwise relating, to the Bankruptcy Case.

"<u>Organizational Documents</u>" means (a) the articles or certificate of incorporation, the bylaws and any shareholders agreement of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and certificate of formation or organization of any limited liability company, (e) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person, and (f) any amendment to any of the foregoing.

"<u>Patents</u>" means all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon.

"<u>Patient Records</u>" shall mean any documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or

behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996, the Health Information Technology for Economic and Clinical Health Act, Title XIII of the American Recovery and Reinvestment Act of 2009 and all regulations promulgated pursuant thereto.

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Body.

"Permitted Liens" shall mean those liens set forth in Section 1.1(b) of the Seller Disclosure Schedule.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, association, estate, Governmental Body or other entity.

"Plan" means each material "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other material employee plan or agreement maintained by the Seller.

"Pre-Closing Accounts Receivable" means (a) accounts receivable arising out of the rendition of medical, surgical, behavioral, diagnostic or other professional health care services or the sale of medical products in the Ordinary Course of Business for dates of service occurring prior to the Closing Effective Date and (b) any accounts receivable due Seller from Affiliates as of the Closing Date.

"Purchased Intellectual Property" means all Intellectual Property Rights (other than rights under an Intellectual Property License and other than the SVCMC Marks) owned by Seller and (a) used by Seller exclusively in connection with the Business and (b) not used to a material degree in any of the Other Businesses, including any in the form of or arising from or in respect of Patents, Marks, Copyrights, Software or Technology, except for any that is an Excluded Asset.

"Real Estate Contract" means the Purchase and Sale Agreement, dated as of the date hereof, among Seller and SV Land Three, LLC (the "Real Estate Buyer"), pursuant to which the Real Estate Buyer shall purchase the Premises prior to, or contemporaneously with, the purchase of the Purchased Assets by Purchaser hereunder, in accordance with the terms thereof.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching of Hazardous Material into the indoor or outdoor environment, or into or out of any property.

"Representatives" means, with respect to any Person, any of its Affiliates and the directors, trustees, officers, members, employees, consultants, agents, advisors and other representatives of such Person or its Affiliates.

"Sale Motion" means the motion or motions of Seller seeking approval and entry of the Bidding Procedures Order and the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court substantially in the form of Exhibit B hereto, with such changes as are reasonably acceptable to Purchaser and Seller.

"Software" means, except to the extent generally available for purchase from a third Person, any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (d) all documentation including user manuals and other training documentation related to any of the foregoing, in each case, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business. That portion of the Software that is owned by Seller is referred to herein as the "Proprietary Software," and that portion of the Software that is owned by any Person other than Seller is referred to herein as the "Third-Party Software."

"Tax Authority" means any federal, state or local government, or agency, instrumentality or employee thereof, charged with the administration of any Law relating to Taxes.

"Taxes" means (a) all federal, state, local or foreign taxes, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, unrelated business income, and estimated taxes, whether disputed or not, and (b) all interest, penalties and additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (a).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business, other than any in the form of Software.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended.

Section 1.2    Terms Defined Elsewhere in this Agreement.    For purposes of this Agreement, each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
|---|---|
| Additional Deposit | 3.2 |
| Additional Purchased Assets | 3.5 |
| Agreement | Recitals |
| Allocation | 11.3 |
| Antitrust Bureau | 8.6(b) |
| Antitrust Division | 8.6(b) |
| Assigned Contracts | 2.1(d) |
| Assignment | 2.5(a) |
| Assumed Liabilities | 2.3 |
| Auction | 7.1(a) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Break-Up Fee | 7.2 |
| Business | Recitals |
| Business Confidential Information | 8.8(b) |
| Closing | 4.1 |
| Closing Date | 4.1 |
| COBRA | 9.2(d) |
| Competing Bid | 7.1(a) |
| CON Termination Date | 4.4(c)(iv) |
| Cure Amounts | 2.5(b) |
| Escrow Agent | 3.2 |
| Escrow Agreement | 3.2 |
| Escrowed Funds | 3.2 |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Excluded Matter | 1.1 |
| Excluded Personal Property Leases | 2.2(e) |
| Excluded Real Property Leases | 2.2(q) |
| Financial Statements | 5.9 |
| FTC | 8.6(b) |
| Healthcare Applications | 8.6(a) |
| Healthcare Programs | 5.17(b) |
| Indemnity Escrow Agreement | 2.10 |
| Initial Deposit | 3.2 |
| Losses | 8.16 |
| Material Contracts | 5.14(a) |
| Medical Records Custody Agreement | 2.9 |
| Nonassignable Assets | 2.6(b) |
| Other Businesses | Recitals |
| Personal Property Leases | 5.12 |
| Petition Date | Recitals |
| Premises | Recitals |
| Proprietary Software | 1.1 |

1649461v.19

| **Term** | **Section** |
|---|---|
| Provider Agreements | 2.1(g) |
| PTO | 9.2(b) |
| Purchase Price | 3.1 |
| Purchased Assets | 2.1 |
| Purchased Intellectual Property Licenses | 2.1(c) |
| Purchased Personal Property Leases | 2.1(b)(ii) |
| Purchased Real Property Leases | 2.1(a) |
| Purchaser | Recitals |
| Purchaser Disclosure Schedule | Article VI |
| Purchaser Documents | 6.2 |
| Receivership Agreement | 8.18 |
| Receivership Date | 8.18 |
| Real Property Leases | 5.11(a) |
| Resident Assets | 8.15 |
| Seller Confidential Information | 8.8(a) |
| Seller Disclosure Schedule | Article V |
| Seller Documents | 5.2 |
| Seller | Recitals |
| SVCMC | Recitals |
| SVCMC Marks | 8.11 |
| Third-Party Software | 1.1 |
| Transition Plan | 8.17 |
| Transfer Taxes | 11.1 |
| Transferred Employees | 9.1(a) |

Section 1.3    <u>Other Definitional and Interpretive Matters</u>.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

<u>Calculation of Time Periods</u>.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

<u>Dollars</u>. Any reference in this Agreement to currency shall be to, and all payments hereunder shall be paid in, U.S. dollars.

<u>Exhibits/Schedules</u>. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of

such other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number shall have the corresponding meanings in the plural and vice versa.

Headings. The provision of a Table of Contents, the division of this Agreement into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All article, section, schedule and exhibit references used in this Agreement are to articles, sections, schedules and exhibits to this Agreement unless otherwise specified.

Herein. The words "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation", whether or not so stated, and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Made Available to Purchaser. The phrase "made available to Purchaser" shall mean made available to Purchaser through posting in SVCMC's electronic data room, via email, facsimile or other electronic transfer to Purchaser or through other written means to Purchaser for all purposes of this Agreement and at such facsimile numbers and addresses provided by Purchaser.

Make Available to Seller. The phrase "make available to Seller" shall mean make available to Seller or its agents through email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

Part of Speech. If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).

Date. The phrase "the date of this Agreement," "date hereof" and terms of similar import, unless the context otherwise requires, shall be deemed to refer to the date set forth in the preamble of this Agreement.

Accounting Terms. All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.

(b)     Each party hereto has been advised by experienced counsel, and the parties hereto have participated jointly, in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto, and no rule of construction shall operate and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1    Purchase and Sale of Assets.    On the terms and subject to the conditions set forth in this Agreement, and subject to entry of the Sale Order, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall, subject to Section 2.5 hereto, sell, transfer, assign, convey and deliver to Purchaser, all of Seller's right, title and interest in, to and under the Purchased Assets, subject to the Permitted Liens, free and clear of any and all Liens or any other interest. "Purchased Assets" means all of the following assets, rights and properties of Seller exclusively pertaining to or exclusively used in connection with the Business as existing on the Closing Effective Date, other than the Excluded Assets, and in each case subject to Section 2.6(b) hereto:

(a)    (i) all right, title and interest of Seller under each Real Property Lease set forth in Section 5.6(a) of the Seller Disclosure Schedule; and (ii) any additional Real Property Leases exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.3 hereto (collectively, the "Purchased Real Property Leases"); provided, however, that at the request of Purchaser, Seller may in its reasonable discretion amend Section 5.6(a) of the Seller Disclosure Schedule up until the conclusion of the Auction;

(b)    (i) the Furniture and Equipment; (ii) the tools, spare parts, supplies (including all of Seller's Inventory) and all other tangible personal property owned by Seller, used by Seller in the conduct of the Business and set forth on Section 2.1(b) of the Seller Disclosure Schedule; and (iii) the Personal Property Leases identified in Section 5.12 of the Seller Disclosure Schedule, along with any additional Personal Property Leases exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.3 hereto (collectively, the "Purchased Personal Property Leases"); provided, however, that at the request of Purchaser, Seller may in its reasonable discretion amend Section 2.1(b) of the Seller Disclosure Schedule up until the conclusion of the Auction;

(c)    (i) the Purchased Intellectual Property set forth on Section 2.1(c) of the Seller Disclosure Schedule; and (ii) the rights of Seller as licensor under the Intellectual Property Licenses identified in Section 2.1(c) of the Seller Disclosure Schedule and all rights of Seller as licensee under the Intellectual Property Licenses, along with any additional Intellectual Property Licenses exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing in accordance with Section 8.3 hereto (collectively, the "Purchased Intellectual Property Licenses"); provided, however, that at the request of Purchaser, Seller may in its reasonable discretion amend Section 2.1(c) of the Seller Disclosure Schedule up until the conclusion of the Auction;

(d)    (i) all Contracts set forth in Section 2.1(d) of the Seller Disclosure Schedule and all rights arising out of such Contracts; and (ii) any additional Contracts exclusively pertaining to or exclusively used in connection with the Business that are entered into after the date hereof but prior to the Closing Effective Date in accordance with Section 8.3

12

hereto (collectively, the "<u>Assigned Contracts</u>"); provided, however, that at the request of Purchaser, Seller may in its reasonable discretion amend Section 2.1(d) of the Seller Disclosure Schedule up until the conclusion of the Auction;

(e)     subject to the provisions of <u>Section 2.9</u> and Article VII hereto, all Documents that are exclusively used in, held for use in or intended to be used in, or that arise exclusively out of, the Business, including Documents relating to the services provided by the Business and employee personnel files (such personnel files to exclude any information that is required to be maintained confidential by Seller pursuant to applicable laws, rules or regulations) for Seller's employees which Purchaser may elect to hire (including, to the extent available, pre-employment, criminal background, drug screen, and immigration records) and books, files, invoices, flow sheets and other technical and non technical data and information relating to the operations and services provided by the Business which are owned by Seller and which are exclusively used in and integral to the operation of the Business, but excluding any Documents and Patient Records described in <u>Section 2.2(g)</u> or <u>Section 2.2(h)</u> hereto;

(f)     all Permits exclusively used by Seller in the Business and set forth in <u>Section 2.1(f)</u> of the Seller Disclosure Schedule (to the extent transferable);

(g)     the Medicare and Medicaid provider numbers for the Business and related provider agreements used in the Business, as identified in <u>Section 2.1(g)</u> of the Seller Disclosure Schedule (collectively, the "<u>Provider Agreements</u>");

(h)     all goodwill and other intangible assets (other than Intellectual Property Rights) owned by Seller and exclusively used in connection with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(i)     all security deposits and prepayments of Business residents, if any, held by Seller for services to be provided on and after the Closing Effective Date;

(j)     all menus, policies and procedures manuals;

(k)     any rights to refunds, settlements and retroactive adjustments arising at any time in connection with any Medical Reimbursement Program including but not limited to any refunds, settlements and retroactive adjustments associated with the Healthcare Program Liabilities and subject to Section 2.2(t) herein and any private sector healthcare cost reimbursement or insurance coverage, provided, however, that notwithstanding anything to the contrary, in the event the Seller is paid, credited or however so receives any such refunds, settlements or retroactive adjustments related to this section prior to Closing, then any and all amounts paid or credited to or however so received, shall be a credit to the Purchaser against the Purchase Price payable hereunder at Closing;

(l)     all accounts receivable generated by the Business on and after the Closing Effective Date and all cash maintained by Purchaser or such other entity as designated by Purchaser in its capacity as Receiver under the Receivership Agreement, subject, however, to the terms of the Receivership Agreement; and

(m)     all telephone numbers and telefax numbers used by the Business.

Section 2.2    Excluded Assets.    Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser or its Affiliates, and Seller shall retain all right, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean the following assets, properties, interests and rights of Seller:

(a)    subject to Section 2.1(l), all cash, cash equivalents, bank deposits or similar cash items of Seller, all securities owned by Seller, and all Pre-Closing Accounts Receivable;

(b)    the Excluded Contracts;

(c)    Intentionally Omitted;

(d)    any other Contract to which Seller is a party or under which it has rights that is not used exclusively in the Business or is used to a material degree in any of the Other Businesses, unless included in Section 2.1(d) of the Seller Disclosure Schedule among the Assigned Contracts;

(e)    the Personal Property Leases identified in Section 2.2(e) of the Seller Disclosure Schedule (the "Excluded Personal Property Leases");

(f)    any Intellectual Property Rights of Seller other than the Purchased Intellectual Property; it being understood that Seller shall not convey, and Purchaser shall not acquire, pursuant to this Agreement any right in or to any website or e-mail address owned or used by Seller (whether or not used in the Business);

(g)    any (i) personnel files for employees of Seller who are not hired by Purchaser; (ii) other books and records that Seller is required by Law to exclusively retain; (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party (other than any patient confidentiality obligation referred to in the foregoing clause (ii) or in Section 2.9 hereto); (iv) books and records and other Documents related to malpractice prevention programs, incident reporting or quality assurance to the extent confidential under applicable Law; (v) Documents relating to proposals to acquire the Business by Persons other than Purchaser or its Affiliates; (vi) any Documents primarily related to or that are required to realize the benefits of any Excluded Assets; (vii) Documents related to Pre-Closing Accounts Receivable; (viii) corporate records and Tax Returns of Seller and (ix) Documents necessary to prepare Tax Returns and Cost Reports;

(h)    any Patient Records; provided that, subject to Section 2.9 hereto, Seller shall provide Purchaser with custody of Patient Records;

(i)    any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for Taxes related to the operation of the Business for any periods prior to the Closing Effective Date, together with any interest due thereon or penalty rebate arising therefrom;

(j)    all insurance policies or rights to proceeds thereof relating to the Business or the Purchased Assets to the extent arising from any date prior to the Closing Effective Date;

(k)     security deposits for rent, electricity, telephone or other utilities and prepaid charges and expenses of Seller to the extent exclusively related to the Business or the Purchased Assets, but in all events subject to adjustment at Closing under this Agreement;

(l)     any rights, claims or causes of action of Seller against third parties relating to assets, properties, business or operations of Seller, including any actions under Chapter 5 of the Bankruptcy Code, provided that with regard to any rights, claims or causes of action against third parties relating to the Purchased Assets or the Business, only to the extent such rights, claims or causes of action exist as of 11:59 p.m. on the day before the Closing Effective Date;

(m)     rights of Seller under this Agreement, the Seller Documents and the Contemplated Transactions;

(n)     any assets of the Other Businesses not otherwise described in Section 2.1 hereto;

(o)     any tangible personal property (i) having religious significance which may be removed from the Purchased Real Property, or (ii) not identified in Section 2.1(b) of the Seller Disclosure Schedule;

(p)     any personal, tangible and intangible property of Seller identified in Section 2.2(p) of the Seller Disclosure Schedule;

(q)     the Real Property Leases identified in Section 2.2(q) of the Seller Disclosure Schedule (the "Excluded Real Property Leases");

(r)     any right to receive or expectancy of Seller in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate), regardless of when received and whether or not designated to be applied or used in respect of the Business;

(s)     the Premises, and all other assets and properties of Seller that are subject to the Real Estate Contract; and

(t)     any rights to refunds, settlements and retroactive adjustments arising from or relating to any period or events or omissions occurring prior to the Closing Effective Date from or relating to any overpayment, duplicate payment, refunds, discounts or adjustments due to private sector healthcare cost reimbursement program or insurance coverage.

Section 2.3     Assumption of Liabilities.     On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely pay, perform and discharge in accordance with their respective terms, only the following Liabilities (collectively, the "Assumed Liabilities"):

(a)     in each case to the extent and only to the extent specifically provided in Article IX hereto, those Liabilities arising out of, relating to or with respect to the employment by Seller of any employees of Seller on or before the Closing Date;

(b)       all Liabilities exclusively arising from and after the Closing with respect to the Assigned Contracts, the Purchased Intellectual Property Licenses, the Purchased Real Property Leases and the Purchased Personal Property Leases;

(c)       all outstanding New York Health Facility Cash Assessment Program Liabilities of Seller as of the Closing Effective Date, provided that the Seller shall timely make all filings, including but not limited to, Cost Reports and provided that Seller makes all payments when due for the period before the Closing Effective Date; provided further that, in the event such Liability arises or become known between the date hereof and the Closing Effective Date, and such Liability is satisfied by Seller prior to the Closing Effective Date, Purchaser shall reimburse Seller for such Liability, excluding fines and penalties related thereto;

(d)       all known, unknown and contingent Healthcare Program Liabilities which to the best of the Seller's knowledge are listed on Section 2.3(d) of the Seller Disclosure Schedule; provided, however, that in the event such Liability arise or become known between the date hereof and the Closing Effective Date, and such Liability is satisfied by Seller prior to the Closing Effective Date, Purchaser shall reimburse Seller at Closing for such Liability;

(e)       the Cure Amounts as required by Section 2.5 hereto; and

(f)       any Liability arising from or relating to any period or events or omissions occurring after the Closing Effective Date from or relating to any overpayment, duplicate payment, refunds, discounts or adjustments due to private sector healthcare cost reimbursement program or insurance coverage, excluding fines and penalties related thereto.

Section 2.4       Excluded Liabilities.   Except for the Assumed Liabilities, Purchaser shall not assume or become liable for the payment or performance of any Liability of Seller of any nature whatsoever, whether accrued or unaccrued, known or unknown, fixed or contingent ("Excluded Liabilities"), including, but not limited to, the following, which shall remain Liabilities of Seller:

(a)       except as otherwise provided in Section 2.3 hereto, any Liability of Seller arising from or relating to the operation of the Business at any time prior to the Closing Effective Date (including, but not limited to, accounts payable) or arising from or relating to the Contemplated Transactions, including, but not limited to Taxes but specifically excluding accounts payable incurred during the Receivership Term while Purchaser or such other entity designated by the Purchaser acts as the Receiver;

(b)       any Liability associated with any Excluded Assets;

(c)       any Liability arising from or relating to any period or events or omissions occurring prior to the Closing Effective Date from or relating to any overpayment, duplicate payment, refunds, discounts or adjustments due to private sector healthcare cost reimbursement program or insurance coverage;

(d)       any Liability arising from or relating to claims of medical malpractice and/or other professional Liability of Seller, or any of its employees, agents or independent

contractors, arising out or relating to any period or events or omissions occurring prior to the Closing Effective Date;

(e)     any Liability arising out of or in connection with any Legal Proceedings (whether instituted prior to or after the Closing) to the extent arising from or relating to any period or acts or omissions which occurred prior to the Closing Effective Date (except as otherwise provided by Section 2.3 hereto); and

(f)     except as set forth in Section 2.3(a) above, any Liability arising from or relating to the CBAs, any Plans or Seller's employees (whether current, former or retired).

Section 2.5     Assignment and Cure Amounts.

(a)     Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing and pursuant to Section 365 of the Bankruptcy Code, Seller shall assume and assign to Purchaser, and Purchaser shall assume from Seller, the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases (including, but not limited to, the 72 Bed Bayley Lease, which the parties hereto agree, notwithstanding anything to the contrary, is a contingency to Purchaser's obligation to close) and Purchased Intellectual Property Licenses pursuant to an assignment (the "Assignment") in a form to be mutually agreed to by the parties, if necessary. No contract, lease, or other agreement shall be assumed absent concurrent assignment to Purchaser. Purchaser shall be responsible for satisfying the requirements of "adequate assurance of future performance" as required by Section 365 of the Bankruptcy Code and shall cooperate fully with Seller in seeking such approval from the Bankruptcy Court, including without limitation, Purchaser providing the necessary evidence required as part of the Sale Motion to approve this Agreement and the transactions contemplated herein.

(b)     The cure amounts (collectively, the "Cure Amounts"), if any, as determined by the Bankruptcy Court, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of Seller under the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses shall be paid by Purchaser (or Purchaser shall have delivered into escrow on terms reasonably acceptable to Seller amounts sufficient to pay any claim therefor that remains disputed as of the Closing, as such amount shall have been determined by the Bankruptcy Court) at or before the Closing (except as otherwise agreed to by the other party to the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses) and Seller shall have no Liability for any such cure amount. Purchaser shall indemnify Seller for any such Cure Amount obligations. Purchaser shall not have the right to terminate this Agreement as a result of the inability of Seller to assign to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof) at the Closing any Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses or Purchaser's decision not to assume any Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses as to which Purchaser has not paid the related Cure Amount in accordance with this section. To the Knowledge of Seller, an estimate as of the date hereof of the Cure Amounts described in this section is set forth on Section 2.5(b) of the Seller Disclosure Schedule.

(c)     Until the Closing, upon reasonable consent of the Seller, Purchaser may identify additional executory contracts and/or unexpired leases other than the Assigned Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property Licenses to be assumed by Seller and assigned to Purchaser for no additional consideration; provided however, that (i) Purchaser be solely obligated for any Cure Amounts or adequate assurance associated with such assumption, (ii) Purchaser shall indemnify Seller for any such Cure Amount obligations and (iii) Purchaser shall not have the right to terminate this Agreement as a result of the inability of Seller to assign such excretory contract and/or unexpired leases to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof).

Section 2.6     Further Conveyances and Assumptions.

(a)     From time to time following the Closing, each party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents at the Closing and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the Liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents at the Closing, and to otherwise make effective the transactions contemplated hereby and thereby; provided however that nothing herein shall obligate or otherwise require Seller to pay any claims or liabilities arising prior to the Petition Date. In the event that Purchaser or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Purchaser shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to Seller. In the event that Seller receives any Purchased Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver such Purchased Assets (or any payments or proceeds related thereto) to Purchaser.

(b)     Except for the assignment of the Provider Agreements, to the extent that the assignment of any Purchased Asset shall require the consent of any other Person and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code (each, a "Nonassignable Asset"), (i) nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained, and (ii) Purchaser shall be obligated to close whether or not the Nonassignable Asset can be transferred and Seller agrees to reasonably cooperate with Purchaser to seek to obtain any required consent; provided however that Seller shall not be required to pay any claims or incur any other obligations in order to obtain such consent. Notwithstanding anything to the contrary contained herein, Purchaser shall not have the right to terminate this Agreement as a result of the inability of Seller to assign to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof) at the Closing any Assigned Contract, Purchased Personal Property Lease, Purchased Real Property Lease or Purchased Intellectual Property License.

Section 2.7     Bulk Sales Laws.  The parties hereto hereby waive compliance by Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

Section 2.8     Accounts Receivable.

(a)     All Pre-Closing Accounts Receivable of the Business shall remain the property of Seller. All accounts receivable relating to the operation of the Business based on services rendered on and after the Closing Effective Date shall be the property of Purchaser. For the avoidance of doubt, Seller shall be entitled to bill for and receive all Pre-Closing Accounts Receivable, to the extent permitted by applicable Law, and Purchaser shall be entitled to bill for and receive all amounts collected in respect of services rendered by the Business on and after the Closing Effective Date. Notwithstanding the foregoing provisions of this Section 2.8, the parties agree to use diligent efforts to agree upon a method to fairly allocate, if necessary, (i) all payments received by Seller prior to the Closing Effective Date which relate to services that will be rendered both by Seller prior to the Closing Effective Date and by Purchaser on and after the Closing Effective Date, and (ii) all payments received on or after the Closing Effective Date by Purchaser which relate both to services rendered by Seller prior to the Closing Effective Date and services rendered by Purchaser on and after the Closing Effective Date. In the event that the parties are unable to agree about the Pre-Closing Accounts Receivable or upon a method of allocation, such matter or matters shall be determined by David Adest or Jesse Frommer of Loeb and Troper LLP, which determination shall be binding upon the parties and the costs of which shall be shared equally by Purchaser and Seller.

(b)     Purchaser shall use its commercially reasonable efforts after the Closing Effective Date to assist Seller in collecting Pre-Closing Accounts Receivable, at no cost to Seller, including providing personnel to assist with entering accurate, relevant patient account information onto Seller's accounting system within ten (10) days of the Closing, assisting in assigning appropriate billing codes with regard to the Pre-Closing Accounts Receivable, submitting to patients statements and claims relating to the Pre-Closing Accounts receivable in a timely manner, forwarding to Seller all revenue and correspondence related to the Pre-Closing Accounts Receivable, providing any relevant medical information needed to resolve the Pre-Closing Accounts Receivable, and assisting Seller in resolving any disputes with third-parties regarding payment of the Pre-Closing Accounts Receivable.  Except as set forth below, each of Purchaser and Seller agrees that it will pay over or cause to be paid over, insofar as practicable within ten (10) Business Days of receipt, to the other (and until so paid, shall hold in trust for the other) all sums received by it or any of its Affiliates in respect of or on account of the other's receivables (but in the case of Pre-Closing Accounts Receivable, Purchaser shall pay over or cause to be paid over such sums net of the applicable percentage rate required to be paid by DOH on Medicaid cash receipts assessments), and provide therewith information available to it identifying the source of the amounts so paid over so to permit the other to apply correctly such amounts to the other's accounts receivable. Notwithstanding the foregoing, for the first thirty (30) days following the Closing Effective Date, Purchaser shall pay all accounts receivable received by the Business, other than those relating to private pay patients, to Seller within three (3) Business Days of receipt, as the parties acknowledge and agree that all accounts receivable received by the Business during such thirty (30) day period will constitute Pre-Closing Accounts

19

Receivable. In addition, upon reasonable request, each recipient shall allow the other (at the other's cost) to audit, access and copy its records relating to the foregoing. All payments for accounts receivable arising out of the Business received from an obligor after the Closing Effective Date shall be applied to the receivable specifically designated by such obligor; provided that in the event that the obligor does not specifically designate a receivable, the payment shall be applied in the order of the age of the accounts receivable of such obligor, starting with the oldest such accounts receivable. The provisions of this Section 2.8 shall survive the Closing to the extent contemplated herein.

Section 2.9    Agreement Regarding Confidentiality of Patient Information.  Seller shall have no obligation to provide Purchaser with custody of Patient Records upon the Closing until Seller and Purchaser enter into a Medical Records Custody Agreement (the "Medical Records Custody Agreement") in the form attached hereto as Exhibit C, and then any such obligation of Seller is subject to Purchaser's compliance with such Medical Records Custody Agreement.

Section 2.10    Intentionally Omitted.

## ARTICLE III

## CONSIDERATION

Section 3.1    Consideration.    The consideration for the Purchased Assets shall be, subject to adjustment as provided in Section 3.5 hereto, (a) Nineteen Million Dollars ($19,000,000), subject to adjustment in accordance with Section 3.3 hereof (the "Purchase Price"); (b) the assumption by Purchaser of the Assumed Liabilities; and (c) the aggregate Cure Amounts payable or reserved by Purchaser under Section 2.5 hereto; provided that Seller shall also be entitled to receive the amounts provided by Section 2.8 hereto.  In the event that the Closing occurs on or prior to September 15, 2011, Purchaser shall be issued a credit against the purchase price of two hundred fifty thousand dollars ($250,000).

Section 3.2    Purchase Price Deposit.    Purchaser shall immediately deposit with Garfunkel Wild, P.C., in its capacity as escrow agent (the "Escrow Agent"), pursuant to that certain Escrow Agreement, dated as of the date hereof, by and among Purchaser, Seller and the Escrow Agent (the "Escrow Agreement"), by wire transfer of immediately available funds, (a) an amount equal to five percent (5%) of the Purchase Price upon execution of this Agreement (the "Initial Deposit"), and (b) in the event that Purchaser is selected as the prevailing bidder at the Auction, within one (1) Business Day after the conclusion of the Auction, an amount (the "Additional Deposit" and, together with the Initial Deposit, collectively, the "Escrowed Funds") equal to an amount such that together with the Initial Deposit, the Escrow Fund shall be equal to ten percent (10%) of the Purchase Price, as it may be subsequently amended at the Auction, each such deposit to be released by the Escrow Agent and delivered to either Purchaser or Seller, in accordance with the provisions of the Escrow Agreement. Pursuant to the Escrow Agreement, the Escrowed Funds shall be deposited into an interest bearing account and (together with all accrued investment income thereon) distributed as follows:

(a)     upon the Closing, the Escrowed Funds shall be delivered to Seller as partial consideration for the Purchased Assets, and all accrued investment income thereon shall be delivered to Purchaser at the Closing;

(b)     if this Agreement is terminated by Seller pursuant to Section 4.4(b)(ii) or Section 4.4(b)(iii) hereto, the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Seller;

(c)     if this Agreement is terminated pursuant to Section 4.4(c)(v) hereto, the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Seller; or

(d)     if this Agreement is terminated pursuant to Section 7.2(c) or Section 7.2(f) hereto, or pursuant to Section 4.4 hereto for any reason other than pursuant to Section 4.4(b)(ii), Section 4.4(b)(iii), or Section 4.4(c)(v) hereto, the Escrowed Funds, together with all accrued investment income thereon, shall in each case be returned to Purchaser.

Section 3.3     Payment of Purchase Price.   On the Closing Date, Purchaser shall pay the Purchase Price, subject to adjustment in accordance with Section 2.1(k), Section 2.1(n), Section 3.5, Section 3.6 and Section 11.2 hereof, and subject to any Purchase Price credit due under the Receivership Agreement, less an amount equal to the portion of the Escrowed Funds being released to Seller on the Closing Date pursuant to Section 3.2 hereto, plus any amounts owed to Seller pursuant to Sections 2.3(c) and 2.3(d) hereof on account of Healthcare Program Liabilities and New York Health Facility Cash Assessment Program Liabilities satisfied by Seller prior to the Closing Effective Date. At Closing, Purchaser shall deposit cash in escrow equal to such amount (if any) as is required by Section 2.5 hereto.

Section 3.4     Resident Transition.   Subject to resident choice, Purchaser shall formally admit all residents of the Business as of midnight on the Closing Date and Seller shall simultaneously discharge them.

Section 3.5     Additional Purchased Assets.   If between the date of this Agreement and the Closing Effective Date, Seller acquires in accordance with Section 8.3 hereto any material properties or assets that would be Purchased Assets ("Additional Purchased Assets"), the Purchase Price shall for all purposes of this Agreement be increased by eighty percent (80%) of the aggregate "present value" of such Additional Purchased Assets. The present value of an Additional Purchased Asset shall be determined by taking the original cost of such Additional Purchased Asset (including any Taxes or delivery charges) and depreciating such original cost on a straight line depreciation basis over a five (5) year period. Notwithstanding the foregoing, this provision shall only apply for each such Additional Purchased Asset having a cost in excess of $50,000.00.

Section 3.6     Intentionally Omitted.

# ARTICLE IV

## CLOSING AND TERMINATION

Section 4.1    Closing Date.  Subject to the satisfaction of the conditions set forth in Article X hereto (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereto (the "Closing") shall take place at the offices of Purchaser's lender or its counsel, otherwise at the offices of Garfunkel Wild, P.C. located at 111 Great Neck Road, Great Neck, New York 11021 (or at such other place as Seller and Purchaser may designate in writing) at 10:00 a.m. (New York time) on a date agreed upon by Seller and Purchaser that is within thirty (30) days following the satisfaction or waiver of the conditions set forth in Article X hereto (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by Seller and Purchaser. Notwithstanding the foregoing, either party may request up to two (2) extensions of the Closing of five (5) Business Days each upon the demonstration of legitimate cause for such extension or extensions, which requests will not be unreasonably delayed, conditioned or withheld by the other party. Notwithstanding the requirement to close within thirty days following the satisfaction or waiver of the conditions set forth in Article X hereto (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), Purchaser shall use its best efforts to (i) submit its CON Application immediately following entry of the Sale Order, (ii) obtain CON Approval by September 1, 2011 and (iii) obtain a financing commitment from TD Bank, N.A. or its affiliates, all of the foregoing so as to close on or before September 15, 2011. In the event that, despite its best efforts to do so, Purchaser is unable to close on or before September 15, 2011 because (x) the CON Approval has not been obtained or (y) Purchaser has not obtained a commitment from TD Bank, N.A. or its affiliates to finance the purchase, Purchaser shall continue to use its best efforts to proceed expeditiously to closing and shall close within a thirty (30) day period following the issuance of the CON Approval and the financing commitment from TD Bank, N.A. or its affiliates or another lender.  The requirement for financing commitment is for timing purposes only and shall not be a condition to closing. Section 6.8 herein shall still apply notwithstanding any other provision herein.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." With respect to the Closing, unless otherwise agreed by Seller and Purchaser in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of Seller in the assets to be acquired by Purchaser hereunder at the Closing, and any Assumed Liability and all risk of loss with respect to the Business, shall be considered to have passed to Purchaser as of 12:00 a.m. (New York time) on the Closing Date. Notwithstanding anything to the contrary contained in this Agreement, the Parties acknowledge and agree that the Contemplated Transactions and the transactions contemplated by the Real Estate Contract must close contemporaneously.

Section 4.2    Deliveries by Seller.  At the Closing, Seller shall deliver to Purchaser:

(a)    a duly executed bill of sale in a form reasonably acceptable to Purchaser and Seller;

(b)     the Assignment, if necessary, duly executed by Seller;

(c)     the officer's certificates required to be delivered pursuant to <u>Sections 10.1(a)</u> and <u>10.1(b)</u> hereto;

(d)     the Medical Records Custody Agreement between Purchaser and Seller, substantially in the form attached hereto as <u>Exhibit C</u>, duly executed by Seller;

(e)     copies of all consents and notices required by <u>Section 10.2(c)</u> hereto for which Seller is responsible;

(f)     duly executed documents as may be necessary to assign Seller's Medicaid and Medicare provider numbers and provider agreements to Purchaser;

(g)     all other instruments of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser free and clear of all Liens (except Permitted Liens); <u>provided</u>, <u>however</u>, that the Sale Order shall be the only required document to evidence the conveyance and transfer free and clear of such Liens;

(h)     a copy of the HHS Stipulation duly executed by Seller, substantially in the form attached hereto as Exhibit E, with such changes as reasonably acceptable to Purchaser;

(i)     the Assignment to Purchaser of Seller's interest as the tenant in the 72 Bed Bayley Seton Lease; and

(j)     such other Documents, instruments and certificates necessary to transfer the Purchased Assets as Purchaser may reasonably request no later than four (4) days before the Closing Date.

Section 4.3    <u>Deliveries by Purchaser</u>.   At the Closing, Purchaser shall deliver to Seller:

(a)     the Purchase Price, in immediately available funds, in accordance with <u>Section 3.3</u> hereto;

(b)     a duly executed bill of sale in form reasonably acceptable to Purchaser and Seller;

(c)     the Assignment, if necessary, duly executed by Purchaser;

(d)     the Medical Records Custody Agreement between Purchaser and Seller, substantially in the form attached hereto as <u>Exhibit C</u>, duly executed by Purchaser;

(e)     the officer's certificates required to be delivered pursuant to <u>Sections 10.2(a)</u> and <u>10.2(b)</u> hereto;

(f)     copies of all consents and notices required by Section 10.1(d) hereto for which Purchaser is responsible;

(g)     a copy of any notification that Purchaser is required under the Escrow Agreement to deliver to the Escrow Agent in order for the Escrow Agent to release the Escrowed Funds to Seller at the Closing;

(h)     evidence reasonably acceptable to Seller of Purchaser's deposit in escrow of such amounts (if any) required by Section 2.5 hereto;

(i)     a copy of the HHS Stipulation duly executed by Purchaser, substantially in the form attached hereto as Exhibit E, with such changes as reasonably acceptable to Seller;

(j)     Intentionally Omitted; and

(k)     such other Documents, instruments and certificates necessary to transfer the Purchased Assets as Seller may reasonably request no later than four (4) days before the Closing Date.

Section 4.4     Termination of Agreement.

(a)     Termination by Purchaser. Purchaser may terminate this Agreement prior to the Closing upon the occurrence of any of the following, unless Purchaser is in material breach of this Agreement prior to the occurrence thereof:

(i)     if any of the conditions to the obligations of Purchaser to close that are set forth in Sections 10.1 and 10.3 hereto shall have become incapable of fulfillment other than as a result of a material breach by Purchaser or its Affiliates of any covenant or agreement contained in this Agreement, and such condition is not waived in writing by Purchaser; provided that the right to terminate this Agreement pursuant to this Section 4.4(a)(i) shall not apply with respect to the approvals of Governmental Bodies addressed in Sections 4.4(c)(iii) and (c)(iv) hereto, which are addressed and provided for in such Sections;

(ii)     if there shall be a material breach by Seller of any representation or warranty, or any covenant or agreement contained in this Agreement, which breach relates to a matter that is, or would result in, a Material Adverse Effect and cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Purchaser to Seller of such breach;

(iii)     if (A) the Bidding Procedures Order is not entered within thirty (30) days from the date the Sale Motion is filed or (B) the Sale Order is not entered within sixty (60) days from the date the Sale Motion is filed, except if the delay in entering the Bidding Procedures Order of Sale Order is a result of Purchaser's breach of its obligations under this Agreement in any material respect; or

(iv)     if at any time prior to Closing, the 72 Bed Bayley Seton Lease is terminated or modified without Purchaser's Consent; or

(v)     if the 72 Bed Bayley Seton Lease is not assigned to Purchaser at Closing.

(b)     <u>Termination by Seller</u>.   Seller may terminate this Agreement prior to the Closing upon the occurrence of any of the following, unless Seller is in material breach of this Agreement prior to the occurrence thereof:

(i)     if any of the conditions to the obligations of Seller to close that are set forth in <u>Sections 10.2</u> and <u>10.3</u> hereto shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller; <u>provided</u> that the right to terminate this Agreement pursuant to this <u>Section 4.4(b)(i)</u> shall not apply with respect to the approvals of Governmental Bodies addressed in <u>Sections 4.4(c)(iii)</u> and <u>(c)(iv)</u> hereto, which are addressed and provided for in such Sections;

(ii)     if there shall be a material breach by Purchaser of any representation or warranty, or by Purchaser of any covenant or agreement contained in this Agreement, which breach would have a Material Adverse Effect on the ability of Purchaser to consummate the Contemplated Transactions or to perform its obligations under this Agreement and cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Seller to Purchaser of such breach; or

(iii)     if the Receivership Agreement is terminated prior to the Closing Date due to a breach or default of Purchaser or such other entity designated by the Purchaser thereunder, if different than Purchaser hereunder.

(c)     <u>Termination by Purchaser or Seller</u>.   Either Purchaser or Seller may terminate this Agreement prior to the Closing upon the occurrence of any of the following unless the party seeking to terminate is in material breach of this Agreement prior to the occurrence of the following:

(i)     by mutual written consent of Seller and Purchaser;

(ii)     intentionally omitted;

(iii)     upon twenty (20) Business Days' written notice to the other party after six (6) months from the entry of the Sale Order by the Bankruptcy Court, if either Purchaser or Seller reasonably determines, after consultation with the DOH and the other party, that it is more likely than not that DOH will not provide such CON Approval by the CON Termination Date for reasons that are specific to Purchaser and the contents of its CON Application and not for reasons that are related to DOH's normal operating procedures in considering the CON Application or DOH's opinion on the financial feasibility of the Contemplated Transactions, it being understood by the parties that DOH's opinion on the financial feasibility of the Contemplated Transactions is a separate and distinct analysis from the DOH's analysis referred to in <u>Section 4.4(c)(v)</u> below of whether Purchaser has sufficient financial resources to fulfill its obligations related to Closing hereunder. Notwithstanding the foregoing, neither Purchaser nor Seller may terminate this Agreement under this <u>Section 4.4(c)(iii)</u> if within such twenty (20)

25

Business Day period DOH provides the CON Approval or either party receives from DOH reasonably satisfactory assurances that Purchaser will receive the CON Approval by the CON Termination Date;

(iv)     upon twenty (20) Business Days' written notice to the other party if the Closing shall not have occurred by the close of business on the date that is twelve (12) months from the entry of the Sale Order (the "CON Termination Date"); provided that such termination pursuant to this Section 4.4(c)(iv) shall not be effective if within such twenty (20) Business Day period all outstanding required regulatory approvals shall have been obtained and all other Closing conditions shall have been satisfied provided, further, that if the Closing shall not have occurred on or before the CON Termination Date due to an uncured (if curable) material breach of any representations, warranties, covenants, or agreements contained in this Agreement, then the breaching party or its Affiliates may not terminate this Agreement pursuant to this Section 4.4(c)(iv);

(v)     in the event that Purchaser's CON Application is finally rejected by the DOH due to: (1) a character and competency issue after Purchaser has exercised its rights to substitute members, officers, directors, or employees of Purchaser in the CON Application in accordance with Section 8.6(a) hereof, or (2) an inability of Purchaser to demonstrate sufficient financial resources necessary to Close under this Agreement;

(vi)     in the event the Real Estate Contract is terminated in accordance with its terms prior to the closing of the transactions contemplated thereunder; or

(vii)     An uncured material default by Purchaser, or any affiliate or assignee of Purchaser, under the Ground Lease shall be deemed to be an uncured default by Purchaser under this Agreement, and an uncured material default by Seller as it relates to 72 neurosurgical beds, or any affiliate or assignee of Seller under the Ground Lease shall be deemed to be an uncured default by Seller under this Agreement.

(d)     Extension of Time Periods.     The time periods for termination of this Agreement set forth in this Section 4.4 may be extended upon the written agreement of the parties without the further consent of the Bankruptcy Court.

(e)     Cross-Default with Real Estate Contract.     Subject to any opportunity to cure as may be set forth in this Agreement: (i) a default in any material respect by Seller under the Real Estate Contract prior to closing thereunder shall be deemed a default by Seller under this Agreement, and a default in any material respect by Seller under this Agreement shall be deemed a default by Seller under the Real Estate Contract; (ii) a default in any material respect by the Real Estate Buyer under the Real Estate Contract prior to closing thereunder shall be deemed a default by Purchaser under this Agreement and a default in any material respect by Purchaser under this Agreement shall be deemed a default by Real Estate Buyer under the Real Estate Contract. In addition, (x) if the Real Estate Buyer is entitled to cancel or terminate the Real Estate Contract or receive the return of the deposit paid thereunder in accordance with its terms, then the Purchaser under this Agreement shall have the right to terminate this Agreement upon notice to Seller and pursue its rights and remedies as provided in this Agreement, including

but not limited to the right to receive the prompt return of the Escrowed Funds plus accrued interest thereon, or (y) if Seller is entitled to terminate the Real Estate Contract upon a default by Real Estate Buyer thereunder or to receive the deposit paid under the Real Estate Contract, then Seller shall be entitled to terminate this Agreement upon notice to Purchaser and shall have the right to receive the Escrowed Funds pursuant to the terms of this Agreement. In all events, if either this Agreement or the Real Estate Contract shall terminate, the other agreement shall simultaneously terminate.

Section 4.5    Procedure for Termination.   In the event of termination of this Agreement by Purchaser or Seller, or both, pursuant to Section 4.4 hereto, written notice thereof shall forthwith be given to the other party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 4.4 hereto) the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 4.6 hereto, without further action by the parties.

Section 4.6    Effect of Termination.

(a)    In the event that this Agreement is validly or automatically terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any party; provided that the obligations of the parties set forth in the Confidentiality Agreement, Escrow Agreement, Sections 3.2, 4.6, 7.2 and 8.8 hereto and Article I hereto, and to the extent necessary to effectuate the foregoing enumerated provisions, Article I hereto, and the obligations with respect to the payment of the Escrowed Funds and the Break-Up Fee, as may be applicable, shall survive any such termination and shall be enforceable in accordance with their terms. In addition, if this Agreement is terminated as provided herein, Purchaser shall upon request redeliver to Seller as soon as practicable any or all Documents, work papers and other material relating to the Business, whether obtained before or after the execution hereof, together with written certification by an authorized officer of Purchaser who has supervised its compliance with this sentence that confirms such compliance.

(b)    Nothing in this Section 4.6 shall relieve the parties of any Liability for a breach of this Agreement prior to the date of termination of this Agreement. If this Agreement is terminated in accordance with Sections 4.4 and 4.5 hereto, Purchaser shall not, directly or indirectly, and shall cause its Affiliates not to, for a period of two (2) years from the date of this Agreement, solicit, recruit, employ or contract with any employee of Seller or any member of Seller's professional staff.

(c)    Notwithstanding any provision of this Agreement to the contrary, no party shall be liable to the other for any indirect, special, consequential, or speculative damages, including, without limitation, loss of opportunity, or profits.

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as otherwise disclosed to Purchaser in a schedule delivered to Purchaser by Seller prior to the execution of this Agreement (the "Seller Disclosure Schedule"), and except for the effects of the commencement of the Bankruptcy Case, Seller hereby represents and warrants to Purchaser as follows:

Section 5.1   Organization and Good Standing.   Seller is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the State of New York, and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 5.2   Authorization of Agreement.   Subject to entry of the Sale Order, (a) Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action, including approval of its members (as applicable), necessary for it to validly execute and deliver, this Agreement and each other agreement, document, or instrument or certificate contemplated by this Agreement to be executed and delivered by Seller in connection with entering into this Agreement, and (b) subject to the satisfaction of the conditions referred to in Section 5.3 hereto, Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action necessary for it to validly execute and deliver, each agreement, document, or instrument or certificate contemplated by this Agreement to be executed by Seller in connection with the consummation of the Contemplated Transactions (together with the other Documents, other than this Agreement, referred to in clause (a) of this sentence, the "Seller Documents") and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. This Agreement and each of the Seller Documents contemplated to be executed and delivered in connection with Seller entering into this Agreement have been, and each other Seller Document will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order and, with respect to Seller's obligations under Section 7.1 hereto, the entry of the Bidding Procedures Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a Legal Proceeding at law or in equity). None of the execution and delivery by Seller of this Agreement and the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Seller.

Section 5.3   Consents of Third Parties; Contractual Consents.

(a)   Except as set forth in Section 5.3 of the Seller Disclosure Schedule, Seller is not required to obtain any consent, waiver, approval, Order, Permit or authorization of, or to

make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Seller Documents by Seller, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order, (ii) the entry of the Bidding Procedures Order with respect to Seller's obligations under Section 7.1 hereto, (iii) Healthcare Regulatory Consents, (iv) approvals under applicable Antitrust Laws, and (v) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications of which the failure to have obtained or made same would not have a Material Adverse Effect.

(b)     To Seller's Knowledge, and except as set forth in Section 5.3(b) of the Seller Disclosure Schedule, none of the execution and delivery by Seller of this Agreement or any of the Seller Documents, the consummation of the Contemplated Transactions by Seller, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of or a material default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Seller is a party or by which any of the Purchased Assets are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a Material Adverse Effect.

Section 5.4     Litigation.   There are no Legal Proceedings pending or, to the Knowledge of Seller, threatened against Seller, or to which Seller is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a Material Adverse Effect. Seller is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a Material Adverse Effect.

Section 5.5     Licenses and Governmental Permits.   Seller is currently established and licensed by the DOH, pursuant to the Public Health Law of the State of New York, to operate the Business as a 200 bed skilled nursing facility. To Seller's Knowledge, Seller possesses all Permits required for the operation of the Business as currently operated, except for any Permits the failure of which to have would not result in a Material Adverse Effect. The Business participates as a provider in the Medicare and Medicaid programs pursuant to Medicare and Medicaid provider agreements.

Section 5.6     Intentionally Omitted.

Section 5.7     Health Surveys.   Section 5.7 of the Seller Disclosure Schedule contains the most recent DOH survey or inspection report of the Business and accepted Plan of Correction, if any. Except as may be set forth in said report, and except as set forth in Section 5.7 of the Seller Disclosure Schedule, to Seller's Knowledge, there are no material violations, orders or deficiencies issued or recommended by any Governmental Body, and there are no material inspections, license reviews, investigations or proceedings of any sort pending by or before any such Governmental Body that relate to the Business and that, if adversely determined, would result in a Material Adverse Effect.

Section 5.8    Notices.    Except as set forth in <u>Section 5.8</u> of the Seller Disclosure Schedule, the Business has not been served with any notice which: (a) requires the performance of any material work or alterations on the Business, or in the streets bounding thereon; or (b) orders the installation, repair or alteration of any improvements on the Business or the streets bounding thereon, in each case including, but not limited to, notices received under the Americans with Disabilities Act of 1990, as amended.

Section 5.9    Financial Statements.    Seller has furnished Purchaser with (i) audited financial statements for Seller for the year ended December 31, 2008, and (ii) (A) unaudited balance sheet and the related statements of income for the twelve (12) month period ended January 31, 2011 (the "<u>Year End Financial Statements</u>"), and (B) Seller's unaudited balance sheet for the Business as of June 30, 2010 (the "<u>Interim Balance Sheet</u>" and together with the Year End Financial Statements, the "<u>Financial Statements</u>"). Seller shall provide Purchaser with such additional financial information as Purchaser reasonably requests between the date hereof and the Closing Effective Date. Seller shall deliver to Purchaser such regularly prepared periodic unaudited balance sheet items and/or operating data with respect to the Purchased Assets and/or the Business as and when the same are prepared and/or delivered to Seller and/or its Representatives along with and any Cost Reports that are required to be filed for any periods prior to Closing.

Section 5.10    Title to Purchased Assets.    Except as set forth in <u>Section 5.10</u> of the Seller Disclosure Schedule, and other than the real property subject to the Real Property Leases, Intellectual Property Licenses, and the personal property subject to the Purchased Personal Property Leases, Seller owns each of the Purchased Assets. Purchaser will be vested with good title to such Purchased Assets, subject to entry of the Sale Order, free and clear of all Liens, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. To Seller's Knowledge, no Person has any right or option to acquire the Purchased Assets or any material part thereof.

Section 5.11    Real Property Leases.

(a)    <u>Section 5.11(a)</u> of the Seller Disclosure Schedule sets forth a true, correct and complete list of all real property and interests in real property leased or licensed by Seller and exclusively used in the Business, as lessee, lessor, licensee or licensor (the "<u>Real Property Leases</u>").  Seller has a valid leasehold interest in the Purchased Real Property Leases, which shall be transferred to Purchaser at Closing, subject to entry of the Sale Order, free and clear of all Liens other than Permitted Liens.

(b)    All Purchased Real Property Leases are in full force and effect.  Except as set forth in <u>Section 5.11(b)</u> of the Seller Disclosure Schedule and as otherwise superseded by the applicable provisions of the Bankruptcy Code, Seller has not received written notice of any default which remains uncured, and, to the Knowledge of Seller, the other parties under each of the Purchased Real Property Leases have complied in all material respects therewith, and are not in default thereunder beyond any applicable notice and cure periods.  All Purchased Real Property Leases shall be transferred to Purchaser at Closing without amendments thereto and with the same terms and conditions as exist as of the date hereof.

Section 5.12   Tangible Personal Property.   Section 5.12 of the Seller Disclosure Schedule sets forth all leases of personal property, including Equipment, exclusively used by Seller in the operation of the Business that involve annual payments in excess of $10,000.00. ("Personal Property Leases").

Section 5.13   Intellectual Property.   Seller has licenses to use all material Third-Party Software used in the operation of the Business as now operated.

Section 5.14   Material Contracts.

(a)   Section 5.14(a) of the Seller Disclosure Schedule sets forth a list of all of the following Contracts to which Seller is a party or by which it is bound and that are exclusively related to the Business or by which the Purchased Assets may be currently bound or affected (collectively, the "Material Contracts"):

(i)   Contracts with any labor union or association representing any employees of Seller; and

(ii)   Contracts which involve the annual expenditure of more than $75,000.00 in the aggregate or require performance by any party more than one year from the date hereof that, in either case, are not terminable without penalty on less than thirty (30) days' notice.

(b)   Except (i) as otherwise provided in the Bankruptcy Code, (ii) for events of default arising as a result of the commencement of the Bankruptcy Case, or (iii) for general principles of equity that may limit the specific performance of particular provisions, each Material Contract is a legal, valid and binding obligation of Seller and is enforceable by Seller against the other party or parties to such Material Contract in accordance with its terms.

Section 5.15   Employees; Employee Benefits.

(a)   Section 5.15(a) of the Seller Disclosure Schedule sets forth a true and complete list of all Plans.  Each Plan has been administered and is in compliance with the terms of such Plan and in accordance with all other applicable Laws except where the failure thereof would not have a Material Adverse Effect. Purchaser shall not assume any Plans or any Liabilities associated therewith, unless otherwise expressly set forth herein.

(b)   Except as set forth in Section 5.15(b) of the Seller Disclosure Schedule, no "reportable event" (as such term is used in Section 4043 of ERISA), "prohibited transaction" (as such term is used in Section 406 of ERISA or Section 4975 of the Code) or "accumulated funding deficiency" (as such term is used in Section 412 or 4971 of the Code) has heretofore occurred with respect to any Plan which would have a Material Adverse Effect.

Section 5.16   Employment and Labor.

(a)   Section 5.16(a) of the Seller Disclosure Schedule (i) sets forth a true and complete list of all employees of Seller as of the date set forth therein (ii) shall be updated and delivered by Seller to Purchaser not later than sixty (60) days prior to the Closing and (iii) to the

Knowledge of the Seller, accurately sets forth in all material respects the following information: (1) the position; (2) date of hire; (3) current annual salary or hourly wage; (4) accrued vacation, holidays and/or sick leave as a result of the individual's employment with Seller; and (5) the collective bargaining representative, if any, of which the individual is a member. Thereafter and prior to the Closing Effective Date, Seller shall likewise deliver as soon as practicable to Purchaser updates to <u>Section 5.16(a)</u> of the Seller Disclosure Schedule with respect to any individual that is hired by, or transferred to, the Business as an employee consistent with the provisions in <u>Section 8.2</u> hereto.

(b)     <u>Section 5.16(b)</u> of the Seller Disclosure Schedule identifies each labor or collective bargaining agreement applicable to employees of Seller, none of which shall be assumed by Purchaser (the "<u>CBAs</u>").

Section 5.17     <u>Compliance with Laws; Permits</u>.

(a)     Seller is duly authorized by DOH to operate the Business.

(b)     Seller is eligible to receive payment under Titles XVIII and XIX of the Social Security Act and is a "provider" under existing provider agreements with the Medicare and Medicaid programs (collectively, the "<u>Healthcare Programs</u>") through the applicable intermediaries.

(c)     Except as set forth in <u>Section 5.17(c)</u> of the Seller Disclosure Schedule, to the Knowledge of Seller, Seller is in compliance with all Laws and Permits applicable to the Purchased Assets or the Business, except where the failure to be in compliance would not have a Material Adverse Effect.

Section 5.18     <u>Financial Advisors</u>.     Except as set forth in <u>Section 5.18</u> of the Seller Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the Contemplated Transactions. Any fees, commissions or like payment due to any such Person shall be paid by Seller and no Person is or shall be entitled to any fee or commission or like payment from Purchaser.

Section 5.19     <u>No Other Representations or Warranties; Schedules</u>.     Except for the representations and warranties contained in this <u>Article V</u> (as modified by the Seller Disclosure Schedules), neither Seller nor any other Person makes any other representation or warranty whether express or implied, written or oral, with respect to Seller, the Business, the Purchased Assets, the Assumed Liabilities or the Contemplated Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, its Affiliates or any of their respective officers, directors, members, employees, agents, consultants or other Representatives. Except for the representations and warranties contained in this <u>Article V</u> (as modified by the Seller Disclosure Schedules), Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its

32

Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser or its Representatives by any director, officer, member, employee, agent, consultant or other Representative of Seller or any of its Affiliates). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business. Seller makes no implied representation or warranty as to the condition, merchantability, usage, suitability or fitness for any particular purpose with respect to the Purchased Assets except for the representations and warranties contained in this Article V (as modified by the Seller Disclosure Schedules). The disclosure of any matter or item in any Section of the Seller Disclosure Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect. The representations and warranties of Seller in this Agreement are for diligence purposes only and do not survive the Closing, however their disclaimers survive.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as otherwise disclosed to Seller in a schedule delivered to Seller by Purchaser prior to the execution of this Agreement (the "Purchaser Disclosure Schedule"), Purchaser hereby represents and warrants to Seller, as follows:

Section 6.1    Organization and Good Standing.    Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of New York and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 6.2    Authorization of Agreement.    Purchaser has all requisite power, authority and legal capacity to execute and deliver this Agreement, the Receivership Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement and the Receivership Agreement or to be executed by it in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly and validly authorized by all necessary corporate action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior the Closing, duly and validly executed and delivered by Purchaser, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a Legal Proceeding at law or in equity). None of the execution and delivery by Purchaser of this Agreement and the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Purchaser.

Section 6.3    Conflicts; Consents of Third Parties.

(a)    To Purchaser's Knowledge, except as set forth in Section 6.3(a) of the Purchaser Disclosure Schedule, Purchaser is not required to obtain any consent, approval, authorization, waiver, Order or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) the Healthcare Regulatory Consents, and (ii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications (A) that have already been obtained or made or (B) of which the failure to have obtained or made would not have a Material Adverse Effect or would not reasonably be expected to prevent or materially delay the ability of Purchaser to perform or consummate the Contemplated Transactions.

(b)    To Purchaser's Knowledge, except as set forth in Section 6.3(b) of the Purchaser Disclosure Schedule, none of the execution and delivery by Purchaser of this Agreement or any of the Purchaser Documents, the consummation of the Contemplated Transactions by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser or any of its Affiliates is a party or by which any of the properties or assets of Purchaser or any of its Affiliates are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the Contemplated Transactions.

Section 6.4    Litigation.    There are no Legal Proceedings pending or, to the Knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions. Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions.

Section 6.5    Financial Advisors.    Except as set forth in Section 6.5 of the Purchaser Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the Contemplated Transactions and no such Person is entitled to any fee or commission or like payment from Seller in respect thereof.

Section 6.6    Healthcare Regulatory Compliance Status.

(a)    To Purchaser's Knowledge, except as set forth in Section 6.6 of the Purchaser Disclosure Schedule, neither Purchaser nor its members, managers, officers, or

employees is involved in any litigation, proceeding or investigation by or with any Governmental Body which, if determined or resolved adversely, would have a material adverse impact on the ability of Purchaser to obtain or maintain any governmental qualifications, registrations, filings, licenses, Permits, Orders, approvals or authorizations necessary for Purchaser to conduct the Business and to own or use the Purchased Assets, as the Business is conducted and the Purchased Assets are owned and used on the date hereof, where the failure to have such qualifications, registrations, filings, licenses, Permits, Orders, approvals or authorizations could reasonably be expected to prevent or materially delay the consummation of the Contemplated Transactions by Purchaser or the performance by Purchaser of any of its material obligations under this Agreement.

(b)     To Purchaser's Knowledge, neither Purchaser nor any of its members, directors, officers or employees has (i) been indicted or convicted of a felony, (ii) been suspended or excluded from the Healthcare Programs or (iii) failed to pass a character and competency or financial feasibility review by DOH or comparable Governmental Body of another State. To Purchaser's Knowledge, there is no reason why Purchaser should fail to successfully obtain CON Approval for reasons relating to the character, competence and/or financial capacity of Purchaser and  its members, managers, officers, or employees.

Section 6.7    <u>Acknowledgement Regarding Condition of the Business</u>. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, whether express or implied or written or oral, beyond those expressly given by Seller to Purchaser in <u>Article V</u> hereto (as modified by the Seller Disclosure Schedule), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred to Purchaser on a "WHERE IS" and, as to physical condition, "AS IS" basis. Purchaser further represents that neither Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, written or oral, as to the accuracy or completeness of any information regarding Seller, the Business or the Contemplated Transactions not expressly set forth in this Agreement, and neither Seller, any of their Affiliates or any other Person will have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or the use by Purchaser or any of its Affiliates of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its Representatives, or any other document or information in any form provided to Purchaser or its Representatives in connection with the sale of the Business and the Contemplated Transactions. Purchaser acknowledges that it, along with its Representatives, has conducted to its satisfaction, its own independent investigation of the Business and the Purchased Assets and, in making the determination to proceed with the Contemplated Transactions, Purchaser has relied on the results of its own independent investigation.

Section 6.8    <u>Financing</u>.    On the Closing Date Purchaser will have sufficient funds on hand to consummate the Contemplated Transactions. On the Closing Effective Date, Purchaser or such other entity designated by the Purchaser thereunder will have sufficient funds to fulfill its obligations under the Receivership Agreement. Purchaser acknowledges that it shall not be a

contingency to the obligations of Purchaser to consummate the Contemplated Transactions that Purchaser have sufficient financial resources for payment of the Purchase Price.

Section 6.9    No Other Representations or Warranties; Schedules.    Except for the representations and warranties contained in this Article VI (as modified by the Purchaser Disclosure Schedules), neither Purchaser nor any other Person makes any other representation or warranty, whether express or implied, written or oral, with respect to Purchaser or the Contemplated Transactions, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser or any of their respective officers, directors, members, managers, employees, agents, consultants or other Representatives.    Except for the representations and warranties contained in this Article VI (as modified by the Purchaser Disclosure Schedules), Purchaser disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Seller by any director, officer, member, manager, employee, agent, consultant, or other Representative of Purchaser or any of its Affiliates). The disclosure of any matter or item in any Section of the Purchaser Disclosure Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material. The representations and warranties of Purchaser in this Agreement shall not survive the Closing, however their disclaimers shall survive.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

Section 7.1    Competing Transactions.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or otherwise better competing bids (each a "Competing Bid") in accordance with the Bidding Procedures Order.  If one or more Competing Bids are received, Seller shall conduct an auction of the Purchased Assets in accordance with the Bidding Procedures Order (the "Auction").

(b)    Seller is permitted to cause its Representatives to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person (in addition to Purchaser and Representatives) in connection with any sale or other disposition of all or any part of the Purchased Assets. In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Purchased Assets to prospective purchasers.

Section 7.2    Break-Up Fee.

(a)    In consideration for (i) Purchaser having expended, and continuing to expend, considerable time and expense in connection with this Agreement and the negotiation thereof and (ii) the benefit conferred on Seller by Purchaser's willingness to enter into this

Agreement, in the event that a Competing Bid is accepted by Seller and the Bankruptcy Court issues an Order approving the transaction with the party making such Competing Bid (an "Alternative Transaction"), Purchaser shall be entitled to a break-up fee in an amount equal to two percent (2%) of the Purchase Price (the "Break-Up Fee"), which Break-up Fee shall be payable in accordance with Section 7.2(b) below.

(b)     The Break-Up Fee shall be paid to Purchaser, without further order of the Bankruptcy Court, (i) upon the consummation of an Alternative Transaction, or (ii) if no Alternative Transaction closes, then Purchaser shall be paid the Break-Up Fee with priority as an expense of the administration of the Debtors' estates (A) pursuant to, and in connection with, any confirmed plan of reorganization or liquidation of the Seller; or (B) if no plan of reorganization or liquidation for the Seller is confirmed, as and if provided by the Bankruptcy Code or Order of the Bankruptcy Court. All valid obligations of Seller to Purchaser, or to Purchaser or such other entity designated by the Purchaser thereunder in its capacity as receiver under the Receivership Agreement, in the Contemplated Transactions shall be entitled to priority as expenses of the administration of the Debtors' estates.

(c)     Purchaser acknowledges that, if a Competing Bid is selected at Auction but such bidder does not obtain the right to purchase the Purchased Assets, Purchaser shall proceed with diligence and shall be prepared to close the Contemplated Transactions in accordance with the terms of this Agreement in the event that the Sale Order is entered within thirty (30) days of the Auction. If an Order is entered by the Bankruptcy Court approving a Competing Bid, this Agreement shall automatically be deemed terminated, the effect of which shall thereafter be governed by Section 4.6 hereof; provided, however, if Purchaser successfully appeals any such Order approving a Competing Bid, Purchaser agrees it will either waive any entitlement it may have to the Break-up Fee hereunder, or agree to reinstate this Agreement and consummate the Contemplated Transactions in accordance with the terms set forth in this Agreement (as the same may hereafter be modified or amended pursuant to the provisions of this Agreement or by Purchaser at the Auction).

(d)     Seller acknowledges and agrees that (a) the approval of the Break-Up Fee is an integral part of the Contemplated Transactions, (b) in the absence of Seller's obligation to pay the Break-Up Fee, Purchaser would not have entered into this Agreement, (c) the entry of Purchaser into this Agreement is necessary for preservation of the estate of Seller and is beneficial to Seller, and (d) the Break-Up Fee is reasonable in relation to Purchaser's efforts and to the magnitude of the Contemplated Transactions.

(e)     The provisions of this Agreement regarding the payment of the Break-Up Fee shall be subject to the approval of the Bankruptcy Court as part of the Bidding Procedures Order.

(f)     If the Break-Up Fee payable under this Section 7.2 shall not be approved by the Bankruptcy Court, Purchaser shall have the right, but not the obligation, to terminate this Agreement within three (3) Business Days after the Bankruptcy Court declines to approve the Break-Up fee by delivery of written notice to Seller, and receive the prompt return of the Escrowed Funds, together with all accrued interest thereon, and upon the payment thereof to Purchaser, neither party shall have any further obligations to the other. If Purchaser does not

timely terminate this Agreement in accordance with the foregoing, Purchaser's termination right under this Section 7.2(f) shall be null and void and of no further force and effect.

Section 7.3    Bankruptcy Court Filings.    As promptly as practicable following the execution of this Agreement, Seller shall, at its sole costs and expense, file with and seek the approval of the Bankruptcy Court of the Sale Motion, including the Break-Up Fee and entry of the Bidding Procedures Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other Documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Bidding Procedures Order or Sale Order shall be appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.

Section 7.4    Notice of Sale.    Notice of the sale of Purchased Assets contemplated in this Agreement shall be served in accordance with the Bidding Procedures Order.

## ARTICLE VIII

## COVENANTS

Seller hereby covenants and agrees with Purchaser as follows:

Section 8.1    Conveyance.    At Closing, Seller shall convey the Purchased Assets to Purchaser, free and clear of all violations, liens and encumbrances, except for Permitted Liens or as otherwise provided herein.

Section 8.2    Access to Information.    Subject to Section 2.9 hereto and the other provisions of this Section 8.2 and subject to compliance with applicable Antitrust Laws, Seller agrees that, prior to the Closing Effective Date, and at its own expense, Purchaser shall be entitled, through its Representatives, to make such investigation of the assets, properties and operations of the Business and such examination of the books and records of Seller pertaining to the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and, and at its own expense, to make extracts and copies of such books and records; it being understood, however, that the foregoing shall not entitle Purchaser to access (a) the books, records and Documents referred to in Section 2.2(g) hereto or (b) any books, records or Documents the disclosure of which by Seller to Purchaser would (i) notwithstanding Section 2.9 hereto, violate any patient confidentiality obligation of Seller or (ii) any other agreement or any obligation of confidentiality to which Seller is a party or is bound prior to the date hereof or (iii) any obligation of confidentiality by which Seller is bound under applicable Law. In addition, following the issuance of the Sale Order, Purchaser shall be permitted to have access to Patient Records and employee files solely for the purpose of implementing the Transition Plan set forth in Section 8.17 of the Purchaser Disclosure Schedule. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, any request for such examination shall be made to one of the Persons

identified in Section 8.1 of the Seller Disclosure Schedule, and Purchaser's access to such information shall be subject to any restrictions on disclosure by Seller to Purchaser or use of the information contained therein by Purchaser applicable pursuant to any agreement to which Seller is a party or is bound prior to the date hereof or under applicable Law. Seller shall cause its Representatives to promptly cooperate with Purchaser and its Representatives in connection with such investigation and examination, and Purchaser and its Representatives shall cooperate with Seller and its Representatives and shall use its commercially reasonable efforts to minimize any disruption to Seller's business and operations, including the Business. Notwithstanding anything herein to the contrary, Seller shall not be required to permit any such investigation or examination if, and to the extent that, Seller, upon advice of counsel, determines that such investigation or examination by Purchaser would or is reasonably likely to result in a loss of any attorney-client or attorney work product privilege available to Seller. Notwithstanding any provision of this Agreement to the contrary, Seller shall timely cooperate and provide Purchaser with such information as Purchaser reasonably requires to prepare and file its CON Application and to respond to DOH requests or inquiries and for other legitimate purposes related to the Contemplated Transactions, including, without limitation, in connection with Purchaser finalizing its financing for the Contemplated Transactions (although Purchaser acknowledges and agrees that its obligations to consummate the Contemplated Transactions are not contingent on Purchaser obtaining such financing).

Section 8.3    Conduct of the Business Pending the Closing.   Subject to the terms and conditions of the Receivership Agreement but except as otherwise set forth herein, during the period from the date hereof through and including the Closing, except (i) as set forth in Section 8.3 of the Seller Disclosure Schedule, (ii) as required by applicable Law (including without limitation as a result of the commencement of the Bankruptcy Case), or (iii) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Seller shall use commercially reasonable efforts to operate the Business in the Ordinary Course of Business. Without limiting the generality of the foregoing, from the date of this Agreement through and including the Closing Effective Date, Seller shall, except (i) as set forth in Section 8.2 of the Seller Disclosure Schedule, (ii) as required by applicable Law (including without limitation as a result of the commencement of the Bankruptcy Case) or (iii) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), solely as it relates to the Business:

(a)    operate the Business only in the ordinary course, in a businesslike manner and in substantially the same manner as it has heretofore, and in compliance in all material respects with all applicable Federal and State Laws;

(b)    within ten (10) Business Days of receipt or filing, as the case may be, provide Purchaser with copies of all the DOH survey reports and material notices from Governmental Bodies that are received by Seller along with copies of all Seller's responsive correspondence therefor.

(c)    Seller shall timely file plans of correction, if necessary, and shall provide Purchaser with copies of all of the same within ten (10) Business Days of filing;

(d)    not acquire or dispose of any fixed assets with a value of $10,000.00 or more, or make any capital expenditures in excess of $10,000.00 per item for the Business;

(e)    maintain and keep the Purchased Assets in the same condition and working order as exists on the date hereof, including making necessary repairs and replacements, ordinary wear and tear, depreciation and casualty excepted;

(f)    maintain and preserve intact the business organization relating to the Business, to retain adequate staffing of the Business and to maintain the Business's relationship with physicians, employees, residents, residents' families, suppliers, customers, and others having business relationships with the Business so that they shall be preserved for Purchaser on the Closing Effective Date;

(g)    consult with Purchaser and obtain Purchaser's approval in each instance before renewing or entering into any Contracts not terminable by Purchaser, without cost, penalty or liability, it being understood that Purchaser shall not be obligated to assume any Contract entered into or extended after the date hereof which is not terminable without cost or penalty to Purchaser unless Purchaser has specifically hereafter consented in writing to assume such Contract;

(h)    Seller shall afford Purchaser, and its agents, reasonable access to the Business during normal business hours upon prior reasonable request;

(i)    file all Costs Reports required to be filed for any periods prior to the Closing Effective Date and provide Purchaser, within ten (10) Business Days of filing, with copies of any Cost Reports that are required to be filed for any periods prior to the Closing Effective Date and cooperate with the Purchaser in connection with its duties under the Receivership Agreement including but not limited to providing the Purchaser will al documents and information reasonably required by Purchaser in connection with its duties under the Receivership Agreement and in connection with the filing of cost reports for period commencing on and after the Closing Effective Date.  In the event Seller does not timely file such cost reports, the parties will negotiate either a credit to the Purchase Price and/or an extension to the Closing; provided, however, that the effect of Seller's failure to file any such Cost Reports shall not constitute a Material Adverse Effect;

(j)    maintain all of its books and records in accordance with past practice;

(k)    keep in full force and effect all licenses currently in effect, unless such licenses are no longer necessary for the operation of the Business;

(l)    keep in full force and effect all insurance policies or other comparable policies of insurance currently in effect, or the replacements thereof, unless such licenses are no longer necessary for the operation of the Business;

(m)    promptly advise Purchaser in writing if Seller becomes aware of any threatened or actual claim, action, suit, or proceeding, arbitration or investigation against the Business, any of its employees or the Purchased Assets, which if adversely determined would result in a Material Adverse Effect;

(n)     subject to the Bidding Procedures Order, not enter into any agreement, other than this Agreement, for the sale of the Purchased Assets; and

(o)     notwithstanding anything to the contrary, not amend or modify the Real Property Leases without Purchaser's prior written consent which consent may be withheld for any or no reason.

Section 8.4     Satisfaction of Conditions.   Seller shall use reasonable commercial efforts to obtain the satisfaction of the conditions specified in Article X of this Agreement.

Section 8.5     Consents; Insurance.

(a)     Through the filing of the Sale Motion and except as may be satisfied through the entry of the Sale Order, Seller shall use its commercially reasonable efforts, and Purchaser shall cooperate with Seller, including by taking the actions referred to in Section 8.5 hereto, to obtain at the earliest practicable date following entry of the Sale Order all necessary consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Seller (including all consents listed in Section 5.3 of the Seller Disclosure Schedule), and to give at the earliest practicable date following entry of the Sale Order any notices required to be given by Seller, in order for Seller to consummate the Contemplated Transactions on the terms and in the manner provided hereby; provided that Seller shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than postpetition filing or postpetition application fees payable to any Governmental Body) or to initiate any litigation or Legal Proceedings to obtain any such item except as otherwise provided by Section 8.5 hereto. Purchaser shall use its commercially reasonable efforts, and Seller shall cooperate with Purchaser, including by taking the actions referred to in Section 8.5 hereto, to obtain at the earliest practicable date following entry of the Sale Order all consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Purchaser, and to give at the earliest practicable date following entry of the Sale Order any notices required to be given by Purchaser, in order for Purchaser to consummate the Contemplated Transactions on the terms and in the manner provided hereby and to operate the Business after the Closing; provided that Purchaser shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any litigation or Legal Proceedings to obtain any such consent or approval except as otherwise provided by Section 8.10 hereto.

Section 8.6     Regulatory Approvals.

(a)     Purchaser shall, at its own cost and expense, (i) within five (5) Business Days of the date of this Agreement, cooperate with Seller in initiating informal discussions with DOH concerning the form and substance of the CON Application; (ii) subject to Seller's timely cooperation to the extent reasonably required, within the later of forty-five (45) days after the date hereof, or two (2) Business Days after Purchaser's receipt of notice from Seller that the Sale Order was entered, formally submit a complete CON Application to DOH; and (iii) promptly after the entry of the Sale Order, submit to any other Governmental Body all other applications for any Healthcare Regulatory Consents required in order for Purchaser to consummate the Contemplated Transactions and to operate the Business in accordance with applicable Law

(collectively with the CON Application, the "Healthcare Applications"), excepting however such applications which are required to be filed after the Closing, and further excepting, such applications for Healthcare Regulatory Consents which are required to be filed by Seller in order to consummate the Contemplated Transactions, which shall be promptly submitted and diligently prosecuted by Seller, at its sole cost and expense, after the entry of the Sale Order by the Bankruptcy Court. Purchaser shall use best efforts to prosecute its Healthcare Applications and shall, subject to the cooperation required of Seller, timely submit all information and Documents requested in connection therewith by DOH and any other Governmental Body. Without limiting the generality of the foregoing, Purchaser shall promptly take such actions as may be reasonably necessary to cure any character or competency objections that DOH may raise to the CON Application, including removing or substituting any members, officers, directors, or employees that fail to obtain character and competency approval from DOH. Each party shall provide the other with prompt written notice of a party's submission of a Healthcare Application. Within five (5) Business Days of its submission or receipt, a party shall deliver to the other party a complete copy of all correspondence to or from DOH or any other applicable Governmental Body having jurisdiction concerning a Healthcare Application. Each party shall provide the other party with periodic reports of a party's efforts to obtain all Healthcare Regulatory Consents. In addition, Purchaser shall provide Seller with notice as promptly as practicable of its receipt of DOH's approval, contingent approval or a rejection of the CON Application, or of any pending or threatened Legal Proceeding which seeks to challenge the Contemplated Transactions, along with a copy of any documentation related thereto. Purchaser shall not knowingly take any action prior to the Closing intended to disqualify Purchaser as an established and licensed operator of the Business. Purchaser shall timely respond to any "30-day letters" relating to Purchaser's CON Application and shall not seek any extension of the deadline within which Purchaser must respond to any such 30-day letter without the written approval of Seller in each instance, which written approval will not be unreasonably withheld by Seller.

(b)     If necessary, each of Purchaser and Seller shall use its commercially reasonable efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under any of the Antitrust Laws with respect to the Contemplated Transactions (including such submission to the Antitrust Bureau of the Office of the Attorney General of the State of New York (the "Antitrust Bureau") as may be required in connection with the CON Application under the Donnelly Act (New York General Business Law Sections 340 through 347)) as promptly as practicable and, in any event, within five (5) Business Days in connection with all submissions to the Antitrust Bureau in connection with the CON Application and within five (5) Business Days in the case of all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request under any of the Antitrust Laws for information, Documents, or other materials received by each of them or any of their respective Affiliates from the Federal Trade Commission (the "FTC"), the Antitrust Division of the United States Department of Justice (the "Antitrust Division"), the Antitrust Bureau or any other Governmental Body in respect of such filings or the Contemplated Transactions. Each party shall use its commercially reasonable efforts to cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such Documents to the non-filing parties promptly following the submission thereof) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division, the Antitrust Bureau or any other Governmental Body under any of the Antitrust Laws with respect to any such filing or any such transaction.

(c)     If necessary, each of Purchaser and Seller shall use its commercially reasonable efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates in respect of the Contemplated Transactions under any applicable Law, including such filings as are required to obtain the consents, approvals, authorizations, waivers, Orders, licenses or Permits or to provide the notices specified in Section 5.3 of the Seller Disclosure Schedule or Section 6.3(a) of the Purchaser Disclosure Schedule, as promptly as practicable, (ii) comply at the earliest practicable date with any request for additional information, Documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Body in respect of such filings or the Contemplated Transactions and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such Documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any Governmental Body under such Laws with respect to any such filing or any such transaction.

(d)     Each of Purchaser and Seller shall use its commercially reasonable efforts to furnish to each other through counsel all information required for any application or other filing to be made pursuant to any applicable Law in connection with the Contemplated Transactions. Each such party shall promptly inform the other parties through counsel of any material oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No such party shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.

(e)     Subject to applicable Law, Purchaser and Seller will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under any of the Antitrust Laws. Each such party may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.6 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials.

(f)     Each of Purchaser and Seller shall use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the Contemplated Transactions under any of the Antitrust Laws.  In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any of the Contemplated Transactions as in violation of any of the Antitrust Laws, each such party shall cooperate and use its commercially reasonable efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other Order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the Contemplated Transactions, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and Seller decide that litigation is not in their respective

reasonable best interests. Each such party shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under any of the Antitrust Laws with respect to such transactions as promptly as possible after the date of this Agreement. In connection with and without limiting the foregoing, each of Purchaser and Seller agrees to use its commercially reasonable efforts to take promptly any and all steps necessary to avoid or eliminate each and every impediment under any of the Antitrust Laws that may be asserted by any Federal, state and local and non-United States antitrust or competition authority, so as to enable Purchaser and Seller to close the Contemplated Transactions as expeditiously as possible.

Section 8.7    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement, each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Contemplated Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Contemplated Transactions. Without limiting the generality of the foregoing, from time to time after the Closing, without additional consideration, each party hereto will (or, if appropriate, cause its Affiliates to) execute and deliver such further instruments and take such other action as may be necessary or reasonably requested by the other party to make effective the Contemplated Transactions and to provide the other party with the intended benefits of this Agreement. In addition, upon the reasonable request of Purchaser, Seller shall execute, acknowledge and deliver all such further assurances, deeds, assignments, powers of attorney and other instruments and paper as may be required to sell, transfer, convey, assign and deliver to Purchaser all right, title and interest in, to and under the Purchased Assets. If any party to this Agreement shall, following the Closing, have in its possession any asset or right which under this Agreement should have been delivered to the others at the Closing, such party shall promptly deliver such asset or right to the others.

(b)    Without limiting the generality of the foregoing, if Purchaser or any of its Affiliates shall at any time after the Closing receive any charitable gift, contribution or bequest that might be an Excluded Asset, or receives any notice that such a charitable gift, contribution or bequest may be received or available to Purchaser, Purchaser shall give prompt written notice thereof to Seller and make available to Seller upon reasonable request such information that Purchaser or any of its Affiliates has available to it regarding such gift, contribution or bequest and will cooperate with Seller in determining whether such gift, contribution or bequest should be characterized as an Excluded Asset. The provisions of this Section 8.7 shall survive the Closing.

Section 8.8    Confidentiality.

(a)    From and after the date hereof, Purchaser shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Seller, and not use to the detriment of Seller, any Seller Confidential Information relating to or obtained from Seller or its Representatives. For purposes of this Section 8.8, "Seller Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Purchased Assets, the Assumed Liabilities, the Business, the Excluded Assets, the Excluded Liabilities or the Other Businesses, including

methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided that Seller Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) is or becomes generally available to the public other than as a result of a disclosure by Purchaser or any of its Representatives, (ii) becomes available to Purchaser on a non-confidential basis from a source other than Seller or its Representatives; provided that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Purchaser from a third party having the right to disseminate the Seller Confidential Information without restriction on disclosure or (iv) can be shown by Purchaser through written Documents or evidence maintained by Purchaser to have been independently developed by either of them; and provided, further, that upon the Closing, the restrictions contained in this Section 8.8 shall not apply to confidential or proprietary information related primarily to the Business or the Purchased Assets and the Assumed Liabilities. Purchaser may disclose any of the Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. Purchaser shall instruct its Representatives having access to the Seller Confidential Information of such obligation of confidentiality. If Purchaser or anyone to whom it has transmitted Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Confidential Information, Purchaser shall provide Seller with prompt written notice prior to making any disclosure so that such Seller may seek a protective Order or other appropriate remedy. If such protective Order or other remedy is not obtained, Purchaser shall furnish only that portion of the Seller Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed, and Purchaser will exercise commercially reasonable efforts to obtain assurance to the extent possible that confidential treatment will be accorded to that portion of Seller Confidential Information that is being disclosed. In any event, Purchaser will not oppose action by Seller to obtain an appropriate protective Order or other reliable assurance that confidential treatment will be accorded Seller Confidential Information. The restrictions contained hereinabove shall not apply to any disclosures made in connection with obtaining the Regulatory Approvals contemplated under this Article VIII or in connection with any other legitimate purpose of Purchaser related to the Contemplated Transactions, including with regard to Purchaser finalizing its financing for the Contemplated Transactions (although Purchaser acknowledges and agrees that its obligations to consummate the Contemplated Transactions are not contingent on Purchaser obtaining such financing), provided that no disclosures will be made by Purchaser or its Representatives to any party not bound by an obligation of secrecy to Purchaser.

(b)     From and after the Closing Date, unless this Agreement is terminated prior to the Closing, Seller shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Purchaser, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with (i) operating the Other Businesses in the ordinary course before and after the Closing Effective Date, (ii) any investigations by Governmental Bodies, (iii) compliance activities after the Closing related to periods occurring prior the Closing Effective Date, (iv) any Legal Proceedings, (v) enforcing any rights or other claims of Seller under this Agreement, (vi) performing any obligations of Seller under this Agreement, including billing and collecting Pre-Closing Account Receivable and other related activities, or (vii) as permitted by the Medical Records Custody

Agreement. For purposes of this Section 8.8(b), "Business Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Business or to the Purchased Assets or the Assumed Liabilities, other than information primarily pertaining to the Excluded Assets, the Excluded Liabilities or the Other Businesses, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided that Business Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Seller or its Representatives, (ii) becomes available to Seller on a non-confidential basis from a source other than Seller or its Representatives; provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Purchaser or (iii) is lawfully received by Seller from a third party having the right to disseminate the Business Confidential Information without restriction on disclosure. Seller may disclose any of the Business Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. Seller shall instruct its Representatives having access to the Business Confidential Information of such obligation of confidentiality. If Seller or anyone to whom it has transmitted Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information, Seller shall provide Purchaser with prompt notice prior to making any disclosure so that Purchaser may seek a protective Order or other appropriate remedy. If such protective Order or other remedy is not obtained, Seller shall furnish only that portion of the Business Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed, and Seller will exercise commercially reasonable efforts to obtain assurance to the extent possible that confidential treatment will be accorded to that portion of Business Confidential Information that is being disclosed. In any event, Seller will not oppose action by Purchaser to obtain an appropriate protective Order or other reliable assurance that confidential treatment will be accorded Business Confidential Information.

(c) The obligations contained in this Section 8.8 are in addition to any separate confidentiality agreements between any of Seller or SVCMC, on the one hand, and Purchaser or its Affiliates, on the other hand, including, without limitation, the Confidentiality Agreement.

Section 8.9 Preservation of Records. Purchaser agrees that it shall preserve and keep the records held by it relating to the operation of the Business prior to the Closing Date for a period of seven (7) years from the Closing Date or the maximum period of time required by Law, whichever is longer, and shall, subject to Section 2.9 hereto, make such records and personnel available to Seller at Purchaser's sole expense as may be reasonably required by Seller in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or other governmental or healthcare payor investigations or audits of Seller or any of its Affiliates or in order to enable Seller to comply with its obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event Purchaser wishes to destroy such records before or after that time, Purchaser shall first give ninety (90) days prior written notice to Seller and, if it is then existing and functioning, to the Creditors' Committee, and Seller shall have the right at its option and expense, upon prior

written notice given to Purchaser within such ninety (90) day period, to take possession of the records within one hundred and thirty (30) days after the date of such notice.

Section 8.10    Publicity.    Each of Seller and Purchaser agrees that it shall not issue any press release or public announcement concerning this Agreement or the Contemplated Transactions without obtaining the prior written approval of either Purchaser or Seller, as applicable, which approval will not be unreasonably withheld, delayed or conditioned, unless, in the judgment of such issuing party upon advice of counsel, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement; provided that such party that intends to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other parties with respect to the text thereof. Notwithstanding the foregoing, Purchaser understands that Seller will be filing various pleadings, including the Sale Motion, in furtherance of obtaining Bankruptcy Court approval of this Agreement and the Contemplated Transactions and Seller understands that Purchaser will be making various filings in connection with the CON Application and in connection with Purchaser finalizing its financing for the Contemplated Transactions (although Purchaser acknowledges and agrees that its obligations to consummate the Contemplated Transactions are not contingent on Purchaser obtaining such financing).

Section 8.11    Use of Name.    Purchaser agrees that it shall (a) as soon as practicable after the Closing Date and in any event within thirty (30) days following the Closing Date, cease to make any use of the name "Saint Vincents Catholic Medical Centers" or any variation thereon or derivative thereof (including "St. Vincent's"), St. Elizabeth Ann's or any variation thereon or derivative thereof, or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing any of the foregoing, including any name or mark confusingly similar thereto (collectively, the "SVCMC Marks") which are included in the Purchased Assets or otherwise included in materials or assets transferred to Purchaser in connection with the Closing, and (b) immediately after the Closing, cease to hold itself or its Affiliates out as having any affiliation or association with Seller, SVCMC or any of their respective Affiliates. In furtherance thereof, as promptly as practicable but in no event later than sixty (60) days following the Closing Date, Purchaser shall remove, strike over or otherwise obliterate all SVCMC Marks from all materials including any vehicles, business cards, schedules, stationery, packaging materials, displays, signs, promotional materials, manuals, forms, computer Software and other materials transferred to Purchaser on the Closing Date; provided that so long as Purchaser uses any SVCMC Marks and has not removed all SVCMC Marks from all materials, Purchaser shall comply with the Ethical and Religious Directives for Catholic Health Care Services issued by the National Conference of Catholic Bishops, as amended from time to time. Purchaser shall also take, and cooperate with Seller in taking, such actions as are reasonably necessary to change all telephone book listings of the Business.

Section 8.12    Supplementation and Amendment of Schedules.

(a)    Purchaser may, at its option, include in the Purchaser Disclosure Schedule, and Seller may, at its option, include in the Seller Disclosure Schedule, as the case may be, any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the

47

meaning of such terms for purposes of this Agreement. Information disclosed in the Purchaser Disclosure Schedule or the Seller Disclosure Schedule, as the case may be, shall constitute a disclosure for all purposes of this Agreement notwithstanding any reference to a specific Section in such Disclosure Schedule, and all such information shall be deemed to qualify the entire Agreement and not just such Section.

(b)     Unless otherwise expressly set forth herein, no less than three (3) Business Days prior to the Closing Effective Date, Seller shall deliver to Purchaser an update to the Seller Disclosure Schedule to reflect changes thereto which occur between the date hereof and the Closing Effective Date in the Ordinary Course of Business in accordance with Section 8.3 hereto.

Section 8.13     Covenant Not to Compete or Solicit.

(a)     Throughout the one (1) year period immediately after the Closing Date, Seller shall not, and Seller shall not permit any of its Affiliates to, at any time, directly or indirectly, without the prior written consent of Purchaser, own, operate, manage or control any business or healthcare facility that renders the type of health care services as provided by the Business on the Closing Date within Richmond County, New York. Notwithstanding the foregoing and without agreeing (implicitly or otherwise) that the following activities would otherwise be subject to the provisions of this Section 8.13(a), nothing in this Agreement shall preclude, prohibit or restrict a Seller or any of its Affiliates from engaging in any manner in the current and contemplated businesses listed in Section 8.13(a) of the Seller Disclosure Schedule.

(b)     Throughout the one (1) year period immediately after the Closing Date, Seller shall not, and Seller shall not permit any of its Affiliates to, at any time, directly or indirectly, without the prior written consent of Purchaser, solicit, recruit, employ or contract with any Purchaser employee for so long as such employee is employed by Purchaser or its Affiliates; provided that nothing shall prohibit Seller and its Affiliates from performing, or having performed on their behalf, a general solicitation for employees not specifically focused at the Purchaser's employees through the use of media, advertisement, electronic job boards or other general, public solicitations.

Section 8.14     Cooperation.     Seller and Purchaser agree to reasonably cooperate with each other, from the date hereof through and following the Closing Date, in good faith, in an effort to satisfy all further conditions, undertakings and agreements contained in this Agreement.

Section 8.15     Resident Assets.

(a)     At the Closing, Seller shall deliver to Purchaser: (i) a schedule of all resident funds held by the Business delineated for each resident  (ii) a check or checks drawn on the residents' accounts maintained by the Business for the full amount of such account(s) which shall be deposited by Purchaser in a new residents' allowance account to be maintained by Purchaser; and (iii) a schedule of all bank accounts maintained by the Business on behalf of its residents (collectively, the "Residents Assets").

(b)     Seller and Purchaser shall promptly give all notices required by applicable Law in connection with the transfer of the Resident Assets.

Section 8.16    Indemnification.

(a)    Seller shall indemnify, defend and hold Purchaser and Purchaser's Affiliates, successors and assigns, harmless from and against any and all Liabilities, including, without limitation, reasonable attorneys fees (collectively, "Losses"), that are actually incurred by Purchaser (net of any Tax benefit received by Purchaser in connection therewith), to the extent that such Losses exclusively arise from or relate to any Excluded Liabilities. Notwithstanding the foregoing, Purchaser shall not be entitled to offset against any Pre-Closing Accounts Receivable received by Purchaser, which are payable to Seller pursuant to Section 2.8(a)(ii) hereof, for Losses that may be subject to indemnification under this Section 8.16(a).

(b)    In the event Purchaser receives notice of a potential claim or the commencement of a Legal Proceeding involving Purchaser relating to any of the Excluded Liabilities, Purchaser shall promptly notify Seller, provide copies to Seller of any correspondence it receives with respect to such claims or Legal Proceedings, and will fully cooperate with Seller (at Seller's expense for any reasonable third party costs actually incurred by Purchaser in providing such cooperation) in connection with the defense and/or settlement thereof. Furthermore, Purchaser shall take no action with regard to any such claim or Legal Proceeding involving Excluded Liabilities that is inconsistent with Seller's sole and exclusive right to litigate, defend, negotiate, and/or resolve any such claim or Legal Proceeding, including, but not limited to, making any payments in respect of any such claim or Legal Proceeding not expressly authorized in writing by Seller. Seller shall, at its own expense, promptly dispute or satisfy any claim involving Excluded Liabilities.

(c)    Notwithstanding any provision of this Agreement to the contrary, if Purchaser fails to promptly notify Seller and provide copies to Seller of any correspondence it receives concerning claims or Legal Proceedings to which Purchaser would be entitled to indemnification from Seller under this Section 8.16, then, provided that Seller is not already aware of such claim and/or Legal Proceeding and/or did not otherwise receive the foregoing correspondence, Purchaser shall be entitled to indemnification from Seller under this Section 8.16 except for only that portion of the Losses directly attributable to damages arising exclusively from Purchaser's failure to promptly notify Seller. Notwithstanding any provision of this Agreement to the contrary, if Purchaser makes any payments in respect of any claim or Legal Proceeding to which Purchaser would be entitled to indemnification from Seller under this Section 8.16 not expressly authorized in writing by Seller, then Purchaser shall not be entitled to indemnification from Seller under this Section 8.16 for any such claims or Legal Proceedings.

(d)    The provisions of this Section 8.16 shall expire and be of no further force and effect on the earlier of the (i) eighteen (18) month anniversary of the Receivership Date or (ii) twelve (12) month anniversary of the Closing Date.

Section 8.17    Purchaser Transition Plan.    Set forth in Section 8.17 of the Purchaser Disclosure Schedule (to be provided by Purchaser no later than thirty (30) days from the date hereof) is Purchaser's plan and timeline for transitioning the Business to Purchaser as of the Closing Date (the "Transition Plan"). The Transition Plan contains milestones for operational matters that Purchaser will address and complete in order to smoothly transition the Business to Purchaser by the Closing Date, and the timeline within which all such matters shall be addressed

by Purchaser in order for Purchaser to timely consummate the Contemplated Transactions by the deadline contemplated by Section 4.1 hereof. Notwithstanding any provision of this Agreement to the contrary, Purchaser acknowledges and agrees that any inability of Purchaser to achieve the milestones set forth in the Transition Plan in the time frame contemplated by the Transition Plan shall not excuse Purchaser from consummating the Contemplated Transactions within the time period specified in Section 4.1 hereof.

Section 8.18    Receivership Agreement.

(a)    The parties or such other entity designated by the Purchaser thereunder shall enter into a Receivership Agreement – Nursing Home (the "Receivership Agreement") in the form attached hereto as Exhibit D, pursuant to which Purchaser or such other entity designated by the Purchaser thereunder will assume the management and responsibility for the Business through the Closing Date, to the extent permitted by applicable law and regulations, on and in accordance with the terms and subject to the conditions of such Receivership Agreement. The Receivership Agreement is subject to the prior approval of DOH and shall not become effective unless and until DOH has approved same, with such changes, if any, as are acceptable to Seller and Purchaser in their discretion. In the event the DOH approves the Receivership Agreement in a form acceptable to the Seller and Purchaser, the parties shall promptly execute and deliver the Receivership Agreement and the Receivership Agreement shall become effective on the date specified therein (the "Receivership Date").

(b)    The parties shall submit the form of Receivership Agreement to DOH for approval promptly following the date hereof, but in no event later than five (5) Business Days following the date hereof. The Receivership Agreement will terminate upon the Closing or otherwise in accordance with its terms.

Section 8.19    Personal Guaranty of Purchaser Obligations.    Contemporaneous with the execution of this Agreement, Purchaser shall cause each of Daryl Hagler and Kenneth Rozenberg to execute and deliver to Seller a Personal Guaranty.    Notwithstanding the foregoing, Seller acknowledges and agrees that the Personal Guarantys executed by Daryl Hagler and Kenneth Rozenberg shall not apply in the event this Agreement is terminated in accordance with Section 4.4(c)(iii), Section 4.4(c)(iv) or Section 4.4(c)(v), unless Purchaser is then in material breach (after any applicable cure period has lapsed) of any of its obligations under this Agreement.

## ARTICLE IX

## EMPLOYEES AND EMPLOYEE BENEFITS

Section 9.1    Offers of Employment.

(a)    Purchaser intends, but is not obligated to, offer employment, commencing on the Closing Date, to a majority of employees of Seller, which shall include all SVCMC employees working at Bayley Seton, including those on vacation, leave of absence, disability or layoff, who were employed by the Seller on the day immediately preceding the Closing Date. All such employees who accept Purchaser's offer of employment shall become employees of Purchaser as of the Closing Date (hereinafter collectively referred to as the "Transferred

Employees"). Purchaser shall honor Transferred Employees' seniority dates with Seller for purposes of vacation scheduling. Purchaser shall not assume any of Seller's CBAs, but prior to Closing, if required by Federal labor law, shall comply with Federal law and will bargain in good faith with the applicable union or unions with respect to the terms and conditions of represented Employees.

(b)     Subject to the provisions of the Receivership Agreement, prior to, or in connection with, the Closing, Purchaser shall take no action to cause Seller or the Business to terminate the employment of any employee, and neither Seller nor the Business shall be under any obligation to terminate any employee prior to or on the Closing Date. As of the Closing Date Seller shall not have any liability or responsibility with respect to any employee benefit plan, program, policy or other arrangement maintained by or contributed to by Purchaser with respect to Transferred Employees. Except as set forth in <u>Section 9.2</u> below, Purchaser shall not be obligated after the Closing Date for any obligation or liability of Seller to Employees which arises prior to the Closing Date, including but not limited to any and all employee compensation and benefit obligations or any obligation that may arise from the CBAs or otherwise. Except as set forth in <u>Section 9.2</u> below, Purchaser shall not assume any CBAs, employee compensation and/or benefit obligations or other terms and conditions of employment for any employee pursuant to the CBAs or otherwise. To the extent that Purchaser offers employment to employees of Seller, their rates of pay on and after the Closing Date shall be determined by Purchaser.

Section 9.2     <u>Employment Terms; Employee Benefits</u>.

(a)     As soon as practicable after the Closing Date, Purchaser shall adopt a retirement plan which shall be qualified under Section 501(a) and 401(k) of the Code.

(b)     As of the Closing Date, Purchaser shall assume all wage payment obligations for vacation, holiday time, sick pay, and personal days (including those under any CBA governing employees or employees with individual agreements with Seller, including, but not limited to, severance obligations arising under the governing CBA and/or individual agreements) which were accrued by employees of Seller or employees of SVCMC at Bayley Seton under the terms of Seller's Plans and the CBAs but not yet taken or paid as of the Closing Effective Date (collectively, the "<u>PTO</u>"), and shall also assume all severance obligations (including those under any CBA governing employees or employees with individual agreements with Seller, including, but not limited to, severance obligations arising under the governing CBA and/or individual agreements) of Seller existing as of or arising on or after the Closing Effective Date with respect to employees of Seller or employees of SVCMC at Bayley Seton, whether or not hired by Purchaser which to the best of Seller's knowledge, information and belief, such PTO and severance is listed on <u>Section 9.2(b)</u> of the Seller Disclosure Schedule.

(c)     To the extent Seller or SVCMC becomes subject to any Liabilities under the WARN Act or any comparable state or local Law by reason of the termination of the employment by Purchaser (or any successor thereto) of any Transferred Employee on or after the Closing Date, Purchaser shall be responsible therefor. Without limiting the effect of the foregoing sentence, Seller shall be solely responsible for giving any notice required by the WARN Act or any comparable state or local Law to be given to any Transferred Employee

whose employment is terminated after the Closing Date; provided, however, if the parties enter into the Receivership Agreement, Purchaser shall be responsible for such notice.

(d)     Except to the extent otherwise required by applicable Law, Purchaser shall be responsible for providing continuation coverage, as required by Section 4980B(f) of the Code and Part 6 of Title I of ERISA or any similar Law ("COBRA"), under a group health plan to be maintained by Purchaser, to all employees of Seller or employees of SVCMC at Bayley Seton (and other "qualified beneficiaries" under COBRA with respect to such employees) who for any reason experience a COBRA "qualifying event" within the meaning of Section 4980B of the Code and Part 6 of Title I of ERISA prior to the Closing. Purchaser shall be responsible for any COBRA obligations in respect of Transferred Employees (if any) arising with respect to qualifying events that occur on or after the Closing Date. Additionally, on and after the Closing Date, Purchaser shall provide COBRA continuation coverage to all employees whether or not hired by Purchaser.

(e)     Nothing contained in this Agreement, expressed or implied, shall be construed to confer upon any of the employees or Transferred Employees (including any beneficiary or dependent thereof) any rights or remedies whatsoever including, without limitation, any right to employment or continued employment for any specified period or of any nature or kind under or by reason of this Agreement.

## ARTICLE X

## CONDITIONS TO CLOSING

Section 10.1   Conditions Precedent to Obligations of Purchaser.     The obligation of Purchaser to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Seller set forth in this Agreement shall be true and correct (without giving effect to any materiality or Material Adverse Effect qualifiers set forth therein) at and as of the Closing Effective Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date) and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated as of the Closing Date, to the foregoing effect; provided that in the event any such representation or warranty has been breached the condition set forth in this Section 10.1(a) shall nevertheless be deemed satisfied unless the effect of any breach of an individual representation or warranty, or the effect of all such breaches of representations and warranties taken together, result in a Material Adverse Effect;

(b)     Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated as of the Closing Date, to the forgoing effect; provided that the condition

set forth in this Section 10.1(b) shall be deemed satisfied unless all such failures to so perform or comply taken together result in a Material Adverse Effect;

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in clauses (a) through (i) of Section 4.2 hereto; and

(d)     all notices, consents, approvals, licenses or Permits, or waivers thereof, of the Governmental Bodies set forth in Section 10.1(d) of the Seller Disclosure Schedule and in Section 10.2(c) of the Purchaser Disclosure Schedule shall have been made or obtained, and any applicable waiting period under any Antitrust Laws shall have expired or been terminated.

Section 10.2     Conditions Precedent to Obligations of Seller.  The obligation of Seller to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchaser set forth in this Agreement shall be true and correct (without giving effect to any materiality qualifiers set forth therein) at and as of the Closing, except to the extent such representations and warranties relate expressly to an earlier date (in which case such representations and warranties shall be true and correct, on and as of such earlier date) and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect; provided that in the event any such representation or warranty has been breached the condition set forth in this Section 10.2(a) shall nevertheless be deemed satisfied unless the effect of all such breaches of representations and warranties taken together would prevent or materially delay the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect; provided that the condition set forth in this Section 10.2(b) shall be deemed satisfied unless all such failures to so perform or comply taken together prevent or materially delay the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions;

(c)     all notices, consents, approvals, licenses or Permits, or waivers thereof, of the Governmental Bodies set forth in Section 10.2(c) of the Purchaser Disclosure Schedule and in Section 10.1(d) of the Seller Disclosure Schedule shall have been made or obtained, and any applicable waiting period under any of the Antitrust Laws shall have expired or been terminated;

(d)     the closing of the transactions contemplated by the Real Estate Contract have closed or will close simultaneously with the Contemplated Transactions; and

(e)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 4.3 hereto;

(f)     Consent of the United States Department of Health and Human Services, if applicable.

Section 10.3   Conditions Precedent to Obligations of Purchaser and Seller.    The respective obligations of the parties to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser or Seller, respectively as the case may be, in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions;

(b)     the Sale Order shall have been entered by the Bankruptcy Court and not be subject to any stay or the time for an appeal has expired; and

(c)     in the event an appeal is taken from the entry of the Sale Order on the grounds that the Sale Order improperly authorized the sale of assets to Purchaser free and clear of all Liens, such appeal shall have been finally decided affirming the entry of the Sale Order and all time to further appeal shall have expired.

Section 10.4   Frustration of Closing Conditions.   No party may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3 hereto, as the case may be, to excuse it from consummating the Contemplated Transactions if the failure of any such condition set forth in Section 10.1, 10.2 or 10.3 hereto was primarily caused by such party's failure to materially comply with any provision of this Agreement.

## ARTICLE XI

## TAXES

Section 11.1   Transfer Taxes.    Seller shall pay any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges (including any interest and penalty thereon) payable in connection with the Contemplated Transactions ("Transfer Taxes"). Seller shall make due and timely payment of any Transfer Tax to the applicable Tax Authority and shall provide Purchaser with a true and complete copy of each Tax Return relating to Transfer Taxes as filed and evidence of the timely filing of such Tax Return and payment of such Transfer Tax.  The parties shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds of Transfer Taxes.

Section 11.2   Prorations.   All applicable real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets, if any, for any taxable period that includes the Closing Effective Date and ends after the Closing Effective Date, whether imposed or assessed before or after the Closing Effective Date and payroll due Transferred Employees (including split week), shall be prorated between Seller and Purchaser as of 12:01 a.m. (New York time) on the Closing Effective Date based on the number of days in such period through and including the day prior to the Closing Effective Date and the number of days in such period on and after the Closing Effective Date; provided, however, that nothing in this

Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party. If any Taxes subject to proration are paid by Purchaser, on the one hand, or Seller, on the other hand, the proportionate amount of such Taxes paid (or in the event of a refund of any portion of such Taxes previously paid is received, such refund) shall be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund).

Section 11.3    Purchase Price Allocation.    The Purchase Price will be allocated for Tax purposes (the "Allocation") among the Purchased Assets as set forth in Section 11.3 of the Purchaser Disclosure Schedule. The parties agree that no portion of the Purchase Price shall be allocated to the covenants contained in Section 8.17 hereto. The Seller and the Purchaser shall report the Allocation as provided in Section 1060 of the Code, and shall prepare and file all Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Allocation. No party shall take any position (whether in audits, Tax Returns or otherwise) that is inconsistent with the Allocation unless required to do so by applicable law.

Section 11.4    Cooperation on Tax Matters.    The parties shall furnish or cause to be furnished to each other, as promptly as practicable following the request therefore, and at the expense of the requesting party, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other filings relating to Tax matters, for the preparation for and defense of any Tax audit, for the preparation of any Tax protest, or for the prosecution or defense of any suit or other proceeding relating to Tax matters.

# ARTICLE XII

## MISCELLANEOUS

Section 12.1    Expenses.    Except as otherwise expressly provided in this Agreement, each party shall bear its own costs and expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

Section 12.2    Specific Performance.    Seller agrees that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached by Seller, irreparable damage to Purchaser would occur, no adequate remedy at law would exist and damages would be difficult to determine, and that Purchaser shall be entitled to specific performance of the terms hereof (without the posting of any bond), in addition to any other remedy at law or equity. The rights set forth in this Section 12.2 shall be in addition to any other rights which Purchaser may have at law or in equity pursuant to this Agreement.

Section 12.3    Governing Law; Jurisdiction; Consent to Service of Process.    This Agreement and any disputes arising in connection herewith shall be governed by and construed in accordance with the internal Laws of the State of New York without regard to the conflict of law principles thereof. Without limiting any party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected

with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (b) any and all Legal Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations pursuant to Section 12.2 hereto; provided that if the Bankruptcy Case has closed, each of the parties hereto irrevocably agrees that any Legal Proceeding with respect to this Agreement or for recognition and enforcement of any judgment in respect hereof shall be brought and determined exclusively in the United States District Court for the Southern District of New York or if such Legal Proceeding may not be brought in such court for jurisdictional purposes, exclusively in the Supreme Court of New York sitting in the County of New York. Each of the parties hereto hereby (a) irrevocably submits with regard to any such Legal Proceeding to the exclusive personal jurisdiction of the aforesaid courts in the event any dispute arises out of this Agreement or any transaction contemplated hereby, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the state or federal courts referenced above. Each of the parties hereto further agrees to accept and acknowledge service of any and all process which may be served in any such Legal Proceeding in said courts in the State of New York, and agrees that service of process upon such party by a method permitted by the applicable Laws of the State of New York to such party's address as set forth in Section 12.6 hereto, will be deemed in every respect effective service of process upon such party, in any Legal Proceeding.

Section 12.4  WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY ACTION TO WHICH THEY ARE PARTIES INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

Section 12.5  Entire Agreement; Amendments and Waivers.  This Agreement (includes the schedules and exhibits hereto), the Confidentiality Agreement, the Escrow Agreement, the Indemnity Escrow Agreement, the Personal Guarantys, and the Receivership Agreement contain the entire understanding and agreement of the parties hereto and thereto with respect to the subject matter hereof and thereof, and supersede all previous written or oral negotiations, commitments, understandings and writings. This Agreement may be amended, modified, supplemented or changed, and any provision hereof can be waived, only by written instrument duly executed by all of the parties hereto. Any party hereto may, by written notice to the other parties hereto (a) extend the time for performance of any of the obligations of the other party under this Agreement, (b) waive any inaccuracies in the representations or warranties of the other party contained in this Agreement, (c) waive compliance with any of the conditions or covenants of the other party contained in this Agreement or (d) waive or modify performance of any of the obligations of the other party under this Agreement. Except as provided in the immediately preceding sentence, no action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or

as a waiver of any other or subsequent breach, whether of a similar or dissimilar nature. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

Section 12.6  Notices.    All notices and other communications under this Agreement shall be in writing and, unless otherwise provided in this Agreement, shall be deemed given (a) when delivered personally by hand, (b) when sent by facsimile (confirmed in writing by mail promptly thereafter dispatched), (c) three (3) days after being mailed by certified or registered mail, postage prepaid, return receipt requested or (d) one (1) Business Day following the day sent by a nationally recognized overnight courier service, in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

(a)     If to Purchaser, to:

SV Operating Three, LLC
3 Hunters Run
Suffern, New York, 10901
Fax:     (845) 354-8753
Attn:   Kenneth Rozenberg
           Managing Member

with a copy to (which shall not constitute notice):

Isidor Friedenberg, Esq.
2 Cara Drive
Suffern, New York 10901
Fax:     (845) 362-0168

(b)     If to Seller, to:

Saint Vincent Catholic Medical Centers
170 West 12th Street
New York, New York 10011
Fax:     (212) 356-4990
Attn:   General Counsel

with a copy to (which shall not constitute notice):

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Fax:     (212) 715-8000
Attn:   Adam C. Rogoff, Esq.

And

Garfunkel Wild, P.C.
111 Great Neck Road, Suite 503
Great Neck, New York 11021
Fax:    (516) 466-5964
Attn:   Judith A. Eisen, Esq.

Section 12.7   Invalid Provisions.    If any term or other provision of this Agreement is held to be invalid, illegal, or incapable of being enforced under any present or future Law, and if the rights or obligations under this Agreement of Seller on the one hand and Purchaser on the other hand will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

Section 12.8   Binding Effect; Assignment; Successors and Assigns.    This Agreement shall apply to, be binding in all respects upon and inure to the benefit of the parties and their respective successors, administrators and permitted assigns. A successor to Seller shall include Seller as a reorganized debtor. No assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of Law or otherwise) without the prior written consent of Purchaser and Seller and any attempted assignment without the required consents shall be void. No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors, administrators and permitted assigns.

Section 12.9   No Personal Liability.    In entering into this Agreement, the parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any party hereto shall be personally liable or responsible to any other party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named parties only (but nothing contained herein shall limit the Liability of any Person for his or her fraudulent acts).

Section 12.10   Execution in Counterparts.    This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original, but all of which together will

constitute one (1) and the same agreement. Any counterpart may be executed by facsimile signature, or by electronic mail in "portable document format" (".pdf"), and such facsimile or .pdf signature shall be deemed an original.

Section 12.11 <u>Survival of Representations, Warranties and Covenants</u>. The representations, warranties and covenants of the parties contained in this Agreement shall not survive the Closing; <u>provided</u>, <u>however</u>, that the provisions of <u>Section 2.8</u>, <u>Section 2.10</u>, <u>Section 8.3(i)</u>, and <u>Section 8.16</u> shall survive the Closing in accordance with the terms thereof.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SISTERS OF CHARITY HEALTH CARE SYSTEM NURSING HOME, INC., D/B/A ST. ELIZABETH ANN'S HEALTH CARE & REHABILITATION CENTER**

By: _Mark E. Toney_

Name: MARK E. TONEY

Title: CRO

**SV OPERATING THREE, LLC**

By: _____

Name:

Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SISTERS OF CHARITY HEALTH CARE SYSTEM NURSING HOME, INC., D/B/A ST. ELIZABETH ANN'S HEALTH CARE & REHABILITATION CENTER**

By: _____
     Name:
     Title:

**SV OPERATING THREE, LLC**

By: _____
     Name: _Kenneth Rozenberg_
     Title: _M. Member_

**EXHIBIT A TO ASSET PURCHASE AGREEMENT**

**FORM OF BIDDING PROCEDURES ORDER**

[Omitted]

See Exhibit A to Motion

**<u>EXHIBIT B TO ASSET PURCHASE AGREEMENT</u>**


**<u>FORM OF SALE ORDER</u>**


[Omitted]

See Exhibit B to Motion

**EXHIBIT C TO ASSET PURCHASE AGREEMENT**


**FORM OF MEDICAL RECORDS CUSTODY AGREEMENT**

## MEDICAL RECORDS CUSTODY AGREEMENT

This Medical Records Custody Agreement (the "Agreement") is made and entered into as of _____, 2011 by and between Sisters of Charity Health System Nursing Home, Inc., d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center, a New York not-for-profit corporation ("Seller"), and SV Operating Three, LLC, a New York limited liability company ("Purchaser").

WHEREAS, Seller and Purchaser entered into an Asset Purchase Agreement, dated as of _____, 2011, pursuant to which Seller agreed to sell, and Purchaser agreed to purchase, certain assets of Seller's 300 bed skilled nursing and residential health care facility known as St. Elizabeth Ann's Health Care & Rehabilitation Center (the "Facility"), pursuant to the terms and conditions set forth therein (the "Asset Purchase Agreement") effective upon the Closing (as defined in the Asset Purchase Agreement);

WHEREAS, Seller wishes to ensure the continuation of necessary health care services for patients of the Facility and to provide for the smooth transfer of the Patient Records (as defined below) to Purchaser so that the Patient Records may be accessed readily by health care providers that will provide continuing treatment to the patients; and

WHEREAS, Purchaser also has agreed to assume the custody and storage of the Patient Records pursuant to applicable law.

NOW, THEREFORE, in consideration of the mutual promises contained herein, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  <u>Transfer and Custody of Patient Records.</u>

    a.      Upon the Closing, Seller will transfer to Purchaser custody of its existing patient records, patient charts and patient films for patients receiving health care services from the Facility, including paper records and digital media records (the "Patient Records"). Seller hereby appoints Purchaser, and Purchaser agrees to serve during the term of this Agreement, as custodian for the maintenance, safekeeping, inspection and copying of the Patient Records.

    b.      The parties agree that the Patient Records are being transferred for custodial purposes to Purchaser hereunder for purposes of the care and treatment of patients by Purchaser, its employees and staff, the billing activities of Purchaser related to such care and the operations of the Facility as operated by Purchaser.

    c.      Purchaser shall store and maintain the Patient Records in accordance with applicable Federal, State and local laws, rules and regulations, including those laws, rules and regulations governing the confidentiality of patient protected health information, and Purchaser shall take reasonable measures to protect the Patient Records from theft, loss, unauthorized destruction and unauthorized access. Purchaser shall at all times safeguard the safety of the Patient Records and will promptly report to Seller any problems or security incidents with respect to the Patient Records.

d.     All Patient Records transferred to Purchaser hereunder shall be retained by Purchaser for a period of the longer of six (6) years from the Closing Date (as defined in the Asset Purchase Agreement) or the time period required by applicable law or regulation.

Notwithstanding the foregoing, in the event that Seller notifies Purchaser of an actual or potential claim, investigation or litigation regarding a particular patient, Purchaser shall retain the Patient Records for that individual until Seller notifies Purchaser that such Patient Records can be destroyed. Subject to the previous sentence, nothing herein shall prohibit Purchaser from transferring the Patient Records to off-site storage facilities and/or destroying the Patient Records following the end of the applicable minimum retention period specified in this Section 1(d).

2.     <u>Patient Communication and Access</u>.

a.     Purchaser shall provide timely access to, and photocopies of, the Patient Records to patients and their legal representatives to the extent required by laws, rules or regulations applicable to the parties, and to other individuals, entities, and governmental agencies that have the right to access and/or receive photocopies of Patient Records.  Such access and copies shall be provided within the time periods required by applicable laws, rules and regulations. Purchaser may charge appropriate copying fees, consistent with its then-existing policies and procedures and the requirements of applicable laws, rules and regulations. The form of authorization/release for Patient Records which shall be utilized for such purpose shall be compliant with applicable federal and state law.

b.     Purchaser shall promptly provide Seller with access to the Patient Records upon request during regular business hours, at no cost to Seller.  Purchaser shall provide copies of Patient Records to Seller upon written request at the cost of five cents ($0.05) per page.  Seller shall not request access to or copies of any Patient Records, or portions thereof, which Seller is not entitled to receive from Purchaser in accordance with applicable state and federal law and regulations in effect as of the time of request.

3.     <u>Legal and HIPAA Compliance</u>.  Purchaser acknowledges that the Patient Records being transferred hereunder are confidential.  In the event that a patient or other appropriate person under applicable laws, rules or regulations (including, without limitation, a committee for an incompetent, a conservator, or other person pursuant to court order) requests that a copy of a patient's Patient Records be provided to such person or to another health care provider, Purchaser shall promptly forward, or shall cause its designee to forward, a copy of the Patient Records; <u>provided</u>, <u>however</u>, that in all instances, Purchaser or its designee shall comply with all provisions of applicable law, rules and regulations with respect to the confidentiality of such Patient Records. With respect to the Patient Records transferred to Purchaser hereunder, Purchaser shall abide by all applicable laws, rules and regulations applicable to such records, including, without limitation, the Federal Health Insurance Portability and Accountability Act of 1996 and its related regulations.

1590469v.2

4.     Term and Termination.

       a.     This Agreement shall take effect upon execution by the parties hereto and shall remain in effect for as long as Purchaser retains custody of the Patient Records transferred hereunder.

       b.     This Agreement may be terminated at any time by the mutual written agreement of the parties.

5.     Insurance.  Purchaser represents and warrants that its activities hereunder are covered by insurance policies in the minimum amount of $1,000,000 per incident, $3,000,000 in the aggregate.  Purchaser shall provide a certificate of insurance evidencing such coverage upon execution of this Agreement.

6.     Miscellaneous.

       a.     Neither party may assign this Agreement without the express prior written consent of the other party, and any attempt to assign this Agreement without such consent shall be void.

       b.     Neither party shall be authorized to act as agent for the other or to incur any liability in the name of or on behalf of the other, unless specifically authorized in this Agreement or in a writing executed by the party that would be responsible for the obligation.

       c.     This Agreement shall be governed by the laws of the State of New York, exclusive of conflict of law rules.  Each party to this Agreement hereby agrees and consents that any dispute with respect to this Agreement shall be adjudicated in the Courts set forth in the Asset Purchase Agreement.  By execution and delivery of this Agreement, each such party hereby: (i) accepts the jurisdiction of such Courts; (ii) agrees to be bound by any order of such Courts; (iii) waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the venue set forth above; and (iv) further waives any claim that such Courts are an inconvenient forum.

       d.     Nothing express or implied in this Agreement is intended to confer, nor shall anything herein confer, upon any person other than a party hereto any rights, remedies, obligations or liabilities whatsoever.

       e.     This Agreement is the entire agreement between the parties concerning the subject matter hereof and supersedes all prior agreements, whether written or oral, concerning the subject matter hereof.  This Agreement shall not be changed or modified, except by a writing signed by both of the parties hereto or their respective successors.  Except as otherwise provided herein, all rights and remedies set forth in this Agreement shall be in addition to and not exclusive of any other rights or remedies now or hereafter existing at law or in equity.

       f.     Any notice, request, instruction or document to be given hereunder by any party to another shall be in writing and delivered personally or mailed, first class registered or certified mail, postage prepaid, or by reputable overnight courier, to the address of such other party stated below:

To Seller:

Saint Vincents Catholic Medical Centers of New York
170 West 12th Street
New York, New York 10011
Attn:  Mark E. Toney, Chief Restructuring Officer
Fax:  (212) 604-3331

With a copy to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Fax:     (212) 715-8000
Attn:    Adam C. Rogoff, Esq.

Garfunkel Wild, P.C.
111 Great Neck Road
Great Neck, New York  11021
Attn:  Judith A. Eisen, Esq.

Purchaser:

SV Operating Three, LLC
3 Hunters Run
Suffern, New York, 10901
Fax:     (845) 354-8753
Attn:    Kenneth Rozenberg
          Managing Member

With a copy to:

Isidor Friedenberg, Esq.
2 Cara Drive
Suffern, New York 10901
Fax:     (845) 362-0168

Each party hereto shall have the right to give notice to the other party changing its address as stated above and such address shall thereupon be deemed to be changed accordingly.

g.       If any provision of this Agreement or the application of any provision hereof to any person or circumstances is held to be legally invalid, inoperative or unenforceable, then the remainder of this Agreement shall not be affected unless the invalid provision substantially impairs the benefits of the remaining portions of this Agreement to the other party or parties.

h.       Any consent or waiver executed in writing by a party hereto shall be binding upon such party from and after the date of execution thereof unless a later or earlier date is specified therein.  No delay or failure to exercise any remedy or right occurring upon any default shall be

construed as a waiver of such remedy or right, or an acquiescence in such default, nor shall it affect any subsequent default of the same or a different nature.

i.      All headings and captions in this Agreement are for convenience only.  They shall not be deemed part of this Agreement and shall in no way define, limit, extend or describe the scope or intent of any provisions hereof.

j.      The parties hereto shall execute and deliver all documents, provide all information and take or forbear from all such action as may reasonably be necessary or appropriate to achieve the purposes set forth in this Agreement.

k.      This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

l.      This Agreement may be executed in counterparts and each such counterpart, when taken together, shall constitute a single and binding agreement.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, this Medical Records Custodial Agreement is signed as of the day and year first above written.

**SISTERS OF CHARITY HEALTH SYSTEM NURSING HOME, INC., D/B/A ST. ELIZABETH ANN'S HEALTH CARE & REHABILITATION CENTER**

By: _____

      Name:
      Title:

**SV OPERATING THREE, LLC**

By: _____

      Name: Kenneth Rozenberg
      Title: M member

6

**EXHIBIT D TO ASSET PURCHASE AGREEMENT**

**FORM OF RECEIVERSHIP AGREEMENT - NURSING HOME**

**RECEIVER AGREEMENT – NURSING HOME**

**RECEIVER AGREEMENT – NURSING HOME** (this "Agreement"), dated as of _____ ____, 2011, by and between Sisters of Charity Health System Nursing Home, Inc., d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center, a New York not-for-profit corporation ("SEA" or "Seller") and SV Operating Three, LLC, a New York limited liability company (the "Receiver").

**RECITALS**

WHEREAS, SEA, along with certain of its affiliates are debtors-in-possession (the "Debtors") under title 11 of the United States Code, 11 U.S.C. § 101 *et seq*., and filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code initiating bankruptcy cases (the "Bankruptcy Cases") on April 14, 2010 in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 10-11963);

WHEREAS, SEA operates (a) a 300 bed skilled nursing and residential health care facility under the name "St. Elizabeth Ann's Health Care & Rehabilitation Center" Home (the "Facility") at the premises known as 91 Tompkins Avenue, Staten Island, New York 10304 (the "Premises"), and at the premises known as 75 Vanderbilt Avenue, Building No. 1., Staten Island, New York (the "Bayley Seton Premises"), where 72 licensed neurobehavioral beds of Seller's 300 total licensed beds are located, and (b) an adult day health care program that is conducted at the Premises;

WHEREAS, SEA and Receiver have previously entered into an Asset Purchase Agreement, dated as of _____ __, 2011 (the "Purchase Agreement"), pursuant to which Receiver agreed to purchase substantially all of the assets of SEA related to the operation of the Facility;

WHEREAS, the Bankruptcy Court has approved the Purchase Agreement and issued an order confirming that Receiver and SEA are permitted to consummate the transactions contemplated by the Purchase Agreement in accordance with the terms thereof (the "Sale Order");

WHEREAS, SEA wants to ensure the continuity of the Facility's operations pending the closing of the transactions contemplated by the Purchase Agreement and has requested the Department to approve the assumption of the operation of the Facility by Receiver pursuant to the provisions of applicable laws, regulations and this Agreement; and

WHEREAS, SEA recognizes that Receiver is appointed with the approval of the Department as an interim operator of the Facility, and SEA is desirous of ultimately effectuating a transfer of the operation of the Facility to Receiver as the new established operator of the Facility pursuant to the terms of the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and covenants herein contained, it is mutually agreed by and between the signatories to this Agreement as follows:

# ARTICLE I

# RECEIVERSHIP

Section 1.01   SEA hereby confirms its request to the Department to approve the assumption of the operation of the Facility by Receiver and agrees that Receiver's obligations under this Agreement are contingent upon the Purchase Agreement being in full force and effect.

Section 1.02   Receiver, having complied with all of the requirements of the Department, is hereby appointed as receiver of the Facility to commence its operations as Receiver at 12:01 a.m. on [_____ __], 2011 (the date on which Receiver is authorized to act as the receiver of the Facility is hereinafter sometimes referred to as the "Receivership Date"). Receiver accepts its appointment as receiver of the Facility effective as of Receivership Date and has executed this Agreement in the appropriate space provided on the signature page attached hereto. Receiver shall accept the real property occupied by SEA and the furniture, fixtures and equipment located at the Facility in their then present "as is" condition. Receiver shall fund all operations of the Facility from and after the Receivership Date, ensuring that the Facility has sufficient funds to satisfy its operating expenses, including, without limitation, any severance obligations and benefit continuation obligations of employees of SEA whose employment is terminated during the Term of Receivership (as defined below). Receiver shall be required to fund, in a timely manner, all sums necessary to maintain the Facility in good repair during the Term of Receivership. All funds provided by the Receiver in accordance with the foregoing shall be included as Advances as such term is hereinafter defined.

Section 1.03   Term.

(a)   The duration of the appointment of Receiver as receiver of the Facility (sometimes hereinafter referred to as the "Term of Receivership") shall continue until [_____ 2012] **[twelve (12) months from entry of the Sale Order]** (the "Outside Date"), subject to renewal, extension or earlier termination as provided below. If the Purchase Agreement is terminated for any reason, this Agreement shall automatically terminate upon the occurrence of such contingency and be of no further force and effect except as otherwise set forth hereinafter. This Agreement shall also automatically terminate upon the closing of the transactions contemplated by the Purchase Agreement. The Department may, with the consent of SEA, extend the duration of the appointment of Receiver until the appointment of a new receiver acceptable to the Department or the issuance of an operating certificate to a new established operator of the Facility. In such event, SEA shall join with Receiver to seek Department approval to renew or extend the appointment of Receiver for a period or periods each of which shall not exceed an additional six (6) months. Any such renewals or extensions shall be on the same terms and conditions as set forth herein or such other terms and conditions as may be agreed upon in writing by the parties; provided, however, that the Term of Receivership may be terminated sooner, anything in this Agreement to the contrary notwithstanding, if (i) Receiver is in material breach of any of its obligations under this Agreement and which breach cannot be cured or has not been cured within twenty (20) business days after the giving of written notice by SEA to Receiver of such breach; (ii) the Department determines, in its sole discretion, that deficiencies have occurred at the Facility during the term of Receiver's appointment as receiver of the Facility which warrant the removal of Receiver; (iii) if Receiver has been convicted of a felony;

2

or (iv) if the Department determines, with respect to matters other than deficiencies as set forth in clause (ii) above, in its sole discretion, that Receiver is not in substantial compliance with the terms and provisions of this Agreement; provided, however, that in such event the Department will have provided Receiver and SEA with written notification of the nature and extent of its non-compliance, and Receiver shall have failed, in the Department's opinion, to make sufficient progress toward attaining compliance.

(b)　　Receiver waives any right to a hearing under any section of the Public Health Law relative to revocation of an operating certificate, and agrees to surrender the operating certificate issued to it upon expiration or termination of this Agreement, or expiration or termination of any renewal or extension thereof, subject to the terms of this Receiver Agreement.

(c)　　The Purchase Agreement is attached to this Agreement as Exhibit A. The Purchase Agreement requires Receiver to submit an application for approval of establishment to the Public Health Council within the later of forty-five (45) days after the date of the Purchase Agreement or two (2) business days after Purchaser's receipt of notice from Seller that the Sale Order was entered by the Bankruptcy Court approving Receiver as the Purchaser under the Purchase Agreement. SEA represents that it will not interfere with the application of Receiver, or its designee, to become the new established operator of the Facility.

Section 1.04　　SEA agrees to promptly and diligently execute all documents necessary to transfer to Receiver the operation of the Facility and all assets and property belonging to SEA and relating to the Facility (other than the Excluded Assets as defined in the Purchase Agreement (the "Excluded Assets")), it being understood by the parties that legal title to such assets and property shall not pass from SEA to Receiver unless and until all transactions contemplated by the Purchase Agreement close, including but not limited to all security deposits and prepayments of residents, if any, held by SEA for services to be provided on and after the Receivership Date, for possession and use by Receiver in the operation of the Facility during the Term of Receivership. Upon the closing under the Purchase Agreement, Receiver shall retain the assets purchased under the Purchase Agreement in accordance with its terms.

Section 1.05　　SEA irrevocably agrees as consideration for the undertaking of the appointment of Receiver as receiver to promptly and diligently execute and deliver any and all documents required to transfer the operations, and all assets and property belonging to or leased to SEA, to Receiver, or its designee, as the new established operator of the Facility to the extent provided in the Purchase Agreement, if, as and when all of the conditions precedent to SEA's obligations to close on the sale of such operation, assets and property have been satisfied or waived or to any successor receiver or established operator of the Facility.

Section 1.06　　Provided that the Facility has a Title XIX provider agreement, Receiver shall be reimbursed as an operator through the Medicaid program pursuant to 10 N.Y.C.R.R. Subpart 86-2. The Department shall not be responsible for any expenses incurred by Receiver and related to the operation of the Facility which are not reimbursed pursuant to Subpart 86-2 or by any other payor.

Section 1.07    SEA, in connection with the appointment by the Department of Receiver, waives the right to terminate this Agreement or contest the appointment of the Receiver, except for (a) a termination of this Agreement in accordance with the second sentence of Section 1.03(a) hereof, (b) claims related to the Department's alleged failure to honor or its breach or default under this Agreement or (c) breaches or defaults under this Agreement by Receiver. No such claim of the Department's or Receiver's breach or default hereunder may be made by SEA until after SEA has provided the Department or Receiver, as applicable, with written notice of its alleged failure, breach or default and such failure, breach or default shall not have been cured within a reasonable time after receipt of such notice. Ten (10) business days shall be deemed a reasonable time to cure any monetary defaults and twenty (20) business days shall be deemed a reasonable time to cure other defaults.

Section 1.08    To the extent permitted by applicable law, Receiver shall have the right to use SEA's Medicare and Medicaid program provider numbers with respect to the Facility and SEA shall execute and deliver to Receiver such documents as may be required to assign such numbers and its provider agreements to Receiver.

Section 1.09    Termination; Substitute Receiver.

(a)    SEA agrees that this Agreement shall not be terminated without the prior approval of the Department, other than a termination in accordance with the second sentence of Section 1.03(a) hereof or Section 1.07 hereof. If, for any reason other than the closing of the transactions contemplated by the Purchase Agreement, this Agreement expires or is terminated, including but not limited to termination ordered by the Commissioner of Health for failure of Receiver to operate the Facility in conformance with 10 N.Y.C.R.R., or the Medicare/Medicaid requirements for long term care facilities, the Public Health Law and/or this Agreement, the parties agree that the operation of the Facility will, subject to the prior approval of the Department, immediately revert to the control of SEA or its designee, unless SEA consents in its discretion to the appointment of another voluntary receiver (the "Substitute Receiver"). In the event that SEA does not propose a Substitute Receiver within the time period delineated by the Department, the Department may appoint a Substitute Receiver without the approval of SEA or the need to petition the Supreme Court.  The appointment of a Substitute Receiver shall be subject to approval by the Department. In such event, SEA, the Department and the Substitute Receiver shall enter into a substitute receiver agreement substantially similar to this Agreement.

(b)    In the event the Substitute Receiver is terminated or the substitute receiver agreement expires, the Facility will revert to the control of SEA or its designee, unless SEA consents to the appointment of another Substitute Receiver that is approved by the Department.

Section 1.10    Receiver or SEA may apply to the Department for such rulings as from time to time they may deem necessary in delineating the extent of the authority of Receiver.

Section 1.11    Operation of the Facility.

(a)    Receiver shall operate the business conducted at the Facility on and after Receivership Date for its own account and shall be responsible to manage the revenue and expenses of the business conducted at the Facility during the Term of Receivership on and after

the Receivership Date on and in accordance with the terms and subject to the conditions set forth in this Agreement. Except for the Excluded Assets, Receiver shall be entitled to all revenues relating to the operation of the business conducted at the Facility during the Term of Receivership on and after the Receivership Date, which revenues shall not be deemed to be property of SEA's bankruptcy estate nor shall any liens, claims or encumbrances of any of the Debtors' pre-petition or post-petition creditors be deemed to attach to such revenues. Except as otherwise expressly provided in this Agreement, Receiver shall be liable for all accounts payable and other liabilities, arising out of or relating to the operation of the business conducted at the Facility on and after the Receivership Date and during the Term of Receivership, including but not limited to taxes, employee compensation and benefit obligations, and payments (including but not limited to severance and payment for paid time off accrued but not taken and any contributions to the CBA in connection with same) payable in connection with or upon the termination of employees of SEA during the Term of Receivership.

(b)  Notwithstanding any provision of this Agreement to the contrary, subject, however, to the provisions of Section 2.09 and Section 3.08 hereof (i) Receiver shall be obligated to pay all expenses and liabilities arising out of, and relating to, the operation of the business located at the Facility exclusively during the Term of Receivership on and after the Receivership Date, and (ii) Receiver during the Term of Receivership shall be liable for any and all (A) Medicaid or Medicare overpayments, determined by audit or otherwise, relating to any periods prior to the Receivership Date and (B) health facility assessment obligations for revenue relating to services rendered prior to the Receivership Date and collected by Receiver in accordance with Section 4.06 hereof, regardless of when received by the Facility or SEA, excluding in the case of (A) and (B), however, any such liabilities disclosed in <u>Section 2.3(d)</u> of the Seller Disclosure Schedule to the Purchase Agreement. In no event shall Receiver be liable for any accounts payable or other obligations and liabilities arising out of, or relating to, the operation of the Facility prior to the Receivership Date (except and to the extent otherwise provided in the Purchase Agreement) and such accounts payable and other obligations and liabilities shall remain the liability and responsibility of SEA (collectively, the "<u>Excluded Liabilities</u>"). Notwithstanding the foregoing, nothing in this Agreement shall affect Receiver or SEA's rights or obligations under the Purchase Agreement.

## ARTICLE II

## REPRESENTATIONS, WARRANTIES AND AGREEMENTS OF RECEIVER

Receiver represents, warrants and agrees as follows:

Section 2.01   It shall not act as an agent of the Department nor represent or hold itself out as an agent for the Department in any matter nor shall it hold itself out as a political subdivision of the State.

Section 2.02   It shall act in good faith and shall not delegate its duties and responsibilities to any other individual or entity, except that it may hire its own administrators, consultants and staff.

Section 2.03   It shall operate the Facility in substantial compliance with all applicable laws, rules and regulations, including, but not limited to, the requirements for participation in the Medicare/Medicaid programs.

Section 2.04   In its operation of the Facility as Receiver, it shall not engage in any practice that may result, directly or indirectly, in any financial gain to itself in its capacity as receiver, except as expressly provided under the terms of this Receiver Agreement; provided, however, that Receiver may be paid monthly fees for services as Receiver which, if annualized, would yield a sum of Fifty Thousand Dollars ($50,000) per annum, it being understood that the reimbursability of such fee shall be in accordance with 10 N.Y.C.R.R, Subpart 86-2.

Section 2.05   Receiver shall hold the assets of SEA in trust for SEA and shall, subject to the terms of this Agreement, take no action which would result in diminution of the assets entrusted to it by SEA without the prior written consent of SEA, which consent will not be unreasonably withheld or delayed. It is also agreed to by the parties that, except as otherwise specifically provided in this Agreement, Receiver shall not be responsible for any Excluded Liabilities and that those shall remain the responsibility of SEA; provided, however, in the event SEA does not satisfy any such Excluded Liabilities, nothing herein shall be construed in a manner inconsistent with the Bankruptcy Cases or applicable law governing receiverships. Additionally, Receiver shall be entitled to indemnification from SEA for any liabilities incurred by Receiver for Excluded Liabilities in accordance with the terms, and subject to the conditions, of Section 8.16 of the Purchase Agreement (the "Excluded Liabilities Indemnity").

Section 2.06   Subject to the provisions of this Agreement, in the event of the expiration or termination of the appointment of Receiver as receiver, Receiver shall promptly execute and deliver such assignments, reassignments, conveyances, releases and other documents as may be required to restore the parties to the *status quo ante* and/or to transfer the assets held in trust by Receiver, liabilities and operation of the Facility, and divest itself of all incidents of ownership thereof to SEA or to such person(s) or entities as SEA shall designate, subject to the approval of the Department.

Section 2.07   Receiver shall, within thirty (30) days after the end of each (a) month during the Term of Receivership, provide SEA and the Department with a resident census for the Facility, and (b) quarter during the Term of Receivership, a completed financial statement in the form and containing the information set forth in the Monthly Operating Report template annexed to this Agreement as Exhibit 2.07 summarizing Receiver's operation of the Facility during the previous quarter. Nothing herein contained shall be construed so as to limit the provisions of Section 4.03 hereof.

Section 2.08   All funds contributed by Receiver, and any profits generated by the Facility, during the Term of Receivership, or any subsequent receivership period, shall be retained by Receiver or any Substitute Receiver, if applicable, and only utilized to fund the Facility's operations as provided under this Agreement, and not distributed to Receiver, any Substitute Receiver, or SEA during the Term of Receivership. Upon the expiration or termination of Receiver's appointment as receiver, any remaining funds contributed to the Facility by Receiver shall be retained by or distributed to Receiver and any profits generated by the Facility during the Term of the Receivership shall be a credit against the Purchase Price, if

Receiver is established as the operator of the Facility, or if Receiver is not established as the operator of the Facility paid and distributed as provided in Section 2.09 hereof. Notwithstanding the foregoing or any other provision of this Agreement to the contrary, Receiver may reimburse itself during the Term of Receivership solely from, and to the extent of, any profits generated by the Facility during the Term of Receivership to cover any sums advanced or expended by Receiver to or on behalf of the Facility and its operations for customary and reasonable expenses necessary to operate the Facility during the Term of Receivership (collectively, "Advances"); provided, however, that Receiver shall be entitled to indemnification from SEA for any liabilities incurred by Receiver for Excluded Liabilities in accordance with the Excluded Liabilities Indemnity. Subject to the provisions of Section 2.09 below, upon the expiration or termination of this Agreement, Receiver shall be entitled to receive distributions to it of the aggregate outstanding balance of all Advances solely from, and to the extent of, any profits generated by the Facility during the Term of Receivership, and shall also be entitled to receive distributions to it of the aggregate outstanding balance of any liabilities incurred by Receiver that are eligible for indemnification from SEA pursuant to the Excluded Liabilities Indemnity in accordance with its terms but which remain outstanding, irrespective of any profits, and if any such amounts are owed to Receiver at the time of Closing under the Purchase Agreement, such amounts shall be an offset to the Purchase Price payable by Receiver thereunder. This Section 2.08 shall survive any expiration or termination of this Agreement and/or the Purchase Agreement.

Section 2.09  Immediately upon (i) the expiration or termination of this Agreement (other than a termination of this Agreement resulting from the closing of the transactions contemplated by the Purchase Agreement), or (ii) a breach of this Agreement by Receiver that remains uncured after any applicable cure period, any instructions or agreements in place between the parties and any banking institutions, or otherwise, that provide Receiver with control over or access to SEA and/or Facility bank accounts shall automatically terminate and be of no further force and effect. Thereafter, SEA or any Substitute Receiver shall first cause all outstanding customary and reasonable expenses incurred during the Term of Receivership to be paid solely from and to the extent of any cash on hand, accounts receivable accrued during the Term of Receivership and any profits generated by the Facility during the Term of Receivership. Any remaining profits of the Facility earned during the Term of Receivership after the payment of such customary and reasonable expenses shall be distributed to Receiver, unless this Agreement was terminated due to Receiver's breach hereunder or under the Asset Purchase Agreement, in which any such profits will be held by SEA or any Substitute Receiver pending an order of a court of competent jurisdiction. Notwithstanding the foregoing, or any other provision of this Agreement to the contrary, Receiver shall also be entitled to receive distributions to it of the aggregate outstanding balance of any liabilities incurred by Receiver that are eligible for indemnification from SEA pursuant to the Excluded Liabilities Indemnity in accordance with its terms, irrespective of any profits and any Healthcare Program Liabilities reimbursable to Receiver in accordance with Section 3.08 hereof. This Section 2.09 shall survive any expiration or termination of this Agreement and/or the Purchase Agreement.

Section 2.10  Receiver shall not incur any new obligation or make any new borrowings secured by any assets of SEA, or undertake any transaction which would place a new encumbrance upon the assets of SEA during the Term of Receivership, without the prior written approval of SEA and the Department. Notwithstanding the foregoing, it is understood and agreed by SEA and the Department that Receiver may encumber accounts receivable of the Facility

generated during the Term of Receivership as collateral for borrowings needed by Receiver to fund the working capital requirements of the Facility. Receiver shall be entitled, pursuant to Section 8.1(iv) hereof, to cause UCC-3 modification statements to be filed, if applicable, in connection with accounts receivable of the Facility generated during the Term of Receivership to permit the Receiver to obtain financing of said receivables immediately upon the commencement of the Term of Receivership. No such encumbrances shall attach or apply to accounts receivable of the Facility relating to periods prior and subsequent to the Term of Receivership. In the event any execution or attachment is issued against SEA, Receiver, the Facility or any of their property, relating to obligations which first accrued during the Term of Receivership, other than the encumbrances of accounts receivable of the Facility generated during the Term of Receivership, such encumbrance shall be cured or removed within twenty-one (21) days after notice in writing to Receiver of such encumbrance or cured or removed within a reasonable time in the event that the same cannot be cured or removed with reasonable diligence within such twenty-one (21) day period. In no event shall any such lien or encumbrance be permitted to continue for more than sixty (60) days. Nothing contained herein shall prohibit Receiver from applying for and, subject to the required approvals, obtaining a receivership loan from the State of New York. The restrictions upon the Receiver as set forth herein shall not apply to any obligations, borrowings or encumbrances arising from or related to replacements or repairs or other physical building or reimbursable capital improvements related to the Facility. Notwithstanding the foregoing the parties agree that (a) Receiver may place liens on any furniture, equipment and other personal property purchased by Receiver, and (b) Receiver may lease furniture and equipment in its own name and grant security interests in connection therewith.

Section 2.11    Receiver is authorized to execute and perform this Agreement and neither the execution nor delivery of this Agreement nor compliance with its terms and conditions will constitute a breach or violation of any agreement or instrument to which it is bound.

Section 2.12    Receiver shall cooperate at no cost to SEA and lend its name to such administrative and/or judicial rate appeals as SEA, as the real party in interest, deems appropriate to file (including under the Medicaid, Medicare, or any other third party reimbursement or insurance program). Receiver shall in good faith cooperate with SEA, in preparing, filing and prosecuting such appeals before the appropriate administrative or judicial bodies. It is expressly understood that Receiver, at its own cost and expense, may file such rate appeals as it may deem appropriate arising from, or relating to, its operation of the Facility. Monies generated by all appeals are subject to the terms and conditions of this Agreement, with the effect that monies generated by appeals applicable to the Term of Receivership shall belong to the Receiver and monies generated by appeals applicable to periods prior to and subsequent to the Term of Receivership shall belong to SEA or any Substitute Receiver.

Section 2.13    Intentionally Omitted.

Section 2.14    It shall be deemed an event of default hereunder, if Receiver shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or shall file any petition or answer seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future Federal, State or other statute or law, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of

8

Receiver, and such appointment shall not have been vacated or stayed, on appeal or otherwise, or if within thirty (30) days after the expiration of any such stay, such appointment shall not have been vacated.

Section 2.15   It shall be deemed an event of default hereunder, if Receiver is convicted of a felony in connection with any activity or program subject to the regulations, supervision or administration of the New York State Department of Health or in violation of the New York State Public Officers Law, in a court of competent jurisdiction or of a crime outside of the State which, if committed within the State, would have been such a felony.

Section 2.16   SEA shall be entitled to reasonable access to all of the books and records relating to the Excluded Assets and the obligations of SEA, at the Facility, during normal business hours upon one (1) business day prior notice to Receiver upon the condition that such access does not interfere in any material respect with the operation of the Facility.

Section 2.17   Receiver shall devote whatever time is necessary, including on-site presence, to accomplish its duties and responsibilities.

Section 2.18   Receiver shall promptly comply with all of its obligations under this Agreement, the Purchase Agreement and all related agreements.

Section 2.19   SEA shall, within ten (10) business days of the Receivership Date, and in consultation with Purchaser, file such motions as are necessary to reject in the Bankruptcy Cases all contracts, leases and agreements referred to in Section 3.10 of this Agreement. During term of Receivership, with Seller's reasonable consent, Receiver may identify additional contracts, leases and agreements for rejection other than any CBAs (as such term is defined in the Purchase Agreement) upon reasonable consent of Seller. Receiver shall thereafter be free to negotiate such contracts, leases and agreements for the Facility as it may determine (the "New Contracts") and shall comply with all such New Contracts and shall indemnify and defend SEA and hold it harmless from any action, lawsuit, arbitration, etc., and from any loss it may sustain, including reasonable attorneys' fees, which may result from Receiver's failure to comply with such New Contracts and/or the terms of and Receiver's obligations under this Agreement; provided, however, that any contracts and agreements may be canceled by Receiver if it can do so without penalty and without cost or expense to SEA or the Facility and without violation of any laws or regulations. Receiver shall enter into New Contracts only for its own account and shall not hold itself out as the agent of SEA for the purposes of entering into any New Contract or other obligation. Notwithstanding any provision of this Agreement to the contrary, Receiver shall have no obligations or liabilities for any breaches or failures under any contracts, leases or agreements which existed prior to the Receivership Date and the same shall be included in the definition of Excluded Liabilities for purposes of this Agreement. During the Term of Receivership, Receiver shall comply with and shall take all action necessary to ensure SEA's compliance with, all contractual obligations SEA owes to any employees.  SEA's obligations under any applicable CBAs (as such is defined in the Purchase Agreement) and all laws and regulations concerning employment of employees.  Notwithstanding any provision of this Agreement to the contrary, the parties agree that nothing contained in this Agreement shall be construed as requiring Receiver, as the Purchaser under the Purchase Agreement, to assume any CBAs (as such term is defined in the Purchase Agreement) or any terms or conditions contained therein and the parties

agree and confirm that the Purchase Agreement does not require Receiver to assume the CBAs and that Receiver's compliance with any CBAs in accordance with the terms of this Agreement shall not be deemed an assumption by Receiver of any CBA.

Section 2.20   During the Term of Receivership, Receiver shall obtain the Department's and SEA's written approval before transferring any ownership interest in Receiver to a person or entity other than an original member of Receiver and SEA's approval shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, Receiver may add members in Receiver as part of its CON Application; provided, however, that Receiver at all times shall be controlled by Kenneth Rozenberg, as sole managing member of Receiver, and Receiver may substitute members in Receiver consistent with the terms of the Purchase Agreement.

## ARTICLE III

### REPRESENTATIONS, WARRANTIES AND AGREEMENTS OF SEA

SEA represents, warrants and agrees as follows:

Section 3.01   SEA has full power and authority to execute and perform this Agreement.

Section 3.02   SEA hereby makes available to Receiver all items of tangible personal and real property and equipment belonging to or leased by SEA on the Receivership Date and used in the operation of the Facility and all permits and licenses relating to the Facility (other than the Excluded Assets), to the extent permitted by applicable law, and all of SEA's possessory interest therein, including, but not limited to, all prepayments received by SEA with respect to services to be rendered by the Facility on or after the Receivership Date, the use of the Premises by the Receiver (which Premises are owned by SEA) and the Bayley Seton Premises (which Bayley Seton Premises are leased by Saint Vincents Catholic Medical Centers of New York ("SVCMC"), and all prepayments received by SEA with respect to services to be rendered by the Facility on or after Receivership Date. SEA shall turn over to Receiver on Receivership Date all personal funds of residents of the Facility in its possession.

Section 3.03   Other than any refinancings of existing indebtedness of SEA, SEA shall not incur any new obligations or make new borrowings secured by the Facility or any part of the Facility or SEA's or the Facility's assets (other than the Excluded Assets) or knowingly undertake any transaction which would cause a new lien, security agreement or other encumbrance to be placed upon the assets of Receiver, the Facility or SEA used in the operation of the Facility during the Term of Receivership without the prior written approval of Receiver and the Department. In the event any execution or attachment is issued against the Receiver and/or the Facility, SEA or its property, pursuant to a new lien that is not associated with a refinancing of existing indebtedness of SEA and relates to obligations of SEA which accrued prior to the Receivership Date, such encumbrance shall be cured or removed by SEA within twenty-one (21) days after notice in writing to the Facility of such encumbrance, or cured or removed within a reasonable time in the event that the same cannot be cured or removed with reasonable diligence within such twenty-one (21) day period. In no event shall any new lien or encumbrance be permitted to continue for more than sixty (60) days.

GWTDOCS 1590485v7

Section 3.04    SEA shall not be entitled to any compensation for entering into this Agreement or receivership arrangement contemplated herein.

Section 3.05    SEA and its officers and directors shall not retain any authority over the operation of the Facility on and after the Receivership Date, and shall not attempt to exercise any direction over Receiver with respect to such operation. Without limiting the foregoing, during the Term of Receivership, SEA shall have no authority to hire or fire employees or modify the terms and conditions under which employees are employed.  Notwithstanding the foregoing, SEA shall timely file all Medicare and Medicaid cost reports required to be filed with respect to periods prior to the Receivership Date.

Section 3.06    Nothing in this Agreement shall be construed to diminish any rights that any person or entity not a party to this Agreement may have to proceed against SEA with respect to financial obligations arising out of transactions occurring prior to the Receivership Date.

Section 3.07    <u>Intentionally Omitted</u>.

Section 3.08    If during the Term of Receivership Receiver receives notice of the assessment of any Healthcare Program Liabilities (as such term is defined in the Purchase Agreement) of SEA relating to the Facility for any period prior to the Receivership Date, Receiver shall promptly provide such notice to SEA. Receiver shall pay any such Healthcare Program Liabilities as and when due. If Receiver pays any such Healthcare Program Liabilities and this Agreement subsequently expires or is terminated for any reason other than due to a breach hereunder or under the Purchase Agreement by Receiver, SEA shall promptly reimburse Receiver for such payments made.

Section 3.09    Notwithstanding any provision of this Agreement to the contrary, SEA shall remain liable for any and all Excluded Liabilities arising out of, or relating to, the operation of the Facility prior to the Receivership Date and during the Receivership (regardless of when the same becomes due), other than (a) liabilities that constitute "Assumed Liabilities" (as such term is defined in the Purchase Agreement), which are expressly assumed by Receiver in accordance with the terms of the Purchase Agreement and (b) payments (including severance and payment for paid time off accrued but not taken and any contributions to the CBA in connection with same) payable in connection with or upon the termination of employees of SEA during the Term of Receivership, which shall be the sole obligation of Receiver.

Section 3.10    Annexed hereto as Schedule 3.10 is a list of all material contracts, leases and agreements relating exclusively to the Facility to which SEA is a party or may be bound, and which SEA shall reject in the Bankruptcy Cases in accordance with Section 2.19 hereof. Seller is permitted to amend and supplement Schedule 3.10 hereto after the date hereof and prior to the Receivership Date. Notwithstanding any provision of this Agreement to the contrary, Receiver acknowledges and agrees that SEA may not be able to immediately reject in the Bankruptcy Cases any "master agreements" referred to in Schedule 3.10 hereto. SEA shall use reasonable commercial efforts to either reject such master agreements in the Bankruptcy Cases, or to terminate the portions of such master agreements that relate to the Facility as soon as is practicable.

Section 3.11    SEA shall comply with all of its obligations under this Agreement and the Purchase Agreement and related agreements.

Section 3.12    SEA represents that it owns the Premises and that no lease agreement exists for the Premises. SEA acknowledges Receiver's right to occupy the Facility during the term of this Agreement. SEA represents that it rents the Bayley Seton Premises pursuant to a lease agreement described in Schedule 3.12 annexed hereto. SEA acknowledges Receiver's right to occupy the Bayley Seton Premises during the term of this Agreement and agrees not to terminate, modify, amend, or otherwise alter the Bayley Seton Premises lease without the Receiver's prior written consent which consent may be withheld for any or no reason.

Section 3.13    It is acknowledged that neither party will have an adequate remedy at law in the event of a breach or threatened breach by the other party of any of its obligations hereunder and the non-breaching party shall be entitled to such equitable and injunctive relief as may be available to restrain a violation or threatened violation of the provisions of this Agreement, or to compel compliance with and enforce the provisions hereof. Nothing herein shall be construed as prohibiting a party from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages, or as a waiver of any legal claims as may be held by a party hereto. Recovery of damages shall include penalties, fines, costs and expenses of investigation and defense of any claim, damages for personal injury or property, dimunition in the value of the Premises and fees incurred for the services of attorneys, consultants, contractors or experts. Notwithstanding any provision of this Agreement to the contrary, neither party shall be liable to the other for any indirect, special, consequential, or speculative damages, including, without limitation, loss of opportunity or profits.

## ARTICLE IV

## POWERS, DUTIES, RIGHTS AND OBLIGATIONS OF RECEIVER

Except as limited by this Agreement, the powers, rights, duties, and obligations of Receiver shall include those accorded a receiver appointed in an action to foreclose a mortgage on real property and in equity, and Receiver shall also have the powers, duties, rights and obligations as if appointed under Section 2810(2) of the Public Health Law, including, but not limited to, the following:

Section 4.01    Receiver may sue and be sued in its capacity as receiver for the Facility.

Section 4.02    Receiver shall use all reasonable care, diligence and prudence in the use and maintenance of the Facility and the building in which the Facility is located.

Section 4.03    Receiver shall maintain an appropriate system of financial accounts with respect to the operation of the Facility, shall meet all reporting requirements of the Department, and shall itemize receipts and expenditures in a current and business-like manner in accordance with New York State rules and regulations as well as the New York State RHCF Accounting and Reporting Manual. Receiver shall have full control over and take full responsibility for all accounts and bookkeeping with the Facility during the Term of Receivership hereunder.

Section 4.04   Receiver may enter into, amend and terminate contracts and may borrow funds on behalf of the Facility and may incur expenses for the improvement, maintenance and operation of the Facility; provided, however, that Receiver may not assign any of its obligations hereunder.

Section 4.05   Receiver shall not be required to obtain a bond other than a Resident's Personal Funds Trust Fund Bond.

Section 4.06   Receiver shall collect incoming accounts receivable for services rendered by the Facility during the Term of Receivership from all sources and apply them (other than any such payments as shall constitute Excluded Assets) to the costs incurred in the performance of its functions hereunder. All payments on accounts receivable received from an obligor after the Receivership Date shall be applied to the receivable specifically designated by such obligor; provided that in the event that the obligor does not specifically designate a receivable, the payment shall be applied in the order of the age of the accounts receivable of such obligor, starting with the oldest such accounts receivable. All accounts receivable for services rendered by the Facility before the Receivership Date which are paid to Receiver during the Term of Receivership shall be paid to SEA, net of the applicable percentage rate required to be paid by DOH on Medicaid cash receipts assessments, by wire transfer to an account designated in writing by SEA within three (3) business days of Receiver's receipt of such funds. In addition, upon reasonable prior notice, Receiver shall allow SEA or its representative, at SEA's cost, to audit, access and copy its records relating to the foregoing.

Section 4.07   In the event that the Department determines that deficiencies exist at the Facility, and in accordance with applicable law imposes a civil penalty, such penalty may be assessed against Receiver in its personal capacity only if the Department, in its discretion, determines either that the deficiencies arose subsequent to Receivership Date or that the deficiencies arose prior to Receivership Date, but were not corrected within a reasonable period of time. Receiver shall provide SEA with prompt notice of any and all deficiencies at the Facility identified by the Department.

Section 4.08   Receiver may hire and fire such personnel, including professional consultants, as from time to time it may deem necessary or advisable, except as prohibited by law or regulation. Such consultants shall be required to keep and maintain accurate records of the time they devote to the management and operation of the Facility indicating in reasonable detail the nature and extent of the matters on which they worked so that their time may properly be allocated to appropriate cost centers. The Department at this time takes no position as to the reimbursability of such expenses under the Medicaid program.

Section 4.09   Receiver shall, at its own expense, secure all insurance necessary in the conduct of the Facility's business during the Term of Receivership, including but not limited to professional liability (medical malpractice) insurance in an amount not less than $1,000,000 each occurrence/$3,000,000 in the aggregate, commercial general liability in an amount not less than $1,000,000 per occurrence/$3,000,000 aggregate, workers compensation coverage with statutory limits and employers' liability with limits not less than $1,000,000 per accident, business auto liability coverage in amount not less than $1,000,000 per accident, umbrella/excess liability coverage in amount not less than $5,000,0000 per occurrence, Property insurance - "All Risk of

13

Loss" insurance on all real and personal Property, including boiler and machinery (machinery breakdown), flood and earthquake, all equipment under lease agreements or for which the Receiver is legally obligated to insure.  Coverage shall be on a replacement cost basis.  SVCMC should also be named as an additional insured under the general liability policy and this insurance should be primary to any other insurance or self insurance that may apply, without limitation, malpractice, general liability, property and casualty, and workers' compensation insurance, in its own name and/or it may be added by endorsement to SEA's and/or the Facility's insurance policies, at Receiver's own expense, if practicable and mutually agreed to by the parties. The Department at this time takes no position with respect to the reimbursability of such expenses under the Medicaid program.

Section 4.10   Prior to making any capital or leasehold improvement, Receiver shall notify SEA of its plans but shall not be obligated to obtain any consent from SEA therefor.  In connection with such improvements, Receiver shall comply with all requirements, codes, rules, laws, regulations, statutes and any requirements of regulatory agencies having jurisdiction, including but not limited to the Department.  At the end of the Term of Receivership or such earlier termination as provided in this Agreement, unless due to a Closing under the Purchase Agreement.   Receiver shall return the Premises to the condition prior to entering into this Agreement, ordinary wear and tear excluded and excluding any capital or leasehold improvements.

Section 4.11   Receiver represents that it has no employment, consulting agreements or other business agreements of any kind whatsoever with SEA (except for the Purchase Agreement and related agreements) and no other agreement of such kind will be entered into during the Term of Receivership; provided, however, Receiver or an affiliate of Receiver may negotiate and enter into agreements for the acquisition of assets of affiliates of SEA during the Term of Receivership.

## ARTICLE V

## OPERATION OF THE FACILITY

Section 5.01   The Department shall not be responsible for any debts and obligations incurred in the operation of the Facility by Receiver during the receivership.

Section 5.02   Receiver shall operate the Facility and enter into the functions and responsibilities hereunder on Receivership Date as provided in this Receiver Agreement.

Section 5.03   The books and records of SEA relating to the Facility shall be in the possession and control of Receiver during the Receivership, and SEA shall have access to same. Nothing herein shall be deemed to transfer ownership of the books and records of SEA to Receiver. Upon termination of the Receivership, Receiver shall have access and a right to the aforesaid books and records of its Receivership.

Section 5.04   Receiver and SEA, to the extent each has such documents, shall make all books and records, accounts, agreements and documents of whatsoever nature, or copies thereof,

relating to the Facility available to the Department upon demand. There will be no charge to the Department for any copies made.

## ARTICLE VI

## SPECIAL PROVISIONS RELATING TO THE FACILITY

Section 6.01   No provision contained herein shall be deemed to relieve SEA from any civil or criminal liability incurred or imposed by law by reason of acts or omission of SEA prior to Receivership Date. SEA waives no right with respect to disputing or contesting any asserted liability.

## ARTICLE VII

## RELATING TO THE DEPARTMENT

Section 7.01   A provisional operating certificate shall be deemed to have been issued to Receiver as of the Receivership Date. Such operating certificate shall be issued and delivered to Receiver by the Department as soon as practicable and shall remain in effect during the Term of Receivership. Upon termination of the appointment of Receiver as receiver pursuant to Section 1.03 herein, Receiver shall surrender its operating certificate to the Department.

Section 7.02   The Department shall promulgate a Medicaid reimbursement rate for Receiver in accordance with Subpart 86-2 if requested by Receiver. The Department, provided all conditions of participation in Title XVIII and Title XIX are met, agrees to recommend to the United States Department of Health and Human Services that a Title XVIII Provider Agreement be issued to Receiver and to issue a Title XIX Provider Agreement to Receiver.

## ARTICLE VIII

## BANKRUPTCY COURT PROVISIONS

8.1.   This Agreement is subject to and shall only become effective upon entry of the Sale Order (in form reasonably satisfactory to Receiver) (i) approving this Agreement and all provisions hereof and authorizing SEA and the Receiver to execute any and all documents and take all actions necessary to effectuate the Contemplated Transactions (as such term is defined in the Purchase Agreement); (ii) providing that the Receiver is entitled to the receivables and revenues generated by the Receiver's operations (the "Receivership Revenues") free and clear of any liens or encumbrances on the Debtors' assets; (iii) providing that the Receivership Revenues shall not be property of the Debtors' estates; (iv) authorizing the Receiver to file any documents and take any and all action necessary to remove any security interest, lien or encumbrance on Receivership Revenues (subject to certain limitations and obligations of Receiver related thereto that are incorporated into the Sale Order and agreed to by Receiver); and (v) declaring that the Receiver shall have no obligation to pay any more than one-half (50%) of the U.S. Trustee fees (which fees SEA and Receiver will split equally) or have any reporting requirements except as otherwise specifically required in this Agreement or non-bankruptcy law.

# ARTICLE IX

## INDEMNIFICATION

Section 9.01    Indemnification.

(a)    Receiver shall indemnify, defend and hold harmless Seller and Seller's Affiliates, successors and assigns, from and against any and all debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all fines, penalties, interest, costs and expenses relating thereto, including, without limitation, reasonable attorney's fees (collectively, "Losses") that are actually incurred by Seller, to the extent that such Losses arise from or relate to any failure by Receiver to perform its obligations under this Agreement or otherwise arise from or relate to the operations of the Facility during the Term of Receivership.

(b)    In the event Seller receives notice of a potential claim or the commencement of any judicial, administrative or arbitral actions, suits, alternative dispute resolution proceedings (public or private), or claims or any proceedings by or before any governmental body (collectively, a "Legal Proceeding") involving Seller arising from or relating to any failure by Receiver to perform its obligations under this Agreement or otherwise arising from or related to the operations of the Facility during the Term of Receivership, Seller shall promptly notify Receiver, provide copies to Receiver of any correspondence it receives with respect to such claims or Legal Proceedings, and will fully cooperate with Receiver (at Receiver's expense for any reasonable third party costs actually incurred by Seller in providing such cooperation) in connection with the defense and/or settlement thereof.  Furthermore, Seller shall take no action with regard to any such claim or Legal Proceeding that is inconsistent with Receiver's sole and exclusive right to litigate, defend, negotiate, and/or resolve any such claim or Legal Proceeding, including, but not limited to, making any payments in respect of any such claim or Legal Proceeding not expressly authorized in writing by Receiver.  Receiver shall, at its own expense, promptly dispute or satisfy any claim against Seller arising from or relating to any failure by Receiver to perform its obligations under this Agreement or otherwise arising from or related to the operations of the Facility during the Term of Receivership.

(c)    Notwithstanding any provision of this Agreement to the contrary, if Seller fails to promptly notify Receiver and provide copies to Receiver of any correspondence it receives concerning claims or Legal Proceedings to which Seller would be entitled to indemnification from Receiver under this Section 9.01, then, provided that Receiver is not already aware of such claim and/or Legal Proceeding and/or did not otherwise receive the foregoing correspondence, Seller shall be entitled to indemnification from receiver under this Section 9.01 except for only that portion of Losses directly attributable to damages arising exclusively from Seller's failure to promptly notify Receiver.  Notwithstanding any provision of this Agreement to the contrary, if Seller makes any payments in respect of any claim or Legal Proceeding to which Seller would be entitled to indemnification from Receiver under this Section 9.01 not expressly authorized in writing by Receiver, then Seller shall not be entitled to indemnification from Receiver under this Section 9.01 for any such claims or Legal Proceedings.

16

(d)     Seller shall indemnify, defend and hold harmless Receiver and Receiver's Affiliates, successors and assigns, from and against any and all debt, liability or obligation (whether direct of indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all fines, penalties, interest, costs and expenses relating thereto, including, without limitation, reasonable attorney's fees (collectively, "Losses") that are actually incurred by Receiver, to the extent that such Losses arise from or relate to any failure by Seller to perform its obligations under or its breach of this Agreement or, except as specifically set forth herein, otherwise arise from or relate to the operations of the Facility prior to the Term of Receivership.

(e)     In the event Receiver receives notice of a potential claim or the commencement of any judicial, administrative or arbitral actions, suits, alternative dispute resolution proceedings (public or private), or claims or any proceedings by or before any government body (collectively, a "Legal Proceeding") involving Receiver arising from or relating to any failure by Seller to perform its obligations under or its breach of this Agreement or, except as specifically set forth herein, otherwise arising from or related to operations of the Facility prior to the Term of Receivership,  Receiver shall promptly notify Seller, provide copies to Seller of any correspondence it receives with respect to such claims or Legal Proceedings, and will fully cooperate with Seller (at Seller's expense for any reasonable third party costs actually incurred by Receiver in providing such cooperation) in connection with the defense and/or settlement thereof.  Furthermore, Receiver shall take no action with regard to any such claim or Legal Proceeding that is inconsistent with Seller's sole and exclusive right to litigate, defend, negotiate, and/or resolve any such claim or Legal Proceeding, including, but not limited to, making any payments in respect of any such claim or Legal Proceeding not expressly authorized in writing by Seller.  Seller shall, at its own expense, promptly dispute or satisfy any claim against Receiver arising from or relating to any failure by Seller to perform its obligations under or its breach of this Agreement or, except as specifically set forth herein, otherwise arising from or related to the operations of the Facility prior to the Term of Receivership.

(f)     Notwithstanding any provision of this Agreement to the contrary, if Receiver fails to promptly notify Seller and provide copies to Seller of any correspondence it receives concerning claims or Legal Proceedings to which Receiver would be entitled to indemnification from Seller under this Section 9.01, then, provided that Seller is not already aware of such claim and/or Legal Proceeding and/or did not otherwise receive the foregoing correspondence, Receiver shall be entitled to indemnification from Seller under this Section 9.01 except for only that portion of Losses directly attributable to damages related arising exclusively from Receiver's failure to promptly notify Seller.  Notwithstanding any provision of this Agreement to the contrary, if Receiver makes any payments in respect of any claim or Legal Proceeding to which Receiver would be entitled to indemnification from Seller under this Section 9.01 not expressly authorized in writing by Seller, then Receiver shall not be entitled to indemnification from Seller under this Section 9.01 for any such claims or Legal Proceedings.

## ARTICLE X

## MISCELLANEOUS

Section 10.01  This Agreement may be executed in any number of counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one agreement.

Section 10.02  This Agreement shall be binding upon the parties hereto.  Nothing contained in this Agreement is intended to or shall be construed to confer any rights or remedies on any person or entity not a party to this Agreement, including any third party beneficiary.

Section 10.03  In case any one or more of the provisions contained in this Agreement shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provision contained herein shall not be affected or impaired thereby in any manner.

Section 10.04  The parties agree to promptly execute and deliver any and all necessary documents to give full force and effect to this Agreement.

Section 10.05  Article headings in this Agreement are for convenience only and are not a part of this Agreement.  Such headings shall not affect the meaning or construction of any provision herein.   Inappropriate gender references in this Agreement shall be deemed to be correct.

Section 10.06  Any notice required or permitted to be given pursuant to this Agreement shall be sufficient if given in writing and delivered personally or by registered or certified mail, return receipt requested, postage prepaid as follows:

If to Receiver, to it at the Facility, with a copy to:

Isidor D. Friedenberg, Esq.
2 Cara Drive
Suffern, New York 10901

If to SEA, to:

Saint Vincents Catholic Medical Centers of New York
170 West 12th Street
New York, New York 10011
Attn:  Mark E. Toney, Chief Restructuring Officer
Fax:  (212) 604-3331

with a copy to:

Garfunkel Wild, P.C.
111 Great Neck Road
Great Neck, New York 11021
Attn:  Judith A. Eisen, Esq.

- and –

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Fax:    (212) 715-8000
Attn:   Adam C. Rogoff, Esq.

If to the Department, to:

Thomas Conway, Esq.
General Counsel
New York State Department of Health
Nelson A. Rockefeller Empire State Plaza
Erastus Corning Tower
24th Floor, Room 2482
Albany, New York 12237
Attn: Michael Stone, Esq.

Section 10.07 Nothing herein contained shall be deemed to change the Medicaid reimbursement policies, rules and regulations of the New York State Department of Health.

Section 10.08 Nothing herein shall be construed to mean that, as of the date of this Agreement, the Department has approved any asset purchase agreement relating to the Facility.

Section 10.09 This Agreement constitutes the entire Agreement among SEA, Receiver and the Department relative to the receivership of the Facility. Any agreement between SEA and Receiver relative to the receivership of the Facility entered into subsequent to the date of this Agreement shall be null and void unless approved by the Department.

Section 10.10 Nothing contained herein shall be construed in any way to alter or abridge the right and authorities of the Department or the Public Health Council as provided for in the Public Health Law, except to the extent that the Department has expressly agreed to be bound herein.

Section 10.11 This Agreement shall be construed and enforced in accordance with the laws of the State of New York, without regard to its principles of conflicts of laws. The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, or any breach or default hereunder. Any and all legal proceedings related to the foregoing shall be filed and maintained only in the bankruptcy Court, and the Receiver, SEA and the Department hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court; provided that if the Bankruptcy Cases have closed, the Receiver, SEA and the Department irrevocably agree that any legal proceeding with respect to this Agreement or for recognition an enforcement of any judgment in respect hereof shall be brought and determined exclusively in the United States District Court for the Southern District of New York, or if such legal proceeding may not be brought in such court for jurisdictional purposes, exclusively in the Supreme Court of New York sitting in the County of New York.  Receiver, SEA, and the Department hereby (a) irrevocably submit with regard to any such legal proceeding to the

19

exclusive personal jurisdiction of the aforesaid courts in the event any dispute arises out of this Agreement, (b) agree that they shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court or that such action is brought in an inconvenient forum, and (c) agree that they shall not bring any action relating to this Agreement in any court other than the state or federal courts referenced above.

[Remainder of this Page Intentionally Left Blank]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed, all as of the day and year first above written.

**SISTERS OF CHARITY HEALTH SYSTEM NURSING HOME, INC., D/B/A/ ST. ELIZABETH ANN'S HEALTH CARE & REHABILITATION CENTER**

_____

Dated: _____     By:_____

Name:

Title:

**SV OPERATING [THREE], LLC**

Dated: _____     By:_____

Name:

Title:

**OFFICE OF HEALTH SYSTEMS MANAGEMENT NEW YORK STATE DEPARTMENT OF HEALTH**

Dated: _____     By:_____

Name:

Title:

GWTDOCS 1590485v7

**SCHEDULE 3.10**

**Material Contracts**

# EXHIBIT E TO ASSET PURCHASE AGREEMENT

# HHS STIPULATION

**For a copy of any omitted, nonconfidential exhibits or schedules, please contact Joseph A. Shifer, Esq. of Kramer Levin Naftalis & Frankel LLP at (2121) 715-9100 or via email at jshifer@kramerlevin.com.**

## EXHIBIT C-2 TO MOTION


## REAL ESTATE APA

**PURCHASE AND SALE AGREEMENT**

By and Between

SISTERS OF CHARITY HEALTH CARE SYSTEM NURSING HOME, INC., D/B/A
ST. ELIZABETH ANN'S HEALTH CARE AND REHABILITATION CENTER

as Seller

and

SV LAND THREE, LLC

as Purchaser

Dated as of: _____, 2011

Property

91 Tompkins Avenue
and adjacent parking lot
Staten Island, New York

**TABLE OF CONTENTS**

PAGE

ARTICLE 1 DEFINITIONS.................................................................................................1

ARTICLE 2 GENERAL TERMS.........................................................................................2

SECTION 2.1.    The Transaction.....................................................................2

SECTION 2.2.    Purchase Price .......................................................................2

ARTICLE 3 PERMITTED EXCEPTIONS; TITLE INSURANCE................................3

SECTION 3.1.    Sale Subject to.......................................................................3

SECTION 3.2.    Title Evidence .......................................................................4

SECTION 3.3.    Permitted Exceptions ............................................................5

SECTION 3.4.    Existing Mortgage .................................................................6

ARTICLE 4 APPORTIONMENTS AND PAYMENTS ....................................................6

SECTION 4.1.    Apportionments Relating to the Property .......................6

SECTION 4.2.    Taxes and Assessments ....................................................7

SECTION 4.3.    Transfer of Utilities..............................................................8

SECTION 4.4.    Transfer Taxes......................................................................8

SECTION 4.5.    Tax Returns ...........................................................................9

SECTION 4.6.    Title Charges.........................................................................9

SECTION 4.7.    Transaction Expenses ........................................................9

SECTION 4.8.    Survival ..................................................................................9

ARTICLE 5 COVENANTS REGARDING THE PROPERTY........................................9

SECTION 5.1.    Maintenance and Operation of the Property.................9

ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF PURCHASER .........10

SECTION 6.1.    Generally..............................................................................10

**SECTION 6.2.** **Closing Conditions; Survival of Representations and Warranties** ..................................................................................12

**SECTION 6.3.** **Survival** ...............................................................................12

ARTICLE 7 REPRESENTATIONS AND WARRANTIES OF SELLER ...................................12

    **SECTION 7.1.** **Generally** ...........................................................................12

    **SECTION 7.2.** **Property Representations** .................................................13

    **SECTION 7.3.** **Closing Conditions; Survival of Representations and Warranties** ..................................................................................14

    **SECTION 7.4.** **Knowledge of Seller** ........................................................14

    **SECTION 7.5.** **Survival** ...............................................................................14

ARTICLE 8 CLOSING DATE ...................................................................................15

    **SECTION 8.1.** **Closing Date** .......................................................................15

ARTICLE 9 CLOSING DOCUMENTS ......................................................................15

    **SECTION 9.1.** **Closing** ...............................................................................15

    **SECTION 9.2.** **Further Assurances** ...........................................................15

ARTICLE 10 NOTICES .............................................................................................16

    **SECTION 10.1.** **Notices** ...............................................................................16

ARTICLE 11 BROKER ..............................................................................................17

ARTICLE 12 DEFAULTS; REMEDIES .....................................................................17

    **SECTION 12.1.** **Purchaser's Default** ...........................................................17

    **SECTION 12.2.** **Seller's Default** ...................................................................18

    **SECTION 12.3.** **Cross-Default with Asset Agreement** .............................18

    **SECTION 12.4.** **Cross-Default with Ground Lease** ...................................18

ARTICLE 13 CASUALTY; CONDEMNATION .........................................................19

    **SECTION 13.1.** **Casualty** .............................................................................19

    **SECTION 13.2.** **Condemnation** ...................................................................19

ARTICLE 14 AS-IS; WHERE-IS; DISCLAIMER; WAIVER OF CLAIMS .............................. 20

    **SECTION 14.1.**    **Disclaimers; As-Is, Where-Is Condition** ......................................... 20

    **SECTION 14.2.**    **Survival** ................................................................................................ 22

ARTICLE 15 ENVIRONMENTAL STUDY; ASSUMPTION OF OBLIGATIONS ................ 22

    **SECTION 15.1.**    **Environmental Study** ........................................................................... 22

    **SECTION 15.2.**    **Intentionally deleted** ............................................................................ 22

    **SECTION 15.3.**    **Waiver** .................................................................................................. 22

    **SECTION 15.4.**    **Intentionally omitted** .......................................................................... 22

ARTICLE 16 ESCROW ......................................................................................................... 23

    **SECTION 16.1.**    **Escrow Terms** ...................................................................................... 23

ARTICLE 17 BANKRUPTCY COURT MATTERS .............................................................. 23

    **SECTION 17.1.**    **Competing Transaction** ....................................................................... 23

    **SECTION 17.2.**    **Break-Up Fee** ....................................................................................... 23

    **SECTION 17.3.**    **Bankruptcy Court Filings** ................................................................... 24

    **SECTION 17.4.**    **Notice of Sale** ...................................................................................... 24

ARTICLE 18 MISCELLANEOUS ......................................................................................... 25

    **SECTION 18.1.**    **Entire Agreement** ................................................................................ 25

    **SECTION 18.2.**    **Modification** ......................................................................................... 25

    **SECTION 18.3.**    **Binding Agreement** ............................................................................. 25

    **SECTION 18.4.**    **Assignment** .......................................................................................... 25

    **SECTION 18.5.**    **No Press Releases** ................................................................................ 25

    **SECTION 18.6.**    **Illegality** .............................................................................................. 25

    **SECTION 18.7.**    **Choice of Law** ..................................................................................... 26

    **SECTION 18.8.**    **Construction** ......................................................................................... 26

    **SECTION 18.9.**    **Binding Effect; Assignment; Successors and Assigns** ...................... 26

KL3 2800082.18

**SECTION 18.10.  Ambiguities** ...................................................................................26

**SECTION 18.11.  Expenses** ......................................................................................27

**SECTION 18.12.  Counterparts** ...............................................................................27

**SECTION 18.13.  Waiver of Trial by Jury** .............................................................27

**SECTION 18.14.  Third Party Beneficiaries** ..........................................................27

**SECTION 18.15.  Jurisdiction** .................................................................................27

**SECTION 18.16.  Seller's Constituents** ..................................................................27

**SECTION 18.17.  Purchaser's Constituents** ...........................................................28

**SECTION 18.18.  No Recording** .............................................................................28

**SECTION 18.19.  Not an Offer** ...............................................................................28

**SECTION 18.20.  Failure of Deposit** ......................................................................28

**SECTION 18.21.  No Waiver** ..................................................................................28

**SECTION 18.22.  Severability** .................................................................................28

**SECTION 18.23.  No Survival** .................................................................................29

KL3 2800082.18

# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** is entered into by and between **SISTERS OF CHARITY HEALTH CARE SYSTEM NURSING HOME, INC., D/B/A ST. ELIZABETH ANN'S HEALTH CARE AND REHABILITATION CENTER**, a New York not-for-profit corporation ("**Seller**") and SV LAND THREE, LLC a New York limited liability company ("**Purchaser**") as of the ___ day of _____, 2011.

**WHEREAS**, Seller, along with certain of its affiliates (collectively, the "**Debtors**"), are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on April 14, 2010 (the "**Petition Date**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") (Case No. 10-11963(CGM)) (the "**Bankruptcy Case**");

**WHEREAS**, Seller is the owner of the Property (as hereinafter defined); and

**WHEREAS**, Subject to the approval of the Bankruptcy Court, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code the Property, all as more specifically provided herein.

**WHEREAS**, Simultaneously with the execution and delivery of this Agreement, Seller, as seller, and SV Operating Three, LLC ("**Asset Purchaser**"), as buyer, entered into that certain Asset Purchase Agreement for the purchase and sale of certain assets used in connection with the operation of St. Elizabeth Ann's Health Care and Rehabilitation Center, a skilled nursing facility which is located at the Real Estate (the "**Asset Agreement**").

**WHEREAS**, the Closing (defined below) is contingent upon the closing of the transactions contemplated by the Asset Agreement.

**NOW, THEREFORE**, subject to the terms and conditions of this Agreement, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, including the mutual covenants and agreements set forth herein, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

For purposes of this Agreement, all capitalized terms and certain other terms used herein shall have the respective meanings specified in <u>Schedule I</u> attached hereto and made a part hereof.

## ARTICLE 2
## GENERAL TERMS

**SECTION 2.1.** **The Transaction**.

2.1.1. Subject to the terms and conditions of this Agreement and the entry of the Sale Order, Seller agrees to sell, transfer, convey and assign to Purchaser, and Purchaser agrees to purchase and accept from Seller on the Closing Date (as defined herein) free and clear of all liens, tenancies, leases, options, rights of first refusal, claims and all Interests (as defined in the Sale Order), subject only to Permitted Exceptions, and any other interest to the extent acceptable to Purchaser, as provided in the Sale Order pursuant to Section 363(b) and Section 363(f) of the Bankruptcy Code, Seller's right, title and interest, in and to (i) that certain real property as more particularly described on Schedule II attached hereto and made a part hereof together with the buildings and improvements thereon located at and commonly known as 91 Tompkins Avenue, Staten Island and the adjacent parking lot and designated as Block 534, Lots 120 and 150 (collectively, the **"Real Estate"**), and (ii) the furniture, furnishings, fixtures, equipment and other items of personal property exclusively owned by Seller located in or upon, and used in connection with, the Real Estate (collectively, the **"Personalty"**). The Real Estate and the Personalty are to be conveyed together with (x) all easements, rights of way, air or development rights, reservations, privileges, appurtenances, and other estates and rights of Seller, if any, pertaining to its interest in the Real Estate, and (y) all right, title and interest of Seller, if any, in and to all alleys adjoining its interest in the Real Estate and in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining its interest in the Real Estate to the center line thereof, and (z) subject to apportionment if required hereunder, all right, title and interest of Seller, if any, in and to any award made for any taking by condemnation or any damages to its interest in the Real Estate by reason of a change of grade of any street, road or avenue (such taking or damages, a **"Condemnation"**) or to be made in lieu thereof and in and to any unpaid award for any Condemnation (the Real Estate and the Personalty, together with all of the foregoing, are hereinafter sometimes collectively referred to herein as the **"Property"**).

**SECTION 2.2.** **Purchase Price**.

2.2.1. The **"Purchase Price"** for the Property and the various assignments incidental thereto referred to herein is FIFTEEN MILLION AND NO/100s DOLLARS **(US $15,000,000)**. The Purchase Price shall be payable (i) by the payment of the Escrow Deposit in immediate funds, and (ii) the balance in cash (by wire transfer) at the Closing as directed by Seller in writing at least one (1) business day prior to the Closing. Seller may direct, among other things, that Purchaser pay a portion of the Purchase Price at the Closing, in an amount or amounts specified by Seller, to persons or entities other than Seller for Seller's purposes, including to the Title Company.

2.2.2. Concurrently with the execution and delivery hereof, Seller and Purchaser have agreed that, as security for the performance of Purchaser's obligations hereunder, Purchaser shall deposit with Escrow Agent, by wire transfer to the account described in Schedule III, a cash earnest money deposit in the amount of SEVEN HUNDRED FIFTY THOUSAND AND NO/100s DOLLARS **(US $750,000)** (the **"Initial Deposit"**).

-2-

2.2.3. In the event that Purchaser is selected as the prevailing bidder at the Auction, Purchaser shall deliver to Escrow Agent by wire transfer payable to Escrow Agent an additional deposit in an amount equal to the greater of (x) SEVEN HUNDRED FIFTY THOUSAND AND NO/100s DOLLARS (**US $750,000**) or (y) an amount such that together with the Initial Deposit, the Escrow Deposit shall be equal to 10% of the Purchase Price pursuant to this Agreement, as it may be subsequently amended at the Auction (the **"Additional Deposit"**; the Initial Deposit together with the Additional Deposit and any interest earned thereon shall be collectively referred to herein as the **"Escrow Deposit"**) within the following time periods: (i) the earlier of one (1) Business Day prior to the sale hearing or three (3) Business Days after Purchaser is selected as the prevailing bidder or elects (in its sole discretion) to be designated back-up bidder, and (ii) in the event that Seller selects a Competing Bid at the Auction but, subject to the limitations of Section 7.2(c) of the Asset Purchase Agreement, dated as of even date herewith, between Seller and Purchaser, with respect to certain business assets of Seller, notifies Purchaser in writing that Seller intends to seek Bankruptcy Court approval of Purchaser as the prevailing bidder, Purchaser shall make the Additional Deposit within three (3) Business Days after receipt of such written notification. The Escrow Deposit shall be held by Escrow Agent, in trust, in an interest bearing account pursuant to and in accordance with the provisions of an Escrow Agreement among Seller, Purchaser and Escrow Agent, a copy of which is attached hereto and made a part hereof as <u>Exhibit A</u> (the "**Escrow Agreement**").

2.2.4. Except as otherwise expressly provided in the Asset Agreement, no portion of the Purchase Price is attributable to the Personalty.

## ARTICLE 3
## PERMITTED EXCEPTIONS; TITLE INSURANCE

**SECTION 3.1.** **Sale Subject to**. Subject to the terms and condition of this Agreement and pursuant to the entry of the Sale Order, Seller shall convey, and Purchaser shall accept fee simple title to the Real Estate, insurable by the Title Company at regular premiums, without exceptions or reservations of any type or kind, except (a) ALTA standard printed exceptions other than those that can be removed by the Sale Order, or by an affidavit of Seller to be provided pursuant to Section 3.2.3 hereof, (b) the Permitted Exceptions, and (c) the obligations expressly assumed by Purchaser under this Agreement. The parties hereby agree that **"Title Company"** shall mean National Granite Title Insurance Agency Inc. ("**NGTIA**") underwriting through Fidelity National Title Insurance Company (or its successors) or if NGTIA shall no longer be in the title insurance business, another reputable title insurance company reasonably acceptable to Seller. Notwithstanding the foregoing to the contrary, Purchaser and Seller each acknowledges and agrees that Purchaser must use and employ Fidelity National Title Insurance Company (or its successors) through Kenneth Cohen to insure at least thirty (30%) percent of the insurance insuring (i) Purchaser's title to the Property and (ii) any mortgage executed and delivered by Purchaser at Closing.

3.1.1. Pursuant to the Sale Order, all monetary liens and claims (the "**Liens**") shall attach to the net proceeds of the sale (the "**Net Proceeds**") to the same extent they encumbered the Property. To the extent Seller is required to satisfy any of the Liens from the Net Proceeds, Seller shall make such payments in accordance with the Sale Order or by further

order of the Bankruptcy Court.  Nothing herein is a waiver of the rights of Seller or any other third party to contest the validity, amount or priority of any Liens and the right of any claimant or lienholder to have their respective liens satisfied from Net Proceeds.

SECTION 3.2.    **Title Evidence**.  Purchaser shall order a title commitment within ten (10) days after the date hereof and shall cause a title report to be delivered to Seller's counsel within thirty (30) days after the date hereof.

3.2.1.  If Purchaser's title commitment/report or any update thereto reflects any title exceptions that are not Permitted Exceptions and, therefore, which Purchaser is not required to accept (the **"Non-Permitted Exceptions"**), Seller shall use reasonable efforts, at or prior to Closing, solely through the entry of the Sale Order and as provided in Section 3.1.1 above, to attempt to remove the following: (i) any and all of the Non-Permitted Exceptions that Seller willfully placed of record or consented to be placed of record following the date hereof, and (ii) any and all other Non-Permitted Exceptions that may be removed by the entry of the Sale Order.  Seller shall have no obligation with respect to the clearance of title as required hereunder other than the delivery of the Sale Order.  Seller shall have the right to adjourn the Closing Date, from time to time, up to ninety (90) days in the aggregate for the purpose of removing/eliminating such Non-Permitted Exceptions.

3.2.2.  In the event that there exist any Non-Permitted Exception which is not removed through the entry of the Sale Order, Purchaser may elect within five (5) Business Days after the entry of the Sale Order, and may also elect within five (5) Business Days after the delivery to Seller's counsel of any update to the title report showing any Non-Permitted Exception which is not removed through the entry of the Sale Order or otherwise by Seller (in its sole discretion), as the case may be, to either (i) not consummate the transactions contemplated hereby, in which event this Agreement shall be terminated and of no further force and effect, the Escrow Deposit shall be returned to Purchaser and neither of the parties hereto shall have any rights or obligations to the other hereunder (other than those that, pursuant to the express terms hereof, expressly survive termination hereof) or (ii) consummate the transactions contemplated hereby subject to such additional exceptions and proceed to Closing without an abatement of the Purchase Price.  Purchaser's failure to timely deliver a notice electing to not consummate the transactions contemplated hereby shall be deemed Purchaser's election to consummate the transaction in accordance with the terms and conditions of this Agreement.  Notwithstanding the foregoing, if Purchaser elects to terminate this Agreement as set forth above, Seller shall have the right to void such termination by providing written notice to Purchaser that Seller elects, in its sole discretion, to cure the Non-Permitted Exception by either removing the same at or prior to Closing or providing Purchaser with a credit against the Purchase Price equal to the amount of the cost to cure the Non-Permitted Exception.  In the event Seller elects to cure the Non-Permitted Exception or provide such credit, Purchaser shall be obligated to complete the transaction contemplated by this Agreement.

3.2.3.  If required by the Title Company, Seller agrees to execute, acknowledge and deliver a standard and customary owner's title affidavit at Closing in form and substance reasonably acceptable to Seller as modified for a debtor in chapter 11 and such other matters as the Title Company may reasonably require in order to issue a policy of title insurance to

Purchaser in the manner required under this Agreement; provided however that Seller shall not be obligated to pay any amounts to or claims of third parties in order to do so (other than as required by the Sale Order or pursuant to Sections 3.1.1 (as and to the extent provided for therein) and 3.2.1 above).

      **SECTION 3.3.**      **Permitted Exceptions**. "Permitted Exceptions" means:

      3.3.1.  Those certain title encumbrances set forth on <u>Schedule IV</u>.

      3.3.2.  (A) the state of facts shown on that certain survey made on May 17, 2006 (with respect to Sheets 1 and 2 of 3 of such survey) and November 9, 2006 (with respect to Sheet 3 of 3 of such survey), and last updated on August 7, 2008 (with respect to Sheet 1 of 3 of such survey), August 17, 2007 (with respect to Sheet 2 of 3 of such survey) and June 17, 2009 (with respect to Sheet 3 of 3 of such survey), certified by Otis V. Voils, and (B) such additional state of facts that an accurate survey of the Property would show (including encroachments, projections, retaining walls and stoops) provided that any such facts shall not materially adversely affect the use of any material portion of the existing improvements for its current use;

      3.3.3.  liens for unpaid taxes, assessments, charges, rents and any other governmental charges, which are not yet due and payable and are apportioned in accordance with the provisions of Article 4 hereof;

      3.3.4.  all rights and easements, for (i) access, and (ii) all rights and easements for electricity, gas, telephone, water, cable television and any other utilities to maintain and operate lines, cables, poles and distribution boxes in, over and upon the Real Estate;

      3.3.5.  possible projections and/or encroachments of retaining walls, foundations, stoops, areas, steps, sills, trim, cornices, standpipes, fire escapes, coal chutes, casings, ledges, water tables, lintels, porticos, keystones, windows, hedges, copings, cellar doors, sidewalk elevators, fences, fire escapes and the like, or similar projections or objects upon, under or above any adjoining buildings and/or streets or avenues or those belonging to adjoining premises which encroach upon the Real Estate, or within any set back areas, and variations between the lines of record title and fences, retaining walls, hedges, and the like;

      3.3.6.  possible variations between the tax diagram or the tax map and the record description;

      3.3.7.  (a) any and all violations of building, fire, sanitary, environmental, housing and similar laws, municipal ordinances, orders or requirements affecting the Property from or by any federal, state, county or municipal department, agency, authority or bureau having or asserting jurisdiction (each, a "**Governmental Authority**") and (b) any lien attaching to the Property as a result of the foregoing described in clause (a) (the foregoing described in clauses (a) and (b) being hereafter referred to collectively as the "**Violations**");

      3.3.8.  building, zoning, subdivision and other governmental laws, codes and regulations, and landmark, historic and wetlands designations;

3.3.9.  any matter created or caused by Purchaser or its agents, employees, contractors or representatives; and

3.3.10.  any matters which the Title Company may raise, provided that the Title Company shall agree to omit or insure without additional premium to Purchaser against collection of the same out of the Property.

**SECTION 3.4.** **Existing Mortgage.**  At the request of Purchaser, but at no cost or liability to Seller, Seller shall endeavor to cause General Electric Capital Corporation (the "**Existing Lender**"), the holder of a mortgage currently encumbering the Property (the "**Existing Mortgage**") (to the extent the Existing Mortgage is not subject to any then pending challenge in the Bankruptcy Case as to its validity, priority or enforceability) to assign the Existing Mortgage and the promissory note(s) secured thereby to Purchaser's lender (without recourse, representation, or warranty) at Closing; provided, however, (a) Purchaser shall pay all fees, charges, costs and expenses of the Existing Lender in connection with such assignment of the Existing Mortgage and the promissory note(s) secured thereby, and the preparation of the documents effectuating such assignment and the recording thereof, and (b) the Existing Lender shall have agreed to such assignment and (c) such assignment is consummated at Closing.  In such case, Purchaser shall accept title to the Property subject to (i) the Existing Mortgage assigned at the Closing, the promissory note(s) secured thereby and any financing statements relating thereto and (ii) the other Permitted Exceptions.  To the extent that any mortgage in connection with any loan obtained by Purchaser in connection with the acquisition of the Property (including without limitation the Existing Mortgage) is exempt from mortgage recording tax under Article 11 of the New York State Tax Law, Purchaser shall pay to Seller at Closing an amount equal to fifty percent (50%) of the mortgage recording tax that would have otherwise been due in connection with the recording of Purchaser's mortgage but for the exemption described herein after subtracting the out-of-pocket expenses incurred by Purchaser and described in clause (a) above.  Such assignment of the Existing Mortgage and the promissory note(s) secured thereby shall be in compliance with the applicable requirement of Section 275 of the New York Real Property Law.

**ARTICLE 4**
**APPORTIONMENTS AND PAYMENTS**

**SECTION 4.1.** **Apportionments Relating to the Property**.  Subject to the terms of the Receiver Agreement, the following shall be apportioned between Seller and Purchaser at the Closing with respect to the Property, as of 12:01 a.m. (New York Time) on the Closing Effective Date (the "**Apportionment Date**"), and the net aggregate amount thereof either shall be paid by Purchaser to Seller or credited to Purchaser towards the Purchase Price, as the case may be, at the Closing (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party):

4.1.1.  real property taxes, and any assessments (or installments thereof), including with respect to Business Improvement Districts, on the basis of the fiscal year for which payable; if the Apportionment Date shall be prior to the date on which the real property

tax rate is fixed, the apportionment of real property taxes shall be made on the basis of the tax rate for the preceding year applied to the latest assessed valuation;

4.1.2. to the extent not metered, water rates and charges, sewer taxes and rents and electricity and other utility charges;

4.1.3. fuel oil and liquid propane gas, if any, at the cost per gallon most recently charged to Seller, based on the supplier's measurements thereof taken within ten (10) days of the Closing Date;

4.1.4. insurance proceeds received by Seller, if any, and payable to Purchaser pursuant to Article 13 hereof to the extent not applied to repair or restore the Property in accordance with the provisions of this Agreement;

4.1.5. unopened and unused supplies purchased and not consumed for the Property, if any; and

4.1.6. annual municipal permit and inspection fees and other fees for licenses and permits assigned to Purchaser, if any.

**SECTION 4.2.     Taxes and Assessments**.

4.2.1. If, on the Closing Date, all or any portion of the Real Estate shall be or shall have been affected by assessments (including Business Improvement District assessments) that are, or which may become, payable in annual installments, of which the first installment is then a charge or lien or has been paid or if any of the improvements to be paid for thereby are in place or commenced, then, for purposes of this Agreement only, the installment(s) which shall have been paid or the installment which shall be then due and payable shall be apportioned between Seller and Purchaser and all of the unpaid installments of any such assessments, including those which are to become due and payable after the date hereof, shall continue to be liens upon the Real Estate, it being understood and agreed that Seller and Purchaser shall be responsible for a pro rata share of such assessment, with Purchaser being responsible for the period from and after the Apportionment Date and Seller being responsible for the period prior to the Apportionment Date, regardless of when such installments are due and payable (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

4.2.2. To the extent that any refund of real property taxes, assessments (including Business Improvement District assessments), water rates and charges, sewer taxes and rents or any other utility made after the Closing Effective Date is applicable to a period before the Closing Effective Date, such refund shall be payable to Seller or returned by Purchaser to Seller, net of the actual costs incurred by Purchaser in obtaining same.

4.2.3. To the extent that any refund of real property taxes, assessments (including Business Improvement District assessments), water rates and charges or sewer taxes and rents made after the Closing Effective Date is applicable to a period after the Closing

Effective Date, such refund shall be payable to Purchaser or returned by Seller to Purchaser, after first deducting the actual costs incurred by Seller in obtaining same (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

4.2.4. From and after the date of this Agreement, (a) Seller shall not, without the prior written consent of Purchaser, which consent may be granted or withheld in Purchaser's sole discretion, withdraw, compromise or settle any certiorari proceedings for any fiscal period subsequent to the period in which the Closing is to occur, and (b) Seller shall not, without the prior written consent of Purchaser, which consent shall not be unreasonably withheld or delayed, withdraw, compromise or settle any certiorari proceedings, if any, for any fiscal period in which the Closing is to occur. Any tax savings or refund for any year or years prior to the tax year in which the Closing herein occurs shall belong solely to Seller. Purchaser or Seller, as the case may be, shall execute all consents, receipts, instruments and documents which may reasonably be requested in order to facilitate in instituting or settling such proceeding, as the case may be, and collecting the amount of any refund or tax savings. The net refund of taxes, if any, for such fiscal tax year in which the Closing occurs shall be divided between Seller and Purchaser in accordance with the apportionment of taxes pursuant to the provisions hereof, after deducting therefrom a pro rata share of all reasonable expenses, including reasonable attorneys' fees reasonably and necessarily incurred in obtaining such refund.

SECTION 4.3.    **Transfer of Utilities**. Purchaser, at its sole cost and expense, shall cause the transfer of all utility services for the Real Estate to Purchaser's name as of the Closing Date and Seller shall cooperate with Purchaser in connection therewith. If utility services shall not have been transferred to Purchaser's name for the Real Estate effective as of the Closing Date, then, subject to the Receiver Agreement, at the Closing, any such charges with respect to services not so transferred shall be prorated as set forth in Section 4.1 above, based upon the per diem charges obtained by using the most recent period for which readings of such utility services shall then be available. Purchaser, at its sole cost and expense, shall promptly thereafter cause such utility services to be transferred to Purchaser's name, and Seller shall cooperate with Purchaser in connection therewith. Purchaser shall make all required deposits on account with utility companies or on account with municipalities and shall reasonably cooperate with Seller in having any deposits currently held by such companies and municipalities, returned to Seller. However, Seller shall be solely responsible for obtaining the return of its own utility company deposits, if any (provided, however, that nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party). The provisions of this Section shall survive the Closing.

SECTION 4.4.    **Transfer Taxes**. Seller shall be responsible (either by payment or exemption) for any real property transfer taxes, transfer gains taxes, and other similar taxes and fees imposed on Seller by the State, county or municipality in which the Real Estate is located which are imposed in connection with the sale, assignment, transfer and conveyance of the Real Estate to Purchaser as contemplated by the provisions of this Agreement (collectively, the "**Transfer Taxes**"). Seller may pay the Transfer Taxes, if any, from the Purchase Price at the Closing (provided, however, that, other than as provided in Section 3.1.1, nothing in this

-8-

Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

SECTION 4.5. **Tax Returns**. At the Closing, Purchaser and Seller shall deliver to the Title Company a New York State Transfer Tax Return (TP-584), City of New York Real Property Transfer Tax Return (NYC-RPT) and Equalization form (RP-5217NYC) (collectively, the "**RE Tax Returns**") and deliver same to the Title Company for delivery to the appropriate authority.

SECTION 4.6. **Title Charges**. Purchaser shall pay the cost of Purchaser's title insurance premiums and any title search costs, the cost of a survey for the Property or any update thereto and all recording and filing fees, including, but not limited to, those in connection with the Deed.

SECTION 4.7. **Transaction Expenses**. Except as expressly provided herein, each party shall bear its own costs and expenses, including attorney, accountant and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.

SECTION 4.8. **Survival**. The provisions of this Article 4 shall survive the Closing.

## ARTICLE 5
## COVENANTS REGARDING THE PROPERTY

SECTION 5.1. **Maintenance and Operation of the Property**. Subject to the restrictions imposed upon the Seller as a debtor-in-possession to pay any claims arising or otherwise relating to any period prior to the commencement of the Bankruptcy Case, and the parties understanding that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate or require the Seller to pay any amounts relating to such prepetition periods, the parties agree as follows: between the Petition Date and the Closing, Seller shall use commercially reasonable efforts to maintain and operate the Property in substantially the same manner as the Property is currently being maintained and operated and keep the Property in a condition at least as good as its condition as of the date hereof, reasonable wear and tear, casualty and condemnation excepted (it being agreed that Seller shall not be obligated to perform any capital improvements unless required by Law as a postpetition obligation of the debtor-in-possession and further provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Debtors to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party). Seller shall use commercially reasonable efforts to keep and maintain in force and effect all existing licenses and permits affecting the Property without being obligated to pay any prepetition amounts, other than as provided in Section 3.1.1. Seller shall not be obligated to construct any improvements upon the Property except those which Seller reasonably determines necessary because of emergency situations or to comply with Laws. Seller shall maintain insurance coverages similar to those in effect on the date hereof, including property insurance in an amount equal to the full replacement value of the Property. Notwithstanding anything to the contrary contained herein, Purchaser acknowledges that Asset Purchaser shall be responsible for certain insurance, repair and maintenance obligations in accordance with that certain Receiver Agreement, dated as of even date herewith

(the **"Receiver Agreement"**), which shall be effective from and after the Receivership Date, as such term is defined in the Receiver Agreement.  In the event that Asset Purchaser has an obligation under the Receiver Agreement which, in the absence of this sentence would also be an obligation of Seller hereunder, then Seller shall not have such obligation hereunder.  In addition, Seller shall not be deemed to be in default hereunder as a result of a failure of any representation or covenant contained herein or if any other closing condition cannot be satisfied, as a result of the acts or omissions of Asset Purchaser under the Receiver Agreement.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

SECTION 6.1.    **Generally**.  Purchaser represents and warrants that:

6.1.1. (a)   Purchaser is a duly formed and validly existing limited liability company under the Laws of the state or commonwealth of its formation and is in good standing under the Laws of the state or commonwealth of its formation and, to the extent required by Law, under the Laws of the State of New York, (b) Purchaser has the full right, authority and corporate power to enter into this Agreement, to consummate the transactions contemplated herein and to perform its obligations hereunder and under those Closing Documents to which it is a party, (c) each of the Persons executing this Agreement on behalf of Purchaser is authorized to do so, and (d) this Agreement constitutes a valid and legally binding obligation of Purchaser enforceable against Purchaser in accordance with its terms;

6.1.2.  there are no legal or administrative proceedings pending or, to the best of Purchaser's actual knowledge, without investigation, threatened against or affecting Purchaser that would adversely affect Purchaser's legal authority or financial ability to perform its obligations under the Closing Documents to which it is a party;

6.1.3.  the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance by Purchaser of its obligations hereunder and under the Closing Documents to which it is a party do not and will not conflict with or violate any Law, rule, judgment, regulation, order, writ, injunction or decree of any court or governmental or quasi-governmental entity having jurisdiction over Purchaser or any of the parties comprising Purchaser, including the United States of America, the State of New York or any political subdivision of either of the foregoing, or any decision or ruling of any arbitrator to which Purchaser or any of the parties comprising Purchaser is a party or by which Purchaser or any of the parties comprising Purchaser is bound or affected, or breach any provisions of, or constitute a default under, any contract, agreement, instrument or obligation to which Purchaser or any of the parties comprising Purchaser is a party or by which any of them is bound;

6.1.4.  the execution and delivery of this Agreement by Purchaser does not, and the performance of its obligations hereunder and under the Closing Documents to which it is a party will not, require the consent or approval of any public authority or any other Person other than the New York State Department of Health, or any lender from which Purchaser may seek to obtain financing, as may be applicable provided however that Purchaser acknowledges that its obligations under this Agreement are not contingent upon any such financing;

6.1.5. Purchaser's Federal Tax Identification Number is [_____];

6.1.6. <u>ERISA</u>.  With respect to each source of funds to be used by Purchaser to purchase the Property (respectively a "<u>Source</u>"), at least one of the following statements shall be accurate as of the Closing: (i) the Source does not include the assets of: (x) an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), which is subject to Title I of ERISA; or (y) a "plan" as defined in Section 4975(a) of the Internal Revenue Code of 1986, as amended ("<u>Code</u>"); or (ii) the use of such Source to purchase the Property will not result in a nonexempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code;

6.1.7. <u>Compliance with International Trade Control Laws and OFAC Regulations</u>.  Purchaser (including any owner of any direct or indirect interest in Purchaser) is not now nor shall it be at any time an entity with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories (collectively, a "<u>U.S. Person</u>"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders or lists published by the Office of Foreign Assets Control, Department of the Treasury or otherwise;

6.1.8. <u>Purchaser's Funds</u>.  Purchaser will have at Closing sufficient immediately available funds in order to make all Payments to Seller at Closing.  Purchaser shall take such measures as are required by applicable law to assure that the funds used to pay to Seller the Payments are derived: (i) from transactions that do not violate United States law nor, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under United States law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated;

6.1.9. <u>Anti-Money Laundering Laws</u>.  To the best of Purchaser's knowledge after making due inquiry, neither Purchaser nor any direct or indirect owner of any interest in Purchaser, nor any person or entity providing funds to Purchaser (each, a "<u>Purchaser Party</u>"): (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws (as hereinafter defined in this Section); (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) has had any of its funds seized or forfeited in any action under any Anti Money Laundering Laws.  For purposes hereof, the term "Anti-Money Laundering Laws" shall mean all applicable laws, regulations and sanctions, state and federal, criminal and civil, that: (w) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (x) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (y) require identification and documentation of the parties with whom a financial institution conducts business; or (z) are designed to disrupt the flow of funds to terrorist organizations; and

6.1.10. <u>Purchaser Compliance with Patriot Act</u>. Purchaser is in compliance with any and all applicable provisions of the USA PATRIOT Act of 2001, Pub. L. No. 107-56.

**SECTION 6.2.** **Closing Conditions; Survival of Representations and Warranties.** The following are conditions precedent to the obligation of Seller to close title under this Agreement, any or all of which may at Seller's option be waived in writing:

6.2.1. Each of the representations and warranties of Purchaser set forth in this Agreement shall be deemed to have been repeated by Purchaser, at and as of the Closing Date with the same force and effect as if first made on and as of such date. It shall be a condition to Seller's obligation to close hereunder that all such representations and warranties of Purchaser be true and correct in all material respects as of the Closing Date.

6.2.2. Purchaser shall have (or, with respect to obligations of Purchaser to be performed on the Closing Date, Purchaser shall be ready, willing and able to perform same on the Scheduled Closing Date) (a) delivered, or caused to be delivered, all of the Closing Documents to which it is a party and all other documents, instruments and other items required to be delivered by Purchaser at or prior to Closing (including, without limitation, pursuant to Section 9.1.2), (b) tendered the Purchase Price in accordance with the terms of this Agreement, and (c) performed in all material respects all other material obligations on Purchaser's part to be performed hereunder on or prior to the Closing Date.

6.2.3. All other conditions precedent expressly set forth herein to Seller's obligation to consummate the transaction contemplated hereby have been satisfied (or waived in writing by Seller).

6.2.4. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order.

6.2.5. The closing under the Asset Agreement shall occur concurrently with the Closing under this Agreement.

**SECTION 6.3.** **Survival.** The representations, warranties and certifications of Purchaser set forth in this Agreement shall not survive the Closing.

**ARTICLE 7**
**<u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>**

**SECTION 7.1.** **Generally**. Seller represents and warrants that:

7.1.1. (a) it is a duly formed and validly existing not-for-profit corporation under the Laws of the state or commonwealth of its formation and is qualified to conduct and transact business and, other than as a result of the commencement of the Bankruptcy Case, is in good standing under the Laws of the State of New York, (b) subject to the entry of the Bidding Procedures Order, it has the full right, authority and power to enter into this Agreement, and, subject to the entry of the Sale Order, to consummate the transactions contemplated herein and to perform its obligations hereunder and under those Closing Documents to which it is a party all of

which have been duly authorized by all necessary actions on the part of Seller, (c) each of the Persons executing this Agreement on behalf of Seller is authorized to do so, and (d) subject to the entry of the Sale Order, this Agreement constitutes a valid and legally binding obligation of Seller enforceable against it in accordance with its terms;

7.1.2.  the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance by Seller of its obligations hereunder and under the Closing Documents to which it is a party do not and will not conflict with or violate any Law, rule, judgment, regulation, order, writ, injunction or decree of any court or governmental or quasi-governmental entity having jurisdiction over Seller or any of the parties comprising Seller, including the United States of America, the State of New York or any political subdivision of either of the foregoing, or any decision or ruling of any arbitrator to which Seller or any of the parties comprising Seller is a party or by which Seller or any of the parties comprising Seller is bound or affected, or breach any provisions of, or constitute a default under, any contract, agreement, instrument or obligation to which Seller or any of the parties comprising Seller is a party or by which any of them is bound; and

7.1.3.  Seller's Federal Tax Identification Number is 13-360-3599.

**SECTION 7.2.**     **Property Representations**.     Seller represents and warrants to Purchaser that, as of the date hereof, with respect to the Property:

7.2.1.  There are no leases affecting the Property to which Seller is a party.

7.2.2.  To Seller's actual current knowledge, without investigation, there is no pending nor has Seller received any written notice of any contemplated condemnation proceeding affecting the Real Estate or any part thereof.

7.2.3.  Seller is not a "foreign person" (as defined in the Internal Revenue Code).

7.2.4.  There are no tenancies affecting the Property.

7.2.5.  To Seller's actual current knowledge, Seller has not received any written notice of any pending assessments against the Property.

7.2.6.  There are no tax certiorari proceedings or tax protest proceedings pending with respect to the Property.

7.2.7.  The Property will be delivered free and clear of all leases and Service Contracts to the extent provided for in the Sale Order.

7.2.8.  To Seller's actual current knowledge, without investigation, Seller has no outstanding obligations under the Hill Burton Act.

**SECTION 7.3.    Closing Conditions; Survival of Representations and Warranties**.  The following are conditions precedent to the obligation of Purchaser to close title under this Agreement, any or all of which may at Purchaser's option be waived in writing:

7.3.1.  Except to the extent otherwise unnecessary as a result of the Sale Order and except as may be updated by Seller in writing to maintain accuracy due to one or more factual changes arising after the date hereof (it being understood by the parties hereto that Seller shall not have the right to update any of its representations and warranties because of a factual change arising from a breach of Seller's obligations hereunder or a prior material misrepresentation by Seller), each of the representations and warranties of Seller set forth in this Agreement shall be deemed to have been repeated by Seller, at and as of the Closing Date, with the same force and effect as if first made on and as of such date.  It shall be a condition to Purchaser's obligation to close hereunder that all such representations and warranties of Seller, as the same may have been so updated by Seller, be true and correct as of the Closing Date in all material respects.    As used in this Section 7.3.1, "material" means that the failure of such representations to be true and correct as of the Closing Date results in a diminution in the value of the Property in excess of $350,000 in the aggregate (unless Seller, in its sole discretion, elects to provide Purchaser with a credit against the Purchase Price to the extent such diminution in value exceeds $350,000).

7.3.2.  Seller shall have delivered all of the documents and other items required pursuant to Section 9.1.1 of this Agreement and shall have performed all other material covenants, undertakings and obligations herein agreed to be performed by it, and complied with all material conditions required by this Agreement to be performed or complied with by Seller at or prior to the Closing.

7.3.3.  At the time of the Closing, the Title Company shall be willing to issue a fee title insurance policy in favor of Purchaser subject only to the Permitted Exceptions.

7.3.4.  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order or, if not final, not be subject to a stay on its effectiveness.

7.3.5.  The closing under the Asset Agreement shall contemporaneously occur with the Closing under this Agreement.

**SECTION 7.4.    Knowledge of Seller**.  Whenever a representation or warranty is made in this Agreement on the basis of the knowledge of Seller, such representation and warranty is made solely on the basis of the actual, as distinguished from implied, imputed or constructive, knowledge on the date that such representation and warranty is made, without inquiry or investigation or duty, of Michael Stern and Robert Reyes without attribution to such persons of facts or matters otherwise within the personal knowledge of any other officers, directors or employees of Seller, or third parties.

**SECTION 7.5.    Survival**.  The representations, warranties and certifications of Seller set forth in this Agreement shall not survive the Closing.

-14-

## ARTICLE 8
## CLOSING DATE

**SECTION 8.1.     Closing Date**.  The consummation of the transactions contemplated by this Agreement (the **"Closing"**) shall take place on the "Closing Date" set forth in the Asset Agreement (the **"Scheduled Closing Date"**).  The Scheduled Closing Date or any such other date to which the Closing may be adjourned by Seller and the Asset Purchaser under the Asset Agreement pursuant to the terms of said agreement or by mutual agreement of Seller and Purchaser (it being agreed that neither party shall have any obligation to agree to any other adjournment of the Closing except as expressly permitted pursuant to the terms of the Asset Agreement or this Agreement), is referred to herein as the **"Closing Date"**.  The Closing shall be held at the offices of Purchaser's lender or such lender's counsel provided such offices are located in New York City or Nassau County, New York, otherwise at the offices of Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck, New York 11021.  Notwithstanding anything to the contrary contained herein, if the Closing has not occurred by the date that is 20 years and 11 months after the date hereof, then this Agreement shall immediately and automatically terminate.

## ARTICLE 9
## CLOSING DOCUMENTS

**SECTION 9.1.     Closing**.

9.1.1. At the Closing, contemporaneously with Purchaser's delivery to Seller of all of the Closing Documents and funds required to be delivered by Purchaser hereunder, Seller shall deliver or cause to be delivered to Purchaser, duly executed by Seller in recordable form, where applicable, those Closing Documents to be delivered by Seller as set forth on Schedule V attached hereto and made a part hereof.

9.1.2. At the Closing, contemporaneously with Seller's delivery to Purchaser of all of the Closing Documents required to be delivered by Seller hereunder, Purchaser shall deliver or cause to be delivered to Seller those Closing Documents to be delivered by Purchaser, duly executed by Purchaser in recordable form, where applicable, as set forth on Schedule VI attached hereto and made a part hereof (the documents described in Section 9.1.1 and in this Section 9.1.2 and all other documents required to be delivered hereunder are referred to collectively as the **"Closing Documents"**) and the funds required to be delivered by Purchaser to Seller hereunder.

9.1.3. Purchaser may, upon written notice to Seller given at least three (3) Business Days prior to Closing, elect to have Seller, at no cost or expense to Seller, transfer title to Block 534, Lot 150 at the Closing to a designee of Purchaser which is under common control with Purchaser, pursuant to a separate deed in the same form as the Deed.

**SECTION 9.2.     Further Assurances**.  Seller and Purchaser each agree, at any time and from time to time at or after the Closing, to execute, acknowledge where appropriate, and deliver or cause to be executed, acknowledged and delivered such further instruments and documents and to take such other action as the other of them or the Title Company may

reasonably request to carry out the intents and purposes of this Agreement.  The provisions of this Section 9.2 shall survive the Closing.

## ARTICLE 10
## NOTICES

SECTION 10.1.    Notices.    Any notice, demand or request required or permitted to be given under this Agreement (collectively, "**Notices**") must be in writing and given to the party to whom or which such notice is being sent, (a) by nationally recognized overnight delivery service with receipt acknowledged in writing or (b) by hand delivery, against a signed receipt, in each case, addressed as follows:

| | |
|---|---|
| If to Seller, to: | Sisters of Charity Health Care System Nursing Home, Inc., d/b/a St. Elizabeth Ann's Health Care and Rehabilitation Center c/o Saint Vincent Catholic Medical Centers of New York Office of Legal Affairs 450 West 33rd Street New York, NY 10001 Attention: Chief Legal officer |
| with a copy to: | Saint Vincent Catholic Medical Centers of New York Corporate Real Estate Services 450 West 33rd Street New York, NY 10001 |
| with a copy to: | Garfunkel Wild, P.C. 111 Great Neck Road, Suite 503 Great Neck, New York 11021 Attention:  Robert A. Wild, Esq. |
| -and- | |
| | Kramer Levin Naftalis & Frankel LLP 1177 Avenue of the Americas New York, New York  10036 Attention:  Adam C. Rogoff, Esq. |
| If to Purchaser, to: | SV Land Three, LLC 1 Hunters Run Suffern, New York 10901 |
| with a copy to: | Isidor D. Friedenberg, Esq. 2 Cara Drive Suffern, New York 10901 |

Garfunkel Wild, P.C.
111 Great Neck Road, Suite 503
Great Neck, New York 11021
Attention: Judith A. Eisen, Esq.

In the event of overnight delivery or by hand delivery, notices shall be deemed effective on the next Business Day following deposit with the delivery service or following the day of such hand delivery against appropriate receipt. From time to time either party may designate another or additional addresses for all purposes of this Agreement by giving the other party no less than ten (10) days' prior notice of such change of address in accordance with the provisions of this Article 10. Each party's counsel shall have the right to deliver notices on behalf of its client and any such notice shall be effective as if sent by such party.

## ARTICLE 11
## BROKER

Seller and Purchaser each represents and warrants to the other that it has not dealt with any broker, agent, finder or like Person in connection with the transaction contemplated by this Agreement other than Loeb and Troper LLP and Cain Brothers (collectively, the "**Seller's Broker**"). Purchaser hereby indemnifies Seller and holds Seller harmless from and against any and all claims for commission, fee or other compensation by any broker, agent, finder, or like Person other than Seller's Broker who shall claim to have represented or dealt with Purchaser in connection with this Agreement and for any and all costs incurred by Seller in connection with such claims, including reasonable attorneys' fees and disbursements. The Sale Order shall provide that Purchaser shall have no liability for any and all claims for commission, fee or other compensation by Seller's Broker and any broker, agent, finder or like Person who shall claim to have represented Seller in connection with this Agreement. Subject to approval of the Bankruptcy Court, Seller agrees to pay the commission due to the Seller's Broker, if any, in connection with this transaction pursuant to a separate agreement as and when allowed by order of the Bankruptcy Court. The provisions of this Article 11 shall survive the Closing or the sooner termination of this Agreement.

## ARTICLE 12
## DEFAULTS; REMEDIES

**SECTION 12.1.** **Purchaser's Default**. If Purchaser shall (a) fail or refuse to close as required by the terms of this Agreement, or (b) otherwise be in default hereunder, which default shall continue for twenty (20) Business Days after written notice to Purchaser specifying such default, the parties hereto agree that the damages that Seller would sustain as a result thereof would be substantial, but would be difficult to ascertain. Accordingly, the parties hereto agree that in the event of such default, failure or refusal by Purchaser, Seller's sole remedy shall be to terminate this Agreement and retain the Escrow Deposit in which event Escrow Agent shall deliver the Escrow Deposit to or at the direction of Seller, in which event Purchaser and Seller shall have no further rights or obligations under this Agreement, except those expressly provided

herein to survive the termination of this Agreement.  Nothing contained in this Section shall limit or diminish Purchaser's obligations or liabilities under Sections 11 and 18.11 hereof.

SECTION 12.2.    **Seller's Default**.  If Seller shall (a) fail or refuse to close as required by the terms of this Agreement or (b) otherwise be in default hereunder, which default shall continue for twenty (20) Business Days after written notice to Seller thereof, then Purchaser shall be entitled: (1) to terminate this Agreement and receive a return of the Escrow Deposit or (2) to seek specific performance by Seller of its obligations under this Agreement provided, however, that Purchaser may only pursue such specific performance after the entry of the Sale Order approving the transactions contemplated by this Agreement.  If Purchaser shall not have commenced an action for specific performance within forty-five (45) days after the Scheduled Closing Date, Purchaser shall have waived such right and shall have been deemed to have elected clause (1) above.  Purchaser expressly agrees however, that Purchaser shall not have the right to seek or recover any actual, consequential or punitive damages or any similar additional sums or amounts against Seller for any breach occurring prior to Closing.  Nothing herein shall limit or diminish Seller's obligations or liabilities under Article 11 or Section 18.11 hereof.

SECTION 12.3.    **Cross-Default with Asset Agreement**.  Subject to any opportunity to cure as may be set forth in this Agreement or in the Asset Agreement: (i) a default in any material respect by Seller under the Asset Agreement shall be deemed a default by Seller under this Agreement, and a default in any material respect by Seller under this Agreement shall be deemed a default by Seller under the Asset Agreement; (ii) a default in any material respect by the Asset Purchaser under the Asset Agreement shall be deemed a default by Purchaser under this Agreement and a default in any material respect by Purchaser under this Agreement shall be deemed a default by Asset Purchaser under the Asset Agreement.  In addition, (x) if the Asset Purchaser is entitled to cancel or terminate the Asset Agreement or pursue its remedies thereunder or receive the return of the deposit paid thereunder in accordance with its terms, then Purchaser under this Agreement shall have the right to terminate this Agreement simultaneously therewith upon notice to Seller and/or pursue its rights and remedies as provided in this Agreement, including but not limited to the right to receive the prompt return of the Escrow Deposit, or (y) if the Seller is entitled to cancel or terminate the Asset Agreement or pursue its remedies thereunder or receive the deposit paid thereunder in accordance with its terms, then Seller under this Agreement shall have the right to terminate this Agreement simultaneously therewith upon notice to Purchaser and/or pursue its rights and remedies as provided in this Agreement, including but not limited to the right to receive the prompt payment of the Escrow Deposit.  In all events, if either this Agreement or the Asset Agreement shall terminate, the other agreement shall also simultaneously terminate.

SECTION 12.4.    **Cross-Default with Ground Lease**.  A default by Tenant (as defined in the Ground Lease) under the Ground Lease shall be deemed to be a default by Purchaser under this Agreement, and a default by Landlord (as defined in the Ground Lease) under the Ground Lease shall be deemed to be a default by Seller under this Agreement; provided, however, that the foregoing shall not apply from and after such time (if any) as title to the Premises (as defined in the Ground Lease) has been transferred by Saint Vincents Catholic Medical Centers of New York ("SVCMC") to a non-affiliate of SVCMC who is bound by the Ground Lease.

# ARTICLE 13
## CASUALTY; CONDEMNATION

**SECTION 13.1.** **Casualty**. Notwithstanding anything to the contrary at law or otherwise, Purchaser and Seller acknowledge and agree that in the event that prior to Closing, all or any portion of the Property shall be damaged (whether or not such damage or casualty is covered by insurance), Purchaser shall have no right or ability to cancel or terminate this Agreement and Purchaser shall be required to consummate the transactions contemplated hereby and proceed to Closing without abatement of the Purchase Price. Notwithstanding the foregoing, if the Receiver Agreement is not then in effect and the Property is materially damaged by fire or the elements or by any cause beyond either party's reasonable control and Seller shall not have restored the same by the Scheduled Closing Date, Purchaser shall have the right, upon notice to Seller delivered within fifteen (15) Business Days after the Scheduled Closing Date, not to consummate the transactions contemplated hereby, in which event this Agreement shall be terminated and of no further force and effect, the Escrow Deposit shall be returned to Purchaser and neither of the parties hereto shall have any rights or obligations to the other hereunder except those expressly stated to survive the termination of this Agreement; provided; however, that in the event of such a termination by Purchaser, Seller shall have the right, within 10 days after such notice from Purchaser, to notify Purchaser of Seller's election to restore the damage to the Property, in which event this Agreement shall not terminate and the Scheduled Closing Date shall be adjourned so long as Seller is diligently performing repairs to the Property. In the event Purchaser shall fail to timely deliver such notice of termination, Purchaser shall be obligated to consummate the transaction contemplated hereunder and Seller shall have no obligation to perform any repairs to the Property. Purchaser shall be entitled to receive all insurance proceeds (after deducting any reasonable costs which Seller actually and reasonably incurred to obtain such proceeds, including reasonable attorneys' fees and disbursements and any out-of-pocket costs of restoration actually incurred by Seller) in connection with any such casualty which occurs prior to the Closing Date and Purchaser shall receive a credit against the Purchase Price in the amount of any deductible under Seller's insurance (Seller hereby assigning without representation, covenant or recourse to Purchaser all of Seller's right, title and interest in and to any such net insurance proceeds). For the purposes of this Section 13.1 "materially damaged" shall mean damage to the Property which would cost more than $2,300,000.00 to restore. This paragraph shall survive the Closing. The provisions of this Section 13.1 are intended to constitute an "express provision to the contrary" as provided in Section 227 of the Real Property Law of the State of New York.

**SECTION 13.2.** **Condemnation**. If, prior to the Closing, all or a Material Part (as hereinafter defined) of the Property is taken by eminent domain, Purchaser may, by notice to Seller given within fifteen (15) Business Days after notice from Seller to Purchaser of the taking, elect to cancel this Agreement. In the event that Purchaser shall so timely elect, the Escrow Deposit shall be paid to Purchaser and neither of the parties hereto shall have any rights or obligations to the other hereunder except those expressly stated to survive the termination of this Agreement. Unless this Agreement is so canceled, or if less than a Material Part of the Property is taken by eminent domain, this Agreement shall remain in full force and effect in which event Seller shall, on the Closing Date, and upon receipt of the balance of the Purchase Price, pay to Purchaser any sums of money collected by Seller as an award for any taking by eminent domain,

after deducting any reasonable amount which Seller may have agreed or been obligated to pay in obtaining such award, including reasonable attorneys' fees and disbursements.  Seller shall not compromise or settle any such award without Purchaser's prior consent, which consent shall not be unreasonably withheld, conditioned or delayed.  In addition, Seller shall assign, transfer and set over to Purchaser without representation, covenant or recourse all of Seller's right, title and interest in and to any portion of any condemnation award not yet received by Seller.  For purposes of this Section 13.2, **"Material Part"** shall mean a taking of more than five (5%) percent of the Property.  The provisions of this Article 13 are intended to constitute an "express provision to the contrary" within the meaning of Section 5-1311 of the New York General Obligations Law.  This provision shall survive the Closing.

**ARTICLE 14**
**AS-IS; WHERE-IS;**
**DISCLAIMER; WAIVER OF CLAIMS**

**SECTION 14.1.     Disclaimers; As-Is, Where-Is Condition**.

14.1.1. PURCHASER ACKNOWLEDGES THAT IT IS A SOPHISTICATED PURCHASER, WITH EXPERIENCE IN OWNING AND OPERATING REAL PROPERTY IN THE NATURE OF THE PROPERTY.  PURCHASER REALIZES THE NATURE OF THIS TRANSACTION, UNDERSTANDS AND IS FREELY TAKING ALL RISKS, IF ANY, INVOLVED IN CONNECTION WITH THIS TRANSACTION AND ACKNOWLEDGES THAT THE SAME IS REFLECTED IN THE PURCHASE PRICE AND THE TERMS UPON WHICH PURCHASER IS WILLING TO PURCHASE AND SELLER IS WILLING TO SELL.

14.1.2. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, THE PROPERTY IS BEING SOLD BY SELLER AND PURCHASER AGREES TO ACCEPT THE PROPERTY IN "AS-IS" AND "WHERE-IS" PHYSICAL CONDITION ON THE DATE HEREOF SUBJECT TO REASONABLE WEAR AND TEAR AND SELLER'S OBLIGATIONS HEREIN TO MAINTAIN THE PROPERTY AS PROVIDED FOR IN THIS AGREEMENT.   PURCHASER ACKNOWLEDGES, REPRESENTS AND WARRANTS THAT (I) PURCHASER HAS HAD AN OPPORTUNITY TO MAKE AN INDEPENDENT INVESTIGATION AND EXAMINATION OF THE PROPERTY (AND ALL MATTERS RELATED THERETO), AND TO BECOME FULLY FAMILIAR WITH THE PHYSICAL AND ENVIRONMENTAL CONDITION OF THE PROPERTY, AND (II) EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER AND SELLER-RELATED PARTIES HAVE NOT MADE AND SHALL NOT MAKE ANY VERBAL OR WRITTEN REPRESENTATIONS, WARRANTIES OR STATEMENTS OF ANY NATURE OR KIND WHATSOEVER TO PURCHASER, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO THE ABOVE, AND, IN PARTICULAR, EXCEPT AS EXPRESSLY SET FORTH HEREIN, NO REPRESENTATIONS OR WARRANTIES HAVE BEEN MADE OR SHALL BE MADE WITH RESPECT TO (A) THE PHYSICAL CONDITION OR OPERATION OF THE PROPERTY, INCLUDING THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR CONDITIONS THEREON (INCLUDING THE PRESENCE OF ASBESTOS OR ASBESTOS-CONTAINING

KL3 2800082.18

MATERIALS OR THE RELEASE OR THREATENED RELEASE OF HAZARDOUS SUBSTANCES), (B) THE REVENUES OR EXPENSES OF THE PROPERTY, (C) THE ZONING AND OTHER LEGAL REQUIREMENTS APPLICABLE TO THE PROPERTY OR THE COMPLIANCE OF THE PROPERTY THEREWITH, (D) THE NATURE AND EXTENT OF ANY MATTER AFFECTING TITLE TO THE REAL ESTATE OR TO ANY PERSONALTY, (E) THE QUANTITY, QUALITY, OR CONDITION OF THE PERSONALTY, OR (F) ANY OTHER MATTER OR THING AFFECTING OR RELATING TO THE PROPERTY, OR ANY PORTION THEREOF, THE INTERESTS THEREIN TO BE CONVEYED TO PURCHASER PURSUANT TO THE TERMS OF THE TRANSACTIONS CONTEMPLATED HEREBY.

14.1.3. EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLER HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY, ORAL OR WRITTEN, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW OR OTHERWISE, WITH RESPECT TO THE MATTERS REFERRED TO IN SECTION 14.1.2 ABOVE AND ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IN RESPECT TO THE PROPERTY. PURCHASER DECLARES AND ACKNOWLEDGES THAT THIS EXPRESS DISCLAIMER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND IS REFLECTED IN THE CONSIDERATION PAYABLE BY PURCHASER HEREUNDER AND, AS AN INDUCEMENT FOR SELLER TO PROCEED WITH THIS TRANSACTION, PURCHASER FURTHER DECLARES AND ACKNOWLEDGES THAT THIS DISCLAIMER HAS BEEN BROUGHT TO THE ATTENTION OF PURCHASER AND EXPLAINED IN DETAIL AND THAT PURCHASER HAS VOLUNTARILY AND KNOWINGLY CONSENTED THERETO.

14.1.4. RELEASE. WITHOUT LIMITING THE PROVISIONS OF THIS ARTICLE AND NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT EXCEPT FOR THE REPRESENTATIONS, COVENANTS AND OBLIGATIONS OF SELLER EXPRESSLY SET FORTH IN THIS AGREEMENT, UPON PURCHASER'S EXECUTION OF THIS AGREEMENT, PURCHASER HEREBY RELEASES SELLER AND ITS MEMBERS, PARTNERS, PARENTS, TRUSTEES, AFFILIATED AND SUBSIDIARY ENTITIES AND ALL OF THEIR RESPECTIVE MEMBERS, OFFICERS, DIRECTORS, SHAREHOLDERS, TRUSTEES, PARTNERS, EMPLOYEES, MANAGERS AND AGENTS (COLLECTIVELY, "SELLER'S AGENTS") FROM ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES WHETHER SUIT IS INSTITUTED OR NOT) WHETHER KNOWN OR UNKNOWN, LIQUIDATED OR CONTINGENT (HEREINAFTER COLLECTIVELY CALLED THE "CLAIMS") ARISING FROM OR RELATING TO: (i) ANY DEFECTS (PATENT OR LATENT), ERRORS OR OMISSIONS IN THE DESIGN OR CONSTRUCTION OF THE IMPROVEMENTS WHETHER THE SAME ARE THE RESULT OF NEGLIGENCE OR OTHERWISE; AND/OR (ii) THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO THE BUILDING FACADE, ENVIRONMENTAL AND OTHER PHYSICAL CONDITIONS AFFECTING THE PROPERTY WHETHER THE SAME ARE A RESULT OF NEGLIGENCE OR OTHERWISE, EXCLUDING CLAIMS AGAINST SELLER FOR ACTS OF FRAUD, GROSS NEGLIGENCE

AND WILLFUL MISCONDUCT OR INTENTIONAL MISREPRESENTATION. THE RELEASE SET FORTH IN THIS SECTION 14.1.4 SPECIFICALLY INCLUDES, WITHOUT LIMITATION, ANY CLAIMS UNDER ANY ENVIRONMENTAL REQUIREMENTS OR UNDER THE AMERICANS WITH DISABILITIES ACT OF 1990, AS ANY OF THE SAME MAY BE AMENDED FROM TIME TO TIME AND ANY REGULATIONS, ORDERS, RULES OF PROCEDURES OR GUIDELINES PROMULGATED IN CONNECTION THEREWITH, REGARDLESS OF WHETHER THEY ARE IN EXISTENCE ON THE DATE OF THIS AGREEMENT. PURCHASER ACKNOWLEDGES THAT PURCHASER IS GRANTING THIS RELEASE OF ITS OWN VOLITION AND AFTER CONSULTATION WITH PURCHASER'S COUNSEL.

**SECTION 14.2.** **Survival**. The provisions of this Article 14 shall survive the Closing.

## ARTICLE 15
## ENVIRONMENTAL STUDY; ASSUMPTION OF OBLIGATIONS

**SECTION 15.1.** **Environmental Study**. Seller and Purchaser acknowledge that Seller engaged Preferred Environmental Services, Inc. to perform a Phase I Environmental Assessment with respect to the Property (the "**Environmental Study**"). Seller has provided Purchaser with a copy of the Environmental Study. Purchaser acknowledges that Seller shall be permitted to provide copies of the Environmental Study to any other party, including any other potential purchaser of the Property. At Closing, Purchaser shall provide Seller with a payment equal to $3,250.00 plus out-of-pocket expenses of the environmental consultant (the cost of the Environmental Study).

**SECTION 15.2.** **Intentionally deleted**.

**SECTION 15.3.** **Waiver**. Without limitation of Article 14 hereof, Purchaser, on behalf of itself and its partners, members, affiliates, officers, successors and assigns, hereby, effective as of the Closing Date or commencement of the term of the Receiver Agreement, whichever is earlier, waives, releases, acquits and forever discharges Seller, its officers, directors, partners, members, shareholders, employees, agents, representatives and any other person acting on behalf of Seller, and the affiliates and successors and assigns of any of the preceding, of and from any and all claims, actions, causes of action, demands, rights, damages, costs, expenses and compensation whatsoever, direct or indirect, known or unknown, foreseen or unforeseen, which Purchaser or any of its partners, members, officers, affiliates, successors and assigns now has or which may arise in the future on account of or in any way related to or in connection with any past, present or future physical characteristic or condition of the Property, including, without limitation, any Hazardous Substances in, at, on, under or related to the Property, or any violation or potential violation of any Environmental Law.

**SECTION 15.4.** **Intentionally omitted**.

# ARTICLE 16
## ESCROW

**SECTION 16.1.** **Escrow Terms**. The Escrow Deposit shall be held in escrow by Escrow Agent in accordance with the terms of the Escrow Agreement.

# ARTICLE 17
## BANKRUPTCY COURT MATTERS

**SECTION 17.1.** **Competing Transaction**.

17.1.1. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or otherwise better competing bids (each a **"Competing Bid"**) in accordance with the Bidding Procedures Order (as such term is defined in the Asset Agreement). If one or more Competing Bids are received, Seller shall conduct an auction of the Property in accordance with the Bidding Procedures Order (the **"Auction"**).

17.1.2. Seller is permitted to cause its Representatives to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person (in addition to Purchaser and Representatives) in connection with any sale or other disposition of all or any part of the Property. In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Property and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Property to prospective purchasers.

**SECTION 17.2.** **Break-Up Fee**.

17.2.1. In consideration for (i) Purchaser having expended, and continuing to expend, considerable time and expense in connection with this Agreement and the negotiation thereof and (ii) the benefit conferred on Seller by Purchaser's willingness to enter into this Agreement, in the event that a Competing Bid is accepted by Seller and the Bankruptcy Court issues an order approving the transaction with the party making such Competing Bid (an **"Alternative Transaction"**), Purchaser shall be entitled to a break-up fee in an amount equal to two percent (2%) of the Purchase Price (the **"Break-Up Fee"**), which Break-up Fee shall be payable in accordance with Section 17.2 .2 below.

17.2.2. The Break-Up Fee shall be paid to Purchaser, without further order of the Bankruptcy Court, (i) upon the consummation of an Alternative Transaction, or (ii) if no Alternative Transaction closes, then Purchaser shall be paid the Break-Up Fee with priority as an expense of the administration of the Debtors' estates (A) pursuant to, and in connection with, any confirmed plan of reorganization or liquidation of the Seller; or (B) if no plan of reorganization or liquidation for the Seller is confirmed, as and if provided by the Bankruptcy Code or Order of the Bankruptcy Court. All valid obligations of Seller to Purchaser, shall be entitled to priority as expenses of the administration of the Debtors' estates.

17.2.3. If an Order is entered by the Bankruptcy Court approving a Competing Bid, (i) this Agreement shall automatically be deemed terminated, (ii) the Escrow Deposit shall be promptly returned to Purchaser, (iii) Purchaser shall be entitled to the Break Up Fee as set forth in this Agreement and (iv) neither of the parties hereto shall have any further rights or obligations to the other hereunder except those expressly stated to survive the termination of this Agreement; provided, however, if Purchaser successfully appeals any such Order approving a Competing Bid, Purchaser agrees it will either waive any entitlement it may have to the Break-up Fee hereunder, or agree to reinstate this Agreement and consummate the transaction contemplated hereunder in accordance with the terms set forth in this Agreement (as the same may hereafter be modified or amended pursuant to the provisions of this Agreement or by Purchaser at the Auction).

17.2.4. Seller acknowledges and agrees that (a) the approval of the Break-Up Fee is an integral part of the transactions contemplated herein, (b) in the absence of Seller's obligation to pay the Break-Up Fee, Purchaser would not have entered into this Agreement, (c) the entry of Purchaser into this Agreement is necessary for preservation of the estate of Seller and is beneficial to Seller, and (d) the Break-Up Fee is reasonable in relation to Purchaser's efforts and to the magnitude of the Contemplated Transactions.

17.2.5. The provisions of this Agreement regarding the payment of the Break-Up Fee shall be subject to the approval of the Bankruptcy Court as part of the Bidding Procedures Order.

17.2.6. If the Break-Up Fee payable under this Section 17.2 shall not be approved by the Bankruptcy Court, Purchaser shall have the right, but not the obligation, to terminate this Agreement within three (3) Business Days after a hearing before the Bankruptcy Court at which the Bankruptcy Court considers but does not approve the Break-Up Fee by delivery of written notice to Seller, and receive the prompt return of the Escrow Deposit, together with all accrued interest thereon, and upon the payment thereof to Purchaser, neither party shall have any further obligations to the other. If Purchaser does not timely terminate this Agreement in accordance with the foregoing, Purchaser's termination right under this Section 17.2.6 shall be null and void and of no further force and effect.

SECTION 17.3.    **Bankruptcy Court Filings**.  As promptly as practicable following the execution of this Agreement, Seller shall, at its sole costs and expense, file with and seek the approval of the Bankruptcy Court for the transactions contemplated hereby including the Break-Up Fee and entry of the Bidding Procedures Order.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order including furnishing affidavits or other Documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  In the event the entry of the Bidding Procedures Order or Sale Order shall be appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.

SECTION 17.4.    **Notice of Sale**.  Notice of the sale of the Property contemplated in this Agreement shall be served in accordance with the Bidding Procedures Order.

## ARTICLE 18
## MISCELLANEOUS

**SECTION 18.1.** **Entire Agreement**. This Agreement, the Exhibits and Schedules annexed hereto, and any contemporaneously executed agreements, are the entire agreement between Seller and Purchaser concerning the sale of the Property and all understandings and agreements heretofore had or made between the parties hereto are merged in this Agreement which, together with aforementioned agreements and other items, alone fully and completely expresses the agreement of the parties hereto.

**SECTION 18.2.** **Modification**. Except as otherwise provided herein, this Agreement may not be changed, modified, supplemented or terminated, except by an instrument executed by the parties hereto which are or will be affected by the terms of such change, modification, supplement or termination. Either party hereto may waive any of the terms and conditions of this Agreement made for its benefit, provided such waiver is in writing and signed by the party waiving such term or condition.

**SECTION 18.3.** **Binding Agreement**. Subject to the provisions of this Agreement, the terms, covenants, agreements, conditions, representations and warranties contained in this Agreement shall inure to the benefit of and be binding upon the respective parties hereto. This Agreement shall not inure to the benefit of or be enforceable by any other Person.

**SECTION 18.4.** **Assignment**. Without the express written consent of Seller (which may be granted or withheld in Seller's sole discretion), this Agreement may not be assigned by Purchaser, including any assignment by operation of law. Except as provided for hereunder, any assignment by Purchaser without Seller's prior written consent shall be deemed null and void ab initio and shall be a material default entitling Seller, at its option, to exercise any of its powers, privileges, rights or remedies under this Agreement or at law or in equity. If Seller shall consent to an assignment, any such assignee shall assume all duties and obligations of Purchaser pursuant to this Agreement; provided, however, that any such assignment of Purchaser's interest in this Agreement shall not relieve the original Purchaser of any duties, obligation or liabilities hereunder. Any change in control of Purchaser or of any of the direct or indirect ownership interests in Purchaser, at any level or tier of ownership, whether in one transaction or a series of transactions, shall constitute an assignment for purposes of this Section 18.4. Notwithstanding the foregoing, Purchaser may not assign its interest in this Agreement to any entity unless such entity can satisfy the requirements of adequate protection of future performance for the assignment of any contracts or leases as required by section 365 of the Bankruptcy Code.

**SECTION 18.5.** **No Press Releases**. Intentionally Omitted.

**SECTION 18.6.** **Illegality**. If any term or provision of this Agreement or the application thereof to any Person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by Law.

**SECTION 18.7.    Choice of Law.**    EXCEPT IN SUCH MATTERS AS ARE GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES ANNEXED HERETO, SHALL BE GOVERNED BY, INTERPRETED UNDER, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

**SECTION 18.8.    Construction**.  The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement.  Unless stated to the contrary, all references to Articles, Sections, paragraphs or clauses herein shall be to the specified Article, Section, paragraph or clause of this Agreement, and all references to Exhibits and Schedules shall be to the specified Exhibits and Schedules attached hereto.  All Exhibits and Schedules attached hereto are made a part hereof.  All terms defined herein shall have the same meaning in the Exhibits and Schedules, except as otherwise provided therein.  All references in this Agreement to "**this Agreement**" shall be deemed to include the Exhibits and Schedules attached hereto.  The terms "**hereby**", "**hereof**", "**hereto**", "**hereunder**" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used.  Whenever in this Agreement provision is made for the payment of attorneys' fees, such provision shall be deemed to mean reasonable attorneys' fees and paralegals' fees.  The term "**including**" when used herein shall mean "**including, without limitation**."  Whenever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.

**SECTION 18.9.    Binding Effect; Assignment; Successors and Assigns.**    This Agreement shall apply to, be binding in all respects upon and inure to the benefit of the parties and their respective successors, administrators and permitted assigns.  A successor to Seller shall include Seller as a reorganized debtor.  Except to the extent provided for in Section 18.4 of this Agreement, no assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of Law or otherwise) without the prior written consent of Purchaser and Seller and any attempted assignment without the required consents shall be void.  No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations.  Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.  This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors, administrators and permitted assigns.

**SECTION 18.10.    Ambiguities**.  Each party acknowledges that it and its counsel have reviewed this Agreement, and the parties hereby agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

KL3 2800082.18

**SECTION 18.11. Expenses**. If any legal action or other proceeding is brought for the enforcement of this Agreement or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover its fees and costs, including reasonable attorneys' fees, court costs and other costs incurred in such action or proceeding, in addition to any other relief to which it or they may be entitled. The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

**SECTION 18.12. Counterparts**. This Agreement may be executed in counterparts, each of which together shall be deemed to be an original and all of which shall constitute one and the same Agreement. Any counterpart may be executed by facsimile or PDF signature and such facsimile or PDF signature shall be deemed an original.

**SECTION 18.13. Waiver of Trial by Jury**. THE RESPECTIVE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

**SECTION 18.14. Third Party Beneficiaries**. Except as expressly set forth herein, no Person other than the parties hereto, shall have any rights or claims under this Agreement.

**SECTION 18.15. Jurisdiction**.

18.15.1. FOR THE PURPOSES OF ANY SUIT, ACTION OR PROCEEDING INVOLVING THIS AGREEMENT, PURCHASER AND SELLER EACH HEREBY EXPRESSLY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT AND PURCHASER AND SELLER EACH AGREES THAT SUCH COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY SUCH SUIT, ACTION OR PROCEEDING COMMENCED BY EITHER PARTY.

18.15.2. PURCHASER AND SELLER EACH HEREBY IRREVOCABLY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT BROUGHT IN ANY FEDERAL OR STATE COURT SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK AND HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

18.15.3. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

**SECTION 18.16. Seller's Constituents**. Intentionally Omitted.

KL3 2800082.18

**SECTION 18.17.** **Purchaser's Constituents**. Intentionally Omitted.

**SECTION 18.18.** **No Recording**. Purchaser covenants and agrees that it has no right and in no event will Purchaser record or cause to be recorded this Agreement or any memorandum hereof or affidavit, assignment or other document relating to this Agreement prior to the Closing and, if Purchaser breaches the provisions of this Section, there shall be no cure period (notwithstanding anything to the contrary contained in Section 12.1 hereof), and Seller shall have the option of immediately terminating this Agreement and retaining the Escrow Deposit as its liquidated damages.

**SECTION 18.19.** **Not an Offer**. Notwithstanding anything herein to the contrary, it is to be strictly understood and agreed that (a) the submission by Seller to Purchaser of any drafts of this Agreement or any correspondence with respect thereto shall (i) be deemed submission solely for Purchaser's consideration and not for acceptance and execution, (ii) have no binding force or effect, (iii) not constitute an option for the purchase of the Property or a lease or conveyance of the Property by Seller to Purchaser and (iv) not confer upon Purchaser or any other party any title or estate in the Property, (b) the terms and conditions of this Agreement shall not be binding upon either party hereto in any way unless and until it is unconditionally executed and delivered by both parties in their respective sole and absolute discretion and all conditions precedent to the effectiveness thereof including, but not limited to, the delivery of the Initial Deposit to Escrow Agent, shall have been fulfilled or waived, and (c) if this Agreement is not so executed and delivered for any reason whatsoever (including, without limitation, either party's willful or other refusal to do so or bad faith), neither party shall be liable to the other with respect to this Agreement on account of any written or parole representations, negotiations, any legal or equitable theory (including, without limitation, part performance, promissory estoppel, or undue enrichment) or otherwise.

**SECTION 18.20.** **Failure of Deposit**. If the payment made on account of the Escrow Deposit is by check, and if such check fails collection in due course, there shall be no cure period (notwithstanding anything to the contrary contained in Section 12.1 hereof), and Seller, at its option, may immediately declare this Agreement null, void and of no force and effect, and may pursue its remedies against Purchaser upon such check or in any other manner permitted by law, such remedies being cumulative.

**SECTION 18.21.** **No Waiver**. The failure of either party hereto to seek redress for any breach, or to insist upon the strict performance, of any covenant or condition of the Agreement by the other shall not be, or be deemed to be, a waiver of the breach or failure to perform (unless the time specified herein for the exercise of such right, or satisfaction of such condition, has expired), nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms hereof from constituting a default hereunder.

**SECTION 18.22.** **Severability**. If any term, condition or provision of this Agreement or the application thereof to any circumstance or party hereto, is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement and the applicability of such term, condition or provision to other persons or circumstances shall not be affected thereby. Each term, condition or provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

SECTION 18.23.  **No Survival**.  The delivery and acceptance of the deed at the Closing shall be deemed to constitute full compliance by Seller with all of the terms, conditions and covenants of this Agreement on Seller's part to be performed, and, except as expressly set forth in this Agreement, the representations, warranties, covenants or other obligations of Seller set forth in this Agreement shall not survive the Closing, and no action based thereon shall be commenced after the Closing.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.
SIGNATURES FOLLOW ON THE NEXT PAGE.**

KL3 2800082.18

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

SELLER

SISTERS OF CHARITY HEALTH CARE
SYSTEM NURSING HOME, INC., D/B/A ST.
ELIZABETH ANN'S HEALTH CARE AND
REHABILITATION CENTER

By: _Mark E. Toney_

     Name: MARK E. TONEY

     Title: CRO

PURCHASER

SV LAND THREE, LLC

By: _____

     Name: Daryl Hagler

     Title: Managing Member

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

SELLER

SISTERS OF CHARITY HEALTH CARE SYSTEM NURSING HOME, INC., D/B/A ST. ELIZABETH ANN'S HEALTH CARE AND REHABILITATION CENTER

By: _____

      Name:

      Title:

PURCHASER

SV LAND THREE, LLC

By: _____

      Name: Daryl Hagler

      Title:  Managing Member

-30-

# BILL OF SALE

THIS BILL OF SALE is made and executed as of the _____ day of _____, 20___ from
_____, having an address at
_____, ("Seller"), to SV Land Three, LLC having an address at 1 Hunters Run, Suffern, New York 10901 ("Purchaser").

FOR AND IN CONSIDERATION of the sum of Ten Dollars and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Seller does hereby bargain, sell, convey, deliver, assign, transfer, set over and grant to Purchaser, and to their successors and assigns, all right, title and interest of Seller in and to any and all fixtures, machinery, equipment, furniture and other tangible personal property not owned by any tenant or other occupant of the Property (the "Personalty") affixed or attached to, installed or placed in or upon and to be used for or usable in any present or future enjoyment, occupancy or operation of the building and related improvements comprising the property located at and commonly known as _____, New York.

Title to all the Personalty shall pass to Purchaser upon delivery of this Bill of Sale. Any sales tax, if any, payable in respect of the Personalty shall be the sole responsibility of Purchaser.

Seller makes no warranties or representations whatsoever, including, without limitation, with respect to quality, fitness or merchantability of the Personalty; the Personalty is being transferred "AS IS" physical condition and this Bill of Sale is made without recourse to or covenant by Seller. The Personalty shall be transferred from Seller to Purchaser free and clear of any liens or encumbrances to the extent provided for in the Sale Order (as defined in that certain Purchase and Sale Agreement dated as of _____, 2011 between Purchaser and Seller).

This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the day and year first written above.

_____

By: _____
Name: MARK E. TONEY
Title: CRO

# SCHEDULE I TO PURCHASE AND SALE AGREEMENT

## DEFINITIONS

For all purposes of this Agreement, the following terms shall have the respective meanings specified below:

"**Additional Deposit**" shall have the meaning set forth in Section 2.2.3.

"**Affiliate**" means a Person that: (a) directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with a specified Person; (b) is a director or officer of a specified Person or of an Affiliate of such specified Person within the meaning of clause (a) above; (c) is a partner, member, beneficiary of a trust or other owner of any stock or other evidence of beneficial ownership in a specified Person or an Affiliate of such specified Person within the meaning of clause (a) above; or (d) is related as an ancestor, descendant, sibling, or is the current spouse of a specified Person or an Affiliate of such specified Person within the meaning of clause (a) above.

"**Agreement**" means this Agreement, the Exhibits and Schedules and all amendments, modifications and extensions hereto and thereto.

"**Alternative Transaction**" shall have the meaning set forth in Section 17.2.1.

"**Apportionment Date**" shall have the meaning set forth in Section 4.1.

"**Auction**" shall have the meaning set forth in Section 17.1.1.

"**Break Up Fee**" shall have the meaning set forth in Section 17.2.1.

"**Business Day**" means each day, except Saturdays, Sundays and all days observed by the federal government as legal holidays.

"**Closing**" shall have the meaning set forth in Section 8.1.

"**Closing Date**" shall have the meaning set forth in Section 8.1.

"**Closing Documents**" shall have the meaning set forth in Section 9.1.2.

"**Closing Effective Date**" shall have the meaning set forth in the Asset Agreement.

"**Competing Bid**" shall have the meaning set forth in Section 17.1.1.

"**Condemnation**" shall have the meaning set forth in Section 2.1.

"**Deed**" means the deed to the Real Estate to be delivered by Seller to Purchaser pursuant to <u>Schedule V</u>.

"**Environment**" shall mean soil, surface waters, ground waters, land, stream sediments, surface or subsurface strata and ambient air.

"**Environmental Laws**" shall mean all federal, state or local laws, regulations, guidelines, codes, permits, rules, administrative and judicial decisions, directives, decrees, orders, ordinances, and any other legal requirements relating to the protection of human health and safety or the Environment whenever in effect.

"**Environmental Study**" shall have the meaning set forth in Section 15.1.

"**Escrow Agent**" shall mean Garfunkel Wild, P.C.

"**Escrow Agreement**" shall have the meaning set forth in Section 2.2.3.

"**Escrow Deposit**" shall have the meaning set forth in Section 2.2.3.

"**Existing Lender**" shall have the meaning set forth in Section 3.4.

"**Existing Mortgage**" shall have the meaning set forth in Section 3.4.

"**Final Order**" shall mean an order, ruling, or judgment of the Bankruptcy Court (a) that is in full force and effect; (b) that is not stayed; (c) as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing is then pending; and (d) is no longer subject to review, reversal, modification, or amendment by appeal or writ of certiorari; provided, however, that an order will be deemed a Final Order notwithstanding the filing of a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or other applicable rules.

"**Governmental Authority**" shall have the meaning set forth in Section 3.3.7.

"**Ground Lease**" shall mean that certain Lease of Land, Building and Equipment dated as of the date hereof by and between Saint Vincents Catholic Medical Centers of New York and SV Land I, LLC.

"**Hazardous Substances**"  shall mean all materials and substances now or hereafter subject to any Environmental Laws, including (i) all substances which are designated pursuant to Section 311(b)(2)(A) of the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 1251, et seq., (ii) any element, compound, mixture, solution, or substance which is designated pursuant to Section 102 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq., (iii) any hazardous waste having the characteristics which are identified under or listed pursuant to Section 3001 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., (iv) any toxic pollutant listed under Section 307(a) of FWPCA, (v) any hazardous air pollutant which is listed under Section 112 of the Clean Air Act, 42 U.S.C. § 7401, et seq., (vi) any imminently hazardous chemical substance or mixture with respect to which action has been taken pursuant to Section 7 of the Toxic Substances Control Act, 15 U.S.C. § 2601, et seq., (vii) "hazardous materials" within the meaning of the Hazardous Materials Transportation Act, 49 U.S.C. § 5101, et seq., (viii) any element or compound contained in the list of hazardous substances adopted by the United States Environmental

Protection Agency ("EPA") or by the New York Department of Environmental Conservation ("DEC"), (ix) petroleum or petroleum by-products, (x) asbestos in any form which is or could become friable, (xi) any radioactive material or substance, (xii) lead based paint, (xiii) transformers or other equipment which contain polychlorinated biphenyls, (xiv) all toxic wastes, hazardous wastes and hazardous substances as defined by, used in, controlled by, or subject to all implementing regulations adopted and publications promulgated pursuant to the foregoing statutes, (xv) any other hazardous or toxic substance or pollutant identified in or regulated under any other applicable federal, state or local Environmental Laws and (xvi) any chemical, material, gas or substance that does or may pose a hazard to the Environment, health or safety.

"**Initial Deposit**" shall have the meaning set forth in Section 2.2.2.

"**Law**" means any law, rule, code, regulation, ordinance, moratorium, injunctive proceeding, restriction or similar matter imposed by any federal, state, municipal or local government or any public or quasi-public board, authority, commission, agency or department thereof having jurisdiction over the Property, or any portion thereof and/or Purchaser or Seller.

"**Liens**" shall have the meaning set forth in Section 3.1.1.

"**Material Part**" shall have the meaning set forth in Section 13.2.

"**Net Proceeds**" shall have the meaning set forth in Section 3.1.1.

"**Non-Permitted Exceptions**" shall have the meaning set forth in Section 3.2.1.

"**Notices**" shall have the meaning set forth in Section 10.1.

"**Permitted Exceptions**" shall have the meaning set forth in Section 3.3.

"**Person**" means an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, trust, unincorporated organization or the federal government or any state or local government or any agency or political subdivision thereof.

"**Personalty**" shall have the meaning set forth in Section 2.1.1.

"**Property**" shall have the meaning set forth in Section 2.1.1.

"**Purchase Price**" shall have the meaning set forth in Section 2.2.1.

"**Purchaser**" means SV Land Three, LLC.

"**Purchaser-Related Parties**" means, individually and collectively, and to the extent applicable, (i) Purchaser, (ii) Affiliates of Purchaser, and (iii) the shareholders, officers, directors, employees, members and constituent partners of Purchaser and/or of any direct or indirect partner or member of or corporate joint-venturer with Purchaser, and/or of any Affiliate of Purchaser.

KL3 2800082.18

"**Real Estate**" shall have the meaning set forth in Section 2.1.1.

"**Receiver Agreement**" shall have the meaning set forth in Section 5.1.

"**RE Tax Returns**" shall have the meaning set forth in Section 4.5.

"**Sale Order**" means an order of the Bankruptcy Court substantially in the form of attached to the Asset Agreement as <u>Exhibit B</u> thereto, with such changes (if any) made by Seller as are reasonably acceptable to Purchaser and Seller.

"**Scheduled Closing Date**" shall have the meaning set forth in Section 8.1.

"**Seller**" shall mean Sisters of Charity Health Care System Nursing Home, Inc., d/b/a St. Elizabeth Ann's Health Care and Rehabilitation Center.

"**Seller-Related Parties**" means individually and collectively, Seller and its officers, directors, members, employees, agents, representatives and contractors and Affiliates of Seller.

"**Seller's Broker**" shall have the meaning set forth in Article 11.

"**Service Contracts**" means any written or oral service, maintenance, landscaping, operating, repair, equipment lease, supply, construction or other similar contract or agreement relating to the operation or maintenance of the Property, together with all amendments and modifications thereof in effect on the date hereof. Notwithstanding anything to the contrary, Purchaser shall not be obligated assume any Service Contracts except for such Service Contracts, if any, it designates at any time prior to the Closing.

"**Title Company**" shall have the meaning set forth in Section 3.1.

"**Transfer Taxes**" shall have the meaning set forth in Section 4.4.

"**Unavoidable Delay**" shall mean any delays due to strikes, acts of God, governmental restrictions, enemy action, civil commotion, fire, unavoidable casualty or other causes similarly beyond the control of Seller; provided, however, that any lack of funds shall not be deemed a cause beyond the control of Seller.

"**Violations**" shall have the meaning set forth in Section 3.3.7.

KL3 2800082.18

**SCHEDULE II**

**PROPERTY DESCRIPTION**

**As to Lot 120:**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Staten Island, County of Richmond, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northeasterly side of Tompkins Avenue (75 feet wide (70 feet wide record)), distant 680.77 (680.61 record) feet northwesterly, as measured along said northeasterly side of Tompkins Avenue, from the point formed by the intersection of said northeasterly side of Tompkins Avenue with the northwesterly side of Vanderbilt Avenue,

RUNNING THENCE North 67 degrees 12 minutes 20 seconds East 278.13 feet to a point;

THENCE North 21 degrees 03 minutes 53 seconds West 349.85 feet to a point;

THENCE South 67 degrees 05 minutes 03 seconds West 98.48 feet to a point;

THENCE North 27 degrees 38 minutes 37 seconds West 125.39 feet to a point;

THENCE South 67 degrees 20 minutes 20 seconds West 64.58 feet to a point;

THENCE North 22 degrees 25 minutes 41 seconds West 55.08 feet to a point;

THENCE South 63 degrees 07 minutes 37 seconds West 99.85 feet to a point on said northeasterly side of Tompkins Avenue;

THENCE along said northeasterly side of Tompkins Avenue South 21 degrees 03 minutes 53 seconds East 522.79 feet to the point or place of BEGINNING.


**As to Lot 150:**

ALL that certain plot, piece or parcel of land with the buildings and improvements thereon erected, situate, lying and being in the Borough of Staten Island, County of Richmond, City and State of New York, bounded and described as follows:

BEGINNING at a point which bears North 67 degrees 12 minutes 20 seconds East, a distance of 192.97 feet from a point on the northeasterly side of Tompkins Avenue (75.0 feet wide); which point is distant 680.77 feet northwesterly, as Measured along said northeasterly side of Tompkins Avenue, from the point formed by the intersection of said northeasterly side of Tompkins Avenue with the northwesterly side of Vanderbilt Avenue,

RUNNING THENCE North 67 degrees 12 minutes 20 seconds East 85.16 feet to a point;

THENCE North 21 degrees 03 minutes 53 seconds West 349.85 feet to a point;

THENCE North 67 degrees 05 minutes 03 seconds East 356.37 feet to a point;

THENCE South 22 degrees 14 minutes 25 seconds East 97.51 feet to a point;

THENCE South 67 degrees 43 minutes 10 seconds West 197.64 feet to a point;

THENCE South 21 degrees 44 minutes 11 seconds East 378.58 feet to a point;

THENCE South 41 degrees 21 minutes 09 seconds West 112.32 feet to a point;

THENCE North 46 degrees 39 minutes 03 seconds West 54.76 feet to a point;

THENCE South 68 degrees 25 minutes 15 seconds West 123.04 feet to a point;

THENCE North 22 degrees 55 minutes 42 seconds West 120.08 feet to the point or place of BEGINNING.

EXCLUDING from the above described parcel is the following land:

BEGINNING at a point which bears North 67 degrees 12 minutes 20 seconds East, a distance of 192.97, South 22 degrees 55 minutes 42 seconds East, a distance of 120.08 feet; North 68 degrees 25 minutes 15 seconds East, a distance of 123.04 feet; South 46 degrees 39 minutes 03 seconds East, a distance of 54.76 feet; North 41 degrees 21 minutes 09 seconds East, a distance of 112.32 feet; North 21 degrees 44 minutes 11 seconds West, a distance of 286.58 feet from a point on the northeasterly side of Tompkins Avenue (75.0 feet wide) distant 680.77 feet northwesterly, as Measured along said northeasterly side of Tompkins Avenue, from the point formed by the intersection of said northeasterly side of Tompkins Avenue with the northwesterly side of Vanderbilt Avenue;

RUNNING THENCE South 68 degrees 15 minutes 49 seconds West 105.70 feet to a point;

THENCE North 21 degrees 44 minutes 11 seconds West 165.00 feet to a point;

THENCE North 68 degrees 15 minutes 49 seconds East 105.70 feet to a point;

THENCE South 21 degrees 44 minutes 11 seconds East 165.00 feet to the point or place of BEGINNING.

**<u>SCHEDULE III</u>**

**<u>ESCROW AGENT'S WIRING INSTRUCTIONS</u>**


Bank Information:                    Citibank, N.A.

Receiver/ABA Number:                 02100 0089

Beneficiary Name:                    Garfunkel Wild, P.C., Attorney Trust Account

Checking Account Number:             9955527033

<u>**SCHEDULE IV**</u>

<u>**TITLE ENCUMBRANCES**</u>

1.      The premises have been designated a Landmark Site and Landmark by Notice of Designation recorded October 16, 1989 in Reel 2209 page 233 and are therefore subject to the restricted use as provided in the New York City Charter and Title 25, Chapter 3 of the New York City Administrative Code.

2.      Easement Agreement between Sisters of Charity Health Care System Nursing Home, Inc. and Bayley Seton Hospital dated as of April 30, 1992, recorded May 1, 1992 in Reel 3500 Page 1.

3.      Easement Agreement between Sisters of Charity Health Care System Nursing Home, Inc. and consolidated Edison Company of New York, Inc. dated February 5, 1991, recorded June 4, 1992 in Reel 3572 Page 139.

4.      Waiver of Legal Grade made by Sisters of Charity Health Care System Nursing Home, Inc. to The City of New York dated December 4, 1992, recorded January 11, 1993 in Reel 4067 Page 102, and re-recorded in Reel 4067 Page 109.

5.      Access Road and Frontage Space Agreement made among The New York Foundling, Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care and Rehabilitation Center and Bayley Seton Hospital, by Saint Vincents Catholic Medical Centers of New York, its successor in interest, dated August 1, 2007 and recorded August 10, 2007 as Document No. 211755 as re-recorded on March 3, 2009 as Document No. 282897.

6.      Declaration of Easement made by Saint Vincents Catholic Medical Centers of New York to Sisters of Charity Health Care Systems Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care and Rehabilitation Centers, dated August 28, 2007 and recorded February 28, 2008 as Document No. 241611 as amended by Document No. 301509.

7.      Utility Easement Agreement made between Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care and Rehabilitation Center and Saint Vincents Catholic Medical Centers of New York, dated August 28, 2007 and recorded February 28, 2008 as Document No. 241612, as amended by Document No. 301510.

8.      Temporary Utility and Remediation Agreement made between Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care and Rehabilitation Center and Saint Vincents Catholic Medical Centers of New York, dated August 28, 2007 and recorded February 28, 2008 as Document No. 241613, as amended by Document No. 301508.

9.	Frontage Space Restrictive Declaration dated August 10, 2007 by Bayley Seton Hospital by Saint Vincent Catholic Medical Centers of New York recorded August 10, 2007 as Document No. 211756 as re-recorded on March 3, 2009 as Document No. 282899.

10.	Declaration of Zoning Lot Restrictions recorded August 10, 2007 as Document No. 211759.

	With regard thereto:

	Amended and Restated Declaration of Zoning Lot Restrictions recorded February 27, 2009 as Document No. 282496.

	With regard thereto:

	a.	Waiver of Declaration of Zoning Lot Restrictions recorded August 10, 2007 as Document No. 211754.

	b.	Waiver of Declaration of Zoning Lot Restrictions recorded July 14, 2009 as Document No. 299637.

	c.	Waiver of Declaration of Zoning Lot Subdivision and Restrictions recorded August 17, 2007 in Document No. 213085; recorded August 23, 2007 in Document No. 213927 and recorded July 14, 2009 as Document No. 299638.

11.	Declaration of Zoning Lot Subdivision and Restrictions dated as of July 23, 2007 and recorded September 8, 2009 as Document No. 307704.

12.	Limited Utility Easement Agreement made between The New York Foundling, Sisters of Charity Health Care System Nursing Home Inc. d/b/a St. Elizabeth Ann's Health Care and Rehabilitation Center and Saint Vincent Catholic Medical Centers of New York dated August 1, 2007 recorded August 10, 2007 in Document No. 211757 and re-recorded on March 4, 2009 in Document No. 282898.

13.	Declaration dated as of March 19, 2009 by Sisters of Charity Health Care System Nursing Home Inc., d/b/a St. Elizabeth Ann's Health Care and Rehabilitation Center recorded March 26, 2009 in Document No. 285337.

	With regard thereto:

	a.	Waiver of Declaration by Party in Interest recorded March 26, 2009 Document No. 285335.

	b.	Waiver of Declaration by Party in Interest recorded March 26, 2009 Document No. 285336.

14.	Declaration dated as of March 19, 2009 by Sisters of charity Health Care System Nursing Home Inc., d/b/a St. Elizabeth Ann's Health Care and Rehabilitation Center dated as of March 25, 2009 recorded March 26, 2009 in Document No. 285340.

With regard thereto:

    a. Waiver of Restrictive Declaration recorded March 26, 2009 in Document No. 285338.

    b. Waiver of Execution of Restrictive Declaration and Subordination of Mortgage recorded March 26, 2009 Document No. 285339.

15. Declaration of Zoning Lot Restrictions recorded September 15, 2009 as Document No. 308641.

16. Amended and Restated Zoning Lot Development Agreement recorded November 30, 2009 as Document No. 318357.

17. Easement Grant dated January 22, 2010 by St. Elizabeth Ann's Health Care and Rehabilitation Center to consolidated Edison Company of New York Inc. recorded February 3, 2010 as Document No. 326559.

18. Covenants and Restrictions contained in deed made by The United States of America acting by and through the Secretary of Health and Human Services to Bayley Seton Hospital dated November 25, 1981 recorded December 2, 1981 in Reel 2 page 4692.

19. For Information Only:

    a. Zoning Lot Description recorded August 10, 1990 in Reel 2641 Page 323.

    b. Zoning Lot Certification recorded August 31, 1990 in Reel 2667 Page 55.

    c. Zoning Lot Description and Ownership Statement recorded August 10, 2007 as Document No. 211758.

    d. Waiver of Declaration of Zoning Lot Restriction recorded August 10, 2007 as Document No. 211760.

    e. Zoning Lot Certification recorded September 10, 2007 as Document No. 211761.

    f. Zoning Lot Certification recorded August 17, 2007 as Document No. 213079.

    g. Zoning Lot Certification recorded August 17, 2007 as Document No. 213080.

    h. Zoning Lot Certification recorded August 17, 2007 as Document No. 213081.

    i. Zoning Lot Description and Ownership Statement recorded August 17, 2007 as Document No. 213082.

    j. Waiver of Declaration of Zoning Lot Restrictions recorded August 23, 2010 as Document No. 213926.

k.   Certification Pursuant to Zoning Lot Subdivision recorded February 27, 2009 as Document No. 282495.

l.   Zoning Lot Description and Ownership Statement recorded February 27, 2009 as Document No. 282497.

m.  Zoning Lot Certification recorded March 26, 2009 as Document No. 285334.

n.   Certification Pursuant to Zoning Lot Subdivision recorded February 27, 2009 as Document No. 282495.

o.   Certification Pursuant to Zoning Lot Subdivision is recorded September 8, 2009 as Document No. 307706.

p.   Zoning Lot Description and Ownership Statement recorded September 8, 2009 as Document No. 307709.

q.   Zoning Lot Certification recorded September 11, 2009 as Document No. 308354.

20.   The assessed valuation on the premises herein are listed as fully exempt from taxation at the present time, but will be subject to the discontinuance of such exemption and the possible imposition of an additional tax as of the date of transfer of title or possession from the exempt owner.

**SCHEDULE V**

**CLOSING DOCUMENTS TO BE DELIVERED BY SELLER**

1.      Subject to Section 9.1.3, statutory form of bargain and sale deed(s) without covenants (the **"Deed"**) substantially in the form attached hereto as <u>Exhibit B</u> containing the covenant required by Section 13 of the Lien Law, and properly executed and acknowledged so as to convey the title required to be conveyed by Seller under this Agreement.

2.      Bank or certified check(s), payable to the direct order of the appropriate tax collecting agencies or officials, in the amount of all documentary stamp and transfer and transfer gains taxes, and other taxes, fees and charges, payable by reason of or in connection with the conveyance and transfer of the Property by Seller to Purchaser.  In lieu of delivering such bank or certified checks, Seller may elect, by written notice to Purchaser given at least two (2) Business Days prior to Closing, to have Purchaser pay any of such taxes and charges and give Purchaser a credit on the Closing Date against the Purchase Price in the amount thereof.

3.      Copies of any required real property transfer tax returns properly executed and acknowledged by Seller and Purchaser, as applicable.

4.      All documents, as shall be reasonably necessary to evidence that Seller has proper authority to sell the Property and deliver the documents required to be delivered by Seller pursuant to this Agreement.

5.      All keys to entrance doors to, and equipment and utility rooms located in, the Property and in Seller's possession.

6.      To the extent such are in the possession of Seller or its managing agent, original executed counterparts (or, where unavailable, copies thereof), of all Assumed Service Contracts.

7.      A certificate of a duly authorized representative of Seller, sworn to under penalties of perjury, setting forth Seller's U.S. tax identification number and stating that Seller is a **"United States person"** within the meaning of Sections 1445(f)(3) and 7701(a)(30) of the Code.

8.      To the extent such are in the possession or control of Seller or its managing agent, original copies of all guarantees and warranties then in effect in respect of the Property.

9.      To the extent such are in the possession or control of Seller or its managing agent, original licenses and permits to be transferred hereunder, except to the extent the same are required to be and located at or are affixed of the Property.

10.      Certificate of an authorized representative of Seller with respect to the authority of the person(s) executing this Agreement and the other Closing Documents on behalf of Seller.

11.     A Bill of Sale, without warranty, recourse or representation, conveying the Personalty to Purchaser substantially in the form attached hereto as <u>Exhibit C.</u>

12.     All existing surveys and building plans for the Property and the improvements thereon to the extent in Seller's possession.

## SCHEDULE VI

## PURCHASER'S CLOSING DOCUMENTS

     1.    Copies of any required real property transfer tax returns properly executed and acknowledged by Purchaser and Seller.

     2.    All documents as shall be reasonably necessary to evidence that Purchaser has proper authority to purchase the Property and deliver the documents required to be delivered by Purchaser pursuant to this Agreement.

     3.    Certificate of an authorized representative of Purchaser with respect to the authority of the person(s) executing this Agreement and the other Closing Documents on behalf of Purchaser.

**EXHIBIT A TO APA**

**ESCROW AGREEMENT**

[See Attached]

**ESCROW AGREEMENT**

**BY AND BETWEEN**

**SISTERS OF CHARITY HEALTH CARE SYSTEM NURSING HOME, INC., D/B/A ST. ELIZABETH ANN'S HEALTH CARE AND REHABILITATION CENTER**

and

**SV LAND THREE, LLC**

**AND**

**GARFUNKEL WILD, P.C., AS ESCROW AGENT**

_____, 2011

# ESCROW AGREEMENT

**ESCROW AGREEMENT** ("Agreement") made as of _____, 2011 by and between Sisters of Charity Health Care System Nursing Home, Inc., d/b/a St. Elizabeth Ann's Health Care and Rehabilitation Center, a New York not-for-profit corporation ("Seller"), and SV Land Three, LLC, a New York limited liability company ("Purchaser"), and Garfunkel Wild, P.C., a New York professional corporation with offices at 111 Great Neck Road, Suite 503, Great Neck, New York 11021 (the "Escrow Agent").  All capitalized terms used but not defined herein shall have the meaning assigned to them in the Asset Purchase Agreement (as defined below).

Recitals:  The following recitals are hereby incorporated into this Agreement:

      **A.**      Purchaser and Seller have entered into a Purchase and Sale Agreement, dated as of _____, 2011 (the "Purchase Agreement"), pursuant to which, among other things, Purchaser shall deposit: _____ Dollars ($_____) (the "Initial Deposit") into escrow with Escrow Agent concurrently upon execution of this Agreement.

      **B.**      In the event that Purchaser is selected as the prevailing bidder or elects (in its sole discretion) to be designated back-up bidder at the Auction, on or prior to the earlier of: (a) one (1) Business Day prior to the date of the sale hearing; (b) three (3) Business Days after Purchaser is selected as the Prevailing Bidder; and (c) three (3) Business Days after the conclusion of the Auction, an amount (the "Additional Deposit", if any, together with the Initial Deposit, the "Escrow Fund") equal to the greater of (x) _____ Dollars ($_____) or (y) an amount such that together with the Initial Deposit, the Escrow Fund shall be equal to 10% of the Purchase Price pursuant to the Purchase Agreement, as it may be subsequently amended at the Auction.

      NOW, THEREFORE, the parties hereto as follows:

      1.      Deposit and Acknowledgment of Receipt.

      1.1      Concurrently with the execution and delivery of this Agreement, Purchaser has delivered to Escrow Agent, and Escrow Agent by its execution hereof acknowledges receipt of, Purchaser's wire transfer in the amount of _____ Dollars ($_____), payable to Escrow Agent.

      1.2      Purchaser shall deliver to Escrow Agent by wire transfer payable to Escrow Agent the Additional Deposit in an amount equal to the greater of (x) _____ Dollars ($_____) or (y) an amount such that together with the Initial Deposit, the Escrow Fund shall be equal to 10% of the Purchase Price pursuant to the Purchase Agreement, as it may be subsequently amended at the Auction within the following time periods: (i) the earlier of one (1) Business Day prior to the sale hearing or three (3) Business Days after Purchaser is selected as the prevailing bidder or elects (in its sole discretion) to be designated back-up bidder, and (ii) in the event that Seller selects a Competing Bid at the Auction but, subject to the limitations of  Section 7.2(c) of the Asset Purchase Agreement, dated as of even date herewith, between Seller and Purchaser, with respect to certain business assets of

1

Seller, notifies Purchaser in writing that Seller intends to seek Bankruptcy Court approval of Purchaser as the prevailing bidder, Purchaser shall make the Additional Deposit within three (3) Business Days after receipt of such written notification.

       1.3     Escrow Agent hereby agrees to hold the Escrow Fund in an interest-bearing account pending the disbursement of such Escrow Fund in accordance with the terms of this Agreement.

       1.4     The Escrow Fund shall not be subject to lien or attachment by any creditor of any party hereto and shall be used solely for the purposes set forth in this Agreement. Amounts held in the Escrow Account shall not be available to, and shall not be used by, Garfunkel Wild, P.C. to set off any obligations of either Purchaser or Seller owing to Garfunkel Wild, P.C. in any capacity.

    2.     <u>Terms of Escrow.</u>

       2.1     Upon the Closing, Escrow Agent shall disburse the Escrow Deposit to Seller or as otherwise directed by Seller, without further instruction from Purchaser.

       2.2     Escrow Agent shall, subject to Section 2.1, disburse amounts from the Escrow Fund, and any accrued interest thereon, upon delivery, by Seller and Purchaser to Escrow Agent, of joint written instructions executed by an authorized officer of both parties directing Escrow Agent to deliver to Seller or Purchaser, as the case may be, an amount equal to the amount to which it is entitled pursuant to those joint written instructions. Upon receipt of the joint written instructions, Escrow Agent shall release by wire transfer to an account or accounts designated by Seller or Purchaser, as the case may be, the amount specified in the joint written instructions.

       2.3     Notwithstanding anything to the contrary contained in this Agreement, in the event of a dispute concerning the Escrow Fund, the Escrow Agent shall not disburse any amounts from the Escrow Fund until its receipt of joint written instructions from Seller and Purchaser as set forth hereinabove or an order of a court of competent jurisdiction directing the disbursement of the Escrow Fund.

       2.4     Upon the completion of the disbursements as set forth above, Escrow Agent shall have no further duties hereunder.

    3.     <u>Obligations and Liabilities of Escrow Agent.</u>

       3.1     The duties and obligations of Escrow Agent shall be determined solely by the express provisions of this Agreement.

       3.2     Escrow Agent shall not be responsible in any manner whatsoever for any failure or inability of Purchaser or Seller to perform or comply with any of the provisions of the respective agreements between them.

3.3     Escrow Agent shall not be bound by any modification, cancellation or rescission of this Escrow Agreement unless in writing, signed by Purchaser and Seller and expressly consented to in writing by Escrow Agent.

3.4     Escrow Agent's duties hereunder are as a depository only, ministerial in nature, and Escrow Agent shall incur no liability whatsoever hereunder for any error of judgment, or any action taken or omitted hereunder, except for damages directly resulting from Escrow Agent's gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

3.5     Delivery of the Escrow Funds, along with any accrued interest thereon, by Escrow Agent pursuant to the provisions of this Agreement shall constitute a complete discharge and satisfaction of all obligations of Escrow Agent hereunder.

3.6     Nothing contained herein shall be deemed to preclude Escrow Agent at any time and for any reason from depositing the Escrow Fund into a court of competent jurisdiction upon prior notice to the parties hereto, and abiding by the determination of such court with respect thereto.  In such event, such delivery shall constitute a complete discharge and release of Escrow Agent of its obligations hereunder.

3.7     Escrow Agent shall be entitled to rely conclusively upon any written notice, waiver, receipt, or other document which Escrow Agent believes in good faith to be genuine, including, without limitation, a written statement by Purchaser or Seller that they have complied with the terms of the Agreement with respect to a demand for payment.

3.8     In the event of any controversy or dispute under this Escrow Agreement or with respect to any question as to the construction hereof or any action to be taken or omitted by Escrow Agent, Escrow Agent shall be entitled to consult with counsel of its own choosing.

3.9     Nothing contained herein shall limit or restrict the right of Escrow Agent to represent Seller with respect to any disputes which may arise in connection with the Purchase Agreement, this Escrow Agreement, or any other matter whatsoever.  Seller and Purchaser agree that Escrow Agent's engagement as an attorney by Seller is not and shall not be objectionable for any reason whatsoever.  Escrow Agent shall incur no liability whatsoever to Purchaser (or any affiliate or subsidiary thereof) for any legal advice rendered to Seller or any action or inaction by Seller based upon such legal advice.

4.     Expenses of Escrow Agent.  Escrow Agent shall serve without compensation, however,  Seller shall be liable for one-half (½) and Purchaser shall be liable for one-half (½) of any reasonable out-of-pocket fees and expenses incurred by Escrow Agent in connection with this Agreement, including counsel fees, if any.  The parties shall pay any such amounts due Escrow Agent promptly upon its demand.

5.     Indemnification of Escrow Agent.  Purchaser and Seller agree, jointly and severally, to indemnify Escrow Agent and hold Escrow Agent harmless from any loss, liability and expenses which it incurs in connection with or arising out of its compliance with the terms of this Agreement, including the fees, costs and expenses of defending itself against any claims of liability hereunder, except for a loss, liability or expense arising solely from Escrow Agent's own

gross negligence, willful misconduct or breach of fiduciary duty as determined by a final and non-appealable judgment of a court of competent jurisdiction.

6.      Successor Escrow Agent.  In the event Escrow Agent is no longer able or willing to serve, Escrow Agent shall have the right, after consultation with Seller and Purchaser, to appoint a successor Escrow Agent who shall be bound by the terms and conditions set forth herein.

7.      Notices.

7.1      Any notice, request, demand or other communication permitted or required to be given hereunder shall be in writing and shall be deemed to have been given when such notice shall have been (a) sent by United States mail, postage prepaid to the addressee, or (b) delivered by a nationally recognized overnight courier or facsimile (to the extent a facsimile number is provided below) to the addressee; in each case at the address or facsimile number, as applicable, specified below:

If to Seller:

Sisters of Charity Health Care System Nursing Home, Inc., d/b/a
St. Elizabeth Ann's Health Care and Rehabilitation Center
c/o Saint Vincents Catholic Medical Centers of New York
450 West 33rd Street
New York, New York 10001
Attn:  Mark E. Toney, Chief Restructuring Officer
Fax:  (212) 604-3331

With a copy to:

Garfunkel Wild, P.C.
111 Great Neck Road
Great Neck, New York  11021
Attn:  Judith A. Eisen, Esq.
Fax:  (516) 466-5964

and

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Fax:    (212) 715-8000
Attn:    Adam C. Rogoff, Esq.

If to Escrow Agent:

Garfunkel Wild, P.C.
111 Great Neck Road, Suite 503
Great Neck, New York  11021

Attn:   Judith A. Eisen, Esq.
Fax:  (516) 466-5964

If to Purchaser:

SV Land Three, LLC
1 Hunters Run
Suffern, New York 10901

With a copy to:

Isidor D. Friedenberg, Esq.
2 Cara Drive
Suffern, New York 10901

Any notice or communication served upon Escrow Agent shall be accompanied by an affidavit of service upon all other parties upon whom such notice is required to be served.

8.      Binding Effect; Further Assurances.

8.1     This Agreement shall inure to the benefit of and shall be binding upon the respective heirs, personal representatives, successors, and assigns of the parties hereto.

8.2     Seller and Purchaser hereto covenant that they will execute all instruments and documents and will take all steps which may be necessary in order to implement the provisions of this Agreement.

9.      Governing Law; Forum.

9.1     This Agreement shall be construed under and governed by the laws of the State of New York, without regard to its principles of conflicts of laws.

9.2     Each party to this Agreement irrevocably consents and agrees that any dispute arising out of or in any way connected to this Agreement shall only be adjudicated by the Bankruptcy Court, provided that if the Bankruptcy Case has closed, each of the parties hereto irrevocably agrees that any Legal Proceeding with respect to this Agreement shall be brought and determined exclusively in the United States District Court for the Southern District of New York or if such Legal Proceeding may not be brought in such court for jurisdictional purposes, exclusively in the Supreme Court of New York sitting in the County of New York.  Each of the parties hereto hereby (a) irrevocably submits with regard to any such Legal Proceeding to the exclusive personal jurisdiction of the aforesaid courts in the event any dispute arises out of this Agreement or any transaction contemplated hereby, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the state or federal courts referenced above. Each of the parties hereto further agrees to accept and acknowledge service of any and all process which may be served in any such Legal Proceeding in said courts in the State of New York, and agrees that service of process upon such party by a

method permitted by the applicable Laws of the State of New York to such party's address as set forth in Section 7.1 hereto, will be deemed in every respect effective service of process upon such party, in any Legal Proceeding.

10.    Counterparts.  This Agreement may be executed in one or more counterparts (whether facsimile or original), each of which when taken together shall be deemed one and the same original instrument.

11.    Prevailing Party.  Notwithstanding anything to the contrary, in the event of a dispute between the Purchaser and Seller in connection with the Escrow Funds, the prevailing party shall be entitled to recover from the non-prevailing party the reasonable legal fees and costs incurred by the prevailing party.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Escrow Agreement the day and year first above written.

**SISTERS OF CHARITY HEALTH CARE SYSTEM NURSING HOME, INC., D/B/A ST. ELIZABETH ANN'S HEALTH CARE AND REHABILITATION CENTER**

By: _Mark E. Toney_

Name: MARK E. TONEY

Title: CRO

**SV LAND THREE, LLC**

By: _____

Name: Daryl Hagler

Title: Managing Member

**GARFUNKEL WILD, P.C.**

By: _____

Name:

Title:

IN WITNESS WHEREOF, the parties hereto have duly executed this Escrow Agreement the day and year first above written.

**SISTERS OF CHARITY HEALTH SYSTEM NURSING HOME, INC., D/B/A ST. ELIZABETH ANN'S HEALTH CARE & REHABILITATION CENTER**

By: _____
       Name:
       Title:

**SV OPERATING THREE, LLC**

By: _____
       Name: Kenneth Rosenberg
       Title: M. Member

**GARFUNKEL WILD, P.C.**

By: _____
       Name:
       Title:

7

## **EXHIBIT B TO APA**

## **DEED**

[See Attached]

**THIS INDENTURE**, made the _____ day of _____, 20__, BETWEEN

_____, a New York not-for-profit corporation, with offices at _____,

party of the first part, and

SV LAND THREE, LLC, a New York limited liability company, with offices at 1 Hunters Run,

Suffern, New York 10901, party of the second part.

**WITNESSETH**, that the party of the first part, in consideration of Ten Dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

**THE CERTAIN PREMISES AND IMPROVEMENTS SITUATED THEREON AS MORE PARTICULARLY DESCRIBED ON SCHEDULE A ANNEXED HERETO AND MADE A PART HEREOF**

**TOGETHER** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above-described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

**AND** the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.  The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

      **IN WITNESS WHEREOF**, the party of the first part has duly executed this deed as of the day and year first above written.

                            _____

By:_____
      Name:
      Title:

STATE OF NEW YORK)
                                ) ss:
COUNTY OF)

On the ____ day of _____, 20__, before me, the undersigned, a Notary Public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on this instrument, the individual, or person upon behalf of which the individual acted, executed the instrument.

                                        _____
                                        Notary Public

## **SCHEDULE A**

[See Attached]

*BARGAIN AND SALE DEED*

**Without Covenant Against Grantor's Acts**

_____

*TO*

**SV LAND THREE, LLC**

*PREMISES:*

_____

_____, **NEW YORK**

**BLOCK:** ___

**LOT:** ___

***RECORD AND RETURN TO:***

_____

**<u>EXHIBIT C TO APA</u>**

**FORM OF BILL OF SALE**

[See attached]

# BILL OF SALE

THIS BILL OF SALE is made and executed as of the _____ day of _____, 20__ from _____, having an address at _____, ("Seller"), to SV Land Three, LLC having an address at 1 Hunters Run, Suffern, New York 10901 ("Purchaser").

FOR AND IN CONSIDERATION of the sum of Ten Dollars and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Seller does hereby bargain, sell, convey, deliver, assign, transfer, set over and grant to Purchaser, and to their successors and assigns, all right, title and interest of Seller in and to any and all fixtures, machinery, equipment, furniture and other tangible personal property not owned by any tenant or other occupant of the Property (the "Personalty") affixed or attached to, installed or placed in or upon and to be used for or usable in any present or future enjoyment, occupancy or operation of the building and related improvements comprising the property located at and commonly known as _____, New York.

Title to all the Personalty shall pass to Purchaser upon delivery of this Bill of Sale.  Any sales tax, if any, payable in respect of the Personalty shall be the sole responsibility of Purchaser.

Seller makes no warranties or representations whatsoever, including, without limitation, with respect to quality, fitness or merchantability of the Personalty; the Personalty is being transferred "AS IS" physical condition and this Bill of Sale is made without recourse to or covenant by Seller.  The Personalty shall be transferred from Seller to Purchaser free and clear of any liens or encumbrances to the extent provided for in the Sale Order (as defined in that certain Purchase and Sale Agreement dated as of _____, 2011 between Purchaser and Seller).

This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the day and year first written above.

_____

By:_____
        Name:
        Title:

**EXHIBIT C-3 TO MOTION**


**BAYLEY SETON GROUND LEASE**

# LEASE OF LAND, BUILDING AND EQUIPMENT

LEASE AGREEMENT (this "Lease"), is made as of the ____ day of _____, 2011 by and between **SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK**, a New York not-for-profit hospital with a primary business address at 450 West 33rd Street, New York, New York 10001("Landlord"); and **SV LAND I, LLC**, a New York limited liability company, with offices at 1 Hunters Run, Suffern, New York 10901 ("Tenant").

W I T N E S S E T H:

WHEREAS, Landlord is the owner of that certain plot, piece or parcel of land known as and by the street address of 75 Vanderbilt Avenue, Staten Island, New York as more particularly described on Schedule A attached hereto and made a part hereof (the "Land"); the buildings and other improvements located on the Land (collectively, the "Building"); and the machinery, apparatus, equipment, fittings, personal property and fixtures now or hereafter owned by Landlord and used or procured for use in connection with the operation and/or maintenance of the Building (collectively, the "Building Equipment"; and collectively with the Land and the Building, the "Premises"); and

WHEREAS, Landlord, along with certain of its affiliates (collectively, the "Debtors") are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") on April 14, 2010, in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 10-11963); and

WHEREAS, Tenant desires to lease the Premises from Landlord in accordance with the terms hereof; and

WHEREAS, Landlord has agreed to lease the Premises to Tenant on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises, the mutual covenants herein contained and the sum of One Dollar ($1.00), each to the other in hand paid, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
## DEMISE - TERM - RENT

**1.1      Premises**.  In consideration of the rents, covenants and agreements hereinafter reserved and contained on the part of Tenant to be paid, kept and performed, effective as of the Commencement Date (as defined below), Landlord hereby demises and leases the Premises unto Tenant, and Tenant does hereby lease the Premises.  Tenant represents and acknowledges that it has examined the Premises and the state of title thereof and agrees that the Premises are leased and shall be accepted in its "as is", "where is" condition and state of repair without representations, statements or warranties, express or implied (including, without limitation, with respect to the legal use of the Premises) and subject to all encumbrances, conditions,

circumstances, covenants, easements, restrictions, rights-of-way, and other matters of record and existing violations, if any, as of the date hereof or hereafter arising (but subject to the remainder of this Section 1.1), zoning or other laws, rules and orders applicable thereto, tenancies, occupancies, taxes, and all other matters specifically arising from and/or relating to the Premises including, without limitation, the ownership, maintenance and/or operation of the Premises (as opposed to, for example, arising from other properties owned by Landlord and/or obligations of Landlord not specifically relating to the Premises) including, without limitation, the leases and occupancies set forth on Schedule B attached hereto and made a part hereof (the "Space Leases"), and the documents listed on Schedule D annexed hereto (it being understood that Tenant shall also be entitled to any and all benefits, income and other payments actually received pursuant to the documents listed on Schedule D and relating to the period from and after the Commencement Date until the expiration or earlier termination of the Term), as all of the foregoing may have been amended and except as expressly set forth elsewhere herein, provided, however, that, for so long as Tenant shall not be in default under this Lease, Landlord agrees that it shall not enter into any new agreements in respect of the Premises or amend any agreements in respect of the Premises or grant or amend any easements, restrictions, rights-of-way in respect of the Premises or otherwise voluntarily encumber the Premises from and after the date hereof and during the Term of this Lease, as the Term may be extended hereunder, without Tenant's consent unless (i) required under applicable law, or (ii) by a utility provider or other similar entity. Subject to Tenant's right to contest in accordance with the terms set forth herein, Tenant shall abide by all of the covenants and restrictions contained in and perform all of the obligations under the foregoing items only when a written bill, demand, claim, notice or other writing with respect thereto is received from the applicable third party (other than Landlord, unless Landlord is providing to Tenant a writing from a third party). In addition, Tenant has not relied on any representations, statements or warranties, express or implied, and Landlord shall in no event whatsoever be liable for any latent or patent defects in the Premises. In furtherance of the foregoing, for the Term (as defined below) hereof, Landlord hereby assigns, without representation, warranty or covenant of any kind or nature by Landlord (whether express or implied) (except that Landlord represents, warrants and covenants that that it can without restriction of any kind, validly and effectively assign, effective as of the Commencement Date hereof, all of its rights under the Space Leases (to the extent same are in effect as of the Commencement Date) to Tenant), and Tenant, effective as of the Commencement Date hereof, hereby assumes, all of Landlord's rights and obligations under the Space Leases including, but not limited to, the rights to collect and retain for its own account rent and other charges due and payable in respect of the Term (as the same may be extended pursuant to Section 1.2 hereof) under the Space Leases and any other lease which Tenant may hereafter enter into as landlord in accordance with the terms hereof. Landlord further agrees to execute such documents and instruments as Tenant shall reasonably require from time to time after the Commencement Date to reflect the within assignment to Tenant of all of Landlord's rights under the Space Leases. Landlord represents that to its actual current knowledge, without investigation or inquiry as of the date hereof, there are no leases currently in effect at the Premises which are binding upon Tenant except as set forth on Schedule B attached hereto. Notwithstanding anything to the contrary contained in this Lease, Landlord (and not Tenant) shall be responsible for the payment or satisfaction of any and all Pre-Commencement Operational Expenses (hereinafter defined),

2

the matters set forth in Schedule C annexed hereto, and for any and all liabilities, payments, costs, expenses and charges arising from or relating to any and all mortgages signed by Landlord or its affiliates affecting the Premises whether before, during or after the Term, including but not limited to any and all mortgage payments of principal and/or interest, escrow payments, reserve fund payments and all other similar charges and/or payments and/or liabilities in respect thereof (except to the extent such mortgage liability arises exclusively from the default of Tenant under this Lease or of any party claiming by, through or under Tenant, in which event Tenant shall only be liable for the penalties, damages, expenses, fees and other costs demanded by, and payable to, the mortgagee under the applicable loan documents, if any, as a result of such default, but in no event shall Tenant be liable for the repayment of any principal of, or interest, escrow or reserve payments on, any mortgage executed by Landlord or its affiliates). Notwithstanding the foregoing, Landlord represents and warrants to Tenant and agrees that this Lease and Tenant's compliance with the provisions of this Lease do not and will not violate any provision of any mortgage referred to hereinabove and that Tenant shall have no mortgage liability in connection with its compliance with the provisions of this Lease (except as specifically set forth in the parenthetical above). Landlord, after the Commencement Date, shall promptly remit to Tenant any and all sums howsoever received by Landlord at any time paid by the tenants under the Space Leases in respect of any period during the Term (as same may be extended pursuant to Section 1.2 hereof). Landlord shall, upon commencement of the Term, remit such sums received by Landlord in connection with any of the Space Leases including, but not limited to any rent or other prepayments. Tenant shall promptly remit to Landlord any and all sums howsoever received by Tenant at any time relating to the Space Leases for any period other than during the Term (as same may be extended pursuant to Section 1.2 hereof). Landlord agrees to remit to Tenant upon the commencement of the Term all security deposits (if any) held by or for the benefit of Landlord under the Space Leases and Landlord shall indemnify and hold Tenant harmless from and against any and all claims, losses, costs and expenses (including but not limited to reasonable attorneys' fees) incurred in connection with any security deposit required to be held by the landlord under the Space Leases as of the Commencement Date and not remitted by Landlord to Tenant hereunder or if remitted, remitted in an incorrect amount. Tenant agrees to remit to Landlord upon the expiration or earlier termination of this Lease all security deposits held by or for the benefit of the landlord under the Space Leases (and any other space leases entered into by Tenant, as landlord) and Tenant shall indemnify and hold Landlord harmless from and against any and all claims, losses, costs and expenses (including but not limited to reasonable attorneys' fees) incurred in connection with any security deposit received by Tenant and required, as of the expiration or earlier termination of this Lease, to be held by or for the benefit of Tenant under the Space Leases (and any other space leases entered into by Tenant, as landlord) not remitted by Tenant to Landlord hereunder or if remitted, remitted in an incorrect amount. This paragraph shall survive the expiration or earlier termination of this Lease.

(a)     EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, THE PREMISES ARE BEING LEASED BY LANDLORD TO TENANT AND TENANT AGREES TO ACCEPT THE PREMISES IN "AS-IS" AND "WHERE-IS" PHYSICAL CONDITION ON THE COMMENCEMENT DATE. TENANT ACKNOWLEDGES, REPRESENTS AND WARRANTS THAT (I) TENANT HAS HAD AN

3

OPPORTUNITY TO MAKE AN INDEPENDENT INVESTIGATION AND EXAMINATION OF THE PREMISES (AND ALL MATTERS RELATED THERETO), AND TO BECOME FULLY FAMILIAR WITH THE PHYSICAL AND ENVIRONMENTAL CONDITION OF THE PREMISES, AND (II) LANDLORD HAS NOT MADE AND SHALL NOT MAKE ANY VERBAL OR WRITTEN REPRESENTATIONS, WARRANTIES OR STATEMENTS OF ANY NATURE OR KIND WHATSOEVER TO TENANT, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO THE ABOVE, AND, IN PARTICULAR, EXCEPT AS EXPRESSLY SET FORTH HEREIN, NO REPRESENTATIONS OR WARRANTIES HAVE BEEN MADE OR SHALL BE MADE WITH RESPECT TO (A) THE PHYSICAL CONDITION OR OPERATION OF THE PREMISES, INCLUDING THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR CONDITIONS THEREON (INCLUDING THE PRESENCE OF ASBESTOS OR ASBESTOS-CONTAINING MATERIALS OR THE RELEASE OR THREATENED RELEASE OF HAZARDOUS SUBSTANCES), (B) THE REVENUES OR EXPENSES OF THE PREMISES, (C) THE ZONING AND OTHER LEGAL REQUIREMENTS APPLICABLE TO THE PREMISES OR THE COMPLIANCE OF THE PREMISES THEREWITH, (D) THE NATURE AND EXTENT OF ANY MATTER AFFECTING TITLE TO THE PREMISES, (E) THE QUANTITY, QUALITY, OR CONDITION OF THE PERSONALTY, OR (F) ANY OTHER MATTER OR THING AFFECTING OR RELATING TO THE PREMISES, OR ANY PORTION THEREOF.

(b)     RELEASE.  WITHOUT LIMITING THE PROVISIONS OF THIS ARTICLE AND NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS LEASE EXCEPT FOR THE REPRESENTATIONS, COVENANTS AND OBLIGATIONS OF LANDLORD EXPRESSLY SET FORTH IN THIS LEASE, UPON TENANT'S EXECUTION OF THIS LEASE, TENANT HEREBY RELEASES LANDLORD AND ITS MEMBERS, PARTNERS, PARENTS, TRUSTEES, AFFILIATED AND SUBSIDIARY ENTITIES AND ALL OF THEIR RESPECTIVE MEMBERS, OFFICERS, DIRECTORS, SHAREHOLDERS, TRUSTEES, PARTNERS, EMPLOYEES, MANAGERS AND AGENTS (COLLECTIVELY, "LANDLORD'S AGENTS") FROM ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES WHETHER SUIT IS INSTITUTED OR NOT) WHETHER KNOWN OR UNKNOWN, LIQUIDATED OR CONTINGENT (HEREINAFTER COLLECTIVELY CALLED THE "CLAIMS") ARISING FROM OR RELATING TO: (i) ANY DEFECTS (PATENT OR LATENT), ERRORS OR OMISSIONS IN THE DESIGN OR CONSTRUCTION OF THE IMPROVEMENTS WHETHER THE SAME ARE THE RESULT OF NEGLIGENCE OR OTHERWISE; AND (ii) ANY OTHER CONDITIONS, INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO THE BUILDING FACADE, ENVIRONMENTAL AND OTHER PHYSICAL CONDITIONS AFFECTING THE PREMISES WHETHER THE SAME ARE A RESULT OF NEGLIGENCE OR OTHERWISE, EXCLUDING CLAIMS AGAINST LANDLORD (BUT NOT LANDLORD'S AGENTS) FOR ACTS OF FRAUD, GROSS NEGLIGENCE AND WILLFUL MISCONDUCT OR INTENTIONAL MISREPRESENTATION. THE RELEASE SET FORTH IN THIS SECTION 1.1(b) SPECIFICALLY INCLUDES, WITHOUT LIMITATION, ANY CLAIMS UNDER ANY ENVIRONMENTAL REQUIREMENTS OR UNDER THE

4

AMERICANS WITH DISABILITIES ACT OF 1990, AS ANY OF THE SAME MAY BE AMENDED FROM TIME TO TIME AND ANY REGULATIONS, ORDERS, RULES OF PROCEDURES OR GUIDELINES PROMULGATED IN CONNECTION THEREWITH, REGARDLESS OF WHETHER THEY ARE IN EXISTENCE ON THE DATE OF THIS LEASE.  TENANT ACKNOWLEDGES THAT TENANT IS GRANTING THIS RELEASE OF ITS OWN VOLITION AND AFTER CONSULTATION WITH TENANT'S COUNSEL.

  **1.2** **Term; Extension Option**.  The term (the "Term") of this Lease shall be five (5) years commencing on the Closing Effective Date (the "Commencement Date") and expiring on the last day of the month in which the fifth (5th) anniversary of the Commencement Date shall occur (the "Expiration Date"), unless extended or sooner terminated as hereinafter provided.  At such time as the Commencement Date and the expiration date are established as provided in this Section, Tenant, upon the request of Landlord, shall execute and deliver to Landlord a statement setting forth the Commencement Date and the expiration date, but the failure of Tenant to execute and deliver such statement shall not detract from the effectiveness of any of the provisions of this Lease.  If this Lease shall then be in full force and effect, either party hereto, upon prior written notice given to other party hereto (which notice in all event shall be given at least thirty (30) days prior to the then current date of expiration of the Term), time being of the essence, shall have the right, on two (2) occasions, to extend the term hereof for five (5) additional years each on the terms and conditions set forth herein, provided, however, that (i) each party may only exercise such extension right if it shall not be in default under this Lease at the time it gives such notice and/or on the first day of the extended term and this Lease shall be in full force and effect on the day immediately preceding the term extension in question, (ii) in no event shall the Term extend beyond the last day of the month in which the fifteenth (15th) anniversary of the Commencement Date shall occur and (iii) it shall be a condition precedent to exercise of the second (2nd) extension option that the first (1st) extension option was exercised in accordance with the terms of this Section 1.2.

  **1.3** **Rent**.  Commencing as of the Commencement Date and throughout the Term, Tenant covenants and agrees to pay: (i) fixed rent (the "Basic Rent") in the amount of One and No/100 dollars ($1.00) per annum to Landlord, payable in advance on the first day of each lease year; and (ii) any and all sums of money (other than Basic Rent) required to be paid by Tenant to Landlord or any other Person under this Lease, including, without limitation, the reimbursement of any costs or expenses incurred by Landlord in connection with the ownership of the Premises (but subject to the penultimate sentence and the last sentence of Section 2.4 hereof), whether or not the sum be designated as additional rent, as and when due hereunder (the "Additional Rent"; the Basic Rent and Additional Rent are sometimes hereinafter collectively referred to as the "Rent").  Tenant covenants to pay, without notice or demand and without deduction or set-off for any reason whatsoever, the Rent and all other sums which under any provision of this Lease may become due hereunder (subject to the remainder of this Section), from Tenant to Landlord or any other Person or otherwise at the times and in the manner provided herein.  Landlord shall have the same rights and remedies for the non-payment of Additional Rent as in the case of the non-payment of Basic Rent.  Tenant shall pay all Additional Rent directly to the applicable Person to whom such payment is owed.  In furtherance of the foregoing, Tenant shall have the right,

5

provided it does so with due diligence and dispatch and in good faith, to contest by appropriate legal proceedings, without cost, expense or liability to Landlord, the amount or validity of any Additional Rent owed to third parties provided such contest and/or non-payment shall not subject Landlord to any criminal liability, fine or penalty.  In all events, Tenant shall not contest any Additional Rent if at any time the Premises, or any part thereof, shall be in danger of being forfeited or lost, such contest shall cause Landlord to be in default under any mortgage, or if Landlord shall be in danger of being subject to criminal liability, fine or penalty by reason of such contest.  The provisions of this Section 1.3 shall survive the expiration or earlier termination of this Lease except as may be expressly provided elsewhere in this Lease.  Nothing contained in this Lease shall be deemed to prevent either party hereto from contesting any amounts claimed by the other party hereto to be owed to such other party which the contesting party, in good faith, believes are not then payable to the other party.

       **1.4**    **Payment of Rent**.  Subject to Section 1.3 above, all Rent payable hereunder shall be paid in lawful money of the United States of America at Landlord's address indicated above or to such other Person at such address as Landlord may from time to time specify.

       **1.5**    **Net Rent to Landlord**.  It is the purpose and intent of Landlord and Tenant that the Rent shall be absolutely net to Landlord, so that this Lease shall yield, net, to Landlord, during the Term, the Rent, free of any charges, assessments, impositions or deductions of any kind and without abatement, deduction or set off whatsoever under any circumstances or conditions, whether existing prior to the Commencement Date or thereafter arising, or whether beyond the present contemplation of the parties.  All costs, expenses and obligations of every kind and nature whatsoever relating to the Premises and the appurtenances thereto and the use and occupancy thereof, which may become payable by Tenant under this Lease shall be paid by Tenant as Additional Rent.  Landlord shall not be expected or required to make any payment of any kind whatsoever or be under any other obligation or liability hereunder, except as herein otherwise expressly set forth.  Without limiting the foregoing, but subject to the provisions of Section 2.4 hereof, (a) Tenant shall pay all costs, expenses and charges of every kind and nature relating to the Premises, which may arise or become due or payable during or after (but attributable to a period falling prior to the later of (i) the end of the Term or (ii) the last day upon which Tenant or any Person or entity ("Person") claiming by through or under Tenant, shall occupy all or any portion of the Premises, other than those Tenants occupying the Premises in accordance with the Space Leases as they exist on the date hereof or pursuant to amendments approved by Landlord in writing) the Term, including all recorded or unrecorded easements, declarations, leases, licenses, covenants, conditions, restrictions or other matters affecting the title to the Premises (all of the foregoing, "Premises Documents"), and Tenant hereby agrees to indemnify Landlord against, and hold Landlord harmless from and against the same, and (b) Tenant's obligations hereunder shall in no event be diminished as a result of any prohibition, limitation, restriction or prevention of Tenant's use, occupancy or enjoyment of the Premises or any part thereof, or any interference with such use, occupancy or enjoyment by any Person (other than Landlord) or for any reason, any matter affecting title to the Premises, any eviction by paramount title or otherwise, the impracticability of performance by Tenant, any action of any governmental authority, Tenant's acquisition of ownership of all or part of the Premises (unless

6

this Lease shall be terminated in connection therewith in accordance with the terms hereof), any breach of warranty or misrepresentation, or any other cause whether similar or dissimilar to the foregoing and whether or not Tenant shall have notice or knowledge thereof and whether or not such cause shall now be foreseeable.  Notwithstanding anything to the contrary contained in this Lease, Landlord (and not Tenant) shall be responsible for the payment or satisfaction of any and all Pre-Commencement Operational Expenses, the matters set forth in Schedule C annexed hereto, and for any and all liabilities, payments, costs, expenses and charges arising from or relating to any and all mortgages signed by Landlord or its affiliates affecting the Premises whether before, during or after the Term, including but not limited to any and all mortgage payments of principal and/or interest, escrow payments, reserve fund payments and all other similar charges and/or payments and/or liabilities in respect thereof (except to the extent such mortgage liability arises exclusively from the default under this Lease of Tenant or of any party claiming by, through or under Tenant, in which event Tenant shall only be liable for the penalties, damages, expenses, fees and other costs demanded by, and payable to, the mortgagee under the applicable loan documents, if any, as a result of such default, but in no event shall Tenant be liable for the repayment of any principal of, or interest, escrow or reserve payments on, any mortgage executed by Landlord or its affiliates).  Notwithstanding the foregoing, Landlord represents and warrants to Tenant and agrees that this Lease and Tenant's compliance with the provisions of this Lease do not and will not violate any provision of any mortgage referred to hereinabove and that Tenant shall have no mortgage liability in connection with its compliance with the provisions of this Lease (except as specifically set forth in the parenthetical above).

## ARTICLE II
## USE OF THE PREMISES

   **2.1     Permitted Use of the Premises**.  Tenant covenants and agrees that at all times during the Term it will have the obligation to use, operate and occupy the Premises for any lawful use which does not violate (i) the terms of the USFHP Contract (as hereinafter defined) and/or (ii) the requirements and/or restrictions contained in that certain Quitclaim Deed between the United States of America, acting by and through the Secretary of Health and Human Services, as grantor, and Bayley Seton Hospital, as grantee, dated November 25, 1981 and recorded December 2, 1981 in Reel 2, Page 4698, to the extent either of the foregoing shall be applicable, (collectively, the "Permitted Use").  Tenant further covenants and agrees that in the use of the Premises, Tenant shall comply with all requirements of any laws, ordinances, orders and regulations of any federal, state, county or other governmental authority (such compliance to include maintaining in full force and effect all licenses) to use the Premises for the Permitted Use.

   **2.2     Prohibited Uses**.  Tenant shall not use or occupy, nor permit or suffer the Premises or any part thereof to be used or occupied for any unlawful or illegal business, use or purpose, or for any business, use or purpose deemed disreputable or extra hazardous, or in such manner as to constitute a nuisance of any kind, or for any purpose or in any way in violation of any then applicable present or future legal requirement affecting the Premises.  Tenant shall

7

immediately upon the discovery of any such unlawful, illegal, disreputable or extra hazardous use, misuse or violation take all necessary steps, legal and equitable, to compel the discontinuance thereof and to oust and remove any subtenant, occupant, licensee, concessionaire, or other Person causing such unlawful, illegal, disreputable or extra hazardous use, misuse or violation.

      **2.3**    **USFHP**. Landlord is engaged in the business of administering a managed health care plan known as the Uniform Services Family Health Plan (the "USFHP") pursuant to that certain Contract No. H9400209C0006 by and between the Department of Defense/TRICARE Management Activity and Landlord, dated October 1, 2008, as same may be amended, supplemented or replaced from time to time (the "USFHP Contract" and such business, the "Business"). Tenant shall not use or occupy, nor permit or suffer the Premises or any part thereof to be used or occupied, for any purpose which would cause a default under the USFHP Contract or otherwise impair Landlord's ability to continue to operate the Business in accordance with all of the terms and conditions of the USFHP Contract. Tenant shall not seek to change the Permitted Use of the Premises without the prior written consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion if Landlord determines in its sole but good faith discretion that such change in the Permitted Use could adversely impact the USFHP Contract or Landlord's operation of the Business. Without limiting the generality of the foregoing, but subject to the provisions of Section 15.3 hereof, Tenant shall not (i) perform any Alterations (as hereinafter defined) on or to the Premises; (ii) assign this Lease; (iii) sublet all or any portion of the Premises (or permit the subletting of all or any portion of the Premises); or (iv) do or permit any other act, if the action listed in (i) through (iv) would cause a default under the USFHP Contract or otherwise adversely impact (other than to a de minimis extent) Landlord's ability to continue to operate the Business in accordance with all of the terms and conditions of the USFHP Contract. Any Landlord determination regarding a default under the USFHP Contract or an adverse impact on the Business as set forth above, shall be made in good faith.

      **2.4**    **Assumption of Obligations**. Except for Pre-Commencement Operational Expenses (as hereinafter defined) and matters set forth in Schedule C annexed hereto (which Tenant does not assume), Tenant hereby assumes, and agrees to pay and perform when due, all of the obligations of Landlord, whether currently existing or hereafter arising, specifically arising from and/or relating to the Premises with respect to the ownership, maintenance and/or operation of the Premises, but limited to all obligations (i) pursuant to (A) the Space Leases, (B) all documents listed on Schedule D annexed hereto (it being understood that Tenant shall also be entitled to any and all benefits, income and other payments actually received pursuant to the documents listed on Schedule D and relating to the period from and after the Commencement Date until the expiration or earlier termination of the Term), (C) all documents (other than judgments and liens) currently of record, and (D) all easements, leases, contracts and other agreements entered into on or after the Commencement Date (other than easements, leases, contracts and/or other agreements entered into by Landlord on or after the Commencement Date in violation of the terms hereof), (ii) relating to the Foundling, The Salvation Army and Saint Joseph's Medical Center (and their respective successors and assigns) by virtue of each such party's ownership and/or occupancy and/or operation of land and/or improvements thereon

which are adjacent to or near the Premises, and (iii) relating to the physical condition of the Premises (including, without limitation, with respect to Tenant's obligations under Articles VIII and XIX hereof), specifically relating to the Premises (as opposed, for example, arising from other properties owned by Landlord and/or obligations of Landlord not specifically relating to the Premises), provided, however, that, for so long as Tenant shall not be in default under this Lease, Landlord agrees that it shall not enter into any new contract, lease or agreement in respect of the Premises or amend any contract, lease or agreement in respect of the Premises or grant or amend any easement, restriction, right-of-way in respect of the Premises or otherwise voluntarily encumber the Premises from and after the date hereof and during the Term of this Lease, as the Term may be extended hereunder, without Tenant's consent unless (i) required under applicable law, or (ii) by a utility provider or other similar entity. Notwithstanding anything to the contrary, Tenant's obligations under this Lease to perform the obligations pursuant to Article 19 shall be as set forth therein. Notwithstanding anything to the contrary, Tenant's obligations to perform the obligations of Landlord under (i) the Premises Documents as set forth in Section 1.5 hereof or (ii) this Section 2.4 including, without limitation, under the documents set forth in Schedule D annexed hereto, shall only arise when due. For purposes of the foregoing sentence, the term "due" shall mean only after a written bill, demand, claim, notice or other writing with respect to such obligation has been received by Tenant from the applicable third party (other than the Landlord, unless Landlord is providing Tenant a writing from a third party), and provided however, that Tenant shall in all events have the right to contest any and all such obligations and the compliance therewith, subject to and upon the terms and conditions contained in Section 1.3 hereof. Notwithstanding anything to the contrary, Tenant shall not be and shall not be deemed to be in default under this Lease for violating the provisions of this Section 2.4 unless and until compliance with such obligation shall be due as aforesaid; provided, however, that notwithstanding the foregoing or anything in this Lease to the contrary, Tenant shall not be deemed to be in default while contesting any such compliance or obligation, subject to and upon the terms and conditions contained in Section 1.3 hereof. Notwithstanding anything to the contrary contained in this Lease, Landlord (and not Tenant) shall be responsible for payment or satisfaction of any and all operational expenses including, but not limited to, all utility bills, real estate taxes (if any), insurance premiums and other similar costs of operating the Premises and all charges, liens and judgments arising from such costs of operating the Premises that pertain or relate to the period prior to the Term (collectively, "Pre-Commencement Operational Expenses"); provided, however, that for purposes of clarification, in no event shall "Pre-Commencement Operational Expenses" include amounts payable, whenever arising (i) in connection with any easements, declarations or similar agreements (whether recorded or unrecorded) affecting the Property including, without limitation, those documents referenced on Schedule D annexed hereto or (ii) relating to the physical condition of the Premises (including, without limitation, with respect to Tenant's obligations under Articles VIII and XIX hereof). Notwithstanding anything to the contrary contained in this Lease, Landlord (and not Tenant) shall be responsible for the payment or satisfaction of any and all Pre-Commencement Operational Expenses, the matters set forth in Schedule C annexed hereto, and for any and all liabilities, payments, costs, expenses and charges arising from or relating to any and all mortgages signed by Landlord or its affiliates affecting the Premises whether before, during or after the Term, including but not limited to any and all mortgage payments of principal and/or

9

interest, escrow payments, reserve fund payments and all other similar charges and/or payments and/or liabilities in respect thereof (except to the extent such mortgage liability arises exclusively from the default under this Lease of Tenant or of any party claiming by, through or under Tenant, in which event Tenant shall only be liable for the penalties, damages, expenses, fees and other costs demanded by, and payable to, the mortgagee under the applicable loan documents, if any, as a result of such default, but in no event shall Tenant be liable for the repayment of any principal of, or interest, escrow or reserve payments on, any mortgage executed by Landlord or its affiliates). Notwithstanding the foregoing, Landlord represents and warrants to Tenant and agrees that this Lease and Tenant's compliance with the provisions of this Lease do not and will not violate any provision of any mortgage referred to hereinabove and that Tenant shall have no mortgage liability in connection with its compliance with the provisions of this Lease (except as specifically set forth in the parenthetical above).

**2.5    Ethical and Religious Directives**.  **Notwithstanding any contrary provision contained herein, Tenant shall not do or permit anything to be done in or upon the Premises, or any part thereof, which would violate any of the Ethical and Religious Directives for Catholic Health Care Services (the "Directives")**.

**2.6    Use of Storage Space**.  Tenant hereby agrees that, during the Term (as same may be extended pursuant to Section 1.2 hereof), Landlord shall be entitled to continue using for storage the rooms located on the second and fifth floors of Building 1 of the Premises (collectively, the "Storage Areas") which are currently used for storage of files and other items, and that Landlord (and its agents) shall have the right to access the Storage Areas from time to time including, without limitation, to add items to and/or remove items from the Storage Areas. Tenant shall have no right to access the Storage Areas and Tenant shall be entitled to no compensation whatsoever in connection with Landlord's use of the Storage Areas.  Tenant shall have the right to provide Landlord with alternative rooms within Building 1 which are substantially similar to the Storage Areas, and Landlord shall vacate the Storage Areas and relocate the items contained in the Storage Areas to such alternative rooms (which alternative rooms shall then be deemed to be the "Storage Areas" for purposes hereof) no later than two (2) weeks after written notice from Tenant to Landlord (which notice shall specify the location of the replacement storage areas and Tenant shall provide Landlord with access thereto).

**ARTICLE III**
**PAYMENT OF TAXES, ASSESSMENTS AND OTHER CHARGES**

**3.1    Taxes**.  For purposes hereof, "Taxes" shall mean all taxes, assessments and all other charges, taxes, levies and sums of every kind or nature whatsoever, general and special, extraordinary as well as ordinary, whether or not now within the contemplation of the parties, as are currently or shall or may during or in respect of the term be assessed, levied, charged or imposed upon or become a lien on the Premises, or any part thereof, or anything appurtenant thereto, or the sidewalks or streets on or adjacent to the Premises.  If, at any time during the Term, the methods of taxation prevailing at the commencement of the Term shall be altered so that, in addition to, in lieu of or as a substitution in whole or in part for the taxes, assessments,

10

levies, impositions or charges now or hereafter levied, assessed or imposed on real estate and the improvements thereon, shall be levied, assessed or imposed any tax or other charge on or in respect of the Premises or the rents, income or gross receipts of Landlord therefrom (including any county, town, municipal, state or federal levy), then such taxes or charges shall be deemed Taxes, and Tenant shall pay and discharge the same as herein provided in respect of the payment of Taxes. Reasonable fees and expenses, if any, incurred by Landlord in obtaining any reduction of the Taxes shall also be considered Taxes for the purpose of this Section. However, Landlord shall have no obligation to attempt to obtain any such reduction.

       **3.2**     **Tenant to Pay Taxes**. Tenant covenants and agrees to pay, as Additional Rent, all Taxes owed or pertaining to any period during the Term directly to the applicable taxing authority not later than the date on which any fine, penalty, interest or cost may be added thereto or imposed by law for the nonpayment thereof (the "Outside Payment Date"); provided, however, that if, by law, any Taxes may at the option of the taxpayer be paid in installments (whether or not interest shall accrue on the unpaid balance of such Taxes), Tenant may exercise the option to pay the same in such installments (together with all interest that shall accrue thereon) and if Tenant shall fail to pay any such Taxes or any such interest on or before the Outside Payment Date twice during the Term, then from and after the second such failure, each such Taxes, or installment thereof, during the Term shall be paid not later than thirty (30) days prior to the applicable Outside Payment Date.

       **3.3**     **Right to Contest Taxes**. Tenant shall have the right, provided it does so with due diligence and dispatch, to contest by appropriate legal proceedings, without cost, expense or liability to Landlord, the amount or validity of any Taxes or other governmental charges provided such contest and/or non-payment shall not subject Landlord to any criminal liability, fine or penalty. Landlord agrees to provide reasonable cooperation to Tenant in the pursuance of such contest, including, without limitation, the execution of any documents or applications necessary in connection therewith, provided that Landlord shall not thereby incur any cost, expense, charge or liability in connection therewith. In all events, Tenant shall not contest any Taxes or other governmental charges if at any time the Premises, or any part thereof, shall be in danger of being forfeited or lost, such contest shall cause Landlord to be in default under any mortgage, or if Landlord shall be in danger of being subject to criminal and/or civil liability or penalty by reason of such contest.

**ARTICLE IV**
**UTILITIES**

       **4.1**     **Tenant to Pay All Utilities**. Tenant shall obtain and pay for all electric current, water, sewage, telephone, heating oil, gas or other fuel and all other utilities supplied to, used in connection with or servicing the Premises and all mechanical systems therein, including without limitation the heating, air conditioning and lighting equipment and systems by direct application to and arrangement with the public utility company servicing the Premises. Tenant shall not use or install any fixtures, equipment or machines the use of which in conjunction with other fixtures, equipment or machines in the Premises would result in an overload of the electrical

11

equipment supplying electric current to the Premises. All Alterations (as defined below) to the electrical equipment supplying electric current to the Premises shall be performed in accordance with Article 10, hereof. Tenant shall not permit its use of electric current to exceed the capacity of then existing risers, feeders, the electrical service panel or bus ducts to the Premises. Landlord shall not be required to furnish to Tenant any services of any kind whatsoever such as, but not limited to, water, steam, heat, gas, hot water, electricity, light and power. Landlord shall not be held liable for: (i) any failure of water supply, electric current or any services by any utility; (ii) injury to person (including death) or damage to property resulting from steam, gas, electricity, water, rain or snow which may flow or leak from any part of the Premises or from any pipes, appliances, plumbing works from the street or subsurface or from any other place; (iii) temporary interference with lights or other easements; and (iv) maintenance or repair work conducted by or for Landlord.

**ARTICLE V**
**INSURANCE**

**5.1    Tenant to Maintain Hazard Insurance**.  Tenant shall, at Tenant's sole cost and expense, obtain "all risks" property coverage including boiler and machinery/machinery breakdown coverage, covering building and all contents. in such amount or amounts as Landlord may from time to time reasonably require.

**5.2    Tenant to Maintain Liability Insurance**.  Tenant, at Tenant's sole cost and expense, shall maintain for the mutual benefit of Landlord and Tenant, comprehensive general liability insurance on an occurrence basis, against claims for personal injury, death or property damage occurring upon, in or about the Premises and on, in or about the adjoining streets and passageways with limits of $1,000,000 per occurrence/$3,000,000 aggregate in respect of bodily injury or death of any number of persons in a single occurrence and $1,0000,000 per occurrence/$3,000,000 aggregate for property damage as well as Excess/Umbrella Liability of not less than $5,000,000 per occurrence/$5,000,000 aggregate.  Tenant shall also maintain Workers' Compensation  insurance in accordance with New York State law and automobile liability insurance as applicable, of not less than $1,000,000 combined single limit.

**5.3    Insurance Policy Requirements**.  All policies of insurance shall, to the extent obtainable at reasonable cost, provide that any loss shall be payable to Landlord notwithstanding any act or negligence of Tenant which might otherwise result in a forfeiture of said insurance, and shall further provide that same shall not be cancelable, terminable, modifiable or non - renewable on less than thirty (30) days' actual prior notice to all insureds and the holder of any Superior Mortgage, as defined below.  All insurance provided under this Lease shall be issued by insurers licensed to do business in the State of New York.  All insurance required hereunder shall name Tenant as the insured and shall also name as additional insureds Landlord and such other parties as Landlord shall designate as additional insureds.  Tenant shall deposit with Landlord and, if requested by Landlord, any Superior Mortgagee, the original certificates of insurance for all insurance required under this Article 5 prior to Tenant's possession of the Premises and, at least thirty (30) days prior to the expiration date of any policy, the original renewal certificates

for such insurance shall be delivered by Tenant to Landlord, together with reasonably satisfactory evidence of its payment.

5.4    **Insurance Waivers**.  All policies procured by Tenant or Landlord with respect to the Premises and the fixtures and equipment therein, whether or not required hereby to be carried, which insure the interest of one party only, shall (if it can be so written and either does not result in additional premium or the other party agrees to pay upon demand any additional resulting premium) include provisions denying to the insurer acquisition by subrogation of rights of recovery against the other.  Both Landlord and Tenant, to the extent permitted by the applicable policy, hereby waive any rights of recovery against the other for any direct damage or consequential loss normally covered by such policies, against which such party is protected by insurance, to the extent of the proceeds paid under such policies, whether or not such damage or loss shall have been caused by any acts or omissions of the other party.

5.5    **Landlord's Insurance**.  Landlord may, at its sole cost and expense, maintain policies of comprehensive general public liability insurance and property damage insurance in such amounts as Landlord deems reasonable, insuring Landlord from all claims, demands or actions for injury to or death of any person or persons and for damage to property made by, or on behalf of, any Person or Persons, firm or corporation, arising from, related to or connected with Landlord's ownership of the Premises.

## ARTICLE VI
## RIGHT TO PERFORM COVENANTS

6.1    **Landlord's Right to Perform Tenant's Obligations**.  If Tenant shall at any time fail to make any payment or perform any other act on its part to be made or performed under this Lease, Landlord may, but shall not be obligated to, and without notice or demand in the case of an emergency but otherwise upon not less than ten (10) days' notice to Tenant, and without waiving or releasing Tenant from any obligation of Tenant under this Lease, make such payment or perform such other act to the extent Landlord may deem necessary, and in connection therewith pay expenses and employ counsel.  All reasonable sums so paid by Landlord and all reasonable expenses in connection therewith shall be deemed Additional Rent hereunder and be payable from Tenant to Landlord within ten (10) days after demand therefor.  Landlord's acceptance of any such payment shall not be deemed to be a waiver of Tenant's default.  The provisions of this Article 6 shall survive the expiration or earlier termination of this Lease.

## ARTICLE VII
## REPAIRS AND MAINTENANCE OF PREMISES
## SURRENDER OF PREMISES - WASTE

7.1    **Tenant to Repair and Maintain the Premises**.  Tenant covenants, at Tenant's sole cost and expense, to take good care of the Premises and the utility connections, sidewalks, curbs and vaults, if any, adjoining the Premises, and to keep the same in good working order and repair and to make promptly all necessary repairs thereto, interior and exterior, structural and nonstructural, ordinary as well as extraordinary, foreseen as well as unforeseen, and equal in

KL3 2810838.19

quality and class to the condition thereof existing as of the date hereof or as may exist upon completion of any Alteration and does hereby expressly waive any right to make repairs at the expense of Landlord as provided for in any statute or law in effect at the time of the execution of this Lease or any amendment thereof, or any other statute or law which may hereafter be enacted during the Term. Such repairs shall be executed pursuant to the provisions of Article 10 hereof. Tenant covenants to keep the Premises and sidewalks in a clean and orderly condition and free of dirt, rubbish, snow and ice and free from vermin, rodents or anything of a similar nature.

      **7.2**    **Surrender of Premises**. On the last day of the Term or on the earlier termination thereof, Tenant shall peaceably and quietly leave, surrender and deliver the Premises to Landlord, together with: (i) all Alterations; and (ii) all fixtures and articles of personal property of any kind or nature which Tenant may have installed or affixed on, in, or to the Premises in accordance with the terms of this Lease, all of the foregoing to be surrendered in good, substantial and sufficient repair, order and condition, reasonable use, wear and tear, and damage by fire or other casualty, excepted, and, unless otherwise consented to by Landlord, free of subtenants and other occupants, but excepting occupants under the Space Leases as they exist on the date hereof or pursuant to amendments approved by Landlord in writing. Tenant shall pay or cause to be paid the cost of repairing or remedying any damage caused by the removal of its property, provided that no item of Tenant's property may be removed if its removal would impair the structural integrity of the Premises. All property not so removed shall be deemed abandoned and may either be retained by Landlord as its property or disposed of, without accountability, at Tenant's sole cost, expense and risk, in such manner as Landlord may see fit. The provisions of this Section 7.2 shall survive the expiration or earlier termination of this Lease.

      **7.3**    **No Holdover**. Subject to Section 7.2 above, if the Premises are not surrendered in accordance with the provisions of this Article 7 upon the expiration or termination of this Lease, Landlord shall have all rights given at law or in equity, in the case of holdovers, to remove Tenant and anyone claiming through or under Tenant. In any event, Tenant shall and does hereby indemnify Landlord against all loss or liability arising from delay by Tenant in so surrendering the Premises, including any claims made by any succeeding tenants founded on such delay. Tenant expressly waives, for itself and for any Person claiming by, through or under Tenant (including creditors), any rights which Tenant or any such Person may have under the provisions of any law in connection with any holdover summary proceedings which Landlord may institute to enforce the provisions of this Section. Tenant's obligations under this Section shall survive the expiration or termination of this Lease. Tenant acknowledges the importance to Landlord that possession of the Premises be surrendered at the expiration or sooner termination of this Lease in the condition required hereunder. In the event that Tenant fails to vacate the Premises at the expiration or sooner termination of this Lease in accordance with the terms hereof, Tenant, in addition to the indemnity obligation set forth above, shall be obligated to pay Landlord damages in an amount equal to twice the fair market rental value for the Premises at the time of such holdover plus twice the Additional Rent provided for on the day preceding the expiration date for such period of time that Tenant holds over on a per diem basis.

KL3 2810838.19

**7.4     No Waste**.  Tenant covenants not to commit or permit any waste or injury to the Premises or permit or suffer any overloading of the floors of the Building.

**ARTICLE VIII
COMPLIANCE WITH LAW**

**8.1     Tenant to Comply with Laws**.  Tenant shall comply with (a) all laws, statutes, rules, regulations, ordinances, codes, judgments, decrees, requirements, orders and other promulgations or pronouncements having the effect of law of the United States, any foreign country or any domestic or foreign state, county, city or other political, public or quasi-public subdivision or of any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, any foreign country or any domestic or foreign state, county, city or other political, public or quasi-public subdivision, now or hereafter enforced against or applicable to, the Premises or relating to use or occupancy thereof by Tenant or to the making by Tenant of repairs, changes, alterations or improvements, whether present or future, ordinary or extraordinary, structural or otherwise, seen or unforeseen, including but not limited to the performance of any duty imposed upon Landlord or Tenant in respect of the sidewalks, parking areas, curbs, streets or vaults adjacent to the Premises and (b) all rules and regulations applicable to the Premises issued by the Board of Fire Underwriters or by any other body hereinafter constituted, exercising similar functions, and by insurance companies writing policies covering the Premises which now or hereafter may become applicable thereto (all of the foregoing, collectively, "Legal Requirements").  Tenant shall pay all costs, expenses, claims, fines, penalties and damages that may be imposed because of the failure to comply with this Article and shall indemnify, defend and hold harmless Landlord from and against any and all liability arising from each non - compliance.  Landlord and Tenant shall each promptly give notice to the other of any notice of violation received by them.

**8.2     Tenant's Right to Contest Laws**.  Notwithstanding the foregoing provisions of this Article 8 but subject to the last sentence of Section 8.1, at no cost, expense or liability of Landlord, Tenant shall, provided that Tenant has given written notice to Landlord of same, have the right and option to contest or review in good faith by legal, administrative or other appropriate proceedings the validity or applicability of such Legal Requirements upon the conditions that Landlord's estate in the Premises shall not be forfeited reason of such contest and that the operation of the Business will not be limited or otherwise affected in any material manner.  Nothing contained herein shall confer or imply any right on the part of Tenant to postpone compliance with any notice or order relating to any Legal Requirement unless Tenant shall stay or otherwise protect against the enforcement thereof.  Any such proceeding instituted by Tenant shall be begun as soon as is reasonably possible after the issuance of any such contested matters and shall be prosecuted to final adjudication with reasonable dispatch.  Notwithstanding the foregoing, Tenant promptly shall comply with any such Legal Requirement and compliance shall not be deferred if at any time the Premises, or any part thereof, shall be in danger of being forfeited or lost, such contest shall cause Landlord to be in default under any mortgage, or if Landlord shall be in danger of being subject to criminal liability, fine or penalty by reason of such contest.  Landlord shall, at Tenant's cost and expense, join in any such

15

proceedings if necessary in order to properly prosecute such proceedings, but Landlord shall not be liable for any costs or expenses, nor shall Landlord incur any liability whatsoever in connection therewith and Tenant hereby indemnifies Landlord in connection with any such expenses. The proceedings referred to herein shall include, but shall not be limited to, appropriate appeals from any judgment, decrees or orders made in any such proceedings.

**8.3**    The provisions of this Article 8 shall survive the expiration or earlier termination of this Lease but the provisions of this Article 8 shall not apply to any Environmental compliance which shall be governed exclusively by Article 19 hereof.

## ARTICLE IX
## SIGNAGE

**9.1**    **Signage**. Tenant shall be permitted to erect or post any signs of any kind on the Premises provided that the same comply with all applicable legal requirements. The parties agree that in the event that either party receives a request or directive from any governmental or accreditation agency to add, remove or change any signage, the signage shall be changed to comply with such request or directive. Tenant shall remove all of its signage upon the expiration or sooner termination of the Lease and shall repair, it Tenant's sole cost and expenses, any damage caused by the removal of such signage. The provisions of this paragraph shall survive the expiration or sooner termination of this Lease.

## ARTICLE X
## CHANGES AND ALTERATIONS BY TENANT

**10.1**    **Alterations**. Subject to Section 2.3 hereof, Tenant shall have the right to make any improvements, modifications, additions, alterations or changes to the Premises or any part thereof (collectively, "Alterations") of any nature without Landlord's prior written consent in each instance, provided that Tenant shall provide Landlord with reasonable prior written notice with respect to the performance of any Alterations (other than purely decorative Alterations), which exceed $500,000 in the aggregate. All Alterations, including all maintenance and repairs required pursuant to Article 8 hereof, shall be performed by Tenant, at its sole cost and expense, in accordance with this Article 10. Notwithstanding the foregoing, no Alteration shall at any time be made which shall change the Permitted Use for which the Premises may be used; result in waste or injury to the Premises; or result in a devaluation of the Premises, without the prior written consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion.

**10.2**    **Title to Alterations**. Title to each Alteration which is real property, fixtures (but not Tenant's trade fixtures), improvements or replacement Building Equipment installed in the Premises or any part thereof at any time, either by Tenant or by Landlord on Tenant's behalf, shall, upon installation be free and clear of all liens and shall vest and become the property of Landlord and shall remain upon and be surrendered with the Premises on the expiration or sooner termination of this Lease. Notwithstanding any contrary provision contained herein, Tenant shall have the right to grant purchase money security interests in connection with the

16

acquisition or replacement Building Equipment, provided that at the expiration or sooner termination of the Term, that such replacement or additional Building Equipment shall be surrendered to and become the property of Landlord free of such purchase money security interests.

      **10.3    Alteration Requirements**.  Any permitted Alterations in or to the Premises shall be performed in accordance with all of the following conditions:

      (a)    No Alteration shall at any time be made which shall diminish the value of the Premises, or change the purposes for which the Premises may be used, provided further that nothing herein shall be deemed to permit Tenant to amend or modify the certificate of occupancy for the Premises to change the use for thereof for any use other than as permitted pursuant to the terms hereof; and

      (b)    All Alterations shall be done in a good and workmanlike manner and shall comply with all building and zoning laws and with all other Legal Requirements and Tenant shall procure all permits, approvals and certificates of occupancy and other certificates as may be required by law; and

      (c)    Prior to the commencement of any Alteration by or for Tenant, Tenant shall furnish to Landlord and shall cause all of its contractors performing the Alteration or any part thereof permitted hereunder to furnish to Landlord original certificates evidencing the existence of the following insurance:

      (1)    Worker's compensation insurance covering all Persons employed for such work and with respect to whom death or bodily injury claims could be asserted against Landlord, Tenant or the Premises, employer's liability in an amount not less than $1,000,000 per accident; and

      (2)    Except for routine maintenance and repairs, broad form comprehensive general liability insurance naming Landlord, its designees, and Tenant as insureds, such insurance to afford protection in an amount determined by Landlord but in no event less than One Million ($1,000,000.00) Dollars combined single limit for damage to property and for injury or death arising out of any one occurrence.  Tenant, at its sole cost and expense, shall cause all such insurance to be maintained at all times when the work to be performed for or by Tenant is in progress.  All such insurance shall be underwritten by reputable insurance companies authorized to do business in New York and all policies, or certificates thereof, issued by the insurer and bearing notations evidencing the payment of premiums, shall be promptly delivered to Landlord; and

      (d)    Before the commencement of any material structural Alteration, Tenant shall deliver to Landlord a copy of any contract with any general contractor, construction manager or subcontractor providing labor, services, materials or supplies in connection with such Alteration; and

KL3 2810838.19

(e)    Tenant shall indemnify, defend and hold Landlord harmless from and against any violations of any Legal Requirement, mechanics lien or other lien, claim for personal injury, property damage or wrongful death arising out of or in connection with any Alteration of the Premises performed by or on behalf of Tenant.  This indemnification shall expressly survive the expiration or sooner termination of the Lease; and

(f)    Upon completion of all Alterations to the Premises, Tenant shall deliver to Landlord each of the following:

(1)    a certificate of occupancy (or equivalent certificate) which may be required by any governmental authority to evidence completion of the Alteration; and

(2)    a certificate of substantial completion executed by the architect, if any, who supervised the Alteration of the Premises, which certificate shall state that all work has been substantially completed in accordance with the plans and specifications; and

(3)    full lien waivers from all individuals (not otherwise employed by a contractor or subcontractor or other mechanic or materialmen which are the subject of this subsection), firms, partnerships and corporations that provided the labor, services, materials or supplies in connection with each such Alteration; and

(4)    for any Alteration that modifies or changes the size of and of the Buildings or which adds improvements beyond any of the Building's lines or alters the exterior of any existing structure or improvement located on the Land, an accurate survey of the Premises certified to Landlord showing the completed structure and parking facilities and showing that there are no encroachments by either on any adjoining premises as a result of the Alteration; and

(g)    Tenant shall reimburse Landlord on demand as Additional Rent for all reasonable expenses incurred by Landlord in inspecting the Alterations to determine whether the same are being or have been performed in accordance with the terms of this Lease, including the reasonable fees and expenses of any architect or engineer employed for such purpose.

## ARTICLE XI
## DAMAGE OR DESTRUCTION

**11.1    Damage to the Premises**.  Damage to or destruction of the Building or any Building Equipment by fire, or other casualty shall not release or diminish Tenant's obligations hereunder, afford Tenant an abatement of rent, entitle Tenant to surrender possession of the Premises, terminate this Lease or violate any provisions hereof.  Tenant covenants and agrees that in case of damage to or destruction of the Building or any Building Equipment occurring after the Commencement Date, by fire or other casualty, Tenant, at Tenant's sole cost and expense, will promptly and diligently repair, restore, replace and rebuild the same to the condition existing immediately prior to such damage or destruction, in accordance with Article 10 hereof.  All insurance proceeds received on account of such damage or destruction up to $375,000 in the aggregate, whether received by Landlord or Tenant, less reasonable cost, if

18

any, of such recovery (which costs shall be payable to the party incurring such costs) shall, so long as no Tenant default which continued beyond the applicable cure period set forth in Article XVII hereof then exists hereunder, be paid to Tenant and promptly applied by Tenant for the payment of the cost of such restoration, repair, replacement or rebuilding including expenditures made for temporary repairs or for the protection of property pending the completion of permanent restoration, repair, replacement, or rebuilding; all such insurance proceeds in excess of $375,000 shall be deposited into a segregated interest-bearing account maintained by an institutional trustee designated by Landlord (with the interest to follow the proceeds thereof) and shall be applied to the payment of the cost of such restoration, repair, replacement or rebuilding including expenditures made for temporary repairs or for the protection of property pending the completion of permanent restoration, repair, replacement, or rebuilding, and, unless an uncured default by Tenant shall then exist hereunder, shall be paid out to Tenant, upon Tenant's request therefor made from time to time and as reasonably approved by Landlord (together with provision by Tenant of such documentation as Landlord shall reasonably require), as such work progresses. If Tenant defaults and such default is not cured within the applicable cure period set forth in Article XVII hereof, Landlord may use and apply the insurance proceeds as it determines in its sole discretion. It is the intention of Landlord and Tenant that the foregoing is an "express agreement to the contrary" as provided in Section 227 of the Real Property Law of the State of New York. Any remaining proceeds shall be the property of Landlord.

## ARTICLE XII
## CONDEMNATION

12.1    **Partial Condemnation**.  If any part of the Premises is taken or condemned for a public or quasi-public use (a sale in lieu of condemnation to be deemed a taking or condemnation) (each an "Appropriation"), this Lease shall, as to the part taken, terminate as of the date title shall vest in the condemnor and continue in full force as to the remainder (without any abatement of Rent) and in the event of such a partial taking Tenant shall promptly and diligently restore the remaining portion of the Premises to a complete architectural unit and such that use prior to such taking is restored to as close to pre-taking functionality as reasonably possible.  Such restoration, repairs and reconstruction shall be performed in accordance with the terms of Article 10 hereof.  Any condemnation proceeds received on account of such Appropriation up to $375,000 in the aggregate, whether received by Landlord or Tenant, less reasonable costs of collecting same, if any (which costs shall be payable to the party incurring such costs), shall, so long as no Tenant default which continued beyond the applicable cure period set forth in Article XVII hereof then exists hereunder, be paid to Tenant and promptly applied by Tenant for the payment of the cost of restoration, repair, replacement or rebuilding including expenditures made for temporary repairs or for the protection of property pending the completion of permanent restoration, repair, replacement, or rebuilding; all such insurance proceeds in excess of $375,000 shall be deposited into a segregated interest-bearing account maintained by an institutional trustee designated by Landlord (with interest to follow the proceeds thereof) and used for such restoration to restore the improvements located on the Premises and, so long as there is no Tenant default, paid out to Tenant, upon Tenant's request therefore made from time to time and as reasonably approved by Landlord (together with

provision by Tenant of such documentation as Landlord shall reasonably require), as such work progresses. If Tenant defaults and such default is not cured within the applicable cure period set forth in Article XVII hereof, Landlord may use and apply the condemnation proceeds as it determines in its sole discretion. Tenant shall, at its sole cost and expense, be responsible for all remaining costs to restore the Premises. Any remaining proceeds shall be the property of Landlord.

**12.2    Total Condemnation**.  In the event of total condemnation of the Premises (a sale in lieu of condemnation to be deemed a taking or condemnation), this Lease shall terminate as of the date title shall vest in the condemnor and, upon such termination, notwithstanding anything to the contrary, neither Landlord nor Tenant shall have any further obligations whatsoever hereunder, except to the extent of an uncured default hereunder by such party and provided further that Tenant shall not be liable for any obligation which first accrued to Landlord prior to the inception of this Lease but Tenant shall nonetheless remain liable in all events for its default hereunder or those of any party claiming by, through or under Tenant.

**12.3    Notice of Proceeding**.  Landlord and Tenant each covenant and agree that promptly after receipt by either party of notice from the condemning authority of the pendency of any such condemnation, such party shall deliver to the other party a copy of such notice.

**12.4    Condemnation Award**.  Any termination hereunder shall be without prejudice to the rights of either party to recover compensation from the condemning authority or be deemed or construed to prevent either Landlord or Tenant from enforcing and prosecuting a claim for the value of their respective interest in any condemnation proceeding.

**ARTICLE XIII**
**MECHANICS' LIENS**

**13.1    No Liens**.  Tenant shall not suffer or permit any mechanics' liens to be filed against the Premises nor against Tenant's leasehold interest therein by reason of work, labor, services or materials supplied or claimed to have been supplied to Tenant or anyone holding the Premises or any part thereof or otherwise claiming by, through or under Tenant.  Landlord shall have the right at all reasonable times to post and keep posted on the Premises any notices that may be provided by law which Landlord may reasonably deem to be necessary or advisable for the protection of Landlord and the Premises from mechanics' liens.  If any such mechanics' liens shall at any time be filed against the Premises after the Commencement Date, Tenant shall cause the same to be discharged of record by payment or bond within thirty (30) days after the date of such filing.  If Tenant shall fail to discharge such mechanics' lien within such period, then, in addition to any other right or remedy of Landlord, Landlord may, but shall not be obligated to, procure its discharge by paying the amount claimed to be due by deposit in court or by bonding. The amount paid by Landlord plus all reasonable legal expenses of Landlord in defending any such action or in procuring the discharge of such lien, with all reasonable necessary disbursements in connection therewith, shall be repaid by Tenant to Landlord within twenty (20) days after demand as Additional Rent.

KL3 2810838.19

## ARTICLE XIV
## LANDLORD'S RIGHT TO ENTER PREMISES

**14.1    Access to the Premises**.  Tenant agrees to permit Landlord and any authorized representatives of Landlord to enter the Premises at all reasonable times, upon reasonable notice or at any other time in case of emergency, to inspect, at Landlord's cost and expense (except in the event Tenant is, or Landlord has a good faith reason to believe that Tenant is, then in default hereunder, in which case such inspection shall be at Tenant's cost and expense), the same and if Landlord shall desire, but without implying any obligation on Landlord so to do, to make any repairs deemed by Landlord to comply with any Legal Requirements to the extent Tenant shall fail to perform such repairs in the time and manner required hereunder.  During the progress of any such work, Landlord may keep and store upon the Premises all necessary materials, tools and equipment.  Landlord shall not in any event be liable for inconvenience, annoyance, disturbance, loss of business or other damage to Tenant, except and only to the extent that such liability, inconvenience, annoyance, disturbance, loss of business or other damage arises solely as a result of Landlord's gross negligence or willful misconduct.

## ARTICLE XV
## ASSIGNING, SUBLETTING AND MORTGAGING

**15.1    No Assignment or Subletting**.  Subject to the provisions hereinafter contained, Tenant, for itself, its heirs, distributees, executors, administrators, legal representatives, successors and assigns, shall not assign, mortgage or otherwise encumber this Lease nor underlet or permit the Premises or any part thereof to be used by others without Landlord's prior written consent in each instance which may be withheld or granted in Landlord's sole and absolute discretion.  If this Lease be assigned, or if the Premises or any part thereof be underlet or occupied by anybody other than Tenant and a default shall exist under this Lease, Landlord may collect rent from the assignee, undertenant or occupant and apply the net amount collected to the Rent herein reserved, but no such assignment, underletting, occupancy or collection shall be deemed a waiver of this covenant, or the acceptance of the assignee, undertenant or occupant as Tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained.  The consent by Landlord to an assignment or underletting shall not in any way be construed to relieve Tenant from obtaining the express consent in writing of Landlord to any further assignment or underletting.  Any assignment or sublease hereunder shall not relieve Tenant of its obligations hereunder.  In no event shall any permitted sublessee assign or encumber its sublease or further sublet all or any portion of its sublet space, or otherwise suffer or permit the sublet space or any part thereof to be used or occupied by others, without Landlord's prior written consent in each instance, which may be granted or withheld in Landlord's sole and absolute discretion.

**15.2    No Transfers of Interests in Tenant**.  For purposes of this Article 15: (i) the issuance of any direct or indirect interest in Tenant or any subtenant (whether stock, partnership interest or otherwise) to any Person or group of related Persons, whether in a single transaction or a series of related or unrelated transactions, in such quantities that after such issuance such

21

Person or group shall have control (as defined below) of Tenant or such subtenant, shall be deemed an assignment of this Lease or such sublease, as the case may be; (ii) a transfer of more than 50% direct or indirect interest of Tenant or any subtenant (whether stock, partnership interest or otherwise) by any party or parties in interest whether in a single transaction or a series of related or unrelated transactions shall be deemed an assignment of this Lease, or such sublease, as the case may be; (iii) any Person or legal representative of Tenant, to whom Tenant's interest under this Lease passes by operation of law, or otherwise, shall be bound by the provisions of this Article 15; and (iv) a modification amendment or extension of a sublease shall be deemed a sublease. Further, for the purposes hereof: stock ownership shall be determined in accordance with the principles set forth in Section 544 of the Internal Revenue Code of 1954; and "control" shall be deemed to mean direct or indirect ownership of not less than 50% of all of the voting stock of a corporation or not less than 50% of all of the legal and equitable interest in any other business entities. Any assignment, sublease, mortgage, pledge, encumbrance or transfer by Tenant in contravention of this Article 15 shall be void.

      **15.3    Permissive Sublettings**. Notwithstanding anything to the contrary, Tenant shall, for its own account, be permitted to enter into subleases or other occupancies for portions of the Premises, without the prior consent of Landlord, provided that (i) the principal purpose of such transaction is not the acquisition of Tenant's interest in this Lease, and (ii) provided the same shall not violate the restrictions set forth in Section 2.3 hereof. Further, any such sublease shall provide that (i) the subtenant shall not violate the terms and conditions of this Lease (ii) such sublease shall be, at all times, subject and subordinate to this Lease in all respects; and (iii) at Landlord's election, after the expiration or earlier termination of this Lease in accordance with its terms, the subtenant shall attorn to Landlord.

## ARTICLE XVI
## INDEMNIFICATION OF LANDLORD

      **16.1    Tenant to Indemnify Landlord**. Tenant shall protect, indemnify, defend and hold Landlord, its affiliates and the officers, directors, trustees, sponsors, members, shareholders, partners, agents, successors and assigns, of each of them (collectively, "Indemnified Parties"), free and harmless from and against any and all claims, suits, proceedings, debts, liabilities, obligations, undertakings, damages, fines, fees, penalties, judgments, assessments, deficiencies, losses and expenses (including without limitation, interest, court costs, reasonable fees of attorneys, accountants and other experts or other expenses of litigation or other proceedings or of any claim, default or assessment) ("Claims" or "Losses") directly or indirectly arising out of, resulting from or relating to:

              (1)    any breach, default, violation or nonperformance of any representation, warranty, covenant, or agreement made by, or any obligation of, Tenant under this Lease, or arising out of or in connection with the falsity or inaccuracy of any such representation, warranty, covenant, or agreement; and

(2)     Tenant's or its agents' or affiliates' activities and conduct relating to or in connection with the Premises or the Business; and

(3)     the use and/or occupancy of, or from any work or thing whatsoever done in or about the Premises or of any passageways or spaces therein or appurtenant thereto, after the Commencement Date of this Lease; and

(4)     any and all violations of any Legal Requirements, any zoning, building, fire, sanitary, environmental (subject Section 19.5 below), housing and similar laws, municipal ordinances, orders or requirements affecting the Premises from or by any federal, state, county or municipal department, agency, authority or bureau having or asserting jurisdiction and any lien attaching to the Premises or any alteration, repair or remedial action required as a result of any of the foregoing violations which exist as of the date hereof or arise at anytime during the Term; and

(5)     any act or negligence of Tenant, or any of its agents, contractors, servants, employees or licensees during the Term;

(6)     any accident, injury or damage whatsoever caused to any Person, firm or corporation occurring during the Term, in or about the Premises, or upon the sidewalks; and/or

(7)     any contest by Tenant in connection with Sections 1.3, 3.3 or 8.1 hereof.

**16.2    Tenant to Defend Landlord**.  In the event any action or proceeding is brought against any Indemnified Party by reason of any such claim, Tenant upon notice from Landlord covenants to resist or defend such action or proceeding, at Tenant's sole cost and expense, by counsel reasonably satisfactory to Landlord.  Tenant shall keep Landlord apprised of any action or proceeding resulting from the foregoing indemnification and Landlord shall be permitted to participate in such proceeding, at Landlord's sole cost and expense, through counsel selected by Landlord or through Tenant's counsel in the defense of any such claim, action or proceeding. Tenant shall not compromise or settle any such claim, action or proceeding without the prior written consent of Landlord.  Notwithstanding the foregoing, if Landlord reasonably determines that the conduct of its defense by Tenant's counsel presents a conflict which could be prejudicial to Landlord's interests, Landlord may select its own counsel to participate in any such proceeding and the cost and expense of same shall be borne by Tenant.

**16.3    Survival**.  Tenant's obligations under this Article 16 shall survive the expiration or termination of this Lease.

KL3 2810838.19

# ARTICLE XVII
## CONDITIONAL LIMITATIONS - DEFAULT PROVISIONS

**17.1** **Non-Monetary Defaults**. If: (a) (i) this Lease shall be assigned or transferred in any manner, or shall by operation of law pass to or devolve upon any party, in violation of Section 15 hereof; or (ii) the Premises are used in violation of, or Tenant otherwise violates or permits the violation of, Article 2 hereof; or (iii) Tenant shall default in fulfilling any of the other covenants, agreements or provisions of, or otherwise defaults under, this Lease (other than the covenant for the payment of Basic Rent or any item of Additional Rent); and in the case of a default under clauses "(ii)" and "(iii)" hereinabove Landlord gives Tenant notice of any such default, and at the expiration of twenty (20) days after the giving of such notice the default upon which said notice was based shall continue to exist, or in the case of a default is susceptible to cure by Tenant but which cannot with due diligence be cured within a period of twenty (20) days, if Tenant fails to proceed promptly after the giving of such notice to cure the same and thereafter to prosecute the curing of such default with all due diligence (it being intended that in connection with such a default not susceptible of being cured with due diligence within twenty (20) days, the time of Tenant within which to cure the same shall be extended for such period as may be necessary to complete the curing with all due diligence (provided Tenant, throughout the entire cure period, is diligently, continuously and in good faith prosecuting such cure); or (b) (i) Tenant shall commence or institute any case, proceeding or other action (x) seeking relief on its behalf as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any existing or future Law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (y) seeking appointment of a receiver, trustee, custodian or other similar official for it or for any part of its property; (ii) Tenant shall make a general assignment for the benefit of creditors; (iii) any case, proceeding or other action shall be commenced or instituted against Tenant (x) seeking to have an order for relief entered against Tenant as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any existing or future Law of any jurisdiction, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (y) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any part of its property, which either results in any such entry of an order for relief, adjudication of bankruptcy or insolvency or such an appointment or the issuance or entry of any other order having a similar effect and which, in any of the foregoing instances, remains undismissed for a period of ninety (90) days; or (iv) a trustee, receiver or other custodian is appointed for any substantial part of the assets of Tenant which appointment is not vacated or effectively stayed within thirty (30) days, then in any such event Landlord may serve Tenant with a three (3) day notice terminating this Lease, and upon the expiration of said three (3) day period, this Lease and the Term hereunder shall end and expire as fully and completely as if the expiration of said three (3) day period was the day herein definitely fixed for the end and expiration of this Lease and the Term and Tenant shall then quit and surrender the Premises to Landlord, but Tenant shall remain liable as hereinafter provided. Notwithstanding the foregoing, but provided that Landlord shall promptly forward to Tenant the notice of default received from the USFHP, Landlord shall have the right

24

to terminate this Lease immediately in the event of a default by Tenant under Section 2.3 hereof which is not cured within the shorter of (i) the cure period set forth in the written notice of default from the USFHP, or (ii) the cure period provided above in this Section 17.1,. Notwithstanding the foregoing, in the event that the USFHP written notice of default shall not have any cure period set forth therein, the cure period shall be as provided above in this Section 17.1.

**17.2    Monetary Defaults**.  For purposes of this Lease, a "monetary default" shall mean Tenant has defaulted in the payment of Basic Rent or any item of Additional Rent, which default (i) is a default in such payment of Basic Rent or Additional Rent that exceeds, individually or when taken together with one or more other default(s) in the payment of Base Rent or Additional Rent, $100,000, and (ii) remains uncured for a period of 10 days after notice thereof is given by Landlord.  In the event of a monetary default, Landlord or Landlord's agents and servants may, to the extent permitted by law, immediately or at any time thereafter, terminate this Lease as of the date set forth in a notice from Landlord to Tenant and/or reenter the Premises and remove all Persons, subject to applicable law, and all or any property therefrom, either by summary dispossess proceedings or by any suitable action or proceeding at law, without being liable to indictment, prosecution or damages therefore, and repossess and enjoy the Premises together with all additions, Alterations and improvements.

**17.3    Waivers on Default**.  Tenant hereby expressly waives, to the extent permitted by applicable law, the service of notice of intention to reenter provided for in any statute, or to institute legal proceedings to that end, and also waives, to the extent permitted by applicable law, any and all right of redemption in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge.  The terms "enter", "re-enter", or "entry" or "re-entry" as used in this Lease are not restricted to their technical legal meanings.

**17.4    Remedies.**

(a)    If a monetary default shall occur or any other default shall occur beyond any applicable notice and cure period, if any, Landlord may elect to proceed by appropriate judicial proceedings, either at law or in equity, to enforce the performance or observance by Tenant of the applicable provisions of this Lease and/or to recover damages for breach thereof, including seeking expedited relief from the Bankruptcy Court.

(b)    If a monetary default shall occur or any other default shall occur beyond any applicable notice and cure period, if any, and Landlord, at any time thereafter, at its option, gives notice to Tenant stating that this Lease and the Term shall expire and terminate on the date specified in such notice as set forth in Sections 17.1 or 17.2 above, then this Lease and the Term and all rights of Tenant under this Lease shall expire and terminate as if the date specified in the notice given pursuant to this Article 17 were the date herein definitely fixed for the expiration of the Term and Tenant immediately shall quit and surrender the Premises, but Tenant shall remain liable as hereinafter provided.  Anything contained herein to the contrary notwithstanding, if such termination shall be stayed by order of any court having jurisdiction

25

over any proceeding described in Section 17.1(b) hereof, or by federal or state statute, then, following the expiration of any such stay, or if the trustee appointed in any such proceeding, Tenant or Tenant as debtor in possession shall fail to assume Tenant's obligations under this Lease within the period prescribed therefor by law or within one hundred twenty (120) days after entry of the order for relief or as may be allowed by the court, or if said trustee, Tenant or Tenant as debtor in possession shall fail to provide adequate protection of Landlord's right, title and interest in and to the Premises or adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease as provided in Section 17.4(l) hereof, Landlord, to the extent permitted by law or by leave of the court having jurisdiction over such proceeding, shall have the right, at its election, to terminate this Lease on five (5) days' notice to Tenant, Tenant as debtor in possession or said trustee and upon the expiration of said five (5) day period this Lease shall cease and expire as aforesaid and Tenant, Tenant as debtor in possession and/or said trustee shall immediately quit and surrender the Premises as aforesaid.

(c)     If this Lease shall be terminated as provided in this Article 17 and/or Tenant shall be dispossessed by summary proceedings or otherwise as provided in this Article 17 hereof,

(1)     Tenant shall pay to Landlord all Rent payable by Tenant under this Lease to the date upon which this Lease and the Term shall have expired and come to an end or to the date of re entry upon the Premises by Landlord, as the case may be;

(2)     Landlord may repair and alter the Premises in such manner as Landlord may deem necessary or advisable without relieving Tenant of any liability under this Lease or otherwise affecting any such liability, and/or let or relet the Premises or any parts thereof for the whole or any part of the remainder of the Term or for a longer period, in Landlord's name or as agent of Tenant, and out of any rent and other sums collected or received as a result of such reletting Landlord shall:  (i) first, pay to itself the cost and expense of terminating this Lease, re-entering, retaking, repossessing, and repairing and/or altering the Premises, or any part thereof, and the cost and expense of removing all Persons and property therefrom, including in such costs reasonable brokerage commissions, legal expenses and attorneys' fees and disbursements, (ii) second, pay to itself the cost and expense sustained in securing any new tenants and other occupants, including in such costs reasonable brokerage commissions, legal expenses and attorneys' fees and disbursements and other expenses of preparing the Premises for reletting, and, if Landlord shall maintain and operate the Premises, the cost and expense of operating and maintaining the Premises, and (iii) third, pay to itself any balance remaining on account of the liability of Tenant to Landlord; provided that in no event shall Tenant be entitled to any of the rent or other sums collected or received as a result of such reletting.  Landlord in no way shall be responsible or liable for any failure to relet the Premises or any part thereof, or for any failure to collect any rent due on any such reletting, and no such failure to relet or to collect rent shall operate to relieve Tenant of any liability under this Lease or to otherwise affect any such liability;

26

(3)     Tenant shall be liable for and shall pay to Landlord, as damages, any deficiency (referred to as "Deficiency") between the Rent reserved in this Lease for the period which otherwise would have constituted the unexpired portion of the Term and the net amount, if any, of rents collected under any such reletting effected pursuant to the provisions of Section 17.4(c)(2) for any part of such period (first deducting from the rents collected under any such reletting all of the payments to Landlord described in Section 17.4(c)(2) hereof); any such Deficiency shall be paid in installments by Tenant on the days specified in this Lease for payment of installments of Rent, and Landlord shall be entitled to recover from Tenant each Deficiency installment as the same shall arise, and no suit to collect the amount of the Deficiency for any installment period shall prejudice Landlord's right to collect the Deficiency for any subsequent installment period by a similar proceeding; and

(4)     Whether or not Landlord shall have collected any Deficiency installments as aforesaid, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord, on demand, in lieu of any further Deficiencies, as and for liquidated and agreed final damages (it being agreed that it would be impracticable or extremely difficult to fix the actual damage), a sum equal to the amount by which the Rent reserved in this Lease for the period which otherwise would have constituted the unexpired portion of the Term exceeds the then fair and reasonable rental value of the Premises for the same period, both discounted to present worth at the prime rate as determined from time to time by JPMorgan chase or its successor less the aggregate amount of Deficiencies theretofore collected by Landlord pursuant to the provisions of Section 17.4(c)(3) for the same period; it being agreed that before presentation of proof of such liquidated damages to any court, commission or tribunal, if the Premises, or any substantial part thereof, shall have been relet by Landlord for the period which otherwise would have constituted the unexpired portion of the Term, or any part thereof, the amount of rent reserved upon such reletting shall be deemed, prima facie, to be the fair and reasonable rental value for the part or the whole of the Premises so relet during the term of the reletting.

(d)     No termination of this Lease and no taking possession of and/or reletting the Premises, or any part thereof, pursuant to this Article 17, shall relieve Tenant of its liabilities and obligations hereunder, except as specifically provided herein, all of which shall survive such expiration, termination, repossession or reletting except as otherwise specifically provided.

(e)     To the extent not prohibited by law, Tenant hereby waives and releases all rights now or hereafter conferred by statute or otherwise which would have the effect of limiting or modifying any of the provisions of this Article 17.  Tenant shall execute, acknowledge and deliver any instruments which Landlord may request, whether before or after the occurrence of a default beyond any applicable notice and cure period, evidencing such waiver or release.

(f)     The Rent payable by Tenant hereunder and each and every installment thereof, and all reasonable costs (including attorneys' fees and disbursements) and

27

other expenses which may be incurred by Landlord in enforcing the provisions of this Lease or on account of any delinquency of Tenant in carrying out the provisions of this Lease shall be and they hereby are declared to constitute a valid lien upon the interest of Tenant in this Lease and in the Premises.

(g)     Suit or suits for the recovery of damages, or for a sum equal to any installment or installments of Rent payable hereunder or any Deficiencies or other sums payable by Tenant to Landlord pursuant to this Article 17, may be brought by Landlord from time to time at Landlord's election, and nothing herein contained shall be deemed to require Landlord to await the date whereon this Lease or the Term would have expired had there been no default by Tenant and termination.

(h)     Nothing contained in this Article 17 shall limit or prejudice the right of Landlord to prove and obtain as liquidated damages in any bankruptcy, insolvency, receivership, reorganization or dissolution proceeding an amount equal to the maximum allowed by a statute or rule of law governing such proceeding and in effect at the time when such damages are to be proved, whether or not such amount shall be greater than, equal to or less than the amount of the damages referred to in any of the preceding Sections of this Article 17.

(i)     No receipt of moneys by Landlord from Tenant after the termination of this Lease, or after the giving of any notice of the termination of this Lease (unless such receipt cures the default which was the basis for the notice), shall reinstate, continue or extend the Term or affect any notice theretofore given to Tenant, or operate as a waiver of the right of Landlord to enforce the payment of Rent payable by Tenant hereunder or thereafter falling due, or operate as a waiver of the right of Landlord to recover possession of the Premises by proper remedy, except as herein otherwise expressly provided, it being agreed that after the service of notice to terminate this Lease or the commencement of any suit or summary proceedings, or after a final order or judgment for the possession of the Premises, or any part thereof or interest therein, Landlord may demand, receive and collect any moneys due or thereafter falling due without in any manner affecting such notice, proceeding, order, suit or judgment, all such moneys collected being deemed payments on account of the use and occupancy of the Premises or, at the election of Landlord, on account of Tenant's liability hereunder.

(j)     Except as otherwise expressly provided herein or as prohibited by applicable law, Tenant hereby expressly waives the service of any notice of intention to re enter provided for in any statute, or of the institution of legal proceedings to that end, and the right to receive any and all other notices not expressly provided for in this Lease, and Tenant, for and on behalf of itself and all Persons claiming through or under Tenant, also waives any and all right of redemption provided by any law or statute now in force or hereafter enacted or otherwise, or re entry or repossession or to restore the operation of this Lease in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge or in case of re-entry or repossession by Landlord or in case of any expiration or termination of this Lease.

KL3 2810838.19

(k)     In the event of any breach or threatened breach by either party of any of the covenants, agreements, terms or conditions contained in this Lease, the other party shall be entitled to enjoin such breach or threatened breach and shall have the right to invoke any rights and remedies allowed at law or in equity or by statute or otherwise as though re-entry, summary proceedings, and other remedies were not provided for in this Lease.

(l)     If an order for relief is entered or if a stay of proceeding or other acts becomes effective in favor of Tenant or Tenant's interest in this Lease, in any proceeding which is commenced by or against Tenant under the present or any future applicable federal Bankruptcy Code or any other present or future applicable federal, state or other statute or law, Landlord shall be entitled to invoke any and all rights and remedies available to it under such bankruptcy code, statute, law or this Lease, including, without limitation, such rights and remedies as may be necessary to adequately protect Landlord's right, title and interest in and to the Premises or any part thereof and/or adequately assure the complete and continuous future performance of Tenant's obligations under this Lease. Adequate protection of Landlord's right, title and interest in and to the Premises, and adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease, shall include, without limitation, the following requirements:

(1)     that Tenant shall comply with all of its obligations under this Lease;

(2)     that Tenant shall pay to Landlord, on the first day of each month occurring subsequent to the entry of such order, or on the effective date of such stay, a sum equal to the amount by which the Premises diminished in value during the immediately preceding monthly period, but, in no event, an amount which is less than the aggregate Rent payable for such monthly period;

(3)     that Tenant shall continue to use the Premises in the manner required by this Lease;

(4)     that Landlord shall be permitted to supervise the performance of Tenant's obligations under this Lease;

(5)     that Tenant shall hire such security personnel as may be necessary to insure the adequate protection and security of the Premises;

(6)     that Tenant shall pay to Landlord on the date of entry of such order or the effective date of such stay, as partial adequate protection against future diminution in value of the Premises and adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease, a security deposit in an amount acceptable to Landlord, but in no event less than the Rent payable hereunder for the then current lease year;

KL3 2810838.19

(7)     that Tenant has and will continue to have unencumbered assets after the payment of all secured obligations and administrative expenses to assure Landlord that sufficient funds will be available to fulfill the obligations of Tenant under this Lease;

(8)     that Landlord shall be granted a security interest acceptable to Landlord in property of Tenant to secure the performance of all of Tenant's obligations under this Lease; and

(9)     that if Tenant's trustee, Tenant or Tenant as debtor in possession assumes this Lease and proposes to assign the same (pursuant to Title 11 U.S.C. § 365, as the same may be amended) to any Person who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to the trustee, Tenant or Tenant as debtor in possession, then notice of such proposed assignment, setting forth (i) the name and address of such Person, (ii) all of the terms and conditions of such offer, and (iii) the adequate assurance to be provided Landlord to assure such Person's future performance under the Lease, including, without limitation, the assurances referred to in Title 11 U.S.C. § 365(b)(3) (as they may be amended), shall be given to Landlord by the trustee, Tenant or Tenant as debtor in possession no later than twenty (20) days after receipt by the trustee, Tenant or Tenant as debtor in possession of such offer, but in any event no later than fifteen (15) days prior to the date that the trustee, Tenant or Tenant in possession shall make application to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption, and Landlord shall thereupon have the prior right and option, to be exercised by notice to the trustee, Tenant or Tenant in possession prior to the effective date of such proposed assignment, to accept an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such Person, less any brokerage commissions and other expenses which may be payable out of the consideration to be paid by such Person for the assignment of this Lease.

(m)     If this Lease shall terminate as a result of or while there exists a default beyond any applicable notice and cure period, any funds (including the interest, if any, accrued thereon) then held by Landlord in which the Tenant has an interest may be applied by Landlord to any damages payable by Tenant (whether provided for herein or by law or in equity) as a result of such termination or default beyond any applicable notice and cure period, and the balance remaining, if any, shall be paid to Tenant, subject to the rights of any mortgagee, if Tenant would be entitled to receive same but for such termination or default beyond any notice and cure period.

KL3 2810838.19

# ARTICLE XVIII
## SUBORDINATION

**18.1     Subordination**.  This Lease and all rights of Tenant hereunder are and shall be subject and subordinate to all ground leases, encumbrances and/or mortgages (including modification, spreaders and renewals thereof) which may now or hereafter encumber Landlord's fee interest in the Premises.  Landlord shall request that the holders of all such ground leases and mortgages (and all modifications, consolidations, replacements and extensions thereof) provide Tenant with a separate agreement which contains a provision substantially as follows: "If foreclosure or other enforcement proceedings are instituted under this mortgage, Tenant (and Tenant's successors and assigns) shall not be made a party defendant in such proceedings, and if Tenant (or Tenant's successors and/or assigns) shall not be in default under the Lease beyond any applicable notice and cure period then the Lease shall not be terminated, and neither Tenant's leasehold estate nor its possession of the Premises shall be disturbed in connection with such foreclosure or other enforcement proceedings."

**18.2     Confirmation of Subordination**.  The provisions of this Article 18 shall be self-operative and no further instrument of subordination shall be required.  Notwithstanding the foregoing, in confirmation of such subordination, Tenant shall promptly execute, acknowledge and deliver any reasonable instrument that Landlord reasonably request to evidence such subordination provided that Tenant has received the documentation required by Tenant in Section 18.1 hereof.  Any ground lease or mortgage to which this Lease is subject and subordinate is herein referred to as a "Superior Lease" or "Superior Mortgage," as the case may be, and the holder of a Superior Lease or Superior Mortgage is herein referred to as a "Superior Lessor" or "Superior Mortgagee," as the case may be.

# ARTICLE XIX
## ENVIRONMENTAL COMPLIANCE

**19.1     No Hazardous Substances**.  Tenant shall not cause or permit any Hazardous Substances, as defined herein, to be brought on, discharged from, or stored or used at or in connection with the Premises by Tenant, its agents, employees, contractors, licensees or invitees, in violation of Environmental Laws (as defined below).

**19.2     Definitions**.  For purposes hereof, the term "Hazardous Substances" shall mean (i) any substance, gas, material or chemical which is or may hereafter be defined as or included in the definition of "hazardous substances," "toxic substances," "hazardous materials," "hazardous wastes," or defined, listed or regulated as "toxic" or as a "contaminant" or "pollutant" or words of similar import under any Environmental Laws; (ii) petroleum, radon gas, asbestos in any form which is or could become friable, urea formaldehyde foam insulations, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of federal, state or local safety guidelines, whichever are more stringent, and lead based paint; and (iii) any other chemical, material, gas or substance, the exposure to or release of which is or may hereafter be prohibited, limited or regulated by any

31

Environmental Law or any governmental entity having jurisdiction over the Premises, or any chemical, material, gas or substance that does or may pose a hazard to the environment, health or safety. "Environmental Laws" shall mean all federal, state or local laws, regulations, guidelines, codes, permits, rules, administrative and judicial decisions, directives, decrees, orders, ordinances, and any other legal requirements relating to the protection of human health and safety or the Environment whenever in effect. "Environment" shall mean soil, surface waters, ground waters, land, stream sediments, surface or subsurface strata and ambient air.

   **19.3**  **Environmental Inspections**.  If Landlord has a good faith belief that any environmental condition in connection with the Premises exists or any breach or non-compliance with any Environmental Laws has occurred that does, would or could, endanger any tenant or occupant or invitee of the Premises, any adjacent property owner, the general public or any other Person, then, upon notice to Tenant (except in the event of an emergency, in which case no notice shall be required), Landlord and Landlord's servants, employees and agents, including, but not limited to, environmental consultants and engineers, may (but shall not be obligated to) access to the Premises for purposes of performing environmental inspections or sampling, during regular business hours, or other hours either by agreement of the parties or in the event of an emergency, at any time.  If the inspections performed pursuant to this Article involve sampling or testing, Landlord shall use its commercially reasonable efforts to avoid interfering with Tenant's use of the Premises and upon completion of any such sampling or testing shall promptly repair and restore, at its cost and expense (unless Tenant is in default hereunder, in which case same shall be at Tenant's cost and expense), the affected area of the Premises to its condition immediately prior to such testing or sampling.  Notwithstanding the foregoing, in the event that a potential purchaser of the USFHP Contract requests that Landlord conduct a Phase II or other environmental investigation at the Premises, Landlord and its environmental consultant (and/or the environmental consultant selected by such potential purchaser) shall be entitled to access the Premises in order to perform same.  During the term of this Lease, Landlord shall not disclose the results of any investigation performed by Landlord pursuant to this Section 19.3, except (i) as required by law and to the applicable governmental agencies, and (ii) Landlord may provide a copy of any report results produced pursuant to the immediately preceding sentence to any potential purchaser of the USFHP Contract and its consultants and representatives.

   **19.4**  **Environmental Conditions**.  Landlord and Tenant acknowledge and agree that the Premises contain Hazardous Substances (the "Environmental Conditions") and Tenant agrees to lease the Premises in their "as is" condition and state of repair despite the existence of Environmental Conditions.  Tenant covenants and agrees that Tenant shall at its sole cost and expense comply with all Environmental Laws including, without limitation, Environmental Laws applicable to Hazardous Substances and the Environmental Conditions.  Notwithstanding the foregoing, Tenant shall not be deemed to be in default under this Lease for violating the provisions of this Section 19.4 until Tenant receives a writing from a third party (other than Landlord, unless Landlord is providing to Tenant a writing from a third party) requiring or demanding repairs, cleanup or removal of Hazardous Substances and/or other remedial and/or corrective action under Environmental Laws.  For all purposes of this Lease, a "third party" may

32

be a governmental authority, agency or other body or any other person or entity (other than Landlord).

**19.5    Environmental Indemnity**. Tenant shall be responsible for and shall indemnify and hold harmless the Debtors and their respective officers, directors, shareholders, employees, agents, partners, affiliates, and any successor to any interest of Saint Vincents Catholic Medical Centers of New York ("SVCMC") in or to the Property or any portion thereof or interest therein and all of the foregoing parties' respective officers, directors, shareholders, employees, agents and principals from and against any loss, damage, cost, expense or liability (including, without limitation, reasonable attorney's fees and costs) directly or indirectly arising out of or attributable to the failure to comply with Environmental Laws, the presence of Hazardous Substances at, on, under, from or about the Premises and any and all Environmental Conditions existing at any time (whether before or during the period of this Lease, or after the period of this Lease to the extent the Environmental Conditions or the presence of Hazardous Substances is caused by Tenant's acts or omissions).  Notwithstanding anything to the contrary, Tenant's indemnification obligation hereunder as it pertains to Section 19.4 hereof shall not arise unless and until compliance with the obligations under Section 19.4 shall be required or demanded as set forth in said Section 19.4.  Tenant shall promptly notify Landlord of any matter relating to Hazardous Substances or Environmental Laws in connection with the Premises.  Tenant's obligation to the Landlord under this indemnity shall be without regard to fault on the part of the Tenant with respect to violation of the law, regulation, code or ordinance which results in liability to the Landlord.  Except as otherwise expressly provided in this Lease, the provisions of this Article 19 including this indemnity shall survive the expiration or termination of this Lease.

**ARTICLE XX**
**QUIET ENJOYMENT**

**20.1    Quiet Enjoyment**.  Landlord covenants and agrees that so long as Tenant has not defaulted, beyond any applicable notice and cure period, in any obligation under this Lease, Tenant may lawfully and quietly hold, occupy and enjoy the Premises during the Term of this Lease without hindrance or molestation by Landlord or any Person or Persons claiming through or under Landlord, subject, however, to the matters herein expressly set forth.

**ARTICLE XXI**
**INTENTIONALLY OMITTED.**

**ARTICLE XXII**
**PUT OPTION; 72-BED LEASE; TENANT RIGHT TO PURCHASE; TERMINATION OF APA OR PSA; CROSS-DEFAULT; TAX LOT SUBDIVISION**

**22.1    Put Option**.  Landlord may require, at any time prior to the fifteenth (15th) anniversary of the Commencement Date, that Tenant or its designee immediately acquire fee title to the Premises or the Remainder Parcel (as defined below) (the "Put Option") for One and

No/100s Dollar upon the terms and conditions set forth in this Section 22.1. Landlord shall have the right, in its sole and absolute discretion, and without Tenant's consent, to exercise the Put Option by delivering to Tenant or its designee a Quit Claim Deed (the "Deed") in the form annexed hereto as Exhibit A so as to transfer full ownership to the Premises or Remainder Parcel, as applicable, to Tenant or its designee, in its then as-is, where-is condition (but not subject to any mortgages or other liens or encumbrances created by Landlord or its transferee of the Premises after the date hereof without the consent of Tenant), and either (i) in accordance with the Sale Order, if SVCMC is delivering the Deed, or (ii) subject to the condition of the Premises on the date of delivery of the Deed, and all other charges, liens, security interests and encumbrances affecting the Premises other than matters which were cleared from title in accordance with an order of the Bankruptcy Court transferring title to the Premises from SVCMC to the transferee of the USFHP Contract (the "USFHP Contract Transfer Order"), if any party other than SVCMC is delivering the Deed; provided, however, that (x) provisions of the USFHP Contract Transfer Order relating to the transfer of the Premises to that transferee being free and clear of liens, claims and encumbrances against SVCMC and the Premises (the "USFHP Free and Clear Provisions") shall be at least as favorable to the USFHP Contract transferee as the corresponding terms and conditions contained in paragraphs O, 5, and 7 of the Sale Order (the "Tenant Free and Clear Provisions") in the event that SVCMC had exercised the Put Option, and (y) no liens, claims, interests, obligations, rights or encumbrances shall be permitted exceptions (unless otherwise removed or satisfied prior to transfer of the Premises to Tenant) to the USFHP Free and Clear Provisions which would not also have been a permitted exception to the Tenant Free and Clear Provisions in the event that SVCMC had exercised the Put Option. For the avoidance of doubt, the Tenant Free and Clear Provisions shall not include, and Tenant shall be required to accept title to the Premises subject to, (i) the Space Leases, (ii) all matters recorded against the Premises as of the date hereof (other than as set forth on Schedule C), (iii) all matters listed on Schedule D, and (iv) all matters arising on or after the date hereof (except (x) any mortgages or other liens or encumbrances created by Landlord or its assignee after the date hereof without the consent of Tenant or (y) to the extent such a matter relates to a Pre-Commencement Operational Expense or as set forth on Schedule C). Upon the delivery of the Deed, Tenant or its designee shall accept the delivery of same and shall timely pay all fees and charges payable to the order of the appropriate State, City or County officer in the amount of any applicable transfer taxes payable by reason of the delivery of the Deed. Tenant agrees at all times to cooperate fully with Landlord with the execution and recordation of the Deed and any other documents required in connection therewith. Upon the delivery of the Deed to Tenant or its designee, this Lease shall terminate and Landlord shall have no further obligation hereunder and Tenant hereby releases Landlord from any liability with respect to this Lease or the Premises and Tenant shall be deemed to have reaffirmed, as of the date of delivery of the Deed, all of the terms and provisions of Sections 1.1(a) and 1.1(b) and Tenant's assumption of all obligations relating to the Premises or Remainder Parcel, as applicable, including, without limitation, Tenant's obligations as landlord under the Space Leases, without any further act of the parties hereto, and Tenant shall remain liable for all obligations hereunder which expressly survive termination of this Lease. The provisions of this Section 22.1 shall survive expiration or termination of this Lease or delivery of the Deed, as applicable. Notwithstanding anything to the

contrary, Tenant may designate another party to take title to the Premises pursuant to this Section 22.1.

**22.2    Sale of Premises**.  Landlord agrees that, unless a default shall have occurred and continued beyond the applicable notice and cure period set forth in Article XVII hereof, it shall not, without Tenant's consent (which consent may be withheld in Tenant's sole and absolute discretion) sell or otherwise transfer title to the Premises during the Term, as same may be extended in accordance with Section 1.2 hereof, to any party other than (i) a transferee of the USFHP Contract, provided however that such transfer must be necessary (A) in order for such transferee to be entitled to or otherwise receive any or all benefits of, or rights under or to, the USFHP Contract and/or (B) in order not to void or otherwise violate the USFHP Contract (as determined by Landlord in its sole and absolute but good faith discretion), or (ii) Tenant or its designee. Landlord agrees that upon the closing of the transfer of the USFHP Contract to the transferee of the USFHP Contract at any time after the date hereof and prior to the termination or expiration of this Lease (as same may be extended pursuant to Section 1.2 hereof), in no event shall Landlord retain ownership of the Premises but that the Premises shall be transferred to either the transferee of the USFHP Contract (if such transfer is necessary under (A) and/or (B) above) or otherwise to Tenant or its designee as set forth herein.

**22.3    72-Bed Lease**.  Notwithstanding anything to the contrary contained herein, in no event shall Tenant hereafter modify, amend, or otherwise alter the 72-Bed Lease without the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed; provided, however, that any such modification, amendment or alteration shall not be binding on any party that succeeds Tenant as the lessor under the 72-Bed Lease.  Notwithstanding anything to the contrary contained herein, Landlord shall not sell or otherwise transfer the Premises to any party unless and until such party shall affirm in writing (a copy of which shall be delivered to the then tenant under the 72-Bed Lease) that its acquisition will not affect the terms and conditions of the 72-Bed Lease if the 72-Bed Lease is then in effect.

**22.4    Right to Purchase**.  During the period beginning on the Commencement Date and continuing until the expiration or earlier termination of this Lease (as this Lease may be extended pursuant to Section 1.2 hereof), provided that Landlord, in its sole and absolute but good faith discretion, shall have determined (i) that Landlord is not required to hold title to the Premises (or the Remainder Parcel, as applicable) in order to be entitled to or otherwise receive any or all benefits of, or rights under or to, the USFHP Contract and (ii) that the sale or other transfer of title to the Premises to Tenant will not void or otherwise violate the USFHP Contract, Tenant shall have the right to purchase the Premises (or the Remainder Parcel, as applicable) for One Dollar ($1.00).  The delivery of the Deed by Landlord pursuant to this Section 22.4 shall have the same effect, and shall be in accordance with and subject to the same terms and conditions as those contained in Section 22.1 above.  Tenant shall have no rights under this Section 22.4 in the event Tenant is in default under this Lease beyond any applicable notice and cure period and/or this Lease has been terminated as a result thereof.

**22.5    Termination of Tenant's Obligations.**  Notwithstanding anything to the contrary contained herein, at any time after the date hereof and prior to the termination or expiration of this Lease (as same may be extended pursuant to Section 1.2 hereof), upon the earlier of (a) the closing of any sale or other transfer of the USFHP Contract to a third party without the transfer of the Premises to the same party to which the USFHP Contract is transferred, or to Tenant or its designee; or (b) any sale or transfer of title to the Premises to any party other than (i) Tenant or its designee or (ii) a transferee of the USFHP Contract, then, unless such sale or transfer has been consented to by Tenant (which consent Tenant may withhold in its sole and absolute discretion), all of Tenant's obligations under this Lease shall immediately terminate as of the date of such sale or transfer including, but not limited to, any and all obligations accrued prior to such date.

**22.6    Termination of APA or PSA; Cross-Defaults**.  Notwithstanding anything to the contrary contained herein (including, without limitation, the stated term hereof), this Lease shall immediately and automatically terminate, and neither party shall have any further rights or obligations hereunder (except for those rights and obligations which expressly survive termination hereof) as of the date (if any) that the APA (as defined below) and the Real Estate Contract terminate, so long as the Closing (as defined in each such agreement) has not theretofore occurred.  A default by Purchaser under the APA or by Real Estate Buyer under the Real Estate Contract shall be deemed to be a default by Tenant hereunder, and a default by Seller under the APA or by Seller under the Real Estate Contract shall be deemed to be a default by Landlord hereunder; provided, however, that this sentence shall be of no further force or effect if and when title to the Premises has been transferred by SVCMC to a non-affiliate of SVCMC who is bound by this Lease.  Notwithstanding the foregoing or anything to the contrary, upon the earlier of (i) the termination of the APA or the Real Estate Contract through no default of Purchaser under the APA or by Real Estate Buyer under the Real Estate Contract, or (ii) the termination (as opposed to expiration) of this Lease through no default of Tenant, or (iii) the expiration of this Lease, then, unless the Premises are being transferred to Tenant or its designee, all of Tenant's obligations under this Lease shall immediately terminate as of such termination or expiration date including, but not limited to, any and all obligations accrued prior to such date, except for obligations and liabilities first accruing after the inception of this Lease and resulting from an uncured default of Tenant or any party claiming by, through or under Tenant under this Lease.

**22.7    Tax Lot Subdivision**.  Landlord shall have the right, at any time and in its sole discretion, to require Tenant, at Tenant's sole cost and expense, to make application to any relevant or necessary city agencies, including, without limitation, the New York City Landmarks Preservation Commission ("LPC") and the New York City Department of Finance ("Department of Finance"), for such licenses, permits, approvals, certificates, rulings or amendments (collectively, the "Tax Lot Subdivision Approvals") and to take any actions reasonably necessary to effectuate a tax lot subdivision of the Land ("Tax Lot Subdivision") so that the land on which the building known by street address as 131 Bay Street and identified as the Seaman's Retreat: Main Building in the designation report issued by the LPC (#178 LP-1395) on April 9, 1985 (as shown on Exhibit B attached hereto, the "Building 7 Parcel") is situated shall be one tax lot and the remainder of the Land and the buildings and improvements located thereon (the "Remainder

36

Parcel") will be a separate tax lot. In the event Landlord elects for Tenant to seek the Tax Lot Subdivision, Tenant shall promptly commence same and shall diligently prosecute same to completion as expeditiously as reasonably possible. Landlord may, at any time and in its sole discretion, seek the Tax Lot Subdivision at Tenant's sole cost and expense, and in connection therewith Tenant agrees to (i) allow Landlord access onto the Land to allow for the preparation of a survey thereof, and (ii) to otherwise cooperate with Landlord in connection with the Tax Lot Subdivision including, without limitation, by executing any applications or other documentation, all of the foregoing to be at Tenant's sole cost and expense. Without limitation of any of the foregoing or of Tenant's other obligations under this Lease, but subject to the penultimate sentence and the last sentence of Section 2.4 hereof, Tenant shall promptly pay any and all past due real estate taxes, charges or tax liens for prior tax years against the Land in accordance with the terms of this Lease and as required by the Department of Finance or any successor agency in order to effectuate the Tax Lot Subdivision. In the event that Landlord seeks the Tax Lot Subdivision, Tenant shall not appear in opposition to any action brought, sought or defended by Landlord before any city agency or any other municipal or other governmental department, court or agency, arising out of or in connection with the Tax Lot Subdivision or any other certificate, amendment, permit, approval, license or ruling that affects or may affect the ability of Landlord to effectuate the Tax Lot Subdivision. The effectuation of the Tax Lot Subdivision during the Term shall automatically and immediately provide Tenant with the right to purchase the Remainder Parcel for One ($1.00) Dollar pursuant to Section 22.4 hereof.

**22.8    Survival**. The provisions of this Article 22 shall survive the expiration or earlier termination of this Lease.

**ARTICLE XXIII**
**MISCELLANEOUS PROVISIONS**

**23.1    No Recourse**. Tenant shall look only to Landlord's interest in the Premises for the satisfaction of Tenant's remedies or for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord in the event of any default or liability by Landlord hereunder, and no other property or assets of Landlord or of any parent, subsidiary, affiliate, officer, employee, director, shareholder, partner, agent, sponsor, trustee or principal of Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease, the relationship of Landlord and Tenant hereunder or Tenant's use or occupancy of the Premises. Landlord shall have no personal liability beyond its interest therein and no other property or assets of Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies.

**23.2    Delivery of Estoppel Certificates**. Tenant and Landlord agree that at any time and from time to time upon not less than ten (10) days' prior request by the other, Tenant or Landlord, as the case may be, will execute, acknowledge and deliver to the other a statement in writing certifying: (i) that this Lease is unmodified and in full force and effect (or if there have been modifications that the same is in full force and effect as modified and identifying the modifications); (ii) the dates to which Basic Rent has been paid; and (iii) that, so far as the

37

person making the certificate knows, the other party is not in default under any provisions of this Lease, nor does there exist any condition or state of facts which, with the passage of time or giving of notice or both, would constitute such a default (or, if such person knows of any such default, the nature of same). It is intended that any such statement may be relied upon by any Person proposing to acquire Landlord's or Tenant's interest in this Lease (or sublet from Tenant) or any prospective mortgagee of, or assignee of any mortgage upon such interest.

**23.3  Invalidity of Particular Provision**. If any covenant, agreement or condition of this Lease or the application thereof to any Persons, firm or corporation or to any circumstance, shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such covenant, agreement or condition to Persons, firms or corporations or to circumstances other than those as to which it is invalid or unenforceable, shall be valid and enforceable to the fullest extent permitted by law.

**23.4  Notices**. All notices, demands and requests which may or are required to be given hereunder shall be in writing and shall be deemed given two (2) days after the date on which same are sent by United States Registered or Certified Mail Return Receipt Requested, postage pre-paid, the day after the date on which same are sent by Federal Express or other overnight carrier, or on the day delivered if delivered by hand: (i) if to Tenant, addressed to Tenant at the address first above written (or at such other place and to such other addressee as Tenant may from time to time designate by notice, sent to similar fashion, to Landlord); or (ii) if to Landlord, addressed to Landlord at the address first above written (or at such other place and to such other addressee as Landlord may from time to time designate by notice, sent in similar fashion to Tenant), with a copy simultaneously and in the same manner sent to Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attention: Adam C. Rogoff, Esq.

**23.5  No Waiver**. No failure by Landlord to insist upon the strict performance of any of the terms of this Lease or to exercise any right or remedy consequent upon a breach thereof, and no acceptance by Landlord of any performance by Tenant or full or partial rent during the continuance of any such breach, shall constitute a waiver of any such breach or of any of the terms of this Lease. None of the terms of this Lease to be kept, observed or performed by Tenant, and no breach thereof shall be waived, altered or modified except by a written instrument executed by Landlord. No waiver of any breach shall affect or alter this Lease, but each of the terms of this Lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

**23.6  Injunctive Relief**. In the event of any breach of any of the terms contained in this Lease, the non-breaching party shall be entitled to enjoin such breach and shall have the right to invoke any right or remedy allowed at law or in equity or by statute or otherwise. The foregoing right shall be in addition to all other rights and, with respect to the Landlord, as though entry, re-entry, summary proceedings and other remedies were not provided for in this Lease.

38

**23.7    Cumulative Remedies**.  Each right or remedy of Landlord provided for in this Lease shall be cumulative and shall be in addition to every other right or remedy provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or the beginning of the exercise by Landlord of any one or more of the rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by Landlord of any or all other rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or other law.  Notwithstanding anything to the contrary contained herein, in no event shall either party hereto be liable for the other party's loss of opportunity or lost profits.

**23.8    No Oral Modifications**.  This Lease cannot be changed orally, but only by agreement in writing signed by the party against whom or against whose successors and assigns enforcement of the change is sought.

**23.9    No Recording of Lease; Memorandum of Lease**.  This Lease shall not be recorded in its entirety.  On the Commencement Date, Tenant shall, at its sole cost and expense, cause the Memorandum of Lease (which the parties shall execute upon the mutual execution and delivery of this Lease) in the form annexed hereto as Exhibit C (the "Memorandum of Lease") to be recorded in the applicable recording office.  Within ten (10) days, time being of the essence, after the earlier to occur of (a) the occurrence of a breach beyond the giving of any required written notice and the expiration of any applicable cure period or (b) the expiration or earlier termination of the Lease, Tenant shall remove of record the Memorandum of Lease.  The provisions of this Section 23.9 shall survive termination or expiration of this Lease.

**23.10   Captions Not Controlling**.  The captions in this Lease and the table of contents preceding this Lease are for convenience and reference only and in no way define, limit, describe or enhance the scope or intent of this Lease nor in any way affect this Lease.

**23.11   Jurisdiction**.  The parties further agree that any action or proceeding in respect to any matters arising out of or in any way relating to this Lease shall be brought only in the State of New York, County of New York.  Each party hereto hereby (a) irrevocably consents and submits to the jurisdiction of any Federal, state, county or municipal court sitting in the State of New York in respect to any action or proceeding brought therein concerning any matters arising out of or in any way relating to this Lease; (b) irrevocably waives personal service of any summons and complaint and consents to the service upon it of process in any such action or proceeding by mailing of such process to such party at the address set forth herein; (c) irrevocably waives all objections as to venue and any and all rights it may have to seek a change of venue with respect to any such action or proceedings; (d) agrees that the laws of the State of New York shall govern in any such action or proceeding and waives any defense to any action or proceeding granted by the laws of any other country or jurisdiction unless such defense is also allowed by the laws of the State of New York; and (e) agrees that any final judgment rendered against it in any such action or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment or in any other manner provided by law.  So long as Landlord (*i.e.*: Saint Vincents Catholic Medical Centers of New York) is the landlord

39

hereunder and the Bankruptcy Case remains active, for the purposes of any suit, action or proceeding involving this Lease, Landlord and Tenant each hereby expressly submits to the jurisdiction of the Bankruptcy Court and Landlord and Tenant each agrees that such court shall have exclusive jurisdiction over any such suit, action or proceeding commenced by either party.

**23.12  Broker.**  Tenant represents that in connection with this Lease it has not dealt with any broker, agent, finder, or like Person nor has Tenant had any correspondence or other communication in connection with this Lease with any Person who is a broker, agent, finder, or like Person.  Tenant hereby indemnifies Landlord and agrees to hold Landlord harmless from and against any and all loss, cost, liability, claim, damage, or expense (including, without limitation, court costs and attorneys' fees and disbursements) arising out of any inaccuracy of the above representation.  Subject to approval of the Bankruptcy Court, Seller agrees to pay any commission due to Loeb and Troper LLP and Cain Brothers in connection with this Lease pursuant to a separate agreement as and when allowed by order of the Bankruptcy Court.  The provisions of this Section shall survive the expiration or earlier termination of this Lease.

**23.13  Successors and Assigns**.  The parties hereto agree that the covenants and agreements herein contained shall be binding on and shall inure to the benefit of Landlord, its successors and assigns, and Tenant, its successors and permitted assigns including, without limitation, any party's chapter 7 or 11 trustee.

**23.14  No Partnership or Joint Venture**.  This Lease shall not be construed to create a partnership or joint venture between the parties, it being the intention of the parties only to create a landlord and tenant relationship.

**23.15  Tenant's Authority**.  Tenant represents to Landlord as follows:

(a)     Tenant has the power and authority to execute and deliver this Lease.

(b)     The execution of this Lease will not violate or constitute a default on the part of Tenant under any agreement to which Tenant is a party or by which it is bound.

(c)     The execution of this Lease by Tenant does not require the joinder or approval of any other party.

**23.16  No Merger**.  Except as otherwise expressly provided in this Lease, there shall be no merger of this Lease or the leasehold estate created hereby with the fee estate in the Premises or any part thereof by reason of the same Person acquiring or holding, directly or indirectly, this Lease or the leasehold estate created hereby or any interest in this Lease or in such leasehold estate as well as the fee estate in the Premises.

**23.17  No Abatement**.  Except as may be otherwise expressly provided herein, there shall be no abatement, diminution or reduction of Rent payable by Tenant hereunder or of the

40

other obligations of Tenant hereunder under any circumstances. The parties intend that the obligations of Tenant hereunder shall be separate and independent covenants and agreements and shall continue unaffected unless such obligations shall have been modified or terminated pursuant to an express provision of this Lease.

     **23.18  No Liability**. Landlord shall not in any event whatsoever be liable for any injury or damage to Tenant or to any other Person happening on, in or about the Premises and its appurtenances, nor for any injury or damage to the Premises or to any property belonging to Tenant or any other Person which may be caused by any fire or breakage, or by the use, misuse or abuse of the Premises which may arise from any other cause whatsoever, unless caused by the willful misconduct of Landlord, its officers, agents, employees or licensees.

     **23.19  Waiver of Jury Trial**. Landlord and Tenant hereby waive and agree to waive trial by jury in any action, proceeding or counterclaim brought by either party against the other on any matters arising out of or in connection with this Lease, the relationship of Landlord and Tenant thereunder, the Premises, Tenant's use or occupancy of the Premises, or any claim of injury or damage.

     **23.20  Definition of "Landlord"**. "Landlord" means only the owner, at the time in question, of the Premises or a portion thereof, so that in the event of any transfer or transfers of title to the Premises, the transferor shall be and hereby is relieved and freed of all obligations of Landlord under this Lease, or relating to the Premises, and it shall be deemed, without further agreement, that such transferee has assumed all obligations of Landlord during the period it is the holder of Landlord's interest under this Lease.

     **23.21  Certain Remedies**. If Tenant requests Landlord's consent and Landlord fails or refuses to give such consent, Tenant shall not be entitled to any damages for any withholding by Landlord of its consent, it being intended that Tenant's sole remedy shall be an action for specific performance or injunction, and that such remedy shall be available only in those cases where this Lease provides that Landlord shall not unreasonably withhold its consent and Landlord fails to give its consent when required under this Lease. No dispute relating to this Lease or the relationship of Landlord and Tenant under this Lease shall be resolved by arbitration unless this Lease expressly provides for such dispute to be resolved by arbitration.

     **23.22  Counterclaims**. If Landlord commences any summary proceeding or action for nonpayment of Rent or to recover possession of the Premises, Tenant shall not interpose any counterclaim of any nature or description in any such proceeding or action, unless Tenant's failure to interpose such counterclaim in such proceeding or action would result in the waiver of Tenant's right to bring such claim in a separate proceeding under applicable law.

     **23.23  Bankruptcy Matters**. This Lease is subject the terms of the Bidding Procedures Order, approval by the Bankruptcy Court, and entry of the Sale Order. Tenant agrees that it will promptly take such actions as are reasonably requested by Landlord to assist in obtaining entry of the Sale Order.

**23.24    No Development Rights.**Tenant acknowledges that it has no rights to any development rights, air rights or comparable rights appurtenant to the Premises, and consents, without further consideration, to any utilization of such rights by Landlord.  Tenant shall promptly execute and deliver any instruments which may be requested by Landlord, including instruments merging zoning lots, evidencing such acknowledgment and consent.  The provisions of this Section 23.24 shall be construed as an express waiver by Tenant of any interest Tenant may have as a "party in interest" (as such term is defined in Section 12-10 Zoning Lot of the Zoning Resolution of the City of New York) in the Premises.

**23.26    Certain Defined Terms**.  Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in that certain Asset Purchase Agreement dated as of the date hereof by and between Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care and Rehabilitation Center and SV Operating Three, LLC (the "APA").

**23.27    Power of Attorney**.  Tenant hereby appoints Landlord as its attorney-in-fact with full right, power and authority, in the name, place and stead of Tenant, and at Tenant's sole cost and expense, to (a) execute any agreement, instrument or other document, (b) deliver, file or record, or cause to be delivered, filed or recorded, any such agreement, instrument or other document, and (c) take any and all other action or other measures that may be necessary, appropriate or desirable duly and effectively to (v) effect the subordination as contemplated by Section 18.2 hereof, (w) transfer, convey, deliver and vest in Tenant title to the Premises as contemplated by Section 22.1 hereof, (x) effect the Tax Lot Subdivision as contemplated by Section 22.7 hereof, and (y) remove of record any Memorandum of Lease as contemplated by Section 23.9 hereof.  The foregoing appointment shall be a special power of attorney coupled with an interest and shall be irrevocable.  To evidence the appointment of Landlord as Tenant's attorney-in-fact pursuant to this Section 23.27, concurrently with the execution of this Lease by Tenant, Tenant shall execute, acknowledge and deliver to Landlord a power of attorney in the form annexed hereto as Exhibit D (which Landlord may, at its election, record); provided, however, that the failure of Tenant to execute, acknowledge and deliver to Landlord such power of attorney shall not limit, modify or otherwise affect the appointment of Landlord as Tenant's attorney-in-fact as provided in this Section 23.27, and such appointment shall remain in full force and effect in accordance with its terms in the event of such failure.  Landlord shall not exercise its rights under subclause (w) or (x) of this Section 23.27 until after written notice has been given by Landlord with respect to same and Tenant has failed, within thirty (30) days after such notice, to perform the applicable act for which Landlord has been appointed attorney-in-fact hereunder.  The provisions of this Section 23.27 shall survive termination or expiration of this Lease.

**23.28    Prevailing Party.** Notwithstanding anything to the contrary, in the event of a dispute between the parties hereto in connection with this Lease, the prevailing party shall be entitled to recover from the non-prevailing party the reasonable legal fees and costs incurred by the prevailing party.

KL3 2810838.19

**23.29  Third Parties.** Nothing contained in this Lease is intended to or shall be construed to confer any rights or remedies on any person or entity not a party to this Lease, including any third party beneficiary.

**23.30  Employee Matters**.  The provisions of Exhibit E annexed hereto are hereby incorporated herein by reference thereto.

[Signatures appear on the following page]

**IN WITNESS WHEREOF**, this Lease has been executed by the Landlord and Tenant as of the date and year first above written.

LANDLORD:

SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK

By: _Mark E. Toney_
Name:  MARK E TONEY
Title:  CRO

TENANT:

SV LAND I, LLC

By: _____
Name: Daryl Hagler
Title: Managing Member

**IN WITNESS WHEREOF**, this Lease has been executed by the Landlord and Tenant as of the date and year first above written.

LANDLORD:  SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK

By:_____
    Name:
    Title:

TENANT:  SV LAND I, LLC

By:_____
    Name: Daryl Hagler
    Title: Managing Member

43

**SCHEDULE A**

**LAND DESCRIPTION**

BEGINNING at a point on the northwesterly side of Vanderbilt Avenue (75.0 feet wide); which point is distant 958.34 feet southwesterly, as measured along said northwesterly side of Vanderbilt Avenue, from the point formed by the intersection of said northwesterly side of Vanderbilt Avenue with the southwesterly side of Bay Street.

1.      Running thence north 46 degrees 39 minutes 03 seconds west 445.76 feet to a point.

2.      Thence north 41 degrees 21 minutes 09 seconds east 112.32 feet to a point.

3.      Thence north 21 degrees 44 minutes 11 seconds west 378.58 feet to a point.

4.      Thence north 67 degrees 43 minutes 10 seconds east 197.64 feet to a point.

5.      Thence north 22 degrees 14 minutes 25 seconds west 97.51 feet to a point.

6.      Thence north 67 degrees 05 minutes 03 seconds east and part of the distance along the southerly terminus of Brownell Street 414.00 feet to a point.

7.      Thence south 22 degrees 02 minutes 46 seconds east 420.95 feet to a point.

8.      Thence south 18 degrees 48 minutes 34 seconds east 142.11 feet to a point of curvature.

9.      Thence southwesterly on a curve deflecting to the right having a radius of 104.85 feet, a central angle of 74 degrees 21 minutes 16 seconds, and a distance of 136.07 feet to a point of tangency.

10.     Thence south 55 degrees 32 minutes 42 seconds west 307.93 feet to a point of curvature.

11.     Thence southeasterly on a curve deflecting to the left having a radius of 30.00 feet, a central angle of 90 degrees, 03 minutes 20 seconds, and a distance of 47.15 feet to a point of tangency.

12.     Thence south 34 degrees 30 minutes 38 seconds east 148.98 feet to a point on the said northwesterly side of Vanderbilt Avenue.

13.     Thence along said northwesterly side of Vanderbilt Avenue south 55 degrees, 37 minutes 15 seconds west 150.00 feet to the point or place of beginning.

KL3 2810838.19

## SCHEDULE B

1.  Lease Agreement dated as of January 1, 2007 by and between Saint Vincents Catholic Medical Centers of New York, as landlord, and Richmond University Medical Center, as tenant, as modified by the Lease Modification dated as of November 18, 2008, and as amended by the Amendment to Lease dated as of July 23, 2009 and as further amended by the Settlement Agreement dated as of March 31, 2011.

2.  Lease Agreement dated as of August 1, 2009 by and between Saint Vincents Catholic Medical Centers of New York, as landlord, and Sisters of Charity Health Care System Nursing Home, Inc. (d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center), as tenant, as amended by agreement dated as of the date of the Lease to which this Schedule is annexed (as so amended, the "72-Bed Lease")

3.  Lease Agreement dated as of November 1, 2010 by and between Saint Vincents Catholic Medical Centers of New York, as landlord, and Saint Joseph's Hospital, Yonkers, as tenant, as amended by Lease Modification and Extension Agreement dated as of May 1, 2011 (extending the term).

KL3 2810838.19

**SCHEDULE C**

1.      UCC-1 Financing Statement listing St. Vincents Catholic Medical Centers of New York as debtor, and General Electric Capital Corporation as secured party, filed in Richmond County on January 17, 2006 as Document No. 99917 and continued by a UCC-3 Statement filed in the Richmond County Clerk's Office on September 1, 2010 as Document No. 350226.

2.      Notice of Federal Lien under IRC §412(n) or §430(k) in the amount of $5,053,504 filed in the Richmond County Clerk's office on February 5, 2010 by Pension Benefit Guaranty Corporation.

3.      Any claim, judgment, lien or encumbrance against Landlord or the Premises arising from any claim against Landlord to the extent same does not specifically relate to the Premises (such as, for example, claims relating to other properties owned by Landlord or Landlord's general business operations unrelated to the Premises), but, for purposes of clarification, the foregoing shall not be deemed to include claims, judgments, liens or encumbrances arising from any easements, agreements or other matters relating to an adjacent or nearby property, property owner and/or operator (such as the documents listed on Schedule D).

4.      Any claim, judgment, lien or encumbrance against Landlord or the Premises arising from claims of medical malpractice and/or claims of other liability of Landlord, or any of its employees, agents or independent contractors, at or from the Premises, arising out of any breach of any contracts affecting the Premises entered into by Landlord prior to the Commencement Date of this Lease, except that Tenant shall in all events be liable for all claims, judgments, liens and encumbrances relating to the Space Leases (provided that such claims, judgments, liens and encumbrances first arise or accrue after the Commencement Date of this Lease, except with respect to the physical condition of the Premises (including, without limitation, with respect to Tenant's obligations under Articles VIII and XIX hereof), for which Tenant shall in all events be liable regardless of when such claims, judgments, liens and encumbrances first arise or accrue), all documents (other than judgments or liens) currently of record which are not referenced in this Schedule C, all obligations relating to the Foundling, The Salvation Army and Saint Joseph's Medical Center (and their respective successors and assigns) by virtue of each such party's ownership and/or occupancy and/or operation of land and/or improvements thereon which are adjacent to or near the Premises, and all documents listed on Schedule D.

5.      Any claim, judgment, lien or encumbrance against Landlord or the Premises arising from or relating to claims against Landlord, its employees, agents or independent contractors for death or injury to person or property, at or from the Premises, occurring during any period prior to the Commencement Date of this Lease, but subject to Tenant's liability as set forth in Article XIX of the Lease.

6.      Any and all union collective bargaining agreements and, except as provided in <u>Exhibit E</u>, any and all obligations to Landlord's employees.

KL3 2810838.19

## SCHEDULE D

1.      Easement Agreement between Sisters of Charity Health Care System Nursing Home, Inc. and Bayley Seton Hospital dated as of April 30, 1992, recorded May 1, 1992 in Reel 3500 Page 1.

2.      Access Road and Frontage Space Agreement made among The New York Foundling, Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care and Rehabilitation Center and Bayley Seton Hospital, by Saint Vincents Catholic Medical Centers of New York, its successor in interest, dated August 1, 2007 and recorded August 10, 2007 as Document No. 211755 as re-recorded on March 3, 2009 as Document No. 282897.

3.      Declaration of Easement made by Saint Vincents Catholic Medical Centers of New York to Sisters of Charity Health Care Systems Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care and Rehabilitation Centers, dated August 28, 2007 and recorded February 28, 2008 as Document No. 241611 as amended by Document No.301509.

4.      Utility Easement Agreement made between Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care and Rehabilitation Center and Saint Vincents Catholic Medical Centers of New York, dated August 28, 2007 and recorded February 28, 2008 as Document No. 241612, as amended by Document No. 301510.

5.      Temporary Utility and Remediation Agreement made between Sisters of Charity Health Care System Nursing Home, Inc. d/b/a St. Elizabeth Ann's Health Care and Rehabilitation Center and Saint Vincents Catholic Medical Centers of New York, dated August 28, 2007 and recorded February 28, 2008 as Document No. 241613, as amended by Document No. 301508.

6.      Frontage Space Restrictive Declaration dated August 10, 2007 by Bayley Seton Hospital by Saint Vincent Catholic Medical Centers of New York recorded August 10, 2007 as Document No. 211756 as re-recorded on March 3, 2009 as Document No. 282899.

7.      Amended and Restated Declaration of Zoning Lot Restrictions recorded February 27, 2009 as Document No. 282496.

   With Regard thereto:

        a.      Waiver of Declaration of Zoning Lot Restrictions recorded July 14, 2009 as Document No. 299638.

8.      Utility Easement Agreement dated as of July 23, 2009 by and between Saint Vincents Catholic Medical Centers of New York and The Salvation Army recorded July 27, 2009 as Document No. 301507.

9.      Declaration of Zoning Lot Subdivision and Restrictions dated as of July 23, 2007 and recorded September 8, 2009 as Document No. 307704.

48

10.	Declaration of Zoning Lot Restrictions recorded August 10, 2007 as Document No. 211759.

   With regard thereto:

	a.	Waiver of Declaration of Zoning Lot Restrictions recorded August 10, 2007 as Document No. 211754.

	b.	Waiver of Declaration of Zoning Lot Restrictions recorded July 14, 2009 as Document No. 299637.

11.	Declaration of Zoning Lot Subdivision and Restrictions recorded August 17, 2007 as Document No. 213083.

   With regard thereto:

	a.	Waiver of Declaration of Zoning Lot Subdivision and Restrictions recorded August 17, 2007 as Document No. 213084.

	b.	Waiver of Declaration of Zoning Lot Subdivision and Restrictions recorded February 25, 2008 as Document No. 241001.

		As rescinded by Document No. 282496.

12.	Limited Utility Easement Agreement between The New York Foundling and Sisters of Charity Health Care System Nursing Home, Inc., d/b/a St Elizabeth Ann's Health Care and Rehabilitation Center and Saint Vincent Catholic Medical Centers of New York dated August 1, 2007 and recorded August 10, 2007 as Document No. 211757.

13.	Signage Preservation and Road Relocation Agreement between Saint Vincents Catholic Medical Centers of New York and The Salvation Army dated July 23, 2009.

14.	Agreement as to Separation of Utilities (Utility Reimbursement Agreement) between Saint Vincents Catholic Medical Centers of New York and The Salvation Army dated July 23, 2009.

15.	Agreement as to Separation of Utilities (Utility Reimbursement Agreement) dated as of November 1, 2010 by and between Saint Vincent Catholic Medical Centers of New York and Saint Joseph's Hospital, Yonkers.

16.	Amendment to Utility Reimbursement Agreement between Saint Vincents Catholic Medical Centers of New York and Saint Joseph's Hospital, Yonkers dated April 1, 2011.

17.	Amendment to Utility Reimbursement Agreement between Saint Vincents Catholic Medical Centers of New York and Saint Joseph's Hospital, Yonkers dated as of May 1, 2011 (extending the term).

18.     Utility Easement Agreement between Sisters of Charity Health Care System Nursing Home, Inc., d/b/a St. Elizabeth Ann's Health Care and Rehabilitation Center and St. Joseph's Hospital, Yonkers dated February 14, 2011.

19.     Letter from Saint Vincent Catholic Medical Centers dated March 7, 2007 and signed by Lorraine Salmon, regarding proposed terms of Permanent Road and Parking Easement.

20.     Letter from Saint Vincent Catholic Medical Centers dated March 7, 2007 and signed by Paul Rosenfeld, regarding proposed terms of Permanent Road and Parking Easement.

21.     Letter from Michael R. Newman to Marianne DiTommaso dated August 16, 2010, and letter form Randy Wood to Marianne DiTommaso dated August 16, 2010.

22.     Saint Vincent Catholic Medical Centers Purchase Order No. 18993-131 to Stoneledge Scaffolding issued June 2008 and Purchase No. 18993-131 Addenda.

23.     Saint Vincent Catholic Medical Centers Purchase Order No. 19647-131 to Stoneledge Scaffolding.

24.     Email from Paul Rosenfeld to Kenneth Klum dated May 4, 2009, and Letter from Signature Construction Group Inc. dated February 4, 2010.

25.     ConEdison System Operation Manual – Operation and Maintenance of Equipment on High Tension Customer's Premises, dated 9/17/1982.

KL3 2810838.19

# EXHIBIT A TO GROUND LEASE

## QUITCLAIM DEED

Form 8004 (3/00) – Quitclaim Deed–Individual or Corporation. (single sheet)
**CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT – THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.**

_____

**THIS INDENTURE**, made the __ day of _____, 20___ and

**BETWEEN**

SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK, a New York not-for-profit hospital, with a primary business address at 450 West 33rd Street, New York, New York 10001

party of the first part and,

[                                              ]
party of the second part,

**WITNESSETH**, that the party of the first part, in consideration of ten dollars paid by the party of the second part, does hereby remise, release and quitclaim unto the party of the second party, the heirs or successors and assigns of the party of the second part forever,

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the County of Richmond and State of New York, known as 75 Vanderbilt Avenue, Staten Island, New York 10304 and more particularly described in <u>Schedule A</u> attached hereto.

TOGETHER with all right, title and interest, if any, of the party of the first part, in and to any streets and roads abutting the above-described premises to the center lines thereof; TOGETHER with the appurtenances, and all the estate and rights of the first part in said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it reads "parties" whenever the sense of this indenture so requires.

51

**IN WITNESS WHEREOF,** the party of the first part has duly executed this deed the day and year first above written.

IN PRESENCE OF:

_____     _____

_____     _____

**Acknowledgement taken in New York State**

State of New York, County of      , ss:

On the     day of     , in the year    , before me, the undersigned, personally appeared    personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument.

**Acknowledgement by Subscribing Witness taken in New York State**

State of New York, County of      , ss:

On the     day of     , in the year    , before me, the undersigned, personally appeared    the subscribing witness to the foregoing instrument, with whom I am personally acquainted, who being by me duly sworn, did depose and say, that he/she/they reside(s) in    that he/she/they know(s)    to be the individual described in and who executed the foregoing instrument; that said subscribing witness was present and saw said execute the same; and that said witness at the same time subscribed his/her/their name(s) as a witness thereto.

**Acknowledgement taken in New York State**

State of New York, County of      , ss:

On the     day of     , in the year    , before me, the undersigned, personally appeared    personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument.

**Acknowledgement taken outside New York State**

*State of    , County of    , ss: *(or insert District of Columbia, Territory, Possession or Foreign Country)

On the     day of     , in the year    , before me, the undersigned, personally appeared    personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in the (add the city or political subdivision and the sate or country or other place the acknowledgement was taken).

| SECTION | 5.0 |
|---|---|
| BLOCK | 534.00 |
| LOT | 1.0 |
| COUNTY OR TOWN | Richmond |

TO

**RETURN BY MAIL TO:**

Distributed by

**Zip No.**

RESERVE THIS SPACE FOR USE OF RECORDING OFFICE

53

## Schedule A

KL3 2810838.19

**EXHIBIT B TO GROUND LEASE**

THE BUILDING 7 PARCEL



55

<u>**EXHIBIT C TO GROUND LEASE**</u>

**MEMORANDUM OF LEASE**

<u>**RECORD AND RETURN TO**</u>:
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York  10036
Attention: Daniel R. Berman, Esq.

**Section 5**
**Block 534**
**Lot 1**
**County of Richmond**
**City of New York**
**State of New York**

DATE OF LEASE:          _____, 2011

LANDLORD:          Saint Vincents Catholic Medical Centers of New York.
ADDRESS:            450 West 33rd Street
                    New York, New York 10001
                    Attention: _____

TENANT:            SV LAND I, LLC
ADDRESS:            1 Hunters Run
                    Suffern, New York 10901

PREMISES:          That certain plot, piece or parcel of land known as and by the street address of 75 Vanderbilt Avenue, Staten Island, New York 10304 as more particularly described on the legal description attached hereto as **Exhibit A** (the "Land"); the buildings and other improvements located on the Land (the "Building"); and the machinery, apparatus, equipment, fittings, personal property and fixtures now or hereafter owned by Landlord and used or procured for use in connections with the operation and/or maintenance of the Building (collectively, the "Building Equipment"; and collectively with the Land and the Building, the "Premises").

TERM OF LEASE:     A period of five (5) years commencing on the Closing Effective Date (as defined in the Lease) (the "Commencement Date") and

56

ending on the last day of the month in which the fifth $(5^{th}$ anniversary of the Commencement Date shall occur (the "Expiration Date"), as such dates may be adjusted pursuant to the terms of the Lease.

OPTION TO EXTEND: Either party has the option to extend the term of the Lease for two (2) periods of five (5) years each, at the rental and upon the terms and conditions set forth in the Lease, provided that written notice of the election to extend the term must be given at least thirty (30) days prior to the then current date of expiration of the term, time being of the essence. In no event will the Lease expire later than the last day of the month in which the fifteenth $(15^{th})$ anniversary of the Commencement Date shall occur.

This Memorandum of Lease is only a memorandum of certain terms of the Lease and shall not serve to expand or vary the Lease. The rights, privileges, obligations and remedies of the Landlord and the Tenant under the Lease, with respect to each other, the Premises or otherwise, are fixed, determined and governed solely by the terms of the Lease, this instrument being a Memorandum of Lease executed by the parties hereto for the purpose of providing an instrument for recording pursuant to Section 291-c of the Real Property Law in lieu of recording the Lease. For a statement of the complete rights, privileges, obligations and remedies created by or granted pursuant to the Lease, reference should be made to the Lease.

**[Signature page follows.]**

KL3 2810838.19

IN WITNESS WHEREOF, the parties hereto have executed this Memorandum of Lease as of this _____ day of _____, 2011.

WITNESSES:

LANDLORD: Saint Vincents Catholic Medical Centers of New York, a New York not-for-profit hospital

_____

By: _~Mark E. Toney~_____

_____

Name: _MARK E. TONEY_____

Title: _CRO_____


TENANT: SV LAND I, LLC, a New York limited liability company

_____

By: _____

_____

Name: _____

Title: _____

IN WITNESS WHEREOF, the parties hereto have executed this Memorandum of Lease as of this _____ day of May, 2011.

WITNESSES:

LANDLORD: Saint Vincents Catholic Medical Centers of New York, a New York not-for-profit hospital

_____

By: _____

_____

Name: _____

Title: _____

TENANT: SV LAND I, LLC, a New York limited liability company

_____

By: _____

_____

Name: _____

Title: _____

STATE OF NEW YORK     )
                  )   ss:
COUNTY OF _____  )

      On the _____ day of _____, 2011, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                _____
                                      Notary Public


STATE OF NEW YORK     )
                  )   ss:
COUNTY OF _____  )

      On the _____ day of _____, 2011, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                  _____
                                      Notary Public

KL3 2810838.19

## Exhibit A

BEGINNING at a point on the northwesterly side of Vanderbilt Avenue (75.0 feet wide); which point is distant 958.34 feet southwesterly, as measured along said northwesterly side of Vanderbilt Avenue, from the point formed by the intersection of said northwesterly side of Vanderbilt Avenue with the southwesterly side of Bay Street.

1.  Running thence north 46 degrees 39 minutes 03 seconds west 445.76 feet to a point.

2.  Thence north 41 degrees 21 minutes 09 seconds east 112.32 feet to a point.

3.  Thence north 21 degrees 44 minutes 11 seconds west 378.58 feet to a point.

4.  Thence north 67 degrees 43 minutes 10 seconds east 197.64 feet to a point.

5.  Thence north 22 degrees 14 minutes 25 seconds west 97.51 feet to a point.

6.  Thence north 67 degrees 05 minutes 03 seconds east and part of the distance along the southerly terminus of Brownell Street 414.00 feet to a point.

7.  Thence south 22 degrees 02 minutes 46 seconds east 420.95 feet to a point.

8.  Thence south 18 degrees 48 minutes 34 seconds east 142.11 feet to a point of curvature.

9.  Thence southwesterly on a curve deflecting to the right having a radius of 104.85 feet, a central angle of 74 degrees 21 minutes 16 seconds, and a distance of 136.07 feet to a point of tangency.

10.  Thence south 55 degrees 32 minutes 42 seconds west 307.93 feet to a point of curvature.

11.  Thence southeasterly on a curve deflecting to the left having a radius of 30.00 feet, a central angle of 90 degrees, 03 minutes 20 seconds, and a distance of 47.15 feet to a point of tangency.

12.  Thence south 34 degrees 30 minutes 38 seconds east 148.98 feet to a point on the said northwesterly side of Vanderbilt Avenue.

13.  Thence along said northwesterly side of Vanderbilt Avenue south 55 degrees, 37 minutes 15 seconds west 150.00 feet to the point or place of beginning.

# POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, which are intended to constitute a POWER OF ATTORNEY, that SV Land I, LLC, a New York limited liability company, with offices at 1 Hunters Run, Suffern, New York 10901 ("Tenant"), does hereby irrevocably appoint Saint Vincents Catholic Medical Centers of New York, a New York not-for-profit hospital with a primary business address at 450 West 33rd Street, New York, New York 10001 ("Landlord"), its agent and attorney-in-fact to act in its name, place and stead in any way which Tenant could, if Tenant were personally present, with respect to the following matters for which it is permitted by law to act through an agent: (a) execute any agreement, instrument or other document, (b) deliver, file or record, or cause to be delivered, filed or recorded, any such agreement, instrument or other document, and (c) take any and all other action or other measures that may be necessary, appropriate or desirable duly and effectively to (w) effect the subordination as contemplated by Section 18.2 of that certain Lease, Building and Equipment Agreement, dated May ___, 2011, by and between Landlord and Tenant (the "Lease") with respect to the real property located at 75 Vanderbilt Avenue, Staten Island, New York 10304 as more particularly described on the legal description attached hereto as Exhibit A, (x) transfer, convey, deliver and vest in Tenant title to the Premises (as such term is defined in the Lease) as contemplated by Section 22.1 of the Lease, (y) effect the Tax Lot Subdivision (as such term is defined in the Lease) as contemplated by Section 22.7 of the Lease, and (z) remove of record any Memorandum of Lease (as such term is defined in the Lease) as contemplated by Section 23.9 of the Lease. Tenant hereby further grants Landlord the full and unqualified authority to delegate any or all of the foregoing powers to any person or party whom Landlord may select. This power is coupled with an interest, and shall be irrevocable. To induce any third party to act hereunder, Tenant hereby agrees that any third party receiving a duly executed copy or facsimile of this instrument may act hereunder, and Tenant for itself and for its heirs, executors, legal representatives and assigns, hereby agrees to indemnify and hold harmless any such third party from and against any and all claims that may arise against such third party by reason of such third party having relied on the provisions of this instrument.

IN WITNESS WHEREOF, SV Land I, LLC has caused this Power of Attorney to be duly executed by an authorized officer as of this 13 day of May, 2011.

SV LAND I, LLC, a New York limited liability company

By: _____

Name: PAUL HAUE

Title: M - M bnB

STATE OF NEW YORK     )  
                           )    ss:  
COUNTY OF _____ )

On the \_\_\_\_\_ day of _____, 2011, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____  
Notary Public

AGENT'S SIGNATURE AND ACKNOWLEDGMENT OF APPOINTMENT:

Saint Vincent's Catholic Medical Centers of New York has read the foregoing Power of Attorney. Saint Vincent's Catholic Medical Centers of New York is the party identified therein as agent for the principal named therein. Saint Vincent's Catholic Medical Centers of New York acknowledges its legal responsibilities.

SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK

By: _____  
Name: MARK E. TONEY  
Title: CRO

STATE OF NEW YORK     )  
                           )    ss:  
COUNTY OF _____ )

On the \_\_\_\_\_ day of _____, 2011, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____  
Notary Public

61

<u>Exhibit A</u>

BEGINNING at a point on the northwesterly side of Vanderbilt Avenue (75.0 feet wide); which point is distant 958.34 feet southwesterly, as measured along said northwesterly side of Vanderbilt Avenue, from the point formed by the intersection of said northwesterly side of Vanderbilt Avenue with the southwesterly side of Bay Street.

1.      Running thence north 46 degrees 39 minutes 03 seconds west 445.76 feet to a point.

2.      Thence north 41 degrees 21 minutes 09 seconds east 112.32 feet to a point.

3.      Thence north 21 degrees 44 minutes 11 seconds west 378.58 feet to a point.

4.      Thence north 67 degrees 43 minutes 10 seconds east 197.64 feet to a point.

5.      Thence north 22 degrees 14 minutes 25 seconds west 97.51 feet to a point.

6.      Thence north 67 degrees 05 minutes 03 seconds east and part of the distance along the southerly terminus of Brownell Street 414.00 feet to a point.

7.      Thence south 22 degrees 02 minutes 46 seconds east 420.95 feet to a point.

8.      Thence south 18 degrees 48 minutes 34 seconds east 142.11 feet to a point of curvature.

9.      Thence southwesterly on a curve deflecting to the right having a radius of 104.85 feet, a central angle of 74 degrees 21 minutes 16 seconds, and a distance of 136.07 feet to a point of tangency.

10.      Thence south 55 degrees 32 minutes 42 seconds west 307.93 feet to a point of curvature.

11.      Thence southeasterly on a curve deflecting to the left having a radius of 30.00 feet, a central angle of 90 degrees, 03 minutes 20 seconds, and a distance of 47.15 feet to a point of tangency.

12.      Thence south 34 degrees 30 minutes 38 seconds east 148.98 feet to a point on the said northwesterly side of Vanderbilt Avenue.

13.      Thence along said northwesterly side of Vanderbilt Avenue south 55 degrees, 37 minutes 15 seconds west 150.00 feet to the point or place of beginning.

# EXHIBIT E TO GROUND LEASE

1.      During the Term (as the same may be extended pursuant to Section 1.2 hereof), and subject to the terms and conditions of this Lease, Tenant shall have the right, at no cost, expense or liability to Landlord, to make any and all operational decisions relating to the Premises including, without limitation, in connection with all employees employed at the Premises ("Bayley Seton Employees"), subject to the remainder of the terms of this exhibit and provided that Tenant shall in all events comply with all of its obligations contained in this Lease (including, without limitation, Article VIII hereof) but in all events specifically excluding obligations under any and all union collective bargaining agreements.  For purposes of clarification, Bayley Seton Employees shall not include employees employed by or for Sisters of Charity Health Care System Nursing Home, Inc., d/b/a St. Elizabeth Ann's Health Care & Rehabilitation Center, Richmond University Medical Center or Saint Joseph's Hospital, Yonkers, who work at the Premises.

2.      Tenant shall be solely responsible for all costs, expenses and liability in connection with all employment actions taken by Tenant with respect to the Bayley Seton Employees, if any, hired on or after the Commencement Date.  To the fullest extent possible under applicable law, Tenant shall indemnify Landlord for any claims of joint-employer status of Landlord and Tenant involving employees or contractors hired or employed by or for Tenant for times on or after the Commencement Date.

3.      For all Bayley Seton Employees who are either (i) terminated by the Landlord at the request of Tenant or (ii) terminated on or about the Commencement Date, Tenant shall pay Landlord amounts equal to: (a) gross paid time off for payments for any unused accrued vacation and/or sick time that Landlord owes the Bayley Seton Employees (including related withholding taxes) as of the Commencement Date; and (b) gross severance amounts that Landlord owes the Bayley Seton Employees (including related withholding taxes). Tenant shall make the above payments to Landlord within 5 days after Landlord's presentation to Tenant of reasonable proof of its obligation to pay each such amount.

KL3 2810838.19

**<u>EXHIBIT C-4 TO MOTION</u>**

**<u>72 BED BAYLEY SETON LEASE</u>**

1

# FIRST AMENDMENT TO LEASE

This First Amendment to Lease (this "<u>Amendment</u>") is dated as of _____, 2011, by and between SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK, with an address at 170 West 12th Street, New York, New York 10011 ("<u>Landlord</u>"), and SISTERS OF CHARITY HEALTH CARE SYSTEM NURSING HOME, INC. (d/b/a ST. ELIZABETH ANN'S HEALTH CARE & REHABILITATION CENTER), with an address at 91 Tompkins Avenue, Staten Island, New York 10304 ("<u>Tenant</u>").

## <u>W I T N E S S E T H</u>:

WHEREAS, by that certain Lease Agreement dated as of August 1, 2009 (the "<u>Lease</u>") between Landlord and Tenant, Landlord demised and leased to Tenant and Tenant rented and leased from Landlord the Premises (as defined in the Lease); and

WHEREAS, Landlord and Tenant desire to make certain modifications to the Lease subject to the terms hereof.

WHEREAS, Tenant has contracted to sell its business and assign the Lease to a third party ("Purchaser") and Landlord has consented to such assignment, subject to the terms of the transaction documents.

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, Landlord and Tenant hereby agree that the Lease is hereby amended, modified and supplemented as follows:

1.     <u>Defined Terms</u>.  Capitalized terms used but not defined in this Amendment shall have the same meanings as are ascribed to them in the Lease, unless otherwise noted.

2.     <u>Term</u>.  The Term is hereby extended so that the Term shall, in lieu of anything set forth in the Lease, expire and come to an end on the earlier of (a) 15 years after the date hereof, or (b) the date set forth in a notice to Landlord from Purchaser, advising Landlord that Purchaser shall vacate the Premises as of the date set forth in such notice with such notice to be provided to Landlord at least one year prior to the vacate date set forth in such notice (the "<u>New Expiration Date</u>") as though such date were originally specified in the Lease as and for the expiration thereof.  Further, effective as of the date hereof, use in the Lease of the terms "Expiration Date," or the words "expiration of the term of this lease" and the like shall be deemed to mean and to be the New Expiration Date.  Nothing contained herein or otherwise shall operate as a consent by Landlord to any future extension of the Lease and Tenant expressly acknowledges that it shall have no right to extend or renew the term of the Lease and/or to extend the New Expiration Date.

3.     <u>Rent During Extended Term</u>:  The Basic Rent payable during the extended term of the Lease shall be $1,500,000, payable in twelve (12) equal monthly installments of $125,000 and otherwise in accordance with the terms of the Lease, as amended hereby.

2

4.      Short-Term Ground Lease:  Tenant acknowledges that Landlord may enter into a short-term (i.e. less than 25 years) ground lease of the Property (the "Short-Term Ground Lease"), pursuant to which the ground tenant (the "Ground Tenant") would become the landlord under the Lease, as amended hereby, for the term of the Short-Term Ground Lease or the term of the Lease, as amended hereby, whichever term is shorter.  In the event of the expiration or termination of the Short-Term Ground Lease, provided that the Lease has not expired or terminated, the Lease (as amended hereby) will continue as a direct lease between Landlord and Tenant, subject to the terms and conditions of the Lease, as amended hereby, and provided further that Landlord shall not be: (i) liable for any act, omission or default of any Ground Tenant; (ii) liable for the return of any moneys paid to or on deposit with any Ground Tenant; (iii) subject to any offset, claims or defense that Tenant might have against any Ground Tenant; (iv) bound by any Basic Rent or Additional Rent which Tenant might have paid for more than the current month to any Ground Tenant; (v) bound by any covenant to perform or complete any construction in connection with the Property or the Premises or to pay any sums to Tenant in connection therewith; or (vi) bound by any waiver or forbearance under, or any amendment, modification, abridgment, cancellation or surrender of, the Lease (as amended hereby) made without the consent of Landlord.

5.      Assignment:  Landlord hereby consents, on one occasion only, to the assignment by the current Tenant of its interest in the Lease to an entity that purchases the business operations of the current Tenant at the Premises, without being subject to Section 15.3 of the Lease.  Any further assignment by Tenant shall be subject to the terms and conditions of the Lease, as amended hereby.

6.      Premises Description:  The parties acknowledge that Schedule B-2 was not annexed to the Lease.  Such schedule is annexed hereto as Exhibit A.

7.      Full Force and Effect.  Except as herein expressly amended, modified and supplemented, all of the terms, conditions and provisions of the Lease remain in full force and effect and are hereby ratified and confirmed in every respect.

8.      Counterparts.  This Amendment may be executed in one or more counterparts, any one or all of which shall constitute but one agreement.

9.      Governing Law.  This Amendment shall be governed by and construed in accordance with the laws of the State of New York and shall be binding upon the parties hereto and their respective permitted successors in interest and assigns.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

KL3 2805711.9

IN WITNESS WHEREOF, Landlord and Tenant have executed this Amendment as of the day and year first written above.

Landlord:    SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK

By: _Mark E. Toney_____
Name:  MARK E. TONEY
Title:  CRO

Tenant:    SISTERS OF CHARITY HEALTH CARE SYSTEM NURSING HOME, INC. (d/b/a ST. ELIZABETH ANN'S HEALTH CARE & REHABILITATION CENTER)

By:_____
Name:
Title:

3

**EXHIBIT A**

