TOGUT, SEGAL & SEGAL LLP
Conflicts Counsel for Post-Confirmation SVCMC
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Frank A. Oswald
Lara R. Sheikh
David M. Smith

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ST. VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK, *et al*. | ) ) ) ) | Case No. 10-11963 (CGM) |
| | ) | (Jointly Administered) |
| Debtors. | ) ) ) | [Related Dkt. No. 3796] |

**POST-CONFIRMATION SVCMC'S RESPONSE TO AIG
COMPANIES' MOTION FOR RELIEF FROM THE AUTOMATIC
STAY TO PURSUE COUNTERCLAIMS IN ARBITRATION
PROCEEDING COMMENCED BY DEBTORS**

TO THE HONORABLE CECELIA MORRIS
CHIEF UNITED STATES BANKRUPTCY JUDGE:

Saint Vincents Catholic Medical Centers of New York ("SVCMC") and certain of its affiliates, the post-confirmation debtors herein (collectively, the "Debtors"), by and through their undersigned counsel, Togut, Segal & Segal LLP, submit this response (the "Response") to the motion (the "Motion") of National Union Fire Insurance Company of Pittsburgh, Pa. and each of its affiliates that provided insurance coverage to the Debtors (together, the "AIG Companies" or "AIG") for an order granting relief from the automatic stay to pursue counterclaims against the Debtors in a pending arbitration commenced by the Debtors to resolve a dispute concerning AIG's

handling of workers' compensation claims. In support of the Response, the Debtors respectfully represent as follows:

## Preliminary Statement

The Debtors do not object to the entry of an order lifting the automatic stay so that disputes relating to AIG's Proofs of Claim can be arbitrated in accordance with the Arbitration Agreement (annexed to the Motion as Exhibit A), provided that the order: (a) specifically identifies the disputed issues to be arbitrated (the "Arbitrable Claim Disputes"); and (b) provides for the appointment of a separate three-person arbitration panel to expeditiously determine only those Arbitrable Claim Disputes.

Over the past several months, through an exchange of documents and information, the Debtors and the AIG Companies have identified and considerably narrowed their disputes, as described below, to four (4) discrete issues: (1) whether approximately $7 million in "incurred, but not yet reported" medical malpractice claims are time-barred under expired "claims made" policies; (2) approximately $1.1 million is discrepancies in the appropriate level of reserves for open medical malpractice claims; (3) $6.7 million in casualty loss deductibles that AIG concedes were paid; and (4) whether approximately $2.2 million of Saint Vincents Hospital losses are secured by the QIL Collateral (defined below). In short, AIG has asserted claims aggregating approximately $42.3 million which the Debtors believe are grossly overstated. As described below, AIG's claim to $6.7 million in paid policy deductibles is not an arbitrable dispute, as there is no genuine dispute that the deductibles were satisfied. AIG cannot assert a claim for the paid deductibles in good faith without also including a corresponding credit for the same amount, which it has not done. As a result, this issue, while disputed, is not a genuine dispute and should not be considered an Arbitrable Claim Dispute.

It does not appear that the parties will be able to settle the Arbitrable Claim Disputes by mutual agreement.[1] Accordingly, consistent with the Arbitration Agreement, it is appropriate for the Arbitrable Claim Disputes to be determined expeditiously by an arbitration panel comprised of 3 arbitrators.

The AIG Companies incorrectly suggest that all Arbitrable Claim Disputes must be decided in a pending arbitration commenced by the Debtors that currently only involves very specific insurance claims-handling issues relating to the AIG Companies' allegedly improper handling of approximately 54 workers' compensation claims filed against SVCMC (the "E&O Arbitration"). The Arbitration Agreement does not contemplate that *all* disputes between the Debtors and the AIG Companies, who have a twenty year relationship, be decided by the *same* single arbitration panel but only that "any" disputes be decided by a three-person arbitration panel.[2]

The Arbitrable Claim Disputes raise discrete legal issues relating to the interpretation of contracts and statutes that are entirely unrelated to the complex and fact-intensive issues to be addressed in the E&O Arbitration. In fact, the E&O Arbitration panel was carefully chosen by the Debtors (through separate counsel Reed Smith LLP) and AIG based on the panel members' expertise in evaluating the specific workers' compensation claims handling issues involved in the E&O Arbitration. In

---

[1] The Arbitration Agreement requires arbitration of "any dispute that [SVCMC], Queensbrook and [AIG] cannot settle by mutual agreement arising in connection with obligations secured by the Cross Collateralization Agreement." Arbitration Agreement, pg. 12.

[2] Putting aside arguments concerning the expectations of the parties, ripeness and statute of limitations which belie AIG's interpretation that every possible dispute between the parties must be submitted at the same time to one arbitration panel, AIG's position is not supported by the language of the Arbitration Agreement. See Motion, Ex. A., Arbitration Agreement at 11-12 ("WHEREAS, the [AIG, QIL and SVCMC] desire that any disputes that arise in connection with the Program and/or Reinsurance be decided by a single arbitration panel in accordance with the Arbitration Clause" and the Arbitration Clause itself provides that "If a dispute that you or we cannot settle by mutual agreement arises about this agreement [i.e., the Payment Agreement] or any transaction related to it, that dispute must be submitted to 3 arbitrators").

3

addition, the selection process did not contemplate the possibility that the Arbitrable Claim Disputes would be decided by that panel. Moreover, the E&O Arbitration could take several months to fully resolve because: (1) AIG has already indicated that it will seek extensive discovery, including depositions, related to the Debtors' allegations in that arbitration; and (2) it involves a fact-intensive inquiry, through expert reports and mini-hearings, with respect to AIG's handling of approximately 54 workers compensation claims. There is no good reason, let alone requirement, to tie up resolution of the straight-forward contractual and statutory-interpretation based Arbitrable Claim Disputes in the unrelated factual intensive E&O Arbitration.

    Once the Arbitrable Claim Disputes are determined by a separate arbitration panel, the Debtors anticipate that the pending objections to AIG's Proofs of Claim can be resolved by stipulation and order fixing the allowed amount of AIG's claims. Once the allowed amount is fixed, the excess Queensbrook Insurance Limited ("QIL") collateral securing those claims can be released and upstreamed as a dividend to the Debtors' estate for distribution to creditors.

## **PERTINENT FACTS**

    1.  AIG has insured SVCMC and, prior to the merger between Catholic Medical Centers of Brooklyn and Queens ("CMC"), Saint Vincents Hospital (SVH), the Sisters of Charity Service Corporation, Sisters of Charity Health Care System Corporation and St. Mary's Hospital of Brooklyn (the "2000 Merger"), CMC for more than 20 years under Workers Compensation and Employers Liability Insurance Policies (each, a "Policy," collectively, the "Policies"). The Policies provide that SVCMC is responsible for a $250,000 deductible (the "Deductible") on each claim. Under each Policy, AIG required reserves to be established (the "Reserves") for the future payment of incurred claims based on their expected value. QIL issued a deductible

4

reimbursement policy for SVCMC whereby it agreed to pay the Deductible on each claim.

2. Additionally, from July 1991 through December 31, 2005, AIG insured, and QIL reinsured, medical professional liability insurance coverage for certain physicians employed by SVCMC (and prior to the 2000 Merger, by CMC) with a retention of $500,000 per occurrence payable by QIL (the "Retention"). Losses in excess of $500,000 up to $1 million or $1.3 million (effective April 1, 2002) per occurrence were subject to reinsurance (the "Excess," together with the Retention, the "MedMal Loss" or "MedMal Losses").

3. Obligations to AIG for each Deductible and MedMal Loss were collateralized with cash and letters of credit (the "Collateral"). As of the Petition Date, QIL maintained the Collateral to secure these obligations consisting of two letters of credit in AIG's favor aggregating $37,853,702 (the "LCs") and cash in the amount of $814,684 (the "QIL Cash", together with the "LCs", the "QIL Collateral").

4. The Debtors' schedules listed multiple contingent, unliquidated claims on behalf of AIG. AIG filed 9 proofs of claim nos. 4041, 4042, 4043, 4044, 4045, 4046, 4047 and 4049 as contingent, unliquidated claims and proof of claim no. 4048 as a general unsecured claim in the amount of $2,081,983 (together, the "AIG Claims").

5. On June 29, 2012, the Bankruptcy Court entered an Order confirming the Debtors' Second Amended Joint Chapter 11 Plan (the "Plan"), and the Plan became effective on June 29, 2012.

6. Pursuant to section 12.1(r) of the Plan, the Bankruptcy Court retains jurisdiction over all matters arising in the Chapter 11 Cases, including, *inter alia*, "recovery of all assets of any of the Debtors and property of the applicable Debtor's Estate, wherever located."

5

7.  Pursuant to the Plan, all objections to Claims (as defined in the Plan) were required to be made no later than the first business day that is the later of (a) January 25, 2013 or (b) such other later date as the Bankruptcy Court may establish upon a motion by the Liquidating Trustee in accordance with the Plan (the "Claims Objection Deadline").

8.  On December 17, 2012, the Liquidating Trustee filed an omnibus objection to the AIG Claims (the "December Objection"), with the exception of proof of claim no. 4048 on the grounds that they lacked sufficient documentation.  On January 25, 2013 (the "January Objection" together with the December Objection, the "AIG Claim Objections"), the Liquidating Trustee filed an objection to proof of claim no. 4048 on the ground that it was inconsistent with the Debtors' Books and Records.  The parties agreed to adjourn the hearing on the AIG Claim Objections while they were awaiting, among other things, a full and complete statement from AIG of all of its claims against the Debtors and the support thereof.

9.  By letter, dated August 8, 2013 (the "August 8 Letter"), AIG described its fixed and unliquidated claims against SVCMC in the aggregate amount of $42.3 million comprised of:  (a) $25 million in alleged casualty loss claims ($10.4 million payable now for Deductibles for past losses and $14.6 million as Reserves for future losses); and (b) $17.3 million in alleged MedMal Losses ($6.3 million in reserves for pending open claims, $4 million for "anticipated loss development" on open claims, and $7 million for "Incurred But Not Reported" claims).

10. As described more fully below, SVCMC's reconciliation of the AIG Claims supports maximum allowed AIG Claims (secured by QIL Collateral) in the aggregate amount of approximately $25.3 million comprised of:  (a) $16.1 million in casualty loss claims ($1.5 million payable now for Deductibles for past losses and $14.6

6

million, as Reserves for future losses); and (b) $9.2 million in alleged MedMal Losses ($5.6 million in reserves for pending open claims, $3.6 million for "anticipated loss development" on open claims, and $0 for "Incurred But Not Reported" claims.)

11. It is critical that the allowed amount of the AIG Claims be fixed to permit the Debtors to seek the release of the excess QIL Collateral (the "Excess Collateral") for distribution to the Debtors' creditors under their confirmed Chapter 11 Plan. Accordingly, the Debtors consent to a separate arbitration of the Arbitrable Claim Disputes (further described below) so that the Court can be in a position to ultimately fix the AIG Claims for purposes of distribution.

**I.    Claim Disputes to be Arbitrated**

    **A.    Medical Malpractice "IBNR" Claims**

12. AIG incorrectly relies on 11 NYCRR § 73.5(d) (the "NY Insurance Regulation") to assert approximately $7 million in "incurred, but not reported" medical malpractice "tail" claims (the "IBNR Claims") under "claims made" medical malpractice policies that expired in 2005 and were issued by AIG to physicians working at the Debtors' hospitals. The NY Insurance Regulation provides:

> Upon termination of coverage, a policy issued to a person must provide, to a hospital whose facilities are used by each such person extended reporting period coverage [tail coverage] as required by subdivision (b) of this section to protect the interests of such hospital, if such person does not purchase extended reporting period coverage. The insurer shall not charge the hospital a premium for such coverage.

13. Significantly, the NY Insurance Regulation applies only "[u]pon termination of coverage." 11 NYCRR § 73.5(d). SVCMC's coverage did not terminate upon the expiration of the AIG policies. Rather, Queensbrook New York, Inc. ("Queensbrook New York") issued a retroactive medical malpractice policy to replace the expiring AIG medical malpractice program effective January 1, 2006 so that there

7

was no gap in coverage. As a result, the NY Insurance Regulation relied upon by AIG to support its $7 million in IBNR Claims, which applies only to medical malpractice polices that are *terminated* without tail coverage, does not appear to apply.

14. On December 20, 2013, the Debtors issued a formal document request to AIG for copies of the subject AIG medical malpractice policies so they can determine if there are any provisions in those policies that could obligate AIG to provide tail coverage for IBNR Claims, notwithstanding the replacement coverage provided by Queensbrook New York. To date, those policies have not been provided.

15. Based on the Debtors and AIG's inability to settle their differences relating to the IBNR Claims (the "IBNR Claim Dispute") by mutual agreement, the IBNR Claim Dispute should be identified as one of the Arbitrable Claim Disputes to be determined by a separate three-person arbitration panel in accordance with the Arbitration Agreement.

    **B.**     **Differences in Actuarial Analyses for Open Medical Malpractice Claims**

16. In addition to the IBNR Claim Dispute, there are approximately $1.1 million in discrepancies between the Debtors' and AIG's actuarial analyses for appropriate reserve amounts for open MedMal Loss claims and anticipated loss development amounts for such MedMal Losses (the "MedMal Loss Claim Dispute").

17. Unfortunately, it has not been possible for the Debtors' and AIG's actuaries to discuss their analyses because the Debtors' actuary will not release its analyses unless either: (a) AIG signs a standard release letter, which AIG will not sign; or (b) it is required to release the analyses pursuant to a Court Order or subpoena. AIG has been unwilling to issue a subpoena in the Debtors' bankruptcy cases but has informed the Debtors that it will seek the analyses through a subpoena issued in an arbitration. Accordingly, the MedMal Loss Claim Dispute remains unresolved and

should be identified as one of the Arbitrable Claim Disputes to be determined by a separate three-person arbitration panel in accordance with the Arbitration Agreement.

      **D.**    **The SVH Losses**

18.    Lastly, by Memorandum Decision, dated December 18, 2013, the Court directed arbitration of the Debtors' and AIG's dispute over whether approximately $2.2 million in losses owed by SVCMC's predecessor, SVH, are secured by the QIL Collateral (the "SVH Losses Dispute"). The Debtors submit that the SVH Losses Dispute should be included as one of the Arbitrable Claim Disputes to be determined by a separate three-person arbitration panel in accordance with the Arbitration Agreement.

**II.**    **$6.7 Million in Paid Deductibles Is Not an Arbitrable**

19.    AIG concedes that $6.7 million in Deductibles for workers compensation losses for the policy periods of 1995-1999 were satisfied by SVCMC's wholly-owned affiliate QIL (the "Paid Deductibles").[3]

20.    Yet, without providing any contractual or statutory basis for its alleged setoff right, AIG argues that the Debtors' obligation to AIG for the Paid Deductibles remains owing, payment of which would create a $6.7 million obligation by AIG to QIL that AIG could setoff against other QIL obligations to AIG. In other words, AIG would have an additional $6.7 million in potential assets available for setoff over and above the $38.7 million in QIL Collateral that is already available to satisfy the AIG Claims. If AIG is correct, it would have over $45.4 million in setoff rights available to satisfy claims that by AIG's own calculations will not exceed $35.6 million ($42.3 million less $6.7 million in Paid Deductibles) and by the Debtors' calculations will not exceed

9

$25.3 million. Thus, the AIG Claims are clearly oversecured and there is no basis for AIG's alleged setoff rights.

21. Putting aside that there is no genuine dispute relating to the Paid Deductibles, the Debtors do not concede that SVCMC is liable for the $6.7 million in Deductibles that comprise the Paid Deductibles. Specifically, AIG has not provided copies of any unpaid invoices for Deductibles owing for the relevant policy periods (1995-1999), or any other evidence that SVCMC or its predecessors did not satisfy the Deductibles from 15 or more years ago.

22. As described above, there is no genuine dispute relating to the Paid Deductibles but rather only a dispute concocted by AIG in an effort to inflate the AIG Claim to a level in excess of the QIL Collateral and have the issue heard by an arbitration panel. Accordingly, AIG's inclusion of $6.7 million of Paid Deductibles in its $10.4 million claim for Deductibles under its casualty programs with the Debtors is not asserted in good faith and should not be considered an Arbitrable Claim Dispute.

### III. The Claims Dispute Should be Determined By an Arbitration Panel Separate from the E&O Arbitration Panel

23. Contrary to AIG's assertion, its proposed counterclaims do not "arise from the same transactions" at issue in the E&O arbitration. (Motion at ¶ 35). As noted, the factual and legal disputes underlying the E&O Arbitration are unrelated to the Arbitrable Claim Disputes.

24. The panel of arbitrators in the E&O Arbitration was carefully selected based on their expertise with disputes relating to the handling of workers' compensation claims. As noted, the E&O Arbitration will address AIG's handling of

---

[3] Although this disputed amount happens to relate to deductibles for workers' compensation losses, the dispute involves a disagreement over the application of deductible payments, not the handling of specific workers' compensation claims.

10

approximately 54 individual workers compensation claims, which are appropriately determined by the insurance experts (a retired risk manager of a health care facility and former insurance company executives) selected for the E&O Arbitration panel. In contrast, as described above, the Arbitrable Claim Disputes raise straight-forward legal issues based on contract and statutory interpretation that are more appropriately determined by lawyers rather than the former insurance company and healthcare managers and executives selected for the E&O Arbitration panel. Moreover, SVCMC's party-appointed arbitrator and the neutral "umpire" arbitrator were not apprised of the Arbitrable Claim Disputes in the selection process and may not be able, or willing, to consider such Claim Disputes.[4] Accordingly, AIG is incorrect in its assertion that "inclusion of the Counterclaims at this juncture in the Pending Arbitration would not be prejudicial to either party." (Motion at ¶ 32).

25.     In addition, while still in its very initial stages (the Panel was only formally accepted on December 10, 2013), the E&O Arbitration could take months to fully resolve particularly in light of the fact that (1) AIG has already indicated that it will seek extensive discovery, including depositions, related to the Debtors' allegations in that arbitration; and (2) it involves a fact-intensive inquiry, through expert reports and mini-hearings, with respect to AIG's handling of approximately 54 workers compensation claims. There is simply no good reason or basis to delay resolution of the

---

[4]  SVCMC's party-appointed arbitrator, a retired risk manager for a healthcare facility, as well as the neutral "umpire" arbitrator, a former insurance company executive who has authored numerous publications on workers' compensation claims handling, were not aware of the Claim Disputes or AIG's potential counterclaims until weeks after their selection as panel members. In fact, during the development of a questionnaire to be sent to potential neutral candidates, AIG never requested, or even raised, its potential counterclaims despite the questionnaire's inclusion of a neutral statement of the claim to evaluate candidates. The Debtors were also not fully aware of all the potential counterclaims until AIG served its Answer to the E&O arbitration demand on December 5, 2013, weeks after all panel members were selected.

11

Arbitrable Claim Disputes by subsuming them in the pending unrelated E&O Arbitration.

26. Moreover, AIG misinterprets the recital in the Arbitration Agreement. As noted above, the Arbitration Agreement recites the "desire that any disputes that arise in connection with the Program and/or Reinsurance be decided by a single arbitration panel in accordance with the Arbitration Clause." Arbitration Agreement, pg. 12. The recital does not require that *all* disputes be arbitrated by the *same single* arbitration panel but only that <u>any</u> disputes that arise be decided by a three-person panel in accordance with the Arbitration Clause set forth in the Arbitration Agreement.

27. Based on the foregoing, the Debtors respectfully request that the Court grant the Motion, in part, by entering an order lifting the automatic stay to permit the Arbitrable Claim Disputes to be determined by a single arbitration panel separate from the E&O Arbitration panel in accordance with the Arbitration Agreement, and reserving the parties' rights to seek arbitration of any other disputes that may arise that cannot be resolved by mutual agreement.

DATED:  New York, New York
        January 16, 2014

>                    SAINT VINCENTS CATHOLIC MEDICAL
>                    CENTERS OF NEW YORK, *et al.*,
>                    Post-Confirmation Debtors
>                    By their Conflicts Counsel,
>                    TOGUT, SEGAL & SEGAL LLP
>                    By:
>                    /s/ Frank A. Oswald
>                    FRANK A. OSWALD
>                    LARA R. SHEIKH
>                    DAVID SMITH
>                    One Penn Plaza, Suite 3335
>                    New York, New York 10119
>                    (212) 594-5000